CONGREGATION JESHUAT ISRAEL,  :
                                       :
           Plaintiff,           :
                                         :
           v.                :          C.A. No. 12-822S
                                         :
CONGREGATION SHEARITH ISRAEL,  :
                                         :
           Defendant.      :

## AMENDED ANSWER AND COUNTERCLAIM

## AMENDED ANSWER

Defendant Congregation Shearith Israel ("Defendant" or "Shearith Israel"), by and through its counsel, hereby answers the Complaint as follows:

1.      Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 1.

2.      Admitted.

3.      Defendant admits that Peter F. Kilmartin is Attorney General of Rhode Island but is without knowledge or information sufficient to form a belief as to the truth or falsity of the other allegations contained in paragraph 3.

4.      Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 4.

5.      Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 5, except that it denies that

Touro is the continuation and legal successor to the Congregation Yeshuat Israel ("Yeshuat Israel") formed in the late 17th century.

6.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 6.

7.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 7, except that it admits on information and belief that Shearith Israel loaned Torah scrolls to Yeshuat Israel as alleged in paragraph 7.

8.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 8, except that it admits on information and belief that during the operation of the Touro Synagogue in the 18th century, the synagogue used Torah scrolls, including those loaned by Defendant, and that the scrolls were presumably adorned with bells, or Rimonim, including at least one pair on information and belief crafted by the silversmith Myer Myers of New York.

9.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 9, except that it avers on information and belief that Congregation Yeshuat Israel ceased to exist after 1822.

10.     Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 10.

11.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 11, except that it admits on information and belief that after 1822 the synagogue, cemetery, and ritual items of

Yeshuat Israel were conveyed to Shearith Israel, and admits on information and belief the ostensible fact of the statements of Moses Lopez to Stephen Gould.

12.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 12.

13.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 13, except that it admits that after 1818 ownership of the personal property, including the Rimonim, was transferred to Shearith Israel.

14.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 14, except that it admits that the Rimonim and other religious articles were loaned by Shearith Israel to a newly-formed Congregation Jeshuat Israel after 1883, which congregation was not a continuation of the prior congregation, Yeshuat Israel, which loan continues to the present time.

15.     Defendant admits that a set of Rimonim was inscribed with the word "Newport" on its base, but is without knowledge or information sufficient to form a belief as to the truth or falsity of the other allegations contained in paragraph 15.

16.     Defendant admits the written terms of the charter and the deeds but is without knowledge or information sufficient to form a belief as to the truth or falsity of the other allegations contained in paragraph 16.

17.     Defendant admits the terms of the 1903 and 1908 indentures, denies knowledge or information sufficient to form a belief as to the truth or falsity of the other

allegations in paragraph 17, and specifically denies that the "reunited Touro" was a continuation of Yeshuat Israel that ceased to exist as of 1822.

18.     Defendant admits that the Touro Synagogue was designated a National Historic Site and admits the Agreement with the United States in 1945, but denies the other allegations contained in paragraph 18.

19.     Defendant admits on information and belief that a set of Rimonim was displayed at Yale University in 2002, but denies the other allegations contained in paragraph 19.

20.     Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 20.

21.     Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 21.

22.     Defendant denies the allegations in paragraph 22 except that it admits that it did learn of a purported potential sale of the Rimonim in June 2012.

### Count I

23.     Defendant adopts its responses to paragraphs 1-22.

24.     Defendant admits that there is a dispute (not a good faith dispute) over title to the Rimonim, but Defendant avers that the Rimonim are owned by it.

### Count II

25.     Defendant adopts its responses to paragraphs 1-24.

26.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26.

27.     Defendant admits that it objects to the sale of the Rimonim but denies the other allegations contained in paragraph 27.

28.     Denied.

## Count III

29.     Defendant adopts its responses to paragraphs 1-28.

30.     Denied.

## Count IV

31.     Defendant adopts its responses to paragraphs 1-30.

32.     Defendant admits that it holds title to the Synagogue in accordance with the instruments of conveyance and denies the other allegations contained in paragraph 32.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

## Count V

38.     Defendant adopts its responses to paragraphs 1-37.

39.     Defendant avers that it is the owner of the personal property in the Synagogue, and denies the other allegations of paragraph 39.

WHEREFORE, Defendant demands that Judgment be entered in its favor as to the ownership of the Rimonim and other personal property and that otherwise the Complaint be dismissed and that it be awarded its costs, including its attorney's fees.

