# EXHIBIT 2, PART 2

One of CSI's main concerns, as contemporary observers recognized and as CSI protests made clear, was that there was no connection at all between the new Newport congregation and the historic, colonial-era CYI. In a January 1894 petition to the Rhode Island General Assembly, Congregation Shearith Israel made many of the same historical arguments that they had put forward in their 1881 petition. The original CYI was comprised of Sephardic Orthodox Jews from the Spanish and Portuguese rituals and traditions, which CSI members noted "is essentially and in many points entirely different from the rite as practised by the German and Polish Jews."[64] Furthermore, not a single member of the new congregation had any blood, ethnic, or lineal connection to the original CYI.[65] This fact was recognized even by non-Jewish Newport observers at the time. An 1886 essay titled "The Israelites in Rhode Island," published in the Rhode-Island journal *The Narragansett Historical Register*, laid out the history of Jews in Newport, noting that the last members of the colonial-era Spanish and Portuguese congregation in Newport (the original CYI) moved to New York in 1822. "Newport now counts none of the old Jewish families of Portuguese and Spanish blood," local historian Frederic Denison observed.[66]

Congregation Shearith Israel asserted the same thing. As the January 1894 petition to the Rhode Island General Assembly from CSI President L. Napoleon Levy stated of this new congregation, "while as a matter of fact none of them belong to the Sephardic or Spanish and Portuguese sections of the Jewish nation, which was the rite with which the members of the ancient community at Newport were identified, nor are they any descendants or in any way connected with the former Congregation, they being of the German or Polish contingent herein

---

[64] CJI 0087: L. Napoleon Levy and CSI petition to the Rhode Island General Assembly, January 1894.
[65] CSI 4057 and CJI 0089: L. Napoleon Levy and CSI Petition to the Rhode Island General Assembly, January 1894.
[66] Denison, "The Israelites in Rhode Island," 314.

before alluded to, and by their action in endeavoring to adopt this name [of Congregation Yeshuat Israel], are manifestly perpetrating a fraud upon the citizens of Newport in attempting to establish a relation between the ancient Congregation and themselves, while as a matter of fact they are totally different in form of worship and in social standing, as well among the Israelites as Gentiles."[67] Levy was clear that it would be acceptable for the newly formed Newport Jewish congregation to incorporate under one of any of the other hundreds of possible names permissible and known to Jews, but to use the name of the original congregation was misleading at best and fraudulent at worst.[68]

CSI president L. Napoleon Levy followed up on this petition to the Rhode Island General Assembly with an in-person appearance in the spring of 1894 to argue his case before the state legislature.[69] He was apparently temporarily successful, for in May 1894 the Rhode Island General Assembly initially rejected the proposed charter of the Newport congregation.[70] But this particular Newport congregation was persistent; they again filed their application the next month, in June 1894, and this time—perhaps due to local political pressure, as some contemporary observers suggested—a charter was granted by the Rhode Island General Assembly on June 12.[71]

Therefore, from the perspective of CSI, starting in 1893 this particular Newport Ashkenazic congregation was attempting an unwarranted power grab by claiming the name of the colonial-era Sephardic congregation and tapping into the funds held in trust by the Newport

---

[67] CJI 0089-0090 and CSI 4057-4058: L. Napoleon Levy and CSI Petition to the Rhode Island General Assembly, January 1894.

[68] CSI 4057-4058: L. Napoleon Levy and CSI Petition to the Rhode Island General Assembly, January 1894.

[69] CSI 5296-5297: CSI Meeting Minutes, May 4, 1894.

[70] CSI 5287: CSI Meeting Minutes, June 4, 1894. Somewhat confusingly, in their official petition to the Newport Mayor and City Council in May 1893, the newly-formed Newport congregation used the name Congregation Jeshuat Israel, even though in their own meeting minutes and, a few months later, in their own Constitution and Bylaws, they used the name Congregation Yeshuat Israel (which is the name CSI representatives use in their protests to the Rhode Island General Assembly). See CJI 1166: CJI Meeting Minutes, May 28, 1893; CJI 1167-1168: Isaac Levy and Max Levy's petition to the Newport Mayor and City Council, May 30, 1893.

[71] CSI 5278: CSI Meeting Minutes, July 2, 1894; CJI 0155: "An Act Incorporating a Congregation Jeshuat Israel in the City of Newport," May 1894 (passed June 13, 1894).

City Council and the state of Rhode Island intended for the Touro Synagogue. This attempt to assert control even extended to the religious objects loaned by CSI. On June 15, 1893, Eugene Schreier of CJI wrote a somewhat demanding letter to H.P. Mendez of CSI, urging that CJI be "placed in possession" of the synagogue appurtenances and paraphernalia that CSI had temporarily placed in the Newport Bank, particularly the synagogue silver, including the "Silver Bells," or the *rimonim*. Schreier also hoped that Mendez would give the silver directly to CJI, without going through the recently hired Rev. David Baruch (who CSI saw as their hand-picked representative at CJI), since it would give CJI more direct control over the religious objects.[72] But CSI had already sent a lease letter to Baruch two days prior (on June 13, 1893), setting out the terms of the loan and use of the ritual objects—including the *rimonim*—from CSI (discussed in greater detail below).[73] There is no evidence that Mendez altered the arrangement he had with Baruch as a result of Schreier's demands, nor would Mendez have had any motivation to do so, given that he felt CJI was overreaching in the first place.

