# EXHIBIT 2, PART 3

Fisher 41

and synagogue silver by referencing the "silver paraphernalia of the temple," which always included the *rimonim*, among other items.[145]

But the word "appurtenances" in the context of a synagogue can also be used to specifically reference the ritual items used to adorn the Book of the Law. *The Jewish Yearbook* from 1899 mentions specifically the "appurtenances" of the Book of the Law itself (*sepher torah*); the same publication later describes the *sepher torah* as always being bound in a binder, covered with a mantle, "while the two tops of the handles or rollers are covered with a crown of silver or gold, or with gold or silver bells."[146] Similarly, a book published in 1908 containing a description of Jewish ceremonial objects at the United States National Museum refers to the "decorative appurtenances" of the Torah (the Book of the Law), which include the wrapping band (*mappah*), the mantle, and the "crown or bells of precious metal, which are fitted over the upper ends of the rollers."[147] Relatedly, the Israel Museum's detailed publication titled *The Torah Scroll* explains that "all the Torah ornaments are regarded as tashmishei qedushah – sacred appurtenances."[148] In this context, "Torah ornaments" includes the wrapping band, mantle, and *rimonim*, as outlined above.

It comes as no surprise, then, that in the documents relating to the Congregation Shearith Israel and the synagogue in Newport, both "appurtenances" and "paraphernalia" show up, sometimes separately, and sometimes together (in addition to the other parallel phrases mentioned above). Given the contemporaneous usage of these terms, the most natural point of reference is, consistently, the necessary sacred objects for Jewish services, including the *rimonim*. This is logical, since in 1894 neither the newly-formed CJI nor the Touro Synagogue

---

[145] Ibid., 3:418.
[146] *The Jewish Year Book* (Greenberg & Company, 1899), 276, 318.
[147] United States National Museum, Cyrus Adler, and Immanuel M. Casanowicz, *The Collection of Jewish Ceremonial Objects in the United States National Museum* (U.S. Government Printing Office, 1908), 706–707.
[148] Avraham Shtal, *The Torah Scroll* (Israel Museum, 1979), 4.

had its own synagogue appurtenances. The histories of the Newport Jewish congregations and the synagogue itself clearly state that through most of the nineteenth century, "The Newport synagogue was without any ritual objects. These had been taken away when the services at the synagogue ceased at the end of the eighteenth century, and had been deposited for safe-keeping in the synagogue of the Congregation *Shearith Israel* in New York."[149] In CSI's own synagogue, the usual practice was to keep the ritual silver, including the *rimonim*, in a "patent fire proof safe." As discussed in the expert report of Dr. Vivian Mann, a survey of CSI's property in 1869 revealed that several "Articles of Silver," including two sets of the Myer Myers *rimonim*, were in the fire proof safe and were "property of [CSI] in keeping of Shamas [i.e., the Sexton]" along with other silver.[150] Additionally, these *rimonim* are not noted in the margins of the 1869 inventory as being the property of anyone else or any other institution; this confirms that they are the property of CSI (as are the other silver items, with the exception of those noted otherwise). When the synagogue was officially re-opened in 1882, synagogue appurtenances—sacred ritual objects—had to be brought to Newport from CSI in New York City: "*Sefarim* [Books of the Law] and other necessary ritual objects for the services were sent to Newport from New York."[151] At some point this would have involved *rimonim* to accompany the Books of the Law, likely including the *rimonim* previously used by the original CYI stored in the CSI safe.[152]

A question naturally emerges from these documents: What, exactly, does it mean for these ritual items to have been "deposited for safe-keeping" at CSI in New York in the 1820s? The *Oxford English Dictionary* informs us that "safekeeping" is the "action of keeping safe; protection, preservation." Importantly, however, the *OED* notes that "safekeeping" can also refer

---

[149] Gutstein, *The Story of the Jews of Newport*, 259.

[150] CSI 4956: May 23, 1869: Congregation Shearith Israel, "Inventory of all Property & Effects," p. 34. See also Dr. Vivian Mann, Expert Report, November 24, 2014, p. 6.

[151] Gutstein, *The Story of the Jews of Newport*, 259.

[152] CSI 4956: May 23, 1869: Congregation Shearith Israel, "Inventory of all Property & Effects," p. 34.

to "custody."[153] Similarly, a "safekeeper" is not just a "protector," but also a "guardian."[154] It is clear from these definitions, the documents in the 1820s, and the actions of CSI, that the ritual objects were not simply sent to CSI in New York for safe storage; they were returned or sent to CSI because the objects had mostly come from CSI in the first place as loans to CYI.[155] In the absence of a viable congregation in Newport, CSI simply received much of what had been theirs in the first place.[156] This explains the 1869 CSI inventory, which carefully distinguishes property CSI was holding that the inventory indicates is the "property of" others on the one hand, and, on the other hand, the inventory's clear reference to the Myer Myers rimonim, which are referred to as the "property of [CSI]." The inventory identifies one set of the Myer Myers *rimonim* as "marked" Myers followed by "New Port" to indicate how those rimonim were marked, not to whom they belonged. The inventory just as clearly indicates that all four Myer Myers finials (two sets) were the property of CSI.[157]

