# EXHIBIT D

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- x
CONGREGATION SHEARITH ISRAEL,           :
                                        :      12 Civ. 8406 (MGC)
                Plaintiff,              :
                                        :
        - against -                     :
                                        :      Declaration of B. Schlessinger Ross
CONGREGATION JESHUAT ISRAEL,            :
                                        :
                Defendant.              :
                                        :
-------------------------------------------------- x
```

I, B. Schlessinger Ross, hereby declare:

1. I am the Co-President of Defendant Congregation Jeshuat Israel, also known as Touro Synagogue. I have been Co-President of the Congregation since 2007, a member of the Congregation's Board of Trustees since 2003, and a member of the Congregation since 1985. I reside at One Gordon Street, Newport, Rhode Island. I have personal knowledge of the facts and circumstances described below, except those facts which are described on information and belief, and as to those facts I believe them to be true.

2. Touro Synagogue is a Jewish congregation located in Newport, Rhode Island. The Congregation is a non-profit corporation organized and existing under the laws of the State of Rhode Island. (Exh. A, attached). The Congregation's principal and only place of business is located at Touro Street in Newport.

3. Touro Synagogue has approximately 139 members, most of whom reside within Rhode Island or Bristol County, Massachusetts. The Congregation holds services at the Synagogue's sanctuary and sponsors religious, educational, social and cultural programs and activities at the Synagogue. All of the Congregation's officers and directors live in Rhode

Island, except for one director who lives in Hartford, Connecticut and one who lives in California. (*Id.*).

4. Touro Synagogue dates back to at least 1763, when the synagogue building — the oldest in North America — was consecrated. After the American Revolution, the number of Jewish residents in Newport diminished until 1822, when the last Jewish resident of Newport left. The synagogue fell into disuse until the Jewish population of Newport increased toward the end of the 19th Century. The synagogue was re-consecrated in 1883 and in 1894 Touro was granted a corporate charter under the name Congregation Jeshuat Israel.

5. Touro Synagogue does not do business in New York — certainly not with any measure of permanence or continuity. The Congregation does not have an office in New York, does not solicit business in the State of New York, has no bank accounts, real estate, or other property there, and has no employees in New York. Just three of the Congregation's 139 members reside in New York.

6. Touro Synagogue does not offer services to persons, businesses, companies, partnerships or corporations in New York, and does no advertising for business in New York. To the best of my knowledge, Touro Synagogue has not conducted any activities within New York. Touro Synagogue has no continuous, systematic or substantial contact with the State.

7. The Congregation maintains a website on the internet located at www.tourosynagogue.org.

8. Touro Synagogue is not authorized to do business in New York.

- 2 -

9. Touro Synagogue does not have a phone listing nor any mailing address in New York. Additionally, as far as I know the Congregation has never consented to be a party to a lawsuit in New York, and has no agent for service of process within New York.

10. According to the Congregation's records, Touro Synagogue in 1903 and again in 1908 entered into leases with plaintiff Congregation Shearith Israel ("CSI"), which purports to own the land and the Touro Synagogue building. Those leases, attached as Exhibits A and B to CSI's complaint, were with certain named individuals of Touro Synagogue "as trustees." The subject matter of the leases was the land and building in Rhode Island constituting the synagogue "[w]ith the appurtenances and paraphernalia belonging thereto."

11. The 1903 lease expired and was replaced by the 1908 lease. The 1908 lease expired in 1913 and has never been formally renewed, and Touro Synagogue has remained in possession continuously since that time. The Congregation has sporadically remitted to CSI the sum of one dollar during the ensuing one hundred years.

12. The Congregation's records do not indicate where the 1903 or 1908 leases were negotiated. From the face of the documents, it appears that the trustees, as lessor, executed the leases in New York and that Congregation Jeshuat Israel executed the leases in Rhode Island. It also appears that the leases were recorded in the land evidence records of the City of Newport, Rhode Island.

13. As far as I am aware, during the past hundred years Touro Synagogue's dealings with CSI have been episodic at best. As far as I know, CSI has not provided any material financial or other support to Touro Synagogue during the period that I have been involved with the Congregation.

14. The finials or "Rimonim" at issue in this case are decorative items which may be used to adorn the synagogue's Torah scrolls during Jewish religious services. We believe that the Rimonim, crafted by colonial silversmith Myer Myers and one of Touro Synagogue's most valuable possessions, were gifted to Touro Synagogue in the 1760's. The Rimonim were, we believe, stored at CSI for safekeeping between approximately 1833 and 1883, a period when there were few if any Jews in Newport. The Rimonim have been in the exclusive possession of Touro Synagogue since they were returned by CSI to the Congregation in 1883, when, as noted, Touro Synagogue was re-consecrated upon the revival of the Jewish community in Newport.

15. The Rimonim have not been in New York for approximately 130 years. During that time, Touro Synagogue has exercised exclusive control over the Rimonim, which are now on loan to and on display at the Museum of Fine Arts in Boston, and has maintained the Rimonim at the Congregation's own cost.

16. It is my understanding and belief that the Rimonim were not part of the real estate leases described above.

17. In 2012, in response to inquiries, the Museum indicated that it would be interested in purchasing one of Touro Synagogue's sets of Rimonim.

18. The "standstill agreement" referenced in CSI's complaint was an oral agreement between CSI's counsel in Rhode Island and our counsel in Rhode Island. That oral agreement was memorialized in a letter dated July 19, 2012. The letter, attached as Exhibit F to CSI's complaint, stated that Congregation Jeshuat Israel would give notice to CSI if Touro Synagogue "takes any further action to sell the rimonim."

19. To the best of my knowledge, the parties did not meet in New York for the purpose of discussing the contractual relationship between them. I was, however, present at a meeting on October 24, 2012 at 590 Madison Avenue, New York, to meet with representatives of CSI to discuss a possible settlement of the dispute over the Rimonim. Prior to the meeting, however, the parties stipulated that the presence of representatives of Touro Synagogue in New York on that day could not and would not be used as evidence of personal jurisdiction over the Congregation.

20. Consistent with the Standstill Agreement, Touro Synagogue has not sold the Rimonim and has not taken any further action to sell them. Rather, after months of fruitless negotiations with CSI, the Congregation on November 8, 2012 initiated a suit in Rhode Island seeking a declaratory judgment as to the parties' respective interests in the Rimonim, as well as injunctive relief. Obtaining a determination from the Court as to both Congregations' respective rights and obligations before any sale does not fall within or constitute a breach of the standstill agreement.

21. Touro Synagogue expects witnesses in Rhode Island will testify concerning the nature and disposition of the parties as well as Touro Synagogue's possession and control of the Rimonim continuing to the present. These witnesses likely will include the officers and directors of Touro Synagogue, twenty-four of twenty-six of whom live in Rhode Island (*see* Exh. A), as well as third-party congregants living in Rhode Island, such as past officers and directors.

22. To the best of Touro Synagogue's knowledge, all its documents that would be relevant to CSI's claims are located in Rhode Island. These documents include, among other things, records pertaining to Touro Synagogue's lengthy possession and control of, and care for,

the Rimonim and other personal property. Further relevant documents, especially concerning the land at issue in Rhode Island, may be found in the files of various government offices in that state.

23. Upon information and belief, CSI is a much bigger and wealthier congregation than Touro Synagogue, which, as noted, has 139 members. Indeed, CSI generally is considered one of the most prominent congregations in New York, if not the United States.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of June, 2013

_____
B. Schlessinger Ross