# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

CONGREGATION JESHUAT ISRAEL,

        Plaintiff,

v.

                                   C.A. NO. 12-822-M (LDA)

CONGREGATION SHEARITH ISRAEL,

        Defendant.

## PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY OF PROF. LINFORD FISHER

        Plaintiff Congregation Jeshuat Israel ("Touro"), by its undersigned counsel, hereby moves to exclude the proposed expert testimony of Professor Linford Fisher. As detailed in the accompanying Memorandum of Law, Prof. Fisher's testimony should be excluded for several reasons: (1) he is not qualified to opine on the topics of his proposed testimony; (2) his proposed testimony improperly usurps the role of the trier of fact and the Court; (3) his opinions are based on unreliable methodology; and (4) on account of the conduct of Prof. Fisher and his counsel during his deposition and thereafter.

                            Respectfully Submitted:

                            CONGREGATION JESHUAT ISRAEL,

                            By Its Attorneys,

                            PARTRIDGE SNOW & HAHN LLP

                            */s/ Steven E. Snow*
                            Steven E. Snow (#1774)
                            40 Westminster Street, Suite 1100
                            Providence, RI 02903
                            (401) 861-8200 / (401) 861-8210 FAX
                            ses@psh.com

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Gary P. Naftalis (admitted *pro hac vice*)
Jonathan M. Wagner (admitted *pro hac vice*)
Tobias B. Jacoby (admitted *pro hac vice*)
Daniel P. Schumeister (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9253 / (212) 715-9238 FAX
gnaftalis@kramerlevin.com
jwagner@kramerlevin.com
tjacoby@kramerlevin.com
dschumeister@kramerlevin.com

DATED: January 20, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of January, 2015, I caused a true copy of the within document to be delivered through the ECF system to all counsel of record.

*/s/ Steven E. Snow*

2422574_1/7804-2

- 2 -

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

CONGREGATION JESHUAT ISRAEL,

      Plaintiff,

v.                                                    C.A. NO. 12-822-M (LDA)

CONGREGATION SHEARITH ISRAEL,

      Defendant.

---

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY OF PROF. LINFORD FISHER

Plaintiff Congregation Jeshuat Israel ("Touro") respectfully submits this memorandum in support of its Motion to Exclude the Proposed Expert Testimony of Professor Linford Fisher.

### Preliminary Statement

On several independent grounds, Prof. Fisher's proposed testimony fails to pass muster under Fed. R. Evid. 702.

*First*: Prof. Fisher is not qualified. He proposes to testify concerning issues touching on three principal topics: American Jewish history, Jewish ritual, and the law. But he has no education, training or expertise in any of these subjects. He has no background in and has never been trained in American Jewish history. He does not know and has never studied the basics of Jewish ritual practice. He has never published or lectured about Judaica or Jewish historical topics. And while he offers conclusions as to ownership, successorship, legal decisions and trust relationships, he is not a lawyer, has never taken courses in law school, cites no legal authority in his report other than the documents that are the subject of the case, and cannot explain the most basic principles of the legal areas about which he offers testimony.

*Second*: Prof. Fisher's proposed testimony improperly usurps the role of the trier-of-fact and the Court. As is apparent from his report and as he acknowledged at his deposition, Prof. Fisher has for the most part merely read documentary evidence selected by CSI counsel, weighed that evidence, made credibility determinations, opined as to the state of mind of historical actors long dead, and then reached factual and legal conclusions. Under the governing authorities, however, factual determinations are the exclusive province of the trier-of-fact, and legal determinations are the exclusive province of the Court.

*Third*: the opinions that Prof. Fisher proffers are unreliable. For example, a focal point of Prof. Fisher's report is his conclusion that the terms "appurtenances" and "paraphernalia" contained in the parties' legal documents more than a century old, were intended to cover the Rimonim at issue in this case. But his methodology is flawed. He principally cites foreign or modern sources that discuss synagogue items – rather than contemporaneous late-19th- or early-20th century American legal documents or authorities – and concludes that "appurtenances" and "paraphernalia" reference ritual objects that are "necessary" or "required" for the functioning of a synagogue, a group of objects that he claims includes Rimonim or finial bells, like those at issue in this case. Yet as even CSI's other proposed expert Dr. Vivian Mann has testified and as is well-settled, rimonim are not necessary, essential or required for a functioning synagogue. Moreover, an expert is not needed to cite the sources upon which Prof. Fisher relies, and the sources in any event do not support Prof. Fisher's opinion.

*Fourth*: Prof. Fisher's testimony should be barred on account of his and his counsel's conduct at the deposition. As the transcript makes clear, Prof. Fisher dodged and stalled throughout deposition, refusing to provide straight-forward answers to direct questions. Then, in clear contravention of Fed. R. Civ. P. 30, CSI's counsel unilaterally terminated the deposition

before seven hours of deposition time had elapsed, accusing Touro's counsel of having "fabricated" its deposition time-keeping. Likewise in violation of the Federal Rules and the expert discovery schedule set by the Court, on the evening of January 15 – more than two weeks after Prof. Fisher's deposition and nearly two months after submitting his original report – CSI disclosed a new "Addendum to [Prof. Fisher's] Expert Report," addressing documents and issues that Dr. Fisher could have and should have addressed in his initial report. CSI and its proposed expert should not be permitted to flout the Federal Rules in this fashion.

