Fisher 50

Synagogue of said Congregation Shearith Israel.")[179] Notably, the very act under which Touro Synagogue was made a National Historic Site states as its goal the preservation of "historic sites, buildings and objects." This, accompanied with the descriptions of Touro Synagogue that include the *rimonim*, show that the *rimonim* are not only appurtenances to Touro Synagogue but also are so integral as to be part of the Synagogue's "genus [sic] loci."[180]

The important relationship of the *rimonim* to the Touro Synagogue was recognized by CJI again in 2004, when CJI applied for a State Preservation Grant and stated in its application that the Touro Synagogue (not CJI, notably) "is very fortunate to have many of its original interior furnishings. . . . Two sets of silver Remunim [sic]."[181] To this day, the CJI website affirms that CSI has since the 1820s had "legal oversight of the building, [and] its contents."[182] As part of the ensuing renovation, these-colonial era *rimonim* were removed from the building, cleaned, repaired, and polished.[183]

In sum, Jewish synagogues need very specific religious objects in order to function as a legitimate house of worship. These include the Books of the Law and the accompanying finials (*rimonim*), as the examples given above make clear, along with other specific ritual items. And the most common shorthand way to reference all of these essential Jewish sacred and ritual objects is with the words "appurtenances" and/or "paraphernalia" (along with a few other synonyms, such as "sacred movables" and "fixtures"). Therefore, in the 1903 and 1908 leases, the words "appurtenances" and "paraphernalia" were definitely intended to include the *rimonim*.

---

[179] CSI 0096: An agreement between the U.S. Department of Interior, CSI, and CJI, Nov. 7, 1945.
[180] See Materials from the United States Department of the Interior National Park Service for Touro Synagogue National Historic Site, pp. 7, 23. The intended phrase was likely "genius loci," or "spirit of the place."
[181] CSI 0157-0158: State Preservation Grant Application Form, July 30, 2004.
[182] CSI 5189: "Touro Synagogue History," Touro Synagogue website.
[183] Urofsky, *A Genesis of Religious Freedom*, 108.

Fisher 51

**CSI as Owners of the Property and Sacred Ritual Objects (Appurtenances, Paraphernalia, Sacred Movables, Fixtures, Etc.)**

In reviewing these documents and in conducting my own independent investigation, there are several important points regarding CSI's ownership of the synagogue building, cemetery, and synagogue appurtenances that deserve explicit delineation. The first is straightforward: in none of the documents I have looked at has CJI ever been recognized as the legitimate owner of the Touro Synagogue, the cemetery, or the ritual objects (appurtenances and paraphernalia) therein by any of the relevant, independent authorities. In fact, the opposite is true: at almost every point along the way (especially after 1894), CSI is recognized as having sole legal claim to the building and ritual objects.

The second point is this: at repeated and critical points along the way, CJI has freely admitted in writing and by their actions that they (CJI) are not the owners of the building or the synagogue appurtenances. During a May 28, 1893, congregational meeting in which the new CJI declared themselves to be a newly-gathered congregation, the congregation resolved to write to CSI, stating: "That we request of them [CSI] the further assistance which they have in the past rendered in the *loan* of such property as has formerly been in use in the services."[184] This is an admission that the ritual items ("property") for "use in the services"—namely, the necessary ritual objects to conduct a service—did not belong to CJI and had, in fact, been loaned from CSI. CJI was requesting to simply continue this loan of required religious objects.

Similarly, in a June 25, 1893, letter from CJI to CSI, CJI representatives state: "Certainly we do not claim any ownership in the property. . . . Although we do not claim ownership in the property or appurtenances, rest assured we will guard the same zealously for our pride in this

---

[184] CJI 1167: CJI Congregational Meeting Minutes, May 28, 1893. Emphasis added.

Fisher 52

ancient house of worship . . ."[185] Once again, these are very clear statements in which CJI recognized their complete lack of ownership of both the synagogue and the necessary ritual items inside of it (the appurtenances).

It is important to note, too, that CJI set up a legal standard for CSI to prove CSI's ownership of the synagogue and its appurtenances. On June 25, 1893, CJI secretary Max Levy (writing for CJI) wrote to CSI, stating: "The establishment of a clear title to the property should be your aim. . . . The heirs-at-law, alone, can move in the matter."[186] This was repeated by CJI representative Eugene Schreier a few weeks later: "They [CSI] should first lay before us all legal papers as to their rights to the property in question. . . . If the New York Congregation have a legal deed and title to the property why not prove it: surely this is not asking too much in such an important matter."[187] In response, CSI contacted the surviving heirs-at-law of the original CYI, and these descendants of the original CYI congregation members signed deeds of conveyance to CSI representatives in 1894.[188] In so doing, CSI fulfilled precisely the legal standard of ownership that CJI itself set out for CSI, even assuming that one was needed.

After the January 1903 U.S. Circuit Court ruling, CJI unequivocally recognized CSI's ownership of the synagogue and appurtenances. In direct response to this court decision, the CJI Board of Trustees stated twice in their February 1903 meeting minutes that CSI is "the owners of the Synagogue building at Newport" and that CSI is the "owners of the property."[189] In that same document, the CJI Board of Trustees directed two CJI individuals to "surrender the possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport, to the said

---

[185] CJI 0042: Letter from CJI to CSI, June 25, 1893.
[186] CJI 0042: Letter from CJI to CSI, June 25, 1893.
[187] CSI 2182: Eugene Schreier to William P. Sheffield, Jr., July 6, 1893.
[188] CJI 0126-0151: Deeds of Conveyance, 1894.
[189] CJI 0471: February 2, 1903 meeting of the CJI Board of Trustees.

Trustees," meaning the CSI trustees.[190] It is telling that such surrender of premises included the building and the ritual items inside of it. From the documents, it appears that CJI took nothing from the building before handing over the keys—simply because they had no legal claim of ownership to the important ritual items inside of it (like the *rimonim* or any of the other synagogue appurtenances).

But the most forthright admission by CJI of CSI's ownership came on January 30, 1903, after the U.S. Circuit Court ruling. CJI representatives signed a document that stated: "The Congregation, Jeshuat Isreal [sic], agrees to admit and recognize without qualification the title and ownership of L. Napoleon Levy and other Trustees to the synagogue building, premises, and fixtures."[191] There could hardly be a more direct statement of and admission regarding CSI's complete and total ownership over the synagogue building and its contents.

Third, at key moments during these turn-of-the-century debates, legal authorities repeatedly affirmed CSI's ownership of and legal title to the synagogue property, cemetery, and synagogue appurtenances. This started with the legal heirs of the original CYI and their deeds of conveyance to CSI in 1894, as discussed above. CSI's ownership was also affirmed by the 1903 U.S. Circuit Court ruling, in part based on these 1894 deeds of conveyance. Judge Arthur L. Brown declared in his opinion that "it appears by the bill that the defendants were in actual possession under deeds purporting to convey them a legal title."[192] As a result of this court ruling, whatever attempted claims CJI had regarding the synagogue and its appurtenances were completely squelched, as these 1903 documents and the subsequent February 1903 lease makes clear. Furthermore, CSI's ownership was over time confirmed by the Newport City Council, the

---

[190] CJI 0471: February 2, 1903 meeting of the CJI Board of Trustees.
[191] CSI 4533: Agreement between CSI and CJI, January 30, 1903.
[192] CSI 0318: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903.

U.S. Circuit Court, CJI (in writing, at several key moments), and, later, the U.S. Department of the Interior and other governmental entities.

Additionally, there are numerous other places in the twentieth and twenty-first centuries where CSI's ownership of the Touro Synagogue is demonstrated clearly and acknowledged by CJI and external authorities. These examples can be grouped together around several recurring themes. First is the issue of rental payments. The indenture with lease requiring a one-dollar annual payment was set up in 1903 and continues to this day.[193] During the one-hundred-plus years after 1903, this lease payment was normally made without any special notice or fanfare, as a clear recognition of CJI's operation under the lease and of ownership on the part of CSI. There were a few times when CJI fell behind in payments, but soon caught up as requested by CSI. In some cases, the cause was unclear – perhaps simple unintentional neglect. This occurred in 1916, when the CSI Board of Trustees wrote to CJI to inform them that CJI had been behind in rental payments since July 1, 1910.[194] In 1959, CSI representatives wrote to CJI, again requesting that rental payments be made and continue to be made on an annual basis, and CJI promptly complied.[195] A similar situation unfolded in 1993, when CJI was found to be six years behind in lease payments.[196]

In other cases, isolated CJI congregants have raised objections regarding the rental payments by refusing outright to pay them, but subsequently resumed payments upon demand by other congregants or CSI. In such cases, the rental payments stood in for larger issues of ownership and desired autonomy. On August 28, 1979, for example, CJI President Saul J. Schweber wrote to CSI to "humbly request a release from the bonds of trusteeship from Shearith

---

[193] CSI 5189: "Touro Synagogue History," Touro Synagogue website.
[194] CSI 9699: CSI Board of Trustee Meeting Minutes, November 13, 1916.
[195] CSI 0775-CSI 0778: Correspondence between CSI and CJI, March 1959.
[196] CJIB 6844: CJI Board of Officers Minutes, August 23, 1993.

