# EXHIBIT B

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

------------------------------x

CONGREGATION JESHUAT ISRAEL,

              Plaintiff,

        v.             C.A. NO. 12-822-m (LDA)

CONGREGATION SHEARITH ISRAEL

              Defendant.

------------------------------x

December 30, 2014

9:01 a.m.

Deposition of LINFORD FISHER, taken
by the Plaintiff, pursuant to Agreement,
at the offices of Kramer Levin Naftalis
& Frankel LLP, 1177 Avenue of the
Americas, New York, New York, before
David Levy, CSR, RPR, CLR, a Notary
Public of the State of New York.

Job No: 37071

**2**

```
 1
 2    A P P E A R A N C E S:
 3
 4    Attorneys for Plaintiff
 5       KRAMER LEVIN NAFTALIS & FRANKEL, LLP
 6       1177 Avenue of the Americas
 7       New York, New York 10036
 8       (212) 715-9100
 9    BY: JONATHAN M. WAGNER, ESQ.
10       jwagner@kramerlevin.com
11       TOBIAS B. JACOBY, ESQ.
12       tjacoby@kramerlevin.com
13       DANIEL SCHUMEISTER, ESQ.
14       dschumeister@kramerlevin.com
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1
 2    A P P E A R A N C E S (Cont'd):
 3
 4    Attorneys for Defendants
 5       CADWALADER, WICKERSHAM & TAFT, LLP
 6       One World Financial Center
 7       New York, New York 10281
 8       (212) 504-6000
 9    BY: LOUIS M. SOLOMON, ESQ.
10       louis.solomon@cwt.com
11       SOLOMON B. SHINEROCK, ESQ.
12       solomon.shinerock@cwt.com
13       YAN GRINBLAT, ESQ.
14       yan.grinblat@cwt.com
15       JENNIFER CHIANG, ESQ.
16       jennifer.chiang@cwt.com
17
18
19
20
21
22
23
24
25
```

**4**

```
08:52:46   1
08:52:46   2    LINFORD   FISHER, having been duly
08:52:46   3    sworn by the Notary Public, was examined
09:01:41   4    and testified as follows:
09:01:46   5       MR. WAGNER:  Actually, first question
09:01:45   6    is for Mr. Solomon.  In the e-mail last
09:01:48   7    night, you said that there are a small
09:01:52   8    number of documents that we may ask the
09:01:54   9    experts to speak to.  So my question is,
09:01:58  10    is Mr. Fisher going to address the
09:01:59  11    documents that were produced last night?
09:02:02  12       MR. SOLOMON:  I don't know.  I did
09:02:04  13    show them to him yesterday.  At the time I
09:02:06  14    wasn't sure what we were producing to you.
09:02:08  15    And so you might ask whatever questions
09:02:12  16    you have on them, but I did show them to
09:02:14  17    him.
09:02:16  18       MR. WAGNER:  Okay.  Well, having seen
09:02:18  19    them --
09:01:42  20    EXAMINATION BY
09:01:42  21    MR. WAGNER:
09:02:19  22       Q.  -- are you offering any opinions on
09:02:21  23    those documents?
09:02:22  24       A.  I would need to know the, specifically
09:02:24  25    which document and --
```

**5**

```
           1    Fisher
09:02:26   2       Q.  Okay.
09:02:27   3       MR. WAGNER:  Why don't you --
09:02:29   4       MR. SOLOMON:  I don't think he knows
09:02:31   5    which documents --
09:02:31   6       MR. WAGNER:  Okay, why don't we show
09:02:33   7    them to him.
09:02:36   8       (Documents passed to the witness.)
09:02:39   9       A.  Do you have something specific within
09:02:41  10    here that you want me to look at?
09:02:43  11       Q.  Well, when was the first time you saw
09:02:45  12    these documents?
09:02:48  13       A.  I need to look at them to know which
09:02:51  14    ones they are.
09:02:53  15       (Witness perusing documents.)
09:03:19  16       A.  Some of these I've seen months ago.
09:03:21  17       Q.  Okay.
09:03:21  18       A.  Some of them I have seen probably a
09:03:29  19    week or two ago.
09:03:31  20       Q.  Okay.
09:03:32  21       A.  And some of them I'm not sure that
09:03:34  22    I've actually seen.
09:03:35  23       Q.  Okay.  Maybe, I want to move this
09:03:39  24    along as efficiently as possible, so I'm going to
09:03:42  25    ask you at some point during the day to let me know
```

2  (Pages  2  to  5)

6

Fisher

09:03:46  2  whether you're offering any opinions about these
09:03:49  3  documents and then I may have to question you about
09:03:51  4  them. But I don't want to take the time to have
09:03:53  5  you go through them, so let's go through what you
09:03:55  6  do have in your very impressive report.
09:03:58  7      A. Sure.
09:03:58  8      Q. Okay. So why don't you put this
09:04:01  9  aside.
09:04:14  10      Now, we'll be talking about rimmonim.
09:04:25  11  And when I reference the Myer Myers rimmonim, I
09:04:28  12  mean the rimmonim that are at issue in this case
09:04:30  13  that are currently on display at the Museum of Fine
09:04:36  14  Arts, is that okay with you?
09:04:37  15      A. Yes.
09:04:37  16      Q. Where do those rimmonim go when they
09:04:40  17  are in use?
09:04:42  18      A. The specific Myer Myers rimmonim that
09:04:47  19  are on display right now? When they are not on
09:04:50  20  display, when they are being used actively by a
09:04:53  21  congregation in worship?
09:04:55  22      Q. Yes.
09:04:56  23      A. They go on the ends of the rods that
09:04:59  24  the Torah scrolls are wrapped around.
09:05:02  25      Q. They go on top of the Torah?

7

Fisher

09:05:03  2      A. They go on the top of the rods, yes.
09:05:06  3      Q. All right. Now, what did you do to
09:05:10  4  prepare for your deposition today?
09:05:15  5      A. In preparation for the deposition, I
09:05:18  6  went back and read my report, and when -- things
09:05:26  7  that I wanted to double-check, I went back to the
09:05:29  8  documents themselves and reread some of the
09:05:33  9  original documents.
09:05:33  10      Q. Did you meet with any lawyers to
09:05:36  11  prepare for today?
09:05:39  12      A. Yes. We had a meeting yesterday.
09:05:41  13      Q. Okay. And who was that with?
09:05:44  14      A. With the people in this room.
09:05:46  15      Q. How long was the meeting?
09:05:50  16      A. I believe we met off and on for
09:05:52  17  roughly five hours.
09:05:53  18      Q. Were there any opinions -- when I
09:05:59  19  refer to CSI, I mean Spanish-Portuguese. When I
09:06:03  20  refer to CJI, I mean the plaintiff in this case,
09:06:07  21  Congregation Jeshuat Israel. I will refer to CYI
09:06:09  22  which is an issue in your report, which we'll get
09:06:11  23  to.
09:06:12  24      Were there any opinions that CSI asked
09:06:14  25  you to give that you declined to give?

8

Fisher

09:06:31  2      A. None that I can recall sitting here
09:06:32  3  right now.
09:06:33  4      Q. And other than what you may say with
09:06:34  5  respect to these new documents, do you have any
09:06:36  6  opinions other than what's stated in your report?
09:06:38  7      A. Without knowing specifically about
09:06:45  8  additional documents or issues or concerns that you
09:06:48  9  may raise here today or that may come to light in
09:06:51  10  the future, sitting here today, nothing else is
09:06:55  11  pressing in terms of my opinion.
09:06:56  12      Q. Did you look, aside from these, the
09:07:01  13  documents that were produced yesterday that I just
09:07:04  14  showed you, have you looked at any additional
09:07:06  15  documents about this case since your report was
09:07:08  16  submitted?
09:07:11  17      A. I did some independent research, just
09:07:17  18  trying to understand what else might be out there
09:07:19  19  that we hadn't looked at so far. And there was a
09:07:28  20  volume of transcriptions of J.J. Lyons' notes -- he
09:07:34  21  was minister at CSI in the 1870 -- that I
09:07:38  22  consulted, and some other miscellaneous items that
09:07:44  23  I don't think I used or recall at the moment,
09:07:48  24  but...
09:07:48  25      Q. Have you reviewed any deposition

9

Fisher

09:07:50  2  transcripts in connection with this matter?
09:07:57  3      A. I have not personally looked at any
09:08:00  4  deposition transcripts in relation to this present
09:08:01  5  case, as I recall.
09:08:03  6      Q. Do you wish to make any changes to
09:08:11  7  your report?
09:08:16  8      A. No. Having reviewed it and sitting
09:08:20  9  here today, unless new documents come to light,
09:08:26  10  unless there's other evidence that's presented, my
09:08:28  11  report is a reflection of my assessment of the
09:08:32  12  documents I looked at and what was available to me
09:08:35  13  at the time.
09:08:36  14      Q. Did anyone point out any errors in the
09:08:46  15  report since it was submitted?
09:08:46  16      A. To my knowledge, no one came to me and
09:08:52  17  said, "This is wrong," with anything in particular
09:08:59  18  about the report.
09:08:59  19      Q. Now, are you a historian?
09:09:03  20      A. I'm a historian.
09:09:03  21      Q. One of the things that a historian
09:09:05  22  must do is to present facts fairly and accurately,
09:09:10  23  correct?
09:09:11  24      A. One of the things a historian must do
09:09:12  25  is to interpret documents. As I tell my students,

3  (Pages 6 to 9)

10

Fisher

09:09:17  2  facts are not just out there, they are the result
09:09:19  3  of an investigation and interpretation of evidence.
09:09:21  4       Q.  Well, let me ask my question again.
09:09:24  5  Is one of the things a historian must do is to
09:09:26  6  present the facts fairly and accurately?
09:09:29  7       A.  One of the things a historian must do
09:09:31  8  is to evaluate evidence fairly and accurately.
09:09:35  9       Q.  And must these facts be presented
09:09:37 10  objectively?
09:09:42 11       A.  Historians are in a search for what
09:09:46 12  they feel is the best reflection of what actually
09:09:49 13  happened.  And in the process of trying to
09:09:52 14  understand what actually happened, it is actually
09:09:57 15  central to the historical enterprise to have
09:10:01 16  arguments and to weigh in and to make judgments.
09:10:04 17       Q.  Do you believe your report is
09:10:06 18  accurate?
09:10:15 19       A.  Without knowing specifically what
09:10:16 20  you're referring to within it, I can say that I
09:10:22 21  did, to the best of my ability as a historian, to
09:10:24 22  reflect the progress of events and the episodes and
09:10:30 23  the evidence that I consulted for this case.
09:10:34 24       Q.  Do you believe you've presented those
09:10:39 25  events and episodes and evidence accurately?

11

Fisher

09:10:43  2       A.  I did so to the best of my knowledge
09:10:46  3  at the time with the evidence that I had in front
09:10:49  4  of me.
09:10:49  5       Q.  And did you present that evidence
09:10:50  6  fairly?
09:10:55  7       A.  I maintained very carefully the
09:10:59  8  standards of my profession, which is to say that
09:11:04  9  documents don't speak for themselves and you need
09:11:07 10  to interpret what's going on, taking a fuller
09:11:10 11  context into mind, and construct arguments and try
09:11:16 12  to understand the past in its own context.
09:11:19 13       Q.  Do you believe you've presented the
09:11:20 14  evidence objectively?
09:11:22 15       A.  As much as within the realm of the
09:11:28 16  historian to understand the evidence, to understand
09:11:33 17  the past, to take into consideration everything
09:11:38 18  that is out there, I have maintained the standard
09:11:43 19  of my field by presenting things in a way that
09:11:46 20  reconstructs the past faithfully.
09:11:48 21       Q.  And did you present both sides of the
09:11:50 22  story?
09:11:50 23       A.  I considered documents submitted by
09:11:56 24  both sides that reflect the perspectives that are
09:12:02 25  various and multiple, and as a part of the

12

Fisher

09:12:05  2  historical process, whenever possible, tried to
09:12:09  3  consider alternate interpretations and
09:12:12  4  understandings and different ways to read documents
09:12:15  5  adds a historian should.
09:12:16  6       Q.  Well, let me ask you this:
09:12:18  7       When a document that you cited has
09:12:23  8  some material that favored CSI's position in this
09:12:27  9  case, and some material that favored CJI's position
09:12:32 10  in this case, did you ignore the material that
09:12:35 11  supported CJI?  Is that what you did here?
09:12:41 12       A.  To the best of my knowledge, I, as a
09:12:44 13  historian, take the fuller range of the progress of
09:12:50 14  events and evidence into consideration; and so if
09:12:55 15  one document -- and if you have a document you want
09:12:59 16  me to look at and to think about that question with
09:13:02 17  you, I'm happy to do that -- but to the best of my
09:13:07 18  knowledge, when documents provided conflicting
09:13:09 19  evidence, as any historian would, I always tried to
09:13:13 20  keep the wider context and other documents in mind
09:13:13 21  as well to sort of triangulate evidence, to
09:13:22 22  understand them.
09:13:22 23       Q.  Is that another way of saying you
09:13:24 24  ignored the evidence supporting CJI?
09:13:26 25            MR. SOLOMON:  I object to the

13

Fisher

09:13:27  2  question.  I think you've misstated his
09:13:29  3  answer.
09:13:29  4            MR. WAGNER:  Okay.  All you have to do
09:13:31  5  is say "objection as to form."
09:13:33  6       You can answer.
09:13:35  7       A.  I think you're putting words into my
09:13:37  8  mouth.  That's not what I said.  I said very
09:13:39  9  clearly that when there are -- when a document
09:13:41 10  provides multiple perspectives, I try to understand
09:13:45 11  that document in the wider context and the larger
09:13:48 12  flow of what was happening in that time frame.
09:13:51 13       Q.  Professor Fisher, how were you
09:13:52 14  retained in this case?  How did it come about that
09:13:56 15  you were retained?
09:13:57 16       A.  I was contacted by the defendants --
09:14:02 17  counsel for the defendants and was invited to,
09:14:09 18  because of my field and my expertise, to weigh in
09:14:15 19  on several particular pieces of this case relevant
09:14:18 20  to my area of study.
09:14:19 21       Q.  What is your area of study?
09:14:20 22       A.  I'm a historian of the history of
09:14:23 23  religion in America more broadly.
09:14:26 24       Q.  And what about specifically?
09:14:29 25       A.  Specifically, the history of religion

4  (Pages 10 to 13)

14

|  |  | Fisher |
|---|---|---|
| 09:14:32 | 2 | in America and my -- some of my research has |
| 09:14:36 | 3 | focused on the colonial period, on New England in |
| 09:14:40 | 4 | the colonial period, on the religion in the |
| 09:14:43 | 5 | colonial period, on religion in the 19th century on |
| 09:14:47 | 6 | Native Americans. |
| 09:14:48 | 7 | Q. Am I right your specialty is early |
| 09:14:54 | 8 | Native American religion? |
| 09:14:54 | 9 | A. That's one of my specialties. |
| 09:14:55 | 10 | Q. Have you published any papers on |
| 09:14:58 | 11 | American Jewish history? |
| 09:15:02 | 12 | A. I have not published any papers that |
| 09:15:04 | 13 | were solely on American Jewish history. But the |
| 09:15:09 | 14 | important thing, when you understand -- when you |
| 09:15:12 | 15 | are looking at any one denomination, any one |
| 09:15:16 | 16 | movement, is the wider context of the history of |
| 09:15:19 | 17 | religion in America. |
| 09:15:20 | 18 | Q. Just answer my question. Did you |
| 09:15:21 | 19 | publish any papers on American Jewish history? |
| 09:15:24 | 20 | MR. SOLOMON: Asked and answered. |
| 09:15:26 | 21 | Object to the question. |
| 09:15:27 | 22 | MR. WAGNER: You can answer. |
| 09:15:28 | 23 | A. I think I answered that question. |
| 09:15:29 | 24 | Q. What's the name of the paper? |
| 09:15:30 | 25 | A. I just said I did not publish any |

15

|  |  | Fisher |
|---|---|---|
| 09:15:32 | 2 | paper that was solely on American Jewish history. |
| 09:15:35 | 3 | Q. Okay. What's your hourly rate here? |
| 09:15:40 | 4 | A. Started at 275. |
| 09:15:42 | 5 | Q. What is it now? |
| 09:15:43 | 6 | A. And after a certain number of hours, |
| 09:15:45 | 7 | it is now at 200. |
| 09:15:47 | 8 | Q. How many hours have you worked on this |
| 09:15:49 | 9 | matter? |
| 09:15:52 | 10 | A. I have not looked recently. It's |
| 09:15:57 | 11 | approaching 200, probably. |
| 09:15:58 | 12 | Q. Did you have any research assistants |
| 09:16:08 | 13 | helping you? |
| 09:16:09 | 14 | A. For one small segment of this project, |
| 09:16:16 | 15 | I, with the advice of counsel to CSI, employed one |
| 09:16:23 | 16 | of my graduate students at Brown. |
| 09:16:26 | 17 | Q. Have you ever been to CSI? |
| 09:16:27 | 18 | A. I have not. |
| 09:16:28 | 19 | Q. Have you ever been to Touro? |
| 09:16:31 | 20 | A. I have. |
| 09:16:31 | 21 | Q. Have you been there for services? |
| 09:16:35 | 22 | A. I have been there for what I think the |
| 09:16:37 | 23 | vast majority of the public has been there for, |
| 09:16:39 | 24 | which is a tour of the synagogue and to see the |
| 09:16:49 | 25 | Loeb Visitors Center. |

16

|  |  | Fisher |
|---|---|---|
| 09:16:49 | 2 | Q. My question is, have you been there |
| 09:16:51 | 3 | for services? |
| 09:16:51 | 4 | A. I've not been there for services. |
| 09:16:53 | 5 | Q. Okay. That's all you have to answer. |
| 09:16:55 | 6 | Have you ever seen the rimmonim that are at issue |
| 09:16:58 | 7 | in this case? |
| 09:16:59 | 8 | A. In person? |
| 09:17:00 | 9 | Q. Yes. |
| 09:17:01 | 10 | A. To my recollection, I have not seen |
| 09:17:03 | 11 | the rimmonim in question. |
| 09:17:05 | 12 | Q. Have you ever been to a Jewish |
| 09:17:07 | 13 | service? |
| 09:17:07 | 14 | A. I attended a Shabbat service at Brown |
| 09:17:13 | 15 | University with some students about two years ago. |
| 09:17:15 | 16 | Q. Was that on a Friday night? |
| 09:17:18 | 17 | A. It was on a Friday night. |
| 09:17:18 | 18 | Q. Were rimmonim used? |
| 09:17:20 | 19 | A. No, they were not. |
| 09:17:21 | 20 | Q. Was that service illegitimate? |
| 09:17:22 | 21 | A. That service was not illegitimate. It |
| 09:17:25 | 22 | was not an orthodox service. And it was not a |
| 09:17:30 | 23 | Sephardic service. |
| 09:17:35 | 24 | Q. Well, had it been an orthodox service |
| 09:17:38 | 25 | and a Sephardic service and didn't use rimmonim on |

17

|  |  | Fisher |
|---|---|---|
| 09:17:45 | 2 | that Friday night, would it have been a legitimate |
| 09:17:47 | 3 | service? |
| 09:17:59 | 4 | A. I'm not sure that that's something |
| 09:18:01 | 5 | that I can speak directly to. |
| 09:18:04 | 6 | Q. Well, you stated in your report |
| 09:18:24 | 7 | that -- by the way, was this at Brown Hillel? |
| 09:18:29 | 8 | A. Yes. |
| 09:18:30 | 9 | Q. Did they have rimmonim? |
| 09:18:32 | 10 | A. I have not personally seen any |
| 09:18:34 | 11 | rimmonim. That doesn't mean they don't have them. |
| 09:18:36 | 12 | Q. You said that rimmonim are "necessary |
| 09:18:40 | 13 | sacred objects for a Jewish service." You wrote |
| 09:18:42 | 14 | that in your report, right? |
| 09:18:44 | 15 | A. Um-hum. |
| 09:18:44 | 16 | Q. So was the service on Friday you went |
| 09:18:46 | 17 | to -- |
| 09:18:46 | 18 | MR. SOLOMON: I'm sorry, just so the |
| 09:18:48 | 19 | record is clear, you're sometimes going |
| 09:18:50 | 20 | "um-hum," and I think the reporter, I'm |
| 09:18:53 | 21 | not sure exactly what he's getting. |
| 09:18:58 | 22 | Answer audibly, just yes, no, or -- |
| 09:19:01 | 23 | THE WITNESS: I will do that -- |
| 09:19:02 | 24 | MR. WAGNER: By the way, if you want |
| 09:19:04 | 25 | to take a break to get it working? |

5  (Pages 14 to 17)

18

Fisher

09:19:07  2   MR. SOLOMON: Having too much fun.
09:19:09  3   Q. Are services at Brown illegitimate if
09:19:17  4   they don't have rimmonim?
09:19:22  5   A. I don't think it's my position to
09:19:26  6   judge the particular services at Brown on the basis
09:19:33  7   of their use of rimmonim or not.
09:19:34  8   Q. That's what you did in your report,
09:19:36  9   isn't it?
09:19:38  10   MR. SOLOMON: Misstates the document.
09:19:42  11   Object to the question.
09:19:43  12   Q. Doesn't your report state that
09:19:44  13   rimmonim are necessary ritual objects, ritual
09:19:49  14   objects required for a synagogue? Isn't that your
09:19:50  15   testimony? Isn't that your opinion in this case?
09:19:57  16   A. As with everything in the report, you
09:20:01  17   have to understand it in the context of the report.
09:20:04  18   To extract that out and apply it to a situation in
09:20:07  19   2012 is simply bad application of that document.
09:20:13  20   Q. You didn't qualify in your report that
09:20:17  21   these points only apply to 1903, did you?
09:20:22  22   A. The whole report itself is about
09:20:27  23   specifically a Sephardic orthodox synagogue.
09:20:31  24   Q. So it's only Sephardic orthodox
09:20:35  25   synagogues that require rimmonim, is that your

19

Fisher

09:20:38  2   testimony?
09:20:42  3   A. The documents that I looked at, both
09:20:45  4   secondary and primary, indicate that the rimmonim
09:20:52  5   are very important for -- by the way, can you show
09:20:58  6   me which page you're on here?
09:21:00  7   Q. I'm going to get to that in a couple
09:21:02  8   of minutes. Let it put aside for a moment. I'll
09:21:06  9   come back to it.
09:21:07  10   Have you ever been deposed before?
09:21:09  11   A. I have not.
09:21:09  12   Q. Have you ever testified in a case
09:21:11  13   before?
09:21:13  14   A. My sister and I were hit by a drunk
09:21:16  15   driver and I had to testify in court, but it was
09:21:18  16   unrelated to anything professional.
09:21:20  17   Q. Have you ever been retained as an
09:21:22  18   expert for litigation?
09:21:24  19   A. I have not.
09:21:24  20   Q. Do you have an understanding of what
09:21:26  21   your role is as an expert?
09:21:36  22   A. I feel I have been duly informed by
09:21:39  23   counsel to CSI as to what this process entails,
09:21:44  24   yes.
09:21:45  25   Q. Can you name any recognized authority

20

Fisher

09:21:49  2   on Myer Myers?
09:21:51  3   A. Besides David Barquist?
09:21:53  4   Q. Well, is he a recognized authority on
09:21:56  5   Myer Myers?
09:21:57  6   A. He is one of, my understanding is...
09:22:02  7   Q. Anyone else that you can name?
09:22:05  8   MR. SOLOMON: Were you finished?
09:22:06  9   A. I was going to say my understanding is
09:22:08  10   that there are only a few people out there who are
09:22:14  11   active today in the academy who are -- who somebody
09:22:21  12   would turn to, to understand the kind of silver
09:22:26  13   that Myer Myers produced, including the silver that
09:22:29  14   he actually did produce.
09:22:33  15   Q. Just, can you name any experts on hire
09:22:35  16   Myers or recognized authorities on Myer Myers
09:22:39  17   besides David Barquist?
09:22:42  18   A. Sitting here today, I know that there
09:22:46  19   are specifically books out there on Myer Myers, but
09:22:51  20   I cannot recall at the moment the name of the
09:22:54  21   author.
09:22:54  22   Q. Can you name any recognized
09:22:56  23   authorities on colonial American Jewish history?
09:23:12  24   A. When you say "colonial," do you mean
09:23:14  25   North America --

21

Fisher

09:23:15  2   Q. Yes.
09:23:19  3   A. -- Caribbean?
09:23:21  4   Q. I mean North America.
09:23:23  5   A. One person whose worked I have used in
09:23:26  6   my classes is Holly Snyder, who has published on
09:23:32  7   American Jewry, Judaism in the Caribbean, and...
09:23:40  8   Q. Can you name any recognized
09:23:42  9   authorities on later American Jewish history?
09:23:44  10   A. I'm trying to understand the purpose
09:24:07  11   of this question, I guess. Do you mind saying more
09:24:10  12   about that?
09:24:11  13   Q. Doesn't work that way. Can you answer
09:24:14  14   the question?
09:25:05  15   A. It's kind of embarrassing. There's a
09:25:08  16   person who teaches at Brandeis. Jonathan Sarna is
09:25:15  17   his name. I've used his work before, and it wasn't
09:25:18  18   coming to me.
09:25:19  19   Q. Thank you. Now, you cited a number of
09:25:22  20   secondary sources in your report, is that correct?
09:25:24  21   A. Um-hum.
09:25:24  22   Q. Yes?
09:25:25  23   A. Yes, I did.
09:25:25  24   Q. Before you cited those sources, did
09:25:30  25   you do anything to make sure those sources were

6 (Pages 18 to 21)

22

```
                 1            Fisher
09:25:32    2    reliable?
09:25:32    3       A. Any time I work on anything, and a
09:25:48    4    historian works on anything, you try to evaluate
09:25:51    5    sources. So yes, I tried to understand within my
09:25:58    6    capacity and within the realm of this particular
09:26:02    7    project, to understand not just what was being
09:26:06    8    written but who was writing it.
09:26:08    9       Q. And are the secondary sources that you
09:26:12   10    cited in your report, are they reliable sources?
09:26:15   11       A. You have to point out which ones
09:26:17   12    you're talking about.
09:26:17   13       Q. Well, as you sit here today, can you
09:26:20   14    think of any sources that you cited, secondary
09:26:23   15    sources, that are not reliable?
09:26:26   16       A. May I look at the secondary --
09:26:27   17       Q. Sure.
09:26:28   18       A. -- source list here?
09:26:32   19       Q. This is exhibit --
09:26:34   20       MR. WAGNER: -- I'm sorry, here's
09:26:36   21    Exhibit 1. You get an official one. It's
09:26:38   22    a souvenir.
09:26:42   23       (Fisher Exhibit 1, expert report
09:26:42   24    of Prof. Linford D. Fisher dated
09:26:42   25    11/24/14, marked for identification, as
```

23

```
                 1            Fisher
09:26:44    2    of this date.)
09:26:44    3       A. So you're referring to the list that
09:26:47    4    is Exhibit B, "Materials Incorporated Into the
09:26:54    5    Expert Report"?
09:27:04    6       MR. SOLOMON: Is that where you want
09:27:08    7    him to look?
09:27:08    8       MR. WAGNER: That's fine.
09:27:09    9       Q. Are these sources reliable? I'm
09:27:13   10    talking about the secondary sources now. Let's put
09:27:15   11    aside the...
09:27:21   12       A. Again, if you could, if you have
09:27:24   13    issues with one of them, or want to talk about one
09:27:28   14    of them, I think that's a little more helpful.
09:27:31   15       Q. No, I don't. I just want to know, are
09:27:33   16    you able to answer the question whether the
09:27:34   17    secondary sources that you cited and relied on in
09:27:37   18    your report are reliable? That's all. It's not a
09:27:41   19    trick question.
09:27:43   20       MR. SOLOMON: I object to that.
09:27:45   21       MR. WAGNER: Fine, we can strike that
09:27:46   22    piece.
09:27:46   23       Q. Just, are they reliable?
09:27:56   24       A. Again, I would want to hear which
09:27:58   25    particular one that you're talking about. But
```

24

```
                 1            Fisher
09:28:02    2    sitting here, to the best of my knowledge today,
09:28:05    3    having applied the standards of my field, to the
09:28:11    4    best of my knowledge, the secondary sources I have
09:28:14    5    used for this report were reliable enough for me to
09:28:20    6    employ them in this written document, in my
09:28:25    7    estimation.
09:28:25    8       Q. You cited a work by Urofsky, do you
09:28:29    9    recall that? It may not be on your list.
09:28:33   10       A. It is on the list.
09:28:33   11       Q. Do you consider that to be a work of
09:28:37   12    scholarship?
09:28:56   13       A. Do you mind defining "scholarship" for
09:28:59   14    me? What do you mean by "scholarship"?
09:29:02   15       Q. How do you define "scholarship"?
09:29:05   16       A. Well, there's different kinds of
09:29:07   17    writing.
09:29:07   18       Q. Are you able to answer the question
09:29:09   19    whether you believe the Urofsky book is a work of
09:29:13   20    scholarship?
09:29:14   21       A. From what I've seen, the Urofsky book,
09:29:19   22    at points where I was reading the primary sources
09:29:22   23    myself, Urofsky reflected the kind of nuance and
09:29:29   24    intention and care that a professional historian
09:29:33   25    would bring to these documents, which gave me
```

25

```
                 1            Fisher
09:29:37    2    enough confidence in the book to cite it in this
09:29:40    3    report.
09:29:40    4       Q. You also cited Gutstein; is he an
09:29:45    5    authoritative source on the Jews of Newport?
09:29:51    6       A. His work is widely consulted.
09:29:53    7       Q. Do you know who Rabbi Marc Angel is?
09:30:05    8       A. A-n-g-e-l?
09:30:07    9       Q. Yes.
09:30:08   10       A. I do not recall coming across his name
09:30:11   11    at the moment.
09:30:47   12       MR. WAGNER: I'm going to mark this as
09:30:50   13    Exhibit 2. You're already up to two. Two
09:30:53   14    souvenirs. Mark this as Exhibit 2.
09:30:55   15       (Fisher Exhibit 2, document entitled,
09:30:55   16    "Rhode Island Jewish Historical Notes,"
09:30:55   17    November 1975, Bates numbered JHA00001
09:30:55   18    through 73, marked for identification,
09:31:22   19    as of this date.)
09:31:22   20       Q. Now, this document wasn't on your list
09:31:24   21    of other sources, but it was a document listed on
09:31:27   22    your list of documents you reviewed by what's
09:31:31   23    called a Bates number. Do you remember reviewing
09:31:34   24    this? And it's also cited in your report, as
09:31:39   25    Mr. Jacoby reminds me.
```

7  (Pages 22 to 25)

26

Fisher

09:31:43  2   (Witness perusing document.)
09:31:46  3   Q. Do you remember this?
09:31:50  4   A. I remember there was one particular
09:31:53  5   citation out of this document, yes.
09:31:55  6   Q. And is this a reliable authority?
09:32:04  7   A. Without looking into it more, I can't
09:32:07  8   say definitively but knowing that it was published
09:32:09  9   in the Rhode Island Jewish Historical Notes, one
09:32:14  10  would hope that due diligence had been made by
09:32:25  11  Bernard Kusnitz.
09:32:30  12  Q. Am I right that you wouldn't have
09:32:35  13  cited it unless you thought it was reliable?
09:32:40  14  A. In general, the citations I made from
09:32:49  15  this or other documents that I cited, my evaluation
09:32:54  16  at that time, when constructing this report, was
09:32:58  17  that they were something that I was comfortable
09:33:00  18  citing.
09:33:00  19  Q. Is that another way of saying that
09:33:04  20  they were reliable?
09:33:05  21  A. It depends in what way you're talking
09:33:06  22  about "reliable." But yes, when I was writing the
09:33:10  23  report and reviewing the documents and conducting
09:33:12  24  my investigation, the way in which I cited this
09:33:17  25  particular document and the way in which I cited

27

Fisher

09:33:20  2   others, I felt consistent to me as a historian and
09:33:25  3   I felt comfortable doing so.
09:33:26  4   Q. Okay. Now, we can put that aside for
09:33:30  5   a minute. Do you have any expertise in Jewish
09:33:33  6   ornaments?
09:33:34  7   A. One of my areas of specialty as a
09:34:10  8   colonial American historian and historian of
09:34:12  9   religion in America is material culture; and so the
09:34:16  10  general body of material objects relating to
09:34:22  11  religion in America are something that I am used to
09:34:25  12  and comfortable in -- with, in interpreting and
09:34:27  13  understanding and placing into context.
09:34:32  14  MR. SHINEROCK: When you get to a good
09:34:33  15  stopping point, can we just break to get
09:34:35  16  this sorted out?
09:34:38  17  MR. WAGNER: Yes. Just give me a few.
09:34:42  18  Q. Are you an expert in Jewish ornaments?
09:34:47  19  A. In my classes, I teach and have shown
09:34:53  20  images of, pictures of, helped students to
09:34:56  21  interpret Jewish religious documents and items of
09:35:03  22  material culture.
09:35:03  23  Q. So you're saying you are an expert in
09:35:06  24  Jewish ornaments?
09:35:07  25  MR. SOLOMON: Object to the form.

