# EXHIBIT C

**Professor Linford D. Fisher - Addendum to Expert Report, January 15, 2015**
<u>CJI v. CSI, No. 12-822-M (D. R.I.)</u>

The questions and documents provided by counsel to CJI during my deposition do not alter my opinions or conclusions. At the same time, I would like to briefly comment on two of the new documents that CJI's counsel produced, Exhibits 9 and 12 to my Deposition (CSI 5412 and CSI 5415). These two documents are telegrams (undated as to year), which counsel for CJI represented as being from 1903. After looking at them more closely, particularly in conjunction with other documents, which I was not able to do in the midst of my deposition, I am convinced that they actually further confirm the conclusions in my written report (throughout I will rely on the representation of CJI's counsel that these date from 1903). In particular, these two telegrams demonstrate the extent to which considerations about the appurtenances of worship were part and parcel of the building itself, and were very much on the minds of CSI representatives as they drew up the lease and signed it, along with CJI. Assuming for the moment that these two telegrams are indeed from February 1903, they fit entirely into the unfolding of the events in the wake of the Judge Brown decision on January 3, 1903:

- On January 30, 1903, CJI leaders signed a statement agreeing "to admit and recognize without qualification the title and ownership of [the Trustees] of the Congregation Shearith Israel to the synagogue building, premises, and fixtures" (CSI 4533).
- On February 2, CJI called a special meeting and resolved to "surrender possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport to the said Trustees [from Congregation Shearith Israel], owners of the property, and to agree upon the terms and the provisions of a lease" between themselves and CJI (CJI 0471).
- Also on February 2, a lease was drawn, laying out the terms of the agreement – that lease included a reference to "appurtenances" (CSI 0027).
- On February 10, L. Napoleon Levy wrote to CSI counsel, W.P. Sheffield, requesting that "and paraphernalia belonging thereto" be added to the language of the lease. In case that was not possible, Levy said that CSI could "rely on the resolution passed by Jeshuat Israel or obtain another paper from them" (CSI 0014).
- That same day (February 10), representatives from CSI signed the lease in the presence of a notary in New York (CSI 0030).
- The next day, February 11, Mr. Steinberg of CSI wrote to H.P. Mendez (who was in Newport), noting "One sephar [sic] and Bells is now at Newport our property" (Exhibit 9, CSI 5412). This telegram is pretty nebulous, and since we are lacking the surrounding correspondence, it is difficult to know to which question precisely Steinberg is responding. But CSI's concern for the sepher and bells in the context of the lease is very clear.
- On February 12, Levy wrote to Mendez, "Possibly better postpone business until next week cannot find Sheffield" (CSI 5413). Someone, likely Mendez, then responded, in an undated correspondence, writing that Sheffield is in New York and will not return until Friday and, asking whether he should return to New York (CSI 5414).
- On February 18, shortly after 10:30 am, representatives from CSI met at the Touro Synagogue, where the interlined addition ("and paraphernalia belonging thereto") was agreed upon by representatives for CJI and signed in the presence of a notary at 11:04 am (CSI 0015; CSI 0031). At this time, Mendez reported that he went over the "personal

- property" with representatives of CJI (CSI 0015). At 1:24 pm of that same day, Levy sent a telegram from New York to Mendez, stating "Don't insist matter sepher and bells leave to your discretion" (Exhibit 12, CSI 5415).
- These documents all show that the sepher and bells were important, and CSI was taking every precaution to include them in the lease by confirming their inclusion in the property owned by CSI and being leased by CJI by adding the phrase "and paraphernalia belonging thereto" into the document. Levy's correspondences to Mendez on February 12 and 18 show CSI's desire to have legal representation during the lease signing. Levy and Mendez contemplated delaying the proceedings because Sheffield was not available in Rhode Island to oversee the drafting and signing of the lease – the addition of the terms was legal in nature (albeit confirmatory of the language already there), and CSI desired the presence of their legal representative. However, Levy suggested that Mendez not insist on the matter because, in his previous letter of February, he indicated that if the language could not be added, CSI could rely on the resolution of CJI or obtain another paper from CJI. But since this telegram came after the signing of the lease by CJI, it could not have had any bearing on the proceedings. And, unfortunately, the exchange is incomplete, so we cannot be sure what prompted the telegram from Levy. What we do know is that the sepher and rimonim were very much part of the conversation and consideration during the lengthy process of surrender of the premises and paraphernalia on January 30 and the final signing of the lease during the morning of February 18.

Furthermore, after further review of the documents, there are a few minor clarifications I would like to make regarding statements made in my report, as follows.

- P. 22, 3rd line from the top (and footnote 72): the letter from Eugene Schreier on June 15, 1893, is actually addressed to the widow of Abraham P. Mendez (not H.P. Mendez). The same is true for footnote 116 on page 33.
- P. 46, 6th line (in the body of the report) from the bottom: the line that reads: "The lease, which referred specifically to the synagogue 'and appurtenances,' was signed by CJI representatives on February 1, 1903" should be changed to: "The lease, which referred specifically to the synagogue 'and appurtenances,' was drawn up on or about February 2, 1903."
- Definition of Hazzan (Pp. 7, 18): counsel for CJI questioned my definition of Hazzan (rabbi), intimating that there were no rabbis in the United States until the 1840s. Some of the sources I looked at used "Hazzan" and "Rabbi" interchangeably, and Hazzanim often served as functional leaders of American synagogues in this time period. "Hazzan" was, at times in the eighteenth and nineteenth centuries, used to refer to the cantor, or lay worship leader. CJI's contention accords with my definition – I am informed that CSI, to this day, continues to call its Rabbi and spiritual leader "Hazzan." None of this affects my opinions or conclusions.
- Exhibit B: Discovery Materials: "CJI 0386" should be "CJI 0386-0407."
- Counsel for CJI wanted to engage in a debate about the relative importance of rimonim to a Sephardic synagogue. *See* Exhibit 3 marked at my deposition. There is no need for me to debate the point. Whether essential or merely important or desirable, rimonim are thought to be part and parcel of a fully functioning Sephardic synagogue. It is that aspect of them that CJI or others has repeatedly described. And it is that aspect, which (among

many other things) supports my view that the rimonim at the Touro synagogue, in 1903 and since, were not afterthoughts and would naturally have been included in the various terms used by the parties, as I address in my report.

Additionally, in response to Mr. Wagner's request during the deposition for publications and syllabi related to American Jewish history (followed afterwards by a written request), I spent between 1-2 hours perusing my publications and syllabi to comply with his requests, including communicating that information to counsel.

Dated:   Providence, Rhode Island
         January 15, 2015

_____
Linford D. Fisher