# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

CONGREGATION JESHUAT ISRAEL,

        Plaintiff,

v.

CONGREGATION SHEARITH ISRAEL,

        Defendant.

C.A. NO. 12-822-M (LDA)

## PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED
## EXPERT TESTIMONY OF DR. VIVIAN MANN

Plaintiff Congregation Jeshuat Israel ("Touro"), by its undersigned counsel, hereby moves to exclude the proposed expert testimony of Dr. Vivian Mann. As detailed in the accompanying Memorandum of Law, Dr. Mann's proposed testimony does not meet the standards of Fed. R. Evid. 702 in several ways: (1) Dr. Mann is not qualified to opine on the topics of her proposed testimony; (2) her proposed testimony improperly usurps the role of the trier of fact and the Court; and (3) her opinions are based on unreliable methodology.

Respectfully Submitted:

CONGREGATION JESHUAT ISRAEL,

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

*/s/ Steven E. Snow*
Steven E. Snow (#1774)
40 Westminster Street, Suite 1100
Providence, RI  02903
(401) 861-8200 / (401) 861-8210 FAX
ses@psh.com

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Gary P. Naftalis (admitted *pro hac vice*)
Jonathan M. Wagner (admitted *pro hac vice*)
Tobias B. Jacoby (admitted *pro hac vice*)
Daniel P. Schumeister (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9253 / (212) 715-9238 FAX
gnaftalis@kramerlevin.com
jwagner@kramerlevin.com
tjacoby@kramerlevin.com
dschumeister@kramerlevin.com

DATED: January 20, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of January, 2015, I caused a true copy of the within document to be delivered through the ECF system to all counsel of record.

*/s/ Steven E. Snow*

2422575_1/7804-2

- 2 -

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

CONGREGATION JESHUAT ISRAEL,

        Plaintiff,

v.

CONGREGATION SHEARITH ISRAEL,

        Defendant.

C.A. NO. 12-822-M (LDA)

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY OF DR. VIVIAN MANN

Plaintiff Congregation Jeshuat Israel ("Touro") respectfully submits this memorandum in support of its Motion to Exclude the Proposed Expert Testimony of Dr. Vivian Mann.

### Preliminary Statement

Under Fed. R. Evid. 702, an expert must utilize his or her specialized expertise to provide testimony that is helpful to the trier of fact. Here, however, all Dr. Mann has done is read documents largely selected by defendant CSI's counsel, assess and weigh that documentary evidence, decide which evidence was most persuasive in her view, and then make factual and even legal determinations. In this way, Dr. Mann seeks to usurp the role of the trier of fact and the Court. That is clearly barred by Fed. R. Evid. 702.

Dr. Mann's testimony should be excluded on other grounds as well. She has no experience in the law and concededly no expertise, yet she seeks to opine as to a legal conclusion – the ownership and control of the Rimonim at issue in this case. She purports to be able to opine as to the state-of-mind and understanding of people long-dead, a subject off-limits to experts. She claims to provide insightful analysis, but her analysis is based almost entirely on

documents selected by CSI's counsel.  And her most significant conclusions are unreliable, marred by serious logical errors and skewed, misleading quotations from documents.

For all or any one of these reasons, the Court should exclude Dr. Mann's testimony.

## I.    BACKGROUND

### A.    Issues of This Case

A central dispute in this case is the ownership of historic, centuries-old property: a pair of silver finial bells crafted in the 18th century by the renowned silversmith Myer Myers (the "Rimonim" or "Rimmonim"), and the building known as the Touro Synagogue.

Touro, a Jewish congregation residing in Touro Synagogue (Compl. ¶ 1), has possessed the Rimonim for more than a century (*id.* at 1), if not longer.  After reflection, and to secure its financial future and the future of Touro Synagogue as an open and active place of worship, in 2012 Touro decided to sell the Rimonim and place the proceeds in an irrevocable endowment fund.  (*Id.* ¶ 21).  Upon learning of the potential sale in June 2012 CSI objected, claiming that CSI owned the Rimonim.  (*Id.* ¶ 22).  This litigation ensued.

By its Complaint, Touro seeks among other things a declaratory judgment as to its ownership rights in the Rimonim, and an injunction against CSI interfering with a sale.  (*Id.* ¶¶ 23-28).  Alternatively, Touro seeks a declaratory judgment that if CSI owns the Rimonim, then (i) that ownership is in trust, (ii) CSI should be removed as trustee, and/or (iii) the Court should permit the sale.  (*Id.* ¶¶ 29-37).

CSI's Amended Answer and Counterclaim asks for a declaratory judgment attesting to its purported ownership of the Rimonim and Touro Synagogue (Am. Counterclaims ¶¶ 46-48, 58-60), and that any sale of the Rimonim would be contrary to the "ritual, rites, and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed by [CSI]" and thus unlawful.

(*Id.*).  CSI further claims that Touro has breached a purported lease and should therefore be removed as lessee of the Touro Synagogue and evicted.  (*Id.* ¶¶ 62-65).

