**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

CONGREGATION JESHUAT ISRAEL,       :
                                   :
            Plaintiff,             :
                                   :
      v.                           :          C.A. No. 12-822M
                                   :
CONGREGATION SHEARITH ISRAEL,      :
                                   :
            Defendant.             :


**CONGREGATION SHEARITH ISRAEL'S OPPOSITION TO**
**PLAINTIFF'S MOTION TO EXCLUDE THE**
**PROPOSED EXPERT TESTIMONY OF DR. VIVIAN MANN**


Deming E. Sherman (#1138)
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI  02903
Tel.:  (401) 274-9200
Fax:  (401) 276-6611
E-mail: dsherman@lockelord.com

Louis M. Solomon (Admitted *Pro Hac Vice*)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
Tel.:  (212) 504-6600
Fax:  (212) 504-6666
E-mail: Louis.Solomon@cwt.com

*Attorneys for Defendant*
*Congregation Shearith Israel*

February 2, 2015

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ..............................................................................................................1

BACKGROUND ...............................................................................................................1

I.    DR. MANN'S PROPOSED TESTIMONY..................................................................1

ARGUMENT ....................................................................................................................3

II.   LEGAL STANDARD..............................................................................................3

III.  DR. MANN IS QUALIFIED TO TESTIFY AS AN EXPERT........................................4

     A.    Dr. Mann's Expertise Will Help Determine The Provenance Of The Rimonim ....................................................................................................4

     B.    Dr. Mann Is Qualified To Testify About The Provenance Of The Rimonim By Analyzing Historical Documents .......................................................7

IV.   DR. MANN'S TESTIMONY WILL HELP THE TRIER OF FACT UNDERSTAND THE EVIDENCE....................................................................................................9

     A.    Historians Such As Dr. Mann Routinely Provide Expert Testimony Analyzing Documents And Evidence And Providing Historical Context..............9

     B.    Dr. Mann Properly Interprets And Contextualizes Historical Documents ...........11

     C.    Dr. Mann Properly Uses Historical Expertise To Analyze Writings To Determine What Historical Actors Did, Thought, And Intended .........................15

V.    DR. MANN'S METHODOLOGY IS RELIABLE .......................................................18

     A.    Dr. Mann's Testimony Is Impartial And Even-Handed......................................20

VI.   DR. MANN PROPERLY OPINES ON INTER-CONGREGATIONAL RELATIONSHIPS................................................................................................23

VII.  DR. MANN'S SUPPLEMENTAL REPORT WAS PROPER.........................................24

CONCLUSION................................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

### <u>CASES:</u>

*Alvarado v. Weinberger*,
511 F.2d 1046 (1st Cir. 1975).................................................................8

*Armstrong Coal Co. v. Blackburn*,
2014 WL 4364625 (W.D. Ky. Sept. 3, 2014) ...................................6, 12

*Baker v. Buffenbarger*,
2006 WL 140548 (N.D. Ill. Jan. 13, 2006).............................22, 24, 27

*Bone Shirt v. Hazeltine*,
2003 WL 26091116 (D.S.D. Dec. 31, 2003) ...................................16

*Brown v. Crown Equip. Corp.*,
445 F. Supp. 2d 59 (D. Me. 2006) ...................................................18

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
239 F.3d 179 (2d Cir. 2001)..........................................................22

*Carondelet Sav. & Loan Ass'n v. Citizens Sav. & Loan Ass'n*,
604 F.2d 464 (7th Cir. 1979) .........................................................12

*Cayuga Indian Nation of N.Y. v. Pataki*,
165 F. Supp. 2d 266 (N.D.N.Y. 2001), *rev'd on other grounds*,
413 F.3d 266 (2d Cir. 2005)....................................................6, 10, 16

*Cook v. Rockwell Int'l Corp.*,
580 F. Supp. 2d 1071 (D. Colo. 2006)........................................21-22

*Cruz-Vargas v. R.J. Reynolds Tobacco Co.*,
348 F.3d 271 (1st Cir. 2003)..........................................................16

*Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, Inc.*,
2014 Wl 693328 (N.D. Okla. Feb. 21, 2014) ........................................6

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)...............................................18, 20, 22, 23

*Diefenbach v. Sheridan Transp.*,
229 F.3d 27 (1st Cir. 2000)..........................................................4-5

**PAGE(S)**

*Echevarria v. Caribbean Aviation Maint. Corp.*,
    841 F. Supp. 2d 565 (D.P.R. 2012)..................................................................22

*Est. of Mitchell v. Comm'r*,
    101 T.C.M. (CCH) 1435 (2011) ......................................................................5

*Gay v. Stonebridge Life Ins. Co.*,
    660 F.3d 58 (1st Cir. 2011)......................................................................24, 25

*Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*,
    345 F.3d 15 (1st Cir. 2003)........................................................................5, 8

*Gov't of Peru v. Johnson*,
    720 F. Supp. 810 (C.D. Cal. 1989), *aff'd*,
    933 F.2d 1013 (9th Cir. 1991) (Unpublished) ...........................................6

*Hunter v. Underwood*,
    471 U.S. 222 (1985)........................................................................................15

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)...........................................................17

*JJI Int'l, Inc. v. Bazar Grp., Inc.*,
    2013 WL 3071299 (D.R.I. Apr. 8, 2013)......................................................24

*Kidder, Peabody & Co. v. IAG Int'l Accept. Grp. N.V.*,
    14 F. Supp. 2d 391 (S.D.N.Y. 1998).............................................................17

*Langbord v. U.S. Dep't of Treas.*,
    2009 WL 1312576 (E.D. Pa. May 7, 2009) ...................................................6

*Levin v. Dalva Bros.*,
    459 F.3d 68 (1st Cir. 2006)............................................................................5

*Licciardi v. TIG Ins. Grp.*,
    140 F.3d 357 (1st Cir. 1998)........................................................................27

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003), *aff'd*,
    99 F. App'x 274 (2d Cir. 2004) (Summary Order)....................................17

*MacDermid Printing Solutions, Inc. v. Cortron Corp.*,
    2014 WL 2615361 (D. Conn. June 12, 2014)..............................................18

*Marshall v. Perez Arzuaga*,
    828 F.2d 845 (1st Cir. 1987)..........................................................................8

**PAGE(S)**

*Metavante Corp. v. Emigrant Sav. Bank,*
    619 F.3d 748 (7th Cir. 2010) ..........................................................12

*Milward v. Acuity Specialty Prods. Grp., Inc.,*
    639 F.3d 11 (1st Cir. 2011)..........................................................18, 20

*Minn. v. Mille Lacs Band of Chippewa Indians,*
    526 U.S. 172 (1999)..................................................................9-10

*Mitchell v. U.S.,*
    141 F.3d 8 (1st Cir. 1998)................................................................8

*N.J. v. N.Y.,*
    1997 WL 291594 (U.S. Mar. 31, 1997)......................................6, 9, 16

*N.Y. v. Shinnecock Indian Nation,*
    523 F. Supp. 2d 185 (E.D.N.Y. 2007), *vacated & remanded on other grounds,*
    686 F.3d 133 (2d Cir. 2012)..............................................................6

*OneBeacon Am. Ins. Co. v. Com. Union Assur. Co. of Can.,*
    804 F. Supp. 2d 77 (D. Mass. 2011), *aff'd,*
    684 F.3d 237 (1st Cir. 2012)...........................................................18

*Payton v. Abbott Labs,*
    780 F.2d 147 (1st Cir. 1985)..............................................................8

*Peckham v. Cont'l Cas. Ins. Co.,*
    895 F.2d 830 (1st Cir. 1990)...........................................................11

*Phillips v. Calhoun,*
    956 F.2d 949 (10th Cir. 1992) .........................................................10

*Prado Alvarez v. R.J. Reynolds Tobacco Co.,*
    313 F. Supp. 2d 61 (D.P.R. 2004), *aff'd,*
    405 F.3d 36 (1st Cir. 2005)............................................................16

