UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CONGREGATION JESHUAT ISRAEL,  :
:
             Plaintiff,  :
:
             v.  :      C.A. No. 12-822M
:
CONGREGATION SHEARITH ISRAEL,  :
:
             Defendant.  :

**DECLARATION OF DR. VIVIAN MANN IN OPPOSITION TO CJI'S MOTION
TO EXCLUDE HER EXPERT TESTIMONY**

Dr. Vivian Mann declares as follows pursuant to 28 U.S.C. § 1746:

        1.     Counsel for Defendant Congregation Shearith Israel showed me the motion made by Plaintiff Congregation Jeshuat Israel (which I will refer to as CJI, although CJI refers to itself as Touro, which is not its correct name) and advised me that I was permitted to respond to portions of that motion directed to erroneous points and mischaracterizations made by CJI. I do so here, but only with respect to the most serious errors and groundless attacks made by CJI against me. I ask the Court to review my initial report and addendum as well as my deposition for a statement of my opinions. I understand that Shearith Israel will be submitting a legal memorandum addressing the motion.

        2.     CJI makes the recurring accusation that Shearith Israel counsel furnished me with all the documents on which I based my opinions (*see, e.g.*, CJI Motion to Exclude the Testimony of Dr. Vivian Mann ["Mann Br."] at 1-2, 8, 10, 17). CJI's statement is completely inaccurate and is not supported by anything I said in my report or deposition. On the contrary, it was at my behest that eighteenth-century documents such as the CSI Ledger were reviewed. I

1

am the one who conducted all of that review – as well as a review of the original CSI Board minutes of the nineteenth century. It was I who independently conducted research into secondary literature as well at the libraries of the Jewish Theological Seminary and the Jewish Museum. I made at least 10 transfers of photographs of original documents to Shearith Israel counsel, which I discovered and photographed during my independent research: three date before my report was submitted, and seven after, because of requests from counsel for CJI. Of the more than 70 photographs that I took of documents, I discovered and photographed approximately 50 during my independent research before meeting with CSI counsel for the first time. These included documents about which Shearith Israel had no prior knowledge or had only incomplete knowledge. To demonstrate the level of falsehood in the CJI memorandum, attached hereto are additional documents, constituting original photographs of documents that I took during the course of my research, many of which have already been produced in this case (Ex. 40).

3. Additionally, in pursuing a thorough examination of the rimmonim, I requested that CSI counsel furnish additional documents related to Ubaldo Vitale's restoration of the rimmonim around the year 2001. I understand that, in response to this request, CSI counsel issued a subpoena to Ubaldo Vitale and obtained documents and photos detailing the restoration work he did, which were subsequently produced. These documents are examples of CSI counsel's aid in providing to me any documents I requested, whether or not supportive of CSI's position.

4. All or most of the above research was done before I met with counsel for Shearith Israel. Subsequently, counsel did furnish their copies of original documents such as letters. The contents of most of these I had already encountered during my own research, although they were not always transcribed verbatim in secondary sources.

5. CJI counsel submitted another irresponsible accusation in asserting that I

relied excessively on documents in my report and testimony, which is not in accord with the working practice and procedures used by art historians (Mann Br. at 7).  As CJI counsel phrased the problem, "Dr. Mann does not in her report rely on physical analysis of the disputed Rimonim [sic] to support her conclusions"  (Mann Br. at 5).  This statement too is false.  Before the examination of the finials and after, I researched documents that would contextualize them within the history of Shearith Israel.  But, as I explained at my deposition, I had seen the finials at issue at the MFA in December 2013, and I examined the Shearith Israel finials during the week of October 20, 2014.  I observed the following, among other things:

- that the copper armatures within the two finials were made differently, one by a technique used earlier in the 18th Century, and another used later.  This fact supports the conclusion that the two finials in New York, one with the word Newport and one without, were made at different times and that the two finials now on loan to the MFA in Boston, one with the word Newport and one without, were made at different times.
- that two different chasers and engravers worked on the floral decoration of the finials, which accords with the first finding and with Dr. Barquist's statements regarding the personnel associated with the Myer Myers atelier in the period when both sets of finials were made.
- that there was no evidence for the speculation that the shafts of the finials were switched at some time after they were made (MFA 0160).

6.   CJI claims that I asserted "legal determinations" during my deposition (Mann Br. at 6, 9, 10).  This too is false.  When I was retained as an expert witness, I was asked by Shearith Israel counsel to determine the provenance of the finials, that is, to determine the history of their possession and/or ownership.  This is a task routinely undertaken by art historians.  Within this framework, I made attestations of facts that serve to reconstruct the

3

provenance of the finials.  At no time did I assert that I was offering legal opinions.  At several times during my deposition, I reminded counsel for CJI that I was not an expert on US law, but that I had written a book that included material on legal issues in Jewish law (Mann Dep. at 270-72).  I understand that deciding the law is a matter for this Court; I have no intent to do that, and I have not.

