**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| CONGREGATION JESHUAT ISRAEL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 12-822M |
| | : | |
| CONGREGATION SHEARITH ISRAEL, | : | |
| | : | |
| Defendant. | : | |

**CONGREGATION SHEARITH ISRAEL'S OPPOSITION TO
PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED
<u>EXPERT TESTIMONY OF PROFESSOR LINFORD FISHER</u>**

Deming E. Sherman (#1138)
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI  02903
Tel.:  (401) 274-9200
Fax:  (401) 276-6611
E-mail: <u>dsherman@lockelord.com</u>

Louis M. Solomon (Admitted *Pro Hac Vice*)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
Tel.:  (212) 504-6600
Fax:  (212) 504-6666
E-mail: <u>Louis.Solomon@cwt.com</u>

*Attorneys for Defendant*
*Congregation Shearith Israel*

February 2, 2015

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................................................ii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 6

I.    PROFESSOR FISHER'S CREDENTIALS AND EXPERTISE.........................................6

II.   CJI'S CLAIMS AND PROFESSOR FISHER'S PROPOSED TESTIMONY ...................7

ARGUMENT ........................................................................................................................ 10

III.  LEGAL STANDARD..........................................................................................................10

IV.   PROFESSOR FISHER IS QUALIFIED TO TESTIFY AS AN EXPERT ......................12

V.    PROFESSOR FISHER'S TESTIMONY IS BASED UPON SPECIALIZED
      KNOWLEDGE THAT WILL HELP THE TRIER OF FACT UNDERSTAND
      THE EVIDENCE................................................................................................................15

      A.    Historians Such As Professor Fisher Routinely Provide Expert Testimony
            Analyzing Documents And Evidence And Providing Historical Context............15

      B.    Professor Fisher Properly Uses Historical Expertise To Analyze Writings
            To Determine What Historical Actors Did, Thought, And Intended...................17

      C.    Professor Fisher Permissibly Provides Testimony About The Historical
            Context And Factual Meanings Of Historical Legal Documents .........................20

VI.   PROFESSOR FISHER'S METHODOLOGY IS RELIABLE..........................................23

VII.  PROFESSOR FISHER'S DEPOSITION AND ADDENDUM REPORT.......................26

CONCLUSION..................................................................................................................... 30

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES:**

*ADP Marshall, Inc. v. Noresco, LLC*,
  710 F. Supp. 2d 197 (D.R.I. 2010)........................................................................11

*Alvarado v. Weinberger*,
  511 F.2d 1046 (1st Cir. 1975)...............................................................................14

*Armstrong Coal Co. v. Blackburn*,
  2014 WL 4364625 (W.D. Ky. Sept. 3, 2014).......................................................21

*Baker v. Buffenbarger*,
  2006 WL 140548 (N.D. Ill. Jan. 13, 2006)...........................................................25

*BASF Corp. v. Sublime Restorations, Inc.*,
  880 F. Supp. 2d 205 (D. Mass. 2012)...................................................................28

*Beaudette v. Louisville Ladder Grp., LLC*,
  2005 WL 2573384 (D.N.H. Oct. 7, 2005), *aff'd*,
  462 F.3d 22 (1st Cir. 2006)...................................................................................15

*Bldrs. Steel Co. v. Comm'r*,
  179 F.2d 377 (8th Cir. 1950) ................................................................................12

*Bone Shirt v. Hazeltine*,
  2003 WL 26091116 (D.S.D. Dec. 31, 2003) ........................................................18

*Brown v. Crown Equip. Corp.*,
  445 F. Supp. 2d 59 (D. Me. 2006) ........................................................................20

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
  239 F.3d 179 (2d Cir. 2001)..................................................................................25

*Carondelet Sav. & Loan Ass'n v. Citizens Sav. & Loan Ass'n*,
  604 F.2d 464 (7th Cir. 1979) ................................................................................21

*Cayuga Indian Nation of N.Y. v. Pataki*,
  165 F. Supp. 2d 266 (N.D.N.Y. 2001), *rev'd on other grounds*,
  413 F.3d 266 (2d Cir. 2005)......................................................................16, 18, 22

*Cook v. Rockwell Int'l Corp.*,
  580 F. Supp. 2d 1071 (D. Colo. 2006)..................................................................24

**PAGE(S)**

*Crowe v. Marchand*,
    506 F.3d 13 (1st Cir. 2007)...................................................................................11

*Cruz-Vargas v. R.J. Reynolds Tobacco Co.*,
    348 F.3d 271 (1st Cir. 2003)................................................................................18

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993).......................................................... 10, 23-24, 25, 26

*Diefenbach v. Sheridan Transp.*,
    229 F.3d 27 (1st Cir. 2000).................................................................................12

*Echevarria v. Caribbean Aviation Maint. Corp.*,
    841 F. Supp. 2d 565 (D.P.R. 2012)..................................................................25

*EEOC v. Bloomberg L.P.*,
    2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010).................................................26

*Faulkner v. Arista Records LLC*,
    2014 WL 4547824 (S.D.N.Y. Sept. 15, 2014).................................................26

*Gay v. Stonebridge Life Ins. Co.*,
    660 F.3d 58 (1st Cir. 2011).............................................................................28, 29

*Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*,
    345 F.3d 15 (1st Cir. 2003).............................................................................12, 14

*Hunter v. Underwood*,
    471 U.S. 222 (1985)..............................................................................................18

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)..............................................................19

*In re Salem*,
    465 F.3d 767 (7th Cir. 2006) ..............................................................................11

*JJI Int'l, Inc. v. Bazar Grp., Inc.*,
    2013 WL 3071299 (D.R.I. Apr. 8, 2013)..........................................................28

*Kidder, Peabody & Co. v. IAG Int'l Accept. Grp. N.V.*,
    14 F. Supp. 2d 391 (S.D.N.Y. 1998).................................................................19

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) .......................................................................................10-11

*Levin v. Dalva Bros.*,
    459 F.3d 68 (1st Cir. 2006)..................................................................................11

USActive 32020979.10

**PAGE(S)**

*Lippe v. Bairnco Corp.*,
288 B.R. 678 (S.D.N.Y. 2003), *aff'd*,
99 F. App'x 274 (2d Cir. 2004) (Summary Order) ................................................. 19

*MacDermid Printing Solutions, Inc. v. Cortron Corp.*,
2014 WL 2615361 (D. Conn. June 12, 2014) ....................................................... 24

*Marshall v. Perez Arzuaga*,
828 F.2d 845 (1st Cir. 1987) .............................................................................. 14

*Marx & Co. v. Diners' Club, Inc.*,
550 F.2d 505 (2d Cir. 1977) ............................................................................... 23

*Metavante Corp. v. Emigrant Sav. Bank*,
619 F.3d 748 (7th Cir. 2010) ........................................................................ 11, 21

*Mille Lacs Band of Chippewa Indians v. Minn.*,
861 F. Supp. 784 (D. Minn. 1994), *aff'd*,
124 F.3d 904 (8th Cir. 1997), *aff'd*,
526 U.S. 172 (1999) ........................................................................................... 22

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
639 F.3d 11 (1st Cir. 2011) .......................................................................... 23-24

*Minn. v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999) ........................................................................................... 16

*Mitchell v. U.S.*,
141 F.3d 8 (1st Cir. 1998) .................................................................................. 14

*N.J. v. N.Y.*,
1997 WL 291594 (U.S. Mar. 31, 1997) ................................................... 16, 18, 22

*N.Y. v. Shinnecock Indian Nation*,
523 F. Supp. 2d 185 (E.D.N.Y. 2007), *vacated & remanded on other grounds*,
686 F.3d 133 (2d Cir. 2012) ........................................................................ 22, 23

*OneBeacon Am. Ins. Co. v. Com. Union Assur. Co. of Can.*,
804 F. Supp. 2d 77 (D. Mass. 2011), *aff'd*,
684 F.3d 237 (1st Cir. 2012) ....................................................................... 19-20

*Payton v. Abbott Labs*,
780 F.2d 147 (1st Cir. 1985) .............................................................................. 14

*Peckham v. Cont'l Cas. Ins. Co.*,
895 F.2d 830 (1st Cir. 1990) ....................................................................... 20-21

USActive 32020979.10

**PAGE(S)**

*Phillips v. Calhoun,*
   956 F.2d 949 (10th Cir. 1992) ...............................................................16

