UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CONGREGATION JESHUAT ISRAEL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 12-822M |
| | : | |
| CONGREGATION SHEARITH ISRAEL, | : | |
| | : | |
| Defendant. | : | |

**DECLARATION OF PROFESSOR LINFORD FISHER IN OPPOSITION TO
CJI'S MOTION TO EXCLUDE HIS EXPERT TESTIMONY**

Professor Linford D. Fisher declares, pursuant to 28 U.S.C. § 1746:

1. My C.V. and biography are attached to the report I gave in this case. I have reviewed CJI's motion to exclude all of my expert testimony and have been asked by counsel for Shearith Israel to review and, if appropriate, respond to the criticisms leveled against me by CJI (which confusingly and mistakenly calls themselves Touro in the CJI memorandum). I will do so below but wish to note here the following: I was brought in, as a historian, to serve as an expert witness. In doing my duty, I relied on my training as a historian and did what I always do – search widely for evidence, reconstruct events into a coherent narrative that is true to the reliable evidence, and make determinations based on the evidence at hand. I was not acting in the role of Judge or legal decisor and told CJI counsel that repeatedly during my deposition. Yet CJI uses my method against me, which makes me wonder what exactly expert witnesses in these kinds of historically-based cases are "allowed" to do according to counsel for CJI. It would appear nothing. That would be a shame, I respectfully suggest, since I believe both my expertise and my craft would be able to assist the Court in determining the truth in this case. In what

1

follows I will ignore the offensive and unprofessional name calling that CJI engages in.

    2.  I will not ignore, however, the suggestion that I lack the qualifications to speak to the subjects I address in my report. I state my qualifications in my report. I believe I am highly qualified to address the issues I speak to. I recognize that the Court will decide if those issues are ones of interest to the Court in the search for the truth in this matter.

    3.  On page 1 of the CJI memorandum to the Court, CJI says I am not an expert in Jewish law or ritual. I was not brought in to serve as such an expert. I believe I do have the knowledge and experience to research and offer opinions on the topics I address in my report, and my work has touched upon religious and in some cases Jewish topics. I adamantly reject the notion that someone would need to be a religious Jew to address the questions of pertinence here. Indeed, it is my understanding that CJI specifically refused to take this case to a religious court in which such determinations could be made by those with great knowledge of Jewish law and ritual.

    4.  On pages 4-5 of the CJI memorandum to the Court, CJI misrepresents my stated expertise. My area of expertise is the history of religion in America; my focus on Natives and Christianity is just one of my sub-specializations. Having reviewed literally thousands of documents, I believe that my expertise could be of significant help to the Court in resolving the disputes raised by CJI. CJI also misrepresents my knowledge (or supposed lack thereof) regarding the "early history of Jews in this country." I have studied, lectured, and written on that subject or on subjects embraced by that subject. I explain some of this in my deposition. Counsel for CJI also evidently misunderstands what a Ph.D. general/qualifying exam is (for American religious history, in this case). Calling the exercise a "test" is misleadingly incomplete and inaccurate: Ph.D. general exams (four of them, for me, in four different fields) each last four hours for the written portion, followed by a two-hour comprehensive oral exam covering all four exams. This is not a "test." It requires months (if not more) of research, study, reading,

publishing and other comprehensive efforts to attain expertise in substantive areas.

   5. On page 6 of the CJI memorandum to the Court, CJI misstates what I said about rimonim being necessary objects. CJI fails to mention that I am citing other historians on this point. This was a constant error made by counsel for CJI at my deposition and led to prolonged and repeated questions, over and over again, throughout the day. Let me state this another way. In paragraph 8 of CJI's complaint, CJI says:

> "Torah scrolls are traditionally adorned with silver finial bells (rimonim) which typically are placed on the top of the scroll handles when the Torah is not opened for use. Then the Torah is raised with the finials on, the accompanying ringing of the bells draws the congregation's attention. The beauty of the decoration emphasizes the importance of the Torah."

This is all I was trying to say in my report. My point is that rimonim are not inadvertent objects in a synagogue (as the CJI complaint quoted above makes clear); they would not have been overlooked in the lease between Shearith Israel and CJI. The telegrams shown to me by CJI counsel at my deposition, confirming the actual and specific interest in the bells in connection with the lease negotiation, drafting, or execution (assuming CJI counsel's representation that the telegrams date from 1903), underscore this point.

