# EXHIBIT 1

**Professor Linford D. Fisher**
**Department of History**
**Brown University**

**Expert Report**

**Congregation Jeshuat Israel**
**v.**
**Congregation Shearith Israel**

**Case No. 12-822-M (D. R.I.)**

**November 24, 2014**

Fisher 1

**Qualifications**

I am a historian of religion in American history, with special expertise in New England religious history. I received my doctorate from Harvard University in 2008. I am a regular, full-time member of the Department of History at Brown University, where I have taught since 2009. My course offerings include classes on American religious history, colonial U.S. history, and the wider early modern Atlantic world. My publications to date include two books and a dozen articles and essays on various aspects of colonial U.S. history. My curriculum vitae, including a list of publications, is attached as Appendix A.

I have academic and professional interest and expertise in the general themes of religious freedom in Rhode Island and early America. My most recent book, *Decoding Roger Williams: The Lost Essay of Rhode Island's Founding Father* (Baylor University Press, 2014), deals directly with the important topics of the founding of Rhode Island and the role of religious liberty in the colony (which ultimately allowed for the immigration of Jewish communities in the first place, starting in the 1650s). I have also given public lectures on the history of religious liberty in Rhode Island, which naturally includes the history of Judaism and the Touro Synagogue in Newport.

In 2012-2013, I was part of a core steering committee for The Spectacle of Toleration, a joint collaboration between the Newport Historical Society, Brown University, and Salve Regina University to commemorate the 350th anniversary of the famous 1663 Rhode Island charter from King Charles II (which refers to Rhode Island's full religious liberty as a "lively experiment"). Over the course of one full year, we planned a variety of public programming, along with a major academic conference in Newport and Providence in October 2013 that focused on religious freedom in western history. The history of Judaism in America and the history of

religious freedom in Rhode Island featured prominently in the papers at the conference, some of which will be published in 2015 as a book, titled *The Lively Experiment* (Rowman and Littlefield Press).

I am also personally familiar with the history of the Touro Synagogue. I routinely include its history in my classes on colonial and religious history, and I have also taken my students to Touro Synagogue on a class field trip to tour the Loeb Visitor Center and the synagogue itself.

## Opening Statement and Summary

The following is my assessment of two specific aspects of Congregation Jeshuat Israel v. Congregation Shearith Israel (Case No. 12-822-M [D. R.I.]): 1) Concerning the relationship between the original (colonial-era) Congregation Yeshuat Israel and the current Congregation Jeshuat Israel (incorporated in 1894);[1] 2) Concerning the meaning of the words "appurtenances and paraphernalia" and related terminology as they appear in the indentures with leases between Congregation Shearith Israel and Congregation Jeshuat Israel in 1903 and 1908, as well as in other related historical documents, and whether these words were intended to include the disputed *rimonim*. (By "disputed *rimonim*" I refer to four Torah-adorning bells that CJI claims to own and that are attributed to the colonial era silversmith, Myer Myers.)

In assessing these questions, I have reviewed documents given to me by counsel for CSI (constituting well over a thousand pages). A list of the documents I have relied on in connection

---

[1] In this document I will use "Congregation Yeshuat Israel" when referring to the original colonial-era Spanish and Portuguese (Sephardic) Newport Jewish congregation (abbreviated CYI); "Congregation Jeshuat Israel" when referring to one of the newer (incorporated in 1894) Newport Jewish congregations (abbreviated CJI); and "Congregation Shearith Israel" for the Spanish and Portuguese (Sephardic) Jewish congregation located in New York City (abbreviated CSI). This is in keeping with the vast majority of the historical usages found in the original documents and as most often referenced by historians. Outside of direct reference to the two Newport Jewish congregational entities, the difference between "yeshuat" and "jeshuat" is largely insubstantial, however, and related to orthographic/phonetic preference when translating from Hebrew into English. Both terms mean "salvation."

Fisher 3

with the opinions expressed in this report are annexed hereto as Appendix B. I have also conducted my own research in original sources from the time period and have consulted other relevant works by historians. Additionally, I have drawn on my own intimate knowledge of Rhode Island in the colonial period and nineteenth century as a historian of early America and as a specialist in the history of religion in America. I bring to these questions the standards of my field of expertise, namely, history, and I have followed usual and normal procedure in assessing evidence, evaluating sources, and thinking broadly about the time period in which these events took place. At the end of the day, historians have to make judgments about the past based on the best evidence available to them, which is what I have done here.

After a review of all of these materials, it is my assessment that: 1) the current Congregation Jeshuat Israel was not (neither in 1894 nor since) in any way connected to or related to the original Congregation Yeshuat Israel; and 2) the words "appurtenances and paraphernalia" and similar terms discussed below as contained in the 1903 and 1908 indentures with leases and in other historical documents clearly refer to and include the disputed *rimonim* and other sacred ritual objects. 3) Furthermore, these two conclusions logically lead to a third, namely, that the new CJI has never owned the Touro Synagogue, the property, the cemetery, the *rimonim*, nor any of the other ritual items that were loaned to it around the time of CJI's formation and then leased to CJI beginning at least as early as 1903. It is clear from the historical record that, as between CJI and CSI, it is CSI that owns the Touro Synagogue, the property, the cemetery, the *rimonim*, and the other ritual items that were loaned to CJI around the time of CJI's formation and then leased to CJI beginning at least as early as 1903.

Fisher 4

I reserve the right to change my assessment if more evidence is submitted, particularly from the plaintiffs; although I have reviewed certain documents that the plaintiffs produced, to date they have not submitted any expert testimony.

**Historical Background and Context**

The origins of the original Jewish community in Newport date back to the 1650s, when fifteen Spanish and Portuguese (Sephardic) Jewish families arrived in Newport. These Jewish families were seeking a place of religious freedom and a welcoming commercial environment, having formerly emigrated from the Iberian Peninsula to Amsterdam, and from there to Curaçao, Recife (Brazil), and Barbados, and from these locales to North America, whether New York (in 1654) or Newport (by 1658).[2] Although the exact origins of these original Newport Jewish families are somewhat contested by historians, it is clear that from early on there were some family connections to the Sephardic Jewish community in New York (Congregation Shearith Israel), from which some of the Newport families had come.[3] Rhode Island, which had first been settled by Roger Williams in 1638, was quickly gaining an international reputation as a place that allowed for complete religious freedom of both private belief and public worship. Jews, atheists, Muslims, "heretics"—all were guaranteed religious protection in Rhode Island. This was made plain in several laws and charters of the colony. A law passed in 1647 specifically stated that "all men may walk as their consciences persuade them, everyone in the name of his god."[4] This

---

[2] William Pencak, *Jews and Gentiles in Early America* (The University of Michigan Press, 2005), 83. See also CSI 1174: Rabbi Theodore N. Lewis, "Touro Synagogue, Newport, R.I., 1763-1963," *Newport Historical Society Bulletin*, no. 111 (July 1963): 3.

[3] See, for example: Peter Wiernik, *History of the Jews in America: From the Period of the Discovery of the New World to the Present Time* (Jewish Press Publishing Company, 1912), 72–73; Robert P. Swierenga, *The Forerunners: Dutch Jewry in the North American Diaspora* (Wayne State University Press, 1994), 42; Pencak, *Jews and Gentiles in Early America*, 83.

[4] Jon L. Wakelyn, *America's Founding Charters: Primary Documents of Colonial and Revolutionary Era Governance* (Greenwood Publishing Group, 2006), 1:151.

general religious protection was given royal confirmation in 1663, when King Charles II of England granted a royal charter for the colony of Rhode Island, in which he stated: "…that no person within the said colony, at any time hereafter shall be any wise molested, punished, disquieted, or called in question, for any differences in opinion in matters of religion . . . but that all and every person and persons may, from time to time, and at all times hereafter, freely and fully have and enjoy his and their own judgments and consciences, in matters of religious concernments."[5]

For the first one hundred years of their existence in Newport, this small Sephardic Jewish community did not have the numbers or the resources to build their own synagogue, so they simply gathered for worship in a few of their own homes.[6] In 1677, two members of this Newport Jewish community purchased a plot of land in Newport to use as a cemetery.[7] And as their numbers increased in the mid-eighteenth century, and as other congregations in North America and elsewhere began building their own synagogues, this Newport congregation began plans to build a dedicated place of worship that could also be used for educational purposes. To raise money for the purchase of land and the construction of a building, the Newport Jewish congregation sent out letters of support to Jewish communities in North America and the Caribbean. This included two appeals to the oldest Jewish congregation in the American colonies, Congregation Shearith Israel (CSI), in New York City (which resulted in two separate financial gifts within five years).[8] Because of the generous outpouring of gifts and contributions from CSI and elsewhere, the Newport congregation was able to purchase a plot of land on the

---

[5] 1663 Rhode Island Charter, *available at* http://sos.ri.gov/library/history/charter/, accessed on August 22, 2014.
[6] CJI 2012: Morris Aaron Gutstein, *The Story of the Jews of Newport; Two and a Half Centuries of Judaism, 1658-1908* (New York, 1936), 82.
[7] Frederic Denison, "The Israelites in Rhode Island," in *The Narragansett Historical Register: 1885-1886*, vol. 4, 1886, 302.
[8] CJI 2016, 2021-2022: Gutstein, *The Story of the Jews of Newport*, 88-89, 95-96. See also Melvin I. Urofsky, *A Genesis of Religious Freedom: The Story of the Jews of Newport, RI and Touro Synagogue* (The George Washington Institute for Religious Freedom, 2013), 55, 57.

outskirts of Newport on June 30, 1759, from Ebenezer Allen of Sandwich, Massachusetts.

Construction on the synagogue started almost immediately, following plans designed by architect

Peter Harrison. Its interior, while mostly of "classical colonial" style, was also distinctly flavored

with some features of a Spanish Portuguese traditional synagogue (modeled in part, perhaps,

after the Sephardic Synagogue in Amsterdam, Holland, dating from 1675).[9]

The Newport congregation dedicated their new synagogue on December 2, 1763, in what

was a large affair for the entire city of Newport.[10] To supply the religious and ritual objects

necessary for a working synagogue, the Newport congregation solicited and received gifts and

loans from the wider Jewish community in North America and Europe, including 149 pounds

(English money), a perpetual lamp, some brass candlesticks, and candle wax from CSI in New

York, which also loaned at least two Torah Scrolls.[11] Additional Scrolls of the Law were loaned

to the Newport congregation for their new synagogue, including scrolls from Jewish

congregations in London and Amsterdam. By 1769, there were six "Scrolls of the Holy Law" in

the ark of the synagogue, possibly each with its own set of *rimonim*, or silver bells.[12]

Shortly after the dedication of their new synagogue, the Newport Jewish congregation

officially adopted the name "Congregation Yeshuat Israel" (CYI). Even as late as 1764, the

congregation signed letters that requested financial support as "Kahal Kodesh Nephutsay Israel"

(holy congregation of the dispersed of Israel). By 1766, however, some candlesticks that had

been given to the Newport congregation were engraved with the name "Holy Congregation,

---

[9] CJI 2019-2020: Gutstein, *The Story of the Jews of Newport*, 92-94.

[10] CJI 2023: Gutstein, *The Story of the Jews of Newport*, 98. See also Urofsky, *A Genesis of Religious Freedom*, 59-60.

[11] CSI 5591: CSI Elder Meeting Minutes, January (Tebeth) 22, 1759. In this meeting, CSI Elders agreed to "lend the Sepher Tora" belonging to a Jewish congregation in Georgia to the Newport congregation. See also CJI 2022: Gutstein, *The Story of the Jews of Newport*, 97; CSI 5274: CSI Trustees Meeting Minutes, January 11, 1818.

[12] CJI 2027: Gutstein, *The Story of the Jews of Newport*, 105. Other historians count eight total Torah Scrolls in Newport synagogue by the late 1760s. See Urofsky, *A Genesis of Religious Freedom*, 61.

Yeshuat Israel" (holy congregation of the salvation of Israel).[13] The new name likely signaled an optimistic shift, from dispersal to rootedness and salvation, as represented in the synagogue.[14]

Despite this long history and the auspicious, visible coming of age with a synagogue building, by the end of the eighteenth century, the synagogue in Newport had ceased to function as an active Jewish synagogue. Although the community lost its *Hazzan* (rabbi), the remaining Newport Jews still gathered weekly under the leadership of laymen.[15] To have the synagogue essentially close a mere thirty years or so after the consecration of the building itself was an unexpected turn of events. The most direct cause was the American Revolution (1776-1783), which involved the occupation of Newport by the British army. Many American colonists fled from of the city, including the vast majority of the Jewish population. In the years leading up to the Revolutionary War, and certainly afterwards, the Newport Jewish community was not growing or to my knowledge making purchases of Jewish ritual objects. It is well known that from and after 1776 the Jewish community in Newport dwindled. Even after the end of the war in 1783, the Jewish population at Newport never regained its vitality and population. It did, however, earn its place in the important developments of religious liberty in the new United States, primarily through letters of correspondence between CYI warden Moses Seixas and U.S. President George Washington in 1790. Washington's letter to Seixas on August 18, 1790, assured Newport's Jews that the United States "gives to bigotry no sanction, to persecution no assistance" (borrowing the wording Seixas used in his letter to Washington).[16]

---

[13] CSI 0601: Rabbi Theodore Lewis, *The Newport Jewish Tercentenary, 1658-1958*, p. 6. See also David and Tamar de Sola Pool, *An Old Faith in the New World* (Columbia University Press, 1955), 420; Urofsky, *A Genesis of Religious Freedom*, 62.
[14] CSI 3542: Rabbi Theodore Lewis, "History of Touro Synagogue," *Bulletin of the Newport Historical Society*, No. 159, Vol. 48, Part 3, Summer 1975, p. 283.
[15] Urofsky, *A Genesis of Religious Freedom*, 85.
[16] CSI 0438-0444: *Touro Synagogue of Congregation Jeshuat Israel, Newport, Rhode Island, Founded 1658*, 22-25.

Fisher 8

Nonetheless, as a result of the clearly diminished Jewish population in Newport, by 1791 the synagogue was closed down for regular worship services.[17] A few members of the original families from Congregation Yeshuat Israel remained in Newport for a few more decades before they, too, moved to New York City and joined CSI between 1818 and 1822.[18] As the last remaining CYI members moved to New York City, CSI naturally inherited legal oversight of the religious scrolls and other ritual sacred objects, as most of them had come from CSI in the first place.[19] Congregation Yeshuat Israel had simply ceased to exist, and CSI was rightly left holding the keys, quite literally.[20]

Throughout the nineteenth century, because of the long-standing family and cultural ties to CYI and the Newport synagogue, CSI retained not just legal oversight of, but actual spiritual authority regarding, the building and all associated ritual objects formerly used by the original Congregation Yeshuat Israel in Newport. This is most clearly observable in the few times the synagogue was temporarily opened for services, funerals, and other events between 1820 and 1880. In each case, it was CSI who opened the Newport synagogue, loaned the essential ritual objects for services, and provided a minister (a rabbi or *Hazzan*) to officiate. In 1833, the synagogue in Newport was opened for the burial of Rebecca Lopez (daughter of Isaac Touro), over which the CSI minister presided.[21] In 1854, the synagogue was opened again for other

---

[17] According to some reports, by the 1790s the Newport synagogue "owned only one old, cracked *shofar*, the ram's horn that is sounded on the High Holidays, but even worse, no one knew how to blow it." Urofsky, *A Genesis of Religious Freedom*, 86.

[18] CSI 0423: *Touro Synagogue of Congregation Jeshuat Israel, Newport, Rhode Island, Founded 1658*, 10.

[19] CJI 0291: H.P. Mendez to Mayor Garrettson, January 13, 1901; CSI 5339: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881. See also CSI 5258: CSI Trustee Meeting Minutes, February 10, 1833, which indicates that "Four Sepharim" were deposited in CSI's synagogue under CSI's charge.

[20] According to David and Tamar de Sola Pool, in the 1820s "the last representatives of the Congregation Yeshuat Israel in Newport formally handed over to the active Congregation Shearith Israel in New York the title to their closed synagogue, burial ground and other communal property." Pool, *An Old Faith in the New World*, 422. See also Urofsky, *A Genesis of Religious Freedom*, 86.

[21] CSI 5340: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881.

