# EXHIBIT 31

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CONGREGATION JESHUAT ISRAEL, | : |
| Plaintiff, | : |
| v. | : C.A. No. 12-822M |
| CONGREGATION SHEARITH ISRAEL, | : |
| Defendant. | : |

## DEFENDANT CONGREGATION SHEARITH ISRAEL'S DISCLOSURE OF POTENTIAL USE OF JEWISH RELIGIOUS LAW, RITUAL, CUSTOM, OR PRACTICE

Defendant Congregation Shearith Israel (CSI) hereby gives conditional notice to Plaintiff Congregation Jeshuat Israel (CJI) that CSI reserves the right to rely on Jewish law, ritual, custom, or practice (LRCP) in connection with the resolution of CJI's claims in this action. Cf. Fed. R. Civ. P. 44.1. CSI reserves the right to object to the need or use of Jewish LRCP and further reserves the right to call one or more witnesses, including expert witnesses, and adduce other evidence in connection with Jewish LRCP.

Without limiting the issues that CSI may wish to raise in responding to CJI's claims, CSI does summarize the substance of what it currently believes it reserves the right to adduce proof on as follows:

***First***, as a matter of Jewish LRCP, CJI acted improperly in refusing to agree to permit a Beit Din, or court of Jewish law, to resolve the supposed dispute between it and CSI. It is a reality of life, and has been for thousands of years, that Jewish communities or their representatives do not always see rights and entitlements in the same way. Disputes happen. It is for that reason that a very fundamental precept of Jewish LRCP includes detailed and strict rules about how disputes are to be resolved. These are not obscure or subtle or debatable. All or

1

certainly most Orthodox Jews know that such disputes are to be resolved quickly, quietly, and effectively through a Beit Din. Every Orthodox Rabbi certainly knows this.

CJI would have been fully protected during a Beit Din process. CJI could have chosen a Rabbi of its choosing as its party-appointed member of the Beit Din. CSI would have chosen one, and then the two Rabbis would have chosen a third. Jewish LRCP has detailed and extensive procedures painstakingly designed to protect the rightful interests of litigants. The Beit Din process has been studied, fashioned, and effectively functioned within normative (Orthodox) Judaism for over 2,000 years (there is detailed discussion of the process in the Talmudic Tractate *Sanhedrein*). Access to a Beit Din signifies absolutely no disrespect to this Court. On the contrary, CJI's refusal to avail itself of that dispute resolution mechanism is disrespectful to Jewish tradition and to this Court. To the extent the law permits, the Court should consider directing the parties to obtain from a duly authorized Beit Din responses to questions of Jewish LRCP that the Court determines to be pertinent, subject to the Court's determination after receipt of such responses concerning what if anything should be done as a result.

CJI's refusal to participate in the Beit Din process is itself sufficient grounds to remove CJI from having any role in Touro Synagogue.

***Second***, based on the evidence, CSI reserves the right to prove that CSI and CJI resolved litigation brought by CJI against CSI in the early 1900s by making clear that Touro Synagogue, its cemetery, as well as all of the variously stated appurtenances, paraphernalia, and personal property were owned by CSI and were being borrowed or leased by CJI under the terms of formal written agreements. This proof too would have been sufficient in itself as a matter of Jewish LRCP to lay ownership and control of the Rimonim in CSI, or, again, at a minimum to have prompted questions and a discussion and, in the event the dispute could not be resolved, then resort to a Beit Din, as discussed above.

***Third***, the indenture with lease (1903, 1908) demonstrates that CJI as lessee undertook the express covenant and condition to "cause [the Newport Synagogue, its paraphernalia, and appurtenances] . . . to be used and occupied for the maintenance therein of the usual and stated religious services according to the ritual rites and customs of the Orthodox Spanish and Portug[u]ese Jews as at this time practiced in the Synagogue of the Congregation Shearith Israel, in the City of New York". As a matter of Jewish LRCP and otherwise, CSI would never have permitted sale of the Rimonim under the circumstances presented here – and were there a question about that, as a matter of Jewish LRCP, CJI should have approached CSI and, in the event of a remaining dispute, agreed to take the matter to a Beit Din.

***Fourth***, the indenture with lease (1903, 1908) further requires that, "before any Minister can officiate in said Synagogue, his appointment must be approved of in writing by a majority of the" CSI trustees. As a matter of Jewish LRCP, under the circumstances presented no Orthodox Rabbi would approve of such a sale, certainly not without getting CSI's approval or resolving any dispute with CSI before a Beit Din.

***Fifth***, Jewish LRCP as applicable to the issues here includes the Jewish ritual concept of ***Tashmishei Kedusha.*** Regardless of the resolution of any dispute about ownership as between CSI and CJI, CJI could not have sold the Rimonim under the circumstances presented even if it owned them, as a matter of Jewish LRCP. Contemporaneous and prior authoritative Jewish LRCP determined that rimonim are what is called *tashmishei kedusha* and hence were clearly among the appurtenances and paraphernalia of the Touro Synagogue and the Torah scrolls therein. The concept of *tashmishei kedusha* is used in reference to objects that come in contact with or are used to adorn and honor sacred objects in Jewish ritual, in this case, the Torah. Rimonim are without question *tashmishei kedusha*. Jewish legal literature makes a number of references to silver adorning sacred ritual objects, including Maimonides from the 12th Century

3

and the normative compilation of Jewish law by leading Sephardic and Ashkenazic Rabbis of the last 600 years, Rabbi Joseph Caro and Rabbi Moses Isserlis, in their seminal work, the *Shulhan Arukh*.

