# EXHIBIT 41

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

CONGREGATION JESHUAT ISRAEL,

        Plaintiff

v.                                 C.A. NO. 12-822-M

CONGREGATION SHEARITH ISRAEL.

        Defendant

## PLAINTIFF CONGREGATION JESHUAT ISRAEL'S OBJECTIONS AND ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

        Pursuant to Fed.R.Civ. P. 33, Plaintiff Congregation Jeshuat Israel ("CJI" or "Plaintiff") hereby submits its objections and answers to Defendant Congregation Shearith Israel's ("CSI" or "Defendant") First Set of Interrogatories.

### General Objections

1. CJI objects in whole or in part to each and every interrogatory to the extent that it calls for disclosure of information from persons or entities other than CJI including, but not limited to, Touro Synagogue Foundation and the Touro National Heritage Trust.

2. CJI objects in whole or in part to each and every interrogatory to the extent that it is vague, ambiguous or of uncertain meaning. CJI further objects in whole or in part to each and every interrogatory to the extent that it does not identify documents, subjects and time-frames with sufficient particularity to permit a reasonable response.

3. CJI objects in whole or in part to each and every interrogatory to the extent that it purports to require CJI to provide information or documents not in its possession, custody, or control.

4. CJI objects in whole or in part to each and every interrogatory to the extent that it is neither relevant to any party's claim or defense, nor relevant to the subject matter of the instant litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

5. CJI objects in whole or in part to each and every interrogatory to the extent that it is overly broad, oppressive, unduly burdensome, expensive or beyond the permissible scope of discovery under Rule 26 of the Federal Rules of Civil Procedure.

6. CJI objects in whole or in part to each and every interrogatory to the extent that it is not subject to reasonable limitation in time or scope.

7. CJI objects in whole or in part to each and every interrogatory to the extent that it purports to require CJI to produce information in a manner inconsistent with or beyond the scope of the Federal Rules of Civil Procedure.

8. CJI objects in whole or in part to each and every interrogatory to the extent that it purports to require disclosure of information or documents, or otherwise requests information or documents, obtained or prepared for, or in anticipation of litigation or for trial, constitutes attorney work product, is made confidential by law, reveals the substance of communications protected from disclosure by the attorney/client privilege,

or is otherwise privileged from disclosure, pursuant to the Federal Rules of Civil Procedure or the laws of the State of Rhode Island. Any inadvertent production of such documents or disclosure of such information shall not be deemed a waiver of any confidence, privilege or the work product doctrine.

9. CJI objects in whole or in part to each and every interrogatory to the extent that it seeks information or documents that contain confidential or proprietary business information, trade secrets, or other proprietary information, intellectual property and/or commercially sensitive information of CJI or to the extent it seeks information or documents that contain confidential information which would impinge on the constitutionally protected right of privacy of individuals. Any inadvertent production of such documents or disclosure of such information shall not be deemed a waiver of any confidence or privilege. Confidential information will be produced pursuant to the Stipulation for the Production and Exchange of Confidential Information entered into by the parties on October 23, 2013.

10. CJI objects in whole or in part to each and every interrogatory to the extent that it is unreasonably cumulative or duplicative or seeks information already known to Defendant.

11. CJI objects in whole or in part to each and every interrogatory to the extent that it seeks disclosure of information that is obtainable by

Defendant from some other source that is more convenient, less burdensome or less expensive.

12. CJI objects in whole or in part to each and every interrogatory to the extent that the information sought is already in the public domain, is a matter of public record, or is in the possession of Defendant.

13. CJI objects in whole or in part to each and every interrogatory to the extent that it assumes facts not in evidence.

14. CJI objects in whole or in part to each and every interrogatory to the extent that it seeks to vary the obligations imposed upon CJI under the Federal Rules of Civil Procedure.

15. CJI objects in whole or in part to each and every interrogatory to the extent it improperly seeks to elicit legal conclusions, or to have CJI characterize documents or their contents.

16. CJI objects in whole or in part to each and every interrogatory to the extent that it is compound and cannot reasonably be responded to.

17. In responding to each interrogatory, CJI does not concede the relevancy, materiality, or admissibility of the response. CJI's response to each interrogatory is made subject to, and without waiving or intending to waive, any objection to the competency, relevancy, materiality, privilege or admissibility as evidence for any purpose of any of the responses given herein.

