# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

CONGREGATION JESHUAT ISRAEL,

               Plaintiff,

v.                                            C.A. NO. 12-822-M (LDA)

CONGREGATION SHEARITH ISRAEL,

               Defendant.

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTIONS TO EXCLUDE THE PROPOSED EXPERT TESTIMONY
OF PROF. LINFORD FISHER AND DR. VIVIAN MANN**

## **Preliminary Statement**

Plaintiff Congregation Jeshuat Israel ("Touro") respectfully submits this reply memorandum in support of its Motions to Exclude the Proposed Expert Testimony of Professor Linford Fisher and Dr. Vivian Mann.

CSI mischaracterizes Touro's position.  Touro does not maintain that historians are always improper expert witnesses.  However, the very cases cited by CSI recognize that expert testimony is admissible only if it assists – and only if it does not supplant or usurp – the Court or the trier of fact.  Historical experts may under limited circumstances provide context or background, but they may not (i) construct a narrative of the operative facts from discovery materials or otherwise, (ii) provide legal analysis and conclusions, or (iii) offer opinion testimony concerning the subjective state of mind or intent of the parties.

The proposed CSI expert testimony violates each of these bedrock principles.  Although CSI tries to cloak the opinions in question under the mantle of "context" and "background," Prof. Fisher and Dr. Mann repeatedly and impermissibly (i) draw factual conclusions based on a review of a selective portion of the discovery record, (ii) offer legal conclusions concerning ownership rights, contract formation and modification, adverse possession, the existence and nature of any trust relationship between the parties, and other legal issues, and (iii) purport to divine the intent, concerns, knowledge and understanding of actors who died long ago.

For these and other reasons described below and in Touro's Opening Briefs, the Court should grant Touro's motions, allow the parties to present the evidence unvarnished by any expert spin, and let the chips fall where they may.

<u>**Argument**</u>

**I.    CSI'S EXPERTS SEEK TO IMPROPERLY USURP<br><u>THE ROLE OF THE COURT AND TRIER OF FACT</u>**

Under Fed. R. Evid. 702, expert testimony must assist, but not supplant or usurp, the Court and the trier of fact.  From this general principle come specific applications:  experts may not (i) supplant the trier of fact by constructing a narrative from the case record, (ii) usurp the Court by offering legal analysis and conclusions, and (iii) encroach upon the exclusive province of the fact-finder by opining on a party's state of mind or intent.  (Touro Fisher Br. 9-19).  *See generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  The proposed testimony of Prof. Fisher and Dr. Mann contravenes these rules.

**A.    CSI's experts present CSI's narrative based on discovery material,<br><u>usurping the role of the trier of fact</u>**

What is the nature of the exercise performed by CSI experts?  Despite the dust kicked up by CSI in its opposition, any reading of their reports leaves no doubt.  They reviewed some of the documents produced by the parties.  They interpreted those documents.  They made credibility determinations.  And they drew factual conclusions.  Prof. Fisher and Dr. Mann acknowledged at their depositions that they undertook this precise exercise.  (Fisher Tr. 123, 136-38; Mann Tr. 55, 78; *see also* Mann Tr. 241: "I built a case for the ownership by CSI.").

As Touro demonstrated in its Opening Briefs, federal courts consistently hold that an expert improperly usurps the role of the fact-finder (and counsel) by simply arguing a client's case based on the discovery record.  (Touro Fisher Br. 10-12; Touro Mann Br. 8-10).  *See also Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003) ("the expert's role is not to be an advocate").  Constructing a narrative in this fashion is an exercise well within the ken of both the lawyers and the finder of fact – particularly since the documents in question are non-technical, non-scientific, and virtually all written in English.

In response, CSI claims that courts "routinely use historians as experts to analyze historical documents, weigh historical evidence, and draw historical conclusions in a variety of contexts." (CSI Fisher Br. 16; CSI Mann Br. 9). But the cases cited by CSI undercut its position, and highlight the proper role of a historical expert witness:  to provide helpful background or context otherwise unavailable to the trier of fact – a far cry from the advocacy exercise performed by CSI's experts here.

For example, in *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 181 (1999), the expert testimony merely provided "historical context." (CSI Fisher Br. 16). In *Cayuga Indian Nation of N.Y. v. Pataki*, 165 F. Supp. 2d 266, 300 (N.D.N.Y. 2001), *rev'd on other grounds*, 413 F.3d 266 (2d Cir. 2005), the experts gave "historical backdrop." (CSI Fisher Br. 16). In *United States v. Kantengwa*, 2012 WL 4591891, at *3 (D. Mass. Oct. 3, 2012) (CSI Fisher Br. 16), the expert explained the "association between a roadblock and the program of mass genocide" when it was "not evident or likely that the typical juror (or judge) would recognize" that association. *Kantengwa*, 2012 WL 4591891, at *3 (denying motion for acquittal or new trial by Rwandan immigrant convicted of lying about involvement in genocidal conflict). In *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 948 (N.D. Ill. 2010) (CSI Fisher Br. 16-17), a historian testified concerning "policies, practices or customs of the Chicago Police Department" around the time of alleged Section 1983 violations; the expert did not testify to the factual events underlying plaintiff's Section 1983 claim. And there was no *Daubert* motion at issue in *N.J. v. N.Y.*, 1997 WL 291594, at *10, *14 (U.S. Mar. 31, 1997), *exceptions overruled in part and sustained in part*, 523 U.S. 767 (1998) (CSI Fisher Br. 16) – a report by a special master (and not a decision by the Supreme Court) which did not make clear precisely what the experts had done.

Against this backdrop, the fact-finding task undertaken by CSI's experts is fundamentally and legally flawed. No amount of smoke generated by CSI in its opposition can obscure this point. *GST Telecoms, Inc. v. Irwin*, 192 F.R.D. 109, 110 (S.D.N.Y. 2000) (excluding experts who among other things offered "personal assessments of the credibility of the situations involved").

