# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CONGREGATION JESHUAT ISRAEL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 12-822M |
| | : | |
| CONGREGATION SHEARITH ISRAEL, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT CONGREGATION SHEARITH ISRAEL'S PRETRIAL MEMORANDUM

Deming E. Sherman (#1138)
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI  02903
Tel.: (401) 274-9200
Fax: (401) 276-6611
E-mail: Deming.Sherman@lockelord.com

Louis M. Solomon (Admitted *Pro Hac Vice*)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
Tel.: (212) 504-6600
Fax: (212) 504-6666
E-mail: Louis.Solomon@cwt.com

*Attorneys for Defendant*
*Congregation Shearith Israel*

May 11, 2015

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ vi

INTRODUCTION AND SUMMARY ................................................................................. 1

    A.    Summary of the Claims. ................................................................................. 1

    B.    200 Years of Shearith Israel Oversight of Touro Synagogue and Its Contents. ....................................................................................................... 1

    C.    Overview of Factual Narrative ...................................................................... 3

    D.    Key issues to be decided at trial .................................................................... 5

    E.    Five CJI Issues that the Court Should Not Permit To Distract the Trial. ............... 6

STATEMENT OF FACTS .................................................................................................. 8

    A.    SEVENTEENTH CENTURY – SHEARITH ISRAEL .......................................... 8

    B.    EIGHTEENTH CENTURY – THE SYNAGOGUE LATER KNOWN AS THE TOURO SYNAGOGUE ........................................................................ 8

    C.    NINETEENTH CENTURY ............................................................................ 10

        1.    The Transfer To Shearith Israel Of Title To The Newport Synagogue And Ownership Of Its Contents Not Previously Owned ........ 10

        2.    The 1869 Inventory ........................................................................ 12

        3.    Shearith Israel Unlocks The Doors To The Touro Synagogue, Controlling The Real And Personal Property ............................................. 13

        4.    Shearith Israel Again Answers The Call For Aid, Specifically Limiting Any Auhorization for Use of the Real or Personal Property ....................................................................................... 14

        5.    Shearith Israel Protects Its Rights In The Touro Synagogue And Its Personalty ....................................................................................... 15

    D.    TWENTIETH/TWENTY-FIRST CENTURIES ................................................... 18

        1.    Shearith Israel Stops The Infighting Between The Newport Congregations By Locking The Doors Of The Touro Synagogue And Its Contents, Exercising Ultimate Control Over Both ....................... 18

## TABLE OF CONTENTS (cont'd)

**Page**

2.  The Court Upholds Shearith Israel's Ownership And Right To Control Personality Within The Touro Synagogue ..................................18

3.  More Judicial Approval Of Shearith Israel's Ownership And Control Of The Touro Synagogue And Its Real And Personal Property ..................................................................................................19

4.  CJI And The Public Recognize Shearith Israel's Ownership And Control Over The Touro Synagogue And Its Contents ...........................19

5.  Drafting the 1903 Indenture with Lease Specifically To Embrace Personality ..................................................................................................20

6.  The Formal Ceremony Of The Keys Between CJI And Shearith Israel ..................................................................................................21

7.  Shearith Israel And CJI Enter Into The 1903 Indenture With Lease .........22

8.  The Indenture With Lease Remains In Force Into 2012 ............................22

9.  Shearith Israel's Additional Involvement With the Touro Synagogue, CJI, and the Touro Synagogue Foundation ...........................25

10. As Part of Shearith Israel's Ownership, the Rimonim Are Integral To The Touro Synagogue As A Functioning House Of Worship ............26

E.   CJI'S BREACH OF THE INDENTURE WITH LEASE AND OTHER AGREEMENTS ..................................................................................................27

THE CLAIMS AT ISSUE ........................................................................................28

SUMMARY OF ARGUMENT ...............................................................................29

ARGUMENT ............................................................................................................30

I.    FORMAL LEGAL INSTRUMENTS DETERMINE THE RIGHTS OF THE PARTIES OVER THE SYNAGOGUE AND ITS APPURTENANCES / PARAPHERNALIA AND OF THE STATUS OF THE PARTIES INTER SE ..............30

II.   *RES JUDICATA* BARS MUCH OF CJI'S CASE ..........................................32

A.   *Res Judicata* Bars CJI From Litigating Ownership Of The Rimonim ..................33

B.   *Res Judicata* Bars CJI From Relitigating The Trust Issues ...................34

# TABLE OF CONTENTS (cont'd)

**Page**

III.    THE INDENTURE WITH LEASE AND THE RESTRICTIVE DOCUMENTS GOVERN THE SHEARITH ISRAEL–CJI RELATIONSHIP AND PREVENT CJI FROM EXERCISING DOMINION OVER THE BUILDING OR THE RIMONIM .................................................................................................35

    A.    When CJI's 1902 Coup Failed in 1903, It Surrendered All Purported Rights To the Touro Synagogue And Its Personalty ...............................35

    B.    The Restrictive Letters and Indenture with Lease Are Still In Effect...................36

        1.    The Course Of Conduct Between The Parties Affirms The Continued Vitality of Shearith Israel's Rights...........................................36

        2.    CJI Has Repeatedly And Publicly Affirmed The Indenture with Lease ...................................................................................37

        3.    CJI Continued Until 2012 To Operate Pursuant To The Terms Of The Indenture With Lease, And Its Actions Can Only Be Explained As Those Of A Lessee ...............................................39

        4.    The Restrictive-Use Authorizations Alternatively Remain In Full And Effective Force......................................................40

    C.    The Rimonim And All Other Personal Property Located At Touro Were Purposefully Included In The Documents Granting CJI The Limited Right To Use Shearith Israel's Rimonim And In The Indenture With Lease.................40

        1.    "Paraphernalia", "Appurtenances", "Fixtures" "Personal Property", "Contents" All Refer To The Personalty And Encompass The Rimonim ...................................................................................42

        2.    The Rimonim Are Appurtenant To The Touro Synagogue ......................45

        3.    Sephardic Rites And Rituals Also Precludes CJI's Attempted Sale..........45

    D.    As Lessee, CJI Is Estopped From Contesting Ownership Of The Touro Synagogue And The Rimonim...................................................................46

IV.    EVEN ASSUMING, ARGUENDO, THAT THE RIMONIM ARE NOT COVERED BY THE WRITTEN LICENSES OR THE INDENTURE WITH LEASE, CJI STILL HAS NO RIGHT TO SELL THEM ..................................................47

    A.    CJI Does Not Own the Touro Synagogue or the Rimonim ...................................47

## TABLE OF CONTENTS (cont'd)

**Page**

1. CJI Cannot Prove Ownership And Does Not Benefit From Any Presumption Based On Its Possession Of The Rimonim ...........................47

2. No Evidence Exists That CJI Inherited The Myer Myers Rimonim From Yeshuat Israel .................................................................49

3. There Is No Evidence That Yeshuat Israel Was Ever Gifted Myer Myers Rimonim ...........................................................................52

4. Shearith Israel Has Exercised Continuous Control Over The Touro Synagogue And Its Personalty ..................................................53

B. Shearith Israel Is The Lawful Owner Of The Touro Building, Lands, And Appurtenant Personalty, Including The Rimonim .................................53

1. Shearith Israel Owns Three Pairs Of Rimonim, Including The Unmatched Ones At Issue Here ..................................................53

2. Shearith Israel Owns The Touro Building And Lands .............................54

3. Shearith Israel Took Title To All Property Within Touro When It Took Title To The Synagogue ..................................................54

4. Shearith Israel's Title Has Been Affirmed Repeatedly ............................55

C. Regardless Of Ownership, The Constitution And By-Laws Of CJI Preclude CJI From Exercising Dominion Over The Rimonim ...........................56

D. The Rimonim Are An Integral Part of the Touro Synagogue's Genus Loci / Religious Articles .................................................................57

V. NO TRUST RELATIONSHIP EXISTS BETWEEN SHEARITH ISRAEL AND CJI ....................................................................................57

A. No Trust Was Ever Formed .................................................................58

1. The 1759 Conveyance Does Not Create A Trust ......................................58

2. None Of The Subsequent Conveyances Created A Trust .........................59

B. Even If A Trust Was Created, CJI Is Not A Beneficiary ......................................61

1. The Only Conceivable Language Of Trusteeship Does Not Indicate A Trust For The Benefit Of CJI, But Only That The Shearith Israel Trustees Act As Trustees — For Shearith Israel ......................................62

## TABLE OF CONTENTS (cont'd)

**Page**

C.   Even Were CJI A Beneficiary, It Cannot Oust The Trustee Or Compel A Sale Of Trust Property ............................................................................62

VI.   CJI BREACHED ITS DUTIES TO SHEARITH ISRAEL UNDER THE WRITINGS PERMITTING LIMITED USE AND THE INDENTURE WITH LEASE ...................................................................................................64

A.   CJI's Attempted Sale Of The Rimonim Violates Shearith Israel's Ownership Rights.........................................................................64

B.   CJI's Attempted Sale Of The Rimonim Violates The Terms Of The Limited Permission Documents And The Indenture With Lease. .......64

C.   CJI's Attempted Sale Of The Rimonim Perpetrated A Fraud ..............64

D.   CJI's Attempted Sale Of The Rimonim Was For Improper Purposes.................65

VII.   SHEARITH ISRAEL HAS DISCHARGED ITS DUTIES TO CJI AND TO THE TOURO SYNAGOGUE, THUS DEFEATING CJI'S DEFENSES, WHICH FAIL IN ANY EVENT...............................................................................65

A.   CJI's Assertions Underpinning Its Affirmative Defenses Are Meritless.............66

B.   CJI's Affirmative Defenses of Laches, Estoppel, and Waiver Fail .....................67

1.   CJI Cannot Avail Itself of the Affirmative Defense of Laches ...............67

2.   CJI Cannot Avail Itself of the Affirmative Defense of Equitable Estoppel....................................................................................68

3.   CJI Cannot Avail Itself of the Affirmative Defense of Waiver ...............69

CONCLUSION AND RELIEF SOUGHT ...................................................................70

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

<u>CASES:</u>

*Am. Bridge Co. v. Providence Place Grp. Ltd. P'ship*,
   263 F. Supp. 2d 330 (D.R.I. 2003)........................................................................32

*Andrukiewicz v. Andrukiewicz*,
   860 A.2d 235 (R.I. 2004)...................................................................................67

*Apparel Art Int'l, Inc. v. Amertex Enters., Ltd.*,
   48 F.3d 576 (1st Cir. 1995)................................................................................32

*Armington v. Meyer*,
   236 A.2d 450 (R.I. 1967)...................................................................................58

*Barnes v. Michalski*,
   925 N.E.2d 323 (Ill. App. Ct. 2010) ...................................................................52

*Bradshaw v. Ashley*,
   180 U.S. 59 (1901)...........................................................................................48

*Cardi v. Amoriggi Sea Foods, Inc.*,
   468 A.2d 1223 (R.I. 1983).................................................................................37

*Carter v. Holland*,
   825 So. 2d 832 (Ala. Civ. App. 2001) ................................................................52

*City of N.Y. v. Carleton*,
   21 N.E. 55 (N.Y. 1889).....................................................................................48

*Cooke v. Mortg. Elec. Registration Sys., Inc.*,
   2013 WL 2368846 (D.R.I. May 29, 2013) .........................................................33

*Cuzzone v. Plourde*,
   2005 WL 2716749 (R.I. Super. Ct. Oct. 17, 2005)...............................................63

*David v. Levy*,
   119 F. 799 (C.C.D.R.I. 1903) .................................................................. *passim*

*Del Drago v. Comm'r*,
   214 F.2d 478 (2d Cir. 1954)..............................................................................60

*Desnoyers v. Metro. Life Ins. Co.*,
   272 A.2d 683 (R.I. 1971)..............................................................................58, 59

PAGE(S)

**CASES:**

*Dudley v. Hurst*,
  8 A. 901 (Md. 1887) .............................................................................................44

*E. P. Bacon & Co. v. Thompson*,
  14 N.W. 312 (Iowa 1882) ...................................................................................43

*El Marocco Club, Inc. v. Richardson*,
  746 A.2d 1228 (R.I. 2000) ...................................................................................69

*Elena Carcieri Trust-1988 v. Enter. Rent-A-Car Co. of R.I.*,
  871 A.2d 944 (R.I. 2005) .....................................................................................31

*Fisk v. Brayman*,
  42 A. 878 (R.I. 1899) ...........................................................................................46

*Fitzgerald v. O'Connell*,
  386 A.2d 1384 (R.I. 1978) .............................................................................67, 68

*Friedman v. Goodman*,
  151 S.E.2d 455 (Ga. 1966) ..................................................................................46

*Goller v. Stubenhaus*,
  134 N.Y.S. 1043 (Sup. Ct. N.Y. Cnty. 1912) .....................................................44

*Grant v. Briskin*,
  603 A.2d 324 (R.I. 1992) .....................................................................................46

*Haffenreffer v. Haffenreffer*,
  994 A.2d 1226 (R.I. 2010) .............................................................................31, 41

*Harcourt v. Gaillard*,
  25 U.S. 523 (1827) ...............................................................................................47

*Hargrove v. Cox*,
  104 S.E. 757 (N.C. 1920) .....................................................................................46

*Hill v. M. S. Alper & Son*,
  256 A.2d 10 (R.I. 1969) ..................................................................................31, 32

*In re Gordon*,
  2000 WL 276829 (R.I. Super. Ct. Feb. 14, 2000) ...............................................63

*In re McNally's Estate*,
  389 N.Y.S.2d 60 (4th Dep't 1976) ......................................................................52

**PAGE(S)**

**CASES:**

*In re Platner,*
    525 N.Y.S.2d 887 (2d Dep't 1988)............................................................52

*In re Schrieb's Will,*
    78 N.Y.S.2d 54 (Surr. Ct. Richmond Cnty. 1947).................................59

*Irons v. FBI,*
    811 F.2d 681 (1st Cir. 1987)...........................................................69, 70

*Isaacs v. Emory,*
    1 A. 713 (Md. 1885) .........................................................................60

*J.R.P. Assocs. v. Bess Eaton Donut Flour Co.,*
    1998 WL 356896 (R.I. Super. Ct. June 22, 1998) ..............................38

*Jackson v. U.S.,*
    19 Ct. Cl. 504 (1884) .......................................................................33

*Kain v. Gibboney,*
    101 U.S. 362 (1879)..........................................................................60

*Kale v. Combined Ins. Co. of Am.,*
    924 F.2d 1161 (1st Cir. 1991)...........................................................60

*Kolbe v. BAC Home Loans Servicing, LP,*
    738 F.3d 432 (1st Cir. 2013)............................................................41

*Lacassange v. Chapuis,*
    144 U.S. 119 (1892)....................................................................43-44

*Lawrence v. Andrews,*
    122 A.2d 132 (R.I 1956) ..................................................................58

*Leahey v. Univ. of R.I.,*
    1985 WL 6033 (D.R.I. Aug. 1, 1985),
    *aff'd*, 802 F.2d 439 (1st Cir. 1986) .................................................33

*Lenzini v. Gianetti,*
    142 A. 139 (R.I. 1928)......................................................................37

*Livingston v. Tapscott,*
    585 So. 2d 839 (Ala. 1991)..............................................................52

*Lund v. Gray Line Water Tours, Inc.,*
    277 S.E.2d 404 (S.C. 1982) .............................................................46

**PAGE(S)**

**CASES:**

*Lux v. Lux,*
    288 A.2d 701 (R.I. 1972) ........................................................................................60

*Marie v. Allied Home Mortg. Corp.,*
    402 F.3d 1 (1st Cir. 2005) ....................................................................................69

*Metro. Nat'l Bank of N.Y. v. St. Louis Dispatch Co.,*
    149 U.S. 436 (1893) ............................................................................................44

*Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa,*
    388 F.3d 15 (1st Cir. 2004) .............................................................................31-32

*Pickerell v. Carson,*
    8 Iowa 544 (1859) ..............................................................................................43

*Pickering v. Higgins,*
    30 A.2d 846 (R.I. 1943) ......................................................................................58

*Pier of Newport, LLC v. N.A.J. Assocs.,*
    2014 R.I. Super. LEXIS 21 (Feb. 11, 2014) ......................................................41

*Porn v. Nat'l Grange Mut. Ins. Co.,*
    93 F.3d 31 (1st Cir. 1996) .............................................................................32-33

*Providence Teachers Union v. Providence Sch. Bd.,*
    689 A.2d 388 (R.I. 1997) ...............................................................................68, 69

*Ramirez-Carlo v. U.S.,*
    496 F.3d 41 (1st Cir. 2007) ............................................................................39, 56

*Raymond v. B. I. F. Indus.,*
    308 A.2d 820 (R.I. 1973) ....................................................................................68

*Renaissance Dev. Corp. v. Airport Valet, Inc.,*
    2013 WL 6405298 (R.I. Super. Ct. Dec. 2, 2013) ..............................................38

*Rex-Tech. Int'l, LLC v. Rollings* (*In re Rollings*) (Unpublished)
    451 F. App'x 340 (5th Cir. 2011) ...................................................................47, 48

*Robinson v. U.S.,*
    7 Cl. Ct. 155 (1984) ............................................................................................33

*Sarni v. Meloccaro,*
    324 A.2d 648 (R.I. 1974) ....................................................................................67

PAGE(S)

**CASES:**

*Sherman v. Champlain Transp. Co.*,
   31 Vt. 162 (1858) ..................................................................................38

*Silva v. Fitzpatrick*,
   913 A.2d 1060 (R.I. 2007) ....................................................................52

*Slepkow v. Robinson*,
   324 A.2d 321 (R.I. 1974) ......................................................................52

*Smith v. Haskins*,
   45 A. 741 (R.I. 1900) ............................................................................47

*Stambaugh v. Moffett*,
   278 S.W.2d 74 (Ky. Ct. App. 1955) ....................................................52

*Talbot v. Talbot*,
   5 A. 535 ( R.I. 1911) ........................................................................58, 59

*Tefft v. Reynolds*,
   113 A. 787 (R.I. 1921) .....................................................................48, 52

*Tidewater Realty, LLC v. R.I.*,
   2000 R.I. Super. LEXIS 112 (Feb. 15, 2000) ......................................69

*Tucker v. Countryman*,
   414 N.E.2d 101 (Ill. 1953) ....................................................................60

*U.S. v. Certain Land in Barnstable Cnty., Mass.*,
   314 F. Supp. 1372 (D. Mass. 1970) ......................................................48

*U.S. v. Fleet Bank (In re Calore Exp. Co.)*,
   288 F.3d 22 (1st Cir. 2002) ...................................................................69

*U.S. v. Grass Bros.*,
   13 U.S. Cust. App. 33 (1925) ...............................................................34

*Union & New Haven Trust Co. v. Koletsky*,
   167 A. 803 (Conn. 1933) ......................................................................60

*Williams v. Morris*,
   95 U.S. 444 (1877) ................................................................................46

*Willison v. Watkins*,
   28 U.S. 43 (1830) ..................................................................................46

## STATUTES & OTHER AUTHORITIES:

18 U.S.C. § 1001 .................................................................................................31

R.I. Gen. Laws Ann. § 9-1-4 (West 2006 & Supp. 2014) ..............................................58

*Restatement* (*Third*) *of Trusts*):
    § 2 (2003) ....................................................................................................58
    § 10 (2003) ..................................................................................................58
    § 13 (2003) ..................................................................................................58
    § 22 (2003) ..................................................................................................59
    § 37 (2003) ..................................................................................................63
    § 37 cmt. e (2003) .......................................................................................63
    § 44 (2003) ..................................................................................................58
    § 46 (2003) ..................................................................................................60

*Restatement (Third) of Trusts):*
    § 87 (2007) ..................................................................................................63
    § 87 cmt. b (2007) .......................................................................................63
    § 87 cmt. c (2007) .......................................................................................63

Defendant Congregation Shearith Israel respectfully submits this Trial Brief.

