# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CONGREGATION JESHUAT ISRAEL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 12-822M |
| | : | |
| CONGREGATION SHEARITH ISRAEL, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT CONGREGATION SHEARITH ISRAEL'S
## POST-TRIAL MEMORANDUM

Deming E. Sherman (#1138)
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI  02903
Tel.: (401) 274-9200
Fax: (401) 276-6611
E-mail: Deming.Sherman@lockelord.com

Louis M. Solomon (Admitted *Pro Hac Vice*)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
Tel.: (212) 504-6600
Fax: (212) 504-6666
E-mail: Louis.Solomon@cwt.com

*Attorneys for Defendant*
*Congregation Shearith Israel*

June 29, 2015

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

CJI'S CLAIMS; SHEARITH ISRAEL'S COUNTERCLAIMS ...................................................... 1

SUMMARY OF ARGUMENT ...................................................................... 1

    A.    CJI'S OWNERSHIP CLAIM FAILS ON BOTH LAW AND FACT ................... 1

    B.    CJI FAILED TO MAKE OUT ANY OF ITS TRUST BURDENS ....................... 3

    C.    PRIMARY EVIDENCE COMPRISING FORMAL LEGAL INSTRUMENTS DETERMINES THE RIGHTS OF THE PARTIES TO THE SYNAGOGUE, ITS RITUAL OBJECTS, AND THE STATUS OF THE PARTIES INTER SE ...................................................................... 4

    D.    THE INDENTURES WITH LEASE GOVERN THE RELATIONSHIP BETWEEN THE PARTIES AND PRECLUDE SALE OF THE RIMONIM ...................................................................... 6

    E.    EVEN ABSENT THE INDENTURES, CJI'S CONSTITUTION AND BY-LAWS AND OTHER LIMITED USE DOCUMENTS PRECLUDE SALE ...................................................................... 7

    F.    SHEARITH ISRAEL PROVED THAT IT OWNS THE RIMONIM AND THAT CJI BREACHED ITS OBLIGATIONS BY PURSUING A SALE ........... 8

    G.    *RES JUDICATA* BARS MUCH OF CJI'S CASE .................................... 9

    H.    CJI'S EQUITABLE DEFENSES FAIL ON BOTH FACTS AND LAW ............ 10

ARGUMENT ...................................................................... 11

I.    THERE IS NO EVIDENCE THAT CJI OBTAINED TITLE TO THE RIMONIM ........ 11

    A.    The Facts Adduced At Trial Prove That Shearith Israel And Not CJI Owned Rimonim 1-6 (Using Dr. Mann's Numeration) ......................................... 13

    B.    CJI Is Not Entitled To Any Evidentiary Presumption Based On Its Possession Of The Rimonim ...................................................................... 14

    C.    CJI's "Indicia Of Control" Evidence Is Without Legal Significance .................. 16

II.    CJI FAILED TO PROVE THAT IT OBTAINED OWNERSHIP OF THE RIMONIM THROUGH ANY CONNECTION WITH THE COLONIAL YESHUAT ISRAEL ...................................................................... 19

    A.    CJI Failed To Prove That Yeshuat Israel Ever Owned The Rimonim ................. 19

# TABLE OF CONTENTS (cont'd)

**Page**

          1.     There Is No Evidence That Yeshuat Israel Purchased The Rimonim ........................................................................20

          2.     There Is No Evidence That Yeshuat Israel Was Gifted The Rimonim ........................................................................20

   B.     Even Had Yeshuat Israel Owned The Rimonim, CJI Failed To Prove Any Connection Between It And Yeshuat Israel ........................21

III.   THE INDENTURES WITH LEASE GOVERN THE SHEARITH ISRAEL–CJI RELATIONSHIP ........................................................24

   A.     The Indentures With Lease Remained In Effect Until At Least 2012 ................24

   B.     The Indentures With Lease Include The Rimonim ................................26

          1.     The Specific Terms Of The Indentures With Lease Encompass Personal Property, Including The Rimonim ........................26

          2.     The Parties Intended The Indentures With Lease To Include All Personal Property, Including The Rimonim ........................29

   C.     The Indentures With Lease Estop CJI From Claiming Ownership Of The Rimonim Or Selling The Rimonim ........................32

IV.   EVEN IF THE RIMONIM ARE NOT COVERED BY THE INDENTURES WITH LEASE, OTHER LIMITED USE DOCUMENTS PRECLUDE CJI FROM SELLING THE RIMONIM ........................................................33

   A.     The 1897 Constitution And By-Laws Precludes CJI From Selling The Rimonim ........................................................33

   B.     Other Loan And Limited Use Documents Preclude CJI From Selling The Rimonim ........................................................35

V.   SHEARITH ISRAEL PROVED THAT IT OWNS THE RIMONIM AND THAT CJI BREACHED ITS OBLIGATIONS BY PURSUING A SALE ........................37

   A.     Shearith Israel Proved That It Owns The Rimonim ........................37

   B.     CJI Breached The Governing Documents Between The Parties ........................39

VI.   CJI FAILED TO PROVE THE EXISTENCE OF A TRUST FOR CJI'S BENEFIT ........................................................41

# TABLE OF CONTENTS (cont'd)

**Page**

A. The 1759 Deed To The Touro Synagogue Land Does Not Create A Trust ..........44

B. The 1787 Will Of Jacob Rodrigues Rivera Does Not Create A Trust.................45

    1. No Private Trust Has Been Created ...........................................46

    2. No Public Trust Has Been Created ...........................................48

    3. If A Public Trust Exists, CJI Cannot Be A Beneficiary ...........................48

C. The 1894 Deeds Of Conveyance Do Not Create A Trust For The Benefit Of CJI.........................................................................................49

D. The 1945 Agreement With The Federal Government Cannot Create A Trust ............................................................................................51

E. CJI Cannot Misconstrue Rhode Island Legislative Comments ...........................52

F. CJI Cannot Claim The Existence Of A Religious Trust While At The Same Time Claim That This Court Cannot Interpret Religious Intent.................54

G. Shearith Israel's Custom Barring Sale Of The Rimonim Is A Strictly Factual Question, Since It Depends Entirely On How Shearith Israel Acts, Not On Questions Of Religious Law ....................................................56

VII. EVEN WERE THE COURT TO FIND THAT CJI IS THE BENEFICIARY OF AN IDENTIFIABLE TRUST, CJI HAS PROVEN NO BREACH OF SHEARITH ISRAEL'S DUTIES THAT WOULD SUPPORT REMOVING SHEARITH ISRAEL AS TRUSTEE OR MODIFYING THE TRUST .........................56

VIII. *RES JUDICATA* OR CLAIM PRECLUSION BARS MUCH OF CJI'S CASE..............61

A. The Replevin Decision And The Decision In *David v. Levy* Were Final And On The Merits ................................................................................63

B. The Parties In Both Cases Are Sufficiently Identical To The Parties In The Instant Suit For *Res Judicata* To Apply.....................................................63

C. CJI Is Barred From Re-Bringing Claims That Were Decided In The Replevin And *David v. Levy* Cases, And From Bringing Any Related Claims That CJI Should Have Brought At That Time...........................................65

D. At A Minimum, CJI's Declaration Of Trust, Trustee Removal, And Declaration Of Ownership Claims Are Barred.....................................................66

## TABLE OF CONTENTS (cont'd)

**Page**

IX.    CJI'S EQUITABLE DEFENSES FAIL ON THE LAW AND THE FACTS ..................68

    A.    All Three Defenses Fail For The Absence Of Cognizable Delay In Shearith Israel's Protecting Its Rights ....................................................................69

    B.    All Three Defenses Fail Pursuant To CJI's "Unclean Hands" .............................69

    C.    CJI Cannot Avail Itself Of The Affirmative Defense Of Laches .........................70

    D.    CJI Cannot Avail Itself Of The Affirmative Defense Of Equitable Estoppel..............................................................................................................72

    E.    CJI Cannot Avail Itself Of The Affirmative Defense Of Waiver ........................73

CONCLUSION AND RELIEF SOUGHT ....................................................................................74

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES:

*Acevedo–Villabos v. Hernandez,*
     22 F.3d 384 (1st Cir. 1984)) .................................................................. 63

*Adam v. Adam,*
     624 A.2d 1093 (R.I. 1993) .................................................................... 69

*Airframe Sys., Inc. v. Raytheon Co.,*
     601 F.3d 9 (1st Cir. 2010) ..................................................................... 63

*Allen v. Withrow,*
     110 U.S. 119 (1884) ...................................................................... 43, 49-50

*Allied Structural Steel Co. v. Spannaus,*
     438 U.S. 234 (1978) .............................................................................. 54

*Am. Bridge Co. v. Providence Place Grp. Ltd. P'ship,*
     263 F. Supp. 2d 330 (D.R.I. 2003) .................................................. 62, 64

*Andrukiewicz v. Andrukiewicz,*
     860 A.2d 235 (R.I. 2004) ...................................................................... 70

*Angel v. Bullington,*
     330 U.S. 183 (1947) .............................................................................. 63

*Apparel Art Int'l, Inc. v. Amertex Enters., Ltd.,*
     48 F.3d 576 (1st Cir. 1995) ................................................................... 62

*Armington v. Meyer,*
     236 A.2d 450 (R.I. 1967) .......................................................... 42, 44, 49

*Att'y-Gen. v. N. Am. Life Ins. Co.,*
     91 N.Y. 57 (1883) ................................................................................. 58

*Aunyx Corp. v. Canon U.S.A., Inc.,*
     978 F.2d 3 (1st Cir. 1992) ............................................................... 64, 65

*AVX Corp. v. Cabot Corp.,*
     424 F.3d 28 (1st Cir. 2005) ................................................................... 65

*Barnes v. Michalski,*
     925 N.E.2d 323 (Ill. App. Ct. 2010) ..................................................... 21

<u>PAGE(S)</u>

*Bell v. Hood*,
    327 U.S. 678 (1946)..............................................................................63

*Booknau v. Clark*,
    79 N.W 159 (Neb. 1899)......................................................................15

*Bradford v. Goldman*
    287 N.W. 541 (Mich. 1939)..................................................................12

*Bradshaw v. Ashley*,
    180 U.S. 59 (1901)...............................................................................15

*Brice v. Trs. of All Saints Mem'l Chapel*,
    76 A. 774 (R.I. 1910).................................................................48-49, 59

*Bristol v. Nolan*,
    53 A.2d 466 (R.I. 1947)...............................................................42, 48, 49

*Buchanan v. Bank of Am., N.A.*,
    2011 WL 3705352 (R.I. Super. Ct. Aug. 17, 2011)..............................57

*Buchanan v. McLyman*,
    153 A. 304 (R.I. 1931).........................................................................59

*Burbank v. Burbank*,
    25 N.E. 427 (Mass. 1890)................................................................56-57

*Cardi v. Amoriggi Sea Foods, Inc.*,
    468 A.2d 1223 (R.I. 1983)....................................................................24

*CardioFocus, Inc. v. Cardiogenesis Corp.*,
    859 F. Supp. 2d 192 (D. Mass. 2012)...................................................69

*Chase v. Sanborn*,
    5 F. Cas. 521 (C.C.D.N.H. 1874)....................................................11, 19

*Citizens' Bank & Trust Co. v. Bradt*,
    50 S.W. 778 (Tenn..Ct. App. 1898).......................................................51

*City of N.Y. v. Carleton*,
    21 N.E. 55 (N.Y. 1889) ........................................................................15

*City of Providence v. Payne*,
    134 A. 276 (R.I. 1926)....................................................................50, 53

*Cooke v. Mortg. Elec. Registration Sys., Inc.*,
    2013 WL 2368846, (D.R.I. May 29, 2013) ...........................................63

**PAGE(S)**

*Coolidge v. Long,*
    282 U.S. 582 (1931)..............................................................53

*Cuzzone v. Plourde,*
    2005 WL 2716749 (R.I. Super. Ct. Oct. 17, 2005).....................57, 60

*David v. Levy,*
    119 F. 799 (1903)..............................................................44

*Dayton v. Peck, Stow & Wilcox Co. (Pexto),*
    739 F.2d 690 (1st Cir. 1984)................................................23

*Del Drago v. Comm'r,*
    214 F.2d 478 (2d Cir. 1954)..............................................45, 46

*De*nver Found. v. Wells Fargo Bank, N.A.,
    163 P.3d 1116 (Colo. 2007)..................................................43

*Desnoyers v. Metro. Life Ins. Co.,*
    272 A.2d 683 (R.I. 1971)..................................................43, 46

*El Marocco Club, Inc. v. Richardson,*
    746 A.2d 1228 (R.I. 2000)....................................................72

*Elena Carcieri Tr.-1988 v. Enter. Rent-A-Car Co. of R.I.,*
    871 A.2d 944 (R.I. 2005)....................................................26

*Federated Dep't Stores, Inc. v. Moitie,*
    452 U.S. 394 (1981)..........................................................63

*Ferro v. Ferrante,*
    240 A.2d 722 (R.I. 1968)....................................................16

*Fisher v. Shipyard Vill. Council of Co-Owners, Inc.,*
    760 S.E.2d 121 (S.C. Ct. App. 2014).....................................34

*Fitzgerald v. O'Connell,*
    386 A.2d 1384 (R.I. 1978)................................................70, 71

*Fiumara v. Fireman's Fund Ins. Cos.,*
    746 F.2d 87 (1st Cir. 1984)..............................................65, 66

*Fraioli v. Lemcke,*
    328 F. Supp. 2d 250 (D.R.I. 2004)....................................23-24

*Freshour v. King (In re Freshour's Est.),*
    345 P.2d 689 (Kan. 1959)................................................43, 49

<u>**PAGE(S)**</u>

*Friarsgate, Inc. v. First Fed. Sav. & Loan Ass'n of S.C.*,
   454 S.E.2d 901 (S.C. Ct. App. 1995) ..................................................................69

*Friedman v. Goodman*,
   151 S.E.2d 455 (Ga. 1966) ..............................................................................32

*Fritz v. Thompson*,
   271 P.2d 205 (Cal. 1954) ................................................................................51

*From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church*,
   803 A.2d 548 (Md. 2002) ................................................................................44

*Geoghegan v. Smith*,
   105 A. 864 (Md. 1919) ....................................................................................45

*Gonzalez v. Banco Cent. Corp.*,
   27 F.3d 751 (1st Cir. 1994) ....................................................................*passim*

*Grant v. Briskin*,
   603 A.2d 324 (R.I. 1992) ................................................................................32

*Gresham v. Strickland*,
   784 So. 2d 578, 581 (Fla. Dist. Ct. App. 2001) .......................................... 60-61

*Griffin v. Griffin*,
   141 S.W.2d 16 (Ark. 1940) ..............................................................................43

*Grissom v. Pawtucket Tr. Co.*,
   559 A.2d 1065 (R.I. 1989) ..............................................................................69

*Guthrie v. Clark*,
   293 N.Y.S.2d 452 (Sup. Ct. 1968) ..................................................................33

*Haffenreffer v. Haffenreffer*,
   994 A.2d 1226 (R.I. 2010) ..................................................................26, 27, 28

*Harcourt v. Gaillard*,
   25 U.S. 523 (1827) ....................................................................................11, 12

*Hargrove v. Cox*,
   104 S.E. 757 (N.C. 1920) ................................................................................32

*Hill v. M. S. Alper & Son*,
   256 A.2d 10 (R.I. 1969) ....................................................................29-30, 31

*Hopper v. Callahan*,
   28 A. 385 (Md. 1894) .................................................................................. 15-16

**PAGE(S)**

*In re Air Crash at Dallas/Ft. Worth Airport on Aug. 2, 1985,*
    861 F.2d 814 (5th Cir. 1988) ............................................................................. 64

*In re Cowee's Will,*
    120 N.Y.S.2d 674 (Surr. Ct. 1953) ................................................................... 58

*In re Est. of Bolinger,*
    943 P.2d 981 (Mont. 1997) ................................................................................ 45

*In re Est. of Holmgren,*
    604 N.E.2d 1092 (Ill. App. Ct. 1992) .......................................................... 19, 20

*In re Iannochino,*
    242 F.3d 36, 43 (1st Cir. 2001) .................................................................... 62, 64

*In re Mathues' Est.,*
    185 A. 768 (Pa. 1936) ........................................................................................ 61

*In re McNally's Est.,*
    389 N.Y.S.2d 60 (App. Div. 1976) ................................................................... 21

*In re Platner,*
    525 N.Y.S.2d 887 (App. Div. 1988) ................................................................. 21

*In re Small's Est.,*
    58 N.W.2d 477 (Iowa 1953) ......................................................................... 59-60

*In re Staas' Est.,*
    235 N.Y.S.2d 490 (Surr. Ct. 1962) ................................................................... 48

*In re Tr. of Brooke,*
    697 N.E.2d 191 (Ohio 1998) ............................................................................ 53

*Irons v. FBI,*
    811 F.2d 681 (1st Cir. 1987) ........................................................................ 73, 74

*Isaacs v. Emory,*
    1 A. 713 (Md. 1885) .......................................................................................... 47

*J.R.P. Assocs. v. Bess Eaton Donut Flour Co.,*
    1998 WL 356896 (R.I. Super. Ct. June 22, 1998) ........................................... 24

*Jackson v. U.S.,*
    19 Ct. Cl. 504 (1884) ................................................................................... 62-63

*Kain v. Gibboney,*
    101 U.S. 362 (1879) .......................................................................................... 47

**PAGE(S)**

*Kale v. Combined Ins. Co. of Am.*,
    924 F.2d 1161 (1st Cir. 1991)..................................................................65, 67-68

*Keifer v. Schuneman*,
    78 N.E.2d 780 (Ohio Ct. App. 1948)..................................................................37

*King v. Grand Chapter of R.I. Order of E. Star*,
    919 A.2d 991 (R.I. 2007)..................................................................34

*Kolbe v. BAC Home Loans Servicing, LP*,
    738 F.3d 432 (1st Cir. 2013)..................................................................29

*Koolen v. Mortg. Elec. Registration Sys., Inc.*,
    953 F. Supp. 2d 348 (D.R.I. 2013)..................................................................62

*Lawrence v. Andrews*,
    122 A.2d 132 (R.I. 1956)..................................................................42

*Leahey v. Univ. of R.I.*, 1985 WL 6033, (D.R.I. Aug. 1, 1985), *aff'd*,
    802 F.2d 439 (1st Cir. 1986)..................................................................*passim*

*Lenzini v. Gianetti*,
    142 A. 139 (R.I. 1928)..................................................................24

*Leo v. Armington*,
    59 A.2d 371 (R.I. 1948)..................................................................44

*Livernois v. Brandt*,
    37 Cal. Rptr. 279 (Cal. Ct. App. 1964)..................................................................43

*Livingston v. Tapscott*,
    585 So. 2d 839 (Ala. 1991)..................................................................21

*Long v. Hammond*,
    145 P. 527 (Cal. 1914 1914)..................................................................39, 40

*Lukaszewski v. Walmsley*,
    113 A.2d 727 (R.I. 1955)..................................................................43

*Lund v. Gray Line Water Tours, Inc.*,
    289 S.E.2d 404 (S.C. 1982)..................................................................32

*Lux v. Lux*,
    288 A.2d 701 (R.I. 1972)..................................................................47

*MacDonald v. Manning*,
    239 A.2d 640 (R.I. 1968)..................................................................42, 44

**PAGE(S)**

*Marie v. Allied Home Mortg. Corp.*,
    402 F.3d 1 (1st Cir. 2005).................................................................73

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*,
    196 F.3d 409 (2d Cir. 1999)...........................................................55

*Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*,
    142 F.3d 26 (1st Cir. 1998)............................................................65

*McClure v. Middletown Trust Co.*,
    110 A. 838 ( Conn. 1920) ..............................................................58

*McCormick v. Brevig*,
    980 P.2d 603 (Mont. 1999)......................................................43, 50

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*,
    312 F.3d 94 (2d Cir. 2002).............................................................55

*Motta v. Samuel Weiser, Inc.*,
    768 F.2d 481 (1st Cir. 1985)......................................................21-22

*Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa*,
    388 F.3d 15 (1st Cir. 2004)............................................................29

*Navajo Tribe of Indians v. U.S.*,
    9 Cl. Ct. 336 (1986) ......................................................................58

*Negrón–Fuentes v. UPS Supply Chain Solutions*,
    532 F.3d 1 (1st Cir. 2008)..............................................................63

*Pickering v. Higgins*,
    30 A.2d 846 (R.I. 1943).............................................................44, 50

*Pier of Newport, LLC v. N.A.J. Assocs.*,
    2014 R.I. Super. LEXIS 21 (Feb. 11, 2014) ...................................26