## FIRST AFFIRMATIVE DEFENSE

This action is barred by reason of Plaintiff's breach of a Standstill Agreement.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff is estopped from bringing this action by reason of its breach of a Standstill Agreement.

## THIRD AFFIRMATIVE DEFENSE

This action is barred by the applicable statute of limitations and/or laches.

## FOURTH AFFIRMATIVE DEFENSE

The Complaint in this action fails to state a claim upon which any relief can be granted.

## FIFTH AFFIRMATIVE DEFENSE

This action is barred by accord and satisfaction.

## SIXTH AFFIRMATIVE DEFENSE

This action is barred by estoppel, waiver, and res judicata.

## COUNTERCLAIM

This Counterclaim, as well as the Answer above, is asserted without prejudice to the Complaint filed by Congregation Shearith Israel (hereinafter "Defendant" or "Shearith Israel") entitled <u>Congregation Shearith Israel v. Congregation Jeshuat Israel</u>, C.A. No. 12-CV-8406, in the United States District Court for the Southern District of New York, and is asserted on the condition that the New York action is stayed, dismissed, or otherwise terminated.

Defendant Congregation Shearith Israel, the Spanish & Portuguese Synagogue of New York, asserts its Counterclaim against Plaintiff Congregation Jeshuat Israel

(hereinafter "Plaintiff," "Jeshuat Israel," or in context "Touro Synagogue"), and alleges on personal knowledge for matters relating to itself and on information and belief with respect to all other matters, as follows:

## NATURE OF THE COUNTERCLAIM

1.      Congregation Shearith Israel is a Jewish Congregation in New York.  It is North America's first Jewish Congregation and has been home to Jews since after the first arrival of Jews in America in 1654.  Part of the mission of Congregation Shearith Israel has been to be a haven for Jews as well as actively to participate in, promote, and celebrate the American Jewish experience.  Congregation Shearith Israel follows the Orthodox Jewish ritual of the Spanish and Portuguese Jews.

2.      Shearith Israel owns various religious and ritual objects.  These include land, building, cemeteries (both active and historic), and religious objects used by its Synagogue located at 2 West 70th Street in New York City.  These also include land, building, and religious objects used by Defendant Jeshuat Israel at the Touro Synagogue located in Newport, Rhode Island.  For over 100 years Shearith Israel has owned the Touro Synagogue, including its land, building, and religious objects.  For over 100 years these have been leased to Jeshuat Israel.  Shearith Israel has approved the Rabbis (or spiritual leaders) of Touro Synagogue.  As the governing documents provide, and as a formal agreement with the United States made in 1945 records, Shearith Israel holds the title to the Touro Synagogue and its appurtenances, and Jeshuat Israel is the lessee of the Synagogue building as well as of the variously described appurtenances, paraphernalia, or "etc." – including the ritual objects.  These are all "to be used for religious purposes."  More specifically, as the agreement with the United States says, the "divine services" at

the Touro Synagogue are to be conducted "in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed in the Synagogue of said Congregation Shearith Israel."

3.      In recent years, one or more persons associated with the Touro Synagogue, purporting to act as the directors and/or officers of Jeshuat Israel, have breached the governing legal instruments between Shearith Israel and Jeshuat Israel by seeking to usurp control of the Touro Synagogue from Shearith Israel. The motive animating this attempt at usurpation is the self-aggrandizement of the people involved, not the continued or renewed vitality of the Touro Synagogue or the faithful adherence to the purpose of the Touro Synagogue, which even the improper and unauthorized bylaws of Jeshuat Israel state "shall be to conduct religious worship services which observe orthodox Jewish law and honor the Sephardic heritage of Touro Synagogue."

4.      The most recent example of this attempted usurpation is the effort by Jeshuat Israel to sell certain religious articles that are owned by Shearith Israel and have been loaned/leased for more than 100 years to Touro Synagogue. The objects in question are finial bells, or rimonim (the Rimonim), which adorn the Torah Scrolls used during Jewish religious services. The Rimonim were crafted in the 18th century by the well-known silversmith Myer Myers in New York. Rimonim are an important part of the ritual, rites, and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed by Shearith Israel. The Rimonim are currently on display at the Museum of Fine Arts in Boston, Massachusetts ("MFA"). Jeshuat Israel purportedly has entered into a conditional agreement with the Museum of Fine Arts to sell the Rimonim to the Museum for $7 million (net after commission) without the consent of Shearith Israel.