When faced with such a challenge, CSI was forced into the position of proving once and for all that they were the rightful owners and trustees of the synagogue itself, the religious and sacred objects (appurtenances) inside of it, and the cemetery. Accordingly, even while the General Assembly of Rhode Island was deliberating in the spring of 1894 whether or not to grant the new Newport Jewish congregation a charter under the same name as the original Newport Jewish congregation, CSI decided to take more direct action to show that, even if they might not be able to block the congregation from using the historic name of Congregation Jeshuat Israel, CSI could at least put into writing their long-standing legal title to the synagogue, grounds, and religious and ritual objects. CSI contacted as many of the living descendants of the original CYI

---

[72] CJI 0039-0040: Eugene Schreier to H.P. Mendez, June 15, 1893.
[73] CJI 0036: Henry Pereira Mendez to David Baruch, June 13, 1893.

congregation as they could locate (many of whom were still living in New York and were part of the CSI congregation) and had them legally convey to CSI for one dollar the synagogue in Newport itself, the land, premises, "together with the appurtenances and all the estate."[74] The indentures (deeds of conveyance) executed in 1894 formally and legally transferred to CSI "all of the rights" of the "heirs at law" of the descendants of the original CYI and were recorded in the Book of Land Evidence, Newport, Rhode Island, Volume 67, page 275.[75]

These deeds were consistently recognized as simply making even more official what had already been conveyed, and indeed, had been practiced and assumed by custom prior to that point. These deeds of conveyance merely reaffirmed what was stated in a letter dated February 20, 1818, from the last members of the original CYI to CSI, transferring the Scrolls of the Law to CSI.[76] Similarly, in 1826, Moses Lopez of New York City wrote to Stephen Gould in Newport, stating, "That building is now consider'd as own'd at present by the Hebrew Society in this city [NYC] and I am doubtful whether the Trustees of it will tamely submit to the forced agency of the [Newport City] Council to repair their own property without their consent."[77]

To CSI, the Newport City Council, and most other contemporary observers, these deeds of conveyance in 1894 affirmed CSI as "owners" of the Newport synagogue and its appurtenances.[78] The legality of these deeds of conveyance was recognized by later authorities

---

[74] CJI 0127: Deed of Conveyance, April 10, 1894.

[75] CSI 0093: Agreement between the Secretary of the Interior, Congregation Shearith Israel, and Congregation Jeshuat Israel, November 7, 1945; see also CSI 0685: *Historical Background and By-Laws of the Congregation Jeshuat Israel of Newport, Rhode Island, Adopted January 28, 1945*; CJI 0126-0151: Deeds of Conveyance, 1894.

[76] CSI 5339: Memorial of a Committee of Board of Trustees of Congregation Shearith Israel of New York presented to the City Council, Newport, Rhode Island, 1881.

[77] CSI 5186: Moses Lopez to Stephen Gould, 1826.

[78] CJI 0291: H.P. Mendez to Mayor Garrettson, January 13, 1901. Significantly, even later generations of CJI leadership freely recognized the authority of these 1894 deeds of conveyance. A c. 1945 publication titled *Historical Background and By-Laws of the Congregation Jeshuat Israel of Newport, Rhode Island* included an extract of the "Deed of Trust of Mary Ann Lopez, et al., conveying Title and Trust of the Jewish Synagogue and its Grounds and Appurtenances, to the Trustees of the Congregation Shearith Israel of New York. Dated April 27, 1894, May 2, 1894, and recorded in the Book of Land Evidence of Newport, Rhode Island, Vol. 67 page 274 ff." See CSI 0685: *Historical Background and By-Laws of the Congregation Jeshuat Israel of Newport, Rhode Island, Adopted January*

Case 1:12-cv-00822-LM-AKJ Document 41-3 Filed 12/08/14 Page 6 of 22 PageID #: 373

and parties involved, including CJI itself, a U.S. Circuit Court in 1903, and the U.S. Federal Government in the mid-twentieth century.[79] These deeds of conveyance further established the continuity between the original CYI and CSI in New York and, by extension, affirmed the *lack* of such continuity between the original CYI and the newly formed CJI (in 1894). If the new CJI had had any claim to continuity with CYI, the late-nineteenth century heirs at law of the original CYI would surely have recognized such continuity and instead would have deeded the land, building, and appurtenances to the newly formed CJI. But the heirs at law for the original CYI did not deed it to the newly formed CJI, because there was in fact no continuity, as everyone involved in the matter recognized.

In addition to securing these deeds of conveyance, CSI retained ongoing control in other important ways. This influence was reflected most basically in the final form of the new Newport congregation's actual name. Despite the new congregation's claims to the name Congregation Yeshuat Israel (as seen from both their congregational declaration on May 28, 1893, regarding their organization and founding, and their Constitution and Bylaws adopted on December 17, 1893), CSI's protests led to a slight but significant change of just one letter in the actual name under which the Rhode Island General Assembly granted a charter in June 1894: Congregation Jeshuat Israel (instead of Yeshuat).[80] This name change was officially reflected in CJI's

---

*28, 1945*, p. 10. Similarly, in a 1948 pamphlet published by the Friends of the Touro Synagogue, the 1894 deeds of conveyance are quoted at length to indicate that CSI holds legal title to the land and building. See CSI 0423: *Touro Synagogue of Congregation Jeshuat Israel, Newport, Rhode Island Founded 1658*, p. 10.

[79] See, for example, CSI 0685: *Historical Background and By-Laws of the Congregation Jeshuat Israel of Newport, Rhode Island, Adopted January 28, 1945*, p. 10, which seems to be a publication of CJI itself, and gives part of the text of the Deed of Trust from Mary Ann Lopez, et al. See also CSI 0318: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903; CSI 0093: An agreement between the U.S. Department of Interior, CSI, and CJI, Nov. 7, 1945, regarding making the Touro Synagogue a National Historic Site; CSI 0777: A letter from CJI President A.L. Greenberg to the CJI Secretary, March 18, 1959.