One of the clearest definitions of what "appurtenances" meant to the various parties involved comes from a key document in 1893. After the death of the new Newport congregation's first minister, Reverend Abraham P. Mendez, in 1893, CSI and the Newport congregation called another minister for the Newport synagogue, again of the Spanish Portuguese Sephardic ritual, the Rabbi David Baruch. In a June 13, 1893, letter to Baruch, CSI minister Henry Pereira Mendez of New York laid out the terms regarding the use of the building and the sacred ritual objects that would allow the Newport synagogue to remain open. "You are

---

[153] "Safekeeping, n." Oxford English Dictionary Online. September 2014. Oxford University Press. http://www.oed.com/view/Entry/169683 (accessed September 16, 2014).
[154] "Safekeeper, n." Oxford English Dictionary Online. September 2014. Oxford University Press. http://www.oed.com/view/Entry/169682 (accessed September 16, 2014).
[155] CSI 5591: CSI Elder Meeting Minutes, January (Tebeth) 22, 1759.
[156] CSI 5274: CSI Trustee Meeting Minutes, January 11, 1818. CSI Trustee Meeting Minutes from February 10, 1833, indicates that "Four Sepharim" from Newport were deposited in CSI's synagogue under CSI's charge. CSI 5257: CSI Trustee Meeting Minutes, February 10, 1833.
[157] CSI 4956: May 23, 1869: Congregation Shearith Israel, "Inventory of all Property & Effects," p. 34. See also Dr. Vivian Mann, Expert Report, November 24, 2014, p. 6.

Fisher 44

hereby empowered to use the Sefarim, **Bells**, Books, Shofar **and all other appurtenances** for worship now in Newport Synagogue," Mendez stated, as the representative of CSI. These synagogue appurtenances were only a temporary loan to CJI; CSI in no way intended to give up ownership or long term possession and control. The letter instructs Baruch that, "Upon termination of your appointment, you will return to us [that is, to CSI] or to our agent or legal representative, the custody of the buildings and appurtenances."[158] In this document, the ritual bells, or *rimonim*, are clearly listed by CSI as one of the "appurtenances." In a June 25, 1893, letter to CSI, Max Levy, president of Congregation Shearith Israel, states emphatically, "Although we do not claim ownership in the property or appurtenances, rest assured we will guard the same zealously for our pride in this ancient house of worship."[159] This exchange demonstrates that both CSI and CJI representatives used "appurtenances" when referring to the ritual objects required to run regular worship services in the Touro Synagogue.

In 1894, when the living descendants of the families of the original Congregation Yeshuat Israel deeded the Touro Synagogue grounds and religious objects to the representatives of Congregation Shearith Israel, the language was intentionally inclusive of the accompanying ritual objects in the synagogue, along with the property itself: "Together with the appurtenances and all the estate, and rights of the said parties of the first part in and to, said premises."[160] That "appurtenances" in this specific context was intended to include the ritual objects of the synagogue can readily be inferred by looking at one of the descendants of the original CYI families, Caroline Cohen. In 1892 and 1893, Caroline Cohen wrote two times to CSI, each time asking them to find a congregation that might have use for a pair of *rimonim* that had been in her

---

[158] CJI 0036: Henry Pereira Mendez to David Baruch, June 13, 1893. Emphasis added.

[159] CJI 0042: Max Levy to CSI, June 25, 1893.

[160] CSI 0199: Deeds of Conveyance, 1894. See also CJI 0126-0151: Deeds of Conveyance, 1894.

family.[161] On June 20, 1893, when she heard about the effort of CSI to gain deeds of conveyance from the descendants of the original CYI members, Cohen wrote to H.P. Mendez of CSI, desiring that her name be added "to the list of those who wish the old forms retained, and the **old relics** secured, in the venerable Synagogues that still remain in this country."[162] Similarly, her signed statement of support for CSI in securing the legal title to the synagogue and its appurtenances, written in 1894, makes perfectly clear her use of "appurtenance": "We, the undersigned descendants of the Hebrews of Newport R.I. unite with the Spanish and Portuguese Congregation, New York, who are acting on behalf of other descendants, with the view of exercising a becoming control over the building erected by our ancestors, its grounds, **the appurtenances of worship** and the cemetery."[163] The concern for these heirs at law was not simply the synagogue building itself and the cemetery, but also the synagogue appurtenances ("the appurtenances of worship")—including Books of the Law and the accompanying *rimonim*, some of which had been loaned to the Touro Synagogue, in this case from Caroline Cohen via CSI.

Throughout the proceedings of the 1890s, ownership and possession of the synagogue were always directly connected to the religious objects within the synagogue. On May 30, 1898, an official delegation from CSI to the Touro Synagogue declared in writing that Eugene Schreier was to "act as the representative or agent of said congregation Spanish and Portuguese Shearith Israel of N.Y. to take charge of the building, **appurtenances**, properties, sconces, and cemetery situated the Synagoge [sic] building on the ancient site in Touro St. and the cemetery..."[164]

---

[161] CSI 5236-5237: Caroline Cohen to H.P. Mendez, March 2 [?], 1892; see also CJI 0395: Caroline Cohen to the Trustees of the Spanish and Portuguese Synagogue, NYC, June 20, 1893.

[162] CJI 0406: Caroline Cohen to H.P. Mendez, June 20, 1893. Emphasis added.

[163] CJI 0145: Letter of Caroline Cohen, et al., 1894. Emphasis added.

[164] CSI 4583: Official notice of a delegation from CSI to CJI, May 30, 1898. Emphasis added.