## I.    BACKGROUND

### A.    Issues of This Case

As noted in greater detail in Touro's Memorandum in Support of Plaintiff's Motion to Exclude the Proposed Expert Testimony of Dr. Vivian Mann, this case largely concerns ownership of colonial-era silver finial bells ("Rimonim" or "Rimmonim") and the building known as Touro Synagogue. Touro respectfully references that Memorandum for a discussion of the principal issues in the case.

### B.    Issues Addressed by Prof. Fisher's Report

In a 65-page report (Exh. A), Prof. Fisher proposes to opine on at least four issues:

- "the relationship between . . . (colonial-era) Congregation Yeshuat Israel and [Touro]," (Fisher Report at 2).

- The intended "meaning of the words 'appurtenances and paraphernalia'" as used by CSI and Touro in early 20th century documents. (*Id.*).

- "the new CJI has never owned the Touro Synagogue, the property, the cemetery, the [Rimonim], nor any of the other ritual items that were loaned to it around the time of CJI's formation and then leased to CJI beginning at least as early as 1903." (*Id.* at 3).

- "there appears to be no historical evidence of a trust relationship between CSI and CJI." (*Id.* at 34).

## II.    ARGUMENT

### A.    The Governing Standard: *Daubert* and Fed. R. Evid. 702

For a description of the standard governing expert testimony, Touro respectfully references its memorandum in support of its motion to exclude Dr. Mann's testimony.

### B.    Prof. Fisher Is Not Qualified

Prof. Fisher is unqualified to provide expert testimony on any of the subjects of his report, and his proffered testimony should be excluded on that basis alone.

"[A] district court acts properly by excluding opinions that are beyond the witness's expertise." *Levin v. Dalva Bros.*, 459 F.3d 68, 78 (1st Cir. 2006). To be qualified, experts must have specific expertise in the particular topic about which they propose to testify; expertise in the general field is not enough. *See, e.g., Beaudette v. Louisville Ladder Grp.*, 2005 WL 2573384, at *2 (D.N.H. Oct. 7, 2004) ("The problem is not one of engineering expertise or experience, *per se*, but a lack of expertise and experience with respect to the subject matter at issue – whether the failed ladder met the standard set out in paragraph 7.2 of ANSI A14.5."), *aff'd*, 462 F.3d 22 (1st Cir. 2006). Prof. Fisher cannot meet this standard.

### 1.    Prof. Fisher Lacks Basic Knowledge and Understanding of American Jewish History and Jewish Ritual

Prof. Fisher is an Assistant Professor of History at Brown University. He claims "special expertise in New England religious history." (Fisher Report at 1). Prof. Fisher is clearly an expert on the interaction of American native peoples and Christianity. (*See* Fisher Report at Exhibit A (curriculum vitae)). Prof. Fisher's dissertation concerned "The Great Awakening and the Shaping of Native Cultures" in the colonial era. (*Id.* at 1). Every peer-reviewed article that

he has written has focused on Native Americans. (*Id.* at 1-2). And the vast majority of his scholarly work shares the same focus on native peoples. (*Id.* at 1-11).

That expertise is not relevant to this case or to the opinions that Prof. Fisher proposes to offer. This litigation concerns a dispute between two Jewish congregations. Native peoples and Christianity are not involved. Prof. Fisher nevertheless proposes to offer opinions on American Jewish history and Judaica; the relationship, legal or otherwise, between two historical Jewish congregations; the intended meaning of words in agreements between and in the documents authored by Jewish congregations; and the ownership of Jewish ritual objects. (Fisher Report at 2-3).

Prof. Fisher knows almost nothing that would qualify him to opine on these topics. Prof. Fisher has never taken a single class in Jewish history or American Jewish history. (Fisher Tr. 45-46) (Exh. B). He did not know basic information concerning the early history of Jews in this country. (*Id.* at 174-78) The only classes he has ever taken addressing Judaism in general concerned biblical Hebrew and ancient Jewish practices. (*Id.* at 46). He has never written any papers or articles, peer-reviewed or otherwise, on Jewish history, American Jewish history or Jewish ornaments. (*Id.* at 14-15, 38-39). When asked to describe his training in American Jewish history, he cited a test he took ten years ago – although he could not specify what portion of the test concerned American Jewish history. (*Id.* at 175) When asked to provide a list of his publications that related to American Jewish history, Prof. Fisher could only identify, after more than an hour of research, two works of his that touch upon the subject. (*See* Exh. C at 3). Neither discusses Jews or Judaism in any way except the most tangential manner. *See* Linford D. Fisher, *Colonial Encounters*, in The Columbia Guide to Religion in American History 49, 52, 53,

55, 57 (Paul Harvey & Edward J. Blum eds., 2012); Linford D. Fisher et al., Decoding Roger Williams: The Lost Essay of Rhode Island's Foundation Father, 14, 17, 195 (2014).