Israel. We hereby refuse to fulfill our annual token rent fee of $1.00 for years 1978 and 1979."

Schweber explained, "The complexity of maintaining and preserving this historic shrine . . .

make it imperative that we enjoy full autonomy and have full control of our destiny. We can no

longer tolerate a trusteeship."[197] CSI President Edgar J. Nathan replied in December of that year,

firmly reminding Schweber of the long-standing lease agreement and "legal relationship" that

could not be changed without "approval of a court."[198] Regular payments resumed shortly

thereafter.[199]

      Second are the terms of the lease. There are other significant undertakings that CJI took

on in the indentures with leases in 1903 and 1908—a lease that CJI affirms remains in force to

this day. These undertakings include conducting religious services "according to the ritual rites

and customs of the Orthodox Spanish and Portugese [sic] Jews as at this time practised in the

Synagogue of the Congregation Shearith Israel in the city of New York," and permitting CSI to

approve any rabbi hired at the Touro Synagogue.[200] Together, they confirm the role that CSI has

played with respect to the Touro Synagogue as owner and guardian of the Touro Synagogue, and

the role that CJI has accepted from the beginning as a lessee.

      Third, CJI repeatedly deferred to CSI as the owner of the synagogue in the twentieth

century, particularly with regard to repairs and major decisions related to the building or the

property. Two years after signing the 1903 lease, CJI requested permission from CSI to add onto

the side building in which the religious school met.[201] CSI, as owner, declined, noting that its

---

[197] CJI 1220: Saul J. Schreiber to Trustees of Congregation Shearith Israel, undated, but likely August 28, 1979.
[198] CJI 1221: Edgar J. Nathan to Saul J Schreiber, December 13, 1979.
[199] On May 8, 1983, CJI minutes authorized the payment of rent to CSI. See CJIB 5658: CJI Meeting, May 8, 1983.
[200] CSI 0002: 1908 CJI/CSI lease, January 14, 1908.
[201] CSI 9254: CSI Board of Trustees Meeting Minutes, January 17, 1905.

Fisher 56

board "would not consent to any alterations of any description in that historic edifice."[202] (CSI

trustees denied a similar petition from CJI to build an addition in 1911.)[203] In 1908, CSI worked

with CJI to install a tablet at the Touro Synagogue in memory of Judah Touro, which was

dedicated on September 7 of that year, with leaders from CSI co-officiating.[204] On July 25, 1927,

CJI wrote to CSI for approval regarding the wording of several plaques to be posted on the gates

of the synagogue and at the cemetery. CSI sent back specific wording for the plaques, which

included this important phrase: "Title vested in the Congregation Shearith Israel in the City of

New York 5654 - 1894)."[205] Similarly, on July 7, 1939, the CJI secretary wrote to CSI "to

request permission from your Congregation to erect a monument on the lawn of the Touro

Synagogue as a memorial to the principle of religious and civil liberty established on this island

300 years ago."[206] CSI responded a month later, on August 10, 1939, approving of the monument

and its final location.[207] CJI requested permission from CSI on other occasions, too, for changes

to the building and premises, as on March 15, 1975, when CJI requested CSI's "concurrence"

regarding the need for a burglar and fire alarm system to be installed. Notably, CJI referred to

CSI as "legal owner of Touro Synagogue."[208]

   CSI's ownership of not just the building, but of the synagogue appurtenances and

paraphernalia (ritual objects), was acknowledged by CJI in 1959, when the Smithsonian Institute

wrote to CJI Rabbi Theodore Lewis asking if it would be possible to include a Jewish religious

---

[202] CSI 9257: CSI Board of Trustees Meeting Minutes, February 27, 1905 (quotation). For the initial request, see CSI 9254: CSI Board of Trustees Meeting Minutes, January 17, 1905. See also Urofsky, *A Genesis of Religious Freedom*, 103.
[203] CSI 9438: CSI Board of Trustees Meeting Minutes, January 29, 1911.
[204] "Touro Tablet Unveiled," *New York Times*, September 8, 1908.
[205] CSI 1446-1449: Correspondence between CSI and CJI, 1927. The date given here is in Jewish and Common Era years. It is unclear what signage was ultimately used. I have not seen additional records from CSI or any records from CJI on this.
[206] CSI 2110: CJI Secretary to CSI, July 7, 1939.
[207] CSI 2092: Victor Tarry to Max Levy, August 10, 1939.
[208] CJIB 4155: Saul Fine to Edgar J. Nathan, March 16, 1975.

artifact in the United States National Museum. Lewis immediately wrote to CSI, seeking advice and input. CSI's response was less than enthusiastic, and it seemingly ultimately refused, although the documents are not entirely clear.[209] But the very fact that CJI recognized that they were not authorized to loan such religious objects (including the requested silver) illustrates the way that CJI over time continued to operate within the lessee framework set up by the 1903 and 1908 leases.

CSI's recognized ownership of the synagogue appurtenances was demonstrated when, quite significantly, some **CJI members** protested when CJI leaders first proposed selling the *rimonim* in 2008, and continued to voice substantial questions in subsequent congregational meetings. Such protests illustrate an internal recognition by some CJI members one hundred years later that the lease agreements of 1903 and 1908 extended to the synagogue appurtenances and paraphernalia, including the *rimonim*. When the CJI leadership brought the problem of a severe financial deficit to the congregation during an October 19, 2008, meeting, the third financial option to remain solvent was "The possible sale of some real and personal property," which might include one set of the Myer Myers *rimonim*, along with other items (such as the Gilbert Stuart painting of Abraham Touro). CJI's minutes are clear about the concerns raised: "A discussion followed including opposition to selling the rimonim and the possibility that they belong to Shearith Israel."[210]

Similarly, in a March 29, 2009, special congregational meeting to gain authorization for the Board of Officers "to sell or otherwise dispose of, any real or personal property that belongs to the congregation," the question was again raised: "Do we own the rimonim?" The response

---

[209] CSI 0999-1001: David de Sola Pool to Edgar J. Nathan, Jr., August 7, 1957; CSI 1302-1303: Victory Tarry to Theodore Lewis, August 10, 1959.
[210] CJI 1298: CJI Congregational Meeting, October 19, 2008.

was vague: "We have been told that we do own them."[211] Tellingly, the proposed motion to authorize the Board to sell the *rimonim* or other real property failed to meet the required two-thirds majority to pass; twenty voted in favor, while fourteen voted against it.[212] The idea of selling the *rimonim* was proposed yet again to CJI members during a June 25, 2012, congregational meeting. And, once again, serious objections were raised, based on probable CSI ownership. No fewer than ***three*** different members raised serious concerns about the possibility of selling one set of the Myer Myers *rimonim* since, if CSI owned them, "Congregation Jeshuat Israel has no authority to sell them."[213] The CJI congregational approval that followed came after representations by CJI leadership that CJI owned the rimonim and that Christie's supported that conclusion. These three recent examples of internal CJI dissent show a long-term, continuous awareness by at least some CJI members of CSI's ownership of the building and the synagogue appurtenances, based on the 1903 and 1908 indentures with leases.

Fourth, CSI's ownership has been consistently and readily acknowledged by CJI whenever CJI attempted to do anything outside of itself, such as applying for state and federal grants or dealing with outside entities like the U.S. Federal Government. As noted above, the 1945 agreement between the United States Department of the Interior, CSI, and CJI affirmed CSI's legal ownership of the Touro Synagogue and its appurtenances (religious objects) in Article IV (b): "That the title to the Touro Synagogue, Newport, Rhode Island, and its appurtenances, subject to the covenants above set forth and recorded deeds and declarations of Trusts, apportaining [sic] thereto, shall remain in the Shearith Israel Trustees."[214] This document simply states what was known by all parties involved to be fact: that CSI ("owners") had held the

---

[211] CJI 1315: CJI Special Meeting, March 29, 2009.
[212] CJI 1315: CJI Special Meeting, March 29, 2009.
[213] CJI 1246-1247: CJI Congregational Meeting, June 25, 2012.
[214] CSI 0097-0098: An agreement between the U.S. Department of Interior, CSI, and CJI, Nov. 7, 1945.