28

Fisher

09:35:12  2   A. In my teaching, I use and help my
09:35:17  3   students to interpret Jewish religious objects as I
09:35:20  4   do the wider realm of material culture in early
09:35:24  5   America and the rest of American religious history.
09:35:28  6   Q. Are you able to tell me yes or no
09:35:30  7   whether you're an expert in Jewish ornaments?
09:35:32  8   A. I think you'd have to define for me
09:35:34  9   what "expert" is. I have expertise in
09:35:37  10  understanding material culture in early America,
09:35:39  11  which includes items of Jewish ritual culture.
09:35:43  12  Q. When was the first time you heard of
09:35:45  13  the term "rimmonim"?
09:35:47  14  A. Probably back when I was studying for
09:35:52  15  field exams in the mid 2000s, and reading up on
09:35:57  16  American religious history.
09:35:58  17  Q. Can you name some Jewish ornaments?
09:36:02  18  A. Besides the breast plate, the
09:36:03  19  circumcision -- well, there's a kit, there's also a
09:36:09  20  shield, I understand; books of law, the Torah, the
09:36:14  21  rimmonim, the crowns, you have the heichal, the
09:36:19  22  bima, the -- I mean, there's...
09:36:24  23  Q. Do you teach any courses in
09:36:30  24  specifically in Jewish ornaments?
09:36:47  25  A. I have not to date taught a class that

29

Fisher

09:36:50  2   was devoted solely to Jewish religious ornaments.
09:36:54  3   Q. Are you an expert in American Jewish
09:36:57  4   history?
09:37:03  5   A. I'm an expert in the history of
09:37:04  6   religion in America, of which American Jewish
09:37:08  7   history is a part.
09:37:11  8   Q. Do you teach American Jewish history?
09:37:15  9   A. I teach classes on history of religion
09:37:18  10  in America and within that, deal directly through
09:37:24  11  readings and lectures on American Jewish history.
09:37:27  12  Q. What portion of the course is devoted
09:37:29  13  to American Jewish history?
09:37:39  14  A. Often, it is the equivalent of one
09:37:43  15  week, sometimes broken up into two segments.
09:37:46  16  Q. So one week out of 13 weeks? Six
09:37:51  17  percent, seven percent? What readings do you use?
09:37:55  18  A. Well, depends which class your talking
09:37:57  19  about.
09:37:57  20  Q. Any.
09:38:00  21  A. One of my favorite things to use from
09:38:03  22  the colonial American history class, which actually
09:38:06  23  extends up to 1865, is the first edition, the first
09:38:11  24  volume of a Jewish magazine called The Israelite,
09:38:20  25  and it's a mouthpiece of Reform Judaism, and it

8 (Pages 26 to 29)

---

**30**

Fisher

| | |
|---|---|
| 09:38:25 | 2 cast and incredible vision for the role of Judaism, |
| 09:38:28 | 3 not only in the U.S. but the world, and it |
| 09:38:32 | 4 proclaims Judaism as the religion of all mankind. |
| 09:38:37 | 5     Q. Any other sources that you use? |
| 09:39:18 | 6     A. Are you talking about primary or |
| 09:39:19 | 7 secondary? |
| 09:39:20 | 8     Q. Any. |
| 09:39:20 | 9     A. Any sources. There was an essay on |
| 09:39:33 | 10 Judaism in the Atlantic World by the aforementioned |
| 09:39:36 | 11 Holly Snyder that I have used before as well. |
| 09:39:40 | 12     Q. Are you an expert in American legal |
| 09:39:42 | 13 history? |
| 09:39:45 | 14     A. In my work as a historian, in |
| 09:39:48 | 15 publications, I have written and I've -- excuse me, |
| 09:39:53 | 16 I've utilized specifically legal documents and |
| 09:39:58 | 17 reviewed court cases from the colonial period. |
| 09:40:04 | 18 I've read through depositions, I've read through |
| 09:40:06 | 19 opinions and I have published on specific legal |
| 09:40:11 | 20 cases, especially in the colonial period. |
| 09:40:17 | 21     Q. Have you ever opined on a disputed |
| 09:40:22 | 22 ownership issue before? |
| 09:41:01 | 23     A. The primary disputes that I've written |
| 09:41:07 | 24 on that were central to my first book, The Indian |
| 09:41:11 | 25 Reawakening, are land. And land in the colonial |

---

**31**

Fisher

| | |
|---|---|
| 09:41:14 | 2 period, especially as regards Native Americans and |
| 09:41:17 | 3 Europeans, was constantly a battle. And so -- |
| 09:41:24 | 4     Q. Let me rephrase the question, because |
| 09:41:25 | 5 it was my fault. |
| 09:41:27 | 6     Have you ever opined on any ongoing |
| 09:41:31 | 7 legal disputes about the ownership of property? |
| 09:41:36 | 8     A. In writing, in public -- |
| 09:41:38 | 9     Q. Anywhere. |
| 09:41:39 | 10     A. Anywhere. |
| 09:41:39 | 11     Q. Ongoing disputes. Not what happened |
| 09:41:42 | 12 three hundred years ago. |
| 09:41:44 | 13     A. In my teaching, at the beginning of |
| 09:41:47 | 14 every class, I invite students to let me know what |
| 09:41:52 | 15 they've seen in the news that week that relates to |
| 09:41:54 | 16 what we're talking about in class. And I also |
| 09:41:57 | 17 bring to my students current issues within the |
| 09:42:03 | 18 United States and sometimes globally that relate to |
| 09:42:06 | 19 what we're talking about. |
| 09:42:07 | 20     Q. What ownership disputes have you |
| 09:42:12 | 21 brought to them? |
| 09:42:13 | 22     A. There are several examples. One of |
| 09:42:16 | 23 them -- most often, I would say, they involve |
| 09:42:23 | 24 objects of Native American patrimony, objects that |
| 09:42:28 | 25 have been pillaged and stolen from Native American |

---

**32**

Fisher

| | |
|---|---|
| 09:42:33 | 2 communities over the course of American history |
| 09:42:35 | 3 that, after the 1990 Native American Graves and |
| 09:42:43 | 4 Repatriation Act, required people who had these |
| 09:42:51 | 5 objects to return them back to Native American |
| 09:42:56 | 6 communities from whence they came. And so these |
| 09:42:59 | 7 actual objects that are disputed today that are |
| 09:43:04 | 8 being repatriated back to native communities is |
| 09:43:07 | 9 probably what we spend the most time talking about |
| 09:43:11 | 10 in my Native American course, anyway. |
| 09:43:14 | 11     There's also the case of land. |
| 09:43:17 | 12 There's constantly negotiations by the Federal |
| 09:43:20 | 13 Government to understand the past, to understand |
| 09:43:23 | 14 past treaties, and there's also other cases, human |
| 09:43:32 | 15 remains, for example, objects that are sacred, |
| 09:43:37 | 16 wampum belts and so forth. |
| 09:43:39 | 17     Q. Do you know what legal principles |
| 09:43:42 | 18 apply in this case? |
| 09:43:45 | 19     A. In which case? |
| 09:43:48 | 20     Q. This case. |
| 09:43:48 | 21     A. That is under consideration, not the |
| 09:43:49 | 22 cases I just mentioned? |
| 09:43:51 | 23     Q. Right. |
| 09:44:14 | 24     A. I was not asked necessarily to -- |
| 09:44:17 | 25     Q. That's fine. |

---

**33**

Fisher

| | |
|---|---|
| 09:44:19 | 2     A. -- weigh in on the specific legal |
| 09:44:21 | 3 principles that are at stake in this case. |
| 09:44:23 | 4     Q. Do you know whether any legal |
| 09:44:25 | 5 presumptions apply in this case? |
| 09:44:38 | 6     A. Again, I was not asked to weigh in on |
| 09:44:40 | 7 the question of legal presumption. |
| 09:44:46 | 8     Q. Are you an expert on property law? |
| 09:44:51 | 9     A. I have experience in my writings and |
| 09:44:54 | 10 in my research outside of this case that deals |
| 09:44:58 | 11 directly with the question of property rights, the |
| 09:45:04 | 12 transfer of property, the ownership of property and |
| 09:45:07 | 13 how that gets adjudicated in a court of law. |
| 09:45:09 | 14     Q. Well, my question is, do you consider |
| 09:45:11 | 15 yourself to be an expert on property law? |
| 09:45:17 | 16     A. I have published on issues related to |
| 09:45:20 | 17 property law which, in my field of history, puts |
| 09:45:24 | 18 one in a position of having expertise on these |
| 09:45:27 | 19 questions. |
| 09:45:28 | 20     Q. Do you know the legal requirements for |
| 09:45:30 | 21 conveyance of real property? |
| 09:45:47 | 22     A. I would need to know more about the |
| 09:45:48 | 23 context that you're talking about. It could change |
| 09:45:53 | 24 over time. It depends what particular object |
| 09:45:55 | 25 you're talking about. |

9 (Pages 30 to 33)

34

Fisher

```
09:45:56   2      Q. How do I transfer land?  What are the
09:45:59   3   requirements?  Do you know?
09:46:02   4      A. Again, it depends if you're talking
09:46:04   5   about the 21st century --
09:46:06   6      Q. Today.
09:46:06   7      A. Today.  My expertise in property
09:46:10   8   rights and legal disputes over property are not
09:46:19   9   primarily centered in what I've published so far on
09:46:23  10   the question of the 20th century and the transfer
09:46:28  11   of land.
09:46:28  12      Q. But I just want to know whether you
09:46:30  13   know the requirements for the transfer of real
09:46:32  14   property today, that's all.
09:46:37  15      A. In my publications so far, and my
09:46:39  16   teaching and my own personal research have not
09:46:47  17   fully informed me to date on the requirements of
09:46:50  18   transferring legally something like land today.
09:46:54  19      Q. Okay.  Do you know what the
09:46:57  20   requirements were for the transfer of real property
09:46:59  21   in 1822?
09:47:44  22      A. Again, I think it depends a lot on the
09:47:46  23   context.  The law as it has been applied to various
09:47:53  24   people groups in the United States has not been
09:47:56  25   uniformly applied, if you think about Native
```

35

Fisher

```
09:47:59   2   American for example --
09:48:00   3      Q. Let me stop you.  I'm not interested
09:48:02   4   in Native Americans, and I would really appreciate,
09:48:05   5   if we want to get out of here today, that you
09:48:09   6   answer my questions directly.
09:48:10   7      Do you know the requirements for the
09:48:11   8   transfer of real property, what they were in 1822?
09:48:15   9   Do you know?
09:48:16  10      MR. SOLOMON:  He's modified his
09:48:17  11   question.  Okay?  So if you happen to know
09:48:20  12   in the context of Native Americans, don't
09:48:22  13   tell him, because he doesn't want to know
09:48:24  14   it.
09:48:25  15      I object to the form of the question.
09:48:29  16      A. Again, without knowing specifically
09:48:31  17   which property and in what context, I have not
09:48:38  18   personally come across or read a definition of what
09:48:52  19   would constitute the legal transfer of property in
09:48:54  20   1822 as you are currently defining it.  That is, as
09:48:58  21   I'm sitting here today, what I've read so for.
09:49:02  22      Q. Do you know whether a writing was
09:49:04  23   required for the transfer of real property in 1822?
09:49:08  24      A. Again, it would depend on the context,
09:49:24  25   it depends on the situation.  But sitting here
```

36

Fisher

```
09:49:27   2   today, I have not -- I have not come across
09:49:33   3   anything that would have informed me either way on
09:49:35   4   that question.
09:49:36   5      Q. Do you know what the requirements were
09:49:38   6   for the transfer of personal property in the 1800s?
09:49:42   7      A. What I've read and relied upon so far
09:50:07   8   has not dealt directly with that specific question.
09:50:10   9      Q. Do you know what a deed is?
09:50:12  10      A. It depends on the context.  In the
09:50:18  11   context of slavery --
09:50:20  12      Q. Not interested in slavery.  I'm --
09:50:22  13      MR. SOLOMON:  It's hard for us to
09:50:24  14   guess what you're interested or not
09:50:25  15   interested, so why don't you make --
09:50:27  16      MR. WAGNER:  We're going to be here --
09:50:29  17   unless he answers the questions directly,
09:50:31  18   we're going to be here --
09:50:32  19      MR. SOLOMON:  It's sort of hard to
09:50:34  20   guess.
09:50:34  21      Q. Do you really think I'm asking about
09:50:36  22   slavery?
09:50:36  23      MR. SOLOMON:  You asked about a deed.
09:50:38  24      MR. WAGNER:  Okay.
09:50:38  25      Q. Do you know what a deed is?
```

37

Fisher

```
09:50:41   2      A. I have seen several different kinds of
09:50:44   3   deeds in American history, yes.
09:50:46   4      Q. And you've referenced some deeds in
09:50:48   5   your report, right?  Correct?
09:50:52   6      A. Right.
09:50:52   7      Q. Do you know whether a deed for real
09:50:53   8   property transfers the personal property that is on
09:50:58   9   the real property?  Do you know?
09:51:09  10      A. Without something specific, without a
09:51:10  11   specific context, and knowing the wording of the
09:51:13  12   deed, I think that's a pretty general statement to
09:51:17  13   respond to.
09:51:18  14      I have seen deeds that specifically
09:51:20  15   mention personal and real property on the property.
09:51:24  16   And I have seen some that have not.
09:51:27  17      Q. Do you have any understanding whether,
09:51:30  18   if a deed is silent, the personal property on that
09:51:35  19   real property is transferred as well, or don't you
09:51:38  20   know?
09:51:39  21      A. It would depend on the context and
09:51:41  22   who's involved and what other kinds of written
09:51:44  23   documents or other testimony would surround that
09:51:46  24   particular case.
09:51:46  25      Q. Are you an expert in linguistics?
```

10  (Pages 34 to 37)

---

38

Fisher

1
2    A. I'm an historian who is accustomed to
3    close readings of texts and who pays attention to
4    the words that are used and the way in which they
5    are used and the context in which they are used.
6    Q. Does that make you an expert in
7    linguistics?
8    A. In my publications, I have done close
9    readings and used analysis of words that are
10   specifically within my context of American history,
11   American religious history and Native American
12   history.
13   Q. Well, does that in your mind make you
14   an expert in linguistics?
15   A. On the specific things that I have
16   researched, on the specific documents and texts I
17   have read, my training has given me the background
18   I need to make decisions and judgments on specific
19   words and ideas that are contained within the
20   documents I'm looking at.
21   Q. And do you believe that makes you an
22   expert on linguistics?
23   A. It depends on the context and what
24   document we're talking about. And...
25   Q. Have you ever written any articles

---

39

Fisher

1
2    specifically on American Jewish history?
3    A. As I've said before, I have published
4    essays and -- or, my published works, there are
5    things related to the general history of religion
6    in America which also deals with American Judaism
7    and its history.
8    Q. So you've dealt with it only in a
9    general way, correct?
10   A. I have not published a single essay
11   that is entirely dedicated to American Jewish
12   history.
13   Q. Have you ever published anything on
14   the Newport Jewish community?
15   A. Prior to this -- sorry, strike that.
16   That's possible. I have not before -- I've never
17   before published an article devoted solely to the
18   American Newport Jewish community.
19   Q. And you've not published any articles
20   solely devoted to Jewish ornaments?
21   A. I have not published any articles that
22   were solely devoted to Jewish ornaments.
23   Q. Are you an expert on synagogues?
24   A. My training and teaching, I -- I have
25   covered the history of American Judaism which,

---

40

Fisher

1
2    along the way, deals with some of -- synagogues in
3    American Jewish history.
4    Q. Well, do you consider yourself an
5    expert on synagogues?
6    A. My teaching and my training has
7    provided a background that would allow me to
8    contextualize the existence and the rise of
9    American Jewish synagogues.
10   Q. Are you an expert on Jewish services?
11   A. My general training and background as
12   a historian of American religion has given me tools
13   and skills and resources I need to interpret
14   documents related to Jewish religious services.
15   Q. When is the Torah used in a Jewish
16   service?
17   A. Talking about present day Jewish
18   services --
19   Q. Yes.
20   A. -- or historical Jewish services?
21   Q. Today. Or in 1903. You can pick
22   1903.
23   A. Because it changed over time.
24   Q. Fine. 1903.
25   A. It depends which branch of Judaism

---

41

Fisher

1
2    you're talking about.
3    Q. Orthodox.
4    A. The books of the law and the Torah are
5    often the centerpiece of these orthodox services.
6    They are carried in with often and what I've seen
7    so far, often carried in with great ceremony, with
8    the rimmonim adorning the tops of the rods, the
9    handles, the bells sort of jingling softly to alert
10   people of the presence of these books of the law.
11   Q. How many times have you seen that done
12   in a service?
13   A. I have read descriptions of it from
14   the era surrounding 1903.
15   Q. So you never seen it --
16   A. I wasn't alive in 1903 to see it
17   personally.
18   Q. Today.
19   A. Today?
20   Q. Have you ever seen it done today, have
21   you ever seen rimmonim being used at a service?
22   A. During an orthodox Sephardic service?
23   Q. Any.
24   A. To my recollection sitting here today,
25   I do not recall ever having seen the rimmonim being

11  (Pages 38 to 41)

42

|  |  | Fisher |
| --- | --- | --- |
| 09:57:51 | 2 | used in any Jewish religious service. |
| 09:57:55 | 3 | Q.  Because you've only been to services |
| 09:57:57 | 4 | once, right? |
| 09:57:59 | 5 | A.  That is correct. |
| 09:57:59 | 6 | Q.  Is the Torah used on a Sunday? |
| 09:58:05 | 7 | A.  We're still talking about an |
| 09:58:08 | 8 | orthodox -- |
| 09:58:09 | 9 | Q.  Yes. |
| 09:58:09 | 10 | A.  -- congregation? |
| 09:58:11 | 11 | Q.  Yes.  1903 or today.  I'll take either |
| 09:58:13 | 12 | one. |
| 09:58:38 | 13 | A.  I -- sitting here today, I cannot |
| 09:58:41 | 14 | recall descriptions from 1903 about the use of the |
| 09:58:45 | 15 | Torah on a Sunday morning. |
| 09:58:46 | 16 | Q.  Okay.  Do you know today whether a |
| 09:58:49 | 17 | Torah is used on a Sunday in services? |
| 09:58:52 | 18 | A.  In orthodox -- |
| 09:58:53 | 19 | Q.  Yes. |
| 09:58:55 | 20 | A.  -- congregation.  I do not recall |
| 09:59:05 | 21 | sitting here today having come across any |
| 09:59:09 | 22 | descriptions that would reveal to me an answer to |
| 09:59:15 | 23 | that question either way. |
| 09:59:16 | 24 | Q.  So you don't know? |
| 09:59:21 | 25 | A.  Sitting here right now, I do not |

43

|  |  | Fisher |
| --- | --- | --- |
| 09:59:23 | 2 | recall anything that comes to mind. |
| 09:59:24 | 3 | Q.  Do you know whether a Torah is used on |
| 09:59:26 | 4 | a Monday? |
| 09:59:44 | 5 | A.  Again, sitting here today, nothing |
| 09:59:47 | 6 | comes to mind that would lend insight to that |
| 09:59:50 | 7 | question. |
| 09:59:51 | 8 | Q.  If I asked the same question with |
| 09:59:53 | 9 | respect to Tuesday, Wednesday, Thursday and Friday, |
| 09:59:55 | 10 | would you know whether the Torah is used on those |
| 09:59:57 | 11 | days? |
| 10:00:19 | 12 | A.  Limiting my response to today, to the |
| 10:00:21 | 13 | 21st Century, to an Orthodox Jewish synagogue and |
| 10:00:26 | 14 | congregation, my answer would be the same for each |
| 10:00:31 | 15 | of the days of the week aside from the actual |
| 10:00:34 | 16 | service, which is to say, I've, sitting here, |
| 10:00:41 | 17 | nothing comes to mind that would lend insight into |
| 10:00:43 | 18 | that question. |
| 10:00:43 | 19 | Q.  Now, do you believe that a Torah is |
| 10:00:45 | 20 | used on Saturday? |
| 10:01:44 | 21 | A.  Again, because we're talking about the |
| 10:01:46 | 22 | 21st Century and since you've asked me to answer |
| 10:01:53 | 23 | questions that relate to that, I -- I'm not |
| 10:02:02 | 24 | entirely certain. |
| 10:02:04 | 25 | Q.  What about in 1903, was the Torah used |

44

|  |  | Fisher |
| --- | --- | --- |
| 10:02:07 | 2 | on Saturday? |
| 10:02:12 | 3 | A.  It might have depended on which |
| 10:02:16 | 4 | congregation. |
| 10:02:16 | 5 | Q.  Touro Synagogue, do you know whether |
| 10:02:19 | 6 | they used the Torah on Saturdays in 1903? |
| 10:02:29 | 7 | A.  Sitting here today, I don't recall |
| 10:02:31 | 8 | anything that would have indicated either way. |
| 10:02:33 | 9 | Q.  Do you know how many times Jews |
| 10:02:36 | 10 | convene services in the course of a day? |
| 10:02:40 | 11 | A.  In 1903 or today? |
| 10:02:41 | 12 | Q.  Yes, 1903. |
| 10:02:44 | 13 | A.  In the course of a day? |
| 10:02:45 | 14 | Q.  Yes. |
| 10:02:45 | 15 | A.  Would likely depend on the synagogue. |
| 10:02:56 | 16 | Q.  Orthodox synagogue. |
| 10:02:58 | 17 | A.  Specifically within orthodoxy, which |
| 10:03:01 | 18 | synagogue?  From what I've read and looked at to |
| 10:03:07 | 19 | date, I don't recall anyone specifically commenting |
| 10:03:10 | 20 | on this question. |
| 10:03:12 | 21 | Q.  Are you a member of the American |
| 10:03:17 | 22 | Jewish Historical Society? |
| 10:03:18 | 23 | A.  No, I am not. |
| 10:03:22 | 24 | Q.  Are you a member of any local Jewish |
| 10:03:24 | 25 | historical society? |

45

|  |  | Fisher |
| --- | --- | --- |
| 10:03:25 | 2 | A.  No, I am not. |
| 10:03:34 | 3 | Q.  Are you a member of the American |
| 10:03:38 | 4 | Historical Society? |
| 10:03:38 | 5 | A.  The American Historical Society? |
| 10:03:46 | 6 | Q.  Yes. |
| 10:03:57 | 7 | A.  I'm not a member of the American |
| 10:03:59 | 8 | Historical Society. |
| 10:03:59 | 9 | Q.  Okay.  Have you ever taught any |
| 10:04:01 | 10 | courses that focused solely on Jewish history? |
| 10:04:07 | 11 | A.  In my classes on the history of |
| 10:04:09 | 12 | religion in America, I have -- |
| 10:04:16 | 13 | Q.  Let me strike the question.  I |
| 10:04:18 | 14 | apologize.  Again, I'm trying to speed this up. |
| 10:04:21 | 15 | Have you ever taught any courses specifically in |
| 10:04:23 | 16 | Jewish history? |
| 10:04:27 | 17 | A.  My courses on the history of religion |
| 10:04:30 | 18 | in America touch specifically on the history of |
| 10:04:33 | 19 | American Judaism. |
| 10:04:33 | 20 | Q.  Right, and I think you testified to |
| 10:04:35 | 21 | that already.  But there's no course that you teach |
| 10:04:37 | 22 | that is solely on Jewish history, correct? |
| 10:04:42 | 23 | A.  To date, so far, I have not offered a |
| 10:04:46 | 24 | class that was solely devoted to American Jewish -- |
| 10:04:50 | 25 | Q.  Have you ever taken any courses in |

12  (Pages 42 to 45)

46

Fisher

10:04:53   1
10:05:17   2   Jewish history, solely Jewish history?
10:05:19   3       A. To my recollection, I have never taken
10:05:23   4   courses solely devoted to American Jewish history.
10:05:26   5       Q. Have you ever taken any courses solely
10:05:26   6   in Judaism?
10:05:26   7       A. When I was at seminary, which was a
10:05:48   8   Protestant seminary for three years, I had to learn
10:05:52   9   biblical Hebrew. I studied that for two years, and
10:05:55  10   we took exegetical classes on Hebrew Bible books.
10:06:01  11       Q. But were any of the courses devoted
10:06:05  12   solely to Judaism?
10:06:06  13       A. The courses I took were largely
10:06:15  14   devoted to Pre-Second Temple Judaism.
10:06:20  15       Q. Have you ever taught any courses in
10:06:22  16   Judaism, solely in Judaism?
10:06:25  17       A. My courses on American Jewish history
10:06:28  18   touch specifically on the history of American
10:06:30  19   Judaism as a part of the wider run of American
10:06:36  20   religious history. But to date, I have never, not
10:06:39  21   yet, taught a course solely devoted to American
10:06:43  22   Jewish history.
10:06:43  23       Q. Have you ever taught any courses
10:06:45  24   solely devoted to Jewish religious objects?
10:06:50  25       A. Jewish religious objects fall within a

47

Fisher

10:06:53   1
10:06:53   2   broader category of material culture and American
10:06:56   3   religion, which is something that I have taught on
10:07:00   4   and touched on in my classes. But to date, I have
10:07:04   5   never taught a course solely devoted to American
10:07:09   6   Jewish religious objects.
10:07:12   7       Q. And I think you testified, but correct
10:07:13   8   me if I'm wrong, you have not published any papers
10:07:15   9   that are solely devoted to American Jewish history
10:07:18  10   or Judaism, correct?
10:07:21  11       A. I have published works and papers that
10:07:23  12   deal with the broader themes that deal directly
10:07:26  13   with American Judaism, religious freedom, and --
10:07:33  14   but I have not, to date, published any works that
10:07:38  15   deal solely with American Jewish history.
10:07:43  16       Q. Outside of your coursework, have you
10:07:45  17   ever given any lectures devoted solely to American
10:07:48  18   Jewish history?
10:08:21  19       A. Many of the lectures I give deal with
10:08:24  20   the colonial period and American religious history,
10:08:27  21   and I have included elements and episodes of
10:08:30  22   American Jewish history within these larger
10:08:35  23   lectures.
10:08:35  24            But to date, I have never been
10:08:37  25   invited -- sorry, strike that -- I have never given

48

Fisher

10:08:44   1
10:08:44   2   a lecture that was solely devoted to American
10:08:47   3   Jewish history.
10:08:47   4       Q. Have you been to any conferences
10:08:49   5   devoted solely to American Jewish history?
10:08:56   6       A. Every conference I attend contains
10:08:58   7   panels and sessions on American Jewish history.
10:09:01   8       Q. That's not my question. My question
10:09:02   9   is, have you been to any conferences devoted solely
10:09:05  10   to American Jewish history?
10:09:07  11       A. I have never been to a conference that
10:09:11  12   was devoted solely to American Jewish history, but
10:09:13  13   as I said, every historical conference I attend
10:09:19  14   has -- most historical conferences I attend have a
10:09:21  15   panel or sessions on American Jewish history.
10:09:23  16       Q. Have you been on any of those panels
10:09:25  17   devoted to American Jewish history?
10:09:38  18       A. I have been asked to chair panels,
10:09:42  19   some of the papers of which deal in some form with
10:09:48  20   American Jewish history.
10:09:50  21       Q. Was that the panel that you
10:09:53  22   reference -- is that the conference you referenced
10:09:54  23   on page 1 and going to page 2 of your report?
10:10:08  24       A. That's one of the instances. I was on
10:10:10  25   the steering committee for that conference and...

49

Fisher

10:10:16   1
10:10:16   2       Q. Now, some of the papers that are going
10:10:18   3   to be published from that conference deal with the
10:10:20   4   history of Judaism in America, correct?
10:10:22   5       A. They do.
10:10:22   6       Q. Did you author any of those?
10:10:25   7       A. In this particular collected volume of
10:10:29   8   edited papers, I am not the author of any of these
10:10:34   9   papers. But as a conference organizer, it would
10:10:38  10   have been presumptuous to do so.
10:10:39  11       Q. Just so that the record is clear, have
10:10:47  12   you ever authored any paper devoted solely to
10:10:50  13   American Jewish history?
10:11:05  14       A. My publication record reflects my
10:11:07  15   engagement with the broader themes that surround
10:11:11  16   American religion and American Jewish history. But
10:11:14  17   to date, I have not published an essay devoted
10:11:18  18   solely to American Jewish history.
10:11:20  19       Q. Okay. I mean no disrespect, but I
10:11:22  20   well understand your point about the broader
10:11:24  21   context. That's fine. So you don't have to say it
10:11:28  22   every time. Again, I'm just trying to get you out
10:11:30  23   of here as quickly as possible. You have a very
10:11:33  24   long report, and I don't want to make the day any
10:11:35  25   longer than it is.