CSI has submitted reports from two purported experts:  Professor Linford Fisher and Dr. Vivian Mann.  Touro received the reports on November 26, 2014 and deposed the witnesses on December 30 and 31, 2014.

### B.    Issues Addressed by Dr. Mann's Report

In her report (Exh. A at 3), Dr. Mann proposes to provide the following testimony:

- the Rimonim "have been and remain the personal property" of CSI.

- "The Minutes of the Board of Trustees of [CSI] and other documentary evidence demonstrate [CSI's] control and ownership of the Touro Synagogue in Newport and its appurtenances, including the Rimmonim at issue.  I have seen no evidence that, prior to CJI's attempt to sell the Rimmonim, either CSI or [Touro] was confused about the fact that CSI owned the Rimmonim."

- Touro's sale of the Rimonim "would not only be inconsistent with CSI's ownership of the Rimmonim but would also be so unprecedented that the sale would seriously undermine inter-congregational support and assistance, which has been indispensable to the sustenance of Jewish communal life for centuries including in America."

## II.    ARGUMENT

### A.    The Governing Standard: *Daubert* and Fed. R. Evid. 702

Under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993) and Federal Rule of Evidence 702, a proposed expert may testify "in the form of an opinion or otherwise" only if: (1) the witness "is qualified as an expert by knowledge, skill, experience, training or education," (2) the expert's knowledge is helpful to the trier of fact, (3) "the testimony is based

on sufficient facts or data," (4) "the testimony is the product of reliable principles and methods," and (5) "the expert has reliably applied those principles and methods to the facts of the case."

Rule 702 entrusts the District Court to play a critical "gatekeeping role" to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. "The burden of laying the proper foundation for admission of the expert testimony is on the proponent of the expert testimony, and its admissibility must be shown by a preponderance of the evidence." *Hartford Ins. Co. v. Gen. Elec. Co.*, 526 F. Supp. 2d 250, 252 (D.R.I. 2007). The standard for an expert testimony admissibility is "stringent." *Id.*

Just as it does in a jury trial, the district court must act as a gatekeeper during a bench trial. *See, e.g., Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013) ("In a bench trial or hearing without a jury, the district court judge acts as both gatekeeper and fact-finder. He must determine both whether expert evidence is admissible under Federal Rule of Evidence 702 and whether it is credible."); *CIT Group/Business Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 678 (S.D.N.Y. 2011) (excluding expert testimony in bench trial).

### B.    Dr. Mann Is Not Qualified

As a threshold matter, Dr. Mann lacks the necessary qualifications as an expert in this case.

"[A] district court acts properly by excluding opinions that are beyond the witness's expertise." *Levin v. Dalva Bros.*, 459 F.3d 68, 78 (1st Cir. 2006). To be qualified, experts must have specific expertise in the specific topic about which they propose to testify; expertise in the general field is not enough. *See, e.g., Beaudette v. Louisville Ladder Grp.*, 2005 WL 2573384, *2 (D.N.H. Oct. 7, 2005) (excluding expert who lacked required specific expertise; "The problem is not one of engineering expertise or experience, *per se*, but a lack of expertise and

experience with respect to the subject matter at issue – whether the failed ladder met the standard set out in paragraph 7.2 of ANSI A14.5."), *aff'd*, 462 F.3d 22 (1st Cir. 2006). And when, as here, proffered expertise is "non-scientific" in nature, "the qualifications of the expert will be of particular importance" because "in the nonscientific world, theories are often not subject to testing or experimentation." *Voilas v. Gen. Motors Corp.*, 73 F. Supp. 2d 452, 461 (D.N.J. 1999) (internal quotations omitted).

As Dr. Mann repeatedly emphasized at her deposition, "I'm not a historian." (Mann Tr. 54 (Exh. B)). Nor is she an expert in American Jewish history. (*Id.* at 26-27, 54-55). Rather, she is an *art* historian. She herself noted that the distinction is important:

> Art history is focused on a work or works that are connected. History is focused on documents primarily. Art historians examine the works, compare them to other works and then go on to documentation, to fill out the context of the piece.

(*Id.* at 50; *see also id.* at 70-72 (emphasizing her training and expertise as an art historian and not an historian)).

Appropriate as her object-first approach may be in her professional discipline, that methodology is inapposite for a litigation that turns on historical documents, including legal documents. According to Dr. Mann's own report, this is a case about documents; she cites more than 80 documents as "incorporated into" her report. (*See* Mann Report at Exh. B). With one exception – her opinion that the Newport Rimonim are not a true pair (*id.* at 14 n. 57) – Dr. Mann does not in her report rely on physical analysis of the disputed Rimonim to support her conclusions. *See Noriega-Sanchez v. Ford Motor Co.*, 2009 WL 2870643, *3 (D.P.R. Sept. 2, 2009) (disqualifying expert with nine years' experience as mechanical engineer and 22 years' experience as forensic engineer because he was not sufficiently qualified as to "belt wedge design and its connection to belt-to-belt tread separation in a Firestone FR480 steel-belted radial passenger tire").