*Primavera Familienstifung v. Askin,*
    130 F. Supp. 2d 450, *amended on reconsideration in part,*
    137 F. Supp. 2d 438 (S.D.N.Y. 2001).........................................17-18

*Saginaw Chippewa Indian Tribe of Mich. v. Granholm,*
    690 F. Supp. 2d 622 (E.D. Mich. 2010)..........................................10

*Santos v. Posadas De P.R. Assocs.,*
    452 F.3d 59 (1st Cir. 2006)..............................................................5

USActive 32025887.16

PAGE(S)

*Trafton v. Sunbury Primary Care, P.A.*,
    689 F. Supp. 2d 198 (D. Me. 2010) ............................................................................... 8-99

*U.S. v. Corey*,
    207 F.3d 84 (1st Cir. 2000)................................................................................................5

*U.S. v. Davis*,
    1993 WL 414761 (D.R.I. Apr. 14, 1993)........................................................................26

*U.S. v. Dazey*,
    403 F.3d 1147 (10th Cir. 2005) .......................................................................................12

*U.S. v. Diaz*,
    300 F.3d 66 (1st Cir. 2002)..............................................................................................22

*U.S. v. Kantengwa*,
    2012 WL 4591891 (D. Mass. Oct. 3, 2012).............................................................10, 14

*U.S. v. Luna*,
    649 F.3d 91 (1st Cir. 2011)..............................................................................................5

*U.S. v. Members of Est. of Boothby*,
    16 F.3d 19 (1st Cir. 1994)................................................................................................5

*U.S. v. Newmont USA Ltd.*,
    2007 WL 4856859 (E.D. Wash. Nov. 16, 2007) ............................................................6

*U.S. v. One Lucite Ball Containing Lunar Material*,
    252 F. Supp. 2d 1367 (S.D. Fla. 2003) ...........................................................................6

*U.S. v. Reed*,
    575 F.3d 900 (9th Cir. 2009) .........................................................................................10

*U.S. v. Vargas*,
    471 F.3d 255 (1st Cir. 2006)...........................................................................................18

*U.S. v. Wade*,
    203 F. App'x 920 (10th Cir. 2006) (Unpublished) ................................................... 11-12

*Walden v. City of Chi.*,
    755 F. Supp. 2d 942 (N.D. Ill. 2010) .......................................................................10, 15

*Willco Kuwait (Trading) S.A.K. v. deSavary*,
    843 F.2d 618 (1st Cir. 1988).........................................................................................11

USActive 32025887.16

**PAGE(S)**

## STATUTES & OTHER AUTHORITIES:

Fed. R. Civ. P.:
    26(a)(3)(B) ............................................................................................26
    26(e)(1) advisory committee's note (2000 Amends.) ...........................26
    26(e)(2) ..................................................................................................26

Fed. R. Evid.:
    401(a) ......................................................................................................9
    702 advisory committee's note (2000 Amends.) .................................23
    702(a) ......................................................................................................9
    704 .........................................................................................................11
    704(a) ....................................................................................................11

John Phillip Reid,
    *Law and History*, 27 Loy. L.A. L. Rev. 193 (1993) ...........................19

USActive 32025887.16

Defendant Congregation Shearith Israel ("Shearith Israel") respectfully submits this memorandum in opposition to the January 20, 2015 motion (the "Motion") of plaintiff Congregation Jeshuat Israel ("CJI") to exclude *the entirety of* the expert testimony of Dr. Vivian Mann ("Mann Br.").  As shown below, Dr. Mann's expert testimony is proper and germane: (1) Dr. Mann is qualified to opine on the topics addressed in her report; (2) her skill and knowledge will assist the Court in understanding the history and provenance of the rimonim; and (3) her opinions are based on accurate records and methods, reliably applied.

## INTRODUCTION

To minimize the Court's burden, we incorporate here the Introduction in Shearith Israel's opposition to CJI's motion to exclude Professor Fisher's testimony.

## BACKGROUND

### I.    DR. MANN'S PROPOSED TESTIMONY

A summary of some of the issues Dr. Mann speaks to underscores the helpfulness of her opinions to the Court, subject to cross-examination and to the Court's ultimate determinations including as to the weight to be accorded to those opinions:

There is a formal inventory from 1869 detailing the objects at Shearith Israel that belong to Shearith Israel (Ex. 15).  The nomenclature in the inventory is abbreviated and requires someone skilled in reading such things to explain to the Court that the inventory unambiguously states that Shearith Israel owns the rimonim that CJI surreptitiously tried to sell in 2012 (*see* Declaration of Dr. Vivian Mann ["Mann Decl."] ¶ 8).  Dr. Mann is the expert capable of understanding the inventory and its context and explaining its significance, not CJI counsel.

CJI lawyers claim that the two rimonim that CJI tried to sell were "gifted to the Newport congregation, CJI" (CJI Complaint ["Compl."] ¶ 8).  Dr. Mann has examined all the relevant documentation from the Eighteenth and Nineteenth Centuries of both CJI (none) and of Shearith

Israel (thousands of mostly handwritten pages of minutes, documents, and payment ledgers) and concludes that Shearith Israel in fact paid for the rimonim and did not gift or give them to CJI but loaned them.  Dr. Mann provides powerful reasons for her conclusion, including by analyzing the price of silver at the time, the weight of the rimonim, the timing and circumstances, and the extensive documentation leaving no reasonable conclusion other than that, quite apart from the controlling leases, Shearith Israel owned and continues to own the rimonim as a matter of fact (Ex. 4 [Expert Report of Dr. Vivian Mann ("Mann Rep.")] at 5-6; Ex. 6 [Addendum to Expert Report of Dr. Vivian Mann ("Mann Supp.")] at 1-4; Mann Decl. ¶ 8).  It is impossible to understand how CJI can believe that all of this evidence should be kept from the Court, since there are no percipient witnesses alive to testify to any of these facts.

CJI lawyers assert that a finial that has been in New York City for close to 200 years, bearing the label "Newport", is ***not*** one of the original "Newport" finials because the shafts of the finials were switched (Ex. 28 at 230:12-19).  Dr. Mann, an art historian and specialist in Judaica (Ex. 5 [Deposition of Dr. Vivian Mann ("Mann Dep.")] at 26:22; Mann Rep. at 2), **whom CJI concedes is "an expert on Judaica"** (ECF No. 42 at 3), examined the finials and concluded, based on the physical evidence, that CJI's claims were incorrect and that the shafts were never switched (Mann Rep. at 14 n.57; Mann Decl. ¶ 5).  The only expert on either side who can testify to this fact is Dr. Mann.  The evidence is crucial to (among other things) the injunction requested by CJI.

CJI lawyers claim that art catalogues have "represented that Touro owns the Rimonim" (Compl. ¶ 19).  Who better than an art historian, a reader and writer of countless catalogues, to explain to the Court that CJI's lawyers are both misreading and misinterpreting the catalogues.

CJI lawyers assert that the rimonim at Touro have been there, uninterrupted, for at least 130 years (Compl. ¶ 14). Dr. Mann has examined documents and photographs from earlier than 1913 and from the mid-Twentieth Century and disagrees, showing movement of the rimonim back and forth, which demonstrates that Shearith Israel had control over the rimonim. For example, rare rimonim dating even earlier than the Myer Myers rimonim were loaned to Touro and then returned to Shearith Israel before the mid-Twentieth Century (Mann Supp. at 5-6).