       7.      CJI also asserts that "Dr. Mann has not based her analysis on objective fact" (Mann Br. at 11-14).  This statement is simply untrue.  My history of the provenance of the Myer Myers finials is based on examination of the finials, on a review of original documents, on a reading of secondary sources, as well as my knowledge and experience in the field of art history, especially in the field of Jewish ceremonial art.  My work has been based fully on accepted methods of art historical research.

      8.      CJI claims some defect in my identification of the 1764 payment of £36.4.1 as payment for rimmonim.  I based my conclusion on a number of factors, including: 1) that the silver mark on the finials dates to the time of the payment; 2) the work shows techniques used earlier than those on Myers' second pair; 3) the notation of the payment in the Shearith Israel Ledger is unique and singular, not equivalent to other types of payment to Myer Myers and not explicable on any other basis; (4) the amount paid is, basically, exactly what the rimmonim "should have" cost based on the evidence of Barquist (p. 52):

> The price of chased silver in 1760 was 18 shillings per oz.  The earlier pair of finials weighed a total of ~40.8 oz. according to Barquist. 40.8 oz. x 18 shillings per oz.=734.4 shillings, divided by 20 shillings per pound = £36.14.4.  The payment to Myer Myers was £36.4.1, a nearly identical sum;

(5) facts relating to Myer Myers and his relationship to Shearith Israel and the absence of any documentation of a relationship to Congregation Yeshuat Israel, which is apparent in the language used to describe the payments in the eighteenth century; the familiar, possessory

4

language used to describe the rimmonim in the nineteenth century (for example, in the 1869 Inventory, which was a "complete Inventory of all the property and effects belonging to the Congregation" (Ex. 15); and the absence of board minutes or other writings suggesting that Shearith Israel was holding the rimmonim for safekeeping); (6) the personal, economic, social, political, and military circumstances at play at the time; and (7) the absence of any evidence from CJI that it has ever had a possessory or ownership interest in the rimmonim.

9. My reiteration of these considerations concerning the documents in my Addendum is not new, but are summarized here because counsel for CJI's questions at my deposition did not allow for a full statement of the above points. The same holds true for the photographs described in the Addendum, which I had also described at my deposition. They were placed in the Addendum to clarify my testimony for CJI counsel.

10. I never stated that the payment to Myer Myers in 1775 for £10.15 was the entire payment for the rimmonim. The language in the Shearith Israel Ledger states "to Mr. Myer Myers due him on a pair Rimmonim." Counsel criticizes my report based on *his* interpretation of the wording of the minutes, while I maintain that the sum represents partial payment given the amount of silver and the workmanship of the rimmonim. Respectfully, I am not speculating; counsel for CJI is. [Following the same process used above for the earlier pair of rimmonim: 42 +34 dwt.= 43 7/10 oz. x 18 shillings=786.6 shillings divided by 20 shillings per pound=£ 39.6  total cost of second pair, of which £ 10.5 was a partial payment.]

11. CJI asserts that I picked only the evidence supporting Shearith Israel's case (Mann Br. at 9). This too is untrue, and I did and do reject some of the statements of counsel for CJI as they are untenable. For example, the inclusion in the CJI motion of some of the discussion concerning an exhibition brochure by Tom Freudenheim (then a curator at the Jewish Museum NY) misrepresents what I said at my deposition. I stated then that I accepted Freudenheim's discussion of the **use** of finials within a synagogue, but the exhibition brochure

5

did not present evidence of original research on the provenance of the finials (Mann Dep. at 52-54). I stand by that.

12. CJI is at its most misleading when it accuses me of falsifying the meaning of a document by omitting key words and by relying on the same document to reach an erroneous conclusion (Mann Br. at 15). The sequence of events from 1818-1833 is as follows (nothing of substance was omitted from my quotation of the minutes, for the reasons that are quite clear):

> On January 11, 1818, the Trustees of Shearith Israel decided to ask Mrs. Moses Seixas and her son Benjamin to return two Torah Scrolls that Shearith Israel had lent to Newport in 1760 and that were still in the home of the Seixas family. As noted in my report (Mann Rep. at 9), the Trustees offered to consider a further *loan* of the two Scrolls "If hereafter a minyan shall be in New Port RI." They also noted that the Seixas family was in possession of "*other* Sepharim" – that were in addition to the two that Shearith Israel had loaned. As to those "other" scrolls belonging to the Newport synagogue, Shearith Israel resolved that in case the Seixas family agreed and they "will forward them to this City, the Trustees will deposit them in Hachal in the new Shool [synagogue] for safekeeping." CSI also offered to pay the costs of shipping the scrolls.
>
> On December 11, 1832, the Trustees of Shearith Israel decided to again ask Mrs. Seixas and her son to transfer these other additional scrolls belonging to the Newport synagogue to Shearith Israel for safekeeping. On February 10, 1833, the committee reported that the four Sepharim belonging to Newport were transferred and a receipt for same given to the Seixas's.

It is clear that the only time the phrase "safekeeping" is used in the CSI minutes cited above is

6

with respect to the four Torah scrolls belonging to the Newport congregation. There is no reference at all to rimmonim. (When CSI documents refer to Torah scrolls that include rimmonim, the "bells" are specifically mentioned.)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in New York, NY on February 1, 2015.

_____
  Dr. Vivian Mann