*Polidore v. McBride,*
   2010 WL 3666971 (D.R.I. Sept. 13, 2010)..........................................26

*Prado Alvarez v. R.J. Reynolds Tobacco Co.,*
   313 F. Supp. 2d 61 (D.P.R. 2004), *aff'd,*
   405 F.3d 36 (1st Cir. 2005) ...................................................................18

*Primavera Familienstifung v. Askin,*
   130 F. Supp. 2d 450, *amended on reconsideration in part,*
   137 F. Supp. 2d 438 (S.D.N.Y. 2001)...................................................19

*R.W. Int'l Corp. v. Welch Foods, Inc.,*
   937 F.2d 11 (1st Cir. 1991)....................................................................27

*Rowe Entm't, Inc. v. William Morris Agency, Inc.,*
   2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003)...................................26

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.,*
   161 F.3d 77 (1st Cir. 1998)..............................................................10, 11

*Saginaw Chippewa Indian Tribe of Mich. v. Granholm,*
   690 F. Supp. 2d 622 (E.D. Mich. 2010)..........................................14, 16

*Santos v. Posadas De P.R. Assocs.,*
   452 F.3d 59 (1st Cir. 2006)....................................................................12

*Trafton v. Sunbury Primary Care, P.A.,*
   689 F. Supp. 2d 198 (D. Me. 2010) ......................................................14

*U.S. v. Brown,*
   415 F.3d 1257 (11th Cir. 2005) ............................................................11

*U.S. v. ConAgra Grocery Prods. Co.,*
   4 F. Supp. 3d 243 (D. Me. 2014) ..........................................................11

*U.S. v. Dazey,*
   403 F.3d 1147 (10th Cir. 2005) ............................................................21

*U.S. v. Diaz,*
   300 F.3d 66 (1st Cir. 2002)....................................................................25

*U.S. v. Kantengwa,*
   2012 WL 4591891 (D. Mass. Oct. 3, 2012).........................................16

USActive 32020979.10

**PAGE(S)**

*U.S. v. Members of Est. of Boothby*,
16 F.3d 19 (1st Cir. 1994) ............................................................................12

*U.S. v. Reed*,
575 F.3d 900 (9th Cir. 2009) .......................................................................16

*U.S. v. Vargas*,
471 F.3d 255 (1st Cir. 2006) ........................................................11, 12, 23

*U.S. v. Wade*,
203 F. App'x 920 (10th Cir. 2006) (Unpublished) .................................21

*Walden v. City of Chi.*,
755 F. Supp. 2d 942 (N.D. Ill. 2010) .......................................15, 16-17, 21-22

*Warford v. Indus. Power Sys., Inc.*,
553 F. Supp. 2d 28 (D.N.H. 2008) .............................................................11

*Willco Kuwait (Trading) S.A.K. v. deSavary*,
843 F.2d 618 (1st Cir. 1988) .......................................................................21

**STATUTES & OTHER AUTHORITIES:**

Fed. R. Civ. P. 37(a)(2) (former) ...............................................................27

Fed. R. Evid.:
401(a) ...........................................................................................................16
702 advisory committee's note (2000 Amends.) ........................................10
702(a) .................................................................................................10, 15-16
704 ..........................................................................................................20-21
704(a) ...........................................................................................................20

11 Charles Alan Wright *et al.*,
*Fed. Prac. & Proc.: Civil 3d* § 2885 (2002 & Supp. 2014)..............11-12

USActive 32020979.10

Defendant Congregation Shearith Israel ("Shearith Israel") respectfully submits this memorandum in opposition to the January 20, 2015 motion of Plaintiff Congregation Jeshuat Israel ("CJI") to strike *the entirety of* the opinions and grounds of American history expert Professor Linford Fisher ("Fisher Br.").  Professor Fisher's expert testimony is proper and germane: (1) he is qualified to opine on the topics addressed in his report; (2) his skill and knowledge will assist the Court in analyzing the volumes of ancient evidence that will be before it at trial; and (3) his opinions are based on accurate records and methods, reliably applied.

To avoid repetition, the Introduction below will also serve to introduce Shearith Israel's memorandum opposing CJI's motion to strike *the entirety of* the opinions and grounds of Judaica art historian and provenance expert Dr. Vivian Mann ("Mann Br.").  Both experts have submitted Declarations opposing CJI's motions ("Fisher Decl." and "Mann Decl.").  All documents cited in all the submissions are annexed as exhibits to the Declaration of Louis M. Solomon.

## **INTRODUCTION**

CJI feels the need to confuse the Court by calling itself "Touro", the name of a synagogue building that Shearith Israel has owned for ~200 years and that CJI has leased since 1903.  We will avoid that confusion and call the lessee by its acronym, CJI.  CJI's lawsuit involves ownership and control of the Touro Synagogue ("Touro"), its historic cemetery, and at least four Torah finials, known in Hebrew as rimonim.  Rimonim are ritual objects housed in the synagogue, typically with the Torah scrolls, and the four at issue were made by silversmith Myer Myers approximately 250 years ago.

CJI seeks extraordinary relief:  first, declarations that CJI is the "true and lawful owner of" the four rimonim and that if Shearith Israel owns the rimonim, it does so "in trust for the sole benefit of [CJI]" (CJI Complaint ("Compl.") ¶¶ 24, 30); second, an injunction that Shearith Israel

may not interfere with CJI's intended sale of two of the rimonim (*id.* ¶ 28); third "to remove [Shearith Israel] as Trustee for the Newport synagogue and land" and hand over the "trust property" to CJI (*id.* ¶ 37); and fourth, to remove Shearith Israel representatives from the CJI Board, notwithstanding that the CJI Constitution and By-Laws irrevocably permit Shearith Israel participation unless Shearith Israel agrees otherwise, which it has not (Ex. 7 ¶¶ 3-5).

The relief sought by CJI is as unfounded as it is audacious. The rimonim were made more than 130 years before CJI even came into existence. CJI can produce no bill of sale or gift or deed that it owns the rimonim. It can produce no trust instrument that identifies CJI as the beneficiary of any trust. It can produce no document duly amending its Constitution and By-Laws, eliminating the otherwise irrevocable right of Shearith Israel to sit on the CJI Board. Nor can it produce any witness to testify to the historical facts that CJI must prove to carry its burden of proof. When, 112 years ago, CJI sued Shearith Israel over some of the exact same issues -- whether CJI had the right to possess Touro and its contents or was the beneficiary of any trust -- CJI lost across-the-board on a demurrer (Ex. 8).

CJI admits that it used the Touro synagogue, its appurtenances, and paraphernalia pursuant to leases from Shearith Israel signed in 1903 and 1908 (CJI's Amended Answer to Counterclaim ("CJI Answer") ¶ 2). CJI swore to the government that the lease remains in effect (Ex. 9). CJI's website similarly admits that CJI, as lessee, pays rent to Shearith Israel as owner and lessor (it paid rent as recently as 2012, when it sued Shearith Israel) (Ex. 10). On the basis of these admissions alone, CJI's claims fail.

But CJI admits four additional things: (i) Shearith Israel acquired "legal oversight" over the Synagogue building and its contents by 1820, which it has never relinquished (Ex. 10); (ii) approximately 83 years later, when CJI lost the litigation it brought against Shearith Israel, CJI

irrevocably surrendered the Touro Synagogue building (into which it and/or others had unlawfully broken) as well as "fixtures" and "paraphernalia" back to Shearith Israel, literally handing back the keys to a locked edifice, leaving CJI with absolutely nothing (*e.g.*, no rimonim) and declaring Shearith Israel "owners of the property" (Exs. 11-12); (iii) in 1903, at the time of the formal Handing Over of the Keys Ceremony, CSI and Shearith Israel went over the personal property that CJI did not own, possess, and have access to, which would have included the rimonim, so that there would be no confusion concerning what CJI was getting access to *as lessee* (Exs. 13-14); and (iv) the parties specifically included personal property of the Synagogue (*e.g.*, the rimonim) in their discussions, litigation, and resolution (Exs. 13-14).  Rimonim were specifically adverted to in at least 13 mid-to-late Nineteenth Century and early Twentieth Century documents as ***belonging to Shearith Israel*** or as being ***loaned*** to CJI, ***not owned*** by CJI (Exs. 15-27).