   6. On page 9 of the CJI memorandum to the Court, CJI disregards my own testimony that I *do* have experience reading and interpreting legal documents in American history. I also strongly disagree that I lack "specialized knowledge" that will help the Court more fully understand the documents and the case.

   7. On page 2 of the CJI memorandum to the Court, CJI misrepresents my own research process. I explained the process at length in my deposition. I totally disagree that I "dodged and stalled" during the deposition. On pages 10, 11, and 12 of the CJI memorandum, CJI again misrepresents my research process. I relied on documents from counsel to Shearith Israel, but I also conducted separate and rigorous primary and secondary investigations on my own, trying to place this case and the documents I was given in a wider historical context.

3

Literally hundreds of documents were reviewed by me that I sourced and located. I also asked Shearith Israel counsel for any documents that CJI thought were significant and for any CJI expert reports. I was advised that CJI has never identified any documents that it wanted me to review or consider and that indeed CJI had chosen not to identify any experts to testify as part of CJI's case. CJI's misrepresentations continue in the assertion (repeated on page 15 of their memorandum as well) that, as part of a research process, the "whole record" must be reviewed and discussed. What does that mean? There is no single "record" that is bound or in a paper or computer file. The past comes to us in bits and pieces, and we reconstruct it to the best of our abilities. Likewise, no historian quotes from or utilizes everything equally. Neither at my deposition or in their motion has CJI identified any primary source documents that undermine my opinions or conclusions. In fact the two primary source documents I was shown at my deposition, the telegrams, only strengthened what I was saying. A similar error appears on page 18 of the CJI memorandum, where CJI misunderstands what historians do with documents regarding "state of mind"; the documents themselves state (and people through them) what concerned them. This is not me presuming to know what they meant.

        8.     I disagree that a historian might not be helpful to the Court in understanding the texts at hand. First of all, there are thousands of documents. Isn't the Court entitled to have someone go through them and identify the salient ones? Second, these documents are not always self-evident, especially terms that are used in them. Third, without a larger understanding of the past, and of this time period, especially the context in which the key documents were written and agreed upon, important details would be misunderstood or omitted. I would challenge the assertion on page 14 of the CJI memorandum that I have no expertise in understanding and interpreting historical legal cases. In fact, several legal cases were at the heart of a few of my publications. I readily admit that I do not read or interpret these texts as a Judge or lawyer would (this is a mischaracterization repeated by CJI on page 19 of its memorandum).

4

But understanding, for example, the 1902-03 litigation as a precursor to CJI's absolute surrender of the Touro synagogue, including its contents, should be of assistance to the Court in understanding 1) what the parties intended in using the language they did in the leases and 2) that CJI, as a newcomer to the situation, was wholly dependent upon Shearith Israel for the religious objects used for worship in the Touro Synagogue, including the rimonim. To elaborate briefly, in the Jewish Encyclopedia (a source I cite in my report), there are entries in both 1901 and 1905 to Newport (Exs. 35 and 36). Comparing the two, one notes the very limited discussion in the 1901 edition. By 1905, however, there is a much fuller discussion. As part of that discussion, the entry reads: "Both synagogue and cemetery are now the property of the New York congregation, and the courts after litigation have sustained its title thereto." To a historian it is obvious that the court case attracted the attention of nonparties and nonlawyers, including the writer and editors of the Jewish Encyclopedia. A historian's perspective on this is surely no substitute for the Court's determination of what the earlier case decided, and I do not offer my view to substitute for the Court's. At the same time, the court case formed a part of the thinking of the parties at the time and in part informed their actions in entering into the 1903 lease. This Court's consideration of the matter would, in my opinion, be incomplete without consideration of the 1903 litigation.

        9.      Addressing pages 15-16 of the CJI memorandum to the Court, I strongly disagree that my report is simply a spin on Shearith Israel's position. I approached these issues and these documents with an open mind, and concluded in the end that the evidence overwhelmingly weighed on the side of Shearith Israel for the reasons that I lay out clearly in my report. I also strongly disagree that I "ignored" evidence that was helpful to CJI. Historians routinely do not cite and/or use sources that they think are wrong, especially secondary sources that have no basis in primary sources, or secondary sources that seem to be contradicted by primary sources. The irony here is that I did quote the sources that CJI counsel asked me about, just not the particular sentence that they had wanted me to quote. Yet they evidently could not or

chose not to find an expert who believed that their sentence from the source I cited was reliable or worthy of citation. If I did not quote particular parts of secondary materials that CJI's counsel suggest favor CJI's position, it is in part because those secondary sources seemed to misunderstand the situation or were contradicted by the weight of multiple primary sources. That is not the same as "ignoring" such secondary interpretations.