Fisher 9

burials, this time for Judah Touro and Catherine Hays.[22] In 1859, CSI received a request (from

the Newport City Council) to open the "ante-room" of the synagogue for "school purposes."[23] (It

is unclear if CSI actually granted permission for this use, but if it did, it was temporary.) In 1876,

a Newport Jewish merchant, M.J. Moss, requested that the synagogue be opened for the "Fall

Holydays of that year."[24] Once again, it is unclear if this request was granted, for CSI's response

was that opening the synagogue required a quorum of Jews, called a *minyan*, which meant at

least ten men above the age of thirteen.[25] The Newport synagogue was additionally temporarily

opened by CSI for services in 1850 and 1877, with official services led by CSI ministers from

New York.[26]

Even though it largely sat empty between 1790 and 1880, the Newport synagogue

received a financial boost in the form of several bequests given in the nineteenth century by

Abraham and Judah Touro. Abraham and Judah were the sons of Isaac Touro, who first arrived

in Newport in 1758 and officiated in the newly dedicated Newport synagogue after it was opened

in 1763. When Abraham and Judah passed away in the nineteenth century, they made a series of

bequests to Jewish congregations in the United States (and beyond), including Congregation

Shearith Israel in New York City.[27] Given their family's connection to Newport, the Touro

brothers also bequeathed substantial funds to the city of Newport and the state of Rhode Island to

---

[22] CSI 5341: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881. See also Benjamin Brown, "The Rebirth of the Jewish Community in Newport, 1850-1854," *Rhode Island Jewish Historical Notes* 13, no. 3 (2001): 428–429.
[23] CSI 5341-5342: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881.
[24] CSI 5342: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881.
[25] CSI 5342-5343: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881. See also Denison, "The Israelites in Rhode Island," 307.
[26] Denison, "The Israelites in Rhode Island," 314. For an examination of the 1850 opening (seemingly, as a historic and nostalgic Sabbath celebration for regional and vacationing Jews, many of whom were related to the original CYI congregation), see Brown, "The Rebirth of the Jewish Community in Newport, 1850-1854," 424–425.
[27] Urofsky, *A Genesis of Religious Freedom*, 91. A plaque still exists today in the synagogue of CSI commemorating Abraham Touro's bequest to that congregation.

maintain the physical building of the synagogue and to pay for a minister, should an appropriate and sufficient Sephardic Jewish community return to constitute an active congregation.[28] The city of Newport seems to have been the functional trustee of these funds and even appointed a city employee, Stephen Gould, to oversee the care of the cemetery and upkeep of the building. But the actual repairs were normally coordinated with CSI, whom the city of Newport treated as the owners of the property, real and personal.[29] Throughout, CSI retained control and authority over the ritual use (or non-use) of the building and property, as well as the ritual objects needed to officially use the synagogue.[30]

In 1881, almost sixty years after the last descendants of the original CYI moved to New York, the CSI leadership in New York received a petition (both via the Newport City Council and from the Jewish community in Newport) from a newly arrived and growing Jewish immigrant community (largely from Germany and Poland) requesting "to have service in the Newport Synagogue and the use of the Judah Touro Fund to pay the expense of a Rabbi."[31] At a congregational meeting in September, CSI agreed temporarily to open the synagogue and pay for a Spanish-Portuguese (Sephardic) minister only for the "ensuing holydays" that year, but they declined to allow the Touro Funds to be used for a minister "until there shall be a sufficient number of permanent residents to maintain the services."[32] This was repeated again in 1882,

---

[28] CJI 0587: David C. Adelman, "They Broke In—To Pray," *Rhode Island Jewish Historical Notes*, Vol. 2, No. 4 (April 1958), 236-237. Abraham Touro's gift in 1822 was $10,000 to the state of Rhode Island for the upkeep of the synagogue. Judah Touro's bequest in 1854 was $10,000 to the city of Newport for the purpose of supporting a minister.

[29] CJI 0088: CSI petition to the Rhode Island General Assembly, January 1894.

[30] The Newport City Council specifically saw their role as a local overseer of the property, without intending "to interrupt the possession, control and management with which the proprietors of said Synagogue and premises or any other persons according to the laws and customs of the Jews may be vested." CSI 1567: "An Abstract of the Title," December 22, 1893. Quote is drawn from Chapter 76 of the Public Statues of Rhode Island.

[31] CSI 4248: CSI to the Newport city clerk, September 30, 1881. See also CSI 8381-8382: CSI Board of Trustee Meeting Minutes, September 18, 1881.

[32] CSI 4249: CSI to the Newport city clerk, September 30, 1881. CSI 8381-8382: CSI Board of Trustee Meeting Minutes, September 18, 1881. See also Urofsky, *A Genesis of Religious Freedom*, 97.

when the synagogue was temporarily opened for a full Portuguese Jewish Sabbath observance on August 4th and 5th, with Henry Pereira Mendez of CSI officiating.[33]

Within a year, there were enough German and Polish (Ashkenazi) immigrants to make opening the synagogue a viable possibility. Although initially hesitant, CSI allowed the Touro Synagogue to be officially reopened and re-consecrated in May 1883, with Abraham P. Mendez, a Sephardic Orthodox rabbi of CSI's choosing (and father of CSI Rabbi Henry P. Mendez), as minister.[34] In 1893, after a struggle for control over the synagogue within the Newport Jewish community, one faction of the Jewish community petitioned for and eventually received (in June 1894, after some opposition by CSI) a charter with a name substantially similar to the name of the original, colonial-era congregation: Congregation Jeshuat Israel.[35]

Between 1894 and 1903, however, another series of controversies broke out, both between CSI and CJI as well as internally within the broader Newport Jewish community (these are outlined in greater detail below). This resulted in a series of closures by CSI of the synagogue, and, eventually, attempts by CJI and another rival Jewish congregation (named the Touro Congregation) to gain possession of the synagogue and premises. But in 1903, a U.S. Circuit Court rejected the attempts by CJI and the Touro Congregation to gain control of the synagogue and its ritual objects. In direct response to this 1903 court decision, CJI formally recognized CSI's legal title to the synagogue and its ritual objects in its own Board of Trustees meeting minutes as well as in a binding agreement on January 30, 1903, between CSI and CJI. These and other documents illustrate that CJI fully acknowledged CSI's ownership and

---

[33] Denison, "The Israelites in Rhode Island," 314.

[34] CJI 0581: David C. Adelman, "They Broke to Pray," 227.

[35] CJI 0155: "An Act Incorporating a Congregation Jeshuat Israel in the City of Newport," June 13, 1894. Regarding this 1893 internal struggle within the Newport Jewish community for control of the synagogue and its appurtenances (ritual objects), see a letter from Rev. David Baruch (CJI) to CSI, dated June 13, 1893, found in JHA 0044: "The 1902 Sit-in at Touro Synagogue," *Rhode Island Jewish Historical Notes*, 7:1 (Nov. 1975), 43.

Fisher 12

irrevocably ceded control, possession, and ownership of the building and religious objects to CSI.[36] Additionally, CJI entered into an indenture with lease agreement for five years with CSI in 1903 to use the synagogue and the necessary sacred ritual items for $1 per year, together with other important undertakings. A lease renewal (also for five years) was signed by both parties in 1908. This lease has remained in force by virtue of the laws of Rhode Island, which stipulate that a tenant without a new contract from the landlord may be treated as a tenant from year to year.[37] Accordingly, this indenture with lease arrangement was recognized by CJI and still stands to this day.[38]

## Congregation Jeshuat Israel: Continuity or Discontinuity?

The first important historical question under consideration here is this: What is the relationship between the current (1894 – present) Congregation Jeshuat Israel and the original (colonial) Congregation Yeshuat Israel? The answer is, simply, that besides the fact that they both used the Touro Synagogue for worship (with CJI's use pursuant to a lease from CSI), there is no relationship between the two. There was no ethnic, blood, cultural, or historical connection or relationship between the original Congregation Yeshuat Israel and the more recently arrived Newport Jewish community when it was incorporated in 1894 as Congregation Jeshuat Israel. This is evident from the documents from the time period, historians' assessments over time, and the testimony of CJI itself at key moments from the 1890s to the present. Conversely, CSI had counted among its members in the nineteenth century families descended from CYI (which it

---

[36] CJI 0471: February 2, 1903, Meeting of the CJI Board of Trustees; CSI 4533: Agreement between CSI and CJI, January 30, 1903.

[37] CSI 9700: Report of S. Howard Cohen, CSI Board of Trustees Meeting Minutes, November 13, 1916.

[38] CSI 5189: "Touro Synagogue History," Touro Synagogue website, which states: "A lease amount of $1 per year is still paid by the current Newport congregation to Congregation Shearith Israel for use of the building and grounds, which are still owned by the New York group."

still does to this day) and had actively taken control over and care of the real and personal

property at the Newport synagogue between the dispersal of the original CYI members from

Newport in the 1810s and CJI's undertaking as lessee to do so in 1903.

As mentioned above, a Jewish congregation in Newport was first gathered in

approximately 1658 when Spanish and Portuguese (Sephardic) refugees arrived from various

diasporic points around the Atlantic, including Curaçao, Recife, and New York. Although the

community grew through the late seventeenth and early eighteenth centuries, it was not until the

mid-eighteenth century that it had sufficient members and resources to build a synagogue, which

it dedicated in 1763. Congregation Yeshuat Israel, as the Newport Congregation called itself by

the mid-1760s, flourished for several decades, and then closed down as a full-time, functional

synagogue by the 1790s due to the disruption caused by the American Revolution (1776-1783).

Remaining members of the original congregation had all moved away from Newport (largely to

New York City) by the early 1820s.[39] In 1822, Newport Quaker and city magistrate Stephen

Gould noted in his journal, "Moses Lopez, the last Jew left Newport for New York."[40]

Gould was not alone in noting the complete lack of any visible Jewish presence in the

city, particularly with regard to the use of the synagogue. In 1836, local Baptist minister Arthur

Ross noted that the Newport synagogue, "which was once thronged with [Jewish] worshippers,

[but] is now never used, except occasionally for the solemnities of the funeral service of some of

the descendants," who lived outside of Newport but wished to be buried in the Jewish cemetery

there.[41] The most famous commentary on the Newport synagogue came in 1854, when Henry

Wadsworth Longfellow's visit to the Newport cemetery and synagogue so impressed him that he

---

[39] Denison, "The Israelites in Rhode Island," 314.
[40] Brown, "The Rebirth of the Jewish Community in Newport, 1850-1854," 423; Urofsky, *A Genesis of Religious Freedom*, 86.
[41] Brown, "The Rebirth of the Jewish Community in Newport, 1850-1854," 423.

wrote an entire poem about them. "Closed are the portals of their Synagogue," Longfellow mused, "No Psalms of David now the silence break, / No Rabbi reads the ancient Decalogue / In the grand dialect the Prophets spake / Gone are the living, but the dead remain."[42] Longfellow might have romanticized the disappearance of the Jews from Newport, but he was absolutely right that there was no viable Jewish congregational presence in Newport in 1854, nor had there been for over half a century. Even in October 1878, the *New York Observer and Chronicle*, when listing out the current or former Jewish congregations in the U.S., stated of Newport: "The Newport congregation has been disbanded, there not being enough Jewish residents in the place to maintain it. The Synagogue is still there, however, and is sometimes used for divine worship during the summer season."[43] Despite the sporadic openings for funerals and occasional services by CSI between 1820 and 1880, all contemporary testimony is clear: the Newport synagogue was not used regularly for Sabbath worship after the 1790s, and the actual members (and their descendants) of the original CYI had not resided in Newport after the early 1820s.

When a newly arrived collection of Jewish families in Newport in the late 1870s and early 1880s began requesting use of the Touro Synagogue, the Newport City Council naturally deferred to CSI in New York, as they had regarding prior requests to use the premises.[44] CSI obliged by opening the synagogue on a few occasions. Sporadic use was one thing, but when the new Jewish community in Newport also petitioned to officially and permanently reopen the synagogue in 1881, CSI resisted, raising several important concerns and considerations in a lengthy petition to the Newport City Council presented in person by CSI minister H.P. Mendez.[45]

---

[42] "The Jewish Cemetery at Newport," Henry Wadsworth Longfellow and Dante Alighieri, *The Works of Henry Wadsworth Longfellow: The Poetical Works* (Houghton, Mifflin, 1886), 3:33-36.

[43] "Oldest Jewish Congregations," *New York Observer and Chronicle*, October 31, 1878, p. 1.

[44] CSI 4248: CSI to Newport City Clerk, September 30, 1881.

[45] 5334: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881. See also CSI 5324: Report of a CSI committee, July 19, 1893.

At the core of the concern shown by CSI was a cluster of issues. The first was related to the fact that the new Newport Jewish community followed Ashkenazic, not Sephardic, rites. Although this distinction between Ashkenazic and Sephardic rites is perhaps seemingly not important to outside observers today, in the late nineteenth century it was bound up in ethnic identity, collective memory, language, and ritual orthodoxy. In their fifteen-page 1881 memorial, the CSI representatives laid out the long histories and cultural differences between Germanic (Ashkenazic) and Spanish-Portuguese (Sephardic) Jewry, dating back to the first and second centuries of the Common Era (AD) with the forced diaspora of Jews after the Roman conquest in 70 CE.[46] These Jewish communities in exile developed different ritual and cultural traditions that ran deep and even in the seventeenth and eighteenth centuries were often intensely felt and closely guarded. The vast majority of Jews who came to the Americas in the colonial period were Sephardic (originally from Spain and Portugal). When faced with forced exile or execution in the 1490s while living on the Iberian Peninsula, these Jews often superficially adopted Christianity to save their lives while continuing to practice Judaism. Later, when opportunity arose, these *Marranos* (forced Jewish "converts" to Christianity) migrated elsewhere in an effort once again publicly to practice Judaism. Established Jewish congregations in North America were, until the early nineteenth century, largely Sephardic, including those in New York, Newport, Savannah, Montreal, Philadelphia, Richmond, and Charleston; Germanic/Polish Jewish immigration did not start in earnest until the early-mid nineteenth century, although a number of Ashkenazic Jews were present in some locales.[47]

---

[46] CSI 5334-5335: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881.

[47] CSI 5335-5336: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881.

An additional layer of consideration for CSI in the 1880s that might not be readily apparent to twenty-first-century observers is that, more generally, German (Ashkenazic) Jewry in the late nineteenth century was largely part of a reform (liberalizing) movement within European and American Judaism. This movement (which by the 1880s had already become known as Reform Judaism) sought to Americanize Jewish practices by relaxing certain elements of Orthodox Judaism. Reform Jews promoted family seating in the synagogue (instead of separating men and women in worship services), allowed English to be spoken during services, used both German and Hebrew in their prayers, and in general attempted to reconcile their ancient faith with a modern tenor and perspective.[48] CSI, as with other Orthodox synagogues, saw the Reform movement as dangerous, potentially eroding long-standing Jewish traditions and customs.[49]

The third major consideration for CSI regarding the possible opening of the Newport synagogue was that of permanence. It was important to the CSI leaders that, should the Touro Synagogue be opened again, a sufficient number of Jews would remain to keep it open in the long term.[50] It was "rather hard," Mendez and CSI stated in their 1881 memorial, "to see the Synagogue which their fathers built and in which they worshiped, and the Cemetery in which they are buried, taken possession of by a few comparative recent arrivals, whose permanent stay cannot with certainty be guaranteed, and who form a community which consists of only four

---

[48] Denison, "The Israelites in Rhode Island," 315. The differences between Reform and Orthodox approaches to liturgy (and the outlook of Reform Judaism in general) can be seen in an address given by Rabbi Myer Noot of the Reformed Synagogue in Providence on December 7, 1885. Ibid., 318ff.

[49] Gutstein, *The Story of the Jews of Newport*, 270. CSI's concerns were undoubtedly also influenced by a schism experienced in their own congregation in 1825, when it is reported that an Ashkenazic faction within CSI split off, purchased their own synagogue, and went their own direction. See B'Nai Jeshurun, "Our History and Vision," http://www.bj.org/about-bj/our-story/; Abraham J. Karp, "Overview: The Synagogue in America – A Historical Typology," in Jack Wertheimer, ed., *The American Synagogue: A Sanctuary Transformed* (Cambridge: Cambridge University Press, 2003), 6-8.