As *tashmishei kedusha*, the Rimonim could not be sold under basic Jewish LRCP under the circumstances presented here. There are very few exceptions to the principle that *tashmishei kedusha* cannot be sold, and none of those exceptions was remotely applicable here. Possible exceptions were recognized by Jewish law dating from the Mishnaic and Talmudic period, or between 200 and 600 C.E. (delineated in Tractate *Megilla*), and continue to be authoritative today. Those exceptions require that the *tashmishei kedusha* be sold only for the purchase of something of greater ritual holiness, such as a Torah; and *tashmishei kedusha* could be sold under certain circumstances if by doing so it would enable orphans to marry. Exceptions such as these are not vague categories of exceptions; they are inapplicable here. Those determining Jewish law today do not have leeway to create their own exceptions. Under the circumstances presented by CJI, it would have violated Jewish LRCP were CJI to have sold the Rimonim.

***Sixth***, as a matter of Jewish LRCP, a person or institution cannot sell what he or it does not own. That one cannot sell what he or she does not own is a fundamental precept of Biblical law, which has proven to be one of the foundations of Western law. Furthermore, under the circumstances presented by CJI, sale of the Rimonim would have violated relevant Jewish LRCP insofar as and to the extent that a sale would have violated any of the pertinent documents or legal instruments between or governing the parties, including the indenture with leases, the federal government agreement, etc.

***Seventh***, even if CJI owned the Rimonim, and it does not, CJI did not present any justification for selling the Rimonim under Jewish LRCP. Even if CJI owned the Rimonim and had argued that financial needs justified their sale, financial needs such as those claimed are

4

wholly insufficient to justify selling the Rimonim for failure to fit within the narrow and limited exceptions described above *and* because CSI was willing to address CJI's financial condition. Most Orthodox Jewish congregations of which I am aware face fiscal challenges. None that CSI is aware of has taken to selling ritual objects. Moreover, prior to CJI's suing CSI, CSI made offered to CJI of help as a way to avoid this dispute altogether. The economics of CSI's proposal were that CSI or various of its members or trustees would commit to provide up to $75,000 a year to Touro for 10 years. However, CJI rejected the economic proposal. A synagogue's budget deficit is not a permissible reason to sell Tashmishei Kedusha, especially when other congregations offer financial support. Sale of the Rimonim for a purpose such as removing the burden of periodic fundraising to maintain CJI in a particular financial condition or for paying off a debt of CJI, especially one unrelated to the fundamental religious purposes of the Touro Synagogue, would have contravened Jewish LRCP as well.

*Eighth*, CJI has taken a number of incorrect positions. These include references to the great Jewish thinker and legal decisor Maimonides (known in Hebrew by the acronym of his name, Rambam). CJI asserts, for example, that "there's a lot of Rambam that we don't follow today" (Dep. of Zachary S. Edinger, May 1, 2014, p. 102), and CJI has raised questions about Maimonides's views of women and certain minorities (*id.*, p. 103). CJI's questions and assertions are wrong and misleading as a matter of Jewish LRCP. Moses Maimonides, or the Rambam, lived in the 11-12th Centuries and is a venerated giant of Jewish law and scholarship. He wrote in a variety of contexts: He wrote seminal works of Jewish law. He also wrote on philosophical, scientific, medical, and other subjects as well. Not all of his writings have the same authoritative, normative value; indeed, even within his monumental work on Jewish law he has certain non-normative discussions. Students of Maimonides, and of the myriad commentators on Maimonides in the eight centuries since his death, including any Orthodox

5

Rabbi, would know that as well. Certain Maimonidean writings never had normative value, whereas Maimonides' legal writings on Jewish prayer and synagogue ritual are as normative today as they ever were. For example, Maimonides' view of Aristotelian metaphysics was never taken to be doctrinal or normative Jewish law; his views on *Tashmishei Kedusha,* on the other hand, are considered by Jewish religious decisors to be as normative today as they ever were. On subjects of normative Jewish law, normative Orthodoxy, including that practiced by CSI, follows Maimonides relating to the issues relevant here, including rules in or about communal worship and practices. Indeed, Maimonides's legal framework and rules on these subjects echoes those of the Talmud, and the views of Maimonides himself were echoed in the seminal Jewish legal codification, the *Shulchan Aruch*, described above.

CSI reserves the right to adduce or not adduce this proof, or to adduce or not adduce any other proof, in response to CJI's claims and proof.

CONGREGATION SHEARITH ISRAEL,

By its Attorneys,
/s/ Deming E. Sherman
Deming E. Sherman (#1138)
EDWARDS WILDMAN PALMER LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611
E-mail: dsherman@edwardswildman.com

/s/ Louis M. Solomon
Louis M. Solomon (Admitted Pro Hac Vice)
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
Tel.: 1 (212) 504-6600
Fax: 1 (212) 504-6666
E-mail: Louis.Solomon@cwt.com

November 26, 2014