18. CJI objects in whole or in part to each and every interrogatory to the extent that the burden or expense of responding to the interrogatory

outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

19. CJI reserves all objections as to the admissibility at trial of any information provided. All information provided by CJI is for use in this litigation only and for no other purpose.

20. CJI's investigation and discovery in this matter is ongoing. Any responses to the interrogatories are made to the best of CJI's knowledge, and are given without prejudice to its right to amend, supplement and/or clarify its responses, if necessary, in accordance with the Federal Rules of Civil Procedure and the local rules of this Court. CJI expressly reserves the right to amend, supplement and/or clarify its responses to any and all of Defendant's interrogatories.

21. These general objections will be deemed to be continuing throughout the responses that follow, whether or not expressly referred to herein. The stating of additional or other specific objections below shall not constitute a waiver of these general objections. CJI's objections to Defendant's interrogatories are made without waiver of, or prejudice to, any additional objections CJI may make.

22. All subject objections are hereby expressly preserved, as is the right to move for a protective order.

## **Specific Objections and Answers**

INTERROGATORY NO. 1:

Identify and describe the "Jewish community in the City of Newport" as set forth on page 1 of the Complaint.

RESPONSE TO INTERROGATORY NO. 1:

As used in the Complaint, the "Jewish Community in the City of Newport" is meant to be synonymous with the "Jewish Society in Newport," the phrase which describes the beneficiary of the trust which holds the synagogue and land on Touro Street in the City of Newport. That phrase was originally used in the Will of Jacob Rodrigues Rivera, dated June 9, 1787 (Newport Probate Records, Vol. 2, P. 98). This description of the beneficiary was also incorporated in the Memorandum of Agreement, dated November 7, 1945, among the Department of the Interior, the Trustees, and Congregation Jeshuat Israel.

INTERROGATORY NO. 2:

State whether CJI represents the interests of the "Jewish community in the City of Newport" and, if so, the basis for that representation.

RESPONSE TO INTERROGATORY NO. 2:

CJI represents the interests of the "Jewish Community in the City of Newport" and is the beneficiary of the trust in question. This fact has been recognized for well over 100 years by the State of Rhode Island and the City of Newport, who respectively administer the trusts created under the Will of Abraham Touro and the Will of Judah Touro. CJI has been the sole recipient of the trust funds for the purpose of supporting the Touro Synagogue. In addition, the Rhode Island General Assembly, in the Public Laws of 1932, recognized that the property is held "in trust for the benefit of the Congregation Jeshuat Israel." Moreover, CSI, by not

interfering with CJI's possession of the Touro Synagogue and its contents in over 110 years, has effectively recognized CJI as the rightful beneficiary.

INTERROGATORY NO. 3:

State all facts in support of CJI's allegation that CSI should be removed "as Trustee of the synagogue and land in Newport" as set forth on page 1 of the Complaint.

RESPONSE TO INTERROGATORY NO. 3:

Objection. CJI objects to the form of the interrogatory, which seeks "all" facts on the grounds that it is overly broad and unduly burdensome.

Answer. Without waiving the objection, CJI states that one of the foremost duties of a trustee is the duty of utmost loyalty to the beneficiary. CSI's interference with CJI's efforts to sell one of the two sets of Myer Myers rimonim in order to create an adequate endowment to assure the preservation of the synagogue as a place of public worship forever clearly breaches that duty and is fundamentally inconsistent with the purposes of the trust. Moreover, CSI's attempts to profit from the potential lease of the rimonim constitute violations of its duty of utmost loyalty. What is more, CSI breached its duties as trustee when it failed to assist CJI in the renovation and maintenance of the synagogue or to provide any material support over the years. CSI has utterly ignored its obligations to act in the best interests of the beneficiary, the Jewish Society in Newport, and has instead acted in its own self interest.

INTERROGATORY NO. 4:

State all facts relating to the purported revision of CJI's 1894 by-laws at all times, including any revisions in 1994, and, in particular, state whether CSI consented to such revisions, and if so, when.

7

RESPONSE TO INTERROGATORY NO. 4:

  Objection. CJI objects to the form of the interrogatory, asking for "all" facts on the grounds that it is overly broad and unduly burdensome.