1.     *Prof. Fisher*

In his declaration filed as part of CSI's opposition to Touro's motion, Prof. Fisher describes the nature of his exercise:

> In doing my duty, I relied on my training as a historian and did what I always do – search widely for evidence, reconstruct events into a coherent narrative that is true to the reliable evidence, and make determinations based on the evidence at hand.

(Fisher decl. ¶ 1). Prof. Fisher claims that this fact-finding undertaking is helpful because he provides "a larger understanding of the past, and of this time period, especially the context in which the key documents were written and agreed upon." (Fisher decl. ¶ 8). While it may be appropriate in limited circumstances be appropriate for an expert historian to provide historical context or backdrop, *see, e.g.*, *Mille Lacs*, 526 U.S. at 181, Prof. Fisher's report and opinions go far beyond providing background, and are based not on independent research or historical background he has uncovered, but rather almost entirely on selected documents produced in discovery. For example, the heart of his report claims that Touro has never been recognized as the owner of the Rimonim and that "at almost every point along the way (especially after 1894), CSI is recognized as having sole legal claim to the [Touro synagogue] and ritual objects." (Fisher Report at 51). But he cites only a single primary source related to the parties, synagogues in general, or even American Jewish history that is not discovery material produced

in the litigation.  (*Id.* at 51-64).[1]  Of the forty-five footnotes in this section, just four rely on non-discovery material.  (Fisher Report at 51-64; *see also* Fisher Report at 26-30 (relying solely on discovery material)).  Tellingly, even Prof. Fisher's "Historical Background and Context" relies for the most part on documents produced by the parties.  (Fisher Report at 4-12).[2]

In his declaration, Prof. Fisher poses a rhetorical question: "[T]here are thousands of documents.  Isn't the Court entitled to have someone go through them and identify the salient ones?"  (Fisher decl. ¶ 8).  The answer is "Yes."  But unless the Court were to ignore settled standards under *Daubert* and open the floodgates, that person is counsel, not the expert. *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) (it is not the expert's job "to supplant the role of counsel in making argument at trial, and the role of the [fact-finder] in interpreting the evidence").

2.    *Dr. Mann*

Touro's Opening Brief demonstrated that Dr. Mann's proposed testimony should be excluded because her report, like Prof. Fisher's, consisted almost entirely of reading documents, reporting what people said and did, and drawing factual conclusions from those documents. (Touro Mann Br. 8-9, 17-19).

In response, CSI now contends that "key elements of Dr. Mann's report relate to her physical examination of" the Rimonim.  (CSI Mann Br. 12).  That severely mischaracterizes her report – as any fair reading makes clear.  Dr. Mann's reference to a physical examination of one pair of rimonim – not even the rimonim at issue in this case, but rather the set in CSI's

---

[1] Reflecting Prof. Fisher's true area of expertise and also that he cannot provide any help to this Court, the only other primary sources that he cites in this section of his report concern churches. (Fisher Report at 63 n.227).

[2] The one aspect of either expert's report that is arguably based on outside research is Prof. Fisher's proposed testimony concerning the meaning of "appurtenances" and other terms.  But as explained at pages 7-10 below, this testimony is inadmissible for other reasons.

possession – is buried in a four-line footnote at the very end of her report, supposedly supporting her opinion that the rimonim possessed by Touro are a mis-matched pair. (Mann Report at 14 n.57). Although Dr. Mann in her declaration in opposition purports to provide additional physical analysis, even with that improper supplemental report her opinions still remain largely based on her review of the documentary record. As she summed up her conclusion, "From all the evidence cited above, Shearith Israel owns" the Rimonim. (*Id.* at 14).

As with Prof. Fisher, CSI asserts that Dr. Mann will assist the Court by "contextualizing" certain documents and "drawing on her specialized knowledge." (CSI Mann Br. 12). To support this position, CSI cites Dr. Mann's analysis of one document, a CSI inventory from 1869. (*Id*. at 12-14). CSI then suggests that Dr. Mann's expertise is helpful, at least with respect to that document, because she understands the use of two different forms of "ditto" in the inventory and because she can read Hebrew, which appears sporadically in the inventory. (*Id.*). Even with respect to that document, there is no specialized expertise or knowledge in recognizing that sets of quotations marks at the end of a line mean "ditto," nor in recognizing the same meaning of "Do." *See, e.g*., 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 1 (using "Do." in Social Security guidelines); Random House Dictionary (2015) (noting under definition of "ditto" "Symbol: " " and "Abbreviation: do."), *available at* http://dictionary.reference.com/browse/ditto. As for Dr. Mann's translation of Hebrew, we do not anticipate that the parties will disagree concerning the meaning of Hebrew words, and in any event an expert is not needed to translate.

Dr. Mann and CSI also cite entries from CSI's ledger dating to the 1700's (CSI Mann Br. 2, 7), but again she merely provides her gloss on those entries. Moreover, neither these nor any of the other documents she cites in her report are technical or scientific or data-based. The Court

can read them just as well as Dr. Mann can, and counsel is free to make whatever arguments he/she deems appropriate from the admissible evidence.

Finally, CSI asserts that Dr. Mann's report is a product of specialized expertise, arguing that "seemingly insignificant events are more meaningful when viewed as part of a larger context." (CSI Mann Br. 14). In the portion of the report referenced here by CSI, Dr. Mann merely opined, based on speculation and her review of the discovery material, concerning CSI's intent when it returned the Rimonim to Newport. (Mann Report at 14). In this way, the so-called "larger context" referenced by CSI is not the historical or cultural context that might under limited circumstances be the proper province of an expert, but rather factual events found in the record.

At bottom, CSI proposes that Dr. Mann function as an ancillary to CSI counsel, constructing a narrative of events in CSI's favor. (Touro Mann Br. 8-10). As Dr. Mann admitted, "I built a case for the ownership by CSI." (Mann Tr. 241). That is the role of an advocate, not the role of the expert. *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004).