## INTRODUCTION AND SUMMARY

**A.    Summary of the Claims.**  This suit began in 2012 when plaintiff Congregation Jeshuat Israel ("CJI"), without warning, sued Defendant Congregation Shearith Israel ("Shearith Israel") after CJI, also without warning, tried secretly to sell two Torah finials (called rimonim) that it does not own and got caught.  Shearith Israel has owned the rimonim for hundreds of years and first loaned and then leased their use to CJI pursuant to valid and written Indenture with Lease instruments dated 1903 and 1908 ("the Indenture with Lease") – instruments that remained in force until CJI's breach in 2012.  Rimonim are sacred objects that adorn the most sacred object in the Jewish religion, the Torah.  The two rimonim that CJI secretly tried to sell are among the prized Jewish articles of worship left from Colonial America.  CJI rejected Shearith Israel's entreaties to resolve any disputes quietly, swiftly, and inexpensively before a Court of Jewish Law, or Beit Din, and raced to sue Shearith Israel instead.

CJI seeks a declaratory judgment that it owns the rimonim and can freely sell them.  Alternatively, CJI seeks a declaration that the rimonim, along with the Touro Synagogue in which they have reposed, are held in trust for CJI – even though there is not a single document reflecting any trust relationship between Shearith Israel and CJI – and that somehow CJI, as purported trust beneficiary, can unilaterally sell or force a sale of the rimonim.

In its counterclaims, Shearith Israel seeks to enforce its rights to protect and preserve the Touro Synagogue and the rimonim for the open use of worshippers in Rhode Island.  Shearith Israel wants future generations of worshippers to be able to experience these historic treasures and the fullness of Touro Synagogue's rich history, which includes the rimonim.

**B.    200 Years of Shearith Israel Oversight of Touro Synagogue and Its Contents.**
That CJI knew in 2012 that Shearith Israel had long owned the Touro Synagogue, its contents,

and the old Jewish cemetery in Newport isn't a controversial proposition – and not just because CJI paid rent to Shearith Israel in 2012. *See* Section D.8, *infra*. CJI's own website admits, as generations of Touro Synagogue Rabbis cum historians have written, Shearith Israel has had the "legal oversight" over or title to the Touro Synagogue, its contents, and the cemetery for nearly 200 years. *See* Section C.1, *infra*. (Shearith Israel's assistance to the Touro Synagogue and to the Jewish community in Newport actually goes back even further, as we will prove at trial.) The "contents" of the Touro Synagogue that Shearith Israel owns and over which it exercised legal oversight include four silver finial bells crafted by Colonial era silversmith Myer Myers (CJI secretly tried to sell two of these four).

Over a 200-year period, Shearith Israel has exercised its ownership and legal oversight to protect the Touro Synagogue and its contents in various ways. For much of that period (more than 70 years during the Nineteenth Century), there were few or no Jews in Newport on any regular basis. During this time, Shearith Israel obtained title to the real and personal property associated with Touro; protected the Synagogue by using Shearith Israel's scarce funds; approved maintenance work done by the City of Newport; sent its clergy to perform weddings and funerals for those Jews wishing to be married or buried there; and made related rulings (such as how internment should occur). Longfellow's beautiful poem titled The Jewish Cemetery at Newport results from efforts of Shearith Israel, who assisted in maintaining the cemetery during the Nineteenth Century. *See* Section C.1, *infra*.

Since the late Nineteenth Century, when Jews started returning to Newport, Shearith Israel's legal oversight included again using its scarce financial resources; ensuring that public funds were expended for purposes relating to maintaining the Synagogue and paying for Rabbis to preside there; keeping in-fighting between groups of Jews settling in Newport from harming

the Synagogue; and actually establishing judicially in Rhode Island state and federal courts that it owned the Synagogue and its personalty so that it could carry out its role to protect the Touro Synagogue and its contents. Shearith Israel's legal oversight relatedly took the form permitting a new corporate entity, CJI, to use the Touro Synagogue and its contents as a lessee to ensure that Touro Synagogue remains a Jewish house of orthodox worship open to all – exactly how the Touro Synagogue was run before Shearith Israel attained title and how Shearith Israel insisted the Synagogue be run before it leased the premises and contents to CJI. *See* Section C.3, *infra*.

    **C.**    **Overview of Factual Narrative.**  As the factual narrative below demonstrates, in at least four ways Shearith Israel made sure that it would continue to be able to carry out its legal oversight role even with CJI on the scene. That way, if CJI lost its way or was no longer acting to preserve and protect Touro Synagogue and its contents — as happened in 2012 when it tried to sell the rimonim — Shearith Israel could step back in:

    *First*, Shearith Israel ensured that proper, legally effective documentation existed so that the Touro Synagogue and its religious objects would continue to be open and available. *See* Sections C.5; D.5-7, *infra*. Shearith Israel first "loaned" and then "leased" the Synagogue and rimonim (among other things) to CJI. The 1903 Indenture with Lease, renewed in 1908, was not onerous to CJI, but it was and remains legally effective to ensure that CJI not act antithetically to Shearith Israel's rights to protect the Touro Synagogue and its contents. The Indenture with Lease (and its renewal) are among the most important documents in the case.

    *Second*, the pertinent historical factual context leading up to the Indenture with Lease leaves no doubt that CJI cannot sustain its burden of proof. CJI was a newly created entity with no assets, no property, and neither the entitlement nor the wherewithal to secure entry to the Touro Synagogue or to any of the ritual personal property that Shearith Israel owned. CJI

admitted in writing that it did not own the Synagogue or its appurtenances of worship.  CJI obtained access and use solely by license, solely by obtaining the prior written permission from Shearith Israel.  The contents and personal property were variously referred to by the parties, but the intent to cover the personal property is without legitimate debate.

   ***Third***, since 1903, Shearith Israel has been a benevolent landlord, permitting CJI essentially to manage the Touro Synagogue without interference, provided CJI abided by the limitations that permitted CJI access.  When necessary, Shearith Israel has vindicated its rights, succeeding in each case decided on the merits since 1899.  Those decisions are preclusive of several of CJI's claims.  When necessary, Shearith Israel has exercised its sovereign right as owner – more than once before the 1903 Indenture with Lease it locked the doors to the Touro Synagogue (with the rimonim inside) to confirm its rights.  *See* Section D.5, *infra*.  Indeed, before Shearith Israel and CJI entered into the Indenture with Lease in 1903, Shearith Israel not only locked the doors (with the rimonim inside), keeping CJI out; Shearith Israel required CJI to execute formal board resolutions permanently surrendering the property to Shearith Israel, and the parties went through a formal and deliberately public and scripted Ceremony of the Keys where CJI obtained the keys only after its complete surrender of the real and personal property and the execution of the Indenture with Lease covering both into the future.  *See* Section D.6, *infra*.  Since that time Shearith Israel has rejected efforts to change the Touro Synagogue building's outside or inside.  Over the decades Shearith Israel has acted as owner, approving efforts to maintain the Synagogue and contents, including with the federal government in 1945 and more recently, including in 2001 and 2004, with various federal and state agencies.

   ***Fourth***, since 1897, CJI's own Constitution and Bylaws have required CJI to keep four permanent Shearith Israel trustees on its Board.  Those same instruments have prohibited CJI

from selling anything without Shearith Israel's consent.  This formal protection has never validly changed, despite CJI's having ignored it.  *See* Section C.5, *infra*.

**D.**  **Key issues to be decided at trial.**  The key issues raised in CJI's claims and in Shearith Israel counterclaims involve (i) **ownership and/or control** of the sacred properties and objects of Touro Synagogue and its contents, and (ii) the **relationship/status** between CJI and Shearith Israel with respect to them.  This Court can determine the ownership of the rimonim and the legal relationship between the parties through analyzing the writings between the parties, prior court decisions, and the parties' written representations to government agencies, among others, all as explicated by Shearith Israel's experts (CJI is calling no experts in its case).

CJI's case begins and ends with its failure of proof, not only because of the absence of any bill of sale or other evidence of ownership of the rimonim, but because of the key documents between the parties.  The Indenture with Lease and the documents demonstrate only limited license for CJI's use of Touro Synagogue or personalty.  Pursuant to the Indenture with Lease, trustees of Shearith Israel, as owners of the Touro Synagogue as well as its appurtenances and paraphernalia, leased the Synagogue, appurtenances, and paraphernalia to CJI (D150-1).  Shearith Israel therefore was and has remained the owner; CJI was and has remained the lessee.

CJI had no right to sell the rimonim if the Indenture with Lease is in force and if it covers ritual objects such as rimonim.  Accordingly, there are two main factual issues to be decided with respect to the Indenture with Lease: first, did it remain in force, and, second, does the instrument and the other written documents of limited permissive use cover the real property and the rimonim.  Shearith Israel intends to prove that the Indenture with Lease and other writings remained in force and cover the real estate and rimonim.  And the Court's finding that the Indenture with Lease remained in force and embraced the real and personal property will dispose

of CJI's case.  This is so because, if the Indenture with Lease covers the rimonim, CJI cannot sell them irrespective of whether, for example, Shearith Israel owns the rimonim or whether CJI is or is not the beneficiary of any trust.

The proof supporting Shearith Israel's counterclaims overlaps much of the proof on CJI's claims but is broader.  Assuming Shearith Israel needs to put on a case, it will adduce proof that will permit broader findings that (i) Shearith Israel owns and controls the Touro Synagogue, its cemetery, and the rimonim; (ii) CJI is not the beneficiary of any trust from Shearith Israel and had no authority to sell the rimonim; (iii) Shearith Israel has fulfilled any obligations it had to CJI; and (iv) Shearith Israel has the rights given it under the CJI 1897 Constitution and Bylaws.

**E.**      **Five CJI Issues that the Court Should Not Permit To Distract the Trial.**  We cannot permit CJI mischaracterizations to confuse the Court or the public any longer:

*First*, Shearith Israel legally could have returned its property including the rimonim to New York at any time.  But it has never done that and has no intention of doing that so long as there is a congregation worshipping at the Touro Synagogue and carrying out the Touro Synagogue's purpose, which Shearith Israel has protected for 200 years.  Shearith Israel will continue to guard the religious, cultural, historical gem that is Touro Synagogue and its contents.

*Second*, there is no issue in this case of displacing or ejecting from the Touro Synagogue any congregant or worshiper.  Shearith Israel told CJI that in writing over 16 months ago.  It is CJI leadership, not worshipers, that has lost its way and needs to be stopped or replaced.  CJI is not the Touro Synagogue.  Nor is CJI synonymous with the Jews worshiping at Touro Synagogue or in Newport.  Those worshipers can but need not be members of CJI.  With this Court's help, Shearith Israel will to continue to guard and protect Touro Synagogue as well as its religious artifacts for use by the Jews of Newport.

***Third***, the party seeking to deprive worshipers is CJI, who wants to sell two irreplaceable rimonim so that they are forever gone from Rhode Island's treasured Touro Synagogue, gone from Jewish worshipers both at the Touro Synagogue and elsewhere, and gone as actual, usable American religious objects. Trying to sell what it does not own, CJI leadership is motivated, not by the interests of worshipers, but by self-aggrandizement and unrelated business burdens.

***Fourth***, perhaps the most time-consuming of CJI's red herrings are CJI's assertions that it is the beneficiary of a trust and that as a result it could secretly sell the rimonim. There is not a single document creating a trust ***for the benefit of CJI***. CJI is a lessee whose leadership has run amok. Its leadership needs to be stopped or replaced. CJI's efforts to get the benefit of trusts that do or might exist for the benefit of others should be resisted. And even were CJI able to prove it is somehow the beneficiary of a trust, that would never lead to the conclusion that it could surreptitiously sell the rimonim. That would turn trust law on its head. Allegations of a trust obscure the true relationship of the parties as lessor and lessee. CJI cannot in good faith claim it is the beneficiary of any alleged trust after the Federal Court in Rhode Island held in 1903 that CJI is not the beneficiary of any such trust.

***Fifth***, there is another factual detour that CJI will take us on: that somehow it is proper for CJI to steal and sell the rimonim because the Touro Synagogue needs money. There isn't a religious institution in the world that is not in need of funds. That does not justify misappropriation of property. And, if Shearith Israel needs to prove it, it will show that CJI has ample funds to run the Touro Synagogue, that if it does not it is because of independent financial obligations CJI has taken on that undermine its role as caretaker of the Touro Synagogue, and that if Shearith Israel needs to step in because CJI has so lost its way that it cannot figure out how lawfully to keep the Touro Synagogue afloat, then Shearith Israel will.

## STATEMENT OF FACTS

Shearith Israel's factual summary is made while preserving all evidentiary objections.

### A.    SEVENTEENTH CENTURY – SHEARITH ISRAEL

Congregation Shearith Israel was founded when the first Jews came to the New World as a group in 1654 (D447-23).  It is the first Jewish congregation established in North America.  Shearith Israel follows the Western Sephardic rites and rituals that were practiced in America through Colonial times.  As was custom for religious institutions, all property and other "temporalities" of the congregation were "vested in the Trustees of [the] Corporation" (D17-2).  The trustees of Shearith Israel would hold real and other property in trust for the Congregation.  Care thus must be taken in reviewing the documents to ask, not whether real or personal property is being held in trust, but **for whom** it is being held.

### B.    EIGHTEENTH CENTURY – THE SYNAGOGUE LATER KNOWN AS THE TOURO SYNAGOGUE

By the 1700s, a community of Jews had settled in Newport, Rhode Island, under the name of Congregation Yeshuat Israel ("Yeshuat Israel").  They worshipped according to the traditions, rites, and rituals of Western Sephardic Jewry.  In 1759, three Yeshuat Israel congregants, Jacob Rodrigues Rivera, Moses Lopez, and Isaac Hart, purchased a plot of land on which to build a synagogue (D424).  This original deed to Rivera, Lopez and Hart did not contain any language of trust, but instead conveyed the land to the purchasers and their heirs and assigns forever (*id.*).

Yeshuat Israel was dependent on the generosity and support of other Jewish congregations to obtain the necessary funds to build Touro Synagogue, including Shearith Israel from whom Yeshuat Israel, in 1759, specifically requested assistance in its building efforts (D36-4).  Shearith Israel answered the call for aid by sending over £149 to Newport (D36-6).

Yeshuat Israel then ran out of funds in 1761 and had to request further assistance from Shearith Israel, which Shearith Israel again provided (D36-8). With the aid of Shearith Israel, Touro Synagogue was completed and consecrated in December of 1763 (D448-113 to 116).

During the dedication of the Synagogue at Newport, Shearith Israel sent as gifts: a Ner tamid (an "eternal light"), candlesticks, and wax (D36-11). In addition to gifts of objects, Yeshuat Israel also obtained loans of certain ritual objects from Shearith Israel, including the loan of two Torah scrolls, one that had previously belonged to a congregation in Georgia (D5). CJI's website on the history of the Touro Synagogue states: "It was from the New York community that [Yeshuat Israel] had obtained several ritual objects for their services." (D19-2).

None of the documented gifts by Shearith Israel or other congregations to the Newport Synagogue included the Myer Myers rimonim. Indeed, a detailed account by academic Ezra Stiles of Touro Synagogue's dedication makes no mention of any finials on the Torah scrolls as of the dedication in 1763 (D7). By 1769, however, Touro Synagogue had obtained two sets of rimonim, neither of which was from Myer Myers (D7-9 (noting a scroll from Lopez and a scroll from the Portuguese Synagogue in London, both with silver tops and bells washed with gold)).

Jews worshipped for only a brief time at the Newport Synagogue before Newport was occupied by the British during the Revolutionary War, causing Newport's commerce to grind to a halt, and forcing most of its Jewish residents to flee. As former CJI rabbi, Morris Gutstein wrote, "[t]he conflict with Great Britain was a death blow to the prosperity of the city of Newport, and in particular to the Jewish community of the town" (D448-208). By the 1790s the Newport synagogue "owned only one old, cracked shofar, the ram's horn that is sounded on the High Holidays, but even worse, no one knew how to blow it" (D451-103). The doors of the Synagogue were closed just decades after its consecration (D448-260).

C.    **NINETEENTH CENTURY**

    1.    **The Transfer To Shearith Israel Of Title To The Newport Synagogue And Ownership Of Its Contents Not Previously Owned**

The Jewish population in Newport continued to dwindle in the Nineteenth Century, with many Jews leaving Newport for New York and joining Shearith Israel (D448-260). In 1822, the last Jewish resident of Newport left for New York, leading to a long period during which the doors to the Newport Synagogue were locked. Shortly after the Jews fled Newport, when "the seats of the newly built Crosby Street Synagogue of the Congregation Shearith Israel of New York were allotted, among their holders were the Seixas, the Levys, the Lopez and the Judah families together with many more names of old Newporters or their descendants" (*id.*).

At this time, ownership and control of the rimonim and other articles formerly at the Newport Synagogue passed to Shearith Israel in New York (*id.* at 259 to 260). CJI's own website states that during this time "**Legal oversight of the [Touro Synagogue], its contents, and its deed was handed to Congregation Shearith Israel in New York**" (D19-2; *see also* D24-2). Not only did legal oversight pass, but "**title of the building passed into the hands of the Congregation Shearith Israel of New York Cit**y" (D324-10; D449-106 ("In the early '20s of the nineteenth century, **the Newport synagogue was already considered the property of the trustees of the New York congregation**.")). When the doors to Newport Synagogue were closed and the keys handed over to Shearith Israel, the transfer of ownership included the personalty associated with the Synagogue, as indicated in later references by Shearith Israel to its control over the Touro Synagogue "&c." (D91-1; D117-1; D155) or "etc." (D117-5; D240-2).