*Porn v. Nat'l Grange Mut. Ins. Co.*,
    93 F.3d 31 (1st Cir. 1996)........................................................ *passim*

*Powers v. Calvo*,
    1995 WL 941377 (R.I. Super. Ct. Jan. 19, 1995), *aff'd*
    673 A.2d 74 (R.I. 1996)..................................................................16

*Providence Teachers Union v. Providence Sch. Bd.*,
    689 A.2d 388 (R.I. 1997)................................................................72

**PAGE(S)**

*R.G. Fin. Corp. v. Vergara–Nunez,*
    446 F.3d 178 (1st Cir. 2006) ..................................................................62

*Ramirez-Carlo v. U.S.,*
    496 F.3d 41 (1st Cir. 2007) ...................................................................25

*Raymond v. B.I.F. Indus., Inc.,*
    308 A.2d 820 (R.I. 1973) ......................................................................71

*Reg'l Properties, Inc. v. Fin. & Real Est. Consulting Co.,*
    752 F.2d 178 (5th Cir. 1985) .................................................................69

*Renaissance Dev. Corp. v. Airport Valet, Inc.,*
    2013 WL 6405298 (R.I. Super. Ct.) ......................................................24

*Rex-Tech. Int'l, LLC v. Rollings (In re Rollings),*
    451 F. App'x 340 (5th Cir. 2011) (per curiam) (Unpublished) ..................11, 12, 14

*Robinson v. U.S.,*
    7 Cl. Ct. 155 (1984) ..............................................................................63

*Rocha v. Peter Pan Bus Lines, Inc.,*
    2011 WL 2896965 (D.R.I. July 15, 2011) .......................................63, 64

*Russell v. Allen,*
    107 U.S. 163 (1883) .........................................................................42-43

*S. Seattle Auto Auction, Inc. v. Ladd,*
    370 P.2d 630 (Or. 1962) ........................................................................12

*Sarni v. Meloccaro,*
    324 A.2d 648 (R.I. 1974) ......................................................................70

*Sheldon v. Hamilton,*
    47 A. 316 (R.I. 1900) ............................................................................16

*Sherman v. Champlain Transp. Co.,*
    31 Vt. 162 (1858) ..................................................................................32

*Silva v. Fitzpatrick,*
    913 A.2d 1060 (R.I. 2007) ....................................................................21

*Slepkow v. Robinson,*
    324 A.2d 321 (R.I. 1974) ...............................................................12, 21

*Sloat v. City of Newport ex rel. Sitrin,*
    9 A.3d 1217 (R.I. 2011) ........................................................................69

**PAGE(S)**

*Smith v. Haskins*,
    45 A. 741 (R.I. 1900) .................................................................................11, 12

*Stambaugh v. Moffett*,
    278 S.W.2d 74 (Ky. Ct. App. 1955) ........................................................21

*Standard Funding Corp. v. Universal Roadmaster, Inc.*,
    2005 WL 2511283 (N.J. Super. Ct. Oct. 12, 2005) ........................19, 20

*Stearns v. Newport Hosp.*,
    62 A. 132 (R.I. 1905) ........................................................48, 56, 60

*Syenergy Methods, Inc. v. Kelly Energy Sys., Inc.*,
    695 F. Supp. 1362 (D.R.I. 1988) ..............................................23

*Talbot v. Talbot*,
    78 A. 535 (R.I. 1911) ..........................................................42, 45

*Tefft v. Reynolds*,
    113 A. 787 (R.I. 1921) ..................................................... *passim*

*Tidewater Realty, LLC v. R.I.*,
    2000 R.I. Super. LEXIS 112 (Feb. 15, 2000) ........................................73

*Trinity United Methodist Church v. Cleaver*,
    2006 WL 114872 (Conn. Super. Ct. Apr. 6, 2006) ..............................67

*Trs. of Peninsula Annual Conf. of Methodist Church, Inc. v.*
    *N.Y. E. Annual Conf.*,
    211 A.2d 588 (Del. 1965) ..............................................................48

*Tucker v. Countryman*,
    111 N.E.2d 101 (Ill. 1953) ....................................................45, 46, 50

*Twisp Min. & Smelting Co. v. Chelan Min. Co.*,
    133 P.2d 3002 (Wash. 1943) ........................................................34

*U.S. v. Certain Land in Barnstable Cnty., Mass.*,
    314 F. Supp. 1372 (D. Mass. 1970) ..............................................15

*U.S. v. Fleet Bank of Mass. (In re Calore Exp. Co.)*,
    288 F.3d 22 (1st Cir. 2002) ..........................................................73

*Union & New Haven Trust Co. v. Koletsky*,
    167 A. 803 (Conn. 1933) ............................................................45, 46

**PAGE(S)**

*Walsh v. Israel Couture Post No. 2274*,
    542 A.2d 1094 (R.I. 1988) ............................................................................16

*Wethington v. Ind.*,
    360 N.E.2d 276 (Ind. Ct. App. 1977) .....................................................39, 40

*Whitnum v. Town of Greenwich*,
    2014 WL 4161983 (D. Conn. Aug. 19, 2014) ...............................................55

*Williams v. Morris*,
    95 U.S. 444 (1877) ........................................................................................32

*Willison v. Watkins*,
    28 U.S. 43 (1830) ....................................................................................32, 71

*Zabriskie v. Clev., Columbus, & Cincinnati R.R. Co.*,
    64 U.S. 381 (1859) ........................................................................................34

**STATUTES & OTHER AUTHORITIES:**

U.S. Const. art. I, § 10, cl. 1 ...............................................................................53

18 U.S.C. § 1001 ................................................................................................25

Fed. R. Civ. P. 8 ................................................................................................62

R.I. Const. art. I, § 12 .......................................................................................53

R.I. Gen. Laws Ann. (West 2006 & Supp. 2014):
    § 9-1-4 ..........................................................................................................42
    § 34-18-37 .....................................................................................................26

*Restatement (Second) of Judgments* (1982):
    § 40 ...............................................................................................................64
    § 41 ...............................................................................................................64

*Restatement (Third) of Trusts* (2003):
    § 2 .................................................................................................................42
    § 10 ...............................................................................................................42
    § 13 ...............................................................................................................42
    § 22 ...............................................................................................................49
    § 37 ...............................................................................................................57
    § 37 & cmt. e ................................................................................................57
    § 44 ...............................................................................................................42
    § 45 cmt. a ....................................................................................................46

**PAGE(S)**

George Gleason Bogert et al., *The Law Of Trusts & Trustees*
§ 522 (rev'd 2d ed. 1993 & Supp. 2014) ................................................................46

Defendant ("Shearith Israel") respectfully submits this Post-Trial Brief.  This Brief (along with the Pre-Trial Brief (ECF No. 70)) also supports Shearith Israel's Motion to Dismiss Plaintiff's ("CJI") case under Fed. R. Civ. P. 52 (Trial Transcript Day 5 ("TR5") 17:25-21:12). Shearith Israel has structured the presentation below to aid overall comprehension.  Yet the Court will not overlook the distinct burdens of proof each party bears on its respective claims and defenses.  The facts proved at trial are laid out in atomized fashion in the accompanying Findings of Fact ("FoF").

## CJI'S CLAIMS; SHEARITH ISRAEL'S COUNTERCLAIMS

Having been caught trying to sell an unmatched pair of Shearith Israel Torah finials, called Rimonim 2 and 4 by Dr. Mann (FoF 97-98), CJI sued Shearith Israel in 2012 seeking a declaration that it owns these rimonim and can freely sell them.  CJI also seeks a declaration that the Touro Synagogue is held in trust for CJI.  In the alternative, CJI claims that the rimonim are also part of this trust and that somehow CJI, as purported trust beneficiary, can unilaterally sell or force a sale of the rimonim, and that Shearith Israel should be removed as trustee of this trust. Shearith Israel's counterclaims seek to protect and preserve the Touro Synagogue and the rimonim for the open use of worshippers in Rhode Island.  Shearith Israel wants future generations of worshippers to be able to experience these historic, cultural, and religious treasures and the fullness of Touro Synagogue's rich history, including the rimonim.

## SUMMARY OF ARGUMENT

## A.    CJI'S OWNERSHIP CLAIM FAILS ON BOTH LAW AND FACT

CJI failed to prove that it owns Rimonim 2 and 4, or Rimonim 5-6 (using Dr. Mann's numeration) or that it obtained the rimonim based on its connection to the colonial Congregation Yeshuat Israel.  CJI adduced no evidence that Yeshuat Israel ever owned or even possessed those rimonim, a burden it was required to surmount through "competent evidence."  CJI also failed to

prove that it was in any meaningful way connected to Yeshuat Israel, which ceased to exist more than 100 years before CJI came into existence. An unincorporated entity cannot have legal successors, but even if it could, legal successorship requires establishing a link between the assets or management of corporations – evidence of both was absent here. *See* Point II.B.

CJI also failed to carry its burden in proving that it independently acquired the rimonim following its formation in 1893 or its incorporation in 1894. CJI could point to nothing transferring it title, no evidence of purchase, and no evidence of gift. The fact that the rimonim were at some point physically at Touro Synagogue does not help CJI – absent a clear, contemporaneous manifestation of donative intent, which requires proof by "clear and satisfactory evidence", the law presumes that any such transfer was a loan and not a gift. CJI adduced no evidence of donative intent and cannot defeat this robust legal presumption. On the contrary, the evidence was overwhelming that Shearith Israel loaned any ritual objects to CJI, on the express condition that such loans were at Shearith Israel's sufferance. *See* Point I.B.

CJI does not benefit from any presumption of ownership because of its possession of the rimonim. The presumption is inapplicable when another can show older or better title – and Shearith Israel's 1765-74 evidence of ownership and its 1869 Inventory are clear, unrebutted proof that Shearith Israel owned Rimonim 1-2 and 3-4 decades if not a century before CJI came into existence. Any presumption is also inapplicable because the rimonim are covered by the 1903 and 1908 Indentures with Lease between the parties – possession pursuant to a lease defeats any presumption of ownership and in fact carries the opposite conclusion: Shearith Israel is the rightful owner. The documents from Shearith Israel granting CJI limited use of religious items, and the permanent CJI Constitution and By-laws are equally powerful proof to overcome any argument made from mere possession. *See* Points IV.A and IV.B.

**B.      CJI FAILED TO MAKE OUT ANY OF ITS TRUST BURDENS**

For over 250 years Shearith Israel has given respect, affection, support, and ritual oversight to the Touro Synagogue, its ritual objects, and its congregants (FoF 462; 528-550). Indeed, were it not for the meritless extremes to which CJI distends trust concepts, Shearith Israel would not have been so insistent in pointing out the unnecessary and advisory nature of this Court's entry into the "trust" fray and CJI's utter failures of proof.  Yet CJI continues to contort trust law into a catchall that would give it a back door to the relief it seeks, and not for the first time.  In the parties' prior lawsuit, CJI, using the exact same underlying instruments, alleged that Touro Synagogue was held in trust for its benefit – and lost.  Claim preclusion bars CJI from re-litigating this claim.  *See* Point VII.D.

Even if CJI's claim were cognizable, CJI utterly failed to establish the existence of any trust *for its benefit* by the clear and convincing evidence the law requires.  CJI's trust theories were as scattershot as its proof was inadequate.  Finding a trust for CJI's benefit amid the various disparate instruments over a 200 year period is impossible, as we show in the detailed FoFs concerning all the possible trust-creating instruments (FoF 462-92).  So too is establishing the trust beneficiary, the trust corpus, and the trust purpose.  *See* Point VI.

- Is CJI alleging the existence of a private trust for its benefit?  Impossible – CJI is not named as a beneficiary in any document purporting to establish a trust.  The myriad sources that CJI pointed to at trial had only one constant:  none mentions CJI as the beneficiary of any trust.

- Is CJI alleging the existence of a charitable trust for its benefit?  Impossible again – charitable trusts exist to serve a charitable purpose rather than a beneficiary – any charitable trust that purports to have a definite beneficiary must fail.  Moreover, only the

Attorney General has standing to enforce the terms of a charitable trust. Such a trust would not give CJI use, possession, or control of Touro Synagogue and would certainly not permit CJI to sell the rimonim. *See* Point VII.

Nor can the 1945 Agreement with the U.S. Government create a trust. Even if the terms of the Agreement were read to ascribe trust obligations to Shearith Israel – and they do not – any such trust obligations would flow from the 1894 Deeds of Conveyance. Moreover, any trust obligations the Agreement affirms (or any new ones it creates, although this would be contrary to law) would be of a charitable trust, which cannot exist for CJI's benefit and CJI would have no standing to enforce. The Agreement does make one thing clear: CJI's rights and obligations are solely those of a lessee. *See* Point VII.

And then come CJI's real failures of proof: showing entitlement to the selfish relief it seeks. CJI introduced no evidence and can point to no law that would enable it to control the sale of part of the trust's corpus. Nor can CJI remove a trustee. Period. Even if CJI had standing to do so (it does not) – there is no warrant to remove a trustee who has abided by the terms of this putative trust, and who is by law given wide-ranging discretion to carry out its terms. Neither does any temporary acrimony give CJI the right to remove a trustee – CJI initiated the current litigation and injected, of its own volition, temporary adversity into a relationship that was harmonious for over 100 years. *See* Point VII.

## C. PRIMARY EVIDENCE COMPRISING FORMAL LEGAL INSTRUMENTS DETERMINES THE RIGHTS OF THE PARTIES TO THE SYNAGOGUE, ITS RITUAL OBJECTS, AND THE STATUS OF THE PARTIES INTER SE

Primary source legal documents govern this case, both because of the plain language they use and because of the unequivocal acts the parties have undertaken in compliance with them. Professor Fisher and Dr. Mann gave unrebutted, uncontradicted testimony that in history, as in evidence, primary historical proof of provenance and relationships is accorded significantly more

weight than secondary evidence (FoF 60; 654).  Both experts carefully relied on primary evidence or alerted the Court when such evidence did not exist (FoF 61; 653).  The primary evidence proves Shearith Israel's case and leaves CJI bereft of the rights it claims.

CJI's attempt to refute this primary proof with secondary evidence fails.  CJI strategically decided not to call any experts to sift through hundreds of years of records and to explain the documents, examine the actual ritual objects, and assist the Court, even after this Court strongly advised CJI to reconsider that choice with extreme care.  CJI also decided not to call any experts in rebuttal.  All CJI has, then, is second- and third-hand, rank hearsay accounts, not subject to discovery or cross-examination, that were written decades if not centuries after the fact.  CJI could not find true experts to agree with its positions, and so on the crucial issues, its case does not contain any primary proof.  Instead it offered abjectly inconclusive half-statements or snippets, which CJI then further engineered into sound bites.

To take two examples, CJI asserts that certain secondary sources claim that the rimonim were made for the colonial Yeshuat Israel.  These statements should be given no weight, as they are not backed up with any evidence.  These same sources claim that ascertaining the full provenance of the rimonim from inception is impossible (FoF 653).  The primary evidence shows that Shearith Israel paid for the rimonim and took and claimed ownership of the rimonim by 1869.  There is no proof in the record to undermine those conclusions.

The same is true regarding the relationship between CJI and the colonial Yeshuat Israel.  Professor Fisher painstakingly went through the primary evidence, which utterly destroys CJI's myth that somehow it is a successor to Yeshuat Israel.  CJI's proof is secondary literature written by non-lawyers trying to offer opinions of "legal succession" (FoF 225-31).  The effort fails.

**D.    THE INDENTURES WITH LEASE GOVERN THE RELATIONSHIP BETWEEN THE PARTIES AND PRECLUDE SALE OF THE RIMONIM**

Professor Fisher testified that the 1903 Indenture with Lease was the culmination of a ten-year process whereby CJI, admitting it owned nothing, nonetheless challenged Shearith Israel's ownership of the Touro Synagogue and personal property.  Professor Fisher's testimony traced the restrictions agreed to by CJI in the Indenture with Lease to protections that Shearith Israel repeatedly sought to establish during the prior decade:  that the Synagogue remain open to all comers; that the culture and tradition of the colonial congregation continue to be honored and the synagogue and its personalty remain in use according to Sephardic tradition; and that Shearith Israel maintain control and oversight over the Synagogue and personalty.

The evidence at trial showed that the 1903 Indenture with Lease, which was renewed in 1908, remains in effect and continues to govern the relationship between Shearith Israel and CJI.  The law is clear that the parties' continued acknowledgement of the Indenture and actions in conformity with its terms perpetuate the Indenture's effect and render CJI a holdover tenant.

The evidence showed that these Indentures represented the culmination of a process by which Shearith Israel established and secured its rights to the Touro Synagogue, lands, and personal property.  The law affords great weight to the intent of the parties and circumstances surrounding contract drafting when interpreting contracts between parties.  Here, the evidence proved that, at the time of lease signing, Shearith Israel had total control of the Touro Synagogue and its personal property, and thus, as CJI explicitly acknowledged, commanded all of the leverage in negotiations.  At that time, CJI had nothing – it had suffered an adverse judgment in federal court and had no synagogue and no access to any religious items.  The doors to Touro Synagogue were locked, the rimonim and all personal property were inside, and CJI was on the outside looking in.  Because of this dynamic, both parties intended that the lease cover both the

Touro Synagogue and all of the personal property within, including the rimonim, as evidenced by both the scope of the lease and by the terminology it used (FoF 326-31; 344-56).

In the 100+ years since, both parties have abided by the terms of the Indentures, with Shearith Israel providing CJI with quiet enjoyment of the property for a symbolic fee, and CJI in turn paying the specified $1 per year rent (as recently as 2012), vetting its rabbinical appointments with Shearith Israel, and acting in accordance with Shearith Israel's practices (i.e., rites, rituals, and customs) – until it came time to fabricate the need for a vanity endowment (FoF 363-402).  This Court can and we believe must enforce that provision and can do so without any Constitutional inhibition of any kind.  *See* Point III.A.

## E.    EVEN ABSENT THE INDENTURES, CJI'S CONSTITUTION AND BY-LAWS AND OTHER LIMITED USE DOCUMENTS PRECLUDE SALE

CJI's 1897 Constitution and By-Laws precludes CJI from selling the rimonim without Shearith Israel's approval.  CJI's "permanent" (CJI's own term) Constitution and By-Laws was finalized in 1897 and gave Shearith Israel several inalienable rights.  Four Shearith Israel trustees were brought onto CJI's board; these four trustees could vote by proxy; and a unanimous vote of the Shearith Israel trustees was required to dispose of any real or personal property at Touro Synagogue or in *any way* alter or affect the status or rights of the Shearith Israel trustees. Without Shearith Israel's express approval, any subsequent changes to these relevant provisions would be void (FoF 274-82).  The law unambiguously required CJI to abide by the protocols of its Constitution if it wanted to amend it – which CJI indisputably failed to do.  *See* Point IV.A.

Moreover, even prior to the ratification of the 1897 Constitution and By-Laws, Shearith Israel had established a pattern of loaning personal property to be used at the Touro Synagogue, and memorialized these loans with documents expressly limiting the rights of the recipients (FoF 254-64).  Regardless of the limits imposed on CJI's use of personal property by the 1903

Indenture with Lease and the 1897 Constitution and By-Laws, CJI has no right to sell the rimonim in light of these limited use documents.

Finally, CJI cannot be allowed to sell the rimonim due to its representations to government agencies and other organizations that the rimonim are an essential part of the Touro Synagogue. CJI has received money from these entities, who relied on the accuracy of CJI's representations regarding Touro Synagogue's *genius loci* (FoF 435-39). *See* Point IV.B.

## F.    SHEARITH ISRAEL PROVED THAT IT OWNS THE RIMONIM AND THAT CJI BREACHED ITS OBLIGATIONS BY PURSUING A SALE

Shearith Israel's proof regarding its 1869 Inventory was a moment of absolute clarity in the historical record. Shearith Israel adduced unrebutted proof that it had both possession and ownership of the rimonim 25 years before CJI ever existed. CJI offered no evidence showing any transfer of title to the rimonim after 1869, either to CJI or to anyone else. The law presumes that Shearith Israel's status as owner does not change absent proof of subsequent conveyance – and no such proof was adduced by CJI.

Shearith Israel introduced evidence of compelling factual scenarios under which it obtained title to the rimonim, explaining why Shearith Israel had both possession and ownership when the 1869 Inventory was made. First, Dr. Mann testified that Shearith Israel's ledgers reflect a payment to Myer Myers consistent both with the date the rimonim were made and the amount of money the rimonim would have cost at that time (FoF 136-48). Second, assuming the rimonim were at Newport at the time, Professor Fisher testified that when the colonial Congregation Yeshuat Israel disbanded following the Revolution, Shearith Israel took title to the Touro Synagogue and all its contents (FoF169-77), commencing what is now a nearly-200-year history of religious and cultural oversight over both.