5.      Jeshuat Israel does not own and has no right to sell the Rimonim.  Sale would deprive the relevant Jewish communities of ownership of these religious objects; would be contrary to the ritual, rites, and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed by Shearith Israel; and sale in the manner proposed would raise serious questions of Jewish religious law.  Shearith Israel, in its own right and as trustee of religious objects for the Jews past, present, and future, objects to the sale of the Rimonim and of any other of its possessions.

6.      Shearith Israel has attempted to resolve the issues raised herein without having to come to this Court.  It proposed binding and expedited arbitration.  It proposed convening a court of Jewish law, or Beit Din, to decide on an expedited basis.  Jeshuat Israel through its purported Board has rejected all such efforts.  Shearith Israel has also offered to negotiate a long-term lease of the Rimonim to the MFA and the donor of funds for the purchase of the Rimonim on terms that Shearith Israel believes would be acceptable to MFA, compliant with all relevant religious laws and practices, and would both permit the broader Jewish and non-Jewish community to view the Rimonim but still keep them available for ritual use by Jews in the future.  This too Jeshuat Israel rejected and affirmatively refused to cooperate with.  Instead, Jeshuat Israel sued Shearith Israel, in blatant breach of an oral and written standstill agreement.

7.      This action is therefore necessary.  It seeks a declaration of Shearith Israel's ownership of and legal and equitable rights in the Rimonim along with the land, building, and other personalty used by Touro Synagogue, together with appropriate injunctive and equitable relief.  Defendant also seeks damages for the harm done by Jeshuat Israel's attempted usurpation of land, building, and personalty that do not belong to it.

## BACKGROUND

8.     Congregation Shearith Israel, the Spanish and Portuguese Synagogue of New York, was founded in 1654.  It was the first Jewish congregation to be established in North America.

9.     In or about 1658, Jews began to settle in Newport, Rhode Island, when approximately fifteen Jewish families of Spanish and Portuguese heritage and ritual settled there.

10.     During the 18th century, among the most prominent members in the Newport Jewish community were Jacob Rodrigues Rivera, Aaron Lopez, and Rev. Isaac Touro.  Jacob Rodrigues Rivera was the son of Abraham Rodrigues Rivera, who was Parnas (or President) of Congregation Shearith Israel in New York.  Aaron Lopez was born in Portugal and arrived in Newport about 1750.  Isaac Touro was trained as a *hazzan* (or prayer leader) in Amsterdam and came to Newport about 1759.  Other notable Jewish families in 18th century Newport were the Levy, Seixas, Machado, Hays, Hart, and Pollack families.

11.     The Newport Jewish community was organized under the name Congregation Yeshuat Israel, a different and entirely unrelated entity from the Plaintiff here, and Jacob Rodrigues Rivera, Moses Levy, and Isaac Hart purchased a plot of land on which to build a synagogue.  Money for the synagogue was solicited from individuals and various congregations, including Shearith Israel, which donated money on several occasions.  The synagogue, now known as the Touro Synagogue, was consecrated in December 1763.

12.     During the operation of Touro Synagogue in the 18th century, the Synagogue used Torah scrolls, including those loaned by Shearith Israel in New York.

These scrolls were all presumably adorned with silver finial bells, or Rimonim. Two pairs of Rimonim possessed by Yeshuat Israel were crafted by the silversmith Myer Myers of New York.

13. The American Revolution was disastrous for the community of Newport. The British occupied Newport during the war and seized nearly all of the merchant ships owned by the Jewish merchant families. Newport's commerce ground to a halt, and most of the Jews left Newport for the duration of the war. After the war, many of the Jewish families returned to Newport, although they never regained the commercial prosperity of the 18th century.

14. The number of Jewish residents in Newport slowly diminished. The Lopez, Rivera, Seixas, and Levy families left Newport and settled mainly in New York. The Touro and Hays families settled for the most part in Boston. In 1822 the last Jewish resident of Newport, Moses Lopez, left for New York.

15. By 1822, Yeshuat Israel, original possessor of the Rimonim, ceased to exist.

16. After 1822, the Synagogue, cemetery, and ritual items of Yeshuat Israel were left in the care of Stephen Gould, who took care of the property for several years. Thereafter, ownership of the Synagogue and real and personal property, including the Rimonim, were conveyed to Shearith Israel. For example, in 1826, Moses Lopez, then residing in New York, wrote to Stephen Gould that the "building is now considered owned at present by the Hebrew Society of this city" [i.e., Congregation Shearith Israel] and that he was "determined to send for the keys and place them in [the trustees] hands that they may do what they please with them."