[80] CJI 0048: "Constitution, By-Laws and Rules of the Congregation Yeshuat Israel of Newport, R.I., Adopted December 17, 1893"; CJI 1166: Minutes of a Meeting, CJI, May 28, 1893. Later generations noted the significance of the name change. On August 7, 1957, CSI minister David de Sola Pool observed that CJI was a "relatively recent

subsequent correspondence and the revised 1897 Constitution and Bylaws.[81] More substantially, the wording of the 1894 Act of Incorporation for the state of Rhode Island guaranteed that the newly formed CJI would conduct their services "according to the Sephardic Ritual and strict rules and laws of the Orthodox Jewish Faith" (a provision that was also stated in Article XIX of CJI's 1897 Constitution and Bylaws).[82]

Of equal significance was the fact that, although CJI's original Constitution and Bylaws (adopted December 17, 1893) failed to mention CSI even once or even make any commitment to the Sephardic rituals, CSI's protests forced a revised version, which included substantial changes that better reflected CSI's ownership of and connection to the synagogue building and its appurtenances. In direct response to CSI's requests (and, indeed, with CSI's input and approval), a new version of the Constitution and Bylaws was drawn up in 1896 and adopted by CJI on January 31, 1897.[83] Importantly, the 1897 CJI Constitution and Bylaws explicitly incorporated representatives from CSI into the structure of CJI governance. According to Article III of the Constitution and Bylaws, four trustees from CSI should be chosen, who were "declared to be Trustees of this Congregation [CJI]" and could vote either in person or by proxy on all matters related to the congregation.[84] These four CSI trustees were also decreed to be members of the CJI congregation (Article XII).[85] Tellingly, Article XIX of the Constitution and Bylaws also ensured that "No real or other property owned, or which may hereafter by acquired by this

---

incorporation under a name that is spelled differently from the one in use by the congregation in Revolutionary times." CSI 1001: David de Sola Pool to Justice Edgar J. Nathan, August 7, 1957.

[81] CJI 0454: Constitution, By-Laws and Rules of Congregation Jeshuat Israel, January 31, 1897.

[82] CJI 0155: "An Act Incorporating a Congregation Jeshuat Israel in the City of Newport," June 13, 1894.

[83] CJI 0175: Letter and resolutions to CSI from Rev. David Baruch, February 16, 1896; CJI 0465: Constitution and By-Laws of Congregation Jeshuat Israel, January 31, 1897.

[84] CJI 0455: Constitution and By-Laws of Congregation Jeshuat Israel, January 31, 1897; see also CJI 0290-0291: H.P. Mendez to Mayor Garrettson, January 13, 1901. When CSI received the newly revised Bylaws in early February 1897, they immediately proceeded to elect four representatives from CSI to serve on the CJI Board of Trustees. See CSI 8998: CSI Board Meeting Minutes, February 9, 1897. One historian referred to this provision in the bylaws as "a permanent allotment of four seats on the synagogue's board of trustees to the New York congregation." Urofsky, *A Genesis of Religious Freedom*, 98.

[85] CJI 0459: Constitution and By-Laws of Congregation Jeshuat Israel, January 31, 1897.

Fisher 26

Congregation shall be sold or exchanged or mortgaged, unless by unanimous vote of the members present, and represented by proxy at a Special Meeting convened for that purpose."[86]

Furthermore, the 1897 Constitution and Bylaws included in Article XXI a clear prohibition against any changes that would in any way remove the influence of the CSI trustees from the congregational and decision making life of CJI: "But no addition, alteration or amendment shall be made to this Constitution and By-Laws that shall in any way add to, alter or affect the status of the four Trustees of the Spanish and Portuguese Congregation Shearith Israel of the City of New York, or of Article XIX. of this Constitution and By-Laws, unless the said four Trustees of the said Congregation Shearith Israel vote affirmatively for such proposed addition, alteration or amendment" (Article XIX required a unanimous vote for the sale of present or future property).[87]

In this way, the CSI trustees ensured that CJI would make decisions that were in keeping with the desires of CSI and the authentic practice of Judaism that had been CYI's legacy. These provisions also ensured that CJI would not sell or otherwise misuse the building or the sacred objects on loan from CSI. Throughout, CSI believed its mission included serving as owner and caretaker to the Touro Synagogue, which it had performed with regard to the synagogue building and cemetery (in conjunction with the Newport City Council) for the better part of the entire nineteenth century. CSI believed that it had an obligation to provide for "all members of the Jewish faith" at Newport, in part because CSI was home to the families of the original, colonial-era congregation, and in part because of the 1894 deeds of conveyance from the descendants of original CYI members.[88]

---

[86] CJI 0462: Constitution and By-Laws of Congregation Jeshuat Israel, January 31, 1897.
[87] CJI 0463: Constitution and By-Laws of Congregation Jeshuat Israel, January 31, 1897.
[88] CSI 0213: CSI to the Mayor and City Council of Newport, Rhode Island, May 1, 1899.