Additionally, CJI itself, in the Bill of Complaint it filed in 1902 against members of Congregation Shearith Israel, demonstrated that meaningful ownership of the synagogue entailed ownership of its contents: CJI complained that CSI members had "removed from said Synagogue and have taken into their possession and control certain deeds, books, accounts, letters, papers, writings, vellums, parchments, scrolls and other embellishments."[165] CJI also understood that the litigation would decide the lawful "possession of said premises with the appurtenances thereto."[166] CJI's bid for possession and ownership of the Touro Synagogue and "the appurtenances thereto" was roundly rejected by the U.S. Circuit Court in 1903.[167]

The understanding of "appurtenances" and "paraphernalia" as encompassing the necessary ritual objects at the Newport synagogue can also be seen in the wording of the leases enacted in the first decade of the twentieth century. After the January 1903 United States Circuit Court ruling (which was in favor of CSI and affirmed control of the synagogue by CSI), an indenture with lease was drawn up that would provide a legal framework within which CJI could utilize the property and necessary ritual objects while CSI retained legal title to both the property and the ritual and sacred objects inside the synagogue. The lease, which referred specifically to the synagogue "and appurtenances," was signed by CJI representatives on February 1, 1903.[168] The next day, Congregation Jeshuat Israel called a special meeting (February 2, 1903), and authorized representatives to "surrender possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport to the said Trustees [from Congregation Shearith Israel], owners of the property, and to agree upon the terms and the provisions of a lease from

---

[165] CSI 0262: Bill of Complaint of David Fishel, et al., May 1, 1902.

[166] CSI 0180: Bill of Complaint of David Fishel, et al., May 1, 1902.

[167] CSI 0316-0319: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903.

[168] CSI 0014: L. Napoleon Levy to William P. Sheffield, Jr., February 10, 1903; TSF 2421: "The 1902 Sit-in at Touro Synagogue," p. 69.

said Trustees to this Congregation for the term of five years from February 1, 1903, at the nominal rent of one dollar yearly."[169]

But CSI wanted to make absolutely sure that the lease comprehensively stated the exact terms and coverage of the lease, even down to the sacred ritual objects within the synagogue. According to the correspondence of the CSI trustees, the lease initially only referenced the property, building, "and appurtenances;" some of the CSI trustees wanted the language of the lease to be more clearly all-encompassing (perhaps for avoidance of any doubt, perhaps to confirm the intent of the parties with some redundancy). The suggestion was made to add the phrase "and paraphernalia belonging thereto"—a sort of comprehensive legalese to make sure all items were covered—which was done; this addition was confirmed by CJI on February 18, 1903.[170] The final lease, for a five-year term and for the sum of one dollar per year, contained the full and comprehensive wording: "appurtenances and paraphernalia belonging thereto."[171]

The final in-person transactions were clearer still. To be absolutely sure, Reverend H.P. Mendez from CSI—who had traveled from New York to oversee the signing of the lease by CJI—"went over the personal property with the Committee" from CJI on the same day the revised lease was fully executed and placed on record by W.P. Sheffield (February 18, 1903).[172] By using this precise wording ("appurtenances and paraphernalia"), and by going over the personal property in detail with the CJI committee, the CSI trustees wanted to make sure that each, every, and all religious objects within the Newport synagogue—most of which had come from CSI (or had been entrusted to CSI by Mrs. Cohen), including the *rimonim* that by then were

---

[169] CJI 0471: "At a Special Meeting of the Board of Trustees," February 2, 1903. See also TSF 2422: "The 1902 Sit-in at Touro Synagogue," p. 70.

[170] CSI 0014: L. Napoleon Levy to William P. Sheffield, February 10, 1903; CSI 0015: William P. Sheffield, Jr. to L. Napoleon Levy, February 18, 1903.

[171] CSI 0027: 1903 CJI/CSI lease.

[172] CSI 0015: William P. Sheffield, Jr. to L. Napoleon Levy, February 18, 1903.

kept in a safe and secure place because of their importance—remained within the ownership and control of CSI itself, not CJI. The signing of the lease by CJI representatives signaled their full and binding agreement.

This same full phrase encompassing both appurtenances and paraphernalia appeared again in the next renewal of the lease between CSI and CJI, five years later. The five-page, five-year lease dated January 14, 1908, between representatives of CSI and CJI clearly specified the boundaries of the property itself, the buildings, "with the appurtenances and paraphernalia belonging thereto."[173] As with the 1903 lease, the 1908 lease placed various restrictions on the use of the property and the appurtenances, namely, that they had to be used for "the usual and stated religious services according to the ritual rites and customs of the Orthodox Spanish and Portugese [sic] Jews as at this time practiced in the Synagogue of the Congregation Shearith Israel in the city of New York," along with other obligations.[174]

The meaning of "appurtenances"—as sacred ritual objects, including *rimonim*—in the context of a synagogue changed little into the mid-twentieth century. On June 22, 1958, the *New York Times* reported that a Brooklyn synagogue had been recently robbed, and that the thief had taken a "silver chalice and silver appurtenances to the Torah" from the ark.[175] "Silver appurtenances to the Torah," as we have seen previously, includes reference to the crowns or finials (*rimonim*) used to decorate the Torah handles. These usages are entirely consistent with the language used over time in the history of Judaism, in the late nineteenth and early twentieth century in the U.S., and, in particular, in the 1903 and 1908 leases (and the 1893 agreement between CSI and CJI Rev. Baruch), in which "appurtenances" refers to all of the ritual objects required for a synagogue, including the Scrolls of the Law and the accompanying *rimonim*.