Nor has Prof. Fisher ever taught any courses on Jewish history. (Fisher Tr. 45). He has never lectured on American Jewish history or been on a panel addressing the topic. (*Id.* at 46-48). He has never attended a conference on American Jewish history. (*Id.* at 48). He does not belong to any organization devoted to Jewish history. (*Id.* at 44-45). And though Prof. Fisher claims that he teaches courses about American religious history that "deal directly" with American Jewish history (Fisher Tr. 29), he admits that only a single week in Prof. Fisher's 13-week courses addresses Judaism or Jewish history. (*Id.*).

Because of his lack of elemental knowledge of American Jewish history or Jewish ritual, Prof. Fisher's report is marred by basic errors that go to the heart of his analysis. For instance, and as detailed at pages 16-17 below, Prof. Fisher's argument that the terms "appurtenances" and "paraphernalia" referenced in the parties' agreements were intended to cover the Rimonim and reflected the parties' understanding that CSI owned the Rimonim, hinges to a significant degree on his contention that Rimonim are "necessary ritual objects of a synagogue" (Fisher Report at 38), and are "required to operate a synagogue." (*Id.* at 40). Dr. Fisher repeatedly asserted that without certain ritual objects including Rimonim, "a Jewish synagogue cannot legitimately exist and function." (*Id.* at 37). He made these points more than a dozen times in his report. (*See, e.g, id.* at 35-42, 46, 48, 50-52, 65). But Prof. Fisher could not be more wrong; Rimonim are not necessary or required. Dr. Vivian Mann, CSI's other proposed expert, testified without exception that Rimonim are not a necessary part of a synagogue. (*See* Mann Tr. 48 ("Q: Does a synagogue need or require rimmonim to have a service? A: No."; *see also id.*, agreeing that a synagogue can function without Rimonim; *id.* at 92, agreeing that "the use of rimmonim (scroll

ornaments) is entirely ornamental")).[1]  Notably Prof. Fisher has never seen Rimonim used in a service (Fisher Tr. at 41-42), is not aware of how frequently they are used in Jewish services (*id.* at 73-74), does not know when or how often Torahs, which the rimmonim adorn, are used in Jewish services (*Id.* at 42-44), and has attended Jewish services only once in his entire life. (Fisher Tr. 16, 41-42).  While Touro does not mean to suggest that one must attend Jewish services to qualify as an expert in American Jewish history or Judaica or otherwise to offer an admissible opinion in this case, the problem for Prof. Fisher is that he has no scholarly background, education, training or expertise in these subjects to compensate for his lack of experience.

Prof. Fisher's unfamiliarity as to the other topics about which he proffers testimony likewise undercuts his ability to offer proper admissible opinions.  He devotes a significant portion of his report to his conclusion that there is no connection, legal or otherwise, between Congregation Yeshuat Israel, the original possessor of the Rimonim, and the current Touro congregation, plaintiff Congregation Jeshuat Israel.  (Fisher Report at 12-34).  In addressing the connection between the two congregations, Prof. Fisher focuses on events surrounding the re-opening of Touro Synagogue in the 1880s.  (*Id.* at 14-18).  According to Prof. Fisher, CSI resisted the re-opening, "raising several important concerns and considerations" in a petition to the Newport City Council. (*Id.* at 14).  Of the three concerns Prof. Fisher addresses, two concern what Prof. Fisher saw as key distinctions between Ashkenazic Jews (from Eastern Europe) and Sephardic Jews (from the Mediterranean region). (*See id.* at 15, 18 & 25-26).  However, Prof. Fisher's deposition demonstrates that he knows nothing about the Ashkenazic-Sephardic divide that is apparently so central to his opinion.  When asked, Prof. Fisher could not name a single

---

[1] Touro has submitted Dr. Mann's deposition transcript together with its motion to exclude her testimony.

concrete difference between the Ashkenazic and Sephardic traditions. (*See generally* Fisher Tr. 157-60). The most Prof. Fisher could muster was that "[i]t comes down to the form of the liturgy, maybe the structure of the service." (*Id.* at 158). But Prof. Fisher was unable to elaborate on this vague answer, and acknowledged that in fact he could not differentiate between the two traditions' practices. (*Id.* at 160-61).

2.     Prof. Fisher Lacks Expertise in the Legal Issues
<u>About Which He Seeks to Testify</u>

Although his report is replete with legal conclusions concerning legal matters, Prof. Fisher is not qualified to opine on legal subjects -- even assuming such testimony were otherwise permitted. (*See* pages 9-19 below).