Fisher 59

legal title to the synagogue and its appurtenances (necessary ritual objects) since the early nineteenth century. CJI again affirmed CSI's ownership in 1986 and again in 1989 on a National Registry of Historic Places Registration form, where it stated: "The property is still owned by the Congregation of Shearith Israel of New York City . . ."[215]

CSI's ownership (and the lease agreements from 1903/1908) was also affirmed in a 2001 Operating Agreement between the National Trust for Historic Preservation, CJI, and the Society of Friends at Touro Synagogue National Historic Site, Inc. Page 2 of that document affirms, "WHEREAS, the Touro Synagogue is an active place of worship of the Congregation Jeshuat Israel, which has possession of the site through a lease with Congregation Shearith Israel as owner . . ."[216] Significantly, this 2001 "Operating Agreement" made a distinction between the "operation" of the Touro Synagogue and "ownership" of it (a distinction CJI leaders had already made in 1998, when they noted that "though Shearith Israel is the owner of the building, CJI maintains, runs, and insures the building"[217]). As the attorneys for CJI explained to the attorney for CSI on November 5, 2001 (when CJI's attorneys sent a copy of the Operating Agreement for approval and promised to amend it, if needed, to please CSI), "it is an 'Operating' Agreement related only to the operation and not the ownership of the site."[218]

This on-site management role by CJI within the framework of ownership by CSI was affirmed a few years later, in 2004, when CJI applied for a State Preservation Grant. The State Preservation Grant application stated plainly that CSI was the "owner" and the "on site management of the property and preservation of the property has been entrusted to Congregation

---

[215] TSF 0112: National Register of Historic Places Registration Form, February 1989; for 1986, see Materials from the United States Department of the Interior National Park Service for Touro Synagogue National Historic Site, p. 10.

[216] TSF 0725: Historic Site Operating Agreement between the National Trust for Historic Preservation, CJI, and the Society of Friends at Touro Synagogue National Historic Site, Inc., October 17, 2001.

[217] CJIB 6631: CJI Congregational Meeting Minutes, February 8, 1998.

[218] TSF 0722: Andrew M. Teitz to Alvin Deutsch, November 5, 2001.

Jeshuat Israel and the Touro Synagogue Foundation."[219] CJI's long role as renters and caretakers of the property and appurtenances (even extending to repairs, grant writing, and fund raising) did not change the basic framework of the lease or CSI's ownership, as CJI recognized in 2004 and had recognized for the entire preceding century, nor did such caretaking ever imply or lead to ownership on the part of CJI with regard to the synagogue, the cemetery, or the synagogue appurtenances.

Accordingly, when CJI has applied for grants, they have acknowledged CSI as the legal owners of the property and have requested letters of permission and support for their applications. This happened in 1999, when CJI applied for a grant from the National Trust for Historic Preservation; in 2003, when CJI applied for a Getty Grant; and in 2004, when CJI applied for a State Preservation Grant.[220] In particular, the 2004 State Preservation Grant listed CSI as owner, described the *rimonim* as part of the synagogue's "original interior furnishing" (*not* separate property of CJI), and stated that the lease was "perpetual."[221] In each of these applications, CJI acknowledged CSI as the owner of the Touro Synagogue.

Lastly, during much of the twentieth century, CSI's ongoing ownership and oversight can be seen in its leadership role in the Touro Foundation. Officially titled "The Society of Friends of Touro Synagogue National Historic Shrine Inc.," the Touro Foundation was organized in 1948 following the establishment of the Touro Synagogue as a National Historic Site.[222] Even though it is a separate non-profit organization from CJI, CSI's legal ownership of the Touro Synagogue

---

[219] CSI 0148: 2004 State Preservation Grant Application.
[220] See CSI 0979: David J. Nathan to B. Schlessinger Ross, January 28, 1999; CSI 0980: CSI to the National Trust for Historic Preservation, January 28, 1999; CSI 0984: Alan Singer to the Getty Grant Program, April 3, 2003; CSI 0148: State Preservation Grant Application, July 28, 2004.
[221] CSI 0148, 0157-0158: State Preservation Grant Application, July 28, 2004. Other histories of the Touro Synagogue concur, stating, "The contract between Shearith Israel and Jeshuat Israel has held for more than a century". See Urofsky, *A Genesis of Religious Freedom*, 100.
[222] CJIB 1535: Meeting Minutes of The Society of Friends of Touro Synagogue National Historic Shrine Inc., Nov. 20, 1960; CSI 5189: "Touro Synagogue," Touro Synagogue website.

and important supervisory role was acknowledged in the structural organization and leadership of the Touro Foundation. According to the Foundation's Bylaws, the Board of Directors for the Touro Foundation was comprised of five members from CSI and five members from CJI. Additionally, the presidents of both CJI and CSI were also members of the Board of Directors.[223] Such an arrangement gave CSI an equal voice in the undertakings and decision-making of the Touro Foundation. As a precautionary measure, the Touro Foundation was required to notify CSI before any contracts were entered into for the purpose of working on the synagogue building.[224] Over time, CJI, or individuals associated with CJI, appear to have sought to chip away at such influence over the management and operation of the property, but such attempts to reduce CSI's influence did not affect the legal reality of CSI's ownership of the building.[225]

Stepping back, then, it seems important to also point out several related historical realities regarding the entirety of the relationship between CSI and CJI. First, as a historian, I recognize that, over the course of successive generations, it is often the case that agreements are not enforced nor enacted consistently over time with the same degree of self- or outward-awareness. This phenomenon is well-known to historians with regard to a variety of contexts and situations. This can result from confidence that the counterparty was performing adequately; it can result from natural human processes of neglect or unintentional oversight by one party or another; or it can result from ill-willed intentions at times. But it is important to recognize that, no matter what the actual practices of successive leaders, the underlying legal agreement remains the same

---

[223] CJIB 1543: Meeting Minutes of The Society of Friends of Touro Synagogue National Historic Shrine Inc., Nov. 20, 1960.
[224] CSI 2304: Extract of the meeting of the Board of Directors for the Society of Friends of Touro Synagogue and Touro Synagogue Restoration Committee, June 26, 1958.
[225] TSF 0456: Bylaws of the Society of Friends of Touro Synagogue National historic Shrine, Inc., adopted August 11, 1991. Prior versions of the Society of Friends bylaws indicated that there should be equal representation from CSI and CJI on the Society of Friends board (five representatives each, plus the president of each congregation). See CJIB 1543: The Society of Friends of Touro Synagogue National Historic Shrine Inc., Meeting Minutes, Nov. 20, 1960.

Fisher 62

unless it is officially and legitimately altered by both parties. In the case of CSI and CJI, the underlying legal agreement—that of ownership and incidents of ownership by CSI of the property and appurtenances and paraphernalia, and of a lessee-ship by CJI—was never officially, legally, nor legitimately changed.

As such, from my perspective as a historian, what is most important to look at are the moments when there is a recognition of this past agreement, a negotiation over the implications of that past agreement, and, finally, a return to compliance (a process that repeated itself over the course of more than one hundred years between CSI and CJI starting in 1903). Although some later CJI leaders may have at times disagreed with the 1903 lease agreement (and the required one dollar per year lease fee and other specific undertakings), and although at a few points some CJI leaders refused to pay it, over the long term that lease agreement and legal arrangement ultimately stood firm. The lease fee was routinely paid over time (when years were skipped there is evidence that payments were eventually made up), even as recently as 2012, and the Touro Synagogue website confirms that rent is still paid annually.[226]

Second, it is important to consider the longer history of actions by these two congregations over time rather than just a few isolated actions by individuals representing and/or associated with these congregations. Regardless of how some individuals from CJI might have felt regarding the ownership of the synagogue and its appurtenances by CSI (particularly in the 1970s, when there seems to have been some desire to be free from what CJI representatives termed "the bonds of trusteeship"), the overall actions of CJI as a congregation and legal entity consistently reflect their acknowledgement of CSI's ownership. This is most evidently displayed in the applications for grants and in being included in insurance policies, as outlined above, but

---

[226] CSI 0802: Rent check from CJI, February 12, 2012; CSI 5189: "Touro Synagogue History," Touro Synagogue website.

also with regard to the treatment of the Touro Synagogue's ritual objects mentioned in the 1903

and 1908 leases and indentures.