13 (Pages 46 to 49)

50

Fisher

| | | |
|---|---|---|
| 10:11:37 | 2 | So if you want to take a break now, |
| 10:11:39 | 3 | that's fine. |
| 10:11:40 | 4 | MR. SOLOMON: This isn't working. |
| 10:11:41 | 5 | MR. WAGNER: Why, why don't you... |
| 10:11:44 | 6 | (Recess taken.) |
| 10:27:23 | 7 | EXAMINATION (Cont'd.) |
| 10:27:24 | 8 | BY MR. WAGNER: |
| 10:30:03 | 9 | Q. Professor Fisher, you said that you |
| 10:30:07 | 10 | referenced Touro in your classes. That's on page |
| 10:30:10 | 11 | 2. Do your students, do you require your students |
| 10:30:15 | 12 | to read anything devoted to Touro Synagogue? |
| 10:30:19 | 13 | A. To the best of my knowledge, I cannot |
| 10:30:45 | 14 | recall requiring anything, any specific reading on |
| 10:30:50 | 15 | Touro Synagogue, although I have taken them down |
| 10:30:53 | 16 | for a tour of the synagogue and the Loeb Visitors |
| 10:30:53 | 17 | Center. |
| 10:31:00 | 18 | RQ    MR. WAGNER: I'd make a request for |
| 10:31:04 | 19 | the syllabus for your classes and we'll |
| 10:31:07 | 20 | follow that up with a letter. |
| 10:31:08 | 21 | Q. Now, I think you alluded to this |
| 10:31:11 | 22 | before, but do you know Hebrew? |
| 10:31:13 | 23 | A. I have studied Hebrew in the past. |
| 10:31:16 | 24 | Biblical Hebrew, that is. |
| 10:31:18 | 25 | Q. Now, you state on page 50 that you |

51

Fisher

| | | |
|---|---|---|
| 10:31:28 | 2 | say, this is on the second full paragraph — you |
| 10:31:34 | 3 | have it there — you have it, yes? |
| 10:31:38 | 4 | A. Page 150, yes. |
| 10:31:39 | 5 | Q. You say, in the second paragraph, "In |
| 10:31:41 | 6 | sum, Jewish synagogues need very specific religious |
| 10:31:46 | 7 | objects in order to function as a legitimate house |
| 10:31:48 | 8 | of worship. These include the books of the law and |
| 10:31:51 | 9 | the accompanying finials (rimmonim) as the examples |
| 10:31:55 | 10 | given above make clear, along with other specific |
| 10:31:58 | 11 | ritual items." |
| 10:31:59 | 12 | Do you see that? |
| 10:32:00 | 13 | A. I do see that. |
| 10:32:01 | 14 | Q. What's the basis for that statement? |
| 10:32:10 | 15 | What's your support? |
| 10:32:25 | 16 | A. I would point to several pieces of |
| 10:32:27 | 17 | evidence that this report includes to support that |
| 10:32:31 | 18 | statement. I'd say first of all, the context of |
| 10:32:34 | 19 | this report, and that statement, is specifically |
| 10:32:36 | 20 | within orthodox Judaism. This is the context of |
| 10:32:42 | 21 | this case. |
| 10:32:47 | 22 | The examples that I reference here |
| 10:32:50 | 23 | come prior to this point, and some of the examples |
| 10:32:53 | 24 | I'm giving are drawn from secondary sources where |
| 10:32:58 | 25 | you have historians describing the importance of |

52

Fisher

| | | |
|---|---|---|
| 10:33:04 | 2 | ritual objects within a synagogue. In other cases, |
| 10:33:10 | 3 | there are primary sources, sources from the 1890s |
| 10:33:16 | 4 | whereby individuals trying to start services or to |
| 10:33:23 | 5 | hold services recognize that they are in need of |
| 10:33:28 | 6 | specific religious objects in order to conduct the |
| 10:33:32 | 7 | services. |
| 10:33:32 | 8 | Q. So is it your testimony that an |
| 10:33:34 | 9 | orthodox service requires rimmonim in order to |
| 10:33:37 | 10 | conduct the service? |
| 10:33:41 | 11 | A. Again, the documents that I have |
| 10:33:43 | 12 | relied upon indicate the centrality of these |
| 10:33:48 | 13 | religious objects to conduct services. |
| 10:33:50 | 14 | Q. So is that another way of saying yes, |
| 10:33:53 | 15 | it is required? |
| 10:33:54 | 16 | MR. SOLOMON: Objection. |
| 10:33:54 | 17 | Q. You can answer. |
| 10:33:57 | 18 | A. As I've just stated, the documents |
| 10:33:59 | 19 | that I have relied upon and the people that I've |
| 10:34:01 | 20 | looked at, what they have said indicates that the |
| 10:34:07 | 21 | rimmonim and the other religious objects are |
| 10:34:15 | 22 | central to the functioning of a orthodox Sephardic |
| 10:34:21 | 23 | Jewish synagogue. |
| 10:34:22 | 24 | Q. You also say on page 36, in the middle |
| 10:34:28 | 25 | of the page you say, "Most synagogues have multiple |

53

Fisher

| | | |
|---|---|---|
| 10:34:31 | 2 | scrolls of the law with an accompanying pair of |
| 10:34:34 | 3 | rimmonim for each scroll." |
| 10:34:35 | 4 | Do you see that? |
| 10:34:36 | 5 | A. I do see that. |
| 10:34:37 | 6 | Q. What's the basis for that statement? |
| 10:34:39 | 7 | Have you surveyed synagogues? |
| 10:34:41 | 8 | MR. SOLOMON: Which question did you |
| 10:34:43 | 9 | want him to answer? |
| 10:34:44 | 10 | Q. What's the basis for this statement? |
| 10:34:53 | 11 | A. Again, this statement is based upon |
| 10:34:55 | 12 | both a reading of secondary literature that |
| 10:34:58 | 13 | describes Jewish synagogues around the Atlantic |
| 10:35:01 | 14 | world, even North Africa, and in North America, as |
| 10:35:06 | 15 | well as the specific cases that, or the specific |
| 10:35:13 | 16 | documents that were relevant to this case from the |
| 10:35:16 | 17 | 1880s and 1890s. |
| 10:35:19 | 18 | Q. Have you done any survey of synagogues |
| 10:35:22 | 19 | to see how many own rimmonim? |
| 10:35:23 | 20 | A. Of orthodox -- |
| 10:35:26 | 21 | Q. Yes. |
| 10:35:27 | 22 | A. -- Sephardic synagogues? |
| 10:35:30 | 23 | Q. Any. Orthodox, Sephardic, anyone. |
| 10:35:32 | 24 | Have you done any surveys? |
| 10:35:38 | 25 | A. I have not personally conducted a |

14  (Pages 50 to 53)

54

Fisher

10:35:40  1  survey of Jewish synagogues in North America. But
10:35:44  2  again, as my report makes clear from the citations,
10:35:47  3  I'm relying on historians and authors who have done
10:35:53  4  a more extensive survey of synagogues in this time
10:35:57  5  period.
10:35:58  6      Q.  Which historian did a survey and
10:36:00  7  concluded that most have rimmonim?  Which ones?
10:36:12  8      A.  I didn't say that there was an author
10:36:16  9  that did -- specifically did what you're asking in
10:36:20 10  terms of extensive survey.  I said that I relied
10:36:23 11  upon historians who have a broader understanding of
10:36:27 12  synagogues in North America, the Caribbean --
10:36:30 13      Q.  The record is what it is.  Is this a
10:36:34 14  material part of your opinion, that rimmonim are
10:36:35 15  required for a legitimate Jewish service, is that a
10:36:39 16  material part of your opinion?
10:36:40 17      MR. SOLOMON:  I object to the form.
10:36:43 18  Misstated his --
10:36:43 19      MR. WAGNER:  Okay.
10:36:43 20      Q.  You can answer.
10:36:49 21      A.  Based on the documents I've read,
10:36:51 22  which is what this report reflects, there was a
10:36:54 23  central concern among the parties involved for the
10:36:59 24  presence of books of the law and accompanying

55

Fisher

10:37:02  1  rimmonim that were consistently stated and desired
10:37:07  2  and utilized in this time period.
10:37:11  3      Q.  Okay.  That's not my question.  Just
10:37:14  4  listen to my question.
10:37:16  5      Is a material part of the opinion that
10:37:18  6  you offer in this case that rimmonim are required
10:37:24  7  for a legitimate house of worship, Jewish house of
10:37:29  8  worship?
10:37:30  9      MR. SOLOMON:  Where are you reading?
10:37:31 10      MR. WAGNER:  Page 150.
10:37:32 11      Q.  Is that a material part of your
10:37:33 12  opinion?
10:37:34 13      A.  I think I did answer your question,
10:37:36 14  that this report reflects my reading of documents
10:37:40 15  and what people are actually saying in this time
10:37:43 16  period.  And the reports reflecting these documents
10:37:48 17  indicate their concern for the centrality of the
10:37:54 18  rimmonim and the books of the law within their
10:37:56 19  services.
10:37:56 20      Q.  That's not my question.  And I'm sure
10:37:58 21  that it's my fault that you're not understanding.
10:38:02 22      You say that the rimmonim are owned by
10:38:05 23  CSI, correct?
10:38:10 24      A.  The report does say that.

56

Fisher

10:38:11  1      Q.  And you believe that, right?
10:38:13  2      A.  Based upon the investigation that I've
10:38:15  3  done and the documents that I've read, the evidence
10:38:19  4  seems to lean clearly in that direction.
10:38:21  5      Q.  By the way, does it lean a hundred
10:38:25  6  percent?
10:38:25  7      A.  I was not asked to give a percentage.
10:38:27  8      Q.  But can you?
10:38:28  9      A.  As a historian who looks at the way
10:38:32 10  the evidence is raised, the evidence is weighed and
10:38:40 11  looks at what's in front of you, that's not a part
10:38:42 12  of the historical profession, to give percentages.
10:38:45 13  But the overwhelming body of documents and evidence
10:38:49 14  leans in clear favor of CSI's ownership.
10:38:50 15      Q.  And that's what you did.  You weighed
10:38:52 16  the evidence in this case, right?
10:38:52 17      A.  I did.
10:38:55 18      Q.  Okay.  So let me get back to my
10:38:58 19  question.  You believe, or you wrote in your report
10:39:01 20  that CSI owns the rimmonim, correct?
10:39:03 21      A.  Do you have a page number that you
10:39:04 22  could show me in the report?
10:39:08 23      Q.  Are you able to answer that question?
          24  Isn't that your opinion, that CSI owns the
          25

57

Fisher

10:39:12  1  rimmonim?  Do you really need to reference your
10:39:14  2  report?
10:39:14  3      A.  I just want to make sure we're looking
10:39:16  4  at the same statement.  So do you have a page
10:39:18  5  number for that statement?
10:39:20  6      Q.  No, I don't.  You can find it.
10:39:32  7      (Witness perusing document.)
10:39:38  8      A.  If you can show me where the report
10:39:40  9  says that, I'd be happy to answer your question.
10:39:42 10      Q.  Are you able to tell me what your
10:39:47 11  opinions are without looking at your report?
10:39:49 12      A.  The report contains my opinion, and
10:39:50 13  it's the basis for this discussion.
10:39:54 14      Q.  Sir, I don't really want to make this
10:39:58 15  any harder than it is, and I really mean no
10:40:00 16  disrespect, but can you tell me whether your
10:40:03 17  opinion in this case is that CSI owns the rimmonim?
10:40:08 18  Otherwise, what are we here for?
10:40:10 19      A.  I gave my opinion based upon the
10:40:14 20  documents that I consulted.  The judge will decide
10:40:18 21  this case ultimately.  I was brought on to
10:40:22 22  understand specific aspects of this case and in the
10:40:26 23  process, felt that the evidence leaned in a
          24  particular direction and I, as a historian, leaning
          25

15  (Pages 54 to 57)

58

Fisher

10:40:31  upon my training and the standards from my field,

10:40:36  made the statements that are in front of you in a

10:40:38  report.

10:40:38  Q. Okay. Put aside the report. Are you

10:40:41  able to tell me, independently of the report,

10:40:43  whether it's your opinion that CSI owns these

10:40:51  rimmonim?

10:40:51  A. The judge will ultimately decide this

10:40:53  particular question of ownership. But I can tell

10:40:56  you from reading the documents that I consulted,

10:41:00  and after having conducted the research that I did,

10:41:04  the evidence seems to suggest that, as between CJI

10:41:10  and CSI, CSI, according to the evidence I've looked

10:41:15  at so far, and sitting here today, are far more the

10:41:23  owners of the rimmonim.

10:41:23  Q. Okay. And is a material part of your

10:41:27  opinion that CSI owns the rimmonim? Your statement

10:41:32  in your report on page 36 that, "Jewish synagogues

10:41:36  need very specific religious objects to function as

10:41:40  a legitimate house of worship, these include

10:41:43  rimmonim," is that a material part of your opinion

10:41:45  that CSI owns the rimmonim?

10:41:48  A. I think you asked two questions there.

10:41:50  Q. I don't think so. But --

59

Fisher

10:41:52  A. Can you restate --

10:41:53  Q. You have a Ph.D., I don't. Is a

10:41:57  material basis for your opinion that CSI owns the

10:42:00  rimmonim your conclusion that Jewish synagogues

10:42:04  need very specific religious objects to function as

10:42:07  a legitimate house of worship and these include

10:42:10  rimmonim?

10:42:19  A. I'm still not sure I understand the

10:42:20  question.

10:42:20  Q. Okay.

10:42:22  A. Do you want to rephrase that one more

10:42:24  time?

10:42:25  Q. Okay, let's try it a different way.

10:42:40  MR. WAGNER: Let's mark this as the

10:42:42  next exhibit.

10:43:06  (Fisher Exhibit 5, single-page

10:43:06  document headed, "Statements by

10:43:06  Professor Fisher that Rimonim are

10:43:06  'Essential,' 'Necessary' or Required",

10:43:06  marked for identification, as of this

10:43:06  date.)

10:43:06  Q. So I collected in one place all of

10:43:09  your statements in your report that rimmonim are

10:43:11  "Essential," "Necessary" or "Required," and maybe

60

Fisher

10:43:16  somebody will find fault with what I've done here.

10:43:19  But by my count, on at least 17 occasions in your

10:43:22  report, you made statements to that effect.

10:43:25  Do you see that?

10:43:26  MR. SOLOMON: I object to the use of

10:43:27  the document.

10:43:27  MR. WAGNER: I understand.

10:43:28  Q. Go ahead. Do you see those

10:43:31  statements?

10:43:32  A. I see the statements that you have

10:43:34  extracted out of context from my report.

10:43:36  Q. Fine.

10:43:37  A. And put on this piece of paper.

10:43:39  Q. In context, are these statements

10:43:41  important to your conclusions about ownership?

10:43:45  A. Well, they are not in context here.

10:43:47  Q. Fine. In context, are these 17

10:43:50  statements important to your opinion?

10:43:52  A. Well, let's go through them page by

10:43:54  page and look at them. Page 35 is the first one.

10:44:20  (Witness perusing document.)

10:44:51  A. So the one thing I would point out --

10:44:54  MR. SOLOMON: Where is it on page 35?

10:44:59  MR. JACOBY: Towards the bottom.

61

Fisher

10:45:01  THE WITNESS: Four lines --

10:45:04  A. -- so this paragraph leads up to a

10:45:08  broader discussion across sort of the history of

10:45:12  Judaism and I am here relying upon, look at page

10:45:18  125, David F. Goldberg and John D. Rayner, on page

10:45:21  36 --

10:45:22  MR. SOLOMON: Footnote 125?

10:45:24  THE WITNESS: Yes, I'm sorry.

10:45:26  A. Footnote, excuse me, footnote 125 on

10:45:28  page 36, David F. Goldberg, and John D. Rayner,

10:45:37  R-a-y-n-e-r, "The Jewish people, Their History and

10:45:41  Their Religion, published in 1989, in which they

10:45:46  themselves, say, "Any house or room can be made

10:45:50  into a synagogue by being so designated and used.

10:45:54  It needs, however, to be equipped with a few

10:45:56  essential appurtenances."

10:45:59  So much of this language is simply

10:46:02  reflecting a wider consensus of historians of

10:46:06  Judaism, of actual documents that are taking place

10:46:14  or that are reflected activity on the ground.

10:46:21  Again, the wider context here in the

10:46:23  1890s is of the basic impossibility of coming into

10:46:32  Touro Synagogue without books of the law, without

10:46:36  these appurtenances. A synagogue building by

62

Fisher

| | | |
|---|---|---|
| 10:46:42 | 2 | itself is, according to these two historians here, |
| 10:46:47 | 3 | simply a building. |
| 10:46:47 | 4 | Q. Let me stop you for a second. What |
| 10:46:51 | 5 | investigation did you do with respect to David |
| 10:46:54 | 6 | Goldberg and John Rayner? What did you do to see |
| 10:46:59 | 7 | what kind of authorities they are? Did you do any |
| 10:47:02 | 8 | investigation? |
| 10:47:07 | 9 | A. In this particular case, I, sitting |
| 10:47:23 | 10 | here, do not recall having done any additional |
| 10:47:27 | 11 | investigation into the two authors. But I did skim |
| 10:47:29 | 12 | through the book and assessed it, as I would any |
| 10:47:34 | 13 | other secondary source, to see how they are using |
| 10:47:38 | 14 | sources and evidence and whether or not it seems |
| 10:47:41 | 15 | like it would be something that would be credible |
| 10:47:44 | 16 | to use in a historical investigation. |
| 10:47:49 | 17 | Q. And that's how you evaluated them, |
| 10:47:51 | 18 | right? That's all you did. |
| 10:47:53 | 19 | A. As I'm sitting here and recalling my |
| 10:47:55 | 20 | process in this particular case, that is what I |
| 10:47:59 | 21 | remember. |
| 10:47:59 | 22 | Q. What year were they writing? |
| 10:48:06 | 23 | A. The book was published in 1989. |
| 10:48:08 | 24 | Q. And where are they from? |
| 10:48:13 | 25 | A. Sitting here, I do not recall seeing |

63

Fisher

| | | |
|---|---|---|
| 10:48:15 | 2 | anything that indicated that either way. |
| 10:48:17 | 3 | Q. Do you know they are from England, |
| 10:48:19 | 4 | they are not from the United States? |
| 10:48:19 | 5 | A. Again, I didn't see anything that |
| 10:48:24 | 6 | would indicate either way. |
| 10:48:25 | 7 | Q. And in fact, that source nowhere says |
| 10:48:28 | 8 | that rimmonim are essential or required for Jewish |
| 10:48:31 | 9 | service, does it? |
| 10:48:39 | 10 | A. This particular book that we're |
| 10:48:41 | 11 | talking about here? |
| 10:48:43 | 12 | Q. Yes. |
| 10:48:46 | 13 | A. Well, on page 36, I'm quoting from |
| 10:48:49 | 14 | them directly, as I quoted before, it says, "Any |
| 10:48:57 | 15 | room or house" -- "house or room, excuse me, can be |
| 10:48:59 | 16 | made into a synagogue by being so designated and |
| 10:49:03 | 17 | used. It needs, however, to be equipped with a few |
| 10:49:06 | 18 | essential appurtenances." |
| 10:49:08 | 19 | And then it goes through the actual |
| 10:49:10 | 20 | things that they are referring to, which I list out |
| 10:49:13 | 21 | here below and actually put in quotes, the scroll |
| 10:49:15 | 22 | of the law, the Sefer Torah, and then on top of the |
| 10:49:19 | 23 | wooden rollers for the books of the law, I'm |
| 10:49:22 | 24 | quoting directly here, "Are surmounted by a pair of |
| 10:49:27 | 25 | silver finials known from their usual shape as |

64

Fisher

| | | |
|---|---|---|
| 10:49:30 | 2 | rimmonim (pomegranates) incorporating tiny silver |
| 10:49:35 | 3 | bells." |
| 10:49:35 | 4 | Q. You didn't give the entire quote from |
| 10:49:37 | 5 | that page of the book, did you? |
| 10:49:41 | 6 | A. I'm not sure of what you mean. |
| 10:49:43 | 7 | Q. Well, do you remember? |
| 10:49:47 | 8 | A. I -- the quotes come from that section |
| 10:49:52 | 9 | that's on synagogue appurtenances. |
| 10:49:55 | 10 | Q. We'll come back to these two people. |
| 10:49:59 | 11 | But my question is a different one. |
| 10:50:02 | 12 | Are your statements about rimmonim |
| 10:50:04 | 13 | being required, being necessary or being essential, |
| 10:50:08 | 14 | are they important to your decision, to your |
| 10:50:11 | 15 | conclusion in this case? That's all I'm asking |
| 10:50:14 | 16 | you. Is it important? |
| 10:50:20 | 17 | A. Any statements in this report have |
| 10:50:22 | 18 | tried to reflect the concerns of people on the |
| 10:50:24 | 19 | ground. So to the degree that people in the 1890s |
| 10:50:30 | 20 | reflected a concern or articulated a concern to |
| 10:50:33 | 21 | have synagogue appurtenances within the Touro |
| 10:50:39 | 22 | Synagogue, then to the extent that they are |
| 10:50:42 | 23 | reflecting that concern, then that is what I have |
| 10:50:45 | 24 | tried to put in this report. |
| 10:50:46 | 25 | Q. But are those conclusions important to |

65

Fisher

| | | |
|---|---|---|
| 10:50:48 | 2 | your -- are those observations important to your |
| 10:50:51 | 3 | conclusions about the issue of ownership? |
| 10:50:55 | 4 | A. Insomuch as the vying congregations in |
| 10:51:38 | 5 | Newport felt that the presence of these synagogue |
| 10:51:41 | 6 | appurtenances were important for their maintenance |
| 10:51:43 | 7 | of an active Jewish synagogue, and insomuch as they |
| 10:51:49 | 8 | tried to control or claim or utilize them, there |
| 10:51:57 | 9 | might be a connection between their relevance and |
| 10:52:02 | 10 | importance to people trying to maintain a |
| 10:52:04 | 11 | functioning synagogue and the question of |
| 10:52:07 | 12 | ownership. |
| 10:52:07 | 13 | Q. There might be a connection? Just |
| 10:52:10 | 14 | might be? You said this 17 times in your report. |
| 10:52:13 | 15 | It's only "might"? |
| 10:52:15 | 16 | MR. SOLOMON: Object to the form of |
| 10:52:16 | 17 | the question. |
| 10:52:16 | 18 | Q. You can answer. |
| 10:52:29 | 19 | A. Again, it depends on -- on the context |
| 10:52:32 | 20 | here. But the people who were trying to operate |
| 10:52:36 | 21 | services in Touro Synagogue in the 1880s and 1890s |
| 10:52:42 | 22 | saw these synagogue appurtenances as central to |
| 10:52:45 | 23 | what they were doing in Newport. And -- |
| 10:52:48 | 24 | Q. How do you know what they saw? |
| 10:52:50 | 25 | A. 'Cause there's correspondence that |

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

66

Fisher

10:52:54 1
10:53:00 2  indicates that they are desirous of these specific
10:53:02 3  items and they request them.
10:53:06 4      Q. Have you seen all the correspondence?
10:53:09 5      A. I'd be happy to be shown more. But
10:53:15 6  from what I have seen, and in the pendant
10:53:18 7  investigations that I have done myself, these
10:53:20 8  synagogue appurtenances and concern regarding them
10:53:24 9  come up repeatedly by individuals involved with
10:53:26 10 operating services in Touro Synagogue.
10:53:27 11     Q. Have you looked at all the documents
10:53:43 12 that have been produced in this case?
10:53:45 13     A. I have looked at the documents that
10:53:47 14 were given to me and deemed relevant for the
10:53:50 15 particular questions that I was asked to address.
10:54:00 16 And I have, within my ability, tried to look in the
10:54:04 17 relevant secondary and primary literature, given
10:54:08 18 the time constraints that I had and given the
10:54:09 19 availability of additional documents.
10:54:15 20     Q. So the documents -- I'm talking about
10:54:17 21 the primary sources from the documents I
10:54:22 22 produced -- you got those from counsel.
10:54:25 23     A. Some of the documents, probably the
10:54:28 24 majority of the documents that I have utilized in
        25 this case in terms of primary documentation, were

67

Fisher

10:54:32 1
10:54:35 2  given to me by counsel to CSI.
10:54:37 3      Q. So the counsel made the decisions as
10:54:48 4  to what to give you, right?
10:54:51 5      A. The counsel to CSI made the initial
10:54:54 6  decisions about what they thought was relevant to
10:54:57 7  answer the questions that I was being asked to
10:54:59 8  assess.
10:55:02 9      But at any time, when I had questions
10:55:07 10 about any part of the case or any other documents
10:55:11 11 that were out there or not being utilized
10:55:18 12 currently, they worked with me constantly to turn
10:55:22 13 up anything that was relevant and I, as any good
10:55:27 14 historian would do, tried to do due diligence to
10:55:33 15 understand the larger context through other kinds
10:55:36 16 of documents that they might not have seen as
10:55:41 17 immediately relevant but are relevant for me for
10:55:43 18 understanding the broader context in which these
10:55:44 19 events took place.
10:55:47 20     Q. Okay. Let's just focus, I just want
10:55:48 21 to focus on the documents that have been produced
10:55:50 22 by the parties in the case.
10:55:53 23     Did you pose the question to counsel
10:55:55 24 whether they had given you all of the relevant
        25 documents?

68

Fisher

10:56:03 1
10:56:05 2      A. Sitting here today, I can't recall if
10:56:07 3  there was ever a moment where I asked that specific
10:56:12 4  question. But we had conversations in an ongoing
10:56:16 5  way about which documents are relevant to the kinds
10:56:18 6  of questions I was asking.
10:56:21 7      Q. Would you agree with me that an
10:56:25 8  important part of this was -- really a fascinating
10:56:30 9  story -- is the events the first two months of
10:56:34 10 1903, the settlement and the resolution and the
10:56:40 11 lease?
10:56:42 12     A. The events of the first two months of
10:56:46 13 1903 are certainly an important piece of this
10:56:47 14 larger story.
10:56:50 15     Q. What did you do to ensure that you got
10:56:55 16 all of the documents in CSI's possession about
10:57:03 17 those events, if anything?
10:57:25 18     A. Again, I don't recall a specific
10:57:27 19 moment when I asked them that question. But we
10:57:32 20 were in constant communication over the course of
10:57:38 21 four months now about how we could possibly turn up
10:57:44 22 any relevant documents. And they were always
10:57:46 23 exceedingly willing and ready to provide the
10:57:49 24 documentation that they had in their possession, to
        25 the best of my knowledge, that would be relevant to

69

Fisher

10:57:52 1
10:57:54 2  the specific questions that I was asking.
10:57:56 3      Q. So you would have expected them to
10:57:58 4  give you all the documents they had about those
10:58:00 5  events, correct?
10:58:01 6      A. I would have expected them to give me
10:58:05 7  the documents that they believed were relevant to
10:58:08 8  the specific questions that I was asked to address.
10:58:13 9      Q. Let me go back to page 50 again. You
10:58:17 10 say in sum, "Jewish synagogues need very specific
10:58:19 11 religious objects in order to function as
10:58:21 12 legitimate houses of worship. These include the
10:58:25 13 books of the law and the accompanying finials, as
10:58:27 14 the examples given above make clear."
10:58:29 15     Is it your testimony that if a
10:58:32 16 synagogue doesn't have finials, doesn't have
10:58:35 17 rimmonim, it's not a legitimate house of worship?
10:58:38 18     A. I was not asked to make definitive
10:58:42 19 pronouncements on issues of Jewish law. But I was
10:58:46 20 asked to evaluate the documents under
10:58:49 21 consideration, and using the wider context of what
10:58:52 22 was happening in the 1890s, to try to understand
10:58:57 23 the concerns of people on the ground and to
        24 understand what was at stake in the use of the
10:59:02 25 Touro Synagogue.

18  (Pages 66 to 69)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

70

Fisher

```
10:59:03   2    Q. Okay, sir. Just answer my question.
10:59:05   3  Don't give me a speech.
10:59:08   4    MR. WAGNER: Can you repeat the
10:59:09   5  question?
10:59:25   6    (Record read.)
10:59:26   7    A. My testimony is that the actions of
10:59:27   8  the people in the 1890s reflect a concern that
10:59:31  10  seems to indicate that rimmonim were central to the
10:59:33  10  functioning of, at least in this case, the
10:59:38  11  synagogue under consideration.
10:59:40  12    Q. So does that mean if they didn't have
10:59:42  13  rimmonim, their services were illegitimate?
10:59:46  14    A. The correspondence and actions of
10:59:59  15  people on the ground seemed to indicate that they
11:00:01  16  felt that the presence of synagogue appurtenances
11:00:07  17  were important to the functioning of their
11:00:09  18  synagogue.
11:00:09  19    Q. Sir, I'm not asking people on the
11:00:11  20  ground, I'm not asking important. I'm asking for
11:00:13  21  your view. I'm entitled to an answer.
11:00:16  22    Is it your view that if a synagogue in
11:00:23  23  1903 did not have rimmonim, it was illegitimate?
11:00:28  24    A. My report is a full -- a reflection of
11:00:37  25  the documents that I've read. And it is my
```

71

Fisher

```
11:00:42   2  assessment that the people on the ground felt that
11:00:45   3  these things were important to --
11:00:47   4    Q. You're just repeating -- are you able
11:00:49   5  to answer my question or no? Are you able to --
11:00:51   6    MR. SOLOMON: Anything you want to add
11:00:53   7  to the answers that you've made, you
11:00:56   8  may --
11:00:56   9    THE WITNESS: I don't believe so, no.
11:00:57  10    Q. Now, do you know when CSI was founded?
11:01:08  11    A. Well, 1654 is given as the sort of
11:01:13  12  traditional date of the entrance of Jews into New
11:01:17  13  York City.
11:01:17  14    Q. And are you aware they didn't have
11:01:20  15  rimmonim until the 1730s? Are you aware of that?
11:01:29  16    A. I have not come across anything that
11:01:31  17  would have indicated that either way.
11:01:32  18    Q. Really? Did you read Vivian Mann's
11:01:35  19  report?
11:01:40  20    A. I did read Vivian Mann's report.
11:01:42  21    Q. Doesn't she say that in her report?
11:01:47  22    A. Do you have a copy of the report for
11:01:48  23  me?
11:02:18  24    (Fisher Exhibit 4, expert report of
11:02:18  25  Dr. Vivian Mann dated 11/24/14, marked
```

72

Fisher

```
11:02:20   2  for identification, as of this date.)
11:02:20   3    Q. Can you turn to page 8. And do you
11:02:31   4  see she says under Roman Numeral VII, "At the time
11:02:34   5  of this first loan," which I think is 1760, "CSI
11:02:38   6  could not have provided silver finials to accompany
11:02:41   7  the scrolls since the congregation owned only one
11:02:45   8  pair that was donated to it in the late 1730s."
11:02:49   9    Do you see that?
11:02:49  10    A. I do see that.
11:02:50  11    Q. Is it your testimony that before 1730,
11:02:53  12  CSI's services were illegitimate?
11:03:01  13    A. I was not asked to make pronouncements
11:03:05  14  on the legitimacy of CSI prior to --
11:03:07  15    Q. I wasn't asking whether you were
11:03:09  16  asked. But my question, were the services before
11:03:13  17  illegitimate?
11:03:17  18    A. Nothing I have read seems to indicate
11:03:18  19  that in the 1730s or any time prior, CSI was
11:03:24  20  considered to be illegitimate.
11:03:27  21    Q. Now, if my service that I go to
11:03:39  22  doesn't use rimmonim, is there something wrong with
11:03:43  23  that service?
11:03:49  24    A. I wasn't asked to make pronouncements
11:03:53  25  on contemporary services that you might attend that
```