Dr. Mann's background and experience are particularly inapt because to a significant degree this is a case about legal documents and the legal concepts expressed therein. The parties' pleadings have made clear from the start that certain wills, deeds, and other legal instruments are important to each side's respective position. (*See, e.g.*, Compl. ¶ 10 (citing 18th century "Will of Rivera"), ¶ 16 (1894 deeds of conveyance), ¶ 17 (1903 and 1908 leases), ¶ 18 (1945 tri-party agreement); Am. Counterclaim ¶ 2 (claiming Touro Synagogue is "leased" to Touro, and relying on specific language in the "governing documents" and the 1945 "formal agreement"), ¶ 23 (deeds), ¶ 27 (1903 and 1908 "lease agreements")).

Underscoring the importance of the legal ramifications of these documents, Dr. Mann herself in her report repeatedly cites legal documents and draws legal conclusions. She states that her Report "addresses principally the provenance of and ownership rights to two Torah finials . . . ." (Mann Report at 2). She opines that the Rimonim "have been and remain the personal property of" CSI. (*Id.* at 3). She concludes that "From all of the evidence cited above, Shearith Israel owns three pairs of Myer Myers rimmonim. . . ." (*Id.* at 14; *see also id.* at 4 ("Shearith Israel Owns Three Pairs of Finials Crafted by Myer Myers."); *id.* at 7 ("Shearith Israel Owns and Exercises Control Over the Touro Synagogue and its Contents and Appurtenances."). And there can be no dispute that the conclusions concerning ownership and control reached by Dr. Mann are legal conclusions. *In re Lane*, 937 F.2d 694, 698 n.7 (1st Cir. 1991) (describing the phrase "property of the plaintiffs [appellants]" as a "summary legal conclusion"). *See also McCormick v. Braverman*, 451 F.3d 382, 392 (6th Cir. 2006) ("Certainly, these independent claims may deny a legal conclusion of the state court, i.e., the Henry Ruff Property is the sole property of Edward's estate . . . ."); *Welsh v. The Big Ten Conference, Inc.*, 89 U.S.P.Q. 2d 2035,

2038 n.2 (N.D. Ill. 2008) ("As Big Ten points out, Welsh's argument as to ownership is not a fact but a legal conclusion that the court does not have to accept.").

Notwithstanding Dr. Mann's repeated conclusions in her Report concerning ownership and control, Dr. Mann admitted that she is not qualified to opine on those issues:

> Q.    Now, do you understand the concepts of ownership and control to be legal concepts?
>
> A.    I think the way they are used here, yes.
>
> Q.    And are you qualified to opine on ownership and control?
>
> A.    No.

(Mann Tr. 174).  In similar fashion, Dr. Mann admitted that she is not an expert at reading legal documents.  (*Id.* at 170-71).  She acknowledged that she is not an expert on property law.  (*Id.* at 57).  She averred that she has only ever read legal cases decided on the basis of Jewish law.  (*Id.* at 56-57).  She admitted that she cannot address questions of "legal relationships."  (*Id.* at 170).  She acknowledges that she is not an expert at reading leases or deeds (*id.* at 170, 193), and does not know the legal requirements for the transfer of title to real property.  (*Id.* at 188).  And she never before opined on an issue of disputed ownership.  (*Id.* at 56).

Against this backdrop, and in light of her own admissions, Dr. Mann is unqualified to provide expert testimony concerning ownership and control of the Rimonim.  *Beaudette*, 2005 WL 2573384, at *2.

**C.    Dr. Mann's Proposed Testimony Should Be Excluded Because She Improperly Attempts to Usurp the Role of the Court**

There is a second, independent reason why the Court should exclude Dr. Mann's proposed testimony:  all she has done is read documents, weigh the evidence, and draw conclusions, both factual and legal.  But that is the role of the trier of fact and the Court, not the expert.

1.    Dr. Mann Acts As a Partisan Advocate and Usurps the Role of the Court by Weighing the Evidence and Drawing Factual Conclusions

In assisting a trier of fact, the expert's role is limited to providing "information and explanations; the expert's role is not to be an advocate." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003) (excluding expert testimony), *aff'd*, 99 F. App'x 274 (2004). A party may not use experts to "argue the client's cause" rather than bring knowledge or expertise to bear on the issue. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 538 (S.D.N.Y. 2004). Experts similarly cannot only "lend their credentials and reputations to the party who calls them without bringing much if any relevant knowledge to bear on the facts actually at issue." *Id.* Nor is it the expert's job "to supplant the role of counsel in making argument at trial, and the role of the [fact-finder] in interpreting the evidence." *Primavera Familiestifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) (excluding expert testimony), *amended on reconsideration on other grounds*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001).

Furthermore, expert testimony interpreting documents is helpful to the trier of fact only when specialized knowledge or experience is needed for such interpretation. *See United States v. Zajanckauskas*, 441 F.3d 32, 39 (1st Cir. 2006) (quoting 29 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure* § 6264 (2005)) ("Expert testimony does not assist where [the trier of fact] has no need for an opinion because it can easily be derived from common sense, common experience, the [trier of fact's] own perceptions, or simple logic.").