CJI representatives secretly secured its congregants' vote to sell two of the four rimonim based on representations by CJI's president that Shearith Israel's possession of the rimonim for nearly the entire Nineteenth Century was "for safekeeping" only, that they were "returned to us when the synagogue reopened", and that "Christie's research indicates that [CJI has] good title to the items" (Ex. 37). Dr. Mann has reviewed the relevant documents and concludes that there is not a single document stating that Shearith Israel held rimonim for "safekeeping", and that in fact the documentation states that the rimonim "belong to kahal" (for reasons she explains, this is a reference to Shearith Israel) (Mann Dep. at 207:17-208:20, 300:20-301:8). This invalidates CJI's contention that "Christie's research" indicates that CJI has good title to the rimonim (Ex. 37). The Christie's witness affirmed that the CJI statement to its congregants was false (Ex. 38 at 94:16-95:5, 96:2-23), thus rendering the supposed vote in favor of selling null and void.

None of Dr. Mann's testimony should be struck, and certainly not before the Court has heard it, subject to cross-examination and determinations as to weight.

## ARGUMENT

## II.    LEGAL STANDARD

For a description of the standard governing expert testimony, Shearith Israel respectfully incorporates Point III of its opposition to CJI's motion to exclude Professor Fisher's testimony.

## III.    DR. MANN IS QUALIFIED TO TESTIFY AS AN EXPERT

Dr. Mann is an art historian with almost three decades of curating experience at The Jewish Museum in New York, where she was Chair of Judaica, and fifteen years of experience teaching Jewish ceremonial art at The Jewish Theological Seminary, where she is a Professor and director of the Master's Program in Jewish Art and Visual Culture (Mann Rep. at 2). Dr. Mann is considered a worldwide expert in Judaica, has authored five books and thirty-six articles on Jewish art, including a chapter specifically focused on finial bells, and has co-authored or contributed to seventeen exhibitions and catalogues and more than fifty scholarly papers in her area of expertise (Mann Rep., App'x A). Dr. Mann was awarded the Jewish Cultural Achievement Award in Jewish Thought by the National Foundation for Jewish Culture in 1999 for helping establish Jewish Art as a new field of Jewish studies (Mann Rep. at 2).

Dr. Mann also has specialized experience relating to inter-synagogue relations based on reading historical sources including with respect to Touro, reading hundreds of original responsa (questions asked to knowledgeable rabbis and their answers), and writing a book on texts relating to Jewish art in which she deals directly with this subject (Mann Dep. at 58:2-6). Dr. Mann's opinions are likewise informed by a wealth of personal experience – she comes from a rabbinic family where inter-congregational relationships were frequently addressed (*id.* at 259:20-24).

### A.    Dr. Mann's Expertise Will Help Determine The Provenance Of The Rimonim

CJI argues that Dr. Mann's experience as an art historian does not qualify her to opine on the provenance of the rimonim because she is not an expert in interpreting legal documents and cannot offer legal conclusions (Mann Br. at 5-7). CJI's points are factually incorrect (Dr. Mann will not be offering legal analysis or conclusions) and legally irrelevant. "It is well-settled that trial judges have broad discretionary powers in determining the qualification, and thus, admissibility, of expert witnesses". *Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 30 (1st Cir.

2000); *see also U.S. v. Members of Est. of Boothby,* 16 F.3d 19, 22 (1st Cir. 1994) ("a trial judge has broad latitude in determining whether a proffered expert has suitable qualifications").  "[A] witness need not always possess a particular degree or set of educational qualifications in order to offer expert testimony".  *Boothby,* 16 F.3d at 22.  "The test is whether, under a totality of the circumstances, the witness can be said to be qualified as expert in a particular field, through any one or more of the five bases enumerated in Rule 702 – knowledge, skill, experience, training, or education".  *Santos v. Posadas De P.R. Assocs.*, 452 F.3d 59, 64 (1st Cir. 2006).  The Court is "to determine, given the proffered expert's background, whether the . . . specialized knowledge he offers 'will assist the trier better to understand a fact in issue'".  *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24 (1st Cir. 2003).

Dr. Mann testifies that she helps "reconstruct the provenance" of the rimonim, "a task routinely undertaken by art historians" (Mann Decl. ¶ 7).  CJI's contention that a lack of legal experience should bar Dr. Mann's opinion on the provenance of the rimonim is entirely inconsistent with the case law, in which provenance experts have routinely been allowed to testify regarding ownership.  *See, e.g.*, *Est. of Mitchell v. Comm'r*, 101 T.C.M. (CCH) 1435, at *12 n.5 (2011) (noting that experts may opine regarding "provenance", the "origin or history of ownership").  The First Circuit upheld an expert's testimony on the provenance of weaponry.  *U.S. v. Luna,* 649 F.3d 91, 105 (1st Cir. 2011), and an antique, *Levin v. Dalva Bros.*, 459 F.3d 68, 79 (1st Cir. 2000); *see also U.S. v. Corey*, 207 F.3d 84, 88-89 (1st Cir. 2000) (expert testified that "shotgun had been manufactured in Massachusetts" based *inter alia* on a telephone conversation with a Smith and Wesson historian, "customary research into technical reference manuals and materials obtained at the ATF 'research libraries'").

Courts have also heard expert opinion evidence regarding the provenance and/or historical ownership of historical artifacts, *Gov't of Peru v. Johnson*, 720 F. Supp. 810, 812-14 (C.D. Cal. 1989), *aff'd*, 933 F.2d 1013 (9th Cir. 1991) (Unpublished); *Langbord v. U.S. Dep't of Treas.*, 2009 WL 1312576, at *4-6 (E.D. Pa. May 7, 2009); *see also U.S. v. One Lucite Ball Containing Lunar Material*, 252 F. Supp. 2d 1367, 1372 (S.D. Fla. 2003) (expert testimony *inter alia* as to when a "moon rock and plaque" were given to president of Honduras).

Experts have also provided testimony related to other ownership issues. *See, e.g., N.J. v. N.Y.*, 1997 WL 291594, at *10 (U.S. Mar. 31, 1997) (U.S. Supreme Court hearing expert testimony of five historians on whether New York or New Jersey had sovereignty over a portion of Ellis Island); *Cayuga Indian Nation of N.Y. v. Pataki*, 165 F. Supp. 2d 266, 300 (N.D.N.Y. 2001) (allowing testimony from three experts regarding the historical backdrop of a land claim litigation), *rev'd on other grounds*, 413 F.3d 266 (2d Cir. 2005); *N.Y. v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185, 196 (E.D.N.Y. 2007) ("plaintiffs' expert agreed that the whole Town was owned by the Shinnecocks at the time of first European contact"), *vacated & remanded on other grounds*, 686 F.3d 133 (2d Cir. 2012); *Armstrong Coal Co. v. Blackburn*, 2014 WL 4364625, at *2 (W.D. Ky. Sept. 3, 2014) (expert testimony on location of boundary line); *U.S. v. Newmont USA Ltd.*, 2007 WL 4856859, at *1 (E.D. Wash. Nov. 16, 2007) (expert historian testified providing "'detailed corporate and technological history of Dawn Mining Company and its relationship to the company that was called Newmont Mining Corporation'" and concluded that "Newmont has controlled Dawn and Dawn's operations since Dawn's creation in 1955"); *Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, Inc.*, 2014 WL 693328, at *3-4 (N.D. Okla. Feb. 21, 2014) (permitting expert historian to testify "about facts concerning the ownership of TFMC that can be supported by the historical record").

Dr. Mann is an art historian who, as CJI concedes, is an expert on Judaica (CJI Motion to Set Time for Disclosure of its Rebuttal Witnesses and Reports at 3). To an art historian, the object is the primary source, and any analysis must begin with the object itself (Mann Dep. at 50:15-18, 70:14-19). Dr. Mann's testimony regarding the physical characteristics of the rimonim, as they relate to provenance, will be invaluable to the Court. Dr. Mann physically examined the rimonim at issue, as well as Shearith Israel's other rimonim (Mann Decl. ¶ 5; Mann Dep. at 12:3-8). Key observations made during these physical examinations are at the heart of Dr. Mann's testimony and include the following:

- A silver mark on the finials dates to the time Shearith Israel paid Myer Myers, their maker, £36.4.1. Based on, among other things, the price of silver at that time and the weight of the rimonim, Dr. Mann determines that Shearith Israel's payment to Myers was for the rimonim.