Against the overwhelming documentary record, and with zero direct documentary or testamentary evidence to support its claims, CJI substitutes a narrative of allegations.  Well over half the CJI Complaint contains allegations of events over 100 years old.  CJI's claimed narrative includes allegations that CJI "is the continuation and legal successor to that original community" established 250 years ago (Compl. ¶ 5); that when Shearith Israel assumed legal oversight over Touro and its contents, it was doing so just "for safekeeping" (*id.* ¶¶ 13, 22); that when CJI surrendered Touro and all of its real and personal property back to Shearith Israel, and subsequently leased it back from Shearith Israel, this somehow did not include the rimonim (CJI Answer ¶ 26); that an inscription "Newport" on two of the four finials, made dozens of years before CJI's founding, supports its claims (Compl. ¶ 15); that even though one of the finials marked "Newport" has been in New York since before CJI existed, that is so because the shafts

of the rimonim were inadvertently switched (Ex. 28 at 230:12-19); and that more recent third

party art catalogues have "represented that Touro owns the Rimonim" (Compl. ¶ 19).

CJI's claimed narrative requires analysis of thousands of ancient documents and directly

implicates issues on which Shearith Israel's two experts have admissible testimony:

- Professor Linford Fisher, a tenured Assistant Professor of History at Brown University, speaks to, among other things, the use of critical terms in operative documents (*e.g.*, appurtenances, paraphernalia, fixtures) (Ex. 1 [Expert Report of Professor Linford Fisher ("Fisher Rep.")] at 35-40), the special meaning of the terms used given the crucially important, indeed dispositive, historical context of the transactions (*id.* at 40-50), the fact that the language used in the surrender documents, the leases and other documents specifically embrace the rimonim (*id.*), and the fact that CJI is factually not the successor to the original Newport congregation and factually not the beneficiary of any trust (*id.* at 12-34).

- Dr. Vivian Mann, an internationally renowned art historian and provenance expert of objects of Jewish ritual art, having inspected the rimonim, speaks to among other things the integrity of the rimonim and that their shafts were not switched (Ex. 4 [Expert Report of Dr. Vivian Mann ("Mann Rep.")] at 14 n.57), to the provenance of the rimonim since the time they were made in the 1760-70s (*id.* at 4-6), and to the fact that Shearith Israel has not relinquished or surrendered ownership or control of the rimonim either before or since CJI became a lessee of Touro Synagogue and its contents (*id.* at 8-13).

Neither expert speaks to any legal conclusions. Nor will they at trial.

CJI's motions assert that 100% of the opinions offered by Professor Fisher and Dr. Mann

is inadmissible under *Daubert*. This assertion is frivolous. Yet CJI makes its dilatory and

oppressive motions even more meritless by the specious grounds it uses to attack Shearith

Israel's two experts.  CJI uses nomenclature that sounds vaguely *Daubert*-like.  But in reality, CJI is dressing up cross-examination and summation in *Daubert* garb.  CJI claims the experts speak to ultimate issues (Fisher Br. at 13-14; Mann Br. at 8-10).  Yet decades ago, Fed. R. Evid. 704 abolished that ground as being sufficient to strike an expert's testimony even before a jury. CJI says that the experts reviewed documents, interpreted them, and attempted to give the Court a coherent narrative, a way for the Court to determine the intent of the parties (*see* Fisher Br. at 18-19; Mann Br. at 19, 22).  That is indeed a small part of what Professor Fisher and Dr. Mann did, but this is done by virtually every expert.  It is precisely this effort that will assist the Court, subject to the crucible of cross-examination, and to the Court's determination of what weight the evidence should be given.  CJI says that one of the experts is not Jewish enough, when he was not called as an expert on Judaism (CJI refused to resolve this dispute before a Jewish court of law) (Fisher Br. at 4-8).  The other expert is apparently too Jewish, so her testimony, based on decades of experience with Jewish ritual objects and the relationship between Jewish congregations is somehow speculative (Mann Br. at 19-20).  CJI is wrong.

The cases are legion permitting historians and art historians/provenance experts to testify. That is sufficient in itself to compel denial of CJI's blunderbuss motions.  This Court will be the trier of fact, not a jury.  The Court will hear (or read) the foundation laid for the opinions to be offered, will hear the questions, and can rule on admissibility then or at the end of the evidence. None of the reasons supporting *Daubert* gate-keeping exclusion apply in this case.  CJI cites no case granting wholesale exclusion under *Daubert* in circumstances remotely similar to this one: tens of thousands of documents spanning more than 250 years, where historical context provides evidence of what the parties intended and did; and where the writings used words of specialized meaning, whose meaning and intent must be drawn from context that only an expert can provide.

Shearith Israel's experts will not usurp the role of this Court.

CJI decided not to call any experts as part of its case. That was its knowing and strategic choice. We think CJI's failure to engage and identify experts will be fatal to its proof, but that is not the issue now. CJI's error, however, is no reason to deprive Shearith Israel and the Court of the benefit of true experts. Expert testimony, subject to the crucible of cross-examination, will be vital to aid the Court in arriving at the truth. The Court should deny in full CJI's motion to strike the entirety of the expert testimony of Professor Fisher and Dr. Mann.

## BACKGROUND

### I.    PROFESSOR FISHER'S CREDENTIALS AND EXPERTISE

Professor Fisher is a historian of religion in American history, with special expertise in New England religious history and religious freedom in Rhode Island (Fisher Rep. at 1-2, Ex. A). He holds a Doctorate in History of Religion in America from Harvard University and a dual M.A. in Church History and Religion from Gordon-Conwell Theological Seminary (*id.*).

Professor Fisher is currently a tenured Assistant Professor of History at Brown University (his Associate Professorship begins this summer). He has published and lectured extensively on various aspects of U.S. and New England history, American religious history (including Jewish religious history), colonial U.S. history, and Native American religious history (Fisher Decl. ¶ 4). He has lectured on the history of religious liberty in Rhode Island, including the history of Judaism and the Touro Synagogue (*id.* at 1-2). His classes have dealt with ownership disputes of Colonial-era artifacts and interpretations of land treaties between Native American tribes and the United States Government (Ex. 2 [Deposition of Linford Fisher ("Fisher Dep.")] at 27:4-9, 30:12-20, 31:20-32:16, 37:25-38:5).

## II.    CJI'S CLAIMS AND PROFESSOR FISHER'S PROPOSED TESTIMONY

CJI (incorporated in 1894) repeatedly claims that it is a "continuation" and "legal successor" to Congregation Yeshuat Israel ("CYI"), the historic Jewish community in Newport, which disbanded by the 1820s (*e.g.*, Compl. ¶ 5 n.2 (claiming that "[t]he change in spelling [from CYI to CJI] is without legal significance" because CJI "is the continuation of and legal successor to that original community").   Professor Fisher's report shows this to be false. Professor Fisher uses his expertise to analyze documents and materials to show that CJI "was not (neither in 1894 nor since) in any way connected to or related to the original Congregation Yeshuat Israel" (Fisher Rep. at 3).   Professor Fisher shows this through the disbandment of CYI, the shift of those congregants to New York, after which "CSI [Shearith Israel] naturally inherited legal oversight of the religious scrolls and other ritual sacred objects" of CYI, and the subsequent emergence of CJI, a new group of Jewish congregants, decades later (*id.* at 3, 8).

CJI claims that, in 1894, when the original heirs of CYI signed deeds transferring the Touro Synagogue and its contents to the Trustees of Shearith Israel, somehow "None of [those] deeds . . . transferred or purported to transfer the Rimonim or any other personal property" (Compl. ¶ 16).   Professor Fisher's analysis of documents contextualizing the 1894 transfer wholly discredits CJI's contention.   He demonstrates, through Shearith Israel's board minutes, that Shearith Israel was wary of the fledgling Rhode Island congregation, fearing that Touro would be "taken possession of by a few comparative recent arrivals, whose permanent stay cannot with certainty be guaranteed . . ." (Fisher Rep. at 16 (quoting Ex. 29)).   Given this broader historical context, Professor Fisher shows that Shearith Israel sought to protect its rights in Touro, the cemetery, and the rimonim by obtaining deeds from the remaining heirs of the original Rhode Island congregation, who had by this time relocated to New York.   These heirs transferred ownership of Touro "[t]ogether, with the appurtenances and all the estate" to Shearith

Israel (*id.* at 22-23 (quoting Ex. 30); *id.* at 43-45).  Professor Fisher shows that the CYI heirs were specifically concerned with Touro's personalty, and that they fully intended this transfer to include all personal property of Touro, including the rimonim (*id.*).