        10.     Let me address more briefly CJI's distortions concerning the substance of my report, since I believe a fair reading of my report would show that CJI's caricatures and mischaracterizations should be disregarded, not my report. On page 16, CJI completely misrepresents the overall evidence from 1893 – 1903 regarding the meaning of "appurtenances" and "paraphernalia," including the Mrs. Cohen statement and letters, the Mendez letter to Baruch in June 1893, and other wider usage in this time period. CJI misrepresents my citations regarding "appurtenances" and "paraphernalia"; to the contrary, I did include contemporaneous examples of the uses of these terms. The few references to uses outside the United States only strengthen my point, namely, that these were widely-shared and widely-understood terms. To give another example of that, Charles Dickens, in writing about his visit to the United States and to the White House in the mid-19th century, wrote as follows:

> "We entered a large hall, and having twice or thrice rung a bell which nobody answered, walked without further ceremony through the rooms on the ground floor, as divers other gentlemen (mostly with their hats on, and their hands in their pockets) were doing very leisurely. Some of these had ladies with them, to whom they were showing the premises; others were lounging on the chairs and sofas; others, in a perfect state of exhaustion from listlessness, were yawning drearily. The greater portion of this assemblage were rather asserting their supremacy than doing anything else, as they had no particular business there, that anybody knew of. A few were closely eyeing the *movables*, as if to make quite sure that the President (who was far from popular) had not made away with any of the furniture, or sold the *fixtures* for his private benefit."

It is clear from this entry that the word "fixtures" is being used synonymously with the word "movables," referring to personal property. Since one of the key documents that will be before

6

this Court confirms CJI's absolute surrender of Touro along with its fixtures, I would have thought the Court would be assisted by knowing of this use, even though by an Englishman.

11. Concerning page 17 of the CJI memorandum, I disagree that any of the OED's other definitions of "appurtenances" at all change my discussion of their meaning. I did not "skip" the meanings I disagreed with; I used the one that I felt was most relevant, but all of them could apply and support my conclusions. I also object to the implication on page 17 of the CJI memorandum that I was "selective and biased" in my use of source material. There is no objective basis to this statement; it is completely wrong. Similarly I disagree that I have a "partisan spin" (Fisher Br. at 19). I have reached my conclusions after a rigorous examination of a wide variety of evidence along with independent research.

12. On page 3 and 21 of the CJI memorandum to the Court, CJI says that there is new material in my Addendum. I do not agree. What I was doing on the whole was responding to issues raised in the deposition, as well as to two specific new (to me) documents counsel for CJI showed me at my deposition. Those documents are highly supportive of my conclusions, so I made reference to them and called them to the Court's attention. It is not fair or accurate to say that the Addendum covered ground I should have dealt with in the report. I disagree that my Addendum addresses documents that I tried to avoid during the deposition; I also disagree completely with the statement that in the Addendum, I made "substantive changes" to my report and to my deposition testimony. The changes were minor, nonsubstantive, and do not alter the opinions contained in the report.

13. I reviewed the portion of the CJI memorandum suggesting some impropriety with the timing of the deposition. I answered the questions posed to me, many of them over and over, as ably as I could. The repetition of the questions took up huge amounts of time during the day. I mentioned to the CJI counsel that I needed to take a 7:00 p.m. train back from New York (I went to New York as an accommodation to counsel for CJI). To make the

train I needed to end the deposition, get to my hotel, and get to the train station, which took over an hour. We did not waste time during the day and kept breaks and lunch to a minimum. At no time before very late in the afternoon did counsel for CJI express any sense either that we were delaying or that they were going to go so late that I would miss my train. We did not delay at all. In addition, at the request of CJI's counsel, after the deposition was over I then spent an additional 1-2 hours reviewing my writings, course syllabi, and related documents. Having to return to New York for more deposition would seem unnecessary and unfair to me. If the Court determines that I should have to reappear for more questioning, I request that it be done in Providence at a time that will not interfere with my professional responsibilities at Brown and elsewhere.

      14.    The above are some but not all of the errors and mischaracterizations in the CJI memorandum. For a fuller statement of my opinions and bases, I request that the Court read my report, addendum, and deposition. I understand that counsel to Shearith Israel will be submitting a legal memorandum addressing the motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Providence, Rhode Island on January 30, 2015.

_____

Professor Linford D. Fisher