[50] CSI 5334: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881.

married men, none of whom have been long resident in Newport, and certainly not long enough to warrant the said descendants confiding such sacred objects to such new comers."[51]

So seriously did CSI take the general importance of a long-term, ritually authentic (from CSI's perspective), positive Jewish presence in the Newport synagogue, that they stated clearly in their 1881 petition to the Newport City Council that it would be better that the synagogue be kept closed than to possibly have "the honor of our name and the high reputation of the old Newport Jews . . . be lowered."[52] Given the relatively nice financial benefit of accessing the funds left by the Touro brothers held in trust by the city of Newport and the state of Rhode Island, CSI was also suspicious that the Newport Jewish immigrants were simply positioning themselves to take control of these funds without respect to the history and lineage of the Touro Synagogue itself. Representatives from CSI state this clearly in several places. For example, in their 1881 petition to the Newport City Council, they assert (quoting the *Jewish Messenger* of New York), "It is needless to have it reopened simply for anybody's pecuniary benefit."[53]

In the end, a compromise was reached in 1881. CSI agreed to open the Newport synagogue for the High Holy Days in 1881, but declined to utilize the Touro funds for a minister until a sufficient quorum was present.[54] Scrolls of the Law that were brought up from CSI in New York for these services were accordingly returned to New York after their completion.[55] The following year, when apparently enough males were present to constitute a *minyan*, CSI agreed to officially re-open the synagogue on a more permanent basis, but only if they (CSI) could control the hiring of a Sephardic minister, thus ensuring that the Touro Synagogue would

---

[51] CSI 5334: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881.

[52] CSI 5345: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881.

[53] CSI 5346: Memorial of the Board of Trustees of Shearith Israel, N.Y., Presented to City Council of Newport, R.I., 1881.

[54] CSI 5330: Report of a CSI committee, July 19, 1893. See also Urofsky, *A Genesis of Religious Freedom*, 97.

[55] CJI 0406: CSI Minutes of October 25, 1881; CSI 5330: Report of a CSI committee, July 19, 1893.

continue to be home to a Jewish community of the Sephardic Orthodox tradition. This surely must have been a somewhat jarring shift for the Ashkenazic German/Polish community in Newport, but they agreed to those terms in consideration of the substantial benefit of gaining access to the Touro Synagogue and its appurtenances and paraphernalia, as well as the benefit of the Touro funds. The new immigrants were, after all, the newcomers with no legal claim to the synagogue, the land, or the requisite ritual items.

Accordingly, in late 1882, CSI gave a formal call to minister to the Reverend Abraham P. Mendez of London to serve as the minister of the newly formed Newport Jewish community.[56] His hiring ensured the ritual orthodoxy of services at the Newport synagogue in the Spanish and Portuguese rites (particularly in line with what was practiced at CSI in New York) and gave the desired direct oversight to CSI for the rituals performed at the Newport synagogue.[57] With an approved *Hazzan* in place, CSI officially re-opened the Newport synagogue in May 1883 and sent two *sepharim* (Books of the Law) "to be used by the Newport Cong[regation] during the pleasure of the Board."[58] The end result was that the Touro Synagogue (as it was now called, in honor of the bequests by the Touro brothers) was once again open for regular services for the first time in almost a century, fully in observance with the Spanish Portuguese (Sephardic) rites and led by a Sephardic minister of CSI's calling, but attended by German and Polish (Ashkenazic) Jews.

This settlement seemed to work well for a decade, until Rev. Abraham P. Mendez, who was officiating at the Newport synagogue, passed away. Various people connected with the decade-old congregation worshipping at Touro Synagogue used this transition in leadership to

---

[56] CJI 0290: H.P. Mendez to Mayor Garrettson, January 13, 1901; CSI 5331-5332: Report of a CSI committee, July 19, 1893; CSI 8439: CSI Board of Trustees Meeting Minutes, December 21, 1882.

[57] CJI 0088: L. Napoleon Levy and CSI Petition to the Rhode Island General Assembly, January 1894.

[58] CSI 8448: CSI Board of Trustees Meeting Minutes, May 17, 1883. See also CJI 0581: David C. Adelman, "They Broke In—To Pray," 227.

assert their own control and presence over the synagogue. An internal struggle for power ensued between at least two factions within the congregation that had been using the Touro Synagogue since 1882.[59] In May 1893, one of the groups formally organized as a congregation and petitioned to be incorporated as a religious organization within the state of Rhode Island.[60] This attempt to incorporate an official Jewish congregation in Newport in 1893 met with resistance, particularly from Congregation Shearith Israel. CSI was supportive of a Jewish congregation in Newport, and was even supportive of that congregation using the Touro Synagogue and utilizing the Touro funds for their minister under certain restrictions (relating to continuing observances according to the Sephardic rites). The reason for the controversy in 1893 was simple: the new congregation in Newport was trying to officially incorporate as a legal body using the exact name of the former congregation in Newport: Congregation Yeshuat Israel.

In response, on June 13, 1893, CSI formed a special committee to investigate the situation in Newport.[61] The CSI committee members traveled in person to Newport, met with the president and vice-president (Max Levy and Eugene Schreier, respectively) of the newly formed congregation, addressed the Newport mayor, and performed their own research in the records of the City Clerk's office to better clarify the Newport congregation's intentions, CSI's legal title to the property, and the desires of the original CYI members (as reflected in the wills of the colonial-era members).[62] The CSI committee returned to New York in July 1893 convinced that official and legal action should be taken to secure their title to the Newport synagogue.[63]

---

[59] JHA 0044: "The 1902 Sit-in at Touro Synagogue," 43. According to the CSI committee formed in 1893 to investigate the situation in Newport, the rival group was "championed by one Rosen, for whom they entertained a strong dislike." CSI 5322: Report of a CSI committee, July 19, 1893.

[60] CJI 0155: "An Act Incorporating a Congregation Jeshuat Israel in the City of Newport," May 1894 (passed June 13, 1894). According to a letter from CJI Rev. David Baruch, the application for incorporation by CJI had already occurred by June 13, 1893. See JHA 0044: "The 1902 Sit-in at Touro Synagogue," 43.

[61] CSI 5321: Report of a CSI committee, July 19, 1893.

[62] CSI 5322, CSI 5328, CSI 5349: Report of a CSI committee, July 19, 1893.

[63] CSI 5350-5352: Report of a CSI committee, July 19, 1893.

One of CSI's main concerns, as contemporary observers recognized and as CSI protests made clear, was that there was no connection at all between the new Newport congregation and the historic, colonial-era CYI. In a January 1894 petition to the Rhode Island General Assembly, Congregation Shearith Israel made many of the same historical arguments that they had put forward in their 1881 petition. The original CYI was comprised of Sephardic Orthodox Jews from the Spanish and Portuguese rituals and traditions, which CSI members noted "is essentially and in many points entirely different from the rite as practised by the German and Polish Jews."[64] Furthermore, not a single member of the new congregation had any blood, ethnic, or lineal connection to the original CYI.[65] This fact was recognized even by non-Jewish Newport observers at the time. An 1886 essay titled "The Israelites in Rhode Island," published in the Rhode-Island journal *The Narragansett Historical Register*, laid out the history of Jews in Newport, noting that the last members of the colonial-era Spanish and Portuguese congregation in Newport (the original CYI) moved to New York in 1822. "Newport now counts none of the old Jewish families of Portuguese and Spanish blood," local historian Frederic Denison observed.[66]

Congregation Shearith Israel asserted the same thing. As the January 1894 petition to the Rhode Island General Assembly from CSI President L. Napoleon Levy stated of this new congregation, "while as a matter of fact none of them belong to the Sephardic or Spanish and Portuguese sections of the Jewish nation, which was the rite with which the members of the ancient community at Newport were identified, nor are they any descendants or in any way connected with the former Congregation, they being of the German or Polish contingent herein

---

[64] CJI 0087: L. Napoleon Levy and CSI petition to the Rhode Island General Assembly, January 1894.
[65] CSI 4057 and CJI 0089: L. Napoleon Levy and CSI Petition to the Rhode Island General Assembly, January 1894.
[66] Denison, "The Israelites in Rhode Island," 314.

before alluded to, and by their action in endeavoring to adopt this name [of Congregation Yeshuat Israel], are manifestly perpetrating a fraud upon the citizens of Newport in attempting to establish a relation between the ancient Congregation and themselves, while as a matter of fact they are totally different in form of worship and in social standing, as well among the Israelites as Gentiles."[67] Levy was clear that it would be acceptable for the newly formed Newport Jewish congregation to incorporate under one of any of the other hundreds of possible names permissible and known to Jews, but to use the name of the original congregation was misleading at best and fraudulent at worst.[68]

CSI president L. Napoleon Levy followed up on this petition to the Rhode Island General Assembly with an in-person appearance in the spring of 1894 to argue his case before the state legislature.[69] He was apparently temporarily successful, for in May 1894 the Rhode Island General Assembly initially rejected the proposed charter of the Newport congregation.[70] But this particular Newport congregation was persistent; they again filed their application the next month, in June 1894, and this time—perhaps due to local political pressure, as some contemporary observers suggested—a charter was granted by the Rhode Island General Assembly on June 12.[71]

Therefore, from the perspective of CSI, starting in 1893 this particular Newport Ashkenazic congregation was attempting an unwarranted power grab by claiming the name of the colonial-era Sephardic congregation and tapping into the funds held in trust by the Newport

---

[67] CJI 0089-0090 and CSI 4057-4058: L. Napoleon Levy and CSI Petition to the Rhode Island General Assembly, January 1894.

[68] CSI 4057-4058: L. Napoleon Levy and CSI Petition to the Rhode Island General Assembly, January 1894.

[69] CSI 5296-5297: CSI Meeting Minutes, May 4, 1894.

[70] CSI 5287: CSI Meeting Minutes, June 4, 1894. Somewhat confusingly, in their official petition to the Newport Mayor and City Council in May 1893, the newly-formed Newport congregation used the name Congregation Jeshuat Israel, even though in their own meeting minutes and, a few months later, in their own Constitution and Bylaws, they used the name Congregation Yeshuat Israel (which is the name CSI representatives use in their protests to the Rhode Island General Assembly). See CJI 1166: CJI Meeting Minutes, May 28, 1893; CJI 1167-1168: Isaac Levy and Max Levy's petition to the Newport Mayor and City Council, May 30, 1893.

[71] CSI 5278: CSI Meeting Minutes, July 2, 1894; CJI 0155: "An Act Incorporating a Congregation Jeshuat Israel in the City of Newport," May 1894 (passed June 13, 1894).

City Council and the state of Rhode Island intended for the Touro Synagogue. This attempt to assert control even extended to the religious objects loaned by CSI. On June 15, 1893, Eugene Schreier of CJI wrote a somewhat demanding letter to H.P. Mendez of CSI, urging that CJI be "placed in possession" of the synagogue appurtenances and paraphernalia that CSI had temporarily placed in the Newport Bank, particularly the synagogue silver, including the "Silver Bells," or the *rimonim*. Schreier also hoped that Mendez would give the silver directly to CJI, without going through the recently hired Rev. David Baruch (who CSI saw as their hand-picked representative at CJI), since it would give CJI more direct control over the religious objects.[72] But CSI had already sent a lease letter to Baruch two days prior (on June 13, 1893), setting out the terms of the loan and use of the ritual objects—including the *rimonim*—from CSI (discussed in greater detail below).[73] There is no evidence that Mendez altered the arrangement he had with Baruch as a result of Schreier's demands, nor would Mendez have had any motivation to do so, given that he felt CJI was overreaching in the first place.

When faced with such a challenge, CSI was forced into the position of proving once and for all that they were the rightful owners and trustees of the synagogue itself, the religious and sacred objects (appurtenances) inside of it, and the cemetery. Accordingly, even while the General Assembly of Rhode Island was deliberating in the spring of 1894 whether or not to grant the new Newport Jewish congregation a charter under the same name as the original Newport Jewish congregation, CSI decided to take more direct action to show that, even if they might not be able to block the congregation from using the historic name of Congregation Jeshuat Israel, CSI could at least put into writing their long-standing legal title to the synagogue, grounds, and religious and ritual objects. CSI contacted as many of the living descendants of the original CYI

---

[72] CJI 0039-0040: Eugene Schreier to H.P. Mendez, June 15, 1893.
[73] CJI 0036: Henry Pereira Mendez to David Baruch, June 13, 1893.

congregation as they could locate (many of whom were still living in New York and were part of

the CSI congregation) and had them legally convey to CSI for one dollar the synagogue in

Newport itself, the land, premises, "together with the appurtenances and all the estate."[74] The

indentures (deeds of conveyance) executed in 1894 formally and legally transferred to CSI "all

of the rights" of the "heirs at law" of the descendants of the original CYI and were recorded in

the Book of Land Evidence, Newport, Rhode Island, Volume 67, page 275.[75]

These deeds were consistently recognized as simply making even more official what had

already been conveyed, and indeed, had been practiced and assumed by custom prior to that

point. These deeds of conveyance merely reaffirmed what was stated in a letter dated February

20, 1818, from the last members of the original CYI to CSI, transferring the Scrolls of the Law to

CSI.[76] Similarly, in 1826, Moses Lopez of New York City wrote to Stephen Gould in Newport,

stating, "That building is now consider'd as own'd at present by the Hebrew Society in this city

[NYC] and I am doubtful whether the Trustees of it will tamely submit to the forced agency of

the [Newport City] Council to repair their own property without their consent."[77]

To CSI, the Newport City Council, and most other contemporary observers, these deeds

of conveyance in 1894 affirmed CSI as "owners" of the Newport synagogue and its

appurtenances.[78] The legality of these deeds of conveyance was recognized by later authorities

---

[74] CJI 0127: Deed of Conveyance, April 10, 1894.

[75] CSI 0093: Agreement between the Secretary of the Interior, Congregation Shearith Israel, and Congregation Jeshuat Israel, November 7, 1945; see also CSI 0685: *Historical Background and By-Laws of the Congregation Jeshuat Israel of Newport, Rhode Island, Adopted January 28, 1945*; CJI 0126-0151: Deeds of Conveyance, 1894.

[76] CSI 5339: Memorial of a Committee of Board of Trustees of Congregation Shearith Israel of New York presented to the City Council, Newport, Rhode Island, 1881.

[77] CSI 5186: Moses Lopez to Stephen Gould, 1826.

[78] CJI 0291: H.P. Mendez to Mayor Garrettson, January 13, 1901. Significantly, even later generations of CJI leadership freely recognized the authority of these 1894 deeds of conveyance. A c. 1945 publication titled *Historical Background and By-Laws of the Congregation Jeshuat Israel of Newport, Rhode Island* included an extract of the "Deed of Trust of Mary Ann Lopez, et al., conveying Title and Trust of the Jewish Synagogue and its Grounds and Appurtenances, to the Trustees of the Congregation Shearith Israel of New York. Dated April 27, 1894, May 2, 1894, and recorded in the Book of Land Evidence of Newport, Rhode Island, Vol. 67 page 274 ff." See CSI 0685: *Historical Background and By-Laws of the Congregation Jeshuat Israel of Newport, Rhode Island, Adopted January*

Fisher 24

and parties involved, including CJI itself, a U.S. Circuit Court in 1903, and the U.S. Federal Government in the mid-twentieth century.[79] These deeds of conveyance further established the continuity between the original CYI and CSI in New York and, by extension, affirmed the *lack* of such continuity between the original CYI and the newly formed CJI (in 1894). If the new CJI had had any claim to continuity with CYI, the late-nineteenth century heirs at law of the original CYI would surely have recognized such continuity and instead would have deeded the land, building, and appurtenances to the newly formed CJI. But the heirs at law for the original CYI did not deed it to the newly formed CJI, because there was in fact no continuity, as everyone involved in the matter recognized.

In addition to securing these deeds of conveyance, CSI retained ongoing control in other important ways. This influence was reflected most basically in the final form of the new Newport congregation's actual name. Despite the new congregation's claims to the name Congregation Yeshuat Israel (as seen from both their congregational declaration on May 28, 1893, regarding their organization and founding, and their Constitution and Bylaws adopted on December 17, 1893), CSI's protests led to a slight but significant change of just one letter in the actual name under which the Rhode Island General Assembly granted a charter in June 1894: Congregation Jeshuat Israel (instead of Yeshuat).[80] This name change was officially reflected in CJI's

---

*28, 1945*, p. 10. Similarly, in a 1948 pamphlet published by the Friends of the Touro Synagogue, the 1894 deeds of conveyance are quoted at length to indicate that CSI holds legal title to the land and building. See CSI 0423: *Touro Synagogue of Congregation Jeshuat Israel, Newport, Rhode Island Founded 1658*, p. 10.

[79] See, for example, CSI 0685: *Historical Background and By-Laws of the Congregation Jeshuat Israel of Newport, Rhode Island, Adopted January 28, 1945*, p. 10, which seems to be a publication of CJI itself, and gives part of the text of the Deed of Trust from Mary Ann Lopez, et al. See also CSI 0318: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903; CSI 0093: An agreement between the U.S. Department of Interior, CSI, and CJI, Nov. 7, 1945, regarding making the Touro Synagogue a National Historic Site; CSI 0777: A letter from CJI President A.L. Greenberg to the CJI Secretary, March 18, 1959.