  Answer. CJI's bylaws have been amended many times, including significant revisions occurring in 1945, 1959, 1983 and 1994. The details of these amendments are included in the minutes of the Board of Trustees of CJI and in the archived records of committees charged with considering amendments to the bylaws, all of which will be produced for inspection by CSI, pursuant to CJI's responses to CSI's First Request for Production of Documents. Importantly, the bylaws of CJI adopted January 28, 1945 eliminated the requirement that the four trustees, which CSI had the right to appoint, vote affirmatively for amendments affecting the status of those trustees. The 1945 bylaws retained CSI's ability to appoint four trustees but removed their ability to vote by proxy. These amendments were done contemporaneously with the negotiations with the Department of the Interior which led to the designation of Touro Synagogue as a national historic shrine. It is apparent that CSI must have been aware of these bylaw changes in 1945.

  A review of the congregational minutes manifests the fact that no CSI appointed trustee attended CJI trustee meetings for many years prior to the 1945 amendments and no attempt was made to vote by proxy. In addition, no CSI appointed trustees attended meetings subsequent to the adoption of the 1945 bylaws, which required them to participate in person and without proxy. Indeed, as Edgar J. Nathan III, the President of CSI, wrote on December 13, 1979, "for so long as I can remember, [CJI] has always had fully autonomy … [and] complete control of its destiny."

8

INTERROGATORY NO. 5:

State all facts in support of CJI's allegation that it is both the owner and possessor of the Rimonim.

RESPONSE TO INTERROGATORY NO. 5:

Objection. CJI objects to the form of the interrogatory, which requests "all" facts on the grounds that it is overly broad and unduly burdensome.

Answer. Without waiving its objections, CJI states as follows:

Sometime between the late 1760s or early 1770s, the Jewish silversmith Myer Myers of New York created two sets of rimonim, which were eventually gifted to the Newport congregation, CJI. During the American Revolution, the British occupied Newport, blockaded the harbor, and devastated the local economy. The impact was particularly hard on the Jewish merchant families residing in Newport. Over time, the number of Jewish residents in Newport diminished and, by 1822, the last of the original Jewish residents left. The synagogue, cemetery and ritual items were left in the care of Stephen Gould, a Quaker from Newport. The empty synagogue in Newport eventually fell into disuse, but there was money available to preserve the building and its furnishings. Abraham Touro died in 1822 and left $10,000 to the State of Rhode Island in trust for the support of the synagogue. In 1854 his brother, Judah Touro, died and left another $10,000 in trust with the Town Council of Newport. The proceeds from these trust funds, administered by the State of Rhode Island and the municipality of Newport, is what saved and preserved Touro Synagogue and its contents. It is notable that neither of the Touros appointed CSI as trustee, nor mentioned CSI at all in connection with the trust funds.

In 1818 Benjamin Seixas, a member of the Newport Congregation, transferred for safekeeping two of the sacred Torah scrolls to CSI. Thereafter, in or about 1833, two other

Torah scrolls apparently were deposited for safekeeping in New York with CSI. It is likely that the rimonim were brought to New York for safekeeping during this period, although there is no documentation evidencing the bailment.

In about 1880, Jews from Eastern Europe began to settle permanently in Newport. In September 1881, Morris Rosen and others petitioned the Newport City Council to have the synagogue opened for worship. CSI initially opposed this petition, but eventually the Touro Synagogue was officially re-consecrated in May, 1883. The Torah scrolls, rimonim and other personal property were returned to Newport by CSI around that time. For the last 130 years, the rimonim have been in the exclusive possession of CJI, at a minimum creating a presumption of ownership. During that time, CJI has exclusively and at its own cost, maintained, restored and insured the rimonim. Upon information and belief, CSI never insured the rimonim and never asked to be added as an additional insured with respect to the rimonim. Upon information and belief, CSI has failed to manifest any indicia of ownership of the rimonim in over 100 years.

INTERROGATORY NO. 6:

State all facts in support of CJI's allegations that "[f]or the last 130 years, the Rimonim have been in the exclusive possession of Touro" as set forth in paragraph 14 of the Complaint.

RESPONSE TO INTERROGATORY NO. 6:

Objection. CJI objects to the form of the interrogatory, which seeks "all" facts on the grounds that it is overly broad and unduly burdensome.

Answer. CJI has had possession and control of the rimonim for over 130 years. CJI occasionally loaned the rimonim to museums such as the Yale University Art Museum, the Library of Congress, and the Boston Museum of Fine Arts. CJI never sought CSI's permission

10

or approval to lend the rimonim for display and, despite knowing of the loans, CSI never objected nor asserted a claim of ownership.

INTERROGATORY NO. 7:

State whether since 1903 the exclusive form of worship at the Touro synagogue has been the "Sephardic Rites as practiced by the New York Congregation in New York" as set forth in paragraph 10 of the Complaint, and if not, state the other rites and rituals conducted by CJI at the Touro Synagogue and when.