> B.    Prof. Fisher and Dr. Mann improperly and repeatedly opine on the subjective state of mind and intent of actors long dead

An expert usurps the role of the trier of fact when he or she offers conclusions concerning the state of mind or understanding of the parties. (Touro Fisher Br. 18; Touro Mann Br. 19). *See OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Canada*, 804 F. Supp. 2d 77, 85 (D. Mass. 2011) ("A party's intent or state of mind is not the proper subject of expert testimony."). Prof. Fisher and Dr. Mann repeatedly violate this principle.

The cases cited by CSI underscore why its experts' opinions are inadmissible on this score. For example, CSI cites two decisions concerning tortious-failure-to-warn claims brought

against tobacco companies, and notes that in those cases the experts were opining as to "common knowledge." However, the "common knowledge" defense in that class of cases relies on establishing the "knowledge" of the theoretical, objective "ordinary consumer." *Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271, 275-76 (1st Cir. 2003); *Prado Alvarez v. R.J. Reynolds Tobacco Co.*, 313 F. Supp. 2d 61, 74 (D.P.R. 2004) (CSI Fisher Br. 18; CSI Mann Br. 16). In neither case was an expert testifying to a party's actual, subjective knowledge or intent, as CSI's experts propose here. Similarly, in *N.J. v. N.Y.*, 1997 WL 291594, at *59 (CSI Fisher Br. 18; CSI Mann Br. 15), experts testified concerning general "public perception" with respect to a piece of land – not the actual intent of either party to own or convey that land. And in *Hunter v. Underwood*, 471 U.S. 222, 229 (1985) (CSI Fisher Br. 18; CSI Mann Br. 15), historians provided historical context by testifying that a 1901 Alabama Constitutional Convention had been "part of a movement." They did not opine concerning the actual, subjective intent or state of mind of members of the Alabama legislature. The other cases cited by CSI do not advance its position. *See Bone Shirt v. Hazeltine*, 2003 WL 26091116, at *6-7 (D.S.D. Dec. 31, 2003) (CSI Fisher Br. 18; CSI Mann Br. 16; admitting expert testimony on the socio-economic effects of an allegedly discriminatory redistricting plan); *Pataki*, 165 F. Supp. 2d at 305, 308 (CSI Fisher Br. 18; CSI Mann Br. 16; not a decision on a motion to exclude, and in any event the historian testified only that the fact that a tribe did not fight with the Americans in the Revolutionary War did not necessarily mean that every member of that tribe supported the British).

### 1.    *Prof. Fisher*

CSI contends that Prof. Fisher's proposed testimony concerning the parties' intent would merely "assist[] the Court in determining the intent of historical parties" or "put[] the Court's mind back into history so that the Court can determine the truth." (CSI Fisher Br. 17-18). In

fact, Prof. Fisher attempts to do far more than "assist[]" the Court or provide "context" to put the Court's "mind back into history." Throughout his report, Prof. Fisher improperly opines on the state of mind of actors long dead. He claims, for instance, to know the "concerns" of CSI in the 1880s (Touro Fisher Br. 18-19), and that in 1937 "everyone involved understood that CSI owned" the Rimonim. (Fisher Report at 49). CSI and Prof. Fisher's latest submissions underscore the point. According to CSI, Prof. Fisher's report shows that in the 19th century, the heirs of members of Congregation Yeshuat Israel "fully intended" to transfer all personal property to CSI. (CSI Fisher Br. 7-8). Prof. Fisher also claims to know that "the parties were both acutely interested in" the Rimonim and had "deliberately inserted language into the leases to confirm" that CSI owned the synagogue and the Rimonim. (*Id.* at 8-9). And in his declaration Prof. Fisher purports to draw from documents the "actual and specific interest" of the parties during a lease negotiation, and that a "court case formed a part of the thinking of the parties" in 1903. (Fisher decl. ¶¶ 5, 8).

CSI and Prof. Fisher believe that he "properly uses historical expertise to analyze writings to determine what historical actors did, thought, and intended." (CSI Fisher Br. 17). Under *Daubert* and Fed. R. Evid 702, that is not permitted. 4 Weinstein's Federal Evidence § 702.03[3] (2d ed. 2014) ("State of mind of one of the parties" is "committed exclusively to the trier of fact.").

### 2.    *Dr. Mann*

Dr. Mann's proposed intent testimony likewise cannot be squared with Fed. R. Evid. 702. She claims to know what people were thinking centuries ago, based solely on discovery materials or court documents from this case. CSI's opposition does not provide a single concrete example how Dr. Mann is "putting the Court's mind back into history so that the Court can determine the truth" (CSI Mann Br. 15), other than through her citations to the discovery record.

*See Brown v. Crown Equip. Corp.*, 445 F. Supp. 2d 59, 68 (D. Me. 2006) ("The plaintiff properly notes that she will not attempt to offer through her expert witnesses evidence about the subjective intent or state of mind of the defendants or its employees.").

C.    Prof. Fisher's opinions concerning the meaning of
      terms in the parties' legal documents are inadmissible

On separate, independent grounds Prof. Fisher's proposed testimony concerning the parties' intent when they used certain terms in legal documents, most notably in their lease agreement, is inadmissible.  First, he does not provide helpful, contemporaneous evidence concerning the usage of the terms at issue – principally "appurtenances" and "paraphernalia." And second, he does not bring to bear any expertise with respect to those terms.

As a general matter, experts may not offer opinions concerning the intent of contracting parties.  (Touro Fisher Br. 18, citing *OneBeacon Am. Ins.*, 804 F. Supp. 2d at 85).  Experts may testify concerning a trade or industry's specialized meaning for a term but may not otherwise opine as to contract interpretation.  (Touro Fisher Br. 19).  Cases cited by CSI highlight this distinction.  For instance, in *Phillips v. Calhoun*, 956 F.2d 949, 952 (10th Cir. 1992) (CSI Fisher Br. 16; CSI Mann Br. 10), the expert testified not to what the parties intended but rather to "customary meaning and usage" of the terms in question.  *See also Carondelet Sav. & Loan Ass'n v. Citizens Sav. & Loan Ass'n*, 604 F.2d 464, 470 (7th Cir. 1979) (CSI Fisher Br. 21; CSI Mann Br. 12; expert testifying to meaning of "servicing" in industry).