After the doors were locked, Shearith Israel exercised control over the real and personal property associated with what later became known as the Touro Synagogue. The Synagogue was opened only occasionally, mainly for funerals, and only with the permission from Shearith

Israel (D38-7 to 10; D473).  When repairs of the Synagogue were needed, the Newport Town Council wrote to Shearith Israel, "requesting them to furnish the council with the Keys of said Synagogue, for the purposes of making said repairs" (D23).  CJI's former Rabbi, Morris Gutstein noted this deference to Shearith Israel, stating: "For in 1825, when the Rhode Island Legislature was considering repairing the building, they were prevented from doing so without consulting the New York congregation **which was considered the rightful and legal owner of the property**" (D449-106 to 107).

Similar care was taken with the Colonial cemetery at Newport.  In 1852, the famed poet Henry Wadsworth Longfellow visited the old Jewish cemetery at Newport, noting in a poem that "Gone are the living, but the dead remain, And not neglected; for a hand unseen . . .  Still keeps their graves and their remembrance green." (D448-276 to 277).  Thus, despite the scattering of the Newport Jews and the closing of the Synagogue, Shearith Israel played a central role in ensuring that the Synagogue and its related properties were maintained and cared for.

During this epoch, the Synagogue received two bequests in the wills of Abraham and Judah Touro, two sons of Isaac Touro, who officiated in the Newport synagogue when it had opened in 1763.  Abraham Touro bequeathed $10,000 to the state of Rhode Island in 1822 for the upkeep of the Synagogue.  Isaac bequeathed another $10,000 to the City of Newport for supporting a minister at the Synagogue (D477-1).  To this day, these "Touro Funds" continue to provide significant financial benefit to the Touro Synagogue.

With regard to the personalty at the Synagogue, Stephen Gould of Newport requested of Shearith Israel that a mutilated scroll be deposited in the tomb of the late Judah Touro. Manifesting its legal control, Shearith Israel denied the request – according to the Shearith Israel tradition, Torah scrolls were not buried with people except in the sole case of the deceased

having filled Ecclesiastical office in their lifetime (D31-4).  Further manifesting its legal control, Shearith Israel's board minutes of 1818 show that the Shearith Israel board requested from the Seixas family the return of two Sepharim which it had "loaned" to the Newport Synagogue, noting that if a future congregation at Newport requested a further "loan" of the Sepharim, such "loan" would be granted (D20-3).  Then, it was noted that there were "other Sepharim" in the possession of the Seixas family and that, should the Seixas wished, these "other Sepharim" could also be sent to New York "for safe keeping" to be returned when "duly required" (D20-3).

There is no evidence in any of the contemporaneous documents that the rimonim were ever held by Shearith Israel for "safe keeping" or for their return to Newport.

## 2.     The 1869 Inventory

In 1869, the Shearith Israel Board directed and then confirmed an inventory of the objects that Shearith Israel owned or was holding for others (D33; D35).  The inventory confirms ownership and possession by Shearith Israel of two pairs of rimonim bearing the mark of Myer Myers, one pair of which bore the engraving "Newport" (D34-36).  Notably, next to these two pairs of Myer Myers rimonim there is no reference to the rimonim being the property of another. There are ditto marks indicating that these rimonim are the "property of [Kahal – Hebrew for Congregation] in keeping of Shamas [Hebrew for Sexton]" (*id.*).  Thus, two pairs of Myer Myers finials were at Shearith Israel in New York, owned by Shearith Israel, throughout the Nineteenth Century.  An inventory taken of the Touro Synagogue at approximately the same time period confirms that no rimonim were there (D37-4 to 6).

### a.     Further Exercise Of Shearith Israel Ownership And Control: Mixing The Pairs Of Rimonim When Later Loaning Them For Use In The Touro Synagogue

When the two finials in dispute were loaned to the Touro Synagogue in the late Nineteenth Century following the re-establishment of services (summarized below), the finials

-12-

selected were from the two different pairs owned by Shearith Israel and noted in its inventory of 1869—one final from the set engraved "Newport" and one final from the unengraved set. Deposition of Dr. Vivian Mann at 10:25-11:16; D189-3 (publication picturing the mismatched finials at Touro in 1913)).  CJI admits that this unmatched pair was at the Touro Synagogue by 1902 (CJI Answer to Countercl. ¶ 29).

### 3.    Shearith Israel Unlocks The Doors To The Touro Synagogue, Controlling The Real And Personal Property

Toward the end of the Nineteenth Century, Newport and its Jewish population experienced something of a revival, initially as a summer destination.  A contingent of Jewish families emigrated to Newport from Eastern Europe, bringing with them the rites and rituals of Eastern European Jewry (Ashkenaz in ritual).  Desiring to worship in the Touro Synagogue, one or more Jews requested that the doors of Touro Synagogue be reopened (D41-2).  The Newport City Council ordered that all petitions or applications of parties desiring the use of the Touro Synagogue be transmitted to the Shearith Israel Board of Trustees, who were the owners of the Synagogue and related property (*id.*).

Shearith Israel desired to have the Touro Synagogue open for public worship.  It agreed to open its doors, but only under "suitable auspices" that would protect the Synagogue, the Touro Fund, and Shearith Israel's rights (D46-2).  Shearith Israel refused to allow the Touro Fund to be accessed "until there shall be a sufficient number of permanent residents to maintain services throughout the year in accordance with the principles and forms of orthodox Judaism as contemplated by the terms of the will of the late Judah Touro" (D43-2).  Once there were enough Jews, Shearith Israel engaged Rev. A.P. Mendez of London to accept the Touro pulpit (D47-1), and allowed for payment of his salary through the Touro Funds.  After Rev. Mendez's death in 1893, Shearith Israel appointed Rev. David Baruch to be the hazzan, or ritual minister, of the

Touro Synagogue (D57-3).  Shearith Israel also controlled the dispensation of the Touro Funds and intervened when necessary to prevent any diversion of the funds away from their intended functions of paying the salary of Touro's minster and maintaining the synagogue (D76).

###### 4.    Shearith Israel Again Answers The Call For Aid, Specifically Limiting Any Auhorization for Use of the Real or Personal Property

Shearith Israel further assisted in reestablishing worship services at the Touro Synagogue by sending to Newport various ritual objects for use there.  The record demonstrates that these transfers were authorized for limited purposes, with Shearith Israel over and over again retaining its right to recall them.  For example, in 1883, when services were reestablished on a more permanent basis under the leadership of Rev. A. P. Mendez, Shearith Israel designated two Sepharim to be used at Touro Synagogue "*during the pleasure of the Board*" (D52-3).

The nascent congregation that would become CJI had nothing.  It thus requested of Shearith Israel "the further assistance which they have in the past rendered *in the loan of such property as has formerly been in use in the services*" (D58-2).  Shearith Israel responded to this request for assistance by empowering the minister it appointed at Touro Synagogue "*to use the Sepharim, Bells, Books, Shofar and all other appurtenances for worship now in Newport Synagogue or in storage at the Newport Bank (Bank of Rhode Island) and the Synagogue building and adjoining buildings*" provided that "*custody of the buildings and appurtenances*" *be returned to Shearith Israel upon termination of the minister's appointment*" (D60).

CJI requested that Shearith Israel provide an order to the Rhode Island Bank "to deliver the silver Bells" to the new entity (D62-2).  Shearith Israel refused.  It did know CJI, did not fully trust the people running it, and would not lose control of the objects.  It was willing to send an "order for the silver sefer-bells and whatever is stored in Newport" but instructed that the

order not be signed until someone could guarantee "their safe keeping **and their return whenever desired by us**" (D70).

In February of 1897, CJI's President reported that "a pair of Bells in the Synagogue were claimed as the property of Congregation Shearith Israel of New York" who had requested the bells be forwarded to them (D96-2).  CJI complied (*id.*).  Subsequently, in September of 1897, Shearith Israel again sent a pair of silver bells to Touro Synagogue "for temporary use" until the Congregation could "procure a pair for permanent use" (D101).

The rimonim at issue in this lawsuit were among the silver ritual objects as to which Shearith Israel expressly reserved the right to get back.  *See* CJI Answer to Countercl. ¶ 29 (admitting that "At the time of the resolution of the litigation between the congregations in 1902, the rimonim (among other Torah bells) existed in the Touro Synagogue").

### 5.    Shearith Israel Protects Its Rights In The Touro Synagogue And Its Personalty

The new Newport Jews that began worshipping at the Touro Synagogue in the 1880s were strangers to the Colonial congregation Yeshuat Israel and strangers to Shearith Israel in every way.  The congregation that would become CJI had (and continues to have) no cultural, spiritual, legal, or other connection to Yeshuat Israel, the Colonial congregation that previously worshipped at Touro Synagogue and whose remaining heirs became members of Shearith Israel (D38).  CJI, instead, is a wholly separate congregation that did not have its beginnings until the 1880s and indeed was not incorporated in Rhode Island until 1894 (D84).  CJI's former Rabbi Theodore Lewis noted that even in the Twentieth Century "there are no descendants of the early Jewish settlers living in Newport." (D452-10).

Shearith Israel undertook to exercise its control to protect the Touro Synagogue's legacy as the "**Trustees and owners of the [Touro] Synagogue and personal property therein**"

-15-

(D67-2).  When CJI sought to incorporate itself in Rhode Island under the exact name of the ancient Jewish congregation of Newport, specifically Congregation Yeshuat Israel, Shearith Israel intervened by petitioning the Rhode Island General Assembly (D74).

CJI specifically admitted: "***we do not claim ownership in the property or appurtenances***" (D65), making clear in at least two subsequent and contemporaneous written communications that the "property or appurtenances" specifically embraced the "***personal property***" such as the rimonim  (D67-2; D66-2).  CJI thought that only the heirs-at-law of the original owners could establish clear title to the property (D65).

As a result, Shearith Israel sought and obtained further legal protections of its title to Touro Synagogue (and personalty) by obtaining official deeds of transfers for the Touro Synagogue.  Jacob Rodrigues Rivera, Moses Lopez, and Isaac Hart bought the land on which Touro Synagogue now stands in 1759 (D424).  Isaac Hart later conveyed his interest to Jacob Rodrigues Rivera (D16-2).  Upon Rivera and Lopez's death, title vested in their heirs (D98-9 to 10).  These heirs, many of whom had become members of Shearith Israel, formally and legally executed the necessary deeds conveying to the Shearith Israel Trustees the synagogue, the land, and premises, "together with all the appurtenances and all the estate" in 1894 (D78-2).  The deeds formalized and confirmed that Shearith Israel owned what had already been conveyed to Shearith Israel in the early 1800's after the initial closing of Touro Synagogue's doors—namely, Touro Synagogue and its related real and personal property.  CJI has recognized the authority of the 1894 deeds, as evidenced by its former president and historian Bernard Kusinitz, writing in 1975 that "***Touro Synagogue belonged to and still is the legal property of the trustees of Congregation Shearith Israel of New York City, title and trust of the synagogue having been deeded to them by remaining legal heirs of the synagogue in 1894***" (D445-3).

-16-

Shearith Israel also protected its rights of oversight of Touro Synagogue and its contents by establishing its right to sit on and participate in the newly formed CJI's board.  CJI's original Constitution and By-laws, adopted in 1893, did not provide any rights to Shearith Israel (D71). Shearith Israel protested, and after much exchange with CJI, successfully procured protections for Shearith Israel's rights in connection to the Touro Synagogue (D89-1 to 2; D94).  CJI's Constitution and By-Laws, adopted in 1897 (the "Constitution and By-Laws"), responded directly to Shearith Israel's concerns by incorporating four trustees from Shearith Israel into CJI's governance structure.  These trustees were given full power to vote on all matters relating to CJI in person or by proxy (D95-2 to 3).

CJI's Constitution and By-Laws further protected Shearith Israel's rights to the real and personal property at the Touro Synagogue, requiring that no property could be sold, exchanged, or mortgaged other than by unanimous vote of the members present (D95-10).  Both of these protective provisions were expressly prohibited from being changed in any way that would remove the influence of the Shearith Israel trustees without Shearith Israel's written consent (D95-11).  There is no evidence that CJI ever obtained that written consent or ever validly amended the CJI Constitution and By-Laws.  By obtaining rights in the very governing instruments of the newly formed CJI, Shearith Israel ensured that CJI would govern itself in a manner consistent with the rights of Shearith Israel and the legacy of Touro Synagogue and its real and personal property.  The Constitution and By-Laws emendation was a significant event, crucial to Shearith Israel's willingness to permit CJI even limited and restricted use of the Touro Synagogue and the related personalty (D445-7).

D.   **TWENTIETH/TWENTY-FIRST CENTURIES**

   1.   **Shearith Israel Stops The Infighting Between The Newport Congregations By Locking The Doors Of The Touro Synagogue And Its Contents, Exercising Ultimate Control Over Both**

By the 1900s, tensions began building over which of competing Jewish groups would pray at the Touro Synagogue and possibly have access to the Touro Funds (D445-04 to 05).  A schism developed in the Rhode Island Jewish community, and a large number of congregants split from the nascent CJI (*id.* at 7 to 8).  The new faction called itself the Touro Congregation (*id.*).  In 1899, the Touro Congregation tried to claim possession of the Touro Synagogue and broke into the premises to lock out CJI, who at that time had permission from Shearith Israel to worship at Touro (*id.* at 8 to 9).  Shearith Israel initiated and eventually prevailed in an ejectment action against the Touro Congregation, and the keys to Touro Synagogue were delivered back to Shearith Israel (*id.* at 8 to 10; D115).

When order was restored, the Touro Congregation settled its differences with CJI. Following this legal battle, Shearith Israel repeatedly entreated CJI to memorialize its use of Touro Synagogue by signing a lease (D124), so that both Shearith Israel's and CJI's interests would be protected.  CJI refused, and after nearly two years of negotiations, Shearith Israel was forced to close the Synagogue again (D125-1; D128-2; D131-1; D135-1).

   2.   **The Court Upholds Shearith Israel's Ownership And Right To Control Personality Within The Touro Synagogue**

In February of 1901, CJI brought a replevin action attempting to obtain possession of a scroll that had been gifted to and locked in the Touro Synagogue when Shearith Israel had the doors locked (D445-14).  CJI claimed that the scroll was the property of the new congregation. The Court disagreed, returning the Torah to Shearith Israel's agent (*id.*).

3.    **More Judicial Approval Of Shearith Israel's Ownership And Control Of The Touro Synagogue And Its Real And Personal Property**

In 1902, it was CJI that staged a break-in.  Again Shearith Israel was forced to bring ejectment proceedings, this time against CJI (D140).  Shearith Israel again prevailed at trial (D139) but the decision was thrown out on procedural grounds.  While that lawsuit was pending, CJI and several individual plaintiffs filed a declaratory action in Rhode Island state court against the Shearith Israel Trustees in May of 1902 (D136).  Ultimately in 1903, Shearith Israel obtained a decision in Rhode Island Federal Court firmly settling the issue of ownership, holding that "the defendants were in actual possession under deeds purporting to convey them a legal title, upon a trust declared therein" (D143-3).  As historian Melvin Urofsky notes, the 1903 decision "completely vindicate[ed] the rights of Shearith Israel in the Newport synagogue" (D451-117).

4.    **CJI And The Public Recognize Shearith Israel's Ownership And Control Over The Touro Synagogue And Its Contents**

Shearith Israel secured possession of the Touro Synagogue and resolved to "take all necessary measures to preserve the property, with power" to protect the property against any further takeover attempts (D144-1).  CJI in turn recognized that it had no rights of its own to the Touro Synagogue or the persoalty and was wholly dependent on Shearith Israel for access to the Synagogue, its land, cemetery, and personalty.  CJI entered into a settlement agreement with Shearith Israel whereby CJI agreed "**to admit and recognize without qualification the title and ownership of [the Trustees] of the Congregation Shearith Israel to the synagogue building, premises and fixtures**" (D146).

On February 2, 1903, by formal Board resolution, CJI resolved "**to surrender the possession of the Synagogue building, premises, and paraphernalia belonging thereto at Newport**" to the Shearith Israel Trustees, "**owners of the property**," and enter into the Indenture with Lease from Shearith Israel for a term of five years with a rent of one dollar per

year (D147).  Following the 1903 lawsuit, the public similarly recognized Shearith Israel's title

to Touro Synagogue and its associated real and personal property (D162-7) (noting in 1905:

"**Both synagogue and cemetery are now the property of the new York congregation, and**

**the courts after litigation have sustained its title thereto**").

5.      **Drafting the 1903 Indenture with Lease Specifically To Embrace
        Personalty**

Contemporaneous documents demonstrate that, in drafting the Indenture with Lease,

Shearith Israel purposefully encompassed within its bounds the personal property associated with

Touro Synagogue at that time, which included (by CJI's own admission) the rimonim.  *See*

Compl. at 1 (claiming that the rimonim "have been in [CJI's] continual possession and control

for approximately 130 years); CJI Answer to Countercl. ¶ 29 (admitting that "in 1902, the

rimonim (among other Torah bells) existed in the Touro Synagogue").

Specifically, on February 10, 1903, L. Napoleon Levy, the President of Shearith Israel,

wrote to Shearith Israel's lawyer in Newport, William P. Sheffield, regarding the language of the

Indenture, stating: "***I notice an omission in the lease; we neglected to include the***

***paraphernalia.  If you can arrange to insert, 'with the paraphernalia belonging thereto' . . .***

***please do so***" (D149).  The document goes on to state: "***If not, we will rely on the resolution***

***passed by Jeshuat Israel or obtain another paper from them.***"  This same letter suggests that a

list of the personal property be made, confirming that the parties understood that the leasehold

would embrace personalty as well as realty (*id.*).  That same day, L. Napoleon Levy wrote to Dr.

H. P. Mendez, Shearith Israel's minister and representative for the lease negotiations, advising

that Mendez "***Obtain surrender of the building and personal property***" (D151-2).

CJI asserts that, one day later, on February 3, a Shearith Israel officer wrote to H. P.

Mendez, stating "***One Sepher and Bells is now at New Port our property***" (D152).  Assuming

CJI's representation of the date of this document is believed, the document is further evidence that "paraphernalia" or "personal property" were on the minds of the Shearith Israel officers at the time of the Indenture with Lease signing, and that these terms confirmed that the personal property such as the rimonim were included (*id.*).  And, assuming CJI's representation as to the date, this was again confirmed by a subsequent telegram sent on February 18 from Mr. Levy to H.P. Mendez noting**, "*sefer and bells*"** were part of the Indenture with Lease design and drafting (D478).