The proof of Shearith Israel ownership continues after the 1869 inventory as well. Professor Fisher testified that Shearith Israel cemented its claims to the Touro Synagogue and its contents in 1894, when the heirs and descendants of the colonial Newport congregation signed deeds of conveyance in favor of Shearith Israel, specifically because at that time, the nascent CJI was attempting to undermine Shearith Israel's claims to the Synagogue and personal property (FoF 242-53).  *See* Point V.A.

CJI breached the key governing documents with its attempted sale.  The limited use documents, 1897 Constitution, and Indentures with Lease prohibit CJI from selling property without Shearith Israel's express approval, which was never sought, much less given. Separately, the Constitution, Indentures, and 1945 Agreement with the Federal Government, as well as other formal documents, require Touro Synagogue and its contents to be used according to Shearith Israel's custom and ritual.  Shearith Israel put on unrebutted, unobjected-to proof that selling the rimonim would violate this clause.  *See* Point V.B.

## G.    *RES JUDICATA* BARS MUCH OF CJI'S CASE

But the Court need not even reach the merits of many of CJI's claims to decide the matter.  CJI's declaration of trust, removal of trustee, and declaration of ownership claims are all barred by the doctrine of claim preclusion or *res judicata*.

In 1902, in *David v. Levy*, CJI sued Shearith Israel, alleging that Touro Synagogue was held in trust for its benefit, relying on the very same documents it now claims create a trust for its benefit.  In 1903, the Circuit Court for the District of Rhode Island dismissed CJI's claims on demurrer, ruling that CJI was not and could not be a beneficiary of any putative trust containing the Touro Synagogue (FoF 313-16).

Claim preclusion now bars CJI from relitigating all the issues it had brought in 1903, as well as any issues that could have been brought from the operative facts underpinning the 1903

lawsuit. Thus, CJI is estopped from claiming (1) that Shearith Israel holds Touro Synagogue or the rimonim in trust for CJI's benefit, (2) that CJI can, on that basis, remove Shearith Israel as trustee, and (3) that CJI has any ownership rights in the rimonim, as well as any other personalty that was at the Touro Synagogue at the time the 1902 suit was brought. *See* Point VIII.

## H.    CJI'S EQUITABLE DEFENSES FAIL ON BOTH FACTS AND LAW

CJI cannot avail itself of the affirmative defenses of laches, equitable estoppel, or waiver. Initially, even if everything that CJI alleged was true, CJI's 'declarations' that it owned the rimonim or warnings that the rimonim may be sold are not sufficient to start the clock on these equitable defenses – an actual violation of rights must occur.

These claims fail on the facts as well. CJI failed to prove Shearith Israel's awareness that CJI was actively violating Shearith Israel's ownership rights prior to 2012, and CJI failed to prove that CJI relied on Shearith Israel's purported relinquishment of its rights to CJI's detriment. The evidence adduced was directly the opposite: CJI leadership testified that it never considered even the potential that Shearith Israel may claim title to the rimonim, so it could not have relied on Shearith Israel's position. CJI leaders also testified that CJI deliberately kept Shearith Israel in the dark from 2008, when the plan to sell the rimonim was hatched, until 2012, when that plan was finally ratified by CJI's congregants (and only after CJI made material misstatements to its congregation) (FoF 609-37). CJI did adduce evidence of a conversation with Shearith Israel in 2009, wherein precisely nothing of substance was discussed and CJI did not divulge its specific plan to sell the rimonim at issue here (although CJI's plan had at that time been in action for a year). It also adduced evidence of a newspaper article mentioning the potential for a sale of religious items, without any evidence that anyone from Shearith Israel had seen or heard of the article until after litigation had ensued (FoF 650-52). *See* Point IX.

**ARGUMENT**

The arguments below are in aid of the Relief set forth at the end of this brief and in further support of the motion to dismiss made at the close of CJI's case.  That motion is predicated on four failures of proof:  (1) CJI failed to prove ownership of the rimonim (TR5 18:23-19:4); (2) CJI failed to prove the necessary contours of the trust, or the existence of a trust for CJI's benefit (TR5 19:4-7); (3) even assuming a trust existed, CJI failed to prove that Shearith Israel had breached any duties to trust beneficiaries, or that cause existed to remove Shearith Israel as trustee (TR5 19:7-15); and (4) CJI failed to prove that selling the rimonim comported with the rites, rituals, and customs that must be observed in accordance with the 1894 Deeds of Conveyance, the 1903 and 1908 Indentures with Lease, and the 1945 Agreement with the Federal Government (TR5 19:16-22), even assuming CJI had rights to enforce those instruments.  Those and CJI's other evidentiary and legal failures are addressed herein.

## I.    THERE IS NO EVIDENCE THAT CJI OBTAINED TITLE TO THE RIMONIM

CJI has introduced no evidence that it ever obtained legal title to the rimonim between its formation in 1894 and the present day.  "'[I]n a declaratory judgment action, the party seeking relief bears the burden of proof.'"  *Rex-Tech. Int'l, LLC v. Rollings* (*In re Rollings*), 451 F. App'x 340, 345-46 (5th Cir. 2011) (per curiam) (Unpublished) (citation omitted) (holding that a party seeking a declaratory judgment of ownership bears the burden of proof because that party "accepted the risk of proving its case by filing suit").  A party seeking to establish title "must prevail on the strength of his own title, and not on the weakness of the defendant's."  *Smith v. Haskins*, 45 A. 741, 742 (R. I. 1900); *see also Harcourt v. Gaillard*, 25 U.S. 523, 529 (1827).  The party seeking relief "must prove their ownership by competent evidence".  *Chase v. Sanborn*, 5 F. Cas. 521, 523 (C.C.D.N.H. 1874).

-11-

The evidence adduced at trial was insufficient to establish CJI's ownership of the rimonim.  In light of the uncontradicted evidence that Shearith Israel had title to the rimonim in 1869 (FoF 194-201), CJI's mere statements of perceived ownership carry no legal weight.  *See Bradford v. Goldman*, 287 N.W. 541, 543 (Mich. 1939) ("A mere statement of ownership by a party is a conclusion of law, and not competent evidence of the ownership"); *S. Seattle Auto Auction, Inc. v. Ladd*, 370 P.2d 630, 634 (Or. 1962) ("Assumptions or opinions of witnesses are not competent evidence of ownership").  The law required CJI to produce evidence that title to the rimonim shifted to CJI after its formation, but CJI witnesses readily admitted that no evidence existed showing such a transfer (FoF 161-63).  In light of these admissions, CJI has not met its burden of proving ownership of the rimonim "on the strength of [its] own title".  *Smith*, 45 A. at 742; *see also Harcourt*, 25 U.S. at 529; *In re Rollings*, 451 F. App'x at 345-46.

CJI readily admitted that no evidence exists that CJI ever purchased the rimonim – no bill of sale, no receipt, no writing of any kind indicating ownership or title transfer from Shearith Israel (FoF 161-63).  Absent such proof, all evidence of the physical transfer of the rimonim to Newport for use at Touro carries the legal presumption of a loan.  *See* Point I.B.  The documentary evidence reinforces the validity of this presumption.  All documented transfers of religious items to Newport evidence Shearith Israel's intent to loan these items subject to stringent limitations on use.  *See* Point IV.B.  But even if this evidence is ignored, rebutting the presumption of a loan requires "clear and satisfactory evidence." *Slepkow v. Robinson,* 324 A.2d 321, 325 (R.I. 1974); *see also* Point II.A.2.  In lieu of proof that it purchased the rimonim or that it received the rimonim as a gift, CJI's theory of ownership seems to be that title transferred to it, somehow, by accretion, simply because the rimonim were in Newport for the last 100 years.  In light of clear, primary evidence to the contrary, CJI's theory is patently insufficient to sustain its

burden of proof of ownership, and the physical transfer of the rimonim to Newport to be used at the Touro Synagogue must be considered a loan to CJI.  *See* Point I.B.

A.    **The Facts Adduced At Trial Prove That Shearith Israel And Not CJI Owned Rimonim 1-6 (Using Dr. Mann's Numeration)**

CJI claims ownership of Rimonim 2 and 4 (the mismatched rimonim currently at the Boston Museum of Fine Arts ("MFA")) – even though Rimon 2 does not have "Newport" carved into the base (FoF 97-98).  CJI does not claim ownership of Rimonim 1 and 3 (the mismatched rimonim currently in New York) – even though Rimon 3 has "Newport" engraved on its base. There is no evidence that when Rimonim 2 and 4 were in use at Touro Synagogue, anyone at CJI ever objected or asked for the other "Newport" finial to be sent to Newport (FoF 273).  With respect to Rimonim 2 and 4, as well as Rimonim 5 and 6 (the Carline Cohen rimonim), the proof at trial by Dr. Mann was compelling and uncontroverted.  Dr. Mann testified that Shearith Israel paid for Rimonim 1-2 in 1765 (since Rimonim 1-2 comprise one true set) (FoF 128-156).  And it is undisputed that Shearith Israel paid for Rimonim 3-4 a decade later (since Rimonim 3-4 comprise the other true set) (FoF 157-59).

CJI tried to explain the unexplainable by claiming that the bases of the rimonim were switched.  But it could offer no credible testimony verifying this, instead relying on two lay witnesses that never took apart the rimonim and had never even seen the rimonim removed from their bases other than in photographs (FoF 271).  Dr. Mann conclusively disproved this baseless contention, testifying that only a professional could remove and reattach the bases (FoF 269). The disingenuous nature of CJI's "bases-switching" claim was brought to light by the fact that the claim did not emerge until CJI and Christie's began promoting the rimonim to potential purchasers, who would never have paid top dollar for a mismatched pair (FoF 270).

It was also undisputed that Rimonim 5 and 6 were initially loaned by Caroline Cohen to the rabbi that Shearith Israel appointed to minister at Touro Synagogue in 1892 (FoF 218-20), and then gifted a year later to Shearith Israel (FoF 221). In light of this unrebutted primary source proof, CJI can have no claim of ownership over the Caroline Cohen rimonim.

**B.    CJI Is Not Entitled To Any Evidentiary Presumption Based On Its Possession Of The Rimonim**

CJI cannot avail itself of any presumption of ownership because no presumption of ownership arises from possession where "there [is] a dispute *ab initio* as to the ownership of the property in dispute". *In re Rollings*, 451 F. App'x at 346. Even if CJI's evidence is to be fully credited, this would be the case at bar (in truth, the evidence adduced shows there was no dispute as to ownership prior to CJI's formation – Shearith Israel owned the rimonim prior to that time (*see* Points IV.B and V.A)). Professor Fisher testified to a pattern, started before CJI was even incorporated, wherein Shearith Israel would loan religious items, including silver, to be used at the Touro Synagogue and CJI would try to circumvent Shearith Israel and obtain ownership of these items (FoF 254-64). Variations on this theme emerged in 1894, when CJI challenged Shearith Israel's rights in the Touro Synagogue and personal property (FoF 236); in 1895 when CJI attempted to divert the Touro Fund (FoF 217); in 1896-97 when CJI sought to use the Touro Synagogue and personalty without Shearith Israel's oversight (FoF 276); and 1899-1903, when Shearith Israel's rights to Touro Synagogue and its personal property were challenged (and upheld) in a series of court decisions (FoF 290-322). As CJI admits, the rimonim were at the Touro Synagogue when these were finally resolved in 1902-03 (FoF 338).

Before then, CJI had repeatedly disclaimed ownership over all of the personal property then at Touro Synagogue (FoF 234; 333-34). CJI is not entitled to any presumption of ownership when it repeatedly clarified to Shearith Israel that it did not claim ownership to the

Touro Synagogue or to any of its personalty and, manifested that representation in a series of public ceremonies (FoF 234; 333-34; 337; *see also* Point III.B).

Furthermore, Shearith Israel claimed ownership over the Touro Synagogue and its contents since the 1820s, well before CJI came into existence.  Uncontradicted evidence that Shearith Israel claimed ownership to the rimonim in 1869 (FoF 194-201) is, for the same reason, conclusive in nullifying any possible presumption of ownership based on CJI's current possession of the rimonim.  This evidence clearly showed that Shearith Israel had both possession and ownership of the rimonim a full 25 years before CJI came into existence (FoF 194-201).  No presumption of ownership pursuant to possession applies when the counterparty claims ownership through older or better title.  *See Bradshaw v. Ashley*, 180 U.S. 59, 63 (1901) (refusing to apply presumption on behalf of current occupant of plot of land and holding that possession of property does not create presumption of ownership if counterparty can claim older or better title); *see also City of N.Y. v. Carleton*, 21 N.E. 55, 56 (N.Y. 1889) (finding evidence of prior possession to be dispositive in ownership dispute); *U.S. v. Certain Land in Barnstable Cnty., Mass.*, 314 F. Supp. 1372, 1375 (D. Mass. 1970) ("a possessory title under Massachusetts law is not good against one having an older or better title").  Furthermore, CJI's statements of perceived or actual ownership are "not competent evidence" of ownership because Shearith Israel can trace its title to an older source.  *See Booknau v. Clark*, 79 N.W 159, 160 (Neb. 1899) ("There is absolutely no evidence tending to prove that H. H. Patton ever had any title to the animal.  It is true that in the mortgage he asserted ownership, but that fact was not competent evidence against Clark, who traced his title to another source.").

Finally, a presumption of ownership is inapplicable when the party seeking the presumption is holding the property pursuant to a lease.  *See* Point III.C.  *See also Hopper v.*

*Callahan*, 28 A. 385, 386 (Md. 1894) (holding that possession of farming chattel with the owner's consent does not imply a right to sell because "[w]hen a man is in charge of a farm for the owner it is not at all strange that [he] should have the possession and control of the personal property on it"); *Tefft v. Reynolds*, 113 A. 787, 789 (R.I. 1921) ("When a party enters into possession of land under permission or license from the owner, the presumption is that his possession is in subordination to the true owner").

### C.    CJI's "Indicia Of Control" Evidence Is Without Legal Significance

CJI introduced evidence that it expended money to maintain the Touro Synagogue and the rimonim.  This is legally irrelevant to any issue before this Court.  First, Shearith Israel had no legal obligations under the Indenture with Lease other than to secure title and provide access. In Rhode Island, a non-residential landlord has no duty to repair the property unless such a duty is stipulated in the lease.  *Ferro v. Ferrante*, 240 A.2d 722, 726 (R.I. 1968) (*citing Sheldon v. Hamilton*, 47 A. 316, 317 (R.I. 1900)); *see also Walsh v. Israel Couture Post No. 2274*, 542 A.2d 1094, 1097 (R.I. 1988); *Powers v. Calvo*, 1995 WL 941377, at *3  (R.I. Super. Ct. Jan. 19, 1995), *aff'd*, 673 A.2d 74 (R.I. 1996).  The Indentures with Lease contain no such provision, so Shearith Israel had no obligation to aid CJI in paying for the maintenance and care for the Touro Synagogue and the rimonim (the evidence, however, shows that Shearith Israel did provide such aid (FoF 530-32; 545-46)), and CJI was simply fulfilling its obligations under the lease.

Shearith Israel entered into the Indenture with Lease with CJI because it saw in CJI an able day-to-day caretaker whose interests in preserving Touro Synagogue's Sephardic traditions dovetailed with its own (FoF 370-79).  It was incumbent on CJI to pay the symbolic $1.00 a year rent, adhere to specific rites, rituals, and customs, and have Shearith Israel approve its rabbinical appointments, which it did.  *See* Point III.A.  Shearith Israel, meanwhile, had no obligations to CJI other than facilitating quiet enjoyment of the Synagogue and ritual items, which it did.

Shearith Israel likewise had no such obligations under any putative trust, since a trustee is not required to expend personal funds to maintain the trust property.  *See* Point VII.

Evidence of CJI's claimed financial outlay is also factually irrelevant.  CJI has repeatedly acknowledged its role as the day-to-day caretaker of the Touro Synagogue and all associated properties, and averred that Shearith Israel has no day-to-day obligations to care for the property (FoF 373-39).  This is entirely consistent with the parties' positions as lessor and lessee.  And in exchange for undertaking this obligation, CJI reaped the benefit of leasing the most culturally and historically significant synagogue in the Americas for $1 per year, subject to use restrictions and other non-burdensome covenants in the Indenture with Lease.  Moreover, for the entire time that CJI was charged with the day-to-day stewardship of Touro Synagogue, CJI received significant financial inflow from the Touro Funds and from the Touro Synagogue Foundation ("TSF"), which significantly decreased and oftentimes completely covered maintenance costs and the salary of Touro's minister (FoF 588-94).  TSF's fundraising was so successful that CJI never had to fundraise for itself pre-2008 (FoF 596).

Similarly, CJI's claim that it paid to insure the Touro Synagogue and the rimonim is of no factual or legal significance.  First, since CJI was contractually tasked with day-to-day care of Touro Synagogue and its contents, and Shearith Israel had no duty to maintain the premises, insuring both the Synagogue and the rimonim fell squarely within CJI's duties under the Indenture with Lease.  Second, CJI, as a lessee, had an insurable interest in both the Touro Synagogue and the rimonim, and its insurance policies did not limit coverage to property owned by CJI (FoF 440-56).  Third, the evidence at trial demolished the inferences CJI tried to draw from its purchase of insurance.  Shearith Israel knew it owned the building and contents so it insisted that it be on all of the CJI insurance policies (FoF 440; 447).  And CJI put Shearith Israel

on all its policies, including liability, fire (which included coverage for contents), and fine arts (FoF 448-55).  Shearith Israel had every reason to believe that its interests in both the Synagogue building and its artifacts were protected.

Evidence that CJI loaned the rimonim without Shearith Israel's approval is likewise irrelevant.  Dr. Mann and Michael Katz testified that CJI's loaning the rimonim is entirely consistent with Shearith Israel's ownership rights, and consistent with Shearith Israel's treatment of the Myer Myers rimonim currently in New York, which were readily loaned to museums and exhibits (FoF 459-61).  Shearith Israel only had reason to object when it discovered that its ownership rights were being jeopardized by CJI's attempt to *sell* the rimonim in 2012.

And finally, the hearsay attributions of ownership in articles and publications are far too error-prone and problematic to provide any insight into the actual ownership of the rimonim.  Dr. Mann's unrebutted, unrefuted expert testimony is conclusive that statements in museum catalogues are not competent evidence of ownership.  Such statements often indicate simply who loaned the piece (which is not indicative of ownership) (FoF 645-55).  Oftentimes, the catalogues rely on the representations of the loaning party and reflect little or no independent research to verify these claims (FoF 655).  These catalogues are often profoundly wrong regarding provenance (for example, one catalogue claims that the Carline Cohen rimonim were made for Newport, which is indisputably false) (FoF 656-59).  CJI's reliance on statements in exhibition catalogues underscores the bankruptcy of its position with respect to its "indicia of ownership" evidence.

II.    **CJI FAILED TO PROVE THAT IT OBTAINED OWNERSHIP OF THE RIMONIM THROUGH ANY CONNECTION WITH THE COLONIAL YESHUAT ISRAEL**

A.    **CJI Failed To Prove That Yeshuat Israel Ever Owned The Rimonim**

CJI adduced no evidence establishing that the colonial Yeshuat Israel ever owned the rimonim.  The party seeking to establish ownership "must prove . . . ownership by competent evidence".  *Chase,* 5 F. Cas. at 523.  CJI introduced no "competent evidence" that the colonial Congregation Yeshuat Israel ever purchased, received as a gift, or otherwise owned or claimed ownership of the rimonim.

CJI wants the Court to presume that the two rimonim marked "Newport" were once the property of the colonial congregation. But it claims ownership to one bell that is marked "Newport" and one bell that is not.  *See* Point I.A.  There is no evidence that the unmarked bell was ever in Newport prior to being sent up to be used at Touro sometime in the 1890s (there is no evidence that the bell marked "Newport" was ever there prior to that time either, but this will be addressed below).  By CJI's own logic, this must mean that the unmarked bell was never owned or even possessed by the colonial congregation, so CJI cannot possibly claim ownership of the unmarked bell by virtue of some link to Yeshuat Israel.

With respect to the second bell it claims it owns, CJI's sole evidence that Yeshuat Israel ever owned or possessed it is hearsay from secondary literature, unsupported by any primary sources or any citation whatsoever.  This is insufficient to establish that Yeshuat Israel ever owned the bell.  *See In re Est. of Holmgren*, 604 N.E.2d 1092, 1095-97 (Ill. App. Ct. 1992) (holding that hearsay evidence is not "competent evidence" when introduced for purposes of establishing ownership); *Standard Funding Corp. v. Universal Roadmaster, Inc.*, 2005 WL 2511283, at *2-3 (N.J. Super. Ct. Oct. 12, 2005) (same).