17.     Touro Synagogue then fell into disuse.  For the next approximately 60 years after 1822, the Synagogue opened only occasionally, mainly for funerals.  The town of Newport expressed concern about the Synagogue falling into disrepair and requested Shearith Israel to help.  During this time, Shearith Israel exercised control over the real and personal property associated with the Touro Synagogue.  When there was a need to open the Synagogue or do repair work, permission was sought from Shearith Israel by Stephen Gould and later his widow and children.  Likewise, Shearith Israel sent its own ritual ministers to attend the occasional funerals or other services held in Newport.

18.     In the early part of the 19th century, Abraham and Judah Touro left bequests for the upkeep of the cemetery and Synagogue.  The will of Judah Touro left money to the City Council of Newport for the upkeep of the Synagogue.

19.     Toward the end of the 19th century, Newport experienced a revival, mainly as a summer resort.  There were occasional requests to use the Synagogue, appoint a rabbi, or use the Touro funds.  Shearith Israel was consulted and helped arrange such services when appropriate.

20.     In 1880-81, services were held for the high holidays and the Synagogue reopened for regular services.  Shearith Israel facilitated these services and engaged Rev. Abraham Pereira Mendes of London to accept the pulpit of the Newport Congregation. The Synagogue was reconsecrated in May of 1883.

21.     Rev. Mendes ministered to the Congregation from 1883 until his death in 1893.  After his death, Shearith Israel appointed Rev. David Baruch to be the *hazzan*, or ritual minister.  A letter of June 13, 1893 confirmed that Shearith Israel owned and controlled the real and personal property of Touro Synagogue, that the bells, including

the Rimonim, were part of the ritual of the service, and that "appurtenances" included the

Rimonim:

> You are hereby empowered to use the Sepharim, Bells [i.e., rimonim], Books, Shofar and all *other* appurtenances for worship now in Newport Synagogue or in storage at the Newport Bank (Bank of Rohde Island) and the Synagogue building and adjoining buildings as minister to the officiate in said synagogue subject to the condition sent to the [Mayor] 5th June. Upon termination of your appointment, you will return said to our agent or legal representative the custody of the buildings and appurtenances. (emphasis supplied)

22.     In or about 1893 a split appeared within the Jewish community of

Newport. Shortly after Shearith Israel's appointment of Rev. Baruch, two separate

bodies were organized, each claiming authority to use the Synagogue and applied for

funds from the Touro trust. The first to organize was a new congregation known as

Congregation Jeshuat Israel, which was chartered in or about 1894. This is not the same

entity as Yeshuat Israel and is neither related nor a successor in interest. Shearith Israel

was involved in the drafting of Jeshuat Israel's constitution and bylaws. Jeshuat Israel

conducted services in the synagogue under the auspices of Rev. Baruch.

23.     Shearith Israel obtained deeds from the descendants of the prior

congregation Yeshuat Israel confirming ownership in Shearith Israel of the Synagogue,

which by operation of law included its real and personal property including the Rimonim

as well as its cemetery.

24.     The second competing congregation to form was the "Touro

Congregation," which met in rented quarters and in other historic buildings in Newport.

25.     This situation reached a climax in 1899 when Rev. Baruch died. The

congregations selected new ministers. Both congregations applied for use of the Touro

funds from the City Council of Newport. The Council granted the funds to the Touro

Congregation because it was the larger of the two. A battle erupted between the two congregations, with the Touro Congregation attempting to take physical control of the Synagogue. Jeshuat Israel managed to regain physical control of the premises, and a legal battle ensued.

26. After several court cases, the matter was finally resolved in 1902. Neither Jeshuat Israel nor the Touro Congregation had ownership rights. Shearith Israel retained its ownership of the Synagogue as well as its real and personal property, including the Rimonim. Shortly thereafter, Rabbis were nominated by the unified congregation but had to be approved by Shearith Israel, a clear indication of ownership and control that extends to this day.

27. Shearith Israel entered into lease agreements with Jeshuat Israel in 1903 and 1908, renting the synagogue and related religious articles, including the Rimonim, for the value of $1.00 per year, which Jeshuat Israel has paid as rent. Copies of the leases are attached as Exhibits A and B.