The above legal protections were not the only ones CSI took to ensure that CSI remained in control to carry out its mission and obligations to the Jews of Newport. CSI also made sure that any effort by CJI (or individuals associated with CJI) to subvert CSI's oversight, authority, or ownership of the synagogue and the religious objects on loan was unsuccessful. CSI's awareness that certain CJI congregants might entertain such designs can be observed in a February 7, 1897, letter between H.P. Mendez and L. Napoleon Levy (both of CSI), in which Mendez suggests that Levy request in writing from CJI a pledge "that our [CSI's] trustees will not be ousted, and that the number of their trustees will not be so increased as to practically silence our four."[89] And, in fact, within the first five years after the passing of the revised (1897) Constitution and Bylaws, CSI accused some members associated with CJI of trying to eject the CSI trustees outright (discussed in greater detail below).[90]

The newly formed CJI's legitimacy was also challenged from within the Newport Jewish community. The records of the late nineteenth century show that after the death of CJI minister David Baruch in March 1899, there was a rival splinter group within the CJI congregation that independently sought recognition from the Newport City Council and the state of Rhode Island and, by extension, full possession and use of the Touro Synagogue and the synagogue appurtenances.[91] This rival group called themselves the Touro Congregation and received a charter from the state of Rhode Island on April 10, 1899. The Touro Congregation and Congregation Jeshuat Israel both elected and appointed their own ministers: the Touro Congregation called E.M. Meyer, and CJI appointed Moses Guedalia (although it is unlikely that CSI approved either appointment).[92] Recognizing that the Touro Congregation had more

---

[89] CSI 1691: H.P. Mendez to L. Napoleon Levy, February 7, 1897.
[90] CJI 0293: H.P. Mendez to Mayor Garrettson, January 13, 1901.
[91] Rev. David Baruch to CSI, dated June 13, 1893, found in JHA 0044: "The 1902 Sit-in at Touro Synagogue," 43.
[92] CJI 0581: Adelman, "They Broke In—To Pray," 227.

influential members, the Newport City Council decided to recognize the Touro Congregation over CJI.[93] Arguing that they were the rightful possessors of the synagogue, members of the Touro Congregation tried in 1899 to "obtain possession of it by force," which CSI saw as a "sacrilegious attack . . . upon a sacred building."[94] Consequently, CSI filed for a court ordered ejectment of the Touro Congregation, which they received in July 1899 from the Supreme Court of Rhode Island.[95] The keys were eventually returned to CSI in New York, which by that time was considered by the state of Rhode Island and the city of Newport to be the rightful owner and trustees of the property.

After the ejection of the Touro Congregation in July 1899, CSI rabbi H.P. Mendez traveled from New York to personally conduct services in the Newport synagogue for a few months that summer and during the High Holy Days in September. Services continued more regularly with CSI's permission in February 1900, when CJI selected the Rev. Henry Samuel Morais to serve as minister in Newport (an appointment CSI seemingly confirmed).[96] By this time some of the Touro Congregation members had rejoined CJI. In June 1900, Julius Engel— formerly associated with the Touro Congregation—acting as CJI president, drafted radical amendments to the 1897 Constitution and Bylaws that would have completely cut out CSI's integrated supervisory role (including excising the four CSI trustees and removing the possibility of voting by proxy).[97] There is no evidence that Engel's proposals reflected wider sentiments within CJI, or that the proposals gained any traction or were even voted upon. But when CSI

---

[93] TSF 2410: "The 1902 Sit-in at Touro Synagogue," 47.

[94] CJI 0292: H.P. Mendez to Mayor Garrettson, January 13, 1901.

[95] CJI 0259: Order of the Rhode Island Supreme Court, July 10, 1899.

[96] CJI 0294: H.P. Mendez to Mayor Garrettson, January 13, 1901. Mendez seemed to be concerned that CJI was requesting to pay Morais throughout the controversies of 1900 and 1901, even though the Touro Synagogue was officially closed by CSI, and despite the fact that CJI was barely meeting regularly as a congregation. Still, Mendez affirmed Morais as a minister and states that CSI approved his appointment.

[97] CSI 1894-1895: Julius Engel, notice of a special meeting of the Congregation Jeshuat Israel, June 21, 1900. Engel signed it as "President, Congregation Jeshuat Israel." H.P. Mendez also refered to Engel as the CJI president at this time. See CJI 0293: H.P. Mendez to Mayor Garrettson, January 13, 1901.

Fisher 29

found out about this proposed violation of their agreement and of the 1897 Bylaws (which required CSI approval for any such changes), CSI simply closed down the Touro Synagogue in mid-July 1900. Once again, CSI Rabbi Mendez traveled from New York that summer and early fall to conduct services, significantly, "for all who wished to worship," not just for CJI.[98] Mendez additionally refused to recognize Engel, whose sympathies were still with the Touro Congregation, which had been legally ejected from the synagogue building the year prior.[99] With things still unresolved, Eugene Schreier, acting as an agent for CSI, posted a notice in the *Newport Daily News* on January 1, 1901, that the Newport synagogue would be closed "until further notice."[100] The Synagogue did not officially re-open until early 1903, after possession had been resolved by the courts.

But Touro Congregation—the splinter group—was not done yet. On April 21, 1902, its members staged a break-in at the Touro Synagogue in an attempt to force a legal showdown with CJI and, ultimately, CSI.[101] A lengthy legal process ensued, during which time the Touro Congregation and/or CJI attempted to maintain control of the synagogue building (April 21, 1902 – February 2, 1903).[102] CSI sued the Touro Congregation and named CJI in the case as well, in an effort to affirm their exclusive legal control over the property. The case was moved to different courts in Rhode Island but in late 1902 ended up in the U.S. Circuit Court in the District of Rhode Island. On January 3, 1903, Judge Arthur L. Brown ruled against CJI and the Touro Congregation.[103] In fact, one of the key claims to de facto ownership by CJI was taken head on by Judge Brown. In his January 1903 opinion, Judge Brown flatly rejected the notion that CJI

---

[98] CJI 0293: H.P. Mendez to Mayor Garrettson, January 13, 1901.
[99] CJI 0293: H.P. Mendez to Mayor Garrettson, January 13, 1901.
[100] TSF 2413: "The 1902 Sit-in at Touro Synagogue," p. 53.
[101] TSF 2416: "The 1902 Sit-in at Touro Synagogue," pp. 58-59.
[102] TSF 2421-2422: "The 1902 Sit-in at Touro Synagogue," 68, 70.
[103] CSI 0317: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903; CSI 9212: CSI Board of Trustees Meeting Minutes, January 22, 1903.