---

[173] CSI 0001: 1908 CJI/CSI lease.
[174] CSI 0002: 1908 CJI/CSI lease.
[175] "Synagogue is Robbed: Silver Items Valued at $800 Missing in Brooklyn," *New York Times*, June 22, 1958, 27.

Fisher 49

This understanding—of ownership as encompassing all of the religious and ritual items in the Newport synagogue set forth in these leases—clearly continued in the successive generations of leadership at both CSI and CJI. On January 5, 1937, the CSI board received word via a CSI member who had recently attended a service at the Touro Synagogue that "he noticed that 2 or 3 pairs of Myers silver bells were being used every Saturday by the Congregation, and that the congregation did not seem particularly careful about them, probably not realizing their great worth."[176] In response, the CSI board acted as owners: they deliberated about how to intervene. Options included lending them to a museum as exhibits to preserve them, but CSI realized that, if they would remove the *rimonim* for such purposes, they would want or need to provide CJI with a replacement pair of bells. No actions of the CSI board were recorded in this particular instance, but it is evident that everyone involved understood that CSI owned the Myer Myers' *rimonim* used at the Touro Synagogue.[177]

Relatedly, in 1945, when the Touro Synagogue was made a National Historic Site, the United States Department of the Interior entered into an agreement with CSI ("holders of the fee title simple," or owners) and CJI ("lessees") that used this same language to refer to the ritual objects within the synagogue. Article IV (b) stated: "That the title to the Touro Synagogue, Newport, Rhode Island, and its appurtenances, subject to the covenants above set forth and recorded deeds and declarations of Trusts, apportaining [sic] thereto, shall remain in the Shearith Israel Trustees, to be used for religious purposes as set forth in Article I (f) of this Agreement."[178] (Article I (f) states that the synagogue shall be open to the public and that the synagogue shall be used "for the maintenance of divine services in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as practiced and preserved in the

---

[176] CJI 0405: Minutes of the CSI Board of Trustees, January 5, 1937.

[177] CJI 0405: Minutes of the CSI Board of Trustees, January 5, 1937.

[178] CSI 0097-0098: An agreement between the U.S. Department of Interior, CSI, and CJI, Nov. 7, 1945.

Fisher 50

Synagogue of said Congregation Shearith Israel.")[179] Notably, the very act under which Touro

Synagogue was made a National Historic Site states as its goal the preservation of "historic sites,

buildings and objects." This, accompanied with the descriptions of Touro Synagogue that include

the *rimonim*, show that the *rimonim* are not only appurtenances to Touro Synagogue but also are

so integral as to be part of the Synagogue's "genus [sic] loci."[180]

The important relationship of the *rimonim* to the Touro Synagogue was recognized by

CJI again in 2004, when CJI applied for a State Preservation Grant and stated in its application

that the Touro Synagogue (not CJI, notably) "is very fortunate to have many of its original

interior furnishings. . . . Two sets of silver Remunim [sic]."[181] To this day, the CJI website

affirms that CSI has since the 1820s had "legal oversight of the building, [and] its contents."[182]

As part of the ensuing renovation, these-colonial era *rimonim* were removed from the building,

cleaned, repaired, and polished.[183]

In sum, Jewish synagogues need very specific religious objects in order to function as a

legitimate house of worship. These include the Books of the Law and the accompanying finials

(*rimonim*), as the examples given above make clear, along with other specific ritual items. And

the most common shorthand way to reference all of these essential Jewish sacred and ritual

objects is with the words "appurtenances" and/or "paraphernalia" (along with a few other

synonyms, such as "sacred movables" and "fixtures"). Therefore, in the 1903 and 1908 leases,

the words "appurtenances" and "paraphernalia" were definitely intended to include the *rimonim*.

---

[179] CSI 0096: An agreement between the U.S. Department of Interior, CSI, and CJI, Nov. 7, 1945.
[180] See Materials from the United States Department of the Interior National Park Service for Touro Synagogue National Historic Site, pp. 7, 23. The intended phrase was likely "genius loci," or "spirit of the place."
[181] CSI 0157-0158: State Preservation Grant Application Form, July 30, 2004.
[182] CSI 5189: "Touro Synagogue History," Touro Synagogue website.
[183] Urofsky, *A Genesis of Religious Freedom*, 108.

**CSI as Owners of the Property and Sacred Ritual Objects (Appurtenances, Paraphernalia, Sacred Movables, Fixtures, Etc.)**

In reviewing these documents and in conducting my own independent investigation, there are several important points regarding CSI's ownership of the synagogue building, cemetery, and synagogue appurtenances that deserve explicit delineation. The first is straightforward: in none of the documents I have looked at has CJI ever been recognized as the legitimate owner of the Touro Synagogue, the cemetery, or the ritual objects (appurtenances and paraphernalia) therein by any of the relevant, independent authorities. In fact, the opposite is true: at almost every point along the way (especially after 1894), CSI is recognized as having sole legal claim to the building and ritual objects.