Prof. Fisher purports to opine on the legal ownership and status of the Rimonim and Touro Synagogue. He asserts that Touro "has never owned the Touro Synagogue, the property, the cemetery, the [Rimonim], nor any of the other ritual items that were loaned to it around the time of CJI's formation and then leased to CJI beginning at least as early as 1903." (Fisher Report 3; *see also id.*: "It is clear from the historical record that . . . CSI . . . owns the Touro Synagogue, the property, the cemetery, the [Rimonim] . . . ."). Notwithstanding these legal pronouncements, Prof. Fisher is not a lawyer. (Fisher Tr. 128-29). He has never taken courses in law school. (*Id.* at 129). He is not an expert on property law. (*Id.* at 33). He knows no rules of contract construction. (*Id.* at 228). He does not know the requirements for the legal transfer of property. (*Id.* at 33-34, 197-98). He could not answer whether Rimonim – movable, silver bells that adorn a Torah scroll (CSI Counterclaim ¶ 4) – are personal or real property. (*Id.* at 213). He purports to opine on the ways in which contracts may be altered by the parties (Fisher Report at 61-62), but he admitted at his deposition that he did not know how a contract is formed or modified. (Fisher Tr. 129).

- 8 -

Prof. Fisher goes on to claim that "there appears to be no historical evidence of a trust relationship between CSI and CJI." (Fisher Report 34).  At the same time, he admits that "trust law is not something I have expertise in" (Fisher Tr. 236), and he fails to cite any legal authority to support his report's conclusion.  He likewise proposes to offer testimony concerning (i) whether CJI is CYI's successor (*see* Fisher Report at 12-34), (ii) whether certain actions by CJI's Board were *ultra vires* (*id.* at 31), (iii) whether CJI acquired ownership by adverse possession (*id.* at 65), (iv) the significance of litigation documents and legal decisions arising from lawsuits between CSI and Newport congregants in the 1890's and early 1900's, (*id.* at 28-31), and (v) the significance of legal documents such as deeds and leases and what the parties to those documents intended.  Prof. Fisher has no expertise in these areas, and has no business offering legal opinions of this nature.  *Noriega-Sanchez v. Ford Motor Co.*, 2009 WL 2870643, at *3 (D.P.R. Sept. 2, 2009) (disqualifying expert with 9 years' experience as mechanical engineer and 22 years' experience as forensic engineer because he was not sufficiently qualified as to "on belt wedge design and its connection to belt-to-belt tread separation in a Firestone FR480 steel-belted radial passenger tire").

In short, Prof. Fisher lacks the "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  On that basis, his testimony should be barred.

C.    **Prof. Fisher's Proposed Testimony Should Be Excluded Because He Improperly Acts as a Partisan Advocate and Seeks to Usurp the Role of the Court**

Prof. Fisher's report reads like the fact section of a brief, collecting and commenting on factual evidence and telling CSI's side of the case – and only CSI's side.  The exercise undertaken by Prof. Fisher – analyzing documents, weighing the evidence, and drawing factual

and legal conclusions – usurps the role of the trier-of-fact and the Court. That is inappropriate under Fed. R. Evid. 702.

>1.    Prof. Fisher's Proposed Testimony
>Would Usurp the Role of the Trier-of-Fact

In assisting a trier of fact, the expert's role is limited to providing "information and explanations; the expert's role is not to be an advocate." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003) (excluding expert testimony), *aff'd*, 99 F. App'x 274 (2004). A party may not use experts to "argue a client's cause" rather than bring knowledge or expertise to bear on the issue. Experts similarly cannot "lend their credentials and reputations to the party who calls them without bringing much if any relevant knowledge to bear on the facts actually at issue." *In re Rezulin*, 309 F. Supp. 2d 531, 538 (S.D.N.Y. 2004). Nor is it the expert's task "to supplant the role of counsel in making argument at trial, and the role of the [fact-finder] in interpreting the evidence." *Primavera Familiestifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) (excluding expert testimony), *amended on reconsideration on other grounds*, 137 F. Supp. 2d 438 (S.D.N.Y.).

Furthermore, expert testimony interpreting documents is helpful to the trier of fact only when specialized knowledge or experience is needed and useful for such interpretation. *See United States v. Zajanckauskas*, 441 F.3d 32, 39 (1st Cir. 2006) (quoting 29 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure* § 6264 (2005)) ("Expert testimony does not assist where [the trier of fact] has no need for an opinion because it can easily be derived from common sense, common experience, the [trier of fact's] own perceptions, or simple logic.").

Prof. Fisher's proposed testimony runs afoul of these governing standards. He described his exercise as follows: he only read certain documents supplied by CSI's counsel. (Fisher Tr.

136). He weighed the evidence. (*Id.*). Based upon what CSI's counsel gave him, he tried to reconstruct what happened. (*Id.* at 136-37). He made credibility determinations. (*Id.* at 137-38). And he reached factual conclusions. (*Id.* at 137). As Prof. Fisher noted, "I made judgments and weighed evidence to try to understand what people did and at times, what they intended." (*Id.* at 123).

This exercise is clearly improper. It is the Court, not the expert, that is supposed to undertake this analysis. The Court does not need Prof. Fisher to present and comment on the admissible evidence. *See Kidder Peabody & Co. v. IAG Int'l Acceptance Group*, 14 F. Supp. 22391, 398 (S.D.N.Y. 1992) (barring testimony of proposed expert who purported to opine on what the parties "did, or what they said to each other"); *Primavera*, 130 F. Supp. 2d at 529 (expert may not "supplant the role of the [fact-finder] in interpreting the evidence").