Third, a wider look at the history of religion in America reveals that there have been

hundreds of court cases involving disputed property and ritual items between the seventeenth

century and the present, involving the entire spectrum of religious denominations and

organizations including Congregationalists, Presbyterians, Baptists, Mormons, and Jews, among

others. These cases have shown that deeds, written contracts, and the conveyances of the heirs at

law matter; that the original intentions of donors, heirs, and founders are often valued quite

highly; that religious objects and buildings can, in fact, revert back to former owners, donors, or

even to a wider religious community at large if a church ceases to exist; and that courts over time

tend to favor established hierarchies and subordinate relationships.[227] Additionally, the loan,

gifting, or transfer of religious objects often retains a close connection with their original donors

or loaners; the sale of religious property (buildings or ritual objects) can rarely be done without

considering the intentions of the gift or loan, or consulting any living members or entities who

have any claim at all to the religious property or objects. In the long history of church property

---

[227] Regarding the importance of deeds, written contracts, and the conveyances of the heirs at law, see the literature and documentation related to the Temple Lot Case: R. Jean Addams, "The Church of Christ (Temple lot) and the Reorganized Church of Jesus Christ of Latter Day Saints: 130 Years of Crossroads and Controversies," *Journal of Mormon History* 36:2 (Spring 2010), 54-127; Samuel Appleton Blatchford, *United States Court of Appeals Reports*, Volume 36: Cases Adjudged in the United States Court of Appeals for the Eighth Circuit in May and December Terms 1895 (Albany: Banks and Brothers Law Publishers, 1897), 786-789. For an example of the high value of the original intentions of donors and heirs, see the series of legal cases surrounding the Catholic parish closings in the wake of the clergy sex abuse scandals in the early 2000s: Catharine P. Wells, *Who Owns the Local Church? A Pressing Issue for Dioceses in Bankruptcy*, SSRN Scholarly Paper (Rochester, NY: Social Science Research Network, November 14, 2005); Janet I. Tu, "Spokane Diocese can't sell parishes, judge rules," *The Seattle Times*, July 16, 2006; Congregation of the Clergy to William Skylstad, July 16, 2006; Code of Canon Law, Chapter 2, accessed via http://www.vatican.va/archive/ENG1104/_PD.HTM. Regarding church property reverting to a wider religious community, see "The Dedham, MA Ruling," in David Parke, ed., *The Epic of Unitarianism* (Boston: Skinner House Books, 1985), 91-96; Congregation of the Clergy to William Skylstad, July 16, 2006; Code of Canon Law, Chapter 2, especially section 121 and 123, accessed via http://www.vatican.va/archive/ENG1104/_PD.HTM. In terms of courts respecting hierarchical and subordinate relationships, see the case of *Kedroff v. St. Nicholas Cathedral*, as described in Ike Mark Ellman, "Driven from the Tribunal: Judicial Resolution of Internal Church Disputes," *California Law Review* 69:5 (September 1981), 1378-1444; Stanley Forman Reed, "Opinion," *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 24 November 1952.

Fisher 64

disputes in the U.S., deeds are almost always respected, as are hierarchies and subordinate

relationships (both of which apply directly to CJI v. CSI). Considering CJI's actions in this

longer span of history makes the attempt to sell the *rimonim* without consulting the wider

religious community from which they originated—in this case, CSI, who was entrusted with

their oversight, use, and care by the heirs at law of the original CYI congregants, and who are in

fact the owners of the *rimonim*—seem highly aberrant.[228]

In sum, the entire course of dealings between CSI and CJI, as represented in the

documents I have looked at, indicates that after 1903 CJI understood itself to simply be a

religious entity that was permitted use of (within a specific lease agreement) the synagogue and

its religious objects (appurtenances). This permission was granted by the synagogue's legal

owner, Congregation Shearith Israel, whose ownership has for the past more than one hundred or

so years been explicitly agreed to by Congregation Jeshuat Israel.


**Conclusion**

In conclusion, after a thorough reading of the available documents relevant to this case

and after conducting my own independent investigation and research, it seems clear to me as a

historian with expertise in American religious history and the history of Rhode Island that, first,

there is no historical connection (culturally or genealogically) between the original (colonial-era)

Congregation Yeshuat Israel and the current (1894-present) Congregation Jeshuat Israel; and,

second, that the words "appurtenances" and "paraphernalia" as contained in the 1903 and 1908

indentures with leases, along with other relevant historical documents, do indeed refer very

---

[228] This is also reflected in the sentiments expressed by Maimonides, the famed twelfth century Torah scholar who decreed, "'the decorative silver and gold pomegranates that are made for a Torah scroll are considered sacred articles,' which could not be sold except to buy a Torah." David L. Barquist, *Myer Myers: Jewish Silversmith in Colonial New York* (New Haven, Conn.: Yale University Press, 2001), 154.

Fisher 65

specifically to the disputed *rimonim* and all other sacred and ritual objects necessary for a fully functioning Jewish synagogue. Additionally, my reading of these documents, along with my own independent historical investigation, has convinced me that at no time did the new (1894) CJI own the synagogue, the cemetery, or any of the ritual items that had been on loan to them from CSI from the time of the re-opening of the Touro Synagogue in 1883. All evidence points towards CSI as the owners of the synagogue, cemetery, and appurtenances (ritual items). CJI has from 1903 to the present operated self-consciously within a repeatedly acknowledged lease structure that they themselves have described as "perpetual." Property maintenance and caretaking was part of this lease arrangement and understanding; CJI was operating as managers and caretakers in keeping with their responsibilities as tenants, and often in close relationship with CSI, without such property management ever implying ownership over time or any sort of adverse possession. In short, CSI still owns the disputed *rimonim*; CJI does not. CJI's use of these ritual objects was and still is governed by the lease structure set up in 1903 and 1908, and has rightly remained in effect to this day.

**Compensation and Prior Testimony**

My compensation for this expert testimony is $275 per hour. I have never previously testified as an expert at trial or by deposition within the preceding four years.

Dated:     Chicago, Illinois
           November 24, 2014

_____
Linford D. Fisher

## EXHIBIT A

**CURRICULUM VITAE OF PROF. LINFORD FISHER**

# LINFORD D. FISHER

Department of History, Brown University
Box N, 79 Brown Street, Providence, RI 02912
Linford_Fisher@Brown.edu

**EMPLOYMENT**

BROWN UNIVERSITY                                                    2009-present
*Assistant Professor of History*, Department of History

INDIANA UNIVERSITY—SOUTH BEND                                      2008-2009
*Assistant Professor of History*, Department of History

HARVARD UNIVERSITY                                                 2007-2008
*Tutor in Early American History*, History and Literature

**EDUCATION**

HARVARD UNIVERSITY                                                 2008
*Th.D., History of Religion in America*
    Dissertation: "'Traditionary Religion': The Great Awakening and the
        Shaping of Native Cultures in Southern New England, 1736-1776"
    Advisors: David D. Hall, Jill Lepore, and Laurel Ulrich

GORDON-CONWELL THEOLOGICAL SEMINARY, South Hamilton, MA           2002
*M.A., Church History*
    Concentration: American Religious History
    Thesis: "Addressing the Social Question: Robert A. Woods and Boston's
        South End House, 1892-1925"
    Graduated summa cum laude
*M.A., Religion*
    Graduated summa cum laude

LANCASTER BIBLE COLLEGE, Lancaster, PA                            1999
*B.S., Religion*
    Graduated with honors

**PUBLICATIONS**

*BOOKS*

*The Land of the Unfree: Africans, Indians, and the Varieties of Slavery and Servitude in Colonial New England and the Atlantic World* (in progress).

*Decoding Roger Williams: The Lost Essay of Rhode Island's Founding Father*, with J. Stanley Lemons and Lucas Mason-Brown (Baylor University Press, forthcoming 2014).

*The Indian Great Awakening: Religion and the Shaping of Native Cultures in Early America* (Oxford University Press, 2012).

*PEER-REVIEWED ARTICLES*

"'By Treachery and Seduction': Indian Baptism and Conversion in the Roger Williams Code," with Lucas Mason-Brown, *William and Mary Quarterly* (forthcoming April 2014).

"'Dangerous Designes': The 1676 Barbados Act to Prohibit New England Indian Slave Importation," *William and Mary Quarterly* 71 no. 1, 3rd ser. (January 2014): 99-124.

"A Brass Hawk and an Indian Bible: Land, Sachemship Disputes, and Power in the Conversion of Ben Uncas II," *Journal of Social History* 47:2 (Winter 2013): 1-25.