73

Fisher

```
11:03:57   2  were --
11:03:57   3    Q. I know you were not asked the
11:03:59   4  questions that I'm asking you now. But I'm
11:04:01   5  entitled to ask them, the same way he gets to ask
11:04:05   6  questions of my witness if I have one.
11:04:07   7    So can you answer that question? Is
11:04:10   8  my service illegitimate if I don't use rimmonim?
11:04:13   9    A. I don't know. I'm not entirely sure
11:04:17  10  that, given more -- without having more information
11:04:21  11  and more context, that I would be in a position,
11:04:25  12  sitting here today, to make that pronouncement.
11:04:26  13    Q. Because you don't even know how many
11:04:29  14  times rimmonim are used during the course of a week
11:04:31  15  at a Jewish service, do you?
11:04:44  16    A. Again, from what I've seen, thinking
11:04:46  17  about the 21st century, no, I do not know precisely
11:04:51  18  how many times I think it -- the -- possibly maybe
11:04:57  19  varied --
11:04:58  20    Q. You don't know how many times rimmonim
11:04:59  21  were used in a service in 1903, do you?
11:05:10  22    A. In a service?
11:05:11  23    Q. Yes, in a service.
11:05:12  24    A. Well, I said before that they were
11:05:14  25  carried in on top of the books of the law within
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

74

Fisher

| | | |
|---|---|---|
| 11:05:17 | 2 | one service. |
| 11:05:17 | 3 | Q. Do you know how many times rimmonim |
| 11:05:20 | 4 | were used in the course of a week in the synagogue, |
| 11:05:25 | 5 | or is that beyond your expertise? |
| 11:05:27 | 6 | A. I think we covered this earlier and I |
| 11:05:30 | 7 | said, sitting here today, I don't recollect having |
| 11:05:35 | 8 | come across an answer to that question. |
| 11:05:37 | 9 | Q. Now, if a synagogue is poor, and they |
| 11:05:44 | 10 | can't afford silver, is it an illegitimate service? |
| 11:05:51 | 11 | A. Again, it's not in my place to |
| 11:05:52 | 12 | pronounce what they are not -- today, or in |
| 11:05:58 | 13 | specific instances that you're talking about, |
| 11:06:03 | 14 | whether that is the case. The report reflects what |
| 11:06:08 | 15 | other historians have been saying about the use of |
| 11:06:12 | 16 | synagogue appurtenances. And the report reflects |
| 11:06:17 | 17 | the concerns of people on the ground and their |
| 11:06:19 | 18 | desire for these appurtenances. |
| 11:06:21 | 19 | Q. Okay. You don't have to give that |
| 11:06:23 | 20 | speech every time. I just asked a question. If a |
| 11:06:25 | 21 | synagogue is too poor to afford rimmonim, is their |
| 11:06:31 | 22 | service illegitimate in your eyes? |
| 11:06:34 | 23 | A. I don't know. I don't know that I |
| 11:06:45 | 24 | have enough of context information to answer that |
| 11:06:47 | 25 | question. |

75

Fisher

| | | |
|---|---|---|
| 11:06:48 | 2 | Q. And again, the historians you used are |
| 11:06:55 | 3 | Goldberg and Rayner. |
| 11:06:56 | 4 | A. One of the historians. Some of the |
| 11:06:59 | 5 | historians. |
| 11:06:59 | 6 | Q. We'll come to the heart of your report |
| 11:07:01 | 7 | later. Let's move on. |
| 11:07:04 | 8 | Who wrote your report? |
| 11:07:10 | 9 | A. I did. |
| 11:07:10 | 10 | Q. And do you stand by the report? |
| 11:07:18 | 11 | A. I stand by what I wrote as of the |
| 11:07:22 | 12 | dating of the report and the evidence that I had in |
| 11:07:25 | 13 | front of me, as of November 24th, 2014. |
| 11:07:27 | 14 | Q. Who, if anyone, reviewed the report? |
| 11:07:43 | 15 | A. I was in conversation with counsel to |
| 11:07:45 | 16 | CSI about the report. |
| 11:07:46 | 17 | Q. Did they review drafts? |
| 11:07:48 | 18 | A. As I recall, they would have seen |
| 11:08:05 | 19 | my -- a version of this prior to the final |
| 11:08:08 | 20 | submission. |
| 11:08:08 | 21 | Q. How many versions were there before |
| 11:08:10 | 22 | the final? |
| 11:08:11 | 23 | A. I don't recall precisely. |
| 11:08:22 | 24 | Q. More than five? |
| 11:08:31 | 25 | A. Possibly. |

76

Fisher

| | | |
|---|---|---|
| 11:08:32 | 2 | Q. More than ten? |
| 11:08:37 | 3 | A. I don't recall, but I highly doubt it. |
| 11:08:39 | 4 | Q. Did counsel edit the report at all? |
| 11:08:54 | 5 | A. There was input regarding line edits |
| 11:08:59 | 6 | and fact checking. |
| 11:08:59 | 7 | Q. Did you personally fact-check |
| 11:09:03 | 8 | everything in the report? |
| 11:09:04 | 9 | A. I personally went through and -- every |
| 11:09:14 | 10 | quotation, went back to try to ensure the greatest |
| 11:09:17 | 11 | degree of accuracy and to try to make sure that the |
| 11:09:24 | 12 | citations were correct. |
| 11:09:27 | 13 | Q. And are all the citations correct? |
| 11:09:50 | 14 | A. To the best of my knowledge, yes. |
| 11:09:52 | 15 | There was one that I came across recently that I |
| 11:09:56 | 16 | think I had misquoted something. But that was a |
| 11:10:02 | 17 | very small piece of this. |
| 11:10:05 | 18 | Q. Are all the words in the report your |
| 11:10:08 | 19 | words? |
| 11:10:08 | 20 | A. I'm not sure that I could remember |
| 11:10:33 | 21 | precisely in the line editing process if some words |
| 11:10:38 | 22 | were introduced that are not mine. But I was |
| 11:10:42 | 23 | concerned to make this report reflect my own voice |
| 11:10:47 | 24 | and sensibilities and process. |
| 11:10:49 | 25 | Q. Did counsel draft any portion of the |

77

Fisher

| | | |
|---|---|---|
| 11:10:52 | 2 | report? |
| 11:10:54 | 3 | A. Counsel did not give me or insert |
| 11:11:01 | 4 | anything of substance, of substantial length. |
| 11:11:08 | 5 | Again, I can't recall precisely what happened in |
| 11:11:12 | 6 | the copyediting phase. There might have been turns |
| 11:11:16 | 7 | of phrases. |
| 11:11:18 | 8 | Q. When you say "of substantial length," |
| 11:11:20 | 9 | what do you mean? How many pages is that? |
| 11:11:22 | 10 | MR. SOLOMON: Objection to the form. |
| 11:11:24 | 11 | A. That was not pages. |
| 11:11:25 | 12 | Q. Okay, you can answer. |
| 11:11:27 | 13 | A. We're not talking about pages. We're |
| 11:11:28 | 14 | talking about words. |
| 11:11:29 | 15 | Q. Well, how do you define "substantial" |
| 11:11:33 | 16 | then? |
| 11:11:34 | 17 | A. A sentence. |
| 11:11:36 | 18 | Q. So there's no -- are there any full |
| 11:11:40 | 19 | sentences that came from counsel? |
| 11:12:06 | 20 | A. Again, sitting here thinking about the |
| 11:12:09 | 21 | copyediting process, no single sentence jumps out |
| 11:12:14 | 22 | to me as being wholly written or given by counsel. |
| 11:12:19 | 23 | Q. What about the punctuation, is that |
| 11:12:22 | 24 | all yours? |
| 11:12:27 | 25 | A. To the best of my knowledge, the |

20 (Pages 74 to 77)

78

Fisher

| | | |
|---|---|---|
| 1:12:28 | 2 | punctuation is my own. |
| 1:12:30 | 3 | Q. Are the ellipses yours? |
| 1:12:33 | 4 | A. Do you have specific examples? |
| 1:12:38 | 5 | Q. I will. But do you remember whether |
| 1:12:40 | 6 | they were all yours? |
| 1:12:46 | 7 | A. Again, sitting here, thinking about |
| 1:12:48 | 8 | the copyediting process, I used ellipses in my own |
| 1:12:54 | 9 | writing sometimes, and I don't recall either way |
| 1:12:58 | 10 | whether the ellipses, without you pointing them to |
| 1:13:01 | 11 | me, pointing them out to me, is specifically -- |
| 1:13:07 | 12 | Q. Would you agree with me that it's bad |
| 1:13:09 | 13 | historical method to use ellipses to change the |
| 1:13:12 | 14 | meaning of a sentence? |
| 1:13:17 | 15 | A. Ellipses are used by historians all |
| 1:13:18 | 16 | the time. It depends on how they are used. |
| 1:13:20 | 17 | Q. Just answer the question. |
| 1:13:21 | 18 | A. It depends on the context, it depends |
| 1:13:23 | 19 | on the quotation. But generally speaking, it's |
| 1:13:39 | 20 | good to understand the full context of a quote from |
| 1:13:43 | 21 | which it emerged. |
| 1:13:44 | 22 | Q. Do you believe that reasonable minds |
| 1:13:46 | 23 | could differ as to the conclusions that you reach? |
| 1:13:52 | 24 | A. It depends on the specific conclusions |
| 1:13:54 | 25 | that you're talking about. |

79

Fisher

| | | |
|---|---|---|
| 1:13:55 | 2 | Q. Well, the conclusions that CSI owns |
| 1:13:58 | 3 | the rimmonim. Do you believe reasonable minds |
| 1:14:00 | 4 | could differ? |
| 1:14:04 | 5 | A. At some level, disagreement is part of |
| 1:14:08 | 6 | the historical profession. |
| 1:14:09 | 7 | Q. So is that another way of saying that |
| 1:14:11 | 8 | reasonable minds can differ? |
| 1:14:12 | 9 | A. I'm not quite done yet. But in this |
| 1:14:15 | 10 | particular case, the evidence seemed to be so |
| 1:14:18 | 11 | overwhelming in one direction that this was not |
| 1:14:22 | 12 | simply a matter of me sitting down with any kind of |
| 1:14:27 | 13 | foregone conclusion and interpreting documents |
| 1:14:31 | 14 | simply through the lens of a particular desired |
| 1:14:35 | 15 | outcome. |
| 1:14:35 | 16 | It was actually the whole course of |
| 1:14:40 | 17 | looking at these documents leaned so heavily in one |
| 1:14:43 | 18 | direction that I truly believe that most of my |
| 1:14:49 | 19 | colleagues in the field who would sit down with the |
| 1:14:53 | 20 | same documents would come to similar conclusions. |
| 1:14:57 | 21 | Q. Would you stake your reputation on |
| 1:15:01 | 22 | this report? |
| 1:15:04 | 23 | MR. SOLOMON: I object to the form of |
| 1:15:05 | 24 | the question. |
| 1:15:05 | 25 | Q. You can answer. |

80

Fisher

| | | |
|---|---|---|
| 11:15:19 | 2 | A. In some ways, everything that I write |
| 11:15:23 | 3 | puts me out there in a certain way and my |
| 11:15:27 | 4 | reputation is at stake at least partially. In the |
| 11:15:33 | 5 | academic world, there's a double-blind review |
| 11:15:36 | 6 | process that helps to ensure the kinds of things |
| 11:15:43 | 7 | that historians say are indeed true. And I would |
| 11:15:50 | 8 | feel no differently about this document, that is to |
| 11:15:53 | 9 | say that submitting it to a double-blind review |
| 11:15:57 | 10 | process would reveal, I think, its careful use of |
| 11:16:04 | 11 | sources and careful documentation. |
| 11:16:06 | 12 | Q. You have in your report Exhibit B, |
| 11:16:11 | 13 | which is a list of material. Is that the entire |
| 11:16:14 | 14 | universe of documents produced by the parties that |
| 11:16:17 | 15 | you looked at? |
| 11:16:22 | 16 | A. You're referring to section A of -- |
| 11:16:25 | 17 | Q. Of the discovery materials. |
| 11:16:29 | 18 | A. Right. To the best of my knowledge, |
| 11:16:32 | 19 | this is the entirety of the documents that were |
| 11:16:37 | 20 | presented to me through counsel for CSI but |
| 11:16:39 | 21 | produced by both parties, CJI and CSI, upon which |
| 11:16:44 | 22 | this document is based. |
| 11:16:45 | 23 | Q. And do you believe you looked, you |
| 11:16:47 | 24 | have looked at a complete record? |
| 11:16:48 | 25 | A. Very -- in very view cases do |

81

Fisher

| | | |
|---|---|---|
| 11:17:00 | 2 | historians ever feel like they have looked at |
| 11:17:03 | 3 | everything that is possibly out there. When |
| 11:17:10 | 4 | possible, it is nice to look at all available |
| 11:17:13 | 5 | evidence. That is the most ideal scenario. |
| 11:17:16 | 6 | Q. Do you believe you've looked at all, |
| 11:17:18 | 7 | let's say, all reasonably available evidence? |
| 11:17:26 | 8 | A. It depends how you define "reasonably |
| 11:17:29 | 9 | available." I have looked at what was given to me |
| 11:17:33 | 10 | by counsel to CSI, and within reason, I have |
| 11:17:39 | 11 | conducted independent investigation on the |
| 11:17:45 | 12 | secondary and primary material that is available |
| 11:17:48 | 13 | and relevant from this time period to this case. |
| 11:17:51 | 14 | It doesn't mean that there is nothing |
| 11:17:53 | 15 | else out there. And I'd be happy to discuss |
| 11:17:57 | 16 | additional evidence. I think my report pretty |
| 11:18:00 | 17 | clearly says that I'm open to alternate -- strike |
| 11:18:10 | 18 | that. The report clearly says that I am open to |
| 11:18:14 | 19 | testimony from the other side, expert testimony in |
| 11:18:17 | 20 | particular, which has not been received. |
| 11:18:20 | 21 | So the report is based upon what was |
| 11:18:23 | 22 | given to us, given to me by both parties and based |
| 11:18:30 | 23 | upon what I also found myself. |
| 11:18:33 | 24 | Q. If an employee of CSI had prepared a |
| 11:18:36 | 25 | memorandum concerning the rimmonim based on the |

21  (Pages 78 to 81)

82

Fisher

11:18:40  2  archives of Spanish-Portuguese Synagogue, is that
11:18:45  3  something you would have wanted to see?
11:18:49  4      A. It depends which time period you're
11:18:51  5  talking about, and --
11:18:52  6      Q. The entire time period.  Covering the
11:18:57  7  same subjects that you covered.  Is that something
11:18:59  8  you would have wanted to see?
11:19:00  9      A. Within the same time period?
11:19:02  10     Q. Yes.
11:19:02  11     A. The 1880s, 1890s?
11:19:04  12     Q. Yes.  19 -- early 1950s, lease,
11:19:09  13  1937 -- is that something you would have wanted to
11:19:11  14  see?
11:19:11  15         MR. SOLOMON:  The question is
11:19:13  16     misleading.  He's asking you when was the
11:19:15  17     document prepared.
11:19:16  18         MR. WAGNER:  No, I don't think he's
11:19:17  19     asking that.
11:19:17  20         MR. SOLOMON:  Yes, he is, and you're
11:19:20  21     misleading him by suggesting that's when
11:19:23  22     the document was prepared.  I object to
11:19:24  23     the form of the question.
11:19:24  24     Q. If a CSI employee prepared a
11:19:28  25  memorandum after this dispute began that traces the

83

Fisher

11:19:32  2  rimmonim during the same time period that you trace
11:19:35  3  the rimmonim, is that something you would have
11:19:37  4  wanted to see?
11:19:38  5      A. So you're talking about a CSI employee
11:19:42  6  post-2012.
11:19:43  7      Q. In 2012.
11:19:44  8      A. In 2012.
11:19:45  9      Q. Yes.
11:19:46  10     A. Tracing back this history.  If the
11:19:50  11  report was based upon historical documents and
11:19:55  12  documentation, and depending on its contents and
11:20:06  13  its findings, it's possible that it would have been
11:20:14  14  relevant but, without seeing it, I can't say either
11:20:17  15  way.
11:20:17  16     Q. And if there were differences between
11:20:19  17  what's in that document and what's in your report,
11:20:22  18  would that concern you?
11:20:35  19     A. The historical enterprise is all about
11:20:38  20  assessing different kinds of evidence and making
11:20:42  21  judgments and arguments based upon them.  And so
11:20:46  22  the introduction of any one particular document
11:20:49  23  into this case would be handled as any other
11:20:53  24  document.  It would be assessed along with
11:20:58  25  everything else, and I would try to understand it

84

Fisher

11:21:01  2  within its context of production, as well as
11:21:05  3  understand how it might influence or shape the
11:21:09  4  conclusions I drew and the rest of the evidence
11:21:13  5  within the report.
11:21:14  6         No single piece of evidence is ever
11:21:15  7  considered in isolation.
11:21:20  8      Q. Can you give me -- I know this may be
11:21:23  9  hard -- but in four or five sentences, what does a
11:21:26  10  historian do?
11:21:51  11     A. The most basic level is, a historian
11:21:53  12  tries to understand the past, tries to understand
11:21:57  13  the people, places and events and most importantly,
11:22:01  14  in their particular context.
11:22:04  15     Q. What did you understand your
11:22:05  16  assignment in this case to be?
11:22:10  17     A. I think I laid that out pretty clearly
11:22:11  18  in my report.  In the first couple of --
11:22:14  19     Q. Can tell me in your own words
11:22:17  20  generally what your assignment was?
11:22:23  21     A. I was asked by counsel to CSI to,
11:22:28  22  using the standards of my profession, to evaluate
11:22:33  23  the question of the continuity between the colonial
11:22:39  24  era CYI, and the current post-1893-1894 CJI.  That
11:22:49  25  was one part of it.

85

Fisher

11:22:51  2         The second part was to try to
11:22:54  3  understand the full contextual range of the use of
11:22:59  4  the word "appurtenances" and "paraphernalia" and
11:23:06  5  other parallel phrases.
11:23:07  6      Q. Had you ever looked at those terms
11:23:09  7  before?
11:23:28  8      A. To the best of my recollection,
11:23:32  9  sitting here today, I cannot recall ever having
11:23:37  10  undertaken as much of an in-depth study on those
11:23:41  11  particular words.
11:23:42  12     Q. Now, were you supposed to look at all
11:23:44  13  the evidence objectively?
11:23:56  14     A. The role of a historian is to look at
11:23:58  15  evidence in context, and without predetermining the
11:24:05  16  uses of those documents or any particular outcome.
11:24:10  17     Q. Were you supposed to cite all the
11:24:12  18  evidence pro and con?
11:24:16  19     A. I would say two things:  First of all,
11:24:31  20  in the context of my role as a historian, it is not
11:24:35  21  always the case that when one is writing and
11:24:39  22  publishing on particular topics, that you have
11:24:42  23  either the room, the time, or the need to present
11:24:47  24  each and every counterargument or alternate
11:24:52  25  possible interpretation.

22  (Pages 82 to 85)

86

Fisher

1:24:54  2      And in this particular case, it was
1:24:58  3  not charged to me in particular to spend space and
1:25:04  4  time on evaluating and presenting alternate
1:25:10  5  possible positions, although this is something that
1:25:17  6  came up, certainly, and as a historian, possible
1:25:26  7  interpretations to the contrary, are of interest to
1:25:31  8  me.
1:25:31  9      Q. So let me just, so what you did was,
1:25:33  10  you marshalled the evidence and presented it in
1:25:38  11  favor of CSI's position, correct?
1:25:40  12      MR. SOLOMON: Object to the form. It
1:25:41  13  misstates his testimony.
1:25:42  14      Q. You can answer.
1:25:47  15      A. I don't think that you're reflecting
1:25:48  16  what I just said accurately.
1:25:49  17      Q. Okay. Did you marshal the evidence,
1:25:51  18  all of the evidence that you gathered in favor of
1:25:53  19  CSI?
1:25:54  20      A. What I did was look at the evidence
1:26:00  21  that was presented to me and conduct my own
1:26:03  22  independent investigation whenever reasonably
1:26:06  23  possible to make sure that the conclusions I
1:26:10  24  reached were firmly rooted in the documents that
1:26:13  25  were available and best reflected the kinds of

87

Fisher

1:26:19  2  concerns and issues that were at stake for the
1:26:23  3  people in this time period that I was writing
1:26:25  4  about.
1:26:25  5      Q. Did you present any contrary evidence
1:26:27  6  in your report?
1:27:10  7      (Witness perusing document.)
1:27:17  8      A. There are places within the report at
1:27:21  9  which I hint at alternate understandings and
1:27:29  10  interpretations.
1:27:29  11      Q. Okay. Where is that?
1:27:42  12      MR. SOLOMON: So you want him to page
1:27:44  13  through and give you every one --
1:27:45  14      MR. WAGNER: We can start with one.
1:27:50  15      A. I would say generally that any time
1:27:53  16  you see words like "possibly," or "maybe" is a
1:27:58  17  concession in that direction. But I will give you
1:28:00  18  a specific example.
1:28:02  19      Q. Okay, please do.
1:28:04  20      A. So on page 21, footnote 70, this is
1:28:11  21  related to the question of the name change. The
1:28:15  22  original name that the congregation in Newport, one
1:28:21  23  of two that was vying for recognition, first called
1:28:26  24  themselves Congregation Yeshuat Israel with a Y,
1:28:31  25  the same exact name and spelling as the colonial

88

Fisher

1:28:34  2  era congregation. And then I point out that the
1:28:39  3  actual charter that was given to them by the State
1:28:42  4  of Rhode Island in 1949 -- 1894, excuse me,
1:28:47  5  actually reflected a slight modification in the use
1:28:50  6  of a J instead of a Y. And in the footnote on page
1:28:54  7  70, I say -- if I could just read it to you,
1:29:05  8  footnote 70 essentially cites an instance in which,
1:29:13  9  see, before the official name change to CJI, the
1:29:20  10  Newport congregation uses that alternate spelling
1:29:24  11  themselves.
1:29:25  12      So that's just one example of the way
1:29:27  13  in which I was incorporating evidence that didn't
1:29:35  14  quite fit, perhaps, or...
1:29:39  15      Q. Did you cite in your report instances
1:29:41  16  where CSI called Congregation Jeshuat Israel,
1:29:47  17  Congregation Yeshuat Israel?
1:30:22  18      A. Without reading through the entire
1:30:24  19  report for that specific question, sitting here
1:30:26  20  right now, I don't recall an instance of either
1:30:29  21  including or excluding that particular point.
1:31:03  22      MR. WAGNER: Let's mark this.
1:31:05  23      (Fisher Exhibit 5, copy of handwritten
1:31:05  24  receipt dated 3/1/03, Bates numbered
1:31:05  25  CSI5411, marked for identification, as

89

Fisher

1:31:29  2  of this date.)
1:31:29  3      Q. Now, sir, this document was not on
1:31:31  4  your list of documents reviewed. Have you seen it
1:31:33  5  before?
1:32:03  6      A. I have not seen it before, to the best
1:32:05  7  of my recollection.
1:32:07  8      Q. Now, did you cite in your report
1:32:13  9  instances where CSI referred to the original
1:32:25  10  congregation in Newport as CJI?
1:32:46  11      A. Again, sitting here right now without
1:32:48  12  reading it line by line looking for that
1:32:50  13  particular answer, I do not recall either citing or
1:32:55  14  omitting such an instance.
1:32:58  15      MR. WAGNER: Let's mark this as the
1:33:00  16  next exhibit.
1:33:01  17      MR. SOLOMON: Six?
1:33:02  18      MR. WAGNER: Six.
1:33:02  19      (Fisher Exhibit 6, two-page
1:33:02  20  handwritten document, Bates numbered
1:33:02  21  CSI4582 and 45823, marked for
1:33:03  22  identification, as of this date.)
1:33:03  23      Q. Sir, have you seen this document
1:33:27  24  before?
1:34:41  25      (Witness perusing document.)

23  (Pages 86 to 89)

90

```
                    1              Fisher
11:34:44   2      A. I believe I have seen this document
11:34:45   3   before.
11:34:45   4      Q. And do you see the very beginning, as
11:34:48   5   a matter of fact, you cite this document in your
11:34:50   6   report, right?
11:34:50   7      A. I believe so, yes.
11:34:52   8      Q. Okay, the first sentence says, "The
11:34:54   9   congregation Shearith Israel Spanish-Portuguese of
11:34:58  10   NY among whose members of descendants of those who
11:35:02  11   founded the Congregation Jeshuat Israel of Newport,
11:35:05  12   Rhode Island, who purchased the land for a cemetery
11:35:07  13   in the City of Newport," I don't know, "For the
11:35:12  14   site of a synagogue and who erected thereon a holy
11:35:16  15   place of worship," do you see that?
11:35:18  16      A. I do, yes.
11:35:18  17      Q. And you didn't cite that sentence in
11:35:20  18   your report, did you?
11:35:23  19      A. To the best of my knowledge, I did not
11:35:33  20   cite, that sentence in my report.
11:35:36  21      MR. WAGNER: Mark this as the next
11:35:38  22   exhibit.
11:35:40  23      (Fisher Exhibit 7, excerpt from
11:35:40  24   book, Morris A. Gustein, "The Story of
11:35:40  25   the Jews of Newport," published 1936,
```

91

```
                    1              Fisher
11:35:40   2   marked for identification, as of this
11:36:17   3   date.)
11:36:17   4      Q. You cited this in your report, didn't
11:36:19   5   you?
11:36:19   6      A. Yes. I believe I did.
11:36:21   7      Q. Now, when you cited this document, did
11:36:22   8   you include in your report all of the material from
11:36:25   9   this article that contradicts your opinion?
11:36:31  10      MR. SOLOMON: Other than citing the
11:36:33  11      article, did he quote the entire article
11:36:36  12      in his report?
11:36:37  13      MR. WAGNER: No, not the entire -- I
11:36:39  14      admit that not every piece of the article
11:36:42  15      supports us.
11:36:43  16      A. It's actually a book, yes.
11:36:45  17      Q. I'm sorry, a book. Mr. Jacoby knows
11:36:48  18   this case better than anybody. Maybe not as well
11:36:51  19   as Ed Solomon.
11:36:52  20      A. That's an important thing, because
11:36:53  21   it's actually a sizeable book, and it would not be
11:36:59  22   relevant to cite everything in this book.
11:37:02  23      Q. So what you did was, you pulled out of
11:37:04  24   the book the pieces that supported your opinions,
11:37:08  25   right?
```

92

```
                    1              Fisher
11:37:09   2      MR. SOLOMON: Object to the form.
11:37:11   3   Misstates his testimony.
11:37:12   4      MR. WAGNER: Well, I'm asking that.
11:37:13   5      Q. Is that what you did?
11:37:16   6      A. That is not what any historian sets
11:37:19   7   out to do. A historian reads within the context of
11:37:25   8   other documentation, other sources, and often
11:37:30   9   approaches a source wanting to know broader
11:37:37  10   contextual issues, and in some ways trying to track
11:37:40  11   down individual people or names or movements within
11:37:44  12   a given book.
11:37:45  13      Q. Did you choose specific pieces of this
11:37:47  14   book to cite?
11:37:48  15      A. Every historian always chooses
11:37:51  16   specific --
11:37:52  17      Q. I'm not asking what every historian --
11:37:55  18   I'm asking what you did. If I wanted to ask you
11:37:57  19   what every historian did, I would ask that. Please
11:38:00  20   answer my questions.
11:38:01  21      Did you choose pieces of this book to
11:38:03  22   cite?
11:38:05  23      A. Since it's not possible to cite
11:38:07  24   everything in every article or book, of course.
11:38:10  25   That's a very natural way that I always operate.
```

93

```
                    1              Fisher
11:38:14   2   You select things from a book or article to cite
11:38:18   3   that seem relevant to the issues at hand.
11:38:20   4      Q. And you made decisions about what to
11:38:23   5   cite and put in your report, correct?
11:38:27   6      A. Because it's not possible to cite the
11:38:28   7   entire book, decisions always have to be made about
11:38:32   8   what to include.
11:38:32   9      Q. But if something contradicted your
11:38:35  10   conclusions from this book, would it have been
11:38:39  11   appropriate to cite it?
11:38:43  12      A. It depends on the relevance of what
11:38:45  13   was being stated. And if you have something in
11:38:48  14   particular you want to look at, I'm happy to do so.
11:38:51  15      Q. What if the statement was that CJI was
11:38:54  16   the legal successor to CSI, is that something
11:38:57  17   that's important in this case?
11:38:58  18      A. Can we look at the where it says that?
11:39:01  19      Q. Just tell me, is that an important
11:39:02  20   issue in this case?
11:39:03  21      MR. SOLOMON: It's an incomprehensible
11:39:05  22   question --
11:39:05  23      Q. Is it important in this case --
11:39:05  24      MR. SOLOMON: Even you didn't intend.
11:39:08  25   So let's have the question read back.
```

24  (Pages 90 to 93)

94

```
                        1
                            Fisher
1:39:09    2    Q. Is it important in the issue in this
1:39:12    3  case whether CJI is the legal successor of CSI?
1:39:19    4       MR. SOLOMON:  You did it again.
1:39:20    5    Q. You can answer.
1:39:26    6       THE WITNESS:  Can you read back the
1:39:27    7    question again?
1:39:37    8       (Record read.)
1:39:38    9       MR. WAGNER:  Yes, I'll --
1:39:40   10    Q. -- is it an important issue in this
1:39:42   11  case whether CJI is the legal successor of CSI?
1:39:47   12    A. It is one of the important questions
1:39:49   13  that this report deals with, and that I tried to
1:39:51   14  address in this particular case.
1:39:52   15    Q. You and I both screwed up.
1:39:56   16       MR. SOLOMON:  No, you screwed up and
1:39:57   17    then you misled him, despite the number of
1:40:00   18    times I told you.
1:40:00   19       MR. WAGNER:  Well, he's got a Ph.D.
1:40:02   20    from Harvard.  I'm not at that level.  He
1:40:07   21    may be at that level.  He has a Harvard
1:40:10   22    degree.
1:40:10   23    Q. Is it an important question in this
1:40:12   24  case whether CJI is a legal successor of CYI?
1:40:16   25    A. The question of whether or not CJI is
```

95

```
                        1
                            Fisher
11:40:37    2  the legal successor to CYI is one of the pieces
11:40:42    3  that is relevant to this case that I tried to
11:40:44    4  address in my document.
11:40:47    5    Q. Okay.  Let me stop you for a second.
11:40:50    6  Do you know why that question is important?
11:41:06    7    A. There are several reasons why I think
11:41:08    8  that question is important.  And it depends from
11:41:11    9  whom -- whose perspective you're looking at.  The
11:41:17   10  answer to that question might look different in
11:41:19   11  2014 than it did in 1882 or '83, for example.
11:41:23   12    Q. Well, let me just, in the context of
11:41:26   13  this case, do you have an understanding whether and
11:41:28   14  why that question is important?
11:41:46   15.   A. From the documents I've seen in the
11:41:47   16  1880s, for example, the question of continuity was
11:41:55   17  discussed and contested for reasons of ritual
11:42:01   18  authenticity of blood lineage, of trustworthiness,
11:42:17   19  whether or not those people were known to other
11:42:19   20  individuals who were related to original CYI
11:42:22   21  members --
11:42:22   22    Q. Let me stop you for a second, and I
11:42:25   23  apologize for interrupting.  But do you -- I want
11:42:28   24  to focus you so that we do this efficiently.
11:42:31   25      Do you have an understanding what
```

96

```
                        1
                            Fisher
11:42:34    2  relevance the issue of whether CJI is the legal
11:42:38    3  successor to CYI, what relevance that has to the
11:42:48    4  possible outcome of this case, or is that something
11:42:50    5  you just don't know?  Again, I don't mean to ask
11:42:52    6  trick questions.  Just, do you know or not know?
11:43:04    7    A. It's possible that, since you're
11:43:07    8  giving me a hypothetical of sorts, it's possible
11:43:14    9  that the question of legal succession would be
11:43:22   10  related, if you ignored a lot of other evidence,
11:43:22   11  would be related or bear upon the question of
11:43:31   12  ownership, I would suspect.
11:43:33   13    Q. Okay.  Now, can you turn to page 275.
11:43:36   14    A. Sure.
11:43:37   15    Q. The first paragraph, fifth line, it
11:43:43   16  says, "In the controversy, Congregation Shearith
11:43:51   17  Israel inevitably supported Congregation Jeshuat
11:43:55   18  Israel, which was the legal successor of the old
11:43:58   19  congregation," do you see that?  Do you see that?
11:44:03   20    A. I do see that, yes.
11:44:04   21    Q. And did you see it at the time when
11:44:05   22  you were preparing your report?
11:44:09   23    A. I do not recall reading this
11:44:10   24  particular sentence.
11:44:11   25    Q. Now, you state in your report...
```

97

```
                        1
                            Fisher
11:45:27    2       (A pause in the proceedings.)
11:45:35    3    Q. Can you look at page 5 of your report,
11:45:38    4  the bottom?
11:45:39    5    A. Um-hum.
11:45:40    6    Q. A you say, second-to-last line,
11:45:48    7    "Because of the generous outpouring of gifts and
11:45:51    8  contributions from CSI and elsewhere, the Newport
11:45:55    9  congregation was able to purchase a plot of land on
11:45:57   10  the outskirts of Newport on June 30, 1759, from
11:46:02   11  Ebenezer Allen, do you see that?
11:46:05   12    A. I do see that.
11:46:05   13    Q. Isn't it a fact that synagogues
11:46:09   14  couldn't purchase land at that time?
11:46:09   15    A. It is a fact that synagogues --
11:46:12   16    Q. Is that just a mistake in the report?
11:46:14   17    A. -- it is a shorthand way of not
11:46:17   18  cluttering up the report by referring to sort of
11:46:21   19  the specifics of the sort of three individuals who
11:46:27   20  were entrusted with the purchase of the
11:46:28   21  congregation -- excuse me, the purchase of the land
11:46:32   22  on behalf of the congregation.
11:46:36   23    Q. Can you look at Exhibit 2.  Can you
11:47:04   24  turn to page 71.  This is, I think we agreed, this
11:47:08   25  is an article that you cited in your report, right?
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

98

Fisher

11:47:10  2    A. I did cite this, yes.
11:47:12  3    Q. Can you turn to page 71.
11:47:17  4    MR. JACOBY: That's the pagination of
11:47:19  5    the article, not the --
11:47:21  6    MR. WAGNER: Yes.
11:47:28  7    Q. Do you see the story of the paradox?
11:47:31  8    Seven lines down, it says, "It settled
11:47:34  9    once and for all the principle of which Newporters
11:47:37  10   would be the legal successors to the old
11:47:40  11   congregation, Yeshuat Israel, and which group would
11:47:44  12   shape the destiny of Touro Synagogue in the years
11:47:47  13   ahead."
11:47:48  14   Do you see that?
11:47:48  15   A. I do see that.
11:47:49  16   Q. You cited this publication in your
11:47:51  17   report, right?
11:47:52  18   A. Um-hum.
11:47:53  19   Q. But once again, you didn't cite that
11:47:54  20   line, did you?
11:47:56  21   A. Not that I recall, no.
11:47:56  22   Q. Now, you gave some information about
11:48:02  23   some legal proceedings in the late 1890s and early
11:48:07  24   1900s, correct?
11:48:08  25   A. I recall that I did, yes.

99

Fisher

11:48:09  2    Q. And do you remember you read a
11:48:13  3    decision by Judge Brown?
11:48:17  4    A. I do recall reading that, yes.
11:48:18  5    Q. And that decision was on a demurrer,
11:48:21  6    correct?
11:48:24  7    A. Yes, it was.
11:48:25  8    Q. What's a demurrer?
11:48:26  9    A. A demurrer, to the best of my
11:48:31  10   recollection, sitting here, is a request to dismiss
11:48:37  11   a case on technical grounds.
11:48:43  12   Q. And did that demurrer decision decide
11:48:45  13   the issue of ownership?
11:48:50  14   A. Strictly speaking, one of the things
11:49:16  15   that this decision weighed in on was the question
11:49:21  16   of possession, out of which could be inferred
11:49:30  17   broader implications, as seen by the leases at --
11:49:35  18   in 1903 and 1908, and as seen by the surrender of
11:49:40  19   the premises that took place within a few weeks of
11:49:42  20   that decision being handed down.
11:49:44  21   Q. Okay. But did his decision decide the
11:49:49  22   issue of ownership? I don't want to get into what
11:49:52  23   happened after. Did the decision decide the issue
11:49:55  24   of ownership?
11:49:57  25   A. But you can't just extract something

100

Fisher

11:49:58  2    out from the context of how people interpreted and
11:50:02  3    understood it and lived it out in that time period.
11:50:07  4    So the question, the technical question of whether
11:50:10  5    or not it settled the issue of ownership can
11:50:13  6    partially only be understood by how people
11:50:16  7    themselves responded to that decision and, in
11:50:19  8    response to that decision, CJI clearly surrendered
11:50:24  9    possession of the synagogue and the paraphernalia
11:50:30  10   and clearly entered into a lease agreement with CSI
11:50:34  11   as a result.
11:50:34  12   Q. Did you read Mr. Burke's description
11:50:37  13   of what happened back in 1903?
11:50:41  14   A. Do you have something to point me to?
11:50:43  15   Q. No, do you know who Mr. Burke is?
11:50:45  16   A. He was the attorney for the other
11:50:47  17   side.
11:50:47  18   Q. Did you read his account of what
11:50:49  19   happened?
11:50:50  20   A. I do not recall if I read the entire
11:50:53  21   thing, or where that would have been held at the
11:50:56  22   moment.
11:50:56  23   Q. Okay. Can you look at the bottom of
11:50:58  24   page 68, top of 69?
11:51:02  25   A. On --

101

Fisher

11:51:03  2    Q. On Allen, Jewish Historical --
11:51:09  3    MR. JACOBY: Fisher Exhibit 2.
11:51:14  4    A. Two. I'm sorry, what page was that?
11:51:16  5    Q. 69 -- I'm sorry, 68. Bottom of 68.
11:51:21  6    Do you see it says, "In the last analysis, despite
11:51:24  7    all that happened, Judge Brown's decision in the
11:51:27  8    demurrer did not decide the question of legal
11:51:29  9    ownership, but only the rights to possession."
11:51:32  10   Do you see that?
11:51:34  11   A. I'm still trying to find where you're
11:51:36  12   at, actually.
11:51:37  13   Q. Bottom of 6 -- oh, I'm sorry. I'll
11:51:41  14   join your side but only for a second. Here
11:51:43  15   (indicating).
11:51:45  16   A. Okay, thanks.
11:51:46  17   Q. Do you see that?
11:51:54  18   A. I do see that. But again, I would
11:51:56  19   point to other evidence --
11:51:59  20   MR. SOLOMON: He only asked if you saw
11:52:01  21   it.
11:52:01  22   A. I saw it.
11:52:02  23   Q. That's all. He's more skillful than I
11:52:05  24   am. He'll ask all those questions at trial. And
11:52:08  25   you didn't cite that line in your report, did you?