Dr. Mann's proposed testimony is nothing more than a brief dressed up as an expert report. As Dr. Mann explained at deposition: "I built a case for the ownership by CSI." (Mann Tr. 241). And indeed, that is all that Dr. Mann does in her report. She assesses some of the documentary evidence – largely the material cherry-picked for her by CSI's counsel, *see* pages

17-19 below. She interprets the evidence in favor of a pro-CSI narrative. And she then presents her factual and legal conclusions.

> Q.      Okay. So you read the documents, you reported what they said. And did you draw factual conclusions from the documents?
>
> A.      Yes.
>
> Q.      Did you weigh the evidence?
>
> A.      In what sense?
>
> Q.      Well, did you read some things, decide – I mean, you gave an example of Freudenheim, where you used some of the Freudenheim, not other of Freudenheim. You made judgments as to what evidence was more persuasive or less persuasive, didn't you?
>
> A.      Yes.

(Mann Tr. 55; *see also id.* at 78, acknowledging that she tried to "reconstruct what happened," and "based on [her] reading of documents," drew "factual conclusions").

This exercise is nothing that CSI's experienced counsel could not do without Dr. Mann, in a brief. Underscoring the point, nothing in the documents is incomprehensible to the layman, and so Dr. Mann provides no help to the Court, as an expert must. *See* Fed. R. Evid. 702(a) & Advisory Committee Notes. This flaw is particularly acute because the fact-finder here – the Court – is well-equipped to interpret the documents that Dr. Mann seeks to construe, including legal documents. "Even the most learned expert cannot supplant the Court in its task of interpreting the written document." *MediaCom Corp. v. Rates Tech., Inc.*, 4 F. Supp. 2d 17, 24 (D. Mass. 1998).

This case thus falls squarely within the ambit of *Kidder, Peabody & Co. v. IAG Int'l Acceptance Group,* 14 F. Supp. 2d 391 (S.D.N.Y. 1992). There, the court precluded Professor Arthur Miller's testimony that encroached upon the role of the fact-finder by opining as to what

the parties "did, or what they said to each other." *Id.* at 398.  Equally unequivocal authority likewise bars Dr. Mann's testimony.  *See United States v. Bronston,* 658 F.2d 920, 930 (2d Cir. 1981) (excluding expert testimony "regarding the ultimate question of whether [defendant's] conduct amounted to a breach of fiduciary duty" because the expert's testimony "would in substance have conveyed nothing more to the jury than his 'general belief as to how the case should be decided'") (quoting *Marx & Co., Inc., v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) (testimony of expert who "repeatedly gave his conclusions as to the legal significance of various facts adduced at trial," based "merely on his examination of documents . . . which were equally before the judge and jury" should have been excluded; "[t]he admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case")).

     2.    <u>Dr. Mann Usurps the Role of the Court by Opining on Legal Conclusions Central to This Case</u>

As noted at pages 6-7 above, Dr. Mann also offers legal conclusions concerning ownership and control.  Yet as the authorities cited at page 7 above establish, ownership of the Rimonim is an ultimate legal issue central to the Court's final decision in this case.  On this ground, too, her testimony should be excluded.

An expert may not testify as to the ultimate legal conclusion in a case.  *See Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 360 (D. Mass. 2008) (excluding any legal conclusions regarding disputed contract).  Federal courts have specifically held inadmissible expert testimony seeking to opine as to ownership.  *See In re Phillips*, 491 B.R. 255, 261 n.10 (Bankr. D. Nev. 2013) (expert witness qualified as an expert in the securitization industry nonetheless not allowed to opine as to "ownership and possession" of promissory note, in part because "the issue of

ownership is a legal conclusion within the court's domain."). Dr. Mann's proposed testimony runs afoul of this settled principle.

**D.   Dr. Mann's Proposed Testimony Should Be Excluded Because It Is Based on an Unreliable Methodology**

As a third basis to exclude Dr. Mann's testimony, her proposed opinion is predicated on an unreliable methodology.

In assessing an expert's reliability, the Court must determine whether the expert testimony has a "traceable, analytical basis in objective fact." *Bagdon v. Abbott*, 524 U.S. 624, 653 (1993). "[O]pinion evidence that is connected to existing data only by the *ipse dixit* of the expert" should not be admitted. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999). "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' . . . . The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." Fed. R. Evid. 702 Advisory Committee Note. Not only that, but "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *Id.* Dr. Mann herself acknowledged the importance of presenting facts accurately and fairly. (Mann Tr. 27).

In violation of these bedrock rules, Dr. Mann has not based her analysis on objective fact. All she has provided is skewed speculation about what occurred centuries ago. We provide two important examples among many.