- Differences in the copper armature indicate that the two rimonim at issue are from different original sets. Differences in the engraving and chasing of the rimonim further indicate that the set at issue is not a true pair; and

- There is no evidence supporting CJI's claim that the shafts of the finials were switched.

(Mann Rep. at 14 n.57; 6 n.19; Mann Decl. ¶ 5).

**B.    Dr. Mann Is Qualified To Testify About The Provenance Of The Rimonim By Analyzing Historical Documents**

CJI misrepresents the extent to which Dr. Mann's expertise and experience will enable her to assist the Court in evaluating the material evidence in this case. It claims that all of Dr. Mann's opinions based on documentary evidence, rather than a physical inspection of the rimonim, are improper (Mann Br. at 4-7). This distinction is factually and legally meritless.

Dr. Mann's testimony regarding the provenance of the rimonim is based on her personal inspection of the rimonim, her review of the original documents and secondary sources, and her

knowledge and experience in the field of art history and Jewish religious artifacts in particular (Mann Decl. ¶ 7).  This dovetails perfectly with the quintessential task of an art historian: to "examine the works, compare them to other works ***and then go on to documentation, to fill out the context of the piece***" (Mann Dep. at 50:15-18) (emphasis added).  Dr. Mann testified that she has extensive experience contextualizing artwork through the interpretation of historical documents (*id.* at 72:4-7), which is exactly what art historians do.  As Dr. Mann testified, it is proper for art historians to start with the object and then analyze both primary and secondary works about the object in order to determine its provenance (*id.* at 50:15-18, 70:20-23).  CJI has shown nothing to refute this.  Thus clearly, Dr. Mann, a distinguished art historian, may apply her knowledge of historical documents toward determining the provenance of the rimonim.

And even if, assuming *arguendo*, CJI's argument had legs (it assuredly does not), Dr. Mann's specialty *vel non* goes to the weight, not the admissibility, of her testimony.  It is established in the First Circuit that an expert need not be a "specialist in the field in which he is giving his opinion" to testify.  *Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir. 1985).  This "affects not the admissibility of his opinion but the weight the jury may place on it".  *Id.* (permitting testimony from non-specialist doctor because "teratology, the study of abnormal development and congenital malformations, is scientific knowledge that is part of the field of medicine" and the doctors were "qualified as experts in the field of medicine"); *see also Gaydar*, 345 F.3d at 24-25 (permitting general practitioner who was not a gynecologist or obstetrician to testify about pregnancy complications even though he had never examined a patient with the condition at issue); *Mitchell v. U.S.*, 141 F.3d 8, 15 (1st Cir. 1998); *Marshall v. Perez Arzuaga*, 828 F.2d 845, 851 (1st Cir. 1987); *Alvarado v. Weinberger*, 511 F.2d 1046, 1049 (1st Cir. 1975) (doctor who is not a psychiatrist can give an opinion about someone's mental health); *Trafton v.*

*Sunbury Primary Care, P.A.*, 689 F. Supp. 2d 198, 204 (D. Me. 2010).  Clearly, then, Dr. Mann, whose lifetime of experience and study in art history has trained her to read ancient documents to trace provenance, may so apply her expertise before this Court.

### IV.    DR. MANN'S TESTIMONY WILL HELP THE TRIER OF FACT UNDERSTAND THE EVIDENCE

### A.    Historians Such As Dr. Mann Routinely Provide Expert Testimony Analyzing Documents And Evidence And Providing Historical Context

Rule 702 permits expert witness testimony where an expert who has "specialized knowledge" can help "the trier of fact to understand the evidence or to determine a fact in issue". Fed. R. Evid. 702(a).  An expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue" if that testimony will have a "tendency to make a fact more or less probable than it would be without the evidence".  Fed. R. Evid. 702(a); Fed. R. Evid. 401(a).  Dr. Mann's testimony as an art historian will assist the Court in evaluating the provenance of the rimonim.  Dr. Mann brings "an understanding of the provenance" of the rimonim, as well as "an understanding of the differences between the pairs, based on their artistic qualities, [and] the way they were made" (Mann Dep. at 55:23-56:9).  More generally, Dr. Mann brings "an understanding of how these five pairs of rimmonim fit within the history of rimmonim in general and were influenced by European examples" (*id.*).

As the cases discussed in Point III, *supra*, hold, provenance experts are routinely allowed to testify to establish the historical ownership of works of art.  Courts also routinely use historians as experts to analyze historical documents, weigh historical evidence, and draw historical conclusions in a variety of contexts.  *See, e.g.*, *N.J./N.Y.*, 1997 WL 291594, at *10 (U.S. Supreme Court hearing expert testimony of five historians on whether New York or New Jersey had sovereignty over a portion of Ellis Island); *Minn. v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 181 (1999) (embracing expert testimony regarding the historical context

surrounding the signing of two ancient treaties); *Pataki*, 165 F. Supp. 2d at 300 (allowing testimony from three experts regarding the historical backdrop of a land claim litigation); *U.S. v. Kantengwa*, 2012 WL 4591891, at *3 (D. Mass. Oct. 3, 2012) (hearing expert testimony regarding the "association between a roadblock and the program of mass genocide").

For example, historians (and other experts) have testified about the meanings of historical terms and documents.  *See, e.g.*, *Phillips v. Calhoun*, 956 F.2d 949, 952 (10th Cir. 1992) (calling on experts "to offer their understanding of the customary meaning and usage of the terms in question"); *U.S. v. Reed*, 575 F.3d 900, 922 (9th Cir. 2009) (allowing expert testimony regarding "'drug jargon'"); *Saginaw Chippewa Indian Tribe of Mich. v. Granholm*, 690 F. Supp. 2d 622, 635 (E.D. Mich. 2010) (holding that a historian was "qualified to provide expert opinions concerning the historical interpretation of the 1855 and 1864 treaties"); *Pataki*, 165 F. Supp. 2d at 309 (relying on an expert to construe the term "'members of any state'" as it related to Native Americans in a 19th Century agreement); *Walden v. City of Chi.*, 755 F. Supp. 2d 942, 951 (N.D. Ill. 2010) (expert historian had specialized mastery of "aspects of historical research that require training and education, including knowing where to search for sources, formulating searches based on an understanding of the history of the period in question, and evaluating the reliability of sources" and historian's "research utilized his experience and education as an academic historian and could not have been completed by 'anyone'").

Dr. Mann's testimony here is similar to that of the historians in these cases.  Dr. Mann reviewed thousands of primary and secondary documents, which she located herself and obtained through both parties' productions (Mann Decl. ¶ 2; Mann Rep., App'x B).  She used her expertise to identify and organize relevant facts, discount unreliable evidence, and present a comprehensive history of the rimonim (Mann Decl. ¶¶ 3, 11; Mann Dep. at 23:3-12, 47:13-17,

68:20-21).  Dr. Mann's testimony would assist the Court in sifting through thousands of pages of ancient documents (*id.* at 56:12-17), and help establish the provenance of the rimonim by drawing on her deep knowledge of Jewish silver and Myer Myers to determine when the rimonim were made and for whom, as well as the context of their transfers between Shearith Israel and Touro.  Dr. Mann properly opines on historical ownership and extrapolates from this the implication of current ownership and control.  She does not offer "legal determinations", but simply helps "reconstruct the provenance" of the rimonim, "a task routinely undertaken by art historians" (Mann Decl. ¶ 6).  Dr. Mann's testimony is about the facts.  She may utilize terminology (like 'ownership') that also has legal meaning, but this does not bar her testimony.

**B.**     **Dr. Mann Properly Interprets And Contextualizes Historical Documents**

CJI claims that Dr. Mann's report would not assist the Court because it is only "a brief dressed up as an expert report" in which she just "reconstructed what happened based on her reading of the documents" (Mann Br. at 8-9).  CJI specifically claims that Dr. Mann provides no help to the Court because "nothing in the documents" interpreted by Dr. Mann is beyond the understanding of a layman (*id.* at 9).  CJI could not be more wrong.