CJI "denies that the land, building and religious objects [of Touro] have been the subject of leases" from Shearith Israel to CJI (CJI Answer ¶ 2).  Professor Fisher discredits CJI's claim by analyzing documents.  Shearith Israel intended to, and did, lease Touro and its religious items (including the rimonim) to CJI (Fisher Rep. at 30-31).  This conclusion stems from the events surrounding the 1903 Circuit Court decision between Shearith Israel and CJI.  Professor Fisher shows from the CJI board minutes (among other places) that CJI believed the court decision affirmed Shearith Israel's ownership rights in Touro and all of its attendant personalty.  Immediately after the ruling, CJI voted unanimously "to surrender the possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport, to the said Trustees [of Shearith Israel], owners of the property" (*id.* at 30 (quoting Ex. 11)).  Shearith Israel leased back to CJI the Touro building and all of its personalty, to which, by its actions, CJI showed that it believed its rights were lost following the lawsuit (*id.* at 29-31).

CJI "denies that the Rimonim . . . are 'appurtenances'" (CJI Answer ¶ 21).  Professor Fisher shows that this is also incorrect.  Professor Fisher analyzes documents against the backdrop of what he considers to be the relevant historical context, and shows that the parties were both acutely interested in the rimonim in connection with the lease negotiations, drafting, and execution (Fisher Rep. at 35-50).  He shows that CJI was a fledgling congregation at the time the 1903 and 1908 leases were signed and was reliant on Shearith Israel to obtain the space and objects necessary for it to worship.  Shearith Israel would have been wary and purposeful in granting aid, given the earlier in-fighting and legal disputes about usage and ownership of the

Touro Synagogue and its religious items.  Professor Fisher shows that Shearith Israel deliberately inserted language into the leases to confirm its ownership rights to Touro and the rimonim (*id.* at 46-48).  Professor Fisher also shows how the word "appurtenances" as used between the parties at that time included rimonim, citing, among other things, the letter Shearith Israel's minister wrote to CJI in which Shearith Israel temporarily loaned and "empowered [CJI's rabbi] to use the Sefarim, **Bells**, Books, Shofar and all other ***appurtenances for worship*** now in Newport Synagogue" (*id.* at 43-44 (quoting Ex. 19) (emphasis added)).  Professor Fisher then supported this by conducting historical research,  which showed that scholars writing during this time period used the term "appurtenances" (and the interchangeable "paraphernalia") to encompass rimonim (*id.* at 3, 35-50).

CJI "den[ies] that the Rimonim are significant religious articles" (CJI Answer ¶ 51).  Professor Fisher refutes this claim.  He located contemporaneous primary and secondary sources discussing the importance of rimonim to Jewish religious services (Fisher Rep. at 36-37).  His examination of the historical record reinforces that rimonim are important accompaniments to the Torah scrolls, a fact that CJI admits when it states that "[w]hen the Torah is raised with the finials on, the accompanying ringing of the bells draws the congregation's attention.  The beauty of the decoration emphasizes the importance of the Torah" (Compl. ¶ 8; Fisher Decl. ¶ 5).

CJI claims that any interest in the land, building, or religious objects held by Shearith Israel "is held in trust for the 'Jewish Society in Newport,' which is Touro Synagogue" (CJI Answer ¶ 2).  Professor Fisher uses his expertise to show that the "Jewish Society in Newport" is not equal to Touro Synagogue or CJI.  Instead, CJI was merely "the entity chosen by CSI [Shearith Israel] (subject to conditions and the approval of CSI) to care for CSI's synagogue and appurtenances and/or paraphernalia *as lessee*" (Fisher Rep. at 34 (emphasis in original)).  Based

on his research and his expertise as a historian, Professor Fisher concludes that "the new CJI has never owned the Touro Synagogue, the property, the cemetery, the [rimonim], nor any of the other ritual items that were loaned to it around the time of CJI's formation and then leased to CJI beginning at least as early as 1903" (*id.* at 3).

## ARGUMENT

### III.   LEGAL STANDARD

Rule 702 permits expert witness testimony where an expert who has "technical, or other specialized knowledge" can help "the trier of fact to understand the evidence or to determine a fact in issue".  Fed. R. Evid. 702(a).  The Supreme Court explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) that "[t]he inquiry envisioned by Rule 702, is, we emphasize, a flexible one".  *Id.* at 594.  The rule is interpreted consistent with the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony'".  *Id.* at 588.  "As long as an expert's . . . testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process – competing expert testimony and active cross-examination".  *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (quoting *Daubert*, 509 U.S. at 590).  "[R]ejection of expert testimony is the exception rather than the rule".  Fed. R. Evid. 702 advisory committee's note (2000 Amends.).

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court further explained that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable".  *Id.* at 152.  There is no "definitive checklist or test, and the gatekeeping inquiry must be tied to the particular facts".  *Id.* at 138.  "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from specialized experience.'  And whether the specific expert testimony focuses upon specialized observations, the specialized translation of

those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest 'upon an experience confessedly foreign in kind to the jury's own'". *Id.* at 148-49.

Accordingly, the First Circuit says that a court has "broad latitude in executing its gate-keeping function; there is no particular procedure it is required to follow". *U.S. v. Vargas,* 471 F.3d 255, 261 (1st Cir. 2006). The First Circuit also interprets Rule 702 "liberally in favor of the admission of expert testimony". *Levin v. Dalva Bros.*, 459 F.3d 68, 78 (1st Cir. 2006). This court has noted that "expert testimony must be relevant 'in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue'". *ADP Marshall, Inc. v. Noresco, LLC*, 710 F. Supp. 2d 197, 225-26 (D.R.I. 2010) (quoting *Ruiz-Troche*, 161 F.3d at 81). The trial court is afforded "'substantial latitude in the admission or exclusion of opinion evidence'". *Id.* (quoting *Crowe v. Marchand*, 506 F.3d 13, 16 (1st Cir. 2007)).

The standard is even more relaxed in a bench trial. *U.S. v. Brown*, 415 F.3d 1257, 1268-69 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself"); *see also U.S. v. ConAgra Grocery Prods. Co.*, 4 F. Supp. 3d 243, 254 (D. Me. 2014); *Warford v. Indus. Power Sys., Inc.*, 553 F. Supp. 2d 28, 30 (D.N.H. 2008). "[W]here the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it". *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006). "[T]he usual concerns of the rule – keeping unreliable expert testimony from the jury – are not present in such a setting". *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010). In a bench trial, a court "can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence". 11

Charles Alan Wright *et al.*, *Fed. Prac. & Proc.: Civil 3d* § 2885 (2002 & Supp. 2014); *see also*

*Bldrs. Steel Co. v. Comm'r*, 179 F.2d 377, 379 (8th Cir. 1950).

## IV.    PROFESSOR FISHER IS QUALIFIED TO TESTIFY AS AN EXPERT

CJI argues that Professor Fisher is not qualified because he is not an expert in American

"Jewish history, Jewish ritual, and legal issues" (Fisher Br. at 1, 4-8).  To the extent CJI's

assertion matters, it is wrong.  "It is well-settled that 'trial judges have broad discretionary

powers in determining the qualification, and thus, admissibility, of expert witnesses'".

*Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 30 (1st Cir. 2000); *see also U.S. v. Members of*

*Est. of Boothby,* 16 F.3d 19, 22 (1st Cir. 1994) ("a trial judge has broad latitude in determining

whether a proffered expert has suitable qualifications").  "[A] witness need not always possess a

particular degree or set of educational qualifications in order to offer expert testimony".

*Boothby*, 16 F.3d at 22.  "It is not required that experts be 'blue-ribbon practitioners' with

optimal qualifications".  *Vargas*, 471 F.3d at 262.  "The test is whether, under a totality of the

circumstances, the witness can be said to be qualified as expert in a particular field, through any

one or more of the five bases enumerated in Rule 702 – knowledge, skill, experience, training, or

education".  *Santos v. Posadas De P.R. Assocs.*, 452 F.3d 59, 64 (1st Cir. 2006).  The court is "to

determine, given the proffered expert's background, whether the . . . specialized knowledge he

offers 'will assist the trier better to understand a fact in issue'".  *Gaydar v. Sociedad Instituto*

*Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24 (1st Cir. 2003).