[80] CJI 0048: "Constitution, By-Laws and Rules of the Congregation Yeshuat Israel of Newport, R.I., Adopted December 17, 1893"; CJI 1166: Minutes of a Meeting, CJI, May 28, 1893. Later generations noted the significance of the name change. On August 7, 1957, CSI minister David de Sola Pool observed that CJI was a "relatively recent

subsequent correspondence and the revised 1897 Constitution and Bylaws.[81] More substantially, the wording of the 1894 Act of Incorporation for the state of Rhode Island guaranteed that the newly formed CJI would conduct their services "according to the Sephardic Ritual and strict rules and laws of the Orthodox Jewish Faith" (a provision that was also stated in Article XIX of CJI's 1897 Constitution and Bylaws).[82]

Of equal significance was the fact that, although CJI's original Constitution and Bylaws (adopted December 17, 1893) failed to mention CSI even once or even make any commitment to the Sephardic rituals, CSI's protests forced a revised version, which included substantial changes that better reflected CSI's ownership of and connection to the synagogue building and its appurtenances. In direct response to CSI's requests (and, indeed, with CSI's input and approval), a new version of the Constitution and Bylaws was drawn up in 1896 and adopted by CJI on January 31, 1897.[83] Importantly, the 1897 CJI Constitution and Bylaws explicitly incorporated representatives from CSI into the structure of CJI governance. According to Article III of the Constitution and Bylaws, four trustees from CSI should be chosen, who were "declared to be Trustees of this Congregation [CJI]" and could vote either in person or by proxy on all matters related to the congregation.[84] These four CSI trustees were also decreed to be members of the CJI congregation (Article XII).[85] Tellingly, Article XIX of the Constitution and Bylaws also ensured that "No real or other property owned, or which may hereafter by acquired by this

---

incorporation under a name that is spelled differently from the one in use by the congregation in Revolutionary times." CSI 1001: David de Sola Pool to Justice Edgar J. Nathan, August 7, 1957.

[81] CJI 0454: Constitution, By-Laws and Rules of Congregation Jeshuat Israel, January 31, 1897.

[82] CJI 0155: "An Act Incorporating a Congregation Jeshuat Israel in the City of Newport," June 13, 1894.

[83] CJI 0175: Letter and resolutions to CSI from Rev. David Baruch, February 16, 1896; CJI 0465: Constitution and By-Laws of Congregation Jeshuat Israel, January 31, 1897.

[84] CJI 0455: Constitution and By-Laws of Congregation Jeshuat Israel, January 31, 1897; see also CJI 0290-0291: H.P. Mendez to Mayor Garrettson, January 13, 1901. When CSI received the newly revised Bylaws in early February 1897, they immediately proceeded to elect four representatives from CSI to serve on the CJI Board of Trustees. See CSI 8998: CSI Board Meeting Minutes, February 9, 1897. One historian referred to this provision in the bylaws as "a permanent allotment of four seats on the synagogue's board of trustees to the New York congregation." Urofsky, *A Genesis of Religious Freedom*, 98.

[85] CJI 0459: Constitution and By-Laws of Congregation Jeshuat Israel, January 31, 1897.

Congregation shall be sold or exchanged or mortgaged, unless by unanimous vote of the members present, and represented by proxy at a Special Meeting convened for that purpose."[86]

Furthermore, the 1897 Constitution and Bylaws included in Article XXI a clear prohibition against any changes that would in any way remove the influence of the CSI trustees from the congregational and decision making life of CJI: "But no addition, alteration or amendment shall be made to this Constitution and By-Laws that shall in any way add to, alter or affect the status of the four Trustees of the Spanish and Portuguese Congregation Shearith Israel of the City of New York, or of Article XIX. of this Constitution and By-Laws, unless the said four Trustees of the said Congregation Shearith Israel vote affirmatively for such proposed addition, alteration or amendment" (Article XIX required a unanimous vote for the sale of present or future property).[87]

In this way, the CSI trustees ensured that CJI would make decisions that were in keeping with the desires of CSI and the authentic practice of Judaism that had been CYI's legacy. These provisions also ensured that CJI would not sell or otherwise misuse the building or the sacred objects on loan from CSI. Throughout, CSI believed its mission included serving as owner and caretaker to the Touro Synagogue, which it had performed with regard to the synagogue building and cemetery (in conjunction with the Newport City Council) for the better part of the entire nineteenth century. CSI believed that it had an obligation to provide for "all members of the Jewish faith" at Newport, in part because CSI was home to the families of the original, colonial-era congregation, and in part because of the 1894 deeds of conveyance from the descendants of original CYI members.[88]

---

[86] CJI 0462: Constitution and By-Laws of Congregation Jeshuat Israel, January 31, 1897.
[87] CJI 0463: Constitution and By-Laws of Congregation Jeshuat Israel, January 31, 1897.
[88] CSI 0213: CSI to the Mayor and City Council of Newport, Rhode Island, May 1, 1899.

Fisher 27

The above legal protections were not the only ones CSI took to ensure that CSI remained in control to carry out its mission and obligations to the Jews of Newport. CSI also made sure that any effort by CJI (or individuals associated with CJI) to subvert CSI's oversight, authority, or ownership of the synagogue and the religious objects on loan was unsuccessful. CSI's awareness that certain CJI congregants might entertain such designs can be observed in a February 7, 1897, letter between H.P. Mendez and L. Napoleon Levy (both of CSI), in which Mendez suggests that Levy request in writing from CJI a pledge "that our [CSI's] trustees will not be ousted, and that the number of their trustees will not be so increased as to practically silence our four."[89] And, in fact, within the first five years after the passing of the revised (1897) Constitution and Bylaws, CSI accused some members associated with CJI of trying to eject the CSI trustees outright (discussed in greater detail below).[90]

The newly formed CJI's legitimacy was also challenged from within the Newport Jewish community. The records of the late nineteenth century show that after the death of CJI minister David Baruch in March 1899, there was a rival splinter group within the CJI congregation that independently sought recognition from the Newport City Council and the state of Rhode Island and, by extension, full possession and use of the Touro Synagogue and the synagogue appurtenances.[91] This rival group called themselves the Touro Congregation and received a charter from the state of Rhode Island on April 10, 1899. The Touro Congregation and Congregation Jeshuat Israel both elected and appointed their own ministers: the Touro Congregation called E.M. Meyer, and CJI appointed Moses Guedalia (although it is unlikely that CSI approved either appointment).[92] Recognizing that the Touro Congregation had more

---

[89] CSI 1691: H.P. Mendez to L. Napoleon Levy, February 7, 1897.
[90] CJI 0293: H.P. Mendez to Mayor Garrettson, January 13, 1901.
[91] Rev. David Baruch to CSI, dated June 13, 1893, found in JHA 0044: "The 1902 Sit-in at Touro Synagogue," 43.
[92] CJI 0581: Adelman, "They Broke In—To Pray," 227.

Fisher 28

influential members, the Newport City Council decided to recognize the Touro Congregation over CJI.[93] Arguing that they were the rightful possessors of the synagogue, members of the Touro Congregation tried in 1899 to "obtain possession of it by force," which CSI saw as a "sacrilegious attack . . . upon a sacred building."[94] Consequently, CSI filed for a court ordered ejectment of the Touro Congregation, which they received in July 1899 from the Supreme Court of Rhode Island.[95] The keys were eventually returned to CSI in New York, which by that time was considered by the state of Rhode Island and the city of Newport to be the rightful owner and trustees of the property.

After the ejection of the Touro Congregation in July 1899, CSI rabbi H.P. Mendez traveled from New York to personally conduct services in the Newport synagogue for a few months that summer and during the High Holy Days in September. Services continued more regularly with CSI's permission in February 1900, when CJI selected the Rev. Henry Samuel Morais to serve as minister in Newport (an appointment CSI seemingly confirmed).[96] By this time some of the Touro Congregation members had rejoined CJI. In June 1900, Julius Engel— formerly associated with the Touro Congregation—acting as CJI president, drafted radical amendments to the 1897 Constitution and Bylaws that would have completely cut out CSI's integrated supervisory role (including excising the four CSI trustees and removing the possibility of voting by proxy).[97] There is no evidence that Engel's proposals reflected wider sentiments within CJI, or that the proposals gained any traction or were even voted upon. But when CSI

---

[93] TSF 2410: "The 1902 Sit-in at Touro Synagogue," 47.

[94] CJI 0292: H.P. Mendez to Mayor Garrettson, January 13, 1901.

[95] CJI 0259: Order of the Rhode Island Supreme Court, July 10, 1899.

[96] CJI 0294: H.P. Mendez to Mayor Garrettson, January 13, 1901. Mendez seemed to be concerned that CJI was requesting to pay Morais throughout the controversies of 1900 and 1901, even though the Touro Synagogue was officially closed by CSI, and despite the fact that CJI was barely meeting regularly as a congregation. Still, Mendez affirmed Morais as a minister and states that CSI approved his appointment.

[97] CSI 1894-1895: Julius Engel, notice of a special meeting of the Congregation Jeshuat Israel, June 21, 1900. Engel signed it as "President, Congregation Jeshuat Israel." H.P. Mendez also refered to Engel as the CJI president at this time. See CJI 0293: H.P. Mendez to Mayor Garrettson, January 13, 1901.

found out about this proposed violation of their agreement and of the 1897 Bylaws (which required CSI approval for any such changes), CSI simply closed down the Touro Synagogue in mid-July 1900. Once again, CSI Rabbi Mendez traveled from New York that summer and early fall to conduct services, significantly, "for all who wished to worship," not just for CJI.[98] Mendez additionally refused to recognize Engel, whose sympathies were still with the Touro Congregation, which had been legally ejected from the synagogue building the year prior.[99] With things still unresolved, Eugene Schreier, acting as an agent for CSI, posted a notice in the *Newport Daily News* on January 1, 1901, that the Newport synagogue would be closed "until further notice."[100] The Synagogue did not officially re-open until early 1903, after possession had been resolved by the courts.

But Touro Congregation—the splinter group—was not done yet. On April 21, 1902, its members staged a break-in at the Touro Synagogue in an attempt to force a legal showdown with CJI and, ultimately, CSI.[101] A lengthy legal process ensued, during which time the Touro Congregation and/or CJI attempted to maintain control of the synagogue building (April 21, 1902 – February 2, 1903).[102] CSI sued the Touro Congregation and named CJI in the case as well, in an effort to affirm their exclusive legal control over the property. The case was moved to different courts in Rhode Island but in late 1902 ended up in the U.S. Circuit Court in the District of Rhode Island. On January 3, 1903, Judge Arthur L. Brown ruled against CJI and the Touro Congregation.[103] In fact, one of the key claims to de facto ownership by CJI was taken head on by Judge Brown. In his January 1903 opinion, Judge Brown flatly rejected the notion that CJI

---

[98] CJI 0293: H.P. Mendez to Mayor Garrettson, January 13, 1901.
[99] CJI 0293: H.P. Mendez to Mayor Garrettson, January 13, 1901.
[100] TSF 2413: "The 1902 Sit-in at Touro Synagogue," p. 53.
[101] TSF 2416: "The 1902 Sit-in at Touro Synagogue," pp. 58-59.
[102] TSF 2421-2422: "The 1902 Sit-in at Touro Synagogue," 68, 70.
[103] CSI 0317: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903; CSI 9212: CSI Board of Trustees Meeting Minutes, January 22, 1903.

Fisher 30

could claim any right to the Touro Synagogue simply by virtue of being a Jewish Society in Newport (CJI based this claim on the eighteenth-century wills of Rivera, Levy, and Hart, which spoke of the synagogue as a trust for the Jews of Newport). In Judge Brown's opinion, "no trust of this general character would arise from a purchase of the land for the purposes set forth in paragraph 1 of the bill" (that is, the bill of complaint lodged by CJI in the court case).[104] More specifically, Judge Brown rejected the notion that the "Jewish Society" mentioned by Rivera, Levy, and Hart could in any way refer to the new CJI.[105] Throughout, Judge Brown repeatedly noted that CJI's case for ownership was "fatally defective" and ruled against it.[106]

This 1903 Circuit Court ruling once again settled the issue of possession, confirming that the Newport synagogue was owned by and should be returned to CSI.[107] The U.S. Circuit Court ruled in favor of CSI in part based on CSI's long history as functional legal title holders and property owners as well as the deeds of conveyance given to them in 1894 from the living descendants of the original CYI. As a result, on February 2, 1903, the CJI trustees, in compliance with the Circuit Court ruling, voted unanimously "to surrender the possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport, to the said Trustees, owners of the property, and to agree upon the terms and provisions of a lease from said Trustees to this Congregation for the term of five years from February, 1 1903."[108] CJI agreed to lease from CSI the synagogue, the premises, and the sacred ritual objects for $1 per year (along with other

---

[104] CSI 0317: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903.
[105] CSI 0318: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903.
[106] CSI 0317: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903.
[107] CJI 0586: Adelman, "They Broke In—To Pray," p. 234-235.
[108] CJI 0471: February 2, 1903 meeting of the CJI Board of Trustees; TSF 2422: "The 1902 Sit-in at Touro Synagogue," pp. 70-71.

responsibilities and provisions).[109] The first five-year indenture with lease was signed in 1903 between the two parties; a second and similar lease was signed in 1908, an arrangement that has consistently been recognized by CJI in the intervening one hundred-plus years.[110]

Despite the efforts by some individuals within the larger Newport Jewish community to limit CSI's influence, it appears there is no evidence that CJI or any other entity was ever effective in validly limiting CSI's rights as owner of Touro Synagogue and its paraphernalia and appurtenances. The 1897 Constitution and Bylaws were operative until at least 1945, when a purported revised set of bylaws was passed (though there seems to be no evidence that CSI was ever given notice of or voted on the modification – which would render the proposed modifications null or ultra vires). The purported 1945 bylaw revisions attempted to prohibit voting by proxy (that is to say, they tried to require the CSI trustees to travel to Newport in person for each meeting of the Board of Trustees to be able to vote on any item of importance). Nonetheless, CJI did reaffirm the ongoing inclusion of the four CSI representatives on the CJI Board of Trustees.[111]

During the controversies between 1881 and 1903, CJI members seemingly never actually stated that they were connected, whether by culture, bloodlines, or families, to the original colonial-era Congregation Yeshuat Israel in Newport. Even in the mid-twentieth century, CJI's own official documents and internal discussions over various issues reveal that, sixty years later, they still recognized themselves as having no genealogical or cultural continuity with CYI. On January 15, 1950, when CJI called a special congregational meeting to consider the offer of the Morgenstern Foundation to loan to CJI the original 1790 letter from George Washington to CYI

---

[109] CSI 9214: CSI Board of Trustees Meeting Minutes, March 10, 1903; CJI 0471: February 2, 1903 meeting of the CJI Board of Trustees; CSI 0027-0036: 1903 CJI/CSI Lease, February 2, 1903.
[110] CSI 0001-0005: 1908 CJI/CSI lease, January 14, 1908. See also Urofsky, *A Genesis of Religious Freedom*, 100.
[111] CSI 0689: Article II, Bylaws of Congregation Jeshuat Israel, "adopted" on January 28, 1945.

Fisher 32

warden Moses Seixas, the attendees debated whether CJI even had the right to accept the letter at all. One member, Samuel Adelson, asserted that "there was a very serious question whether the Congregation had any rights of ownership in the letter. He stated that while it [the Washington letter] was addressed to the Hebrew Congregation of Newport, R.I., yet no members of the present congregation were lineal descendants of the members of the Congregation in 1790. He pointed out that the Synagogue itself was rented from the Congregation Shearith Israel in New York."[112]

Similarly, individuals in Newport associated with the Touro Synagogue freely admitted that there was no historic connection between CJI and the colonial-era CYI. On January 9, 1956, David C. Edelman of Newport wrote to Maxwell Wyckoff of New York City, stating that CJI was "in no sense continuous with the original Congregation Yeshuat Israel," and that "the personal property [of CYI] went to the heirs of the original Congregation."[113]

Additionally, Congregation Jeshuat Israel's own later official histories of the Jewish community in Newport stated plainly that there was no blood connection between the original Congregation Yeshuat Israel and the later CJI. In a twenty-page pamphlet titled *The Newport Jewish Tercentenary, 1658-1958* (published in 1959 by the Jewish Newport Tercentenary Committee), the Rabbi Theodore Lewis of CJI stated, "Today there are no descendants of the early Jewish settlers living in Newport. The present community is largely composed of immigrants from Poland and Russia, who came to Newport towards the end of the 19th century, and their children, native-born Americans. There is also a fair sprinkling of American born Jews who have come from other communities."[114]

---

[112] CJIB 0530: CJI Special Meeting Minutes, January 15, 1950.
[113] JHA 0187: David C. Edelman to Maxwell Wyckoff, January 9, 1956.
[114] CSI 0604: Rabbi Theodore Lewis, *The Newport Jewish Tercentenary, 1658-1958*, p. 9.