RESPONSE TO INTERROGATORY NO. 7:

Objection. CJI objects to this interrogatory on the grounds that: (i) the term "Sephardic Rites as practiced by the New York Congregation in New York" is vague, ambiguous, unclear, and not capable of being adjudicated; (ii) adjudication of whether Touro Synagogue has followed "Sephardic Rites as practiced by the New York Congregation in New York" is barred by the Establishment Clause of the U.S. Constitution; (iii) to the extent that any such requirement exists, it is unenforceable as contrary to public policy; and (iv) paragraph 10 of CJI's complaint does not "set forth" or otherwise mention "Sephardic Rites as practiced by the New York Congregation in New York."

Answer. Subject to its objections, CJI states that the congregation has always been conducted pursuant to the rules and laws of the Orthodox Jewish faith and continuously has used a siddur which includes a Sephardic nusach. Upon information and belief, at no time since 1903 has CSI complained about the rites and rituals conducted by CJI at the Touro Synagogue.

INTERROGATORY NO. 8:

State and describe any and all Rabbis that CJI has engaged by name and date, and for each describe whether CJI has engaged the consent of CSI and, if so, the discussions surrounding the consent and when.

RESPONSE TO INTERROGATORY NO. 8:

The answer to this interrogatory may be determined by examining the minutes of CJI's trustee meetings since 1893. These minutes (except for certain years which have been lost for years) are located in CJI's archives in Newport, and CJI will give CSI reasonable opportunity to examine and to make copies, compilations, abstracts or summaries of these minutes. Since the burden of deriving or ascertaining the answer will be substantially the same for CSI as for CJI, CJI hereby exercises its option, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, to produce the minutes for inspection and, to the extent they are relevant, for copying.

INTERROGATORY NO. 9:

State the purpose of the Touro Synagogue Foundation and the Jewish Heritage Trust and the relationship between them and CSI.

RESPONSE TO INTERROGATORY NO. 9:

Upon information and belief, Touro Synagogue Foundation, formerly known as the Society of Friends of Touro Synagogue, was founded contemporaneously with the designation of Touro Synagogue as a National Historic Site. The Touro Synagogue Foundation is a 501(c)(3) not-for-profit, non-sectarian organization dedicated to maintaining and preserving Touro Synagogue, the Colonial Jewish Cemetary, Patriots Park, and to promoting and teaching religious diversity, Colonial Jewish history and the history of Touro Synagogue. The Foundation operates public programs in partnership with the National Park Service, the National Trust for Historic Preservation, and is project of Save America's Treasures.

The Society of Friends of Touro Synagogue, National Historic Shrine, Inc., was incorporated as a Rhode Island non-business corporation on or about February 26, 1948, in order to assist in the maintenance and upkeep of the Touro Synagogue, provide tours and sponsor the annual observance of a reading of the George Washington letter. It changed its name to Touro Synagogue Foundation in September, 2003.

CJI is unfamiliar with any organization known as the "Jewish Heritage Trust." It is familiar with a former organization known as the "Touro National Heritage Trust." That organization, started in or about 1986, was originally known as the Touro Synagogue Endowment, Inc. Besides raising endowment funds, the organization was intended to develop a major national center for the study of the early Jewish experience in America, including the origins and development of religious freedom. The trust sponsored a Touro National Heritage Trust Fellowship at the John Carter Brown Library at Brown University. Upon information and belief, the Touro National Heritage Trust has been largely inactive since approximately 1996.

CJI is not aware of the relationship if any between these entities and CSI.

INTERROGATORY NO. 10:

State whether the Touro Synagogue Foundation has raised funds for restoration and maintenance of the Touro Synagogue or any real property therein, and if so, in what amounts and when.

RESPONSE TO INTERROGATORY NO. 10:

Objection. CJI objects to this interrogatory to the extent that it calls for disclosure of information from Touro Synagogue Foundation, a separate legal entity.

Answer. Without waiving its objection, CJI responds that it believes that Touro Synagogue Foundation has raised funds for restoration and maintenance of Touro Synagogue.

The details concerning this fund raising would be in the records of the Foundation, a separate legal entity from CJI.

INTERROGATORY NO. 11:

State whether CJI has expended monies for the restoration and maintenance of the Touro Synagogue, including any real property therein, and if so, in what amounts and when, excluding any funds provided by John Loeb Jr., the Ambassador John Loeb Jr. Visitors' Center, the George Washington Institute for Religious Freedom and/or the Touro Synagogue Foundation.