Prof. Fisher does not provide any probative evidence concerning the purported trade or industry usage of "appurtenances" or "paraphernalia."  He provides only a single contemporaneous American source that uses "appurtenance," and does not cite any source using the term "paraphernalia" alone.  And Prof. Fisher does not provide a single contemporaneous usage of the relevant terms in any legal authority or document, even though the parties here used

the terms in that context. Prof. Fisher likewise relies on a series of unsupported analytical leaps to reach his desired conclusion. (Touro Fisher Br. 15-17).

As a second obstacle, Prof. Fisher brings no expertise to bear on these definitions and terms. All he has done is read materials – principally definitions and secondary sources that he collected solely for this case. Assuming those materials are admissible, CSI's counsel and the Court can read them just as well as Dr. Fisher.

> D.    CSI's experts opine as to legal conclusions based on their analyses of legal documents

Expert witnesses may not offer legal conclusions. *See Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 360 (D. Mass. 2008) (excluding legal conclusions regarding disputed contracts). As demonstrated in Touro's Opening Briefs, the opinions of Prof. Fisher and Dr. Mann should be barred on this ground too (Touro Fisher Br. 13-14; Touro Mann Br. 10-11) – and doubly so, since both conceded that they are not qualified to testify on legal issues. (Mann Tr. 56-57, 170-71, 174, 188, 193; Fisher Tr. 33-34, 128-29, 197-98, 228).

In response, CSI's claims "Neither expert speaks to any legal conclusions." (CSI Fisher Br. 4). As any fair reading establishes, both reports are replete with legal conclusions. (Touro Fisher Br. 8-9; Touro Mann Br. 6-7). And as demonstrated in Touro's Opening Briefs, an expert usurps the role of the Court by opining as to legal analysis and conclusions. (Touro Fisher Br. 8-9, 13-14; Touro Mann Br. 6-7, 10-11). The cases cited by CSI do not undo this fundamental rule. (CSI Fisher Br. 21-22; CSI Mann Br. 6).[3]

---

[3] In *Armstrong Coal Co. v. Blackburn*, 2014 WL 4364625 (W.D. Ky. Sept. 3, 2014) (CSI Fisher Br. 21; CSI Mann Br. 6, 12), plaintiff argued only that the expert, a surveyor, should be excluded because his work "represents a material compromise of . . . independent professional judgment" as a licensed surveyor. Motion in Limine at 2, Dkt # 42-1, *Armstrong Coal Co. v. Blackburn*, Civil Action No. 4:12-cv-00089-JHM (W.D. Ky. May 4, 2014). In *Mille Lacs Band of Chippewa Indians v. Minnesota*, 861 F. Supp. 784, 791 (D. Minn. 1994) (CSI Fisher Br. 22), where no challenges to the expert testimony were discussed, there is no indication that a historian

1.    *Prof. Fisher*

CSI expends much energy trying to re-characterize Prof. Fisher's legal opinions as testimony about "facts."  To cite one example, CSI claims that Prof. Fisher's use of "ultra vires" to describe the actions of CSI was simply one of his "historical factual opinions." (CSI Fisher Br. 22).  Although any fact testimony on this issue would be barred too, *see* pages 2-5 above, CSI has mis-described Prof. Fisher's exercise.  He was using the term in its legal sense to make a legal pronouncement about the legal effect of legal documents:

> The 1897 Constitution and Bylaws were operative until at least 1945, when a purported revised set of bylaws was passed (though there seems to be no evidence that CSI was ever given notice of or voted on the modification – which would render the proposed modifications null or ultra vires).

(Fisher Report at 31).

---

testified about the *legal* "effect" of treaties and orders.  In *Walden*, 755 F. Supp. 2d at 951 (CSI Fisher Br. 21-22), the expert's testimony "that certain interrogation methods were illegal" was not testimony concerning the interrogation at issue nor the ultimate legal conclusion disputed in the case.  In *N.Y. v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185, 196 (E.D.N.Y. 2007) (CSI Fisher Br. 22; CSI Mann Br. 6), the issue addressed by testimony that the "Town was owned by the Shinnecocks at the time of first European contact" merited only a single short paragraph of the decision and was not in dispute in the case; the expert testimony credited there was that of plaintiff, who claimed the tribe currently did not own the land.  And *Pataki*, 165 F. Supp. 2d at 309 (CSI Fisher Br. 22; CSI Mann Br. 6, 10), stands only for the unremarkable proposition that witness testimony is used in the calculus of legal analysis.  Likewise, the experts' testimony noted in the special master report in *N.J. v. N.Y.*, 1997 WL 291594, at *10 (CSI Fisher Br. 22), as to "assert[ions of] sovereignty" – the contents of which is only described in a single, summary sentence – appears to have been factual testimony that was used by the court in legal analysis, like any testimony.   In *United States v. Newmont USA Ltd.*, 2007 WL 4856859, at *1 (E.D. Wash. Nov. 16, 2007) (CSI Mann Br. 6), defendants had not moved as to an expert improperly offering legal conclusions, *see* Motion in Limine, Dkt #325, No. CV-05-020-JLQ (E.D. Wash. Oct. 12, 2007); and rightly so, since the "corporate and technology history" and even the "ultimate conclusion" regarding control of the mining company's operations were not conclusions of law.  2007 WL 4856859, at *1.  *See also Cyprus Amax Minerals Co. v. TCI Pacific Commc'ns*, 2014 WL 693328, at *3-4 (N.D. Okla. Feb. 21, 2014) (CSI Mann Br. 6; "expert testimony on the ultimate [legal] issue as to whether the corporate veil should be pierced" was "not necessary" but experts could testify concerning "relevant facts").

Legal opinions and analyses are deeply woven into Prof. Fisher's report – even on top of his lack of expertise to do so. Prof. Fisher offers opinions concerning ownership and ownership rights, contract formation and modification, adverse possession, ultra vires, and the supposed absence of a trust relationship between the parties. (Touro Fisher Br. 8-9). He claims to draw lessons from "hundreds of court cases involving disputed property and ritual items" over the last several hundred years. (Fisher Report at 63). And he spends several pages of his report interpreting litigation materials and legal documents such as leases, deeds and the like. (*Id.* at 24-26, 29-31, 34, 39, 44, 46-49, 52-53, 55, 58-59).