Mr. Levy's proposed language of "with the paraphernalia belonging thereto" was inserted into the final Indenture and Lease before execution, and the personal property at Touro Synagogue was reviewed prior to the Indenture with Lease and keys being passed to CJI, who from that moment on, functioned solely as a lessee of Touro Synagogue and its appurtenances and paraphernalia belonging thereto, including the rimonim (D155).

### 6.    The Formal Ceremony Of The Keys Between CJI And Shearith Israel

Shearith Israel insisted that a formal Ceremony of the Keys occur by CJI's board-designated committee before Shearith Israel would permit CJI's use of the Touro Synagogue or its contents.  As part of the Ceremony, CJI represented that it had "***full authority from the trustees of the congregation to deliver possession and execute [the] lease***" (*id.*).  The CJI committee then delivered the keys of "the Synagogue, ***ark & c.***" to Shearith Israel's Dr. H. P. Mendez (*id.*).  Sheaith Israel sent a detailed, seven-point list of what it needed before it would hand back the keys to CJI.  This list included clarifying the language of the Indenture with Lease to ensure it covered the "personal property"; obtaining "surrenders of the building and personal property"; and making the surrender, which "is a matter of importance and should be made publicly," known to the press.  All of these things were done (D151).

-21-

7.    **Shearith Israel And CJI Enter Into The 1903 Indenture With Lease**

The Indenture with Lease, executed on February 18, 1903, encompassed the Touro Synagogue together with "the appurtenances and paraphernalia belonging thereto" (D148-2). The Indenture with Lease imposes limitations on CJI's use of the leased real and personal property and reserves to Shearith Israel approval of rabbis at the Touro Synagogue.  The instrument calls for payment of $1.00 a year in rent.

8.    **The Indenture With Lease Remains In Force Into 2012**

The parties from that point forward recognized the validity and continued vitality of the Indenture with Lease.

a.    **The Course Of Conduct Between The Parties Confirms The Indenture With Lease's Continued Validity And Operation**

The course of dealings between Shearith Israel and CJI is replete with documents that evidence years of performance affirming the original terms agreed upon in 1903.  CJI has sent payment of one dollar per year in rent to Shearith Israel in most years since 1903 (*see*, *e.g.*, D156; D196; D181; D288; D305).  CJI paid rent to Shearith Israel as recently as 2012, before the dispute began (D396).  Further, CJI's website affirms Shearith Israel's ownership and that a "***lease amount of $1 per year is still paid by the current Newport congregation to Congregation Shearith Israel***" (D19-2).

The Indenture with Lease further provides that CJI's appointment of ministers in the Touro Synagogue was subject to approval by Shearith Israel's representatives in New York (D148-3).  Shearith Israel began to exercise this right even prior to the signing of the Indenture with Lease through the appointment of Touro Synagogue's first minister since the reopening of the doors in the late 1800's, A. P. Mendez (D51-1).  Since 1903, Shearith Israel has continued to aid CJI in finding ministers and approving each successive minister at Touro Synagogue

pursuant to the terms of the Indenture with Lease (D145; D183-1; D184-1; D215-3; D217-4; D228-3; D249; D315; D320-3; D394-1).  As recently as 1996, Shearith Israel approved a line of rabbis from Yeshiva University under Rabbi Shulman's recommendation, stating that "any rabbi who was approved by Rabbi Shulman would be good" (D338-1).

> **b.      CJI Has Repeatedly And Publicly Affirmed The Indenture With Lease**

CJI's leadership has affirmed through the decades that the Indenture with Lease continues to govern the relationship between the two congregations (D281 (1962, attestation that the Indenture with Lease "is our present status"); D302-1 (1979, attestation expressing desire "to terminate its relationship as tenant of Congregation Shearith Israel"); D317-2 (1986, attestation that it was on record in federal court that CJI is the lessor); D336-1 (1995, attestation that "we are tenants and custodians of the building, which is owned by Congregation Shearith Israel"). More recently, CJI's then-president stated in 1998 that "Shearith Israel is the owner of the building" while CJI only "maintains, runs, and insures the building" (D344-1).

CJI has similary made attestations to the government that it continues to function as lessee of Touro Synagogue and its related properties.  In 1945, CJI, Shearith Israel, and the United States Government executed an agreement designating Touro Synagogue a National Historic Site to be protected and preserved.  This 1945 agreement reiterated key terms of the Indenture with Lease, recognizing CJI's promise as "Lessee of the Synagogue building, etc." to maintain the religious traditions practiced since the Colonial era and affirmed that title to the synagogue "and its appurtenances" shall remain in Shearith Israel (D240-2).  At that time, CJI's lawyer noted that "acceptance of these leases . . . operates as an estoppel to object to the title of the Congregation Shearith Israel and the Trustees of that Congregation must be treated as the legal owners of the fee simple title to the property" (D236-3).  CJI's "***possession of the site***

*through a lease with Congregation Shearith Israel as owner*" was again confirmed by CJI in 2001 as part of an agreement with the National Trust for Historic Preservation (D364-4).  In 2004, CJI again confirmed that it leases the Touro Synagogue from Shearith Israel and that said lease was "*perpetual*" (D375-1).

### c.    CJI Continues To Act As Lessee

Throughout the Twentieth Century, CJI repeatedly deferred to Shearith Israel as the owner and landlord of Touro with regard to repairs, changes, and other major decisions related to the Synagogue or the related property.  In 1905, Shearith Israel refused CJI's request to erect a school building on the property adjoining the Touro Synagogue (D164).  Again in 1911, CJI requested Shearith Israel's permission to make an addition to the Synagogue, which Shearith Israel denied because it would have been a desecration to the historic edifice (D185).  In 1920, Shearith Israel successfully intervened when CJI introduced a bill to the Rhode Island Legislature that would have enabled CJI to use the Touro Fund for erecting a building and for extraordinary improvements to Touro Synagogue, limiting the bill to exclude provision for a new building and to expenditures actually needed and approved by Shearith Israel (D423-4; D197-1).

This pattern of CJI obtaining Shearith Israel's permission to make alterations to Touro Synagogue continued throughout the Twentieth Century (*see, e.g.*, D222-1; D224-1 (approving the design of a monument and tablet to be erected on the lawn of Touro Synagogue); D259, D260-3 to 4, D261-1 (requiring Shearith Israel to be informed before any contract for work to the Touro Synagogue building or original site was entered into); D294 (requesting Shearith Israel's concurrence as "legal owner of Touro Synagogue" in installing a burglar and fire alarm system)).  Further, Shearith Israel has been named as an additional insured on the insurance policies covering Touro Synagogue and its contents including the rimonim (D343-1 to 2, D348-1; D388-7; D412-1).

9.    **Shearith Israel's Additional Involvement With the Touro Synagogue, CJI, and the Touro Synagogue Foundation**

Since entering into the Indenture with Lease with CJI, Shearith Israel has maintained its oversight of Touro Synagogue and its related properties and relationship with CJI.  Admittedly, less oversight was needed when Shearith Israel had no belief that CJI was secretly trying to sell Shearith Israel property.  During a large part of the Twentieth Century, Shearith Israel's oversight was exercised through its leadership role in The Society of Friends of Touro Synagogue (now the Touro Synagogue Foundation) (collectively, "TSF").  TSF was established in 1948 following the designation of Touro Synagogue as a National Historic Site with a two-fold mission to preserve and maintain Touro Synagogue and to educate the public about its history (D19-2)  Shearith Israel's important role in relation to and legal ownership of Touro Synagogue was acknowledged in TSF's original structural organization and leadership.  According to TSF's original by-laws, TSF's board had to be comprised of the presidents of Shearith Israel and CJI, as well as five additional members from each of the respective congregations (D280-1).  Through representation on TSF's board, and in addition to Shearith Israel's rights as loaner of restricted property, lessor, and its protections in the CJI Constitution and By-Laws, Shearith Israel retained and exercised oversight control over the Touro Synagogue through the organization dedicated to the Touro Synagogue's preservation and maintenance.

Shearith Israel also involved itself with CJI by appointing members of its own Congregation to serve as liaison to CJI.  Shearith Israel's liaisons served as a channel of communication regarding Touro Synagogue, striving to build relationships with the leadership at CJI and TSF and safeguard Shearith Israel's interests as owner and landlord of Touro Synagogue and its related properties.  Deposition of Dr. Leonard Groopman at 15:5-20, 28:8-11.

Throughout CJI's existence, Shearith Israel has sent other precious ritual objects for Congregation Jeshuat Israel's use during services.  For example, by 1936, we know that Shearith Israel had sent its oldest pair of rimonim, made around 1730, to Touro Synagogue (D448-162).  By 1958, we know that this pair of rimonim was back at Shearith Israel (D449-91).

### 10.    As Part of Shearith Israel's Ownership, the Rimonim Are Integral To The Touro Synagogue As A Functioning House Of Worship

The rimonim remained and continue to be a religious articles integrally connected to the Touro Synagogue.  (Occasional loans of the rimonim to museums have always been fine.)  For example, in 1937, Shearith Israel received word that "2 or 3 pairs of Myers silver bells were being used every Saturday by [CJI], and that the congregation did not seem particularly careful about them, probably not realizing their great worth" (D221-3).  Shearith Israel's board considered taking steps to preserve the rimonim, showing their ownership and control over the rimonim, but ultimately no action was taken because the Board recognized they would have to send other bells to replace the Myer Myers rimonim (*id.*).  When, in 2001, the rimonim were in need of repair, it was one of Shearith Israel's members, Roy Zuckerberg, who had previously underwritten the repair of the mixed-set of rimonim at Shearith Israel, who underwrote the repair costs of other halves of the mixed-set at the Touro Synagogue (D361-2; D363).

The general public understands that the Myer Myers rimonim have been, and continue to be, part of the essential ritual furnishings at the Touro Synagogue, as evidenced by the explicit inclusion in multiple histories and descriptions of Touro Synagogue of the rimonim.  A brochure for the Touro Synagogue prepared by the U.S. Department of the Interior includes a picture and description of the "exquisite silver belltops" of the scrolls of law crafted by Myer Myers, noting that the rimonim are among the objects that "give to the synagogue a profoundly religious atmosphere" (D350-9).  A 2004 application submitted by CJI to for a State Preservation Grant

states that among Touro Synagogue's original interior furnishings were two sets of silver rimonim crafted by Myer Myers (D375-10). In a 1986 National Register of Historic Places nomination form, a description of the Touro Synagogue notes that "[t]he rimonim-silver belltops which adorn the rollers, are the work of the famous pre-revolutionary silversmith, Myer Myers" (D324-7). That same description notes that Touro Synagogue is still owned by Shearith Israel, who together with the U.S. government, CJI, and TSF, "continue to preserve the balance, fabric and genus loci of the site," which includes the rimonim (D324-10).

**E.    CJI'S BREACH OF THE INDENTURE WITH LEASE AND OTHER AGREEMENTS**

In recent years, one or more persons associated with CJI, purporting to act as the directors and/or officers of CJI, have breached the governing legal instruments between Shearith Israel and CJI by seeking to usurp control of the Touro Synagogue and ownership of the rimonim from Shearith Israel. Discovery in the case revealed that, in ~2008-09 several individuals acting as CJI officers began secretly to seek potential purchasers for the rimonim (D381-2).

In or around June 2012, the individuals involved in the sales process disclosed their plans to the general membership of CJI in an effort to obtain congregational approval for the sale (D398). CJI procured the Congregation's approval for the sale of the rimonim only by falsely claiming that Christie's had "conducted extensive research" (Deposition of Bertha Schlessinger Ross ("Ross Dep.") at 260:15-20), that indicated CJI had good title to the rimonim (D398-3). In fact, no such research had been done, nor had CJI conducted an independent investigation (Ross Dep. at 238:14; Deposition of David Bazarsky ("Bazarsky Dep.") at 173:18-24; 175:11-12). CJI failed to research title to the rimonim despite the fact that, throughout the sales process, CJI's own congregants repeatedly questioned the CJI leadership about whether CJI had any right to sell the rimonim given that Shearith Israel may have ownership rights to them (D381-2; D385-2;

D398-2 to 4).  Instead, the leadership three times ignored its congregants' concerns, continued planning for the sale of the rimonim, and never spoke to Shearith Israel (Bazarsky Dep. at 192:22-193:1, 193:12-25).  Further, the very CJI leader who told the Congregation that Christie's had concluded CJI had good title had not seen any research by Christie's to that effect (Ross Dep. at 238:10-14, 238:22-24, 239:7-15, 264:20-23).  Christie's itself confirmed that Christie's had not investigated titled to the rimonim (Deposition of Jeanne Sloane at 21:11-22), that Christie's had not discussed with CJI whether CJI owned the rimonim (*id.* at 22:23-23:3), and that Christie's had simply relied on CJI's representation that CJI had good title to the rimonim (*id.* at 19:9-15, 96:7-18).

Shearith Israel learned of the attempted sale of the rimonim to the Boston Museum of Fine Arts informally through a concerned CJI member (D398-4).  Shearith Israel intervened by asserting its ownership of Touro Synagogue and the rimonim (D399).  The parties subsequently met in an effort to resolve the matter and entered into a Standstill Agreement.  During settlement discussions, CJI rejected Shearith Israel's proposal to convene a Beit Din, or Court of Jewish Law, to resolve these issues (CJI Answer to Countercl. ¶ 6).  Additionally, CJI rejected Shearith Israel's offer to provide up to $75,000 per year for 10 years towards CJI's actual operating expenditures (D405).  Instead, CJI breached the Standstill Agreement and initiated legal action against Shearith Israel.

### THE CLAIMS AT ISSUE

CJI's complaint seeks four types of relief, each turning on issues of **ownership and/or control** and the **relationship between CJI and Shearith Israel**.  First, declarations that CJI is the "true and lawful owner of" the four rimonim and that if Shearith Israel owns the rimonim, it does so "in trust for the sole benefit of [CJI]" (Compl. ¶¶ 24, 30); second, an injunction that Shearith Israel may not interfere with CJI's sale of two of the rimonim (*id.* ¶ 28); third, "to

remove [Shearith Israel] as Trustee for the Newport synagogue and land" and hand over the "trust property" to CJI (*id.* ¶ 37); and fourth, to remove Shearith Israel representatives from the CJI Board (the CJI Constitution and By-Laws irrevocably permit Shearith Israel participation unless Shearith Israel agrees otherwise, which it has not (Ex. 7 ¶¶ 3-5)).  On all its claims (and defenses), CJI bears the burden of going forward and the burden of persuasion.  In some cases that burden is clear and convincing; in the others, preponderance of the evidence (*see infra*).

Shearith Israel's counterclaims to be tried are mirror images of CJI's claims, with the addition of a claim seeking a declaration that CJI has breached the Indenture with Lease that governs the relationship between the two parties and, if necessary, removal of CJI as lessee of Touro Synagogue and all related real and personal property owned by Shearith Israel (Shearith Israel Answer and Counterclaims ("Counterclaims") ¶ 65).  The relief sought by Shearith Israel is for the purpose of preserving for religious use the Touro Synagogue, its lands, cemetery, and personalty, including the rimonim with the intention by Shearith Israel that the Touro Synagogue remain a place of public worship.

## **SUMMARY OF ARGUMENT**

The documents can and should decide this case.  Evidence will show that the restrictive letters of authorization and the Indenture with Lease govern the relationship between the parties. In 1903, after a federal court determined Shearith Israel held lawful title to the Touro Synagogue, the doors to the Synagogue were locked, and Shearith Israel held the key to Touro Synagogue and everything inside, including the rimonim.  *See* Section III.A, *infra*.  Shearith Israel then leased the Touro Synagogue, along with its attendant personalty, including the rimonim, to CJI. *See* Section III.C, *infra*. The Indenture with Lease remained in force and has been repeatedly affirmed by CJI through both admissions and conduct.  *See* Section III.B, *infra*.

*Res judicata* bars the heart of CJI's claims.  A federal court has already held that CJI has no property rights in the Touro Synagogue and that it cannot be a beneficiary of any putative trust containing Synagogue Touro.  *See David v. Levy*, 119 F. 799, 800 (C.C.D.R.I. 1903).  CJI is estopped from relitigating these claims and estopped from litigating ownership of the rimonim.

But even in the absence of the restrictive authorization and the Indenture with Lease, CJI cannot meet its burden of proving ownership of the Touro Synagogue or the rimonim.  Moreover, the evidence will show that Shearith Israel took title to the Touro Synagogue and its personalty decades before CJI even existed, *see* Section C.1, *supra*; independently, that its ownership and control were confirmed late in the Nineteenth Century, *see* Section C.5, *supra*; and that Shearith Israel has continued to exercise control over both.

The evidence will likewise show that there is no trust relationship between the parties.  *See* Section V, *infra*. None of the writings CJI identifies shows the creation of a trust, much less by the clear and convincing evidence the law requires.  But even if a trust exists CJI cannot claim to be a beneficiary and certainly cannot compel a sale of the trust res or oust the trustee.

Finally, the evidence will show that CJI has breached its obligations to Shearith Israel under the restrictive letters authorizing use and the Indenture with Lease, as well as under the CJI Constitution and By-Laws.  *See* Section VI, *infra*. Conversely, Shearith Israel has faithfully discharged its duties to CJI and has been a benevolent landlord for the last 100+ years.  *See* Section VII, *infra*.  CJI's "equitable" defenses fail, both on the law and on the facts.

## **ARGUMENT**

## I.    **FORMAL LEGAL INSTRUMENTS DETERMINE THE RIGHTS OF THE PARTIES OVER THE SYNAGOGUE AND ITS APPURTENANCES / PARAPHERNALIA AND OF THE STATUS OF THE PARTIES INTER SE**

CJI's case must ignore the specifically limited letters of authorization, amended Certificate of Incorporation, the 1903 and 1908 Indenture with Lease between the parties,

numerous agreements it made with and representations it made to the State and Federal Governments, and the other clear manifestations of the parties' intent.  CJI claims, wrongly, that, well, after all, it has been in possession of the premises and rimonim for over 100 years and that should end the matter.  There is no merit to CJI's request for lawlessness.  *See* Section IV, *infra*. As a juridical entity, CJI entered into binding written agreements.  *See* Section D.7, *supra*.  It sued in federal court and suffered a judgment there.  *See* Sections D.2-3, *supra*.  It swore under penalty of perjury to its lessor-lessee relationship with Shearith Israel.  *See* Section D.8, *supra*.

These documents have legal consequences. *See, e.g.*, 18 U.S.C. § 1001 (prohibiting knowingly making false statements to the federal government).  These documents and the parties' intent, clearly manifested therein, are also dispositive as to Shearith Israel's ownership of the rimonim and the relationship between the parties.  When interpreting such documents, a court's "primary objective is to ascertain the intent of the parties." *Haffenreffer v. Haffenreffer*, 994 A.2d 1226, 1233 (R.I. 2010).  If this intent can be discerned from the face of the document, its terms are to be assigned their plain and ordinary meaning.  *See  Elena Carcieri Trust-1988 v. Enter. Rent-A-Car Co. of R.I.*, 871 A.2d 944, 947 (R.I. 2005) (interpreting a rental agreement).