-19-

### 1.    There Is No Evidence That Yeshuat Israel Purchased The Rimonim

CJI introduced no documentary or testimonial evidence that the colonial Congregation Yeshuat Israel ever paid for or purchased any rimonim, much less that Yeshuat Israel purchased rimonim from or made by Myer Myers.  CJI can show no bill of sale, no receipt, and no other writing wherein Yeshuat Israel claimed ownership to the rimonim (FoF 114; 161-63).  In short, CJI has adduced no direct proof that Yeshuat Israel owned the rimonim.  Its sole proof is a smattering of secondary hearsay material, lacking any personal knowledge, that claims without support (and over two hundred years after the fact) that the rimonim were made for the colonial congregation.  As Dr. Mann explained, none of these secondary sources cites to any primary evidence in support of these claims (FoF 653).  Moreover, this hypothesis has been countered by Dr. Mann, who relied on primary material to conclude that Shearith Israel paid for the rimonim. *See* Point V.A.  CJI's evidence on this point amounts to nothing more than double or triple hearsay, which is controverted by the primary evidence and is insufficient as a matter of law to establish ownership.  *In re Est. of Holmgren*, 604 N.E.2d at 1095-97; *Standard Funding*, 2005 WL 2511283, at *2-3.

### 2.    There Is No Evidence That Yeshuat Israel Was Gifted The Rimonim

CJI similarly introduced no documentary or testimonial evidence that the colonial Congregation Yeshuat Israel was ever gifted Myer Myers rimonim (FoF 114; 151-55; 162). There is no gift receipt, no contemporaneous record of transfer, and no mention of any rimonim, much less these specific rimonim, at Touro Synagogue at or around its consecration.  Not even the unsupported hearsay of the secondary sources supports the notion that the rimonim were gifted to Yeshuat Israel.

Putting aside the fact that there is simply no evidence that the rimonim were even at the Touro Synagogue during Yeshuat Israel's existence, without evidence of ownership or donative

intent, the law presumes their presence in Newport to be a loan, rather than a gift. *See Tefft*, 113 A. at 789 (conveyance of personal property to another results in the presumption that the conveyance was a loan rather than a gift). A valid gift requires (1) a manifestation by the donor (2) of "'present true donative intent.'" *Silva v. Fitzpatrick,* 913 A.2d 1060, 1063 (R.I. 2007) (citation omitted). The standard for such a manifestation requires more than the simple act of conveying the property to another: a gift can only be effectuated by the donor's "words or actions 'exhibit[ing] the requisite donative intent.'" *Id.* (citation omitted). This donative intent must be proven by "clear and satisfactory evidence." *Slepkow*, 324 A.2d at 325. Absent such evidence, courts uniformly recognize a legal presumption against finding a gift, in favor of finding a loan. *See, e.g., Livingston v. Tapscott*, 585 So. 2d 839, 841 (Ala. 1991); *Stambaugh v. Moffett*, 278 S.W.2d 74, 76 (Ky. Ct. App. 1955); *Barnes v. Michalski*, 925 N.E.2d 323, 337-38 (Ill. App. Ct. 2010); *In re Platner*, 525 N.Y.S.2d 887, 889 (App. Div. 1988); *In re McNally's Est.*, 389 N.Y.S.2d 60, 61 (App. Div. 1976).

CJI has offered up no evidence to show that Myer Myers, Shearith Israel, or any other party exhibited the requisite "donative intent", much less the "clear and satisfactory evidence" the law requires before a gift can be established. *See Silva*, 913 A.2d at 1063; *Slepkow*, 324 A.2d at 325.

**B.    Even Had Yeshuat Israel Owned The Rimonim, CJI Failed To Prove Any Connection Between It And Yeshuat Israel**

Even assuming Yeshuat Israel owned the rimonim, CJI cannot be the successor of the colonial Yeshuat Israel in any legal sense because there exists no legal framework under which CJI could have any colorable claim to inherit ownership rights from Yeshuat Israel. Yeshuat Israel was a voluntary association, which could not own property – only its individual members could do so. *See Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 485 (1st Cir. 1985) (noting that a

voluntary association "is not recognized as a legal person or entity capable of owning property on its own," and that only "individuals who comprise the organization" can have property rights). There is no evidence that such property was owned by the individual for the collective or for the benefit of others (*cf.* FoF 106). Therefore, any connection to the colonial congregation would effectively be a connection to the heirs and descendants of its members, whether that connection be lineal or contractual (a fact recognized by Shearith Israel when it embarked upon obtaining deeds of conveyance from the heirs and descendants of Yeshuat Israel's members (FoF 242-53)). CJI has adduced no evidence that any of its founding members shared any link with the heirs and descendants of the colonial congregation. And, other than John Loeb's token membership in the last few years, there is no evidence that any CJI congregant shares any sort of connection to the descendants of the colonial congregation, and CJI has readily admitted as much (FoF 226-29).

To the contrary, Shearith Israel introduced evidence affirmatively disproving any link between CJI and the colonial congregation and showing that Shearith Israel, not CJI, has the best claim to hold title under the rights of the original members of the colonial congregation. Professor Fisher testified that CJI and Yeshuat Israel were separated by 70-100 years, came from different parts of Europe, and practiced different types of Judaism (FoF 226). Most of Yeshuat Israel's members moved to New York and joined Shearith Israel in the 1820s (FoF 168-70), prompting CJI's own rabbi to later write that during this time, "the last representative of the Newport congregation **formally handed over to the active Congregation Shearith Israel in New York the title of the closed synagogue, burial ground, and other communal property**" (FoF 169) (emphasis added). Separately, in 1894, the over 50 heirs and descendants of the colonial congregation reaffirmed their connection to Shearith Israel and Shearith Israel's rights in

-22-

the Touro Synagogue and personal property by signing deeds of conveyance to Shearith Israel, formalizing its ownership of the Touro Synagogue, lands, cemetery, and contents (FoF 242-53).

Even if the colonial Yeshuat Israel were not a voluntary association incapable of owning property, there is still no legal framework under which CJI would be considered the legal extension of Yeshuat Israel. Under the "continuity of enterprise doctrine," CJI would not qualify as the successor to Yeshuat Israel. Under this doctrine, there are only two situations under which a legal successorship results (absent contractual agreement or fraud): (1) when a transaction amounts to a de facto merger of the purchaser and the seller corporations, or (2) when the purchaser is merely a continuation of the seller corporation. *Dayton v. Peck, Stow & Wilcox Co.* (*Pexto*), 739 F.2d 690, 692 (1st Cir. 1984). Neither of these exceptions applies here.

CJI's incorporation in 1894 cannot be considered a de facto merger with Yeshuat Israel. The de facto merger doctrine applies when four conditions are met: "(1) when the purchaser corporation retains key personnel from the seller corporation; (2) when a common identity of ownership exists between the purchaser and seller corporations; (3) when the purchaser corporation employs the purchased assets to continue the normal business operations of the seller corporation; and (4) when the seller corporation ceases its ordinary business operations in the area in which the sold assets were used." *Syenergy Methods, Inc. v. Kelly Energy Sys., Inc.*, 695 F. Supp. 1362, 1364 (D.R.I. 1988). CJI introduced no evidence of a shared identity or continuity between any of the members of Yeshuat Israel and the founders of CJI. The evidence does, however, show such connections between Yeshuat Israel and Shearith Israel (FoF 168-70).

Neither can CJI be considered a mere continuation of Yeshuat Israel. To be considered a mere continuation, the acquiring corporation must maintain "the same or similar management and ownership but wea[r] a different hat." *Fraioli v. Lemcke*, 328 F. Supp. 2d 250, 277 (D.R.I.

-23-

2004).  But, as discussed, the evidence was precisely the opposite:  CJI's original management (and membership) had absolutely no connection to any member of the colonial congregation (FoF 226-32).

CJI's proof of its connection to the colonial Yeshuat Israel was limited to lay testimony from its own leadership testifying to their "belief" that the two are connected (FoF 229), a plaque whose claims have no basis in fact (and whose text has no legal effect) (FoF 226), and hearsay secondary sources (penned by non-lawyers) that, without attribution or citation, claim legal successorship between the two congregations (FoF 226).  No proof at all was introduced to show that CJI had actual legal successorship rights based on a link to the colonial congregation.

## III.    THE INDENTURES WITH LEASE GOVERN THE SHEARITH ISRAEL–CJI RELATIONSHIP

### A.    The Indentures With Lease Remained In Effect Until At Least 2012

The evidence showed that the Indenture with Lease was executed on February 18, 1903, and renewed in 1908 (FoF 336; 356).  When the term of the 1908 Indenture with Lease expired, both parties continued to abide by the lease terms, rendering CJI a holdover tenant.  Under a holdover tenancy, the terms of the Indentures with Lease continue to govern the relationship between the two parties.  *J.R.P. Assocs. v. Bess Eaton Donut Flour Co.*, 1998 WL 356896, at *2 (R.I. Super. Ct. June 22, 1998); *Renaissance Dev. Corp. v. Airport Valet, Inc.*, 2013 WL 6405298, at *4-6 (R.I. Super. Ct. Dec. 2, 2013).

Evidence of CJI's continued compliance with the terms of the Indentures with Lease affirms their continued effect.  A landlord's continued acceptance of even irregular and late payments ratifies the lease and perpetuates its existence.  *See, e.g.*, *Cardi v. Amoriggi Sea Foods, Inc.*, 468 A.2d 1223, 1226 (R.I. 1983); *Lenzini v. Gianetti*, 142 A. 139, 140 (R.I. 1928).  The evidence has shown that CJI paid, and Shearith Israel accepted, the $1 yearly rent through 2012

(FoF 398-400).  CJI's own website affirms that a "lease amount of $1 per year is still paid by the current Newport congregation to Congregation Shearith Israel" (FoF 401).  And CJI has repeatedly affirmed its obligation to pay rent under the Indentures (FoF 398-402).

CJI has repeatedly affirmed its continued obligations under the Indentures in other ways as well.  CJI's Minutes and internal communications have acknowledged its status as lessee (FoF 408-11; 414-16).  CJI has also made the same acknowledgements in communications with Shearith Israel (FoF 417; 420-27) and in representations to various government and nonprofit funding entities (FoF 417; 438).  The 1945 Agreement between CJI, Shearith Israel, and the Federal Government, which CJI repeatedly (and rightly) claimed decides this case, specifies that "in carrying out the provisions of this Agreement, [Shearith Israel and CJI's] obligations shall be performed in accordance with and subject to their respective rights and obligations as **lessor and lessee**" (FoF 405) (emphasis added).  This is the only mention of the parties' obligations to and relationship with each other.

Making such statements to the Federal Government carries significant legal consequences.  *See, e.g.*, 18 U.S.C. § 1001 (prohibiting knowingly making false statements to the Federal Government).  And CJI's repeated affirmations of the Indentures with Lease's continued authority to its congregants, the general public and the Federal Government estop CJI from claiming that the Indentures with Lease no longer govern the relationship between Shearith Israel and CJI.  *See Ramirez-Carlo v. U.S.*, 496 F.3d 41, 50 (1st Cir. 2007) (holding that the VA's failure to disavow terms of settlement proposed by plaintiff in letter to the VA estops the VA from denying those terms after settlement).

And even CJI's sporadic refusal to pay rent served as an affirmation of its obligations under the Indentures (FoF 409).  It was not until the first day of testimony at trial that CJI

enunciated its current position, that the lease is not in effect.  If CJI insists on invalidating the Indentures, either by breaching their terms or by annulling the Indentures in court, it must, after giving proper notice (R.I. Gen. Laws Ann. § 34-18-37 West 2006 & Supp. 2014)), vacate the premises, and restore Shearith Israel to possession.  But non-payment of rent or other breaches of its obligations cannot somehow transfer ownership of the rimonim to CJI, particularly when it reaffirmed the Indentures with Lease and paid rent as recently as 2012 (FoF 380-427).

**B.    The Indentures With Lease Include The Rimonim**

The trial evidence showed that both CJI and Shearith Israel intended the Indentures to include the contents of the Synagogue, including the rimonim.  The intentions of the parties govern the terms of the 1903 and 1908 Indentures with Lease.  *Pier of Newport, LLC v. N.A.J. Assocs.*, 2014 R.I. Super. LEXIS 21, at *28 (Feb. 11, 2014) (interpreting lease agreement and emphasizing that court's "primary objective is to ascertain the intent of the parties"); *Haffenreffer v. Haffenreffer*, 994 A.2d 1226, 1233 (R.I. 2010) (when interpreting such documents, a court's "primary objective is to ascertain the intent of the parties").  Where the terms of the document are ambiguous, a court may look to extrinsic evidence to ascertain the parties' intent.  *Elena Carcieri Tr.-1988 v. Enter. Rent-A-Car Co. of R.I.*, 871 A.2d 944, 947 (R.I. 2005) (interpreting rental agreement).  Courts interpret contract terms in consonance with the meanings the parties ascribed to those terms when executing the agreement.  *See Haffenrefferr*, 994 A.2d at 1233-34 (evaluating extrinsic evidence to ascertain parties' beliefs regarding meaning of "estate of").

**1.    The Specific Terms Of The Indentures With Lease Encompass Personal Property, Including The Rimonim**

The terms "paraphernalia" and "appurtenances" as used in the Indentures with Lease encompass the personal property at the Touro Synagogue and include the rimonim.  As Professor

Fisher's unrebutted testimony showed, the parties used these term "appurtenances" to refer specifically to rimonim, as well as to other religious items used at the Touro Synagogue (FoF 347-56). In an 1893 letter to the rabbi then officiating at the Touro Synagogue, the rabbi at Shearith Israel expressly calls "bells" [or rimonim] "appurtenances for worship", along with other religious items such as "Sefarim" [or Torah scrolls], "Books", and the "Shofar" [or ram's horn used during certain holidays] (FoF 349).

Professor Fisher also showed that the parties used the terms "appurtenances" and "personal property" interchangeably when referring to the personalty of the Touro Synagogue (FoF 234-36; 349). When CJI challenged Shearith Israel's rights in the Touro Synagogue in 1893, it wrote that "[CJI] do[es] not claim ownership in the property or appurtenances" at Touro (FoF 234). In its response, discussing the very same issue, Shearith Israel claimed its rights to "the synagogue and personal property therein" (FoF 235). CJI's reply similarly used the term "Synagogue Building or personal property therein" when discussing Shearith Israel's ownership rights (FoF 236). This Court should interpret the use of "appurtenances" in the Indentures with Lease in light of this contemporaneous usage of "appurtenances" between the parties. *See Haffenrefferr*, 994 A.2d at 1233-34.

Professor Fisher testified that such usage of the term "appurtenances" dovetails with the Oxford Dictionary of the Jewish Religion's definition of "Tashmishei Kedusha", or "appurtenances of holiness" because this definition encompasses "items used to decorate ritual objects", which unquestionably includes the rimonim (whose sole purpose is to adorn and enhance the beauty of the Torah) (FoF 359).

There is an even stronger inference that the term "paraphernalia", specifically as it was used in the Indentures with Lease, was meant to encompass personal property, including the

rimonim.  Professor Fisher's unrebutted testimony showed that when the 1903 Indenture was being negotiated, L.N. Levy, Shearith Israel's President, sent a letter to the Shearith Israel representatives at Newport instructing them to add the term "paraphernalia" to the Indenture (FoF 352).  This term was duly interlined and the interlineation received a separate notarization when the Indenture was being signed (FoF 356).  Clearly, this was not a stock term and was ascribed a specific meaning as used between the parties at that time.  In the very same letter, L.N. Levy instructed that the Shearith Israel representatives "obtain surrenders of the building and personal property" and that they "obtain a list of the personal property signed by the officer of [CJI]" (FoF 353).  Professor Fisher's testimony makes clear that, in interlining the term "with the paraphernalia belonging thereto" into the 1903 Indenture, Shearith Israel specifically meant to include the "personal property" then at the Touro Synagogue, which would have (by CJI's admission) included the rimonim (FoF 354).  The advertence of this act was underscored when, in the 1908 Indenture, the phrase "with the paraphernalia belonging thereto" was typed into the Indenture (FoF 356).

CJI also used the term "paraphernalia" to refer to the personal property at the Touro Synagogue during lease negotiations.  When authorizing its absolute surrender, just days before the signing of the 1903 Indenture, CJI agreed to "surrender the possession of the Synagogue building, premises and paraphernalia belonging thereto" to Shearith Israel (FoF 334).  This evidence points strongly toward the conclusion that both parties intended "paraphernalia" as used in the Indentures with Lease to encompass the personal property at the Touro Synagogue, including the rimonim.  *See Haffenrefferr*, 994 A.2d at 1233-34.  Moreover, evidence that the term "paraphernalia" is used to refer to religious items in a synagogue, and specifically to

rimonim, reinforces Professor Fisher's conclusion that this term was used to encompass the religious items at Touro and specifically the rimonim (FoF 361).

Professor Fisher also concluded that in certain instances the term "fixtures" was used between the parties to refer to personal property (FoF 362). Even the counter-evidence adduced by CJI leads to the conclusion that the meaning of "fixtures" depends on context and the intent of the parties (FoF 362).

### 2. The Parties Intended The Indentures With Lease To Include All Personal Property, Including The Rimonim

The evidence adduced shows that the parties intended the Indentures to include personal property, whether or not through the use of the specific terms above. The circumstances and events surrounding the signing of the 1903 Indenture are relevant in the Court's interpretation of the parties' intent. *See Kolbe v. BAC Home Loans Servicing, LP,* 738 F.3d 432, 440 n.6 (1st Cir. 2013) ("When two parties draft a contract with language specific to their transaction, the relevant expectations to assess are those of the individual parties to the contract . . . against background and purpose [of the agreement]"); *Hill v. M. S. Alper & Son,* 256 A.2d 10, 15 (R.I. 1969) ("we will . . . consider the situation of the parties and the accompanying circumstances at the time the contract was entered into, not for the purpose of modifying or enlarging or curtailing its terms, but to aid in the interpretive process and to assist in determining its meaning"); *see also Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa*, 388 F.3d 15, 20 (1st Cir. 2004) (evaluating evidence beyond the seemingly unambiguous four corners of the document because "extrinsic evidence may in fact reveal an ambiguity not otherwise patent . . . [and] language may point only slightly in one direction and extrinsic evidence strongly in another"). Thus, in *Hill*, the court determined that even though the codified terms of the contested contract did not expressly call for the appellee to receive proceeds from a property sale, the "general background . . .

circumstances and situations" indicated that payment was proper under the particular scenario. 256 A.2d at 16.

Shearith Israel clearly and reasonably believed that the Indentures with Lease included personalty because, during the drafting of the 1903 Indenture, CJI's words and deeds confirmed as much. When the 1903 Indenture was being executed, CJI and Shearith Israel went through a formal "ceremony of the keys" wherein the keys to both the synagogue and the Ark (where religious items were kept) were exchanged as the Indenture was being signed and filed (FoF 328-30; 337). As Professor Fisher elucidated, this ritual confirmed that both the Synagogue and the personal property were being covered by the 1903 Indenture (and hence the 1908 Indenture), since the keys to and possession of both changed hands at this time (FoF 328).

Separately, Professor Fisher's unrebutted testimony, based on primary documents written by both parties, made clear that both CJI and Shearith Israel discussed the Touro Synagogue and its personal property in tandem, and that Shearith Israel was specifically concerned with establishing its rights to both the real and personal property associated with Touro. When Shearith Israel discussed its rights in the Touro Synagogue in the 1880s and 1890s, it repeatedly used the term "&c" or et cetera, meaning that it was concerned with more than just the synagogue building (FoF 347). In 1893, when discussing the parties' rights in the Touro Synagogue, the parties communicated not just about the building and lands, but also about the "personal property" (FoF 234-36). As already discussed, during the drafting of the 1903 Indenture, Shearith Israel's president instructed its representatives in Newport to "[o]btain a list of the personal property signed by the officer of [CJI]" when going over the necessary steps to be accomplished during the lease signing ceremony (FoF 329).

In light of this overarching concern with the personal property that was at the time at Touro Synagogue, the parties clearly intended that this personal property be included in the Indentures with Lease.  This conclusion is buttressed by the relative positions of the parties at the time the lease was signed.  Professor Fisher testified that in the wake of the 1903 *David v. Levy* decision (*see* Point VIII), CJI was left with nothing (FoF 326).  It viewed the decision as a complete loss and, in negotiating a settlement with Shearith Israel, authorized the total surrender of both the real and personal property at Touro (FoF 333-36).  In contrast, Shearith Israel believed that it had achieved a comprehensive victory (FoF 320).  It was negotiating with CJI from a position of power, whereas CJI believed that it had lost access to the Synagogue and the attendant personal property.