28. In 1946, the Touro Synagogue was designated a National Historic site. In the agreements reached between the United States Government, Shearith Israel, and Jeshuat Israel, Shearith Israel ownership of the synagogue was reconfirmed, as set forth in Exhibit C.

## THE RIMONIM

29. At the time of the resolution of the litigation between the congregations in 1902, the Rimonim (among other Torah bells) existed in the Touro Synagogue.

30. The 1903 and 1908 indentures between Shearith Israel and Jeshuat Israel described the real estate subject to the indenture and also conveyed a leasehold interest in

"the appurtenances and paraphernalia belonging thereto."  This language included the Rimonim and other religious articles in the Synagogue.

31.     A written note regarding the language of the 1903 indenture reveals that Shearith Israel was specifically concerned with the objects within the synagogue, and not merely the building and its furniture.  Specifically, a letter dated February 10, 1903 from L. Napoleon Levy, the Parnas (or President) of Shearith Israel, stated:

> I notice an omission in the lease; we neglected to include the paraphernalia.  If you can arrange to insert, 'with the paraphernalia belonging thereto'…please do so.

A copy of this letter is attached as Exhibit D.  This language was ultimately included in the indentures executed in 1903 and five years later in 1908.  The same letter states:

> A list of the personal property should be made so that no dispute will arise in the future.

32.     A letter dated February 18, 1903, written to L. Napoleon Levy states:

> Rev. Dr. Mendez called this morning and at 10.30 A.M. we meet at the Synagogue the Committee appointed by the Congregation Jeshuat Israel.  The amendment to the lease "with the paraphernalia belonging thereto" was interlined and the Committee than acknowledge the lease before me, as notary.  The keys of the Synagogue, **ark &c**, were delivered by the Vice President of the Congregation to Dr. Mendez as representing the New York trustees.  The committee stated that they had full authority from the trustees of the congregation to deliver possession and execute lease.  Dr. Mendez subsequently delivered with the lease the keys to the Committee and then Dr. Mendez went over the **personal property** with the Committee, while I placed the lease on record. (emphasis supplied)

33.     Shearith Israel has at various times over the last 100 years remained involved in the affairs of Jeshuat Israel, especially with respect to the approval of Rabbinic appointments.  The indentures are triple net in nature, and Shearith Israel has complied with its obligations under the indentures save those that have been waived.

## PLAINTIFF'S IMPROPER EFFORTS TO SELL THE RIMONIM, STANDSTILL AGREEMENT, AND BREACH

34.     In or about June 2012, Shearith Israel learned that Jeshuat Israel intended to sell the Rimonim to the MFA under a conditional agreement for the sum of $7 million (net of commission).

35.     On or about June 29, 2012, Shearith Israel sent a demand letter to Jeshuat Israel advising Jeshuat Israel of its ownership the Rimonim and advising Plaintiff that it has no right to sell the Rimonim without its consent.  A copy of the letter is attached as Exhibit E.

36.     Defendant, as owner of the Rimonim, objected to the sale of the Rimonim to the MFA.

37.     On July 19, 2012, representatives of Plaintiff and Defendant had a meeting via videoconference to discuss the Rimonim.  At that meeting, the parties agreed to exchange documents that bear on the ownership of the Rimonim and engage in further discussions.  At the meeting the parties also agreed to a Standstill Agreement that was confirmed in writing that date.  A copy of the confirming letter is attached as Exhibit F. Among other things, Jeshuat Israel agreed to give notice to Defendant before it took ***any*** action to sell the Rimonim.

38.     The parties again met in New York on October 24, 2012 to discuss a resolution of the matter.  The Standstill Agreement was confirmed at the meeting and thereafter.

39.     On November 8, 2012, without notice to Shearith Israel, and while Defendant reasonably believed that discussions about resolving the issues relating to the Rimonim were continuing and bearing fruit, Plaintiff filed a civil action in the Newport

Superior Court, State of Rhode Island for an injunction allowing it to sell the Rimonim and for related declaratory and other relief.  This action was removed to the U. S. District Court for Rhode Island pursuant to 28 U.S.C. § 1441.

40.     Plaintiff claims to have developed a long term strategy for use of the Touro Synagogue based on the sale of the Rimonim and possibly other religious objects without seeking or obtaining the approval and consent of Shearith Israel.  This strategy is unrealistic, illogical, and inappropriate.  It ignores Shearith Israel's ownership and reflects the self-aggrandizement and self-promotion of the purported leadership of Jeshuat Israel.