could claim any right to the Touro Synagogue simply by virtue of being a Jewish Society in

Newport (CJI based this claim on the eighteenth-century wills of Rivera, Levy, and Hart, which

spoke of the synagogue as a trust for the Jews of Newport). In Judge Brown's opinion, "no trust

of this general character would arise from a purchase of the land for the purposes set forth in

paragraph 1 of the bill" (that is, the bill of complaint lodged by CJI in the court case).[104] More

specifically, Judge Brown rejected the notion that the "Jewish Society" mentioned by Rivera,

Levy, and Hart could in any way refer to the new CJI.[105] Throughout, Judge Brown repeatedly

noted that CJI's case for ownership was "fatally defective" and ruled against it.[106]

        This 1903 Circuit Court ruling once again settled the issue of possession, confirming that

the Newport synagogue was owned by and should be returned to CSI.[107] The U.S. Circuit Court

ruled in favor of CSI in part based on CSI's long history as functional legal title holders and

property owners as well as the deeds of conveyance given to them in 1894 from the living

descendants of the original CYI. As a result, on February 2, 1903, the CJI trustees, in compliance

with the Circuit Court ruling, voted unanimously "to surrender the possession of the Synagogue

building, premises and paraphernalia belonging thereto at Newport, to the said Trustees, owners

of the property, and to agree upon the terms and provisions of a lease from said Trustees to this

Congregation for the term of five years from February, 1 1903."[108] CJI agreed to lease from CSI

the synagogue, the premises, and the sacred ritual objects for $1 per year (along with other

---

[104] CSI 0317: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903.
[105] CSI 0318: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903.
[106] CSI 0317: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903.
[107] CJI 0586: Adelman, "They Broke In—To Pray," p. 234-235.
[108] CJI 0471: February 2, 1903 meeting of the CJI Board of Trustees; TSF 2422: "The 1902 Sit-in at Touro Synagogue," pp. 70-71.

responsibilities and provisions).[109] The first five-year indenture with lease was signed in 1903 between the two parties; a second and similar lease was signed in 1908, an arrangement that has consistently been recognized by CJI in the intervening one hundred-plus years.[110]

Despite the efforts by some individuals within the larger Newport Jewish community to limit CSI's influence, it appears there is no evidence that CJI or any other entity was ever effective in validly limiting CSI's rights as owner of Touro Synagogue and its paraphernalia and appurtenances. The 1897 Constitution and Bylaws were operative until at least 1945, when a purported revised set of bylaws was passed (though there seems to be no evidence that CSI was ever given notice of or voted on the modification – which would render the proposed modifications null or ultra vires). The purported 1945 bylaw revisions attempted to prohibit voting by proxy (that is to say, they tried to require the CSI trustees to travel to Newport in person for each meeting of the Board of Trustees to be able to vote on any item of importance). Nonetheless, CJI did reaffirm the ongoing inclusion of the four CSI representatives on the CJI Board of Trustees.[111]

During the controversies between 1881 and 1903, CJI members seemingly never actually stated that they were connected, whether by culture, bloodlines, or families, to the original colonial-era Congregation Yeshuat Israel in Newport. Even in the mid-twentieth century, CJI's own official documents and internal discussions over various issues reveal that, sixty years later, they still recognized themselves as having no genealogical or cultural continuity with CYI. On January 15, 1950, when CJI called a special congregational meeting to consider the offer of the Morgenstern Foundation to loan to CJI the original 1790 letter from George Washington to CYI

---

[109] CSI 9214: CSI Board of Trustees Meeting Minutes, March 10, 1903; CJI 0471: February 2, 1903 meeting of the CJI Board of Trustees; CSI 0027-0036: 1903 CJI/CSI Lease, February 2, 1903.

[110] CSI 0001-0005: 1908 CJI/CSI lease, January 14, 1908. See also Urofsky, *A Genesis of Religious Freedom*, 100.

[111] CSI 0689: Article II, Bylaws of Congregation Jeshuat Israel, "adopted" on January 28, 1945.

warden Moses Seixas, the attendees debated whether CJI even had the right to accept the letter at all. One member, Samuel Adelson, asserted that "there was a very serious question whether the Congregation had any rights of ownership in the letter. He stated that while it [the Washington letter] was addressed to the Hebrew Congregation of Newport, R.I., yet no members of the present congregation were lineal descendants of the members of the Congregation in 1790. He pointed out that the Synagogue itself was rented from the Congregation Shearith Israel in New York."[112]

Similarly, individuals in Newport associated with the Touro Synagogue freely admitted that there was no historic connection between CJI and the colonial-era CYI. On January 9, 1956, David C. Edelman of Newport wrote to Maxwell Wyckoff of New York City, stating that CJI was "in no sense continuous with the original Congregation Yeshuat Israel," and that "the personal property [of CYI] went to the heirs of the original Congregation."[113]

Additionally, Congregation Jeshuat Israel's own later official histories of the Jewish community in Newport stated plainly that there was no blood connection between the original Congregation Yeshuat Israel and the later CJI. In a twenty-page pamphlet titled *The Newport Jewish Tercentenary, 1658-1958* (published in 1959 by the Jewish Newport Tercentenary Committee), the Rabbi Theodore Lewis of CJI stated, "Today there are no descendants of the early Jewish settlers living in Newport. The present community is largely composed of immigrants from Poland and Russia, who came to Newport towards the end of the 19th century, and their children, native-born Americans. There is also a fair sprinkling of American born Jews who have come from other communities."[114]

---

[112] CJIB 0530: CJI Special Meeting Minutes, January 15, 1950.