The second point is this: at repeated and critical points along the way, CJI has freely admitted in writing and by their actions that they (CJI) are not the owners of the building or the synagogue appurtenances. During a May 28, 1893, congregational meeting in which the new CJI declared themselves to be a newly-gathered congregation, the congregation resolved to write to CSI, stating: "That we request of them [CSI] the further assistance which they have in the past rendered in the *loan* of such property as has formerly been in use in the services."[184] This is an admission that the ritual items ("property") for "use in the services"—namely, the necessary ritual objects to conduct a service—did not belong to CJI and had, in fact, been loaned from CSI. CJI was requesting to simply continue this loan of required religious objects.

Similarly, in a June 25, 1893, letter from CJI to CSI, CJI representatives state: "Certainly we do not claim any ownership in the property. . . . Although we do not claim ownership in the property or appurtenances, rest assured we will guard the same zealously for our pride in this

---

[184] CJI 1167: CJI Congregational Meeting Minutes, May 28, 1893. Emphasis added.

ancient house of worship . . ."[185] Once again, these are very clear statements in which CJI
recognized their complete lack of ownership of both the synagogue and the necessary ritual items
inside of it (the appurtenances).

It is important to note, too, that CJI set up a legal standard for CSI to prove CSI's
ownership of the synagogue and its appurtenances. On June 25, 1893, CJI secretary Max Levy
(writing for CJI) wrote to CSI, stating: "The establishment of a clear title to the property should
be your aim. . . . The heirs-at-law, alone, can move in the matter."[186] This was repeated by CJI
representative Eugene Schreier a few weeks later: "They [CSI] should first lay before us all legal
papers as to their rights to the property in question. . . . If the New York Congregation have a
legal deed and title to the property why not prove it: surely this is not asking too much in such an
important matter."[187] In response, CSI contacted the surviving heirs-at-law of the original CYI,
and these descendants of the original CYI congregation members signed deeds of conveyance to
CSI representatives in 1894.[188] In so doing, CSI fulfilled precisely the legal standard of
ownership that CJI itself set out for CSI, even assuming that one was needed.

After the January 1903 U.S. Circuit Court ruling, CJI unequivocally recognized CSI's
ownership of the synagogue and appurtenances. In direct response to this court decision, the CJI
Board of Trustees stated twice in their February 1903 meeting minutes that CSI is "the owners of
the Synagogue building at Newport" and that CSI is the "owners of the property."[189] In that same
document, the CJI Board of Trustees directed two CJI individuals to "surrender the possession of
the Synagogue building, premises and paraphernalia belonging thereto at Newport, to the said

---

[185] CJI 0042: Letter from CJI to CSI, June 25, 1893.
[186] CJI 0042: Letter from CJI to CSI, June 25, 1893.
[187] CSI 2182: Eugene Schreier to William P. Sheffield, Jr., July 6, 1893.
[188] CJI 0126-0151: Deeds of Conveyance, 1894.
[189] CJI 0471: February 2, 1903 meeting of the CJI Board of Trustees.

Fisher 53

Trustees," meaning the CSI trustees.[190] It is telling that such surrender of premises included the
building and the ritual items inside of it. From the documents, it appears that CJI took nothing
from the building before handing over the keys—simply because they had no legal claim of
ownership to the important ritual items inside of it (like the *rimonim* or any of the other
synagogue appurtenances).

But the most forthright admission by CJI of CSI's ownership came on January 30, 1903,
after the U.S. Circuit Court ruling. CJI representatives signed a document that stated: "The
Congregation, Jeshuat Isreal [sic], agrees to admit and recognize without qualification the title
and ownership of L. Napoleon Levy and other Trustees to the synagogue building, premises, and
fixtures."[191] There could hardly be a more direct statement of and admission regarding CSI's
complete and total ownership over the synagogue building and its contents.

Third, at key moments during these turn-of-the-century debates, legal authorities
repeatedly affirmed CSI's ownership of and legal title to the synagogue property, cemetery, and
synagogue appurtenances. This started with the legal heirs of the original CYI and their deeds of
conveyance to CSI in 1894, as discussed above. CSI's ownership was also affirmed by the 1903
U.S. Circuit Court ruling, in part based on these 1894 deeds of conveyance. Judge Arthur L.
Brown declared in his opinion that "it appears by the bill that the defendants were in actual
possession under deeds purporting to convey them a legal title."[192] As a result of this court
ruling, whatever attempted claims CJI had regarding the synagogue and its appurtenances were
completely squelched, as these 1903 documents and the subsequent February 1903 lease makes
clear. Furthermore, CSI's ownership was over time confirmed by the Newport City Council, the

---

[190] CJI 0471: February 2, 1903 meeting of the CJI Board of Trustees.

[191] CSI 4533: Agreement between CSI and CJI, January 30, 1903.

[192] CSI 0318: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S.
Circuit Court, January 10, 1903.

U.S. Circuit Court, CJI (in writing, at several key moments), and, later, the U.S. Department of the Interior and other governmental entities.