Exacerbating the flawed nature of Prof. Fisher's undertaking, he did not even seek to assess all the evidence. Prof. Fisher acknowledged in his report that of the documents produced in this case, he reviewed only "documents given to me by counsel for CSI" rather than the entire record. (Fisher Report at 2). Prof. Fisher testified that of those documents produced by the parties, he reviewed only those documents that CSI's counsel determined "relevant" (Fisher Tr. 67) or "important" (*Id.* at 134). As Prof. Fisher put it: "I had to lean upon what they gave me . . . ."; "[C]ounsel for CSI must have made the decision about whether or not they were important or necessary and frankly, it's unclear without further study and investigation whether they would have impacted the case one way or another . . . ." (*Id.*) At deposition, Prof. Fisher was shown documents that he had never seen, including documents that CSI had produced months ago (*see id.* at 115-20, 134) -- documents that Dr. Fisher later concluded were important enough to address in his untimely Addendum Report. (Exh. C).

Courts regularly exclude expert testimony that has taken into account only a portion of the available record. *See, e.g., Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003) (excluding expert testimony where only plaintiff-supplied information was relied upon for analysis). As one court explained, "Any expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply." *Id. See also Polidore v. McBride*, 2010 WL 3666971, at *6-7 (D.R.I. Sept. 13, 2010) (excluding proposed expert testimony that relied solely on counsel-provided materials).

Moreover, it is not only the law that mandates that experts review all available material; the historical method commands that historians gather and assess all evidence – not just that which conveniently suits a theory. *See* John Philip Reid, *Law and History*, 27 Loy. L.A. L. Rev. 193, 195-96 (1993) ("In discovering the past, the historian weighs every bit of evidence that comes to hand. The lawyer, by contrast, is after the single authority that will settle the case at bar."). In this respect, Prof. Fisher has failed both legally and professionally. *See E.E.O.C. v. Bloomberg, L.P.*, 2010 WL 3466370, at *14 (S.D.N.Y, Aug. 31, 2010) (excluding expert testimony because "[r]elying solely on the information fed to him by the EEOC without independently verifying whether the information is representative undermines the reliability of his analysis."); *Faulkner v. Arista Records LLC*, 2014 WL 4547824, at *14 (S.D.N.Y. Sept. 15, 2014) (excluding expert testimony on reliability grounds because expert "had failed to review all of the documents produced" by the adversary and had relied on counsel to provide documents for his review).

2.    By Drawing Legal Conclusions, Prof. Fisher's
Proposed Testimony Usurps the Role of the Court

As noted above, a fair portion of Prof. Fisher's report addresses legal issues, including (i) whether CSI or Touro owns the Rimonim, (ii) whether Touro is the successor to CYI, (iii) the nature of the legal relationship between the parties, (iv) issues of contract construction, (v) whether certain actions by Touro's board were *ultra vires*, and (vi) whether Touro obtained ownership by adverse possession. Even putting aside his lack of qualification to opine on legal issues, Rule 702 bars this testimony.

Experts may not testify as to the ultimate legal issues in a case. *See Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 360 (D. Mass. 2008) (excluding any legal conclusions regarding disputed contract). More specifically, Courts have held inadmissible expert testimony seeking to opine as to ownership. *In re Phillips*, 491 B.R. 255, 261 n.10 (Bankr. D. Nev. 2013) (expert witness qualified as an expert in the securitization industry nonetheless not allowed to opine as to "ownership and possession" of promissory note in part because "the issue of ownership is a legal conclusion within the court's domain."). And numerous federal courts, including the First Circuit, are in accord that ownership is a legal conclusion. *See In re Lane*, 937 F.2d 694, 698 n.7 (1st Cir. 1991) (describing the phrase "property of the plaintiffs [appellants]" as a "summary legal conclusion"); *see also Kendall v. Thaxton Rd. LLC*, 443 F. App'x 388, 390 (11th Cir. 2011) ("The appropriate response to Kendall's incorrect assertion of ownership was to strike that legal conclusion from the complaint . . . ."); *McCormick v. Braverman*, 451 F.3d 382, 392 (6th Cir. 2006) ("Certainly, these independent claims may deny a legal conclusion of the state court, i.e., the Henry Ruff Property is the sole property of Edward's estate . . . ."). Other subjects about which Prof. Fisher proposes to testify – adverse possession, *ultra vires*, contract construction, and the like – are also legal conclusions. *Girl Scouts of Middle Tenn., Inc. v. Girl Scouts of*

*U.S.A.*, 770 F.3d 414, 427 (6th Cir. 2014) ("GSMT further failed to properly plead its claim to relief under Tenn. Code Ann. § 48-53-104, alleging no facts to support its legal conclusion that its delegation of power to GSUSA was ultra vires."); *Weiss v. DHL Exp., Inc.*, 718 F. 3d 39, 44 (1st Cir. 2013) ("We begin by reviewing long-standing principles of contract law. Interpretation of a contract is ordinarily a question of law for the court."); *Ariel Land Owners, Inc. v. Dring*, 374 F. App'x 346, 350 (3d Cir. 2010) ("Moreover, Dring has not produced, nor did our own research reveal any controlling state precedent on point that would undermine the District Court's legal conclusion on adverse possession."); *Mintz v. FDIC*, 729 F. Supp. 2d 276, 280 (D.D.C. 2010) ("Mr. Mintz's unsupported assertion that WM Bank and 'possibly the FDIC' are the 'successors and assigns' of Dime Bancorp . . . does not cure this deficiency; that assertion is a mere 'legal conclusion[] cast in the form of [a] factual allegation[].') (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)).