"'It provd But Temporary, & Short lived': Pequot Affiliation in the First Great Awakening," *Ethnohistory* 59:3 (July 2012): 465-488.

"Native Americans, Conversion, and Christian Practice in Colonial New England," *Harvard Theological Review* 102:1 (January 2009): 101-124.

"'I believe they are Papists!': Natives, Moravians, and the Politics of Conversion in Eighteenth-Century Connecticut," *The New England Quarterly* 81:3 (September 2008): 410-437.

*OTHER ARTICLES*
"Writing Histories: Empire, Religion, and the Production of Native American Manuscripts, 1600 – 1800," in *Manuscripts* 63:4 (Fall 2011): 101-120.

*PEER-REVIEWED BOOK CHAPTERS*
"Religion, Race, and the Formation of Pan-Indian Identities in the Brotherton Movement, 1700-1800," in *Native Diasporas: Native American Identity in North America*, Gregory D. Smithers, ed. (forthcoming 2014).

"Colonial Encounters," in *The Columbia Guide to Religion in American History*, Paul Harvey and Edward J. Blum, eds. (Columbia University Press, 2012).

*OTHER ESSAYS*
Religion in American History (http://usreligion.blogspot.com/)
"Roger Williams, the First American? Some Thoughts on John Barry's Roger Williams and the Creation of the American Soul," 7/12/2012
"Big Ideas in a Small State: Roger Williams and the 375th Anniversary of the founding of Providence, Rhode Island," 5/23/2012
"A Step Closer to a Mohawk Saint," 12/19/2011
"Of Tea Parties, Historical Fundamentalism, and Antihistory," 10/27/2010
"Frankly, My Dear, I Don't Give a Franciscan," 8/23/2010
"King Philip's Board Game: Educating or Trivializing?" 4/14/2010
"The View from Pachgatgoch (or, Why Moravians are Still Sexy)," 2/19/2010
"Doctrine of Christian Discovery," 11/12/2009
"'To Live Upon Hope': Conversation with Rachel Wheeler," 8/19/2009
"Thoughts on the 1st Biannual Religion and American History Conference," 6/7/2009
"Comparative Ethnohistory," 4/3/2009

"American Indians and the Doctrine of (Christian) Discovery," 7/13/2012, History of Christianity (http://www.churchhistory.org/blogs/)

"Dickinson, Jonathan (1688-1747)" in *Encyclopedia of the American Enlightenment*, 2 vols. (Continuum, 2012).

"Indian Casinos" in *Encyclopedia of the Culture Wars*, 2 vols. (M.E. Sharpe, 2009).

"Loyalists," and "Loyalist Exiles" in the *Encyclopedia of the American Revolutionary War*, 4 vols (ABC-CLIO, 2006).

"Native Americans, Conversion to Christianity" in *The United States at War: Understanding Conflict and Society*, ABC-CLIO's reference website (2005).

"Lawrence Abbott Lowell," "Robert A. Woods," and "Neighborhood Idea" in *The Encyclopedia of the Gilded Age and Progressive Era*, 3 vols (M.E. Sharpe, 2005).

*BOOK REVIEWS*

Stephen Saunders Webb, *Marlborough's America* (Yale, 2013) in the *Canadian Journal of History/Annales canadiennes d'histoire* (in progress).

Eric R. Schlereth, *An Age of Infidels: The Politics of Religious Controversy in the Early United States* (Penn, 2013) in *The Journal of Religion* (in progress).

Julius Rubin, *Tears of Repentance: Christian Indian Identity and Community in Colonial Southern New England* (Nebraska, 2013) in *Ethnohistory* (forthcoming).

Edward E. Andrews, *Native Apostles: Black and Indian Missionaries in the British Atlantic World* (Harvard, 2013) in *Journal of American Studies* (forthcoming 2014).

Laura Chmielewski, *The Spice of Popery: Converging Christianities on an Early American Frontier* (Notre Dame, 2011) in *Church History* 82:4 (December 2013).

Hilary E. Wyss, *English Letters and Indian Literacies: Reading, Writing, and New England Missionary Schools, 1750-1830* (Penn, 2012) in *Journal of American History* 100:2 (2013).

Amanda Porterfield and John Corrigan, eds., *Religion in American History* (Wiley Blackwell, 2010) in *Church History and Religious Culture* 93:1 (2013).

Tracy Neal Leavelle, *The Catholic Calumet: Colonial Conversions in French and Indian North America* (Penn, 2012) in *Church History* (June 2013).

R. Todd Romero, *Making War and Minting Christians: Masculinity, Religion, and Colonialism in Early New England* (University of Massachusetts, 2011) in *The Catholic Historical Review* 98:3 (July 2012).

Brad D. E. Jarvis, *The Brothertown Nation of Indians: Land Ownership and Nationalism in Early America, 1740–1840* (Nebraska, 2010) in *Journal of American History* 98:1 (June 2011).

4

Joseph M. Hall, Jr., *Zamumo's Gifts: Indian-European Exchange in the Colonial Southeast* (Penn, 2009) in the *Florida Historical Quarterly* 89:2 (Fall 2010).

Rachel Wheeler, *To Live Upon Hope: Mohicans and Missionaries in the Eighteenth-Century Northeast* (Cornell, 2008) in the *Journal of Social History* 44:1 (Fall 2010).

Corinna Dally-Starna and William A. Starna, eds., *Gideon's People: Being a Chronicle of an American Indian Community in Colonial Connecticut and the Moravian Missionaries Who Served There*, 2 vols. (Nebraska, 2009) in the *New England Quarterly* 83:2 (June 2010).

Margaret Connell Szasz, *Scottish Highlanders and Native Americans: Indigenous Education in the Eighteenth-Century Atlantic World* (Oklahoma, 2007) in *Scotia: Interdisciplinary Journal of Scottish Studies* 31 (2009).

Thomas S. Kidd, *The Great Awakening: The Roots of Evangelical Christianity in Colonial America* (Yale, 2007) in *The New England Quarterly* 81:2 (June 2008).

Timothy L. Wood, *Agents of Wrath, Sowers of Discord: Authority and Dissent in Puritan Massachusetts, 1630-1655* (Routledge, 2006) in *Fides et Historia* 39:1 (Winter/Spring 2007).

Phillip Benedict, *Christ's Churches Purely Reformed: A Social History of Calvinism* (Yale, 2002) in *Journal of Early Modern History* 8:2 (May 2004).

Francis Bremer, *John Winthrop: America's Forgotten Founding Father* (Oxford, 2003) in *Fides et Historia* 36:1 (Winter/Spring 2004).

Denis R. Janz, ed., *A Reformation Reader* (Fortress, 1999) in the *Journal of the Evangelical Theological Society* (September 2001).

## CONFERENCE PRESENTATIONS

*PRESENTING*

Respondent to and chair of a panel entitled "The Message is the Medium: Missions to Indians as Central to the Early American Republic" at the American Society of Church History/American Historical Association Meeting, Washington, D.C., 2014.

"Whose Voices? Historians, Natives, and the not-so-Pastness of the Past," at the American Society of Church History / American Historical Association conference in New Orleans, January 2013.

"A Forced Diaspora: Tracking New England Native Enslavement in the Seventeenth-Century Atlantic," at the Native American and Indigenous Studies Association conference in Uncasville, CT, June 2012.

Respondent to a panel entitled "Reassessing Missions in the Colonial Atlantic World," at the American Society of Church History / American Historical Association conference in Chicago, January 2012.

"'Desired to be instructed': Parsing Indian Initiative Prior to the First Great Awakening." Presented at the American Society of Church History / American Historical Association conference in San Diego, CA, January 2010.

"Christian Indians? On the Dangers of Homogenizing Indians' Religious Experiences in Colonial New England." Presented at the American Society for Ethnohistory conference in New Orleans, Louisiana, October 2009.

"Leaving the English: Joseph Johnson and the Pan-Indian Migration to Brotherton, NY, 1775-1785." Presented at the Boston Area Early American History Seminar, Massachusetts Historical Society, Boston, MA, June 2008.

"'Preserving Their Liberty': Indian Churches and the Quest for Autonomy after the First Great Awakening." Presented at the Annual Conference of the Omohundro Institute for Early American History and Culture, Boston, MA, June 2008. Also co-organized the panel of which this paper was part, entitled "Indigenous Christianities in Early America and the Atlantic World."

"'I pray to him in my way': Religious change and Indian agency in the First Great Awakening." Presented at the American Historical Association conference in Washington, D.C., January 2008. Also organized the panel of which this paper was part, entitled "Conversion in the Contact Zones: Navigating Religious Practice and Identity among America's First Peoples."