26  (Pages 98 to 101)

## 102

Fisher

11:52:18  2   A. I don't recall if I cited that
11:52:20  3  particular line in my report.
11:52:24  4   Q. Now, I want you to wipe away
11:52:25  5  everything that we've done, and I'm just asking you
11:52:28  6  non-pejorative questions, and I don't mean to
11:52:31  7  suggest anything. So let me ask you a little bit
11:52:34  8  about historical method.
11:52:36  9   A. Um-hum.
11:52:36  10   Q. Is it appropriate historical method to
11:52:39  11  ignore contrary evidence?
11:52:49  12   A. From my understanding of the
11:52:51  13  historical profession, it is appropriate to
11:52:54  14  consider but not always include or utilize contrary
11:52:59  15  historical evidence.
11:52:59  16   Q. Okay. Is it appropriate historical
11:53:02  17  method to look at only part of a record?
11:53:04  18   A. In my understanding of the historical
11:53:10  19  profession, it is appropriate to perhaps -- I'm
11:53:25  20  sorry. In my understanding of the historical
11:53:31  21  profession, it is appropriate to cite and utilize
11:53:37  22  in a limited way historical evidence. Nothing in
11:53:40  23  the profession requires citing everything that you
11:53:45  24  look at. In fact --
11:53:46  25   Q. No, I'm not talking about citing.

## 103

Fisher

11:53:49  2  Just, when you research something, do you try to
11:53:51  3  look at the entire record as best you can?
11:53:55  4   A. Within the realm of reason and what is
11:53:58  5  available in the time that is available to you, and
11:54:01  6  what you know at that moment, it is normal and
11:54:08  7  usual practice to try to understand the full record
11:54:12  8  as it exists, although every historian will tell
11:54:15  9  you, after a book is published, that they come
11:54:18  10  across things that they did not know before.
11:54:20  11   Q. Is it appropriate historical method to
11:54:22  12  cherry-pick documents?
11:54:24  13   MR. SOLOMON: Object to the form, I
11:54:30  14   don't know what you think you're doing or
11:54:32  15   not. Objection.
11:54:32  16   Q. You can answer.
11:54:42  17   A. The way the question is worded is
11:54:45  18  presuming a certain kind of negative tinge to what
11:54:55  19  historians do which is to make arguments and to
11:54:58  20  cite things in limited ways at different times in
11:55:02  21  different ways.
11:55:03  22   Q. Is it appropriate -- I'm sorry.
11:55:04  23   A. The notion of cherry picking implies a
11:55:09  24  selectivity that is following bad historical
11:55:15  25  precedents and procedure. But selectivity is, by

## 104

Fisher

11:55:20  2  its very definition and nature, part of what
11:55:24  3  historians have to engage in.
11:55:26  4   Q. Is it appropriate historical method to
11:55:27  5  put a spin on documents?
11:55:30  6   MR. SOLOMON: Same objection.
11:55:36  7   Q. You can answer.
11:55:37  8   A. No document comes uninterpreted. I
11:55:43  9  tell my students that on the first day of class,
11:55:46  10  every document needs to be interpreted.
11:55:50  11   Q. Is it appropriate historical method to
11:55:52  12  opine as to the state of mind of actors, historical
11:55:55  13  actors?
11:55:56  14   A. Historians try to understand the time
11:56:01  15  period in which individuals and movements were
11:56:06  16  writing and took place and often, based upon
11:56:13  17  documentation that is relevant to answering the
11:56:16  18  question of what motivated people or what they were
11:56:21  19  thinking, often it is the case that based upon a
11:56:26  20  broader understanding of that context, that
11:56:29  21  individuals are interpreted by historians in
11:56:34  22  particular ways.
11:56:35  23   Q. Is it appropriate historical method to
11:56:37  24  pronounce that something is more likely than not to
11:56:41  25  have occurred?

## 105

Fisher

11:56:49  2   A. Every active historical writing
11:56:52  3  engagement involves decisionmaking and weighing of
11:56:56  4  evidence and making decisions and pronouncements
11:57:01  5  about what took place or what didn't take place.
11:57:03  6   Q. But my question is, when you do that,
11:57:05  7  are you saying that something is more likely than
11:57:07  8  not to have occurred?
11:57:12  9   A. Historians are engaged in the art of
11:57:14  10  weighing evidence, not unlike attorneys, I would
11:57:16  11  add.
11:57:16  12   Q. Is there a hierarchy of primary and
11:57:26  13  secondary sources?
11:57:28  14   A. Do you mean within primary and within
11:57:32  15  secondary or between --
11:57:33  16   Q. Well, between primary and secondary,
11:57:36  17  is there a hierarchy?
11:57:38  18   A. Both of them are needed for any good
11:57:41  19  historical work. You never know what you've found
11:57:45  20  in the primary sources unless you know what the
11:57:47  21  broader trends have been in terms of the
11:57:51  22  historiography, in terms of what other historians
11:57:53  23  have written. This is always the case.
11:57:55  24   Q. But if you're faced with a
11:57:57  25  contradiction between a primary source and a

27 (Pages 102 to 105)

---

106

Fisher

| 11:58:00 | 2 | secondary source, which, as a general matter, is |
| 11:58:02 | 3 | more persuasive? |
| 11:58:04 | 4 | A. It entirely depends on the context. |
| 11:58:06 | 5 | It depends on which secondary source, which primary |
| 11:58:09 | 6 | source, what the issue is. |
| 11:58:11 | 7 | Q. If the secondary source cites a |
| 11:58:13 | 8 | primary source, is it important for the historian |
| 11:58:15 | 9 | to check the primary source to see if the secondary |
| 11:58:18 | 10 | source got it right? |
| 11:58:32 | 11 | A. In an ideal world with unlimited |
| 11:58:35 | 12 | research assistants and time, it would be nice to |
| 11:58:41 | 13 | be able to track down every primary source that a |
| 11:58:44 | 14 | historian references. |
| 11:58:45 | 15 | Often, it's not possible. The sources |
| 11:58:47 | 16 | don't exist in readily available form; they are in |
| 11:58:51 | 17 | archives in other countries, they are in |
| 11:58:54 | 18 | out-of-print books that aren't available in ready |
| 11:58:57 | 19 | fashion. And so it is common within the historical |
| 11:59:02 | 20 | profession to make certain arguments based upon |
| 11:59:05 | 21 | primary sources and in other cases, to lean upon |
| 11:59:11 | 22 | the research of others in providing context and on |
| 11:59:16 | 23 | understanding and even making arguments based upon |
| 11:59:19 | 24 | these secondary sources. |
| 11:59:20 | 25 | Q. Can you turn to page 37 of your |

---

107

Fisher

| 11:59:24 | 2 | report. |
| 11:59:33 | 3 | MR. SOLOMON: Can we have a breaking |
| 11:59:36 | 4 | point for a quick break, let's -- |
| 11:59:38 | 5 | MR. WAGNER: Let me just finish with |
| 11:59:39 | 6 | this one. |
| 11:59:40 | 7 | A. Thirty-seven, you said? |
| 11:59:41 | 8 | Q. Okay, the top of 37. |
| 11:59:43 | 9 | A. Right. |
| 11:59:43 | 10 | Q. Bottom of 36, top of 37. You cite the |
| 11:59:47 | 11 | Authoritative Dictionary of Jewish religion, which |
| 11:59:52 | 12 | translates the phrase "tashmishei quedushah," do |
| 11:59:56 | 13 | you see that? |
| 11:59:56 | 14 | A. I do see that. |
| 11:59:57 | 15 | Q. And it goes on, continuing to page 37, |
| 12:00:00 | 16 | "Were items used to decorate ritual objects; e.g., |
| 12:00:09 | 17 | the keter Torah or rimmonim ornaments," do you see |
| 12:00:13 | 18 | that? |
| 12:00:13 | 19 | A. I do see that. |
| 12:00:14 | 20 | Q. Are the rimmonim, did you mean to |
| 12:00:15 | 21 | communicate the rimmonim reference to the rimmonim |
| 12:00:19 | 22 | that go on top of the Torah? |
| 12:00:21 | 23 | A. Without going back to this document to |
| 12:00:44 | 24 | see the context of the quote, it does appear that |
| 12:00:58 | 25 | this particular quote is referencing the rimmonim |

---

108

Fisher

| 12:01:04 | 2 | that would adorn the Torah. |
| 12:01:05 | 3 | Q. And all of your references to rimmonim |
| 12:01:08 | 4 | in the report reference rimmonim that go on top of |
| 12:01:12 | 5 | a Torah, right? |
| 12:01:29 | 6 | A. To the best of my knowledge, sitting |
| 12:01:31 | 7 | here right now, it does seem, as I recall, the |
| 12:01:36 | 8 | rimmonim mentioned in this report, at least most of |
| 12:01:43 | 9 | them refer to the ornaments that would adorn the |
| 12:01:45 | 10 | Torah. |
| 12:01:46 | 11 | MR. WAGNER: Okay, let's mark this as |
| 12:01:47 | 12 | the next exhibit. |
| 12:01:48 | 13 | MR. SOLOMON: And then -- |
| 12:01:49 | 14 | MR. WAGNER: I'm just going to finish |
| 12:01:51 | 15 | with this exhibit, then we'll take a |
| 12:01:52 | 16 | break. |
| 12:01:53 | 17 | (Fisher Exhibit 8, excerpt from |
| 12:01:53 | 18 | The Oxford Dictionary of the Jewish |
| 12:01:53 | 19 | Religion, Second Edition, three pages, |
| 12:01:53 | 20 | marked for identification, as of this |
| 12:02:15 | 21 | date.) |
| 12:02:15 | 22 | Q. You're responsible for the ellipses in |
| 12:02:17 | 23 | this report, aren't you? |
| 12:02:24 | 24 | A. As far as I can remember, I am. |
| 12:02:25 | 25 | Q. Okay, let's see what you left out. Do |

---

109

Fisher

| 12:02:28 | 2 | you see the entry for "tashmishei quedushah," do |
| 12:02:33 | 3 | you see that? |
| 12:02:34 | 4 | A. Um-hum. |
| 12:02:34 | 5 | Q. It says, "Ritual objects" -- I'm |
| 12:02:37 | 6 | skipping -- "items used to decorate ritual objects, |
| 12:02:41 | 7 | e.g., the Keter Torah or rimmonim ornaments for the |
| 12:02:45 | 8 | embroidered parochet curtains that cover the |
| 12:02:49 | 9 | synagogue Ark," is that -- |
| 12:02:50 | 10 | A. I see that. |
| 12:02:51 | 11 | Q. And these are not rimmonim that go on |
| 12:02:53 | 12 | top of a Torah, correct? Or don't you know? |
| 12:03:10 | 13 | A. It appears that these might be |
| 12:03:12 | 14 | rimmonim that are not adorning the Torah. |
| 12:03:14 | 15 | Q. Might be or are not? Is there any |
| 12:03:17 | 16 | doubt? |
| 12:03:18 | 17 | MR. SOLOMON: I object to the form of |
| 12:03:20 | 18 | the question. But -- |
| 12:03:20 | 19 | Q. You can answer. |
| 12:03:21 | 20 | MR. SOLOMON: Pose it in the form of a |
| 12:03:23 | 21 | question. |
| 12:03:23 | 22 | Q. Do you think this is appropriate |
| 12:03:26 | 23 | scholarship? |
| 12:03:28 | 24 | A. Well, it's not only this document that |
| 12:04:06 | 25 | refers to this, and that's -- |

28  (Pages 106 to 109)

110

Fisher

12:04:08  2   Q. Answer my question. My question is,
12:04:11  3   do you think your description of this document in
12:04:13  4   your report where you left out what kind of
12:04:15  5   rimmonim they are is appropriate scholarship?
12:04:18  6       MR. SOLOMON: I think you're
12:04:19  7   misreading the document and I object to
12:04:16  8   the question.
12:04:20  9       MR. WAGNER: Okay.
12:04:21  10      Q. You can answer.
12:04:22  11      A. The rimmonim, whether they are the
12:04:24  12  Torah rimmonim or they are the rimmonim that are
12:04:26  13  used for the embroidered parochet or the curtain,
12:04:31  14  are still part of the same body of ritual objects.
12:04:33  15      Q. So is it your testimony that this is
12:04:35  16  perfectly appropriate, what you've done here?
12:04:42  17      A. That's not what I said. I said --
12:04:44  18      Q. Just tell me. Is it? Would you
12:04:46  19  change this citation now?
12:05:06  20      A. I think the citation still proves a
12:05:09  21  larger point of what the appurtenances of holiness
12:05:12  22  are and how they are important.
12:05:14  23      If you look down at the bottom here,
12:05:16  24  it says, "Torah ornaments," right? So this is
12:05:19  25  cross-referencing within this encyclopaedia, as to

111

Fisher

12:05:23  2   what is related to the appurtenances of holiness.
12:05:27  3       Q. So is that another way of saying you
12:05:30  4   wouldn't change?
12:05:31  5       A. I would, in reading this document
12:05:36  6   again, I might think about how to phrase it
12:05:43  7   differently, but it would not alter this
12:05:47  8   particular, the flow of this particular part of the
12:05:49  9   report.
12:05:49  10      Q. Would it surprise you if I told you
12:05:51  11  your report is full of stuff like this?
12:05:54  12      MR. SOLOMON: Object to the question.
12:05:55  13      Q. You can answer.
12:05:56  14      MR. SOLOMON: Let's go. What have you
12:05:58  15  got?
12:05:58  16      MR. WAGNER: I will.
12:05:59  17      MR. SOLOMON: What have you got?
12:06:01  18  Let's see it. Because so far it's
12:06:03  19  nothing.
12:06:03  20      MR. WAGNER: Okay.
12:06:04  21      MR. SOLOMON: Then don't talk to a
12:06:05  22  witness like that. It's completely
12:06:07  23  inappropriate and I object to the
12:06:09  24  question.
12:06:09  25      MR. WAGNER: Okay.

112

Fisher

12:06:10  2       Q. Would it surprise you if there's all
12:06:12  3   kinds of stuff like this in your report?
12:06:12  4       MR. SOLOMON: I object to the form of
12:06:15  5   the question.
12:06:15  6       Q. You can answer.
12:06:16  7       A. Same thing. I would be happy to walk
12:06:19  8   through the report with you and --
12:06:20  9       Q. I'm going to take that as an offer to
12:06:27  10  stay past the seven hours.
12:06:28  11      MR. SOLOMON: You may be disappointed.
12:06:31  12      MR. WAGNER: I don't think so.
12:06:32  13      MR. SOLOMON: You may be disappointed
12:06:34  14  at seven hours.
12:06:35  15      MR. WAGNER: I may be disappointed at
12:06:37  16  seven hours. Why don't we take a break.
12:06:38  17      THE WITNESS: Sounds good.
12:06:40  18      MR. WAGNER: And we have lunch coming
12:06:41  19  at 12:30 but --
12:06:43  20      MR. SOLOMON: Let's just take a short
12:06:45  21  break.
12:06:48  23      THE WITNESS: Okay.
12:06:48  23      (Recess taken.)
12:13:19  24  EXAMINATION (Cont'd.)
12:13:19  25  BY MR. WAGNER:

113

Fisher

12:13:22  2       Q. We talked a little bit about -- I'm
12:13:25  3   sorry, are you ready?
12:13:27  4       A. Yes, I'm ready.
12:13:28  5       Q. By the way, you're the boss. Whenever
12:13:30  6   you want to take a break --
12:13:32  7       MR. SOLOMON: Well, you wanted to take
12:13:35  8   a break.
12:13:35  9       MR. WAGNER: No, you wanted --
12:13:38  10      MR. SOLOMON: He leaned over to me --
12:13:40  11      THE WITNESS: It's fine. I'm also
12:13:41  12  hungry, but you say lunch is coming in 15
12:13:44  13  minutes.
12:13:45  14      MR. WAGNER: Yes.
12:13:54  15      THE WITNESS: Fingers crossed.
12:13:55  16      Q. Do you know how many sets of rimmonim
12:13:57  17  were in the Newport synagogue in 1903?
12:14:06  18      A. I have not seen anything to indicate
12:14:08  19  the number of rimmonim in the Newport synagogue
12:14:14  20  and...
12:14:25  21      (A pause in the proceedings.)
12:14:25  22      A. To my recollection, I do not recall
12:14:27  23  seeing anything that gives the exact number of
12:14:29  24  rimmonim in the Newport synagogue in 1903.
12:14:36  25      Q. There were at least two sets, is that

29  (Pages 110 to 113)

114

Fisher

| | | |
|---|---|---|
| 12:14:39 | 2 | right?  There was the Caroline Cohen set, and the |
| 12:14:44 | 3 | Myer Myers set, right?  The other Myer Myers set. |
| 12:14:49 | 4 | A.  I have not seen any documentation that |
| 12:14:50 | 5 | would show that definitively. |
| 12:14:52 | 6 | Q.  But part of your opinion is that |
| 12:14:53 | 7 | whatever was in the synagogue at the time was |
| 12:14:57 | 8 | leased to CJI, right?  Correct? |
| 12:15:16 | 9 | A.  Yes, this written report does, again, |
| 12:15:23 | 10 | reflecting documents and written by people who were |
| 12:15:27 | 11 | involved in this process, does make the case that |
| 12:15:29 | 12 | the objects inside of the synagogue, or at least |
| 12:15:35 | 13 | that was used within the religious services |
| 12:15:37 | 14 | contained within the synagogue, were part of what |
| 12:15:41 | 15 | was at stake in the lease in 1903. |
| 12:15:44 | 16 | Q.  Okay.  And I think your testimony is |
| 12:15:46 | 17 | that every Torah is adorned with rimmonim, right? |
| 12:15:53 | 18 | A.  The historical evidence, both primary |
| 12:15:55 | 19 | and secondary, indicates that ideally, every Torah |
| 12:15:59 | 20 | is adorned with a set of rimmonim. |
| 12:16:02 | 21 | Q.  Now, if there were a document around |
| 12:16:04 | 22 | that time that said that Spanish-Portuguese owned |
| 12:16:10 | 23 | one set of Torahs and rimmonim, would that be |
| 12:16:12 | 24 | relevant to you? |
| 12:16:13 | 25 | A.  The Spanish and Portuguese? |

115

Fisher

| | | |
|---|---|---|
| 12:16:16 | 2 | Q.  Yes, owned one set of the rimmonim at |
| 12:16:18 | 3 | Touro Synagogue, would that be relevant to you? |
| 12:16:20 | 4 | A.  So let me be clear.  If there were a |
| 12:16:22 | 5 | document that indicated that CSI owned one pair -- |
| 12:16:27 | 6 | Q.  One pair. |
| 12:16:29 | 7 | A.  -- that was at -- in Touro Synagogue |
| 12:16:33 | 8 | in 1903? |
| 12:16:34 | 9 | Q.  Yes, just one pair.  Would that have |
| 12:16:37 | 10 | been relevant to you? |
| 12:16:38 | 11 | A.  Again, it depends on the context, it |
| 12:16:41 | 12 | depends when that was written, depends who's |
| 12:16:43 | 13 | writing it. |
| 12:16:44 | 14 | Q.  What if it were written in February of |
| 12:16:46 | 15 | 1903 by someone at Spanish-Portuguese Synagogue? |
| 12:16:52 | 16 | A.  It would be weighed alongside of other |
| 12:16:55 | 17 | kinds of evidence that I was drawing upon. |
| 12:16:57 | 18 | Q.  Would it change your opinion? |
| 12:16:59 | 19 | A.  I don't know until I see it.  I have |
| 12:17:02 | 20 | not seen any such document. |
| 12:17:09 | 21 | As I said, it would be considered |
| 12:17:11 | 22 | alongside of the other evidence that I was looking |
| 12:17:14 | 23 | at. |
| 12:17:54 | 24 | (Fisher Exhibit 9, copy of telegram |
| 12:17:54 | 25 | dated 2/11, year not indicated, from |

116

Fisher

| | | |
|---|---|---|
| 12:17:54 | 2 | "Steinberg" to Rev. Dr. H.P. Mendes, |
| 12:17:54 | 3 | marked for identification, as of this |
| 12:17:54 | 4 | date.) |
| 12:17:54 | 5 | Q.  Have you seen this document before? |
| 12:18:12 | 6 | A.  I do not recall seeing this document |
| 12:18:14 | 7 | before. |
| 12:18:14 | 8 | Q.  Does the date have any significance to |
| 12:18:17 | 9 | you?  February 11, 1903? |
| 12:18:22 | 10 | MR. SOLOMON:  You're representing |
| 12:18:23 | 11 | that? |
| 12:18:23 | 12 | MR. WAGNER:  Yes. |
| 12:18:40 | 13 | A.  So that, just to clarify, the date is |
| 12:18:41 | 14 | something that you're getting from other contexts? |
| 12:18:43 | 15 | Q.  Well, it says February 11 on it. |
| 12:18:46 | 16 | A.  190 -- |
| 12:18:47 | 17 | Q.  Well, let's assume it's 1903. |
| 12:18:49 | 18 | A.  But it doesn't say 1903. |
| 12:18:52 | 19 | Q.  No, but one of the things I get to |
| 12:18:55 | 20 | do -- |
| 12:18:55 | 21 | MR. SOLOMON:  You're representing it's |
| 12:18:58 | 22 | 1903 and you're asking him to assume it. |
| 12:19:00 | 23 | MR. WAGNER:  Yes. |
| 12:19:00 | 24 | A.  So assuming this was 1903, February 11th, 1903 |
| 12:19:02 | 25 | the document does not say 1903, February 11th, 1903 |

117

Fisher

| | | |
|---|---|---|
| 12:19:07 | 2 | is a significant moment in this exchange. |
| 12:19:13 | 3 | Q.  When was the lease signed? |
| 12:19:21 | 4 | A.  Looking at my report -- as I recall, |
| 12:19:25 | 5 | we can double-check the report if you would like, |
| 12:19:27 | 6 | it was signed on February 1st, 1903. |
| 12:19:55 | 7 | MR. WAGNER:  Let's mark this as the |
| 12:19:57 | 8 | next exhibit. |
| 12:19:58 | 9 | (Fisher Exhibit 10, copy of lease |
| 12:19:58 | 10 | Bates numbered CSI0027 through 31, |
| 12:19:58 | 11 | marked for identification, as of this |
| 12:20:20 | 12 | date.) |
| 12:20:20 | 13 | Q.  Sir, I'm going to save you a little |
| 12:20:23 | 14 | bit of time.  This is the lease.  If you look at |
| 12:20:25 | 15 | page 30, second-to-last page.  If you look at the |
| 12:20:32 | 16 | top, you see that the CSI people, this is the |
| 12:20:35 | 17 | notary, signed it on February 10th.  Do you see |
| 12:20:39 | 18 | that?  It's on the second-to-last page at the top. |
| 12:20:52 | 19 | (Witness perusing document.) |
| 12:21:02 | 20 | A.  Yes, I see that. |
| 12:21:03 | 21 | Q.  Okay.  And if you turn to the next |
| 12:21:05 | 22 | page, you'll see that it was -- actually, the |
| 12:21:08 | 23 | bottom, if you look at the bottom there, the |
| 12:21:10 | 24 | Newport folks signed it on February 18, do you see |
| 12:21:16 | 25 | that? |

30 (Pages 114 to 117)

118

Fisher

12:21:33  2    A. This is when it was received in
12:21:34  3  Newport for the record.
12:21:35  4    Q. No, but if you look at the page
12:21:37  5  before -- look at the page before at the bottom,
12:21:39  6  there's a notary who indicated February 18.
12:21:52  7    A. Um-hum, yes.
12:21:52  8    Q. Now, did you see any evidence that
12:21:54  9  there was a dispute at the time about the one pair
12:21:56 10  of rimmonim and Torah referenced in the prior
12:22:01 11  telegram?
12:22:07 12    A. No, but this date, if it is 1903, is
12:22:11 13  after, as I recall, the surrender of the property
12:22:17 14  and appurtenances on the part of CJI to CSI.
12:22:25 15    Q. Sir, isn't it a fact that the premises
12:22:29 16  were surrendered on February 18th?
12:23:07 17    (A pause in the proceedings.)
12:23:08 18    Q. I'm going to save you some time again.
12:23:09 19    MR. WAGNER: Let's mark this as the
12:23:13 20  next exhibit.
12:23:14 21    (Fisher Exhibit 11, letter dated
12:23:14 22  2/18/03, William P. Sheffield, Jr.,
12:23:14 23  Esq., to L. Napoleon Levy, Esq., marked
12:23:32 24  for identification, as of this date.)
12:23:32 25    Q. Do you see Exhibit 11? You've seen

119

Fisher

12:23:34  2  that before, right?
12:23:47  3    A. Yes, I see this.
12:23:47  4    Q. Does it indicate the premises was
12:23:50  5  surrendered on the 18th?
12:23:51  6    A. This is not the same document I was
12:23:52  7  referring to.
12:23:53  8    Q. Not my question. Does this document
12:23:56  9  indicate that the premises were surrendered on
12:23:58 10  February 18th?
12:24:26 11    A. This appears to indicate that the
12:24:28 12  actual transfer of the keys took place on the 18th.
12:24:31 13  But there was a written surrender that took place
12:24:34 14  prior to this point.
12:24:35 15    Q. Okay. But the keys were surrendered
12:24:42 16  and delivered by the vice-president of the
12:24:46 17  congregation to Dr. Mendes on February 18th, right?
12:24:59 18    A. That's what this document says, yes.
12:25:01 19    Q. Now, are you aware that there was a
12:25:04 20  dispute around this time about the rimmonim?
12:25:26 21    (Brief interruption.)
12:25:28 22    Q. Actually, have you seen any evidence
12:25:29 23  that there was a dispute around this time
12:25:31 24  concerning the one pair of rimmonim and the sefer
12:25:37 25  that was referenced in the prior telegram? Have

120

Fisher

12:25:40  2  you seen any evidence?
12:25:54  3    A. Sitting here, I don't recall looking
12:25:55  4  at any evidence that would have indicated
12:26:00  5  controversy over this specific set of rimmonim
12:26:03  6  outside of the broader contestation over the
12:26:08  7  synagogue and its appurtenances.
12:26:11  8    (Fisher Exhibit 12, telegram dated
12:26:11  9  2/18, year not indicated, Levy to
12:26:11 10  Mendes, Bates numbered CSI5415, marked
12:26:31 11  for identification, as of this date.)
12:26:31 12    Q. Have you seen this document before?
12:27:01 13    A. I have not seen this document before.
12:27:03 14    Q. Is it your opinion that the the
12:27:08 15  parties inserted the word "appurtenances" in the
12:27:14 16  lease specifically to cover the rimmonim?
12:27:26 17    A. This document indicates, based upon my
12:27:28 18  reading of the wider sources of this time period,
12:27:32 19  that the appurtenances were linked, that word and
12:27:37 20  the usage were linked to the items necessary to run
12:27:41 21  the synagogue in enough places that my
12:27:47 22  interpretation of the 1903 lease is, not just that
12:27:53 23  the word "appurtenance" was included but that CSI
12:27:58 24  specifically added a phrase, "And paraphernalia
12:28:03 25  thereunto."

121

Fisher

12:28:04  2    Q. Let's put aside the reference to
12:28:06  3  paraphernalia. The reference is to appurtenance.
12:28:09  4  Is it your testimony that that word was
12:28:12  5  specifically inserted to cover all of the Torah
12:28:16  6  ornaments including the rimmonim?
12:28:19  7    A. I think the document suggests that
12:28:21  8  that is my interpretation. And the con -- the
12:28:25  9  conversations that took place prior to this moment
12:28:29 10  in 1903, and even after, seem to confirm that.
12:28:33 11    Q. Okay. Now, you talk about
12:28:35 12  conversations. You weren't present during any of
12:28:39 13  these conversations, right?
12:28:41 14    A. "The exchanges," is perhaps a better
12:28:43 15  word.
12:28:43 16    Q. But again, you weren't present --
12:28:43 17    A. I will presume none of us --
12:28:46 18    Q. These events occurred many years ago?
12:28:47 19    A. That's what historians do, we look at
12:28:49 20  the written documentation.
12:28:51 21    Q. Not my question, what historians do.
12:28:51 22  My question is whether these are events that
12:28:53 23  occurred hundreds of years ago, that's all.
12:28:55 24    It's going to go much faster and
12:28:58 25  you're going to beat all the holiday traffic if you

31 (Pages 118 to 121)

122

Fisher

12:29:04  2    just answer the questions.

12:29:07  3        So am I right that these events

12:29:08  4    occurred many years ago?

12:29:13  5        A.  If these documents are from 1903,

12:29:15  6    these events occurred before my lifetime.

12:29:17  7        Q.  Okay.  Now, am I right that a fair

12:29:21  8    portion of your report opines as to what parties

12:29:25  9    did or said to each other?

12:29:37  10       A.  Based upon documents that were in

12:29:39  11   front of me and understanding a wider context of

12:29:42  12   this time period, it is within the scope of the

12:29:47  13   historical profession to do precisely what I did,

12:29:50  14   which is to try to understand people and events and

12:29:54  15   actions in their contexts.

12:29:56  16       Q.  Okay.  You've given me that speech

12:29:59  17   many times.  My only question is, am I right that a

12:30:03  18   fair portion of your report opines as to what the

12:30:05  19   parties did or said to each other?

12:30:11  20       A.  At moments in the report, I was trying

12:30:13  21   to understand what people were doing and why, based

12:30:20  22   upon the documentary record they left.

12:30:22  23       Q.  I understand that.  You don't have to

12:30:24  24   give the same preface.  And am I right that a fair

12:30:29  25   amount of your report opines as to what the parties

123

Fisher

12:30:32  2    intended?

12:30:36  3        A.  As is usual for what historians do,

12:30:39  4    looking at the documents that we have at our

12:30:41  5    disposal, I made judgments and weighed evidence to

12:30:48  6    try to understand what people did and, at times,

12:30:53  7    what they intended.

12:30:54  8        Q.  I mean, the very first paragraph of

12:30:57  9    your report says that, doesn't it?  The one, two,

12:31:02  10   three, four, five, six, seven.  "Whether these

12:31:07  11   words were intended to include the disputed

12:31:09  12   rimmonim."

12:31:13  13       MR. SOLOMON:  So the question is, is

12:31:15  14   that in his report?

12:31:15  15       MR. WAGNER:  Yes.

12:31:16  16       MR. SOLOMON:  Okay.

12:31:21  17   A.  This is on page 2?

12:31:22  18   Q.  Yes.  After the opening statement,

12:31:26  19   towards the bottom of that paragraph.

12:31:29  20   A.  Yes, I see that.

12:31:30  21   Q.  Okay.  And a fair amount of your

12:31:33  22   report opines as to what the parties knew,

12:31:36  23   believed, discussed or understood, correct?

12:31:44  24   A.  Again, based on the evidence that was

12:31:46  25   at my disposal, I was trying to understand the

124

Fisher

12:31:49  2    specific context in which documents were produced

12:31:53  3    as well as the larger flow of the events that took

12:31:56  4    place in this time period.

12:31:57  5        Q.  Sir, am I right that a fair amount of

12:32:02  6    your report opines as to what the parties knew,

12:32:06  7    believed, discussed or understood?  I don't need

12:32:09  8    the preface.  I just need an answer.  I don't want

12:32:12  9    to be here all day.

12:32:13  10       A.  I believe I'm giving you an answer.

12:32:16  11   I, based upon the documents that I reviewed, I, as

12:32:20  12   historians do, tried to understand what people were

12:32:24  13   saying and doing and intended.

12:32:26  14       Q.  And you were opining as to what

12:32:29  15   parties understood, correct?

12:32:30  16       A.  Based upon the documents that were at

12:32:32  17   my disposal at time, yes, I did that.

12:32:37  18       Q.  And you also gave your opinion as to

12:32:39  19   the legal significance of certain facts, correct?

12:32:42  20       A.  If you want to show me --

12:32:44  21       Q.  Well, you have a long discussion in

12:32:46  22   your report about legal cases, right?

12:32:50  23       A.  Do you want to show me where that's

12:32:52  24   at?

12:32:53  25       Q.  Do you know independently without

125

Fisher

12:32:55  2    reference to your report whether you discuss legal

12:32:57  3    opinions in your report?