A centerpiece of Dr. Mann's report is her conclusion that 250 years ago Myer Myers originally made the Rimonim for CSI, and not for Touro's predecessor Congregation Yeshuat Israel ("CYI"), and thus, according to Dr. Mann, CSI and not CYI was the original possessor and owner of the Rimonim. This point may be important among other reasons because possession

- 11 -

creates a presumption of ownership. *Willcox v. Stroup*, 467 F.3d 409, 412 (4th Cir. 2006) (collecting sources and recognizing that the presumption created by possession "has been a feature of American law almost since its inception."). If the presumption applied here and CSI cannot overcome it, then Touro should prevail. Notably, CSI has never before taken the position that CSI rather than CYI originally possessed the Rimonim, and no scholar has ever come to that conclusion. In sharp contrast, CSI averred in its pleading that CYI was the "original possessor" of the Rimonim. (*See* Am. Counterclaims ¶ 15).

Dr. Mann bases her contrary opinion on 18th-century CSI ledger entries spanning 15 years. She states (Mann Report at 5):

- "In 1759, [Myer Myers] was paid £20.0 to create a work of 'plate' (silver) in honor of 'Mr. Abraham Abrahamson in Consideration of his serving as a Hazan to the Kaal.'"

- "In 1764, the CSI Minutes list a debit: 'Ballance due to Myer Myers £36.4.1.' In 1765, Shearith Israel's minutes note 'Cash paid Myer Myers. Balla. [Balance] of his acco[un]t. payed [or passed] £36.4.1.'"

- "In 1774, Myer Myers was paid £10.15 toward the total cost of a pair rimmonim. The minutes of the Board read: 'Cash paid Mr Myer Myers due him on A Pair Rimmonim.' The next entry reads: 'Cash Paid . . . for 16 Gilt Bells.'"

Dr. Mann deduces from these entries that Myer Myers created the Rimonim for CSI in 1764. According to Dr. Mann: "The total of the amount paid in 1765 compared to the payment in 1759 for a work of plate suggests the amount of £36.4.1 was payment for a larger, more complicated work such as a pair of finials." She goes on to declare that "These three entries attest to the fact that Myer Myers made one piece of plate and two pairs of finials for Shearith Israel," including the pair at issue in this case. (*Id.* at 6).

Dr. Mann's conclusion that Myer Myers made the Rimonim for CSI in 1764 has no "traceable, analytical basis in objective fact." *Bagdon*, 524 U.S. at 653. To reach her conclusion, Dr. Mann's analysis requires unsupported supposition after unsupported supposition:

- The 1764 minutes do not specify that the "[b]allance due" to Myer Myers was for any sort of ritual silver work. This omission is particularly noteworthy since (i) CSI records for 1759 and 1774 specify that Myers' payment was for silver work he had performed, and (ii) the 1765 minutes cited by Dr. Mann list another payment to Myer Myers specifying the purpose of that payment – a balance due with respect to "the new house." (Exh. C). The absence of any reference to Rimonim in the 1764 and 1765 entries for £36.4.1 is underscored by Dr. Mann's recognition that CSI's records are "[e]xceedingly meticulous." (Mann Tr. 69). It is entirely possible that Mr. Myers was simply being repaid for a loan, paid for an unrelated good or service he had provided to the congregation, or reimbursed for charity payments he had made. Mr. Myers was president of CSI at the time, so creating ritual silver was not his sole connection to that congregation. (*See* Mann Report at 5).

- Even if one assumes that the 1765 payment was for silver work, Dr. Mann cannot show that such silver work consisted of finial bells. The 1764 and 1765 minutes do not specify exactly what Myers had made. And clearly CSI knew how to so particularize. The 1759 minutes state that the payment was for a "plate." Even more telling, the 1774 minutes specify a payment for "rimmonim." Thus, even assuming the 1764 payment was for silver work, it is equally possible that Myers had fashioned some other type of silver object.

- Dr. Mann can offer no objective explanation for the disparities in cost cited in the 1765 and 1774 ledger entries. According to Dr. Mann's theory, the finial bells cost £36.4.1 in 1764. But this figure is at odds with the next ledger entry she cites, showing that a decade later, in 1774, a pair of different "rimmonim" (this time actually specified in the ledger) cost only £10.15 – a third of the 1764 amount. Dr. Mann's report is silent as to this discrepancy. She assumes that the £10.15 amount was not the "total cost" of the rimmonim, although nothing in the entry itself indicates that the payment is only partial. (Mann Report at 5). At deposition Dr. Mann vaguely referenced an unspecified source she had consulted concerning the price of silver. (Mann Tr. 119-20). But Dr. Mann admitted that she does not even know the total price of any set of finial bells made by Myers, and that no records survive from his shop. (*Id.* at 118-19). And with respect to the particular entries at issue, Dr. Mann admitted that she does not know the total amount paid for the 1774 rimmonim or, if the £36.4.1 paid in 1765 was for goods received from Myers, whether that was the total amount paid for such goods. (*Id.*). Thus, even if one assumes that the 1765 payment was for silver work, the conclusion that Myer Myers created Rimonim in 1764 is stymied by the unexplained disparity in prices and the lack of any concrete evidence of the Rimonim's price.