CJI claims that Dr. Mann "usurps the role of the court" by drawing factual and legal conclusions.  Here, CJI simply ignores Rule 704(a) which states that "[a]n opinion is not objectionable just because it embraces an ultimate issue".  Fed. R. Evid. 704(a); *see also Peckham v. Cont'l Cas. Ins. Co.*, 895 F.2d 830, 837-38 (1st Cir. 1990) ("'testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact'") (construing Fed. R. Evid. 704); *Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 624 (1st Cir. 1988) ("The 'ultimate facts rule' was abolished by Fed. R. Evid. 704").  "'[A] witness may properly be called upon to aid the [fact finder] in understanding the facts in evidence even though reference to those facts is couched in

legal terms'". *U.S. v. Wade*, 203 F. App'x 920, 930 (10th Cir. 2006) (Unpublished); *see also*

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748 761 (7th Cir. 2010) (expert testimony on

whether defendant's performance was "commercially reasonable"); *U.S. v. Dazey*, 403 F.3d

1147, 1171-72 (10th Cir. 2005) ("Although [the expert] also opined that any investment program

using the word 'prime bank' was a fraud and that the Wealth–Mart trading program did not exist,

he did not directly testify that any particular defendant actually violated the law.  Even if [the

expert's] testimony arguably embraced the ultimate issue, such testimony is permissible as long

as the expert's testimony assists, rather than supplants, the [fact finder's] judgment"); *see also*

*Carondelet Sav. & Loan Ass'n v. Citizens Sav. & Loan Ass'n*, 604 F.2d 464, 470 (7th Cir. 1979)

(expert testimony heard to help discern meaning of ambiguous language in loan participation

agreement); *Armstrong Coal*, 2014 WL 4364625, at *2 (allowing dueling experts to opine as to

ownership of several parcels of land).

First, Dr. Mann's testimony goes far beyond the analysis of documentary evidence.  As

noted in Point III.A., *supra*, key elements of Dr. Mann's report relate to her physical examination

of the rimonim at issue and her comparison of those finials to finials that CJI admits are the

property of Shearith Israel (Mann Decl. ¶ 5).  Dr. Mann's expertise in analyzing Jewish ritual

objects is also necessary for her analysis of photographs depicting CJI's collection of rimonim,

from which she is able to establish that CJI had borrowed Shearith Israel's oldest set of rimonim,

which were subsequently returned to Shearith Israel (Mann Supp. at 5-6).

Second, Dr. Mann would help the Court understand many of the ancient documents at

issue here, by contextualizing those documents and by drawing on her specialized knowledge.

For example, Dr. Mann opined that Shearith Israel's May 23, 1869 inventory of property owned

by the Congregation confirms that Shearith Israel owned two pairs of rimonim bearing the mark

of Myer Myers, including the set at issue (Mann Rep. at 6 (citing Ex. 15)).  Dr. Mann took a long

and complex, handwritten document and, using her skill as an art historian, deciphered what was

occurring in 1869.  The inventory refers to two entries that appear under a list entitled "Articles

of Silver", and they read as follows:

> 1 Pair of Do. marked "Myers" (the Maker)    ″ ″ ″
>
> 1 Pair of Do. marked "Myers NewPort"       ″ ″ ″

(id.).  To decipher these two entries, Dr. Mann first had to recognize that the three quotation

marks at the end of each entry referenced a passage several lines above, which reads:

> property of קהל in
>
> keeping of Shamas

(Mann Rep. at 6).  Second, she had to recognize the Hebrew word "קהל" (pronounced *kahal*) and

properly understand from other contexts that it referred to "congregation" (Mann Dep. at 168:11-

16).  Third, she had to recognize that "Shamas" was a transliterated Hebrew title equivalent to a

sexton or synagogue assistant (*id.*).  Fourth, she had to know from her prior work experience that

the term "Do." in the two entries meant "ditto", and were referencing the word "רמונים" five lines

up (*id.* at 167:24-168:2).  Fifth, she had to recognize the Hebrew word "רמונים" (pronounced

*rimonim*) (Mann Rep. at 6).  The result of Dr. Mann's efforts, after applying her expertise to

decode the document, is the conclusion that the inventory of property belonging to Shearith

Israel unambiguously indicates that Shearith Israel owns the rimonim that CJI tried to sell:

> Pair of Do. [Ditto. *i.e.* Rimonim] marked 'Myers' (the Maker), property of [*Kahal*] in keeping of Shamas
>
> Pair of Do. [Ditto. *i.e.* Rimonim] [engraved] New Port property of [*Kahal*] in keeping of Shamas

Going further, Dr. Mann supports her conclusion by noting that the 1869 inventory only

listed property owned by Shearith Israel.  Property that Shearith Israel held but did not own was

not included in the inventory (Mann Dep. at 296:15-16).  Finally, Dr. Mann concludes based on her analysis and investigation that the author of the 1869 inventory was "very thorough", accounting for Shearith Israel property off the synagogue premises, carefully noting when ritual objects had prior owners, and going so far as to account for "the brooms and the rags" (*id.* at 177:6-178:4).  Drawing on this documentary support, Dr. Mann is able to opine that these two entries unambiguously report that Shearith Israel owned the rimonim in 1869.

Dr. Mann's interpretation of the 1869 inventory and many other documents at issue in this case involves what she does as an expert art historian and goes beyond the understanding that a non-expert could glean from independently reviewing the documents (Mann Dep. at 52:2-9; Mann Decl. ¶¶ 2, 8).  Dr. Mann's reading of such documentary evidence draws on her training as an art historian, her expertise in contextualizing sources, and the inferences she is able to draw from these sources based on her knowledge of religious artifacts, Jewish culture, and inter-congregational relationships (Mann Dep. at 27:4-7, 54:11-17, 258:10-24; Mann Decl. ¶ 7).

A third reason for admitting Dr. Mann's testimony is that it would help the Court understand the way in which seemingly insignificant events are more meaningful when viewed as part of a larger context.  *See, e.g.*, *Kantengwa*, 2012 WL 4591891, at *3.  For example, Dr. Mann's opinion that Shearith Israel intended to loan the rimonim to CJI during the turn of the Twentieth Century is based in part on the fact that Shearith Israel sent a mismatched pair, sending only one of the finials with the word "Newport" inscribed on its base (Mann Rep. at 14; Mann Dep. at 10:25-12:3).  Given how the rimonim were kept (who but an expert can opine to this? (Mann Dep. at 99:16-101:3)), Dr. Mann opines that the individuals at Shearith Israel who chose the two finials to be sent to Newport regarded all four of the Myer Myers finials equally as the property of Shearith Israel (Mann Rep. at 14).  In this way, Dr. Mann would assist the Court

in contextualizing historical events in ways that would not be apparent to a lay reader and might be determined by the Court to be quite important in the determination of the issues in suit.

Finally, Dr. Mann's testimony would still be admissible even if "all she has done is read the documents, weigh the evidence, and draw conclusions" (Mann Br. at 7). As in *Walden*, Dr. Mann's testimony should be admitted because she used her special training to help guide her own independent research, identify where to search for sources, formulate searches based on her understanding of the historical context, and evaluate the credibility of sources (Mann Dep. at 23:3-8, 45:18-46:8). Simply having the ability to gather, read, and interpret historical documents is enough to qualify Dr. Mann as an expert historian. *Walden*, 755 F. Supp. 2d at 951.

**C.    Dr. Mann Properly Uses Historical Expertise To Analyze Writings To Determine What Historical Actors Did, Thought, And Intended**

Expert historians have routinely testified regarding the thoughts and actions of historical actors by studying evidence evincing these thoughts and actions. What CJI mischaracterizes as opinions on state of mind is accurately described as assisting the Court in determining the intent of historical parties; or as putting the Court's mind back into history so that the Court can determine the truth. None of this is objectionable.