Here, Professor Fisher's qualifications and experience are more than sufficient to allow

him to assist the Court in understanding the facts and issues in his expert report.  Professor Fisher

is a tenured professor whose education, teaching, and publications have focused on United States

religious history, and specifically, the religious history of Colonial New England (Fisher Rep. at

1-2, Ex. A; Fisher Dep. at 13:21-14:6).  Professor Fisher has studied and written about American Jewish history (Fisher Decl. ¶ 3), is familiar with the history of the Touro synagogue and includes it in his lectures (Fisher Rep. at 2).  He routinely reviews primary and secondary documents and material from American history in his research, and has reviewed and analyzed land treaties, historical ownership disputes, and colonial American material culture (Fisher Dep. at 27:4-9, 30:12-20, 31:20-32:16, 37:25-38:5; *see also* Fisher Decl. ¶¶ 3-4, 6).

Professor Fisher's knowledge of colonial New England religious history, his training and education in the history of religion, and his skill and experience in conducting research and interpreting historical documents (including historical legal documents) are more than sufficient to permit him to assist the Court in understanding historical issues like the connection between the colonial CYI congregation and CJI, the historical understanding of the words "appurtenances" and "paraphernalia" and related terms, and the history of ownership of the rimonim and Touro.  These opinions do not require expertise in either law or Jewish ritual. Professor Fisher does not need to know the mechanics of Jewish ritual to comment on the importance of rimonim to Sephardic ceremonies (Fisher Decl. ¶¶ 3, 6).  He relies, as a historian, on secondary sources, as well as the writings of Shearith Israel congregants and on Dr. Mann (*see, e.g.*, Fisher Dep. at 51:14-52:7, 61:3-62:3).  It is particularly ironic for CJI to claim that these issues require expertise in Jewish law, since in 2012, Shearith Israel proposed to settle this dispute quickly, quietly, and effectively before a Beit Din – a Rabbinical court composed of experts in Jewish law and ritual – and CJI refused to do so (CJI Answer ¶ 6).  (If necessary, we will adduce evidence at trial demonstrating CJI's wrongful refusal to resolve this dispute that way.  *See* Ex. 31).

Moreover, even assuming *arguendo* that Professor Fisher lacked some narrow sub-

specialization in American Jewish history as a basis for his opinions, the law does not require any such sub-specialization in order to permit him to testify.  It is established in the First Circuit that an expert need not be a "specialist in the field in which he is giving his opinion" to testify. *Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir. 1985).  This "affects not the admissibility of his opinion but the weight the jury may place on it". *Id.* (permitting testimony from non-specialist doctor because "teratology, the study of abnormal development and congenital malformations, is scientific knowledge that is part of the field of medicine" and the doctors were "qualified as experts in the field of medicine"); *see also Gaydar*, 345 F.3d at 24-25 (permitting general practitioner who was not a gynecologist or obstetrician to testify about pregnancy complications even though he had never examined a patient with the condition at issue); *Mitchell v. U.S.*, 141 F.3d 8, 15 (1st Cir. 1998); *Marshall v. Perez Arzuaga*, 828 F.2d 845, 851 (1st Cir. 1987); *Alvarado v. Weinberger,* 511 F.2d 1046, 1049 (1st Cir. 1975) (doctor who is not a psychiatrist can give an opinion about someone's mental health); *Trafton v. Sunbury  Primary Care, P.A.*, 689 F. Supp. 2d 198, 204 (D. Me. 2010).

In *Saginaw Chippewa Indian Tribe of Mich. v. Granholm*, 690 F. Supp. 2d 622 (E.D. Mich. 2010), plaintiffs sought to exclude a historian from testifying as an expert because he did not specialize in Indian history.  The court permitted the testimony explaining that "although [the expert] has focused his research, writing, and teaching more broadly on the American frontier, he has provided a well reasoned and well researched report on the experience of the Chippewa Indians living in mid-Michigan during the mid-to-late nineteenth century". *Id.* at 636.  The court also explained that "[t]o the extent [the expert] has, at times, focused on 'public' and 'frontier' history, rather than American Indian history, the potential biases created by his particular focus should be the subject of cross examination, not exclusion under *Daubert*". *Id.* at 635.  Similarly,

in *Walden v. City of Chi.*, 755 F. Supp. 2d 942 (N.D. Ill. 2010), the court permitted the expert testimony of a historian despite claims that he did not have the correct specialization.  The court reasoned, "'[n]othing in Rule 702 or in the jurisprudence interpreting the rule indicates that an expert must have specific knowledge about the precise object of the litigation'" and that "'[t]here is no requirement that the subject of the witness's proposed testimony precisely overlap with his prior experience in both kind and degree'".  *Id.* at 950-51.

The only case cited by CJI to support the supposed requirement for sub-specialization does not support its claim.  In fact, in that case, *Beaudette v. Louisville Ladder Grp., LLC*, 2005 WL 2573384 (D.N.H. Oct. 7, 2005), *aff'd*, 462 F.3d 22 (1st Cir. 2006), the engineering expert was not permitted to testify because the issue did not pertain to engineering at all.  *Id.* at *2 (excluding an engineering expert's testimony as to what was a "good commercial practice").  Here, a qualified historian of colonial religious history in New England has sufficient qualifications to aid this Court in contextualizing the disbandment of CYI, the shift of those congregants to New York and subsequent emergence of CJI decades later, the historical meaning of "appurtenances" and "paraphernalia" and related terms, the factual historical evidence of ownership of the rimonim and Touro, and any trust relationship between the congregations.

## V.    PROFESSOR FISHER'S TESTIMONY IS BASED UPON SPECIALIZED KNOWLEDGE THAT WILL HELP THE TRIER OF FACT UNDERSTAND THE EVIDENCE

### A.    Historians Such As Professor Fisher Routinely Provide Expert Testimony Analyzing Documents And Evidence And Providing Historical Context

CJI argues that Professor Fisher, by analyzing documents, weighing evidence, and drawing factual conclusions, impermissibly usurps the role of the Court (Fisher Br. at 10-12).  There is no basis for this argument.  Rule 702 permits expert witness testimony where an expert who has "specialized knowledge" that can help "the trier of fact to understand the evidence or to

determine a fact in issue". Fed. R. Evid. 702(a). An expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue" if that testimony will have a "tendency to make a fact more or less probable than it would be without the evidence". Fed. R. Evid. 702(a); Fed. R. Evid. 401(a).

Courts routinely use historians as experts to analyze historical documents, weigh historical evidence, and draw historical conclusions in a variety of contexts. *See, e.g.*, *N.J. v. N.Y.*, 1997 WL 291594, at *10 (U.S. Mar. 31, 1997) (U.S. Supreme Court hearing expert testimony of five historians on whether New York or New Jersey had sovereignty over a portion of Ellis Island); *Minn. v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 181 (1999) (embracing expert testimony regarding the historical context surrounding the signing of two ancient treaties); *Cayuga Indian Nation of N.Y. v. Pataki*, 165 F. Supp. 2d 266, 300 (N.D.N.Y. 2001) (allowing testimony from three experts regarding the historical backdrop of a land claim litigation), *rev'd on other grounds*, 413 F.3d 266 (2d Cir. 2005); *U.S. v. Kantengwa*, 2012 WL 4591891, at *3 (D. Mass. Oct. 3, 2012) (hearing expert testimony regarding the "association between a roadblock and the program of mass genocide").

For example, historians (and other experts) have testified about the meaning of historical terms and documents. *See, e.g.*, *Phillips v. Calhoun*, 956 F.2d 949, 952 (10th Cir. 1992) (calling on experts "to offer their understanding of the customary meaning and usage of the terms in question"); *U.S. v. Reed*, 575 F.3d 900, 922 (9th Cir. 2009) (allowing expert testimony regarding "'drug jargon'"); *Granholm*, 690 F. Supp. 2d at 635 (holding that a historian was "qualified to provide expert opinions concerning the historical interpretation of the 1855 and 1864 treaties"); *Pataki*, 165 F. Supp. 2d at 309 (relying on an expert to construe the term "'members of any state'" as it related to Native Americans in a 19th Century agreement); *Walden*, 755 F. Supp. 2d

at 951 (historian had specialized mastery of "aspects of historical research that require training and education, including knowing where to search for sources, formulating searches based on an understanding of the history of the period in question, and evaluating the reliability of sources" and historian's "research utilized his experience and education as an academic historian and could not have been completed by 'anyone'").