This assessment (of a complete lack of continuity between CJI and the original CYI) has not changed over time. Local Rhode Island historians today (some of whom are Jewish) readily affirm that, in terms of blood, ethnic, and cultural identification, the current CJI is distinct and separate from the original CYI, and always has been, despite the closely similar names.[115]

Several conclusions follow from the historical reality described above. First, despite their use of the Touro funds and the Touro Synagogue, the current (post-1894) CJI can lay no claim to being or representing the original Jews of Newport. Judge Brown's 1903 U.S. Circuit Court Decision (discussed above) confirms this. In recognition of this lack of continuity, CSI did not give the synagogue or the synagogue appurtenances to CJI after they incorporated in 1894, even though CJI asked for them.[116]

Second, any obligation that CSI arguably might have arising out of CSI's legal title and ownership of the synagogue, cemetery, and synagogue appurtenances is to the Jews of Newport more generally (or more precisely a subset of that group), not to CJI in particular. This can be seen especially in two particular instances. The first instance was in 1892 and 1893, when Caroline Cohen (descendent of eighteenth-century Newport resident Moses Michael Hays) specifically charged CSI with determining which American Jewish congregation might be best suited to utilize a pair of *rimonim* that were in her family. Although Cohen slightly preferred that the silver bells be used in the Newport synagogue, she let it up to CSI to determine if "any orthodox synagogue in New York or Phila[delphia] would have use for them," should the Newport synagogue not have need for them.[117] If the bells ended up in Newport, Cohen's personal commitment and her charge to CSI was to the Newport synagogue more generally, not

---

[115] Personal conversations with historians at Brown University and the Newport Historical Society.
[116] CJI 0039: Eugene Schreier to H.P. Mendez, June 15, 1893.
[117] CSI 5236-5237: Caroline Cohen to H.P Mendez, March 2 [?], 1892; see also CJI 0395: Caroline Cohen to the Trustees of the Spanish and Portuguese Synagogue, NYC, June 20, 1893.

to CJI specifically. Cohen stated that the bells were "to be used in that synagogue [Touro Synagogue] **by any congregation** (following its ancient minhag [custom or ritual]) subject to your [CSI's] approval."[118] The second instance was in 1900, when, after some internal discord within CJI, CSI shut down the Newport synagogue for regular CJI services and instead held services in the synagogue for all of the Jews of Newport (not just CJI members), with CSI Rabbi H.P. Mendez officiating.[119] Even after 1903, from an outside perspective, the Touro Synagogue and its appurtenances continued to exist independently in Newport quite apart from the congregation that happened to be in residence at that time. In his monumental survey of historic silver in American churches, E. Alfred Jones specifically linked the four sets of *rimonim* at the Touro Synagogue with the "Jewish Synagogue" in Newport, not with CJI.[120]

Accordingly, there appears to be no historical evidence of a trust relationship between CSI and CJI. After 1903, CJI was the entity chosen by CSI (subject to conditions and the approval of CSI) to care for CSI's synagogue and appurtenances and/or paraphernalia *as lessee*, but CJI was never seen as the rightful owner or inheritor of them. The fact that CSI agreed (as owners) to lease the building and the appurtenances to CJI does not indicate whatsoever that there was any continuity between the original CYI and the new CJI, nor does it indicate a right of successorship or ownership. On the contrary, CJI's leasing of the property indicates the true relationship: that of an entity that has been given permission (within a legal framework) to use the property and the synagogue appurtenances and paraphernalia for specific purposes and subject to specific requirements and limitations: a lessee, not an owner.[121]

---

[118] CJI 0395: Caroline Cohen to the Trustees of the Spanish and Portuguese Synagogue, NYC, June 20, 1893. Emphasis added.
[119] CJI 0293: H.P. Mendez to Mayor Garrettson, January 13, 1901.
[120] E. Alfred Jones, *The Old Silver of American Churches* (Letchworth, England: Arden Press, 1913), 320.
[121] CSI 0027-0036: 1903 CJI/CSI Lease, February 2, 1903; CSI 0001-0005: 1908 CJI/CSI lease, January 14, 1908. See also Urofsky, *A Genesis of Religious Freedom*, 107.

**"Appurtenances," "Paraphernalia," and other Similar Words Referring to *Rimonim* and Other Ritual Objects**

A second key consideration in this case is whether the terms "appurtenances" and "paraphernalia" (along with other similar words) as contained in documents from the late-nineteenth and early-twentieth centuries refer to the disputed *rimonim* and other ritual objects. This is important because the 1903 and 1908 documents and indentures with leases between CSI and CJI clearly state that the lease of the building and grounds also includes the "appurtenances and paraphernalia belonging thereto."[122] If use of the term "appurtenances" and/or "paraphernalia" was intended to include the sacred ritual objects in the synagogue (including the *rimonim*), then those objects would be included within the indentures with leases as items leased from CSI. A close reading of the historical documents themselves alongside of contemporary historical usages of these terms makes it abundantly clear that these phrases were indeed intended to include the disputed *rimonim* and all other sacred ritual objects in use at the Newport synagogue at the time of the signing of the 1903 and 1908 indentures with leases.

According to the *Oxford English Dictionary*, one of the definitions of "appurtenances" is: "The mechanical accessories employed in any function or complex scheme; apparatus, gear."[123] It therefore has use and application outside of religious contexts as well. But within a Jewish religious context, "appurtenances" takes on a more specific meaning, referring to the sacred and ritual objects necessary for a synagogue to conduct full religious services. This is readily apparent from the terminology widely utilized by Jewish scholars and ministers over time, as

---

[122] CSI 0027-0036: 1903 CJI/CSI Lease, February 2, 1903; CSI 0001-0005: 1908 CJI/CSI lease, January 14, 1908.
[123] "Appurtenance, n." Oxford English Dictionary Online. June 2014. Oxford University Press. http://www.oed.com/view/Entry/9922?redirectedFrom=appurtenances& (accessed August 23, 2014).

Fisher 36

well as by historians. More specifically, the phrase "synagogue appurtenances" shows up in contemporary publications in the early twentieth century.[124]

But what are these "synagogue appurtenances"? In their survey of Judaism across the centuries, two recent historians have noted, "Any house or room can be made into a synagogue by being so designated and used. It needs, however, to be equipped with a few essential appurtenances."[125] The most vital of these is "the Scroll of the Law (*sefer torah*)," which is usually made up of parchment paper or vellum (calf skin) stitched together and wrapped around a pair of wooden rollers. These wooden rollers "are surmounted by a pair of silver finials known from their usual shape as *rimmonim* ('pomegranates'), incorporating tiny silver bells."[126] Most synagogues have multiple Scrolls of the Law, with an accompanying pair of *rimonim* for each scroll. In addition to these Scrolls of the Law and accompanying silver bells, other key synagogue appurtenances include additional scrolls; a sacred storage container called the ark, or the *tevah* ("chest"; sometimes referred to as the *hechel* ["sanctuary"]); and a *ner tamid* ("the perpetual light"). The other (usually non-movable) essential appurtenance is the *bimah*, or the raised platform from which holy scriptures or prayer services are read.[127]

Indeed, this specific reference is also evident in the English translation of the Hebrew word *tashmish*, which is often rendered as "appurtenance." As the authoritative *Oxford Dictionary of the Jewish Religion* states, the translation of the phrase "Tashmishei Qedushah" is "appurtenances of holiness," which are defined as the "ritual objects (e.g., the shofar, spice box,

---

[124] See, for example, *The Antiquary*, vol. 42 (London, 1906), 402.

[125] David F. Goldberg and John D. Rayner, *The Jewish People: Their History and Their Religion* (Harmondsworth: Penguin Books, 1989), 321.

[126] Goldberg and Rayner, *The Jewish People*, 322.

[127] Goldberg and Rayner, *The Jewish People*, 322.

*menorah*, Seder plate) or items used to decorate ritual objects (e.g., the *keter* Torah or *rimmonim* ornaments...).”[128]

These essential ritual furnishings have remained virtually unchanged in Jewish synagogues around the globe for centuries. One historian lists the essential “synagogue appurtenances” in a seventeenth-century North African synagogue as “Torah scrolls, Torah coverings and finials [*rimonim*], chandeliers or candelabra and candles.”[129] Similarly, in the *History of the Ancient Synagogue of the Spanish and Portuguese Jews* (1901), the author states: “A community comes into existence when sufficient public spirit is found among its members to lay the foundation of a Synagogue, to appoint a Rabbi, to endow it with all the necessary appurtenances.” The author continues, enumerating the “necessary appurtenances”: “scrolls, vestments, crowns and candles.”[130] “Crowns” in this context are gold or silver objects placed on the tops the wooden rollers for the Scrolls of the Law that form the base for the *rimonim*, the gold or silver bells.[131] Without these essential religious and ritual objects—these synagogue “appurtenances”—a Jewish synagogue cannot legitimately exist and function.

The word “paraphernalia,” when used with reference to a Jewish synagogue, is usually a synonymous and parallel term for “appurtenances.” As used historically and by historians in the context of Jewish ritual, synagogue “paraphernalia” refers to the same ritual and sacred objects that “appurtenances” does. One historian refers to “the paraphernalia of a synagogue such as an ark for the Torah or a raised reading desk,” that is, the *tevah*/*hechel* and *bimah*, referenced above

---

[128] “Tashmishei Qedushah,” in Adele Berlin, *The Oxford Dictionary of the Jewish Religion* (Oxford University Press, 2011), 723.
[129] Jane S. Gerber, *Jewish Society in Fez 1450-1700: Studies in Communal and Economic Life* (Brill, 1980), 56.
[130] Moses Gaster, *History of the Ancient Synagogue of the Spanish and Portuguese Jews: The Cathedral Synagogue of the Jews in England, Situate in Bevis Marks* (London, 1901), 6.
[131] CJI 2030: Gutstein, *The Story of the Jews of Newport*, 108.

as "synagogue appurtenances."[132] This synonymous and parallel usage can be seen in some documents from the wider global Jewish community, dating from 1908, in which two different Jewish synagogues and their religious objects in Jamaica are described in relation to a fire in 1882: "The Spanish and Portuguese Synagogue, situated in Princess Street, was, with all its **appurtenances**, with the exception of one register book of Births, Marriages and Deaths, entirely consumed by the fire of December, 1882. The English and German Synagogue in Orange Street met, likewise, with a similar fate on the same occasion; its **paraphernalia**, however, was saved through the promptitude of the late Mr. H. A. Joseph."[133] In both cases, the author is referring to the vital religious objects in a synagogue, to which either "appurtenances" or "paraphernalia" can refer.

Additionally, there are other parallel terms that can refer to the necessary ritual objects of a synagogue, such as "sacred movables," "personal property," and "furniture." In some cases, they are used in exactly the same way as "appurtenances" and/or "paraphernalia." In their 1881 petition to the Newport City Council, CSI representatives protested that the nascent Jewish community had not yet resided long enough in Newport to warrant CSI "confiding such sacred objects to such new comers."[134] In that same petition, CSI refers to the Scrolls of the Law (with which the *rimonim* are associated) as forming the "essential part of the furniture of a Synagogue. Without them a Synagogue loses its adaptability for regular and practical worship."[135] In a January 13, 1901, letter from the Reverend H.P. Mendez of CSI to the mayor of Newport, Rhode Island, Mendez states that in 1818, when the Newport synagogue officially closed, the last

---

[132] Gershom Scholem, *The Messianic Idea in Judaism: And Other Essays on Jewish Spirituality* (Knopf Doubleday Publishing Group, 2011), 155.

[133] Augustus Constantine Sinclair et al., *The Handbook of Jamaica ...: Comprising Historical, Statistical and General Information Concerning the Island* (U.S. Government Printing Office, 1908), 366. Emphasis added.

[134] CSI 5334: Memorial of the Board of Trustees of Congregation Shearith Israel of New York presented to the City Council of Newport, Rhode Island, 1881.

[135] CSI 5339: Memorial of the Board of Trustees of Congregation Shearith Israel of New York presented to the City Council of Newport, Rhode Island, 1881.

members of the original CYI congregation sent "the sacred movables" to CSI in New York, which we know from other sources included the Books of the Law, one of the key synagogue appurtenances.[136] And in a July 6, 1893, letter, W.P. Sheffield Jr. stated that the Congregation Shearith Israel desired to have cordial relations with the Newport congregation, but "as the Trustees and owners of the Synagogue and personal property therein they will see that their rights are respected, if it should be necessary."[137] These various references to "personal property," "sacred movables," "furniture," and "sacred objects" all seemingly point to necessary ritual objects required to conduct official services in a synagogue, including Books of the Law, the silver (chalice, finials, candlesticks), and the ark, all of which are referred to elsewhere by historians and contemporaries as synagogue appurtenances.

But there are other objects of value and concern within a synagogue, which are sometimes referred to as "fixtures." On January 30, 1903 (in the aftermath of the 1903 decision against them), CJI agreed "to admit and recognize without qualification the title and ownership of [the Trustees] of the Congregation Shearith Israel to the synagogue building, premises, and fixtures."[138] Contemporary usage reveals that "fixtures" could refer to some of the same items as "appurtenances," namely, the necessary ritual items for a synagogue. In the same time period as the January 30, 1903, document by CSI cited above, the word "fixtures" is used by contemporary sources to refer to the *hechal* (ark) and the *ner tamid* ("the perpetual light"), which other sources list as "appurtenances."[139] For example, the *Young Israel* magazine stated in 1907 that "Every synagogue has certain fixtures and utensils," which in this case included the perpetual lamp, *ner*

---

[136] CJI 0291: H.P. Mendez to Mayor Garrettson, January 13, 1901; CSI 5339: Memorial of the Board of Trustees of Congregation Shearith Israel of New York presented to the City Council of Newport, Rhode Island, 1881.
[137] CJI 0047: W.P. Sheffield Jr. to Eugene Schreier and Max Levy, July 6, 1893.
[138] CSI 4533: Agreement between CSI and CJI, January 30, 1903.
[139] Naphtali Phillips, "Historical Sketch," *American Jewish Historical Quarterly* 21 (1913): 196; *Young Israel*, vol. 1, no. 7 (The Union of American Hebrew Congregations, 1907), 216.

*tamid*, among other things.[140] These and other publications refer to "synagogue fixtures," which seem to refer to at least some of the same objects as "synagogue appurtenances."[141] Usage of the phrase "synagogue fixtures" by historians confirm this as well. One historian lists the "synagogue fixtures" as comprising "the benches, the sofa, the *bema*, the planks, and the reading table," among other things.[142] As we have seen above, the *bema* (also *bemah*), or the reading stand, was considered by other sources to be part of the synagogue appurtenances.

Therefore, there is a considerable amount of parallel and overlapping usage with these terms, intending to refer to various aspects of the sacred ritual objects required for a working synagogue.