RESPONSE TO INTERROGATORY NO. 11:

Yes. The details concerning these expenditures are contained in the minutes of congregation and its trustees, which are located in the congregation's archives in Newport, Rhode Island. The specific answer to this interrogatory may be determined by examining these business records. CJI shall provide CSI a reasonable opportunity to examine these records and to make copies, compilations, abstracts, or summaries thereof. Since the burden of deriving or ascertaining the answer is substantially the same for CSI as for CJI, CJI hereby exercises its option to produce the records pursuant to Rule 33(d) of the Federal Rules of Civil Procedure.

INTERROGATORY NO. 12:

State all facts in support of the allegation in paragraph 19 of the Complaint that CSI was aware of the display of the Rimonim at Yale University in 2002 and "did not object" to the credit of ownership to CJI.

RESPONSE TO INTERROGATORY NO. 12:

Objection. CJI objects to the form of the interrogatory, which requests "all" facts on the grounds that it is overly broad and unduly burdensome.

Answer. Without waiving its objection, CJI states that the rimonim were on display at Yale University Art Gallery in conjunction with the exhibition entitled "Myer Myers: Jewish Silversmith in Colonial New York," held on September 14 through December 30, 2001. CSI's almost identical set of Myer Myers rimonim were also on display at Yale. There were numerous receptions, and trustees and congregants of CSI are known to have attended the exhibition. Thereafter, the exhibition became the subject of a book entitled, "Myer Myers: Jewish Silversmith in Colonial New York," by David L. Barquist, published by Yale University Press. Both the exhibition and the book described the provenance of the rimonim at issue as belonging to CJI, probably earlier than 1780, and identifies the current owner as Congregation Jeshuat Israel, Newport, Rhode Island. Similarly, CSI's Torah finials were identified as belonging to that congregation.

Upon information and belief, CSI never communicated any disagreement with the description of the provenance of the rimonim.

INTERROGATORY NO. 13:

State all facts relating to the proposed sale of the Rimonim to the Boston Museum of Fine Arts, and/or any other attempts to sell or lease the Rimonim and when.

RESPONSE TO INTERROGATORY NO. 13:

Objection. CJI objects to the form of the interrogatory, which requests "all" facts on the grounds that it is overly broad and unduly burdensome.

15

<u>Answer</u>. Without waiving its objection, CJI states that, at a meeting of the congregation held on October 19, 2008, CJI passed a resolution authorizing the formation of a committee to investigate the possible sale or disposition of any synagogue assets to raise funds for the endowment of the congregation. A member of that committee, Andrew B. Segal, approached Christie's and Sotheby's concerning the possible sale of one of the two sets of Myer Myers rimonim. In the summer of 2009, both Christie's and Sotheby's presented proposals to CJI to act as exclusive agent to offer the rimonim for private sale. Christie's was ultimately selected and Christie's proceeded to facilitate a loan of the rimonim to the Museum of Fine Arts, Boston ("MFA") for the inaugural installation of the MFA's new Art of the Americas wing. On or about October 2, 2009, CJI entered into an agreement appointing Christie's as its agent to sell the property privately for an amount which results in net proceeds no less than $11,500,000. One set of the rimonim went on display at the MFA in November, 2010 and remain there to this day.

In April 2011, the MFA communicated an offer to Christie's of its desire to purchase the rimonim at proposed price of $5,000,000. Negotiations ensued and, by late January, 2012, CJI authorized Christie's to propose a sale to the MFA at a price of $7,000,000 net, with the Museum paying Christie's commission of $400,000 for a total sale price of $7,400,000. Thereafter, the MFA extended an offer to purchase the rimonim at the price set by CJI. A special congregation meeting of CJI was set for June 25, 2012 to discuss and vote on the resolution to sell the rimonim to the MFA.

After long reflection and discussion, CJI decided to sell the rimonim in order to secure the financial future of the Congregation and ensure that the synagogue and grounds are properly maintained and the synagogue will always be open for services and have a Rabbi in

residence.  In addition, the sale offered the public as well as the Jewish community in Newport

the ability to see the rimonim showcased as symbols of Newport's Jewish Community's role in

the founding of America and the establishment of religious freedom.  It was CJI's intention that

the entire net proceeds from the sale be put into an irrevocable endowment fund from which only

interest could be drawn.