Prof. Fisher was not using legal terms in an incidental way. Rather, Prof. Fisher – not a lawyer or even legal historian and thus not even qualified – proposes to offer legal analysis and legal conclusions. That usurps the role of the Court, and should not be permitted. *GST*, 192 F.R.D. at 111 (citing cases and excluding legal conclusions offered by experts).

    2.    *Dr. Mann*

CSI argues that Dr. Mann, as an art historian, is permitted to testify concerning the ownership of objects of art. Yet in none of the cases cited by CSI did a court hold that a party's expert witness may testify to the ultimate legal conclusion of ownership rights in a disputed object. Federal courts have instead held that such expert testimony inadmissible. (Touro Mann Br. 10, citing *In re Phillips*, 491 B.R. 255, 261 n.10 (Bankr. D. Nev. 2013)).[4]

---

[4] *See United States v. Luna*, 649 F.3d 91, 105 (1st Cir. 2011) (CSI Mann Br. 5; expert testified about where bullets were manufactured); *United States v. Corey*, 207 F.3d 84, 88-89 (1st Cir. 2000) (CSI Mann Br. 5; same); *Levin v. Dalva Bros.*, 459 F.3d 68, 79 (1st Cir. 2006) (CSI Mann Br. 5; experts testifying concerning "appraisal value," "visual observations" and that clock was "unusual," but not testifying on ownership); *Estate of Mitchell v. Comm'r of Internal Revenue*, 101 T.C.M. (CCH) 1435, at *12 & n.5 (2011) (CSI Mann Br. 5; no objection indicated; value and not ownership of paintings was at issue and tax court noted only that experts may consider "provenance" when "valuing art" as it can "help to establish that [a painting] has not been altered and is not a forgery, a reproduction or stolen art"); *Langbord v. U.S. Dep't of Treasury*, 2009 WL 1312576, at *4-6 (E.D. Pa. May 7, 2009) (CSI Mann Br. 6; experts testifying concerning how

CSI also attempts to massage Dr. Mann's legal conclusions into proper expert opinion testimony by claiming that Dr. Mann "will not be offering legal analysis or conclusion" since her only testimony concerns "provenance" based on an analysis of "the object itself." (CSI Mann Br. 4, 7). In fact, Dr. Mann's report contains only a single reference, buried in a footnote, to physical examination of one pair of rimonim – CSI's pair in New York, not even the pair at issue in this case. Dr. Mann's opinions are clearly legal conclusions. As she puts it, "The Report addresses principally the provenance of and ownership rights to" the Rimonim. (Mann Report at 2). Under the governing authorities, that is beyond the proper bounds of expert testimony – particularly since, as Dr. Mann conceded, she has no legal expertise. (Mann Tr. 56-57, 170-71, 174, 188). *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony which states a legal conclusion.").

     E.     <u>Rule 704 has no bearing on these motions</u>

CSI contends that Touro's motions "ignore[] Rule 704(a) which states that '[a]n opinion is not objectionable just because it embraces an ultimate issue.'" (CSI Fisher Br. 20). Rule 704(a) is of no help to CSI on these motions.

Touro does not maintain that CSI's experts should be excluded "just because" their opinions "embrace[] an ultimate issue." Rather, CSI's proposed opinion testimony cannot be squared with well-settled rules barring an expert from usurping the role of the Court by (i) constructing a narrative that is in substance based on discovery materials, (ii) providing legal

"disputed coins could have been obtained" or whether they were "officially released," but not who owned them); *Gov't of Peru v. Johnson*, 720 F. Supp. 810, 812-14 (C.D. Cal. 1989) (CSI Mann Br. 6; experts testifying to country of origin, date of excavation and foreign laws, and court's discussion of ownership does not mention expert testimony on the legal question); *see also United States v. One Lucite Ball Containing Lunar Material*, 252 F. Supp. 2d 1367, 1372 (S.D. Fla. 2003) (CSI Mann Br. 6; court-appointed expert, and testifying as to meaning of foreign and not domestic law).

analysis and conclusions, and (iii) opining on the subjective state of mind of actors long dead. Numerous federal court cases hold that expert testimony along these lines is inadmissible. (*See* Touro Fisher Br. 9-14; Touro Mann Br. 8-11). These cases were all decided after the adoption of Rule 704(a), and are consistent with the Rule.

## II.    CSI'S EXPERTS SHOULD BE EXCLUDED FOR ADDITIONAL REASONS

### A.    CSI's experts are not qualified

#### 1.    *Prof. Fisher*

Although Prof. Fisher proposes to offer opinions on American Jewish history and legal issues, Prof. Fisher lacks any meaningful knowledge, skill, experience, training, or education in those particular areas. (Touro Fisher Br. 4-9; CSI Fisher Br. 6, 12-15; Fisher decl. ¶¶ 3, 4, 6). To the extent Prof. Fisher has acquired any relevant knowledge, he did so only for this litigation. *See Silva v. Am. Airlines, Inc.*, 960 F. Supp. 528, 531 (D.P.R. 1997) (witness could not extend his qualifications by acquiring knowledge specifically for litigation in question). The Court therefore would "act[] properly [here] by excluding opinions that are beyond the witness's expertise." *Levin v. Dalva Bros.*, 459 F.3d 68, 78 (1st Cir. 2006) (CSI Mann. Br. 5; affirming exclusion of expert's opinion concerning origin of clock in the Regence period on the ground that expert had insufficient experience with Regence-era furniture).