Where the terms of the document are ambiguous, a court may look to extrinsic evidence to ascertain the parties' intent.  *Id.*  Additionally, a court may require further contextual information beyond the terms of the document to interpret even unambiguous terms.  *Hill v. M. S. Alper & Son*, 256 A.2d 10, 15 (R.I. 1969) ("[A]lthough there is no ambiguity, we will nonetheless consider the situation of the parties and the accompanying circumstances at the time the contract was entered into, not for the purpose of modifying or enlarging or curtailing its terms, but to aid in the interpretive process and to assist in determining its meaning."); *see also Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa*, 388 F.3d 15, 20 (1st Cir. 2004)

(evaluating evidence beyond the seemingly unambiguous four corners of the document because "extrinsic evidence may in fact reveal an ambiguity not otherwise patent . . . [and] language may point only slightly in one direction and extrinsic evidence strongly in another").

It is within the Court's discretion to determine whether extrinsic evidence will aid in its interpretation of the operative agreement.  *See Hill*, 256 A.2d at 15-16; *Nat'l Tax Inst.*, 388 F.3d at 19-20.  Thus, in *Hill*, the court determined that even though the codified terms of the contested contract did not expressly call for the appellee to receive proceeds from a property sale, the "general background . . . circumstances and situations" suggested that payment was proper under the particular scenario.  256 A.2d at 16.

## II.  *RES JUDICATA* BARS MUCH OF CJI'S CASE

The 1901 litigation determined that Shearith Israel, not CJI, was entitled to possess personal property in the Touro Synagogue.  And in the 1902-03 litigation between the parties, CJI argued that (1) the original conveyance of the Touro land in 1759 and the will of Jacob Rodriguez Rivera established a trust for the Jews of Newport, and (2) that CJI was a beneficiary of this trust.  That Court rejected these contentions.  *See* Sections D.2-3, *supra*.  *Res judicata* now bars CJI from relitigating them before this Court.  It likewise bars CJI from claiming ownership to Touro Synagogue and the rimonim, since CJI did or certainly could have brought these claims and either lost or failed to do so.

"'Under the federal law of *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were raised or could have been raised in that action.'"  *Am. Bridge Co. v. Providence Place Grp. Ltd. P'ship*, 263 F. Supp. 2d 330, 333-34 (D.R.I. 2003) (*quoting Apparel Art Int'l, Inc. v. Amertex Enters., Ltd.*, 48 F.3d 576, 583 (1st Cir. 1995)).  *Res judicata* bars subsequent litigations between the parties that "arise out of the same transaction, seek redress for essentially the same basic wrong, and rest on the same

or a substantially similar factual basis" as a previously decided action, *Porn v. Nat'l Grange Mut. Ins. Co.*, 93 F.3d 31, 34 (1st Cir. 1996), if "'all of the events which define the . . . complaint occurred or were plainly presaged while [the prior action] was still open,'" *Leahey v. Univ. of R.I.,* 1985 WL 6033, at *2 (D.R.I. Aug. 1, 1985) (citation omitted), *aff'd*, 802 F.2d 439 (1st Cir. 1986). It is legal bedrock that "a particular legal theory not pressed in the original suit will nonetheless be precluded in the subsequent one if it prescinds from the same set of operative facts." *Kale v. Combined Ins. Co. of Am.*, 924 F.2d 1161, 1166 (1st Cir. 1991).

The preclusive effect of *res judicata* is undiminished by the passage of time. "A case decided at the last term of a court is as much *res judicata* as a case decided in the last century." *Jackson v. U.S.*, 19 Ct. Cl. 504, 506-07 (1884). As long as the prior decision was a judgment on the merits and there is sufficient identity between the parties and the claims, *res judicata* applies. "It is the character of the thing done which determines the status of a case, and not the lapse of time." *Id.* at 507; *see also Robinson v. U.S.*, 7 Cl. Ct. 155, 159-60 (1984) (holding that a judgment entered 72 years prior had preclusive effect on the action in question).

The 1901 return of the Torah scroll and the 1903 dismissal of CJI's claims on demurrer (*see David,* 119 F. at 800) were both final and on the merits. *See Cooke v. Mortg. Elec. Registration Sys., Inc.*, 2013 WL 2368846, at *2 (D.R.I. May 29, 2013). The parties, too, were all but identical. So all claims that were or could have been brought in *David* are now barred.

A.    ***Res Judicata* Bars CJI From Litigating Ownership Of The Rimonim**

CJI should be estopped from contesting ownership of the rimonim, since this claim arose from the same set of operative facts that brought about the replevin and *David* suits and either were or should have been brought at that time. CJI clearly knew the rimonim existed — it had earlier failed to get them sent directly to CJI and did in the 1902 lawsuit even sought to preclude Shearith Israel from removing "embellishments" of "great historic value" from the Touro

-33-

Synaogue.  (D136 (CJI Compl. in *David,* 119 F. 799) ¶¶ 1, 16).  *see also U.S. v. Grass Bros.*, 13 U.S. Cust. App. 33, 35 (1925) (defining "embellishment" as "'a beautifying or adorning'" or "'[a]nything that renders more beautiful or attractive . . .'") (emphasis & citation omitted).  CJI should now be barred from bringing its declaratory judgment claim before this Court.

**B.      *Res Judicata* Bars CJI From Relitigating The Trust Issues**

In *David*, CJI contended that the CSI trustees held the deed to Touro "as trustees of the Jews of Newport" and that CJI was a beneficiary of this trust.  (D136 ¶ 1).  The court rejected this claim, holding that "no trust of this general character would arise from a purchase of the land for the purposes set forth in . . . the bill."  *David*, 119 F. at 799.  The court also reasoned that if any trust was created, it would have been a trust for the "Jewish Society, in Newport", and held that CJI could not show that it was the Jewish Society (and of course it's not).  *Id.* at 800.

*Res judicata* now bars CJI from relitigating this very issue before this Court.  Count III of CJI's Complaint seeks a declaration that Shearith Israel holds both Touro Synagogue and the rimonim in trust, with CJI as the sole beneficiary.  Compl. ¶¶ 29-30.  CJI has the audacity to claim to be the **sole** beneficiary of this putative trust because "The 'Jewish Society in Newport' **is** Congregation Jeshuat Israel."  CJI Am. Answer ¶ 25 (emphasis added).  But *David* expressly rejected this argument, holding that "'Congregation Jeshuat Israel, a corporation created by law,' can[not] be regarded as having any right or interest in such a trust . . . ."  *David*, 119 F. at 799.  The *David* court astutely noted that if such a trust were formed (a theory it looked askance at), the beneficiaries could only be the Jews of Newport as individuals.  *Id.*  Accordingly, CJI cannot seek a declaration of trust from this Court (Compl. ¶¶ 29-30), nor can it remove Shearith Israel as a trustee, assuming any trust even exists.

### III. THE INDENTURE WITH LEASE AND THE RESTRICTIVE DOCUMENTS GOVERN THE SHEARITH ISRAEL–CJI RELATIONSHIP AND PREVENT CJI FROM EXERCISING DOMINION OVER THE BUILDING OR THE RIMONIM

The Indenture with Lease represents the comprehensive terms of the parties' agreement memorialized in a single, final writing and continues to be one of the operative documents governing the relationship between Shearith Israel and CJI. Its existence and vitality have been consistently upheld since its signing in 1903 – with CJI paying rent under its terms as recently as 2012. Because the Indenture with Lease governs the relationship between Shearith Israel and CJI, and because it is a reliable indication of the benefit and bargain the parties negotiated for through its execution, the Court's primary role is to adjudicate this dispute according to the terms of that document.

The Indenture with Lease evinces the parties' mutual intent that Shearith Israel maintain ownership and control over not only the Touro Synagogue, but also its contents, including the rimonim. *See* Section III.C, *infra*. The evidence will show that Shearith Israel had all the leverage during lease negotiations, as CJI had just been thwarted in Federal court and had abandoned – surrendered – all claims to Touro and everything in it. *See* Section III.A, *infra*. Shearith Israel made sure that the Indenture with Lease protected its rights to not just the Synagogue but to all of its personalty, including the rimonim, while still maintaining its goal of keeping Touro a functioning synagogue. The evidence will also show that the terms of the original Indenture with Lease were still in effect in 2012; they had been repeatedly affirmed by CJI through both admissions and conduct throughout the last century. *See* Section III.B, *infra*.

### A. When CJI's 1902 Coup Failed in 1903, It Surrendered All Purported Rights To the Touro Synagogue And Its Personalty

The evidence will show that CJI viewed the 1903 court decision as a comprehensive defeat. *See* Sections D.2-5, *supra*. The doors to the Touro Synagogue were shuttered once

again, and CJI once more found itself on the outside looking in.  Shearith Israel, quite literally, held the keys to Touro Synagogue and everything within it (*id.*; see also D144-1 (Shearith Israel minutes of January 22, 1903, noting that "the suit instituted in the U.S. Court at Providence R.I. by the Hebrews of New Port to determine their title to the Synagogue at that place had been dismissed, all the issues having been determined in favor of this Cong.")).

Shearith Israel, desiring to see the Touro Synagogue remain an active house of worship (as it still does), agreed to lease the Synagogue including personalty to CJI in exchange for the legal protections that such a lease entails.  *See* Sections D.5-7, *supra*.  CJI concurred – it had zero leverage and nothing to bargain with.  It accepted Shearith Israel's settlement proposal and formally agreed "to admit and recognize without qualification the title and ownership of L. Napoleon Levy and acting Trustees [of Shearith Israel] to the [Touro] synagogue building, premises and fixtures" (D146).  CJI's Board ratified this settlement four days later, authorizing and directing the CJI leadership "to surrender the possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport, to the [Shearith Israel] Trustees, owners of the property" (D147).  The leadership was then authorized to enter into a lease with Shearith Israel "in form satisfactory to the landlord" (*id.).*

**B.**    **The Restrictive Letters and Indenture with Lease Are Still In Effect**

**1.**    **The Course Of Conduct Between The Parties Affirms The Continued Vitality of Shearith Israel's Rights**

The history of dealings contains no communication between the parties that CJI was walking away from the restrictions in the letters authorizing its use of the real and personal property.  Further, there is substantial evidence that CJI reaffirmed the existence and vitality of the Indenture with Lease.  *See* Section D.8, *supra*.  Most obviously, CJI remains in residence in the Touro Synagogue; hence every day it confirms the continuing operation of the Indenture with

Lease.  Additionally, CJI has regularly paid $1 per year in rent to Shearith Israel since 1903.  *Id.*
CJI will claim it paid this rent sporadically or that it was not rent so much as a symbolic token
payment.  But the evidence will show that CJI would catch up when it was in arrears.
Sometimes this required a reminder from Shearith Israel for CJI to fulfill its obligations as a
tenant, but CJI complied until the 2012 breach.  *Id.*  The law is clear: A landlord's continued
acceptance of even irregular and late payments ratifies the lease and perpetuates its existence.
*See, e.g.*, *Cardi v. Amoriggi Sea Foods, Inc.*, 468 A.2d 1223, 1226 (R.I. 1983); *Lenzini v.
Gianetti*, 142 A. 139, 140 (R.I. 1928).

CJI paid rent to Shearith Israel as recently as 2012, the year that this dispute began. *See*
Section D.8, *supra*.  That it has not paid since is a reason CJI's leadership needs to be changed
and suffer the consequences of materially breaching the Indenture with Lease.  Even as of the
date of this filing, CJI's website affirms Shearith Israel's ownership and avers that a "lease
amount of $1 per year is still paid by the current Newport congregation to Congregation Shearith
Israel".  *See id*.

Since 1903, Shearith Israel has continued to aid CJI in finding ministers for and
approving of each successive minister at Touro Synagogue pursuant to the terms of the Indenture
with Lease.  *See* Sections D.8-9, *supra*.  Further, Shearith Israel confirmed to CJI in 1996 that
"any rabbi who was approved by Rabbi Shulman would be good," thus providing Shearith
Israel's approval for a line of rabbis from Yeshiva University under Rabbi Shulman's
recommendation.  *Id.*  These approvals confirm the role that Shearith Israel continues to play as
owner and guardian of the Touro Synagogue, and the role that CJI has accepted as lessee.

## 2.    CJI Has Repeatedly And Publicly Affirmed The Indenture with Lease

CJI has reaffirmed the key terms of the Indenture with Lease many times since 1903.  A
1908 renewal repeated the terms of the 1903 writing nearly verbatim (D174).  Even after the

lease term ended, Shearith Israel continued to treat CJI as a holdover tenant, pursuant to Rhode

Island law at the time (D191-1 to 2).  Under such a holdover tenancy, the terms of the Indenture

with Lease continue to govern the relationship between the two parties.  *J.R.P. Assocs. v. Bess*

*Eaton Donut Flour Co.*, 1998 WL 356896, at *2 (R.I. Super. Ct. June 22, 1998);  *Renaissance*

*Dev. Corp. v. Airport Valet, Inc.*, 2013 WL 6405298, at *4-6 (R.I. Super. Ct. Dec. 2, 2013).

Thus, CJI continued until 2012 to function solely as lessee of Touro Synagogue, along with "the

appurtenances and paraphernalia belonging thereto" (D148), all of which in law belong or at a

minimum presumptively belong to Shearith Israel.  *Sherman v. Champlain Transp. Co.*, 31 Vt.

162, 173 (1858) (holding that a landlord's ownership of the leased property is presumed even if

the tenant is a holdover).

CJI itself has acknowledged the ongoing nature of this holdover tenancy through the

payment of the one dollar per year rent for as recent as 2012 (D396).  Its website continues to

acknowledge that "[a] lease amount of $1 per year is still paid by the current Newport

congregation to Congregation Shearith Israel for use of the building and grounds, which are still

owned by the New York group" (D19-2).  Various members of CJI's leadership have also

affirmed through the decades that the Indenture with Lease continued to govern the relationship

between the two congregations.  *See* Section D.8, *supra*.

CJI has also made attestations to the government that it continues to function as a lessee

of Touro Synagogue and its related properties.  *See id.*  The 1945 National Historic Site

agreement reiterated key terms of the Indenture with Lease, recognizing CJI's promise as

"Lessee of the Synagogue building, etc." to maintain the religious traditions practiced since the

colonial era, and affirming that title to the synagogue "and its appurtenances" shall remain in

Shearith Israel (D240-2).  CJI's affirmation of the Indenture with Lease is even more pointed

when considering it was made after receiving a legal opinion from its own lawyer regarding the 1945 agreement concluding that CJI's "acceptance of these leases . . . operates as an estoppel to object to the title of the Congregation Shearith Israel and the Trustees of that Congregation must be treated as the legal owners of the fee simple title to the property" (D236-3).

CJI's "possession of the site through a lease with Congregation Shearith Israel as owner" was again confirmed by CJI in 2001 and again in 2004. *See* Section D.8, *supra*. CJI's repeated affirmations of the Indenture with Lease's continued authority to its congregants, the general public and the federal government estop CJI from claiming that the Indenture with Lease no longer governs the relationship between Shearith Israel and CJI. *See Ramirez-Carlo v. U.S.*, 496 F.3d 41, 50 (1st Cir. 2007).

> **3.     CJI Continued Until 2012 To Operate Pursuant To The Terms Of The Indenture With Lease, And Its Actions Can Only Be Explained As Those Of A Lessee**

Throughout the Twentieth Century, CJI repeatedly deferred to Shearith Israel as owner of the Touro Synagogue with regard to repairs, changes, and other major decisions related to the Synagogue or the related property. *See* Section D.8, *supra*. CJI repeatedly asked permission to make additions or modifications to the building, to erect monuments, and to make other changes to the premises. *See id.* CJI has also listed Shearith Israel as a co-insured on its liability and fine arts insurance policies. *See id.* When such changes were approved, Shearith Israel also provided input on the form that these changes should take and the manner in which they should be made. *Id.* When the changes were rejected, CJI took no action in contravention to Shearith Israel's directives. *Id.* These actions affirm that Shearith Israel owns the Touro Synagogue and related properties and allows CJI to worship there pursuant to the Indenture with Lease.

4.    **The Restrictive-Use Authorizations Alternatively Remain In Full And Effective Force**

Assuming, arguendo, that the Indenture with Lease does not cover CJI's use of the Touro Synagogue and the related personal property including the rimonim, the explicit restrictions in the use authorizations remain in full force and effect. Those documents permitted CJI access to the real and personal property that Shearith Israel held only on the express understanding that they belonged to Shearith Israel and needed to be returned when requested. Obviously, in the face of such documents CJI had no right to sell the rimonim.

C.    **The Rimonim And All Other Personal Property Located At Touro Were Purposefully Included In The Documents Granting CJI The Limited Right To Use Shearith Israel's Rimonim And In the Indenture With Lease**

Shearith Israel considered the personalty of Touro Synagogue to be part and parcel of the Synagogue edifice. So naturally, when it leased the building to CJI, the parties understood that the building included the personal property loaned to Newport by Shearith Israel that was part of the Jewish religious service. There is no better example of that than the rimonim. Even without any additional protections, the rimonim, to the extent they are part of the Touro Synagogue, are part of what CJI does ***not*** have any authority to control. However, Shearith Israel took even greater care to include this personal property in documents governing CJI's use of the personalty that Shearith Israel brought to Newport at the end of the Nineteenth Century and in the Indenture with Lease. *See* Section D.5, *supra*.

When Shearith Israel sent an envoy to Newport to sign the Indenture with Lease and allow CJI access after CJI lost the 1902-03 litigation, Shearith Israel representatives were instructed to "[o]btain a list of the personal property signed by the officer of [CJI]", not because there was doubt at that time (there was none) but because of possible future events. (D151). The envoy did just that. Shearith Israel's lawyer recounted the lease signing: "Dr. Mendez

-40-

subsequently delivered with the lease the keys to the Premises and then Dr. Mendez went over the personal property with the committee while I placed the lease on record"  (D155).  While Shearith Israel referred to the personal property at the Touro Synagogue by many names, the contemporaneous evidence makes clear that the fate of this property was in Shearith Israel's mind and that this property, including the rimonim, were encompassed by the terms of the Indenture with Lease.  *See* Section D.5, *supra*.