 It would be illogical to conclude that, in the face of the *David* decision and CJI's total surrender of real and personal property, only the real property would have been encompassed by the Indentures with Lease.  But in the face of this overwhelming evidence, CJI argues that the 1903 Indenture encompassed only realty and all of the personal property was somehow handed over to it with no strings attached.  This contravenes both the reality at the time of the lease signing and the prior relationship between the parties – there is no evidence that prior to the lease signing Shearith Israel gifted personal property to CJI (FoF 323-31).  In contrast, there is copious evidence that Shearith Israel loaned religious articles of worship, under strict conditions that these items were to be returned to Shearith Israel whenever they were requested.  *See* Point IV.B. The "general background . . . circumstances and situations" surrounding the signing of the Indenture with Lease leads to an inevitable conclusion that it encompassed both real and personal property, including the rimonim.  *See Hill*, 256 A.2d at 16.

C.    **The Indentures With Lease Estop CJI From Claiming Ownership Of The Rimonim Or Selling The Rimonim**

Because CJI holds the rimonim pursuant to a valid lease, CJI cannot challenge Shearith Israel's ownership of the rimonim.  *See, e.g.*, *Willison v. Watkins*, 28 U.S. 43, 47 (1830) ("It is an undoubted principle of law, fully recogni[z]ed by this court, that a tenant cannot dispute the title of his landlord, either by setting up a title in himself or a third person, during the existence of the lease or tenancy.  The principle of estoppel applies to the relation between them, and operates in its full force to prevent the tenant from violating that contract by which he [claimed] and [held the] possession"); *see also Williams v. Morris*, 95 U.S. 444, 455 (1877) ("Tenants are never allowed to deny the title of their landlord . . . the rule being that whenever the possession is acquired under any species of tenancy . . . the tenant is estopped from denying the title of the landlord").  A landlord's ownership of the property subject to the lease is presumed even if the tenant is a holdover.  *Sherman v. Champlain Transp. Co.*, 31 Vt. 162, 173 (1858).

Because the rimonim are covered by the Indentures with Lease, and the Indentures remain in effect (*see* Point III.A-B), Shearith Israel is presumed to be the legal owner of the rimonim, and CJI cannot challenge this ownership without first abdicating possession.  The legal presumption in a landlord-tenant relationship is that the landlord holds ownership, and that the tenant has recognized this ownership by taking possession pursuant to the lease.  *See Grant v. Briskin*, 603 A.2d 324, 329 (R.I. 1992); *Fiske v. Brayman*, 42 A.878, 879 (R.I. 1899).  A tenant must abdicate possession of the property to the landlord before the tenant can challenge the landlord's title or ownership rights.  *See, e.g.*, *Lund v. Gray Line Water Tours, Inc.*, 289 S.E.2d 404, 406 (S.C. 1982); *Friedman v. Goodman*, 151 S.E.2d 455, 460-61 (Ga. 1966); *Hargrove v. Cox*, 104 S.E. 757, 758 (N.C. 1920).

And finally, even if CJI can be deemed to own the rimonim (the proof at trial was just the opposite), the continued effect of the Indentures with Lease still precludes their sale. Restrictive covenants, such as those in the Indentures, can restrict how items are used on the property and can give the counterparty non-possessory rights in personal property. *See Guthrie v. Clark*, 293 N.Y.S.2d 452, 462 (Sup. Ct. 1968) (where all lots in subdivision were limited to residential purposes plaintiffs were "entitled to judgment enjoining the defendants . . . from continuing to use any part of said . . . [s]ubdivision for commercial purposes, and providing that the defendants . . . be required forthwith to remove from said premises . . . *all personal property* used in connection therewith or in connection with the marina business") (emphasis added).

As in *Guthrie*, the land upon which the Touro Synagogue stands is subject to a restrictive covenant – namely the Synagogue remain in use in keeping with the Sephardic tradition. Just as the presence of personal property related to "commercial purposes" on the burdened land was entirely inconsistent with the restrictive covenant in *Guthrie*, here the attempt to remove a key piece of personal property integral to the functioning of a synagogue in accordance with the Sephardic tradition is incompatible with the restrictive covenant in the lease under which CJI holds the Touro Synagogue.

## IV. EVEN IF THE RIMONIM ARE NOT COVERED BY THE INDENTURES WITH LEASE, OTHER LIMITED USE DOCUMENTS PRECLUDE CJI FROM SELLING THE RIMONIM

### A. The 1897 Constitution And By-Laws Precludes CJI From Selling The Rimonim

CJI's 1897 Constitution and By-Laws gave Shearith Israel inalienable rights on CJI's Board and would allow Shearith Israel to block the sale of the rimonim. Unrebutted testimony showed that this "permanent" Constitution and By-Laws was never duly amended. The Shearith Israel Trustees were given four seats on CJI's Board (FoF 274-78). The four Shearith Israel

Trustees could vote in person or by proxy (FoF 279-80).  These provisions, and the entirety of Article XIX, which forbade the sale of real and personal property and required CJI services be conducted according to the Sephardic tradition, could also not be changed without unanimous consent of Shearith Israel's four Trustees (FoF 282).

CJI was bound to abide by the terms of the 1897 Constitution and By-Laws and could not make any amendments to the Constitution and By-Laws unless it followed proper procedure to do so.  *See King v. Grand Chapter of R.I. Order of E. Star*, 919 A.2d 991, 998 (R.I. 2007) (holding that constitutions, bylaws, and rules of private organizations create legally enforceable contract-like agreement between organization and its members, and that once these obligations are established, they bind organization).  Any amendments purporting to change those rights and obligations without the consent of Shearith Israel's trustees were *ultra vires* and without effect. *See id.*; *Fisher v. Shipyard Vill. Council of Co-Owners, Inc.*, 760 S.E.2d 121,130 (S.C. Ct. App. 2014) ("'A corporation may exercise only those powers which are granted to it by law, by its charter or articles of incorporation, and by any bylaws made pursuant thereto; acts beyond the scope of the powers so granted are *ultra vires*'") (citation omitted); *Twisp Min. & Smelting Co. v. Chelan Min. Co.*, 133 P.2d 300, 312 (Wash. 1943) ("The term 'ultra vires', in so far as it applies to corporate transactions, is used to describe corporate transactions which are outside the objects for which the corporation was created, as defined in the law of its organization, and therefore beyond the power conferred on the corporation by the legislature"); *Zabriskie v. Clev., Columbus, & Cincinnati R.R. Co.*, 64 U.S. 381, 395 (1859) (holding that corporation cannot undertake actions "that the constitution of the corporation does not authorize" even if corporation believes it is acting in its best interests).

There is no evidence that Shearith Israel ever assented to any changes to any of these provisions (FoF 286-87).  As Bea Ross testified, there is no evidence "that any Shearith Israel trustee was ever notified of a meeting at which the Constitution and By-Laws of 1897 were going to be amended" (FoF 287).  Since there was never any "rule or procedure whereby Shearith Israel trustees would have to make themselves known to CJI" (FoF 288), the onus was on CJI to notify Shearith Israel trustees that it was considering amendments to its Constitution and By-Laws.  Its failure to do so means that Shearith Israel's rights under the 1897 Constitution and By-Laws remain unchanged, and that any sale of property requires the express approval of Shearith Israel, which was never given.

**B.    Other Loan And Limited Use Documents Preclude CJI From Selling The Rimonim**

There is no record of Shearith Israel having ever gifted religious items of worship to the Newport congregation (FoF 161-62; 255).  Rather, the evidence showed that in the 1880s and 1890s, Shearith Israel had established a pattern of *loaning* articles of worship to be used at the Touro Synagogue, subject to explicit limited use documents (FoF 254-64).  Shearith Israel sent objects of worship to Newport to be used during the high holydays in 1881, making clear that those objects were sent on loan, directing the Shamas to "bring from New Port the Sefarim & c. **loaned to the Synagogue** there for services during the recent holy days" (FoF 208) (emphasis added).  In 1883, after Shearith Israel had arranged for a permanent rabbi to minister in Newport, Shearith Israel directed its president to designate two Sefarim (Torah scrolls) to be used at the Newport congregation "during the pleasure of the Board" (FoF 216).  When CJI first contemplated formation as a corporate entity, in 1893, it asked Shearith Israel for "the further assistance which they have in the past rendered in **the loan** of such property as has formerly been in use in the services" (FoF 255) (emphasis added).  In response, Shearith Israel empowered its

appointed minister in Newport "to use the Sefarim, Bells, Books, Shofar and all other appurtenances of worship" at Newport or in the Newport Bank for services and noted that upon termination of the rabbi's appointment, the rabbi would return "the custody of the buildings and appurtenances" to Shearith Israel (FoF 256). The following year, Shearith Israel authorized the loan of "silver sefer-bells (rimonim) and whatever is stored in Newport" noting that the loan should not be consummated until a responsible person guarantees "their safe keeping **and their return whenever desired by us** [meaning Shearith Israel]" (FoF 259) (emphasis added).

These limited use documents make clear that Shearith Israel loaned religious items of worship to the Newport congregations, and that these loans were expressly conditioned on a promise to keep these items safe and to guarantee their return to Shearith Israel immediately upon Shearith Israel's asking. As Professor Fisher testified, absent these loans, CJI would have had nothing – there is no evidence of CJI having any religious articles independent of the loans made to it by Shearith Israel (FoF 233; 255). In the absence of CJI's 1897 Constitution and By-Laws and the Indentures with Lease, these limited use documents preclude CJI from disposing of the religious items that were loaned to it by Shearith Israel.

Finally, CJI cannot be allowed to sell the rimonim based on its representations to government agencies and other organizations that the rimonim are an essential part of the Touro Synagogue. CJI has repeatedly represented that the rimonim are integral to the history and significance of the Touro Synagogue (FoF 433-39). CJI promised to preserve the Touro Synagogue and its contents, including the rimonim (FoF 611). And CJI has received money and other benefits from government agencies and from private organizations, some of which dole out Federal funding, based on these representations (FoF 437). CJI cannot be allowed to renege on

its promises to preserve the Touro Synagogue and its contents, including the rimonim, after reaping the financial benefits these promises brought.

## V.    SHEARITH ISRAEL PROVED THAT IT OWNS THE RIMONIM AND THAT CJI BREACHED ITS OBLIGATIONS BY PURSUING A SALE

### A.    Shearith Israel Proved That It Owns The Rimonim

Unrebutted primary evidence showed that in 1869, Shearith Israel had both possession and ownership of the rimonim (FoF 194-201). This uncontested primary documentation is "competent evidence" of ownership sufficient to carry Shearith Israel's burden of proof. *See* Point II.A. Once Shearith Israel proved its ownership in 1869, it became incumbent on CJI to show better title, which it failed to do. Ownership of personal property is presumed to continue unless a transfer by word or act is shown. *Tefft*, 113 A. at 789 (holding that "[t]he law presumes that the character of the occupation . . . continues to be of the same nature in the absence of some conduct indicating a change"); *see also Keifer v. Schuneman*, 78 N.E.2d 780, 782 (Ohio Ct. App. 1948). CJI adduced no evidence showing that title to the rimonim was ever transferred to it after 1869 (in fact CJI admitted that no such evidence existed). *See* Point I.B. These two facts, without more, are sufficient to establish ownership in favor of Shearith Israel.

The evidence also showed at least three junctures during which Shearith Israel would have obtained ownership rights to the rimonim, two of which precede CJI's existence. Dr. Mann testified, based on primary evidence, that Shearith Israel paid for the rimonim in 1765. Professor Fisher then testified, also based on primary evidence, that title to the Touro Synagogue and its contents passed to Shearith Israel in the 1820s. Professor Fisher then explained that Shearith Israel reinforced its title to the Touro Synagogue, its lands, its cemetery, and its contents, in 1894 by obtaining Deeds of Conveyance from the heirs and descendants of the original colonial congregation.

Dr. Mann, after analyzing Shearith Israel's ledgers from 1765, concluded that Shearith Israel commissioned the rimonim from Myer Myers by issuing him a payment of £36.4.1 in 1764 (FoF 128).  Dr. Mann concluded that the rimonim would have cost approximately this amount in 1765 by analyzing the cost of an ounce of chaste silver in New York at the time and multiplying this amount by the weight of the rimonim (FoF 142).  She then concluded that the £36.4.1 payment to Myer Myers noted in CJI's ledger was payment for the rimonim by comparing it to other types of payments to Myers (FoF 136-140).

But even if Shearith Israel did not obtain title to the rimonim when they were made, it would have done so in the 1820s.  Professor Fisher testified that after the colonial Yeshuat Israel congregation disappeared, many of its former members moved to New York and joined Shearith Israel (the only Jewish congregation in New York prior to 1825) (FoF 165).  At this time, title to the Touro Synagogue and its contents, as well as responsibility for the actual and cultural oversight over the synagogue, transferred to Shearith Israel (FoF 169;182).  Shearith Israel discharged these responsibilities by overseeing the care and upkeep of the Synagogue and opening the edifice for religious services, providing a prayer leader and religious items when occasion for such services arose (FoF 181-90).

Finally, the heirs and descendants of the colonial Newport congregation confirmed Shearith Israel's rights in the Touro Synagogue and associated personalty in 1894 when they executed deeds conveying the synagogue and personalty to Shearith Israel (FoF 243).  As Professor Fisher explained, these conveyances were occasioned by CJI's attempts to claim for itself the Touro Synagogue real and personal property by circumventing Shearith Israel's authority.  *See* Point VI.C.  To squelch CJI's attempted usurpation, the heirs and descendants of

Yeshuat Israel threw their authority behind Shearith Israel, clarifying Shearith Israel's ownership rights to the Touro Synagogue and personalty. *See id.*

## B.    CJI Breached The Governing Documents Between The Parties

CJI, through its attempted sale of the rimonim, has breached its covenants to Shearith Israel under the Indentures with Lease and the limited use documents, has breached its covenants with the Federal Government under the 1945 Agreement, and has even breached its own governing document, the 1897 Constitution and By-Laws.

First, the law makes plain that selling leased property without prior authorization is a violation of the lease. *Wethington v. Ind.*, 360 N.E.2d 276, 276-77 (Ind. Ct. App. 1977) ("knowingly leaving property [of others] in possession of [third party] for the purpose of sale is sufficient exertion of unauthorized control"); *Long v. Hammond*, 145 P. 527, 528 (Cal. 1914) ("No authority rests in a lessee to sell or otherwise dispose of the lessor's property unless there be express provision therefor in the lease, or unless, by fair implication from the terms of the lease, such authority may be inferred").

Second, CJI covenanted in the 1903 and 1908 Indentures with Lease to "not make any alterations" to the Touro Synagogue (FoF 560). Professor Fisher powerfully testified that "meaningful use of the synagogue entails meaningful – or a robust use of these religious articles that CJI did not have" (FoF 344). The removal of the rimonim would constitute such an alteration. CJI readily admitted as much in multiple writings, wherein it represented that the rimonim had become an integral aspect of the *genius loci* of the Touro Synagogue (FoF 438).

Third, CJI's mooted sale violated the many limited use documents that granted CJI possession of the rimonim pursuant to guarantees that it be kept safe and be returned to Shearith Israel at Shearith Israel's asking. *See* Point IV.B.

Fourth, CJI's attempted sale breached the 1945 Agreement with Shearith Israel and the Federal Government, which CJI admitted is "the most important document in the case" (FoF 403). The 1945 Agreement provides that "title to the Touro Synagogue . . . and its appurtenances . . . shall remain in the Shearith Israel Trustees" and that CJI's obligations "shall be performed in accordance with and subject to [its] rights and obligations as . . . lessee" (FoF 403; 405). The language of the 1945 Agreement tracks the language of the Indentures with Lease between the parties (FoF 406). As CJI's attempted sale expressly violated the terms of the Indentures, *see Wethington*, 360 N.E.2d at 276-77; *Long*, 145 P. at 528, so too it violated CJI's covenants with the Federal Government. Additionally, CJI promised to "preserve, protect, maintain and when necessary, restore" the Touro property (FoF 403). Selling the rimonim, which have become intertwined with Touro's identity and history, is flatly inconsistent with CJI's promise to preserve the Touro Synagogue and foster principles of religious freedom.

And fifth, CJI's attempted sale has breached its own governing documents. CJI's 1897 Constitution and By-Laws expressly forbade the sale of any property without the unanimous consent of the four Shearith Israel Trustees that sat on CJI's Board (FoF 282); *see also* Point IV.A. The 1897 Constitution remains in force, and Shearith Israel never consented to the sale of the rimonim (and never will). *See* Point IV.A.

Moreover, the proposed sale violated CJI's binding promise in the Indentures with Lease to use the Synagogue and its religious items in accordance with "the ritual rites and customs of the Orthodox Spanish and Portuguese Jews as at this time practiced in the Synagogue of the Congregation Shearith Israel" (FoF 341). The 1897 Constitution contains a similar requirement, noting that the congregation is to follow the "Sephardic Minhag" (FoF 282). This same requirement is repeated in the 1945 Agreement (FoF 406). The unrebutted testimony of Michael

Katz and the deposition testimony of Zachary Edinger made plain that selling the rimonim would do great violence to the very customs that CJI repeatedly covenanted to uphold (FoF 503-504; 506). This was confirmed by the testimony of Dr. Mann, who averred that once used, the rimonim become imbued with a high level of holiness and must continue to be used for their religious purpose (FoF 95).

Finally, granting CJI's proposed relief would do the same violence to the governing documents. It would approve CJI's material breach of the Indentures with Lease and condone a violation of CJI's governing documents. It would also invalidate an official compact that CJI and Shearith Israel made with the Federal Government, which requires that the Touro Synagogue be used in accordance with Shearith Israel's rites, rituals, and customs. As we argue below (Point VI.G), there is no tension between the Court's duty to abide by Constitutional obligations and its duty to enforce the law.

## VI.    CJI FAILED TO PROVE THE EXISTENCE OF A TRUST FOR CJI'S BENEFIT

The Court need not address the trust issues on the merits. CJI, over 100 years ago, attempted to assert the existence of a trust for its benefit, based on the very same documents it now claims create a trust. The Circuit Court for the District of Rhode Island (Brown, J.,) held that CJI cannot be a beneficiary of any such trust. Claim preclusion or *res judicata* now bars CJI from re-litigating the same trust claims in the current litigation. *See* Point VIII.D.

Claim preclusion aside, CJI has not advanced any coherent theory of trust creation. It pointed to three writings as potential sources of a trust – the 1759 conveyance of land on which Touro Synagogue would be built; the 1787 will of Jacob Rodrigues Rivera, one of the three purchasers of the Touro land, and the 1894 Deeds transferring Touro Synagogue, its lands, cemetery, and contents, to Shearith Israel – as well as the 1945 agreement with the Federal Government as secondary evidence of a trust created in the distant past. But CJI's proof fails to

measure up – it is wholly silent on key issues, and its silence dooms CJI's ability to carry its burden of proof to show trust creation, a burden it must carry by clear and convincing evidence (see below). Crucially, CJI has not identified whether the alleged trust is a charitable public trust or a private trust, attempting instead to stitch together an amalgam of the two. CJI hopes that amidst this confusion the Court will help it cobble together a Franken-trust that would have no basis in law. All the confusion shows is that CJI has not met its burden to prove trust creation, much less by the clear and convincing evidence required by law.

Any trust containing real property requires a writing that satisfies the Statute of Frauds. R.I. Gen. Laws Ann. § 9-1-4 (West 2006 & Supp. 2014); *Lawrence v. Andrews*, 122 A.2d 132, 136 (R.I. 1956). To create a private trust, this writing must clearly and unambiguously show (1) a manifestation (2) of a donor's present intent (3) to convey equitable rights (4) over his property (5) to a beneficiary or class of beneficiaries. *Talbot v. Talbot*, 78 A. 535, 540 (R.I. 1911); *see also Restatement* (*Third*) *of Trusts* §§ 2, 10, 13, 44 (2003). Without a concrete, ascertainable beneficiary or class of beneficiaries, no private trust can be created. *Armington v. Meyer*, 236 A.2d 450, 454 (R.I. 1967).