41.     That same leadership recently erected on the historic Touro Synagogue or its surrounding wall a plaque honoring the family of the purported leader of Jeshuat Israel.  This is in violation of the 1945 agreement with the U.S. Department of Interior and in violation of Jeshuat Israel's obligations under the Leases.

42.     Shearith Israel has complied with any and all of its obligations and of any and all preconditions to suit, save those that have been waived.

## COUNT I
## (BREACH OF STANDSTILL AGREEMENT AND DAMAGES)

43.     Defendant repeats and realleges all other paragraphs in this Counterclaim as if fully set forth herein.

44.     Plaintiff breached the Standstill Agreement by filing an action for injunctive and other relief in the Newport County Superior Court, State of Rhode Island seeking authority to sell the Rimonim.

45. As a result, Defendant has been injured in its business and property and reputation and is entitled to such damages as will be ascertained at trial.

## COUNT II
### (DECLARATORY JUDGMENT)

46. Defendant repeats and realleges all other paragraphs in this Counterclaim as if fully set forth herein.

47. As set forth herein, a dispute exists over the ownership, rights, status and legal relations relating to the Rimonim.

48. Defendant seeks a declaration that it is the full and lawful owner of the Rimonim. Defendant further seeks a declaration that Plaintiff does not own the Rimonim. Defendant also seeks an alternative declaration that in any event sale of the Rimonim in the manner contemplated by Plaintiff is contrary to the ritual, rites, and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed by Shearith Israel and thus is both unlawful under the terms of the governing instruments and course of dealing between the parties and in any event is ultra vires and without force or effect.

## COUNT III
### (DAMAGES, PRELIMINARY AND PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF)

49. Defendant repeats and realleges all other paragraphs in this Counterclaim as if fully set forth herein.

50. The actions of Plaintiff entering into a conditional contract to sell the Rimonim interferes with Defendant's ownership rights of the Rimonim and is unlawful for the reasons that Plaintiff does not own the Rimonim, the sale of the Rimonim in the

manner contemplated by Plaintiff is contrary to the ritual, rites, and customs of the

Orthodox Spanish and Portuguese Jews as practiced and observed by Shearith Israel and

thus is both unlawful under the terms of the governing instruments and course of dealing

between the parties and in any event is ultra vires and without force or effect.

51.     The Rimonim are significant religious articles that Defendant does not

intend to sell to the MFA.

52.     The Rimonim should be returned forthwith to the possession of Defendant

in New York or to such other place as Defendant determines absent an agreement

between Shearith Israel and MFA on terms satisfactory to Shearith Israel.

53.     Defendant does not have an adequate remedy at law.

54.     Defendant will suffer irreparable harm if the Rimonim are sold or if

Plaintiff continues to act with respect to them in the manner it is now acting.

55.     The harm to Defendant outweighs the harm to Plaintiff.

56.     The public interest weighs in favor of Defendant.

57.     Defendant is entitled to a preliminary and permanent injunction

prohibiting the sale of the Rimonim by the Plaintiff to the MFA or anyone else and

directing the return of the Rimonim to Shearith Israel absent an agreement satisfactory to

Shearith Israel.

**COUNT IV**
**(DECLARATORY**
**JUDGMENT AND**
**DAMAGES)**

58.     Defendant repeats and realleges all other paragraphs in this Counterclaim

as if fully set forth herein.

59.     As set forth herein, a live dispute and controversy exists over the ownership, rights, status, and legal relations relating to the building, real estate, and any and all personalty used by or for Touro Synagogue.  This dispute includes, without limitation, the fact that the use or sale of any and all real or historic personal property used by Touro Synagogue by Plaintiff in the manner contemplated by Plaintiff is contrary to the ritual, rites, and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed by Shearith Israel and thus is both unlawful under the terms of the governing instruments and course of dealing between the parties and in any event is ultra vires and without force or effect.

60.     Defendant seeks a declaration that Shearith Israel owns and has all legal and equitable right to the building, real estate, and any and all historic personalty used by or for Touro Synagogue, that the use or sale of any and all real or historic personal property used by Touro Synagogue by Plaintiff  in the manner contemplated by Plaintiff is contrary to the ritual, rites, and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed by Shearith Israel and thus is both unlawful under the terms of the governing instruments and course of dealing between the parties and in any event is ultra vires and without force or effect, together with such damages to Shearith Israel that have or may have been caused by Jeshuat Israel's breach of Shearith Israel's ownership and rights.