[113] JHA 0187: David C. Edelman to Maxwell Wyckoff, January 9, 1956.

[114] CSI 0604: Rabbi Theodore Lewis, *The Newport Jewish Tercentenary, 1658-1958*, p. 9.

This assessment (of a complete lack of continuity between CJI and the original CYI) has not changed over time. Local Rhode Island historians today (some of whom are Jewish) readily affirm that, in terms of blood, ethnic, and cultural identification, the current CJI is distinct and separate from the original CYI, and always has been, despite the closely similar names.[115]

Several conclusions follow from the historical reality described above. First, despite their use of the Touro funds and the Touro Synagogue, the current (post-1894) CJI can lay no claim to being or representing the original Jews of Newport. Judge Brown's 1903 U.S. Circuit Court Decision (discussed above) confirms this. In recognition of this lack of continuity, CSI did not give the synagogue or the synagogue appurtenances to CJI after they incorporated in 1894, even though CJI asked for them.[116]

Second, any obligation that CSI arguably might have arising out of CSI's legal title and ownership of the synagogue, cemetery, and synagogue appurtenances is to the Jews of Newport more generally (or more precisely a subset of that group), not to CJI in particular. This can be seen especially in two particular instances. The first instance was in 1892 and 1893, when Caroline Cohen (descendent of eighteenth-century Newport resident Moses Michael Hays) specifically charged CSI with determining which American Jewish congregation might be best suited to utilize a pair of *rimonim* that were in her family. Although Cohen slightly preferred that the silver bells be used in the Newport synagogue, she let it up to CSI to determine if "any orthodox synagogue in New York or Phila[delphia] would have use for them," should the Newport synagogue not have need for them.[117] If the bells ended up in Newport, Cohen's personal commitment and her charge to CSI was to the Newport synagogue more generally, not

---

[115] Personal conversations with historians at Brown University and the Newport Historical Society.

[116] CJI 0039: Eugene Schreier to H.P. Mendez, June 15, 1893.

[117] CSI 5236-5237: Caroline Cohen to H.P Mendez, March 2 [?], 1892; see also CJI 0395: Caroline Cohen to the Trustees of the Spanish and Portuguese Synagogue, NYC, June 20, 1893.

Fisher 34

to CJI specifically. Cohen stated that the bells were "to be used in that synagogue [Touro
Synagogue] **by any congregation** (following its ancient minhag [custom or ritual]) subject to
your [CSI's] approval."[118] The second instance was in 1900, when, after some internal discord
within CJI, CSI shut down the Newport synagogue for regular CJI services and instead held
services in the synagogue for all of the Jews of Newport (not just CJI members), with CSI Rabbi
H.P. Mendez officiating.[119] Even after 1903, from an outside perspective, the Touro Synagogue
and its appurtenances continued to exist independently in Newport quite apart from the
congregation that happened to be in residence at that time. In his monumental survey of historic
silver in American churches, E. Alfred Jones specifically linked the four sets of *rimonim* at the
Touro Synagogue with the "Jewish Synagogue" in Newport, not with CJI.[120]

Accordingly, there appears to be no historical evidence of a trust relationship between
CSI and CJI. After 1903, CJI was the entity chosen by CSI (subject to conditions and the
approval of CSI) to care for CSI's synagogue and appurtenances and/or paraphernalia *as lessee*,
but CJI was never seen as the rightful owner or inheritor of them. The fact that CSI agreed (as
owners) to lease the building and the appurtenances to CJI does not indicate whatsoever that
there was any continuity between the original CYI and the new CJI, nor does it indicate a right of
successorship or ownership. On the contrary, CJI's leasing of the property indicates the true
relationship: that of an entity that has been given permission (within a legal framework) to use
the property and the synagogue appurtenances and paraphernalia for specific purposes and
subject to specific requirements and limitations: a lessee, not an owner.[121]

---

[118] CJI 0395: Caroline Cohen to the Trustees of the Spanish and Portuguese Synagogue, NYC, June 20, 1893.
Emphasis added.
[119] CJI 0293: H.P. Mendez to Mayor Garrettson, January 13, 1901.
[120] E. Alfred Jones, *The Old Silver of American Churches* (Letchworth, England: Arden Press, 1913), 320.
[121] CSI 0027-0036: 1903 CJI/CSI Lease, February 2, 1903; CSI 0001-0005: 1908 CJI/CSI lease, January 14, 1908.
See also Urofsky, *A Genesis of Religious Freedom*, 107.

## "Appurtenances," "Paraphernalia," and other Similar Words Referring to *Rimonim* and Other Ritual Objects

A second key consideration in this case is whether the terms "appurtenances" and "paraphernalia" (along with other similar words) as contained in documents from the late-nineteenth and early-twentieth centuries refer to the disputed *rimonim* and other ritual objects. This is important because the 1903 and 1908 documents and indentures with leases between CSI and CJI clearly state that the lease of the building and grounds also includes the "appurtenances and paraphernalia belonging thereto."[122] If use of the term "appurtenances" and/or "paraphernalia" was intended to include the sacred ritual objects in the synagogue (including the *rimonim*), then those objects would be included within the indentures with leases as items leased from CSI. A close reading of the historical documents themselves alongside of contemporary historical usages of these terms makes it abundantly clear that these phrases were indeed intended to include the disputed *rimonim* and all other sacred ritual objects in use at the Newport synagogue at the time of the signing of the 1903 and 1908 indentures with leases.