Additionally, there are numerous other places in the twentieth and twenty-first centuries where CSI's ownership of the Touro Synagogue is demonstrated clearly and acknowledged by CJI and external authorities. These examples can be grouped together around several recurring themes. First is the issue of rental payments. The indenture with lease requiring a one-dollar annual payment was set up in 1903 and continues to this day.[193] During the one-hundred-plus years after 1903, this lease payment was normally made without any special notice or fanfare, as a clear recognition of CJI's operation under the lease and of ownership on the part of CSI. There were a few times when CJI fell behind in payments, but soon caught up as requested by CSI. In some cases, the cause was unclear – perhaps simple unintentional neglect. This occurred in 1916, when the CSI Board of Trustees wrote to CJI to inform them that CJI had been behind in rental payments since July 1, 1910.[194] In 1959, CSI representatives wrote to CJI, again requesting that rental payments be made and continue to be made on an annual basis, and CJI promptly complied.[195] A similar situation unfolded in 1993, when CJI was found to be six years behind in lease payments.[196]

In other cases, isolated CJI congregants have raised objections regarding the rental payments by refusing outright to pay them, but subsequently resumed payments upon demand by other congregants or CSI. In such cases, the rental payments stood in for larger issues of ownership and desired autonomy. On August 28, 1979, for example, CJI President Saul J. Schweber wrote to CSI to "humbly request a release from the bonds of trusteeship from Shearith

---

[193] CSI 5189: "Touro Synagogue History," Touro Synagogue website.
[194] CSI 9699: CSI Board of Trustee Meeting Minutes, November 13, 1916.
[195] CSI 0775-CSI 0778: Correspondence between CSI and CJI, March 1959.
[196] CJIB 6844: CJI Board of Officers Minutes, August 23, 1993.

Israel. We hereby refuse to fulfill our annual token rent fee of $1.00 for years 1978 and 1979."

Schweber explained, "The complexity of maintaining and preserving this historic shrine . . .

make it imperative that we enjoy full autonomy and have full control of our destiny. We can no

longer tolerate a trusteeship."[197] CSI President Edgar J. Nathan replied in December of that year,

firmly reminding Schweber of the long-standing lease agreement and "legal relationship" that

could not be changed without "approval of a court."[198] Regular payments resumed shortly

thereafter.[199]

Second are the terms of the lease. There are other significant undertakings that CJI took

on in the indentures with leases in 1903 and 1908—a lease that CJI affirms remains in force to

this day. These undertakings include conducting religious services "according to the ritual rites

and customs of the Orthodox Spanish and Portugese [sic] Jews as at this time practised in the

Synagogue of the Congregation Shearith Israel in the city of New York," and permitting CSI to

approve any rabbi hired at the Touro Synagogue.[200] Together, they confirm the role that CSI has

played with respect to the Touro Synagogue as owner and guardian of the Touro Synagogue, and

the role that CJI has accepted from the beginning as a lessee.

Third, CJI repeatedly deferred to CSI as the owner of the synagogue in the twentieth

century, particularly with regard to repairs and major decisions related to the building or the

property. Two years after signing the 1903 lease, CJI requested permission from CSI to add onto

the side building in which the religious school met.[201] CSI, as owner, declined, noting that its

---

[197] CJI 1220: Saul J. Schreiber to Trustees of Congregation Shearith Israel, undated, but likely August 28, 1979.
[198] CJI 1221: Edgar J. Nathan to Saul J Schreiber, December 13, 1979.
[199] On May 8, 1983, CJI minutes authorized the payment of rent to CSI. See CJIB 5658: CJI Meeting, May 8, 1983.
[200] CSI 0002: 1908 CJI/CSI lease, January 14, 1908.
[201] CSI 9254: CSI Board of Trustees Meeting Minutes, January 17, 1905.

Fisher 56

board "would not consent to any alterations of any description in that historic edifice."[202] (CSI trustees denied a similar petition from CJI to build an addition in 1911.)[203] In 1908, CSI worked with CJI to install a tablet at the Touro Synagogue in memory of Judah Touro, which was dedicated on September 7 of that year, with leaders from CSI co-officiating.[204] On July 25, 1927, CJI wrote to CSI for approval regarding the wording of several plaques to be posted on the gates of the synagogue and at the cemetery. CSI sent back specific wording for the plaques, which included this important phrase: "Title vested in the Congregation Shearith Israel in the City of New York 5654 - 1894)."[205] Similarly, on July 7, 1939, the CJI secretary wrote to CSI "to request permission from your Congregation to erect a monument on the lawn of the Touro Synagogue as a memorial to the principle of religious and civil liberty established on this island 300 years ago."[206] CSI responded a month later, on August 10, 1939, approving of the monument and its final location.[207] CJI requested permission from CSI on other occasions, too, for changes to the building and premises, as on March 15, 1975, when CJI requested CSI's "concurrence" regarding the need for a burglar and fire alarm system to be installed. Notably, CJI referred to CSI as "legal owner of Touro Synagogue."[208]

CSI's ownership of not just the building, but of the synagogue appurtenances and paraphernalia (ritual objects), was acknowledged by CJI in 1959, when the Smithsonian Institute wrote to CJI Rabbi Theodore Lewis asking if it would be possible to include a Jewish religious

---

[202] CSI 9257: CSI Board of Trustees Meeting Minutes, February 27, 1905 (quotation). For the initial request, see CSI 9254: CSI Board of Trustees Meeting Minutes, January 17, 1905. See also Urofsky, *A Genesis of Religious Freedom*, 103.
[203] CSI 9438: CSI Board of Trustees Meeting Minutes, January 29, 1911.
[204] "Touro Tablet Unveiled," *New York Times*, September 8, 1908.
[205] CSI 1446-1449: Correspondence between CSI and CJI, 1927. The date given here is in Jewish and Common Era years. It is unclear what signage was ultimately used. I have not seen additional records from CSI or any records from CJI on this.
[206] CSI 2110: CJI Secretary to CSI, July 7, 1939.
[207] CSI 2092: Victor Tarry to Max Levy, August 10, 1939.
[208] CJIB 4155: Saul Fine to Edgar J. Nathan, March 16, 1975.

artifact in the United States National Museum. Lewis immediately wrote to CSI, seeking advice
and input. CSI's response was less than enthusiastic, and it seemingly ultimately refused,
although the documents are not entirely clear.[209] But the very fact that CJI recognized that they
were not authorized to loan such religious objects (including the requested silver) illustrates the
way that CJI over time continued to operate within the lessee framework set up by the 1903 and
1908 leases.