Prof. Fisher also devotes several pages of his report to his interpretation of litigation involving CSI and Newport congregants in the late 1800's and early 1900's, as well as litigation documents and Court decisions concerning those litigations. (Fisher Report at 28-31). That too is the province of the Court, not the expert -- and doubly so here, since Prof. Fisher is not a lawyer or a legal historian and has no expertise in the law.

### D.    Prof. Fisher's Proposed Testimony Should Be Excluded Because His Methodology is Unreliable

As yet another independent ground for excluding his proposed testimony, Prof. Fisher's conclusions are not based on a reliable methodology. *See* Fed. R. Evid. 702(c)-(d).

In assessing an expert's reliability, the court must determine whether the expert testimony has a "traceable, analytical basis in objective fact." *Bagdon v. Abbott*, 524 U.S. 624, 653 (1993). "[O]pinion evidence that is connected to existing data only by the *ipse dixit* of the expert" should

not be admitted. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999). Additionally, "[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' . . . . The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." Fed. R. Evid. 702 Adv. Comm. Note. In similar fashion, the expert's testimony must be "grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *Id.* Courts of this Circuit have also emphasized that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *McGovern v. Brigham & Women's Hosp.*, 584 F. Supp. 2d 418, 424 (D. Mass. 2008) (quoting *Kumho Tire*, 526 U.S. at 152, excluding expert testimony and thus granting summary judgment).

The historical method -- to which all historians must adhere in their analyses -- is a rigorous standard in which all evidence must be assessed. Reid, *Law and History*, *supra* at 195-96. Prof. Fisher himself acknowledged that historians must evaluate evidence fairly and accurately. (Fisher Tr. 10). As Prof. Fisher admits, however, and as demonstrated at pages 11-12 above, he did not assess all the evidence -- only that portion selected and provided by CSI's counsel, albeit supplemented by some limited research. On this basis alone, Prof. Fisher's proposed testimony is unreliable. *See E.E.O.C.*, 2010 WL 3466370, at *14.

Other methodological flaws mar Prof. Fisher's report. His report is nothing more than CSI's spin on events – a far cry from the even-handed approach required of an historian.

To begin with, on multiple occasions Prof. Fisher cited from a source only that material that he deemed helpful to CSI. He routinely ignored material in those very same sources helpful to Touro. (*See, e.g.*, Fisher Tr. 93-98 (ignoring portions of sources cited by Prof. Fisher stating

that CJI was the legal successor to CYI); *id* at 243-45 (ignoring portions of source cited by Prof. Fisher stating that CSI holds property in trust)).

Beyond that, in trying to establish that the terms "appurtenances" or "paraphernalia" mentioned in the parties' 1903 lease referenced the Rimonim at issue and thus purportedly reflected their understanding that CSI and not Touro owned the Rimonim, Prof. Fisher engaged in an inappropriate and misleading word association exercise. As Prof. Fisher acknowledged, he could not identify any source using the words "appurtenances" or "paraphernalia" alone to mean rimonim. (Fisher Tr. 223-26). Instead, he tried to cobble together sources using similar words or longer phrases containing those words, and proclaimed without any basis that because Rimonim are supposedly necessary, essential and required for a Jewish service and a synagogue, those terms must have referenced the rimonim. (Fisher Report at 35-41). This approach could not be more misguided.

- First, Prof. Fisher's underlying premise is incorrect. As demonstrated at pages 6-7 above and as CSI's other expert testified, rimonim are not necessary, essential or required for a Jewish service or a synagogue.

- Second, although the terms "appurtenances" and "paraphernalia" were used by the parties in legal documents, Prof. Fisher did not cite any legal definitions or authorities with respect to those terms. To the contrary, he deliberately avoided them. (*See* page 17 below).

- Third, many of Prof. Fisher's sources were either modern or reflected usage outside the United States. Prof. Fisher largely eschewed contemporaneous sources dating back to the late 1890's and early 1900's, when the parties actually used these terms.

- Fourth, Prof. Fisher presented the sources he cited in a misleading way. For example, Prof. Fisher quoted the Oxford Dictionary of the Jewish Religion for a list of items considered "appurtenances of holiness," as follows:

> ritual objects (e.g., the shofar, spice box, menorah, Seder plate) or items used to decorate ritual objects (e.g., the keter Torah or rimmonim ornaments...).

(Fisher Report at 36-37). But the full quotation reads:

> ritual objects (e.g., the shofar, spice box, menorah, Seder plate) or items used to decorate ritual objects (e.g., the keter Torah or rimmonim ornaments **for the embroidered parokhet [curtain] that covers the synagogue ark**).