"Colonial Conversions: American Indians and Acculturation in Eighteenth-Century New England." Presented at the Colonial Society of Massachusetts Graduate Student Forum in Early American History, Boston, MA, April 2007.

"Natives, Moravians, and the Politics of Conversion in Eighteenth-Century Connecticut." Presented at the Annual Conference of the Omohundro Institute for Early American History and Culture, Quebec City, Quebec, June 2006.

"'Such a dore of opportunity': Roger Williams and Indian Conversion." Presented at the Annual Conference of the American Academy of Religion, San Antonio, TX, November 2004.

"Community, Commerce, and Oppression in Seventeenth-Century Boston: The Case of Robert Keayne Reconsidered." Presented at the Fall 2003 Conference of the New England Historical Association, Worcester, MA, October 2003.

*PRESIDING*

Chair of and respondent to the panel entitled "Religious Minorities in the Nineteenth and Twentieth Centuries" at the Spectacle of Toleration conference 'No person shall bee any wise molested': Religious Freedom, Cultural Conflict, and the Moral Role of the State, Salve Regina University, Newport, RI, October 2013.

Chair of the panel entitled "Spectacle, Spectatorship, and Subjectivity" at the Fifth Annual Brown University Graduate Student Conference, April 2010.

6

Chair of the panel entitled "Inventing Revolution" at the 2008 French-American Colloquium on New Paradigms for Revolutionary Studies, University of Notre Dame, South Bend, IN, October 2008.

### FELLOWSHIPS, GRANTS, AWARDS, AND HONORS

| | |
|---|---|
| Library Company of Philadelphia NEH Long-Term Fellowship ($18,900) | 2014-2015 |
| Humanities Research Grant, Brown University ($1,800) | 2014-2015 |
| Faculty Development Fund Grant, Brown University ($1,500) | 2013-2014 |
| Humanities Research Grant, Brown University ($1,800) | 2013-2014 |
| Elected Resident Member, Colonial Society of Massachusetts | 2013 |
| Karen T. Romer Undergraduate Teaching and Research Award (collaborative research) | 2013 |
| Humanities Initiative Research Award, Brown University ($3,000) | 2013 |
| Humanities Research Grant, Brown University ($1,300) | 2012-2013 |
| Karen T. Romer Undergraduate Teaching and Research Award (collaborative research) | 2012 |
| Richard B. Salomon Faculty Research Award, Brown University ($15,000) | 2011-2012 |
| Franklin Research Grant, American Philosophical Society ($6,000) | 2011-2012 |
| Humanities Research Grant, Brown University ($1,500) | 2011-2012 |
| Young Scholar in American Religion, Center for the Study of Religion and American Culture, IUPUI | 2010-2012 |
| Karen T. Romer Undergraduate Teaching and Research Award (collaborative research) | 2010 |
| Massachusetts Historical Society NEH Long-Term Fellowship ($40,000) | 2010-2011 |
| Humanities Research Grant, Brown University ($1,800) | 2010-2011 |
| American Philosophical Society, Phillips Fund for Native American Research ($2,500) | 2007-2008 |
| Dean's Dissertation Fellowship, Harvard Divinity School ($23,200) | 2007-2008 |
| American Antiquarian Society, Peterson Fellowship ($1,000) | 2007-2008 |
| William R. Hutchison Doctoral Fellowship, Harvard University ($2,500) | 2006-2007 |
| Gilder Lehrman Institute of American History, Research Fellowship ($2,000) | 2006-2007 |
| Distinction in Teaching Award, Committee on Undergraduate Education, Harvard | Fall 2006 |
| Distinction in Teaching Award, Committee on Undergraduate Education, Harvard | Spring 2006 |
| Harvard Divinity School Fellowship ($25,000) | 2002-2005 |
| Church History Departmental Award (scholastic merit), Gordon-Conwell | 2002 |
| Phi Alpha Chi member (Gordon-Conwell scholastic honor society) | 2002 |
| President's Scholarship in Church History, Gordon-Conwell | 2000-2001 |

### PROGRAMMATIC FUNDING

| | |
|---|---|
| Imagine Brown 250+ Grant, for a lecture series, "1764: Brown's Founding in a Global Context" ($25,000) | 2014-2015 |
| Humanities Initiative Research Award, Brown University, to support the JCB/Brown British Atlantic Seminar ($5,000) | 2013-2014 |
| Salomon Grant (for course enhancement), Brown University ($85) | Fall 2013 |
| Salomon Grant (for course enhancement), Brown University ($350) | Spring 2013 |
| Salomon Grant (for course enhancement), Brown University ($150) | Fall 2012 |
| Salomon Grant (for course enhancement), Brown University ($150) | Spring 2012 |
| Salomon Grant (for course enhancement), Brown University ($480) | 2010 |
| Salomon Grant (for course enhancement), Brown University ($450) | 2009 |

### INVITED PRESENTATIONS AND LECTURES

"Decoding Roger Williams: Texts, Cryptography, and the Materiality of an Early American Mystery." Columbia University Society of Fellows, New York City, February 27, 2014.

"Paradise Lost? The Origins and Legacies of Rhode Island's Religious Freedom." Public lecture, East Providence Public Library, East Providence, RI, January 27, 2014.

"The Indian Great Awakening." Public lecture, The Spectacle of Toleration project (Newport Historical Society), Lincoln, RI, September 24, 2013.

"Indian Conversion in the Roger Williams Code." Public lecture, Roger Williams National Memorial, Providence, RI, April 30, 2013.

"Williams on Native Conversion: New Insights from the Roger Williams Code." Public lecture, Duke University, Durham, NC, April 1, 2013.

"The Indian Great Awakening." Public lecture, Connecticut State Library, Hartford, CT, March 21, 2013.

"Native Americans in the First Great Awakening," for REL 730 Native Americans and Christianity, Yale Divinity School, New Haven, CT, February 25, 2013.

"The Indian Great Awakening," Yale Group for the Study of Native America, Yale University, New Haven, CT, February 25, 2013.

"Texts, Math, and History in the Cracking of the Roger Williams Code," for AM 50 Applied Mathematics, Harvard University, Cambridge, MA, February 11, 2013.

Respondent to a panel titled "Race, Religion, and Freedom in the Eighteenth Century North," Boston Area Early American History Seminar, Massachusetts Historical Society, Boston, MA, February 5, 2013.

"Religion and Enslavement in Colonial New England and the Atlantic World." Public lecture, Harvard Divinity School, Cambridge, MA, January 22, 2013.

"God's Own Party? The Past, Present, and Future of the Christian Right in American Politics." Public lecture, Janus Fellows, Brown University, Providence, RI, December 5, 2012.

"The Indian Great Awakening." Congregational Library, Boston, MA, November 15, 2012.

"Christianity and the Native American Religious Experience." Public lecture, Lancaster Mennonite Historical Society, Lancaster, PA, November 12, 2012.

"The Indian Great Awakening." Circle Legacy Center, Lancaster, PA, November 9, 2012.

"The Indian Great Awakening: Religion and the Shaping of Native Cultures in Early America." Public lecture, Brown Bookstore, Providence, RI, October 9, 2012.

"The Indian Great Awakening: Religion and the Shaping of Native Cultures in Early America." Public lecture, John Carter Brown Library, Providence, RI, September 20, 2012.

"Indians at Harvard? Religion, Education, and Natives in Colonial New England." Public lecture, William Hall Public Library, Cranston, RI, April 30, 2012.

"The Indian Great Awakening: Religion and the Shaping of Native Cultures in Early America." Public lecture, South Kingstown Public Library, South Kingstown, RI, March 12, 2012.

"Writing Histories: Empire, Religion, and the Production of Native American Manuscripts, 1600 – 1800." Plenary address, the Manuscript Society Annual Meeting, Providence, RI, June 4, 2011.

"The Land of the Unfree: Africans, Indians, and the Varieties of Slavery and Servitude in Colonial New England." Massachusetts Historical Society, April 6, 2011.

"'An appearance of vital piety & religion': New England Natives and the First Great Awakening." Early American History and Culture Seminar, Newberry Library, Chicago, March 24, 2011.

"The Indian Great Awakening? Natives, Religion, and Empire in New England, 1700-1800." Vanderbilt University, February 16, 2011.

"An Indian Great Awakening? Negotiating Colonialism in Eighteenth Century New England." Massachusetts Historical Society, October 6, 2010.