12:32:58  4        A.  Well, I'd want to make sure we're

12:32:59  5    looking at the same page and understanding the same

12:33:01  6    issue.

12:33:02  7        Q.  Did you discuss Judge Brown's

12:33:04  8    decision?

12:33:05  9        A.  In this report?  I believe I did

12:33:09  10   reference the actual written opinion of Judge

12:33:13  11   Brown.

12:33:13  12       Q.  And you gave your opinion as to the

12:33:14  13   legal significance of that opinion, correct?

12:33:20  14       A.  Based on how people responded to that

12:33:23  15   decision, I interpreted the significance of that

12:33:26  16   decision in that particular context.

12:33:27  17       Q.  You also gave -- look at page 65 of

12:33:53  18   your opinion.  You state, this is the last

12:34:08  19   sentence, you say, "Property maintenance and

12:34:11  20   caretaking was part of this lease arrangement," and

12:34:14  21   then I'm skipping a little, "Without such property

12:34:18  22   management ever implying ownership over time or any

12:34:21  23   sort of adverse possession."

12:34:23  24       Do you see that?

12:34:24  25       A.  I do.

32  (Pages 122 to 125)

126

Fisher

12:34:24 | 2 | Q. And "adverse possession" is a legal
12:34:27 | 3 | term, correct?
12:34:27 | 4 | A. I do believe so.
12:34:28 | 5 | Q. Do you know the elements of adverse
12:34:31 | 6 | possession?
12:34:32 | 7 | A. From what I read, I understand at
12:34:35 | 8 | least some of the elements.
12:34:36 | 9 | Q. So you were opining as to the legal
12:34:40 | 10 | significance of certain facts, were you not?
12:34:42 | 11 | MR. SOLOMON: Object to the question.
12:34:45 | 12 | A. The judge will decide the legal
12:34:48 | 13 | implications of these issues. It was --
12:34:55 | 14 | Q. Sir, I --
12:34:57 | 15 | A. -- this wording is a reflection of the
12:34:58 | 16 | documents that I viewed over the course of this
12:35:00 | 17 | history.
12:35:00 | 18 | Q. I didn't ask what the judge was going
12:35:03 | 19 | to decide. I asked, did you give opinions as to
12:35:09 | 20 | the legal significance of certain facts?
12:35:27 | 21 | A. Again, drawing from these documents
12:35:28 | 22 | and based upon how people responded to events and
12:35:33 | 23 | situations that had to do with the law, this report
12:35:36 | 24 | has tried to reflect sort of what I understood to
12:35:41 | 25 | be happening in these situations.

127

Fisher

12:35:43 | 2 | Q. That's not my question. Did you give
12:35:45 | 3 | opinions as to the legal significance of certain
12:35:48 | 4 | facts?
12:35:52 | 5 | A. Again, my purpose was to understand
12:35:55 | 6 | and reflect what the documents from this time
12:35:59 | 7 | period were showing over time.
12:36:01 | 8 | Q. Can you please answer my question?
12:36:04 | 9 | A. I think I am.
12:36:05 | 10 | Q. What is legal about the answer you
12:36:07 | 11 | just gave?
12:36:10 | 12 | MR. SOLOMON: No, he was
12:36:12 | 13 | disagreeing --
12:36:13 | 14 | Q. Do you know what the term ultra vires
12:36:16 | 15 | means?
12:36:16 | 16 | A. It's beyond powers.
12:36:17 | 17 | Q. Did you draw conclusions as to whether
12:36:20 | 18 | certain actions were or were not ultra vires here?
12:36:23 | 19 | A. I invoked that term in part because it
12:36:27 | 20 | seems, again, from the documents and the way that
12:36:29 | 21 | people responded to them, and what was in place,
12:36:34 | 22 | that that term in my analysis seemed appropriate.
12:36:40 | 23 | Q. And that's a legal -- it's a legal
12:36:42 | 24 | concept, is it not?
12:36:47 | 25 | A. Certainly has usage in legal context,

128

Fisher

12:36:50 | 2 | yes.
12:36:50 | 3 | Q. Were you using it in a legal context
12:36:53 | 4 | or some other context?
12:36:54 | 5 | A. I was using it in the context of my
12:36:56 | 6 | report.
12:36:56 | 7 | Q. Were you using it in a legal context
12:36:58 | 8 | or did you have some other meaning for that term?
12:37:04 | 9 | A. I was referencing the idea that some
12:37:08 | 10 | actions might be contrary to some of the documents
12:37:15 | 11 | and agreements that I was looking at.
12:37:16 | 12 | Q. On page 47, you say the phrase,
12:37:22 | 13 | "'Paraphernalia belonging thereto' was a sort of
12:37:25 | 14 | comprehensive legalese."
12:37:28 | 15 | Do you recall that?
12:37:29 | 16 | A. Forty-seven, you said?
12:37:30 | 17 | Q. Yes.
12:37:31 | 18 | A. Okay. Yes, I see it, and I do recall
12:37:45 | 19 | it.
12:37:46 | 20 | Q. So were you, there, drawing legal
12:37:49 | 21 | conclusions concerning the use of particular terms?
12:38:00 | 22 | A. I was referencing the sort of genre of
12:38:06 | 23 | language that occurs in legal contexts that I have
12:38:06 | 24 | seen in early American history more broadly.
12:38:08 | 25 | Q. Are you a lawyer?

129

Fisher

12:38:09 | 2 | A. I am not a lawyer.
12:38:15 | 3 | Q. Have you ever taken any courses in law
12:38:18 | 4 | school?
12:38:23 | 5 | A. No.
12:38:23 | 6 | Q. Have you ever taken any courses in
12:38:25 | 7 | property law?
12:38:32 | 8 | A. I have not.
12:38:32 | 9 | Q. Do you understand the elements of a
12:38:37 | 10 | contract?
12:38:43 | 11 | A. In what context?
12:38:44 | 12 | Q. Do you understand how a contract comes
12:38:46 | 13 | into being?
12:38:54 | 14 | A. Without knowing the specifics, no,
12:38:56 | 15 | that is not what I was asked to weigh in on or
12:39:04 | 16 | something that I could give you the full outline of
12:39:08 | 17 | at this moment.
12:39:08 | 18 | Q. Do you know how parties alter a
12:39:10 | 19 | contract?
12:39:16 | 20 | A. I don't know. But it depends on the
12:39:23 | 21 | context in which you're talking about altering the
12:39:25 | 22 | contract. One would presume that you would need
12:39:28 | 23 | items in writing and items that would be approved
12:39:36 | 24 | by the parties from either side who have the power
12:39:41 | 25 | to do so.

33 (Pages 126 to 129)

130

|  | 1 | Fisher |
|---|---|---|
| 12:39:41 | 2 | Q. You think that every change in a |
| 12:39:44 | 3 | contract requires a writing?  Is that your |
| 12:39:46 | 4 | testimony? |
| 12:39:46 | 5 | A. In some of the contracts that I have |
| 12:39:48 | 6 | seen altered in early American history, it is -- |
| 12:39:57 | 7 | and sometimes might not stand up under scrutiny |
| 12:40:01 | 8 | without something written. |
| 12:40:02 | 9 | Q. Not my question.  My question is, do |
| 12:40:04 | 10 | you understand that a contract may be changed |
| 12:40:06 | 11 | without a writing, or is that something you just |
| 12:40:08 | 12 | don't know? |
| 12:40:10 | 13 | A. It depends on the context.  The |
| 12:40:12 | 14 | contracts that I have seen that have been contested |
| 12:40:15 | 15 | legally in early American history, from what I've |
| 12:40:19 | 16 | seen so far, in the context that I'm working in, |
| 12:40:24 | 17 | the most normal way in which they were changed was |
| 12:40:26 | 18 | through a process that involves a written change. |
| 12:40:31 | 19 | Q. That's not my question.  I really |
| 12:40:33 | 20 | would ask that you answer my questions.  Have you |
| 12:40:37 | 21 | taken any courses in contract law? |
| 12:40:40 | 22 | A. I have not. |
| 12:40:41 | 23 | Q. Now, does a fair amount of your report |
| 12:40:45 | 24 | opine as to state of mind? |
| 12:40:51 | 25 | A. A historian always tries to understand |

131

|  | 1 | Fisher |
|---|---|---|
| 12:40:53 | 2 | what was happening broadly in particular contexts. |
| 12:40:56 | 3 | And that also understands how people see themselves |
| 12:40:59 | 4 | in those contexts and make decisions. |
| 12:41:01 | 5 | Q. Is that another way of saying that |
| 12:41:03 | 6 | some of your report opines as to state of mind? |
| 12:41:06 | 7 | A. I do not recall specifically -- let me |
| 12:41:17 | 8 | go back.  This report tries to faithfully reflect |
| 12:41:24 | 9 | individuals in their particular contexts. |
| 12:41:26 | 10 | Q. Can you look at page 49. |
| 12:41:28 | 11 | A. Yes. |
| 12:41:28 | 12 | Q. The first paragraph, last line, you |
| 12:41:40 | 13 | state, "No actions of the CSI board were recorded |
| 12:41:42 | 14 | in this particular instance but it is evident that |
| 12:41:46 | 15 | everyone involved understood that CSI owned the |
| 12:41:48 | 16 | Myer Myers rimmonim used at Touro Synagogue," do |
| 12:41:52 | 17 | you see that? |
| 12:41:53 | 18 | A. I see that. |
| 12:41:53 | 19 | Q. And did you draw a conclusion in that |
| 12:41:55 | 20 | sentence as to the state of mind of whoever "all" |
| 12:41:59 | 21 | or whoever "everyone" is? |
| 12:42:07 | 22 | A. Reflecting the documents that I have |
| 12:42:09 | 23 | looked at, I drew a conclusion about what people |
| 12:42:14 | 24 | involved were thinking in this time period. |
| 12:42:18 | 25 | Q. Is there any amount of speculation in |

132

|  | 1 | Fisher |
|---|---|---|
| 12:42:24 | 2 | your report? |
| 12:42:26 | 3 | A. I think "speculation" misguides the |
| 12:42:30 | 4 | conversation.  Historians, as I said, always have |
| 12:42:33 | 5 | to be about the business of interpreting.  And in |
| 12:42:38 | 6 | the process, there are times when the documentary |
| 12:42:42 | 7 | record is not as full as you might wish, and so |
| 12:42:47 | 8 | historians take all the available evidence and try |
| 12:42:50 | 9 | to reconstruct situations and actions and events |
| 12:42:56 | 10 | based upon what's available. |
| 12:42:57 | 11 | Q. Well, is there any speculation in your |
| 12:42:59 | 12 | report?  Actually, let me rephrase it. |
| 12:43:05 | 13 | Did you have to make any educated |
| 12:43:07 | 14 | guesses in your report? |
| 12:43:08 | 15 | A. Historians often have to try to |
| 12:43:15 | 16 | understand a lot from a little.  And based upon |
| 12:43:20 | 17 | one's training and education and prior experience |
| 12:43:24 | 18 | with interpreting documents, have to try to assess |
| 12:43:26 | 19 | what happened with what they have to work with. |
| 12:43:28 | 20 | Q. Sir, I'm not deposing other |
| 12:43:32 | 21 | historians.  I'm deposing you.  Did you, not other |
| 12:43:38 | 22 | historians, did you make any educated guesses in |
| 12:43:41 | 23 | this report? |
| 12:43:43 | 24 | A. I'd be happy to look at a place in the |
| 12:43:45 | 25 | report that you might be referring to. |

133

|  | 1 | Fisher |
|---|---|---|
| 12:43:46 | 2 | Q. No, I'm just asking you without |
| 12:43:48 | 3 | referencing the report.  Are you able to answer |
| 12:43:50 | 4 | that question? |
| 12:43:54 | 5 | A. Sitting here, I can't recall specific |
| 12:43:56 | 6 | instances where I did or did not make educated |
| 12:44:00 | 7 | guesses.  But given the nature of the historical |
| 12:44:03 | 8 | profession, it seems consistent with the need to |
| 12:44:10 | 9 | interpret documents that that might have taken |
| 12:44:16 | 10 | place. |
| 12:44:17 | 11 | Q. Okay.  And let me just make sure I |
| 12:44:21 | 12 | understand what you did here. |
| 12:44:23 | 13 | You read certain documents, right? |
| 12:44:27 | 14 | A. Yes. |
| 12:44:28 | 15 | Q. And the documents that were produced |
| 12:44:35 | 16 | in the case that you reviewed came from counsel, |
| 12:44:37 | 17 | right? |
| 12:44:39 | 18 | A. The documents that were given to me |
| 12:44:42 | 19 | came both from counsel and from the plaintiffs. |
| 12:44:45 | 20 | Q. Right, but what I'm saying is, it was |
| 12:44:49 | 21 | the lawyers who gave you those documents, right? |
| 12:44:53 | 22 | A. Most of them.  Not all of them. |
| 12:44:55 | 23 | Q. Right.  You didn't -- you didn't look |
| 12:44:57 | 24 | at -- I think we've established that you didn't |
| 12:44:59 | 25 | look at everything that was produced, right? |

34  (Pages 130 to 133)

134

Fisher

```
12:45:03   2        A.  I would have no way of assessing, nor
12:45:05   3   would anyone in this situation, nor would you, that
12:45:09   4   everything has been looked at.  But what was
12:45:12   5   reasonably available to me I looked at.
12:45:14   6        Q.  But we saw at least some documents
12:45:16   7   that were produced in this case by CSI that you did
12:45:19   8   not look at, right?  Those telegrams?
12:45:22   9        A.  That appears to be the case, although
12:45:26  10   counsel for CSI must have made the decision about
12:45:35  11   whether or not they were important or necessary and
12:45:39  12   frankly, it's unclear without further study and
12:45:45  13   investigation whether they would have impacted the
12:45:46  14   case one way or another.
12:45:47  15        Q.  But you trusted their judgement,
12:45:51  16   correct?
12:46:02  17        A.  To a certain extent, I had to lean
12:46:06  18   upon what they gave me because I don't have
12:46:09  19   unlimited resources to go through the archives of
12:46:14  20   CSI and CJI, nor do I have the time to go through
12:46:18  21   the archives in Newport, the city, and of the
12:46:22  22   historical society, to make sure that every paper
12:46:24  23   was turned over.
12:46:26  24        But I did, in addition to receiving
12:46:29  25   documents from them, part of which had been
```

135

Fisher

```
12:46:32   2   submitted by CJI, do a reasonable amount of looking
12:46:37   3   around and reading and research to see if there was
12:46:41   4   anything that was contrary or had been overlooked
12:46:46   5   by them.
12:46:47   6        Q.  Sir, can you just answer my question?
12:46:49   7   I thought it was a very simple question.  Did you
12:46:52   8   trust the judgement of the CSI lawyers to give you
12:46:54   9   what was relevant from the parties' document
12:46:56  10   production, or did you not trust them?  Just, I
12:47:01  11   just want an answer.
12:47:03  12        MR. SOLOMON:  Asked and answered.
12:47:04  13        Q.  You can answer.
12:47:11  14        A.  I think I answered your question.  I
12:47:15  15   trusted them to give me what though thought was
12:47:18  16   relevant, and yet I also conducted my own
12:47:22  17   independent investigation that was within reason
12:47:25  18   and within the allotment of time and resources that
12:47:29  19   I had at my disposal.
12:47:30  20        Q.  Okay.  Now, you had this body of
12:47:32  21   documents.  How many Redwells was it?
12:47:35  22        A.  I'm sorry, how many what?
12:47:40  23        MR. JACOBY:  That's a legal term.
12:47:41  24        Q.  Let's scratch that.  It's a
12:47:44  25   generational term.  I think it's generational.  I
```

136

Fisher

```
12:47:47   2   don't think it's legal.  Okay.  You had a lot of
12:47:50   3   documents, right?
12:47:51   4        A.  Yes.
12:47:51   5        Q.  And then you weighed the evidence,
12:47:53   6   right?
12:47:56   7        A.  In conjunction with my own independent
12:47:58   8   investigation, and looking at what I could with the
12:48:01   9   time allotted to me, I assessed the evidence as I
12:48:07  10   would in any other situation of historical
12:48:09  11   question.
12:48:09  12        Q.  You weighed the evidence, right?
12:48:12  13        A.  Well, you're not defining what the
12:48:14  14   evidence is, but the evidence that was at my
12:48:16  15   disposal, whether stuff that I had found or whether
12:48:19  16   items that counsel to CSI had given me, but yes,
12:48:25  17   that is the process.
12:48:26  18        Q.  And based on those, your reading of
12:48:28  19   the documents, you tried to reconstruct what
12:48:30  20   happened.
12:48:37  21        A.  Based upon my reading of the
12:48:39  22   documents, I tried to understand the general flow
12:48:44  23   of events, these general flow of events or these
12:48:48  24   events in general, but more particularly, focused
12:48:53  25   on the questions that I was asked to address by
```

137

Fisher

```
12:48:56   2   counsel.
12:48:56   3        Q.  Right.  But you tried to reconstruct
12:48:58   4   what happened in order to answer those questions.
12:49:02   5        A.  Reconstructing the past is what
12:49:04   6   historians are all about.
12:49:05   7        Q.  And that's what you did, right?
12:49:07   8        A.  As much as I could with the documents
12:49:09   9   that were given to me.  I tried to understand these
12:49:12  10   events and this general time period.
12:49:14  11        Q.  And based on your reading of the
12:49:16  12   documents, you drew factual conclusions, correct?
12:49:25  13        A.  Based upon my reading of the
12:49:27  14   documents, I tried to piece together what was
12:49:34  15   happening in this time period, yes.
12:49:35  16        Q.  Did you also make credibility
12:49:39  17   determinations?
12:49:45  18        A.  In what particular way do you mean
12:49:47  19   "credibility"?
12:49:48  20        Q.  Any.  The credibility of documents, of
12:49:49  21   what people were saying.
12:49:52  22        A.  I think we've touched on this already.
12:49:54  23   Part of the historical enterprise in assessing
12:49:57  24   documents is trying to evaluate when a document was
12:50:01  25   produced, by whom produced, and to weigh a
```

35  (Pages 134 to 137)

138

Fisher

12:50:07  2   particular document alongside of other kinds of
12:50:09  3   evidence.
12:50:10  4        So naturally, there's a lot of
12:50:14  5   weighing that goes on within this longer process of
12:50:18  6   each document.
12:50:19  7   Q. So just, what you did is, you made
12:50:23  8   some credibility determinations.
12:50:25  9        MR. SOLOMON: Object to the form.
12:50:26 10   Misstated the answer.
12:50:28 11        MR. WAGNER: He can answer.
12:50:30 12   A. I think I already said this, that,
12:50:32 13   yes. I, as is normal in the historical profession,
12:50:37 14   had to make certain kinds of assessments about
12:50:44 15   documents and their reliability.
12:50:46 16   Q. Do you rule out all other scenarios,
12:50:50 17   other than the ones that you've posited in your
12:50:52 18   report?
12:51:01 19   A. Based upon the evidence that I had at
12:51:03 20   my disposal as of the writing of this report, the
12:51:10 21   conclusions I came to seemed to most faithfully
12:51:14 22   reflect the documentation and the narrative and the
12:51:17 23   progression of these event.
12:51:18 24   Q. Right, I understand that. But do you
12:51:20 25   rule out all other scenarios?

139

Fisher

12:51:26  2        MR. SOLOMON: I don't understand the
12:51:27  3   question. I object to it.
12:51:28  4   Q. You can answer.
12:51:30  5   A. It seems impossible to rule out
12:51:32  6   scenarios without knowing what I'm ruling out. The
12:51:35  7   evidence leans in a certain, a very particular
12:51:40  8   direction, and historians have to evaluate that
12:51:43  9   evidence and try to understand what happened.
12:51:47 10   There's -- it's not usual to play games with
12:51:59 11   counterfactuals.
12:52:11 12        MR. SOLOMON: Maybe we could break for
12:52:12 13   lunch when --
12:52:13 14        MR. WAGNER: I'd like -- I have one
12:52:14 15   more series, take like five or ten
12:52:16 16   minutes.
12:52:18 17        Are you okay?
12:52:18 18        THE WITNESS: My stomach might be on
12:52:20 19   tape soon, yes.
12:52:24 20   Q. Can you turn to page, the bottom of
12:52:48 21   page 44. The bottom of 44, top of 45. And just
12:53:05 22   read that paragraph.
12:53:06 23        MR. SOLOMON: Bottom of --
12:53:07 24        MR. WAGNER: 44, top of 45.
12:53:10 25   A. So starting with, "In 1984"?

140

Fisher

12:53:13  2   Q. Yes.
12:53:13  3   A. Do you want me to read it out loud?
12:53:15  4   Q. No, no.
12:53:20  5        (Witness perusing document.)
12:54:06  6   A. Okay, I've read it.
12:54:07  7   Q. Now, can you tell me in your own words
12:54:10  8   what you're using the Caroline Cohen statements to
12:54:15  9   show, in as succinct a way as you can so our
12:54:21 10   stomachs don't growl.
12:54:29 11        Maybe I'll show you the Caroline Cohen
12:54:33 12   statement.
12:54:34 13   A. I'm referencing three Caroline Cohen
12:54:37 14   statements here, actually.
12:54:38 15   Q. I'm sorry?
12:54:38 16   A. I'm referencing three Caroline Cohen
12:54:41 17   statements here, actually.
12:54:43 18        MR. WAGNER: Take this one.
12:54:46 19        (Fisher Exhibit 13, handwritten
12:54:46 20   document signed by Caroline Cohen, Bates
12:54:46 21   numbered CJI 000145, marked for
12:55:12 22   identification, as of this date.)
12:55:12 23   Q. You cite, do you remember this
12:55:14 24   document?
12:55:19 25   A. I do remember this document.

141

Fisher

12:55:19  2   Q. Okay. And you cite in this document
12:55:22  3   the reference to appurtenances of worship and a
12:55:29  4   cemetery, to you see that?
12:55:30  5   A. I do, yes.
12:55:31  6   Q. And you draw a conclusion from that,
12:55:35  7   right?
12:55:36  8   A. I said that this strongly suggests
12:55:38  9   that Caroline Cohen had the appurtenances of
12:55:45 10   worship and very, very likely the rimmonim that she
12:55:50 11   had just donated to CSI that came with CJI.
12:55:56 12   Q. Why would -- you say that CSI owned
12:56:01 13   those rimmonim. Why would she be referencing
12:56:13 14   rimmonim that CSI owns here?
12:56:42 15   A. Most likely because they were being
12:56:44 16   utilized in the Touro Synagogue at this time
12:56:48 17   period.
12:56:48 18   Q. Now, you used the document not only to
12:56:53 19   show what Caroline Cohen intended but the very next
12:56:59 20   sentence says, "The concern for these heirs at law
12:57:03 21   was not simply the synagogue building itself and
12:57:06 22   the cemetery, but also the synagogue appurtenances
12:57:09 23   (the appurtenances of worship)," do you see that?
12:57:12 24   A. I do see that.
12:57:12 25   Q. So you draw a conclusion from what

36  (Pages 138 to 141)

142

Fisher

12:57:14  2  Caroline Cohen said vis-a-vis the other heirs,
12:57:18  3  correct?
12:57:18  4      A. In this particular instance, I'm
12:57:20  5  relying upon what Caroline Cohen is saying in this
12:57:24  6  document and the concern that she exhibited when
12:57:27  7  she made the donation of the rimmonim to CSI,
12:57:31  8  eventually went to CJI.
12:57:33  9      Q. But you're saying that the heirs
12:57:36  10  shared the same concern, correct?
12:57:40  11      A. She is one of the descendants of Herr
12:57:45  12  Moses Michael Hayes, and this particular document,
12:57:48  13  you've extracted it because it's a part of a longer
12:57:53  14  progression of deeds of conveyance.
12:57:54  15      Q. I didn't extract it. You extracted
12:57:57  16  it, didn't you?
12:57:58  17      A. Well, in what you've given me, you
12:58:00  18  extracted it.
12:58:00  19      Q. Okay. She wasn't one of the people
12:58:02  20  who signed the deeds over to CSI, was she?
12:58:06  21      A. From what I've seen so far, this is
12:58:07  22  the primary representation of her support of the
12:58:12  23  deeds of conveyance.
12:58:13  24      Q. But she didn't actually sign the
12:58:15  25  deeds, did she?

143

Fisher

12:58:18  2      A. Like I just said, from what I've seen
12:58:20  3  so far, this is the primary form of her support for
12:58:23  4  the deeds of conveyance.
12:58:25  5      Q. Is her name on the deed?
12:58:30  6      A. There are several deeds. But in any
12:58:33  7  case, I don't recall seeing her name.
12:58:35  8      Q. Okay. I'll make a representation that
12:58:37  9  her name is not on the deeds. Now, did you look at
12:58:43  10  the statements by the actual heirs who deeded over
12:58:51  11  the property?
12:58:51  12      A. If by those statements you mean the
12:58:53  13  deeds of conveyance that were signed by the heirs,
12:58:56  14  yes, that was a part of the documentation that I
12:58:58  15  looked at in this process.
12:59:04  16      MR. WAGNER: Let's just look at one of
12:59:05  17  them.
12:59:07  18      (Fisher Exhibit 14, copy of
12:59:07  19  handwritten document, Bates numbered CJI
12:59:07  20  000146, marked for identification, as of
12:59:54  21  this date.)
12:59:54  22      MR. WAGNER: Just give us a second. I
12:59:56  23  think we're going to use a different
12:59:58  24  exhibit.
12:59:59  25      (A pause in the proceedings.)

144

Fisher

13:01:07  2      MR. WAGNER: Okay, let's mark this as
13:01:08  3  the next exhibit.
13:01:08  4      (Fisher Exhibit 15, typewritten
13:01:08  5  document bearing numerous signatures,
13:01:08  6  Bates numbered CJI 000151, marked for
13:01:34  7  identification, as of this date.)
13:01:34  8      Q. Now, you said that these were part of
13:01:38  9  a larger series of statements by the heirs,
13:01:40  10  correct?
13:01:44  11      A. "These" meaning?
13:01:46  12      Q. These types of statements, 14 and 15.
13:01:49  13      A. Well, this is extracted from something
13:01:51  14  else. It appears, maybe not, but what I have
13:01:57  15  looked at was two or three deeds of conveyance that
13:02:03  16  were specifically from individuals and/or couples
13:02:07  17  who were conveying.
13:02:09  18      Q. And none of the other statements like
13:02:12  19  this referenced appurtenances, did they?
13:02:54  20      A. At least some of the deeds --
13:02:57  21      Q. I'm not -- I'm sorry, I'm not talking
13:02:58  22  about the deeds. I'm talking about these
13:03:00  23  statements.
13:03:01  24      A. Oh, like --
13:03:01  25      Q. These types of --

145

Fisher

13:03:02  2      MR. SOLOMON: You want to know whether
13:03:04  3  in the page you showed him the word
13:03:08  4  "appurtenance" appears.
13:03:09  5      Does the word "appurtenance" appear on
13:03:11  6  this page?
13:03:11  7      A. As I said, these are part of a series.
13:03:13  8      Q. I understand that.
13:03:15  9      A. But if you're asking me about this
13:03:16  10  particular document --
13:03:17  11      Q. Um-hum.
13:03:19  12      A. -- because other documents I've seen
13:03:20  13  from 1894 do actually use the language of
13:03:24  14  "appurtenances."
13:03:25  15      Q. Okay, sir, I'm not asking about
13:03:27  16  documents that are not in front of you right now.
13:03:28  17  I'm asking about these documents.
13:03:30  18      Do any of them, of the type that you
13:03:33  19  cited of Caroline Cohen, reference "appurtenance"?
13:03:37  20      A. Aside from Caroline Cohen you're
13:03:39  21  asking me?
13:03:39  22      Q. Yes.
13:03:40  23      A. Well, now you're asking me about other
13:03:42  24  documents that aren't in front of me.
13:03:43  25      Q. That are in this form. Start with the

37 (Pages 142 to 145)

146

Fisher

| | | |
|---|---|---|
| 13:03:46 | 2 | ones that are before you. They don't show, they |
| 13:03:48 | 3 | don't reference "appurtenance," do they? |
| 13:03:56 | 4 | A. Some of the language is the same, |
| 13:03:58 | 5 | "Exercising a becoming control over the building |
| 13:04:05 | 6 | erected by our ancestors." But in this particular |
| 13:04:09 | 7 | case, in this document that you've given me here, |
| 13:04:11 | 8 | this one document, the word "appurtenances" does |
| 13:04:14 | 9 | not seem to appear. |
| 13:04:15 | 10 | Q. Okay. And if I showed you the rest of |
| 13:04:17 | 11 | the documents in that form, that are in that form, |
| 13:04:21 | 12 | which I can show you, would it surprise you that |
| 13:04:24 | 13 | none of them reference "appurtenance" except for |
| 13:04:27 | 14 | the Caroline Cohen one? |
| 13:04:28 | 15 | A. But there are other deeds of |
| 13:04:30 | 16 | conveyance. |
| 13:04:31 | 17 | Q. I'm not asking about other deeds. I'm |
| 13:04:33 | 18 | just asking about the documents that are in this |
| 13:04:36 | 19 | form. |
| 13:04:38 | 20 | A. I'd have to know the context in which |
| 13:04:41 | 21 | these documents were produced, because they seem to |
| 13:04:43 | 22 | be at odds on that particular point with other |
| 13:04:46 | 23 | deeds of conveyance that were also made by other |
| 13:04:50 | 24 | ancestors. |
| 13:04:50 | 25 | Q. Not my question. If you listen to my |

147

Fisher

| | | |
|---|---|---|
| 13:04:52 | 2 | questions, they are really very simple. Do the |
| 13:04:54 | 3 | other documents that are in this form, which you |
| 13:04:57 | 4 | said I pulled out of series, reference |
| 13:05:00 | 5 | appurtenances other than the — |
| 13:05:02 | 6 | MR. SOLOMON: Not reference |
| 13:05:03 | 7 | appurtenances, use the word. He's -- |
| 13:05:05 | 8 | MR. WAGNER: Yes, use the word |
| 13:05:06 | 9 | "appurtenance." |
| 13:05:08 | 10 | Q. Do the other ones use the word |
| 13:05:10 | 11 | "appurtenance"? |
| 13:05:11 | 12 | A. Again, the Caroline Cohen is in a |
| 13:05:14 | 13 | series within a document that I've seen that -- |
| 13:05:18 | 14 | these are the documents within this series do |
| 13:05:20 | 15 | reference the word "appurtenance." |
| 13:05:22 | 16 | I have not -- I don't know that what |
| 13:05:25 | 17 | series these are. You've given me extracted |
| 13:05:27 | 18 | documents without any context. And it's very |
| 13:05:31 | 19 | difficult for me to make these kind of |
| 13:05:33 | 20 | generalizations. |
| 13:05:33 | 21 | Q. Do you know whether Caroline Cohen saw |
| 13:05:36 | 22 | the deeds? |
| 13:05:37 | 23 | A. Sitting here today, I don't recall |
| 13:05:51 | 24 | seeing anything that would confirm or deny that. |
| 13:05:56 | 25 | Q. Okay. |

148

Fisher

| | | |
|---|---|---|
| 13:05:56 | 2 | MR. WAGNER: Let's mark this as the |
| 13:05:58 | 3 | next exhibit. |
| 13:05:58 | 4 | MR. SOLOMON: This will be the last |
| 13:06:02 | 5 | one. |
| 13:06:03 | 6 | (Fisher Exhibit 16, handwritten |
| 13:06:03 | 7 | document Bates numbered CJI 000148, |
| 13:06:03 | 8 | marked for identification, as of this |
| 13:06:23 | 9 | date.) |
| 13:06:23 | 10 | Q. Sir, does this document contain the |
| 13:06:25 | 11 | word "appurtenance"? |
| 13:06:54 | 12 | A. If you're asking me about this |
| 13:06:55 | 13 | particular document -- |
| 13:06:56 | 14 | Q. That's the one I gave you. |
| 13:06:57 | 15 | A. And not the others that do reference |
| 13:06:59 | 16 | appurtenances -- |
| 13:07:00 | 17 | Q. Do we really have to do that? |
| 13:07:03 | 18 | A. In this particular case, extracted |
| 13:07:04 | 19 | from the other body of deeds of conveyance that I |
| 13:07:08 | 20 | have looked at, this particular one does not use |
| 13:07:10 | 21 | the word "appurtenances." There is some parallel |
| 13:07:15 | 22 | language usage, but the word "appurtenance" is not |
| 13:07:18 | 23 | on this document. |
| 13:07:19 | 24 | Q. And it would be inappropriate to pull |
| 13:07:22 | 25 | out one document from a series, would it not? |

149

**Fisher**

**(Continued on following page.)**

| | | |
|---|---|---|
| 13:07:22 | 2 | |
| | 3 | |
| | 4 | |
| | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

38  (Pages 146 to 149)

150

Fisher

13:07:25  2    A. If that's what had happened, that
13:07:27  3    would be inappropriate. In fact, the Caroline
13:07:31  4    Cohen letter was in a series that I received that
13:07:37  5    included other deeds of conveyance that did use the
13:07:40  6    word "appurtenances."
13:07:42  7        MR. WAGNER: I thank you for your
13:07:44  8    patience. Let's take a break. During the
13:07:54  9    break, I think just to save time, if you
13:07:56  10   could go through your references and just
13:08:01  11   flag for me one ones touch on Judaism and
13:08:04  12   Jewish history, that would save some time
13:08:06  13   for you. Thank you.
13:08:38  14       (Luncheon recess:  1:08 p.m.)
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25

151

13:08:38  2    A F T E R N O O N   S E S S I O N
13:08:47  3        (2:09 p.m.)
13:08:47  4    L I N F O R D   F I S H E R,  having been
13:08:47  5        previously sworn, resumed the stand and
13:08:49  6        testified further as follows:
13:33:07  7    EXAMINATION (Cont'd.)
13:33:08  8    BY MR. WAGNER:
14:08:35  9        Q. Hope you had a good lunch. Can you
14:08:53  10   name some experts or authorities on the historical
14:08:56  11   method?
14:08:57  12       A. Well, one extract from what we
14:09:09  13   assigned to graduate students at Brown is from
14:09:17  14   Peter Novak, "The Noble Dream," which addresses the
14:09:25  15   question of objectivity in historical methodology.
14:09:31  16       There's a book -- I'm sorry, how many
14:09:42  17   did you want?
14:09:43  18       Q. Give me two or three.
14:09:44  19       A. Two or three. I mean, in our methods
14:09:58  20   and theory class, we often read some of the major
14:10:02  21   theorists on, sort, of religion in America, which
14:10:04  22   touches on religious interpretation methodologies
14:10:10  23   so, even the Brits like Max Weber and some of the
14:10:16  24   classics in the field like that. Michael Fuco, and
14:10:19  25   others.