In sum, Dr. Mann is simply speculating, on an incomplete record – and about what may have occurred 250 years ago. Her analysis is unproven, and relies upon untested asssumptions lacking any basis in objective fact. She provides no authority to back up the series of logical leaps towards her conclusion. This unreliable conjecture should be excluded. *Shatkin v. McDonnell Douglas Corp.*, 565 F. Supp. 93, 95 (S.D.N.Y. 1983) (excluding proposed testimony

of plaintiff's economics expert where the expert's assumptions "are no more than conjecture and wild speculation. An expert's opinion that is founded in conjecture that is inconsistent with the record has no evidentiary value and must be excluded . . . .").

We offer a second example reflective of Dr. Mann's biased and unreliable approach. As part of her narrative that CSI generally "[e]xercised ownership" of Touro's ritual objects – thus setting the stage for her argument that ownership and control of the Rimonim was an example of ordinary dealing between the parties – Dr. Mann claims that in 1833 CSI recorded in its board minutes that CSI had received back from Touro Synagogue certain torah scrolls, also known as "Sepharim," that CSI supposedly owned. (Mann Report at 9). In support of her narrative, Dr. Mann provides the following quotation from CSI's February 1833 board minutes, with the ellipses provided by Dr. Mann:

> "The Committee Appointed to receive the Sepharim . . . report that they have received the same and deposited them in our Hachal [holy ark] and had given a receipt to the family of the late Moses Seixas [of the CYI congregation] of which the following is a duplicate."

(*Id.*). In fact, the full quotation from the minutes (Exh. D) is as follows:

> "The Committee Appointed to receive the Sepharim **belonging to the Newport Synagogue** report that they have received the same and deposited them in our Hachal [holy ark] and had given a receipt to the family of the late Moses Seixas of which the following is a duplicate." (bold-face added)

(Mann Tr. 31-33). Clearly CSI was not, as Dr. Mann would have the reader believe, "[e]xercis[ing] ownership" over Torahs. Rather, when the language she deleted is restored it is clear that CSI explicitly acknowledged that those ritual objects – and presumably the Rimonim as well – were "belonging to the Newport Synagogue."

The problem of materially misleading scholarship recurs in the very next paragraph of Dr. Mann's report. In addition to hiding the Newport congregation's ownership of Torahs, Dr. Mann's omission here elides the connection between CYI and Touro and CSI's recognition that any successor congregation at Touro Synagogue would be entitled to the ritual objects sent by the then-Newport congregation to CSI for safekeeping. Dr. Mann quotes at length a receipt duplicated in the February 1833 minutes, concerning the Torahs/"Sepharim" received by CSI from the family of Moses Seixas, one of the original members of the 18th century CYI congregation. Dr. Mann quotes the CSI receipt as follows:

> "Received from the family of the late Mr Moses Seixas of New Port Rhode Island, Four Sepharim belonging to the Congregation of that place, and which are now to be deposited in the Synagogue in New York of the Congregation Shearith Israel under the charge of the Trustees of said Congregation to be redelivered when duly requested."

(Mann Report at 9). But in fact, the full quotation (Exh. D) reads:

> "Received from the family of the late Mr Moses Seixas of New Port Rhode Island, Four Sepharim belonging to the Congregation of that place, and which are now to be deposited in the Synagogue in New York of the Congregation Shearith Israel under the charge of the Trustees of said Congregation to be redelivered when duly requested **for the use of the congregation hereafter worshipping at Newport, Rhode Island**." (Bold-face added).

The "congregation hereafter worshipping" in Newport is, as Dr. Mann acknowledged, the plaintiff in this case, Congregation Jeshuat Israel. (Mann Tr. 39-40). Dr. Mann thus removed from the text clear evidence that CSI as well as members of the original CYI had specifically intended that any congregation "hereafter worshipping" at Touro Synagogue would retain or

succeed to ownership of the ritual property in question, presumably including the Rimonim. And yet through use of inaccurate quotation, Dr. Mann pretends that the critical words are not there.[1]

Dr. Mann's methodology and flaws are compounded by her failure to examine the entire record. Courts routinely bar experts who have not examined the entire record. *See, e.g., E.E.O.C. v. Bloomberg, L.P.*, 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010) (excluding expert testimony because "[r]elying solely on the information fed to him by the EEOC without independently verifying whether the information is representative undermines the reliability of his analysis."). As one court explained: "Any expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply." *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003) (excluding expert testimony where only plaintiff-supplied information was relied upon for analysis). A recent District of Rhode Island decision faulted, and excluded, proposed expert testimony that relied solely on counsel-provided materials. *See Polidore v. McBride*, 2010 WL 3666971, at *6-7 (D.R.I. Sept. 13, 2010) (granting motion to exclude).