In *Hunter v. Underwood*, 471 U.S. 222 (1985), the Supreme Court affirmed a finding that a particular article of the Alabama Constitution of 1901 was unconstitutional because it violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 228-29. The Supreme Court credited the expert opinions of historians who "showed that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks". *Id.* This helped establish the "'substantial'" or "'motivating'" factor behind the enactment of the law. *Id.*; *see also N.J./N.Y.*, 1997 WL 291594, at *59 (historian testified concerning public's perception about ownership of land).

In *Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271 (1st Cir. 2003), an expert historian testified "on the precise issue of common knowledge and he concluded by stating his opinion that 'the average consumer in Puerto Rico during the 1950's, during the 1960's' was aware both of health risks, such as cancer and cardiovascular disease, and that 'smoking was or could be difficult to quit'". *Id.* at 277. Likewise, in *Prado Alvarez v. R.J. Reynolds Tobacco Co.*, 313 F. Supp. 2d 61 (D.P.R. 2004), *aff'd*, 405 F.3d 36 (1st Cir. 2005), an expert historian testified that "there has been widespread, pervasive common knowledge throughout the twentieth century" about the adverse effects of smoking. *Id.* at 74. In *Pataki*, an expert historian testified about whether or not everyone in a Native American tribe supported the British, as well as the purpose behind a historic campaign. 165 F. Supp. 2d at 305, 308. A trial court also permitted an expert to opine regarding the effects of discrimination on a Native American tribe. *Bone Shirt v. Hazeltine*, 2003 WL 26091116, at *6-7 (D.S.D. Dec. 31, 2003).

Here, Dr. Mann analyzed the writings of the parties, viewing them through the lens of a historian. Every example CJI quotes shows that Dr. Mann is basing her conclusions on writings, which evidence intent (or lack thereof), or knowledge (or lack thereof) (*see* Mann Br. at 19). CJI attacks Dr. Mann's conclusion that "[she has] seen no evidence indicating that, prior to CJI's attempt to sell the Rimmonim, either CSI or CJI was confused about the fact that CSI owned the Rimmonim" (*id.* (quoting Mann Rep. at 3)). Dr. Mann has reviewed thousands of documents. In her extensive review, she has "seen no evidence" showing CJI's perceived ownership of the rimonim. She addressed this at deposition, explaining this very statement: "I simply meant that there was no *documentary evidence* that contradicted CSI's ownership of everything" (Mann Dep. at 81:3-13 (emphasis added)).

CJI's other example fares no better.  Dr. Mann used Shearith Israel's 1937 Board

Minutes, wherein the Shearith Israel Board considered removing one or more of the Myer Myers

sets of rimonim from Touro, to show that Shearith Israel believed it owned the rimonim (Mann

Br. at 19 (citing Mann Rep. at 11-12)).  There is nothing improper about using historical

documents, authored by the parties, to draw these connections.  Especially since CJI tries to

prove that Shearith Israel somehow slept on its rights, proof that Shearith Israel believed that it

owned the rimonim would help Shearith Israel's defense.  Dr. Mann properly marshals data from

historical documents to infer what historical actors did and thought, based on their own

statements.  In other words, the documents themselves show that actors manifested certain

concerns, thoughts, ideas, and notions – and acted in accordance with them.  The 1937 Minutes

are the evidence allowing Dr. Mann to draw this conclusion (Mann Dep. at 227:9-18).

The cases cited by CJI have nothing to do with the type of expert testimony proffered by

Dr. Mann.  In those cases, the courts excluded testimony which did nothing more than guess

(without support) what the actual living parties to the existing lawsuit were thinking or said.  *See,

e.g.*, *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp.* N.V., 14 F. Supp. 2d 391, 398

(S.D.N.Y. 1998) (excluding expert testimony regarding "what [defendants] did, or what they said

to each other" because "[t]hat evidence must come from the trial testimony of the individuals

concerned, where it will be subject to cross-examination"); *Lippe v. Bairnco Corp.*, 288 B.R.

678, 688 (S.D.N.Y. 2003) (Summary Order) (excluding testimony regarding "the credibility of

defendants' witnesses and defendants' 'real' motivation[n]"), *aff'd*, 99 F. App'x 274 (2d Cir.

2004) (Summary Order); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y.

2004) (excluding expert testimony regarding "intent or motives underlying the conduct" of

defendants); *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 530 (excluding expert

testimony opining on defendants' actual incentives), *amended on reconsideration in part*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001); *OneBeacon Am. Ins. Co. v. Com. Union Assur. Co. of Can.*, 804 F. Supp. 2d 77, 85 (D. Mass. 2011) (excluding testimony regarding intent of the parties to the lawsuit), *aff'd*, 684 F.3d 237 (1st Cir. 2012); *Brown v. Crown Equip. Corp.*, 445 F. Supp. 2d 59, 68-69 (D. Me. 2006) (disallowing "evidence about the subjective intent or state of mind of the defendant or its employees" but allowing expert opinion regarding whether "the defendant's actions or lack of action under certain circumstances complied with the terms of the Policy").

## V.   DR. MANN'S METHODOLOGY IS RELIABLE

Rule 702 and *Daubert* only require that the expert's conclusions have "'a reliable basis in the knowledge and experience of the expert's discipline'". *U.S. v. Vargas*, 471 F.3d 255, 265 (1st Cir. 2006) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)). Testimony with "'good grounds, based on what is known,' should be tested by the adversarial process, rather than excluded". *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011) (quoting *Daubert*, 509 U.S. at 590). "'A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate. . . . Once again, we emphasize that the standard is not that high'". *MacDermid Printing Solutions, Inc. v. Cortron Corp.*, 2014 WL 2615361, at *2 (D. Conn. June 12, 2014).

Dr. Mann, an art historian, sought to put the rimonim in their historical context (Mann Dep. at 26:21-27:7). She did so by following the methods employed by art historians, who "examine the works, compare them to other works and then go on to documentation, to fill out the context of the piece" (*id.* at 50:12-18; *see also id.* at 55:4-9). To understand the context surrounding the rimonim and trace their provenance, Dr. Mann reviewed scores of documents produced by both parties and conducted wide-ranging independent research (Mann Decl. ¶¶ 2-4).

She used her experience with paleography to read and understand the arcane evidence in this case (*id.* at 56:12-17).  Dr. Mann's conclusions are based on "full[y] accepted methods of art historical research" (Mann Decl. ¶ 7).  Dr. Mann's report is based on examination of the finials, a review of the original documents, and a reading of secondary sources, as well as her knowledge and experience in the field of art history and Jewish religious artifacts (*id.*).

A "historian weighs every bit of evidence that comes to hand".  John Phillip Reid, *Law and History*, 27 Loy. L.A. L. Rev. 193, 195-96 (1993) (CJI cites to and paraphrases [but does not quote] this very line – although it attempts to exclude Dr. Mann for weighing evidence).  Dr. Mann did just that.  She reviewed scores of documents produced by both parties, conducted wide-ranging independent research, and supplied Shearith Israel with more than half of all the documents produced in this case (Mann Decl. ¶ 2).  She considered contrary evidence and assessed the reliability of historical evidence and secondary sources (*id.* ¶¶ 2-3, 11).

Dr. Mann painstakingly analyzed the rimonim, photographs, and documents, many of which she discovered, to conclude that in 1764, Shearith Israel paid Myer Myers £36.4.1 to create the rimonim (Mann Rep. at 4-6).  Dr. Mann based her conclusion on at least seven factors, including (1) the silver mark on the finials dating to the time of the payment, (2) the work shows techniques used earlier than those on his second pair, (3) the notation of the £36.4.1 payment to Myer Myers in Shearith Israel's ledger is unique and singular, not equivalent to other types of payment and not explainable on any other basis; (4) the amount paid is equivalent to what the rimonim should have cost based on evidence of the price of chased silver in 1760; (5) facts relating to Myer Myers and his close relationship to Shearith Israel, not to Congregation Yeshuat Israel; (6) the personal, economic, social, political, and military circumstances at play at the time;

and (7) the absence of any evidence from CJI that it ever had a possessory or ownership interest in the rimonim (*id.*; Mann Decl. ¶ 8; Mann Dep. at 75:14-6, 115:23-116:18).