Professor Fisher's testimony here is similar to that of the historians in these cases. Professor Fisher reviewed voluminous documents, primary and secondary, which he located himself and obtained through both parties' productions (Fisher Rep. at 2-3).  He used his expertise to identify and organize the relevant facts, discount unreliable evidence, and present a comprehensive narrative as best he could, with all of that information (*see* Fisher Dep. at 80:23-81:23).  For example, Professor Fisher is "an historian who is accustomed to close readings of texts and who pays attention to the words that are used and the way in which they are used and the context in which they are used" (*id.* at 37:25-38:5).  He used his historical knowledge and skills to independently research and analyze how terms such as "appurtenances" and "paraphernalia" were used between the parties at the turn of the Twentieth Century (Fisher Rep. at 35-42).  The meanings of these terms at that time are not immediately obvious and differ from modern, common parlance.  Professor Fisher showed that these terms were interchangeable and did refer to ritual objects that adorn the Torah, including the rimonim (*id.* at 37-40).

**B.    Professor Fisher Properly Uses Historical Expertise To Analyze Writings To Determine What Historical Actors Did, Thought, And Intended**

Expert historians have routinely testified regarding the thoughts and actions of historical actors by studying evidence manifesting these thoughts and actions.  What CJI mischaracterizes as opinions on state of mind is accurately described as assisting the Court in determining the intent of historical parties; or as putting the Court's mind back into history so that the Court can

determine the truth.  None of this is objectionable.

For example, in *Hunter v. Underwood*, 471 U.S. 222 (1985), the Supreme Court affirmed a finding that a particular article of the Alabama Constitution of 1901 was unconstitutional because it violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 228-29. The Supreme Court credited the expert opinions of historians who "showed that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks". *Id.*  This helped establish the "'substantial'" or "'motivating'" factor behind the enactment of the law. *Id.*; *see also N.J./N.Y.*, 1997 WL 291594, at *59 (historian testified concerning public's perception about ownership of land).

In *Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271 (1st Cir. 2003), an expert historian testified "on the precise issue of common knowledge and he concluded by stating his opinion that 'the average consumer in Puerto Rico during the 1950's, during the 1960's' was aware both of health risks, such as cancer and cardiovascular disease, and that 'smoking was or could be difficult to quit'". *Id.* at 277.  Likewise, in *Prado Alvarez v. R.J. Reynolds Tobacco Co.*, 313 F. Supp. 2d 61 (D.P.R. 2004), *aff'd*, 405 F.3d 36 (1st Cir. 2005), an expert historian testified that "there has been widespread, pervasive common knowledge throughout the twentieth century" about the adverse effects of smoking. *Id.* at 74.  In *Pataki*, an expert historian testified about whether or not everyone in a Native American tribe supported the British, as well as the purpose behind a historic campaign. 165 F. Supp. 2d at 305, 308.  A trial court also permitted an expert to opine regarding the effects of discrimination on a Native American tribe. *Bone Shirt v. Hazeltine*, 2003 WL 26091116, at *6-7 (D.S.D. Dec. 31, 2003).

Here, Professor Fisher applies his knowledge and experience as a historian to marshal data from historical documents and extrapolate what historical actors did and thought, based on

their own statements.  During his deposition, Professor Fisher repeatedly explained that his report reflects "the concerns of people on the ground" (*e.g.*, Fisher Dep. at 64:17-24, 69:18-25, 205:9-206:6).  Professor Fisher, through his knowledge of the relevant time period, contextualizes these documents and helps tell the story of historical actors, and how they perceived, for example, the effects of Judge Brown's 1903 ruling (*id.* at 205:9-206:6), the importance of the rimonim (*id.* at 70:24-71:3; 190:6-25), and Shearith Israel's objections to CJI's attempt to usurp the name of the Colonial congregation (*id.* at 203:15-18).  Professor Fisher compiles and summarizes for the Court myriad first-party documents, which show all these concerns (*see* Fisher Decl. ¶ 7).

The cases cited by CJI have nothing to do with the type of expert testimony proffered by Professor Fisher.  In those cases, the courts excluded testimony that was nothing more than guessing (without support) about what the actual living parties to the existing lawsuit thought or said.  *See, e.g.*, *Kidder, Peabody & Co. v. IAG Int'l Accept. Grp. N.V.*, 14 F. Supp. 2d 391, 398 (S.D.N.Y. 1998) (excluding expert testimony regarding "what [defendants] did, or what they said to each other" because "[t]hat evidence must come from the trial testimony of the individuals concerned, where it will be subject to cross-examination"); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (excluding testimony regarding "the credibility of defendants' witnesses and defendants' 'real' motivation[n]"), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (Summary Order); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (excluding expert testimony regarding "intent or motives underlying the conduct" of defendants); *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 530 (excluding expert testimony opining on defendants' actual incentives), *amended on reconsideration in part*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001); *OneBeacon Am. Ins. Co. v. Com. Union Assur. Co. of Can.*, 804 F. Supp.

2d 77, 85 (D. Mass. 2011) (excluding testimony regarding intent of the parties to the lawsuit), *aff'd*, 684 F.3d 237 (1st Cir. 2012); *Brown v. Crown Equip. Corp.*, 445 F. Supp. 2d 59, 68-69 (D. Me. 2006) (disallowing "evidence about the subjective intent or state of mind of the defendant or its employees" but allowing expert opinion regarding whether "the defendant's actions or lack of action under certain circumstances complied with the terms of the Policy").

If a witness can testify to his or her intent, such testimony is properly refuted by cross-examination, not expert evidence. Even CJI acknowledges that Professor Fisher testified about the actions and states of mind of "actors who are no longer living" (Fisher Br. at 18). No fact witness can testify about what these people thought or said. Professor Fisher is reading documents in the context of historical usages to show what these historical actors did, what they thought, and what motivated them. When he points to Shearith Israel's concern regarding CJI's Ashkenazi roots, he relies on actual historical writings, which detail at great length the differences between the groups and explains why Shearith Israel was wary of these newcomers (Fisher Rep. at 20-22). Professor Fisher uses the documents and his historical knowledge to show that Shearith Israel was circumspect and meticulous in its contractual dealings with the fledgling CJI congregation (*id.*).

## C. Professor Fisher Permissibly Provides Testimony About The Historical Context And Factual Meanings Of Historical Legal Documents

CJI incorrectly argues that Professor Fisher's testimony should be excluded because it is about legal issues and "[e]xperts may not testify as to the ultimate legal issue in a case" (Fisher Br. at 13). CJI is wrong both factually and legally. CJI simply ignores Rule 704(a) which states that "[a]n opinion is not objectionable just because it embraces an ultimate issue". Fed. R. Evid. 704(a); *see also Peckham v. Cont'l Cas. Ins. Co.*, 895 F.2d 830, 837-38 (1st Cir. 1990) ("'testimony in the form of an opinion or inference otherwise admissible is not objectionable

because it embraces an ultimate issue to be decided by the trier of fact'") (construing Fed. R. Evid. 704); *Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 624 (1st Cir. 1988) ("The 'ultimate facts rule' was abolished by Fed. R. Evid. 704").  "'[A] witness may properly be called upon to aid the [fact finder] in understanding the facts in evidence even though reference to those facts is couched in legal terms'".  *U.S. v. Wade*, 203 F. App'x 920, 930 (10th Cir. 2006) (Unpublished); *see also Metavante*, 619 F.3d at 761 (expert testimony on whether defendant's performance was "commercially reasonable"); *U.S. v. Dazey*, 403 F.3d 1147, 1171-72 (10th Cir. 2005) ("Although [the expert] also opined that any investment program using the word 'prime bank' was a fraud and that the Wealth–Mart trading program did not exist, he did not directly testify that any particular defendant actually violated the law.  Even if [the expert's] testimony arguably embraced the ultimate issue, such testimony is permissible as long as the expert's testimony assists, rather than supplants, the [fact finder's] judgment"); *see also Carondelet Sav. & Loan Ass'n v. Citizens Sav. & Loan Ass'n*, 604 F.2d 464, 470 (7th Cir. 1979) (expert testimony heard to help discern meaning of ambiguous language in loan participation agreement); *Armstrong Coal Co. v. Blackburn*, 2014 WL 4364625, at *2 (W.D. Ky. Sept. 3, 2014) (allowing dueling experts to opine as to ownership of parcels of land).