It follows, then, that a cursory survey of contemporary (late nineteenth and early twentieth century) Jewish usage of "appurtenances" and "paraphernalia" reveals a frequent and usual link to the sacred ritual objects required to operate a synagogue. In particular, one notices two trends in usage. The first are cases where "appurtenances" refer more generally to sacred ritual items within the synagogue, as described above. For example, *The Jewish Encyclopedia*, published in 1907, specifically mentions the "appurtenances of the synagogue" and then lists out some of the common elements, including the Scroll of the Law (which, according to *The Jewish Yearbook* and other sources, usually included the bells, or *rimonim*[143]), other sacred books, the ark, and the table.[144] *The Jewish Encyclopedia* also makes clear the link between "paraphernalia"

---

[140] *Young Israel*, vol. 1, no. 7 (The Union of American Hebrew Congregations, 1907), 216.
[141] Robert William Seton-Watson, *The New Europe: A Weekly Review of Foreign Politics*, vols 12-13 (Constable & Company, Limited, 1919), 38.
[142] Steven Fine, *This Holy Place: On the Sanctity of the Synagogue during the Greco-Roman Period* (University of Notre Dame Press, 1997), 70.
[143] *The Jewish Year Book* (Greenberg & Company, 1899), 276, 318.
[144] Cyrus Adler and Isidore Singer, *The Jewish Encyclopedia: A Descriptive Record of the History, Religion, Literature, and Customs of the Jewish People from the Earliest Times to the Present Day* (Funk & Wagnalls, 1907), 4:534.

and synagogue silver by referencing the "silver paraphernalia of the temple," which always included the *rimonim*, among other items.[145]

But the word "appurtenances" in the context of a synagogue can also be used to specifically reference the ritual items used to adorn the Book of the Law. *The Jewish Yearbook* from 1899 mentions specifically the "appurtenances" of the Book of the Law itself (*sepher torah*); the same publication later describes the *sepher torah* as always being bound in a binder, covered with a mantle, "while the two tops of the handles or rollers are covered with a crown of silver or gold, or with gold or silver bells."[146] Similarly, a book published in 1908 containing a description of Jewish ceremonial objects at the United States National Museum refers to the "decorative appurtenances" of the Torah (the Book of the Law), which include the wrapping band (*mappah*), the mantle, and the "crown or bells of precious metal, which are fitted over the upper ends of the rollers."[147] Relatedly, the Israel Museum's detailed publication titled *The Torah Scroll* explains that "all the Torah ornaments are regarded as tashmishei qedushah – sacred appurtenances."[148] In this context, "Torah ornaments" includes the wrapping band, mantle, and *rimonim*, as outlined above.

It comes as no surprise, then, that in the documents relating to the Congregation Shearith Israel and the synagogue in Newport, both "appurtenances" and "paraphernalia" show up, sometimes separately, and sometimes together (in addition to the other parallel phrases mentioned above). Given the contemporaneous usage of these terms, the most natural point of reference is, consistently, the necessary sacred objects for Jewish services, including the *rimonim*. This is logical, since in 1894 neither the newly-formed CJI nor the Touro Synagogue

---

[145] Ibid., 3:418.
[146] *The Jewish Year Book* (Greenberg & Company, 1899), 276, 318.
[147] United States National Museum, Cyrus Adler, and Immanuel M. Casanowicz, *The Collection of Jewish Ceremonial Objects in the United States National Museum* (U.S. Government Printing Office, 1908), 706–707.
[148] Avraham Shṭal, *The Torah Scroll* (Israel Museum, 1979), 4.

had its own synagogue appurtenances. The histories of the Newport Jewish congregations and the synagogue itself clearly state that through most of the nineteenth century, "The Newport synagogue was without any ritual objects. These had been taken away when the services at the synagogue ceased at the end of the eighteenth century, and had been deposited for safe-keeping in the synagogue of the Congregation *Shearith Israel* in New York."[149] In CSI's own synagogue, the usual practice was to keep the ritual silver, including the *rimonim*, in a "patent fire proof safe." As discussed in the expert report of Dr. Vivian Mann, a survey of CSI's property in 1869 revealed that several "Articles of Silver," including two sets of the Myer Myers *rimonim*, were in the fire proof safe and were "property of [CSI] in keeping of Shamas [i.e., the Sexton]" along with other silver.[150] Additionally, these *rimonim* are not noted in the margins of the 1869 inventory as being the property of anyone else or any other institution; this confirms that they are the property of CSI (as are the other silver items, with the exception of those noted otherwise). When the synagogue was officially re-opened in 1882, synagogue appurtenances—sacred ritual objects—had to be brought to Newport from CSI in New York City: "*Sefarim* [Books of the Law] and other necessary ritual objects for the services were sent to Newport from New York."[151] At some point this would have involved *rimonim* to accompany the Books of the Law, likely including the *rimonim* previously used by the original CYI stored in the CSI safe.[152]

A question naturally emerges from these documents: What, exactly, does it mean for these ritual items to have been "deposited for safe-keeping" at CSI in New York in the 1820s? The *Oxford English Dictionary* informs us that "safekeeping" is the "action of keeping safe; protection, preservation." Importantly, however, the *OED* notes that "safekeeping" can also refer

---

[149] Gutstein, *The Story of the Jews of Newport*, 259.
[150] CSI 4956: May 23, 1869: Congregation Shearith Israel, "Inventory of all Property & Effects," p. 34. See also Dr. Vivian Mann, Expert Report, November 24, 2014, p. 6.
[151] Gutstein, *The Story of the Jews of Newport*, 259.
[152] CSI 4956: May 23, 1869: Congregation Shearith Israel, "Inventory of all Property & Effects," p. 34.

to "custody."[153] Similarly, a "safekeeper" is not just a "protector," but also a "guardian."[154] It is clear from these definitions, the documents in the 1820s, and the actions of CSI, that the ritual objects were not simply sent to CSI in New York for safe storage; they were returned or sent to CSI because the objects had mostly come from CSI in the first place as loans to CYI.[155] In the absence of a viable congregation in Newport, CSI simply received much of what had been theirs in the first place.[156] This explains the 1869 CSI inventory, which carefully distinguishes property CSI was holding that the inventory indicates is the "property of" others on the one hand, and, on the other hand, the inventory's clear reference to the Myer Myers rimonim, which are referred to as the "property of [CSI]." The inventory identifies one set of the Myer Myers *rimonim* as "marked" Myers followed by "New Port" to indicate how those rimonim were marked, not to whom they belonged. The inventory just as clearly indicates that all four Myer Myers finials (two sets) were the property of CSI.[157]

One of the clearest definitions of what "appurtenances" meant to the various parties involved comes from a key document in 1893. After the death of the new Newport congregation's first minister, Reverend Abraham P. Mendez, in 1893, CSI and the Newport congregation called another minister for the Newport synagogue, again of the Spanish Portuguese Sephardic ritual, the Rabbi David Baruch. In a June 13, 1893, letter to Baruch, CSI minister Henry Pereira Mendez of New York laid out the terms regarding the use of the building and the sacred ritual objects that would allow the Newport synagogue to remain open. "You are

---

[153] "Safekeeping, n." Oxford English Dictionary Online. September 2014. Oxford University Press. http://www.oed.com/view/Entry/169683 (accessed September 16, 2014).
[154] "Safekeeper, n." Oxford English Dictionary Online. September 2014. Oxford University Press. http://www.oed.com/view/Entry/169682 (accessed September 16, 2014).
[155] CSI 5591: CSI Elder Meeting Minutes, January (Tebeth) 22, 1759.
[156] CSI 5274: CSI Trustee Meeting Minutes, January 11, 1818. CSI Trustee Meeting Minutes from February 10, 1833, indicates that "Four Sepharim" from Newport were deposited in CSI's synagogue under CSI's charge. CSI 5257: CSI Trustee Meeting Minutes, February 10, 1833.
[157] CSI 4956: May 23, 1869: Congregation Shearith Israel, "Inventory of all Property & Effects," p. 34. See also Dr. Vivian Mann, Expert Report, November 24, 2014, p. 6.

hereby empowered to use the Sefarim, **Bells**, Books, Shofar **and all other appurtenances** for worship now in Newport Synagogue," Mendez stated, as the representative of CSI. These synagogue appurtenances were only a temporary loan to CJI; CSI in no way intended to give up ownership or long term possession and control. The letter instructs Baruch that, "Upon termination of your appointment, you will return to us [that is, to CSI] or to our agent or legal representative, the custody of the buildings and appurtenances."[158] In this document, the ritual bells, or *rimonim*, are clearly listed by CSI as one of the "appurtenances." In a June 25, 1893, letter to CSI, Max Levy, president of Congregation Shearith Israel, states emphatically, "Although we do not claim ownership in the property or appurtenances, rest assured we will guard the same zealously for our pride in this ancient house of worship."[159] This exchange demonstrates that both CSI and CJI representatives used "appurtenances" when referring to the ritual objects required to run regular worship services in the Touro Synagogue.

In 1894, when the living descendants of the families of the original Congregation Yeshuat Israel deeded the Touro Synagogue grounds and religious objects to the representatives of Congregation Shearith Israel, the language was intentionally inclusive of the accompanying ritual objects in the synagogue, along with the property itself: "Together with the appurtenances and all the estate, and rights of the said parties of the first part in and to, said premises."[160] That "appurtenances" in this specific context was intended to include the ritual objects of the synagogue can readily be inferred by looking at one of the descendants of the original CYI families, Caroline Cohen. In 1892 and 1893, Caroline Cohen wrote two times to CSI, each time asking them to find a congregation that might have use for a pair of *rimonim* that had been in her

---

[158] CJI 0036: Henry Pereira Mendez to David Baruch, June 13, 1893. Emphasis added.
[159] CJI 0042: Max Levy to CSI, June 25, 1893.
[160] CSI 0199: Deeds of Conveyance, 1894. See also CJI 0126-0151: Deeds of Conveyance, 1894.

family.[161] On June 20, 1893, when she heard about the effort of CSI to gain deeds of conveyance from the descendants of the original CYI members, Cohen wrote to H.P. Mendez of CSI, desiring that her name be added "to the list of those who wish the old forms retained, and the **old relics** secured, in the venerable Synagogues that still remain in this country."[162] Similarly, her signed statement of support for CSI in securing the legal title to the synagogue and its appurtenances, written in 1894, makes perfectly clear her use of "appurtenance": "We, the undersigned descendants of the Hebrews of Newport R.I. unite with the Spanish and Portuguese Congregation, New York, who are acting on behalf of other descendants, with the view of exercising a becoming control over the building erected by our ancestors, its grounds, **the appurtenances of worship** and the cemetery."[163] The concern for these heirs at law was not simply the synagogue building itself and the cemetery, but also the synagogue appurtenances ("the appurtenances of worship")—including Books of the Law and the accompanying *rimonim*, some of which had been loaned to the Touro Synagogue, in this case from Caroline Cohen via CSI.

Throughout the proceedings of the 1890s, ownership and possession of the synagogue were always directly connected to the religious objects within the synagogue. On May 30, 1898, an official delegation from CSI to the Touro Synagogue declared in writing that Eugene Schreier was to "act as the representative or agent of said congregation Spanish and Portuguese Shearith Israel of N.Y. to take charge of the building, **appurtenances**, properties, sconces, and cemetery situated the Synagoge [sic] building on the ancient site in Touro St. and the cemetery..."[164]

---

[161] CSI 5236-5237: Caroline Cohen to H.P. Mendez, March 2 [?], 1892; see also CJI 0395: Caroline Cohen to the Trustees of the Spanish and Portuguese Synagogue, NYC, June 20, 1893.
[162] CJI 0406: Caroline Cohen to H.P. Mendez, June 20, 1893. Emphasis added.
[163] CJI 0145: Letter of Caroline Cohen, et al., 1894. Emphasis added.
[164] CSI 4583: Official notice of a delegation from CSI to CJI, May 30, 1898. Emphasis added.

Additionally, CJI itself, in the Bill of Complaint it filed in 1902 against members of Congregation Shearith Israel, demonstrated that meaningful ownership of the synagogue entailed ownership of its contents: CJI complained that CSI members had "removed from said Synagogue and have taken into their possession and control certain deeds, books, accounts, letters, papers, writings, vellums, parchments, scrolls and other embellishments."[165] CJI also understood that the litigation would decide the lawful "possession of said premises with the appurtenances thereto."[166] CJI's bid for possession and ownership of the Touro Synagogue and "the appurtenances thereto" was roundly rejected by the U.S. Circuit Court in 1903.[167]

The understanding of "appurtenances" and "paraphernalia" as encompassing the necessary ritual objects at the Newport synagogue can also be seen in the wording of the leases enacted in the first decade of the twentieth century. After the January 1903 United States Circuit Court ruling (which was in favor of CSI and affirmed control of the synagogue by CSI), an indenture with lease was drawn up that would provide a legal framework within which CJI could utilize the property and necessary ritual objects while CSI retained legal title to both the property and the ritual and sacred objects inside the synagogue. The lease, which referred specifically to the synagogue "and appurtenances," was signed by CJI representatives on February 1, 1903.[168] The next day, Congregation Jeshuat Israel called a special meeting (February 2, 1903), and authorized representatives to "surrender possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport to the said Trustees [from Congregation Shearith Israel], owners of the property, and to agree upon the terms and the provisions of a lease from

---

[165] CSI 0262: Bill of Complaint of David Fishel, et al., May 1, 1902.
[166] CSI 0180: Bill of Complaint of David Fishel, et al., May 1, 1902.
[167] CSI 0316-0319: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903.
[168] CSI 0014: L. Napoleon Levy to William P. Sheffield, Jr., February 10, 1903; TSF 2421: "The 1902 Sit-in at Touro Synagogue," p. 69.

said Trustees to this Congregation for the term of five years from February 1, 1903, at the nominal rent of one dollar yearly."[169]

But CSI wanted to make absolutely sure that the lease comprehensively stated the exact terms and coverage of the lease, even down to the sacred ritual objects within the synagogue. According to the correspondence of the CSI trustees, the lease initially only referenced the property, building, "and appurtenances;" some of the CSI trustees wanted the language of the lease to be more clearly all-encompassing (perhaps for avoidance of any doubt, perhaps to confirm the intent of the parties with some redundancy). The suggestion was made to add the phrase "and paraphernalia belonging thereto"—a sort of comprehensive legalese to make sure all items were covered—which was done; this addition was confirmed by CJI on February 18, 1903.[170] The final lease, for a five-year term and for the sum of one dollar per year, contained the full and comprehensive wording: "appurtenances and paraphernalia belonging thereto."[171]

The final in-person transactions were clearer still. To be absolutely sure, Reverend H.P. Mendez from CSI—who had traveled from New York to oversee the signing of the lease by CJI—"went over the personal property with the Committee" from CJI on the same day the revised lease was fully executed and placed on record by W.P. Sheffield (February 18, 1903).[172] By using this precise wording ("appurtenances and paraphernalia"), and by going over the personal property in detail with the CJI committee, the CSI trustees wanted to make sure that each, every, and all religious objects within the Newport synagogue—most of which had come from CSI (or had been entrusted to CSI by Mrs. Cohen), including the *rimonim* that by then were

---

[169] CJI 0471: "At a Special Meeting of the Board of Trustees," February 2, 1903. See also TSF 2422: "The 1902 Sit-in at Touro Synagogue," p. 70.
[170] CSI 0014: L. Napoleon Levy to William P. Sheffield, February 10, 1903; CSI 0015: William P. Sheffield, Jr. to L. Napoleon Levy, February 18, 1903.
[171] CSI 0027: 1903 CJI/CSI lease.
[172] CSI 0015: William P. Sheffield, Jr. to L. Napoleon Levy, February 18, 1903.

kept in a safe and secure place because of their importance—remained within the ownership and control of CSI itself, not CJI. The signing of the lease by CJI representatives signaled their full and binding agreement.

This same full phrase encompassing both appurtenances and paraphernalia appeared again in the next renewal of the lease between CSI and CJI, five years later. The five-page, five-year lease dated January 14, 1908, between representatives of CSI and CJI clearly specified the boundaries of the property itself, the buildings, "with the appurtenances and paraphernalia belonging thereto."[173] As with the 1903 lease, the 1908 lease placed various restrictions on the use of the property and the appurtenances, namely, that they had to be used for "the usual and stated religious services according to the ritual rites and customs of the Orthodox Spanish and Portugese [sic] Jews as at this time practiced in the Synagogue of the Congregation Shearith Israel in the city of New York," along with other obligations.[174]

The meaning of "appurtenances"—as sacred ritual objects, including *rimonim*—in the context of a synagogue changed little into the mid-twentieth century. On June 22, 1958, the *New York Times* reported that a Brooklyn synagogue had been recently robbed, and that the thief had taken a "silver chalice and silver appurtenances to the Torah" from the ark.[175] "Silver appurtenances to the Torah," as we have seen previously, includes reference to the crowns or finials (*rimonim*) used to decorate the Torah handles. These usages are entirely consistent with the language used over time in the history of Judaism, in the late nineteenth and early twentieth century in the U.S., and, in particular, in the 1903 and 1908 leases (and the 1893 agreement between CSI and CJI Rev. Baruch), in which "appurtenances" refers to all of the ritual objects required for a synagogue, including the Scrolls of the Law and the accompanying *rimonim*.

---

[173] CSI 0001: 1908 CJI/CSI lease.
[174] CSI 0002: 1908 CJI/CSI lease.
[175] "Synagogue is Robbed: Silver Items Valued at $800 Missing in Brooklyn," *New York Times*, June 22, 1958, 27.