The MFA's offer to purchase the rimonim has been withdrawn pending the

outcome of this litigation.

INTERROGATORY NO. 14:

Identify any witnesses whom you intend to call to testify at the trial or arbitration

of this action, including the name, address and telephone number of each such witness.

RESPONSE TO INTERROGATORY NO. 14:

Since discovery has just begun, CJI has not identified who may be called to testify

at trial.  CJI will~~shall~~ supplement this answer at the appropriate time.

INTERROGATORY NO. 15:

Identify all documents that you intend to offer in evidence at the trial or

arbitration of this action.

RESPONSE TO INTERROGATORY NO. 15:

Since discovery has just begun, CJI has not identified which documents would be

offered in evidence at trial.  CJI will ~~seasonably~~ supplement this answer at the appropriate time.

INTERROGATORY NO. 16:

Identify the person(s) most knowledgeable concerning the relationship and course

of dealing between the parties.

RESPONSE TO INTERROGATORY NO. 16:

17

Objection. CJI objects to identifying the "person(s) most knowledgeable" as beyond the requirements of Rule 30(b)(6) of the Federal Rules of Civil Procedure.

Answer. Without waiving its objection, CJI believes that Ms. Bea Schlessinger Ross, Co-President of CJI, and David Bazarsky, former President of CJI, have knowledge concerning the relationship and course of dealing between the parties.

INTERROGATORY NO. 17:

Identify the person(s) most knowledgeable concerning the ownership, use, possession, control, and maintenance of the Touro Synagogue Building.

RESPONSE TO INTERROGATORY NO. 17:

Objection. CJI objects to identifying the "person(s) most knowledgeable" as beyond the requirements of Rule 30(b)(6) of the Federal Rules of Civil Procedure.

Answer. Without waiving its objection, CJI believes that Ms. Bea Schlessinger Ross, Co-President of CJI, and David Bazarsky, former President of CJI, have knowledge concerning the relationship and course of dealing between the parties.

INTERROGATORY NO. 18:

Identify the person(s) most knowledgeable concerning the ownership, use, possession, control, and maintenance of Rimonim that are or have ever been located in Newport, Rhode Island.

RESPONSE TO INTERROGATORY NO. 18:

Objection. CJI objects to identifying the "person(s) most knowledgeable" as beyond the requirements of Rule 30(b)(6) of the Federal Rules of Civil Procedure.

18

<u>Answer</u>.  Without waiving its objection, CJI believes that Ms. Bea Schlessinger Ross, Co-President of CJI, and David Bazarsky, former President of CJI, have knowledge concerning the relationship and course of dealing between the parties.

CONGREGATION JESHUAT ISRAEL,

_(signature)_

Bea Schlessinger Ross, Co-President

STATE OF RHODE ISLAND
COUNTY OF _Newport_

On this _31st_ day of _October_ , 2013 before me, the undersigned notary public personally appeared Bea Schlessinger Ross, as Co-President of Congregation Jeshuat Israel, a non-profit organization, personally known to the notary or proved to the notary through satisfactory evidence of identification, which was _known_ to be the person whose name is signed on the preceding or attached document, and acknowledged to the notary that he/she signed it voluntarily for its stated purpose.

_(signature)_
Notary Public
Print Name: _Steven E Snow_
My Commission Expires: _6/30/14_
Notary Identification Number: _____

19

As to Objections:

CONGREGATION JESHUAT ISRAEL,

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

_____
Steven E. Snow (#1774)
40 Westminster Street, Suite 1100
Providence, RI  02903
(401) 861-8200 / (401) 861-8210 FAX
ses@psh.com

KRAMER LEVIN NAFTALIS & FRANKEL LLP

_____
Gary P. Naftalis (admitted *pro hac vice*)
Jonathan M. Wagner (admitted *pro hac vice*)
Tobias B. Jacoby (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, NY  10036
(212) 715-9100 / (212) 715-9238 FAX
gnaftalis@kramerlevin.com
jwagner@kramerlevin.com
tjacoby@kramerlevin.com

DATED:  October 31, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of October, 2013, I caused a true copy of the

within document to be mailed to all counsel of record:

| Deming E. Sherman, Esq. | Louis M. Solomon, Esq. |
| Krystle S. Guillory, Esq. | Cadwalader, Wickershawm & Taft LLP |
| Edwards Wildman Palmer LLP | One World Financial Center |
| 2800 Financial Plaza | New York, NY  10281 |
| Providence, RI  02903 | |

_____

1906175_1/7804-2