CSI contends that Prof. Fisher is qualified because he is a historian with general experience interpreting documents. (CSI Fisher Br. 13, 15). The First Circuit cases offered by CSI in support concern not historians, but rather medical doctors who were permitted to opine on medical areas outside their specialties. *See Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24-25 (1st Cir. 2003) (CSI Fisher Br. 14). CSI cites no case applying such a principle to historical experts. And in the two cases involving historians cited by CSI, the court found that the experts were qualified because, unlike Prof. Fisher, they

had expertise in the particular fields at issue.  Prof. Fisher has virtually zero experience – and no expertise – in American Jewish history.  (Touro Fisher Br. 4-9).[5]

CSI also mis-construes Touro's motion, asserting that Touro is attacking Prof. Fisher as "not Jewish enough."  (CSI Fisher Br. 5; Fisher decl. ¶ 3).  On the contrary, Touro noted that Prof. Fisher need not attend Jewish services to qualify as an expert in American Jewish history. (Touro Fisher Br. 7).  Rather, Touro observed that Prof. Fisher has no scholarly background, education, training or other foundation to compensate for his lack of experience.  And since he is not a lawyer nor a legal historian and has never taken any courses in law school, he does not have any foundation to opine on the meaning of legal terms used in deeds, settlement agreements, leases, and litigation documents – even if such expert testimony were permitted. *See* pages 7-13 above.

        2.    *Dr. Mann*

As an art historian, Dr. Mann's expertise is limited to (i) examining a work of art and then (ii) reviewing documentation to "fill out the context of the piece."  (Mann Tr. 50).  Only after confronted with Touro's motion did CSI try to elevate Dr. Mann's physical examination of one pair of rimonim beyond a footnote at the end of her initial report.  (*Compare* Mann Report at 14 n.57 *with* Mann decl. ¶¶ 5, 7; CSI Mann Br. 2, 7-8).

---

[5] In *Saginaw Chippewa Indian Tribe of Mich. v. Granholm*, 690 F. Supp. 2d 622, 635-36 (E.D. Mich. 2010) (CSI Fisher Br. 14), plaintiffs contended that defendant's proffered expert had no expertise in Native American history, but the court found that the expert "studied Indian American history as an undergraduate and graduate student; taught courses focused on Indian history, and other courses that covered topics in Indian history; and, perhaps most importantly, he has conducted extensive research in the subject, particularly in the last ten years" – research resulting in a published book, an expert report in another lawsuit, and a book-length manuscript. *Id.* at 635-36.  In *Walden*, 755 F. Supp. 2d at 949-50 (CSI Fisher Br. 15), the court permitted an "academic historian whose concentration in historical research has been the Chicago Police Department and its relationship with the African-American community" to testify to the practices of the Chicago Police Department at the time of the arrest of plaintiff, an African-American, in the 1950s.

Dr. Mann goes far beyond merely "fill[ing] out the context." She offers a narrative of the interactions between the parties, and opines on among other things (i) ownership rights to the Rimonim and the Touro synagogue building, (ii) the control of the Rimonim and whether the parties were "confused" about who owned them, and (iii) the purportedly negative effect a ruling in favor of Touro would have on American Jewry as a whole. And even if an art historian might be permitted to opine on these issues, Dr. Mann is not that person; her scholarship is focused on European art, and she has no expertise in American history. (Mann Report Exh. A; Mann Tr. 26-27).

        B.     <u>CSI's experts base their opinions on unreliable methodology</u>

        1.     *Dr. Fisher*

CSI has no answer to Touro's showing, in its Opening Brief at pages 14-17, that Prof. Fisher's conclusions are based on unreliable methods. For example, although words like "appurtenances" that he purports to interpret were terms used by the parties in legal documents such as deeds and leases, Prof. Fisher did not offer any legal definitions or authorities and in any event he has no legal expertise. (Touro Fisher Br. 16, 17). CSI claims that Prof. Fisher "did cite a legal definition of 'appurtenances' but did not quote it." (CSI Fisher Br. 25). But Prof. Fisher admitted at deposition that he "did not cite" the legal definition in question in his report. (Fisher Tr. 219; *see also* Fisher Report at 35). In his declaration, Prof. Fisher clarifies that he did not use the legal definition in question because he did not believe it was relevant. (Fisher decl. ¶ 11). That underscores the unreliability of his method. Nor does CSI address Prof. Fisher's misleading use of sources. (Touro Fisher Br. 17).

        2.     *Dr. Mann*

Touro's Opening Brief likewise exposed the unreliable basis for Dr. Mann's proposed testimony. (Touro Mann Br. 11-19). Nothing offered by CSI detracts from that showing.

Neither Dr. Mann's addendum nor her declaration removes from the realm of speculation her opinion concerning the meaning of CSI's 250-year old ledger entries. (Touro Mann Br. 12-14, 21; Mann decl. ¶ 8). Dr. Mann belatedly asserts in her declaration that her conclusion is based in part on the "personal, economic, social, political, and military circumstances at play at the time . . . ." (Mann decl. ¶ 8). Yet Dr. Mann does not particularize what she means, nor were these supposed circumstances spelled out either in her report or supplemental report or at her deposition. Moreover, Dr. Mann, an art historian focused on European objects, is not qualified to opine on circumstances in Colonial America even if she had referenced those circumstances in her report. (Mann Report Exh. A). Ultimately, Dr. Mann takes ledger entries that could reference any one of several subjects, and opines with absolute certainty that they concerned the Rimonim at issue here. That cannot be squared with Fed. R. Evid. 702.

Touro also noted in its moving papers Dr. Mann's mis-description of key documents through use of ellipses and inaccurate punctuation, all omitting words and phrases strongly supporting Touro's case. In response, CSI defends Dr. Mann's right to not "gratuitously quote" from documents. (CSI Mann Br. 22). Given that Dr. Mann deleted only those words in the document that supported Touro's position and undermined that of CSI for whom she is testifying, it is highly unlikely that she omitted full quotations merely to save space. This biased approach is consistent with her improper efforts as an advocate to "buil[d] a case for the ownership by CSI." (Mann Tr. 241).

C.    CSI's experts improperly supplemented their reports

Beyond the legal flaws marring their proposed testimony, any opinions belatedly offered by CSI's experts in their supplemental reports and declaration should be excluded as untimely.