The evidence will show that, when evaluating its rights in the Touro Synagogue, Shearith Israel believed it held ownership rights in the personalty at least as clearly and strongly as it did in the Touro building and lands.  The beliefs of the parties govern the interpretation of the written documents central to this case.  *See Kolbe v. BAC Home Loans Servicing, LP,* 738 F.3d 432, 440 n.6 (1st Cir. 2013) ("When two parties draft a contract with language specific to their transaction, the relevant expectations to assess are those of the individual parties to the contract . . . against background and purpose [of the agreement]"); *see also Pier of Newport, LLC v. N.A.J. Assocs.*, 2014 R.I. Super. LEXIS 21, at *28 (Feb. 11, 2014) (interpreting lease agreement and emphasizing that court's "primary objective is to ascertain the intent of the parties").  Accordingly, courts interpret contract terms in consonance with the meanings the parties ascribed to those terms when executing the agreement.  *See Haffenrefferr*, 994 A.2d at 1233-34 (evaluating extrinsic evidence to ascertain the parties' beliefs regarding the meaning of "estate of").  This Court is well-positioned to determine the beliefs of the parties.  *See* Section I, *supra*.

Shearith Israel clearly and reasonably believed that the written documents and the Indenture with Lease included the personalty.  Shearith Israel mentioned realty and personalty in the same breath when discussing its property rights to Touro, discussing its rights over the Synagogue "&c[etera]", meaning the building and everything associated with it (*see, e.g.,* D91-1

(seeking to establish Shearith Israel's "rights at that place [Touro] (to the properties &c.)"); *see also* D117-03 and D155 (similarly referring to Shearith Israel's rights in the property "&c")).

When discussing the Touro Synagogue personalty, Shearith Israel referred to it by several interchangeable terms, including "personal property", "paraphernalia", "appurtenances", and "fixtures".  The evidence will show that these terms were used both by the parties and in contemporary parlance to discuss personal property related to a building, and specifically, when used between the parties, that these terms encompassed all of the personal property at Touro, including the rimonim.  The documents demonstrate that, when the original indenture was being drafted, Shearith Israel was specifically concerned with establishing the scope of the agreement as it relates to the religious objects within the synagogue, including the rimonim (which were at Touro Synagogue by CJI's own admission (*see* CJI Answer to Countercl. ¶ 29).  Shearith Israel made sure to interline the phrase 'with the paraphernalia belonging thereto' into the Indenture with Lease.  *See* Section D.5, *supra*.  A subsequent correspondence makes clear that the "paraphernalia" that Shearith Israel was concerned with was the Touro personalty.  *Id.*

1.     **"Paraphernalia", "Appurtenances", "Fixtures" "Personal Property", "Contents" All Refer To The Personalty And Encompass The Rimonim**

"Paraphernalia", "Appurtenances" and "Fixtures" are terms that the parties used interchangeably to refer to the Touro Synagogue personal property.  Both the usage of these terms between the parties and contemporaneous usage of these terms in legal and non-legal writings make clear that all of these terms encompassed the rimonim and confirmed that the rimonim (along with all Touro personalty) were withing the ambit of the Indenture with Lease.

The term "appurtenances" had been used between the parties to include the rimonim and other religious objects, as seen through Shearith Israel's letter to Reverend Baruch of CJI empowering Baruch "to use the Sefarim, ***Bells***, Books, Shofar and all ***other appurtenances*** for

-42-

worship now in Newport Synagogue or in storage . . ." provided that "custody of the buildings and appurtenances" be returned to Shearith Israel upon termination of the minister's appointment (D60 (emphasis added)).

CJI has no claim that it owned the rimonim during the first half of the Nineteenth Century, because CJI did not even exist then. CJI also asserts no claim that the rimonim themselves were separately given or transferred to it. Instead, its claim arises out of its possession of the rimonim, which is nothing more than a consequence of CJI's presence in the Touro Synagogue. But CJI cannot have it both ways: if its claim to the rimonim depends on taking possession of them in connection with its lease of the Synagogue, then the rimonim must be appurtenant to the Synagogue. Otherwise, if the rimonim are not appurtenances, then on what basis does CJI claim it has any right to possess them at all?

In the 1800s, courts used "appurtenances" to refer to property or other items that facilitated the carrying on of a business or enterprise. *See Pickerell v. Carson*, 8 Iowa 544, 550-51 (1859) (defining appurtenances as "all such property as pertained or belonged to the room, or as remained there permanently, and was used in carrying on the . . . business" and "all things used in carrying on the business). The *Pickerell* court noted that "[a]ppurtenances signifies something belonging to another thing as principal, and which passes as incident to the principal thing." *Id.* at 551; *see also E. P. Bacon & Co. v. Thompson*, 14 N.W. 312, 314 (Iowa 1882) (holding that a mortgage for a warehouse, which included "all and singular appurtenances belonging or in anywise appertaining" included the warehouse scales, even though the scales were not specifically mentioned in the mortgage).

Likewise, courts in the 1800s defined "paraphernalia" as personal property or items used in a particular activity. *See Lacassange v. Chapuis*, 144 U.S. 119, 121 (1892) (referring to

paraphernalia as part of the items used on a plantation);  *Metro. Nat'l Bank of N.Y. v. St. Louis Dispatch Co.*, 149 U.S. 436, 445 (1893) (referring to paraphernalia as items used for "the printing [of] a newspaper").  Paraphernalia also referred to items that were used for religious worship in line with items such as "scrolls, prayer books, prayer shawls [and] a congregational seal."  *Goller v. Stubenhaus*, 134 N.Y.S. 1043, 1045 (Sup. Ct. N.Y. Cnty. 1912).

Courts during the turn of the Twentieth Century viewed "fixtures" as a similarly broad term.  In ascertaining whether an item should be legally classified as a fixture, courts during this period looked primarily to the intent of the parties.  Thus, an authoritative property treatise published in 1904 concluded that, "[a]ssuming that a personal chattel has been attached actually or constructively to realty, or used in association therewith so as to cause a question to arise as to its character, the most important inquiry is as to the probable or reasonably presumable intention with which it was so affixed or used."  (D160-7 (*citing* twelve late Nineteenth Century cases adhering to this principle and three additional treatises)).  Because the intent of the parties governed, an item did not need to be physically affixed to the land to be a fixture.  Instead, constructive annexation occurred when unaffixed chattel was deemed reasonably necessary to give the property a sense of completeness.  *See id.* at 22; *see also Dudley v. Hurst*, 8 A. 901, 903 (Md. 1887) (holding that loose items in a factory such as crates and work tables were reasonably necessary to the working of the affixed machinery and were therefore fixtures).

Thus, whether through the terms fixtures (D146-1), paraphernalia (D150-1), or appurtenances (*id.*), Shearith Israel was careful to include the personal property of Touro Synagogue and specifically the rimonim in the Indenture with Lease.

### 2.    The Rimonim Are Appurtenant To The Touro Synagogue

Unlike other types of personalty, rimonim only have a religious purpose, and they are only used in a synagogue.  Accordingly, by their very nature, they are a part of, or appurtenant to, a synagogue, and they are undoubtedly among its paraphernailia.

The Court will also hear testimony that rimonim are meaningful to any Jewish Sephardic service, even more so to a Western Sephardic synagogue, and even more and especially so to the Touro Synagogue, where they were specifically called appurtenances (like the other related terms) and also have been featured as part of the Touro Synagogue itself (D350-9).  Because rimonim adorn the Torah scroll, they occupy a special place in Jewish ritual and occupy a special place within a congregation practicing the Sephardic rite.  CJI will claim that rimonim are not appurtenant to a service because a service can happen without them – but CJI offers a false dichotomy.  A Sephardic service can also happen without a Torah and even without a synagogue if these are not available.  But if these are available their use becomes important.  The appurtenance of rimonim to a Sephardic service is much the same.

### 3.    Sephardic Rites And Rituals Also Precludes CJI's Attempted Sale

Assuming it is necessary, the Court will hear that Jewish law and tradition dictate how they must be treated and, crucially, when they can be sold.  Rimonim, like all decorations that touch the Torah, can only be used in accordance with their religious purpose. Rimonim can be sold only in extraordinarily limited circumstances, which do not obtain here.  Testimony will make clear that CJI's professed reasons for trying to sell the rimonim, even if true, would still violate the Sephardic rites that CJI covenanted to uphold, both in its Constitution and By-Laws, and in its Indenture with Lease with Shearith Israel.

**D.      As Lessee, CJI Is Estopped From Contesting Ownership Of The Touro Synagogue And The Rimonim**

CJI acknowledges that, by entering into the Indenture with Lease with Shearith Israel, any personal or real property encompassed by the Indenture with Lease is held or used by CJI solely in its capacity as lessee.  This includes the rimonim, which Shearith Israel purposefully covered in the lease agreement.  *See* Section III.C, *supra*.  Thus, CJI, as lessee and tenant, is estopped from now disputing Shearith Israel's title to the Touro Synagogue or the rimonim and claiming that, through its possession of the property, it has garnered any semblance of title to the Synagogue or the rimonim.  As our Supreme Court has stated:

> It is an undoubted principle of law, fully recogni[z]ed by this court, that a tenant cannot dispute the title of his landlord, either by setting up a title in himself or a third person, during the existence of the lease or tenancy.  The principle of estoppel applies to the relation between them, and operates in its full force to prevent the tenant from violating that contract by which he [claimed] and [held the] possession.

*Willison v. Watkins*, 28 U.S. 43, 47 (1830); *see also Williams v. Morris*, 95 U.S. 444, 455 (1877) ("Tenants are never allowed to deny the title of their landlord . . . the rule being that whenever the possession is acquired under any species of tenancy . . . the tenant is estopped from denying the title of the landlord").

The legal presumption in a landlord-tenant relationship is that the landlord holds ownership, and that the tenant has recognized this ownership by taking possession pursuant to the lease.  *See Grant v. Briskin*, 603 A.2d 324, 329 (R.I. 1992) (*quoting Fiske v. Brayman*, 42 A.878, 879 (R.I. 1899)).  A tenant must abdicate possession of the property to the landlord before the tenant can challenge the landlord's title or ownership rights.  *See, e.g.*, *Lund v. Gray Line Water Tours, Inc.*, 287 S.E.2d 404, 406 (S.C. 1982); *Friedman v. Goodman*, 151 S.E.2d 455, 460-61 (Ga. 1966); *Hargrove v. Cox*, 104 S.E. 757, 758 (N.C. 1920).  CJI's own lawyer admitted as much in a legal opinion,  writing that "the acceptance of these leases by the

Congregation Jeshuat Israel operates as an estoppel to object to the title of the Congregation Shearith Israel and the Trustees of that Congregation must be treated as the legal owners of the fee simple title to the property" (D236-3). This estoppel also precludes CJI from challenging the quality of Shearith Israel's ownership – that is, CJI is estopped from asserting that Shearith Israel holds title to the leased property pursuant to a trust. Indeed, the argument of trust ownership is a patent end-run around the clear law estopping CJI from contesting Shearith Israel's ownership.

Since CJI possessed both the Touro Synagogue and the rimonim pursuant to a lease, CJI is estopped from challenging Shearith Israel's title to both, or asserting that Shearith Israel holds both in trust, whether or not for CJI's benefit.

**IV.    EVEN ASSUMING, ARGUENDO, THAT THE RIMONIM ARE NOT COVERED BY THE WRITTEN LICENSES OR THE INDENTURE WITH LEASE, CJI STILL HAS NO RIGHT TO SELL THEM**

**A.    CJI Does Not Own the Touro Synagogue or the Rimonim**

**1.    CJI Cannot Prove Ownership And Does Not Benefit From Any Presumption Based On Its Possession Of The Rimonim**

CJI cannot meet its burden of proving it holds title to the Touro Synagogue or the rimonim. "[I]n a declaratory judgment action, the party seeking relief bears the burden of proof." *Rex-Tech. Int'l, LLC v. Rollings* (*In re Rollings*), 451 F. App'x 340, 345-46 (5th Cir. 2011) (per curiam) (Unpublished) (holding that a party seeking a declaratory judgment of ownership bears the burden of proof because that party "accepted the risk of proving its case by filing suit"). Moreover, that party "must prevail on the strength of his own title, and not on the weakness of the defendant's." *Smith v. Haskins*, 45 A. 741, 742 (R. I. 1900); *see also Harcourt v. Gaillard*, 25 U.S. 523, 529 (1827).

Even ignoring the fact that CJI's mere possession of the rimonim was pursuant to Shearith Israel's consent prior to, and then pursuant to, the Indenture with Lease, no presumption

of ownership arises from possession where "there [is] a dispute *ab initio* as to the ownership of the property in dispute", which (even if CJI were to be believed) is the case here. *In re Rollings*, 451 F. App'x at 346; *see also Bradshaw v. Ashley*, 180 U.S. 59, 63 (1901) (refusing to apply presumption on behalf of current occupant of a plot of land and holding that possession of property does not create presumption of ownership if counterparty can claim older or better title). Here, independent of the Indenture with Lease there is strong evidence that Shearith Israel owns both the Touro Synagogue and the rimonim. *See* Section IV.B, *infra*. And CJI has expressly disclaimed its ownership of both (*see* D65 (where CJI admits that it "do[es] not claim ownership in the property or appurtenances")). This evidence is sufficient to establish (at the very least) a factual dispute that renders inapplicable any presumption arising from CJI's possession.

The presumption is also inapplicable because Shearith Israel had ownership of both the Touro Synagogue and the rimonim prior to CJI. "When a party enters into possession of land under permission or license from the owner, the presumption is that his possession is in subordination to the true owner." *Tefft v. Reynolds*, 113 A. 787, 789 (R.I. 1921) (holding that "[t]he law presumes that the character of the occupation . . . continues to be of the same nature in the absence of some conduct indicating a change."), *see also City of N.Y. v. Carleton*, 21 N.E. 55, 56 (N.Y. 1889); *U.S. v. Certain Land in Barnstable Cnty., Mass.*, 314 F. Supp. 1372, 1375 (D. Mass. 1970) ("[A] possessory title under Massachusetts law is not good against one having an older or better title."). No presumption applies here, as Shearith Israel has claimed ownership over both Touro Synagogue and the rimonim since at least the 1820s, or over a half-century before CJI existed. *See* Section IV.B, *infra*.

2. **No Evidence Exists That CJI Inherited The Myer Myers Rimonim From Yeshuat Israel**

CJI will claim that, as a purported descendant or successor in interest to the Colonial Yeshuat Israel congregation, it inherited the rimonim. But this cannot be true, both because CJI can claim no connection to that ancient congregation (among other reasons it is estopped) and because there is no evidence that the Colonial congregation ever owned a pair of the Myers rimonim. *See* Sections B, C.1, C.3, *supra*.

As an initial matter, there is no connection between CJI and the Colonial congregation that worshipped in Newport. *See* Sections C1, C.3, *supra*. The Court will hear uncontroverted evidence that the temporal divide between the congregation is at minimum 60 and more likely upwards of 100 years. *See* Sections B, C.3, *supra*. Moreover, the two congregations hailed from different parts of the world and were separated by a gulf in ritual and culture almost as vast as the gulf that separated them in time. *See id.* But even if CJI could claim to be a successor to that ancient congregation (it cannot), its ownership claim still fails because there is no evidence that Yeshuat Israel ever owned the rimonim.

a. **No Evidence Exists That Yeshuat Israel Ever Purchased The Myer Myers Rimonim**

During the ~1760s, Myer Myers, the now famed Jewish silversmith, was a key figure in Shearith Israel's active congregation, serving both us a member and as a "Parnas" (or President) on multiple occasions (D447-584 to 586). Myer Myers made five pairs of finial bells in his lifetime. We intend to show that CJI will not be able to carry its burden of proof of proving that even Yeshuat Israel owned any Myer Myers rimonim. We believe instead that the better evidence will suggest that Myer Myers made two pairs for Shearith Israel, two pairs for Congregation Mikveh Israel in Philadelphia, and one pair as a private commission that was in writing gifted to Shearith Israel in 1893.

### b.    Shearith Israel Paid For Two Sets Of Myer Myers Rimonim That Shearith Israel Owns

Shearith Israel's ledger books indicate the close connection Myer Myers had with Shearith Israel.  Included in the ledger are payments to Myer Myers in his capacity as Parnas (D10) and reimbursements to Myer Myers for items he purchased for Shearith Israel (D10).  Other ledger entries from the relevant time period indicate a 1764 "Balance due to Myer Myers" of £36.4.1 (D8) and a 1765 payment of the same amount for "Cash paid Myer Myers. Balla. of his accot. passed" (D9, corresponding to the same price point that these rimonim would have cost at that time).  Admittedly, the ledger does not specify that this payment was for rimonim, but the Court will hear expert evidence concerning the basis for the conclusion that this payment was likely for a set of finial bells.  In 1774, Shearith Israel again paid Myer Myers the balance of his commission for a second pair of rimonim: its ledger shows a payment of £10.15 to Myer Myers, constituting the balance "due him on A Pair Rimmonim" (D12).  Though not essential to any claim or defense in this case, we believe the Court will be able to find that these two payments show Shearith Israel paid Myer Myers for two pairs of finials, accounting for two out of the five pairs of extant Myers rimonim.

### c.    Mikveh Israel Purchased Two Sets Of  Myer Myers Rimonim

Many patriotic members of Shearith Israel spent the duration of the Revolution at Philadelphia's Mikveh Israel.  Like Shearith Israel, Mikveh Israel practiced the Western Sephardic ritual.  The evidence will show that Myer Myers sold two pairs of Torah finials to Mikveh Israel as well (D355-7).  Mikveh Israel had both the necessary funds to pay for these finials and the close relationship with Myer Myers (*id.*).  The finials sent to Philadelphia in 1772 account for an additional two out of the total five pairs of existing Myer Myers rimonim.

### d.    The Fifth Set Was Donated To Shearith Israel By Myers' Family

Shearith Israel was gifted the fifth set of Myer Myers finials in 1893 by Caroline Cohen, who inherited these finials from her grandparents, Samuel Myers (second son of Myer Myers) and his wife, Elkalah (D355-12).  Cohen, in 1892, wrote to Rev. A. P. Mendez, then minister of Touro Synagogue, asking him personally if he would "accept and use" two sets of bells belonging to her family, noting she preferred the bells to be used at Touro Synagogue because of her former familial ties to the city (D55-2).  Subsequently in 1893, Cohen wrote to Shearith Israel stating "I desire you to *take charge of* the Silver Bells *lent by me* to the late Rev. A.P. Mendez to be used in the Newport Spanish and Portuguese Synagogue" (D63) (emphasis added).  Shearith Israel then took ownership of the fifth set of Myer Myers rimonim, accounting for the third pair of rimonim owned by Shearith Israel.