The requirements of a charitable trust are identical except as to beneficiaries. A charitable trust, instead of naming a beneficiary, must state an intention to convey property for an express charitable purpose. *Bristol v. Nolan*, 53 A.2d 466, 469 (R.I. 1947); *MacDonald v. Manning*, 239 A.2d 640, 644-45 (R.I. 1968). Individuals, organizations, or corporations cannot be beneficiaries of a charitable trust – the trust exists to carry out a purpose, not to support a beneficiary. A charitable trust for a specific beneficiary cannot exist. *See, e.g.*, *Russell v. Allen*, 107 U.S. 163, 167 (1883) ("[A charitable] trust must be for the benefit of an indefinite number of persons; for if all the beneficiaries are personally designated, the trust lacks the essential element

of indefiniteness, which is one characteristic of a legal charity"); *Denver Found. v. Wells Fargo Bank, N.A.*, 163 P.3d 1116, 1125 (Colo. 2007) ("Instead of identifying a person or corporation as beneficiary, the settlor of a charitable trust must describe a purpose which is of substantial public benefit"). "While the human beings who are to obtain advantages from charitable trusts may be referred to as beneficiaries, the real beneficiary is the public and the human beings involved are merely the instrumentalities from whom the benefits flow." *Freshour v. King* (*In re Freshour's Est.*), 345 P.2d 689, 695 (Kan. 1959). Thus, no charitable trust can be created without an express statement of intent as to charitable purpose, and no charitable trust can be created for the benefit of a defined beneficiary.

Alternatively, CJI bears the burden of proving that the Touro Synagogue and its contents are held in private trust for its benefit, and must do so by clear and convincing evidence. *Desnoyers v. Metro. Life Ins. Co.*, 272 A.2d 683, 687-88 (R.I. 1971); *Lukaszewski v. Walmsley*, 113 A.2d 727, 730 (R.I. 1955); *see also Livernois v. Brandt*, 37 Cal. Rptr. 279, 283 (Cal. Ct. App. 1964) ("one who would claim that property which stands of record in another, and is held in trust for his benefit, must establish his claim by evidence that is clear, satisfactory and convincing"); *McCormick v. Brevig*, 980 P.2d 603, 611 (Mont. 1999) ("'the party who asserts the existence of a trust has the burden of proving its existence and contents by 'evidence unmistakable, clear, satisfactory and convincing'") (citations omitted); *Allen v. Withrow*, 110 U.S. 119, 130 (1884) ("such evidence must be clear and convincing, not doubtful, uncertain, and contradictory"). Testimony by interested witnesses alleging the existence of a trust falls far short of the convincing evidence that the law requires. *See Griffin v. Griffin*, 141 S.W.2d 16, 20 (Ark. 1940) (testimony of interested parties alone is not sufficiently clear and convincing to warrant finding existence of a trust).

The clear and convincing standard applies to both private and charitable trusts. *See, e.g.*, *From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church*, 803 A.2d 548, 567 (Md. 2002) ("the burden of proof, to be carried by clear and convincing evidence, as to the existence of an express trust is on the party seeking to establish the trust"). Moreover, in Rhode Island, it is unclear if an individual or corporation even has standing to assert the existence of a public trust – caselaw indicates that such authority exists solely with the Attorney General. *See Leo v. Armington*, 59 A.2d 371, 371 (R.I. 1948).

**A.**     <u>The 1759 Deed To The Touro Synagogue Land Does Not Create A Trust</u>

The 1759 conveyance of land to the three founders of Touro does not purport to convey any rights other than ownership in fee simple, and contains no mention of a trust, a trustee, a beneficiary, or a trust purpose (FoF 106-07; 468). No trust can be formed without these elements. *See Pickering v. Higgins*, 30 A.2d 846, 847 (R.I. 1943) (holding that an instrument is not a "declaration of trust" where it does not appear to have been so intended by the maker); *Armington*, 236 A.2d at 454 (holding that an instrument does not create a valid trust without setting "forth the person or class of persons who will be the beneficiaries thereunder"); *MacDonald*, 239 A.2d at 644 (a charitable trust "may be given effect if the testator's language makes clear his intent to make a gift in trust for a public charitable purpose").

Moreover, this Court in the 1902-03 litigation already recognized that this deed is on its face a transfer of land for fair value, and not a trust instrument. *David v. Levy*, 119 F. 799, 799 (1903) (holding that the 1759 deed "is upon its face a deed to the grantees named for a full money consideration, and affords no evidence itself . . . that the said grantees 'became joint tenants of said parcels of land as trustees of the Jews of Newport, forever'").

In his 1787 will, Jacob Rodrigues Rivera claims that he and the other two purchasers took this land in trust "for the sole Use, benefit and behoof of the Jewish Society, in Newport, to be

for them reserved as a Place of Public Worship forever" (FoF 475).  This post-dated declaration

of supposed intent is without legal significance.  *Talbot*, 78 A. at 540 ("There must be a present

intent to make a trust . . . at the time" of the alleged formation).  Moreover, a writing that is

separate from the writing that conveyed the property, which alleges that the conveyance was in

trust, falls short of the clear and convincing evidence required to evince trust creation when

contradicted by countervailing evidence.  *Geoghegan v. Smith*, 105 A. 864, 866 (Md. 1919); *see*

*also In re Est. of Bolinger*, 943 P.2d 981, 985 (Mont. 1997) (noting that when trust language is

added to a will after the will had been drafted, "the burden of proof to establish the existence of a

trust is upon the party who claims it and must be founded on evidence which is unmistakable,

clear, satisfactory and convincing").  In light of the prior judicial finding that the 1759

conveyance is on its face not a deed in trust, any after-the fact evidence to the contrary falls short

of the clear and convincing standard necessary to evince trust formation.  *Geoghegan*, 105 A. at

866; *In re Est. of Bolinger*, 943 P.2d at 285.

**B.**     **The 1787 Will Of Jacob Rodrigues Rivera Does Not Create A Trust_____**

The uncertainty surrounding Rodrigues Rivera's property holdings at his death, and the

lack of clear intent exhibited in his will, preclude a finding that his will created a trust by clear

and convincing evidence.  "To constitute a valid testamentary trust, it is essential that its material

terms are certain . . . [and i]f any of [the trust's] elements is not described within certainty, no

trust is created."  *Tucker v. Countryman*, 111 N.E.2d 101, 103-04  (Ill. 1953) (finding a

testamentary trust void for vagueness due to "incongruities and uncertainties [in] . . . the subject

of the trust and . . . the nature of the interest of the beneficiaries"); *see also Del Drago v.*

*Comm'r*, 214 F.2d 478, 480 (2d Cir. 1954) (holding that a trust failed for uncertainty); *Union &*

*New Haven Trust Co. v. Koletsky*, 167 A. 803, 806 (Conn. 1933) (same).

The terms of the 1787 will of Jacob Rodrigues Rivera are too uncertain to create a trust. Rodrigues Rivera purports to "quit Claim" his "exclusive right, title or Interest" to "every part and parcel" of the Touro land (FoF 120).  But at the time Jacob Rodrigues Rivera executed his will, he only held title to 1/3 of the Touro Synagogue lands (FoF 119).  Rodrigues Rivera also claims in his will that Isaac Hart, one of the two other purchasers, conveyed his 1/3 interest to Rodrigues Rivera in Hart's will (FoF 119).  But no independent evidence of Hart's will exists – no evidence of the alleged conveyance, no evidence that the will was duly executed or admitted to probate, nothing to corroborate Rodrigues Rivera's claims (FoF 118).  Rodrigues Rivera cannot create a trust using land he does not own – so any resulting trust could contain either 1/3 or 2/3 of the Touro land and cannot under any circumstances contain any more than 2/3, the most Rodrigues Rivera claimed to own at death.  The will of the third purchaser, Moses Levy, who died in 1792, three years after Rodrigues Rivera, makes absolutely no mention of any trust or any trust-like intention (FoF 121).  This makes patently clear that at least 1/3 of the Touro land cannot possibly be held in trust.  This confusion regarding Rodrigues Rivera's land holdings does not come close to meeting the clear and convincing evidence that trust formation requires. *Desnoyers*, 272 A.2d at 687-88.  When faced with such uncertainty, courts have refused to hold that a trust obligation was created.  *See e.g., Tucker*, 111 N.E.2d at 103-04; *Del Drago*, 214 F.2d at 480; *Union & New Haven Trust*, 167 A. at 806.

**1.    No Private Trust Has Been Created**

A private trust cannot be created by the 1787 will because the class of putative beneficiaries as described in the will is too vague and indefinite to support, by clear and convincing evidence, the formation of a trust.  *See Restatement* (*Third*) *of Trusts* § 45 cmt. a (2003) (intended beneficiary or class of beneficiaries of a trust must be described with enough specificity that "the identity of all individuals comprising its membership" can be ascertained);

*Lux v. Lux*, 288 A.2d 701, 704 (R.I. 1972) ("[a trust] relationship cannot be created . . . unless the beneficiaries . . . are identifiable").  It is impossible to ascertain ***for purposes of the law of trusts*** what Rodrigues Rivera meant by the "Jewish Society of Newport".  This could conceivably refer to the colonial Yeshuat Israel, which ceased to exist 100 years before CJI's formation.  But even if such a trust was formed CJI cannot be a beneficiary, since it is not related to Congregation Yeshuat Israel in any meaningful legal way (*see* Point II.B).

Or this could refer to the Jewish population of Newport, which is an indefinite, unascertainable group of beneficiaries, on the basis of which no private trust can be formed.  *See Isaacs v. Emory*, 1 A. 713, 714 (Md. 1885) (holding that no trust could be formed "for the use of the ministry and membership of the Methodist Episcopal Church in the United States" because the purported class of beneficiaries was too vague and indefinite); *Kain v. Gibboney*, 101 U.S. 362, 365 (1879) (holding that bequest to "community attached to the Roman Catholic Church" is void for vagueness because "[i]ts members must be constantly changing, and it must always be uncertain who may be its members at any given time").

Moreover, this Court already held that CJI cannot be a beneficiary for any trust for the benefit of the Jews of Newport.  *See* Point VIII.D.  This holding is supported by the evidence at trial, which showed that there are many more Jews in Newport County than there are members of CJI (FoF 491).  There are also a number of other Jewish congregations and myriad Jewish religious associations that are unaffiliated with CJI (FoF 490).  The proof showed that CJI as an organization does not even speak for all of its congregants.  The record is replete with CJI congregants, and even CJI Board members, that disagree with many of the substantive decisions that the congregation has undertaken (FoF 630).  The CJI Board cannot be a proxy for the Jews of Newport, especially since CJI is now seeking to sell a priceless piece of Newport's historic

and religious legacy to benefit itself, to the detriment of other Jews who would no longer be able to enjoy the use of these historically and religiously important items.

### 2.    No Public Trust Has Been Created

As the above cases clearly show, a charitable trust also cannot be created from such a bequest, because a bequest in favor of a religious organization or group is not a bequest for a charitable *purpose*.  For example, in *In re Staas' Est.*, 235 N.Y.S.2d 490 (Surr. Ct. 1962), the Court held that a bequest to a Historical Society "**in trust**, nevertheless, to apply and use so much of said trust fund as in the judgment of the Trustees of the said Society is felt expedient and necessary to build and erect a special new wing to the existing buildings of the said Society" **did not establish a charitable trust**, but was instead an outright bequest.  *Id.* at 491 (emphasis added); *see also Trs. of Peninsula Annual Conf. of Methodist Church, Inc. v. N.Y. E. Annual Conf.*, 211 A.2d 588, 590 (Del. 1965) (holding that a conveyance to a church did not establish a trust, but was instead a "gift[] on a condition subsequent that [it] be held or used for the purposes designated").  The language of the 1787 will of Rodrigues Rivera is nearly identical to that in *In re Staas' Est.*, and the result should be the same.

### 3.    If A Public Trust Exists, CJI Cannot Be A Beneficiary

One thing is clear:  even if a trust exists for the benefit of the Jews of Newport, CJI cannot be a beneficiary of such a trust.  The essence of a charitable trust is that it cannot have a definite beneficiary – it exists to benefit society or a part thereof.  *See, e.g.*, *Bristol*, 53 A.2d at 469.  The trustees of a charitable trust are given money or property to use according to the charitable purpose – and are often allowed to make tough decisions about how to best use the trust corpus to effectuate this purpose.  *See* Point VII.  Charitable trusts exist to further a society's charitable goals:  they can provide education, help the poor, heal the sick (*see Stearns v. Newport Hosp.*, 62 A. 132, 133 (R.I. 1905)), or be used according to some religious purpose

(*Brice v. Trs. of All Saints Mem'l Chapel*, 76 A. 774, 775 (R.I. 1910)), for example.  It is axiomatic that an individual, society, or corporation cannot be a beneficiary of such a trust.  "While the human beings who are to obtain advantages from charitable trusts may be referred to as beneficiaries, the real beneficiary is the public and the human beings involved are merely the instrumentalities from whom the benefits flow."  *In re Freshour's Est.*, 345 P.2d at 695.  So it is with CJI – to the extent any charitable trust exists, CJI, among countless others, are simply recipients of a trust's charitable purpose.

CJI readily concedes that Shearith Israel is the trustee of any trust that may exist (FoF 493).  According to the law of public trusts, Shearith Israel would then be given wide-ranging discretion to effectuate the purpose of any such trust.  If Shearith Israel believes that leasing the Synagogue and its religious objects to CJI best accomplishes this purpose, it may do so.  But if it feels that the religious purpose of the trust has been jeopardized by CJI's actions, it can also take measures to protect this purpose, in accordance with its powers and duties as trustees.  *See* Point VII.

## C.    The 1894 Deeds Of Conveyance Do Not Create A Trust For The Benefit Of CJI

Six of the nine 1894 Deeds (signed by 35 of the heirs) make no mention of a trust, trustee, beneficiary, or putative trust purpose (FoF 250).  They are, on their face, conveyances in fee, and no private or public trust could flow from such conveyances.  *Armington*, 236 A.2d at 454 (holding that an instrument does not create a valid private trust without setting "forth the person or class of persons who will be the beneficiaries thereunder"); *Bristol*, 53 A.2d at 469 (charitable trust requires express charitable intent); *see also Restatement* (*Third*) *of Trusts* § 22 (2003).  Any purported trust also fails for vagueness, precisely because only three out of the nine total deeds contain any language of trust (FoF 249).  *See Allen*, 110 U.S. at 130 ("evidence [of

trust creation] must be clear and convincing, not doubtful, uncertain, and contradictory"). A single conveyance where only one third of the transfer instruments could even plausibly have sought creation of a trust is nothing if not "doubtful, uncertain, and contradictory." *See id.*; *see also Pickering*, 30 A.2d at 847 (holding that an instrument is not a "declaration of trust" where it does not appear to have been so intended by the maker); *Tucker*, 111 N.E.2d at 104-05 (finding a trust void for vagueness due to "incongruities and uncertainties [in] . . . the subject of the trust"). And certainly this internal contradiction cannot meet the clear and convincing evidence threshold to establish a trust. *See McCormick*, 980 P.2d 603 at 611.

Moreover, Professor Fisher's uncontroverted testimony showed that, by executing the 1894 Deeds of Conveyance, the heirs and descendants of the colonial Yeshuat Israel intended to remove all doubt as to the fact that Shearith Israel, and not CJI, holds exclusive rights and title to the Touro Synagogue, lands, cemetery, and contents. In 1894, the nascent CJI challenged Shearith Israel to prove its rights in the Touro Synagogue and its appurtenances (FoF 236). Shearith Israel responded by obtaining deeds from the heirs and descendants of Yeshuat Israel congregants (FoF 243). These heirs sought to clarify that Shearith Israel held lawful title to the Touro Synagogue and its contents (FoF 244). The intent of the creators would govern the purpose and character of the trust, *City of Providence v. Payne*, 134 A. 276, 279-80 (R.I. 1926), and these acts make clear that, to the extent these deeds created a trust, CJI could not have been that trust's intended beneficiary: in executing these deeds, the heirs intended specifically to confirm that CJI had no rights to the Touro Synagogue and the ritual articles. The wording of the deeds plainly conveys this intent. The three (out of a total of nine) deeds that contain trust language do not even mention CJI or the "Jewish Society of Newport" (FoF 247-48).

The deeds do, however, specify that the property conveyed is to be used "for the maintenance therein of the usual and stated religious services according to the Ritual, Rites and Customs of the orthodox Spanish and Portuguese Jews, as at this time practiced and observed in the Synagogue of the **CONGREGATION SHEARITH ISRAEL**, in the City of New York." (FoF 478) (emphasis added).  Thus, the only potential trust obligation created by these conveyances is for the maintenance of the Touro Synagogue according to Orthodox Sephardic customs as practiced at Shearith Israel, regardless of whether CJI or another congregation worships at that place.

D.    **The 1945 Agreement With The Federal Government Cannot Create A Trust**

The 1945 Agreement makes clear that, to the extent it recognizes trust obligations, any such trust obligations flow from the 1894 deeds of conveyance (FoF 472) (noting that Shearith Israel Trustees are "Trustees under Deed of Trust dated April 27, 1894").  The only trust that could possibly flow from those deeds would be a trust that obligated Shearith Israel to maintain the use of Touro Synagogue according to the Sephardic customs and traditions that Shearith Israel itself practices – not any trust for the benefit of CJI.  *See* Point VI.C.  But this after-the-fact recognition of supposed rights and obligations that a party claims existed in a prior trust does not give legal effect to any such rights or obligations.  *See Citizens' Bank & Trust Co. v. Bradt*, 50 S.W. 778, 781 (Tenn. Ct. App. 1898); *Fritz v. Thompson*, 271 P.2d 205, 209 (Cal. 1954) (holding that statement by executrix of a will that testator had created a trust is not equivalent to a declaration of trust by the testator).  Moreover, whether or not this obligation is official, Shearith Israel has been doing just this since the 1820s, when it took title to Touro Synagogue and its contents and took on a role of cultural/ritual oversight.  *See* Point V.A.

The language of the 1945 Agreement reinforces both Shearith Israel's role as ritual/cultural overseer of the Touro Synagogue and its contents and CJI's role solely as lessee of

the synagogue.  The Agreement's stated purpose is to "preserve, protect, and maintain [Touro Synagogue] in perpetuity for all necessary and desirable public and religious purposes, for the inspiration and benefit of the people of the United States" (FoF 403).  The Agreement makes clear that, in carrying out this purpose, the roles of Shearith Israel and CJI "shall be performed in accordance with and subject to their respective rights and obligations as lessor and lessee" (FoF 405).  CJI's role in the agreement is clearly defined as solely that of lessor.  CJI's relationship to Shearith Israel is similarly well delineated, and the Agreement expressly states that it does not affect any obligations of the parties that were created by the Indentures with Lease (FoF 403-05).

The Agreement similarly does not claim or even intimate that any trust exists for CJI's benefit.  The very language that CJI claims was specifically added – use language in the "public access" paragraph of the agreement – proves that there were no trust obligations created in Shearith Israel (FoF 403-05).  Besides, any such after-the-fact declarations of trust carry no legal effect – intent to create trust obligations must be present at the time of trust creation.  *See* Point VI.A.  To the extent the Agreement does define Shearith Israel's obligation, these are limited to facilitating the religious purpose of the synagogue for the "benefit of the people of the United States".  Shearith Israel had been fulfilling this *moral* role since the 1760s.  It will continue to do so.  But that does not mean that CJI can fabricate a *legal* obligation where none exists.

**E.      CJI Cannot Misconstrue Rhode Island Legislative Comments**

The Rhode Island Legislature's off-handed statement that Touro Synagogue is held in trust for CJI's benefit can have no legal effect.  Initially, this statement was made gratuitously in a piece of legislation that conferred tax-exempt status on the Touro Synagogue (FoF 471).  Whether the synagogue was held in trust had absolutely no bearing on the substance of the legislation.  So far as anyone can tell, there were no legislative hearings, determinations, or findings regarding the existence or creation of a trust or on whose behalf the trust exists.  The

Attorney General, a necessary party in charitable trust creation and administration proceedings, was not a party (and there was no record that the AG was even consulted or knew about it).  In short, nothing indicates that this clause was meant to have any legal effect, certainly not as between the parties, a point made clear in other legislative statements that consistently state that the proprietary rights of third parties are not being affected (FoF 471).

Moreover, any State law that augmented the obligations of the parties to this contract would run afoul of both the United States and Rhode Island Constitutions and be void.  U.S. Const. art. I, § 10, cl. 1 (prohibiting any State from passing any law that would "impair[r] the Obligation of Contracts"); *accord* R.I. Const. art. I, § 12 ("No . . . law impairing the obligation of contracts, shall be passed").  Trust instruments are indisputably contracts and are indisputably subject to these Constitutional protections.  *See Coolidge v. Long*, 282 U.S. 582, 595 (1931).  A legislative act could not change or interfere with a private contract.  The testator's intent would govern in determining the identity of any putative beneficiary of any trust containing the Touro Synagogue.  *See, e.g.*, *Payne*, 134 A.2d at 279-80; *In re Tr. of Brooke*, 697 N.E.2d 191, 194 (Ohio 1998).