**COUNT V**
**(DECLARATORY AND EQUITABLE**
**AND OTHER RELIEF)**

61.     Defendant repeats and realleges all other paragraphs in this Counterclaim as if fully set forth herein.

62.     Plaintiff has breached its obligations to Defendant, including under the Indentures  and under the Agreement with the federal government, by, among other things, attempting to sell Shearith Israel's property, attempting to treat the Synagogue as its own by installing an unauthorized plaque, and attempting to remove Shearith Israel nominees from the Jeshuat Israel Board.

63.     As a result, Jeshuat Israel should be removed as lessee of Touro Synagogue and related real property, and as lessee of all personal property, including all religious objects, owned by Shearith Israel.

64.     Defendant also has been damaged by Jeshuat Israel's breaches in an amount to be ascertained at trial.

65.     The Court should also declare said legal instruments breached, and Shearith Israel shall be entitled to all additional remedies in law and equity arising from such breaches, including an accounting by Jeshuat Israel of all real and personal property in its possession that is owned by Shearith Israel, and an accounting of its financial books and records.

## COUNT VI
## (DECLARATORY AND EQUITABLE AND OTHER RELIEF)

66.     Defendant repeats and realleges all other paragraphs in this Counterclaim as if fully set forth herein.

67.     Jeshuat Israel is under contractual and long-standing obligations and protocols to communicate with Shearith Israel and to comport itself in accordance with said contractual and long-standing obligations and protocols.

68.     In pursuit of its own selfish ends, Plaintiff has neglected its obligations and duties under the contractual and long-standing obligations and protocols. It has, among other things, improperly altered the governing instruments, including the bylaws of the Congregation. This has put Shearith Israel and Jeshuat Israel in an unnecessarily adversarial position, to the detriment of the congregants and communities each of the Synagogues is to serve.

69.     The contractual and long-standing obligations and protocols have legal force and effect. They are articulable and identifiable, they can be understood and enforced by this Court without undue entanglement with religious law or doctrine, and directing compliance with them would not embroil this Court in religious issues to any extent problematic under the law. The Court should direct Plaintiff to comply with its contractual and long-standing obligations and protocols, grant such equitable relief as the Court deems warranted, and award Shearith Israel damages for any amount of loss it has incurred by reason of Plaintiff's misconduct.

WHEREFORE, Defendant demands judgment against Plaintiff as follows:

1.     That this Court declare that Defendant is the full and lawful owner of the Rimonim as well as of the building, real estate, and all other personalty as described herein;

2.     That this Court declare that Plaintiff does not own the Rimonim or the building, real estate, and all other personalty as described herein;

3.     That this Court enter a preliminary and permanent injunction against Plaintiff (a) prohibiting the sale of the Rimonim to the Museum of Fine Arts or anyone else without Defendant's consent; (b) prohibiting the sale of any other real and personal property without Defendant's consent;

4.     That this Court order the immediate return of the Rimonim to the Congregation Shearith Israel in New York unless Shearith Israel agrees otherwise;

5.     That this Court declare Plaintiff to be in breach of the Indentures and Agreement with the United States and order the eviction of Plaintiff from the Touro Synagogue and related real property;

6.     That this Court make the declarations and award the other relief as set forth herein;

7.     That this Court award Defendant damages in amounts to be proven at trial;

8.     That this Court direct Plaintiff to honor its commitments to Defendant under the governing documents and protocols; and

9.     For such other relief as this Court deems meet and just, including attorney's fees and costs.


                              CONGREGATION SHEARITH ISRAEL,

                              By its Attorneys,


                              /s/ Deming E. Sherman
                              Deming E. Sherman (#1138)
                              EDWARDS WILDMAN PALMER LLP
                              2800 Financial Plaza
                              Providence, RI  02903
                              Phone: 401-274-9200
                              Fax: 401-276-6611
                              E-mail: dsherman@edwardswildman.com

/s/ Louis M. Solomon
Louis M. Solomon, Esq.
Louis M. Solomon (*Admitted Pro Hac Vice)*
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY  10281
Tel.:  1 (212) 504-6600
Fax:   1 (212) 504-6666
E-mail: Louis.Solomon@cwt.com

December 6, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of December, 2012, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

/s/ Deming E. Sherman