According to the *Oxford English Dictionary*, one of the definitions of "appurtenances" is: "The mechanical accessories employed in any function or complex scheme; apparatus, gear."[123] It therefore has use and application outside of religious contexts as well. But within a Jewish religious context, "appurtenances" takes on a more specific meaning, referring to the sacred and ritual objects necessary for a synagogue to conduct full religious services. This is readily apparent from the terminology widely utilized by Jewish scholars and ministers over time, as

---

[122] CSI 0027-0036: 1903 CJI/CSI Lease, February 2, 1903; CSI 0001-0005: 1908 CJI/CSI lease, January 14, 1908.
[123] "Appurtenance, n." Oxford English Dictionary Online. June 2014. Oxford University Press.
http://www.oed.com/view/Entry/9922?redirectedFrom=appurtenances& (accessed August 23, 2014).

Fisher 36

well as by historians. More specifically, the phrase "synagogue appurtenances" shows up in
contemporary publications in the early twentieth century.[124]

But what are these "synagogue appurtenances"? In their survey of Judaism across the
centuries, two recent historians have noted, "Any house or room can be made into a synagogue
by being so designated and used. It needs, however, to be equipped with a few essential
appurtenances."[125] The most vital of these is "the Scroll of the Law (*sefer torah*)," which is
usually made up of parchment paper or vellum (calf skin) stitched together and wrapped around
a pair of wooden rollers. These wooden rollers "are surmounted by a pair of silver finials known
from their usual shape as *rimmonim* ('pomegranates'), incorporating tiny silver bells."[126] Most
synagogues have multiple Scrolls of the Law, with an accompanying pair of *rimonim* for each
scroll. In addition to these Scrolls of the Law and accompanying silver bells, other key
synagogue appurtenances include additional scrolls; a sacred storage container called the ark, or
the *tevah* ("chest"; sometimes referred to as the *hechel* ["sanctuary"]); and a *ner tamid* ("the
perpetual light"). The other (usually non-movable) essential appurtenance is the *bimah*, or the
raised platform from which holy scriptures or prayer services are read.[127]

Indeed, this specific reference is also evident in the English translation of the Hebrew
word *tashmish*, which is often rendered as "appurtenance." As the authoritative *Oxford
Dictionary of the Jewish Religion* states, the translation of the phrase "Tashmishei Qedushah" is
"appurtenances of holiness," which are defined as the "ritual objects (e.g., the shofar, spice box,

---

[124] See, for example, *The Antiquary*, vol. 42 (London, 1906), 402.
[125] David F. Goldberg and John D. Rayner, *The Jewish People: Their History and Their Religion* (Harmondsworth:
Penguin Books, 1989), 321.
[126] Goldberg and Rayner, *The Jewish People*, 322.
[127] Goldberg and Rayner, *The Jewish People*, 322.

Fisher 37

*menorah*, Seder plate) or items used to decorate ritual objects (e.g., the *keter* Torah or *rimmonim*
ornaments...)."[128]

These essential ritual furnishings have remained virtually unchanged in Jewish
synagogues around the globe for centuries. One historian lists the essential "synagogue
appurtenances" in a seventeenth-century North African synagogue as "Torah scrolls, Torah
coverings and finials [*rimonim*], chandeliers or candelabra and candles."[129] Similarly, in the
*History of the Ancient Synagogue of the Spanish and Portuguese Jews* (1901), the author states:
"A community comes into existence when sufficient public spirit is found among its members to
lay the foundation of a Synagogue, to appoint a Rabbi, to endow it with all the necessary
appurtenances." The author continues, enumerating the "necessary appurtenances": "scrolls,
vestments, crowns and candles."[130] "Crowns" in this context are gold or silver objects placed on
the tops the wooden rollers for the Scrolls of the Law that form the base for the *rimonim*, the
gold or silver bells.[131] Without these essential religious and ritual objects—these synagogue
"appurtenances"—a Jewish synagogue cannot legitimately exist and function.

The word "paraphernalia," when used with reference to a Jewish synagogue, is usually a
synonymous and parallel term for "appurtenances." As used historically and by historians in the
context of Jewish ritual, synagogue "paraphernalia" refers to the same ritual and sacred objects
that "appurtenances" does. One historian refers to "the paraphernalia of a synagogue such as an
ark for the Torah or a raised reading desk," that is, the *tevah*/*hechel* and *bimah*, referenced above

---

[128] "Tashmishei Qedushah," in Adele Berlin, *The Oxford Dictionary of the Jewish Religion* (Oxford University
Press, 2011), 723.
[129] Jane S. Gerber, *Jewish Society in Fez 1450-1700: Studies in Communal and Economic Life* (Brill, 1980), 56.
[130] Moses Gaster, *History of the Ancient Synagogue of the Spanish and Portuguese Jews: The Cathedral Synagogue
of the Jews in England, Situate in Bevis Marks* (London, 1901), 6.
[131] CJI 2030: Gutstein, *The Story of the Jews of Newport*, 108.

Fisher 38

as "synagogue appurtenances."[132] This synonymous and parallel usage can be seen in some

documents from the wider global Jewish community, dating from 1908, in which two different

Jewish synagogues and their religious objects in Jamaica are described in relation to a fire in

1882: "The Spanish and Portuguese Synagogue, situated in Princess Street, was, with all its

**appurtenances**, with the exception of one register book of Births, Marriages and Deaths,

entirely consumed by the fire of December, 1882. The English and German Synagogue in

Orange Street met, likewise, with a similar fate on the same occasion; its **paraphernalia**,

however, was saved through the promptitude of the late Mr. H. A. Joseph."[133] In both cases, the

author is referring to the vital religious objects in a synagogue, to which either "appurtenances"

or "paraphernalia" can refer.