CSI's recognized ownership of the synagogue appurtenances was demonstrated when,
quite significantly, some **CJI members** protested when CJI leaders first proposed selling the
*rimonim* in 2008, and continued to voice substantial questions in subsequent congregational
meetings. Such protests illustrate an internal recognition by some CJI members one hundred
years later that the lease agreements of 1903 and 1908 extended to the synagogue appurtenances
and paraphernalia, including the *rimonim.* When the CJI leadership brought the problem of a
severe financial deficit to the congregation during an October 19, 2008, meeting, the third
financial option to remain solvent was "The possible sale of some real and personal property,"
which might include one set of the Myer Myers *rimonim*, along with other items (such as the
Gilbert Stuart painting of Abraham Touro). CJI's minutes are clear about the concerns raised: "A
discussion followed including opposition to selling the rimonim and the possibility that they
belong to Shearith Israel."[210]

Similarly, in a March 29, 2009, special congregational meeting to gain authorization for
the Board of Officers "to sell or otherwise dispose of, any real or personal property that belongs
to the congregation," the question was again raised: "Do we own the rimonim?" The response

---

[209] CSI 0999-1001: David de Sola Pool to Edgar J. Nathan, Jr., August 7, 1957; CSI 1302-1303: Victory Tarry to
Theodore Lewis, August 10, 1959.
[210] CJI 1298: CJI Congregational Meeting, October 19, 2008.

was vague: "We have been told that we do own them."[211] Tellingly, the proposed motion to authorize the Board to sell the *rimonim* or other real property failed to meet the required two-thirds majority to pass; twenty voted in favor, while fourteen voted against it.[212] The idea of selling the *rimonim* was proposed yet again to CJI members during a June 25, 2012, congregational meeting. And, once again, serious objections were raised, based on probable CSI ownership. No fewer than *three* different members raised serious concerns about the possibility of selling one set of the Myer Myers *rimonim* since, if CSI owned them, "Congregation Jeshuat Israel has no authority to sell them."[213] The CJI congregational approval that followed came after representations by CJI leadership that CJI owned the rimonim and that Christie's supported that conclusion. These three recent examples of internal CJI dissent show a long-term, continuous awareness by at least some CJI members of CSI's ownership of the building and the synagogue appurtenances, based on the 1903 and 1908 indentures with leases.

Fourth, CSI's ownership has been consistently and readily acknowledged by CJI whenever CJI attempted to do anything outside of itself, such as applying for state and federal grants or dealing with outside entities like the U.S. Federal Government. As noted above, the 1945 agreement between the United States Department of the Interior, CSI, and CJI affirmed CSI's legal ownership of the Touro Synagogue and its appurtenances (religious objects) in Article IV (b): "That the title to the Touro Synagogue, Newport, Rhode Island, and its appurtenances, subject to the covenants above set forth and recorded deeds and declarations of Trusts, apportaining [sic] thereto, shall remain in the Shearith Israel Trustees."[214] This document simply states what was known by all parties involved to be fact: that CSI ("owners") had held the

---

[211] CJI 1315: CJI Special Meeting, March 29, 2009.
[212] CJI 1315: CJI Special Meeting, March 29, 2009.
[213] CJI 1246-1247: CJI Congregational Meeting, June 25, 2012.
[214] CSI 0097-0098: An agreement between the U.S. Department of Interior, CSI, and CJI, Nov. 7, 1945.

legal title to the synagogue and its appurtenances (necessary ritual objects) since the early nineteenth century. CJI again affirmed CSI's ownership in 1986 and again in 1989 on a National Registry of Historic Places Registration form, where it stated: "The property is still owned by the Congregation of Shearith Israel of New York City . . ."[215]

CSI's ownership (and the lease agreements from 1903/1908) was also affirmed in a 2001 Operating Agreement between the National Trust for Historic Preservation, CJI, and the Society of Friends at Touro Synagogue National Historic Site, Inc. Page 2 of that document affirms, "WHEREAS, the Touro Synagogue is an active place of worship of the Congregation Jeshuat Israel, which has possession of the site through a lease with Congregation Shearith Israel as owner . . ."[216] Significantly, this 2001 "Operating Agreement" made a distinction between the "operation" of the Touro Synagogue and "ownership" of it (a distinction CJI leaders had already made in 1998, when they noted that "though Shearith Israel is the owner of the building, CJI maintains, runs, and insures the building"[217]). As the attorneys for CJI explained to the attorney for CSI on November 5, 2001 (when CJI's attorneys sent a copy of the Operating Agreement for approval and promised to amend it, if needed, to please CSI), "it is an 'Operating' Agreement related only to the operation and not the ownership of the site."[218]

This on-site management role by CJI within the framework of ownership by CSI was affirmed a few years later, in 2004, when CJI applied for a State Preservation Grant. The State Preservation Grant application stated plainly that CSI was the "owner" and the "on site management of the property and preservation of the property has been entrusted to Congregation

---

[215] TSF 0112: National Register of Historic Places Registration Form, February 1989; for 1986, see Materials from the United States Department of the Interior National Park Service for Touro Synagogue National Historic Site, p. 10.