(Exh. D; bold-face added). The "rimmonim" mentioned in this source are, as Prof. Fisher ultimately had to admit, not the type of "rimmonim" at issue in this case, that adorn a Torah. Rather, they are rimonim found on a curtain. (*See* Fisher Tr. 109; *see also* Compl ¶ 8 (referencing the finial bells that adorn the Torah); Amended Answer and Counterclaim ¶ 4 (same). Prof. Fisher deleted the relevant language from his quotation of the source.

As another example, Prof. Fisher cited a definition of "appurtenances" he found useful to CSI's cause from the 2014 Oxford English Dictionary. (Fisher Report at 42-43; Exh. E). But he deliberately skipped the first definition in that dictionary – the legal definition – as well as the second definition, because those definitions did not fit his partisan purposes. That is not appropriate scholarship. Reid, *Law and History*, *supra*, at 195-96

Historical method does not countenance selective and biased use of source material. *Id.* Under Fed. R. Evid. 702, nor should this Court.

### E.   Prof. Fisher's Opinions Should Be Excluded Because Experts May Not Opine on State of Mind or Intent

Prof. Fisher's proposed testimony as to what the parties intended, understood, meant or thought should be excluded as improper expert testimony on state of mind and intent.

"State of mind of one of the parties" is "committed exclusively to the trier of fact."  4 Weinstein's Federal Evidence § 702.03[3] (2d ed. 2014)  Federal courts continually bar expert testimony as to state of mind or intent.  *See OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Canada*, 804 F. Supp. 2d 77, 85 (D. Mass. 2011) (excluding expert testimony opining as to intent of parties in contract dispute ), *aff'd*, 684 F.3d 237 (1st Cir. 2012); *Brown v. Crown Equip. Corp.*, 445 F. Supp. 2d 59, 68 (D. Me. 2006) ("The plaintiff properly notes that she will not attempt to offer through her expert witnesses evidence about the subjective intent or state of mind of the defendant or its employees.").

Despite this clear prohibition, Prof. Fisher's report is replete with assessments of the state of mind of actors who are no longer living. For instance, Fisher claims to be able to understand what "concern[ed]" CSI in the 1880s: "One of CSI's main concerns, as contemporary observers recognized and as CSI protests made clear, was that there was no connection at all between the new Newport congregation and the historic, colonial-era CYI."  (Fisher Report at 20).  Prof. Fisher elsewhere opines, without citation, that "everyone involved in the matter recognized" that CJI has no "continuity with CYI."  (*Id.* at 24).  Prof. Fisher's approach is particularly apparent in his efforts to analyze the meaning of "appurtenances" and "paraphernalia" in legal documents and determine ownership of the Rimonim. He purports to opine on "whether these words were intended to include the disputed [Rimonim]."  (*Id.* at 2; *see also id.* at 35 ("A close reading of the historical documents . . . makes it abundantly clear that these phrases were indeed intended to

include the disputed [Rimonim] . . . .")). Prof. Fisher goes on to draw conclusions as to the intent of the contracting parties more than a century ago. (*Id.* at 43-50; *see also* Fisher Tr. 123).

Though experts may testify concerning specialized meanings of terms in their industry of expertise, *SEC v. Goldsworthy*, 2008 WL 2943398, at *5 (D. Mass. Jan 3., 2008), for several reasons Prof. Fisher's proposed testimony does not fit this exception. First, Prof. Fisher does not purport to testify to the trade custom or industry usage. Instead, he explicitly opines as to the parties' intent. Second, as demonstrated at page 16 above, Prof. Fisher provides no contemporaneous American legal sources that provide insight into industry custom or usage. And third, since this is a bench trial and the Court is well-versed in parsing non-technical contracts, purportedly expert testimony will not aid the trier of fact. *See Marx & Co. Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) (excluding expert testimony construing a contract because "[t]he special legal knowledge of the judge makes the witness' testimony superfluous."). Whether the definitions and other authorities that Prof. Fisher cites are relevant, the Court can read them just as well as Prof. Fisher can, without his partisan spin.

How can Prof. Fisher know, more than a hundred years after the fact, what parties understood and intended? Under Fed. R. Evid. 702, that is for the trier-of-fact, not for Prof. Fisher. *OneBeacon Am. Ins. Co.*, 804 F. Supp. 2d at 89; *In re Rezulin*, 309 F. Supp. 2d at 546 ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.") On this basis too, Prof. Fisher's proposed testimony is not admissible.

F.    **Prof. Fisher's Report Should Be Excluded on Account of His and His Counsel's Conduct at the Deposition**

For all the reasons discussed above, Prof. Fisher's testimony should not be permitted. In addition, his conduct and that of his counsel at the deposition and thereafter provides an additional independent reason for exclusion.