"'In Literature & University Learning': Native Views on and Uses of Education in Colonial New England." Seventh Annual All Ivy Native Council Conference, Brown University, Providence, RI, April 18, 2010.

"Discovering Henry Hudson: The Ironic Origins of New York." College Hill Society, Providence, RI, May 28, 2010.

"'Drove Them From Their Planting Land': Sachems, Empire, and Religion in the Mohegan Land Controversy, 1700-1745." Medieval and Modern History Seminar, Brown University, April 20, 2010.

"Contextualizing the First Great Awakening," for RELS 0110 Christianity, Brown University, Providence, RI, March 17, 2010.

"The Ironies of Discovery: Hudson as Explorer." Faculty lecture at a Boldly Brown alumni event, Jazz at Lincoln Center, New York City, November 5, 2009.

"Negotiating Colonialism: Religion, Race, and Empire in New England Indian Lives, 1700-1800." Public lecture, Brown University, Providence, RI, February 26, 2009.

"Race and Slavery in Colonial America," for History H-217 The Nature of History, Indiana University—South Bend, November 10, 2008.

"Perceptions of Native Americans in Mary Rowlandson's Captivity Narrative," for History H-260 The History of Women in the United States, Indiana University—South Bend, September 2, 2008.

"'Traditionary Religion': The Great Awakening and the Shaping of Native Cultures in Southern New England, 1736-1776." Indiana University—South Bend, January 25, 2008.

"John Eliot and the Christian Indians of New England," Roxbury Community College, Roxbury, MA, February 25, 2006.

"The Amish in the American Cultural Imagination: A Response to 'Devil's Playground,'" Center for the Study of World Religions, Harvard University, Cambridge, MA, February 23, 2005.

## PROFESSIONAL SERVICE
### PUBLIC
#### TELEVISION AND VIDEO

INTERVIEWEE for Scholars Online, Choices Program, Brown University (2013).
INTERVIEWEE for *David Brainerd: Missionary to the American Indians*, an independent documentary (2013).
INTERVIEWEE for the Military Channel's program, "America: Facts Vs. Fiction" (2012).
HISTORICAL CONSULTANT AND INTERVIEWEE for *The Tillinghast Nightmare*, an independent documentary on some late eighteenth century vampire cases and investigations (2012).
INTERVIEWEE for *I Voted?*, an independent film on citizenship, voting, and the election (2011).
HISTORICAL CONSULTANT AND INTERVIEWEE for the BBC's program "Who Do You Think You Are?" (2010-2011).
INTERVIEWEE for the History Channel's programs and DVDs "The Real Story of Halloween," "The Real Story of Thanksgiving," and "The Real Story of Christmas" (2010).

#### MEDIA INTERVIEWS
*The Associated Press*; *The Boston Globe*; *The Providence Journal*; *The Smithsonian Magazine*; Slate.com; *The Christian Post*; *Brown Daily Herald*

### PROPOSAL AND MANUSCRIPT REVIEW
*Rhode Island History* (2014)
*William and Mary Quarterly* (2009, 2013)
Routledge (2012, 2013)
*Harvard Theological Review* (2013)
State University of New York Press (2013)
*World Archaeology* (2012)
*Journal of Moravian History* (2012)
Yale University Press (2011, 2012)
CQ Press (Sage) (2010)
*Practical Matters* (2009)

### GRANT PROPOSAL REVIEW
FACULTY LIAISON, John Carter Brown Library (2012 – present)
PEER-REVIEWER, National Historical Publications & Records Commission, National Archives & Records Administration (2011, 2013)

10

PEER-REVIEW PANELIST, National Endowment for the Humanities Long-Term Fellowships (2012)

*TEACHING AMERICAN HISTORY AND NEH SUMMER INSTITUTE LECTURES*
University of Massachusetts, Amherst (2013)
Rhode Island Historical Society (2011)

*ORGANIZATIONAL COMMITTEES*
COUNCIL MEMBER, American Society for Church History (2013-2015)
STEERING COMMITTEE MEMBER, "The Spectacle of Toleration," a multi-year venture that includes public programming and an academic conference planned for October 2013, jointly organized by the Newport Historical Society, the Pell Center for International Relations and Public Policy, Salve Regina University, the George Washington Institute for Religious Freedom, the John Carter Brown Library, Brown University, and the Rhode Island Historical Society.

*DEPARTMENT/UNIVERSITY SERVICE*
BROWN
MEMBER, History Department Graduate Committee (2013-present)
CO-FOUNDER AND MEMBER, Native American and Indigenous Studies at Brown faculty group (2013 – present)
SOPHOMORE ADVISOR (2013 – present)
MEMBER, Brown University Community Council (2012 – present)
FIRST YEAR ADVISOR (2012 – present)
COMPUTER CZAR, Department of History (2011 – present)
MEMBER, Planning and Priorities Committee, Department of History (2011 – 2013)
MEMBER, Ad-hoc faculty temporary replacement committee (2011)
MEMBER, American Indian Studies Search Committee (2011)
MEMBER, Ad-hoc committee to revise course evaluations, Brown University (2009-2010)
INDIANA UNIVERSITY—SOUTH BEND
MEMBER, Religious Studies Committee, Indiana University—South Bend (2008-2009)
FACULTY LIAISON, Advance College Project, Indiana University—South Bend (2008-2009)
MEMBER, University Support Committee for the Civil Rights Heritage Center, Indiana University—South Bend (2008-2009)

*COMMUNITY*
INSTRUCTOR, Brown History Educational Prison Program, Rhode Island Adult Correctional Institute (2013-present)

**TEACHING**
*Brown University*
History 0970 Object Histories: The Material Culture of Early America (Spring 2010; Spring 2012; Fall 2013)
History 1975T Colonial Encounters: Indians, Europeans, and the Making of Early America (Fall 2009; Spring 2013)
History 1978O Enslaved! Indians and Africans in an Unfree Atlantic World (Spring 2014)
History 1800 The History of Religion in America, 1600-1865 (Spring 2010; Fall 2011; Spring 2013)

11

History 1801 Religion, Politics, and Culture in America, 1865 – present (Summer 2011, Fall 2012; Spring 2014)

History 1805 First Nations: The Peoples and Cultures of North America to 1800 (Spring 2012; Fall 2013)

History 2970 Graduate Readings in Early American History (Fall 2011)

History 2980 Religion in the Early Modern Atlantic World (Fall 2012)

*Indiana University—South Bend*

History H-105 American History I

History A-301 Colonial America

Religion R-335 History of Religion in America, 1600-1865

History J-495 Colonial Encounters

*Harvard College*

History and Literature 98a Religion and Gender in the History and Literature of America and Britain, 1600 – 1900

History and Literature 98b Revolutions, Modernity, and the Question of the "Other" in Early America

Religion 98 Christianity and Contemporary American Culture

## MEMBERSHIPS

American Historical Association

Omohundro Institute of Early American History and Culture

American Society for Ethnohistory

American Academy of Religion

American Society of Church History

## REFERENCES

David D. Hall, Harvard University, Study of Religion, 617-495-7732
david_hall@harvard.edu

Laurel Ulrich, Harvard University, Department of History, 617-496-9548
ulrich@fas.harvard.edu

Jill Lepore, Harvard University, Department of History, 617-496-5083
jlepore@fas.harvard.edu

Robert Orsi, Northwestern University, Departments of Religion and History, 847-491-5488
r-orsi@northwestern.edu

David Silverman, George Washington University, Department of History, 202-994-8094
djsilver@gwu.edu

Neal Salisbury, Smith College, Department of History, 413-527-9657
nsalisbu@smith.edu

*Updated 2.2014*

## **EXHIBIT B**

## **MATERIALS INCORPORATED INTO THE EXPERT REPORT OF PROFESSOR LINFORD D. FISHER**

**EXHIBIT B:**
**MATERIALS INCORPORATED INTO THE EXPERT REPORT OF PROFESSOR**
**LINFORD D. FISHER**

### A.  DISCOVERY MATERIALS

CJI 0001
CJI 0019
CJI 0025-0026
CJI 0036
CJI 0038-0041
CJI 0042
CJI 0043-0047
CJI 0048-0060
CJI 0086-0090
CJI 0126-0151
CJI 0155
CJI 0173-0186
CJI 0259-0262
CJI 0274-0277
CJI 0289-0295
CJI 0386
CJI 0394
CJI 0395
CJI 0405
CJI 0406
CJI 0453-0465
CJI 0470-0471
CJI 0581-0587
CJI 1067-1068
CJI 1166-1168
CJI 1210
CJI 1220-1222
CJI 1244-1247
CJI 1297-1299
CJI 1314-1315
CJI 1992-2055
CJIB 1535-1543
CJIB 0529-0531
CJIB 4155
CJIB 4360
CJIB 4674-4676
CJIB 5657-5659
CJIB 6631-6634
CJIB 6844-6850
CJIC 0341-0344
CSI 0001-0005
CSI 0014-0015