152

Fisher

14:10:22  2        Q. If I wanted to, if I wanted to go to,
14:10:26  3    you know, the best or among the best sources to
14:10:28  4    learn what the historical method is, aside from The
14:10:34  5    Noble Dream, where else would I go?
14:10:41  6        A. A lot of our -- there are, I -- a lot
14:10:47  7    of what we do in teaching discipline of history is
14:10:52  8    through actually doing it, and by reading works in
14:10:57  9    the field that sort of represent the broad span of
14:11:04  10   the historical profession and -- and methodology at
14:11:09  11   a certain level.
14:11:12  12       So students learn this primarily not
14:11:14  13   by reading a textbook that tells them how to do it,
14:11:18  14   but by simply reading and learning from historians
14:11:21  15   who are doing it actively.
14:11:23  16       Q. Okay. But if you were to recommend a
14:11:26  17   book to me, I'm not at Brown, unfortunately --
14:11:29  18       A. Right.
14:11:29  19       Q. -- what would you recommend besides
14:11:31  20   the Noble book?
14:11:32  21       A. I would point you towards books in the
14:11:34  22   field that exhibit the kind of methodology that I
14:11:36  23   think are resident with the kind of work that I
14:11:41  24   wouldn't recommend. So one book like this in my
14:11:44  25   field of American religion is called Lived Religion

153

Fisher

14:11:48  2    in America, and it is a sort of theoretical
14:11:51  3    methodological book that does what I'm talking
14:11:53  4    about. It has an essay at the beginning that opens
14:11:58  5    up this theoretical framework of lived religion,
14:12:05  6    and then has essays that demonstrate the practice
14:12:08  7    of lived religion.
14:12:10  8        Q. Are you able to cite any authorities
14:12:12  9    on American Jewish history that have a description
14:12:14  10   of the historical method?
14:12:19  11       A. I would need more time to consider
14:12:20  12   that question, and to...
14:12:23  13       Q. Now, you, when I asked you questions
14:12:28  14   about your opinion with respect to rimmonim as
14:12:31  15   essential, necessary and required, and I think you
14:12:34  16   said you didn't look at any sources of Jewish law,
14:12:36  17   is that correct?
14:12:40  18       A. It depends what you mean by "sources
14:12:42  19   of Jewish law."
14:12:43  20       Q. Have you looked at any sources of
14:12:45  21   Jewish law to determine whether rimmonim are
14:12:46  22   necessary, essential or required for a service?
14:12:58  23       A. I do not recall consulting
14:12:59  24   specifically a textbook that purported to be on the
14:13:06  25   finer points of Jewish law. But I, as is often

39  (Pages 150 to 153)

## 154

Fisher

14:13:12  2   common in the field of history, relied upon other
14:13:15  3   historians and secondary sources as well as read
14:13:19  4   primary source material to place this in the
14:13:23  5   context.
14:13:23  6       Q. But no books that are specifically
14:13:25  7   devoted to Jewish law, correct?
14:13:54  8       A. I mean, I cite dictionaries, several
14:13:56  9   works of reference that include within them
14:14:00 10   elements of Jewish religion, which one presumes
14:14:04 11   would deal with Jewish law.
14:14:05 12       Q. But a dictionary is not a source of
14:14:07 13   Jewish law, is it?
14:14:08 14       A. It's an analysis of some of the kinds
14:14:11 15   of ritual questions that would pertain to Jewish
14:14:14 16   law.
14:14:15 17       Q. But is a dictionary a source of Jewish
14:14:19 18   law, in your view?
14:14:27 19       A. It depends what kind of dictionary;
14:14:29 20   but a dictionary, generally speaking, would contain
14:14:33 21   secondary analyses of items pertaining to Jewish
14:14:36 22   law.
14:14:37 23       Q. Can you name any authorities on Jewish
14:14:39 24   law?
14:15:01 25       A. Sitting here today, I cannot recall

## 155

Fisher

14:15:05  2   any authorities on Jewish law, nor was I
14:15:09  3   necessarily brought in to this case to primarily
14:15:17  4   demonstrate that particular point.
14:15:20  5       Q. Are you an expert on Jewish law?
14:15:22  6       A. The realm of Jewish law is not
14:15:45  7   something that I primarily spend time working on in
14:15:49  8   my career. But I as a historian routinely have to
14:15:51  9   deal with documents and other kinds of evidence
14:15:54 10   that might pertain to not only Jewish law, but also
14:15:58 11   to other American religions.
14:15:59 12       Q. But are you an expert on Jewish law?
14:16:01 13       A. My work so far has not primarily been
14:16:12 14   located --
14:16:13 15       Q. And I'm right that nobody comes to you
14:16:15 16   to consult with you about the ins and outs of
14:16:20 17   Jewish law, do they?
14:16:21 18       A. For this particular case, I was
14:16:24 19   brought on to understand the wider context within
14:16:28 20   which questions about Jewish law were taking place.
14:16:30 21       Q. Not my question. Has anyone come to
14:16:33 22   you for advice about Jewish law?
14:16:36 23       A. Again, Jewish law is not something
14:16:48 24   where I've located myself at work. And yet,
14:16:52 25   there's a broader context and interpretation of

## 156

Fisher

14:16:54  2   documents that might touch on it or pertain to it.
14:16:58  3       Q. Sir, I can't make my questions any
14:17:02  4   simpler. Has anyone come to you to consult about
14:17:07  5   Jewish law?
14:17:08  6       A. Prior to this --
14:17:09  7       Q. Yes.
14:17:11  8       A. -- in -- not even in this case, but in
14:17:13  9   my recollection sitting here, I cannot recall
14:17:17 10   someone coming to me.
14:17:19 11       Q. Okay. And am I right that you're not
14:17:27 12   qualified to opine on issues of Jewish law?
14:17:36 13       A. The skills that I bring to these
14:17:38 14   questions tie into my expertise in the general
14:17:45 15   history of religion in America, and I bring to bear
14:17:48 16   on the kinds of documents that have been involved
14:17:50 17   in this case, which are touching upon issues or
14:17:52 18   questions perhaps of Jewish law, are relevant to
14:17:56 19   the work I do as a historian.
14:17:57 20       Q. Okay. Are you qualified to opine as
14:18:01 21   to whether rimmonim are required in a service as a
14:18:03 22   matter of Jewish law?
14:18:11 23       A. Again, the report is based upon my
14:18:13 24   reading of the sources and leaning upon the
14:18:16 25   secondary analysis of other historians.

## 157

Fisher

14:18:19  2       Q. Do you mean to tell me you are
14:18:21  3   qualified to opine on that issue?
14:18:24  4       A. As a historian, I read documents and
14:18:26  5   try to represent actions and items that happened in
14:18:30  6   the past as assessed by other people and my reading
14:18:34  7   of the documents themselves.
14:18:35  8       Q. Have you read any original sources of
14:18:37  9   Jewish law concerning rimmonim?
14:18:40 10       A. It I guess depends how you want to
14:18:58 11   define it. But I have not sat down to specifically
14:19:07 12   read a single work devoted to the subject of Jewish
14:19:13 13   law.
14:19:13 14       Q. You, in your report, you discuss the
14:19:16 15   differences between Ashkenazic and Sephardic
14:19:19 16   services, do you recall that?
14:19:21 17       A. I do recall.
14:19:21 18       Q. What are the differences?
14:19:23 19       A. It would depend on what context you're
14:19:30 20   talking about, and who is under consideration.
14:19:34 21       Q. Give me any differences.
14:19:38 22       A. The languages used and perhaps --
14:19:48 23       Q. What language?
14:19:50 24       A. Strike that, yeah. There are general
14:19:55 25   cultural differences that meant a great deal to the

40 (Pages 154 to 157)

158

Fisher

4:20:00 | people as reflected in the documents that I was
4:20:02 | relying upon.
4:20:03 | Q. Just tell me. Just, what are the
4:20:05 | differences?
4:20:08 | A. It comes down to the form of the
4:20:09 | liturgy, maybe the structure of the service. And
4:20:13 | again, this is reflecting kinds of things that I've
4:20:19 | seen in the documents.
4:20:21 | Q. Can you cite me one difference?
4:20:26 | A. I think I did. But --
4:20:28 | Q. Can you tell me a difference in the
4:20:30 | liturgy between an Ashkenazic service and a
4:20:34 | Sephardic service?
4:20:43 | A. Sitting here today, I cannot recall
4:20:49 | something concrete. But I can tell you that this
4:20:51 | was of great importance to the people who were --
4:20:56 | both at -- well, at CSI who were concerned with
4:21:00 | some of these cultural and ritual differences
4:21:03 | between these two branches of Judaism.
4:21:06 | Q. Do Ashkenazic and Sephardic celebrate
4:21:24 | different holidays?
4:21:41 | A. Certainly some of the holidays would
4:21:43 | be the same. Whether or not they celebrate
4:21:46 | separate or different ones may be the case. I

159

Fisher

4:21:50 | don't recall reading in the documents whether that
4:21:52 | was the case.
4:21:52 | Q. So you don't know any differences, do
4:21:54 | you?
4:21:56 | A. The differences were important enough
4:21:57 | for people to write in very animated ways about
4:22:04 | this in the 1890s.
4:22:06 | Q. You have -- not my question. You have
4:22:08 | a whole section of your report on the differences
4:22:11 | between Ashkenazic and Sephardic. And I'm
4:22:14 | wondering whether you can specify any of those
4:22:16 | differences.
4:22:17 | A. Let's look at that. Which page --
4:22:19 | Q. Fifteen. Can you identify any
4:22:34 | differences in holidays between Ashkenazic and
4:22:37 | Sephardic?
4:22:51 | A. I don't recall anything in the
4:22:52 | documents that would indicate differences in
4:22:55 | holidays.
4:22:55 | Q. Do you know whether they, Ashkenazic
4:22:59 | and Sephardic, say different prayers?
4:23:01 | A. I believe I've seen references to
4:23:04 | differences in the liturgy between the two.
4:23:07 | Q. And can you identify any of those

160

Fisher

4:23:09 | differences?
4:23:32 | A. Sitting here today, thinking about
4:23:33 | these documents I've looked at, nothing comes to
4:23:36 | mind regarding the specifics of those differences.
4:23:40 | Q. If you walked into a, let's say,
4:23:43 | no-name synagogue, would you know the difference
4:23:45 | between an Ashkenazic service and a Sephardic
4:23:47 | service?
4:23:49 | A. You're talking 1903 or the present?
4:23:51 | Q. 1903.
4:23:55 | A. 1903. I'd have to consider that
4:24:05 | further, I think. But again, people in this time
4:24:07 | period were very concerned about these differences.
4:24:10 | Q. I'm not interested in -- that's not my
4:24:13 | question. I didn't ask the question, "Dr. Fisher,
4:24:17 | were the people then concerned." I was asking
4:24:19 | whether, if you walked into a service in 1903,
4:24:23 | would you know whether the service is Ashkenazic or
4:24:27 | Sephardic?
4:24:32 | A. I hadn't fully considered that
4:24:34 | question when I was writing the report, I --
4:24:37 | Q. I'm just asking the question. Would
4:24:39 | you know the difference?
4:24:48 | A. Sitting here today, thinking about

161

Fisher

4:24:50 | that question, it's possible that I, without
4:24:55 | looking to -- further, would not be entirely sure.
4:24:58 | Q. You've never even been to a Sephardic
4:25:01 | service in your life, have you?
4:25:04 | A. No, I have not.
4:25:05 | Q. Well, the service at Brown, was it
4:25:07 | Sephardic or Ashkenaz, do you know?
4:25:21 | A. I don't recall what my students told
4:25:22 | me going into it. I do know that it was a liberal
4:25:29 | version of what often takes place, as you might
4:25:33 | expect in a place like Brown.
4:25:34 | Q. If it's liberal, it must have been
4:25:37 | Sephardic.
4:25:37 | A. I would guess actually the opposite,
4:25:39 | that it must have been Ashkenaz.
4:25:41 | Q. Okay. Did CSI and Touro Synagogue
4:25:52 | recognize the Myer Myers rimmonim as something
4:25:55 | special?
4:25:57 | MR. SOLOMON: Object to the question.
4:25:59 | Unlimited as to time.
4:26:00 | MR. WAGNER: At any time.
4:26:05 | A. Can we talk about specific times?
4:26:07 | Q. Let's talk the 1800s. Do you know
4:26:12 | whether they were recognized as something special?

41 (Pages 158 to 161)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

162

Fisher

| | | |
|---|---|---|
| 14:26:26 | 2 | A. "Special" is a pretty broad term. |
| 14:26:28 | 3 | There are indications that they were aware of the |
| 14:26:30 | 4 | maker of not just the Myer Myers but other kinds of |
| 14:26:35 | 5 | pieces of silver. |
| 14:26:39 | 6 | But I think it's fair to say that the |
| 14:26:45 | 7 | documents are not always clear as to when greater |
| 14:26:51 | 8 | weight was given to the Myer Myers rimmonim. There |
| 14:26:55 | 9 | was a concern for ritual objects more broadly in |
| 14:26:59 | 10 | this time period. |
| 14:27:00 | 11 | Q. Well, are you aware of any documents |
| 14:27:02 | 12 | that singled out, during this period, the 1800s, in |
| 14:27:07 | 13 | which the parties singled out the Myer Myers |
| 14:27:10 | 14 | rimmonim? |
| 14:27:10 | 15 | A. Well, the inventory of 1869 from CSI |
| 14:27:14 | 16 | is certainly one such time that takes place. |
| 14:27:20 | 17 | Q. Anything else? |
| 14:27:22 | 18 | A. Um -- |
| 14:27:48 | 19 | (Witness perusing documents.) |
| 14:29:11 | 20 | A. Sorry, so I'm trying to find in my |
| 14:29:13 | 21 | report where I talk about the Caroline Cohen |
| 14:29:16 | 22 | donation to CSI that ended up at CJI. And I seem |
| 14:29:20 | 23 | to recall that she may have mentioned that they |
| 14:29:22 | 24 | were Myer Myers, but without the document in front |
| 14:29:24 | 25 | of me I can't be sure. |

163

Fisher

| | | |
|---|---|---|
| 14:29:25 | 2 | Q. Okay. I think we agreed that in that |
| 14:29:29 | 3 | inventory -- |
| 14:29:30 | 4 | A. Sure. |
| 14:29:31 | 5 | Q. -- there was a reference. |
| 14:29:32 | 6 | A. Right. |
| 14:29:32 | 7 | MR. WAGNER: Let me mark the |
| 14:29:34 | 8 | inventory. |
| 14:29:35 | 9 | (Fisher Exhibit 17, multipage |
| 14:29:35 | 10 | handwritten inventory, Bates numbered |
| 14:29:35 | 11 | CSI4921 through 4960, marked for |
| 14:30:00 | 12 | identification, as of this date.) |
| 14:30:00 | 13 | Q. This is the inventory you referenced. |
| 14:30:02 | 14 | Now, it says, "Inventory of all property effects |
| 14:30:05 | 15 | belonging to or in keeping of Kehillat Kodesh |
| 14:30:12 | 16 | Shearith Israel." |
| 14:30:14 | 17 | Do you see that? |
| 14:30:14 | 18 | A. I do. |
| 14:30:15 | 19 | Q. By the way, are you able to read |
| 14:30:17 | 20 | Hebrew like that? |
| 14:30:18 | 21 | A. It's been a long time. |
| 14:30:19 | 22 | Q. For me, too. Now, what do the words |
| 14:30:22 | 23 | "belonging to" mean to you here? |
| 14:30:40 | 24 | A. I have not fully considered that |
| 14:30:41 | 25 | question necessarily in this phrase right here. |

164

Fisher

| | | |
|---|---|---|
| 14:30:43 | 2 | But it would appear to indicate some sort of |
| 14:30:48 | 3 | ownership, I think. |
| 14:30:48 | 4 | Q. So when CSI uses the words "belonging |
| 14:30:55 | 5 | to," is it your understanding that that generally |
| 14:30:58 | 6 | means ownership? |
| 14:30:59 | 7 | A. It depends on the context. And how |
| 14:31:02 | 8 | it's used -- |
| 14:31:03 | 9 | Q. But here, certainly they are using it |
| 14:31:05 | 10 | as ownership, right? |
| 14:31:06 | 11 | A. Again, it depends on the purpose of |
| 14:31:08 | 12 | this inventory, kind of what is intended by it, who |
| 14:31:11 | 13 | it's for. |
| 14:31:12 | 14 | Q. Well, do you interpret the inventory |
| 14:31:13 | 15 | as CSI claiming, or stating that it owns the |
| 14:31:18 | 16 | rimmonim? |
| 14:31:36 | 17 | A. Context is important, so the second |
| 14:31:38 | 18 | page of this document and -- it does talk about it, |
| 14:31:44 | 19 | complete inventory of all the property and effects |
| 14:31:46 | 20 | belonging to the congregation, or in its keeping, |
| 14:31:49 | 21 | which seems to -- would elaborate from the first |
| 14:31:54 | 22 | page of that document you've given me. |
| 14:31:57 | 23 | Q. Okay. But just, is it your |
| 14:31:59 | 24 | understanding that CSI, by using the words |
| 14:32:03 | 25 | "belonging to" in this document, meant to indicate |

165

Fisher

| | | |
|---|---|---|
| 14:32:06 | 2 | ownership, or not? |
| 14:32:09 | 3 | A. It is possible that that was the |
| 14:32:10 | 4 | overall intended of -- effect of the use of those |
| 14:32:14 | 5 | words. But again, I think that even documents that |
| 14:32:17 | 6 | are labeled and titled in certain ways, you have to |
| 14:32:21 | 7 | look precisely within it to know more about what |
| 14:32:24 | 8 | we're talking about. |
| 14:32:24 | 9 | Q. Can you look at page 42 of your |
| 14:32:55 | 10 | report. You say in the middle of the page, this is |
| 14:33:07 | 11 | your discussion of this document, you say, |
| 14:33:11 | 12 | "Additionally, these rimmonim are not noted in the |
| 14:33:13 | 13 | margins of the 1869 inventory as being the property |
| 14:33:16 | 14 | of anyone else or any other institution. This |
| 14:33:19 | 15 | confirms that they are the property of CSI," etc. |
| 14:33:23 | 16 | Do you see that? |
| 14:33:24 | 17 | A. I do see that. |
| 14:33:25 | 18 | Q. So you do conclude based on this |
| 14:33:27 | 19 | document that CSI owns the rimmonim, correct? |
| 14:33:29 | 20 | MR. SOLOMON: Objection, misstates the |
| 14:33:30 | 21 | document. |
| 14:33:30 | 22 | Q. You can answer. |
| 14:33:49 | 23 | A. What this statement shows on page 42 |
| 14:33:51 | 24 | is not necessarily pronouncement about the title of |
| 14:33:54 | 25 | this entire inventory. It is my assessment of |

42 (Pages 162 to 165)

166

| | | |
|---|---|---|
| | 1 | Fisher |
| 14:33:59 | 2 | reading the particular page of the inventory. |
| 14:34:02 | 3 | Q. Well, does the reference to "belonging |
| 14:34:04 | 4 | to" on the cover page mean anything to you? |
| 14:34:15 | 5 | A. Generally, again, without -- while |
| 14:34:19 | 6 | allowing for exceptions within the document itself, |
| 14:34:22 | 7 | that one would expect that "belonging to" might |
| 14:34:25 | 8 | indicate ownership within the context. |
| 14:34:28 | 9 | Q. Now, this is a statement by CSI that |
| 14:34:31 | 10 | it owns the rimmonim, correct? |
| 14:34:32 | 11 | A. That's what this document purports to |
| 14:34:35 | 12 | be yes. |
| 14:34:36 | 13 | Q. Do you have any evidence that CJI or |
| 14:34:39 | 14 | anyone at Touro Synagogue saw this inventory? |
| 14:34:42 | 15 | A. Well, there wasn't a CJI. |
| 14:34:46 | 16 | Q. Any, CYI, CJI, anyone at Touro see |
| 14:34:52 | 17 | this, any indication? |
| 14:34:53 | 18 | A. There was one at Touro who was |
| 14:34:54 | 19 | actually using it so he would have seen it -- |
| 14:34:55 | 20 | Q. Is that another way of saying that you |
| 14:34:57 | 21 | don't know of anyone at any point in time who has |
| 14:35:01 | 22 | seen this other than in the context of this |
| 14:35:02 | 23 | litigation? |
| 14:35:04 | 24 | A. As an internal, what seems to be |
| 14:35:07 | 25 | internal but I could be wrong, of course, as a |

167

| | | |
|---|---|---|
| | 1 | Fisher |
| 14:35:12 | 2 | inventory that was at least prompted internally by |
| 14:35:16 | 3 | CSI, I have not, to my recollection, seen anything |
| 14:35:20 | 4 | that would indicate that, A, there were -- there |
| 14:35:23 | 5 | was anyone to look at it in 1869 at the Touro |
| 14:35:30 | 6 | Synagogue, and B, I do not recall it referenced by |
| 14:35:34 | 7 | any of the later congregations who came to occupy |
| 14:35:38 | 8 | Touro Synagogue. |
| 14:35:38 | 9 | Q. Do you know who Rambam is? |
| 14:35:44 | 10 | A. At's another name for Maimonides. |
| 14:35:46 | 11 | Q. Yes. Are you an expert on Rambam? |
| 14:35:58 | 12 | A. Generally, my expertise does not date |
| 14:36:07 | 13 | back to the medieval period. And I have not |
| 14:36:18 | 14 | usually considered myself an expert on Maimonides. |
| 14:36:21 | 15 | Q. Well, you said "usually." Have you |
| 14:36:23 | 16 | ever considered yourself an expert on Maimonides? |
| 14:36:26 | 17 | A. One does not need to be an expert to |
| 14:36:28 | 18 | use or cite or quote from. |
| 14:36:30 | 19 | Q. That's not my question. Have you ever |
| 14:36:33 | 20 | considered yourself to be an expert on Maimonides? |
| 14:36:37 | 21 | A. To my recollection, I have never |
| 14:36:41 | 22 | suggested that I am an expert on Maimonides. |
| 14:36:46 | 23 | Q. Now, is it your opinion that most of |
| 14:37:09 | 24 | the ritual items at the Newport synagogue in 1818 |
| 14:37:12 | 25 | were loans from CSI to CYI? |

168

| | | |
|---|---|---|
| | 1 | Fisher |
| 14:37:20 | 2 | A. The items are not all the same. Some |
| 14:37:23 | 3 | of them -- some books of the law I have in my |
| 14:37:27 | 4 | report, there's a listing of the particular items |
| 14:37:30 | 5 | that CSI sent and donated to CJI, the original CYI |
| 14:37:44 | 6 | in the 18th century. |
| 14:37:49 | 7 | So the items that were specifically |
| 14:37:52 | 8 | sent up by CSI to CYI, I presume were part of that. |
| 14:38:00 | 9 | From some of the sources I've read, as I can recall |
| 14:38:04 | 10 | sitting here, there were other items that were |
| 14:38:08 | 11 | possibly not from CSI originally, two books of the |
| 14:38:17 | 12 | law, for example, that were given to CYI from |
| 14:38:20 | 13 | elsewhere. |
| 14:38:20 | 14 | Q. And we see that in the Ezra Stiles -- |
| 14:38:24 | 15 | A. That also went down to CSI. |
| 14:38:28 | 16 | Q. Can you turn to page 43 of your |
| 14:38:30 | 17 | report. |
| 14:38:30 | 18 | A. Yes. |
| 14:38:30 | 19 | Q. You see the first full sentence you |
| 14:38:39 | 20 | say, "It is clear from these definitions, the |
| 14:38:42 | 21 | documents in the 1820s and the actions of CSI, that |
| 14:38:46 | 22 | the ritual objects were not simply sent to CSI in |
| 14:38:49 | 23 | New York for safe storage; they were returned, were |
| 14:38:54 | 24 | sent to CSI because the objects had mostly come |
| 14:38:56 | 25 | from CSI in the first place as loans to CYI." |

169

| | | |
|---|---|---|
| | 1 | Fisher |
| 14:39:00 | 2 | Do you see that? |
| 14:39:01 | 3 | A. I do. |
| 14:39:02 | 4 | Q. What items were loaned to CYI by CSI? |
| 14:39:10 | 5 | A. Well, there were at least two -- |
| 14:39:13 | 6 | Q. Well -- I'm sorry, go ahead. |
| 14:39:17 | 7 | A. As I recall from the documents, there |
| 14:39:21 | 8 | were at least two books of the law and then, as I |
| 14:39:26 | 9 | said, there were other items which, if you want me |
| 14:39:29 | 10 | to find them, I can find them in the report, that |
| 14:39:32 | 11 | were sent down as well. |
| 14:39:34 | 12 | Page 6 of my report, I say that the |
| 14:39:40 | 13 | Newport congregation solicited and received gifts, |
| 14:39:47 | 14 | including 149 pounds in English money, perpetual |
| 14:39:52 | 15 | lamp, some brass candlesticks and candle wax from |
| 14:39:56 | 16 | CSI in New York, which also loaned at least two |
| 14:39:59 | 17 | Torah scrolls. |
| 14:40:00 | 18 | Q. So is there anything beyond the two |
| 14:40:02 | 19 | Torah scrolls that CSI loaned to CYI? |
| 14:40:16 | 20 | A. From what I've seen in 1763, this |
| 14:40:19 | 21 | seems to be what is often understood to have come |
| 14:40:24 | 22 | from CSI. |
| 14:40:25 | 23 | Q. As gifts or as loans? |
| 14:40:41 | 24 | A. The record is not always clear on gift |
| 14:40:49 | 25 | versus loan, at least not in some cases. The |

43 (Pages 166 to 169)

170

Fisher

14:40:53   2   language that I'm relying upon here seems to
14:40:59   3   specifically tag the two Torah scrolls as being
14:41:04   4   loaned.
14:41:04   5       Q. So for the Torah scrolls you cite one
14:41:09   6   original source, right? The 1759 minutes, right?
14:41:30   7       A. Yes. There's another one at the end,
14:41:33   8   January 11, 1818, the CSI trustee minutes, at least
14:41:40   9   two primary sources in that footnote.
14:41:42   10      Q. But here you only cite one, right?
14:41:44   11      A. It's the same footnote.
14:41:44   12      Q. But here you only cite one original
14:41:47   13   source.
14:41:47   14      A. I'm citing two.
14:41:49   15      MR. SOLOMON: You're wrong. He keeps
14:41:50   16   telling you that it's in the footnote.
14:41:52   17      Q. Now, the source, 1818, that was fifty
14:41:54   18   years later, right?
14:41:57   19      A. Roughly, yes.
14:41:58   20      Q. Any other proof, any other evidence
14:42:02   21   that any of the items listed, that you listed here
14:42:06   22   are loans?
14:42:54   23      A. I don't believe the documents that I
14:42:56   24   was looking at were entirely clear on the question.
14:42:59   25      Q. Did you look at the public record?

171

Fisher

14:43:15   2   Did you?
14:43:17   3      A. You have to say more. What public
14:43:19   4   record are you referring to?
14:43:21   5      Q. Publications of the American Jewish
14:43:25   6   Historical Society that reprint CSI's minutes.
14:43:30   7      A. I have to take a look at it. I --
14:43:32   8      Q. Have you ever heard of the American
14:43:35   9   Jewish Historical Society?
14:43:36   10      A. I've heard of the American Jewish
14:43:40   11   Historical Society. But until I see the document
14:43:41   12   you just passed out, I don't know if it's something
14:43:44   13   I've consulted or would be relevant.
14:44:13   14      (Fisher Exhibit 18, title page and
14:44:13   15      pages 175 through 185 of a publication
14:44:13   16      of the American Jewish Historical
14:44:13   17      Society, Number 27, not Bates numbered,
14:44:13   18      marked for identification, as of this
14:44:16   19      date.)
14:44:16   20      Q. Have you looked at any publications of
14:44:19   21   the American Jewish Historical Society?
14:44:22   22      A. Are you asking me if I have looked at
14:44:27   23   any?
14:44:28   24      Q. Yes. Ever.
14:44:31   25      A. Surely I must have at some point.

172

Fisher

14:44:33   2      Q. Okay. Can you look at page 184 of
14:44:35   3   this document.
14:44:37   4      A. 184?
14:44:37   5      Q. Yes. Do you see it says a Tamid from
14:44:59   6   M. Samuel Judah, some candlesticks and the Tebah
14:45:02   7   from M. Samuel Hart, a hundred pounds of wax from
14:45:06   8   M. Haym Myers, do you see that?
14:45:09   9      A. I do see that.
14:45:10   10      Q. And those were all gifts from those
14:45:11   11   individuals, were they not?
14:45:13   12      A. I would need more time to consider the
14:45:15   13   full context of this document to see definitively
14:45:18   14   either way.
14:45:19   15      Q. You reference one Torah that was
14:45:22   16   loaned. Am I right that that Torah was itself
14:45:25   17   loaned to CSI from the congregation in Georgia?
14:45:29   18      A. It appears from the meeting minutes
14:45:38   19   that I cite on page 6, footnote 11, that at least
14:45:47   20   one of those particular scrolls that were loans in
14:45:51   21   and around 1759 were within the keeping of CSI and
14:45:57   22   they loaned them to Newport.
14:46:00   23      Q. Now, I don't want to spend too much
14:46:16   24   time on this. But you say, "Additional scrolls" --
14:46:22   25      MR. JACOBY: What page are you on?

173

Fisher

14:46:24   2      MR. WAGNER: Six.
14:46:25   3      MR. JACOBY: Six. Sorry.
14:46:26   4      Q. You say, "Additional -- it's on page
14:46:29   5   6 -- additional scrolls that were loaned to the
14:46:35   6   Newport congregation for their new synagogue
14:46:38   7   including scrolls from Jewish congregations in
14:46:41   8   London and Amsterdam," do you see that?
14:46:43   9      A. I do see that.
14:46:44   10      Q. Isn't it a fact that those were gifts
14:46:47   11   as well?
14:46:52   12      A. Without looking at the documents here,
14:46:59   13   I don't recall whether or not the language used was
14:47:02   14   one of loaning or one of giving. Although...
14:47:25   15      Q. Do you understand the difference
14:47:26   16   between loans and gifts?
14:47:28   17      A. It depends on the context.
14:47:30   18      Q. You're unable to answer that question
14:47:33   19   without knowing the context?
14:47:35   20      A. Context is everything.
14:47:36   21      Q. You think you're going to go into
14:47:39   22   court and I'm going to ask that question and you're
14:47:42   23   not going to answer it?
14:47:43   24      MR. SOLOMON: Sorry, what's your
14:47:44   25   question?