While Dr. Mann apparently performed some limited archival research of her own, the only documents produced by the parties that she reviewed were those selected by defense

---

[1] There are other examples. In support of the statement that "[Touro] has itself recently acknowledged" that CSI owns Touro Synagogue and the Rimonim, Dr. Mann relies on Touro meeting minutes from the period 2009-2012 indicating that a few Touro members questioned Touro's ownership of the Rimonim. (*See* Mann Report at 12). But as Dr. Mann seemed to acknowledge, an honorary trustee of CSI indicated that he believed Touro owned the Rimonim, as he assisted Touro when Touro sought a buyer for the objects. (Mann Tr. 245-47). Dr. Mann brushes off this counter-example without any principled basis. Though statements of one or two of Touro's congregants is somehow the basis for Dr. Mann's conclusion that Touro itself has "acknowledged" CSI's ownership, the action of an honorary CSI trustee is apparently irrelevant because "I'm not sure that he knew or knows the ins and outs of the ownership issue." (Mann Tr. 246).

counsel. "In the course of preparing the Report and rendering my opinions, I reviewed many documents provided to me by counsel for [CSI]." (Mann Report at 3; *see also* Mann Tr. 67, noting that counsel selected documents for her review). In preparing her report Dr. Mann had thus seen only a skewed version of the record, and she never reviewed certain documents that are helpful to Touro. For instance, CSI's counsel provided to Dr. Mann correspondence between CSI and Touro's then-Rabbi, Theodore Lewis, concerning a request made by the Smithsonian in 1959, from which she drew the conclusion that Touro was requesting approval from CSI before loaning objects. (Mann Report at 12). But counsel failed to provide Dr. Mann with the full correspondence, which contradicts the conclusions Dr. Mann reached in her report. (Mann Report at 12; Mann Tr. 251-53; Exh. E). Mistakenly relying on the 1959 Smithsonian events, Dr. Mann noted in her report the significance of Touro purportedly requesting approval from CSI before loaning the Rimonim to museums for display. (Mann Report at 12). Although she acknowledged that it would be significant if Touro did not ask for permission from CSI to loan the Rimonim (Mann Tr. 232-33), CSI did not give Dr. Mann documents produced by the parties demonstrating that Touro indeed loaned the Rimonim on other occasions as well. (*Id.* at 233-36). And Dr. Mann acknowledged that she "didn't look" to see if Touro had requested permission on those occasions (Mann Tr. 234) — nor could she have, since CSI had never made her aware of the relevant documents.

Though expert reports "should not be dependent on" the version of the record supplied by one side's counsel, that is exactly what happened here. *See Rowe*, 2003 WL 22124991, at *3; *Faulkner v. Arista Records LLC*, 2014 WL 4547824, *14 (S.D.N.Y. Sept. 15, 2014) (excluding expert testimony on reliability grounds because expert "had failed to review all of the documents

produced" by the adversary and had relied on counsel to provide documents for his review). On this ground, too, Dr. Mann's proposed testimony is inadmissible.

### E.    Dr. Mann's Opinion Suffers from Other Flaws

Dr. Mann's report suffers from other flaws as well. For example, she opines on several occasions as to the state of mind of historical actors who lived generations and centuries ago. Dr. Mann concludes that "I have seen no evidence indicating that, prior to CJI's attempt to sell the Rimmonim, either CSI or CJI was confused about the fact that CSI owned the Rimmonim." (Mann Report at 3). Dr. Mann also claims that a set of 1937 CSI board minutes and report from Touro's rabbi at the time "evidence the fact that both CSI and [Touro] understood the ownership and control relationship that CSI had over Touro [Synagogue]." (*Id.* at 11-12; *see also id.*: "The minutes quoted above confirm with clarity that CSI understood that the Myers' Rimmonim and the Cohen Donation belonged to it.").

Experts, however, may not opine as to state of mind or intent. Rather, "State of mind of one of the parties" is "committed exclusively to the trier of fact." 4 Weinstein's Federal Evidence § 702.03[3] (2d ed. 2014). Dr. Mann's testimony as to state of mind or intent should therefore be excluded. *See OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Canada*, 804 F. Supp. 2d 77, 85 (D. Mass. 2011) (excluding expert testimony opining as to intent of parties in contract dispute ), *aff'd*, 684 F.3d 237 (1st Cir. 2012); *Brown v. Crown Equip. Corp.*, 445 F. Supp. 2d 59, 68 (D. Me. 2006) ("The plaintiff properly notes that she will not attempt to offer through her expert witnesses evidence about the subjective intent or state of mind of the defendant or its employees.").

As yet another flaw, Dr. Mann offers opinions supported only by her "*ipse dixit*" – her say-so. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to

admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." "[U]nsupported speculation" is prohibited. *Hartford Ins. Co.*, 526 F. Supp. 2d at 252.