CJI now balks at her conclusion – which is fatal to CJI's case. But that is no reason to strike Dr. Mann's carefully researched and reasoned opinion, rooted in her expertise. CJI contends that Dr. Mann is wrong because (1) no other historian comes to this conclusion, and (2) it is "possible" that the 1764 payment was for something other than rimonim (Mann Br. at 11-14). But (1) Dr. Mann has done more original research on this than any other historian (Mann Dep. at 15:12-13), and explained at deposition why others are wrong (*id.* at 13:13-23, 16:3-18:22); and (2) CJI has not pointed to a single document or piece of evidence that directly refutes Dr. Mann or directly supports an alternate scenario. Furthermore, to the extent CJI wants to challenge Dr. Mann's well-reasoned statements, unrefuted by direct evidence, her testimony "should be tested by the adversarial process, rather than excluded". *Milward*, 639 F.3d at 15 (citing *Daubert*, 509 U.S. at 590).

## A.    Dr. Mann's Testimony Is Impartial And Even-Handed

CJI claims that Dr. Mann saw only a "skewed version of the record" and that her report relied on a "partisan version of the record" supplied by Shearith Israel's counsel (Mann Br. at 17-19). This could not be more wrong – and even were it right, this is precisely the stuff of cross-examination and would only go to the weight her testimony should be given. Dr. Mann's independent research led to the discovery and production of ***more than 6,000 pages*** of Shearith Israel board minutes and other documents (Ex. 39). Shearith Israel promptly produced all the documents that Dr. Mann found to ensure completeness of the factual record (a production that CJI unsuccessfully attempted to preclude) (*see* ECF No. 40). In fact, several of the documents in Dr. Mann's report were found and identified by Dr. Mann (Mann Decl. ¶¶ 2-4). The record confirms that Dr. Mann was not a passive recipient, but the source for ***nearly half*** of the entire

production in this case.  CJI dubs Dr. Mann's research a "limited archival review" (Mann Br. at

17).  This is deceitful and insulting to Dr. Mann's extensive work.

CJI misconstrues Dr. Mann's deposition testimony, where she explicitly notes that the

documents, many of which she found, led her to the conclusion that Shearith Israel owned the

rimonim.  Dr. Mann testified that she reviewed "an amalgam of what [Shearith Israel] had and

what I found that they did not know of", and describes just some of the key documents

uncovered through her research (Mann Dep. at 67:9-68:2).  CJI quotes Dr. Mann's report, which

confirms that she "reviewed many documents provided to me by counsel for Congregation

Shearith Israel" (Mann Br. at 17-18 (quoting Mann Rep. at 3)), but it neglects the very next

sentence, where Dr. Mann states in no uncertain terms, "I have also conducted my own research

in original sources found in the archives of CSI from the relevant time period and have consulted

other printed accounts of the history of CSI and of the Touro Synagogue" (Mann Rep. at 3).

Moreover, Dr. Mann had already independently located the majority of documents that were

eventually produced by Shearith Israel during her independent research (Mann Decl. ¶ 4).

CJI argues that Dr. Mann's testimony should be barred because she did not examine the

*entire* record (Mann Br. at 17).  CJI's contentions mimic those made by defendants in *Cook v.

Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071 (D. Colo. 2006).  In *Cook*, defendants claimed that

plaintiffs' expert "'formulated his opinions based on a few historical documents selected by

plaintiffs' counsel,' and assert on this basis that his intended testimony is based on insufficient

facts and data".  *Id.* at 1106.  The court rejected defendants' skewed allegations, noting that the

expert performed an "exhaustive search . . . and review of relevant documents".  *Id.* at 1107.  The

*Cook* Court further observed that the fact that "counsel provided Dr. Wing with a relative

handful of documents is neither improper nor any grounds to disregard the vast amount of

material Dr. Wing and his assistants collected and that he reviewed to prepare his expert report and testimony". *Id*. This Court should similarly reject CJI's argument in light of Dr. Mann's extensive independent research and significant contributions in locating the majority of documents in this case. Furthermore, Dr. Mann has reviewed and relied on many documents produced by CJI in preparing her report and explicitly incorporated hundreds of pages from those documents into her report, cited to at length in her Appendix B (Mann Rep. App'x B).

Finally, experts need not review every document produced, as CJI contends (Mann Br. at 17 (seeking to exclude Dr. Mann for "failure to examine the entire record"); *see also* Mann Dep. at 66:17-18, 67:3-5, 235:22-23, 236:2-3). But even if CJI's contention held water (it does not), this would go to the weight of testimony, and not its admissibility. *See, e.g.*, *Baker v. Buffenbarger*, 2006 WL 140548, at *6 (N.D. Ill. Jan. 13, 2006) (permitting testimony despite claims that expert reviewed "only those documents that the defendants provided" since "'vigorous cross-examination [and] presentation of contrary evidence . . . are the traditional and appropriate means of attacking shaky but admissible evidence'") (quoting *Daubert*, 509 U.S. at 595). "Challenges to the methodology used by an expert witness are usually adequately addressed by cross-examination". *Echevarria v. Caribbean Aviation Maint. Corp.,* 841 F. Supp. 2d 565, 569 (D.P.R. 2012) (citing *U.S. v. Diaz*, 300 F.3d 66, 76-77 (1st Cir. 2002)); *see also Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001).

CJI then attacks Dr. Mann for "materially misleading scholarship" based on her omission of passages from two quotations that allegedly bolster CJI's claims (Mann Br. at 15-17). But Dr. Mann cited to, and considered, the documents in question, and was not obliged to gratuitously quote sections of documents just because CJI might have asked its own expert to consider those phrases but chose not to call any (*see* Mann Decl. ¶¶ 11-14). Dr. Mann's report cites the entire

source from which she quotes.  Dr. Mann examined a full record, and supplied much of it through her own research.  She is not hiding the ball from CJI or from this Court, and if CJI thinks otherwise, this is proper fodder for "[v]igorous cross-examination [and] presentation of contrary evidence", but does not warrant wholesale preclusion.  *Daubert*, 509 U.S. at 595.

## VI.    DR. MANN PROPERLY OPINES ON INTER-CONGREGATIONAL RELATIONSHIPS

Dr. Mann draws on her life-long experience and her readings of historical sources to opine on the importance of inter-congregational relationships and inter-congregational support (Mann Dep. at 258:13-24).  The advisory committee's notes to Rule 702 make clear that "experience alone—or experience in conjunction with other knowledge, skill, training or education—may [] provide sufficient foundation for expert testimony".  Fed. R. Evid. 702 advisory committee's notes (2000 Amends.).  CJI tries to minimize Dr. Mann's expertise in this area by stating without any foundation that her expertise is based "principally" on her 23 years of marriage to a Rabbi (Mann Br. at 20).  While that experience has helped inform Dr. Mann's understanding of inter-congregational relationships, she testified to far more significant personal and professional experiences that inform her expertise.  Dr. Mann comes from a rabbinical family where inter-congregational relationships were discussed "all the time" (Mann Dep. at 57:25-58:6, 259:10-13).  She further testified to reading "hundreds" of sources on inter-congregational relations, as well as writing a book that deals with this subject (*id.* at 260:4-7, 262:9-17, 265:15-22, 267:2-11, 270:20-271:27).  Finally, Dr. Mann testified to numerous examples of the relationship between Shearith Israel and a number of other congregations that bolster her understanding of inter-congregational relationships (*id.* at 262:9-17).