Expert historians routinely testify regarding the legal effects of historical court decisions and legal documents.  In *Armstrong Coal*, a property dispute, plaintiff's expert was permitted to opine that "'at no point in the record chain of title do Mr. Blackburn, or any of his predecessors in title, have any record claim to [one of the land parcels at issue]'".  2014 WL 4364625, at *2.  Likewise, defendant's expert testified that the "deed clearly only conveyed Tracts I and II to Blackburn".  *Id.*  In *Walden*, an expert was permitted to testify "that certain interrogation methods were illegal" because he was an academic historian who used historical sources to draw

historical (not legal) conclusions about the time period.  755 F. Supp. 2d at 951.  In *Mille Lacs Band of Chippewa Indians v. Minn.*, 861 F. Supp. 784 (D. Minn. 1994), *aff'd*, 124 F.3d 904 (8th Cir. 1997), *aff'd*, 526 U.S. 172 (1999), an expert historian testified about the effect of an 1837 treaty and an 1850 executive order.  *Id.* at 791.  Expert historians have also testified about the good faith treatment of a Native American tribe vis-à-vis two ancient treaties.  *Pataki*, 165 F. Supp. 2d at 309; *see also N.J./N.Y.*, 1997 WL 291594, at *10 (both experts "concluded that New Jersey repeatedly asserted her sovereignty over the filled portions of Ellis Island from 1890 to the present"); *N.Y. v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185, 196 (E.D.N.Y. 2007) ("plaintiffs' expert agreed that the whole Town was owned by the Shinnecocks at the time of first European contact"), *vacated & remanded on other grounds*, 686 F.3d 133 (2d Cir. 2012).

Professor Fisher's opinions are about facts.  He may utilize terms (like "ownership") that also have legal meaning but, as shown above, this does not bar his testimony.  Professor Fisher analyzes and opines on historical factual issues concerning the ownership and possession of the rimonim and Touro, and the existence (or lack thereof) of a trust relationship between Shearith Israel and CJI based on the conduct of the parties and the existence of a lease (which CJI acknowledges) (Fisher Rep. at 34).  The fact that he uses the terms "*ultra vires*" (*id.* at 31) and "successorship" (*id.* at 12-34) does not turn his historical factual opinions into legal opinions.  Professor Fisher's opinions about the effect of Judge Brown's 1903 decision, as well as the resulting 1903 and 1908 leases between the congregations are also historical and factual, not legal.  Through interpreting historical documents, Professor Fisher analyzed the reactions of CJI and Shearith Israel to the court decision (Fisher Dep. at 30:12-20; Fisher Decl. ¶ 8).  Professor Fisher read documents, conducted independent primary and secondary research, assessed the reliability of historical sources in accordance with his experience as a historian and researcher,

reviewed documents produced by both parties, and applied his knowledge of the time period, as well as the knowledge gleaned from his research, to understand the significance (not the legal effect) of the court opinion and the leases to the parties (Fisher Decl. ¶ 8).  Professor Fisher clearly is not telling the Court how to apply the law to the facts (*id.* ¶ 1) and has explained that the "[t]he judge will ultimately decide this particular question of ownership" (Fisher Dep. at 58:5-16), and "[t]he judge will decide the legal implications of these issues" (*id.* at 126:12-13).

The cases CJI cites do not support its argument.  In *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977), the expert was precluded from testifying about legal issues such as "the legal standards which he believed to be derived from the contract and which should have governed [defendant's] conduct".  *Id.* at 510.  Professor Fisher, by contrast, discusses historical factual issues that utilize terminology that also happens to appear in legal settings, and conducts historical factual analyses of legal documents.  *See, e.g.*, *Shinnecock Indian Nation*, 523 F. Supp. 2d at 261-62 ("the experts analyzed and considered the pertinent historical documents (including deeds, patents, confirmations, and other colonial era documents) in the context of the contemporary historical understanding").  Professor Fisher properly contextualizes legal documents by showing what historical actors did in response to court decisions, contracts and negotiations, and other legal events.  His analysis of ancient legal decisions and contracts is informed in large part by showing how historical actors understood their meanings.

## VI.    PROFESSOR FISHER'S METHODOLOGY IS RELIABLE

Rule 702 and *Daubert* only require that the expert's conclusions have "'a reliable basis in the knowledge and experience of the expert's discipline'".  *Vargas*, 471 F.3d at 265.  Testimony with "'good grounds, based on what is known,' [] should be tested by the adversarial process, rather than excluded".  *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir.

2011) (quoting *Daubert*, 509 U.S. at 590). "'A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate. . . . Once again, we emphasize that the standard is not that high'". *MacDermid Printing Solutions, Inc. v. Cortron Corp.*, 2014 WL 2615361, at *2 (D. Conn. June 12, 2014).

Here, Professor Fisher used the same rigorous methods that he uses in his academic work. He followed "the standard of [his] field of expertise" and "followed usual and normal procedure in assessing evidence, evaluating sources" (Fisher Rep. at 3; *see also* Fisher Dep. at 11:15-20; Fisher Decl. ¶ 1). As he explained, "I did, to the best of my ability as a historian, . . . reflect the progress of events and the episodes and the evidence that I consulted for this case" (Fisher Dep. at 10:20-23). Professor Fisher also presented events and evidence fairly and accurately (*id.* at 10:24-11:20; *see also* Fisher Decl. ¶¶ 1, 7, 9). He reviewed documents produced by both parties and conducted independent research, at times with the assistance of a teaching assistant (Fisher Dep. at 15:12-16, 81:8-23, 133:20-22; Fisher Rep. at 3). He worked to "turn up anything that was relevant" (Fisher Dep. at 67:3-19, 68:20-69:2). He "considered documents submitted by both sides", considered contrary evidence, and assessed the reliability of historical evidence and secondary sources (*id.* at 21:19-22:8, 23:23-24:7, 56:10-18, 87:5-88:14, 137:22-138:6). He also explained that "in very few cases do historians ever feel like they have looked at everything that is possibly out there" and that "I'd be happy to discuss additional evidence" (*id.* at 80:23-81:23). In short, his methodology was sound. *See, e.g.*, *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1106 (D. Colo. 2006) (expert permitted to testify despite claim that he "'formulated his opinions based on a few historical documents selected by plaintiffs' counsel'").

CJI claims that Professor Fisher's research into the meaning of "appurtenances" and

"paraphernalia" is flawed because he uses "modern" and "foreign" sources and did not cite a "legal" definition of the terms (Fisher Br. at 16).  But Professor Fisher cited over twenty documents dating between 1881 and 1919 in support of his research into the meaning, context, and usage of these terms as they were used around the time the parties drafted and signed the 1903 lease (*see* Fisher Rep. at 35-50; Fisher Decl. ¶ 10).  Likewise, his use of foreign sources *complements* the use of American ones, reflecting a wider range of Jewish thought.  (Fisher Decl. ¶ 10).  Finally, Professor Fisher did cite a legal definition of "appurtenances" but did not quote it (*id.* ¶ 11; Fisher Dep. at 93:4-8, 244:19-23).

In any event, any complaints by CJI about the particular documents reviewed by Professor Fisher would go to the weight of Professor Fisher's testimony and not its admissibility. *See, e.g.*, *Baker v. Buffenbarger*, 2006 WL 140548, at *6 (N.D. Ill. Jan. 13, 2006) (permitting testimony despite claims that the expert reviewed "only those documents that the defendants provided" since "'vigorous cross-examination [and] presentation of contrary evidence . . . are the traditional and appropriate means of attacking shaky but admissible evidence'") (quoting *Daubert*, 509 U.S. at 595).  "Challenges to the methodology used by an expert witness are usually adequately addressed by cross-examination".  *Echevarria v. Caribbean Aviation Maint. Corp.,* 841 F. Supp. 2d 565, 569 (D.P.R. 2012) (citing *U.S. v. Diaz,* 300 F.3d 66, 76-77 (1st Cir. 2002); *see also Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001).

For all its sound and fury, CJI identified only *three* documents that Professor Fisher had not previously reviewed, out of the hundreds (if not thousands) that he did consider (*see* Exs. 27, 32, 33; Fisher Decl. ¶ 12).  Once they were identified, Professor Fisher reviewed these documents and explained that (1) they do not in any way alter his opinions, and (2) they, when

put into proper historical context, reinforce his claims (Ex. 3 [Addendum to Expert Report of Professor Linford Fisher ("Fisher Supp.")]; Fisher Decl. ¶ 12).  Finally, CJI's objections to Professor Fisher's use of ellipses in his quotes (Fisher Br. at 17) is irrelevant.  The report cites the entire source from which he quotes, emphasizing the parts he thought most important (Fisher Decl. ¶ 11).  If CJI seeks to bring other passages from those documents to the Court's attention, this is proper fodder for "[v]igorous cross-examination [and] presentation of contrary evidence"; it does not warrant wholesale preclusion.  *Daubert*, 509 U.S. at 595.