This understanding—of ownership as encompassing all of the religious and ritual items in the Newport synagogue set forth in these leases—clearly continued in the successive generations of leadership at both CSI and CJI. On January 5, 1937, the CSI board received word via a CSI member who had recently attended a service at the Touro Synagogue that "he noticed that 2 or 3 pairs of Myers silver bells were being used every Saturday by the Congregation, and that the congregation did not seem particularly careful about them, probably not realizing their great worth."[176] In response, the CSI board acted as owners: they deliberated about how to intervene. Options included lending them to a museum as exhibits to preserve them, but CSI realized that, if they would remove the *rimonim* for such purposes, they would want or need to provide CJI with a replacement pair of bells. No actions of the CSI board were recorded in this particular instance, but it is evident that everyone involved understood that CSI owned the Myer Myers' *rimonim* used at the Touro Synagogue.[177]

Relatedly, in 1945, when the Touro Synagogue was made a National Historic Site, the United States Department of the Interior entered into an agreement with CSI ("holders of the fee title simple," or owners) and CJI ("lessees") that used this same language to refer to the ritual objects within the synagogue. Article IV (b) stated: "That the title to the Touro Synagogue, Newport, Rhode Island, and its appurtenances, subject to the covenants above set forth and recorded deeds and declarations of Trusts, apportaining [sic] thereto, shall remain in the Shearith Israel Trustees, to be used for religious purposes as set forth in Article I (f) of this Agreement."[178] (Article I (f) states that the synagogue shall be open to the public and that the synagogue shall be used "for the maintenance of divine services in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as practiced and preserved in the

---

[176] CJI 0405: Minutes of the CSI Board of Trustees, January 5, 1937.
[177] CJI 0405: Minutes of the CSI Board of Trustees, January 5, 1937.
[178] CSI 0097-0098: An agreement between the U.S. Department of Interior, CSI, and CJI, Nov. 7, 1945.

Synagogue of said Congregation Shearith Israel.")[179] Notably, the very act under which Touro Synagogue was made a National Historic Site states as its goal the preservation of "historic sites, buildings and objects." This, accompanied with the descriptions of Touro Synagogue that include the *rimonim*, show that the *rimonim* are not only appurtenances to Touro Synagogue but also are so integral as to be part of the Synagogue's "genus [sic] loci."[180]

The important relationship of the *rimonim* to the Touro Synagogue was recognized by CJI again in 2004, when CJI applied for a State Preservation Grant and stated in its application that the Touro Synagogue (not CJI, notably) "is very fortunate to have many of its original interior furnishings. . . . Two sets of silver Remunim [sic]."[181] To this day, the CJI website affirms that CSI has since the 1820s had "legal oversight of the building, [and] its contents."[182] As part of the ensuing renovation, these-colonial era *rimonim* were removed from the building, cleaned, repaired, and polished.[183]

In sum, Jewish synagogues need very specific religious objects in order to function as a legitimate house of worship. These include the Books of the Law and the accompanying finials (*rimonim*), as the examples given above make clear, along with other specific ritual items. And the most common shorthand way to reference all of these essential Jewish sacred and ritual objects is with the words "appurtenances" and/or "paraphernalia" (along with a few other synonyms, such as "sacred movables" and "fixtures"). Therefore, in the 1903 and 1908 leases, the words "appurtenances" and "paraphernalia" were definitely intended to include the *rimonim*.

---

[179] CSI 0096: An agreement between the U.S. Department of Interior, CSI, and CJI, Nov. 7, 1945.
[180] See Materials from the United States Department of the Interior National Park Service for Touro Synagogue National Historic Site, pp. 7, 23. The intended phrase was likely "genius loci," or "spirit of the place."
[181] CSI 0157-0158: State Preservation Grant Application Form, July 30, 2004.
[182] CSI 5189: "Touro Synagogue History," Touro Synagogue website.
[183] Urofsky, *A Genesis of Religious Freedom*, 108.

**CSI as Owners of the Property and Sacred Ritual Objects (Appurtenances, Paraphernalia, Sacred Movables, Fixtures, Etc.)**

In reviewing these documents and in conducting my own independent investigation, there are several important points regarding CSI's ownership of the synagogue building, cemetery, and synagogue appurtenances that deserve explicit delineation. The first is straightforward: in none of the documents I have looked at has CJI ever been recognized as the legitimate owner of the Touro Synagogue, the cemetery, or the ritual objects (appurtenances and paraphernalia) therein by any of the relevant, independent authorities. In fact, the opposite is true: at almost every point along the way (especially after 1894), CSI is recognized as having sole legal claim to the building and ritual objects.

The second point is this: at repeated and critical points along the way, CJI has freely admitted in writing and by their actions that they (CJI) are not the owners of the building or the synagogue appurtenances. During a May 28, 1893, congregational meeting in which the new CJI declared themselves to be a newly-gathered congregation, the congregation resolved to write to CSI, stating: "That we request of them [CSI] the further assistance which they have in the past rendered in the *loan* of such property as has formerly been in use in the services."[184] This is an admission that the ritual items ("property") for "use in the services"—namely, the necessary ritual objects to conduct a service—did not belong to CJI and had, in fact, been loaned from CSI. CJI was requesting to simply continue this loan of required religious objects.

Similarly, in a June 25, 1893, letter from CJI to CSI, CJI representatives state: "Certainly we do not claim any ownership in the property. . . . Although we do not claim ownership in the property or appurtenances, rest assured we will guard the same zealously for our pride in this

---

[184] CJI 1167: CJI Congregational Meeting Minutes, May 28, 1893. Emphasis added.

ancient house of worship . . .”[185] Once again, these are very clear statements in which CJI recognized their complete lack of ownership of both the synagogue and the necessary ritual items inside of it (the appurtenances).

It is important to note, too, that CJI set up a legal standard for CSI to prove CSI's ownership of the synagogue and its appurtenances. On June 25, 1893, CJI secretary Max Levy (writing for CJI) wrote to CSI, stating: “The establishment of a clear title to the property should be your aim. . . . The heirs-at-law, alone, can move in the matter.”[186] This was repeated by CJI representative Eugene Schreier a few weeks later: “They [CSI] should first lay before us all legal papers as to their rights to the property in question. . . . If the New York Congregation have a legal deed and title to the property why not prove it: surely this is not asking too much in such an important matter.”[187] In response, CSI contacted the surviving heirs-at-law of the original CYI, and these descendants of the original CYI congregation members signed deeds of conveyance to CSI representatives in 1894.[188] In so doing, CSI fulfilled precisely the legal standard of ownership that CJI itself set out for CSI, even assuming that one was needed.

After the January 1903 U.S. Circuit Court ruling, CJI unequivocally recognized CSI's ownership of the synagogue and appurtenances. In direct response to this court decision, the CJI Board of Trustees stated twice in their February 1903 meeting minutes that CSI is “the owners of the Synagogue building at Newport” and that CSI is the “owners of the property.”[189] In that same document, the CJI Board of Trustees directed two CJI individuals to “surrender the possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport, to the said

[185] CJI 0042: Letter from CJI to CSI, June 25, 1893.
[186] CJI 0042: Letter from CJI to CSI, June 25, 1893.
[187] CSI 2182: Eugene Schreier to William P. Sheffield, Jr., July 6, 1893.
[188] CJI 0126-0151: Deeds of Conveyance, 1894.
[189] CJI 0471: February 2, 1903 meeting of the CJI Board of Trustees.

Trustees," meaning the CSI trustees.[190] It is telling that such surrender of premises included the building and the ritual items inside of it. From the documents, it appears that CJI took nothing from the building before handing over the keys—simply because they had no legal claim of ownership to the important ritual items inside of it (like the *rimonim* or any of the other synagogue appurtenances).

But the most forthright admission by CJI of CSI's ownership came on January 30, 1903, after the U.S. Circuit Court ruling. CJI representatives signed a document that stated: "The Congregation, Jeshuat Isreal [sic], agrees to admit and recognize without qualification the title and ownership of L. Napoleon Levy and other Trustees to the synagogue building, premises, and fixtures."[191] There could hardly be a more direct statement of and admission regarding CSI's complete and total ownership over the synagogue building and its contents.

Third, at key moments during these turn-of-the-century debates, legal authorities repeatedly affirmed CSI's ownership of and legal title to the synagogue property, cemetery, and synagogue appurtenances. This started with the legal heirs of the original CYI and their deeds of conveyance to CSI in 1894, as discussed above. CSI's ownership was also affirmed by the 1903 U.S. Circuit Court ruling, in part based on these 1894 deeds of conveyance. Judge Arthur L. Brown declared in his opinion that "it appears by the bill that the defendants were in actual possession under deeds purporting to convey them a legal title."[192] As a result of this court ruling, whatever attempted claims CJI had regarding the synagogue and its appurtenances were completely squelched, as these 1903 documents and the subsequent February 1903 lease makes clear. Furthermore, CSI's ownership was over time confirmed by the Newport City Council, the

---

[190] CJI 0471: February 2, 1903 meeting of the CJI Board of Trustees.
[191] CSI 4533: Agreement between CSI and CJI, January 30, 1903.
[192] CSI 0318: Judge Arthur L. Brown, "Opinion on Defendants' Demurrer & Plea," written decision in the U.S. Circuit Court, January 10, 1903.

U.S. Circuit Court, CJI (in writing, at several key moments), and, later, the U.S. Department of the Interior and other governmental entities.

Additionally, there are numerous other places in the twentieth and twenty-first centuries where CSI's ownership of the Touro Synagogue is demonstrated clearly and acknowledged by CJI and external authorities. These examples can be grouped together around several recurring themes. First is the issue of rental payments. The indenture with lease requiring a one-dollar annual payment was set up in 1903 and continues to this day.[193] During the one-hundred-plus years after 1903, this lease payment was normally made without any special notice or fanfare, as a clear recognition of CJI's operation under the lease and of ownership on the part of CSI. There were a few times when CJI fell behind in payments, but soon caught up as requested by CSI. In some cases, the cause was unclear – perhaps simple unintentional neglect. This occurred in 1916, when the CSI Board of Trustees wrote to CJI to inform them that CJI had been behind in rental payments since July 1, 1910.[194] In 1959, CSI representatives wrote to CJI, again requesting that rental payments be made and continue to be made on an annual basis, and CJI promptly complied.[195] A similar situation unfolded in 1993, when CJI was found to be six years behind in lease payments.[196]

In other cases, isolated CJI congregants have raised objections regarding the rental payments by refusing outright to pay them, but subsequently resumed payments upon demand by other congregants or CSI. In such cases, the rental payments stood in for larger issues of ownership and desired autonomy. On August 28, 1979, for example, CJI President Saul J. Schweber wrote to CSI to "humbly request a release from the bonds of trusteeship from Shearith

---

[193] CSI 5189: "Touro Synagogue History," Touro Synagogue website.
[194] CSI 9699: CSI Board of Trustee Meeting Minutes, November 13, 1916.
[195] CSI 0775-CSI 0778: Correspondence between CSI and CJI, March 1959.
[196] CJIB 6844: CJI Board of Officers Minutes, August 23, 1993.

Israel. We hereby refuse to fulfill our annual token rent fee of $1.00 for years 1978 and 1979."

Schweber explained, "The complexity of maintaining and preserving this historic shrine . . .

make it imperative that we enjoy full autonomy and have full control of our destiny. We can no

longer tolerate a trusteeship."[197] CSI President Edgar J. Nathan replied in December of that year,

firmly reminding Schweber of the long-standing lease agreement and "legal relationship" that

could not be changed without "approval of a court."[198] Regular payments resumed shortly

thereafter.[199]

Second are the terms of the lease. There are other significant undertakings that CJI took

on in the indentures with leases in 1903 and 1908—a lease that CJI affirms remains in force to

this day. These undertakings include conducting religious services "according to the ritual rites

and customs of the Orthodox Spanish and Portugese [sic] Jews as at this time practised in the

Synagogue of the Congregation Shearith Israel in the city of New York," and permitting CSI to

approve any rabbi hired at the Touro Synagogue.[200] Together, they confirm the role that CSI has

played with respect to the Touro Synagogue as owner and guardian of the Touro Synagogue, and

the role that CJI has accepted from the beginning as a lessee.

Third, CJI repeatedly deferred to CSI as the owner of the synagogue in the twentieth

century, particularly with regard to repairs and major decisions related to the building or the

property. Two years after signing the 1903 lease, CJI requested permission from CSI to add onto

the side building in which the religious school met.[201] CSI, as owner, declined, noting that its

---

[197] CJI 1220: Saul J. Schreiber to Trustees of Congregation Shearith Israel, undated, but likely August 28, 1979.
[198] CJI 1221: Edgar J. Nathan to Saul J Schreiber, December 13, 1979.
[199] On May 8, 1983, CJI minutes authorized the payment of rent to CSI. See CJIB 5658: CJI Meeting, May 8, 1983.
[200] CSI 0002: 1908 CJI/CSI lease, January 14, 1908.
[201] CSI 9254: CSI Board of Trustees Meeting Minutes, January 17, 1905.

board "would not consent to any alterations of any description in that historic edifice."[202] (CSI

trustees denied a similar petition from CJI to build an addition in 1911.)[203] In 1908, CSI worked

with CJI to install a tablet at the Touro Synagogue in memory of Judah Touro, which was

dedicated on September 7 of that year, with leaders from CSI co-officiating.[204] On July 25, 1927,

CJI wrote to CSI for approval regarding the wording of several plaques to be posted on the gates

of the synagogue and at the cemetery. CSI sent back specific wording for the plaques, which

included this important phrase: "Title vested in the Congregation Shearith Israel in the City of

New York 5654 - 1894.)."[205] Similarly, on July 7, 1939, the CJI secretary wrote to CSI "to

request permission from your Congregation to erect a monument on the lawn of the Touro

Synagogue as a memorial to the principle of religious and civil liberty established on this island

300 years ago."[206] CSI responded a month later, on August 10, 1939, approving of the monument

and its final location.[207] CJI requested permission from CSI on other occasions, too, for changes

to the building and premises, as on March 15, 1975, when CJI requested CSI's "concurrence"

regarding the need for a burglar and fire alarm system to be installed. Notably, CJI referred to

CSI as "legal owner of Touro Synagogue."[208]

CSI's ownership of not just the building, but of the synagogue appurtenances and

paraphernalia (ritual objects), was acknowledged by CJI in 1959, when the Smithsonian Institute

wrote to CJI Rabbi Theodore Lewis asking if it would be possible to include a Jewish religious

---

[202] CSI 9257: CSI Board of Trustees Meeting Minutes, February 27, 1905 (quotation). For the initial request, see CSI 9254: CSI Board of Trustees Meeting Minutes, January 17, 1905. See also Urofsky, *A Genesis of Religious Freedom*, 103.
[203] CSI 9438: CSI Board of Trustees Meeting Minutes, January 29, 1911.
[204] "Touro Tablet Unveiled," *New York Times*, September 8, 1908.
[205] CSI 1446-1449: Correspondence between CSI and CJI, 1927. The date given here is in Jewish and Common Era years. It is unclear what signage was ultimately used. I have not seen additional records from CSI or any records from CJI on this.
[206] CSI 2110: CJI Secretary to CSI, July 7, 1939.
[207] CSI 2092: Victor Tarry to Max Levy, August 10, 1939.
[208] CJIB 4155: Saul Fine to Edgar J. Nathan, March 16, 1975.

artifact in the United States National Museum. Lewis immediately wrote to CSI, seeking advice and input. CSI's response was less than enthusiastic, and it seemingly ultimately refused, although the documents are not entirely clear.[209] But the very fact that CJI recognized that they were not authorized to loan such religious objects (including the requested silver) illustrates the way that CJI over time continued to operate within the lessee framework set up by the 1903 and 1908 leases.