According to CSI, the addenda prepared by Dr. Mann and Prof. Fisher are "substantially justified or [are] harmless." (CSI Mann Br. 24, 25 & CSI Fisher Br. 28, citing *Gay v.*

*Stonebridge Life Ins. Co.*, 660 F.3d 58, 62 (1st Cir. 2011) ("Failure to comply with [Fed. R. Civ. P. 26(a)(2)(B)] may preclude the party from[] using that witness or relevant expert information to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless.") (internal quotation omitted)).    The addenda here were not "substantially justified."  Both based new opinions on documents from CSI's files produced well before Dr. Mann and Prof. Fisher served their initial expert reports.  Nor do the addenda fall within the "limited concept of 'harmless.'"    *Gagnon v. Teledyne Princeton, Inc.*, 437 F.3d 188, 197 (1st Cir. 2006).  CSI served these addenda on the eve of the deadline for Touro's motions to exclude, thereby conferring a potential "unfair tactical advantage . . . ."  *Gay*, 660 F.3d at 62.

Beyond being untimely, Dr. Mann's addendum and declaration constitute improper supplementation under Fed. R. Civ. P. 26(e)(1).  That rule "permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report."  *Minebea Co. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005).   A supplemental report "cannot include new opinions" based on "information available prior to the expiration of the expert report deadline."  *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 2010 WL 1427549, at *4 (D.N.H. Apr. 2, 2010) (internal quotation omitted; supplementation improper under Rule 26(e) where expert offered new opinions).  Nor may a supplemental report "state[] additional opinions or rationales or seeks to 'strengthen' or 'deepen' opinions expressed in the original report . . . ."  *Palmer v. Asarco Inc.*, 2007 WL 2254343, at *3, *5 (N.D. Okla. Aug. 3, 2007) (internal quotation omitted; barring expert from testifying to matters in affidavit submitted two months before trial in response to *Daubert* motion and not considering affidavit on *Daubert* motion).

Rule 26(e) bars Dr. Mann's supplementation.  Most of the facts she now cites as supporting her key conclusion concerning CSI's 18th century ledger entries reflect new opinions, but are based on information available well before she issued her initial report in November 2014.  (Mann decl. ¶ 8).  That is not permitted.  *Minebea*, 231 F.R.D. at 6.[6]

D.    The conduct of Prof. Fisher and counsel at the deposition

As demonstrated in Touro's Opening Brief, the conduct of Prof. Fisher and counsel at deposition provides an additional ground to exclude his testimony.  (Touro Fisher Br. 19-22).  They walked out of the deposition knowing full well that seven hours of testimony had not elapsed, an unfairness exacerbated by Prof. Fisher's lengthy and unresponsive answers that failed to answer the questions actually posed.  In trying to defend its early termination of Prof. Fisher's deposition, CSI inaccurately characterizes the record.  Indeed, its newly-offered excuses would not justify depriving Touro of its rights under the Federal Rules to a full deposition.

First, CSI asserts that Prof. Fisher's deposition was scheduled for December 30, 2014 in New York "as a convenience to CJI counsel."  (CSI Fisher Br. 27)  In fact, it was CSI that had proposed that date and location.  (Exh. A).

Second, CSI suggests that Prof. Fisher needed to terminate the deposition at 5:05 p.m. so that he could catch a 7 p.m. train a few blocks away.  (CSI Fisher Br. 27).  That is not why counsel terminated the deposition.  At the time, CSI's counsel tried to cut short the deposition on three grounds.  Initially, he claimed – mistakenly – that the seven-hour deposition period set out in Rule 26 included time for lunch breaks.  (Fisher Tr. 211-17).  Counsel then switched gears, declaring that the deposition needed to end because "I made plans, I have other work

---

[6] Factors 1, 2, and 6 cited by Dr. Mann are completely new.  Factor 4 represents a different analysis from even that explained in Dr. Mann's improper addendum.  (*Compare* Mann decl. ¶ 8 *with* Touro Mann Br. Exh. F at 3).  And in factor 5, Dr. Mann directly contradicts her sworn and uncorrected deposition testimony that CSI documents show that the Rimonim were sent to CSI for "safekeeping."  (Mann Tr. 209-11).

obligations." (*Id.* at 216). Counsel also asserted that Touro's time record was fabricated. (*Id.* at 250). If the train schedule were in fact a genuine concern – the deposition would have ended at 5:40 p.m., giving Prof. Fisher plenty of time to catch the train – Prof. Fisher could have alerted Touro to the issue in the morning or taken a later train.

Third, CSI asserts that Touro's counsel made "demeaning, bullying claims of impropriety in Professor Fisher's report," by asking whether Prof. Fisher was aware that his report contained inaccuracies. (CSI Fisher Br. 27; Fisher Tr. 111-112). This question was appropriate given that counsel had just exposed an error in the report showing that Prof. Fisher engaged in partisan scholarship. (Fisher Tr. 108-12). This too is a newly-offered excuse for walking out of the deposition. In any event, the remedy for an inappropriate question is an objection to the question, not termination of the deposition.

Fourth, Prof. Fisher asserts that he can tack on to the time at the deposition one to two hours he claims he subsequently spent trying to figure out, in response to a question from Touro's counsel (*see* Fisher Tr. 150), which if any of his publications and courses address American Jewish history. (CSI Fisher Br. 27; Fisher decl. ¶ 13). Quite obviously, time spent outside the deposition cannot be charged against the seven-hour limit. As an aside, if Professor Fisher needed one or two hours to determine if any of his publications reference American Jewish history – and despite all that time and effort came up with virtually nothing, *see* Touro Fisher Br. 5-6 – what does that say about Prof. Fisher's qualifications?

Fifth, CSI contends that Touro's counsel "grossly misestimated" the time left in the deposition (Solomon decl. ¶ 2). That is not true; Touro's counsel was off by ten minutes. (*Compare* Touro Fisher Br. Exh. F *with* Fisher Br. 20-21). As a related point, CSI asserts that Touro did not raise time issues until "late in the afternoon." (Solomon decl. ¶ 2). Touro never

told CSI that the deposition would last less than the full seven hours.  Although again, Touro does not mean to nit-pick the time, Prof. Fisher's premature departure exacerbated the problem caused by his failure to answer questions directly.