In contrast to Congregations Mikveh Israel and Shearith Israel, Yeshuat Israel in the 1760s did not have a familiar relationship with Myer Myers or the funds necessary to commission an extensive piece of silverwork from Myer Myers such as a pair of rimonim.  Instead, Yeshuat Israel was dependent on the generosity of other individuals and other congregations, including Shearith Israel, to obtain the necessary ritual objects needed for services (D448-114 to 115).  In fact, Shearith Israel contributed approximately 10% of the construction cost for the Touro Synagogue, gave still more money when construction stopped because of lack of funds, and loaned Yeshuat Israel appurtenances for worship so that it could hold services according to the Sephardic tradition.  *See id.*; *see also* Section B; D19-2.

Apart from this, there is no evidence that Yeshuat Israel purchased of a set of rimonim.  There is no evidence that Yeshuat had ever paid for the rimonim – no writing showing payment,

no bill of sale, and no mention of a purchase.  *See* Section IV.A.2.a, *supra*.  This lack of documentary proof dooms CJI's affirmative case.

### 3. There Is No Evidence That Yeshuat Israel Was Ever Gifted Myer Myers Rimonim

There is no evidence that Yeshuat Israel was ever gifted a pair of Myer Myers rimonim, either by Shearith Israel or by Myers himself.  This is particularly true given that even Shearith Israel and Mikveh Israel, two congregations that had intimate ties to Myers, had had to purchase their rimonim.  Similarly, there is no evidence that Shearith Israel ever gifted a pair of Myers rimonim to Yeshuat Israel.  A valid gift requires (1) a manifestation by the donor (2) of "present true donative intent," *Silva v. Fitzpatrick*, 913 A.2d 1060, 1063 (R.I. 2007).  The standard for such a manifestation requires more than the simple act of conveying the property to another: a gift can only be effected by the donor's "**words or actions** exhibit[ing] the requisite donative intent".  *Id.*  The law does not presume a gift, *Tefft*, 113 A. at 789 (R.I. 1921), and absent "clear and satisfactory evidence" of a gift, *Slepkow v. Robinson*, 324 A.2d 321, 325 (R.I. 1974), courts uniformly recognize a legal presumption against finding a gift, in favor of finding a loan.  *See, e.g.*, *Carter v. Holland*, 825 So. 2d 832, 835 (Ala. Civ. App. 2001); *Livingston v. Tapscott*, 585 So. 2d 839, 841 (Ala. 1991); *Stambaugh v. Moffett*, 278 S.W.2d 74, 76 (Ky. Ct. App. 1955); *Barnes v. Michalski*, 925 N.E.2d 323, 337-38 (Ill. App. Ct. 2010); *In re Platner*, 525 N.Y.S.2d 887, 889 (2d Dep't 1988); *In re McNally's Estate*, 389 N.Y.S.2d 60, 61 (4th Dep't 1976).

CJI cannot sustain its burden of proof here.  No valid gift can be established because there is no evidence that Shearith Israel or Myer Myers ever manifested with "words or actions" an intent to gift a pair of rimonim.  As the Court held in *Silva*, the lack of evidence of a valid manifestation is sufficient by itself to defeat any claim that CJI inherited rimonim by way of gift.  913 A.2d at 1063.  Shearith Israel documented objects that once belonged to Newport and were

(in the very early Nineteenth Century) being kept in New York for safekeeping (D20-2 to 3, D25-2, D26-1).  By 1869, Shearith Israel also painstakingly identified all items in its charge that belonged to others (D34).  None of these documents identified the rimonim as belonging to someone else, or as being kept solely for safekeeping.  In fact, the 1869 inventory identifies the two Myer Myers pairs of rimonim as the property of Shearith Israel.  *See* Section III.B, *supra*.

### 4.   Shearith Israel Has Exercised Continuous Control Over The Touro Synagogue And Its Personalty

Finally, CJI can point to no evidence that indicates that ownership of Touro Synagogue or the rimonim was transferred to it from Shearith Israel subsequent to 1869.  *See* Section C.2. When Shearith Israel sent up silver for Newport's use, it was done via specific and limited grants of license to use.  And in one of the clearest acts of ownership and control, when the Myer Myers rimonim were loaned, Shearith Israel took one from one set and one from the other to send.  In short, there is no evidence that CJI ever had title to Touro Synagogue or the rimonim, or that title to either was transferred to CJI from any putative owner.  Thus, even without the affirmative evidence that Shearith Israel owns the rimonim, CJI's affirmative case fails.

### B.   Shearith Israel Is The Lawful Owner Of The Touro Building, Lands, And Appurtenant Personalty, Including The Rimonim

### 1.   Shearith Israel Owns Three Pairs Of Rimonim, Including The Unmatched Ones At Issue Here

Shearith Israel's ownership of the first pair of rimonim, one bell of which is one of the rimonim currently in dispute, is evidenced by notations in Shearith Israel's own ledger of a 1764 payment to Myer Myers in the amount of £36.4.1 (D9).  There is also uncontested proof that, a decade later, in 1774, Shearith Israel obtained a second pair of Myer Myers rimonim through its on-account payment to Myer Myers, constituting the balance "due him on A Pair Rimmonim"

(D12) (This amount differs from the £36.4.1 paid in 1764 because it was a partial payment of the balance due to Myers.)  *See* Section IV.A.2.b, *supra*.

The third pair of rimonim came to Shearith Israel by way of donation from Carolyn Cohen in 1893.  *See* Section IV.A.2.d, *supra*.  Ms. Cohen's letters clearly indicate Cohen's transfer of ownership over the rimonim to Shearith Israel, to be used at Touro Synagogue "**subject to [Shearith Israel's] approval**" (D63), which makes perfect sense given the previously witnessed instability of the Newport Jewish population.  These rimonim were subsequently loaned to CJI, to be used at Touro, in accordance with Mrs. Cohen's wishes.

### 2.      Shearith Israel Owns The Touro Building And Lands

Ownership of the Touro Synagogue, its lands, and all personal property then contained within it passed to Shearith Israel in the 1820s.  *See* Section C.1, *supra*.  Since that time, Shearith Israel has maintained ownership over the Touro Synagogue, its land, cemetery, and personalty, including the rimonim.  There is no evidence that Shearith Israel's ownership rights have changed since that time.  *See* Section IV.A, *supra*.

### 3.      Shearith Israel Took Title To All Property Within Touro When It Took Title To The Synagogue

CJI will claim that the 1764 set of rimonim was either made for the Colonial Newport congregation or gifted to it by Shearith Israel shortly after the Touro Synagogue was consecrated.  But even were this were true (it is not provable), title to this set would have vested in Shearith Israel when the doors to Touro Synagogue were closed and the keys handed over to Shearith Israel in the 1820s.  At this time, Shearith Israel took title to everything (that it did not already own), as indicated in later references by Shearith Israel to its ownership and control over the Touro Synagogue "&c." (D91-1; D117-1; D155) or "etc." (D117-5; D240-2).  Shearith Israel

thereafter acted in accordance with these ownership rights: it lent articles of worship to CJI, noting that it expected their return. *See* Section C.4, *supra*.

CJI will argue that Shearith Israel only took possession, but not ownership, of the personalty that was at that time at Touro Synagogue, and held it for safekeeping, to be returned at a later date. There is no evidence to support this errant speculation. The evidence is to the contrary: to begin, "safe-keeping" as relied on by CJI was never used in the context of rimonim; it was used in the context of those Torahs that were transferred to Shearith Israel that had not originally come from Shearith Israel. And more than 35 years later, any "safe-keeping" was no longer a binding restriction on Shearith Israel, even assuming there had ever been one.

Another of the key documents in this case, the 1869 inventory of all items owned or held by Shearith Israel, confirms that Shearith Israel was in possession and ownership of two pairs of Myers rimonim – those fashioned in about 1764, and those fashioned in about 1774 that consistently remained with Shearith Israel. The notation in that inventory clearly identify both pairs of Myers rimonim and is direct evidence that Shearith Israel owned both sets of finials at least by 1869. *See* Section C.2, *supra*. The Court will see that the 1869 inventory identifies the other items at Shearith Israel that were being held only for safekeeping and identifies the rightful owner. The notations for both pairs of rimonim, like all other items owned outright by Shearith Israel, bear no such indications.

### 4.    Shearith Israel's Title Has Been Affirmed Repeatedly

Shearith Israel, determined to protect its rights, took more direct action and put into writing its long-standing legal title to the Touro Synagogue, its grounds, religious and ritual objects, and cemetery. In 1894, the heirs and descendants of the Colonial congregation transferred title to Touro Synagogue and its appurtenances to the Shearith Israel trustees. *See* Section C.5, *supra*. This conveyance was prompted by CJI's request that Shearith Israel clarify

whether it or the town of Newport owned the Synagogue.  *See* D65 (wherein CJI expressly disclaimed all rights in both the Touro building and personal property).  The 1894 conveyances reinforced Shearith Israel's ownership of the Touro lands and personalty.

Shearith Israel's title to both Touro Synagogue and its personalty was affirmed by CJI in a 1945 agreement with the federal government (noting that title to Touro "and its appurtenances" is in and shall remain in Shearith Israel); and by CJI's attorney (noting that Shearith Israel "must be treated as the legal owners of the fee simple title to the property")  *See* Section D.8, *supra*. CJI cannot be allowed to contest Shearith Israel's ownership of Touro and the rimonim in the face of these unambiguous public admissions.  *See Ramirez-Carlo,* 496 F.3d at 50.

**C.    Regardless Of Ownership, The Constitution And By-Laws Of CJI Preclude CJI From Exercising Dominion Over The Rimonim**

Years before the signing of the Indenture with Lease, Shearith Israel protected its ownership of Touro and its personalty by securing the right to four seats on CJI's Board of Trustees.  *See* Section C.5, *supra*.  The CJI Constituion and By-Laws secured Shearith Israel's rights in Touro and its personal property by (1) giving Shearith Israel unfettered rights to participate in CJI's governance, and (2) requiring Shearith Israel's approval before any property could be sold or otherwise disposed of.  *Id*.  Most importantly, the Constitution and By-Laws stipulate that those provisions cannot be changed without the unanimous approval of the Shearith Israel board members.  *Id*.  This "set in stone" provision confirmed that CJI could not, in the future, squeeze out or dilute Shearith Israel's votes.

Shearith Israel's fears proved prescient.  Discovery uncovered the fact that CJI, on several times, and without giving Shearith Israel notice or soliciting the vote of its trustees, attempted to amend its Constituion and By-Laws in order to (1) remove or reduce the rights afforded by the Shearith Israel trustees on CJI's Board, and (2) require a lower vote threshold to

sell its property.  *Id.*  All of these "amendments" were ultra vires and wholly without effect since each of the changes violated the "set in stone" provision of Constitution and By-Laws  The terms of the 1897 Constitution and By-Laws, which remain in effect, require Shearith Israel's approval before the rimonim can be sold.  Needless to say, Shearith Israel was not consulted prior to the mooted sale and in any case, its approval will not be forthcoming – therefore CJI's attempts to sell the rimonim run afoul of its own Constitution and By-Laws.

**D.    The Rimonim Are An Integral Part Of the Touro Synagogue's Genus Loci / Religious Articles**

The rimonim are integrally connected to the Touro Synagogue and have become an integral part of that place.  *See* Section D.10, *supra*.  Shearith Israel, CJI, and people the world over understand their place in history and their longstanding connection to the Newport synagogue.  *Id.*  CJI represented as much in several government documents when describing Touro's historical and cultural significance.  *Id.*  And now, those representations notwithstanding, CJI would sell a piece of Newport's history to further its narrow self-interests. In contrast, Shearith Israel has a longstanding commitment to keep the rimonim at Touro Synagogue for as long as a functioning Jewish congregation worships there in conformity with the Indenture with Lease.  Removing the rimonim from Touro Synagogue would strip a layer of history from Newport and harms both the people of Newport and Jews everywhere.

**V.    NO TRUST RELATIONSHIP EXISTS BETWEEN SHEARITH ISRAEL AND CJI**

We argue above that the entire trust frolic can and should be avoided.  Nonetheless, should the Court wish to analyze the trust issues, Shearith Israel intends to prove that none of the writings that CJI will claim evidences the creation of a trust actually does so, much less by the clear and convincing evidence the law requires.  There is zero evidence that CJI can claim to be a beneficiary of any such trust, much less that it can hijack the trust by forcing the trustees to sell

trust property, or better yet, ousting the trustees and being appointed both trustee and beneficiary by this Court.  Abiding such lawlessness would be akin to letting inmates run the asylum.

But as an initial matter, a federal court has already determined both that (1) the 1759 deed to the three purchasers of Touro property does not evince formation of a trust, and (2) that even if a trust was formed by the 1787 will of Rodriguez Rivera, CJI is not a beneficiary.  *See infra*.

## A.    No Trust Was Ever Formed

Neither the 1759 conveyance of land to the three founders of Touro Synagogue, nor their subsequent wills, created a trust.  In order to establish a trust containing real property, a writing that satisfies the Statute of Frauds is required.  R.I. Gen. Laws Ann. § 9-1-4 (West 2006 & Supp. 2014); *Lawrence v. Andrews*, 122 A.2d 132, 136 (R.I 1956).  This writing must evince (1) a manifestation (2) of a donor's present intent (3) to convey equitable rights (4) over his property (5) to a beneficiary or class of beneficiaries.  *Talbot v. Talbot*, 78 A. 535, 540 ( R.I. 1911); *see also Restatement* (*Third*) *of Trusts*, §§ 2, 10, 13, 44 (2003).  CJI bears the burden of proving that a trust was established, and must do so by **clear and convincing evidence**.  *Desnoyers v. Metro. Life Ins. Co.*, 272 A.2d 683, 687-88 (R.I. 1971).  CJI can point to no writing that meets each of the above requirements, and certainly not by clear and convincing evidence.

### 1.    The 1759 Conveyance Does Not Create A Trust

The 1759 conveyance of land to the three founders of Touro is on its face a transfer of land for fair value.  The writing contains no indication that the land on which the Synagogue would be built is conveyed in trust, and fails to name or even hint at a trust beneficiary.  Each of these independently is fatal to trust formation.  *Pickering v. Higgins*, 30 A.2d 846, 847 (R.I. 1943) (holding that an instrument is not a "declaration of trust" where it does not appear to have been so intended by the maker); *Armington v. Meyer*, 236 A.2d 450, 454 (R.I. 1967) (holding that an instrument does not create a valid trust "without setting forth the person or class of

persons who will be the beneficiaries thereunder"); *see also Restatement* (*Third*) *of Trusts* § 22 (2003).

In his 1787 will, Jacob Rodriguez Rivera claims that he and the other two purchasers took this land in trust "for the sole Use, benefit and behoof of the Jewish Society, in Newport, to be for them reserved as a Place of Public Worship forever" but this post-dated declaration of supposed intent is without legal significance. Rhode Island law is clear: "[t]here must be a present intent to make a trust . . . **at the time**" of the alleged formation. *Talbot*, 78 A. at 541 (emphasis added). Judge Brown's 1903 decision recognized that the 1759 deed "is upon its face a deed to the grantees named for a full money consideration, and affords no evidence itself . . . that the said grantees 'became joint tenants of said parcels of land as trustees of the Jews of Newport, forever.'" *David*, 119 F. at 799.

### 2.     None Of The Subsequent Conveyances Created A Trust

The 1787 Rivera will also does not evince the formation of a trust. Rivera purports to "quit Claim" to his "exclusive right, title or Interest" to "every pace and parcel" of the Touro land (D16-2). But this is far less than the clear and convincing evidence that trust formation requires. *Desnoyers*, 272 A.2d at 687-88. The mere statement of the purpose for which a bequest is made does not in itself show the necessary intent to create a trust to accomplish that purpose. *See, e.g., In re Schrieb's Will*, 78 N.Y.S.2d 54, 55 (Surr. Ct. Richmond Cnty. 1947) (holding that a devise "to be used by [the done] in and toward the education of [her son]" did not create a trust, but merely expressed a moral obligation). General practice and the circumstances here are compatible with the colloquial use of the term "trust" as a private, moral obligation of the parties to provide privately owned property for the community's use.

Moreover, the will's terms are too vague to give rise to a trust. Rivera did not have "exclusive right, title, or Interest" to the entirety of the Touro lands – when his will was admitted

to probate, he only held title to 2/3 of the lands (his original 1/3 and the 1/3 initially belonging to Isaac Hart, who had conveyed it to Rivera) (D16-2).  Rivera could not have created a trust in property that he did not own.  "To constitute a valid testamentary trust, it is essential that its material terms are certain . . . [and] [i]f any of [the trust's] elements is not described within certainty, no trust is created."  *Tucker v. Countryman*, 414 N.E.2d 101, 103-04  (Ill. 1953) (finding a testamentary trust void for vagueness due to "incongruities and uncertainties [in] . . . the subject of the trust and . . . the nature of the interest of the beneficiaries"); *see also Del Drago v. Comm'r*, 214 F.2d 478, 480 (2d Cir. 1954) (holding that a trust failed for uncertainty); *Union & New Haven Trust Co. v. Koletsky*, 167 A. 803, 806 (Conn. 1933) (same).

CJI needs to prove that any putative conveyance on behalf of "the Jewish Society, in Newport" is not too vague and that the beneficiaries are unascertainable.  The intended beneficiary or class of beneficiaries of a trust must be described with enough specificity that "the identity of all individuals comprising its membership" can be ascertained.  *Restatement (Third) of Trusts* § 46 (2003); *Lux v. Lux*, 288 A.2d 701, 704 (R.I. 1972).  For example, in *Isaacs v. Emory*, 1 A. 713 (Md. 1885), the court held that there was no trust "for the use of the ministry and membership of the Methodist Episcopal Church in the United States" because the purported class of beneficiaries was too vague and indefinite.  *Id.* at 714; *see also Kain v. Gibboney*, 101 U.S. 362, 365 (1879) (holding that a bequest to a "community attached to the Roman Catholic Church" is void for vagueness because "[i]ts members must be constantly changing, and it must always be uncertain who may be its members at any given time. No member can ever claim any individual benefit from the bequest, or assert that she is a *cestui que trust*").

Membership in a "Jewish Society" is not always clear-cut because there is no consensus even within the Jewish community on the necessary and sufficient qualifications of Jewishness.

-60-

A classification based Jewish identity, like the Christian-based classifications in *Isaacs* and *Kain*, fails to describe with precision all individuals included in the purported class of beneficiaries.

Finally, the 1792 will of Moses Levy, much like the initial 1759 conveyance, contains no language evincing the formation of a trust and is on its face a bequest of only his 1/3 share of the Touro lands (D18).

**B.      Even If A Trust Was Created, CJI Is Not A Beneficiary**

Judge Brown's 1903 Opinion concluded that CJI failed to adequately allege that the Shearith Israel Trustees held the deed to Touro "as trustees of the Jews of Newport" and that, in any event, "no trust of this general character would arise from a purchase of the land for the purposes set forth in . . . the bill." *David*, 119 F. at 799.  Judge Brown also noted that, even if such a trust would have been created, CJI, "a corporation created by law", was not a beneficiary of said trust.  *Id.*  Further, if any trust did exist, it would be a trust for the "Jewish Society, in Newport" and that "[t]here is no allegation that [plaintiffs] have any standing as members of a Jewish Society, or as persons entitled to admission thereto." *Id.* at 800 (emphasis in the original).