In *Coolidge*, trustees brought an action against the state, which passed a statute, effective in 1921, that subjected the trust to a tax.  The trust instrument, executed in 1907, specified that all income from the trust would be equally divided among the beneficiaries.  The Supreme Court ultimately held that "trust deeds are contracts within the meaning of the contract clause of the Federal Constitution.  [In this case t]hey were fully executed before the taking effect of the state law under which the excise is claimed.  The commonwealth was without authority by subsequent legislation, whether enacted under the guise of its power to tax or otherwise, to alter their effect or to impair or destroy rights which had vested under them."  282 U.S. at 595.

Here, the situation is more clear-cut still. As in *Coolidge*, if that clause in the 1932 Rhode Island statute was to be given legal effect, it would substantially modify the terms of any trust instrument at issue in this case by redefining the putative trust's beneficiary (again, assuming such a trust exists). *See also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978) (invalidating state statute that was held to interfere with corporate pension plans because the statute "worked a severe, permanent, and immediate change in [a corporation's contractual] relationships – irrevocably and retroactively").

**F.    CJI Cannot Claim The Existence Of A Religious Trust While At The Same Time Claim That This Court Cannot Interpret Religious Intent**

The Court should not allow CJI to use religion as both a sword and shield with respect to trust formation. As shown above, all of the sources of a purported trust that CJI points to would indisputably contain a religious nucleus and exist to serve a religious purpose. CJI wants to establish a religious trust but does not want the Court to parse religious issues. CJI cannot have it both ways. If the Court does find a trust, it must consider unrebutted evidence that such a trust must be governed by Sephardic ritual and custom as practiced by Shearith Israel and must accord Shearith Israel, as the alleged trustee, wide latitude in carrying out this religious purpose (which Shearith Israel is trying to uphold and CJI is actively seeking to violate).

The evidence of the religious significance of the rimonim and the practices at Shearith Israel concerning them – the trial testimony of Michael Katz and Dr. Mann, as well as the deposition designations of Zachary Edinger – was introduced without objection from CJI and without any contrary evidence offered by CJI in its case in chief, in cross-examination, or in rebuttal. The record is clear, complete, and uncontroverted on this issue, so nothing precludes this Court from enforcing the terms of the parties' agreement.

As significant, given the clear language of the governing documents, the evidence effectively is factual and not religious in nature – *i.e.*, the evidence explained Shearith Israel's invariant practices with limited evidence of why Shearith Israel's practice is what it is. But the "why" is not what is dispositive in this case. What is dispositive is what Shearith Israel's practice actually was and is. No matter where one turns in this case, one runs into official documents that require the Touro Synagogue to be run according to practices of Shearith Israel. And the dispositive practice here is that Shearith Israel would not sell the rimonim under the circumstances that exist here. This is a factual determination posing no Constitutional issue or challenge of any kind. *See, e.g., Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 431 (2d Cir. 1999) ("[t]o the extent that the jury did consider religious teachings and tenets, moreover, it did so to determine not their validity but whether, as a matter of fact, Martinelli's following of the teachings and belief in the tenets give rise to a fiduciary relationship between Martinelli and the Diocese"); *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.,* 312 F.3d 94, 99 (2d Cir. 2002) ("Courts may decide disputes that implicate religious interests as long as they can do so based on 'neutral principles' of secular law without undue entanglement in issues of religious doctrine"); *Whitnum v. Town of Greenwich*, 2014 WL 4161983, at *2 n.2 (D. Conn. Aug. 19, 2014) ("defendants' attempt to exclude fact testimony as opinion testimony is misguided; surely the testimony of Rabbi Sklarz, a non-expert fact witness who took part in the contested event and had personal knowledge of the proceeding, is admissible for the fact that the Torah is a religious item and that the excerpts of the Torah were read aloud as part of the event proceedings"); *see also* Points I and II of Shearith Israel's Opposition to Plaintiff's Motion in Limine to Preclude the Testimony of Rabbi Dr. Meir Y. Soloveichik and Evidence of Jewish Law, Ritual, Custom or Practice (ECF No. 75).

**G.**    **Shearith Israel's Custom Barring Sale Of The Rimonim Is A Strictly Factual Question, Since It Depends Entirely On How Shearith Israel Acts, Not On Questions Of Religious Law**

What CJI calls a prohibited question of religion is in fact not that at all:  it is instead express stipulations of the use to be made of the Touro Synagogue and its paraphernalia.  That use is to follow the customs as determined by the way Shearith Israel practices (FoF 475; 478-80; 500-512).  The determination of how Shearith Israel practices is not a religious question, but strictly a factual one, indeed a factual question on which there was uncontroverted evidence adduced by Shearith Israel.  The Court can and should determine that according to Shearith Israel practices sacred objects like the rimonim are not sold under the circumstances that CJI claims to exist.  That should end the issue of whether CJI can sell the rimonim without embroiling the Court in any issues of religious law determination.

**VII.    EVEN WERE THE COURT TO FIND THAT CJI IS THE BENEFICIARY OF AN IDENTIFIABLE TRUST, CJI HAS PROVEN NO BREACH OF SHEARITH ISRAEL'S DUTIES THAT WOULD SUPPORT REMOVING SHEARITH ISRAEL AS TRUSTEE OR MODIFYING THE TRUST**

Neither the relevant case law nor the facts in evidence permits CJI to petition the Court to remove Shearith Israel as trustee or to modify the trust more to CJI's own liking.  Only the Attorney General has standing to petition the Court to remove the trustee of a charitable trust – a beneficiary cannot instigate a removal action.  *See Stearns*, 62 A. at 135  (holding that a beneficiary has no standing to petition for removal and noting that "[t]he trust is a public one, and the Attorney General is the proper person to represent the public in any judicial inquiry into the conduct of the trustee in administering it"); *Burbank v. Burbank*, 25 N.E. 427, 428 (Mass. 1890) (holding that the Attorney General is the proper party to institute a removal proceeding and noting that "the law has provided a suitable officer to represent those entitled to the

beneficial interests in a public charity.  It has not left it to individuals to assume this duty, or even to the court to select a person for its performance").

The law of private trusts offers CJI no more assistance.  Court-sanctioned removal of a trustee of a private trust is an extraordinary remedy, and is even more so when the trust instrument does not grant the beneficiary the power of removal.  *See Restatement* (*Third*) *of Trusts* § 37 & cmt. e (2003); *Cuzzone v. Plourde*, 2005 WL 2716749, at *3 (R.I. Super. Ct. Oct. 17, 2005) (refusing to remove trustees for possible self-dealing and breaches of duty of loyalty and recognizing that "because the removal of a trustee is such an extreme form of relief, Courts should exercise their authority sparingly and only upon a showing that the trustee has failed to perform his duties through more than mere negligence"); *Buchanan v. Bank of Am.*, *N.A.*, 2011 WL 3705352, at *5 (R.I. Super. Ct. Aug. 17, 2011) (same).

CJI's allegations of financial mismanagement ring hollow and cannot provide a platform for removal.  Initially, the evidence at trial showed clearly that, as between the parties, CJI was tasked with the day-to-day management of Touro Synagogue (FoF 375).  Until 2008, CJI had done no fundraising on its own – its expenses were all or largely covered by a combination of the Touro Funds and TSF (FoF 596).  Shearith Israel contributed to TSF through active participation and membership on the TSF Board and through donations by Shearith Israel members; Shearith Israel members were targeted by TSF for larger donations as recently as 2005 (FoF 539-50).

But most importantly, the evidence showed that CJI had no "dire" financial need whatsoever – the entire "asserted" need for an endowment was to try to deflect the fully anticipated public backlash from selling sacred objects (FoF 580-87).  CJI and TSF raised well over $10 million for collateral projects such as the Loeb Visitor's Center, which now provides an added cash influx to CJI (FoF 571; 592).  Every single asserted need for cash for maintenance,

renovation, preservation has been fully successful (FoF 588). CJI has operated profitably in every year post-2008 (but who wasn't in the red during the worst recession since the Great Depression?) (FoF 569). Despite claims of layoffs and shut-off water pipes, CJI was operating at a surplus by 2010, and CJI's operating expenses have been rising, not falling, over the past five years (FoF 573). CJI's claims that TSF was moribund were thoroughly debunked when Michael Pimental testified that TSF was still active and fundraising for CJI (FoF 591). On these facts, Shearith Israel would have breached its duty by *allowing* the sale of the rimonim. Every religious organization covets an endowment, but CJI has no need for one, especially when the cost for such a vanity would be the sale of irreplaceable religious items.

Moreover, CJI has not shown that Shearith Israel's actions provide any legal grounds to seek removal. A trustee has no duty to expend his own financial resources to maintain the trust. *See, e.g.*, *Att'y-Gen. v. N. Am. Life Ins. Co.*, 91 N.Y. 57, 61 (1883) ("the trustee has no interest, outside of the performance of duty. What he does is for the benefit of others whose interests are for the time being in his keeping. He owes them no duty to expend his own money for their benefit"); *McClure v. Middletown Trust Co.*, 110 A. 838, 841 (Conn. 1920) ("In the protection and increase of the estate the trustee is not required to advance his own funds"); *Navajo Tribe of Indians v. U.S.*, 9 Cl. Ct. 336, 386-87 (1986) ("the government was under no duty to use its own funds to preserve the trust property"). In fact, the law is to the contrary – the beneficiary must first seek self-help before resorting to the trust for funding. *See In re Cowee's Will*, 120 N.Y.S.2d 674, 682 (Surr. Ct. 1953) ("It is, therefore, the conclusion of this Court that the life beneficiary, Helen Selleck Baldwin, must first resort to her personal means before payment shall be made to her by the trustee from the principal of said trust fund").

There is no evidence that Shearith Israel's duty as putative trustee required it to condone the sale of the rimonim; caselaw supports the conclusion that Shearith Israel acted reasonably under the circumstances.  Even if CJI's contentions regarding trust creation are to be credited, any possible trust would exist to serve a religious purpose (*see* Points VI.A-D and VII).  The trustee's duty would thus be (1) to ensure that Touro Synagogue "be . . . reserved as a Place of Public Worship forever" (FoF 119); or (2) to cause Touro to be used in accordance with "the ritual rites and customs of the Orthodox Spanish and Portuguese Jews as at this time practiced in the Synagogue of the Congregation Shearith Israel" (FoF 478; 480).  This religious purpose was recognized by the Federal Government, and CJI had covenanted to uphold it.  The unrebutted testimony showed that such a purpose would be best served by making sure that the rimonim remain available for use by an active congregation.  *See* Point VII.  No duty can be breached when the trustee acts strictly in accordance with the purpose of the trust.

Courts can, and do, enforce religious trusts and honor their stated religious purpose.  *See, e.g.*, *Brice*, 76 A. at 775 (upholding a charitable trust "for the celebration of religious worship according to the forms of the Protestant Episcopal Church"); *Buchanan v. McLyman*, 153 A. 304, 305 (R.I. 1931) (enforcing a trust created "for the purpose of maintaining public worship at Narragansett Pier according to the doctrine and forms of the Presbyterian Church").  Courts do so by giving broad deference to the trustees to effectuate the wishes of the settlor and act in accordance with the stated charitable purpose.  Thus, in *Brice*, the court rejected plaintiffs' claims that a religious trust had become incapable of being carried out according to its stated purpose and held that the trust's purpose may be "carried out as near as may be according to the intention of the donor by the trustee under the supervision of a court of equity."  76 A. at 782.  Likewise, in *In re Small's Est.*, 58 N.W.2d 477 (Iowa 1953), the court deferred to the trustees to

administer a testamentary trust for the benefit of "believers in the fundamental principles of the Christian religion, and in the Bible" in a manner "as they 'believed' would be acceptable to and approved by [the testator], were he living". *Id.* at 489.

While the *In re Small's Est.* court was guided by the fact that the testator expressly imbued the trustees with such discretion, the result would have been no different if the will were silent in that regard. A trustee of a charitable trust is given "the widest reasonable discretion" in determining how best to effectuate the purpose of the trust. *Stearns,* 62 A. at 135. In *Stearns,* the court interpreted a charitable trust established "for the receiving, healing, and taking care of sick, hurt, injured, or infirm poor persons". *Id.* at 133. The court was ultimately deferential to a tough and controversial decision made by the trustee, noting that "[i]t may well appear that the object of the gift, which the testator declares to be 'to benefit as many such poor persons as practicable,' can be attained most successfully by excluding persons afflicted with contagious diseases, and the trustee must decide whether such is the case at all times while the trust continues." *Id.* at 135. The *Stearns* court concluded by holding that "[a]n erroneous decision of such a question would not in any event constitute a breach of trust." *Id.* Here, too, assuming that a trust exists and CJI is a beneficiary, the Court must give Shearith Israel, as the purported trustee, "the widest reasonable discretion" in administering the trust according to its charitable, religious purpose and respect Shearith Israel's decision, rooted in Sephardic custom, to disallow the sale of the rimonim. *Id.*

And finally, any purported animus that exists between CJI and Shearith Israel cannot give CJI the right to remove Shearith Israel as trustee. Courts both in Rhode Island and elsewhere have held that hostility or tension between the beneficiary and trustee, by itself, is insufficient to warrant removal. *See, e.g., Cuzzone,* 2005 WL 2716749, at *4; *Gresham v. Strickland,* 784 So.

2d 578, 581 (Fla. Dist. Ct. App. 2001).  This is especially so since CJI caused this animus, disrupting decades of cordial relations by engaging in a secret sale of the rimonim and then suing Shearith Israel once its subterfuge was found out.  *See, e.g.*, *In re Mathues' Est.*, 185 A. 768, 769 (Pa. 1936) (holding that hostility between beneficiary and trustee, if not provoked by the trustee, is not a ground for removal).

## VIII.   *RES JUDICATA* OR CLAIM PRECLUSION BARS MUCH OF CJI'S CASE

**The 1901 replevin action**.  The ruling in the 1901 replevin action made clear that personal property made for or reposing in the Touro Synagogue belonged to Shearith Israel, owner and guardian of the Synagogue, not to CJI (FoF 301-04).  Insofar as the Court does not have more information on that suit, the responsibility is CJI's (FoF 305).  The ruling of that action precludes CJI's contrary arguments in this case.  *See infra* Point VIII.C.  At a minimum the ruling is strong *stare decisis* and compelling evidence of the parties' state of mind that when they negotiated the 1903 Indenture with Lease, they fully intended to and did include personal property within the scope of Shearith Israel's control.

**The 1902-03 federal court action (*David v Levy*)**.  In 1902, CJI sued Shearith Israel, alleging that the Touro Synagogue was held in trust for its benefit (FoF 309).  CJI based these trust claims on the exact same documents it uses to allege a trust in this case – the 1759 Deed to the Touro land and the 1787 will of Rodrigues Rivera (using those affirmatively), as well as the 1894 Deeds (using it negatively) (FoF 309).  In 1903, the Circuit Court for the District of Rhode Island held, on demurrer, held that CJI was not a beneficiary of any putative trust that may have been established by the these legal instruments (FoF 314; 317).  *Res judicata* or claim preclusion now bars CJI from re-bringing these trust claims and from bringing any other claims it could have brought during the prior action.

"Res judicata is an affirmative defense and a question of law." *Koolen v. Mortg. Elec. Registration Sys., Inc.*, 953 F. Supp. 2d 348, 351 (D.R.I. 2013) (McConnell, J.) (*citing* Fed. R. Civ. P. 8(c)); *see also R.G. Fin. Corp. v. Vergara–Nunez*, 446 F.3d 178, 182 (1st Cir. 2006).  If "'the judgment in the first action was rendered by a federal court, the preclusive effect of that judgment in the [later-filed] diversity action is governed by federal *res judicata* principles.'" *Koolen*,  953 F. Supp. 2d at 351 (*quoting Porn v. Nat'l Grange Mut. Ins. Co.*, 93 F.3d 31, 33-34 (1st Cir. 1996)).  "'[U]nder the federal law of res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were raised or could have been raised in that action.'" *Am. Bridge Co. v. Providence Place Grp. Ltd. P'ship*, 263 F. Supp. 2d 330, 333 (D.R.I. 2003) (*quoting Apparel Art Int'l, Inc. v. Amertex Enters., Ltd.,* 48 F.3d 576, 583 (1st Cir. 1995)).

In determining whether *res judicata* precludes litigation of a party's claims, the Court considers three factors:  (1) whether a final judgment was entered on the merits in an earlier suit; (2) whether there is sufficient identity between the causes of action asserted in the earlier and later suits; and (3) whether there is sufficient identity between the parties in the two suits. *Koolen*, 953 F. Supp. 2d at 351 (*citing Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 755 (1st Cir. 1994)).  "Where all three elements are satisfied, the parties will be barred from adjudicating the new complaint." *Id.* (*citing In re Iannochino,* 242 F.3d 36, 43, 49 (1st Cir. 2001)).

The preclusive effect of *res judicata* is undiminished by the passage of time.  *See Jackson v. U.S.*, 19 Ct. Cl. 504, 506-07 (1884) ("A case decided at the last term of a court is as much *res judicata* as a case decided in the last century.  So a case adjudicated by competent executive authority is as much a 'settled' case at the expiration of a year as it is at the end of a century").  As long as the prior decision was a judgment on the merits and there is sufficient identity

between the parties and the claims, *res judicata* applies.  *See id.* at 507 ("It is the character of the thing done which determines the status of a case, and not the lapse of time"); *see also Robinson v. U.S.*, 7 Cl. Ct. 155, 160 (1984) (holding that a judgment entered 72 years prior had preclusive effect on the action in question).

A.    **The Replevin Decision And The Decision In *David v. Levy* Were Final And On The Merits**

The *David* decision was on demurrer (FoF 310), the equivalent today of a motion to dismiss for failure to state a claim.  Such a dismissal is considered both final and on the merits for purposes of *res judicata*.  *See Cooke v. Mortg. Elec. Registration Sys., Inc.*, 2013 WL 2368846, at *2 (D.R.I. May 29, 2013) (McConnell, J.) ("'A dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6) is a decision on the merits'") (*quoting Acevedo–Villabos v. Hernandez*, 22 F.3d 384, 388 (1st Cir. 1984)); *see also Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981) (*citing Angel v. Bullington*, 330 U.S. 183, 190 (1947); *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

B.    **The Parties In Both Cases Are Sufficiently Identical To The Parties In The Instant Suit For *Res Judicata* To Apply**

CJI was a named plaintiff in *David* action (FoF 310).  The named defendants were the then-Trustees of Shearith Israel, who were sued in their official capacity as Shearith Israel Trustees (FoF 311).  Thus, there is a perfect identity between the parties in *David* and the parties in the instant suit for *res judicata* to apply.  *See Rocha v. Peter Pan Bus Lines, Inc.*, 2011 WL 2896965, at *3 (D.R.I. July 15, 2011) (McConnell, J.) ("Exact identity of parties is not required, but 'claim preclusion applies if the new defendant is "closely related to a defendant from the original action—who was not named in the previous law suit"'") (*quoting Airframe Sys., Inc. v. Raytheon Co.*, 601 F.3d 9, 17 (1st Cir. 2010); *Negrón–Fuentes v. UPS Supply Chain Solutions*, 532 F.3d 1, 10 (1st Cir. 2008)).  There is a similar identity to the parties in the replevin action.

The named defendant was Eugene Schreier, Shearith Israel's agent, and the plaintiffs were CJI and other congregants (FoF 303).

Even were Shearith Israel somehow deemed only "closely related" to a named party in *David*, the "identity of the parties" requirement is still satisfied because Shearith Israel was in privity with its Trustees, the named defendants in *David*.  *See Am. Bridge*, 263 F. Supp. 2d at 334 ("non-parties may be bound by a prior judgment if they are either 'nominally different' or in privity with a party to the prior action").  Alternately, this requirement is satisfied because the Shearith Israel Trustees were the official representatives of Shearith Israel and controlled the actions of Shearith Israel in the prior action (FoF 6; 311).  *See In re Iannochino*, 242 F.3d at 45-46 ("[W]e have found privity 'if a nonparty either substantially controlled a party's involvement in the initial litigation or, conversely, permitted a party to the initial litigation to function as his de facto representative'") (citation omitted); *Aunyx Corp. v. Canon U.S.A., Inc.*, 978 F.2d 3, 7-8 (1st Cir. 1992) (applying *res judicata* to preclude alter-ego of corporation from relitigating); *In re Air Crash at Dallas/Ft. Worth Airport on Aug. 2, 1985*, 861 F.2d 814, 816-18 (5th Cir. 1988) (applying *res judicata* to bar decedent's daughter from relitigating); *Restatement* (*Second*) *of Judgments* §§ 40, 41 (1982) (endorsing application of *res judicata* to nonparties in similar circumstances); *see also Gonzalez*, 27 F.3d at 756; *Rocha*, 2011 WL 2896965, at *3 ("'claim preclusion applies if the new defendant is "closely related to a defendant from the original action—who was not named in the previous law suit," not merely when the two defendants are in privity'") (citation omitted).