Additionally, there are other parallel terms that can refer to the necessary ritual objects of

a synagogue, such as "sacred movables," "personal property," and "furniture." In some cases,

they are used in exactly the same way as "appurtenances" and/or "paraphernalia." In their 1881

petition to the Newport City Council, CSI representatives protested that the nascent Jewish

community had not yet resided long enough in Newport to warrant CSI "confiding such sacred

objects to such new comers."[134] In that same petition, CSI refers to the Scrolls of the Law (with

which the *rimonim* are associated) as forming the "essential part of the furniture of a Synagogue.

Without them a Synagogue loses its adaptability for regular and practical worship."[135] In a

January 13, 1901, letter from the Reverend H.P. Mendez of CSI to the mayor of Newport, Rhode

Island, Mendez states that in 1818, when the Newport synagogue officially closed, the last

[132] Gershom Scholem, *The Messianic Idea in Judaism: And Other Essays on Jewish Spirituality* (Knopf Doubleday Publishing Group, 2011), 155.
[133] Augustus Constantine Sinclair et al., *The Handbook of Jamaica ...: Comprising Historical, Statistical and General Information Concerning the Island* (U.S. Government Printing Office, 1908), 366. Emphasis added.
[134] CSI 5334: Memorial of the Board of Trustees of Congregation Shearith Israel of New York presented to the City Council of Newport, Rhode Island, 1881.
[135] CSI 5339: Memorial of the Board of Trustees of Congregation Shearith Israel of New York presented to the City Council of Newport, Rhode Island, 1881.

members of the original CYI congregation sent "the sacred movables" to CSI in New York, which we know from other sources included the Books of the Law, one of the key synagogue appurtenances.[136] And in a July 6, 1893, letter, W.P. Sheffield Jr. stated that the Congregation Shearith Israel desired to have cordial relations with the Newport congregation, but "as the Trustees and owners of the Synagogue and personal property therein they will see that their rights are respected, if it should be necessary."[137] These various references to "personal property," "sacred movables," "furniture," and "sacred objects" all seemingly point to necessary ritual objects required to conduct official services in a synagogue, including Books of the Law, the silver (chalice, finials, candlesticks), and the ark, all of which are referred to elsewhere by historians and contemporaries as synagogue appurtenances.

But there are other objects of value and concern within a synagogue, which are sometimes referred to as "fixtures." On January 30, 1903 (in the aftermath of the 1903 decision against them), CJI agreed "to admit and recognize without qualification the title and ownership of [the Trustees] of the Congregation Shearith Israel to the synagogue building, premises, and fixtures."[138] Contemporary usage reveals that "fixtures" could refer to some of the same items as "appurtenances," namely, the necessary ritual items for a synagogue. In the same time period as the January 30, 1903, document by CSI cited above, the word "fixtures" is used by contemporary sources to refer to the *hechal* (ark) and the *ner tamid* ("the perpetual light"), which other sources list as "appurtenances."[139] For example, the *Young Israel* magazine stated in 1907 that "Every synagogue has certain fixtures and utensils," which in this case included the perpetual lamp, *ner*

---

[136] CJI 0291: H.P. Mendez to Mayor Garrettson, January 13, 1901; CSI 5339: Memorial of the Board of Trustees of Congregation Shearith Israel of New York presented to the City Council of Newport, Rhode Island, 1881.
[137] CJI 0047: W.P. Sheffield Jr. to Eugene Schreier and Max Levy, July 6, 1893.
[138] CSI 4533: Agreement between CSI and CJI, January 30, 1903.
[139] Naphtali Phillips, "Historical Sketch," *American Jewish Historical Quarterly* 21 (1913): 196; *Young Israel*, vol. 1, no. 7 (The Union of American Hebrew Congregations, 1907), 216.

*tamid*, among other things.[140] These and other publications refer to "synagogue fixtures," which seem to refer to at least some of the same objects as "synagogue appurtenances."[141] Usage of the phrase "synagogue fixtures" by historians confirm this as well. One historian lists the "synagogue fixtures" as comprising "the benches, the sofa, the *bema*, the planks, and the reading table," among other things.[142] As we have seen above, the *bema* (also *bemah*), or the reading stand, was considered by other sources to be part of the synagogue appurtenances.

Therefore, there is a considerable amount of parallel and overlapping usage with these terms, intending to refer to various aspects of the sacred ritual objects required for a working synagogue.

It follows, then, that a cursory survey of contemporary (late nineteenth and early twentieth century) Jewish usage of "appurtenances" and "paraphernalia" reveals a frequent and usual link to the sacred ritual objects required to operate a synagogue. In particular, one notices two trends in usage. The first are cases where "appurtenances" refer more generally to sacred ritual items within the synagogue, as described above. For example, *The Jewish Encyclopedia*, published in 1907, specifically mentions the "appurtenances of the synagogue" and then lists out some of the common elements, including the Scroll of the Law (which, according to *The Jewish Yearbook* and other sources, usually included the bells, or *rimonim*[143]), other sacred books, the ark, and the table.[144] *The Jewish Encyclopedia* also makes clear the link between "paraphernalia"

---

[140] *Young Israel*, vol. 1, no. 7 (The Union of American Hebrew Congregations, 1907), 216.

[141] Robert William Seton-Watson, *The New Europe: A Weekly Review of Foreign Politics*, vols 12-13 (Constable & Company, Limited, 1919), 38.

[142] Steven Fine, *This Holy Place: On the Sanctity of the Synagogue during the Greco-Roman Period* (University of Notre Dame Press, 1997), 70.

[143] *The Jewish Year Book* (Greenberg & Company, 1899), 276, 318.

[144] Cyrus Adler and Isidore Singer, *The Jewish Encyclopedia: A Descriptive Record of the History, Religion, Literature, and Customs of the Jewish People from the Earliest Times to the Present Day* (Funk & Wagnalls, 1907), 4:534.