[216] TSF 0725: Historic Site Operating Agreement between the National Trust for Historic Preservation, CJI, and the Society of Friends at Touro Synagogue National Historic Site, Inc., October 17, 2001.

[217] CJIB 6631: CJI Congregational Meeting Minutes, February 8, 1998.

[218] TSF 0722: Andrew M. Teitz to Alvin Deutsch, November 5, 2001.

Jeshuat Israel and the Touro Synagogue Foundation."[219] CJI's long role as renters and caretakers
of the property and appurtenances (even extending to repairs, grant writing, and fund raising) did
not change the basic framework of the lease or CSI's ownership, as CJI recognized in 2004 and
had recognized for the entire preceding century, nor did such caretaking ever imply or lead to
ownership on the part of CJI with regard to the synagogue, the cemetery, or the synagogue
appurtenances.

Accordingly, when CJI has applied for grants, they have acknowledged CSI as the legal
owners of the property and have requested letters of permission and support for their
applications. This happened in 1999, when CJI applied for a grant from the National Trust for
Historic Preservation; in 2003, when CJI applied for a Getty Grant; and in 2004, when CJI
applied for a State Preservation Grant.[220] In particular, the 2004 State Preservation Grant listed
CSI as owner, described the *rimonim* as part of the synagogue's "original interior furnishing"
(*not* separate property of CJI), and stated that the lease was "perpetual."[221] In each of these
applications, CJI acknowledged CSI as the owner of the Touro Synagogue.

Lastly, during much of the twentieth century, CSI's ongoing ownership and oversight can
be seen in its leadership role in the Touro Foundation. Officially titled "The Society of Friends of
Touro Synagogue National Historic Shrine Inc.," the Touro Foundation was organized in 1948
following the establishment of the Touro Synagogue as a National Historic Site.[222] Even though
it is a separate non-profit organization from CJI, CSI's legal ownership of the Touro Synagogue

---

[219] CSI 0148: 2004 State Preservation Grant Application.

[220] See CSI 0979: David J. Nathan to B. Schlessinger Ross, January 28, 1999; CSI 0980: CSI to the National Trust
for Historic Preservation, January 28, 1999; CSI 0984: Alan Singer to the Getty Grant Program, April 3, 2003; CSI
0148: State Preservation Grant Application, July 28, 2004.

[221] CSI 0148, 0157-0158: State Preservation Grant Application, July 28, 2004. Other histories of the Touro
Synagogue concur, stating, "The contract between Shearith Israel and Jeshuat Israel has held for more than a
century". See Urofsky, *A Genesis of Religious Freedom*, 100.

[222] CJIB 1535: Meeting Minutes of The Society of Friends of Touro Synagogue National Historic Shrine Inc., Nov.
20, 1960; CSI 5189: "Touro Synagogue," Touro Synagogue website.

Fisher 61

and important supervisory role was acknowledged in the structural organization and leadership

of the Touro Foundation. According to the Foundation's Bylaws, the Board of Directors for the

Touro Foundation was comprised of five members from CSI and five members from CJI.

Additionally, the presidents of both CJI and CSI were also members of the Board of Directors.[223]

Such an arrangement gave CSI an equal voice in the undertakings and decision-making of the

Touro Foundation. As a precautionary measure, the Touro Foundation was required to notify CSI

before any contracts were entered into for the purpose of working on the synagogue building.[224]

Over time, CJI, or individuals associated with CJI, appear to have sought to chip away at such

influence over the management and operation of the property, but such attempts to reduce CSI's

influence did not affect the legal reality of CSI's ownership of the building.[225]

Stepping back, then, it seems important to also point out several related historical realities

regarding the entirety of the relationship between CSI and CJI. First, as a historian, I recognize

that, over the course of successive generations, it is often the case that agreements are not

enforced nor enacted consistently over time with the same degree of self- or outward-awareness.

This phenomenon is well-known to historians with regard to a variety of contexts and situations.

This can result from confidence that the counterparty was performing adequately; it can result

from natural human processes of neglect or unintentional oversight by one party or another; or it

can result from ill-willed intentions at times. But it is important to recognize that, no matter what

the actual practices of successive leaders, the underlying legal agreement remains the same

---

[223] CJIB 1543: Meeting Minutes of The Society of Friends of Touro Synagogue National Historic Shrine Inc., Nov. 20, 1960.

[224] CSI 2304: Extract of the meeting of the Board of Directors for the Society of Friends of Touro Synagogue and Touro Synagogue Restoration Committee, June 26, 1958.

[225] TSF 0456: Bylaws of the Society of Friends of Touro Synagogue National historic Shrine, Inc., adopted August 11, 1991. Prior versions of the Society of Friends bylaws indicated that there should be equal representation from CSI and CJI on the Society of Friends board (five representatives each, plus the president of each congregation). See CJIB 1543: The Society of Friends of Touro Synagogue National Historic Shrine Inc., Meeting Minutes, Nov. 20, 1960.