As is clear from any fair reading of the transcript, Prof. Fisher was evasive throughout his deposition, either filibustering or refusing to answer straightforward questions with direct answers. These were not isolated occurrences. Though counsel for Touro repeatedly pleaded with Prof. Fisher to answer the questions asked, Prof. Fisher either would not do so or gave long speeches that avoided the questions. (*See, e.g.*, Fisher Tr. 56-59, 64-65, 69-74, 121-23, 126-27, 130, 132-33, 160-66, 173, 212-13, 224-26, 239-40, 247-50).

Then, CSI's counsel abruptly unilaterally terminated the deposition before the seven-hour deposition time had run. The Federal Rules make clear that unless otherwise stipulated or ordered by the Court, "a deposition is limited to 1 day of 7 hours." Fed. R. Civ. P. 30(d). The Rule provides for seven hours of actual questioning. "The only time to be counted is the time occupied by the actual deposition." Fed. R. Civ. P. 30(d)(1) & Adv. Comm. Notes (2000). Despite this clear rule, CSI's counsel first tried to stop the deposition at 4 p.m., or seven hours after the 9 a.m. start (*see* Fisher Tr. 211-17) -- even though there had been repeated breaks, including an hour for lunch. (*Id.* at 50, 150-51). After being presented with the Advisory Committee's explanation and the timekeeping records of Touro's counsel (*id.* at 221-22), CSI's counsel reacted by accusing Touro's counsel of having "fabricated" the time-keeping records. (*Id.* at 250). Regrettably, CSI's counsel and Prof. Fisher then walked out of the deposition with more than a half-hour left in the mandated seven-hour deposition period. (*See* Exh. F (time-keeping of Touro's counsel)).

The court reporter's time charts set out in the transcript confirm that Touro had more than a half hour until the seven-hour limit. (*See generally* Fisher Tr. (showing actual deposition from 9:02:19 to 10:11:44 (1 hour 9 minutes), 10:27:24 to 12:06:48 (1 hour 39 minutes), 12:13:19 to 13:08:38 (55 minutes), 14:08:35 to 15:38:51 (1 hour 30 minutes), 15:51:15 to 16:08:54

- 20 -

(17 minutes), and 16:09:52 to 17:05:06 (55 minutes)).  While Touro does not mean to nit-pick the clock, Dr. Fisher's demeanor and failure to answer questions properly made a complete deposition impossible.

Adding to the prejudice to Touro, on the evening of January 15, 2015 -- weeks after CSI prematurely shut down Prof. Fisher's deposition and just days before Touro's motions to exclude were due -- CSI served a 1,200-word "Addendum to Expert Report" (Exh. C) addressing numerous documents and exhibits that had been produced by CSI itself many months ago and about which Prof. Fisher tried to avoid during the deposition when questioned about those documents. (*E.g.*, Fisher Tr. 115-19).  In his Addendum, Prof. Fisher made substantive changes to his original report and to his sworn deposition testimony. (Exh. C).

Prof. Fisher's conduct in evading questions, filibustering, terminating the deposition early and then dumping another report on Touro days before the motion deadline, could not be more unfair-- and runs afoul the Federal Rules.  *Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003).  On this ground as well, the Court should bar the proposed testimony.

In any event, Prof. Fisher's Addendum suffers from the same flaws as his original report. He once again reads documents, weighs the evidence, and draws factual conclusions.  He likewise continues to opine an intent and state of mind. (*See, e.g.*, Addendum at 1 ("CSI's concern for the sepher [Torah] and bells in the context of the lease is very clear."); *id.*: "Levy's correspondences to Mendez on February 12 and 18 show CSI's desire to have legal representation during the lease signing. Levy and Mendez contemplated delaying the proceeding because Sheffield was not available . . . . and CSI desired the presence of their legal representative.")  Why is this testimony necessary or even permitted?  It most assuredly is not. The Court can read the documents and the lawyers can make whatever arguments they deem

appropriate. *See In re Rezulin*, 309 F. Supp. 2d at 549 (excluding testimony that "is merely 'a narrative of the case which a [fact-finder] is equally capable of constructing.'" (quoting *Taylor v. Evans*, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (brackets added).

## CONCLUSION

This case should be decided on the admissible evidence, not on the slanted spin of a non-qualified expert. It is for the Court, not Prof. Fisher, to weigh the evidence and draw the appropriate legal and factual conclusions. For these reasons, the Court should exclude Prof. Fisher's testimony.

CONGREGATION JESHUAT ISRAEL,

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

*/s/ Steven E. Snow*
Steven E. Snow (#1774)
40 Westminster Street, Suite 1100
Providence, RI 02903
(401) 861-8200 / (401) 861-8210 FAX
ses@psh.com

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Gary P. Naftalis (admitted *pro hac vice*)
Jonathan M. Wagner (admitted *pro hac vice*)
Tobias B. Jacoby (admitted *pro hac vice*)
Daniel P. Schumeister (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9253 / (212) 715-9238 FAX
gnaftalis@kramerlevin.com
jwagner@kramerlevin.com
tjacoby@kramerlevin.com
dschumeister@kramerlevin.com

DATED: January 20, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of January, 2015, I caused a true copy of the within document to be delivered through the ECF system to all counsel of record.

/s/ Steven E. Snow_____

2422792_1/7804-2