CSI 0027-0036
CSI 0089-0092
CSI 0093-0102
CSI 0148-0161
CSI 0172-0400
CSI 0266-0269
CSI 0401
CSI 0415-0479
CSI 0595-0613
CSI 0678-0705
CSI 0775-0778
CSI 0802
CSI 0979-0980
CSI 0981
CSI 0984
CSI 0999-1001
CSI 1002
CSI 1003
CSI 1166-1168
CSI 1172-1195
CSI 1302-1303
CSI 1446-1449
CSI 1691
CSI 1551-1579
CSI 1894-1895
CSI 2092
CSI 2110
CSI 2179-2183
CSI 2304
CSI 3538-3580
CSI 4031-4032
CSI 4055-4059
CSI 4248-4249
CSI 4291-4960
CSI 4533
CSI 4582-4583
CSI 5185-5187
CSI 5188-5190
CSI 5236
CSI 5253-5254
CSI 5257-5259
CSI 5265-5271
CSI 5273-5276
CSI 5277-5278
CSI 5287-05288
CSI 5296-5297
CSI 5334-5348
CSI 5591
CSI 8381-8382

CSI 8439
CSI 8446-8448
CSI 8962-8963
CSI 8998
CSI 9090-9091
CSI 9212-9213
CSI 9214
CSI 9254
CSI 9257
CSI 9421
CSI 9438
CSI 9699-9703
JHA 0044
JHA 0186-0189
TSF 0109-0115
TSF 0453-0461
TSF 0689-0698
TSF 0722-0739
TSF 1100
TSF 2408-2423
TSF 2664-2666
TSF 4933
TSF 5649
TSF 5658
TSF 5704-5705
TSF 5726
TSF 5742-5744
TSF 6106
TSF 6802-6803

Expert Report of Dr. Vivian Mann, dated November 24, 2014

**B.**   **OTHER SOURCES**

- 1663 Rhode Island Charter. http://sos.ri.gov/library/history/charter/

- Addams, R. Jean. "The Church of Christ (Temple lot) and the Reorganized Church of Jesus Christ of Latter Day Saints: 130 Years of Crossroads and Controversies." *Journal of Mormon History* 36:2 (Spring 2010).

- Adler, Cyrus, and Isidore Singer. *The Jewish Encyclopedia: A Descriptive Record of the History, Religion, Literature, and Customs of the Jewish People from the Earliest Times to the Present Day*. Funk & Wagnalls, 1907.

- *Antiquary, The*. Vol. 42. London, 1906.

- Barquist, David L. *Myer Myers: Jewish Silversmith in Colonial New York*. New Haven, Conn.: Yale University Press, 2001.

- Berlin, Adele. *The Oxford Dictionary of the Jewish Religion*. Oxford University Press, 2011.

- Blatchford, Samuel Appleton. *United States Court of Appeals Reports*, Volume 36: Cases Adjudged in the United States Court of Appeals for the Eighth Circuit in May and December Terms 1895. Albany: Banks and Brothers Law Publishers, 1897.

- B'Nai Jeshurun. "Our History and Vision." http://www.bj.org/about-bj/our-story/

- Brown, Benjamin. "The Rebirth of the Jewish Community in Newport, 1850-1854." *Rhode Island Jewish Historical Notes* 13, no. 3 (2001).

- Code of Canon Law, Chapter 2, accessed via http://www.vatican.va/archive/ENG1104/_PD.HTM.

- Congregation of the Clergy to William Skylstad. July 16, 2006.

- Denison, Frederic. "The Israelites in Rhode Island." In *The Narragansett Historical Register: 1885-1886*, Vol. 4, 1886.

- Ellman, Ike Mark. "Driven from the Tribunal: Judicial Resolution of Internal Church Disputes." *California Law Review* 69:5 (September 1981), 1378-1444.

- Fine, Steven. *This Holy Place: On the Sanctity of the Synagogue during the Greco-Roman Period*. University of Notre Dame Press, 1997.

- Gaster, Moses. *History of the Ancient Synagogue of the Spanish and Portuguese Jews: The Cathedral Synagogue of the Jews in England, Situate in Bevis Marks*. London, 1901.

- Gerber, Jane S. *Jewish Society in Fez 1450-1700: Studies in Communal and Economic Life*. Brill, 1980.

- Goldberg, David F., and John D. Rayner. *The Jewish People: Their History and Their Religion*. Harmondsworth: Penguin Books, 1989.

- Gutstein, Morris Aaron. *The Story of the Jews of Newport; Two and a Half Centuries of Judaism, 1658-1908*. New York, 1936.

- *Jewish Year Book, The*. Greenberg & Company, 1899.

- Jones, E. Alfred. *The Old Silver of American Churches*. Letchworth, England: Arden Press, 1913.

- Karp, Abraham J. "Overview: The Synagogue in America – A Historical Typology." Jack Wertheimer, ed., *The American Synagogue: A Sanctuary Transformed*. Cambridge: Cambridge University Press, 2003.

- Lewis, Theodore N. "Touro Synagogue, Newport, R.I., 1763-1963.*" Newport Historical Society Bulletin*, no. 111 (July 1963).

- Longfellow, Henry Wadsworth, and Dante Alighieri. *The Works of Henry Wadsworth Longfellow: The Poetical Works*. Houghton, Mifflin, 1886.

- Materials from the United States Department of the Interior National Park Service for Touro Synagogue National Historic Site

- Museum, United States National, Cyrus Adler, and Immanuel M. Casanowicz. *The Collection of Jewish Ceremonial Objects in the United States National Museum*. U.S. Government Printing Office, 1908.

- "Oldest Jewish Congregations." *New York Observer and Chronicle*. October 31, 1878.

- Parke, David. *The Epic of Unitarianism: Original Writings From the History of Liberal Religion*. Boston: Skinner House Books, 1985.

- Pencak, William. *Jews and Gentiles in Early America*. The University of Michigan Press, 2005.

- Phillps, Naphtali. "Historical Sketch." *American Jewish Historical Quarterly* 21 (1913).

- Pool, David and Tamar de Sola. *An Old Faith in the New World*. Columbia University Press, 1955.

- Reed, Stanley Forman. "Opinion," *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 24 November 1952.

- Scholem, Gershom. *The Messianic Idea in Judaism: And Other Essays on Jewish Spirituality*. Knopf Doubleday Publishing Group, 2011.

- Seton-Watson, Robert William. *The New Europe: A Weekly Review of Foreign Politics*. Constable & Company, Limited, 1919.

- Shṭal, Avraham. *The Torah Scroll*. Israel Museum, 1979.

- Sinclair, Augustus Constantine, Laurence R. Fyfe, Joseph Charles Ford, Samuel Paynter Musson, Thomas Laurence Roxburg, Acheson Arundel Cameron Finlay, and Frank Cundall. *The Handbook of Jamaica ...: Comprising Historical, Statistical and General Information Concerning the Island*. U.S. Government Printing Office, 1908.

- Swierenga, Robert P. *The Forerunners: Dutch Jewry in the North American Diaspora.* Wayne State University Press, 1994.

- "Synagogue is Robbed: Silver Items Valued at $800 Missing in Brooklyn." *New York Times.* June 22, 1958.

- "Touro Tablet Unveiled." *New York Times.* September 8, 1908.

- Tu, Janet I. "Spokane Diocese can't sell parishes, judge rules." *The Seattle Times*, July 16, 2006.

- Urofsky. Melvin I. *A Genesis of Religious Freedom: The Story of the Jews of Newport, RI and Touro Synagogue.* The George Washington Institute for Religious Freedom, 2013.

- Wakelyn, Jon L. *America's Founding Charters: Primary Documents of Colonial and Revolutionary Era Governance.* Greenwood Publishing Group, 2006.

- Wells, Catharine P. *Who Owns the Local Church? A Pressing Issue for Dioceses in Bankruptcy.* SSRN Scholarly Paper. Rochester, NY: Social Science Research Network, November 14, 2005.

- Wiernik, Peter. *History of the Jews in America: From the Period of the Discovery of the New World to the Present Time.* Jewish Press Publishing Company, 1912.

- *Young Israel.* The Union of American Hebrew Congregations, 1907.