44  (Pages 170 to 173)

174

| | | |
|---|---|---|
| | 1 | Fisher |
| 14:47:45 | 2 | Q. You don't have to answer that. Can |
| 14:47:47 | 3 | you turn to page 7 of your report. First |
| 14:47:54 | 4 | paragraph, third line, you reference a "hazzan |
| 14:47:58 | 5 | (rabbi)." Who told you that a hazzan was a rabbi? |
| 14:48:02 | 6 | Where did you get that from? |
| 14:48:06 | 7 | A. I've seen it used in that way in some |
| 14:48:10 | 8 | of the documentation I looked at, as I recall. I'd |
| 14:48:12 | 9 | have to go back and double-check what I was looking |
| 14:48:15 | 10 | at. |
| 14:48:15 | 11 | Q. Are you aware that there were no |
| 14:48:17 | 12 | rabbis in the United States until the 1840s? |
| 14:48:20 | 13 | A. I would need to see documentation that |
| 14:48:29 | 14 | shows that and then consider that further before... |
| 14:48:33 | 15 | Q. But that's not something you know as a |
| 14:48:35 | 16 | matter of course in your studies, is it? |
| 14:48:36 | 17 | A. Again, I'd have to see the |
| 14:48:44 | 18 | documentation that would indicate that that was the |
| 14:48:46 | 19 | case. I -- it's -- sitting here today, it's |
| 14:48:51 | 20 | something that I have not seen evidence of either |
| 14:48:54 | 21 | way. |
| 14:48:54 | 22 | Q. You don't really know anything about |
| 14:48:56 | 23 | American Jewish history, do you? |
| 14:48:59 | 24 | MR. SOLOMON: Object to the form of |
| 14:49:00 | 25 | the question. |

175

| | | |
|---|---|---|
| | 1 | Fisher |
| 14:49:00 | 2 | Q. You can answer. Do you really know |
| 14:49:02 | 3 | anything about American Jewish history? |
| 14:49:08 | 4 | A. The history of American Judaism is |
| 14:49:10 | 5 | part of the wider scope of American religious |
| 14:49:14 | 6 | history in which I was trained and which I teach. |
| 14:49:19 | 7 | Q. What training do you specifically have |
| 14:49:23 | 8 | in American Jewish history? |
| 14:49:29 | 9 | A. American Jewish history is a part of |
| 14:49:35 | 10 | the wider scope of American religious history and |
| 14:49:38 | 11 | that's what I was trained in. As a part of that |
| 14:49:41 | 12 | training, I studied for field exams a while back. |
| 14:49:46 | 13 | Q. What year was that? |
| 14:49:50 | 14 | A. 2005. |
| 14:49:51 | 15 | Q. What percentage of the field exam |
| 14:49:53 | 16 | concerned American Jewish history? |
| 14:49:54 | 17 | A. I don't recall. |
| 14:49:55 | 18 | Q. Do you know what role, if any, CSI |
| 14:50:00 | 19 | played in the development of the Jewish Theological |
| 14:50:04 | 20 | Seminary? |
| 14:50:08 | 21 | MR. SOLOMON: Do you, when you asked |
| 14:50:10 | 22 | that question? |
| 14:50:10 | 23 | MR. WAGNER: Yes. |
| 14:50:12 | 24 | MR. SOLOMON: And before you prepared |
| 14:50:13 | 25 | for the deposition, something that |

176

| | | |
|---|---|---|
| | 1 | Fisher |
| 14:50:14 | 2 | everybody knows? |
| 14:50:15 | 3 | Q. Go ahead. |
| 14:50:17 | 4 | MR. SOLOMON: I can assure you, you're |
| 14:50:19 | 5 | going to answer that question at trial. |
| 14:50:21 | 6 | MR. WAGNER: As a matter of fact, I |
| 14:50:22 | 7 | did know. |
| 14:50:23 | 8 | Q. Can you answer that? |
| 14:50:50 | 9 | A. Sitting here today, I do not recall |
| 14:50:52 | 10 | what role CSI had in founding, if any, of the |
| 14:51:01 | 11 | Jewish Theological Seminary. |
| 14:51:02 | 12 | Q. Do you know how many Jews were in the |
| 14:51:04 | 13 | United States at the time of American independence? |
| 14:51:13 | 14 | A. The time of the American independence, |
| 14:51:17 | 15 | the numbers were not -- not great. |
| 14:51:21 | 16 | Q. Ten thousand? Five thousand? What's |
| 14:51:27 | 17 | the number? |
| 14:51:27 | 18 | A. I don't recall documentation that |
| 14:51:28 | 19 | would suggest a particular number. |
| 14:51:31 | 20 | Q. Give me a ballpark. |
| 14:51:31 | 21 | A. Sitting here today, I would have |
| 14:51:35 | 22 | estimated several thousand. |
| 14:52:32 | 23 | Q. Do you know whether the majority of |
| 14:52:34 | 24 | Jews in the Spanish-Portuguese Synagogue in 1764 |
| 14:52:39 | 25 | were Ashkenazic or Sephardic? |

177

| | | |
|---|---|---|
| | 1 | Fisher |
| 14:52:43 | 2 | A. This is which synagogue, again? I'm |
| 14:52:45 | 3 | sorry. |
| 14:52:45 | 4 | Q. Spanish-Portuguese. |
| 14:52:51 | 5 | A. I recall documentation that indicates |
| 14:52:52 | 6 | there were a good number of Ashkenazic Jews |
| 14:52:57 | 7 | present. I don't recall if it was a majority or |
| 14:52:59 | 8 | not. |
| 14:52:59 | 9 | Q. Do you know how many Jews were in New |
| 14:53:01 | 10 | York in the 1820s? |
| 14:53:02 | 11 | A. I do not recall reading or seeing any |
| 14:53:15 | 12 | documentation on -- |
| 14:53:16 | 13 | Q. Was it more than ten thousand? |
| 14:53:18 | 14 | A. I don't know. |
| 14:53:18 | 15 | Q. More than five thousand? |
| 14:53:20 | 16 | A. I don't recall seeing anything that |
| 14:53:22 | 17 | would indicate a number. |
| 14:53:23 | 18 | Q. Do you have any idea of the magnitude? |
| 14:53:25 | 19 | A. In 1820? |
| 14:53:27 | 20 | Q. Yes. |
| 14:53:29 | 21 | A. I do not recall. |
| 14:53:29 | 22 | Q. Do you have any estimate? |
| 14:53:33 | 23 | MR. SOLOMON: Asked and answered. |
| 14:53:33 | 24 | Q. You can answer. |
| 14:53:39 | 25 | A. I don't -- |

45 (Pages 174 to 177)

178

Fisher

14:53:40   2    Q. Do you know whether most were
14:53:41   3   Ashkenazic or most were Sephardic?
14:53:53   4    A. Sitting here today, I don't recall the
14:53:54   5   specifics of the demographic breakdown of American
14:53:57   6   Jews.
14:53:58   7    Q. Did you ever study that? Did you ever
14:54:12   8   study that issue?
14:54:14   9    A. I recall it was part of one of the
14:54:19  10   readings from my exams, and I'm sure it was in one
14:54:26  11   of the textbooks that I was assigned during my
14:54:31  12   classes, but on that particular point, I don't
14:54:33  13   recall the exact number.
14:54:33  14    Q. Have you ever done any study of the
14:54:37  15   demographics of American Jews, let's say, through
14:54:42  16   1903?
14:54:44  17    A. To date, my work has not been
14:54:54  18   primarily centered on the question of Jewish
14:54:56  19   population prior to 1903.
14:54:59  20    Q. On page 6, you say, this is the middle
14:55:56  21   paragraph, the last sentence, "By 1769, there were
14:56:00  22   six scrolls of the holy law in the Ark of the
14:56:03  23   synagogue, possibly each with its own set of
14:56:06  24   rimmonim or silver bells," do you see that?
14:56:08  25    A. I do see that.

179

Fisher

14:56:10   2    Q. Can you make an effort to try to trace
14:56:17   3   the custody of those Torahs, I think through the --
14:56:23   4   I mean, really through 1903, am I right? That's
14:56:26   5   one of the things you do in your report?
14:56:28   6    MR. SOLOMON: I object to the form.
14:56:29   7    Q. You can answer.
14:56:33   8    A. In this report, where there are --
14:56:36   9   where there's evidence as to the location and
14:56:40  10   possession of ritual objects, including scrolls of
14:56:45  11   the law, I've tried to highlight that without
14:56:49  12   intending to specifically always trace the exact
14:56:53  13   location of these six books of the law.
14:56:56  14    Q. At some point, let's say 1832, 1833,
14:57:02  15   and maybe earlier, scrolls were sent from Touro
14:57:08  16   Synagogue to CSI, right?
14:57:12  17    A. That is my understanding.
14:57:13  18    Q. Okay. And is it your understanding
14:57:18  19   that those scrolls -- is it your opinion that those
14:57:24  20   scrolls traveled with rimmonim such that whoever
14:57:30  21   had custody of the Torahs had custody of the
14:57:34  22   rimmonim?
14:57:42  23    A. The documentation is not always clear
14:57:44  24   on that question.
14:57:44  25    Q. So do you know one way or the other?

180

Fisher

14:57:58   2    A. Again, the documentation is not clear
14:58:00   3   on that question of whether or not the rimmonim
14:58:02   4   always traveled with the books of the law. Some
14:58:07   5   authors seem to think that would be the case.
14:58:19   6    Q. Okay. Can you look at footnote 19 in
14:58:52   7   your report. You note there the 1833 minutes,
14:59:03   8   "Which indicate that four seforim were deposited in
14:59:06   9   CSI's synagogue under CSI's charge," do you see
14:59:10  10   that?
14:59:10  11    A. I do.
14:59:11  12    Q. And do you know whether, is there any
14:59:15  13   evidence that those seforim -- actually, let me
14:59:23  14   take that back. By "seforim," do we understand
14:59:28  15   those to be scrolls?
14:59:32  16    A. Sitting here right now, I don't recall
14:59:34  17   what else was said about the four seforim in this
14:59:38  18   particular document. But one would imagine that
14:59:41  19   generally speaking, these might refer to scrolls,
14:59:47  20   if that is your question.
14:59:47  21    Q. Okay. And go back to page 43 of your
14:59:58  22   report. You say, at the top, the sentence we saw
15:00:06  23   before, "It is clear from these definitions, the
15:00:09  24   documents in the 1820s and the actions of CSI, that
15:00:12  25   the ritual objects were not simply sent to CSI in

181

Fisher

15:00:15   2   New York for safe storage. They were returned or
15:00:21   3   sent to CSI because the objects had mostly come
15:00:25   4   from CSI in the first place as loans to CYL."
15:00:29   5    And then, you go on to say, "In the
15:00:35   6   absence of a viable congregation in Newport, CSI
15:00:37   7   simply received much of what had been theirs in the
15:00:39   8   first place." And you cite those 1833 minutes and
15:00:42   9   the reference to four seforim.
15:00:45  10    You see that?
15:00:46  11    A. I do.
15:00:46  12    Q. So I'm just trying to understand, are
15:00:52  13   we supposed to -- is it your opinion that whatever
15:00:57  14   status the seforim had, the rimmonim had, too?
15:01:01  15    MR. SOLOMON: I think you're
15:01:03  16   misstating -- I think he was reading his
15:01:06  17   report. I object to the form.
15:01:08  18    MR. WAGNER: I probably am.
15:01:16  19    A. You want me to answer?
15:01:18  20    Q. Yes.
15:01:18  21    A. Can you restate it, please?
15:01:20  22    Q. Is it your opinion that whatever
15:01:22  23   status the Torahs had, the seforim had in terms of
15:01:26  24   being transferred and kept for safekeeping, the
15:01:29  25   rimmonim had, too?

46 (Pages 178 to 181)

---

182

Fisher

```
15:01:35   2    A. As I said, without looking back at
15:01:37   3  this particular document that I've cited here, and
15:01:41   4  without rereading that and considering it further,
15:01:51   5  it's not clear to me that the same status would be
15:01:56   6  ascribed to both -- your question is not entirely
15:02:00   7  clear. They are different items and different
15:02:03   8  objects. And the record is not entirely clear if
15:02:07   9  they always traveled together, at least in this
15:02:09  10  case.
15:02:09  11    Q. Would it be fair to say that what
15:02:13  12  happened to the rimmonim after the last Jews left
15:02:15  13  Newport in 1820 is not clear?
15:02:22  14    A. Well, what is clear is that at least
15:02:26  15  some of it ended up at CSI because it shows up on
15:02:29  16  the inventory.
15:02:30  17    Q. But my question is, is what happened
15:02:34  18  to the rimmonim after the last Jews left Newport
15:02:36  19  around 1820 not clear?
15:02:41  20    A. It's clear where they ended up
15:02:43  21  eventually.
15:02:43  22    Q. Is it fair to say the complete account
15:02:46  23  of where the rimmonim of the Newport congregation
15:02:48  24  have been since 1920 is not possible?
15:02:58  25    A. On this question, I think I would
```

---

183

Fisher

```
15:03:00   2  defer to the provenance report of Dr. Mann for a
15:03:05   3  more exhaustive testimony on that point.
15:03:07   4    Q. Is her report reliable, in your view?
15:03:16   5    A. From what I've seen of her use of
15:03:19   6  sources and her methodologies and her knowledge of
15:03:25   7  silver from this time period and Jewish religious
15:03:31   8  objects from this time period, nothing I have seen
15:03:33   9  would make me think that her report was not
15:03:39  10  reliable, although I don't have the qualifications
15:03:43  11  she does to speak on every point.
15:03:49  12    MR. WAGNER: Mark this as the next
15:03:50  13  exhibit.
15:03:51  14    (Fisher Exhibit 19, memo dated
15:03:51  15  7/18/12, Zachary Edinger to the Board of
15:03:51  16  Trustees of Congregation Shearith
15:03:51  17  Israel, Bates numbered CJI 000386
15:03:51  18  through 407, marked for identification,
15:04:06  19  as of this date.)
15:04:06  20    Q. Have you seen this document before?
15:04:49  21  I'm just interested in the numbering.
15:04:53  22    A. Right. I was making sure what else
15:04:55  23  was here as well. Because when you refer to "this
15:04:58  24  document," it's not clear what you refer to.
15:05:13  25    By the way, this document says the
```

---

184

Fisher

```
15:05:15   2  congregation's first hazzan was Isaac Touro. So
15:05:25   3  even CJI's own documentation refers to the hazzan
15:05:33   4  being at CJI.
15:05:35   5    MR. SOLOMON: Let me just note for the
15:05:36   6  record that the fact that this says CJI at
15:05:39   7  the bottom does not require the conclusion
15:05:41   8  that it's a CJI document.
15:05:44   9    THE WITNESS: Thank you.
15:05:45  10    Q. I just want to know whether you've
15:05:52  11  seen it.
15:06:24  12    A. It's possible that I've seen part of
15:06:26  13  it.
15:06:26  14    Q. This was not listed in your list of
15:06:29  15  documents you looked at.
15:06:31  16    A. It is actually listed.
15:06:32  17    Q. It is listed?
15:06:33  18    A. The first page.
15:06:34  19    Q. The first page?
15:06:42  20    A. If I'm understanding this, CJI 0386.
15:06:51  21    Q. So you did see this?
15:06:52  22    A. I saw at least the first page. I,
15:06:55  23  sitting here, cannot recall whether or not I looked
15:06:58  24  at or utilized the entirety of the memorandum.
15:07:01  25    Q. Okay. Can you look at page 390. And
```

---

185

Fisher

```
15:07:13   2  do you see at the bottom, the author says, he's
15:07:18   3  discussing 1833, "It is likely that the rimmonim
15:07:21   4  adorning the scrolls were brought to New York for
15:07:24   5  safekeeping at that time."
15:07:26   6    Do you see that? Do you see that?
15:07:35   7    A. No, I'm sorry, I don't.
15:07:36   8    Q. The last sentence on the page.
15:07:38   9    A. Yes, I see it.
15:07:38  10    Q. And do you have any basis to dispute
15:07:41  11  that?
15:07:43  12    MR. SOLOMON: I think he's already
15:07:45  13  told you three times.
15:07:48  14    Q. You can answer.
15:07:49  15    MR. SOLOMON: I object to the
15:07:50  16  repetition of the question, I object to
15:07:51  17  the form of the question. We are leaving
15:07:53  18  at 4 o'clock despite your repetition.
15:07:56  19    Q. You can answer.
15:08:02  20    A. I would need more time to consider
15:08:03  21  this document. This is --
15:08:05  22    Q. Can you turn to Exhibit F, page 405.
15:08:18  23  Now, there you discuss 1937 minutes of the CSI
15:08:23  24  board, do you see that?
15:08:25  25    MR. JACOBY: What page of the report
```

47 (Pages 182 to 185)

186

|  |  | Fisher |
|---|---|---|
| 15:08:27 | 2 | are you on? |
| 15:08:28 | 3 | MR. WAGNER: Forty-nine. |
| 15:08:31 | 4 | A. I'm confused. |
| 15:08:32 | 5 | MR. WAGNER: I'm sorry, let me strike |
| 15:08:33 | 6 | that. |
| 15:08:33 | 7 | Q. You see page 49 of your report? |
| 15:08:39 | 8 | A. I have page 49 of my report in front |
| 15:08:41 | 9 | of me, yes. |
| 15:08:41 | 10 | Q. And there you discuss CSI board |
| 15:08:44 | 11 | minutes from January 5, 1937. |
| 15:08:45 | 12 | A. Yes. |
| 15:08:46 | 13 | Q. And can you turn to page 405 of this |
| 15:08:49 | 14 | document. |
| 15:08:51 | 15 | A. Yes, I have it. |
| 15:08:52 | 16 | Q. And are those the minutes that you |
| 15:08:53 | 17 | reference? |
| 15:09:08 | 18 | A. This appears to be a copy of the |
| 15:09:09 | 19 | minutes that I referenced, yes. |
| 15:09:10 | 20 | Q. Now, you say in response, "CSI board |
| 15:09:20 | 21 | acted as owners. They deliberated about how to |
| 15:09:23 | 22 | intervene, etc. Options included lending them to a |
| 15:09:29 | 23 | museum as exhibits to preserve them, but CSI |
| 15:09:32 | 24 | realized, if they would remove the rimmonim for |
| 15:09:36 | 25 | such purposes, they would want or need to provide |

187

|  |  | Fisher |
|---|---|---|
| 15:09:39 | 2 | CJI with a replacement pair of bells," do you see |
| 15:09:42 | 3 | that? |
| 15:09:43 | 4 | MR. SOLOMON: Do you have a "realized |
| 15:09:48 | 5 | that," comma? |
| 15:09:51 | 6 | MR. WAGNER: "Realized that, if they |
| 15:09:52 | 7 | would." |
| 15:09:52 | 8 | Q. Do you see that? |
| 15:09:55 | 9 | A. I do see that. |
| 15:09:56 | 10 | Q. In what way did they act as owners? |
| 15:10:32 | 11 | A. In my interpretation of this document |
| 15:10:34 | 12 | and as I use it in this particular report, the very |
| 15:10:37 | 13 | active deliberating about stepping in and removing |
| 15:10:40 | 14 | them from a property or location seems to indicate |
| 15:10:46 | 15 | that there is an authority there that would be |
| 15:10:52 | 16 | related to ownership. |
| 15:10:55 | 17 | You can't step in and take something |
| 15:10:57 | 18 | which you don't have control over, and it would be |
| 15:11:00 | 19 | ridiculous to even think about stepping in and |
| 15:11:04 | 20 | taking over -- |
| 15:11:06 | 21 | Q. Well, but you note, as you note that |
| 15:11:09 | 22 | if they took them, they would want or need to |
| 15:11:11 | 23 | replace them. If they owned them, why would they |
| 15:11:14 | 24 | want or need to replace them? |
| 15:11:18 | 25 | A. Because they still want CJI to remain |

188

|  |  | Fisher |
|---|---|---|
| 15:11:21 | 2 | fully functional in their use of all of the scrolls |
| 15:11:25 | 3 | of the law that they have in terms of their ongoing |
| 15:11:30 | 4 | success as a congregation that is occupying Touro |
| 15:11:35 | 5 | Synagogue. CSI has a stake in -- seemingly had a |
| 15:11:39 | 6 | stake in their success. |
| 15:11:40 | 7 | Q. Didn't CSI recognize that if they took |
| 15:11:43 | 8 | those rimmonim, they would have to replace them? |
| 15:11:52 | 9 | A. It's not entirely clear to me that |
| 15:11:53 | 10 | that would be the case. But even if they would |
| 15:11:55 | 11 | have to, the "have" can be interpreted different |
| 15:11:59 | 12 | ways. |
| 15:12:00 | 13 | There's sort of a responsibility that |
| 15:12:04 | 14 | an owner might have as a legally recognized owner |
| 15:12:07 | 15 | of the property; and assuming for the moment, based |
| 15:12:12 | 16 | on this report and other elements of the case, that |
| 15:12:14 | 17 | that extends to the ritual objects within it, that |
| 15:12:17 | 18 | it would be unfair and unkind, so there's a moral |
| 15:12:26 | 19 | "have" that is also possibly a part of the |
| 15:12:30 | 20 | statement. |
| 15:12:32 | 21 | They would have wanted -- they wanted |
| 15:12:34 | 22 | to take care of CJI. |
| 15:12:35 | 23 | Q. Well, the words "want" don't appear in |
| 15:12:39 | 24 | the minutes, do they? That was your word, correct? |
| 15:12:42 | 25 | A. It is my understanding of the |

189

|  |  | Fisher |
|---|---|---|
| 15:12:48 | 2 | collaborative relationship between the two |
| 15:12:52 | 3 | congregations that CSI would be looking out for the |
| 15:12:55 | 4 | best interests of CJI. |
| 15:12:56 | 5 | Q. So based on your interpretation, you |
| 15:12:58 | 6 | changed "would have to," which is the language of |
| 15:13:01 | 7 | the resolution, to, "Would want or need to," is |
| 15:13:05 | 8 | that correct? |
| 15:13:05 | 9 | MR. SOLOMON: Changed? I object to |
| 15:13:06 | 10 | the form of the question. You're |
| 15:13:07 | 11 | misstating his report and the document. |
| 15:13:09 | 12 | Q. Did you make that change? |
| 15:13:13 | 13 | A. I did not make a change, because it's |
| 15:13:14 | 14 | not a direct quote. I'm not misquoting. I am |
| 15:13:17 | 15 | adding, as historians do, a greater understanding |
| 15:13:20 | 16 | of the context within which this document takes |
| 15:13:23 | 17 | place. |
| 15:13:23 | 18 | Q. Did you quote those words in your |
| 15:13:25 | 19 | report? "Would have to"? |
| 15:13:30 | 20 | MR. SOLOMON: I mean, the words "want" |
| 15:13:32 | 21 | or "need," or those in quotation marks? |
| 15:13:35 | 22 | MR. WAGNER: No, I'm asking whether he |
| 15:13:36 | 23 | quoted the words "would have to" in his |
| 15:13:40 | 24 | report in discussing this document. |
| 15:13:42 | 25 | A. On page 49, I do not appear to have |

48  (Pages 186 to 189)

## 190

```
              1                    Fisher
15:13:44      2    quoted that exact phrase, nor did I quote from
15:13:51      3    other parts of that document, nor do I quote from
15:13:53      4    every document.  One does not need to quote from it
15:13:56      5    to use it authoritatively.
15:13:58      6        Q.  Now, you say in the second-to-last
15:13:59      7    sentence, "Everyone involved understood."
15:14:02      8        Who is "everyone"?
15:14:17      9        A.  Well, several layers of meaning in
15:14:19     10    terms of "everyone."  First and foremost, everyone
15:14:21     11    on the board of trustees in CSI is one of the
15:14:24     12    primary points of reference.
15:14:25     13        Q.  Do you know what they were all
15:14:27     14    thinking?
15:14:32     15        A.  Oftentimes when we write about and
15:14:34     16    assess the past, you don't know what people are
15:14:36     17    thinking.  What you have is what they recorded and
15:14:38     18    left behind.  And based on this document, it
15:14:41     19    appears that this board of trustees believed
15:14:45     20    themselves to be in a position of authority to, if
15:14:49     21    necessary, step in and remove the rimmonim for, to
15:14:53     22    protect them and then, as a result, they would, as
15:14:56     23    I say here, want or need, because of their
15:14:58     24    relationship with CJI, to provide a replacement
15:15:01     25    set.
```

## 191

```
              1                    Fisher
15:15:02      2        Q.  Does the document say that no definite
15:15:08      3    actions were taken by the board?
15:15:09      4        A.  No definite action was taken by the
15:15:10      5    board, it says at the very end.
15:15:12      6        Q.  Does it say that?  Does it say that?
15:15:16      7        A.  That's what this document here says.
15:15:17      8        Q.  And have you seen any subsequent
15:15:18      9    action taken with respect to this issue?
15:15:27     10        A.  To date, I have seen no document that
15:15:31     11    leaned either way on whether or not they acted
15:15:33     12    based on this report that came back.
15:15:35     13        Q.  Have you ever seen board minutes
15:15:38     14    reporting that CSI told CJI anything about the
15:15:41     15    rimmonim during this period?
15:15:50     16        A.  Define "this period."  What period are
15:15:52     17    we talking --
15:15:53     18        Q.  The 1930s.
15:15:56     19        A.  The 1930s.  To my recollection, I have
15:15:59     20    not seen anything that indicates that the CSI board
15:16:04     21    was in active discussion with CJI.  That doesn't
15:16:07     22    mean it wasn't happening.
15:16:14     23        But I would say that this conversation
15:16:15     24    with the board of trustees took place within a
15:16:18     25    larger framework of a lease agreement that had been
```

## 192

```
              1                    Fisher
15:16:21      2    set up in 1903 that was certainly on the minds of
15:16:23      3    CJI and certainly on the minds, it would appear, of
15:16:27      4    CSI as well, as confirmed in later documentation
15:16:31      5    where CSI is listed as owners of the synagogue.
15:16:35      6        Q.  Have you seen any documents listing
15:16:37      7    CJI as the owner of the rimmonim?
15:16:40      8        A.  In what period?
15:16:41      9        Q.  Any period.
15:16:51     10        A.  So 1894, if ever.
15:16:59     11        (A pause in the proceedings.)
15:17:02     12        A.  What I have seen are multiple
15:17:04     13    references by CJI representatives, especially in
15:17:08     14    the 1890s, saying that they do not own them.
15:17:12     15        Q.  That's not my question.  My question
15:17:16     16    is, have you seen any documents listing CJI as the
15:17:19     17    owner of the rimmonim?
15:17:20     18        A.  I've not seen every document that
15:17:26     19    would be pertinent to that question.  But in my
15:17:28     20    recollection, I cannot recall sitting here right
15:17:35     21    now reading any document that specifically lists in
15:17:41     22    a clear, unambiguous way, CJI as the owner of the
15:17:46     23    rimmonim.  I mean, you say "rimmonim," you mean the
15:17:50     24    ones that are under dispute?
15:17:52     25        Q.  Have you seen any ambiguous documents
```

## 193

```
              1                    Fisher
15:17:54      2    as to ownership?
15:17:56      3        A.  I have seen documents that link the
15:18:03      4    rimmonim to the Touro Synagogue.  But to my
15:18:09      5    recollection, I have not necessarily seen
15:18:16      6    documentation that would even suggest ambiguous
15:18:22      7    ownership of CJI of the rimmonim.
15:18:25      8        Q.  Am I right that there are people who
15:18:31      9    equate Touro Synagogue with CJI?
15:18:35     10        A.  In which time period?
15:18:37     11        Q.  Any time period.
15:18:42     12        A.  It's possible that some people have
15:18:45     13    made that connection.
15:18:46     14        Q.  Let me --
15:18:52     15        A.  I wasn't done yet.
15:18:54     16        Q.  I'm sorry.
15:18:58     17        A.  I have not seen any valid authority
15:19:00     18    who understands the historical context specifically
15:19:10     19    link CJI with the Touro Synagogue.
15:19:16     20        Q.  You're not offering an opinion as to
15:19:19     21    whether CYI originally owned the rimmonim, are you?
15:19:38     22        Let me rephrase it.  I didn't see that
15:19:40     23    in your report.  Did I miss something?
15:19:49     24        A.  I was not asked to specifically weigh
15:19:51     25    in on that question.  And without rereading the
```

49 (Pages 190 to 193)

194

Fisher

15:19:55  2    specific sections of the report that would relate,
15:19:58  3    I don't recall, again, weighing in on that specific
15:20:01  4    question.
15:20:20  5         MR. WAGNER:  Let's mark the Barquist
15:20:22  6    piece.
15:20:23  7         (Fisher Exhibit 20, excerpt from
15:20:23  8    publication, Barquist, et al, "Myer
15:20:23  9    Myers, Jewish Silversmith in Colonial
15:20:23  10   New York, thirteen pages, not Bates
15:20:23  11   numbered, marked for identification, as
15:20:56  12   of this date.)
15:20:56  13   Q.  Okay.  Just, can you go to page 160.
15:21:06  14   In the upper right, it says, "However, it was not
15:21:11  15   until 1833 that the four Torahs (and presumably
15:21:16  16   their ornaments) were transferred to Shearith
15:21:22  17   Israel 'for safekeeping in our place of worship
15:21:24  18   until they should be required for the use of the
15:21:27  19   Newport shul.'"  Do you see that?
15:21:29  20        A.  I do, yes.
15:21:30  21        Q.  Do you have any basis to dispute that
15:21:34  22   Torahs were transferred with their ornaments at
15:21:36  23   that time?
15:21:37  24        MR. SOLOMON:  Asked and answered.  The
15:21:38  25   same discussion you had with him before.

195

Fisher

15:21:41  2    He's answered it about five times.
15:21:43  3    Q.  You can answer.
15:21:46  4         A.  I believe I've answered this before,
15:21:48  5    and I would need to go back to the 1833 minutes to
15:21:51  6    look a little more closely at the specific wording.
15:21:54  7         Q.  And you say on page 8 of your report,
15:22:11  8    the second-to-last sentence on the first paragraph,
15:22:15  9    "As the last remaining CYI members moved to New
15:22:18  10   York City, CSI naturally inherited legal oversight
15:22:23  11   of the religious scrolls and other ritual sacred
15:22:26  12   objects, as most of them had come from CSI in the
15:22:29  13   first place."
15:22:30  14   Do you see that?
15:22:31  15        A.  I do.
15:22:31  16        Q.  What do you mean by "naturally
15:22:34  17   inherited legal oversight"?
15:22:48  18        A.  I think the report answers this
15:22:50  19   question.  It essentially requires understanding of
15:22:57  20   the broader context of what brought CYI into being
15:23:01  21   in the first place, its close relationship with
15:23:04  22   CSI, the sort of connections in terms of families
15:23:08  23   between CSI and CYI, the return of some CYI
15:23:13  24   families or -- who used to attend CYI when it was
15:23:20  25   opened, back down to Newport in the early 19th

196

Fisher

15:23:25  2    century.
15:23:26  3         And so the connections were organic.
15:23:29  4         Q.  Is there any document reflecting a
15:23:32  5    formal transfer of legal oversight to CSI?
15:23:38  6         A.  There's a document that's referenced
15:23:40  7    in a letter in 1900 by H.P. Mendes to the mayor of
15:23:52  8    Newport and he refers to a letter that was sent to
15:23:57  9    CSI in 1818.
15:23:59  10        Q.  You haven't seen any original source
15:24:01  11   indicating a formal transfer of legal oversight at
15:24:04  12   that time, have you?
15:24:09  13        MR. SOLOMON:  Other than what he just
15:24:11  14   testified to?
15:24:13  15        A.  As I said, there's a reference to an
15:24:15  16   1818 letter in 1900.  There are other documents
15:24:23  17   from this time period, people who are living, were
15:24:28  18   living back then, who essentially state that people
15:24:33  19   understood the legal title to have transferred to
15:24:36  20   CSI.  Stephen Gould, who was CSI's requested
15:24:41  21   appointee within the Newport city government to
15:24:44  22   oversee the Touro -- the synagogue in Newport
15:24:50  23   wasn't called Touro back then -- writes in 1826,
15:24:55  24   essentially saying that it's understood by people
15:24:57  25   involved that the legal title was transferred to

197

Fisher

15:24:59  2    CSI.
15:24:59  3         Q.  Do you know what's involved in
15:25:01  4    transferring legal oversight?
15:25:02  5         MR. SOLOMON:  Had you finished?  Or --
15:25:05  6    I think you cut him off.
15:25:07  7         THE WITNESS:  Yeah, not quite.
15:25:09  8         A.  And there are other evidences about
15:25:11  9    how the City of Newport responds to CSI and works
15:25:15  10   with CSI.  And it also raises the question of where
15:25:18  11   else it would go.  There's nobody left in Newport
15:25:22  12   who is a part of CYI who could stand in that
15:25:26  13   position.  That's why this language of "naturally
15:25:30  14   inherited."  There's nowhere else to go.  The
15:25:33  15   synagogue is empty.
15:25:34  16        Q.  Do you know what is required to
15:25:35  17   transfer legal oversight of a building?
15:25:39  18        A.  It depends in which context, it
15:25:43  19   depends on what the situation is, and it depends on
15:25:48  20   a variety of factors.
15:25:49  21        Q.  So are you able to tell me what is
15:25:54  22   required as a legal matter to transfer legal
15:25:57  23   oversight of this building in 1818 to CSI?  Do you
15:26:02  24   know the requirements?
15:26:04  25        A.  Sitting here today, I do not have in

50  (Pages 194 to 197)