Despite this directive, Dr. Mann offers the opinion that "permitting [Touro] to sell the Rimmonim would . . . be so unprecedented that the sale would seriously undermine inter-congregational support and assistance, which has been indispensable to the sustenance of Jewish communal life for centuries including in America." (Mann Report at 3). Yet she cites no methodology or analysis to back up her conclusion. At her deposition, Dr. Mann asserted that she is an expert in the field of relationships between synagogues, principally because "I was married to a rabbi for 23 years." (Mann Tr. 57-58, 259). But Dr. Mann does not even rely on that specious basis for expertise to support her conclusion. In the portion of her report on the topic, there is not a single citation, not a single mention of an authority or study, nor any connection made to any past experience (personal or historical) that backs up her sweeping conclusion. (Mann Report at 13-14). That does not pass muster under *Daubert*. See *Milward v. Acuity Speciality Prods. Grp., Inc.*, 969 F. Supp. 2d 101, 114 (D. Mass. 2013) (excluding testimony of physician as to cause of plaintiff's cancer because conclusion was based on nothing more than "clinical assessment" or "qualitative approach" of the physician); *see generally Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).[2]

F.    **The Court Should Bar Testimony Predicated on Dr. Mann's Belated Supplemental Report**

Shortly before midnight on January 18, 2015, during a three-day weekend, CSI served a supplemental disclosure signed by Dr. Mann. (Exh. F). Dr. Mann's supplemental report should be excluded based on the timing alone, which is prejudicial to Touro's preparation of its motion and for which CSI has refused to supply any explanation. Under Fed. R. Civ. P.

---

[2] It is far from clear, and Touro does not concede, that this portion of Dr. Mann's report is even relevant.

26(a)(2)(B), Dr. Mann's initial report should have been complete. *Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003) (excluding supplemental expert disclosure because that report was intended to "strengthen, broaden and deepen the earlier opinions" and was therefore untimely).[3]

Nevertheless, a review of the supplemental report permitted within the limited time-frame dictated by CSI's late disclosure shows that Dr. Mann has not brought her opinions outside the realm of speculation – and on that basis too are inadmissible. In Section A of the supplemental report, she tries but fails to fill the holes in her original report that were brought out at her deposition:

- Dr. Mann uses silver prices from 1738 to suggest that the £36.4.1 CSI paid to Myer Myers more than 26 years later in 1765 must have been for a pair of rimmonim. She does not support her assumption that the price of silver and workmanship remained constant. Moreover, the 1738 pricing is even farther removed from 1765 than the price paid by CSI for rimonim in 1774. (Supp. Mann Report § A.3.b.2).

- Dr. Mann appears to continue to assume, without any basis, that the payment in 1774 was not the full price of the rimonim CSI purchased at that time. (*See id.* § A.3.b.3). CSI kept "meticulous records," and so one would expect to see a record of previous payments by CSI for this pair of rimonim. Yet Dr. Mann apparently is not aware of any such payments. Furthermore, and as noted at pages 13-14 above, even if the 1774 payment was only partial, Dr. Mann admitted that she has no idea of the total cost of those – or any – Myer Myers rimonim.

- Dr. Mann assumes that the Rimonim at issue could only have been made in 1764 or 1765, when the ledger entries were made, but she provides no support for this assumption. (*Id.* § A.3.b.1).

Dr. Mann's supplemental report is another attempt to take entries in the CSI 1764/65 record that could be for anything, and opine with absolute certainty that they concerned

---

[3] Considering that (i) the January 20, 2015 deadline for Touro's motion to exclude Dr. Mann's testimony was set by the Court on December 15, 2014, (ii) Monday, January 19, 2015 is a national holiday, and (iii) Dr. Mann was deposed back on December 31, 2014, Touro's counsel asked counsel for CSI why CSI was producing the supplemental report so late. CSI's counsel refused to respond.

the Rimonim at issue here. Moreover, nothing in Section A of Dr. Mann's supplemental report could not have been included in her original report.

Section B of Dr. Mann's supplemental report is equally problematic. She offers an opinion based on a "hitherto unknown photograph." The photograph was published in a book in 1936 by an author with whom Dr. Mann was already familiar when she wrote her report. (Mann Report at 7). The photograph could have been included in Dr. Mann's initial report. Dr. Mann states she does not know the date of this or another photograph, but she then speculates that those photographs nevertheless "may elucidate" specific documents. And, at the end of Section B, Dr. Mann once again impermissibly opines as to the parties' state of mind by claiming to know what they purportedly "understood" over a hundred years ago.

In short, Dr. Mann's supplemental report suffers from the same flaws marring her initial report, and any testimony offered on that basis is inadmissible.

## Conclusion

For these reasons, the Court should exclude Dr. Mann's proposed expert testimony.

CONGREGATION JESHUAT ISRAEL,

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

*/s/ Steven E. Snow*
Steven E. Snow (#1774)
40 Westminster Street, Suite 1100
Providence, RI 02903
(401) 861-8200 / (401) 861-8210 FAX
ses@psh.com

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Gary P. Naftalis (admitted *pro hac vice*)
Jonathan M. Wagner (admitted *pro hac vice*)
Tobias B. Jacoby (admitted *pro hac vice*)
Daniel P. Schumeister (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9253 / (212) 715-9238 FAX
gnaftalis@kramerlevin.com
jwagner@kramerlevin.com
tjacoby@kramerlevin.com
dschumeister@kramerlevin.com

DATED: January 20, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of January, 2015, I caused a true copy of the within document to be delivered through the ECF system to all counsel of record.

/s/ Steven E. Snow

2422818_1/7804-2