Dr. Mann's personal and professional experience with inter-congregational relationships, coupled with her knowledge of facts in this case, helped inform Dr. Mann's opinion regarding

the important role that trust plays in the centuries-old system of inter-congregational support (Mann Rep. at 13-14).  As Dr. Mann noted, Shearith Israel's financial and spiritual assistance in founding both CYI and CJI are primary examples of the importance of this system of trust to the sustenance of Jewish communal life (Mann Dep. at 262:9-17).  Dr. Mann further testified, based on her life-long experience with inter-congregational relationships, that this system of trust remains crucial to many congregations throughout the western hemisphere (*id.* at 258:10-24).  Based on her knowledge and expertise, Dr. Mann properly opined that allowing CJI to sell property owned by Shearith Israel would harm this system of trust, deterring similar loans in the future (Mann Rep. at 13-14).  To the extent that CJI believes this conclusion lacks sufficient basis, they "are free to cross-examine [Dr. Mann] where they think [her] foundations and premises are inadequate or unreliable".  *Baker*, 2006 WL 140548, at *6.

## VII.    DR. MANN'S SUPPLEMENTAL REPORT WAS PROPER

Dr. Mann's Addendum to her expert report was justified and proper.  A party may supplement an expert report if the supplementation is "'substantially justified or is harmless'".  *Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 62 (1st Cir. 2011).  The purpose of expert disclosure is to provide "notice" to the opposing party, *JJI Int'l, Inc. v. Bazar Grp., Inc.*, 2013 WL 3071299, at *4 (D.R.I. Apr. 8, 2013), and "'prevent [ ] unfair tactical advantage'",  *Gay*, 660 F.3d at 62.  CJI's only claim of prejudice is that the addendum was served too close in time to its *Daubert* motion (Mann Br. at 20-21).  This fact is irrelevant, given that Dr. Mann's addendum was served nearly ***four months*** before trial.  Even if the addendum had contained new opinions or theories (it does not), CJI has plenty of time to react to it.  Moreover, the Court will recall that CJI chose not to call any experts as part of its own case – CJI cannot suffer prejudice by the inclusion of the addendum.  The Court should also be aware that CJI itself is still engaging in factual document production.  Indeed, over the past two weeks, CJI has produced over six

hundred pages of documents going to the heart of its principal defense (Solomon Decl. ¶ 3).

But Dr. Mann's addendum contains nothing new.  In both her report, and her deposition, Dr. Mann clearly expresses the two opinions in the addendum, namely that (1) the £36.4.1 ledger entry represents payment for the rimonim (Mann Rep. at 5-6; Mann Dep. at 75:14-75:6, 111:13-113:4, 121:17-122:5, 179:5-180:19); and (2) there was a historical pattern of Shearith Israel loaning objects of worship to CJI, which Shearith Israel controlled (Mann Rep. at 8; Mann Dep. at 196:17-200:13).  Indeed, the addendum was occasioned by questions CJI counsel asked during the deposition, and their requests that Dr. Mann provide additional support for her opinions (Mann Dep. at 74:23-25, 75:6-8, 12-13, 117:4-8, 122:6-7, 123:21-23, 179:5-7, 200:12; Mann Decl. ¶ 9).  Given that Dr. Mann's addendum was occasioned by CJI's own deposition questions, CJI cannot earnestly claim surprise or prejudice – particularly not months in advance of trial when CJI continues to produce for the first time hundreds of pages of what it claims are highly relevant documents.  The addendum is both "'substantially justified'" and "'harmless'", *Gay*, 660 F.3d at 62, and is wholly consistent with the expert disclosure requirements of Rule 26.

With respect to Section A of Dr. Mann's Addendum, Dr. Mann was repeatedly asked about her opinion that a £36.4.1 payment in 1764 from Shearith Israel to Myer Myers was for the rimonim (Mann Dep. at 74:6-75:6, 111:13-113:4, 121:17-122:5, 179:5-180:19).  Dr. Mann explained that the ledger where this payment was recorded contained three types of payments, and the language used to describe the £36.4.1 payment was consistent with language used to describe other payments for silver, not with language used to describe the only two other categories of payments (*id.* at 75:14-76:6).  Counsel for CJI did not seem to understand her point, which she tried to make repeatedly (*id.* at 111:13-113:4, 122:2-5, 179:14-180:19).  As Dr. Mann explains, she was reiterating this point in her addendum "because counsel for CJI's questions at

my deposition did not allow for a full statement of the above points" (Mann Decl. ¶ 9).  The purpose of Section A was simply to provide examples of the three types of payments.

Similarly, Section B of the Addendum discussed two photographs Dr. Mann referred to at her deposition (Mann Dep. at 197:21-25, 198:24-25) in order to "clarify [her] testimony for CJI counsel" (Mann. Decl. ¶ 9).  One, published in 1936, shows that Shearith Israel's oldest, most valuable pair of rimonim was then at Touro (Mann Supp. at 5).  Another, published in 1956, shows that CJI no longer had those rimonim (*id.*).  Dr. Mann offered that evidence to support her claim that Shearith Israel had a pattern of lending valuable sacred objects to CJI and getting their return (Mann Rep. at 7).

Even assuming, *arguendo*, that there is anything new in the Addendum (there is not), Shearith Israel has a duty to supplement Dr. Mann's expert testimony under Rule 26(e).  The duty to supplement applies wherever a party "determines that it may use a witness or document that it did not previously intend to use".  Fed. R. Civ. P. 26(e)(1) advisory committee's note (2000 Amends.).  Supplemental reports are timely if submitted 30 or more days before trial.  Fed. R. Civ. P. 26(e)(2); *see* Fed. R. Civ. P. 26(a)(3)(B).  "Where the movant seeks preclusion of [a supplemental report], the focus of the court's inquiry is upon surprise and prejudice".  *U.S. v. Davis,* 1993 WL 414761, at *1 (D.R.I. Apr. 14, 1993).  The burden is on the party who seeks preclusion "to convince the court that any violation of discovery requirements has occurred".  *Id.*

Dr. Mann's Addendum is the product of research she conducted after CJI repeatedly asked about her opinion and for additional documents at her deposition (Mann Dep. at 74:23-25, 75:6-8, 12-13, 117:4-8, 122:6-7, 123:21-23, 179:5-7, 200:12; Mann Decl. ¶ 9).  It is therefore admissible under Rule 26(e), which allows parties to complete any disclosures made at deposition up to 30 days before trial.  As noted above, CJI suffers no prejudice from the

addendum.  CJI, as the party seeking preclusion of the supplemental disclosure, carries the

burden of showing that a violation of discovery rules occurred and that it has been prejudicial.

*Licciardi v. TIG Ins. Grp.*, 140 F.3d 357, 363 (1st Cir. 1998).  CJI cannot carry its burden on this

record.  Given Shearith Israel's compliance with Rule 26(e), and given the lack of prejudice and

surprise to CJI, the Court should allow Dr. Mann's Addendum.

The only other objections raised by CJI against Dr. Mann's Addendum mirror their

objections to Dr. Mann's initial report, that her opinions are too speculative (Mann Br. at 21-22).

These arguments are appropriate for cross-examination, not as a basis for precluding her opinion.

*Baker*, 2006 WL 140548, at *6.

## CONCLUSION

For the foregoing reasons, the Court should deny CJI's Motion in its entirety and allow

Dr. Mann's proposed testimony.

CONGREGATION Shearith Israel,

By its Attorneys,
/s/ Deming E. Sherman
Deming E. Sherman (#1138)
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI  02903
(401) 274-9200
(401) 276-6611
E-mail: deming.sherman@lockelord.com

/s/ Louis M. Solomon
Louis M. Solomon (Admitted *Pro Hac Vice*)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
Tel.:  1 (212) 504-6600
Fax:  1 (212) 504-6666
E-mail: Louis.Solomon@cwt.com

February 2, 2015

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of February, 2015, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

/s/ Louis M. Solomon