The cases cited by CJI are inapposite.  *See EEOC v. Bloomberg L.P.*, 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010) (excluding expert who "made no effort to ensure that the materials that he reviewed were representative" for a *statistical* analysis); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *2-3 (S.D.N.Y. Sept. 15, 2003) (excluding expert testimony where the evidence cited to was shown to be objectively unrepresentative); *Faulkner v. Arista Records LLC*, 2014 WL 4547824, at *13-15 (S.D.N.Y. Sept. 15, 2014) (excluding expert testimony about the "accuracy and completeness of Arista's royalty records" because, *inter alia,* the expert refused to ask for evidence, failed "initially to review of many categories of records, and his disregard of such relevant records after his belated review"); *Polidore v. McBride*, 2010 WL 3666971, at *6-7 (D.R.I. Sept. 13, 2010) (excluding expert testimony that relied on a handful of documents, refused to divulge his methodology, and refused to conduct any independent research).  None of these facts bears any semblance to Professor Fisher's methodology.

## VII.    PROFESSOR FISHER'S DEPOSITION AND ADDENDUM REPORT

CJI's allegations of impropriety during Professor Fisher's deposition are meritless. Professor Fisher agreed to travel to New York on the day before New Year's Eve for his

deposition as a convenience to CJI counsel. CJI was told at the outset, and later acknowledged, that Professor Fisher had to catch a 7:00 p.m. train, on the day before New Year's eve (Fisher Dep. at 216:8-9; Fisher Decl. ¶ 13). But CJI insisted on asking irrelevant questions – which Professor Fisher dutifully answered – over and over again (*see, e.g.*, Fisher Dep. at 14:10-15:1 [Fisher's publications on American Jewish history], 73:3-74:8 [how many times rimonim are used during service], 136:5-137:10 [whether Fisher "weighed evidence" and tried to "reconstruct what happened"], 153:20-156:19 [whether he is an expert on Jewish law], 176:8-177:25 [the number of Jews living in New York and Rhode Island]). CJI then made demeaning, bullying claims of impropriety in Professor Fisher's report (*id.* at 111:12-112:4). Nevertheless, Professor Fisher accommodated CJI's extracurricular requests and spent between one and two hours following his deposition seeking and then furnishing CJI with information it requested (Ex. 34; Fisher Decl. ¶ 13).

In any event, CJI points to no caselaw or procedural rule that would allow, much less necessitate, preclusion. The Federal Rules are clear: "[s]hould a deponent . . . refuse to answer certain specific questions, the examiner is not remediless. 'If a deponent fails to answer a question propounded, the discovering party may move for an order compelling an answer and the proponent of the question may complete or adjourn the examination before applying for an order.'" *R.W. Int'l Corp. v. Welch Foods, Inc.*, 937 F.2d 11, 15 (1st Cir. 1991) (quoting Fed. R. Civ. P. 37(a)(2) (former)). Like CJI, the appellee in *Welch Foods* never cleared the initial hurdle of moving for an order pursuant to Rule 37. As the First Circuit observed, this is "tantamount to a ball player sprinting from second base to home plate, without bothering to round, let alone touch, third base". *Id.* The First Circuit made clear that once a party "eschewed the essential interim step exemplified by Rule 37(a)", it waived its remedies under the law. *Id.* at 16.

Professor Fisher's concise three-page Addendum to his expert report was justified and proper. A party may supplement an expert report if the supplementation is "'substantially justified or is harmless'". *Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 62 (1st Cir. 2011). "'A substantial justification is one that could satisfy a reasonable person, not a justification of a high degree'". *BASF Corp. v. Sublime Restorations, Inc.*, 880 F. Supp. 2d 205, 210 (D. Mass. 2012). The purpose of expert disclosure is to provide "notice" to the opposing party, *JJI Int'l, Inc. v. Bazar Grp., Inc.*, 2013 WL 3071299, at *4 (D.R.I. Apr. 8, 2013), and "'prevent [ ] unfair tactical advantage'", *Gay*, 660 F.3d at 62. Professor Fisher's Addendum was served nearly four ***months*** before trial, so CJI has plenty of time to react even were there new theories or opinions (there are not). CJI could suffer no prejudice by the addendum – CJI chose not to call any experts as part of its case in any event. The Court should also be aware that CJI itself is still engaging in factual document production. Indeed, over the past two weeks, CJI has produced over 600 pages of documents going to the heart of its principal defense (Solomon Decl. ¶ 3).

There are no new theories or opinions in the Addendum. The primary purpose of the Addendum was to respond to and contextualize ***two one-page documents***, which Professor Fisher saw for the first time at his deposition (*see* Fisher Supp. at 1; Fisher Decl. ¶ 12). Professor Fisher did not focus on these documents before, as they were undated as to year, and it was only at the deposition that counsel for CJI made a binding representation that the documents date from 1903 (Fisher Dep. at 116:8-12; *see also id.* at 120:8-11). After the deposition, when Professor Fisher was first able to analyze the documents and place them in the broader context of documentary evidence he had previously reviewed, he found that (1) these documents did not change any of the opinions in his report, and (2) these documents supported his conclusion that the lease negotiation in 1903 quite advertently included the rimonim.

CJI's disingenuous (and wholly unspecified) claim of prejudice (Fisher Br. at 21) ignores the fact that CJI itself selected these documents for use at deposition. It is Shearith Israel who would be prejudiced if CJI could treat these documents as both a sword and shield – soliciting Professor Fisher's comments during deposition, and then attempting to preclude his testimony afterwards. Moreover, Professor Fisher did not try to "avoid" discussing the documents at deposition (*id.*). He opined on them as best he could, given his unfamiliarity. Professor Fisher testified that the documents confirmed his prior research, linking the term "appurtenances" to "the items necessary to run the synagogue", and that the documents "seem to confirm" his initial interpretations (Fisher Dep. at 120:14-121:10). Finally, CJI's bald claims that "Prof. Fisher made substantive changes to his original report" (Fisher Br. at 21) are meritless and unsupportable. Professor Fisher expressly states that "[t]he questions and documents provided by counsel to CJI during my deposition do not alter my opinions or conclusions" (Fisher Supp. at 1; *see also* Fisher Decl. ¶ 12). Comparing Professor Fisher's report and Addendum prove this:

| Opinion Expressed in Expert Report | Opinion Expressed in Addendum |
| --- | --- |
| A close reading of the historical documents themselves alongside of contemporary historical usages of these terms makes it abundantly clear that these phrases were indeed intended to include the disputed rimonim and all other sacred ritual objects in use at the Newport synagogue at the time of the signing of the 1903 and 1908 indentures with leases (Fisher Rep. at 35). | "the sepher and bells were important, and CSI was taking every precaution to include them in the lease by confirming their inclusion in the property owned by CSI and being leased by CJI by adding the phrase "and paraphernalia belonging thereto" into the document [1903 lease]" (Fisher Supp. at 2). |

Given that Professor Fisher's addendum was occasioned by CJI's own deposition questions, and that Professor Fisher's opinions have been unaffected, CJI cannot in earnest claim to have been prejudiced – particularly not months in advance of trial when CJI continues to produce for the first time 600 of pages of what it claims are highly relevant documents. The Addendum is both "'substantially justified'" and "'harmless'", *see Gay*, 660 F.3d at 62, and

would be wholly consistent with the expert disclosure requirements of Rule 26.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should deny CJI's motion in its entirety and allow

Professor Fisher's proposed testimony.

Defendant Congregation Shearith Israel,

By its Attorneys,
/s/ Deming E. Sherman
Deming E. Sherman (#1138)
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI  02903
Tel.:  (401) 274-9200
Fax:  (401) 276-6611
E-mail: deming.sherman@lockelord.com

/s/ Louis M. Solomon
Louis M. Solomon (Admitted *Pro Hac Vice*)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
Tel.:  1 (212) 504-6600
Fax:  1 (212) 504-6666
E-mail: Louis.Solomon@cwt.com

February 2, 2015

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of February, 2015, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.


/s/ Louis M. Solomon