CSI's recognized ownership of the synagogue appurtenances was demonstrated when, quite significantly, some **CJI members** protested when CJI leaders first proposed selling the *rimonim* in 2008, and continued to voice substantial questions in subsequent congregational meetings. Such protests illustrate an internal recognition by some CJI members one hundred years later that the lease agreements of 1903 and 1908 extended to the synagogue appurtenances and paraphernalia, including the *rimonim.* When the CJI leadership brought the problem of a severe financial deficit to the congregation during an October 19, 2008, meeting, the third financial option to remain solvent was "The possible sale of some real and personal property," which might include one set of the Myer Myers *rimonim*, along with other items (such as the Gilbert Stuart painting of Abraham Touro). CJI's minutes are clear about the concerns raised: "A discussion followed including opposition to selling the rimonim and the possibility that they belong to Shearith Israel."[210]

Similarly, in a March 29, 2009, special congregational meeting to gain authorization for the Board of Officers "to sell or otherwise dispose of, any real or personal property that belongs to the congregation," the question was again raised: "Do we own the rimonim?" The response

---

[209] CSI 0999-1001: David de Sola Pool to Edgar J. Nathan, Jr., August 7, 1957; CSI 1302-1303: Victory Tarry to Theodore Lewis, August 10, 1959.
[210] CJI 1298: CJI Congregational Meeting, October 19, 2008.

was vague: "We have been told that we do own them."[211] Tellingly, the proposed motion to authorize the Board to sell the *rimonim* or other real property failed to meet the required two-thirds majority to pass; twenty voted in favor, while fourteen voted against it.[212] The idea of selling the *rimonim* was proposed yet again to CJI members during a June 25, 2012, congregational meeting. And, once again, serious objections were raised, based on probable CSI ownership. No fewer than ***three*** different members raised serious concerns about the possibility of selling one set of the Myer Myers *rimonim* since, if CSI owned them, "Congregation Jeshuat Israel has no authority to sell them."[213] The CJI congregational approval that followed came after representations by CJI leadership that CJI owned the rimonim and that Christie's supported that conclusion. These three recent examples of internal CJI dissent show a long-term, continuous awareness by at least some CJI members of CSI's ownership of the building and the synagogue appurtenances, based on the 1903 and 1908 indentures with leases.

Fourth, CSI's ownership has been consistently and readily acknowledged by CJI whenever CJI attempted to do anything outside of itself, such as applying for state and federal grants or dealing with outside entities like the U.S. Federal Government. As noted above, the 1945 agreement between the United States Department of the Interior, CSI, and CJI affirmed CSI's legal ownership of the Touro Synagogue and its appurtenances (religious objects) in Article IV (b): "That the title to the Touro Synagogue, Newport, Rhode Island, and its appurtenances, subject to the covenants above set forth and recorded deeds and declarations of Trusts, apportaining [sic] thereto, shall remain in the Shearith Israel Trustees."[214] This document simply states what was known by all parties involved to be fact: that CSI ("owners") had held the

---

[211] CJI 1315: CJI Special Meeting, March 29, 2009.
[212] CJI 1315: CJI Special Meeting, March 29, 2009.
[213] CJI 1246-1247: CJI Congregational Meeting, June 25, 2012.
[214] CSI 0097-0098: An agreement between the U.S. Department of Interior, CSI, and CJI, Nov. 7, 1945.

Fisher 59

legal title to the synagogue and its appurtenances (necessary ritual objects) since the early nineteenth century. CJI again affirmed CSI's ownership in 1986 and again in 1989 on a National Registry of Historic Places Registration form, where it stated: "The property is still owned by the Congregation of Shearith Israel of New York City . . . "[215]

CSI's ownership (and the lease agreements from 1903/1908) was also affirmed in a 2001 Operating Agreement between the National Trust for Historic Preservation, CJI, and the Society of Friends at Touro Synagogue National Historic Site, Inc. Page 2 of that document affirms, "WHEREAS, the Touro Synagogue is an active place of worship of the Congregation Jeshuat Israel, which has possession of the site through a lease with Congregation Shearith Israel as owner . . ."[216] Significantly, this 2001 "Operating Agreement" made a distinction between the "operation" of the Touro Synagogue and "ownership" of it (a distinction CJI leaders had already made in 1998, when they noted that "though Shearith Israel is the owner of the building, CJI maintains, runs, and insures the building"[217]). As the attorneys for CJI explained to the attorney for CSI on November 5, 2001 (when CJI's attorneys sent a copy of the Operating Agreement for approval and promised to amend it, if needed, to please CSI), "it is an 'Operating' Agreement related only to the operation and not the ownership of the site."[218]

This on-site management role by CJI within the framework of ownership by CSI was affirmed a few years later, in 2004, when CJI applied for a State Preservation Grant. The State Preservation Grant application stated plainly that CSI was the "owner" and the "on site management of the property and preservation of the property has been entrusted to Congregation

---

[215] TSF 0112: National Register of Historic Places Registration Form, February 1989; for 1986, see Materials from the United States Department of the Interior National Park Service for Touro Synagogue National Historic Site, p. 10.
[216] TSF 0725: Historic Site Operating Agreement between the National Trust for Historic Preservation, CJI, and the Society of Friends at Touro Synagogue National Historic Site, Inc., October 17, 2001.
[217] CJIB 6631: CJI Congregational Meeting Minutes, February 8, 1998.
[218] TSF 0722: Andrew M. Teitz to Alvin Deutsch, November 5, 2001.

Jeshuat Israel and the Touro Synagogue Foundation."[219] CJI's long role as renters and caretakers of the property and appurtenances (even extending to repairs, grant writing, and fund raising) did not change the basic framework of the lease or CSI's ownership, as CJI recognized in 2004 and had recognized for the entire preceding century, nor did such caretaking ever imply or lead to ownership on the part of CJI with regard to the synagogue, the cemetery, or the synagogue appurtenances.

Accordingly, when CJI has applied for grants, they have acknowledged CSI as the legal owners of the property and have requested letters of permission and support for their applications. This happened in 1999, when CJI applied for a grant from the National Trust for Historic Preservation; in 2003, when CJI applied for a Getty Grant; and in 2004, when CJI applied for a State Preservation Grant.[220] In particular, the 2004 State Preservation Grant listed CSI as owner, described the *rimonim* as part of the synagogue's "original interior furnishing" (*not* separate property of CJI), and stated that the lease was "perpetual."[221] In each of these applications, CJI acknowledged CSI as the owner of the Touro Synagogue.

Lastly, during much of the twentieth century, CSI's ongoing ownership and oversight can be seen in its leadership role in the Touro Foundation. Officially titled "The Society of Friends of Touro Synagogue National Historic Shrine Inc.," the Touro Foundation was organized in 1948 following the establishment of the Touro Synagogue as a National Historic Site.[222] Even though it is a separate non-profit organization from CJI, CSI's legal ownership of the Touro Synagogue

---

[219] CSI 0148: 2004 State Preservation Grant Application.
[220] See CSI 0979: David J. Nathan to B. Schlessinger Ross, January 28, 1999; CSI 0980: CSI to the National Trust for Historic Preservation, January 28, 1999; CSI 0984: Alan Singer to the Getty Grant Program, April 3, 2003; CSI 0148: State Preservation Grant Application, July 28, 2004.
[221] CSI 0148, 0157-0158: State Preservation Grant Application, July 28, 2004. Other histories of the Touro Synagogue concur, stating, "The contract between Shearith Israel and Jeshuat Israel has held for more than a century". See Urofsky, *A Genesis of Religious Freedom*, 100.
[222] CJIB 1535: Meeting Minutes of The Society of Friends of Touro Synagogue National Historic Shrine Inc., Nov. 20, 1960; CSI 5189: "Touro Synagogue," Touro Synagogue website.

and important supervisory role was acknowledged in the structural organization and leadership

of the Touro Foundation. According to the Foundation's Bylaws, the Board of Directors for the

Touro Foundation was comprised of five members from CSI and five members from CJI.

Additionally, the presidents of both CJI and CSI were also members of the Board of Directors.[223]

Such an arrangement gave CSI an equal voice in the undertakings and decision-making of the

Touro Foundation. As a precautionary measure, the Touro Foundation was required to notify CSI

before any contracts were entered into for the purpose of working on the synagogue building.[224]

Over time, CJI, or individuals associated with CJI, appear to have sought to chip away at such

influence over the management and operation of the property, but such attempts to reduce CSI's

influence did not affect the legal reality of CSI's ownership of the building.[225]

Stepping back, then, it seems important to also point out several related historical realities

regarding the entirety of the relationship between CSI and CJI. First, as a historian, I recognize

that, over the course of successive generations, it is often the case that agreements are not

enforced nor enacted consistently over time with the same degree of self- or outward-awareness.

This phenomenon is well-known to historians with regard to a variety of contexts and situations.

This can result from confidence that the counterparty was performing adequately; it can result

from natural human processes of neglect or unintentional oversight by one party or another; or it

can result from ill-willed intentions at times. But it is important to recognize that, no matter what

the actual practices of successive leaders, the underlying legal agreement remains the same

---

[223] CJIB 1543: Meeting Minutes of The Society of Friends of Touro Synagogue National Historic Shrine Inc., Nov. 20, 1960.
[224] CSI 2304: Extract of the meeting of the Board of Directors for the Society of Friends of Touro Synagogue and Touro Synagogue Restoration Committee, June 26, 1958.
[225] TSF 0456: Bylaws of the Society of Friends of Touro Synagogue National historic Shrine, Inc., adopted August 11, 1991. Prior versions of the Society of Friends bylaws indicated that there should be equal representation from CSI and CJI on the Society of Friends board (five representatives each, plus the president of each congregation). See CJIB 1543: The Society of Friends of Touro Synagogue National Historic Shrine Inc., Meeting Minutes, Nov. 20, 1960.

unless it is officially and legitimately altered by both parties. In the case of CSI and CJI, the underlying legal agreement—that of ownership and incidents of ownership by CSI of the property and appurtenances and paraphernalia, and of a lessee-ship by CJI—was never officially, legally, nor legitimately changed.

As such, from my perspective as a historian, what is most important to look at are the moments when there is a recognition of this past agreement, a negotiation over the implications of that past agreement, and, finally, a return to compliance (a process that repeated itself over the course of more than one hundred years between CSI and CJI starting in 1903). Although some later CJI leaders may have at times disagreed with the 1903 lease agreement (and the required one dollar per year lease fee and other specific undertakings), and although at a few points some CJI leaders refused to pay it, over the long term that lease agreement and legal arrangement ultimately stood firm. The lease fee was routinely paid over time (when years were skipped there is evidence that payments were eventually made up), even as recently as 2012, and the Touro Synagogue website confirms that rent is still paid annually.[226]

Second, it is important to consider the longer history of actions by these two congregations over time rather than just a few isolated actions by individuals representing and/or associated with these congregations. Regardless of how some individuals from CJI might have felt regarding the ownership of the synagogue and its appurtenances by CSI (particularly in the 1970s, when there seems to have been some desire to be free from what CJI representatives termed "the bonds of trusteeship"), the overall actions of CJI as a congregation and legal entity consistently reflect their acknowledgement of CSI's ownership. This is most evidently displayed in the applications for grants and in being included in insurance policies, as outlined above, but

---

[226] CSI 0802: Rent check from CJI, February 12, 2012; CSI 5189: "Touro Synagogue History," Touro Synagogue website.

also with regard to the treatment of the Touro Synagogue's ritual objects mentioned in the 1903 and 1908 leases and indentures.

Third, a wider look at the history of religion in America reveals that there have been hundreds of court cases involving disputed property and ritual items between the seventeenth century and the present, involving the entire spectrum of religious denominations and organizations including Congregationalists, Presbyterians, Baptists, Mormons, and Jews, among others. These cases have shown that deeds, written contracts, and the conveyances of the heirs at law matter; that the original intentions of donors, heirs, and founders are often valued quite highly; that religious objects and buildings can, in fact, revert back to former owners, donors, or even to a wider religious community at large if a church ceases to exist; and that courts over time tend to favor established hierarchies and subordinate relationships.[227] Additionally, the loan, gifting, or transfer of religious objects often retains a close connection with their original donors or loaners; the sale of religious property (buildings or ritual objects) can rarely be done without considering the intentions of the gift or loan, or consulting any living members or entities who have any claim at all to the religious property or objects. In the long history of church property

---

[227] Regarding the importance of deeds, written contracts, and the conveyances of the heirs at law, see the literature and documentation related to the Temple Lot Case: R. Jean Addams, "The Church of Christ (Temple lot) and the Reorganized Church of Jesus Christ of Latter Day Saints: 130 Years of Crossroads and Controversies," *Journal of Mormon History* 36:2 (Spring 2010), 54-127; Samuel Appleton Blatchford, *United States Court of Appeals Reports*, Volume 36: Cases Adjudged in the United States Court of Appeals for the Eighth Circuit in May and December Terms 1895 (Albany: Banks and Brothers Law Publishers, 1897), 786-789. For an example of the high value of the original intentions of donors and heirs, see the series of legal cases surrounding the Catholic parish closings in the wake of the clergy sex abuse scandals in the early 2000s: Catharine P. Wells, *Who Owns the Local Church? A Pressing Issue for Dioceses in Bankruptcy*, SSRN Scholarly Paper (Rochester, NY: Social Science Research Network, November 14, 2005); Janet I. Tu, "Spokane Diocese can't sell parishes, judge rules," *The Seattle Times*, July 16, 2006; Congregation of the Clergy to William Skylstad, July 16, 2006; Code of Canon Law, Chapter 2, accessed via http://www.vatican.va/archive/ENG1104/_PD.HTM. Regarding church property reverting to a wider religious community, see "The Dedham, MA Ruling," in David Parke, ed., *The Epic of Unitarianism* (Boston: Skinner House Books, 1985), 91-96; Congregation of the Clergy to William Skylstad, July 16, 2006; Code of Canon Law, Chapter 2, especially section 121 and 123, accessed via http://www.vatican.va/archive/ENG1104/_PD.HTM. In terms of courts respecting hierarchical and subordinate relationships, see the case of *Kedroff v. St. Nicholas Cathedral*, as described in Ike Mark Ellman, "Driven from the Tribunal: Judicial Resolution of Internal Church Disputes," *California Law Review* 69:5 (September 1981), 1378-1444; Stanley Forman Reed, "Opinion," *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 24 November 1952.

disputes in the U.S., deeds are almost always respected, as are hierarchies and subordinate relationships (both of which apply directly to CJI v. CSI). Considering CJI's actions in this longer span of history makes the attempt to sell the *rimonim* without consulting the wider religious community from which they originated—in this case, CSI, who was entrusted with their oversight, use, and care by the heirs at law of the original CYI congregants, and who are in fact the owners of the *rimonim*—seem highly aberrant.[228]

In sum, the entire course of dealings between CSI and CJI, as represented in the documents I have looked at, indicates that after 1903 CJI understood itself to simply be a religious entity that was permitted use of (within a specific lease agreement) the synagogue and its religious objects (appurtenances). This permission was granted by the synagogue's legal owner, Congregation Shearith Israel, whose ownership has for the past more than one hundred or so years been explicitly agreed to by Congregation Jeshuat Israel.

**Conclusion**

In conclusion, after a thorough reading of the available documents relevant to this case and after conducting my own independent investigation and research, it seems clear to me as a historian with expertise in American religious history and the history of Rhode Island that, first, there is no historical connection (culturally or genealogically) between the original (colonial-era) Congregation Yeshuat Israel and the current (1894-present) Congregation Jeshuat Israel; and, second, that the words "appurtenances" and "paraphernalia" as contained in the 1903 and 1908 indentures with leases, along with other relevant historical documents, do indeed refer very

---

[228] This is also reflected in the sentiments expressed by Maimonides, the famed twelfth century Torah scholar who decreed, "'the decorative silver and gold pomegranates that are made for a Torah scroll are considered sacred articles,' which could not be sold except to buy a Torah." David L. Barquist, *Myer Myers: Jewish Silversmith in Colonial New York* (New Haven, Conn.: Yale University Press, 2001), 154.

Fisher 65

specifically to the disputed *rimonim* and all other sacred and ritual objects necessary for a fully functioning Jewish synagogue. Additionally, my reading of these documents, along with my own independent historical investigation, has convinced me that at no time did the new (1894) CJI own the synagogue, the cemetery, or any of the ritual items that had been on loan to them from CSI from the time of the re-opening of the Touro Synagogue in 1883. All evidence points towards CSI as the owners of the synagogue, cemetery, and appurtenances (ritual items). CJI has from 1903 to the present operated self-consciously within a repeatedly acknowledged lease structure that they themselves have described as "perpetual." Property maintenance and caretaking was part of this lease arrangement and understanding; CJI was operating as managers and caretakers in keeping with their responsibilities as tenants, and often in close relationship with CSI, without such property management ever implying ownership over time or any sort of adverse possession. In short, CSI still owns the disputed *rimonim*; CJI does not. CJI's use of these ritual objects was and still is governed by the lease structure set up in 1903 and 1908, and has rightly remained in effect to this day.


**Compensation and Prior Testimony**

My compensation for this expert testimony is $275 per hour. I have never previously testified as an expert at trial or by deposition within the preceding four years.


Dated:     Chicago, Illinois
           November 24, 2014



_____

Linford D. Fisher