Sixth, CSI tries to excuse Prof. Fisher's demeanor, asserting that Touro's counsel asked the same questions "over and over again."  (CSI Fisher Br. 27).  To the extent that Touro's counsel was forced to repeat questions, that was occasioned by Prof. Fisher's repeated failure to answer simple direct questions.  The following exchanges – among pages and pages of others – are emblematic of Prof. Fisher's unwillingness to answer the questions posed:

> Q.  So what you did was, you pulled out of the book the pieces that supported your opinions, right? . . . . Is that what you did?
>
> A.  That is not what any historian sets out to do. A historian reads within the context of other documentation, other sources, and often approaches a source wanting to know broader contextual issues, and in some ways trying to track down individual people or names or movements within a given book.
>
> Q.  Did you choose specific pieces of this book to cite?
>
> A.  Every historian always chooses specific –
>
> Q.  I'm not asking what every historian – I'm asking what you did. If I wanted to ask you what every historian did, I would ask that. Please answer my questions.

(Fisher Tr. 91-92).

* * *

> Q.  So you were opining as to the legal significance of certain facts, were you not?
>
> MR. SOLOMON:  Object to the question.
>
> A.  The judge will decide the legal implications of these issues.  It was --
>
> Q.  Sir, I --

A. -- this wording is a reflection of the documents that I viewed over the course of this history.

Q. I didn't ask what the judge was going to decide.  I asked, did you give opinions as to the legal significance of certain facts?

A. Again, drawing from these documents and based upon how people responded to events and situations that had to do with the law, this report has tried to reflect sort of what I understood to be happening in these situations.

Q. That's not my question.  Did you give opinions as to the legal significance of certain facts?

A. Again, my purpose was to understand and reflect what the documents from this time period were showing over time.

Q. Can you please answer my question?

A. I think I am.

(*Id.* at 126-27).

\* \* \*

Q. Do you know what the word "premises" means?

A. In the context I understand words.

Q. You have a Ph.D. in history from Harvard.  You can't tell me what the word "premises" means?

A. All the more reason to ask for context.  If you're talking about the wills or some of the documentation, that refers to the premises of the Touro Synagogue, if that's what you're talking about.  And it's possible that in some of the documentation, "premises" as a word would not easily or clearly be defined as rimmonim.  But there would be a strong association with the premises on behalf of the rimmonim.

Q. Do you know the difference between real property and personal property?

A. Sitting here today, I don't know that I could produce a full definition of –

Q. Okay.  Do you know whether rimmonim are personal property?

> A. I think it would depend on the context and what document we're looking at and how one defines that.
>
> Q. Are rimmonim real property?
>
> A. Again, it depends on which document you're looking at and how one would define that.

(*Id.* at 212-13).

In defending this conduct, Shearith Israel relies on *R.W. Int'l Corp. v. Welch Foods, Inc.*, 937 F.2d 11, 15 (1st Cir. 1991) (CSI Fisher Br. 27).  But unlike in that case, here the witness did not merely refuse to answer specific questions (although Prof. Fisher did that too).  Rather, Prof. Fisher and his counsel walked out of the deposition before it concluded.  This early departure, coupled with Prof. Fisher's repeated unwillingness to answer questions, frustrated the Court's December 15, 2014 Order (Doc. 43) as well in Touro's rights under Fed. R. Civ. P. 26.  *Compare Chiquita Int'l, Ltd. v. M/V Cloudy Bay*, 262 F.R.D. 318, 323-24 (S.D.N.Y. 2009) (precluding expert testimony; party failed to produce expert for noticed deposition before Court-ordered deadline for *Daubert* submissions) *with R.W. Int'l Corp.*, 937 F.2d at 15 (scheduling order not violated because witness appeared for full deposition and scheduling order was general and did not require witness to answer specific questions).

Finally, CSI suggests that a recent and supposedly late document production by Touro bears on the pending motions.  (CSI Fisher Br. 28).  Why that should be so is not clear.  In any event, CSI paints an inaccurate picture for the Court.  Touro produced the material in question in response to requests that CSI made on January 7 and 15, 2015.  (Exhs. B-D).  CSI claims that these documents should have been produced before the discovery cut-off and in response to a request that CSI made at a June 10, 2014 deposition.  Touro in fact produced documents back on June 24, 2014 in response to CSI's request.  CSI apparently did not seek follow up production until over six months later, in January 2015.  (Exh. B).  As an accommodation to CSI, with one

exception Touro collected the documents belatedly requested by CSI from third parties, current and former insurance brokers and carriers.  (Exh. C).  In this case, as in life, no good deed goes unpunished.[7]

**Conclusion**

For the reasons set forth here and in Touro's Opening Briefs, the Court should exclude the proposed expert testimony of Prof. Fisher and Dr. Mann.

CONGREGATION JESHUAT ISRAEL,

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

*/s/ Steven E. Snow*
Steven E. Snow (#1774)
40 Westminster Street, Suite 1100
Providence, RI  02903
(401) 861-8200 / (401) 861-8210 FAX
ses@psh.com

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Gary P. Naftalis (admitted *pro hac vice*)
Jonathan M. Wagner (admitted *pro hac vice*)
Tobias B. Jacoby (admitted *pro hac vice*)
Daniel P. Schumeister (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, NY  10036
(212) 715-9253 / (212) 715-9238 FAX
gnaftalis@kramerlevin.com
jwagner@kramerlevin.com
tjacoby@kramerlevin.com
dschumeister@kramerlevin.com

DATED:  February 24, 2015

---

[7] CSI fails to mention that on February 2, 2015 CSI itself produced additional insurance-related documents that should have been produced by the fact discovery cutoff.  (Exh. E; Exh. F at 7-8).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of February, 2015, I caused a true copy of the within document to be delivered through the ECF system to all counsel of record.

<u>/s/ Steven E. Snow          </u>