Assuming arguendo that Touro is held in trust, CJI cannot be a trust beneficiary.  In fact, Judge Brown's 1903 opinion affirmed that CJI, a corporation, could not be considered a beneficiary of any trust possibly contemplated by the wills in question.  *David*, 119 F. at 799-800.  If a trust were to have been created by the conveyances, it would be either (1) a trust for the benefit of the Jews of Newport, or (2) a trust for the benefit of Yeshuat Israel, the Colonial congregation worshipping in Newport.  If it were a trust for the Jews of Newport, CJI cannot be the beneficiary, because it does not speak for all the Jews of Newport.  On the other hand, were it a trust for the benefit of Yeshuat Israel or its congregants, CJI would not be a beneficiary because it is not a descendant of or successor in interest to Yeshuat Israel, a congregation that ceased to exist nearly one hundred years before CJI's incorporation.  *See* Sections C.1-3, *supra*.

-61-

Moreover, the course of conduct inter se and the existence of a lease between the parties is strong evidence that CJI is not a beneficiary of any putative trust, and is simply the lessee of the Touro Synagogue and the personalty. CJI had to petition Shearith Israel to be allowed the use of the Touro Synagogue and, eventually, the Touro Fund. It asked for and received religious articles of worship on loan. It tried to forcibly take over the Synagogue and, when thwarted, disclaimed all rights to the Touro building, lands, and personalty. It then entered into an Indenture with Lease with Shearith Israel to regain access to Touro and its articles of worship as lessee, a status it repeatedly and publicly affirmed during the last century. *See* Sections D.2-8.

1.    **The Only Conceivable Language Of Trusteeship Does Not Indicate A Trust For The Benefit Of CJI, But Only That The Shearith Israel Trustees Act As Trustees — For Shearith Israel**

The Court will see language in certain documents that burdens the Shearith Israel trustees with the bond of trusteeship. But this language identifies only the trustees, and not the beneficiary. The trustees of Shearith Israel do hold certain property in trust – for the benefit of Shearith Israel. *See* Section A, *supra*. This is the historical mechanism for how a Synagogue could own land, and Shearith Israel to this day owns property through its trustees. Thus, evidence that the Shearith Israel trustees hold property in trust, without more, does not establish CJI to be a beneficiary of this relationship. In fact, the more apt presumption would be that such language establishes a trust for the benefit of Shearith Israel.

C.    **Even Were CJI A Beneficiary, It Cannot Oust The Trustee Or Compel A Sale Of Trust Property**

Even were the Touro Synagogue and its contents found to be held in trust, and even in the impossible-to-find circumstance that CJI were to be considered a beneficiary of that trust, that would still not support the relief CJI seeks. Even as a purported beneficiary, CJI could not (1)

compel Shearith Israel to sell part of the trust res; (2) petition this Court to remove Shearith

Israel as trustee; or (3) be appointed the trustee of a trust for its own benefit.

Court-sanctioned removal of a trustee is an extraordinary remedy, and is even more so

when the trust instrument does not grant the beneficiary the power of removal. *See Restatement*

(*Third*) *of Trusts* § 37 & cmt. e; *Cuzzone v. Plourde*, 2005 WL 2716749, at *3 (R.I. Super. Ct.

Oct. 17, 2005) (recognizing that "because the removal of a trustee is such an extreme form of

relief, Courts should exercise their authority sparingly and only upon a showing that the trustee

has failed to perform his duties through more than mere negligence").  Without conceding that

Rodriguez Rivera's will gives rise to a trust of any kind, Shearith Israel's actions have at all

times accorded with the intent expressed therein that the Touro Synagogue "be . . . reserved as a

Place of Public Worship forever" (D16-2).  *See* Sections V.A-B, *supra*.  Thus, even if a trust

were found there would be no grounds upon which to remove the trustee.

Further, even if the rimonim were held in trust for CJI's benefit, CJI cannot compel a sale

of the rimonim.  A court may only compel a trustee to act when not doing so would constitute

abuse of the trustee's discretion.  *See Restatement* (*Third*) *of Trusts* § 87 & cmts. b-c (2007); *In

re Gordon*, 2000 WL 276829, at *5 (R.I. Super. Ct. Feb. 14, 2000).  The purpose of any putative

trust, if one existed, would be to preserve Touro Synagogue as "a Place of Public Worship

forever" (D16-2).  But selling the rimonim would hinder, not further, this purpose.  The sale

would strip the Touro Synagogue of an indispensable part of its "genus loci" (*see* D324-10) and

depriving future generations of these appurtenances of worship.  Selling an indispensable piece

of the Touro Synagogue would eviscerate the trust's objectives and violate the duties of the

trustee.

VI. **CJI BREACHED ITS DUTIES TO SHEARITH ISRAEL UNDER THE WRITINGS PERMITTING LIMITED USE AND THE INDENTURE WITH LEASE**

A.    **CJI's Attempted Sale Of The Rimonim Violates Shearith Israel's Ownership Rights.**

CJI does not own and has no right to sell the rimonim.  Shearith Israel is both the actual owner of the rimonim and the party who can show prior possession, thus rebutting any presumption based on CJI's possession of the rimonim.  *See* Sections IV.A-B, *supra*.  Moreover, since the set of rimonim CJI contemplates selling is not a true pair, CJI is attempting to sell one bell which is incontrovertibly owned by Shearith Israel, and to which CJI does not even claim ownership.  In seeking the sale, CJI has breached its obligations under the documents permitting use and under the Indenture with Lease.  *See* Section E, *supra*.

B.    **CJI's Attempted Sale Of The Rimonim Violates The Terms Of The Limited Permission Documents And The Indenture With Lease.**

By misappropriating limited-use and leased property, CJI violated its obligations to Shearith Israel in several ways.  CJI also violated its covenants under the Indenture with Lease not to "permit the same to be occupied *or used* for any purpose other than herein stated" (D150-2).  Depriving the Touro Synagogue of rimonim, integral to its existence, is an additional breach.

C.    **CJI's Attempted Sale Of The Rimonim Perpetrated A Fraud**

CJI perpetrated a fraud on its own congregants by claiming that extensive research by Christie's had concluded that CJI had title to the rimonim when in fact no research to this effect had been done.  *See* Section E, *supra*.  In fact, neither CJI nor Christie's researched the provenance of the rimonim.  *Id.*  When CJI's own congregants repeatedly questioned whether CJI had any right to sell the rimonim given Shearith Israel's ownership rights, CJI claimed Christie's confirmed it had good title – a claim that Christie's unequivocally denied.  *Id.*  Thus, CJI obtained the vote to sell the rimonim by duping its own congregants.

**D.    CJI's Attempted Sale Of The Rimonim Was For Improper Purposes.**

CJI claims it seeks to sell the rimonim in order to insure the congregation's survival.  The point is legally irrelevant.  It is also factually untrue: if need be, the evidence will show that CJI has no economic need to sell the rimonim, even assuming, contrary to law, that a "good reason" would permit theft.  CJI's claimed financial shortfall is unprovable and, even were it true, it is entirely of CJI's own doing, including by saddling itself with debt and other liabilities not mission-critical to its role as caretaker of the Touro Synagogue and the personalty.

A sale of the rimonim would harm the preservation and perpetuation of Touro Synagogue as a place of worship.  Shearith Israel here seeks to protect its ownership and contractual rights, but also to the Touro Synagogue, by faithfully adhering to its long-held and historical purpose of religious worship.

**VII.    SHEARITH ISRAEL HAS DISCHARGED ITS DUTIES TO CJI AND TO THE TOURO SYNAGOGUE, THUS DEFEATING CJI'S DEFENSES, WHICH FAIL IN ANY EVENT**

The Shearith Israel-CJI relationship is principally that of lessor-lessee and is governed by the terms of the still-operational limited use documents and the Indenture with Lease.  *See* Section III.B-C, *supra*.  Over the last century, Shearith Israel has dutifully discharged its duties.  In addition, it has ratified appointments of rabbis, Sections D.8-9, *supra*, thereby helping maintain the Sephardic rituals that CJI has promised to uphold.  And most importantly, as recognized by CJI leadership, Shearith Israel has allowed CJI to remain "[w]ithin the confines of the lease . . . 'autonomous'" (D333-6).  Shearith Israel did not impede CJI's activities as long as CJI abided by the lease terms.

Beyond the lessor-lessee relationship, Shearith Israel has continued to contribute both its time and resources to the advancement of both the Touro Synagogue and CJI.  It has been involved with TSF, the fundraising arm of CJI; it has contributed financially to the Touro

Synagogue, and has encouraged its members to do the same; it has worked with CJI to secure benefits from the Federal Government; and it has perpetuated a liaison program to maintain friendly relations with CJI.  *See* Section D.9, *supra*.

The Indenture with Lease does not require this continued involvement – Shearith Israel has undertaken these tasks because of its long-standing commitment towards maintaining the Touro Synagogue as a place of Jewish worship for as long as an active congregation exists in Newport.  This continued involvement, in and of itself, defeats CJI's affirmative defenses.  But these defenses also fail for additional reasons, as we now show.

## A.    CJI's Assertions Underpinning Its Affirmative Defenses Are Meritless

Shearith Israel did not know its ownership rights were being violated before 2012 – this fact alone is fatal to each of CJI's affirmative defenses.  Specifically, there is no evidence that CJI attempted to violate any of Shearith Israel's ownership rights before 2008-09 (when CJI apparently secretly started considering selling Shearith Israel's rimonim), and from that date until 2012 there is no evidence that Shearith Israel knew anything about CJI's intent to sell the rimonim.  At no point before 2008 did CJI claim to own the rimonim; rather, it used them, maintained them, and loaned them out consistent with the terms of the Indenture with Lease.

Between 2008 and 2012, there will be no evidence of any relevant communication between Shearith Israel and CJI except for one undocumented phone call in 2009.  However, neither participant in that call remembers talking about a plan to sell the rimonim (*see* Ross Dep. at 249:23-252:12; Deposition of Michael Katz at 38:6-39:13).  Nor did CJI have any specific plan to do so at that point (*see* Ross Dep. at 249:23-252:12;  Deposition of Andrew Segal ("Segal Dep.") at 21:8-22:12).  More generally, the evidence will show that the CJI Board did not give Shearith Israel's property rights serious consideration (*see* D398-3; Segal Dep. at 67:24-69:19) and did not feel any need to discuss the issue with Shearith Israel (*see* Segal Dep. at 17:21-18:7;

27:10-29:4; Deposition of Richard Casten at 67:24-69:5).  As described below, these facts prove

fatal to CJI's affirmative defenses of laches, equitable estoppel, and waiver.

**B.**     **CJI's Affirmative Defenses of Laches, Estoppel, and Waiver Fail**

   **1.**     **CJI Cannot Avail Itself of the Affirmative Defense of Laches**

Shearith Israel timely asserted its ownership rights to the rimonim.  Laches bars suit only

when a claimant negligently delays litigating his claim, thereby causing prejudice to the

opposing party.  *See Andrukiewicz v. Andrukiewicz*, 860 A.2d 235, 241 (R.I. 2004).  But the

clock only started ticking once Shearith Israel knew its rights were being violated.  *See Sarni v.*

*Meloccaro*, 324 A.2d 648, 652-53 (R.I. 1974).  Laches also does not bar a suit when the

defendant obscures the need for litigation by outwardly affirming the plaintiff's rights,

particularly where the parties are on friendly terms.  *See Fitzgerald v. O'Connell*, 386 A.2d 1384,

1387-88 (R.I. 1978).

Shearith Israel's ownerships rights were not violated before 2012 (as best we can tell),

when CJI fraudulently induced its congregants to approve a sale of the rimonim and a concerned

CJI congregant informed Shearith Israel of the sale.  *See* Section E, *supra*.  Prior to this, Shearith

Israel had no indication that CJI was acting in violation of Shearith Israel's rights.  Once it

learned of the violation, Shearith Israel immediately intervened, asserting its rightful title to the

rimonim (D399).

The "delay" alleged by CJI caused no prejudice.  Prejudice under laches is measured by

whether litigation delay impedes the court's truth-seeking function, not by harm to the claimant.

*Fitzgerald*, 386 A.2d at 1387.  Moreover, laches is unavailable to a claimant who suffered

prejudice due in part to its own delay in asserting its claims, despite knowing the potential for

litigation.  *Raymond v. B. I. F. Indus.*, 308 A.2d 820 , 824-25 (R.I. 1973).  Here, the Court

remains entirely capable of ascertaining "the truth of the matte[r]."  *Fitzgerald*, 386 A.2d at

1387.  The documents that will decide the case are at this Court's disposal, and CJI cannot point

to any concrete evidence that was lost due to Shearith Israel's purported delay.  Finally, any

harm suffered by CJI flows strictly from its own failure to bring suit despite knowing that

Shearith Israel claimed title to the rimonim.  CJI's own congregants repeatedly put CJI on notice

that Shearith Israel owns both Touro Synagogue and the rimonim as early as 2008 (*see* D381-2;

D385-2; D398-2 to 4) but CJI acted in secret until its misdeeds were exposed in 2012.

Finally, CJI, as lessee, is estopped from making a laches claim against Shearith Israel, the

lessor, because a tenant cannot dispute the title of his landlord.  *See* Section III.D, *supra*.  It

would be unjust for CJI to avail itself of laches simply because Shearith Israel assumed, as did

the world at large, that CJI had possession of Touro and the rimonim pursuant to a lease.

### 2.   CJI Cannot Avail Itself of the Affirmative Defense of Equitable Estoppel

To establish an equitable estoppel defense, CJI must show that (a) Shearith Israel's

affirmative conduct was directed to CJI (b) for the purpose of inducing CJI to act in reliance on

it, and (c) CJI acted in reliance on that conduct to its detriment.  *See Providence Teachers Union

v. Providence Sch. Bd.*, 689 A.2d 388, 391-92 (R.I. 1997).  CJI fails on all three counts.  Shearith

Israel made no "affirmative representation or equivalent conduct" to CJI.  *See id.* at 391.

Shearith Israel's lack of legal action before 2012 cannot be considered an "affirmative

representation" because as noted above, Shearith Israel did not know about CJI's intent to sell

the rimonim before then.

The "key element" of equitable estoppel is that the prejudicial reliance was "intentionally

induced."  *El Marocco Club, Inc. v. Richardson*, 746 A.2d 1228, 1234 (R.I. 2000).  But here, CJI

cannot show Shearith Israel's wrongful intent.  CJI fails to allege, and no evidence suggests, that

Shearith Israel acted (or failed to act) with the intent that CJI rely on its actions or inactions.

Finally, CJI does not claim and cannot establish that it affirmatively relied on any alleged representation by Shearith Israel when it acted.  *See Providence Teachers Union*, 689 A.2d at 391-92.  As noted above, Shearith Israel had no reason to suspect that CJI was violating the terms of the Indenture with Lease by mooting the sale of the rimonim until 2012, and thus had no need to affirm its ownership.  This is especially so, since CJI repeatedly affirmed the Indenture with Lease, as recently as 2012 (and still affirms its existence on its website) (*see, e.g.*, D396; D19-2).  CJI does not claim reliance on any statements made by Shearith Israel, nor could it, since no such statements were ever made.

### 3.    CJI Cannot Avail Itself of the Affirmative Defense of Waiver

For waiver to apply, CJI must show that Shearith Israel's conduct was "so manifestly consistent with" an intentional relinquishment of its ownership of the rimonim that "no other reasonable explanation for [its] conduct is possible."  *Irons v. FBI*, 811 F.2d 681, 686 (1st Cir. 1987) (noting that the burden of establishing an implicit waiver is particularly high).

Shearith Israel did not waive its rights because it never expressed an intention to relinquish its ownership of the rimonim.  *See id.* (holding that waiver is either express or implied from one's conduct).  CJI also cannot show implicit waiver because Shearith Israel had no reason to take action prior to 2012.  Courts have found mere silence insufficient to effectuate waiver where they had an explanation for remaining silent.  *See U.S. v. Fleet Bank (In re Calore Exp. Co.)*, 288 F.3d 22, 42 (1st Cir. 2002) (finding no waiver based on a party's failure to speak where "there was no rule or court order requiring it to do so"); *Tidewater Realty, LLC v. R.I.*, 2000 R.I. Super. LEXIS 112, at *13 (Feb. 13, 2000); *Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 3 (1st Cir. 2005) (finding no waiver based on a failure to raise a right to arbitrate during the pendency of an administrative proceeding because that decision merely reflected a desire to avoid added litigation costs).  Shearith Israel had no reason specifically to reaffirm its ownership

of the rimonim or Touro Synaogue (though it did many times even in recent memory) since it

believed as recently as 2012 that CJI was abiding by the terms of the Indenture with Lease.

Therefore, Shearith Israel's silence cannot be deemed consistent with an intentional

relinquishment of its ownership rights.  *See Irons*, 811 F.2d at 686.

## CONCLUSION AND RELIEF SOUGHT

Shearith Israel respectfully prays for the following relief, among others: dismissing CJI's

claims; declarations that Shearith Israel is the true and rightful owner of the Touro Synagogue,

its lands, its cemetery, and all of the personal property at Touro Synagogue that Shearith Israel

took title to in the 1820s or were subject to the Indenture with Lease including the rimonim; that

CJI is in material breach of the terms of the Indenture with Lease between it and Shearith Israel;

that no trust relationship exists between Shearith Israel and CJI and that any trust that does exist

does not enable CJI to sell the rimonim; that Shearith Israel has the rights in CJI that were

accorded in the 1897 Constitution and Bylaws; and that, though there is neither intent nor desire

to supplant any congregant, CJI leadership either should be replaced from within CJI or with

respect to the Touro Synaogogue; together with costs and any other relief the Court deems just

and proper.


DEFENDANT CONGREGATION SHEARITH ISRAEL,

By its Attorneys,

/s/ Deming E. Sherman
Deming E. Sherman (#1138)
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI  02903
(401) 274-9200
(401) 276-6611
E-mail: deming.sherman@lockelord.com

/s/ Louis M. Solomon
Louis M. Solomon (Admitted *Pro Hac Vice*)
CADWALADER, WICKERSHAM & TAFT LLP One
World Financial Center
New York, NY  10281
Tel.: (212) 504-6600
Fax: (212) 504-6666
E-mail: Louis.Solomon@cwt.com

May 11, 2015

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of May, 2015, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

<u>/s/ Louis M. Solomon</u>