Finally, practical considerations strongly militate in favor of applying *res judicata* to the instant case.  Applying *res judicata* would encourage judicial economy and prevent inconsistent results in two lawsuits based in large part on the same operative set of facts.  *See Gonzalez*, 27

F.3d at 757 ("res judicata serves many desirable ends, among them finality and efficiency"; "the doctrine can achieve its goals only if its preclusive effects occasionally can reach persons who, technically, were not parties to the original action").

**C.    CJI Is Barred From Re-Bringing Claims That Were Decided In The Replevin And *David v. Levy* Cases, And From Bringing Any Related Claims That CJI Should Have Brought At That Time**

*Res judicata* bars both claims that were actually brought and claims that could have been brought in the prior suit.  Dismissal of a claim on *res judicata* grounds is warranted when "'all of the events which define the [instant] federal complaint' occurred or were plainly presaged while [the prior complaint] was still open." *Leahey v. Univ. of R.I.*, 1985 WL 6033, at *2 (D.R.I. Aug. 1, 1985), *aff'd*, 802 F.2d 439 (1st Cir. 1986) (citation omitted).  *Accord Fiumara v. Fireman's Fund Ins. Cos.*, 746 F.2d 87, 91 (1st Cir. 1984) ("'[w]hen either party prevails in an action concerning a transaction, all of the plaintiff's possible rights to remedies against the defendant arising out of that transaction are extinguished'") (citation omitted).  For *res judicata* to take effect, a cause of action need not be a clone of the earlier cause of action.  *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998) (applying *res judicata* to all causes of action that arose out of a "common nucleus of operative fact").

The First Circuit has adopted the transactional approach of the *Restatement* (*Second*) *of Judgments* to determine whether claims are sufficiently related to support a *res judicata* defense. *Kale v. Combined Ins. Co. of Am.*, 924 F.2d 1161, 1166 (1st Cir. 1991).  Under this approach, *res judicata* is triggered when "the plaintiff's second claim grows out of the same transaction or set of related transactions as the previously decided claim." *AVX Corp. v. Cabot Corp.*, 424 F.3d 28, 31 (1st Cir. 2005) (*citing Aunyx*, 978 F.2d at 6-7).  To determine whether the causes of action arise out of the same set of transactions, courts consider "'whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their

-65-

treatment as a unit conforms to the parties' expectations'" but these factors "are merely

suggestive; they are not intended to be exhaustive, nor is any one factor determinative." *Porn*,

93 F.3d at 34 (citation omitted). Courts must also be mindful that "a single transaction may give

rise to a multiplicity of claims, and . . . 'the mere fact that different legal theories are presented in

each case does not mean that the same transaction is not behind each.'" *Id.* (citations omitted).

"The key is to define the underlying injury." *Gonzalez*, 27 F.3d at 756. Thus, *res judicata*

would bar any claims that CJI brought in *David*, and in the replevin action, as well as any claims

that could have been brought, provided that these claims arise from the same factual predicate

that gave rise to the prior lawsuit.

## D.     At A Minimum, CJI's Declaration Of Trust, Trustee Removal, And Declaration Of Ownership Claims Are Barred

CJI's declaration of trust claim is barred by *res judicata* because CJI brought the same

declaration of trust claims in the *David* action and based its prior claims on the same documents

it now alleges create a trust for its benefit. Each of these trust claims arose from the same set of

transactions as the trust claims in the current case. Therefore, the current trust claim must be

barred. *See, e.g.*, *Porn,* 93 F.3d at 34; *Kale,* 924 F.2d at 1164 ("Once there has been an

adjudication on the merits, federal law stipulates that all claims which are 'part of the same cause

of action' are extinguished, whether or not actually asserted in the original action"); *Fiumara*,

746 F.2d at 91; *Leahey*, 1985 WL 6033, at *2.

CJI is now barred by *res judicata* from claiming that Touro Synagogue or its contents are

held in trust, no matter what the source of the putative trust would be. In *David*, CJI argued that

it was a beneficiary of a trust for the "Jews of Newport" – a trust that allegedly arose out of

either the 1759 Deed to the Touro lands or the 1787 will of Jacob Rodrigues Rivera (FoF 309).

CJI also argued that 1894 Deeds had no bearing on this alleged trust (FoF 309), instead choosing

to argue that the 1894 conveyances were without effect and did not alter the trust allegedly established by the other two instruments (FoF 309). These arguments were predicated on the very documents that CJI now uses to allege that it is a beneficiary of the "Jewish Society of Newport" or "Jewish Community of Newport". The Court rejected both of these claims in 1903 (FoF 314; 317). *Res judicata* now bars CJI from asserting a claim, based on these same documents, that it is a beneficiary of a trust for the "Jewish community of Newport" or the "Jewish Society of Newport", a claim that was or surely could have been brought in the earlier action.

A court must dismiss a claim on *res judicata* grounds if the claims in question "arise out of the same transaction, seek redress for essentially the same basic wrong, and rest on the same or a substantially similar factual basis", *Porn*, 93 F.3d at 34, and if "'all of the events which define the . . . complaint' occurred or were plainly presaged while [the prior complaint] was still open." *Leahey*, 1985 WL 6033, at *2 (citation omitted). In *Trinity United Methodist Church v. Cleaver*, 2006 WL 114872 (Conn. Super. Ct. Apr. 6, 2006), plaintiffs were held to be barred by *res judicata* from alleging that a church was being held in trust for their benefit, after having brought a previous suit alleging the existence of a different trust. *Id.* at *7. The same result applies here.

Then, as now, CJI sought a declaration that the Touro Synagogue is held in trust for its benefit. Any semantic differences in the trust claims it pursued in *David* and the trust claims it pursues now, to the extent they exist at all, are irrelevant. In 1902, CJI had in its possession all of the documents it now claims may give rise to a trust (in fact, these documents are either attached to or described in its 1902 Complaint) (FoF 309). It is axiomatic that "a particular legal theory not pressed in the original suit will nonetheless be precluded in the subsequent one if it

prescinds from the same set of operative facts." *Kale*, 924 F.2d at 1166.  CJI's declaration of trust claims must be barred.

CJI is also barred from seeking removal of Shearith Israel as trustee, as it has no standing to pursue removal.  *See* George Gleason Bogert *et al.*, *The Law Of Trusts & Trustees* § 522 (rev'd 2d ed. 1993 & Supp. 2014) ("Proceedings for removal of the trustee by the court may be instituted by anyone who has a specific financial interest in the trust").

Finally, *res judicata* bars CJI from bringing a declaratory action seeking ownership of the rimonim or any other personal property that was at Touro Synagogue in or before 1902, claims it raised explicitly in the replevin action concerning a Sefer Torah and surely could have brought in the *David* action.  In *David*, CJI sought to prevent Shearith Israel from removing religious items and other articles of personal property from the Touro Synagogue (FoF 309).  As CJI readily admits, and as the evidence shows, the rimonim were inside Touro at the time of this suit (FoF 338).  The predicate facts that would have given CJI an ownership claim over the rimonim have not changed in the intervening 100+ years.  Since CJI had knowledge of all of the facts necessary to make these claims and had every opportunity to make these argument in *David*, *res judicata* precludes bringing such a claim in the present action.  *See, e.g.*, *Porn*, 93 F.3d at 34-37; *Leahey*, 1985 WL 6033, at *2-3.

## IX.    CJI'S EQUITABLE DEFENSES FAIL ON THE LAW AND THE FACTS

No matter how CJI dresses up these equitable defenses, the inevitable conclusion is that they fail.  Even were CJI's factual claims to be credited (although the evidence showed otherwise), CJI's equitable defenses have no basis in law.

### A.    All Three Defenses Fail For The Absence Of Cognizable Delay In Shearith Israel's Protecting Its Rights

For all three of CJI's equitable defenses, the clock starts ticking only when an actual violation of rights has occurred.  Mere threats to violate a right are insufficient to trigger these equitable defenses.  *See, e.g.*, *CardioFocus, Inc. v. Cardiogenesis Corp.*, 859 F. Supp. 2d 192, 201 (D. Mass. 2012) (laches triggered by actual act of infringement); *Adam v. Adam*, 624 A.2d 1093, 1096 (R.I. 1993) (laches would have been triggered by actual refusal to pay); *Friarsgate, Inc. v. First Fed. Sav. & Loan Ass'n of S.C.*, 454 S.E.2d 901, 905 (S.C. Ct. App. 1995) (only notice of actual defect in filing would have triggered equitable defenses); *Reg'l Props., Inc. v. Fin. & Real Est. Consulting Co.*, 752 F.2d 178, 182 (5th Cir. 1985) (approving of lower court's holding that only an actual violation can trigger equitable defenses).  Thus, CJI's claims of ownership or alleged notifications that it considered selling the rimonim are insufficient as a matter of law:  the clock would only have started once Shearith Israel's rights were actually violated.

Even were this Court to make new law and hold that mere threats to violate Shearith Israel's rights were sufficient to trigger the equitable defenses clock (they are not), and even if CJI proved that Shearith Israel knew of CJI's plans to sell the rimonim in 2009 (the evidence showed otherwise), a three-year delay is insufficient to give rise to a laches, estoppel, or waiver defense.  *See, e.g.*, *Adam,* 624 A.2d at 1096 (11-year delay insufficient);  *Grissom v. Pawtucket Tr. Co.*, 559 A.2d 1065, 1067 (R.I. 1989) (9-year delay insufficient).  But CJI is flatly wrong on the law and on the facts, and its defenses fail for several other reasons, as discussed below.

### B.    All Three Defenses Fail Pursuant To CJI's "Unclean Hands"

Equitable relief is unavailable when the party seeking this remedy presents itself to the court with unclean hands.  *Sloat v. City of Newport ex rel. Sitrin*, 19 A.3d 1217, 1222 (R.I.

2011).  CJI cannot seek equitable relief after it has (1) manufactured an "unassailable case" to justify its sale of the rimonim based on fabricated financial need (FoF 585); (2) ignored its own congregants' warnings that Shearith Israel may be the rightful owner of the rimonim (FoF 630-32); (3) misled its congregants that CJI had good title to the rimonim to fraudulently secure the right to sell (FoF 610-35); (4) misrepresented to Christie's that it had good title to the rimonim and that the rimonim were a true pair, in order to inflate the selling price (*see* FoF 627-29); (5) shrouded its attempted sale in secrecy specifically to hide its actions from Shearith Israel (FoF 636-39); and (6) when found out, sued Shearith Israel in breach of a standstill agreement and in the midst of negotiations (FoF 496-97).

**C.    CJI Cannot Avail Itself Of The Affirmative Defense Of Laches**

Shearith Israel timely asserted its ownership rights to the rimonim.  Laches bars suit only when a claimant negligently delays litigating his claim, thereby causing prejudice to the Court's truth-seeking function.  *See Andrukiewicz v. Andrukiewicz*, 860 A.2d 235, 241 (R.I. 2004).  But as noted above the clock only started ticking once Shearith Israel knew its rights were being violated.  *See Sarni v. Meloccaro*, 324 A.2d 648, 652-53 (R.I. 1974).  As dispositive, laches does not bar suit when the defendant obscures the need for litigation by outwardly affirming the plaintiff's rights, particularly where the parties are on cordial terms.  *See Fitzgerald v. O'Connell*, 386 A.2d 1384, 1387-88 (R.I. 1978).

CJI adduced no credible evidence showing Shearith Israel's awareness that its ownerships rights were violated before 2012 (*see generally* FoF 636-59).  CJI points only to a brief, general conversation in 2009 when concrete details were not discussed (FoF 645), and a 2009 news article with no evidence that anyone at Shearith Israel had read it prior to commencement of the litigation (FoF 644).

Once Shearith Israel actually learned of the possible sale, on June 25, 2012, it promptly learned what it could and raised a red flag, asserting its claim of title to the rimonim (FoF 495). Prior to this, Shearith Israel had no indication that CJI was acting in violation of Shearith Israel's rights (*see generally* FoF 636-59). Moreover, any delay in bringing suit cannot be considered negligent on the part of Shearith Israel because Shearith Israel reasonably relied on CJI's repeated affirmations of the lease, which Shearith Israel believed covered the rimonim (FoF 344-46). *See Fitzgerald*, 386 A.2d at 1387-88.

Moreover, the "delay" alleged by CJI caused no prejudice. Prejudice under laches is measured by impediment to the court's truth-seeking function, not by harm to the claimant. *Fitzgerald*, 386 A.2d at 1387. Moreover, laches is unavailable to a claimant who suffered prejudice due in part to its own delay in asserting its claims, despite knowing the potential for litigation. *Raymond v. B.I.F. Indus., Inc.*, 308 A.2d 820 , 824-25 (R.I. 1973). Here, the Court remains entirely capable of ascertaining "the truth of the matte[r]." *Fitzgerald*, 386 A.2d at 1387. The documents that will decide the case are at this Court's disposal, and CJI did not point to any concrete evidence that was lost due to Shearith Israel's purported delay. Finally, any harm suffered by CJI flows strictly from its own failure to bring suit despite knowing that Shearith Israel claimed title to the rimonim. CJI's own congregants repeatedly put CJI on notice that Shearith Israel did or might own both Touro Synagogue and the rimonim as early as 2008 (FoF 630), but CJI deliberately hid its plans to sell the rimonim until 2012 – and secured congregational approval to sell only by materially misleading its congregants (FoF 610-20).

Finally, CJI, as lessee, is estopped from making a laches claim against Shearith Israel, the lessor, because a tenant cannot dispute the title of his landlord. *See* Point III.C. It would be highly inequitable and unjust to permit CJI to avail itself of a laches affirmative defense when

Shearith Israel reasonably believed that CJI's possession of the Touro Synagogue and the rimonim was pursuant to the Indentures with Lease. *See Willison*, 28 U.S. at 48. As lessee, CJI cannot challenge Shearith Israel's ownership, and it should not be permitted to attain the same result indirectly by dint of a laches defense.

**D.    CJI Cannot Avail Itself Of The Affirmative Defense Of Equitable Estoppel**

To establish an equitable estoppel defense, CJI needed to show that (a) Shearith Israel's affirmative conduct was directed at CJI, (b) for the express purpose of inducing CJI to act in reliance on this conduct, and (c) CJI acted in reliance on that conduct to its detriment. *See Providence Teachers Union v. Providence Sch. Bd.*, 689 A.2d 388, 391-92 (R.I. 1997). CJI failed on all three elements.

The evidence showed that Shearith Israel made no "'affirmative representation or equivalent conduct'" to CJI. *Id.* at 391 (citation omitted). The facts point to the opposite conclusion: Shearith Israel could not make any such representations since the evidence showed that Shearith Israel had no knowledge of CJI's intent to sell the rimonim until 2012 (*see generally* FoF 636-659).

CJI also elicited no proof even intimating the "'key element'" of equitable estoppel – that any prejudicial reliance was "'intentionally induced.'" *El Marocco Club, Inc. v. Richardson*, 746 A.2d 1228, 1234 (R.I. 2000) (citation omitted). CJI likewise failed to establish that it affirmatively relied on any alleged representation by Shearith Israel when it acted. *See Providence Teachers Union*, 689 A.2d at 391-92. CJI adduced no evidence of Shearith Israel's wrongful intent, and no evidence that Shearith Israel acted (or failed to act) with the intent that CJI rely on its actions or inactions. Again, the evidence is to the contrary: CJI leadership testified that it paid no heed to any external concerns when evaluating the sale of the rimonim and did not consider Shearith Israel's possible position with respect to the sale (FoF 641-47).

The evidence showed that CJI deliberately kept Shearith Israel in the dark regarding the sale until the day the sale was approved (FoF 610-20).

**E.    CJI Cannot Avail Itself Of The Affirmative Defense Of Waiver**

For waiver to apply, CJI must show that Shearith Israel's conduct was "'so manifestly consistent with'" an intentional relinquishment of its ownership of the rimonim that "'no other reasonable explanation for [its] conduct is possible.'"  *Irons v. FBI*, 811 F.2d 681, 686 (1st Cir. 1987) (citations omitted) (noting that burden of establishing implicit waiver is particularly high).

CJI adduced no proof that Shearith Israel, through its actions, deliberately intended to relinquish its property rights in the rimonim.  Simply put, Shearith Israel's property rights were never challenged prior to the attempted sale.  CJI's insuring and repairing of the rimonim was done in accordance with its obligations under the Indentures with Lease.  *See* Point I.C.  And CJI's loaning of the rimonim to museums was not inconsistent with Shearith Israel's ownership. *See* Point I.C.  As far as Shearith Israel was aware, all of CJI's actions vis-à-vis the rimonim were, up to 2012, consistent with Shearith Israel's ownership rights, so even the potential for "intentional relinquishment" of rights was not possible until Shearith Israel discovered that its ownership rights were being violated (*see generally* FoF 636-659).

Shearith Israel's silence likewise cannot be construed as an implicit waiver of its rights. Courts have routinely found mere silence insufficient to effectuate waiver, particularly where the silent party had an explanation for remaining silent.  *See U.S. v. Fleet Bank of Mass.* (*In re Calore Exp. Co.*), 288 F.3d 22, 42 (1st Cir. 2002) (finding no waiver based on a party's failure to speak where "there was no rule or court order requiring it to do so"); *Tidewater Realty, LLC v. R.I.*, 2000 R.I. Super. LEXIS 112, at *12-13 (Feb. 15, 2000); *Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 3 (1st Cir. 2005) (finding no waiver based on failure to raise right to arbitrate during pendency of administrative proceeding because that decision merely reflected desire to

-73-

avoid added litigation costs).  CJI has not shown implicit waiver because Shearith Israel had no

reason to reaffirm its ownership claim over the Touro Synagogue or personal property prior to

2012 (though it did many times even in recent memory (FoF 403-19)), since it believed that CJI

was abiding by the terms of the Indentures with Lease.  Therefore, Shearith Israel's silence

cannot be deemed consistent with an intentional relinquishment of its ownership rights, and CJI's

waiver claim must fail.  *See Irons*, 811 F.2d at 686.

## CONCLUSION AND RELIEF SOUGHT

Shearith Israel respectfully prays for the following relief:

(1)    Dismissal of CJI's claims with prejudice and with costs;

(2)    A declaration that Shearith Israel is the true and rightful owner of Rimonim 1-6

(using Dr. Mann's numbering);

(3)    A declaration that Shearith Israel is the true and rightful owner of the Touro

Synagogue, its lands, historic cemetery, and all of the personal property at Touro Synagogue that

Shearith Israel took title to in the 1820s or were or are subject to the Indenture with Lease and/or

the Documents of Limited Authorized Use, including without limitation Rimonim 1-6;

(4)    A declaration that the 1903/1908 Indentures with Lease cover Rimonim 2, 4, 5-6;

that the Indentures with Lease continued in force until at least 2012; that CJI materially breached

the Indentures with Lease by attempting to sell Rimonim 2 and 4; and that this or any other Court

of competent jurisdiction may take up proceedings arising from said breach should the parties

not come to an agreement beforehand;

(5)    A declaration that Touro Synagogue and Rimonim 2, 4, 5-6 are not held in trust

for CJI's benefit; or that, in the alternative, Shearith Israel did not breach any obligation it had to

CJI under any alleged trust; or that, in the alternative, any alleged breach by Shearith Israel is

wholly insufficient to permit CJI to remove Shearith Israel as trustee and/or sell Rimonim 2 and 4;

      (6)    A declaration that Shearith Israel maintains the rights as specified for it or its Trustees by CJI's 1897 Constitution and By-Laws; and

      (7)    Costs and any other relief that the Court deems just and proper.


              DEFENDANT CONGREGATION SHEARITH ISRAEL,

              By its Attorneys,

              /s/ Deming E. Sherman
              Deming E. Sherman (#1138)
              LOCKE LORD LLP
              2800 Financial Plaza
              Providence, RI  02903
              (401) 274-9200
              (401) 276-6611
              E-mail: deming.sherman@lockelord.com

              /s/ Louis M. Solomon
              Louis M. Solomon (Admitted *Pro Hac Vice*)
              CADWALADER, WICKERSHAM & TAFT LLP
              One World Financial Center
              New York, NY  10281
              Tel.: (212) 504-6600
              Fax: (212) 504-6666
              E-mail: Louis.Solomon@cwt.com

June 29, 2015

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of June, 2015, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

<u>/s/ Louis M. Solomon</u>