# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

CONGREGATION JESHUAT ISRAEL,

   Plaintiff,

v.            C.A. NO. 12-822-M (LDA)

CONGREGATION SHEARITH ISRAEL,

   Defendant.

**CONGREGATION JESHUAT ISRAEL'S PROPOSED FINDINGS OF FACT**

Table of Contents

Page

I.    Summary of findings.................................................................................................. 1

II.    The parties............................................................................................................... 4

   A.   Congregation Jeshuat Israel ............................................................................ 4

   B.   Congregation Shearith Israel........................................................................... 6

III.   The dispute.............................................................................................................. 6

IV.   Brief historical overview......................................................................................... 8

V.    The Rimonim ........................................................................................................ 10

   A.   CYI was the original owner and possessor of the Rimonim............................. 12

   B.   Shearith Israel held the Rimonim in the 19th century in "safe keeping" for roughly sixty years and on the condition that they be returned to Newport ..................... 21

   C.   Shearith Israel returned the Rimonim to Jeshuat Israel more than 100 years ago ........... 25

   D.   Jeshuat Israel is the continuation of or successor to CYI ................................. 26

   E.   Jeshuat Israel has possessed the Rimonim for at minimum over 100 years ..................... 38

   F.   Shearith Israel's conduct has been inconsistent with any ownership claim .................... 47

   G.   There are no documents specifically establishing that Shearith Israel owns the Rimonim ......................................................................................................... 55

   H.   The 1894 deeds ............................................................................................ 55

   I.   The prior litigations between the parties and their aftermath ......................... 60

      1.   1901 litigation ..................................................................................... 60

      2.   1902/1903 litigation ............................................................................. 60

      3.   1903 settlement agreement ................................................................... 63

      4.   1903 Jeshuat Israel resolution............................................................... 65

      5.   1903 lease............................................................................................ 66

      6.   The telegrams...................................................................................... 69

   J.   The 1945 agreement....................................................................................... 70

VI.   Dr. Vivian Mann .................................................................................................. 70

   A.   Dr. Mann's bias and lack of qualifications ...................................................... 70

   B.   Dr. Mann's theory concerning CSI ledgers from 1764 and 1765..................... 75

   C.   Dr. Mann's "formulas" purportedly connecting the ledger entries to the price of rimonim.......................................................................................................... 83

   D.   Dr. Mann's theory concerning the 1869 CSI inventory.................................... 85

   E.   Dr. Mann's theory that Jeshuat Israel's Rimonim are not a true pair .............. 87

F.    Conclusion with respect to Dr. Mann's opinions ................................................. 94
VII.    Dr. Linford Fisher ............................................................................................... 94
A.    Dr. Fisher's bias ................................................................................................... 94
B.    Dr. Fisher's lack of qualifications ....................................................................... 98
C.    Dr. Fisher's opinions that Jeshuat Israel is not connected to CYI ................... 100
D.    Dr. Fisher's word analysis ................................................................................ 101
VIII.    Touro Synagogue ............................................................................................... 104
A.    Touro Synagogue is owned in trust for the benefit of the "Jewish Society of Newport" ............................................................................................................ 105
B.    Jeshuat Israel is the beneficiary of the Trust .................................................... 113
C.    Judge Brown's 1903 decision does not bear on the trust issues presented here ............ 124
D.    CSI's obligations as trustee and under the 1945 Agreement ............................ 126
E.    CSI's conduct is inconsistent with its duties .................................................... 129
F.    Friction between Shearith Israel and Jeshuat Israel .......................................... 145
IX.    Jeshuat Israel's proper efforts to endow Touro Synagogue by selling the Rimonim ..... 146
A.    Jeshuat Israel determined to balance its budget and create an endowment .................... 146
B.    Efforts to cut costs ............................................................................................ 147
C.    Efforts to increase income and to fundraise ...................................................... 149
D.    Exploration of selling assets ............................................................................. 151
E.    Shearith Israel learns in 2009 that Jeshuat Israel is trying to sell Myer Myers rimonim ............................................................................................................. 153
F.    Jeshuat Israel approached Roy Zuckerberg of CSI ........................................... 159
G.    Christie's ........................................................................................................... 159
H.    June 25, 2012 call and e-mail ........................................................................... 161
I.    June 25, 2012 vote ............................................................................................ 164
J.    Cease and desist letter ....................................................................................... 165
X.    Jeshuat Israel's current financial condition is precarious and unsustainable ................. 165
A.    Jeshuat Israel's financial condition ................................................................... 165
B.    Shearith Israel's illusory settlement offer ......................................................... 168
XI.    The endowment sought by Jeshuat Israel .......................................................... 170
XII.    Governance of Jeshuat Israel ............................................................................. 171
A.    Jeshuat Israel's 1897 by-laws ........................................................................... 171
B.    Shearith Israel quickly ceased to involve itself in Jeshuat Israel's governance ............. 172
C.    1945 Jeshuat Israel by-laws .............................................................................. 173
D.    CSI was aware of the 1945 by-laws but took no action ..................................... 174

E.    After 1945, Jeshuat Israel continued without CSI-appointed trustees and amended its by-laws numerous times ........................................................................................ 176

XIII.    Jeshuat Israel's religious practices ................................................................................ 177

XIV.    Jewish Cemetery at Newport ........................................................................................ 178

The Court conducted a non-jury trial on June 1-3, June 5, and June 8-11, 2015. At the trial, plaintiff and counterclaim defendant Congregation Jeshuat Israel ("Jeshuat Israel" or "CJI") called four fact witnesses while defendant and counterclaim plaintiff Congregation Shearith Israel ("Shearith Israel" or "CSI") called one fact witness and two expert witnesses. The parties also submitted deposition designations and documentary evidence. The following constitute this Court's findings of fact pursuant to Fed. R. Civ. P. 52(a).

## I.       Summary of findings

1.       **Jeshuat Israel is the owner of the Rimonim**. As Shearith Israel has admitted several times in three separate pleadings and as all independent authorities have concluded, the Rimonim were originally owned and possessed by the Congregation Yeshuat Israel, which was Jeshuat Israel's predecessor. When in the late 18th and early 19th centuries the Newport Jewish community migrated to other part of the United States leaving Newport without any Jews, their Torahs and silver, including the Rimonim, were given to Shearith Israel -- to hold in "safe keeping" only, with acknowledged direction that the property be returned to whatever congregation was later formed and worshipping in Touro Synagogue. When the Jewish community of Newport revived in the late 19th century as Jeshuat Israel, Shearith Israel complied with the direction by returning the Rimonim to Jeshuat Israel. Jeshuat Israel is and has consistently held itself out as the successor to Yeshuat Israel, with Shearith Israel's acquiescence and acknowledgment.

2.       **Independently establishing ownership, Jeshuat Israel has possessed and borne all responsibility for the Rimonim for more than 100 years, while CSI has not had any involvement.** During that time, Jeshuat Israel has borne all indicia of ownership, expending time, money and effort with respect to the Rimonim, repeatedly lending the Rimonim to museums, otherwise controlling their location and use, and consistently holding itself out as their

owner.  Independent third parties have also represented Jeshuat Israel as the owner of the Rimonim, including in materials reviewed by CSI.  By contrast, during this 100-plus year period Shearith Israel has borne none of the indicia of ownership.  CSI neither exercised control over the Rimonim nor expended any of its own funds on those finials.  CSI's silence and non-involvement during the hundred-plus years in which Jeshuat Israel controlled and openly claimed ownership of the Rimonim cannot be squared with the position that CSI has belatedly taken in this litigation upon learning of the value of the Rimonim.

3.      **Shearith Israel owns Touro Synagogue in a charitable Trust for the benefit of Jeshuat Israel, the current incarnation of the "Jewish Society of Newport."**  CSI has owned the Touro Synagogue building and real estate in trust, for the benefit of the "Jewish Society of Newport," which the Court finds is Jeshuat Israel.  Jeshuat Israel, the permanent congregation worshipping in Touro Synagogue for over a century, represents and embodies the "Jewish Society of Newport" and therefore is the trust beneficiary.  Shearith Israel is the trustee.

4.      The documents speak with one voice on this issue.  The deeds under which CSI acquired the real property, agreements signed by CSI, most notably the critical 1945 tri-partite agreement among CSI, CJI and the United States Government, as well as CSI Board minutes and other CSI documents all acknowledge that CSI is trustee only.  These documents are consistent with the will of Jacob Rodrigues Rivera, an original trustee and owner of the Synagogue, who declared that the Synagogue be held "in Trust only, to and for the sole Use, Benefit and Behoof of the Jewish Society of Newport, to be for them reserved as a Place of Public Worship forever."

5.      **CSI has breached its duties as trustee owed to the beneficiary, Jeshuat Israel in several ways, and should be removed as trustee**.  *First*, Shearith Israel has abandoned and disowned its role, not even acknowledging that it is trustee and instead claiming outright

ownership – a failure that cuts to the core of a trustee's obligations. *Second*, CSI has breached its duty of loyalty, acting for its own interests rather than in the interests of the beneficiary, seeking to claim ownership for itself as well as a piece of the proceeds of any monetization of the Rimonim. CSI has also undermined attempts to sustain the subject of the trust, Touro Synagogue, as a place of worship and evict the Congregation. *Third*, CSI has breached its duty of care, neglecting its responsibilities as trustee and set out in the 1945 agreement, requiring that Shearith Israel "preserve, protect, maintain, and, when necessary, restore" Touro Synagogue. *Fourth*, CSI's conduct has generated a poisoned relationship with Jeshuat Israel, culminating in this litigation in which CSI seeks among other things to evict Jeshuat Israel from the only synagogue it has ever occupied. A new trustee should be appointed, in consultation with the Attorney General of Rhode Island.

6.     **Religion and governance issues**. After generations of ambivalence and non-involvement, CSI has no claim now to involve itself in or change Jeshuat Israel's governance or services. With CSI's full knowledge, Jeshuat Israel has been praying a certain way and following certain rites and rituals for over 100 years. CSI has also abandoned any role in the governance of Jeshuat Israel. With CSI's full knowledge, Jeshuat Israel has changed its by-laws and has been governing itself without any input from CSI for at least the last 70 years.

7.     **Jeshuat Israel is the owner of the cemetery located near the Touro Synagogue**. Again with CSI's knowledge and acquiescence, Jeshuat Israel has long held itself out as owner of the cemetery. When CSI tried to gain ownership of the cemetery in the late 1800's, CSI itself recognized that it was not acting appropriately. Jeshuat Israel is the owner.

II.    **The parties**

A.    Congregation Jeshuat Israel

8.    Congregation Jeshuat Israel is a small Jewish congregation that worships according to Orthodox traditions in Touro Synagogue in Newport, Rhode Island. (June 1 (Bazarsky) Tr. 104).

9.    Consecrated in 1763, Touro Synagogue is the oldest synagogue building in the United States. (D448-116; *see also* P281; P314; P320; P321).

10.    As discussed below, Jeshuat Israel is the continuation of or successor to the congregation that built Touro Synagogue, Congregation Yeshuat Israel ("CYI"). As such, Jeshuat Israel has worshipped in Touro Synagogue from the beginning. After a relatively brief period in the 19th century when there were no Jews in Newport, Jeshuat Israel returned and has been worshipping in Touro Synagogue continuously for at least the last 120 years. (June 9 (Katz) Tr. 50; June 3 (Bazarsky) Tr. 43).

11.    Jeshuat Israel, which maintains and operates Touro Synagogue (P251 at CJI 3060-61; June 3 (Pimental) Tr. 88-89; June 1 (Bazarsky) Tr. 120-21), is the only congregation that prays in Touro Synagogue. (June 1 (Bazarsky) Tr. 104, 112; *see also* June 3 (Bazarsky) Tr. 43). And Touro Synagogue is the only place that Jeshuat Israel prays. (June 1 (Bazarsky) Tr. 104, 115). Indeed, as discussed below, the evidence at trial established that Jeshuat Israel and Touro Synagogue are inseparable. The connection between the two is so strong that it has been inscribed not only in the hearts and minds of the Congregation and the public but also in the law of the State of Rhode Island.

12.    There are no other Jewish congregations or synagogues in the city of Newport and no other congregations conducting Orthodox services on Aquidneck Island. (June 1 (Bazarsky) Tr. 128; June 3 (Bazasrky) Tr. 43; June 3 (Ross) Tr. 186-87). There is another

Jewish congregation in Middletown, but that congregation is Conservative and not Orthodox. (June 1 (Bazarsky) Tr. 128-29; June 3 (Ross) Tr. 186-87).[1]

13.     During the non-summer period, Jeshuat Israel runs services at Touro Synagogue every Friday night and Saturday morning, in addition to the Jewish holidays.  (June 1 (Bazarsky) Tr. 116-17).  Starting in June and continuing through part of October, Touro Synagogue receives a large number of visitors due to its historical importance.  (June 1 (Bazarsky) Tr. 180).  To accommodate these visitors, Jeshuat Israel runs services every morning and every night.  (June 1 (Bazarsky) Tr. 117).  Jeshuat Israel employs a full-time rabbi to lead services in Touro Synagogue.  (June 1 (Bazarsky) Tr. 117-18).

14.     Jeshuat Israel has approximately 140 members, most of whom are over 60 years of age.  (June 3 (Ross) Tr. 184-85; June 3 (Pimental) Tr. 165; June 1 (Bazarsky) Tr. 127-28). The membership is relatively stable, but is slowly declining.  (June 3 (Ross) Tr. 184-85; P244). Most active members live in Newport. (June 3 (Ross) Tr. 184-85).

15.     As discussed below, Jeshuat Israel is just scraping by.  Cost cutting, which has reached its limit, has left the Congregation entirely run by volunteers.  The Congregation's only employees are its rabbi, a part-time maintenance person, and a person who opens the Synagogue on holidays.  (June 3 (Pimental) Tr. 89).  Despite its efforts, Jeshuat Israel is barely meeting expenses.

---

[1] Judaism is roughly divided into three major groups in terms of observance: Orthodox, Conservative, and Reform.  One salient difference between Orthodox and Conservative services is that in Orthodox congregations men and women sit separately at services while Conservative congregations generally have "family seating," where men and woman may sit together. (June 1 (Bazarsky) Tr. 108-09).

B.    Congregation Shearith Israel

16.    Shearith Israel, sometimes called the "Spanish and Portuguese" Synagogue, is an Orthodox Jewish congregation located at Central Park West in Manhattan, New York.  (June 9 (Katz) Tr. 30).

17.    Shearith Israel is a much bigger and wealthier congregation than Jeshuat Israel. Shearith Israel has more than 400 family memberships, which means that it has many more than 400 members.  (Lustig Dep. Tr. 94-95).  Unlike Jeshuat Israel, CSI has numerous paid employees.  CSI has three rabbis, whose salaries are paid directly by certain members.  CSI also has a paid executive director, a paid program director, a paid ritual director, a paid facilities manager, a paid office assistant, a paid executive assistant, a paid choir master, and paid communications associates.  (June 9 (Katz) Tr. 32-33).

18.    As one point of comparison between the two congregations, Jeshuat Israel spent years and years to raise $3 million to repair and restore Touro Synagogue.  CSI has been able to routinely raise $1 million from its members in a single breakfast.  (June 8 (Katz) Tr. 40).

III.    **The dispute**

19.    Both parties claim to own a pair of Colonial-era silver ornaments called "rimonim" crafted by the Jewish silversmith Myer Myers (the "Rimonim").  (Dkt. 1-2 at 10; Dkt. 8 at 18).  The dispute between the parties arose when Jeshuat Israel, which possesses the Rimonim and has done so for well over 100 years, attempted to sell them to the Museum of Fine Arts in Boston for $7.4 million.  (P223; P230).  Jeshuat Israel intended and intends to place the proceeds in an irrevocable endowment to support Touro Synagogue and the Congregation. (P228; P230).  CSI put a halt to the sale by claiming that it, and not Jeshuat Israel, owns the Rimonim.  (P231; June 5 (Ross) Tr. 54).

20.    The dispute over the Rimonim led to larger disputes concerning Touro Synagogue itself.  The parties agree that CSI owns Touro Synagogue but they disagree as to the nature of that ownership.  CSI contends that it owns Touro Synagogue outright and absolutely.  (Dkt. 8 (P241) at p.20 ¶ 60, p.22; Dkt. 70 at 58-59).  Jeshuat Israel argues that Shearith Israel owns Touro Synagogue in a charitable trust for the benefit of Jeshuat Israel.  (Dkt. 1-2 ¶ 32; Dkt. 69 at 4).  That is, that Shearith Israel is the trustee of a trust holding Touro Synagogue and Jeshuat Israel is or embodies the trust beneficiary.

21.    Jeshuat Israel seeks to have CSI removed as trustee of the trust due to breaches of fiduciary duty.  (Dkt. 1-2 ¶¶ 32-37; Dkt. 69 at 4, 39-40).

22.    Also, in the event that the Court finds that Shearith Israel owns the Rimonim, Jeshuat Israel asserts the alternate position that the Rimonim are part of the trust holding Touro Synagogue and that the Court should permit a sale of the Rimonim for equitable reasons.  (Dkt. 1-2 ¶ 30; Dkt. 69 at 4, 39-40).

23.    CSI in its counterclaims seeks the "return" of the Rimonim to CSI in New York.  (P241 at p.19 ¶¶ 52 & 57, p.23 ¶4).  CSI also seeks to gain control over Jeshuat Israel's governance by forcing Jeshuat Israel to return to 1897 by-laws that gave CSI seats on Jeshuat Israel's Board.  (P241 at 22; Dkt. 70 at 17, 56-57).  And, critically, CSI seeks to evict Jeshuat Israel from Touro Synagogue.  (P241 at p.21 ¶ 63, p.23 ¶ 5).

24.    CSI had also sought relief that would require the Court to force Jeshuat Israel to pray a certain way.  (P241 at 20).  The Court need not address those counterclaims, which invariably would have run afoul of the First Amendment, because the Court finds them to be moot.  (*See, e.g.*, June 8 (Katz) Tr. 33-34, 75).

## IV.    Brief historical overview

25.    The facts in this case stretch from the present all the way back to the 18th and even 17th centuries.  At times, the Court will address certain facts and events in detail.  To provide context to these facts and events, the Court first offers a brief historical overview.

26.    By 1658, Newport had a settled Jewish community.  (D448-032).  The community went by the name Congregation Yeshuat (also transliterated as Jeshuat) Israel ("CYI"), meaning "Salvation of Israel."  (D448-086; D488-097).

27.    In the mid-18th century, CYI built a synagogue in Newport, which was consecrated in 1763.  (D448-116).  The synagogue and the land originally were owned by three individuals, Jacob Rodrigues Rivera, Moses Levy, and Isaac Hart, "in Trust only, to and for the sole Use, Benefit and Behoof of the Jewish Society of Newport, to be for them reserved as a Place of Public Worship forever."  (P31).

28.    In a famous exchange of correspondence between Moses Seixas of Touro Synagogue and President George Washington in 1790 – a year before the passage of the Bill of Rights – President Washington declared that the United States would extend equal citizenship to members of all religions, and that "happily the Government of the United States, which gives to bigotry no sanction, to persecution no assistance, requires only that they who live under its protection should demean themselves as good citizens, in giving it on all occasions their effectual support."  (P33).

29.    In the late 18th century, the Jewish population in Newport dwindled as Jews resettled in various places throughout the United States, including Massachusetts and New York.  (D448-212-17; D448-249).  Services at Touro Synagogue ceased in the 1790s.  (D448-248).  The last Jew apparently left Newport in the 1820s.  (D448-259).

30.     The synagogue fell into disuse during a portion of the 19th century.  CYI's personal property was transferred to Shearith Israel in New York for safekeeping for roughly 60 years.  (P38).

31.     Shearith Israel also sometimes acted as guardian of the synagogue building.  However, CSI never had to pay for the upkeep of the building because when Abraham Touro, son of Isaac Touro, the "hazzan" or reader at the Touro Synagogue, died in 1822, he left $10,000 to the State of Rhode Island for the purpose of "supporting" the synagogue.  R.I. Gen. Laws § 35-9-1 (law administering Abraham Touro Fund) (P292).  In 1854, Abraham's brother, Judah Touro, died and left another $10,000 in trust with the Newport city council to pay the salary of an officiant at the synagogue.  R.I. Gen. Laws § 35-9-2 (law administering Judah Touro Fund) (P288).  Touro Synagogue likely received its name from these bequests.

32.     Jews started settling again in Newport in the late 19th century.  (D448-294).  In 1883, Touro Synagogue was re-consecrated (D448-302), and in 1894 the Rhode Island state legislature granted a corporate charter to the congregation worshipping there under the name "Congregation Jeshuat Israel."  (P284).  Jeshuat Israel has continuously worshipped in Touro Synagogue ever since.  (June 9 (Katz) Tr. 50).

33.     Also in 1894, descendants of the original trustees of Touro Synagogue purported to convey the synagogue building and underlying real property by deeds "in trust" to members of the Board of Trustees of Shearith Israel "for the maintenance therein of the usual and stated religious services according to the Ritual, Rites and Customs of the orthodox Spanish and Portuguese Jews, as at this time practiced and observed in the Synagogue of [Shearith Israel]."  (P50; P51; P53).

34.     In February 1903, as part of a settlement of litigation concerning occupancy of the Touro Synagogue building, Jeshuat Israel and Shearith Israel executed a symbolic five-year lease of Touro Synagogue for the token amount of $1 per year.  (P70).  Among other things, Jeshuat Israel agreed to use the synagogue according the Spanish and Portuguese rites, as stated in the 1894 deeds.  (*Id.*).  The lease was renewed for another five-year term in 1908.  (P76).  The parties have not signed any subsequent lease.

35.     In November 1945 Shearith Israel, Jeshuat Israel, and the United States Department of the Interior entered into an agreement concerning the designation of Touro Synagogue as a National Historic Site.  (P90).  The 1945 agreement declared, acknowledged and reaffirmed the trust and also provided that

> [t]he Shearith Israel Trustees and the Congregation Jeshuat Israel agree for themselves, their respective successors and assigns: (a) That they will preserve, protect, maintain, and, when necessary, restore, so far as lies within their power, the Touro Synagogue, Newport, Rhode Island, and the grounds immediately about the Synagogue building . . . .

(*Id.*, Art. I(a)).

## V.    The Rimonim

36.     Torahs are scrolls made of parchment containing the first five books of the Hebrew Bible.  Torahs may be adorned with silver finial bells or "rimonim" that are placed on the top of the two handles on Torah scroll when the Torah is not opened for use.  As CSI's counsel noted during his opening, "Their job is to stay with the Torah."  (June 1 (CSI opening) Tr. 69).[2]

37.     In this case, Jeshuat Israel and Shearith Israel both claim to own rimonim crafted by the Colonial-era silversmith Myer Myers.

---

[2] The singular of rimonim is "rimon."

38.     Myers was a native New Yorker.  He studied silversmithing and became a member of the guild of silversmiths in New York.  He had the largest silversmith workshop in New York and is the only silversmith in colonial America who made Judaica.  (June 9 (Mann) Tr. 123-24).

39.     Myers is known to have made only five pairs of rimonim.  (June 9 (Mann) Tr. 124).  He made one pair for CSI (P277), two pairs for Congregation Mikveh Israel in Philadelphia, and one inscribed "Hays & Myers" for the ancestors of a woman named Caroline Cohen (P279).  (June 9 (Mann) Tr. 127).  At issue here is the fifth pair of rimonim.  (P278; D562).

40.     Myers crafted the Rimonim in question between 1766 and 1776, although they probably date from the "later 1760s or early 1770s."  (P150 at CJI 3248 (item 64), CJI 3254).  The Rimonim are made out of silver, brass, and gilt silver, which is silver gilded with gold.  (D564; June 9 (Mann) Tr. 121).  They are indisputably beautiful objects, as seen in the following photograph of the Rimonim on display at the Museum of Fines Arts in Boston:



(D562).

A.    CYI was the original owner and possessor of the Rimonim

41.    Based on the record evidence, the Court concludes that the Rimonim were made for CYI and that CYI was the original possessor and owner of the Rimonim.

42.    There is no primary source existing today stating unequivocally that Myer Myers made the Rimonim for CYI.  That is not surprising for several reasons.  The Rimonim were fashioned between 240 and 250 years ago.  The records of CYI have largely been lost. (June 10 (Mann) Tr. 33).  Myers himself did not keep any records (unlike Paul Revere).  (June 9 (Mann) Tr. 128-29).  And as CSI's expert Dr. Vivian Mann acknowledged, the Rimonim could have been a gift to the congregation from a private individual.  (June 10 (Mann) Tr. 200).  Against this

backdrop, Jeshuat Israel cannot be faulted for not producing a receipt for rimonim from the 18th century, more than 250 years ago.

43.    Of course, there is likewise no primary source document indicating that Myer Myers made the Rimonim for CSI either.  As Dr. Mann testified, although CSI and the congregation in Newport recognized that the Myer Myers Rimonim were special, and even though CSI kept meticulous records dating back to the 1730's (June 10 (Mann) Tr. 38-39), there is no specific reference dated 1910 or earlier from CSI stating that "We own the Myer Myers rimonim that were located in [what is now called] Touro Synagogue."  (June 10 (Mann) Tr. 39-40).  Nor, as she recognized, is there any CSI document or even any document stating that CSI "hereby loans to you CJI, CYI, the Myer Myers Rimonim" (June 10 (Mann) Tr. 40-41), or that CSI loaned the Rimonim to CYI or CJI.  (June 10 (Mann) Tr. 40-41).

44.    That in itself is significant, because when CSI loaned or gifted religious items, the Congregation obtained a receipt or recorded the loan or gift, including with respect to loans or gifts to CYI, and CSI retained those receipts and records.  (P21 (CSI minutes recording 1760 loan of Torah, originally from Georgia congregation, to CYI); P22 (receipt for 1761 CSI loan of Torah to Philadelphia Congregation); P40 (1847 CSI minutes recording loan of Torahs ("Seapharim") and "two pair Remonim" to another New York congregation).  There is no record of any loan by CSI to CYI of the Rimonim even though, as Dr. Mann acknowledged, the Rimonim at some point prior to 1818 were located in Newport.  (June 10 (Mann) Tr. 42-43).

45.    There is highly persuasive circumstantial evidence, as well as substantial secondary source evidence, establishing that Myer Myers made the rimonim for CYI.

46.    To begin with, Myers had significant connections to CYI, as scholars have noted. (P114 at CJIB 1577 (Jewish Museum catalogue noting Myers' "particular connection" to the

Newport congregation). His sister, Rachel, and her husband Moses Michael Hayes, moved to Newport in the late 1760's or early 1770's – just about the time Myers likely made the Rimonim – and remained in Newport until 1782. (P150 at CJI 3259; P275 at CJI 904; *see also* June 10 (Mann) Tr. 65-66, 200).[3] In addition, Myers fashioned a circumcision plate for a prominent member of CYI in Newport, Moses Seixas, who at various points served as CYI's chief administrative officer or "parnas," warden, and "mohel," the person who performs the ritual circumcision. (June 9 (Mann) Tr. 124; June 10 (Mann) Tr. 200; P101 at item 6). On this score, it is important to note that Myers is known to have made over a hundred silver objects, but only six pieces of Judaica. (*See* P150). Five of those are pairs of rimonim. The sixth is the circumcision shield he made for Moses Seixas in Newport.

47.    Furthermore, the lone surviving CYI ledger from the 1700's indicates that Myer Myers traveled to Newport to repair that congregation's rimonim. (P30). The ledger, dated 1787, notes that CYI paid 12 shillings to Myer Myers for "mending romonim." (P30). Many silversmiths lived closer to Newport than Myers, who lived in New York. Indeed, there were several who lived and worked in Newport proper. (June 10 (Mann) Tr. 109; P79 at CJI 3455, CJI 3477, CJI 3486, CJI 3488, CJI 3493; P93 at CJI 3404, CJI 3418; CJI 3425; CJI 3426; CJI 3432). But CYI turned to Myers himself. (June 10 (Mann) Tr. 108-09; P30). The inference is overwhelming that Myers mended the rimonim because he had made them for the Newport congregation in the first place.

48.    It is also worth noting that some members of the Newport synagogue had considerable wealth. (June 10 (Mann) Tr. 201). As Dr. Mann acknowledged, any one of those members could have commissioned and donated the Rimonim to CYI. (June 10 (Mann) Tr.

---

[3] Hays' sister, Reyna, married Isaac Touro. (P150 at CJI 3259).

201).  Indeed, many Jews made significant donations to CYI.  (June 9 (Mann) Tr. 117-21; P80 at 181-84).   For example, Aaron Lopez, a member of CYI and one of the biggest shipping magnates in Colonial America, is known to have donated rimonim to the Newport congregation in 1769 – which is in the time period that Myers crafted the Rimonim.  (P150 at CJI 3248, CJI 3254; June 9 (Mann) Tr. 121).   Ezra Stiles, a Christian minister in Newport who went on to become president of Yale college, wrote in his diary for May 19, 1769 that Lopez had donated to the Newport congregation a Torah, "with Silver Tops & bells washed with Gold."  (D7-009).  The rimonim donated by Lopez in 1769 very well may be the Rimonim at issue in this lawsuit.  Like the rimonim donated by Lopez, the Rimonim at issue in this case are sliver and "gilt silver," meaning silver gilded with gold.  (D564; June 9 (Mann) Tr. 121-22).[4]

49.    Finally, the bases of the Rimonim (one of which was later switched with a base from one of CSI's rimonim) were engraved "Newport."  We know that the engraving was done at some point prior to 1869.  (D34-036).  According to Dr. Mann, the engraving was not original, meaning that it was not done by Myers or his workshop, because the work is "sloppy."  (June 9 (Mann) Tr. 154-55).  As discussed below, CSI held the Rimonim in safekeeping for a period of time in the 19th century when there were no Jews in Newport.  The Court finds it likely that the Rimonim were engraved "Newport" after being given to CSI for safekeeping.  CSI has its own "identical" or at least extremely similar pair of Myer Myers rimonim.  (P100 at 67; P150 at CJI 3249-50; P277; P278).  The most reasonable interpretation of the evidence is that the Rimonim were engraved "Newport" to distinguish them from CSI's pair and to indicate that they belong to

---

[4] Both Christie's and the Museum of Fine Arts in Boston ("MFA") have suggested that Lopez may have donated the Rimonim.  (D563; P275 at CJI 904).  Other possible donors include Myer Myers's sister, Rachel, and her husband, Moses Michael Hayes.  (P150 at CJI 3259; P275 at CJI 904).

Newport and were to be returned there upon the re-establishment of a congregation pursuant to the directions given to CSI when it took the Rimonim for safekeeping.

50.     At minimum, the engraving indicates that the Rimonim had been located in Newport.  Even Dr. Mann acknowledged that the Rimonim were located in Newport prior to 1818 (June 10 (Mann) Tr. 41-42) and that the "Newport" inscription was "a means of identifying what had been in Newport." (June 10 (Mann) Tr. 130-31).  Given the lack of documentation establishing that CSI was the original owner or possessor of the Rimonim, as well as the absence of documents showing that CSI loaned the Rimonim to Newport, that the Rimonim had been in Newport gives rise to an inference that they were possessed and thus owned by the congregation there, namely CYI.  Moreover, it would be strange for "Newport" to be engraved on the Rimonim if CSI, in New York, owned them.  This engraving is further support for CYI's original ownership of the Rimonim and is inconsistent with CSI's present claims that it owns and has always owned the Rimonim.

51.     In addition to the primary source material, every scholar who has ever examined the issue – and CSI prior to and even repeatedly during this lawsuit – has concluded that Myer Myers made the Rimonim for CYI.

52.     Dr. David Barquist, who is acknowledged as a leading Myer Myers scholar (*see, e.g.*, June 10 (Mann) Tr. 60) and who prepared the authoritative catalogue raisonné for the 2001 exhibition on Myer Myers that started at Yale (P150), noted in that catalogue, titled "Myer Myers, Jewish silversmith in Colonial, New York," that the provenance of the Rimonim at issue is "with Congregation Yeshuat (now Jeshuat) Israel by about 1780 and probably earlier."  (P150 at CJI 3248).

53.    In addition, the Jewish Museum in New York, which ran a substantial exhibition on Myer Myers in the mid-1960s, displayed all five pairs of Myer Myers rimonim and noted that "each pair of headpieces [meaning rimonim] comes from a congregation to which Myers had a particular connection," including "Touro Synagogue."   (P114 at CJIB 1577).   The Jewish Museum also noted in the catalogue that "it was not only the members of Congregation Shearith Israel who showed interest in Myers' work.  He received commissions from other synagogues as well as from many of the most prominent families of his day."  (P114 at CJIB 1576 (emphasis added)).

54.    Jeanette Rosenbaum, also a foremost scholar on Myer Myers (June 10 (Mann) Tr. 68), wrote what the Jewish Museum catalogue called an "exemplary work of its kind" concerning Myer Myers.  (P114 at CJI 1576; *see also id.* at CJI 1582 ("a monograph on Myers has been published [by Rosenbaum] and remains the most definitive study of the man and his work.")).   In that seminal work, "Myer Myers, Goldsmith," the only comprehensive book on Myers until Dr. Barquist's work (June 10 (Mann) Tr. 67-68), Ms. Rosenbaum commented on "two pairs of scroll bells which Myer Myers had made for the Synagogue at Newport, Rhode Island."  (P100 at 24).   Ms. Rosenbaum also noted that "Myers made silver bells for this congregation" – Touro Synagogue – "about 1765."  (P100 at 36).

55.    Consistent with these sources, the Library of Congress, the National Library of the United States, declared in connection with an exhibition on Jews in America, at which the Hays & Myers rimonim were displayed, that "Myer Myers . . . created silver rimonim for synagogues in New York, Newport and Philadelphia."  (P172).

56.    Next, Dr. Guido Schoenberger, an historian of note (June 10 (Mann) Tr. 73-74) stated in an article, "The Ritual Silver Made by Myer Myers," which was published in the

American Jewish Historical Society Journal, that "Myer Myers [made] a pair of his rimonim . . . *circa* 1770 for the new Synagogue at Newport . . . ." (P99 at 5).

57.　　Other scholars and institutions concur.  (P95 at CJI 3354).  For example, the Museum of Fine Arts in Boston, where the Rimonim currently are on loan, states on its gallery label for the Rimonim: "Since before the Revolution, [the Rimonim] have been associated with Congregation Jeshuat Israel of Newport, Rhode Island, whose 1763 building, Touro Synagogue, is the oldest synagogue in the United States still in use." (D564).

58.　　Finally, the Court takes note of the statements of Rabbi Marc Angel, who was CSI's rabbi from 1970, and senior or chief rabbi from the 1980's, until 2007 when he became CSI's "Rabbi Emeritus."  (Angel Dep. Tr. 6-7; June 10 (Mann) Tr. 54; P266).  Rabbi Angel stated in his seminal book "Remnant of Israel – a Portrait of America's first Jewish congregation," a book setting out the definitive history of Shearith Israel and published in 2004 upon the 350th anniversary of the arrival of Jews in America, that Myer Myers "created rimonim for the congregations in Newport and Philadelphia." (P162 at CJI 3226).

59.　　Consistent with that statement, Rabbi Angel delivered an address at the Yale exhibition concerning Myer Myers in which he declared to those assembled that "Myer Myers decided to fashion Torah bells for the synagogues in New York, Newport and Philadelphia." (P158 at CJI 2331).  The preface to the speech indicated that "among the extraordinary pieces on display are a number of Torah Bells (Rimonim) that Myers had made for Congregation Shearith Israel in New York, Jeshuat Israel in Newport, and Mikveh Israel in Philadelphia." (*Id.*).  Dr. Mann acknowledged that Rabbi Angel was knowledgeable about both CSI and CYI.  (June 10 (Mann) Tr. 54).  Rabbi Angel elsewhere in the same speech stated that he had reviewed CSI's

board minutes and other documents dating back to the 1730's (P158 at CJI 2333), so presumably he was knowledgeable on the subject when he presented at Yale.

60.     There is no record evidence that CSI ever contested any of these statements, all made by scholars whose expertise and reputations were acknowledged by CSI's expert Dr. Mann.   (June 10 (Mann) Tr. 53-54, 60, 64-65, 67-68, 72-74).   To the contrary, CSI has acknowledged in its pleadings and elsewhere that Myers made the rimonim for the synagogue in Newport.

61.     For example, CSI's amended counterclaims affirmatively state that "by 1822, Yeshuat Israel, original possessor of the rimonim, ceased to exist."  (P241 at 11, ¶ 15).  CSI's amended answer similarly states that "during the operation of the Touro Synagogue in the 18th Century, the synagogue used Torah scrolls, including those loaned by Defendant, and that the scrolls were presumably adorned with bells, or Rimonim, including at least one pair on information and belief crafted by the silversmith Myer Myers of New York."  (P241 at 2, ¶ 8). The pleading also "admits that after 1818, ownership of the personal property, including the rimonim, was transferred to Shearith Israel."  (P241 at 3, ¶ 13).  Obviously, unless CYI owned the rimonim from the start, ownership could not be "transferred to Shearith Israel" in 1818.  CSI repeated the same representation at paragraph 12 (p. 10-11) and paragraph 16 (p. 11) of its counterclaims.  Bolstering the point, CSI made the same representations and admissions in its initial answer and counterclaims (P240) as well as in its complaint filed in an ill-fated, second-filed, mirror-image action in New York federal court.  (P239).  As set forth in the Court's Conclusions of Law, CSI is bound by its judicial admissions.

62.     In all, CSI admitted on at least ten separate occasions in its pleadings that Myer Myers fashioned the rimonim for the Congregation in Newport.  CSI has never sought to amend

these pleadings, nor did Dr. Mann ever question CSI about these statements that contradict her opinion, even though she was shown CSI's latest pleading at her deposition.  (June 10 (Mann) Tr. 49-51).

63.    CSI's witnesses made similar admissions.  CSI's Rule 30(b)(6) witness on the subject of "ownership, use, possession, control and maintenance of rimonim that were made by Myer Myers and that are or have ever been located in Newport, Rhode Island" as well as "the relationship and course of dealing between the parties" (P246) was Zachary Edinger, CSI's ritual director and manager of CSI's archives.  (Edinger Dep. Tr. 9-10; P234).  He testified that it was his understanding that the congregation occupying Touro Synagogue was the original possessor of the Rimonim.  (Edinger Dep. Tr. 92).

64.    Rabbi Angel, who was CSI's rabbi for almost 40 years, likewise acknowledged that he was familiar with the Rimonim at issue in the case, and he agreed that Myer Myers "made them for the synagogue in Newport, as far as I know."  (Angel Dep. Tr. 15).  Rabbi Angel also agreed that "there is no dispute that what you call Jeshuat Israel was the original possessor of the rimonim."  (*Id.* at 77).  Rabbi Angel further acknowledged that Touro Synagogue "was the original possessor of at least one set."  (*Id.* at 41-42).

65.    In short, prior to this case, every scholar – and before and during this case CSI itself, through its pleadings and witnesses – has acknowledged that Myer Myers crafted the Rimonim for CYI, and that the congregation in Newport was the original owner and possessor of the Rimonim.  Any other conclusion is revisionist history.

B.    <u>Shearith Israel held the Rimonim in the 19th century in "safe keeping" for roughly sixty years and on the condition that they be returned to Newport</u>

66.    It is undisputed that the Rimonim were physically located with CSI for a period of time in the 19th century while there were no Jews in Newport.  The question is how or in what capacity CSI held the Rimonim.

67.    The Court finds that in the 1830's CSI obtained CYI's ritual and other valuable objects, including the Rimonim, from descendants of CYI members with the express acknowledgement that CSI was holding those object in "safe keeping" and on the condition that they be returned to whatever congregation was later established or re-established and worshiping in the Newport Synagogue.

68.    Dr. Mann – as well as CSI's other expert Dr. Linford Fisher – testified that Rimonim go on top of the Torah and typically travel with the Torah, except perhaps when they are on display at museums.  (June 10 (Mann) Tr. 37-38; June 11 (Fisher) Tr. 164-65).  As noted above, CSI's counsel likewise made the point in the opening that "[t]heir job is to stay with the Torah."  (June 1 (CSI opening) Tr. 69).  That is highly significant because, as reflected in 1832 and 1833 minutes of the Board of Trustees of Shearith Israel, the Torah scrolls "belonging to the New Port Synagogue" were transferred to CSI for "safekeeping" only, and subject to the important condition that they be "redelivered when duly required for the use of the Congregation hereafter worshipping in the Synagogue At New Port Rhode Island" – which is Jeshuat Israel.

69.    The pivotal CSI minutes from February 10, 1833 thus state:

> The Committee appointed to receive the Sepharim [Torahs] belonging to the New Port Synagogue report that they have received the same and deposited them in our Hachal [Ark] and had given a receipt to the family of the late Moses Seixas of which the following is a duplicate

(D26A; P38).

70.    The receipt, repeated in the minutes, states:

> Received from the family of the late Mr. Moses Seixas of New Port Rhode Island, Four Sepharim Belonging to the Congregation of that place, and Which are now to be deposited in the Synagogue in New York of the Congregation "Shearith Israel" Under the charge of the Trustees of said Congregation *to be redelivered when duly required for the use of the Congregation hereafter worshipping in the Synagogue At New Port Rhode Island* casualties excepted
>
> New York 19 Kislev 5593 – 11th December 1832 In behalf and by resolve of the Trustees of the Congregation Shearith Israel
>
> Signed by N. Phillips
>          Isaac B. Seixas

(*Id.* (emphasis added)).

71.    Prior to this case, Myer Myers scholars as well as CSI itself had concluded that the Seixas family had delivered the Newport rimonim (including the Myer Myers Rimonim) along with the Torahs, and that the above entry in the CSI minutes pertained to the Rimonim at issue in this case.  Dr. Mann gave the same testimony at her deposition, noting that this entry in the CSI minutes "lay the groundwork for my opinions that items that were used in Newport . . . the [Sepharim] and later the silver was returned [sic] to CSI."  (June 10 (Mann) Tr. 111-12).  She also agreed at trial that the 1833 minutes were an "important document [that she] cited in [her] report."  (June 10 (Mann) Tr. 112).

72.    If the silver were delivered to CSI along with the Torahs "belonging to the New Port Synagogue," then the same conditions applying to the delivery of the Newport Torahs – a bailment, for safekeeping only, with the items to be returned to any new or re-established congregation in Newport worshipping in Touro Synagogue, which is Jeshuat Israel – would apply to the Rimonim.

73.    Scholars have reached the same conclusion as this Court.  For example, Dr. Barquist noted in his seminal Yale catalogue:

> However, it was not until 1833 that the four Torahs (and presumably their ornaments) were transferred to Shearith Israel "for safekeeping in our place of worship until they should be required for the use of the Newport shool [shul]."  At this time, "NEWPORT" may  have been engraved on each finial in Yeshuat Israel's pair to distinguish them from the nearly identical pair already at Shearith Israel.  If this scenario is correct, we may thereby infer that both pairs were in their respective congregation's possession before 1833.  The Torahs and Torah finials were returned from New York in 1883, and the congregation in Newport was rechartered as Jeshuat Israel in 1894.

(P150 at CJI 3254).

74.    CSI's ritual director, Mr. Edinger, made the same point in a critical memorandum he prepared for the CSI Board and that CSI later submitted to Court in the New York action.  (P233 & P234).  The CSI memorandum concludes:

> In 1818, Benjamin Seixas, of Newport, wrote a letter to Shearith Israel (with the consent of Moses, Jacob and Samuel Lopez) transferring two *sifrei torah* from Newport to Shearith Israel for safekeeping.  These appear to be the two *sifrei torah* originally loaned to Newport by Shearith Israel in the mid 18th century.  In 1833, two additional (or possibly four) scrolls of the Newport congregation were deposited for safekeeping in NY.  It is likely that the *Rimonim* adorning these scrolls were brought to NY for safe keeping at that time.

(P234 at 5) (footnotes omitted).

75.    Mr. Edinger, as CSI's Rule 30(b)(6) witness, reiterated this conclusion when he testified that "it is likely that the rimonim were brought to New York for safekeeping" in "[e]ither the 1820s or 1830s."  (Edinger Dep. Tr. 92-93, 167).

76.    CSI's lone live fact witness at trial, its vice president, Michael Katz, repeated this understanding – which flows from the record evidence – when he testified "When I say 'they,' I mean the Jews of Newport, where the Torahs and rimonim and other ritual objects, which had

- 23 -

been in the Touro Synagogue, we [CSI] took them for safekeeping" (June 9 (Katz) Tr. 61), and that the Rimonim "had been given to us [CSI] for, to be held in safekeeping."  (June 8 (Katz) Tr. 66).

77.    The above-referenced documents and testimony are consistent with CSI's minutes from 1832, reporting that Shearith Israel determined to obtain the four Sepharim in possession of the family of the late Moses Seixas "belonging to the New Port Shool."  Shearith Israel minutes note that these Sepharim were to be placed at Shearith Israel "for safe keeping in our place of Worship until they should be required for the use of the New Port Shool."  (P37; D25A-002).

78.    The very fact that Shearith Israel provided a receipt in 1833 shows that CSI understood that the Sepharim (and the Rimonim traveling with the Sepharim) were not CSI's property.  Why otherwise provide a receipt?  Also noteworthy is that in connection with moving items to Shearith Israel's new synagogue building in 1833, Shearith Israel minutes from October or November 1833 were careful to provide "that at a proper time, this Committee [will] place in the Eachal [the Ark] the Sepharim 13 in number, 4 which belong to the New Port Shool."  (P39).

79.    At trial, CSI's experts tried to make something of the fact that the 1833 minutes reference only the Torahs, and that there was no specific document referencing the transfer of the silver to CSI, and thus no recital of conditions or statement confirming Newport's ownership of rimonim.  Even if the 1833 minutes did not cover the Rimonim, this argument is of no help to CSI.

80.    First, CSI has not advanced any principled reason why the Torahs and the rimonim would have been treated differently, such that CSI would obtain the Torahs in safekeeping but obtain absolute ownership of the rimonim that go on top of those Torahs.  Given

the close relationship between Torah and rimonim touted by CSI, the Court finds such differential treatment unlikely.

81.    Second, CSI's expert, Dr. Mann, in fact *had* a document from 1833 referencing the transfer of the Rimonim from Newport to CSI.  (June 10 (Mann) Tr. 121-24).  At her December 31, 2014 deposition, Dr. Mann specified that the document evidenced the transfer of "the silver that had been used in Newport" from the family of Moses Seixas "to CSI for safekeeping" and that this record related to the silver Rimonim.  (Dkt. 65-1 at 19:5-21:22, 96:16-97:4, 164:11-25 (and errata sheet at p. 2), 209:8-211:11, 276:3-8).[5]

82.    Although the document was in Dr. Mann's possession well after this case began and after she was retained as CSI's expert, somehow the document disappeared.  (June 10 (Mann) Tr. 121-22).  Dr. Mann explained, "I could not retrieve -- I could not find it again, which I admit was unfortunate."  (June 10 (Mann) Tr. 124).

83.    As set forth in the Conclusions of Law, the Court draws an adverse inference that the document reviewed and then lost by Dr. Mann showed that in or about 1833 CSI obtained the Rimonim for "safekeeping" only and upon the same conditions that applied to the Newport Torahs.

C.    <u>Shearith Israel returned the Rimonim to Jeshuat Israel more than 100 years ago</u>

84.    By 1883, there were enough Jews in Newport for a congregation to worship in Touro Synagogue.  (D448-302; D448-306).  Although the congregation was not formally incorporated until June 1894 (P284), that did not make it any less of a congregation.  After all,

---

[5] Not all of Dr. Mann's deposition testimony was made part of the record during the trial. However, the Court considers that portion of Dr. Mann's deposition concerning this document, found on the case docket (Dkt. 65-1), as part of Jeshuat Israel's application for an adverse inference.

CYI was never incorporated and CSI does not dispute that CYI was a congregation.  (D448-097; P241 at p.10 ¶ 11).

85.    At some point in the late 19th or early 20th centuries, Shearith Israel returned to Newport the four Torahs referenced in CSI's 1832 and 1833 minutes.  (P150 at CJI 3254).  Based on photographic evidence, Shearith Israel returned the Rimonim to the Newport congregation at some point in or before 1913, and possibly in or before 1895.  (P77; P124 at CJIB 4111).  Beyond this photographic evidence, the record during this period in the late 19th and early 20th centuries is extremely murky as to the particular Rimonim at issue here.

86.    CSI and its experts, Drs. Mann and Fisher, point to various documents from the late 19th century that purportedly reference rimonim.  But Dr. Mann acknowledged that unless there is a specific reference to the Myer Myers Rimonim, we do not know what rimonim are being referenced.  (June 9 (Mann) Tr. 179-80; June 10 (Mann) Tr. 43).  Dr. Fisher further acknowledged that none of the documents from this period upon which CSI relies referenced the Myer Myers Rimonim at issue here.  (June 11 (Fisher) Tr. 194-95).  Indeed, they do not.

D.    Jeshuat Israel is the continuation of or successor to CYI

87.    Shearith Israel's act of returning the Rimonim to Newport complied with the directions given to CSI in the 1830's when it obtained CYI's personal property in safekeeping.  The return also underscored CSI's recognition that Jeshuat Israel was the congregation to which CYI intended to give its personal property as the continuation of or successor to CYI.  After all, Shearith Israel had been instructed to return the Torahs, and thus also the Rimonim, to "the Congregation hereafter worshipping in the Synagogue at New Port Rhode Island" – CJI.

88.    Beyond this act of return – which alone speaks volumes – the record establishes that Jeshuat Israel is the continuation of or successor to CYI.  Shearith Israel, the United States, the state of Rhode Island, and of course Jeshuat Israel have all acknowledged this fact.

89.    *First*, Jeshuat Israel is the only Jewish congregation in the city of Newport and the only Orthodox Jewish congregation in the county of Newport.  (June 1 (Bazarsky) Tr. 104, 112, 115).  More importantly, Jeshuat Israel is and has been the only congregation worshipping in Touro Synagogue, built by CYI in 1763.  (June 1 (Bazarsky) Tr. 104).  As Michael Lustig, CSI's vice president and Rule 30(b)(6) witness testified, Jeshuat Israel is "the current incarnation" of the "Jews of Newport."  (Lustig Dep. Tr. 73).

90.    *Second*, the Court is guided by Shearith Israel's own words and deeds.  For almost 70 years, and until it learned that Jeshuat Israel arranged to sell the Rimonim for $7.4 million, CSI – like everyone else – agreed that Jeshuat Israel is CYI's continuation or successor.

91.    In connection with the designation of Touro Synagogue as a National Historic Site, the United States Department of the Interior erected a large plaque or tablet on the wall of the synagogue in 1947.  (P104 at 148-50).

92.    The following is a photograph of the plaque, which has remained affixed to Touro Synagogue for almost 70 years:



(P261).

93.     The statement "Touro Synagogue of Jeshuat Israel Congregation  Founded 1658" is key.  Since construction on the Touro Synagogue did not begin until 1759, the plaque communicates that Congregation Jeshuat Israel was founded in 1658, and that Jeshuat Israel therefore is the continuation or successor of CYI.

94.     Shearith Israel approved the language of the plaque.  July 25, 1946 minutes from a special congregation meeting of Jeshuat Israel state that "[f]inal text of [the] tablet must be approved and agreed by committees of Congregation Jeshuat Israel, Congregation Shereth [sic] Israel of N.Y. and a representation [sic] of the U.S. Department of Interior . . . ."  (D244).  The minutes further state that Jeshuat Israel determined that the tablet would be erected only "after same is formally drafted and approved by the C.J.I. of Newport, C.S.I of New York, and Department of Interior . . . ."  (D244).  That the text of the tablet would be approved by the Department of the Interior, Jeshuat Israel, *and* Shearith Israel makes sense in light of the 1945 tri-partite agreement discussed at length starting at paragraph 353 below.

95.     The Court's conclusion is further buttressed by the fact that Shearith Israel's rabbi and president participated in the 1947 dedication of Touro Synagogue as a National Historic Site, at which the plaque was publicly unveiled.  (P104 at 148, 150).

96.    Moreover, the plaque is highly visible from the street and it is "hard to miss" when entering the Touro gate to reach the Synagogue.  (June 1 (Bazarsky) Tr. 122-23).  Indeed, it is the only plaque on the Touro Synagogue building.  (June 1 (Bazarsky) Tr. 122).



(P320).

97.     Members of Shearith Israel, including members of CSI's Board of Trustees, have seen the plaque.  But they have never objected to its contents.  (June 9 (Katz) Tr. 37-38; June 1 (Bazarsky) Tr. 122-24).

98.     Based on this evidence, the Court finds that Shearith Israel approved and agreed to the language on the plaque on Touro Synagogue, which unambiguously announces that Jeshuat Israel is the continuation of or successor to CYI.  Moreover, the Court finds that Jeshuat Israel and the United States relied upon Shearith Israel's concurrence in the language of the plaque to permanently affix it to the exterior of Touro Synagogue, where the plaque has remained since 1947.  Jeshuat Israel further relied by continuously holding itself out as the second oldest congregation in America, as noted below.  As set forth in the Court's Conclusions of Law, CSI is barred from disputing that Jeshuat Israel is the continuation of or successor to CYI.

99.     But the plaque does not stand alone.  CSI has acknowledged Jeshuat Israel as CYI's continuation or successor in other ways, both affirmatively and through inaction.

100.     To begin with, the very fact that Shearith Israel – which, as discussed below, is the trustee of Touro Synagogue – leased Touro Synagogue to Jeshuat Israel and, according to Shearith Israel, has continued to do so on an exclusive basis for the last 100+ years, is strong evidence that Jeshuat Israel is in fact the successor to CYI.

101.     Furthermore, CSI's long-time rabbi, Rabbi Marc Angel, in his book "Remnant of Israel," identified the current Jeshuat Israel as one "[o]f the five congregations of colonial days." (P162 at CJI 3225; Angel Dep. Tr. 30-31 (acknowledging that this was the correct reading of his book)).  Rabbi Angel similarly gave a sermon in 2004 that was reproduced in the Congressional Record in which he stated: "We welcome representatives of our sister congregations that date

back to the Colonial period: from the Touro Synagogue in Newport . . . ."  (P167 at 2; P166 at 2). Rabbi Angel made both these statements when he was senior or chief rabbi at CSI.  (Angel Dep. Tr. 6-7).

102.    CSI also has heard Jeshuat Israel represent itself as the continuation of or successor to CYI, but there is no evidence that CSI ever objected.

103.    For example, Jeshuat Israel and the Touro Synagogue Foundation, a 501(c)(3) non-profit that among other things arranges educational programs relating to religious freedom, host an annual reading of letters exchanged between Moses Seixas of the Newport congregation and George Washington in 1790. (P317; P33).  At the 2004 George Washington letter reading ceremony, then co-president of Jeshuat Israel Laura Pedrick commenced the proceedings by proclaiming that "we are celebrating the occasion of receiving a letter to *our* congregation from George Washington . . . ."  (P318 at 1 minute 24 seconds (emphasis added)).  Ms. Pedrick went on to state that "Touro is honored to host representatives from the other colonial synagogues" – a reference that both included CSI and represented that Jeshuat Israel dates back to the Colonial period.  (P318 at 2 minutes 18 seconds).  There is no record of CSI ever objecting to these statements.[6]

---

[6] In the video of the 2004 George Washington letter reading ceremony, Bernard Aidinoff's touching introduction of Justice Ruth Bader Ginsberg begins at 19 minutes 30 seconds.  Justice Ginsberg's elucidating key note address on the first Jewish Supreme Court Justices begins at 24 minutes 20 seconds.

104.    As another example, in 1936, Jeshuat Israel's rabbi at the time, Morris Gutstein, sent a letter to CSI's rabbi on the following letterhead:



(P82).  There is no evidence that CSI ever objected.

105.    In addition, the Touro Synagogue website states that Jeshuat Israel "was founded in 1658."  (P271).  Indeed, Jeshuat Israel's former president, David Bazarsky, testified that Jeshuat Israel "publicize[s] . . . everywhere" that Jeshuat Israel is the second oldest congregation in the United States.  (June 1 (Bazarsky) Tr. 113).  Again, CSI has never objected.  (June 2 (Bazarsky) Tr. 205).

106.    Dr. Barquist wrote in his catalogue raissoné on Myer Myers that the provenance of the Rimonim is "with Congregation Yeshuat (now Jeshuat) Israel by about 1780 and probably earlier."  (P150 at CJI 3248).  This is a clear statement that Jeshuat Israel is the continuation of or successor to CYI.  Mr. Katz testified that he looked at the Yale catalogue.  (June 8 (Katz) Tr. 168-69).  Neither Mr. Katz nor anyone else from CSI ever complained or objected to this description of provenance.  (June 1 (Bazarsky) Tr. 140-41).

107.    Separate from the catalogue, Mr. Katz testified that he attended the Yale exhibition and that, *at the exhibition*, he saw that the "provenance" of Jeshuat Israel's rimonim was attributed to "Congregation Jeshuat Israel Touro Synagogue."  (June 8 (Katz) Tr. 168-69).

Yet CSI did not object to Jeshuat Israel being attributed as the original (and current) owner of the Rimonim, and thus the continuation of or successor to CYI.  (June 8 (Katz) Tr. 169-70).

108.    There likewise is no record of CSI objecting when Bernard Kusinitz wrote in his 1975 article, "The 1902 Sit-In At Touro Synagogue," that in connection with legal cases arising in the late 19th and early 20th centuries involving a rival congregation called the "Touro Congregation," and discussed below, CSI supported "Congregation Jeshuat Israel, the legal successor to the original Congregation Yeshual Israel" and the judicial proceedings "settled once and for all the principle of which Newporters would be the legal successors to the old Congregation Yeshuat Israel and which group would shape the destiny of Touro Synagogue in the years ahead."  (P125 at JHA 48, JHA 72).

109.    Nor is there evidence that CSI objected when Rabbi Gutstein of CJI wrote in his 1936 book "The Story of the Jews of Newport," which carried an introduction by CSI's Rabbi, David de Sola Pool, that "[i]n the controversy, the Congregation Shearith Israel inevitably supported the Congregation Jeshuat Israel which was the legal successor of the old Congregation."  (P81 at CJI 3120).

110.    *Third*, the state of Rhode Island has recognized Jeshuat Israel as the successor to CYI.

111.    In 1894, Shearith Israel petitioned the Rhode Island General Assembly seeking to prevent Jeshuat Israel from incorporating under that name.  Shearith Israel there advanced many of the same points that it raises in this lawsuit in 2015 supposedly establishing that CJI is not CYI's successor.  The petition claimed that the Newport congregation:

> have applied to your Honorable Body for a Charter, and have presumed to assume and asked to be incorporated under the name of "Yeshuat Israel", the name of the ancient Congregation of Newport, while as a matter of fact none of them belong to the Sephardic or Spanish and Portuguese section of the Jewish nation, which was the rite with which the members of the ancient community at Newport were identified, nor are they descendants or in any way connected with the former Congregation, they being of the German or Polish contingent hereinbefore alluded to, and by their action in endeavoring to adopt this name, are manifestly perpetrating an injury upon the citizens of Newport in attempting to establish a relation between the ancient Congregation and themselves, while as a matter of fact they are totally different in form of worship, and in social standing, as well among the Israelites as Gentiles . . . .

(P48 at CSI 4056-57).

112.    Significantly, the Rhode Island General Assembly rejected these arguments and granted a corporate charter to the congregation under the name Congregation Jeshuat Israel. (P284).

113.    To the extent CSI quibbles with the difference between the "Y" and the "J" in the chartered name, the Court does not finds that difference to be significant.  Both "Yeshuat" and "Jeshuat" are transliterations of the same Hebrew word.  (D448-415 (stating in glossary: "*Jeshuat Israel* (spelled in early days *Yesuat* or *Yeshuat*) – Salvation of Israel")).  Dr. Fisher acknowledged that they mean the same thing, salvation.  (June 11 (Fisher) Tr. 169-70, 184-85). And documents show CSI using "Y" and "J" interchangeably after Jeshuat Israel was incorporated.  When Shearith Israel recorded in its minutes that the legislature had rejected its petition and permitted Jeshuat Israel to incorporate under that name, Shearith Israel referred to the congregation in Hebrew – thus acknowledging that the Rhode Island legislature had permitted Jeshuat Israel to incorporate under the name of the so-called ancient Newport congregation.  (P54 at CSI 5278).  In 1903, nine years after Jeshuat Israel was incorporated, CSI's rabbi recorded a receipt for $1 "rent" for Touro Synagogue received from "Congregation

Yeshuat Israel." (P74). And in a 1898 letter from an official CSI delegation, CSI referred to CYI as "congregation Jeshuat Israel." (P56 (emphasis added)).

114.      The Rhode Island legislature's rejection of CSI's arguments should be the end of the story. But the Court notes that the arguments CSI advanced in 1894 and that it seeks to revive here in 2015 are not persuasive.[7]

115.      The distinction between Jews with backgrounds that are Ashkenzic (of German and Eastern European ancestry) and Sephardic (of Spanish and Portuguese ancestry) that CSI tried and tries to draw was and is not relevant to whether Jeshuat Israel is the successor to CYI. Ashkenazic Jews were a significant part of Colonial Jewry. "Even from its earliest days, Shearith Israel[,]" which proclaims itself to be the "Spanish & Portuguese" synagogue, "had Sephardic and Ashkenazi members." (P260 (CSI website)). According to Jonathan Sarna, the only expert on American Jewish history that Dr. Fisher could identify (June 11 (Fisher) Tr. 144), Ashkenazic Jews formed the majority of Shearith Israel by 1720 and exercised "considerable authority" by serving as officers more often than Sephardim. (P150 at CJI 3231 (Essay, "Colonial Judaism" by Jonathan D. Sarna)). In his history of CSI, Rabbi Angel concurred and further noted that "the numbers of Parnasim [the plural of parnas] from 1761 to 1776 were seven Sephardim and twenty-three Ashkenzim." (P162 at CJI 3221-22, CJI 3227). Dr. Barquist tells us that none other than Myer Myers himself was likely of Ashkenazic background. (P150 at CJI 3235).

116.      These demographics were not confined to New York. The "preponderance of colonial Jews were actually Ashkenazim or of mixed background . . . ." (P150 at CJI 3232

---

[7] The only argument CSI raised in its 1894 petition that it has not made here is that the Jews at Jeshuat Israel are lower "in social standing" than were the members of CYI. That prejudiced view holds no water with this Court.

(Sarna)).  This was true in Colonial Newport too.  Stanley F. Chyet, in his work, "Lopez of Newport," wrote that "[t]he Sephardim of the Surinamese capital, it was evident, would not ignore the need of the *predominately Ashkenazic Rhode Islanders*."  (P307 at CJI 3738 (emphasis added)).  Two of the three original trustees of Touro Synagogue – Messrs. Levy and Hart – were of Ashkenazic background (P307 at CJI 3736; P308 at CJI 3744), and "the structure's six cornerstones were dedicated by two Sephardim and four Ashkenazim."  (P308 at CJI 3744).

117.    Furthermore, there is no requirement at Jeshuat Israel, Shearith Israel, or any other Jewish synagogue, that members of the congregation must be direct descendants of the founders.  (6/1/ 2015 (Bazarsky) Tr. 114; June 9 (Katz) Tr. 34).[8]

118.    Beyond its rejection of CSI's 1894 petition, the Rhode Island General Assembly has recognized Jeshuat Israel as the successor to CYI in other ways as well.  Jeshuat Israel has been the beneficiary of the Abraham and Judah Touro Funds since Jeshuat Israel's reconstitution in the late 19th century.  (*See* June 1 (Bazarsky) Tr. 121; P286).   Moreover, the Rhode Island legislature twice has amended the statute governing the administration of the Abraham Touro Fund to expressly reference "Congregation Jeshuat Israel."  R.I. Gen. Law § 35-9-1 (P292).  Since at least 1929, all expenditures on repairs to Touro Synagogue must be approved by "Congregation Jeshuat Israel."  R.I. Pub. Laws, Jan. Session 1929, Ch. 1410 (P286).  And since 1995, "Congregation Jeshuat Israel" may directly draw from the fund up to 4.5% of its value each year.  R.I. Pub. Laws, Jan. Session 1995, Ch. 204 (P291).

---

[8] Although not relevant to its findings in this case, the Court notes that at least one member of Jeshuat Israel, Ambassador Loeb, traces his ancestry to Colonial-era Newport.  (D451-135-36).

119.    *Lastly*, Rhode Island is not alone in recognizing Jeshuat Israel as the successor to CYI.  As noted above, the federal government through the 1947 plaque also has acknowledged this fact.  (P261).

E.    Jeshuat Israel has possessed the Rimonim for at minimum over 100 years

120.    Since CSI returned them to Newport over 100 years ago, Jeshuat Israel has possessed the Rimonim and exercised exclusive dominion and control over them – bearing every indicia of ownership.

121.    *First*, the Rimonim have been continuously located with Jeshuat Israel or in its safe deposit box when not on loan to museums.  (*See* June 1 (Bazarsky) Tr. 133-34; June 3 (Ross) Tr. 197-200; P124 at CJIB 4111; P81 at CJI 3088).

122.    *Second*, Jeshuat Israel has controlled the Rimonim by determining when, where, and how they are used.

123.    Jeshuat Israel uses the Rimonim on the Jewish High Holy Days, but since 1999 or 2000 stores them in a safe deposit box when not in use or on loan to a museum.  (June 1 (Bazarsky) Tr. 133-34; June 3 (Ross) Tr. 197-200).  The Rimonim stay in a safe deposit box 360 days out of the year because Jeshuat Israel is concerned about damaging them and also because the congregation is concerned that it does not have the security to protect them from theft.  (June 1 (Bazarsky) Tr. 134; June 3 (Ross) Tr. 197-200).

124.    Shearith Israel plays no role in Jeshuat Israel's decision to store the Rimonim in a safe deposit box.  (June 1 (Bazarsky) Tr. 134).  Nor does Shearith Israel play any role or have any involvement in determining when and how Jeshuat Israel uses the Rimonim.  (June 1 (Bazarsky) Tr. 134-35).

125.    As further evidence of Jeshuat Israel's exclusive control, Jeshuat Israel has loaned the "Newport" Rimonim and/or the "Hays & Myers" rimonim (which CSI also claims to own) to public exhibitions on seven occasions, all without requesting CSI's permission.

126.    In 1953, Jeshuat Israel loaned both of its pairs of Myer Myers rimonim to an exhibition at the Museum of Fine Arts in Boston entitled, "Early American Jewish Portraits and Silver." (P97 at CJI 1961). The catalogue for that exhibition stated, "[Items] 22-23. Two pairs of Sefer Bells (Rimonim) / Lent by Touro Synagogue, Newport, Rhode Island." (*Id*.).

127.    In 1954, Jeshuat Israel loaned both of its pairs of Myer Myers rimonim to an exhibition at the Brooklyn Museum titled "Works in Silver and Gold by Myer Myers." (P101 at CJI 3720). The checklist for that exhibition shows that Jeshuat Israel's rimonim were items 4 and 5, with both sets attributed to "Touro Synagogue, Newport, Rhode Island." (P101 at CJI 3720). CSI and Mikveh Israel in Philadelphia also displayed their own Myers rimonim. CSI's rimonim were item 1 and attributed to "Congregation Shearith Israel, New York." (P101 at CJI 3720). Mikveh Israel's two sets of rimonim were items 2 and 3, and attributed to "Congregation K.K. Mikveh Israel in the City of Philadelphia." (P101 at CJI 3720). Thus, all the Myers rimonim were together in the exhibition, with CSI's rimonim just two items away from Jeshuat Israel's two sets.

128.    In 1955, Jeshuat Israel loaned the Rimonim to an exhibition at the Museum of Art at the Rhode Island School of Design entitled, "The House of God / An Exhibition in Honor of the American Jewish Tercentenary." (P103). The exhibition catalogue notes that item 66 is "Rimonim, Silver, Myers, 18th Century / Lent by Congregation Jeshuat Israel, Newport." (P103 at TSF 1390). CSI did not loan its own Myers rimonim to the exhibition.

129.    In 1965, Jeshuat Israel loaned both its sets of Myer Myers rimonim to an exhibition at the Jewish Museum in New York titled, "Myer Myers: American Silversmith." (P114).  The catalogue for the exhibition notes that these rimonim were items 1 and 4 (referred to as "Torah Headpieces") and states, "Lent by the Touro Syngogue, Newport, Rhode Island." (P114 at CJIB 1581).  CSI also lent its Myer Myers rimonim.  They were item 2 and thus sandwiched between Jeshuat Israel's two pairs of rimonim at the exhibition.  The entry for CSI's rimonim states: "Lent by Congregation Shearith Israel, New York."  (P114 at CJIB 1581).

130.    In 2001 and 2002, Jeshuat Israel lent both its sets of Myers rimonim to an exhibition that started at the Yale University Art Gallery titled, "Myer Myers / Jewish Silversmith in Colonial New York."  (P150; June 1 (Bazarsky) Tr. 135-36).  The exhibition appeared at Yale from September 14 through December 30, 2001.  Then the exhibition travelled to the Skirball Cultural Center in Los Angeles for February 20 through May 26, 2002, and finally ended at the Henry Francis du Pont Winterthur Museum in Delaware from June 20 through September 13, 2002.  (P150 at CJI 3229; June 1 (Bazarsky) Tr. 142-43).  Both sets of Jeshuat Israel's rimonim were exhibited at all three locations, and thus Jeshuat Israel had loaned the rimonim out for a full year and probably longer.  Jeshuat Israel's "Newport" Rimonim were item 64 in the exhibition catalogue, which stated: "PROVENANCE: with Congregation Yeshuat (now Jeshuat) Israel by about 1780 and probably earlier" and attributed the Rimonim to "The Touro Synagogue, Congregation Jeshuat Israel, Newport, Rhode Island."  (P150 at CJI 3248).   Jeshuat Israel's "Hays & Myers" rimonim were item 100 in the catalogue, which under "provenance" stated that the rimonim were "donated to the Touro Synagogue in 1892."  (P150 at CJI 3259).  The catalogue attributed these rimonim to "Touro Synagogue, Congregation Jeshuat Israel, Newport, Rhode Island."  (*Id.*).

131.    CSI loaned its Myer Myers rimonim to the Yale exhibition, but did not to allow them to travel to the exhibitions in Los Angeles and Delaware.  (P150 at CJI 3248).  CSI's rimonim were item 63, and thus were right next to Jeshuat Israel's "Newport" Rimonim when on display at Yale.  For CSI's rimonim, the catalogue stated "PROVENANCE: with Shearith Israel by 1833 and probably earlier" and attributed the rimonim to "Congregation Shearith Israel, New York."  (P150 at CJI 3248).

132.    From 2004 to 2006, Jeshuat Israel loaned the "Hays & Myers" rimonim to a Library of Congress exhibition entitled, "From Haven to Home / 350 Years of Jewish Life in America."  (P171 at CJI 841, CJI 849; P172; June 1 (Bazarsky) Tr. 141).  The exhibition started at the Library of Congress and then continued to the Skirball Cultural Center in Los Angeles.  (P171 at CJI 841, CJI 849; P172).  The catalogue for the exhibition stated that the rimonim (item 21) were "Courtesy of Touro Synagogue Congregation Jeshuat Israel, Newport, Rhode Island."  (P171 at CJI 858).  Similarly, the website for the exhibition, which the Library of Congress still maintains on-line, states, "Displayed here are the finials belonging to Newport's Touro Synagogue . . . ."  (P172).  Like the catalogue, the website states that the rimonim were "Courtesy of Touro Synagogue Congregation Jeshuat Israel, Newport, Rhode Island."  (P172).

133.    Finally, starting in 2010, Jeshuat Israel loaned the "Newport" Rimonim to the MFA, where the Rimonim are presently located.  (June 3 (Ross) Tr. 203-04; P206; P208).  The MFA attributes the Rimonim to "Touro Synagogue, Newport, Rhode Island."  (D564).

134.    Jeshuat Israel never requested or received permission from CSI to make these long-term loans to third parties.  (June 1 (Bazarsky) Tr. 136-37; June 8 (Katz) Tr. 167-68; Edinger Dep. Tr. 99; June 10 (Mann) Tr. 144).  Indeed, Shearith Israel played no role in Jeshuat Israel's decisions to lend the Rimonim.  (June 1 (Bazarsky) Tr. 135).

135.    Notably, Dr. Mann testified that if Jeshuat Israel had not requested permission from CSI before loaning the Rimonim, that would be significant.  (June 10 (Mann) Tr. 140).  She also testified that she was aware that Jeshuat Israel had in fact loaned the Rimonim without approval.  (June 10 (Mann) Tr. 140-41).  And she further saw no reference in the records that Jeshuat Israel asked CSI's permission to loan the Rimonim. (June 10 (Mann) Tr. 144).

136.    *Third*, Jeshuat Israel has held itself out and been held out as owner of the Rimonim.

137.    The Yale catalogue, and thus likely also the gallery label, stated that the Rimonim's "PROVENANCE [is] with Congregation Yeshuat (now Jeshuat) Israel by about 1780 and probably earlier."  (P150 at CJI 3248).   The Yale exhibition further attributed the rimonim to "The Touro Synagogue, Congregation Jeshuat Israel, Newport, Rhode Island." (P150 at CJI 3248; *see also* P156).  That attribution should be compared to the attribution given to CSI's rimonim, which was "Congregation Shearith Israel, New York."  (P150 at CJI 3248).

138.    The catalogue also states:

> At some point, the word "NEWPORT" was engraved on one finial in cats. 63 [CSI's rimonim] and 64 [CJI's Rimonim].  The two thus engraved presumably formed a single pair that belonged to the Newport congregation but subsequently became intermixed with a pair belonging to Shearith Israel; in other words, *each congregation now **owns** one finial originally from the Newport pair and one finial originally from the New York pair*.

(P150 at CJI 3254 (emphasis added)).

139.    Thus, there can be no question that the Yale exhibition declared publicly that Jeshuat Israel owns the Rimonim.  (Sloane Dep. Tr. 153-55 (head of Christie's silver department testifying that, before Christie's was hired by Jeshuat Israel, she had read the Yale catalogue, which "gave the ownership as Touro (Jeshuat Israel)").

140.     The Yale exhibition similarly declared that Jeshuat Israel owns the Hays & Myers rimonim.  Under "provenance," the catalogue states that those rimonim were "donated to the Touro Synagogue in 1892."  (P150 at CJI 3259).  The catalogue further states that

> In 1892, . . . Caroline (Myers) Cohen offered to donate to the recently-reconsecrated Touro Synagogue two sets of silver ornaments for Torah scrolls. *In addition to this pair marked by Myers, the Touro Synagogue now owns* a pair of Torah finials of Mediterranean origin with the same engraved inscription, and it seems likely that these two pairs were those donated by Caroline Cohen.

(P150 at CJI 3260 (emphasis added)).

141.    At the MFA, the Rimonim are credited to "Touro Synagogue, Newport, Rhode Island" (D564) because that is the name by which most people know Jeshuat Israel.  (June 3 (Ross) Tr. 201-02; P206).  On the loan agreement between Jeshuat Israel and the MFA, Jeshuat Israel clearly represented that its owns the Rimonim.  (P206; P208).

142.    Ownership of the Rimonim likewise was attributed to Jeshuat Israel at the other exhibitions.  (P97 at CJI 1961; P101 at CJI 3720; P103 at TSF 1390; P114 at CJIB 1581; P171 at CJI 858 & P172).  In this regard, it is important to note that the evidence overwhelmingly shows that "Congregation Jeshuat Israel" and "Touro Synagogue" are considered to be synonymous and that "Touro Synagogue" often is used to mean Jeshuat Israel.  (*See below* ¶¶ 377-391).

143.    Other published sources have repeatedly attributed ownership to Jeshuat Israel. For example, in 2009 The *Forward*, a major New York Jewish weekly newspaper, published an article stating that Jeshuat Israel was making inquiries into selling some of its assets, including "two sets of rare silver rimonim . . .  that were crafted by colonial-era Jewish silversmith Myer Myers . . . ."  (P187).  In her important work on Myer Myers, "Myer Myers, Goldsmith: 1723-1795," Jeanette W. Rosenbaum attributed the Rimonim to "Touro Synagogue, Newport Rhode Island."  (P100 at 67, 99-100).  Guido Schoenberger, in his article, noted that "Touro Synagogue" had granted permission for him to use a photograph of the Rimonim, stating "Courtesy of the Touro Synagogue, Newport, Rhode Island (photograph by Museum of Fine Arts, Boston, Mass.)."  (P99 at 9).  Finally, back in 1913 E. Alfred Jones, in his seminal work,

"The Old Silver of American Churches," attributed the Rimonim to "Newport, Rhode Island, Jewish Synagogue."  (P77 at plate XCVI).

144.    These statements of ownership pervaded the public sphere.   Christie's Jeanne Sloane had read many of these sources before Jeshuat Israel approached her to facilitate a sale of the Rimonim.   She testified that the Rimonim were "well published" and "[w]ell-known." (Sloane Dep. Tr. 42).  Ms. Sloane testified that when Jeshuat Israel hired Christie's, she had "no question" that Jeshuat Israel owned the Rimonim because

> remember, it had been published many, many, many times, this pair of Rimonim as property of Touro Synagogue or the Congregation.  It's at least since the '50s it's been published as their property.  In fact, 191[3] is the first I can remember it was published as their property, so I had no reason to do any sort of question.  I had no question.

(*Id.* at 16).

145.    Ms. Sloane had read the relevant portions of the Yale exhibition catalogue raisonné, which attributed ownership to Jeshuat Israel.  (*Id.* at 153-55).  But the Yale catalogue, Ms. Sloane testified, was "just part of a history of documentation that they were owned by Touro . . . ."  (*Id.* at 159-60).  Even though Ms. Sloane did not have a bibliography in front of her, from memory she was able to identify both the books by Jones and Rosenbaum, the latter of which she identified as a "very well-known source."  (*Id.* at 190-91).  As Ms. Sloane testified, (i) "Every time [the Rimonim] had been published, there's a caption and it always gives Touro or CJI credit, photo credit, okay, and that means ownership" (*id.* at 188), (ii) "It's just standard photo credit [that] [y]ou put the owner's name there" (*id.*), and (iii) "it appears that they are owned by [Jeshuat Israel] in all the literature.  It's next to every photograph."  (*Id.* at 65-66).

146.    Ms. Sloane further testified that in her 30 years of experience, the lender of an object to an exhibition invariably is the owner of that object.  (Sloane Dep. Tr. 188-89, 191-93).

Thus, even aside from where the Yale catalogue attributes the "provenance" of the Rimonim to Jeshuat Israel, that the Rimonim were attributed to "The Touro Synagogue, Congregation Jeshuat Israel, Newport, Rhode Island" was enough to convey that Jeshuat Israel, also known as Touro Synagogue, owns the Rimonim.  (*Id.* at 191-93, 195).

147.     Notably, the Court is not aware of *any* source attributing ownership of the particular Rimonim at issue in this lawsuit to CSI.  For example, the various exhibitions and books do not say that the Rimonim were loaned by Jeshuat Israel, but actually owned by CSI in New York.

148.     *Fourth*, Jeshuat Israel has openly represented that it owns the Rimonim, not only to the public in general but to officers and members of CSI.

149.     As discussed below in paragraphs 517 through 541, in 2009 CSI's vice president Michael Katz read an article in the Jewish *Forward* reporting that Jeshuat Israel was trying to sell its Myer Myers rimonim.  Mr. Katz and Jeshuat Israel's co-president, Bea Ross, then spoke on the telephone about the 2009 *Forward* article.  In that conversation, Ms. Ross confirmed to Mr. Katz that Jeshuat Israel was considering selling Myer Myers rimonim, which is precisely what had been reported in the *Forward*.

150.     In addition, in 2008 or 2009, Jeshuat Israel approached a former and now honorary trustee of Shearith Israel, Roy Zuckerberg, who is a long-time member of CSI and someone with whom CSI has a "good relationship"  (June 8 (Katz) Tr. 33, 170; P265 (CSI webpage listing trustees and honorary trustees)), to see if he would be interested in purchasing the Rimonim from Jeshuat Israel.  Mr. Zuckerberg declined, but recommended that Jeshuat Israel contact Sotheby's and Christie's to facilitate a sale.  (Segal Dep. Tr. 22-24; P230).

151.    *Fifth*, Jeshuat Israel has cared for the Rimonim and arranged and paid for all costs concerning the Rimonin, including the costs of storage, security, and cleaning.  (June 1 (Bazarsky) Tr. 146-47).  Jeshuat Israel has had the Rimonim appraised for insurance purposes. (P133; P138; June 1 (Bazarsky) Tr. 155).  And Jeshuat Israel has arranged and paid for insurance covering the Rimonim.  (June 1 (Bazarsky) Tr. 155; June 3 (Pimental) Tr. 63; *see also, e.g.*, P117; P134; P147; P160; P165; P169; P173; P174; P175; P192; P197; P207; P219; P236; P249; P258).  This showing of responsibility is an indicia of ownership, as CSI's own expert Dr. Mann acknowledged.  (June 10 (Mann) Tr. 10).

152.    *Sixth*, in 2001, Jeshuat Israel arranged and raised the funds to pay for the Rimonim to be restored.  (June 1 (Bazarsky) Tr. 147-48, 150-52; P154, P153; D359).  Jeshuat Israel did not ask for or receive permission from Shearith Israel to restore the Rimonim.  (June 1 (Bazarsky) Tr. 148).

F.    Shearith Israel's conduct has been inconsistent with any ownership claim

153.    In stark contrast to Jeshuat Israel, which has borne all indicia of ownership, CSI has conducted itself in a manner inconsistent with any claim of ownership.

154.    *First*, CSI did not even believe that it owned the Rimonim as late as four days before issuing its cease and desist letter and, perhaps even more striking, at the very time CSI issued that letter declaring – mistakenly – that it owns the Rimonim.

155.    CSI's vice president Michael Katz nowhere informed Jeshuat Israel's co-president, Bea Ross, in their June 25, 2012 e-mail exchange, discussed in detail below at paragraphs 554 through 560, that CSI owns the Rimonim.  (P229).  Why?  Because, Mr. Katz testified, "***We weren't sure who owned them at that point***."  (June 8 (Katz) Tr. 153 (emphasis added)).

156.    CSI issued its cease and desist letter, in which it declared that CSI owns Touro Synagogue "including the personal property therein" and including the "Myer Myers rimonim," just four days later on June 29, 2012.  (P231).

157.    In that four day period between the June 25 e-mail exchange and the June 29 cease and desist letter, CSI "began looking at the documents that we had, but it was, *it was too soon to come to any conclusions as to exactly what the status was*."  (June 9 (Katz) Tr. 80 (emphasis added)).  Despite it being "too soon to come to any conclusions," CSI nevertheless issued the cease and desist letter, which brought the potential sale of the Rimonim to the MFA for $7.4 million to an immediate halt – improperly, as it turns out.  (June 5 (Ross) Tr. 54).

158.    Against this backdrop, Mr. Katz's testimony that he was "aghast," "offended," and "couldn't believe" that Jeshuat Israel had not contacted CSI earlier about the potential sale is not credible.  (June 8 (Katz) Tr. 54-55, 67; June 9 (Katz) Tr. 78).  CSI was aware as early as 2009 from both the front page article in the Jewish *Forward* and Mr. Katz's conversation with Ms. Ross that Jeshuat Israel was trying to sell Myer Myers rimonim.  Moreover, the Court does not see how CSI could be "aghast" when CSI was not even sure as late as June 2012 that it owned the Rimonim.  Finally, Mr. Katz never indicated in either his e-mail or telephone communications with Jeshuat Israel that it was in any way improper or "offensive" for Jeshuat Israel to sell the Rimonim.

159.    *Second*, until Jeshuat Israel secured a deal to sell the Rimonim for $7.4 million, CSI never claimed ownership of the Rimonim.  As noted above, Jeshuat Israel has held itself out and been held out as the owner of these specific Rimonim.  But the Court is not aware of a document from before the June 2012 cease and desist letter in which CSI proclaimed itself the owner of the Myer Myers Rimonim at Newport.  The documents from the 1890's upon which

- 48 -

CSI relies are unclear and, in any event, as CSI's experts admitted, none of those documents specifically reference the Myer Myers Rimonim.  (June 9 (Mann) Tr. 179-80; June 10 (Mann) Tr. 43; June 11 (Fisher) Tr. 194-95).  CSI also relied on an 1869 inventory, but as discussed below in paragraphs 279 through 285, that document does not contradict the clear and consistent record described above.

160.    *Third*, the Rimonim have not been physically located with Shearith Israel for well over 100 years.  Indeed, CSI witnesses admitted, as they must, that the Rimonim have not been at Shearith Israel.  (Edinger Dep. Tr. 108-09; Angel Dep. Tr. 101).

161.    *Fourth*, Shearith Israel knew that Jeshuat Israel was loaning the Rimonim to public exhibitions.  Yet CSI never objected to Jeshuat Israel not having first asked for and obtained Shearith Israel's permission.

162.    There can be little doubt that CSI had actual knowledge of the loans.  Mr. Katz testified that CSI knew that Jeshuat Israel was loaning objects that Shearith Israel believed it owned but that CSI never objected:

> Q. And to you knowledge does CJI loan Shearith Israel objects to museums?
>
> A. Yes.
>
> Q. Did Shearith Israel ever object to CJI's loaning Shearith Israel's objects to museums?
>
> A. No.
>
> Q. And in light of the fact that you believe that Shearith Israel owns them, did you ever think about not letting them loan the objects? . . .
>
> A. No.

(June 8 (Katz) Tr. 50).

163.    Mr. Katz certainly knew of Jeshuat Israel's loan to the Yale exhibition.  (June 8 (Katz) Tr. 168-69).  He went to the Yale exhibition and saw Jeshuat Israel's Rimonim right next to CSI's own pair.  (June 8 (Katz) Tr. 169-70).

164.    Others at CSI likewise knew.  CSI's long-time rabbi, Rabbi Marc Angel, was aware.  (Angel Dep. Tr. 89).  CSI's Executive Director, Alan Singer, also knew.  Before the exhibition, as part of a process to gain information about the program, Jeshuat Israel called various people, including Mr. Singer.  (June 3 (Ross) Tr. 204-05).  Ms. Ross, who made the call, knew that CSI had a pair of Myer Myers rimonim and was interested to see if CSI was lending its rimonim to the exhibition.  (June 3 (Ross) Tr. 205).  Ms. Ross asked Mr. Singer if CSI was in fact sending its rimonim.  Mr. Singer informed Ms. Ross that CSI at first was not going to loan its rimonim at all, but ultimately decided to send their pair only to Yale and not to the other locations that were part of the exhibition, namely, Los Angeles and Delaware.  (June 3 (Ross) Tr. 206).  Ms. Ross informed Mr. Singer that Jeshuat Israel was leaning toward sending "our rimonim" to all three locations.  (June 3 (Ross) Tr. 206).  At no time did Mr. Singer raise any questions about the ownership of the Rimonim.  (June 3 (Ross) Tr. 206-07).  Nor did Mr. Singer convey to Ms. Ross that Jeshuat Israel could not decide to loan the Rimonim without CSI's approval because they belong to CSI.  (June 3 (Ross) Tr. 206-07).

165.    CSI also was aware that Jeshuat Israel loaned the Rimonim to the MFA.  (Edinger Dep. Tr. 53).  Moreover, like the Yale exhibition, CSI's own rimonim were displayed right next to or within one item of Jeshuat Israel's rimonim at the MFA in 1953, the Brooklyn Museum in 1954, and the Jewish Museum in 1965.  (P97 at CJI 1961; P101 at CJI 3720; P114 at CJIB 1581).

166.    Despite knowing or being on notice of Jeshuat Israel's loans of Myer Myers rimonim, Shearith Israel never objected to Jeshuat Israel not having obtained Shearith Israel's permission to make those long-term loans to third parties.  (June 8 (Katz) Tr. 168; June 1 (Bazarsky) Tr. 136-37; June 2 (Bazarsky) Tr. 17-18).

167.    It is also worthy of emphasis that Shearith Israel has a practice of obtaining a board vote before loaning objects that CSI owns because (i) CSI believes it owns the items, (ii) CSI regards the items as valuable, and (iii) CSI wants to make sure that its interests are protected.  (June 8 (Katz) Tr. 165-67).  For example, in the case of the Yale exhibition, Shearith Israel's Board voted to loan its Myer Myers rimonim to Yale but not to allow those rimonim to continue on to Los Angeles and Delaware.  (P151; June 8 (Katz) Tr. 167).

168.    Yet significantly, Shearith Israel never voted to loan, or to allowed to be loaned, Jeshuat Israel's Myer Myers rimonim to the Yale exhibition, or to the continuation of that exhibition in Los Angeles and Delaware, where Jeshuat Israel sent its rimonim.  (June 8 (Katz) Tr. 167-69).  In fact, there is no evidence that Shearith Israel voted to allow *any* of the loans that Jeshuat Israel made of Myer Myers rimonim – not to the MFA in 1954, the Brooklyn Museum in 1954, RISD in 1955, the Jewish Museum in 1965, Yale in 2001, the Library of Congress in 2004, or the MFA again in 2010.

169.    These facts are important for three reasons.  First, they underscore that CSI did not grant permission for Jeshuat Israel to loan its Myer Myers rimonim.  Second, CSI did not object to not having being asked for permission.  And third, when CSI knew or should have known that Jeshuat Israel was lending Myer Myers rimonim, CSI did not believe that it owned those rimonim.  Otherwise, pursuant to its policy CSI would have voted on whether to permit the lending of those objects.

170.    *Fifth*, separate from not objecting to the lack of permission for Jeshuat Israel's loans, CSI never objected when Jeshuat Israel was held out as the owner of the Rimonim at various public exhibitions and in published works.  (June 1 (Bazarsky) Tr. 140).

171.    Dr. Mann testified that if Jeshuat Israel announced in a public way that it owned the rimonim, then she would have expected CSI to object.  (June 10 (Mann) Tr. 141).   She further acknowledged that she was aware that Jeshuat Israel publicly proclaimed that it owns the Rimonim in "some writings."  (June 10 (Mann) Tr. 37).

172.    CSI too was aware.  Yet CSI did not object – apparently because, according to CSI's vice president, Mr. Katz, CSI did not think people would care about who owned the Rimonim.  (June 8 (Katz) Tr. 50-51).

173.    Mr. Katz testified more than once to being aware that Jeshuat Israel was held out as the owner of the Rimonim.  Mr. Katz testified that he looked at the Yale catalogue, which, as noted above is replete with statements that Jeshuat Israel owns the Rimonim.  (June 8 (Katz) Tr. 169-70).  Yet no one from CSI ever complained.  (June 1 (Bazarsky) Tr. 154-55).

174.    Separate from the catalogue, Mr. Katz testified that at the Yale exhibition, he saw that the "provenance" of the Rimonim was attributed to "Congregation Jeshuat Israel Touro Synagogue."  (June 8 (Katz) Tr. 169).  Nevertheless, CSI did not object to Jeshuat Israel being identified as the owner.  (June 8 (Katz) Tr. 169-70).

175.    Moreover, CSI did not object even when it learned that Jeshuat Israel was attempting to *sell* the Rimonim.  As noted below at paragraphs 517 through 541, in 2009 Mr. Katz, a member of CSI's Board of Trustees and its vice president, learned from an article in the Jewish *Forward* and then again in a call with Jeshuat Israel's co-president, Ms. Ross, that Jeshuat Israel was trying to sell its Myer Myers rimonim.  Yet Mr. Katz did not object or assert

that CSI owned the Rimonim – at that time or later.  Furthermore, even though Mr. Katz testified that he communicated the substance of the call to CSI's full Board of Trustees (June 8 (Katz) Tr. 141-42), CSI as an entity never objected or took any action whatsoever.

176.  Likewise significant, at around the same time as the *Forward* article, Jeshuat Israel's Andrew Segal informed CSI's honorary trustee Roy Zuckerberg that Jeshuat Israel was trying to sell the Rimonim.  Mr. Zuckerberg never objected to a sale.  On the contrary, he recommended that Jeshuat Israel contact Sotheby's and Christie's to facilitate the sale.  (Segal Dep. Tr. 22-24; P230).

177.  *Sixth*, CSI was aware that Jeshuat Israel had or was having its Myer Myers rimonim restored but did not object even though Jeshuat Israel never asked CSI for permission. (June 8 (Katz) Tr. 51; June 1 (Bazarsky) Tr. 148).  In addition, CSI's Board voted to restore its own Myer Myers rimonim (P151), but apparently never voted to allow Jeshuat Israel to restore the Myers Rimonim in that Congregation's possession.  CSI's conduct was not consistent with an ownership interest.

178.  *Seventh*, CSI minutes from 1937 show that it was informed that Jeshuat Israel was not treating the Myer Myers Rimonim with proper care.  (P83 at CSI 11121; D221A-003). Yet CSI took no action whatsoever.  (*Id*.; June 10 (Mann) Tr. 136-38).  If CSI believed that precious rimonim that it owned were being mistreated, presumably the Congregation would have done *something*.  CSI's inaction in the face of the information provided to it in 1937 is inconsistent with its present claim of ownership.

179.  *Eighth*, and finally, the Court notes that Jeshuat Israel has borne every expense with respect to the Rimonim – including the costs of storing, cleaning and insuring – while CSI has borne no costs.  (June 3 (Pimental) Tr. 63; June 1 (Bazarsky) Tr. 155-56, 160; Edinger Dep.

Tr. 96-97 (CSI Rule 30(b)(6) witness unable to identify any costs CSI covered in last 50 years concerning the Rimonim); Angel Dep. Tr. 87-88 (not aware of CSI insuring the Rimonim). CSI has paid for absolutely nothing.

180.    In addition to not paying for premiums on insurance covering the Rimonim, CSI has shown a lack of interest even in being named as an additional insured on Jeshuat Israel's insurance policies cover the Rimonim.

181.    In 1996, CSI's vice president, Alvin Deutsch, asked Jeshuat Israel's then-president, David Bazarsky, to have CSI added to Jeshuat Israel's liability policy because as "trustee of the building," meaning of Touro Synagogue, Mr. Deutsch was concerned that if someone tripped and fell in the Synagogue, CSI could be named in the lawsuit. Jeshuat Israel added CSI to its liability policy. (June 1 (Bazarsky) Tr. 157).

182.    Then in 1998, Mr. Deutsch, who had become president of CSI, asked if CSI could be named on the fire policy for Touro Synagogue. Jeshuat Israel was concerned that if there were a fire at Touro Synagoge and both Jeshuat Israel and CSI had to sign an insurance check, CSI might not want to use the money to repair the Synagogue. With an agreement in place that the money would be used to repair the Synagogue, Jeshuat Israel added CSI to the fire policy. (June 1 (Bazarsky) Tr. 158-60; P144; P145).

183.    Notably, CSI did not ask Mr. Bazarsky during his time as president of Jeshuat Israel from 1993 to 2005 to add CSI on any insurance covering the Rimonim. (June 1 (Bazarsky) Tr. 138, 158-60; June 3 (Bazarsky) Tr. 26-27).

G.    There are no documents specifically establishing that Shearith Israel owns the Rimonim

184.    As described in more detail in paragraphs 43, 44 and 251 through 271, Shearith Israel kept meticulous records dating all the way back to at least the early 1700's.  But as noted above there is no contemporaneous document from Shearith Israel specifically stating that it owns the Rimonim.  Nor is there any document from Shearith Israel stating that it was loaning the Rimonim to Jeshuat Israel.  Likewise, there is no document from Jeshuat Israel stating that Shearith Israel owns the Rimonim or stating that Jeshuat Israel was borrowing the Rimonim from Shearith Israel.

185.    Significantly, none of the legal documents in this case – including the 1894 deeds, the 1903 and 1908 leases, and the 1945 agreement – reference the Rimonim or ascribe to Shearith Israel legal ownership of the Rimonim or other personal property.

H.    The 1894 deeds

186.    There is no reference to personal property in the 1894 deeds.  Under the deeds, descendants of Rivera and Levy purported to convey the Touro Synagogue "[t]ogether with the appurtenances . . . ."  (P50; P51; P53).  This language did not include the Rimonim.

187.    "Appurtenances" was a well-defined and unambiguous term in real estate contracts.  In fact, the term was so well defined at the time that courts were not permitted to consider extrinsic evidence to determine its meaning.  *See, e.g., United States v. Harris*, 1 Sumn. 21, 26 F. Cas. 185, 191 (Cir. Ct. D. Mass. 1830) (Story, Circuit Justice) ("appurtenances" is "not open to parol evidence to explain or vary the legal sense"; an interpretation of "appurtenances" beyond its technical sense may only be given if "manifest from other parts of the [same] grant"); *McClenaghan v. McEachern*, 56 S.C. 350, 628 (1899) ("using a well-known legal term, 'appurtenant,' which must receive its usual interpretation, in the absence of any language

showing that a broader signification should be given to it, and there is no such language in the clause of the constitution which is now under consideration"); *Johnson v. Nasworthy*, 16 S.W. 758, 758-59 (Tex. Ct. App. 1890) ("The word 'appurtenances' has a meaning too well defined and understood in law, when used in deeds and contracts relating to real estate, to require or need explanation on the ground of ambiguity, and parol evidence is not admissible to vary its meaning and enlarge its well-known signification."); George Warvelle, *A Treatise on the American Law of Vendor and Purchaser of Real Property*, Vol. II, pp. 548-49, Ch. 22 § 2 (Callaghan 1890) (P297) (the term "appurtenances" has "sometimes been construed in such a manner as to take it out of the strict legal and technical interpretation of the term; but this has only been permitted in cases where the question was one of intent, and under special circumstances clearly manifesting the same, and where, *from the other parts of the devise*, it was evident that the phrase should receive an interpretation beyond its strict legal signification. *This enlarged sense of the word is never applied to grants by deed*.") (emphasis added).

188.    The term appurtenances referenced incorporeal rights necessary to use real property, as cases from the relevant time period well establish.  *See, e.g.*, *Humphreys v. McKissock*, 140 U.S. 304, 314 (1891) ("All that can be reasonably claimed is, that the word 'appurtenances' will carry with it easements and servitudes used and enjoyed with the lands for whose benefit they were created.  Even an easement will not pass unless it is necessary to the enjoyment of the thing granted."); *Harris v. Elliot*, 35 U.S. 25, 54 (1836) (finding "appurtenance" could not be taken out of "the strict, legal, and technical interpretation of the term," under which "a thing corporeal cannot properly be appurtenant to a thing corporeal, nor a thing incorporeal to a thing incorporeal"); *Tyson v. Ranney*, 89 Wis. 518, 564 (1895) ("[N]othing passes by implication, or as incident or appurtenant to the lands granted, except such rights,

privileges, and easements as are directly necessary to the proper enjoyment of the granted estate."); *Johnson*, 16 S.W. at 758-59 ("appurtenances" is "commonly understood in law purely incorporeal hereditaments, usually annexed to lands or to houses"); *Griffiths v. Morrison*, 106 N.Y. 165, 170 (1887) ("By the word 'appurtenances' incorporeal easements or rights or privileges will alone pass and of these only such as are necessary to the proper enjoyment of the estate granted.").

189.    Treatises from the time period make the same point. *See, e.g.,* George Warvelle, *A Treatise on the American Law of Vendor and Purchaser of Real Property*, Vol. II, pp. 548-49, Ch. 22 § 2 (Callaghan 1890) (P297) ("Under the head of appurtenances are classed rights of way, rights of flowage, race-ways and water-powers, and generally any other incident in the nature of an easement that is requisite to a fair enjoyment of the grant, or which has been necessarily and incidentally used in connection with the subject of the grant, and which is of a different but congruous nature"; an "enlarged sense of the word is never applied to grants by deed"); George Warvelle, *A Treatise on the American Law of Vendor and Purchaser of Real Property*, Vol. I, pp. 6-7, Ch. 1 § 8 (Callaghan 1890) (P296) (the word "appurtenance" is "designed only to pass incorporeal easements or rights and privileges, and of these only such as are directly necessary to the proper enjoyment of the granted estate"); J. Kendrick Kinney, *A Law Dictionary* (Callaghan 1893) (P301) (defining "Appurtenant" as "Belonging to; accessory or incident to. A thing to be appurtenant to another must be of a different and congruous nature, such as an easement or servitude, or some collateral incident belonging to and for the benefit of the land. A thing corporeal cannot be appurtenant to a thing incorporeal, nor conversely; nor, strictly speaking, can land be appurtenant to land, or land to a house, though it may pass as such where that appears to be the intention."); Henry C. Black, *A Dictionary of Law* (West 1891) (P299) (defining

- 57 -

"Appurtenance" as "That which belongs to something else; an adjunct; an appendage; something annexed to another thing more worthy as principal, and which passes as incident to it, as a right of way or other easement to land; an out-house, barn, garden, or orchard, to a house or messuage.").

190.    Equally clear, as a matter of law "appurtenances" did not include personal property.  *See, e.g.*, *Johnson*, 16 S.W. at 759 (trial court erred in permitting testimony indicating "tools and implements in the blacksmith shop were embraced in the appurtenances mentioned in the deed and contract of guaranty."); *Ottumwa Woolen Mill Co. v. Hawley*, 44 Iowa 57, 60 (1876) ("Counsel for appellant claim that as the mortgage or trust deed conveyed the premises 'with the appurtenances,' something more is conveyed than the real estate. This being the usual form of conveyance of real estate, we are unable to see how personal property can be embraced therein."); *Cook v. Whiting*, 16 Ill. 480, 481-83 (1855) (hewed timbers, posts and round log held not "appurtenances" but rather "personal property, and did not, therefore, pass by the deed . . . under the description of appurtenances"; "a thing corporeal cannot properly be appurtenant to a thing corporeal, nor a thing incorporeal to a thing incorporeal . . . [s]o these materials cannot pass under the term 'appurtenances.'"); *Despatch Line of Packets v. Bellamy Man. Co.*, 12 N.H. 205, 234 (1841) ("Loose, movable machinery, not attached nor affixed, even where it is used in prosecuting any business to which the freeholder property is adapted, is not to be regarded as part of the real estate, or as an appurtenance to it.").

191.    Even were the Court to look beyond the four corners of the deeds, the extrinsic evidence shows that the word "appurtenances" was used in its standard, legal sense and did not include personal property, let alone the Rimonim.

192.    The first draft of the deeds was a pre-printed form called a "law blank."  (P274). The term "appurtenances" in the final deeds finds its origin in the pre-printed language of this form, which shows that the term was mere boilerplate for a deed of real property – not personal property – and not intended to go beyond the well-establish legal meaning it carried at the time. (*Id.* at CSI 3797 ("Together with . . . appurtenances"; "with the appurtenances")).

193.    CSI suggests that the Court should interpret the deeds in light of certain written statements signed by purported descendants of Newport Jews.  (P42).  The Court declines to do so.

194.    The signed statements are not deeds.  They are not incorporated into the deeds. They were not even attached to the deeds.   Moreover, there is no evidence to link these statements temporally to the deeds.  Of the five statements, only one is dated.  That statement is dated June 1893 – almost a full year before the deeds were executed in April 1894.  (P42 at CSI 1264).

195.    Furthermore, the meaning of these statements is not clear.  They are signed by purported descendants of "Hebrews of Newport, R.I." and provide that they "unite" with a "view of exercising a becoming control over" the synagogue building.  (P42).  This is not a transfer of property rights.

196.    Thus, there is no reason why these statements should inform the meaning of the 1894 deeds.  But even if they did, they would not be helpful to CSI.  With one exception, the statements concern "the building," "the buildings [and] cemetery," and "the buildings . . ., its ground and the cemetery." (P42 at CSI 1262, 1264-66).  These statements – with 34 signatures (June 11 (Fisher) Tr. 192-93 –  do not refer to personal property.

197.     A lone statement signed by Caroline Cohen uses the language "the building . . ., its grounds, the appurtenances of worship and the cemetery."  (P42 at CSI 1263).  However, the deeds did not use the term "appurtenances of worship."  Moreover, Ms. Cohen did not sign the deeds, and there is no evidence that Ms. Cohen was involved in the drafting of the deeds or that the drafters reviewed and/or relied on Ms. Cohen's statement.

I.     The prior litigations between the parties and their aftermath

1.     1901 litigation

198.     CSI directs the Court's attention to a secondary source purporting to recount a 1901 replevin action.  (D445-13-14).  The record does not contain any primary source material concerning this suit, such as a complaint, briefs, or even the judicial opinion.

199.     In any event, according to the secondary source, the replevin action concerned only one recently purchased Torah and did not concern any rimonim, let alone the Rimonim at issue in this lawsuit.  (D445-13-14).

2.     1902/1903 litigation

200.     CSI relies very heavily on a 1903 federal judicial opinion, which it claims decided virtually all of the issues in this case.  The Court does not find that that opinion carries any significance here.

201.     To address the opinion, the Court must start by explaining a separate proceeding that arose when Shearith Israel locked Touro Synagogue, preventing the Jews in Newport from praying in that historic place of worship.  The Jews broke in to pray, and on April 28, 1902, Shearith Israel trustees brought a forcible entry and detainer action in Rhode Island state court against individual members of Jeshuat Israel.  (P60).  The suit addressed only possession and not ownership of Touro Synagogue.  (P60; P61 ("I do not understand the question involved in this proceeding is the real title but the actual possession at the time of the forcible and riotous

entry."); P122 at CJI 3279 ("As lawyers know, the case for forcible entry and detainer is a very simple proceeding.  All the complainants have to show is that they were in lawful possession and that the defendants forcibly evicted them."); P105 at CJI 583 & CJI 586 n.11 ("The action of forcible entry and detainer was an ancient legal proceeding to decide rightful possession of premises but did not settle the legal title (ownership)."); P125 at JHA 48 ("action of Forcible Entry and Detainer" was "an ancient legal proceeding to determine rightful possession of a given premise without settling the right of legal title or ownership").

202.    The suit likewise did not concern personal property.  This point is evident from the face of the complaint.  (P60).  In any event, a forcible entry action as a matter of law could not have concerned personal property.  *See* William B. Cunningham, *A Treatise on the Law of Forcible Entry and Detainer and Related Topics* § 90 (Flood, 2d ed. 1895) (P302) ("Nor does the action lie for forcible entering upon a weir, because that is personal property.  Personal property cannot be recovered in an action of forcible entry and detainer.") (citing *Hoffman v. Reichert*, 31 Ill. App. 558 (Ill. App. Ct. 1889), *aff'd* 35 N.E. 527 (Ill. 1893)); *see also Bd. of Comm'rs of Rush Co. v. Stubbs*, 25 Kan. 322, 325 (1881) ("Replevin, and not forcible entry and detainer, is the remedy to recover personal property."); *Field v. Higgins*, 35 Me. 339, 341-42 (1853) (action for forcible entry and detainer could not be maintained to recover possession of personal property).

203.    Then on May 5, 1902 individual members of Jeshuat Israel and Jeshuat Israel as an entity brought a complaint in equity in Rhode Island state court against the Shearith Israel trustees.  (P62).  In the suit, styled *David v. Levy*, the complainants sought (i) to enjoin the forcible entry and detainer action and restrain CSI's interference with complainants' possession of Touro Synagogue, (ii) a declaration that the real property is held in trust for the use of the Jews of Newport, and (iii) an accounting of documents from the Synagogue's archives.

204.    This lawsuit did not relate to the Rimonim.  The complaint did reference, and sought an accounting of, "deeds, books, accounts, letters, papers, writings, vellums, parchments, scrolls and other embellishments" held in the Synagogue's "archives."  (P62 at CSI 180). However, the term "other embellishments" referred to documents.  The complaint also could not have been referring to the Rimonim because that pleading described the property at issue as of "no ascertainable value in money but are of great historic value."  (P62 at CSI 180).  The Rimonim are made out of silver, brass, and gilt silver, and have always had significant monetary value.

205.    On May 8, 1902, a jury found in favor of Shearith Israel in the forcible entry and detainer action.  The jury verdict made no reference to personal property.  (P63).

206.    On June 10, 1902, Shearith Israel removed the complaint in equity, *David v. Levy*, to federal district court on diversity grounds.  (P64).

207.    The next day, on June 11, 1902, the Rhode Island Supreme Court quashed the verdict in the forcible entry and detainer action because the complaint had not been properly sworn by the trustees of the Synagogue.  (P66).

208.    According to a first-hand account from John Burke, the lawyer for Jeshuat Israel in these litigations, the Rhode Island Supreme Court's decisions put the CSI trustees "back in the same position as when they started."  (P122 at CJI 3280).  As a result, Shearith Israel's counsel, William Sheffield, approached Mr. Burke and "said that his clients want to know if some settlement of this controversy could be arrived at."  (*Id.*).  The parties began settlement negotiations.  (*Id.*).

209.    Meanwhile, on January 10, 1903, Judge Arthur Brown sustained Shearith Israel's demurrer of the complaint in *David v. Levy*.  (P67).  Nothing in Judge Brown's decision

addressed personal property.  On the contrary, the decision concerned only the "land or building in question."  (P67 at CSI 317).

210.    Nothing in Judge Brown's 1903 decision in *David v. Levy* bear on the trust issues before the Court now.  (*See below ¶¶* 410-414).

211.    After Judge Brown issued his decision, Mr. Burke recounts that "[e]fforts to see if a compromise could be arrived at were *continued* . . . ."  (P122 at CJI 3281 (emphasis added)). The parties' "continued" settlement discussions, which had started before Judge Brown's decision, led to a settlement agreement that called for a lease.

### 3.    1903 settlement agreement

212.    The settlement agreement between Jeshuat Israel and "L. Napoleon Levy and others Trustees" is dated January 30, 1903.  (P68).  Under the settlement agreement, "[t]he pending litigation between the parties shall be discontinued without costs to either as against the other."  (P68).  The agreement resolved "all matters in difference" between the parties.  (P68; *see also* P69).

213.    The settlement agreement called for the surrender of "said premises" and for a "lease thereof."  (P68).  To understand the meaning of these words and thus the scope of the contemplated lease, reference must be made to the first paragraph of the settlement agreement, which defines the scope of the agreement settling "all matters in difference" between the parties. Under the agreement, Jeshuat Israel agreed to "admit and recognize without qualification the title and ownership of L. Napoleon Levy and other Trustees to the synagogue *building, premises and fixtures*."  (P68 (emphasis added)).

214.    The Rimonim obviously are not the "building" or the "premises."  As for "fixtures," that term likewise did not refer to or include the Rimonim.  Under Rhode Island law, "fixtures" must have been physically affixed or attached to real property.  *See Canning v. Owen*,

48 A. 1033, 1034 (R.I. 1901) ("fixture" must be attached to real property); *see also McCrillis v. Cole*, 55 A. 196, 198 (R.I. 1903) (holding it "settled in this state by *Canning v. Owen* . . . that whatever is attached to the realty with a view to enhance the value thereof, and for the purpose of being permanently used in connection therewith, is a fixture; and the fact that it can be removed without physical injury to the freehold does not change its character.").[9]

215.    Treatises from the period repeatedly acknowledge this general rule.  *See* James M. Kerr, *A Treatise on the Law of Real Property*, Vol. I, pp. 112-13 & nn. 3 & 4 (Banks & Bros., 1895) (P303) (noting that jurisdictions in which actual or physical annexation were not required were in the minority; "for as a general rule there must be some degree of actual annexation or fixation"); Ransom H. Tyler, *A Treatise on the Law of Fixtures* 58-73, 110-28 (William Gould & Son 1877) (P294) (noting that physical annexation, no matter how slight, generally was required and constructive annexation was limited to specific exceptions); Marshall D. Ewell, *A Treatise on the Law of Fixtures* 1-50 (Callaghan & Company 1876) (P293) (noting that the general and majority rule required some physical annexation); *see also* Harrison A. Bronson, *A Treatise on the Law of Fixtures* § 18 (Keefe-Davidson 1904) (P306) (acknowledging that the requirement of physical annexation was the general rule).

216.    The Rimonim are finials that sit loosely upon the Torah, which itself is not attached to the ark or the building.  The Rimonim therefore were never annexed to the Touro Synagogue building or other realty.

---

[9] The law before *Canning* was that a personal chattel became a fixture only if it was "so affixed to the freehold as to be incapable of severance from it without physical injury to the freehold." *Newport Illuminating Co. v. Tax Assessors of Newport*, 36 A. 426, 429 (R.I. 1896).  The change made in *Canning* was that personalty that was physically attached to real property could be a fixture even if removing it would not cause physical injury to the land or building.

4.        1903 Jeshuat Israel resolution

217.      To effectuate the settlement agreement, Jeshuat Israel passed a resolution on February 2, 1903 authorizing a lease with the trustees of the synagogue and the surrender of "the Synagogue building, premises and paraphernalia belonging thereto at Newport . . . ." (P69).  The resolution mirrors the language in the settlement agreement, except that "paraphernalia belonging thereto" replaced "fixtures."

218.      Based on this juxtaposition, the Court concludes that the phrase "paraphernalia belonging thereto" in the resolution had the same meaning as "fixtures" in the settlement agreement.

219.      The settlement agreement resolved and was intended to cover all disputes between the parties.   The resolution states that "All matters in difference between this Congregation and L. Napoleon Levy and others, Trustees, owners of the Synagogue building at Newport, have been amicably settled and adjusted by Messrs. Engel, Josephson and Frant, a Committee authorized to confer with the said Trustees."  (P69).

220.      More to the point, the resolution effectuated the settlement agreement by authorizing Jeshuat Israel to enter into a lease and surrender the property in dispute.   The settlement agreement is limited to "fixtures," which did not include the Rimonim.  The resolution therefore also did not include the Rimonim, as it would not make sense for the resolution effectuating the settlement agreement to be *broader* than the settlement agreement itself.

221.      This interpretation is bolstered by several pieces of evidence.

222.      First, the resolution states "paraphernalia belonging thereto" and not simply "paraphernalia."   "Belonging thereto" refers to the "Synagogue building" and "premises" and thus suggests a connection between the "paraphernalia" and the real property, as in a fixture that is attached to realty for permanent use.

223.    Second, Dr. Mann is an expert in the field of Jewish ornaments and Jewish art. She has written about Jewish ornaments and rimonim, and was retained as CSI's expert on rimonim. (June 10 (Mann) Tr. 151-52). Yet as Dr. Mann acknowledged, she has never referred to rimonim as "paraphernalia." (June 10 (Mann) Tr. 152-53). Nor has she ever referred to rimonim as "fixtures." (June 10 (Mann) Tr. 153). This testimony is consistent with that of CSI's own ritual director, Zachary Edinger, who testified that he does not recall any instance in which rimonim were referred to as "paraphernalia." (Edinger Dep. Tr. 159).

224.    Third and finally, just eight years after the events of 1903, the Rhode Island Supreme Court used the term "paraphernalia" to refer to "fixtures." *Chabot v. Paulhus*, 79 A. 1103, 1104 (R.I. 1911) ("As to the furniture, fixtures, and other paraphernalia of the saloon").

### 5.    1903 lease

225.    To effectuate the settlement agreement, Jeshuat Israel and certain CSI individuals, "as Trustees" of the synagogue, entered into a five-year lease of Touro Synagogue for the nominal "rent" of $1 per year. (P71). The CSI trustees and Jeshuat Israel signed the lease on February 10 and February 18, 1903, respectively. (P71; D150A-4). The parties executed an identical lease for an additional five year term in 1908. (P76).

226.    The 1903 and 1908 nominal $1 leases do not reference "rimonim" or even "personal property." They reference "appurtenances" and "paraphernalia belonging thereto," but as noted above those terms did not refer to or include the Rimonim.

227.    The term "appurtenances" in the leases did not include rimonim for the same reasons that the term as used in the 1894 deeds and other real estate contracts of that time did not include rimonim. *See, e.g.*, *Newport Illuminating Co. v. Tax Assessors of Newport*, 36 A. 426, 429 (R.I. 1896) ("appurtenances" is "employed in leases for the purpose of including any easement or servitudes used or enjoyed with the demised premises"); *Scheidt v. Belz*, 4 Ill. App.

431, 437-38 (Ill. App. 1879) ("appurtenances" in lease and deed did not include "personal property," which is "disconnected with the demised premises"); *Riddle v. Littlefield*, 53 N.H. 503, 508-09 (1873) ("The word 'appurtenances' has a technical signification, and, when strictly considered, is employed in leases for the purpose of including any easements or servitudes used or enjoyed with the demised premises."); John G. Hawley & Malcolm McGregor, *A Treatise on Real Property* 192 (Sprague 2d ed. 1903) (P304) ("Appurtenances mean a right which passes as an incident of the grant of something else as the principal subject of the grant.  In deeds and leases it is restricted to rights and privileges incident to real property, as, for instance, a right of way."); William B. Cunningham, *A Treatise on the Law of Forcible Entry and Detainer and Related Topics* § 42 (Flood, 2d ed. 1895) (P302) ("Appurtenances in a lease include only such things as belong to the realty and do not include personal property.").

228.    As with the 1894 deeds, the Court will not look beyond the four corners of the lease to determine the meaning of the term "appurtenances."  But even were the Court to do so, it would reach the same conclusion: that "appurtenances" in the leases did not refer to or include the Rimonim.

229.    As with the 1894 deeds, the term "appurtenances" in the 1903 lease also finds its origin in the pre-printed language of a "law blank" or pre-printed form.  (P58).  After a blank for the description of the property to be leased, the form that was used by CSI to draft the lease includes the pre-printed words "with the appurtenances, for the term of _____ from the _____ day of _____ . . . ."  (P58 at CSI 4534).  The executed 1903 lease, after describing the property, states: "With the appurtenances for the term of five years from the first day of February . . . ."  (P71).  This shows that the term "appurtenances" was mere boilerplate for a lease of real

property – not personal property – and not intended to impart a broader reading than this well-established and standard legal term carried at the time.

230.    In addition, a letter written by the principal drafter and signer of the lease, CSI's president L. Napoleon Levy, less than a month after executing the lease, uses "appurtenances" in a manner that did not include personal property, let alone rimonim.  In the letter, dated March 2, 1903, Mr. Levy wrote to the Newport City Council to ask that no repairs to the synagogue building be done without CSI's approval and to express CSI's "desire that neither the Synagogue nor the annex be in any way altered, or the coloring or appurtenances changed."  (P75).  Personal property, and certainly rimonim, generally may not be "changed" the way the coloring of synagogue building can be by applying a fresh coat of paint.

231.    Finally, since CSI representatives drafted the lease (P58), to the extent there is any ambiguity in the lease it should be construed against CSI, the drafter.

232.    In addition to "appurtenances," the leases also reference "paraphernalia belonging thereto."  This language mirrors the language in Jeshuat Israel's February 2, 1903 resolution.  As discussed, the Court finds that the phrase in the resolution likely meant "fixtures." The phrase in the lease had the same meaning.  After all, the lease, like Jeshuat Israel's resolution, was merely effectuating the terms of the January 20, 1903 settlement agreement, which concerned "fixtures."  And once again, any ambiguity in this term would be construed against CSI.

233.    With respect to all these terms, the best extrinsic evidence of their meaning is likely the construction placed upon the terms by the parties themselves in performing under the agreements.  As demonstrated at paragraphs 120 through 183 above, for at least 100 years Jeshuat Israel has borne all the indicia of ownership with respect to the Rimonim – and CSI has

borne none.  Jeshuat Israel has also publicly held itself out as owner of the Rimonim; CSI has never so claimed publicly until this lawsuit.

6.    <u>The telegrams</u>

234.    Finally, even if the lease covered some personal property, the evidence does not permit the Court to find that the lease covered rimonim or the particular Rimonim at issue in this lawsuit.  The Court reaches this conclusion based in large measure on two telegrams, likely dated in or around the time of the 1903 lease, which add a significant degree of uncertainty to the events taking place at the beginning of 1903.

235.    The first telegram, likely dated February 11, 1903, is from one "Steinberg" of CSI to CSI's rabbi, H.P. Mendes, who was in Newport at that time.  The telegram states: "One sephar and Bells is now at Newport.  our property."  (P72).  Use of the word "one" along with "is" shows that CSI understood that it owned only one pair of rimonim at Newport.  But by 1895, Jeshuat Israel had at least four pairs of rimonim.  (P124 at CJIB 4111).  Considering that one pair of rimonim was in fact later returned to CSI (P124 at CJIB 4111; D447-161; P77), this telegram suggests that CSI recognized that it did not own the *other* rimonim then located in Newport.

236.    The second telegram, likely dated February 18, 1903 – the date on which Jeshuat Israel signed the lease – is from CSI's president L. Napoleon Levy to CSI's rabbi H.P. Mendes, who was still in Newport.  The telegram states "Dont insist matter   sefer and bells leave to your discretion."  (P73).  This telegram seems to indicate that there was some dispute concerning rimonim at the time.  Yet as with so many events that happened long ago, we do not know the outcome of this dispute or how it may have related to the lease being signed that day.

237.    In short, the telegrams – studiously avoided by CSI's experts in their direct testimony – are evidence that notwithstanding the settlement, surrender of the building, and the lease, CSI recognized that it did not own the Rimonim at issue in this case.  At minimum, in light

of the uncertainty created by the telegrams, as set forth in the Court's Conclusions of Law CSI cannot overcome the presumption of ownership in favor of Jeshuat Israel arising from its long-standing possession and control of the Rimonim.

J.    The 1945 agreement

238.    Finally, the 1945 tri-partite agreement among the United States, Shearith Israel, and Jeshuat Israel, discussed in more detail at paragraphs 353 through 364, likewise does not support CSI's claim to the Rimonim.  The agreement provides that CSI holds "the title to the Touro Synagogue, Newport, Rhode Island, and its appurtenances" in trust.  (P90, Art. IV(b)).  As explained above, "appurtenances" does not include the Rimonim.  Moreover, the agreement identifies certain "personal properties" separately from the real property and "appurtenances," which show that the parties knew how to reference personal property when they wanted to.  The parties covenanted that the public would have access to all parts of the Synagogue "excepting such rooms or space as may be reserved for the keeping of religious vestments, vessels, monies and historical or valuable personal properties . . . ."  (*Id.*, Art. I(f)).  That they did not use the term "personal properties" in describing CSI's ownership interest is thus significant.

## VI.    Dr. Vivian Mann

At trial CSI offered two experts, Drs. Mann and Fisher, concerning issues bearing on ownership of the Rimonim.  Both possessed scant if any relevant qualifications to render the opinions they gave.  Both engaged in inappropriate biased fact-finding.  And when all the dust settled, neither helped CSI.

A.    Dr. Mann's bias and lack of qualifications

239.    Despite the overwhelming evidence, both primary and secondary, that Myer Myers made the Rimonim for the Congregation in Newport, that CYI was the original owner and possessor of the Rimonim, and that Jeshuat Israel has exercised exclusive possession and control

over the Rimonim for generations, CSI offered an art historian and expert on Judaica, Dr. Mann, to address these issues in an effort to rebut or undo the presumption created by possession. Dr. Mann's testimony did not advance CSI's case. If anything, her testimony helped Jeshuat Israel.

240. To begin with, Dr. Mann betrayed bias in CSI's favor. On top of the fees that she has collected from CSI in this matter, she had a relationship with that Congregation prior to this case. (June 10 (Mann) Tr. 25-26). She specifically testified that she "buil[t] the case for ownership by CSI." (June 10 (Mann) Tr. 26). The expert report she submitted in this matter presented only CSI's side. (June 10 (Mann) Tr. 32). As set forth in the Court's Conclusions of Law, an expert is supposed to opine in an even handed manner.

241. Second, and other than her ability to view the works themselves, Dr. Mann had no expertise that was relevant to this case. Dr. Mann read and relied heavily on CSI colonial and historical minutes and ledgers and other documents. Yet she acknowledged that she (i) is not an expert on American Jewish history, (ii) has never taught courses in American Jewish history, (iii) is not qualified to teach courses in American Jewish history, (iv) has never written articles about American Jewish history, and (v) has never written any articles on the Newport Jewish community or on Myer Myers. (June 10 (Mann) Tr. 27-29). She also acknowledged that she has no expertise reading colonial ledgers or reading accounting ledgers from any time. Nor, as she acknowledged, is she an expert at reading board minutes. (June 10 (Mann) Tr. 29-30).

242. Finally, with respect to her qualifications, Dr. Mann claimed to know the difference between a debit and a credit – an elemental concept that does not require expertise. But she did not even know on which side of the ledger debits or credits appear. She said, quite strikingly, that a credit could appear "on either page." (June 10 (Mann) Tr. 30-31).

243.    Third, and as noted in the Court's Conclusions of Law, the exercise that Dr. Mann undertook was a fundamentally flawed one.  As Dr. Mann acknowledged, she read documents that were generated by the parties and reported on what people said and did and drew factual conclusions.  In other words, as she acknowledged, she in effect weighed the evidence.  (June 10 (Mann) Tr. 32-33).  However, as noted in the Court's Conclusions of Law, that is an inappropriate exercise for an expert – even an historical expert.  The Court is able to review the documentary evidence and, with the aid of argument from counsel for the parties, draw conclusions.  The exercise engaged in by Dr. Mann is therefore largely unhelpful to the Court, which is the trier of fact in this case.

244.    Fourth, Dr. Mann recognized that "[m]issing evidence will lead to a partial conclusion."  (June 10 (Mann) Tr. 33-34).  And as she also agreed, "We really don't know what happened here given that these events occurred 250 years ago.  We only have what's recorded in documents" and "the objects" themselves.  (June 10 (Mann) Tr. 34).  On that score, the CYI records have been lost over time (June 10 (Mann) Tr. 33), and other relevant documents have most likely been lost over the last 250 years.

245.    Fifth, Dr. Mann's analysis was artificially constrained because she in effect ceased reviewing records after the nineteenth century.  As she testified, "I have not read the records from the twentieth century at CSI.  I read the 18th and 19th centuries."  (June 10 (Mann) Tr. 34-35).  At the same time, she agreed that if Jeshuat Israel exercised ownership and control in the twentieth century over the rimonim, that would be relevant to her opinion.  (June 10 (Mann) Tr. 36).  She also testified, in response to the Court's questions, that she equates responsibility for the Rimonim with ownership.  (June 10 (Mann) Tr. 10, 35-36).  However, when asked whether she looked at any documents from Jeshuat Israel as to whether that Congregation

maintained and was responsible for the Rimonim in the twentieth century, she said that she read only CSI documents.  (June 10 (Mann) Tr. 36-37).  As set forth above, Jeshuat Israel has borne all the indicia of ownership with respect to the Rimonim, certainly for the past 100 plus years.

246.     Sixth, there is also the matter of Dr. Mann's actions with respect to a critical document.  As described at paragraphs 81 and 82, Dr. Mann had in her possession a CSI document concerning the transfer of CYI silver to CSI around 1833.  As set forth above, CSI's minutes from that year indicate that the Sepharim (Torahs) were transferred to CSI for safekeeping only, and CSI acknowledged that the Torahs "belong[ed] to the New Port Synagogue."  (P38).  But while that key document concerning transfer of the silver was in her possession, the document disappeared.  (June 10 (Mann) Tr. 122).  Dr. Mann acknowledged that the disappearance of the document while in her possession "I admit was unfortunate."  (June 10 (Mann) Tr. 123-24).  It is an understatement that these events cast a long shadow on Dr. Mann's work.

247.     Seventh, other than the possible exception of the inspection of the works, Dr. Mann applied no recognized methodology.  She cited no authority other than Dr. Barquist for her methodology – and she used Dr. Barquist for only one aspect of her work, to provide the price of chased silver in one of her flawed formulas.  (June 10 (Mann) Tr. 76-77).  In his catalogue for the Yale exhibition, Dr. Barquist provides no methodology used by Dr. Mann to form her opinions in this case.  (*See* P150).

248.     There is also the misleading presentation by Dr. Mann in her report, submitted to this Court (Dkt. 55-4), concerning the critical 1833 CSI minutes.  The following chart showing in bold the language Dr. Mann omitted from her report speaks for itself:

| 1833 Minutes – Mann Report | 1833 Minutes – Actual (P38; D26A) |
|---|---|
| "The Committee appointed to receive the Sepharim . . . report that they have received the same and deposited them in our Hachal [holy ark] and had given a receipt to the family of the late Moses Seixas of which the following is a duplicate." | "The Committee appointed to receive the Sepharim **belonging to the New Port Synagogue** report that they have received the same and deposited them in our Hachal [Holy Ark] and had given a receipt to the family of the late Moses Seixas of which the following is a duplicate" |

| 1833 Receipt – Mann Report | 1833 Receipt Actual (P38; D26A) |
|---|---|
| "Received from the family of the late Mr. Moses Seixas of New Port Rhode Island, Four Sepharim belonging to the Congregation of that place, and which are now to be deposited in the Synagogue in New York of the Congregation Shearith Israel under the charge of the Trustees of said Congregation to be redelivered when duly required." | "Received from the family of the late Moses Seixas of New Port Rhode Island, Four Sepharim belonging to the Congregation of that place and which are now to be deposited in the Synagogue in New York of the Congregation Shearith Israel under the charge of the Trustees of said Congregation to be redelivered when duly required, **for the use of the Congregation hereafter worshipping in the Synagogue at New Port Rhode Island** casualties excepted." |

249.    These deletions are especially troubling because when Dr. Mann prepared a chronology in connection with her review of the relevant documents prior to issuing her report, she included the full quote from the receipt.  (P270).  She then deliberately deleted the bolded language above – because, she said, "I didn't consider the end of it important."  (June 10 (Mann) Tr. 118-21).

250.    Last, but not least, there are issues concerning Dr. Mann's demeanor and credibility.  She contradicted her deposition testimony more than a dozen times at trial. (6/20/2015 (Mann) Tr. 34-35, 39-40, 42-43, 45, 50-51, 60, 62-63, 71-72, 119-20, 129-32, 140-41, 143-44, 148-49, 151).  She refused or would not answer questions that she did not like.  (*See, e.g.*, June 10 (Mann) Tr. 76 ("I won't answer"), 121 ("I don't answer that question"), 140 ("I

don't want to answer that"), 152 ("I won't answer").  An expert is supposed to testify fairly, not posture in this fashion or in any fashion.[10]

      B.     Dr. Mann's theory concerning CSI ledgers from 1764 and 1765

251.    Against the evidence and CSI's own admissions, Dr. Mann offered CSI ledgers from 1764 and 1765 as proof that CSI purchased and was the original owner and possessor of the Rimonim.  Dr. Mann is demonstrably wrong, and her belief in her opinions despite their obvious flaws exposes the degree of her bias in this case.

252.    Dr. Mann described "two types of payments" to Myer Myers reflected in the CSI ledgers.  (June 9 (Mann) Tr. 134-35).  As she put it, "one was in remuneration for the goods or the services that he paid for, like he paid somebody wages for carpentry, he was reimbursed. . . ."  She then described a second type of payment, which was "made to the presidents" of CSI.  Each "parnas, each president was required to cover whatever outstanding pledges there were under his presidency; so if people made a pledge that they didn't pay and the presidency ended, that president had to lay out the money."  She went on to note that "in the next presidency, the next year, these people would pay up and he would be reimbursed.  So that is another type of payment."  (*Id.*).

253.    A pattern similar to the one identified by Dr. Mann is indeed reflected in the CSI ledgers.  Each year when there was more cash paid out than received, the parnas would make up the difference between the debit side and the credit side of the ledger.  That advance or loan to the congregation would be recorded on the credit side as the "balance" due to the parnas.  The following year, the congregation would pay back to the parnas the amount that he had advanced.

---

[10] As an aside, Dr. Mann testified that the provenance of the Hays & Myers rimonim in the possession of Jeshuat Israel is "clear-cut."  (June 9 (Mann) Tr. 109; June 10 (Mann) Tr. 144).  In fact, there are substantial scholars, including David Barquist and the late rabbi of CSI, who have written that these rimonim were donated to Jeshuat Israel by Caroline Cohen in 1892.  (June 10 (Mann) Tr. 145-46; P41; P150 at CJI 3260; P92 at CSI 424).

The accounting also worked in reverse when there was a surplus because CSI received more cash than it paid out.  In that case, a notation was made on the debit side of the ledger that the parnas was holding the surplus.  The next year, that surplus was paid to next parnas, who applied it to CSI's accounts.  (*See e.g.*, P78 at CJI 3371-74 (pp. 31-35), CJI 3376-79 (pp. 38-41), CJI 3380-81 (pp. 54-55), CJI 3382-83 (pp. 57-58); P10 through P13; P102 at CJI 3193 (listing CSI's parnassim).[11]

254.    According to Dr. Mann, there is an entry in the 1765 CSI ledger, "Cash paid Myer Myers Ball. of his accot. paid" for "£36.4.1" (P24), that does not fall into either of the two categories she referenced and therefore, in her words, is "anomalous."  (June 9 (Mann) Tr. 132; June 10 (Mann) Tr. 160).  She opined that the £36.4.1 payment is "not explicable on any other basis" except as a payment for the Rimonim at issue here.  (June 10 (Mann) Tr. 87).

255.    For several reasons, the Court does not credit Dr. Mann's opinion, which the Court finds speculative and incorrect.

256.    To begin with, there is a specific entry on the CSI ledgers reflecting a payment for CSI's own rimonim, dated 1774.  (P29; June 10 (Mann) Tr. 91-92).  Thus, CSI officials when preparing the ledgers obviously knew how to reference a payment to Myer Myers for rimonim when they wanted to.  The 1765 ledger entry cited by Dr. Mann does not reference rimonim. (P24; June 10 (Mann) Tr. 87-88).  The absence of any reference to rimonim in the ledgers alone contradicts Dr. Mann's opinion.

257.    Second, and related, Dr. Mann acknowledged that when Myer Myers was reimbursed for specific items, the ledgers indicated for what he was being reimbursed.  But the

---

[11] Originals of the documents transcribed in P78 are found at P1 through P9.  See also P14 through 17, P24 through P29, and  P272, which are CSI ledgers, but for which CSI did not produce ledgers for the preceding or following year.

entry in question does not particularize the nature of the reimbursement.  (D15; June 9 (Mann) Tr. 143 (noting "a whole list of expenses that Myer Myers paid")).  By contrast, when Myer Myers made a plate for CSI, the ledger identifies "plate," the specific purpose for the payment. (June 10 (Mann) Tr. 88-90; P26).

258.    Third, and most important, the entry in question is consistent with the type of entry for reimbursement of the parnas that Dr. Mann described in her testimony and that the record shows occurred time and time again at CSI in the 18th century.  In fact, it appears very clear to the Court that the £36.4.1 entry was to repay Myers for covering the shortfall from the prior year.

259.    Simple logic – and a review of the 1764-1765 ledgers and accompanying CSI Board minutes – compel this conclusion.

260.    In the CSI 1764 ledger on the "debit" side, there are entries for all kinds of expenses paid by CSI, but no entry reflecting a payment to Myer Myers for Rimonim.  (P23; June 10 (Mann) Tr. 104).  That could not have been an oversight, because (i) Myer Myers was the CSI parnas in 1764 (June 10 (Mann) Tr. 105; P102 at CJI 3193), (ii) Myer Myers himself signed the 1764 ledger (P23; June 10 (Mann) Tr. 104), and (iii) the other payments to Myer Myers for a plate in 1759 and rimonim in 1774, were all listed on the debit side.  (P16; P29).

261.    Although in her report she wrote that the 1764 CSI ledger lists a "debit" of £36.4.1, there is an entry only on the "Cred" side for Myer Myers in 1764 – "Balance due to Myer Myers" for "£36.4.1."  (P23; June 10 (Mann) Tr. 104).  As Dr. Mann conceded, that figure represents the *exact difference* between the cash CSI paid out, reflected on the debit (left) side of the ledger in 1764 – £246.2.2 – and the cash CSI received during the same period, reflected on the credit (right) side of the ledger – £209.18.1.  The logic is inescapable that Myer Myers,

fulfilling his role as parnas, made up the difference between the debit side and credit side that year by advancing £36.4.1 to CSI.  Indeed, on the credit side of the ledger, the entry for Myer Myers of £36.4.1 is *added* to the other credits on the page totaling £209.18.1, for a total on the credit side of £246.2.2, thus balancing CSI's books for the year.

262.    To illustrate the point, it helpful to look at the original documents.  The following is an image of the left or debit side of the ledger for 1764 (Hebrew year 5524), showing CSI paid out £246.2.2 in cash during the period:



(P23 (red rectangles added)).

263.    The following is an image of the right or credit side of the ledger for the same year, 1764 (Hebrew year 5524), showing that CSI received £209.18.1 in cash during the period, and CSI's parnas Myer Myers covering the difference between the cash in, £209.18.1, and the cash out, £246.2.2, which was £36.4.1:



(P23 (red rectangles added)).[12]

264.    Sure enough, the following year, 1765, the first entry in CSI's ledger states "Cash paid Myer Myers Ball. of his accot. paid" for £36.4.1 – on the debt side of the ledger. (P24).   The payment is in the precise location and used virtually the same language as the payment in the 1764 ledger reimbursing the prior parnas, Jacob Franks.   (June 10 (Mann) Tr. 106-08; P102 at CJI 3193; P23).   In other words, the advance by Myer Myers in 1764 and repayment to Myer Myers in 1765 of the exact same amount fits the pattern of payments to the parnas described by Dr. Mann herself and consistently reflected in the CSI ledgers.

---

[12] The Court takes judicial notice of the fact that there are 20 shillings in a pound, and 12 pence in a shilling.

265.    Here is an image of the left or debit side of the ledger for 1765 (Hebrew year 5525) showing CSI repaid its parnas, Myer Myers, the £36.4.1 he advanced the congregation in the prior year:



(P24 (red rectangles added)).

266.    Notably, the right side of the ledger for 1765 (Hebrew year 5525) shows a continuation of the pattern.  Since, CSI's cash in of £215.19.6 was less than its cash out of £237.18.6, Sampson Simson, who followed Myers as parnas of CSI (P102 at CJI 3193) had to cover the difference of £21.19.  Simson's advance was recorded in the credit side as "Ballance due to Sampson Simson."



(P24 (red rectangles added)).

267.    Finally, CSI's minutes state:

> 5525 Tisri 25th [October 21, 1764]  At a meeting of the assistants with the Parnassim the following articles were agreed to, and resolved—

> 1st    That Mr. Myer Myers may be paid the Ballance of his Sedakah accot:                                  £ 36. 4. 1

> Also for Ballance due to him, on the new House                                         1. 14. 4

> Together Thirty Seven pounds Eighteen Shillings & five pence                  £ 37. 18. 5

(P78 at CJI 3391).

268.    These minutes show CSI authorizing the repayment of the £36.4.1 amount, which payment was reflected on the debit side of the ledger in 1765.  (P24).  The Court arrives at this determination not only from the timing of the minutes and the exact amount being referenced, £36.4.1, but also because Dr. Mann testified that "Sedakah" relates to a *synagogue*'s "disbursements and income."  (June 10 (Mann) Tr. 169-70; D480-004).  Moreover, as Dr. Mann ultimately acknowledged, "Sedakah" is the Hebrew word for charity and does not mean "bells" or "rimonim."  (June 10 (Mann) Tr. 95-96).[13]

269.    Notably, Jeannette Rosenbaum, acknowledged by Dr. Mann to be a foremost scholar on Myer Myers (June 10 (Mann) Tr. 67-67, 98-99), concluded that this entry was a "resolution to pay Mr. Myer Myers £36.4.1, which he advanced cong. for charity."  (P267; June 10 (Mann) Tr. 98).  Also noteworthy is the entry in the CSI minutes directly below that resolution, which records the authorization of a payment to Myer Myers for "Ballances due to him, on the new House."  That payment also appears in the 1765 ledger.  (P24).  In light of this specificity, the absence in the 1764-1765 minutes and ledger of any reference to a payment to Myer Myers for rimonim speaks volumes.

270.    Based on this evidence, it could not be any clearer that Jeannette Rosenbaum, an acclaimed Myer Myers scholar, is correct and Dr. Mann, an expert retained by CSI for litigation, is wrong.  The payment of £36.4.1 to Myer Myers was a reimbursement for his 1764 advance to the Congregation to make up the deficit for that year.

271.    Dr. Mann tried to explain away this pattern by asserting that when CSI meant to record a repayment to its parnas, the minutes noted a payment to "late parnas."  (June 10 (Mann)

---

[13] For some unknown reason, at trial Dr. Mann insisted on referring to the 1765 minutes as a transcription of a ledger.  Exhibit P78 at page 88 (CJI 3391) clearly transcribes CSI minutes, not a ledger.

Tr. 102-03).   But there are several entries in the CSI ledgers recording repayment to a parnas who had plugged the hole between debits and credits that referenced only the name of the parnas without using the "late parnas" formulation.   For example, the repayment to Jacob Franks, the parnas who preceded Myer Myers, noted on the debt side "Cash paid Mr. Jacob Franks his Ballances" -- again, in the exact location as next year's repayment to Myer Myers.   (June 10 (Mann) Tr. 93-94, 100-03; P23; *see also* P78 at CJI 3372-75).[14]

C.   Dr. Mann's "formulas" purportedly connecting the ledger entries to the price of rimonim

272.   Given that the £36.4.1 amount noted in CSI's 1764 and 1765 ledgers clearly was money Myer Myers advanced and then was repaid, the Court enters bizarre territory when addressing Dr. Mann's "formulas," which she claimed establish that CSI's payment of £36.4.1 to Myers was for rimonim.   The unreliable and biased methodologies employed by Dr. Mann in straining to link the £36.4.1 amount to rimonim, in addition to her obvious misreading of the ledgers, seriously calls into question the entirety of her testimony.

273.   At trial, Dr. Mann presented two different formulas, neither of which were contained in her original report.   The first formula that Dr. Mann used relied on the price of unworked silver in 1739 – some 25 years before the earliest date Dr. Mann opined the Rimonim could have been made.   (June 10 (Mann) Tr. 77-79).   As amply demonstrated at trial and as she acknowledged, Dr. Mann is not an expert on the price of silver in colonial times.   (*Id.* at 80).

274.   Dr. Mann overlooked that the price of silver in the colonies skyrocketed from 1740 to the mid-1760's, by 400 or 500 percent (June 10 (Mann) Tr. 80-81; P135), perhaps in part

---

[14] In light of this evidence, it is perhaps not surprising that  Dr. Mann ultimately recanted a large portion of her opinion, agreeing in response to questions by CSI's counsel on re-direct examination that "[i]n [my] professional opinion," no one knows "where the rimonim were after they were made and before 1869."  (June 10 (Mann) Tr. 159; *see also id*. at 160 (agreeing that "you don't know…who possessed them at any given point in time after they were made and before 1869").

on account of the French and Indian War, waged from about 1754 to 1763. (June 10 (Mann) Tr. 81-82). Dr. Mann herself acknowledged the point. (June 10 (Mann) Tr. 81-82). As a result, her first formula is completely worthless. Moreover, the fact that she chose a silver price far removed from when she thinks the Rimonim were made suggests that she backed into the analysis, starting from the £36.4.1 amount that she wanted to show was for the Rimonim.

275. For the second formula, Dr. Mann claimed that she used in her calculation the weight of the Rimonim contained in the catalogue for the Yale exhibition written by Dr. Barquist. It is striking that Dr. Mann relied on Dr. Barquist for some matters when doing so advanced CSI's interests, but rejected Dr. Barquist when convenient for CSI – for example Dr. Barquist's conclusion concerning the provenance of the Rimonim and the transfer of the silver to CSI in 1833. (June 10 (Mann) Tr. 77). Dr. Mann used in her calculation a weight of 40.8 ounces for the Rimonim, purportedly contained in the Barquist catalogue – although she never pointed out to the Court how she arrived at that figure. (June 10 (Mann) Tr. 84-85).

276. Beyond that, the weight that Dr. Mann used was contradicted by the CSI 1869 inventory upon which CSI and Dr. Mann so heavily rely, and which Dr. Mann said was accurate and without error. (June 10 (Mann) Tr. 44). The weight for the Rimonim set out in the inventory is 45 ounces, not the 40.8 ounces that Dr. Mann used. (June 10 (Mann) Tr. 84-85; D34-0036).

277. The weight of the Rimonim in the inventory was measured 150 years before the Barquist catalogue, and much closer to the date when Myer Myers crafted the Rimonim. (June 10 (Mann) Tr. 85-86). Significantly, Dr. Mann said that items fell off the Rimonim between 1869 and today (June 10 (Mann) Tr. 86), and thus the Rimonim could well have weighed 45 ounces in 1869 and 40 ounces by the date of the Barquist catalogue – even assuming the

catalogue listed a weight of 40 ounces for the Rimonim.  And as Dr. Mann acknowledged, what is relevant here is the weight and price of rimonim when Myer Myers made them back in 1764 or 1765, not the price using a weight measured 250 years later, after items had fallen off.  (June 10 (Mann) Tr. 86-87).

278.    Using the 45 ounces rather than 40.8 ounces, Dr. Mann's formula does not yield a figure of £36.4.1.

D.    Dr. Mann's theory concerning the 1869 CSI inventory

279.    Dr. Mann relied substantially on an 1869 inventory prepared by Reverend Lyons of CSI.  (D34)  The inventory does not advance CSI's case.  On the contrary, the Court interprets the inventory to be consistent with the notion that CSI held the Rimonim in safekeeping only during the 19th century.

280.    The inventory does not purport to list only items owned by CSI.  Rather, the inventory states on the cover page, "all property effects belonging to *or in keeping of*" Shearith Israel.  (D34-001 (emphasis added)).  As Dr. Mann acknowledged, "in keeping of" is not ownership – it is safekeeping (June 10 (Mann) Tr. 126), a legal concept different from ownership.

281.    Second, and related, the inventory does not state that CSI owned the Rimonim.  Dr. Mann fastened mistakenly on three ditto marks next to the reference in the inventory to the rimonim marked "Myers Newport."  (D34-036).  The three ditto marks in question are directly under "keeping of shamash," language of bailment or safekeeping, not ownership.  There is no indication in the inventory that the ditto marks were meant to apply as well to any language other than "keeping of shamash."  (*Id.*).

282.    In fact, it would be illogical for those three ditto marks to mean anything other than "keeping of shamash."  That is because the last three lines of the inventory list pairs of

rimonim that on the left side state that they are owned by individuals.  (*e.g.*, "property of L.I. Cohen").  But the three ditto marks are next to those rimonim too.  (D34-036; June 10 (Mann) Tr. 127-28).



(D34-036 (red rectangles added)).  Against this backdrop, the three ditto marks could not possibly mean ownership by CSI, and rather at most mean "in keeping of Shamash" – the only words directly above the ditto marks.

283.    If anything, therefore, the 1869 inventory shows that the Rimonim were "in the keeping of" CSI, which is consistent with CSI holding the Rimonim in "safekeeping."

284.    Third, there is no evidence that when Reverend Lyons of CSI prepared the inventory (June 10 (Mann) Tr. 126), he had looked at the 1833 minutes concerning the terms of CSI's bailment with respect to the Torahs and presumably the silver.  Nor is there any evidence that anyone from the Newport side reviewed the inventory back then.  (*Id.*).  Dr. Mann also

testified that she has no knowledge that Reverend Lyons conducted any investigation of the provenance of the Rimonim. (*Id.* at 127). Thus, even if the inventory had stated that CSI owned the Rimonim, that would not and could not establish ownership. There is no evidence that Reverend Lyons knew the facts.

285.    Finally, Dr. Mann acknowledged that there were mistakes in the inventory. For example, there is no dispute that four Newport Torahs were given to CSI for safekeeping. *See* paragraph 70 above. Yet only one of those Torahs is identified in the inventory, as Dr. Mann recognized. (June 10 (Mann) Tr. 129). For that reason too, the inventory is not probative.

E.    Dr. Mann's theory that Jeshuat Israel's Rimonim are not a true pair

286.    Dr. Mann gave the opinion that the Rimonim returned to Newport were not a true pair. It is hard to see why that issue is relevant. If the Rimonim in Newport are not a true pair, then that means that CSI currently holds one rimon belonging to Newport. If the rimonim in Newport are a true pair, then there is likewise no issue at all. Under no circumstances could the outcome in this case be that CSI owns three rimonim and Jeshuat Israel owns only one. As set forth above, the Newport congregation started out with two rimon forming a pair of rimonim; that Congregation could not lose its interest in any of the rimonim merely because some un-named individual at CSI may have mixed up the pairs at some point when the rimonim were in the "safekeeping" of CSI.

287.    In addition, Dr. Mann testified that whoever sent the Rimonim "back to Newport, was obviously blind to the [a]esthetic of the fact that there were two different pairs." (June 9 (Mann) Tr. 144). If all four rimon are identical, then it is irrelevant that pairs have been mixed up.

288.    Dr. Mann's speculation as to why an unknown individual sent "back" to Newport one rimon from CSI's pair and one from the Newport pair is just that, speculation. No

one could possibly know what that long deceased person thought. Mixing up the sets could easily have been just a mistake. Indeed, both pairs of rimonim look extremely similar. (P100 at 67; P150 at CJI 3249-50; P277; P278).

289.    In any event, Dr. Mann does not appear to be correct. That the bases or lower shaft section on CSI's pair do not match is clear. (D553; D555). The same is true for Jeshuat Israel's pair. (P278). Dr. Mann opined that this and purported decorative differences on the pierced section of the rimonim show that Jeshuat Israel's Rimonim consisted of one rimon from CSI's pair and one from the Newport pair. The Court nevertheless finds that only the base from one rimon in Jeshuat Israel's pair was switched with one base from CSI's pair.

290.    First, Dr. Mann admitted that the rimonim are actually several pieces. (June 9 (Mann) Tr. 168). According to Dr. Mann, these pieces are soldered together and can be taken apart. (*Id.*). Other evidence shows that the rimonim can be taken apart. (P319; June 5 (Ross) Tr. 8, 59). Thus, switching a base is possible.

291.    Second, CSI's pair has scroll decorations framing the pierced bands that do not appear on Jeshuat Israel's Rimonim. The following photographs of CSI's rimonim – both the rimon with the base marked "Newport" (D559; D561) and the one not so marked (D556; D557) – show scroll decorations on the band below the pierced section.



(D556).



(D557).



(D559).



(D561).

292.     By contrast, the following photograph of Jeshuat Israel's Rimonim from the Yale

exhibition catalogue show no such scroll decorations on the band below the pierced section.  In

fact, the band is smooth, showing only a reflection of the bottom part of the Rimonim.







(P278 (cropped photograph and enlargements).

293.    The same lack of decoration can be seen in the photograph that CSI took of the Rimonim on display at the MFA.



(D562).

294.    Third, another distinguishing feature appears on the lower compressed sphere. On CSI's rimonim, there are bands of punched beading on the outside of the looping design.



(P277).

295.    No such beading appears on Jeshuat Israel's Rimonim.



(P278).

296.    Based on these and other differences, it is not surprising that both the MFA and Christie's concluded that only the base of one rimon was switched and that Jeshuat Israel's Rimonim are otherwise a true pair.  (P213 at CJI 1041; Sloane Dep. Tr. 55-59).  For example, when Ubaldo Vitali restored both CSI's and Jeshuat Israel's pairs of rimonim in 2001, he made plaster casts of all four rimon.  As part of her due diligence, the head of Christie's silver department, Jeanne Sloane, went to Mr. Vitali's workshop in New Jersey sometime between 2009 and 2011, and examined the molds.  Based on this comparison, Ms. Sloane concluded that just the lower shafts or bases had been switched.  She testified that she "compared the plaster molds, and could see precisely that" only the bases had been switched; "it's very obvious when you have them all in front of you."  (Sloane Dep. Tr. 55-59).

297.    Dr. Mann did not have the opportunity to examine all four rimon from both CSI's and Jeshuat Israel's pairs.  Instead, she based her conclusions on a comparison of one rimon to the other in only CSI's pair.  The differences between the two rimon in CSI's own pair described by Dr. Mann could easily be attributed to wear and variations due to the fact that these objects were hand-crafted.  (D556 through D561).

F.    Conclusion with respect to Dr. Mann's opinions

298.    Dr. Mann testified that it is not inappropriate as a historian to ignore contrary evidence or to look at only part of the record.  (June 10 (Mann) Tr. 203).  As set forth above, that is exactly what she did here.

VII.    **Dr. Linford Fisher**

A.    Dr. Fisher's bias

299.    CSI also offered Dr. Linford Fisher as an expert to provide commentary concerning some of the documents and events at issue.  For the reasons set forth below and in the Court's Conclusions of Law, the Court declines to credit any aspect of Dr. Fisher's testimony.

300.    To begin with, Dr. Fisher was biased.  He wrote a 65-page report, a declaration, an addendum, and a rebuttal report.  In those materials and in his three plus hours of direct testimony, he made numerous judgments concerning the facts.  (June 11 (Fisher) Tr. 155-56).  But as far as the Court could tell, every judgment he made with respect to the facts favored the party paying his substantial fees even in the teeth of contrary evidence.

301.    In addition, Dr. Fisher "trusted" CSI counsel to give him the relevant documents.  (*Id.* at 158-59).  That was not a fair or appropriate approach.  For example, he testified that he would have expected counsel to give him all the relevant documents concerning the pivotal events of the first two months of 1903.  (*Id.* at 202).  Yet counsel did not show him critical documents supporting Jeshuat Israel's case, including the 1903 telegrams concerning rimonim.  (*Id.*).

302.    Equally telling, in providing his commentary and purporting to retell the chronology, Dr. Fisher repeatedly skipped relevant documents that were helpful to Jeshuat Israel.  As noted above, he was not shown by counsel and did not include in his testimony any material concerning the 1903 telegrams.  (*Id.* at 202-03).  As described below, he ignored CSI's 1894

petition to the Rhode Island Generaly Assembly objecting to the incorporation of Jeshuat Israel on essentially the same grounds that CSI and Dr. Fisher have asserted here as reasons why Jeshuat Israel has no connection to CYI.  (*Id.* at 182-84).  And only after repeated prodding by the Court did Dr. Fisher acknowledge that the State legislature rejected the petition and permitted Jeshuat Israel to incorporate with the name of the Colonial congregation.  (*Id.* at 185-86).

303.    And like Dr. Mann, Dr. Fisher halted his analysis at 1903 (June 11 (Fisher) Tr. 191), ignoring all the evidence since that time showing that Jeshuat Israel has borne all indicia of ownership with respect to the Rimonim.

304.    As another reflection of his bias, Dr. Fisher in his report ferreted out the lone statement by a purported heir of Colonial-era Newport Jews referencing a desire that CSI "exercise becoming control over the building erected by our ancestors, its grounds, the appurtenances of worship and the cemetery."  (June 11 (Fisher) Tr. 192-93).  But in his report he ignored the formulation used by the vast majority of heirs – 34 – who signed a more limited declaration, that they "welcome control over the buildings erected by ancestors," without reference to "appurtenances of worship."  (DD30; June 11 (Fisher) Tr. 192-93; P42).

305.    On the issue of the supposed lack of connection between CYI and Jeshuat Israel, Dr. Fisher betrayed partisanship in other ways as well.  He brushed off the plaque placed by the Department of Interior by the Touro Synagogue building, essentially claiming that the plaque was hidden.  (June 11 (Fisher) Tr. 149-50).  Not only is that testimony demonstrably incorrect (P320), but Dr. Fisher ignored that CSI approved the language on the plaque and that CSI's president and rabbi attended its dedication at Touro Synagogue.  (D44; P104 at CJI 3205, CJI 3207).  Thus, CSI cannot possibly claim ignorance of its contents, which have been publicly

placed by the synagogue for nearly 70 years.  (June 11 (Fisher) Tr. 180-82; P104 at CJI 3205-CJI 3208).

306.    As yet another reflection of his biased approach, he selectively quoted sources, using material in the sources helpful to CSI while ignoring the material in those same sources that hurt CSI's case.  Dr. Fisher relied on a publication by Morris Gutstein in his direct testimony (June 11 (Fisher) Tr. 41-42; D448), but he ignored the portions of the Gutstein source that confirmed Jeshuat Israel's successorship to CYI.  For example, Gutstein wrote that "in the controversy [in late 1890s and early 1900s], the Congregation Shearith Israel inevitably supported the Congregation Jeshuat Israel which was the legal successor of the old Congregation."  (D448-315; June 11 (Fisher) Tr. 175).

307.    Dr. Fisher also cited an article by Bernard Kusinitz in his direct examination. (P125).  Yet he ignored the portion of the Kusinitz source stating that the litigations in the late 1890s and early 1900s "settled once and for all the principle of which Newporters would be the legal successors to the old Congregation Yeshuat Israel" (June 11 (Fisher) Tr. 177; P125 at JHA 72), and that Shearith Israel "support[ed] Congregation Jeshuat Israel, the legal successor to the original congregation Yeshuat Israel."  (P125 at JHA 48; June 11 (Fisher) Tr. 177).

308.    Dr. Fisher also ignored the address by CSI's Rabbi Angel, placed in the Congressional Record in October 2004 (P167) and commemorating the 350th anniversary of the founding of CSI.  Rabbi Angel there declared that "We welcome representatives of our sister congregations that date back to the Colonial Period:  from the Touro Synagogue in Newport. . . ."  (P167 at 2; June 11 (Fisher) Tr. 180).

309.    There were also issues concerning Dr. Fisher's demeanor.  He repeatedly declined to answer questions when inconvenient for him to do so.  (*E.g.*, June 11 (Fisher) Tr.

159-60, 215).  Like Dr. Mann, in his report he left out key language from a source through misleading use of ellipses.  (*Id.* at 224-28).  He waffled in response to the Court's questions.  (*Id.* at 121-26).  He could not answer simple questions such as whether rimonim are personal property, real property, or movables (*id.* at 159-60), in sharp contrast to CSI's Rule 30(b)(6) witness who testified to the obvious – rimonim are not real property nor part of the building. (Edinger Dep. Tr. 71).

310.    Dr. Fisher was also willing to rely on secondary sources to establish points in favor of CSI, but when secondary source material supported Jeshuat Israel's position but primary source material was not available, he hid behind the absence of such primary source material. For example, he claimed based on secondary sources that the Rimonim must have been in the Touro Synagogue building at the time the 1903 litigation was settled, even though there was no primary source document so indicating the Rimonim were there.  (*E.g.*, June 11 (Fisher) Tr. 235-37).  But Dr. Fisher refused to acknowledge that the Rimonim were given to CSI in 1833, and only for safekeeping, because there was purportedly no primary source document establishing the transfer (*id.* at 173) – even though there is ample secondary source material, including a memorandum by CSI's Rule 30(b)(6) witness that the Rimonim were transferred to CSI for safekeeping at that time, and respected scholars like David Barquist have interpreted the primary source material as evidencing a transfer of the silver and for safekeeping only.  (P150 at CJI 3254; D26; P234 at 5; *see also* Edinger Dep. Tr. 92-93 (acknowledging that rimonim were brought to New York for safekeeping sometime in the 1820's or 1830's)).

311.    Of course, Jeshuat Israel could hardly be faulted for not offering a primary source document specifically reciting the transfer of silver, since CSI's expert Dr. Mann lost that document.

312.    As set forth in the Court's Conclusions of Law and as was the case with Dr. Mann, this approach is inappropriate.  An expert is supposed to be fair and even handed, not partisan.

B.    Dr. Fisher's lack of qualifications

313.    As was the case with Dr. Mann, Dr. Fisher possesses scant relevant qualifications for the opinions he gave.

314.    Dr. Fisher brought little relevant expertise to this case.  He is a Professor of American religious history, but does not specialize in American Jewish History.  (June 11 (Fisher) Tr. 11).  In fact, he had scant if any experience in that field.  He has not (i) published any papers, articles or essays solely on American Jewish history, (ii) given any lectures solely on American Jewish history, (iii) taught any courses solely on American Jewish history, or (iv) taken any courses in American Jewish history.  (June 11 (Fisher) Tr. 139-45).  He claimed that he "cover[s] the history of American Judaism in my survey [] classes" (*id.* at 13), but he admitted that only one session out of thirteen in his survey class addresses American Jewish history.  (*Id.* at 141).

315.    Nor does Dr. Fisher have any relevant training.  The only courses that Dr. Fisher has ever taken on Jewish history concerned pre-second Temple Judaism.  Dr. Fisher's only training in American Jewish history was in connection with his field exams ten years ago.  (*Id.* at 141-45).  He testified at his deposition that to the extent he knows anything about American Jewish history, it is only as part of the wider scope of American religious history.  (*Id.* at 144-45).

316.    Likewise, Dr. Fisher has never written any articles about Jewish ornaments or finials, nor taught any courses on Jewish ornaments.  He purported to interpret Jeshuat Israel's by-laws and opine on corporate governance issues, but he admitted that he is not an expert on

corporate governance, nonprofits or organizational bylaws.  (*Id.* at 147-48).  He had never read any synagogue bylaws prior to this case.  (*Id.* at 147-48).  He ignored or was not familiar with the record in this case establishing that CSI knew about but never objected to revisions to Jeshuat Israel's by-laws limiting CSI's right to participate in Jeshuat Israel's governance.  (*Id.* at 223-24).

317.    Dr. Fisher likewise has no expertise with respect to Myer Myers.  He has not written even an article about the subject.  (June 11 (Fisher) Tr. 162-63).  What was especially telling about Dr. Fisher on this score is that despite his lack of qualifications, he could not bring himself to say whether Dr. Barquist and Jeannette Rosenbaum, both of whom wrote books on Myer Myers and are acclaimed experts, were more knowledgeable than he with respect to Myer Myers.  (*Id.* at 162-63).  In similar fashion, though Dr. Mann is an art historian specializing in Judaica, when confronted with her testimony concerning the use of Rimonim that contradicted his testimony and supported Jeshuat Israel's position, Dr. Fisher denied that Dr. Mann is more knowledgeable than he concerning Rimonim.  (*Id.* at 212-13).

318.    And like Dr. Mann, Dr. Fisher engaged in inappropriate fact-finding.  As he acknowledged, he weighed the evidence and made credibility determinations.  He drew factual conclusions based on his reading of the documents.  (*See, e.g.*, *id.* at 56-57, 84-85, 112-13).  He testified as to what the parties believed, discussed, or understood -- purporting to read the minds of long dead historical actors.  (*See., e.g.*, *id.* at 64-65 ("So [the] understanding in [Caroline Cohen's] mind is that this was something that was temporary to be used"); *id.* at 81 ("this is an ongoing conversation about this…."); *id.* at 108 ("the parties seem to clearly understand….")).  Repeatedly during his testimony, he opined as to who said what to whom.  (*Id.* at 56-57, 69, 81, 108, 153-54).  As best as the Court could determine, Dr. Fisher just read the record and argued

CSI's case – which was not helpful.  As set forth in the Court's Conclusion of Law, Dr. Fisher's testimony was not a fair or appropriate exercise.

C.    Dr. Fisher's opinions that Jeshuat Israel is not connected to CYI

319.    For all the reasons set out above in paragraphs 87 through 119, the Court does not credit Dr. Fisher opinion that Jeshuat Israel is not the continuation or successor to CYI.  The evidence recited above is overwhelming.

320.    Dr. Fisher's response again betrays his selective review of the record.   In asserting that CSI displayed benevolence to Jeshuat Israel in the late 1800's and, further, that there was no connection between CYI and Jeshuat Israel, Dr. Fisher glossed over the 1894 petition that CSI filed with the Rhode Island General Assembly seeking to block the incorporation of a purportedly new congregation under the name "Yeshuat Israel."  (P47).  Dr. Fisher was ultimately forced to concede, in response to the Court's questioning at trial, that over CSI's objection the General Assembly ultimately granted CJI permission to incorporate.  (P284; June 11 (Fisher) Tr. 184-86).

321.    The petition, which Dr. Fisher tried to skip over, is pivotal in many ways.  To begin with, the petition does not claim that CSI owns the personal property, nor does the petition assert that CSI owns the synagogue building outright.  Rather, the petition states that CSI (i) had been made "custodians of the sacred Scrolls of the Law," (ii) was "recognized as having a supervisory interest over the Synagogue properties at Newport," and (iii) was the "lawful custodian[ ] of the ancient Synagogue edifice."  (P47 & P48 (emphasis added)).

322.    Second, and as Dr. Fisher admitted, CSI in its petition objected to the incorporation of the Newport congregation under the name "Yeshuat Israel" on many of the same grounds raised by CSI here.  (June 11 (Fisher) Tr. 104).  As noted above in paragraphs 110 through 117, CSI made many of the arguments Dr. Fisher makes now.  (P47).  Yet the Rhode

Island General Assembly rejected these arguments and permitted the Congregation to incorporate under the name Congregation Jeshuat Israel (P284) -- a name which Dr. Fisher acknowledged means the same thing as Congregation Yeshuat Israel. (June 11 (Fisher) Tr. 169-70, 184-85).

> D.    Dr. Fisher's word analysis

323.    Dr. Fisher purported to perform a kind of word association analysis, apparently in an effort to establish that the parties to the 1903 lease meant to reference the Myer Myers Rimonim when they there used the terms "appurtenances" and "paraphernalia belonging thereto." Similarly, Dr. Fisher opined, also through a word association exercise, that "fixture" referenced in the parties' settlement meant to cover rimonim. He also suggested that several other words had the same meaning. For several reasons, the Court rejects Dr. Fisher's opinion.

324.    Dr. Fisher had no relevant qualifications to perform this analysis. As noted above, he has no expertise in American Jewish history. As for the specific exercise he undertook, Dr. Fisher does not have a degree in linguistics. (June 11 (Fisher) Tr. 139-43).

325.    Dr. Fisher's word analysis was bottomed to a significant extent on his conclusion that rimonim are "necessary to conduct services for a congregation." (June 11 (Fisher) Tr. 26, 73-74; *see also* P269). But as Dr. Mann testified, a synagogue does not require rimonim to conduct a service or to function properly. (June 10 (Mann) Tr. 164; *see also id.* at 78). When confronted with Dr. Mann's testimony, Dr. Fisher simply brushed it off, denying she knew more about rimonim than he did. (June 11 (Fisher) Tr. 212-13).

326.    Moreover, prior to this case Dr. Fisher had never undertaken any analysis of this type with respect to the terms "appurtenances" or "paraphernalia." (June 11 (Fisher) Tr. 215-16). Nor did he cite any recognized methodology for his approach.

327.    Finally, Dr. Fisher testified that he brought to bear all his expertise that he could marshal, and claimed that he performed a diligent and thorough job.  "I draw upon everything that was in my training and what was available to me."  (June 11 (Fisher) Tr. 217).  In addition, he specifically hunted for references to rimonim as "paraphernalia" or "appurtenances."  (June 11 (Fisher) Tr. 217-18).  Yet he could not recall a single source in which Rimonim were called paraphernalia alone – the specific term used in the lease.  (June 11 (Fisher) Tr. 218-19).  And he cited only one source – from England, published in 1989 – that supposedly used the word "appurtenance" alone to mean rimonim.  (June 11 (Fisher) Tr. 219).  And reflecting his bias, he did little if anything to verify that lone source; he merely "skim[med] the book . . . ."  (June 11 (Fisher) Tr. 220-21).

328.    Instead, Dr. Fisher made reference to a smattering of sources – for example, a book about Moroccan synagogues in the 17th century, a book about synagogues in England, and a New York Times article from the 1950's (June 11 (Fisher) Tr. 117-21) – which used "paraphernalia" or "appurtenances" together with other terms.  As the Court noted at trial in questioning him, Dr. Fisher was "taking leaps that I am not hearing the underlying basis for."  (June 11 (Fisher) Tr. 121).  His vague references to the "global Jewish community" (June 11 (Fisher) Tr. 120-21) – about which he has no expertise – were too speculative to support his analysis.  And none of the broader terms he cited were found in the lease or the settlement.  (June 11 (Fisher) Tr. 209-10).

329.    Beyond that, as set forth at paragraphs 187 to 192, 214 to 215, 220 to 224, and 227 to 233 above, Dr. Fisher's analysis cannot be squared with the definitions of the terms in question as well as other relevant evidence.  And as noted above, those far more knowledgeable than Dr. Fisher – Dr. Mann and CSI's Rule 30(b)(6) witness Mr. Edinger – testified that

"paraphernalia" is not a term applied to rimonim or the Torah. Why Dr. Fisher did not follow up, for example with Dr. Mann (June 11 (Fisher) Tr. 223), is a mystery. And Dr. Fisher himself called the term paraphernalia a "comprehensive legalese," but he has no relevant legal experience (June 11 (Fisher) Tr. 150-51), and is not an expert on leases. (June 11 (Fisher) Tr. 207).

330. As for the term "appurtenances" on which CSI and Dr. Fisher so heavily rely, as noted in paragraph 229, that phrase apparently found its way into the lease from a form book on leases; "appurtenances" is a word contained in the pre-printed form. (P58). Thus, the term could not possibly have meant to refer specifically to Torahs or rimonim. (June 11 (Fisher) Tr. 207-10).

331. At bottom, Dr. Fisher would not answer whether rimonim were fixtures, appurtenances or paraphernalia. (June 11 (Fisher) Tr. 196-97). According to Dr. Fisher, "[i]t depends on the context." (*Id.*). That does not describe any recognized methodology of which the Court is aware. The Court declines to credit Dr. Fisher's mere say so.

## VIII.  Touro Synagogue

332.    Touro Synagogue in Newport, Rhode Island is not only the oldest synagogue building in the United States, it is the nation's cradle of religious liberty and one of the crown jewels of the State of Rhode Island.  The importance of Touro Synagogue is epitomized by the exchange between Moses Seixas and George Washington before Washington came to speak at the Synagogue in 1790.  Washington famously declared the United States would extend equal citizenship to members of all religions and give "bigotry no sanction."  (P33).

333.    Every year, Jeshuat Israel and the Touro Synagogue Foundation host at Touro Synagogue a reading of Moses Seixas's letter to George Washington and Washington's response to the Newport congregation.  (June 1 (Bazarsky) Tr. 109-10; June 2 (Bazarsky) Tr. 9-10; June 5 (Ross) Tr. 17-18; P317).  Recent keynote speakers have included United States Supreme Court Justices Ruth Bader Ginsburg and Elena Kagan.  (June 1 (Bazarsky) Tr. 111; P309; P317; P318).  The ceremony is open to the public.  (June 1 (Bazarsky) Tr. 111).

334.    Without question, Touro Synagogue stands as an enduring symbol of religious freedom and tolerance in the United States.  Tens of thousands of visitors flock to Touro Synagogue every year not only to tour the space but to pray in its modest but hallowed confines.  (June 1 (Bazarsky) Tr. 180).  However, the Court does not lose sight of the fact that the Synagogue is home to a local congregation.  That Touro Synagogue, after all these years, is still a place of worship for an active Newport congregation is as much a testament to enduring freedom as anything.  Based on a thorough review of the evidence submitted at trial, the Court concludes that Touro Synagogue is held in trust for the benefit of that congregation, Jeshuat Israel.[15]

---

[15] As set forth above, the Court finds Jeshuat Israel owns the Rimonim.  But if CSI owns the Rimonim at all, CSI owns them only as part of the trust holding Touro Synagogue for the benefit of Jeshuat Israel.

A.   Touro Synagogue is owned in trust for the benefit of the "Jewish Society of Newport"

335.   On June 14, 1759, Jacob Rodrigues Rivera, Moses Levy, and Isaac Hart purchased the land upon which CYI would build the synagogue.  (P19).

336.   At the time, religious institutions could not incorporate and could not purchase or hold real estate.  (P81 at 82).  Rivera, Levy, and Hart therefore were chosen to purchase and hold the real property as trustees.  (P81 at 82-83).

337.   This point is demonstrated by a July 13, 1759 receipt from Naphtali Hart, president of the Newport congregation, given to Myer Myers, then president of Shearith Israel, for Shearith Israel's donation toward building the Newport synagogue.  In the receipt, Hart refers to Rivera, Levy, and Isaac Hart as "trustees for building the Synagogue."  (P20; P80 at 181).

338.   When Rivera died, he left a will dated 1787, in which he declared the trust and its terms:

> Also I do hereby declare and make known unto all proper persons that I have no exclusive right or title, of, in, or to the Jewish Public Synagogue in Newport on account of the Deed thereof being made to myself, Moses Levy & Isaac Harte, ***which the same was done, meant and intended in Trust only, to and for the sole Use, Benefit and Behoof of the Jewish Society of Newport, to be for them reserved as a Place of Public Worship forever***.  Therefore I do for myself and my Heirs hereby remise, release and forever quit claim to all exclusive right, Title or Interest therein or thereto and to every part and Parcel thereof, Always saving and excepting such right as I have by being a single member of that Society.

(P31 (emphasis added)).  Rivera did not describe a new trust, but a pre-existing trust and one that bound the three initial trustees: Rivera, Levy, and Hart.

339.   During the 60-year period in the 19th century when there were no Jews in Newport, CSI acted in a manner consistent with its status as trustee of Touro Synagogue.  (*See* D19-002).  Yet CSI had no legal document establishing its trustee relationship.

340.    In 1893 and 1894, around the time that the congregation in Newport was seeking to incorporate, CSI engaged in an effort to determine what rights "if any" it had in Touro Synagogue and to "clarify" and "secure" those rights.  (D61A; P45 at CSI 5321; P233 at CJI 388, CJI 391).

341.    As part of that effort, CSI sought out descendants of both Rivera and Levy and in 1894 arranged for their execution of deeds that purported to convey Touro Synagogue – for one dollar – to individual members of Shearith Israel's Board of Trustees.  (P50; P51; P53).  N. Taylor Phillips, who was the Clerk of CSI in 1894 and who was an original party to and signer of the 1894 deeds, wrote that the "signatories of the Deed to the Congregation Shearith Israel were not only from some of the heirs of former members of the Old Congregation, but were from the heirs of Jacob Rodriguez Reviera and Moses Levy. . . ."  (P88 at CSI 1456).  That CSI specifically obtained deeds from the heirs of Rivera shows that CSI believed that Rivera's Will was operative.  However, it should be noted that there is no evidence in the record that CSI obtained deeds to Touro Synagogue from *all* then-living heirs of Rivera and Levy.

342.    The 1894 deeds purported to convey the property "IN TRUST," which, as noted, is how Rivera and Levy owned the property in the 18th century.  (P50 at CSI 4506; P51 at CSI 4545; P53 at CSI 84).  Of course, the descendants of Rivera and Levy could not convey a greater interest than possessed by Rivera and Levy.

343.    The record is replete with instances during this period in which CSI refers to itself – internally, to Jeshuat Israel, and to the Rhode Island government – as owning Touro Synagogue in trust and as trustees.  Below, the Court reviews that evidence.

344.    CSI's internal minutes from the very start repeatedly made a point of noting that the deeds were "in trust."  In April 2, 1894 minutes, CSI stated that its "President reported in re

Newport Synagogue etc. that the Deeds conveying the property to the Trustees of this Cong. *in Trust* were about ready for the signatures of the heirs of the original purchasers." (D75 (emphasis added)). May 4, 1894 CSI minutes state that its "President reported in re Newport Synagogue etc. that some of the Deeds conveying the property to the Trustees of this Cong. *in Trust* had been recorded . . . ." (D81 (emphasis added)). And May 31, 1894 CSI minutes referenced the synagogue "lately conveyed by the heirs of the original purchasers of the land on which it is erected *in Trust*, to the Members of this Board and their successors . . . ." (D82 (emphasis added)).

345.    Consistent with these statements, an 1894 letter from L. Napoleon Levy, CSI's president and also a lawyer, to the Rhode Island Judiciary Committee, stated, "*We hold the property in trust*, and here I quote an extract from the *deeds of the Trust under which we hold the property*." (D76-1 (emphasis added)). Mr. Levy continued by writing that "Shearith Israel of this City . . . has been from time immemorial recognized by the municipal authorities of the City of Newport as the *guardians and custodians* of the property." (D76-3 (emphasis added)). As noted at paragraph 321 above, similar language is found in an unsuccessful petition that CSI submitted to the Rhode Island General Assembly to block Jeshuat Israel's incorporation. (P47, P48).

346.    The parties' 1903 settlement agreement, and the documents effectuating that agreement – a Jeshuat Israel's resolution and a lease between the parties – acknowledged and re-affirmed the trust and the role of CSI as trustee.

347.    The January 30, 1903 settlement agreement between the parties stated that Jeshuat Israel "agrees to admit and recognize without qualification the title and ownership of L. Napoleon Levy and others *Trustees* to the synagogue building, premises and fixtures." (P68

(emphasis added)).  Mr. Levy signed the agreement as "L. Napoleon Levy *Trustee* for himself and the other owners *Trustees*."  (P68 (emphasis added)).

348.    Jeshuat Israel's February 2, 1903 resolution likewise stated that "All matters in difference between this Congregation and L. Napoleon Levy and others, *Trustees*, owners of the Synagogue building at Newport, have been amicably settled and adjusted by Messrs. Engel, Josephson and Frant, a Committee authorized to confer with the said *Trustees*."  (P69 (emphasis added)).  The resolution also resolved to surrender possession of the synagogue "to the said *Trustees*, owners of the property . . . ." (P69 (emphasis added)).

349.    In the 1903 lease itself, certain individuals affiliated with CSI leased Touro Synagogue to Jeshuat Israel "as Trustees" of the building.  (P71 at CJI 473).  Those individuals signed the lease as "Trustees."  (D150A-003).  The 1908 lease similarly was between Jeshuat Israel and CSI individuals "as Trustees."  (P76 at CSI 1).

350.    Finally, a March 1, 1903 receipt for a $1 payment received from "Congregation Yeshuat Israel" was signed by CSI's rabbi, H.P. Mendes, "on behalf of L. Napoleon Levy et al. *Trustees*."  (D156 (emphasis added)).

351.    There is no ambiguity in these documents.  CSI individuals were acting as trustees of Touro Synagogue, which they held (and hold) in trust.  A first-hand account from Jeshuat Israel's counsel, John Burke, of the negotiations of the settlement agreement and lease dispels any possible doubt.  Mr. Burke recounted that he negotiated the settlement leading to the lease with "the trustees of the Synagogue," meaning Touro Synagogue.  (P122 at CJI 3281 ("Efforts to see if a compromise could be arrived at were continued, and after some conferences back and forth it was agreed that the trustees of the Synagogue would lease the Synagogue to the Congregation Jeshuat Israel").

352.    Thereafter, CSI continued to acknowledge the trust.  For example, in minutes dated April 25, 1920, CSI referred to its Board as "the Trustees and owners of the Ancient Synagogue Property at Newport."  (D423-004; D423A-004).  CSI also continued publicly to be acknowledged as the trustee of Touro Synagogue.  For example, in his 1936 book, "The Story of the Jews of Newport," Rabbi Morris Gutstein wrote that the "trusteeship" of Touro Synagogue remained vested with CSI.  (P81 at 276-77).

353.    That brings us to the 1945 tri-partite agreement, in which Shearith Israel again re-affirmed that Shearith Israel owns Touro Synagogue in trust for benefit of the "Jewish Society in Newport."

354.    The parties to the agreement, dated November 7, 1945, were (i) the United States of America, by Oscar L. Chapman, then acting Secretary of the Interior, (ii) certain individuals who were members of "the Board of Trustees and Clerk of The Trustees of the Congregation Shearith Israel . . . *as Trustees under Deed of Trust* dated April 27, 1894 . . . hereinafter collectively referred to as the 'Shearith Israel Trustees,'" and (iii) "Congregation Jeshuat Israel in the City of Newport."  (P90 at CSI 93 (emphasis added)).

355.    The fourth "Whereas" clause of the agreement provides, "Whereas, the Shearith Israel Trustees, the holders of the fee simple title *upon certain trusts in the Touro Synagogue* . . ."  (P90 at CSI 93 (emphasis added)).

356.    In Article IV(b), the agreement provides:

> It is mutually understood and agreed . . . (b) That the *title to the Touro Synagogue*, Newport, Rhode Island, and its appurtenances, *subject to the* covenants above set forth and *recorded deeds and declarations of Trusts*, appertaining thereto, shall remain in the Shearith Israel Trustees, to be used for religious purposes *as set forth in Article I(f)* of this Agreement.

(P90 at CSI 97-98 (emphasis added)).

357.     In turn, Shearith Israel and Jeshuat Israel agreed in Article I(f) as follows:

> That the public shall be admitted to all parts of the said Touro Synagogue . . . *so far as consistent with the preservation of the Synagogue for the use, benefit and behoof of the Jewish Society in Newport as a place of public worship forever* and for the maintenance of divine services in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed in the Synagogue of said Congregation Shearith Israel, and subject to such fees as may be mutually agreed upon between the parties.

(P90 at CSI 96 (emphasis added)).

358.     Inclusion of language above tracing Rivera's Will was no accident.  When the 1945 agreement was negotiated, Jeshuat Israel revised the draft to make clear that Shearith Israel owns the Synagogue in trust for the benefit of the Jewish Society of Newport, which as discussed below is Jeshuat Israel.  Shearith Israel was aware of the significance of this change and agreed to it.

359.     On September 24, 1945, Jeshuat Israel obtained a legal opinion from a lawyer, William MacLeod, that the Shearith Israel individuals are "holders of the fee simple title upon certain trusts," the "most authentic definition" of which is contained in Rivera's Will, as "[h]e was one of the original trustees and his declaration made in 1787 [was] only 28 years after the execution of the original deed to the premises" and thus is "entitled to the weightiest consideration."  (P86 at CJI 505-06).  Mr. MacLeod also opined that the 1894 "Deed of Trust" is "not in conflict with Rivera's declaration and can well be taken as an amplification of his declaration."  (P86 at CJI 506).

360.     Mr. MacLeod found that the then-current draft of the agreement did "not wholly represent the trusts upon which, in my opinion, [Shearith Israel] holds the title . . . ."  (P86 at CJI 506).  He therefore suggested amending Article I(f) to the form to which the parties eventually

agreed so as "[t]o perpetuate both recorded declarations of Trust" – meaning both the declarations in Rivera's 1787 Will and in the 1894 deeds.  (P86 at CJI 506-07).

361.    Critically, Mr. MacLeod concluded his opinion with the following statement: "I feel that with this revision of Article I subsection (f) the ***Congregation Jeshuat Israel will not be prevented from presenting in any future Legal action the full story of the trusts originally established for the Jewish Society of Newport***."   (P86 at CJI 507 (emphasis added)).   The changes proposed by Jeshuat Israel therefore would not only perpetuate the declaration of trust in Rivera's Will but also make clear that Congregation Jeshuat Israel in particular has standing to bring legal action on the trust as the "Jewish Society of Newport."

362.    Sharing a common interest, Jeshuat Israel provided Mr. MacLeod's opinion to Shearith Israel.  On October 10, 1945, Shearith Israel's president Henry Hendricks forwarded the opinion to N. Taylor Phillips, a former clerk and president of Shearith Israel and one of the signatories of the 1894 deeds.  (P87).  Mr. Hendrick's letter stated that he enclosed "the proposed contract between the Secretary of the Interior and the two Congregations establishing the Newport Synagogue as a national shrine, with the modifications suggested by Newport.  I also thought you might be interested in the legal opinion which they secured, a copy of which I am enclosing."  (P87).

363.    Mr. Phillips responded by letter the next day.  (P88).  Although Mr. Phillips complained about one aspect of Mr. MacLeod's opinion – from whom the deeds were obtained – neither Mr. Phillips nor Shearith Israel's president, Mr. Hendricks, took issue with any other aspect of Mr. MacLeod's opinion.  In other words, CSI took no issue with the positions of the opinion including that Shearith Israel owns Touro Synagogue in trust for the benefit of the

Jewish Society of Newport, that Congregation Jeshuat Israel has standing to sue on that trust, and that with Jeshuat Israel's revision these points would be enshrined in the agreement.

364.    With Jeshuat Israel's changes made to the draft, the parties signed the agreement. Jeshuat Israel signed on November 7, 1945.  (P90 at CSI 99).  The "Shearith Israel Trustees" signed the agreement "*As trustees*, as aforesaid" on November 14, 1945.  (P90 at CSI 99, CSI 103 (emphasis added)).

365.    Additional evidence supports the conclusion that the 1945 agreement acknowledged and re-affirmed the trust.

366.    Jeshuat Israel minutes from an October 28, 1945 meeting discussing the changes to the 1945 agreement and noted that "[t]he following changes were made in the original agreement:  1. Incorporating quotation from Rivera granting place of worship forever etc. 2. substituting the word trustees for ownership as in the original agreement.  3. Changes in spelling and inclusion of facts regarding the history."  (P89 at CJIC 251).  The minutes further noted that "the revised agreement was accepted by the CSI."  (P89 at CJIC 251).

367.    CSI, for its part, explicitly acknowledged that it holds the Touro Synagogue in trust, in minutes from a meeting held the day it signed the agreement, November 14, 1945:

> The President [of CSI] reported that Congregation Jeshuat Israel (Touro Synagogue) of Newport, R.I. had signed the agreement making the Newport Synagogue Building a national shrine and that after it has been signed by the individual trustees and Clerk of this Congregation *who hold the property in trust*, the agreement would be sent to the U.S. Secretary of the Interior for his signature."

(P91 at CSI 11761).

368.    Also in 1996, CSI's vice president, Alvin Deutsch, referred to CSI as "trustee of the building" in conversation with Jeshuat Israel's then-president, David Bazarsky.  (June 1 (Bazarsky) Tr. 157, 160).  Mr. Bazarsky's testimony is uncontroverted.

369.     Finally, the United States Department of the Interior, the third party to the 1945 agreement, stated in a 1965 brochure that "[w]hen the last survivors of the Congregation Yeshuat Israel moved to New York, title to the Newport Synagogue passed into the hands of New York's Congregation Shearith Israel, *solely as Trustees*."  (P115 at CSI 593 (emphasis added)).

370.     Beyond the parties to the agreement, scholars have continuously recognized that Shearith Israel is the "trustee" of Touro Synagogue.  (P81 at 272-73, 276-77; D449-125; D449-164; P113 at CSI 2739).

B.     Jeshuat Israel is the beneficiary of the Trust

371.     The Court finds that Jeshuat Israel is, represents, and embodies the beneficiary of the trust holding Touro Synagogue.  The Court reaches this conclusion on numerous grounds.

372.     *First*, Touro Synagogue is held "in Trust" for the "Jewish Society of Newport." (P31; P90).  Jeshuat Israel fits that description, since it is the (i) Jewish, (ii) congregation, (iii) of or in Newport, that (iv) worships in Touro Synagogue.  There is no other Jewish congregation in the city of Newport.  (June 3 (Bazarsky) Tr. 43; June 1 (Bazarsky) Tr. 128).  And there is no other Jewish congregation that worships in Touro Synagogue.  (June 1 (Bazarsky) Tr. 104, 112, 115, 128; June 3 (Ross) Tr. 186-87).

373.     The Court notes that "Society" in the "Jewish Society of Newport" meant "congregation."  In "The Story of the Jews of Newport," Rabbi Gutstein noted with respect to Rivera's Will that "Rivera refers to the Congregation in the words 'Society'.  This use of the word 'Society' also occurs earlier in the Cemetery Deed, which is taken also to refer to the Congregation that existed in Newport at the time the Cemetery was purchased in 1677."  (P81 at 352 n. 11).

374.     It is also worthy of emphasis that CSI's own expert, Dr. Fisher, interpreted an 1826 document referencing "the Hebrew Society in this city" as referencing CSI, even though

there were other Jewish synagogues in New York at the time.  (D24; June 11 (Fisher) Tr. 205-06; *see also* P81 at CJI 3126).  The reference to "Hebrew Society" or "Jewish Society" seems to have been a convention referencing a congregation in a particular locale.  In this case, the trust is tied to a particular building in a particular location – Touro Synagogue, in the city of Newport, Rhode Island.

375.    *Second*, Jeshuat is not just the congregation worshipping in Touro Synagogue now.  Jeshuat Israel has been the only Jewish congregation worshipping in Touro Synagogue for at least the last 120 years.  (*See* June 9 (Katz) Tr. 50).  Even if Jeshuat Israel were not the continuation or successor of CYI, Jeshuat Israel has been the congregation worshipping in Touro Synagogue *longer* than CYI worshipped there.

376.    *Third*, the Court takes into account the deep personal connection that Jeshuat Israel has to Touro Synagogue.  Touro Synagogue is, after all, Jeshuat Israel's synagogue.  (June 1 (Bazarsky) Tr. 104).  One witness, Jeshuat Israel's assistant treasurer, Michael Pimental, described Touro Synagogue as his "Jewish identity" and his "Jewish home."  (June 3 (Pimental) Tr. 62).  Many congregants are life-long members and have parents, grand-parents, and even great-grandparents who worshipped in Touro Synagouge as members of Jeshuat Israel.  (*E.g.*, June 1 (Bazarsky) Tr. 104, 112; June 2 (Bazarsky) Tr. 12; June 3 (Bazarsky) Tr. 30-31; June 3 (Pimental) Tr. 59).  For many, the Synagogue is where they have experienced some of the most important events of their lives, including ritual circumcisions, baby namings, weddings, and the remembrance of those passed.  (June 3 (Ross) Tr. 178-79; June 3 (Pimental) Tr. 59-60).

377.    *Fourth*, the connection between Touro Synagogue and the congregation that worships there, Jeshuat Israel, is so deep that the two terms are used synonymously.  Jeshuat

Israel often is referred to as "Touro Synagogue," including by CSI. The record evidence establishing this point is overwhelming.

378.    Examples of Shearith Israel itself referencing Jeshuat Israel as "Touro Synagogue" abound. In his 2004 history of Shearith Israel, written when he was chief rabbi of CSI, Rabbi Marc Angel, wrote: "Jeshuat Israel in Newport, *better known as the Touro Synagogue*, is currently an Ashkenazic Orthodox congregation." (P162 at 57).

379.    Michael Katz, CSI's vice president and the sole CSI fact witness to testify live at trial, testified that "Touro Synagogue" is one of the "common names" for Jeshuat Israel. (June 8 (Katz) Tr. 122-23).

380.    In addition, as Mr. Katz testified, CSI's minutes frequently reference Jeshuat Israel as "Touro Synagogue" or simply "Touro." (June 8 (Katz) Tr. 100, 122-23; June 9 (Katz) Tr. 49-50; P91 (1945 minutes); P168 (2004 minutes); D507 (2005 minutes)). For example, November 16, 2004 CSI minutes state that Dr. Leonard Groopman was "liaison to the Touro Synagogue from Congregation Shearith Israel." (P168 at CSI 1030). In the same minutes, Dr. Groopman reported that he found "the Touro Synagogue" to be an "active, alive Jewish congregation." (P168 at CSI 1031). Similarly, May 17, 2005 CSI minutes state that "Touro Synagogue currently has 137 family memberships . . ." (D507; June 8 (Katz) Tr. 135).

381.    CSI refers to Jeshuat Israel as "Touro Synagogue," "Touro," or "TS" as well in communications and other documents. (P238 (2012 e-mail); D405 (2012 proposed settlement terms)).

382.    And CSI's expert, Dr. Mann, acknowledged that Jeshuat Israel is referred to as Touro Synagogue. (June 10 (Mann) Tr. at 56).

383.    As further evidence, the plaque affixed to the outside wall of Touro Synagogue states: "Touro Synagogue of Jeshuat Israel Congregation / Founded 1658".  (P261).  This statement is attributable to the United States Department of Interior, Jeshuat Israel, *and* Shearith Israel, since all three approved the language.  Shearith Israel representatives also attended the unveiling.  (D244; P104 at 148, 150; *see also* D497-001).

384.    Shearith Israel is not alone in using "Touro Synagogue" and "Congregation Jeshuat Israel" interchangeably.  Jeshuat Israel's co-president Bea Ross testified at trial that "Congregation Jeshuat Israel and Touro Synagogue are synonymous."  (June 3 (Ross) Tr. 188).  Ms. Ross explained that "usually Touro Synagogue and Congregation Jeshuat Israel are used interchangeably" and that most people know the congregation by the name "Touro Synagogue."  (June 3 (Ross) Tr. 201-02).  Thus, when Jeshuat Israel loaned the Rimonim to the MFA, the Congregation asked that the gallery label state "Touro Synagogue" because "that's what people would recognize."  (June 3 (Ross) Tr. 201-02; P206).  She also testified that when people make donations to "Touro Synagogue," Jeshuat Israel deposits those checks and the bank accepts them.  (June 3 (Ross) Tr. 202).

385.    Jeshuat Israel's letterhead states "Touro Synagogue" in big letters, under which "Congregation Jeshuat Israel" appears in much smaller font.



(P215; *see also* P226).  This is Jeshuat Israel's normal stationery, including for correspondence to CSI.  (June 1 (Bazarsky) Tr. 125).

386.    Jeanne Sloane, deputy chair of Christie's and the head of Christie's silver department, testified repeatedly that she thought of Touro Synagogue and Jeshuat Israel as one and the same.  (Sloane Dep. Tr. 7-8, 10-11, 188, 190, 193, 195).  For example, in connection with how ownership of the Rimonim has been attributed in books and at exhibitions, Ms. Sloane testified:

> Q. And so according to you, the lender and the owner is the Touro Synagogue, right? . . .
>
> A.  Well, yes, according to me, the owner would be the Touro Synagogue, which is also known as the Congregation Jeshuat Israel.  To me as a lay person, it's the same thing.

(Sloane Dep. Tr. 193).  Ms. Sloane clarified that by "the same thing" she meant that "Touro Synagogue and Congregation Jeshuat Israel are the same thing."  (*Id.* at 195).

387.    Scholars and museums likewise refer to Jeshuat Israel as "Touro Synagogue." (P114 at CJIB 1577; P172; P171 at CJI 858; P150 at CJI 3248, CJI 3259; P97 at CJI 1961; P95 at CJI 3254).  For example, in the catalogue for the 1965 exhibition of the Rimonim at the Jewish Museum in New York, the curators referred to "Touro Synagogue" as a "congregation":

> Each pair of headpieces [rimonim] comes from *a congregation* to which Myers had a particular connection: his own Congregation Shearith Israel in New York (no. 2); Congregation Mikveh Israel in Philadelphia, where he worshipped when he took refuge from New York during the Revolution (nos. 4,5); and the Touro Synagogue in Newport, whose beautiful sanctuary by Peter Harrison was built in 1763 with the financial aid of the New York congregation (nos. 1, 3).

(P114 at CJIB 1577 (emphasis)).

388.    Use of "Touro Synagogue" to mean Jeshuat Israel can also be found in instances in which "Touro Synagogue" is described as the owner and lender of the Rimonim.

389.    In the catalogue for the exhibition that started at Yale in 2001, ownership of Jeshuat Israel's Rimonim was attributed to "Touro Synagogue, Congregation Jeshuat Israel, Newport, Rhode Island."  (P150 at CJI 3248 (Item 64), CJI 3259 (Item 100)).

390.    On the website for the exhibition at the Library of Congress in the mid-2000s, that august institution – the national library of the United States – stated, "Displayed here are the finials belonging to Newport's Touro Synagogue" and that the rimonim were "Courtesy of Touro Synagogue Congregation Jeshuat Israel, Newport, Rhode Island."  (P172).  The catalogue for the Los Angeles leg of that exhibition similarly noted that the rimonim were "Courtesy of Touro Synagogue Congregation Jeshuat Israel, Newport, Rhode Island."  (P171 at CJI 858).

391.    The catalogue for the exhibition of the Rimonim at the Museum of Fine Arts in Boston in 1953 stated that the Rimonim were "[l]ent by Touro Synagogue, Newport, Rhode

Island."  (P97 at CJI 1961 (items 22 & 23)).  Significantly, the catalogue stated that CSI's rimonim were "[l]ent by Congregation Shearith Israel, New York."  (P97 at CJI 1961 (item 24)).

392.    *Fifth*, the 1945 agreement – a contract exclusively concerned with Touro Synagogue and agreed to by the CSI trustees – acknowledges Jeshuat Israel as the beneficiary in several ways.  While CSI argues that the "Jewish Society of Newport" was CYI and that CYI died out by 1822 or earlier, the term "Jewish Society of Newport" was deliberately used in the 1945 agreement.  That could only have meant Jeshuat Israel, as Jeshuat Israel was the only signatory to the agreement from Newport and the only congregation worshipping in Touro Synagogue.  (P90; June 9 (Katz) Tr. 43-44).

393.    This interpretation is strongly buttressed by the negotiations leading up to the final executed agreement.  Jeshuat Israel added the language from Rivera's Will into the 1945 agreement to (i) perpetuate the trust for the benefit of the Jewish Society in Newport, and (ii) ensure that Congregation Jeshuat Israel would have standing to pursue legal action on the trust.  Indeed, the legal opinion that Jeshuat Israel received and shared with CSI concluded that, with the inclusion of the language from Rivera's Will, "the ***Congregation Jeshuat Israel will not be prevented from presenting in any future Legal action the full story of the trusts originally established for the Jewish Society of Newport***."  (P86 at CJI 507 (emphasis added)).  This is a clear indication that Jeshuat Israel is the Jewish Society of Newport.  Jeshuat Israel provided this legal opinion to CSI, CSI did not take issue with the statements in the opinion, and in fact CSI agreed to the revisions suggested by that opinion knowing full well that they meant that Jeshuat Israel is the Jewish Society of or in Newport.

394.    At trial, Mr. Katz, testified that the term "Jewish Society in Newport" in the 1945 agreement has "no meaning."  (June 9 (Katz) Tr. 47-48).  That position not only violates

fundamental principles of contract interpretation, under which the Court should strive to give meaning to all terms in a contract, but also cannot be squared with the evidence showing that the term was included in the 1945 agreement for very specific reasons – reasons that Jeshuat Israel imparted to CSI and to which CSI accepted when it agreed to the revised version of the 1945 agreement.

395.    *Sixth*, despite his repudiation of the trust re-affirmed in the 1945 agreement, CSI's Mr. Katz nevertheless testified that Jeshuat Israel *is* the Jewish Society of Newport:

> Q.  If Mr. Lustig, whose testimony you were read, had said that **CJI is one of the incarnations** of the Jews of Newport, **the Jewish Society of Newport**, would you have disagreed with that?
>
> A.  **Not at all**.

(June 9 (Katz) Tr. 64 (emphasis added)).

396.    *Seventh*, in 1903 and 1908, Shearith Israel, as trustee, leased Touro Synagogue to Jeshuat Israel for the token amount of $1 per year.   Shearith Israel contends that it has continuously leased the synagogue to Jeshuat Israel ever since.  Shearith Israel has never leased Touro Synagogue to anyone else.  Why would the trustee exclusively lease the synagogue, which it holds in trust for the Jewish Society in or of Newport, to anyone other than the beneficiary of that trust?  The Court finds that the lease provides additional support for its finding that Jeshuat Israel is the trust beneficiary.

397.    *Eighth*, the token "rent" under the lease asserted by CSI – one dollar – suggests a trust relationship instead of an arms-length transaction.

398.    *Ninth*, Jeshuat Israel has made the token one dollar payment only sporadically over the years, and did not make any payments from at least 1993 through 2011.  (June 3 (Bazarsky) Tr. 12-13).   Yet CSI never once took legal action against Jeshuat Israel for non-

payment.  That is yet additional proof that the relationship between CSI and Jeshuat Israel is not, or is much more than, that of landlord-tenant.

399.    *Tenth*, as shown above at paragraphs 87 through 119, Jeshuat Israel is the continuation of or successor to CYI, which was the beneficiary of the trust.  Relatedly, Jeshuat Israel is the entity to which descendants of CYI intended that community's valuable personal property be given – and to which Shearith Israel did give that property.  CSI's 1833 minutes state that the Torahs and likely their rimonim should be returned to "the Congregation hereafter worshipping in the Synagogue at New Port Rhode Island."  (D26A; P38).  The Court notes here and in the Conclusions of Law that to be the beneficiary of the trust, it is not necessary for Jeshuat Israel to be the successor of CYI.  But the fact that Jeshuat Israel is the continuation or successor is further evidence that Touro Synagogue is held for its benefit.

400.    *Eleventh*, Rhode Island state law codifies the connection between Jeshuat Israel and Touro Synagogue by recognizing Jeshuat Israel as the permanent congregation worshipping in that historic house of worship.  Not only is Jeshuat Israel the recipient of the Abraham and Judah Touro Funds (June 1 (Bazarsky) Tr. 121), but the Rhode Island law administering the Abraham Touro Fund expressly references "Congregation Jeshuat Israel" as both the entity that must approve expenditures and the only party that may directly draw money from the fund.  R.I. Gen. Law § 35-9-1 (P292); R.I. Pub. Laws, Jan. Session 1929, Ch. 1410 (P286); R.I. Pub. Laws, Jan, Session 1995, Ch. 204 (P291).  Thus, by Rhode Island statute Jeshuat Israel is the direct beneficiary of income from the state-run fund intended to "support" Touro Synagogue.

401.    That Jeshuat Israel is expressly identified by name in this statute is significant. The statute codifies not only that Jeshuat Israel is the Jewish congregation worshiping in Touro

Synagogue but also that Jeshuat Israel is its *permanent* occupant, for separating one from the other would require changing Rhode Island state law.

402.     *Twelfth*, when land was purchased using money from the Abraham Touro Fund, the Rhode Island legislature enacted legislation in 1932 declaring that the property is "held in trust for the benefit of Congregation Jeshuat Israel."  R.I. Acts & Resolves, Jan. Session, 1932, at p. 427 (P287).  Considering again that the purpose of the Abraham Touro Fund is to "support[]" Touro Synagogue, this legislation is further evidence of the legal connection between Touro Synagogue and Jeshuat Israel.

403.     *Thirteenth*, CSI, the trustee of the trust, has appointed "liaisons" to Jeshuat Israel but not to any other person or entity in the city or county of Newport.  (June 8 (Katz) Tr. 83).

404.     *Fourteenth*, relatedly, although CSI's involvement with Jeshuat Israel has been sparse, as discussed below in paragraphs 449 through 479 and 597 through 602, CSI the trustee of the trust has not had *any* involvement with any other Jewish organization in Newport.  CSI's Rule 30(b)(6) witness, Mr. Edinger, was not even aware of any Jewish organizations in Newport other than Jeshuat Israel.  (Edinger Dep. Tr. 186).  As noted, CSI's lone live fact witness Mr. Katz testified that he was CSI's "liaison" to Jeshuat Israel and not to any other organization or person in the city or county of Newport.  (June 8 (Katz) Tr. 83).  Jeshuat Israel's co-president Bea Ross, who is active in several Newport and Rhode Island Jewish organizations outside Jeshuat Israel, testified that she has not seen any activity or involvement on the part of CSI with the Jewish community of Newport or Jewish organizations in Newport.  (June 5 (Ross) Tr. 11-13).  And Jeshuat Israel's former president David Bazarsky, who is active in the Jewish community in Newport, similarly testified that he has not seen any dealings by CSI with Jews of Newport other than through Jeshuat Israel.  (June 3 (Bazarsky) Tr. 41, 43).

405.     CSI now contends that the "Jewish Society of Newport" is broader than Jeshuat Israel and really means the "Jews of Newport."   The evidence cited above explains why that is not the case.   In addition, the Court notes that to the extent the "Jewish Society of Newport" was meant to be broader than Jeshuat Israel, that term could only have been meant to include those Jews (i) *from the Newport area* (ii) *who actually pray at Touro Synagogue*, regardless of whether they are technically members of Jeshuat Israel.   In this regard, it is important not to lose sight of the trust corpus, the Touro Synagogue in Newport, and the purpose of the trust, to preserve Touro Synagogue for the "sole Use, Benefit and Behoof of the Jewish Society of [or in] Newport, to be for them reserved as a Place of Public Worship forever."   In light of the plain language of the trust documents, there is no reason to believe that the term "Jewish Society of Newport" includes unaffiliated Jews (who are not members of *any* "Society" of Jews) or those Jews who do not pray at Touro Synagogue.

406.     In any event, Michael Lustig, Shearith Israel's Rule 30(b)(6) witness, vice president, and one of only three members of CSI's executive committee, admitted that Jeshuat Israel is "the current incarnation" of "the Jews of Newport."  (Lustig Dep. Tr. 73).   As such, Jeshuat Israel is the beneficiary of the trust even were the beneficiary defined to be "the Jews of Newport," since the Congregation represents those Jews.

407.     Ironically, CSI has affirmed that Jeshuat Israel is the trust beneficiary even when attempting to deny that relationship.   In 1979, Jeshuat Israel's president wrote to CSI to "request a release from the bonds of trusteeship."   (P126).   CSI's president, Edgar J. Nathan, 3d, responded by saying that the relationship has "really not been that of a 'Trustee', but rather, although technically that of a landlord and tenant, that of friendship."   (P127).   However, Mr. Nathan continued by stating that "changing our legal relationship . . . cannot be done with any

degree of simplicity, even if possible. . . . [A]ny change would require, under our laws, approval of a court . . . ."  (P127).  If the relationship between CSI and Jeshuat Israel were merely that of landlord and tenant, no court approval would be required to change that relationship.  The parties could simply enter into a new and different contract.

408.    Taken in the context of the record in this case, CSI's statement that changing the relationship between CSI and Jeshuat Israel would require "court approval" is an acknowledgment that the relationship is one of trustee and beneficiary.

409.    Finally, the Court notes that even were Jeshuat Israel technically *not* the Jewish Society of Newport, all the facts cited above weigh in favor of finding that Jeshuat Israel should be named the beneficiary as the closest approximation of the trust beneficiary.

C.    Judge Brown's 1903 decision does not bear on the trust issues presented here

410.    To the extent that CSI argues that Judge Brown's decision is relevant to the trust issues, Judge Brown did not address whether or how CSI owns the Touro Synagogue.  Rather, the court rejected complainants' claims based on perceived unclean hands at the time – because "the complainants' entry and possession were by forcible entry and detainer, which is a bar to the right of the complainants to seek the aid of a court of equity . . . ."  (P67 at CSI 319).  Judge Brown ruled that he would not enjoin CSI "from establish*ing* their title at law," thus demonstrating that title was not before the court and could be addressed in a separate and later civil action.  (P67 at CSI 319 (emphasis added)); *see also* P105 at CJI 586 (scholar in 1958 noting that "[t]his decision on demurrer did not decide the question of ownership but merely the right to possession"); P125 at 28-29 (scholar in 1975 stating that "despite all that had happened, Judge Brown's decision in the demurrer did not decide the question of legal ownership, but only the rights to possession")).  The court therefore left open and for another day the issue of whether or how CSI owns Touro Synagogue.

411.    The Court also notes that the trust issues in the current lawsuit likewise were not present, addressed, or resolved in *David v. Levy*.  The decision did not "reject" the claim that Touro Synagogue is held in trust for Jeshuat Israel as beneficiaries, and the decision did not "hold" that Jeshuat Israel cannot be the "Jewish Society, in Newport."  In the complaint, certain individuals and Jeshuat Israel asked for a declaration that the Synagogue was held in trust for the "Jews of Newport."  For Judge Brown, this meant that there were technical flaws in the pleadings: (i) the individual complainants had not pled that they were Jews, and (ii) Jeshuat Israel, as a corporate entity, could not be "regarded as having any right or interest in such a trust, since a domestic corporation of this State cannot be regarded as *a Jew of Newport*."  (P67 at CSI 317 (emphasis added)).

412.    Furthermore, Judge Brown acknowledged that Rivera's Will very well may declare a trust by explaining that the "extract from [the Will] contains a recital *which may be interpreted* as declaring that the conveyance . . . was 'in trust only to and for the sole use, benefit and behoof of the Jewish Society, in Newport."  (P67 at CSI 318 (first emphasis added; second emphasis in original)).  But the court found that the complaint did not ask for a declaration of trust for the benefit of the "Jewish Society" in or of Newport: "So far as this tends to show a trust, it is a trust for a Jewish society, and not the trust set forth by the complainants, to wit a trust for the Jews of Newport."  (*Id.*).

413.    It is not surprising then that the court also found that the individual complainants had not properly alleged that they were that "Jewish Society, in Newport," since that claim had not been asserted in the first place.  (*Id.*).  In other words, there was no way or occasion for Judge Brown to decide a claim concerning the identity of the beneficiary of the Touro Synagogue trust for a Jewish "Society" in or of Newport because there was "no allegation that these complainants

have any standing as members of a Jewish society, or as persons entitled to admission thereto, or even that they have the right to demand of such Society or its trustees the right to attend worship." (*Id.*).

414.    Notably, the court's dicta related only to the individual complainants and not to Jeshuat Israel as an entity. In any event, as the complaint did not even seek a declaration of a trust for the benefit of the Jewish "Society" and also failed at the threshold of standing, Judge Brown never addressed – and had no occasion to address – (i) the meaning of "Society", (ii) whether Jeshuat Israel is, or represents or embodies, the "Jewish Society [in or of] Newport", and, more generally, (iii) whether Jeshuat Israel is, represents, or embodies the beneficiary of the trust alleged in the current lawsuit. On the contrary, in the ultimate analysis, Judge Brown necessarily left open and for another day whether there is a trust for the benefit of the Jewish Society in or of Newport, and whether Jeshuat Israel is the beneficiary of that trust.

D.    CSI's obligations as trustee and under the 1945 Agreement

415.    Under the terms of Rivera's Will, as re-affirmed in the 1945 agreement, the purpose of the trust is to keep Touro Synagogue open as a "Place of Public Worship forever" for the "sole Use, Benefit and Behoof of the Jewish Society of Newport." (P31 at CJI 2; P90 at CJI 96). CSI, as trustee, therefore is obligated to further – and certainly not hinder – that purpose. Furthermore, as trustee, CSI is obligated to preserve the trust corpus, which is Touro Synagogue.

416.    CSI also has contractual obligations arising from the 1945 agreement. The very first provision of that contract, Article I(a), provides

> [t]he Shearith Israel Trustees and the Congregation Jeshuat Israel agree for themselves, their respective successors and assigns: (a) That they will preserve, protect, maintain, and, when necessary, restore, so far as lies within their power, the Touro Synagogue, Newport, Rhode Island, and the grounds immediately about the Synagogue building . . . .

(P90 at CSI 94).  These obligations bind not only CSI but impose obligations on its current and future trustees in their individual capacities.

417.    Despite this plain language, CSI contends that this provision does not impose *any* obligations on CSI.  CSI relies on Article II of the Agreement, which provides that "[t]he Shearith Israel Trustees and Congregation Jeshuat Israel mutually agree for themselves, their respective successors and assigns: That in carrying out the provisions of this Agreement, their obligations shall be performed in accordance with and subject to their respective rights and obligations as lessor and lessee as heretofore established, and in accordance with the Statutes of the State of Rhode Island relating to the Abraham Touro Fund and the Judah Touro Fund."  (P90 at CSI 96).  According to CSI, Article II undoes Article I(a) because the written lease between the parties (from 1908) is a "triple net" lease, under which Jeshuat Israel bears *all* expenses concerning Touro Synagogue while Shearith Israel bears *no* expenses.  (June 8 (Katz) Tr. 27; June 9 (Katz) Tr. 55-58).

418.    First, as set out in the Court's Conclusions of Law, even if true, that would not relieve CSI of its obligations as trustee.

419.    Second, the 1945 agreement was a negotiated contract among parties with counsel – and one of the parties was the United States of America.  If CSI did not have the duties stated in Article I(a), why would they have been put in the agreement?  The language is not boilerplate or superfluous but imposes substantial duties on CSI and its trustees.

420.    Third, the lease does not make Jeshuat Israel bear all expenses while relieving Shearith Israel of its obligations.  The words "triple net" do not appear in the lease.  (P71; P76).  Nor is there any language in the lease that imposes upon either party the duty to "preserve, protect, maintain, and, when necessary, restore" Touro Synagogue.

421.    At trial, Mr. Katz directed the Court's attention to a provision in the lease stating: "And at the expiration of the said term the said party of the second part will quit and surrender the premises hereby demised, in as good state and condition as reasonable use and wear thereof will permit, damages by the elements excepted."  (P71 at CJI 474; P76 at CSI 2; June 9 (Katz) Tr. 21).  However, that language was boilerplate taken word for word from the pre-printed portion of the form used to draft the lease.  (P58 at CSI 4536).  Moreover, even if the provision requires that Jeshuat Israel pay for some repairs (excepting repairs for "reasonable use and wear" and "damages by the elements"), the clause does not obligate Jeshuat Israel to cover *all* expenses relating to Touro Synagogue.  Nor does the clause relieve CSI of any obligations.

422.    CSI's counsel also directed the Court's attention to the provision of the lease stating that Jeshuat Israel will cause Touro Synagogue to be "used and occupied for the maintenance therein of the usual and stated religious services" according to particular rites.  (P71 at CJI 474; P76 at CSI 2).  This provision relates only to what religious services are to be conducted in the synagogue.

423.    Further bolstering the Court's conclusions, the record shows that CSI has explicitly admitted its obligations under the 1945 agreement.  In 2003, CSI's Executive Director Alan Singer acknowledged that CSI is obligated under the 1945 agreement to "preserve, protect, maintain, and, when necessary, restore" Touro Synagogue.  Mr. Singer, CSI's highest non-religious employee (June 9 (Katz) Tr. 17), wrote to the Getty Grant Program:

> In 1946, Shearith Israel and Congregation Jeshuat Israel dedicated themselves to preserve, protect, maintain and restore the Synagogue as part of a cooperative agreement when Congress designated Touro Synagogue as a National Historic Site.  In return, the Secretary of the Interior agreed on behalf of the United States, to cooperate with the congregations in the preservation, protection and restoration of the Touro Synagogue property.

(D365).

424.    Furthermore, Mr. Katz admitted at trial that under the 1945 agreement, the CSI trustees agreed to preserve, protect, maintain, and when necessary, restore Touro Synagogue, and that that obligation extends to the successor trustees – of which he is one.  (June 8 (Katz) Tr. 89-93).

E.    CSI's conduct is inconsistent with its duties

425.    CSI has breached its duties as trustees and as a signatory to the 1945 agreement. It is the considered judgment of this Court that, based on CSI's conduct, CSI (i) has demonstrated that it has not acted in the best interests of the beneficiary, (ii) has put its own interests ahead of those of the beneficiary, and (iii) has shown a lack of care toward the trust corpus.  As explained in the Conclusions of Law, the Court's findings mandate removal of CSI from its position as trustee.

- CSI has repudiated the trust

426.    First, CSI has repudiated the trust.

427.    CSI repudiates the trust in the positions it takes in this lawsuit.  CSI asserts that it owns the trust corpus – Touro Synagogue – outright, absolutely, and not in trust.  (Dkt. 8 at 5 ¶ 32 (denying that CSI holds Touro Synagogue in trust); Dkt. 70 at 30, 57-61 (arguing that no trust exists)).  CSI likewise takes the position that it owns the Rimonim absolutely and not in trust.  (Dkt. 8 at 5 ¶ 30 (denying that CSI holds the Rimonim in trust); Dkt. 70 *passim* (arguing that CSI owns the Rimonin outright)).  CSI likewise claims that Jeshuat Israel is not the beneficiary of any trust.  (Dkt. 70 at 61-62).

428.    The testimony of CSI witnesses also shows that CSI considers itself to be free of any obligations as a trustee of a trust for the benefit of Jeshuat Israel or anyone, or as a signatory to the 1945 agreement.

429.     As has been shown above, the inclusion in the 1945 agreement of language from Rivera's Will is highly significant both on its face and in light of the reasons why the parties added it.  Despite this evidence, CSI views the language from Rivera's Will inserted into the 1945 agreement – that the Synagogue is for the "use, benefit and behoof of the Jewish Society in Newport as a public place of worship forever" – to be completely meaningless.  CSI's Vice President Mr. Katz testified that the "Jewish Society in Newport" is the "synagogue" that "went out of existence in 1820" and then testified as follows:

> Q. And so the words that were put in the agreement in 1945 about the trust for the Jewish Society of Newport had no meaning?  Is that your testimony?  Yes or no, please. . . .

> A. Yes.  That's my testimony.

(June 9 (Katz) Tr. 47-48).  This testimony is a clear repudiation of the trust.

430.     Mr. Katz also testified that from 1994, when he became a trustee of CSI, up to this dispute in 2012, he did not believe that CSI had *any* obligation to preserve and maintain Touro Synagogue.  (June 8 (Katz) Tr. 85).  Since Touro Synagogue is the trust corpus, that too is a clear repudiation of the trust.  This position also contradicts the explicit obligations imposed on CSI and its trustees under the 1945 agreement.

431.     Mr. Katz further testified, clearly and repeatedly, that he does not believe that CSI has any responsibilities or obligations to Jeshuat Israel "other than as a landlord."  (June 8 (Katz) Tr. 27, 84).  Again, by denying that it has obligations to the trust beneficiary, CSI repudiates the trust.

432.    CSI's Rule 30(b)(6) witness, Michael Lustig, similarly testified that CSI owns the Rimonim like he owns the pen in his pocket:

> Q. Is it fair to say that your view is that Shearith Israel owns the rimonim at issue in question here in trust for all Jews?
>
> …
>
> A. I feel that Shearith Israel owns the rimonim, period.
>
> Q. Outright, not in trust?
>
> A. They own them, period.
>
> …
>
> Q. I'm trying to figure out what "period" means.
>
> A. Meaning I own this pen. I paid for it, I own it. Shearith Israel owns the rimonim.

(Lustig Dep. Tr. 118-19; *see also id.* at 26-28, 89-90).  Mr. Edinger, CSI's other Rule 30(b)(6) witness, and CSI's Rabbi Angel, both agreed.  (Edinger Dep. Tr. 55, 56, 64-65, 67, 68, 70; Angel Dep. Tr. 16, 55, 56, 113).

- CSI seeks to obtain the trust property for itself

433.    In this lawsuit, CSI seeks to obtain the trust property for itself.  CSI requests a declaration that it owns Touro Synagogue and the Rimonim.  (P241 at p.18 ¶ 48, p.20 ¶ 60, p.22).  CSI also seeks the "immediate return of the Rimonim" to Shearith Israel in New York. (P241 at p.19, ¶¶ 52, 57 & p.23 ¶ 4).

434.    In addition, before the lawsuit began Jeshuat Israel and CSI discussed a possible lease of the Rimonim to the MFA.  CSI, however, sought to obtain the entire lease proceeds as well as a portion of the income from a fund established with those proceeds. (P238; June 2 (Bazarsky) Tr. 41-45; Lustig Dep. Tr. 88-90, 131-32).  That is decidedly self-interested and inappropriate conduct by a trustee.

- • <u>CSI seeks to evict the beneficiary, Jeshuat Israel, from the trust property, Touro Synagogue, which would defeat the purpose of the trust</u>

435.    CSI seeks to evict Jeshuat Israel from Touro Synagogue.  (P241 at p.21 ¶ 63, p.23 ¶ 5).  Merely by making this extraordinary request, CSI has acted in a manner inconsistent with its duties to preserve Touro Synagogue for the use of Jeshuat Israel and to act in Jeshuat Israel's best interests.

436.    Although at one point CSI suggested it would withdraw this counterclaim, despite opportunities and requests CSI has not done so.

437.    In an effort to save from dismissal a mirror-image and second-filed lawsuit that CSI brought in the United States District Court for the Southern District of New York, counsel for CSI represented to that Court that the relief sought in its counterclaims before this Court was not broader than the relief it sought in the New York action. Although CSI sought eviction in Rhode Island but not in New York, CSI's counsel stated that the "judge in Rhode Island . . . is not vested in the case, neither one of you can handle an eviction suit.  Eviction is the exclusive jurisdiction of the state court . . . . *Nobody is getting eviction in any federal court*."  (P245 at 37 (emphasis added)).

438.    Based on these representations, Jeshuat Israel asked CSI to withdraw its eviction counterclaim.  (P252).  However, CSI refused, and has stated that it seeks to evict "CJI" and not "the congregants."  (P253).

439.    At trial, CSI's lone fact witness persisted in suggesting that the distinction between "congregation" and "congregants" is meaningful.  (June 8 (Katz) Tr. 71, 185-86; June 9 (Katz) Tr. 99-100).  It is not.  As that same, lone fact witness conceded, a congregation is made of its congregants.  (June 8 (Katz) Tr. 186).  Evicting the congregation means evicting its congregants.

440.    The evidence shows that evicting Jeshuat Israel would be devastating.  As noted above, Jeshuat Israel has worshipped in Touro Synagogue continuously for at least 120 years and the two are thought of synonymously.   Jeshuat Israel is so deeply intertwined with the Synagogue that evicting Jeshuat Israel likely would require amending Rhode Island law.  R.I. Gen. Law § 35-9-1 (P292).  Since at least 1929 all expenditures from the Abraham Touro Fund on repairs to Touro Synagogue must be approved by "Congregation Jeshuat Israel."  R.I. Pub. Laws, Jan. Session 1929, Ch. 1410 (P286).  And since 1995, "Congregation Jeshuat Israel" may directly draw from the fund up to 4.5% of its value each year.  R.I. Pub. Laws, Jan. Session 1995, Ch. 204 (P291).

441.    Evicting Jeshuat Israel from Touro Synagogue would be, as Mr. Bazarksy put it, "the destruction of . . . the congregation."  (June 1 (Bazarsky) Tr. 126).  Many members of Jeshuat Israel are members because of the rich history associated with Touro Synagogue.  (June 1 (Bazarsky) Tr. 113).  Members – especially long-time members and members whose ancestors also were members of Jeshuat Israel – have "their roots, their connection" to Touro Synagogue. (June 1 (Bazarsky) Tr. 126; *see also* June 3 (Ross) Tr. 178-79; June 3 (Pimental) Tr. 59-60). Many have spent substantial time, money and effort keeping Touro Synagogue in good repair and with a rabbi and an active congregation.  (*E.g.*, June 5 (Pedrick) Tr. 149-50).

442.    Perhaps most importantly, evicting Jeshuat Israel from Touro Synagogue would render that edifice a museum.  The testimony at trial established that there is no congregation, ready to take Jeshuat Israel's place in Touro Synagogue.  (June 1 (Bazarsky) Tr. 127, 131).  The Court agrees with Mr. Bazarsky that "one of the wors[t] things that could ever happen is the oldest synagogue in the United States closes."  (June 1 (Bazarsky) Tr. 127).  Moreover, it would contravene the fundamental purpose of the trust holding Touro Synagogue "for the sole Use,

Benefit and Behoof of the Jewish Society of Newport, to be for them reserved as a Place of Public Worship *forever*." (P31 (emphasis added)).

- CSI has sought to frustrate the trust purpose by blocking the sale of the Rimonim, a step necessary to create a permanent endowment for Touro Synagogue

443.    According to Mr. Katz, CSI objected to the sale of the Rimonim on the following grounds: first and foremost, because CSI owns the Rimonim; second, because CSI opposes selling religious articles; and third because CSI is "holding [the Rimonim] for the Jews of Newport." (June 8 (Katz) Tr. 61; June 9 (Katz) Tr. 42).

444.    Mr. Katz also testified that CSI took into account the "best interests" of "the Jewish Society of Newport or the Jews of Newport" when deciding "whether *or not* to oppose the sale" of the Rimonim. (June 9 (Katz) Tr. 60-61 (emphasis added)). But Mr. Katz did not explain *how* CSI did so. (*See* June 9 (Katz) Tr. 61-62). This testimony was directly contradicted by Michael Lustig, CSI's Rule 30(b)(6) witness concerning CSI's decision to block the sale of the Rimonim. (P256; P257). Mr. Lustig testified that Shearith Israel's Board never even explored the possibility of the sale to the MFA. (Lustig Dep. Tr. 115-16).

445.    The evidence likewise does not support Mr. Katz's claim that CSI considered the interests of anyone other than itself. The only ground given in CSI's cease and desist letter was that CSI owned the Rimonim. (P231). And the testimony of Mr. Lustig shows that CSI halted the sale because it was acting in its own interests.

446.    Mr. Lustig, who has never visited Touro Synagogue since joining CSI (Lustig Dep. Tr. 23-24), testified that CSI's Board *always* considers the interests of CSI, and as a member of the Board, "I always want to protect the rights of CSI." (Lustig Dep. Tr. 41, 129). According to Mr. Lustig, CSI's Executive Committee was authorized by the full Board to act in CSI's best interests, and in fact was acting in the best interest of CSI when it issued the cease and

desist letter.  (Lustig Dep. Tr. 38-39, 40-41; *see also* Edinger Dep. Tr. 69, 75-76, 85; Angel Dep.

Tr. 56).  Mr. Lustig agreed that "the reason that Shearith Israel took action to block the sale of

the rimonim is because . . . Shearith Israel's position is that it owns the rimonim outright . . . ."

(Lustig Dep. Tr. 26-28).  He testified:

> Q. Now, in connection with the board's decision to issue the cease
> and desist letter, what factors did the board take into account in
> reaching that decision?
>
> A. I'm once again working off of a recollection from many years
> ago, but the consideration of the fact that property that we owned
> was being sold out without our permission.

(*Id.* at 80).  Mr. Lustig also testified that in connection with a call concerning the cease and desist

letter among the CSI Trustees in September 2012 – several months after CSI issued the letter –

the interests of Jeshuat Israel were not discussed:

> Q. And during the call, was there a discussion about what action
> would be in the best interests of Congregation Jeshuat Israel?
>
> A. Of Congregation Jeshuat Israel?
>
> Q. Correct.
>
> A. I don't recall the specifics of the call, as I mentioned, but my
> general recollection is that we were focusing on our own issues,
> since that's our fiduciary responsibility, and I don't recall if
> anything came up on CJI.

(*Id.* at 72-73).

447.    To Mr. Lustig's knowledge, Shearith Israel's Board has never discussed a

requirement to take into account the interests of Jeshuat Israel when making decisions about

Touro Synagogue or the potential sale of the Rimonim.  (*Id.* at 99-100).  Mr. Lustig similarly did

not recall CSI's Board ever discussing whether it was required to take into account the interests

of Touro Synagogue, the building, in connection with Jeshuat Israel's attempt to sell the

Rimonim.  (*Id.* at 100-01).  Nor did he recall the Board ever discussing before issuing the cease

and desist letter the ability of Jeshuat Israel to maintain the Touro Synagogue building, whether or not Jeshuat Israel would be able to keep Touro Synagogue open as a place of worship in perpetuity, or whether the sale of the rimonim was in the best interests of Jews in Newport.  (*Id.* at 48, 118, 143, 143).  In fact, as noted Shearith Israel's Board never explored the possibility of the sale.  (*Id.* at 115-16).

448.     Ultimately, whether CSI considered the interests of Jeshuat Israel or even the "Jews of Newport" is irrelevant.  If the Rimonim are held in trust, that CSI considered its own interests at all in making decisions about the trust property is conduct that violates CSI's duties as trustee.  More critically, CSI's actions have deprived Touro Synagogue of an endowment that would further the purposes of the trust.

- CSI has failed to act to preserve the trust corpus, Touro Synagogue, and generally has abandoned its duties and shown a lack of care

449.     For decades and decades, CSI has had little if any involvement with Jeshuat Israel and Touro Synagogue.  CSI has repeatedly failed to act to preserve the trust corpus, Touro Synagogue, when CSI's help was desperately needed.  CSI has abandoned its responsibilities, leaving the trust beneficiary Jeshuat Israel to further the purposes of the trust and the terms of the 1945 agreement on its own.

450.     CSI's Mr. Edinger wrote in his memorandum to CSI's Board that "Shearith Israel involvement from [1946] to today has been only occasional, mainly having to do with the repair and upkeep of the synagogue building."  (P233 at CJI 389).  In the memories of the witnesses, CSI has not even involved itself in repair and upkeep.  Mr. Katz testified that he never believed that CSI had *any* obligation to preserve Touro Synagogue.  (June 8 (Katz) Tr. 85; *see also* Edinger Dep. Tr. 132, 182).  CSI has acted, or rather, not acted, accordingly.

451.    Around 1996, Jeshuat Israel commissioned an historic structures report on Touro Synagogue by Claude Menders.  The report showed that Touro Synagogue needed extensive repairs that would cost millions of dollars.  (June 1 (Bazarsky) Tr. 164-65).

452.    That year, Jeshuat Israel's president David Bazarsky and others from the congregation went to a meeting of the CSI Board.  (June 1 (Bazarsky) Tr. 162-63).  At the meeting, Mr. Bazarsky explained to CSI the significant problems at Touro Synagogue, including that the building flooded when it rained, the ceiling was rotting, and support columns were splitting.  (June 2 (Bazarsky) Tr. 206-07).  Mr. Bazarsky asked CSI, "What can you do to help us?" and "[W]hat help can you offer us?"  (June 1 (Bazarsky) Tr. 165).  As recounted by Mr. Bazarsky, CSI's response was dismissive: "You're on your own. . . . We have our own synagogue to take care of; We're not taking care of your synagogue."  (June 1 (Bazarsky) Tr. 165).  Mr. Bazarsky's testimony is uncontroverted.

453.    After the meeting, CSI did not write any checks to Jeshuat Israel.  (June 8 (Katz) Tr. 96; June 2 (Bazarsky) Tr. 208).  CSI refused to help at all.  According to Mr. Bazarsky, CSI refused to provide its list of members because CSI wanted to solicit those individuals for its own projects.  (June 1 (Bazarsky) Tr. 165; June 2 (Bazarsky) Tr. 208).  CSI also rejected more general, open-ended requests for help: "We asked if they had the names of any fundraising companies or any suggestions at all, and they said no."  (June 1 (Bazarsky) Tr. 165; June 2 (Bazarsky) Tr. 207).  Mr. Bazarsky came away from that meeting thinking that CSI had "no interest in us." (June 1 (Bazarsky) Tr. 165-66).

454.    At some point after receiving the Menders report, Jeshuat Israel raised funds to hire the United States National Park Service to conduct an additional historic structures report.

(June 1 (Bazarsky) Tr. 166).  The second report showed that about $3 million in repairs was needed.  (June 1 (Bazarsky) Tr. 166).

455.    Jeshuat Israel determined to raise the money necessary to save Touro Synagogue. The Congregation teamed up with the Touro Synagogue Foundation to start a capital campaign. (June 1 (Bazarsky) Tr. 166-67; June 5 (Pedrick) Tr. 148).

456.    In 2004, a CSI "liaison" to Jeshuat Israel, Dr. Leonard Groopman, visited the congregation at Touro Synagogue.  (June 8 (Katz) Tr. 98; P168).  Dr. Groopman delivered a report to the Board of CSI on November 16, 2004.  (P168; June 8 (Katz) Tr. 98-100).  In his report, Dr. Groopman noted that Jeshuat Israel was an active, albeit small, congregation, and he praised Jeshuat Israel's dedication to Touro Synagogue.  (P168 at CSI 1031; June 8 (Katz) Tr. 108).

457.    Dr. Groopman informed CSI's Board that Jeshuat Israel and the Touro Synagogue Foundation were embarking on a "major conservation and restoration" of Touro Synagogue, which "has not been worked on in some 35 years."  (P168 at CSI 1031).  His report grimly detailed for the Board the many serious problems plaguing Touro Synagogue:

> The conservation efforts are intended to address both interior and exterior needs of the building, including extensive deterioration of the eastern wall, foundation erosion from water seepage, drainage damage, structural cracks in interior and exterior walls, extensive moisture erosion of interior pillars, structural stability of the balcony, interior restoration of the 1790 appearance, climate control for ongoing conservation needs, security provisions, artifact restoration and maintenance, etc.

(P168 at CSI 1031).  Based on Dr. Groopman's report, CSI's Board understood that Touro Synagouge was in dire need of major and expensive repairs.  (June 8 (Katz) Tr. 104-09).

458.    Dr. Groopman also conveyed to the Board that Jeshuat Israel was having difficulty raising the money necessary to repair and restore Touro Synagogue, and that he had

been asked whether Shearith Israel was going to help by contributing to save the Synagogue. (June 8 (Katz) Tr. 109-10; P168 at CSI 1032).

459.    Dr. Groopman concluded his report by noting, "In our meeting the other day Peter [Neustadter, CSI's president] wondered out loud if we had been having a '*free ride*' and whether now we needed to re-evaluate the nature of our relationship and commitment" to Touro Synagogue.  (P168 at CSI 1032 (emphasis added)).

460.    This comment is telling.  First, the statement evidences that CSI understood that it bore duties.  Why would CSI's president use the language "free ride" if CSI had no responsibilities?  Second, the comment also shows that CSI understood that it was not living up to those duties.  Significantly, CSI chose not to call Mr. Neustadter to explain his admission.

461.    Despite learning of the serious problems at Touro Synagogue – deterioration of walls, foundation erosion, structural cracks, questionable balcony stability – despite CSI's president's admission that CSI had been having a "free ride" with respect to its obligations to Touro Synagogue, and despite its other obligations spelled out in the 1945 agreement, CSI did little if anything to help preserve, protect, maintain or restore the Synagogue.  CSI certainly did not provide any money – not even a token amount – to help in the necessary multi-million dollar effort to save Touro Synagogue.  (June 8 (Katz) Tr. 110-12).  At the time, CSI appears to have been singularly focused on raising money to restore "our building," meaning CSI's own synagogue on Central Park West in Manhattan.  (June 8 (Katz) Tr. 111).

462.    Without CSI, Jeshuat Israel forged ahead to save Touro Synagogue.  The Congregation was not able to afford a professional fundraiser, so the leaders of the campaign themselves worked to raise the necessary funds.  (June 5 (Pedrick) Tr. 149-50; June 2 (Bazarsky) Tr. 212-13).  For example, Jeshuat Israel's co-president, Laura Pedrick, helped to lead the

fundraising effort and devoted a significant amount of time and energy to the project. (June 5 (Pedrick) Tr. 149-50). No one from CSI volunteered or was active in the Campaign to Save Touro Synagogue. (P170 at TSF 6810; June 5 (Ross) Tr. 30-35; June 8 (Katz) Tr. 124-26).

463. By mid-2005, Jeshuat Israel was $1 million away from raising the total amount needed to repair and restore Touro Synagogue. (D509-006; P170 at TSF 6807). This amount turned out to be a serious hurdle.

464. On May 17, 2005, Ms. Pedrick as well as Bernard Aidinoff, a prominent New York lawyer, life-long member of Jeshuat Israel, and then chair of the Touro Synagogue Foundation, and Michael Balaban, Executive Director of the Foundation, travelled to New York and made a presentation to the entire Board of CSI. (June 5 (Pedrick) Tr. 146, 148, 151; D507). Ms. Pedrick noted, "The building was in a major state of disrepair, parts of it were actually crumbling. And we felt that we, being the congregation, Jeshuat Israel and the Touro Synagogue Foundation, got together to put together this campaign to raise funds to preserve and maintain the synagogue." (June 5 (Pedrick) Tr. 148-49).

465. During the meeting, the Jeshuat Israel group made a lengthy and detailed PowerPoint presentation to the CSI Board. "We had photos that we were using to demonstrate some of the significant issues and why we needed their financial support." (June 5 (Pedrick) Tr. 152; *see also* D509). Thus, the serious problems at Touro Synagogue were once again brought to the attention of the Board of CSI. (June 8 (Katz) Tr. 115-16, 119-20; D509; D507).

466. The Jeshuat Israel delegation specifically asked for money from CSI itself, as an institution, towards the conservation of Touro Synagogue. (June 5 (Pedrick) Tr. 152; D509-006; June 8 (Katz) Tr. 115-16, 120-21).

467.     Following up the presentation, on May 26, 2005, Mr. Balaban sent the presentation notes to CSI.  (D509-006).  The notes specifically referenced a request for the sum needed at the time – $1 million "for conservation."  The notes state, "We look forward to the opportunity to work with you as partners and hope you will consider making a contribution to this exciting and groundbreaking project."  (*Id.*).

468.     Despite the serious problems at Touro Synagogue, and despite Jeshuat Israel and the Foundation's explicit plea for help fixing those problems, CSI did not make any contribution whatsoever.  (June 5 Tr. (Pedrick) Tr. 152, 184; June 1 (Bazarsky) Tr. 167-68; June 8 (Katz) Tr. 121-22).  CSI did not even respond to Jeshuat Israel's request.  As Ms. Pedrick put it, "I was extremely disappointed that we didn't even get a response to our request."  In fact, Ms. Pedrick was "shocked" by CSI's non-response.  (June 5 Tr. (Pedrick) Tr. 152-53).

469.     CSI apparently discussed internally whether to contribute, but CSI once again was singularly focused on its own fundraising project for its own synagogue building.  (June 8 (Katz) Tr. 123-24).

470.     The record shows that, aside from $475 that the Second Circuit Court of Appeals ordered Shearith Israel to pay for costs incurred by Jeshuat Israel in briefing CSI's appeal of the dismissal of Shearith Israel's second-filed New York action (P259) – an appeal that Shearith Israel abandoned, but only after full briefing – the last time Shearith Israel provided any support to Jeshuat Israel (other than a contribution for some of the cost of a weekend for CSI members hosted at Jeshuat Israel) likely was in 1983.  At that time, Shearith Israel gave Jeshuat Israel $100.  (P130).

471.     After the May 2005 meeting, Jeshuat Israel once again was forced to proceed without CSI.  Jeshuat Israel and the Touro Synagogue Foundation were able to raise $2 million

to restore Touro Synagogue.  (June 1 (Bazarsky) Tr. 168-69).  They borrowed the remaining $1 million necessary to save the building from Bank Newport.  (June 1 (Bazarsky) Tr. 168-69).

472.     It took years to raise sufficient funds to pay off the loan, which was paid off only recently.  (June 1 (Bazarsky) Tr. 169-70).  CSI did not contribute any money towards paying off that loan.  (June 1 (Bazarsky) Tr. 170).  Indeed, CSI's vice president and Rule 30(b)(6) witness, Mr. Lustig, testified that he was not aware of Shearith Israel providing any support to Jeshuat Israel during his time on CSI's Board.  (Lustig Dep. Tr. 74).

473.     CSI has avoided involvement with Jeshuat Israel and Touro Synagogue at several other important junctures.

474.     For example, as discussed in more detail in paragraphs 517 through 541 below, in 2009 Mr. Katz and Ms. Ross spoke about an article in the Jewish *Forward* reporting Jeshuat Israel's financial troubles, its concerns about its ability to keep Touro Synagogue open, and that it was exploring selling assets – including the Rimonim – to stay afloat.  Mr. Katz's sense from the call was that Ms. Ross was hoping that Shearith Israel would contribute to help alleviate Jeshuat Israel's financial troubles.  (June 8 (Katz) Tr. 139-40).  But Mr. Katz did not offer to have CSI write a check or even offer suggestions about how to raise funds.  Instead, he described to Ms. Ross CSI's own financial situation, presumably in an effort to ward off being asked for help again.  (June 8 (Katz) Tr. 139-41).  After the call, even though Mr. Katz reported his conversation with Ms. Ross to the full Board of CSI, CSI did not give any money to help Jeshuat Israel.  (June 8 (Katz) Tr. 141-42).  Nor did Mr. Katz follow up with Ms. Ross to see how Jeshuat Israel was doing and how its plans to sell assets was proceeding.  (June 8 (Katz) Tr. 142).

475.     These interactions seem to have been emblematic of CSI's ambivalent attitude towards Jeshuat Israel and Touro Synagogue.  Mr. Katz was CSI's "liaison" to Jeshuat Israel

starting in 1998.  (June 8 (Katz) Tr. 22-23).  Yet from 1998 through 2012, when this dispute began, he visited Touro Synagogue and Jeshuat Israel only once – in 1998 to participate in the George Washington letter reading ceremony.  After that, he never went back.  (June 8 (Katz) Tr. 74-76).  While in New York, Mr. Katz had "very infrequent" telephone conversations with Bea Ross – the only person with whom he communicated at Jeshuat Israel.  (June 8 (Katz) Tr. 76-77).

476.    The evidence showed that despite its role as trustee, for the most part CSI simply did not think of Jeshuat Israel.  For example, Mr. Katz testified that he had no understanding that Jeshuat Israel had Board meetings.  In fact, Mr. Katz testified that it "didn't occur" to him that Jeshuat Israel was holding Board meetings because "I don't think about what other – whether other organizations hold board meetings. . . . [I]t just was not something that I gave thought to." (June 8 (Katz) Tr. 79-81).

477.    Another example of CSI avoiding involvement with Jeshuat Israel and Touro Synagogue occurred in 2010 or 2011.  Jeshuat Israel was setting up a giving society called the Abraham Touro Society.  The proceeds from this fundraising effort are put in a permanent endowment, the purpose of which is to maintain and repair Touro Synagogue, to keep a rabbi in residence, and to keep Touro Synagogue open for services – the same purposes as the endowment Jeshuat Israel seeks to establish through the sale of the Rimonim.  (June 3 (Pimental) Tr. 70-73).  The Abraham Touro Society endowment, the corpus of which may not be touched, is placed with the Jewish Federation Foundation in Providence, with restrictions limiting the use of income to the endowment purposes.  (June 3 (Pimental) Tr. 72-73).

478.    Jeshuat Israel is the beneficiary of the Abraham Touro Society endowment. (June 3 (Pimental) Tr. 73).  In 2010 or 2011, Bea Ross and Michael Pimental of Jeshuat Israel approached Mr. Katz and another CSI individual to see if CSI would be interested in being

named the contingent beneficiary of the Abraham Touro Society endowment.  (June 3 (Pimental) Tr. 73-74, 116).  As contingent beneficiary, CSI would be permitted to spend endowment funds on Touro Synagogue in the event that Jeshuat Israel ceased to exist.  Notwithstanding the endowment's purpose to preserve Touro Synagogue, CSI expressed no interest in being named the contingent beneficiary.  (June 3 (Pimental) Tr. 73-74, 116-17; P220 at CJI 1349).

479.    At the end of the day, the evidence shows that CSI was unconcerned about Jeshuat Israel and the Synagogue that Jeshuat Israel maintains at its own expense.  Ms. Ross testified that in the 22 years she has been active in the leadership of Jeshuat Israel, CSI has not been active in any way with respect to Jeshuat Israel.  (June 5 (Ross) Tr. 9).  Mr. Pimental, who joined Jeshuat Israel's Board in 2006, similarly testified that CSI has had no involvement with Touro Synagogue or with Congregation Jeshuat Israel.  (June 3 (Pimental) Tr. 92).  And when it came time to save Touro Synagogue, Mr. Bazarsky, whose tenure as president or co-president of Jeshuat Israel spanned from 1993 to 2005, testified that CSI did nothing to preserve, protect, maintain, and restore the Synagogue.  (June 2 (Bazarsky) Tr. 211-12).

- CSI cannot be trusted to act in the best interests of Jeshuat Israel

480.    Perhaps the most striking trial testimony came at the end of the cross-examination of Mr. Katz.  After Mr. Katz acknowledged that Jeshuat Israel loves Touro Synagogue, that Jeshuat Israel has prayed in Touro Synagogue for 120 years, and that Jeshuat Israel has worked to preserve, maintain and restore Touro Synagogue, counsel asked Mr. Katz a simple question: "Q. And you really don't want that congregation to die, do you?  Yes or no."  Mr. Katz paused for some time to consider his answer.  When he finally gave a response, it was one that exposed his ambivalence towards Jeshuat Israel: "There will be a congregation there regardless of what happens to the present community.  And the, their -- I don't want the community – I don't want the synagogue to become just a museum."  (June 9 (Katz) Tr. 50).

Jeshuat Israel's counsel gave Mr. Katz a second chance, at which point Mr. Katz finally answered that he does not want Jeshuat Israel to die. (*Id.* at 51). But the fact that Mr. Katz had to think long and hard about how to answer the question whether or not he wanted Jeshuat Israel to wither away speaks volumes. How can a trustee be trusted to act in the best interests of the beneficiary in the face of such ambivalence towards the beneficiary's well-being and future?

481.     The Court concludes that CSI cannot be trusted to act in the best interest of the trust beneficiary, Jeshuat Israel. As set out in the Conclusions of Law, the Court will remove CSI as trustee and order the appointment of a new trustee, in consultation with the Attorney General of Rhode Island.

### F.     Friction between Shearith Israel and Jeshuat Israel

482.     Separate and apart from the failure of CSI to adhere to its duties, the Court finds that there is a significant degree of friction and ill-will between the parties. Jeshuat Israel's co-president, Ms. Ross, so testified. (June 5 (Ross) Tr. 55). She further testified that she does not believe that Jeshuat Israel can work with the current leadership of CSI. (June 5 (Ross) Tr. 56).

483.     CSI, for its part, seeks to evict Jeshuat Israel from Touro Synagogue. That drastic request – by itself – is a clear indication of ill feeling. The Court further notes that CSI has impugned Jeshuat Israel's motives in trying to sell the Rimonim for what CSI's counsel referenced as a "vanity" endowment. (June 1 Tr. 58, 98; Dkt. 70 at 7). CSI also has suggested that Jeshuat Israel acted surreptitiously when trying to sell the Rimonim. (*See* June 8 (Katz) Tr. 68, 208-09). As discussed below at paragraphs 517 through 543 and 554 through 560, the record shows that CSI is wrong; Jeshuat Israel has been open and candid about its actions, and in fact CSI knew as early as 2009 that Jeshuat Israel was trying to sell the Rimonim. That CSI has made these unfounded accusations is further evidence that the relationship has broken down.

484.    CSI has suggested that it seeks to "replace" the "leadership" of Jeshuat Israel (Dkt. 70 at 6, 7, 37, 70), the implication being that once Jeshuat Israel's "leadership" were changed to people who accept CSI's positions, there will be smooth sailing. Even assuming the Court had the power to remove and replace Jeshuat Israel's leadership, CSI seems to ignore or be unaware of the fact that Jeshuat Israel's "leadership" – its Board and officers – are at least a full quarter of the membership of the Congregation. (June 5 (Ross) Tr. 14-15). These individuals, by the way, were elected to their positions by the full Congregation. (June 1 (Bazarsky) Tr. 170).

485.    The Court finds that the friction and ill feeling that exists between the parties likely will impair the administration of the trust going forward. For this reason too, the Court finds it appropriate to remove CSI as trustee.

## IX.    Jeshuat Israel's proper efforts to endow Touro Synagogue by selling the Rimonim

486.    After spending years of effort to save Touro Synagogue by repairing and restoring it, Jeshuat Israel turned its efforts to securing the future of the Synagogue as an active place of worship with a congregation and a rabbi in residence.

### A.    Jeshuat Israel determined to balance its budget and create an endowment

487.    In 2008, Jeshuat Israel experienced a significant financial setback on account of the global financial crisis. (June 5 (Ross) Tr. 29). Income from the Abraham and Judah Touro Funds, which account for a substantial portion of Jeshuat Israel's total income, was cut significantly, as were donations. (June 5 (Ross) Tr. 29).

488.    Jeshuat Israel's short-term problems were serious. The Congregation was running a deficit of about $70,000 and about $480,000 remained outstanding on the loan taken out to complete the restoration of Touro Synagogue. (P179; P180 at CJI 1297; P181 at CJI 1325-26). If nothing changed and the Congregation was not faced with a large repair or capital

expenditure, it was reported that the Congregation could operate "for three to four years."  (P181 at CJI 1326).

489.    But beyond its short-term problems, Jeshuat Israel recognized that it faced serious long-term problems arising largely from the fact that the Congregation "is getting smaller as its members age and no new young families move into town to take their place."  (P181 at CJI 1325; *see also* June 1 (Bazarsky) Tr. 179).

490.    Jeshuat Israel resolved to do all that it could to find solutions for both its short- and long-term problems.  (June 3 (Pimental) Tr. 157-58; P179 at CJI 1302; P181).

491.    By the Fall and Winter of 2008, the leadership of Jeshuat Israel determined to raise an endowment to "ensure the financial security of the synagogue."  (P180 at CJI 1297). The purpose of the endowment sought by the Board was clear from the beginning: "We must raise an endowment that is sufficient to guarantee the long-term financial security of the Synagogue and to ensure that it always remains open as a house of worship and that there will always be a rabbi in residence."  (P181 at CJI 1325; *see also* June 3 (Pimental) Tr. 158-59; P230 at CJI 1401).   Without an endowment, the Congregation could fold, in which case Touro Synagogue would be "open only as a museum."  (P181 at CJI 1325).

492.    To stabilize its finances and create an endowment, committees were formed to explore Jeshuat Israel's options.  These committees focused on (i) cost cutting, (ii) fundraising and increasing membership and income, and (iii) the possible sale of the Congregation's real and personal property.  (P180 at CJI 1297-98; P181;  *see also* P179 at CJI 1302).

B.    Efforts to cut costs

493.    Starting in 2008 and 2009, Jeshuat Israel engaged in extensive and deliberate cost cutting to reduce its expenses as much as it possible could.  The Congregation created a more detailed expense section of its Profit and Loss statement so that it could identify and track

"all of the expenses of the organization."  (June 3 (Pimental) Tr. 87).  Jeshuat Israel's assistant treasurer Michael Pimental and others evaluated every line item for every single cost and expenditure to determine what could be reduced or eliminated.  (June 3 (Pimental) Tr. 64-65, 67; *see also* P179 at CJI 1302; P180 at CJI 1298; P181 at CJI 1326-27; P182 at CJI 1317; P190 at CJI 1292).

494.    One of Jeshuat Israel's biggest costs was insurance.  (June 3 (Pimental) Tr. 64-65).  The Congregation bid out insurance programs and changed brokers, which resulted in significant savings.  (June 3 (Pimental) Tr. 64-65).

495.    Jeshuat Israel also began to limit the use of its community center, the Levi Gale House, during the winter months to save heating expenses.  (June 3 (Ross) Tr. 192; June 1 (Bazarsky) Tr. 177; P190 at CJI 1292; P196 at CJI 1304).  Mr. Pimental testified that closing the Levi Gale House did not come without pain, as "[w]e are a community and we wanted to use our community center, but we thought it would be a good exercise in trying to reduce costs as much as possible."  (June 3 (Pimental) Tr. 67-68).

496.    Also to cut costs, Jeshuat Israel eliminated its administrator, who already had been working reduced hours.  (June 3 (Pimental) Tr. 67-68; P190 at CJI 1292).  Without an administrator, running Jeshuat Israel on a day-to-day basis now falls on the backs of a core group of volunteers, who do everything from answering phones, returning messages, and writing thank-you notes for donations, to paying checks, writing bills, and depositing donations at the bank.  (June 3 (Pimental) Tr. 68-69; June 1 (Bazarsky) Tr. 177-78).  For example, Jeshuat Israel's co-president Bea Ross now performs as a volunteer the same services she previously performed as a paid administrator for the Congregation.  (June 3 (Ross) Tr. 183-84).

497.    Jeshuat Israel cut smaller expenses as well.  Mr. Pimental gave as an example the Congregation's Pitney Bowes mail machine.  Jeshuat Israel gave up that machine and volunteers now have to lick stamps and envelopes.  (June 3 (Pimental) Tr. 69).

498.    The Court credits the testimony of Jeshuat Israel's witnesses who asserted that Jeshuat Israel has "cut everything we can."  (June 3 (Pimental) Tr. 78).  As Mr. Pimental put it, the Congregation has cut its expenses "to the bone." (June 3 (Pimental) Tr. 97; *see also* June 1 (Bazarsky) Tr. 176-77).

C.    Efforts to increase income and to fundraise

499.    In addition to cutting costs, Jeshuat Israel also explored ways to increase income. (June 3 (Pimental) Tr. 70; June 1 (Bazarsky) Tr. 181).

500.    Jeshuat Israel evaluated its membership structure and saw potential to raise income and increase membership by adding new classes of members.  (June 3 (Pimental) Tr. 75-77; *see also* P201 at CJI 1330; P205 at CJI 1309-10; P214 at CJI 1323; P217 at CJI 1283).

501.    However, despite Jeshuat Israel's efforts, increasing membership has proved challenging.  Jeshuat Israel conducts Orthodox services in Touro Synagogue, which, among other things means that men and women sit separately.  This separate seating has made it difficult for Jeshuat Israel to attract new members.  (June 1 (Bazarsky) Tr. 130).  Despite the additional membership classes, Jeshuat Israel still has a slowly declining membership.  (June 3 (Ross) Tr. 186; P244).  Leveling and then increasing membership no doubt will take time – time which an endowment would provide the Congregation.

502.    Jeshuat Israel also imposed an assessment on its members.  The assessment did not yield a large amount of money (P182 at CJI 1317) and was "painful" because the Congregation is mainly made of an older population on fixed incomes.  (June 3 (Pimental) Tr.

70-71).  Increasing dues and instituting another assessment is not a viable option due to the Congregation's demographics.  (*Id.*).

503.    In addition, Jeshuat Israel pursued – and continues to pursue – fundraising.  (*See, e.g.*, June 5 (Pedrick) Tr. 182; P179 at CJI 1302; P180 at CJI 1297-98; P182 CJI at 1317; P186 at CJI 1320; P190 at CJI 1293; P198 at CJI 1332; P199 at CJI 1296; P202 at CJI 1290; P212 at CJI 1307).

504.    For example, the Congregation launched the Abraham Touro Society in 2010 or 2011.  (June 3 (Pimental) Tr. 72).  Donors give $10,000 to join the Society.  To date, Jeshuat Israel has raised (including accruals from appreciation) about $200,000 through this program.  (P251 at CJI 3057).  The proceeds of the Abraham Touro Society are secured in an endowment from which Jeshuat Israel may only draw a set amount of income that may only be used to maintain and repair Touro Synagogue, to keep a rabbi in residence, and to keep Touro Synagogue open for services.  (June 3 (Pimental) Tr. 70-73).  Although this fundraising effort is continuing, there is some doubt as to whether Jeshuat Israel will be able to increase the Society's endowment significantly.  (*See* June 3 (Pimental) Tr. 72).  Indeed, Jeshuat Israel's financial reports show that, after the first year, donations have slowed significantly.  (P251; P243; P232; P210; P203).  Assuming donations continue at a steady rate, which likely is not a valid assumption, and assuming the Congregation does not draw any income, it could take over 50 years create an endowment of $7 million through this fundraising effort.  (*Id.*).

505.    When in 2008 and 2009, the Board of Jeshuat Israel evaluated the Congregation's options to raise an endowment, the Board recognized that fundraising was not likely to generate sufficient funds to secure the financial future of Touro Synagogue.

506.    Jeshuat Israel had attempted to raise an endowment before.  "Phase Two" of the campaign to restore Touro Synagogue was to raise an $8 million endowment "[s]ecuring Touro Synagogue's future for both structures and programs."  (P170 at TSF 6807).  However, Jeshuat Israel and the Foundation did not even raise enough money to complete "Phase One" to make desperately needed repairs to Touro Synagogue.  They were able to raise $2 million, but had to borrow an additional $1 million from Bank Newport to complete the restoration work.  (June 1 (Bazarsky) Tr. 168-69).  It took years of additional fundraising to pay off the loan after the restoration was complete.  (June 1 (Bazarsky) Tr. 169-70, 181-82; June 5 (Ross) Tr. 26; P212 at CJI 1306; P218 at CSI 13033).  Jeshuat Israel and the Touro Synagogue Foundation were not able to raise any significant money towards an endowment for Touro Synagogue.  (June 5 (Ross) Tr. 22, 28).

507.    After expending "a lot of effort and time, energy" raising the funds to pay off the last $500,000 of the loan, Jeshuat Israel's leadership believed that "we tapped out everybody.  There was no one left that we could approach.  So we knew fundraising was not going to get our endowment."  (June 1 (Bazarsky) Tr. 182; *see also* June 5 (Ross) Tr. 29).  Moreover, as Ms. Ross testified, raising money for an endowment is extremely difficult because an endowment is abstract; it is not a project that donors can "see," like a restoration project.  (June 5 (Ross) Tr. 29).

508.    Jeshuat Israel's hope for an endowment securing Touro Synagogue, then, lay with potentially selling an asset of value.

D.    Exploration of selling assets

509.    In late 2008 and early 2009, Jeshuat Israel formed a committee to examine the Congregation's assets to determine whether they could be used to fund an endowment.  (June 5 (Ross) Tr. 29-30; June 1 (Bazarsky) Tr. 179).

510.     The committee looked at all assets of the Congregation, including among other things Jeshuat Israel's community center (the Levi Gale House), the rabbi's house, a portrait of Abraham Touro painted by Gilbert Stuart, and the two Myer Myers rimonim.  (June 5 (Ross) Tr. 36; *see also* P170 at CJI 1302; P181 at CJI 1327-28; P182 CJI 1317; P186 at CJI 1320).

511.     The community center turned out only to be worth about $500,000 or $600,000, which would not be enough to raise an endowment.  (June 5 (Ross) Tr. 36; June 1 (Bazarsky) Tr. 182).  Selling the community center would make it extremely difficult for the Congregation to function.   Services are held in Touro Synagogue, but communal activities are held in the community center's social hall.  (June 3 (Ross) Tr. 189).  The community center also houses Jeshuat Israel's administrative office, the Rabbi's office, the Touro Synagogue Foundation's office, a library, and archives.  (June 3 (Ross) Tr. 188-89).

512.     The rabbi's house also turned out to be worth about $500,000.  (June 5 (Ross) Tr. 37-38; June 1 (Bazarsky) Tr. 182).  Again, that would not be sufficient to raise an endowment, and without the rabbi's house, Jeshuat Israel would have to find the Rabbi another place to live or increase his salary so he could pay for housing himself.  (June 5 (Ross) Tr. 38).

513.     Despite the celebrity of its creator, the Gilbert Stuart painting was not nearly as valuable as first thought; a sale could bring under $100,000 and possibly as little as $50,000. (June 5 (Ross) Tr. 38; June 1 (Bazarsky) Tr. 182).

514.     After evaluating all Jeshuat Israel's assets, the committee determined that sale of one pair of Myer Myers Rimonim had the greatest chance of raising enough funds to create an endowment for Touro Synagogue.  (June 5 (Ross) Tr. 39; June 1 (Bazarsky) Tr. 182-83).  No one *wanted* to sell the Rimonim.  (June 5 (Ross) Tr. 39; P181 at CJI 1327).  But given the prior lack of success raising funds for an endowment and the value of the Congregation's other assets, the

committee believed that selling rimonim was the Congregation's "only option" to secure the future of Touro Synagogue.  (June 1 (Bazarsky) Tr. 183).

515.    Almost immediately, Jeshuat Israel's leadership recognized certain guidelines for a sale.  The committee would not recommend that the Congregation sell Myer Myers Rimonim unless the sale would yield enough to endow Touro Synagogue in perpetuity.  (P230 at CJI 1401; P181 at CJI 1327-28).  Jeshuat Israel also was concerned that the rimonim find an appropriate home, like a museum where they could be shared with the public instead of residing out of view in a bank safe deposit box.  (P180 at CJI 1298 ("If we do end up selling them, it would be preferable to have them go to a museum where the public would see them rather than have them go to a private collection."); *see* also June 1 (Bazarsky) Tr. 182-83, 185; June 2 (Bazarsky) Tr. 37; P230 at CJI 1402).

516.    The committee members set out to educate themselves on the Myer Myers Rimonim.  (6/5/2010 (Ross) Tr. 39).  They consulted with experts, including individuals at the Philadelphia Museum of Fine Arts, Yale, and Brandeis.  (June 5 (Ross) Tr. 39-40; P230 at CJI 1401).  Jeshuat Israel then began to make inquiries about selling the Rimonim.

E.    Shearith Israel learns in 2009 that Jeshuat Israel is trying to sell Myer Myers rimonim

517.    Jeshuat Israel made no secret that it was looking into selling assets, including its Myer Myers Rimonim.  On the contrary, Jeshuat Israel disclosed this precise information to a major Jewish newspaper in New York – the Jewish *Forward*.

518.    The *Forward* is a prominent Jewish newspaper in New York, where CSI is located.  (June 10 (Mann) Tr. 141-42).  In fact, the *Forward* is one of only two major periodicals in New York devoted to Jewish news, the other being the *Jewish Week*.  The *Forward* comes out every week in both a print and online edition.  (June 8 (Katz) Tr. 126-27).

519.    On May 27, 2009, the Jewish *Forward* published on-line an article entitled, "Touro Struggles With Its Historic Legacy." (P187). The article was and is available on-line for free and without a subscription. *See* http://forward.com/news/106684/touro-struggles-with-its-historic-legacy/.

520.    On June 5, 2009, the article was published on the front page of the print edition of the *Forward*. (P189).

521.    The 2009 *Forward* article was based in large part on interviews with Jeshuat Israel's co-presidents, Bea Ross and Saul Woythaler. (P187; June 3 (Ross) Tr. 209). As CSI's Mr. Katz acknowledged, Mr. Woythaler and Ms. Ross spoke openly and on the record to this major New York Jewish publication not only about Jeshuat Israel's financial problems but that Jeshuat Israel was considering selling some of their precious assets to solve these financial problems – including their Myer Myers Rimonim. (June 8 (Katz) Tr. 132-33).

522.    The article reported in no uncertain terms that Jeshuat Israel was taking steps to sell its Myer Myers Rimonin to help address its financial problems:

> But to the congregation, Touro is a different story, one of prayer, ritual and ongoing Jewish communal life, and it appears that their story may lose out. So desperate is the synagogue's financial situation that ***it is quietly making inquiries about potentially selling some of its assets, including*** a 19th century mansion that holds the synagogue's offices and ***two sets of rare silver*** **rimonim** (covers for the handles of the Torah scroll) ***that were crafted by colonial-era Jewish silversmith Myer Myers and have belonged to the synagogue since that era***.

(P187 at CJI 1976 (emphasis added)).

523.    After the article was published, CSI's vice president and Board member, Michael Katz, called Ms. Ross at Jeshuat Israel. (June 3 (Ross) Tr. 211).

524.    Ms. Ross testified clearly and credibly about this call.  The Court found Ms. Ross credible based on her demeanor and because her substantive testimony is corroborated by other evidence.

525.    Mr. Katz told Ms. Ross that "he read the article" and he asked whether what was reported there was true.  (June 3 (Ross) Tr. 211-12).  He also asked more generally what was happening at Jeshuat Israel.  (June 3 (Ross) Tr. 212).

526.    Ms. Ross was transparent and candid.  She informed Mr. Katz that "it was true," that Jeshuat Israel was facing a serious budget deficit and had to do something to "shore up our finances and put them on a stable long-term basis."  (June 3 (Ross) Tr. 212).  Ms. Ross further informed Mr. Katz that Jeshuat Israel had formed a committee to look into selling assets and that the assets that Jeshuat Israel was considering selling included – specifically – its Myer Myers rimonim.  (June 3 (Ross) Tr. 212; June 5 (Ross) Tr. 78, 80).

527.    Mr. Katz asked Ms. Ross for information, but he never commented on any potential sale and never followed up on the conversation.  (June 3 (Ross) Tr. 212-13).

528.    Mr. Katz also testified about the call and substantially corroborated Ms. Ross's account.  Mr. Katz testified that during the call Ms. Ross told him "much of what is in the Jewish Forward article" in terms of Jeshuat Israel's serious economic problems and that Jeshuat Israel as having to cut back on office help.  (June 8 (Katz) Tr. 134-35).

529.    Although at trial Mr. Katz first claimed not to recall that Ms. Ross told him that Jeshuat Israel was considering selling assets, at deposition he admitted being so advised:

> QUESTION: Did there come a time when you learned that Jeshuat Israel was considering selling any rimonim?
>
> ANSWER:  At some point I received, after the visit from the Jeshuat Israel group to our board, I had a phone call with Bea Ross, and as I recollect, she mentioned that they were -- that they had assets which they thought they might sell, but that it was a very premature plan.

(June 8 (Katz) Tr. 136).

530.    This question and answer is notable for several reasons.  First, the question had "rimonim" in it.  Mr. Katz's unprompted response was to reference his telephone call with Ms. Ross and admit that she advised that Jeshuat Israel "had assets which they thought they might sell."  Second, CSI's position in this case is that it owns *all* the personal property in Touro Synagogue.  Yet Mr. Katz never objected and never said in the conversation that CSI owns the contents of Touro Synagogue.  (June 8 (Katz) Tr. 137-38).

531.    Ultimately, Mr. Katz admitted at trial that he recalls discussing during the call that Jeshuat Israel was considering selling some real estate but that he just does not recall "one way or the other" whether rimonim were mentioned.   (June 8 (Katz) Tr. 139).   This was consistent with his testimony at deposition, where he agreed that it was "possible" that he had read the *Forward* article before the call and that it was "possible" that he and Ms. Ross specifically discussed "rimonim."  (Katz Dep. Tr. 37-38, 42).  As such, Mr. Katz was not able to contradict Ms. Ross's testimony that he knew in 2009 that Jeshuat Israel was trying to sell Myer Myers rimonim.

532.    Here, the Court notes that Ms. Ross's version of events is corroborated by the testimony of a member of Jeshuat Israel's Board, Andrew Segal.  Mr. Segal recalled that in 2009

Ms. Ross informed him that she had received a call from Mr. Katz "about an article that we were selling the Rimonim."  (Segal Dep. Tr. 72; 80-81).  Ms. Ross told Mr. Segal that she told Mr. Katz "[e]xactly what we were doing."  (Segal Dep. Tr. 18).

533.    To the extent there is a conflict between the testimony of Mr. Katz and Ms. Ross, the Court credits Ms. Ross's testimony.  The Court finds Mr. Katz's memory to be unreliable.

534.    For example, Mr. Katz insisted that Ambassador John Loeb came to a meeting of CSI's Board of Trustees in 2005 to ask for financial support in building the Loeb Visitors Center. (June 8 (Katz) Tr. 37, 113).  However, contemporaneous documents, including CSI's own Board minutes from that meeting, show that Ambassador Loeb was not present and that funding for the Visitors Center had already been completed.  (D507; D509-006; June 8 (Katz) Tr. 113-14).  Mr. Katz nevertheless refused to accept that he was mistaken, even after being shown documents demonstrating that his recollection was incorrect.  (June 9 (Katz) Tr. 25-27, 86-87).

535.    Additional testimony undermined Mr. Katz's credibility.  The Court takes note of the numerous times that Mr. Katz was impeached by his deposition testimony.  (*See, e.g.*, June 8 (Katz) Tr. 78-81, 135-36, 137, 140-41, 157-58, 159-60, 187-88).

536.    Furthermore, Mr. Katz testified that the Board of CSI has never at any point considered removing the Myer Myers Rimonim from Touro Synagogue.  (June 8 (Katz) Tr. 62). But in this very lawsuit CSI's counterclaims seek the "immediate return of the Rimonim" to Shearith Israel in New York.  (P241 at p.19, ¶¶ 52, 57 & p.23 ¶ 4).  Mr. Katz also testified that the notes from the 2005 presentation did not indicate that Jeshuat Israel and the Touro Synagogue Foundation asked for funds for the project to restore Touro Synagogue, even though that is plainly what they say.  (June 9 (Katz) Tr. 28; D509-006).  Mr. Katz also testified that he "can't imagine" that anyone used the language "free ride" in CSI's November 16, 2004 meeting

(June 9 (Katz) Tr. 86), even though he also testified that the minutes quoting that language were circulated to the Board of Trustees to ensure accuracy, and that he had no reason to believe that the minutes did not accurately reflect was is reported in them. (June 8 (Katz) Tr. 103; June 9 (Katz) Tr. 95-96).

537.    In sum, the Court finds that Mr. Katz knew in 2009 that Jeshuat Israel was trying to sell Myer Myers Rimonim.

538.    The Court further finds that CSI knew this fact as well and did not object or claim ownership.  This is not surprising, as Mr. Katz testified that at the time he was not sure who owned the Rimonim.  (June 8 (Katz) Tr. 153).

539.    Significantly, Mr. Katz testified that he reported his conversation with Ms. Ross to the full Board of CSI.  (June 8 (Katz) Tr. 142).  Mr. Katz also testified that CSI subscribes to the *Forward*.  (June 8 (Katz) Tr. 127-28).  After all, the *Forward* is one of two major Jewish newspapers in New York.  And the article in question appeared on the front page.  (P189; June 8 (Katz) Tr. 128).

540.    Finally, the Court observes that CSI's long-time rabbi, Rabbi Marc Angel, testified that he "probably" read the article.  (Angel Dep. Tr. 100).  Considering that the *Forward* is a weekly newspaper, the Court concludes that Rabbi Angel "probably" read the article when it was published.

541.    Despite being aware in 2009 that Jeshuat Israel was trying to sell Myer Myers rimonim, CSI took no action whatsoever.  That is significant.  CSI's own expert Dr. Mann testified that if Jeshuat Israel announced in a public way that it owned the rimonim, then she would have expected CSI to object.  (June 10 (Mann) Tr. 141).  She also testified that if someone

from CSI had read the article in The *Forward* and was knowledgeable about ownership, she would have expected the person to protest.  (June 10 (Mann) Tr. 143-44).  CSI never did.

F.    Jeshuat Israel approached Roy Zuckerberg of CSI

542.    In 2008 or 2009, Mr. Segal approached CSI member and honorary trustee Roy Zuckerberg (June 8 (Katz) Tr. 33, 170; P265), a knowledgeable collector of silver, to see if he would be interested in purchasing the Rimonim and then donating them back to Jeshuat Israel upon his death.  (Segal Dep. Tr. 21-22, 24; P230 at CJI 1401).

543.    Mr. Zuckerberg declined to buy the Rimonim but he recommended that Jeshuat contact Sotheby's, Christie's, and an individual named Jonathan Trace, about selling the Rimonim.  (Segal Dep. Tr. 22-24; P230 at CJI 1401).  Jeshuat Israel followed Mr. Zuckerberg's recommendations and contacted all three.  (Segal Dep. Tr. 22-24; P230 at CJI 1401; June 2 (Bazarsky) Tr. 217).

G.    Christie's

544.    Jeshuat Israel received two very different proposals from Sotheby's and Christie's.

545.    Sotheby's suggested a public auction. (June 5 (Ross) Tr. 41).  Jeshuat Israel rejected that proposal because among other reasons the Congregation (i) only wanted to sell the Rimonim if doing so would yield enough for an endowment and Jeshuat Israel was concerned that the Rimonim might bring less than $7 million at auction, and (ii) was concerned that the Rimonim should go to a proper setting and a public auction would not give them control over who bought the objects.  (June 1 (Bazarsky) Tr. 183, 185; June 5 (Ross) Tr. 41; P230 at CJI 1402).

546.    Christie's recommended a private sales process in which Christie's would approach individual potential buyers one by one.  (June 5 (Ross) Tr. 41-42; June 1 (Bazarsky)

Tr. 185).  Jeshuat Israel chose this route because a private sale would give Jeshuat Israel more control over the price to make sure the sale would yield enough for an endowment, and more control over where the Rimonim would end up.  (June 2 (Bazarsky) Tr. 24-25; P230 at CJI 1402).  Jeshuat Israel informed Christie's that it was concerned about where the Rimonim would be placed.  As Ms. Ross testified, "[i]t couldn't just go anyplace.  It had to be a place that would be appropriate for [the Rimonim]."  (June 5 (Ross) Tr. 44).

547.    Around October 2, 2009, Jeshuat Israel and Christie's entered into an agreement for Christie's to be Jeshuat Israel's exclusive agent to privately sell the Rimonim.  (P195; June 5 (Ross) Tr. 42-43).

548.    The agreement with Christie's provided that Jeshuat Israel was to use "best efforts not to disclose the fact the Property is for sale."  (P195).  Christie's insisted that the sales process be kept confidential for two reasons.  First, Christie's wanted to be able to approach a potential buyer and say that the deal was just for them.  (June 1 (Bazarsky) Tr. 186).  Second, Christie's expressed a concern that if Jeshuat Israel's efforts to sell the Rimonim were publicized, CSI and Mikveh Israel might put their own Myer Myers rimonim up for sale, which might reduce the potential sale price of Jeshuat Israel's Rimonim.  (June 1 (Bazarsky) Tr. 186; June 5 (Ross) Tr. 43-44).

549.    Christie's informed Jeshuat Israel that Christie's would and did investigate the "provenance" of the Rimonim as part of its due diligence.  (June 5 (Ross) Tr. 85; P230 at CJI 1403).  The head of Christie's silver department, Jeanne Sloane, testified that she had "no question" that Jeshuat Israel owned the Rimonim because they had been published "many, many, many times, this pair of Rimonim as property of Touro Synagogue or the Congregation." (Sloane Dep. Tr. 16; *see also id.* at 64-66, 153-55, 159-60, 188-89, 191-93, 195).

550.     By 2010, Christie's had approached five potential buyers without success.  (June 1 (Bazarsky) Tr. 186; P230 at CJI 1403).   Christie's suggested that Jeshuat Israel loan the Rimonim to the MFA, which Jeshuat Israel did in 2010. (June 5 (Ross) Tr. 44-45; June 1 (Bazarsky) Tr. 186-88).   The MFA then through Christie's offered in 2011 to purchase the Rimonim for $5 million.  (P213; June 1 (Bazarsky) Tr. 188).

551.     Jeshuat Israel rejected this offer because it did not think that $5 million was sufficient to create an endowment securing the future of Touro Synagogue.  (June 5 (Ross) Tr. 52-53; June 1 (Bazarsky) Tr. 188).  Jeshuat Israel was able to negotiate the offer up to $7.4 million, with $400,000 going to Christie's as commission.   (June 5 (Ross) Tr. 53; June 1 (Bazarsky) Tr. 188).  The MFA formalized this offer in a letter dated January 31, 2012.  (P223). Jeshuat Israel's committee concluded that accepting this offer would permit the Congregation to create an endowment securing the future of Touro Synagogue.  (June 5 (Ross) Tr. 53).

552.     The committee believed that selling the Rimonim to the MFA would be a win-win situation.  Instead of being in a safe deposit box, the Rimonim would remain on display at the MFA where the world could see it.  (June 2 (Bazarsky) Tr. 37).  CSI's own expert Dr. Mann testified that the MFA is a proper setting for the Rimonim.  (June 10 (Mann) Tr. 149-50).

553.     Several things had to happen before the sale could close.  The full Congregation would have to vote to approve the sale.  (June 5 (Ross) Tr. 54; P229).  Jeshuat Israel and the MFA would have to negotiate and draft a contract of sale.  (P229).  And the Congregation would have to approve the terms of the trust holding the endowment.  (P229; P228 at CJI 1245).

H.     June 25, 2012 call and e-mail

554.     The congregational meeting to vote on a resolution to start the process of selling the Rimonim was scheduled for the evening of June 25, 2012.  (June 3 (Ross) Tr. 213).

555.     Sometime in June 2012, CSI learned of the potential sale of the Rimonim to the MFA.  In the late morning of June 25, 2012, Michael Katz called Bea Ross.  (June 3 (Ross) Tr. 213).  Mr. Katz informed Ms. Ross that he had heard of the meeting and resolution to sell the Rimonim.  He asked how the sale would work and how it was structured.  (June 3 (Ross) Tr. 214).  Ms. Ross said that there were "a lot of moving parts" and that she would write him an e-mail explaining the situation.  (June 3 (Ross) Tr. 214).  Mr. Katz acknowledged that Ms. Ross told him that she was going to put this in writing and that she did not try to evade talking to him. (June 8 (Katz) Tr. 145).

556.     Ms. Ross wrote the promised e-mail to Mr. Katz the very same day.  (P229; June 8 (Katz) Tr. 145).  As Mr. Katz testified, Ms. Ross was very open and gave a detailed description of Jeshuat Israel's plans, and that her e-mail was similar to what she had told the Jewish *Forward* in 2009.  (June 8 (Katz) Tr. 148).

557.     Ms. Ross wrote:

> Dear Michael[:]
>
> It was good to talk to you on the phone about the sale of one of our two sets of Myer Myers rimonim. We understand and appreciate Shearith Israel's interest in Touro Synagogue.   As sister synagogues, we share a long, storied history and a commitment to sustaining orthodox Jewish tradition.
>
> We only reached our decision to sell the rimonim after long reflection and discussion. At present, our income and endowment are barely sufficient to meet our minimum needs. It is our moral and fiduciary responsibility to plan for the future now.  Selling the rimonim for the amount offered will enable us to secure the financial future of the Synagogue and ensure that the Synagogue and grounds are properly maintained and that the Synagogue will always be open for services and have a rabbi in residence.  We would not consider selling the rimonim if those objectives could not have been met.

At the same time, the sale offers us the opportunity to see the rimonim showcased at the new Art of the Americas Wing of the Museum of Fine Arts in Boston as symbols of the Jewish community's role in the founding of America and the establishment of religious freedom.  If a sale must take place, the placement is ideal.

The entire net proceeds from the sale will be put in an irrevocable endowment fund from which only the interest can be drawn.  In the same way our Touro Endowment Funds have helped sustain us until now, this new endowment fund will help sustain us in the future.  As one of our board members has said, "This is a Touro moment.  Will we measure up?"

The terms of the fund agreement will also provide that if the Congregation in Newport ceases to exist and  responsibility for the Synagogue returns to Shearith Israel the income from the fund can be used by Shearith Israel to maintain the Synagogue, if it chooses to accept the responsibility.

In any case, no immediate sale will take place. The resolution passed by our board that will be presented to the Congregation requires a second vote by the Congregation approving the terms of the endowment fund before any sale can take place.

We treasure our Synagogue. The opportunity to secure its financial future while seeing the rimonim displayed as part of the history and culture of America is overwhelmingly positive.

I hope that you will share my thoughts, which reflect those of our board, with your board.  We look forward to talking to you and members of your board at a mutually agreeable time.

My best, Bea.

(P229).

558.    In response, Mr. Katz wrote what can only be characterized as an innocuous e-mail asking Ms. Ross to confirm what she had just written.  (P229).  That is in fact how Ms. Ross understood Mr. Katz's reply.  (June 3 (Ross) Tr. 220).  For his part, Mr. Katz acknowledged at trial that his e-mail merely sought information, including what the terms of the transaction would be.  (June 8 (Katz) Tr. 152-53).

559.     Ms. Ross sent a response to the e-mail that confirmed her prior message and stated "[W]e welcome the opportunity to talk to you and members of your board to address any concerns you may have."  (P229).  Ms. Ross testified that she was not aware of any concerns; rather, she took Mr. Katz's communications as a friendly expression of interest from a sister congregation.  (June 3 (Ross) Tr. 221).  Mr. Katz acknowledged that once again, Ms. Ross did not delay or evade his questions in any way.  (June 8 (Katz) Tr. 153).  Indeed, Mr. Katz testified that Ms. Ross was friendly, open and candid – and that that was how Ms. Ross has *always* been with him.  (June 8 (Katz) Tr. 155).

560.     At no time during the initial call or in the e-mail exchange did Mr. Katz raise any objection or state that CSI owns the Rimonim.  (June 3 (Ross) Tr. 214; June 8 (Katz) Tr. 153).  Remarkably, Mr. Katz testified that he never informed Ms. Ross that Jeshuat Israel could not sell the Rimonim – because "***We weren't sure who owned them at that point***."  (June 8 (Katz) Tr. 153 (emphasis added)).

I.     June 25, 2012 vote

561.     The Jeshuat Israel committee had spent a tremendous amount of time over several years attempting to secure an endowment, first by determining what if anything the Congregation should sell and then by focusing on the Rimonim and exploring a sale of that asset. (June 2 (Bazarsky) Tr. 214).

562.     The committee's efforts culminated in the June 25, 2012 congregation meeting to discuss and vote on a resolution that would start the process of selling the Rimonim to the MFA for $7.4 million.  (P228; P230; P227).

563.     At the meeting, Mr. Segal summarized the committee's activities over the past four years, and Ms. Ross and Mr. Bazarsky described the potential deal and its purpose.  (P228; P230).  The floor was then open to the Congregation, during which time members were free to

and did ask any and all questions. (P228; June 2 (Bazarsky) Tr. 29-30). The Congregation then voted – 31 to 6 – to accept the resolution authorizing the sale of the Rimonim. (P228 at CJI 1247; June 5 (Ross) Tr. 54).

        J.      <u>Cease and desist letter</u>

564.     On June 29, 2012 – four-days after the e-mail exchange between Mr. Katz and Ms. Ross – CSI issued a letter demanding that Jeshuat Israel cease and desist from selling the Rimonim. (P231; June 8 (Katz) Tr. 156-57). The sole reason that CSI gave in the letter was that CSI and not Jeshuat Israel owns the Rimonim. (P231). The cease and desist letter brought the potential sale of the Rimonim to an immediate halt. (June 5 (Ross) Tr. 54).

565.     The timing of CSI's letter is significant. In the four day period between the June 25 e-mail exchange and the June 29 cease and desist letter, CSI "began looking at the documents that we had, but it was, ***it was too soon to come to any conclusions as to exactly what the status was***." (June 9 (Katz) Tr. 80 (emphasis added)). Thus, CSI did not know if it owned the Rimonim on June 25 and also did not know if it owned them on June 29, when CJI issued the cease and desist letter halting the sale to the MFA. Only after issuing the cease and desist letter did CSI ask its employee, Zachary Edinger, to try to find documentary support for the position CSI had just taken. (June 8 (Katz) Tr. 161-63; P233).

**X.    Jeshuat Israel's current financial condition is precarious and unsustainable**

566.     The record establishes that Jeshuat Israel urgently needs to sell the Rimonim to create an endowment.

        A.      <u>Jeshuat Israel's financial condition</u>

567.     Jeshuat Israel's current financial condition is "precarious." (June 3 (Pimental) Tr. 77-78). Jeshuat Israel's assistant treasurer Michael Pimental testified that the Congregation is one "large financial responsibility away from insolvency." (June 3 (Pimental) Tr. 78).

568.    After engaging in extensive and deliberate cost cutting starting in 2008 or 2009, Jeshuat Israel has "cut everything we can." (June 3 (Pimental) Tr. 78). The Congregation is not cutting anything from next year's budget "because we've already cut it [to] the bone." (June 3 (Pimental) Tr. 97; *see also* June 1 (Bazarsky) Tr. 176-77).

569.    As Mr. Pimental explained, the Congregation's current situation is not sustainable in the long run because the core group of volunteers who run Jeshuat Israel and Touro Synagogue on a day-to-day basis are "getting burnt out." (June 3 (Pimental) Tr. 78).

570.    Moreover, Jeshuat Israel is just "barely meeting" expenses on an annual basis. (June 3 (Pimental) Tr. 78). As a result, the Congregation is just "hanging on" and "eking by." (June 3 (Pimental) Tr. 94, 159).

571.    As of June 30, 2014, the Congregation has only $145,487.14 in its general or "emergency" fund. (June 3 (Pimental) Tr. 83; P251 at CJI 3058). These are the only funds that Jeshuat Israel has that are completely unrestricted. (June 3 (Pimental) Tr. 83). Jeshuat Israel has $1.4 million in total liquid assets, but donor restrictions preclude use of much of those funds for the purposes of the endowment that Jeshuat Israel seeks. (June 3 (Pimental) Tr. 80-81; P251 at CJI 3057).

572.    In assessing Jeshuat Israel's financial condition, the Court also is mindful of the Congregation's many substantial deferred expenses.

573.    The Congregation pays to maintain the Touro Synagogue as well as the properties it owns, including the community center (Levi Gale House) and the Rabbi's house. (P251 at CJI 3060-61). On account of Jeshuat Israel's "precarious" financial condition, there is maintenance the Congregation "just can't afford to do." Those expenses, many of which are substantial, get deferred. (June 3 (Pimental) Tr. 88-90, 94; P251 at CJI 3060-61). Mr. Pimental

described the situation as "triage" or "fighting fires;" the Congregation is always trying to allocate resources to address only the most critical maintenance needs first.  (June 3 (Pimental) Tr. 89-90).

574.    Mr. Pimental testified that Jeshuat Israel easily has hundreds of thousands of dollars in deferred maintenance expenses.  (June 3 (Pimental) Tr. 90-91).  For example, peeling paint on the ceiling of Touro Synagogue is pulling plaster off.  Jeshuat Israel received an estimate from the National Park Service that repairing the Synagogue's ceiling would cost about $150,000 to $175,000.  Jeshuat Israel just does not have the money for that repair.  (June 3 (Pimental) Tr. 163-64).

575.    As another example, Jeshuat Israel needs to repair the gutters in the Levi Gale House because they are causing hazardous conditions in the winter.  That repair will cost $12,000 to $15,000.  (June 3 (Pimental) Tr. 164).

576.    The Levi Gale House, which is very old, also has antiquated hot water pipes and is in need of a new heating system.  (June 3 (Ross) Tr. 190-91).

577.    The Rabbi's house owned by Jeshuat Israel, located across the street from Touro Synagogue, also is in need of renovation. (June 3 (Ross) Tr. 192-93).

578.    Jeshuat Israel likewise owns a structure called the Barney House, which is an 18th century Colonial building next to the Visitors Center.  The building is not usable in its current form.  (June 3 (Ross) Tr. 196).  Plans to restore that structure have been on indefinite hold while the Congregation tries to secure the future of Touro Synagogue – which takes priority.  (June 3 (Ross) Tr. 196).

579.    Jeshuat Israel's deferred expenses are not limited to maintenance.  The leadership of Jeshuat Israel recognizes that Touro Synagogue is a potential terrorist target.  (June

3 (Pimental) Tr. 90-92).    The Congregation has installed panic buttons.    Jeshuat Israel desperately wants additional security, but has not because "we can't afford it."    (June 3 (Pimental) Tr. 91-92).

      B.    Shearith Israel's illusory settlement offer

    580.    CSI points to a settlement offer that Jeshuat Israel turned down during settlement negotiations in Fall 2012.  CSI's settlement offer is not relevant or probative on the issues being tried here.

    581.    At the outset, the Court notes that the "proposed term" sheet upon which CSI relies starts by stating that it is "nonbinding."  (D405).  Moreover, CSI's offer was that it would use "reasonable efforts" to "have donated" to Jeshuat Israel a certain percentage of Jeshuat Israel's operating expenses, but no more than $75,000 per year for up to 10 years.  (D405; June 8 (Katz) Tr. 68).  CSI would determine how much money to "have donated" to Jeshuat Israel based on CSI's view of Jeshuat Israel's needs.  (D405; June 5 (Ross) Tr. 10).  In exchange, Jeshuat Israel had to "confirm, both to CSI and to the public" that "CSI owns the land, building, improvements, personalty, etc, including without limitation all ritual objects, including without limitation the sifrai torah and rimonim at or used at or for [Touro Synagogue]."  (D405; June 5 (Ross) Tr. 10).  That is to say, Jeshuat Israel would have to agree to CSI's position, even though Jeshuat Israel did not believe there was any basis for it.  (June 5 (Ross) Tr. 10-11).

    582.    The "offer" also would change the proposed sale of the Rimonim into a loan not to exceed ten years.  That was not a viable alternative.  (June 5 (Ross) Tr. 103-04).  And CSI wanted for itself the entire proceeds of a lease as well as a portion of the income from a fund established with those proceeds.  (P238; June 2 (Bazarsky) Tr. 41-45; Lustig Dep. Tr. 88-90, 131-32).  CSI's counsel wrote:

> Your peremptory and unilateral description of the escrow is unacceptable. I can't here list all the reasons, but they include, without limitation, the fact that, as I said at the meeting, you wanted cash, much of the Income for maintenance during a defined period would go to Touro (SUBJECT TO DOCUMENTATION ACCEPTABLE TO CSI AND TO CSI'S BOARD APPROVAL, WHICH HAS NOT EVEN BEEN SOUGHT MUCH LESS RECEIVED); and, in return, CSI wants clarification of governance, which is and will remain in CSI (completely the opposite of what you wrote); there will need to be a sharing of the income in a way that will favor Touro but is NOT as you describe it, which appears to be 100% to you; the principal belongs to CSI; and there will not be a partial settlement of anything – Touro will be confirming CSI's ownership of land, building, personalty, etc or there will be no compromise at all.

(P238).

583.    Furthermore, as Jeshuat Israel's co-president, Ms. Ross, testified, CSI's "offer" "wasn't going to solve our problem. . . ."  (June 5 (Ross) Tr. 10-11; *see also* June 3 (Pimental) Tr. 99-100 ($75,000 would be "[n]ot enough")).  Jeshuat Israel sought to sell the Rimonim to create an endowment that would secure the long-term future of Touro Synagogue; the Congregation was not looking for a short-term band-aid to make up for holes in its budget.  That is why Jeshuat Israel continued to pursue an endowment even after it balanced its budget.  (June 3 (Pimental) Tr. 158-59).

584.    CSI's proposal would not secure the long-term future of Touro Synagogue and, unlike the sale of the Rimonim for $7.4 million, was uncertain.  CSI was not going to pay Jeshuat Israel money from CSI's coffers.  Rather, CSI was proposing to *try* to obtain donations.  CSI's vice president and Rule 30(b)(6) witness, Michael Lustig, testified that the ability of CSI to make good on its proposal depended on the willingness of private donors to contribute.  (Lustig Dep. Tr. 162-64).

585.    CSI's offer also turned on its own view of Jeshuat Israel's needs.  The record shows that CSI could not have been trusted to properly gauge those needs.  For example, CSI's

vice president and lone live witness, Mr. Katz, testified that, in his view, Touro Synagogue can function without a rabbi – a situation that would turn Touro Synagogue into a museum. (June 8 (Katz) Tr. 133). CSI itself has three rabbis. (June 9 (Katz) Tr. 32).

## XI.    The endowment sought by Jeshuat Israel

586.    As set forth above the financial condition of Jeshuat Israel and the synagogue it maintains is precarious and not sustainable. Without an endowment raised by selling the Rimonim, the future of Touro Synagogue as an open and active house of worship is uncertain.

587.    It is also important to situate Jeshuat Israel's role in the wider Jewish community. Jeshuat Israel does not merely service itself. Because of its historic significance, people from all around the world routinely come to synagogue services at Touro. (June 1 (Bazarsky) Tr. 180). The Synagogue needs to remain open and active for these visitors. Jeshuat Israel thus operates for the benefit of the wider community as well.

588.    The endowment Jeshuat Israel seeks would secure the future of Touro Synagogue as an active and open place of worship. (June 3 (Pimental) Tr. 94). Without it, Touro Synagogue risks becoming a museum.

589.    Mr. Bazarsky testified that "the members of Touro Synagogue are committed to say that the oldest synagogue in the United States must not close and must not become a museum. We don't want people to come through and say there *once* were weddings here, there *once* were bar mitzvahs here." (June 1 (Bazarsky) Tr. 180 (emphasis added)).

590.    With this Court's ruling – permitting the sale of the Rimonin to create a permanent, irrevocable endowment for Touro Synagogue and the congregation worshipping there – Jeshuat Israel is one step closer to its goal of securing the future of the Synagogue they love.

## XII.    Governance of Jeshuat Israel

591.    Jeshuat Israel is governed by officers and Board members, all of whom are elected by the Congregation.  (June 5 (Ross) Tr. 14-15; June 1 (Bazarsky) Tr. 170).  There are 12 officers and 16 members of the Board.  (June 5 (Ross) Tr. 14-15; *see also* June 1 (Bazarsky) Tr. 170).  As a result, at least 25% (more if non-voting associate members are taken out) of the entire membership of the Congregation is part of its leadership.  (June 5 (Ross) Tr. 14-15).  The officers and Board meet once a month, except in July and August.  (June 5 (Ross) Tr. 15).  The full Congregation meets three times a year.  (June 5 (Ross) Tr. 15).

592.    Shearith Israel seeks to gain control over the governance of Jeshuat Israel by asserting that it is entitled to seats on that Congregation's Board under by-laws enacted in 1897.

593.    However, as explained below Jeshuat Israel revised its by-laws 70 years ago. Shearith Israel knew at the time but did not complain – until this lawsuit.  CSI has had nothing to do with Jeshuat Israel's governance for generations.  CSI's attempt to get involved now comes far too late.  Moreover, even if there were some reason to return Jeshuat Israel to its 118 year old by-laws, the Court would not find it appropriate to do so in view of the fact that the Court is removing CSI as trustee of Touro Synagogue.

### A.    Jeshuat Israel's 1897 by-laws

594.    Jeshuat Israel enacted by-laws in 1897.  (P46).  Among other things, the by-laws provided for four CSI-appointed trustees who could vote by proxy, which meant that they did not have to go to Newport for meetings.  (P46, Arts. II & III).  The by-laws required that the trustees CSI appointed to Jeshuat Israel must also be trustees of CSI.  (P46, Art. III).  CSI-appointed trustees were declared to be members of Jeshuat Israel.  (P46, Art. XII).

595.    Article XIX of the 1897 by-laws provided that "No real or other property owned, or which may hereafter be acquired by this Congregation shall be sold or exchanged or

mortgaged, unless by unanimous vote of the members present, and represented by proxy at a Special Meeting convened for that purpose." (P46, Art. XIX).[16]

596.    Article XXI provided that "no addition, alteration or amendment shall be made to this Constitution and By-Laws that shall in any way add to, alter or affect the status of the four Trustees of the Spanish and Portuguese Congregation Shearith Israel of the City of New York, or of Article XIX of this Constitution and By-Laws, unless the said four Trustees of the said Congregation Shearith Israel vote affirmatively for such proposed addition, alteration or amendment." (P46, Art. XXI).

B.    Shearith Israel quickly ceased to involve itself in Jeshuat Israel's governance

597.    In 1897, Shearith Israel resolved to elect trustees to the Board of Jeshuat Israel on annual basis. (P94A). But as best as the Court can determine, CSI appointed trustees in 1897, 1898, and 1899, yet ceased doing so after 1899. (P99A; P105A; P114A). There appears to be no record of CSI-appointed trustees attending or voting in any Jeshuat Israel meetings, certainly not within the last 100 years.

598.    Shearith Israel knew or should have known that Jeshuat Israel was continuing to function. Yet Shearith Israel never appointed or even attempted to appoint trustees to Jeshuat Israel's board. (June 1 (Bazarsky) Tr. 171; June 8 (Katz) Tr. 81-82; Angel Dep. Tr. 6-7, 93-95; Groopman Dep. Tr. 18; Lustig Dep. Tr. 11-12, 12-13, 92-93).

599.    Nor did Shearith Israel complain about not receiving notice of Jeshuat Israel meetings. Under the 1897 by-laws, Jeshuat Israel's Board of Trustees was required to meet at least once every three months, and the trustees were to be given advanced written notice of these meetings. (P46, Art. VI). Thus, if the 1897 by-laws have remained in effect, as CSI contends,

---

[16] To the extent CSI argues that Article XIX is relevant to this case, CSI admits that the Rimonim are the property of Jeshuat Israel.

Jeshuat Israel should have provided and CSI or CSI trustees should have received hundreds of meeting notices over the 118 years that have elapsed since those by-laws were enacted. However, as best as the Court can determine, the last record indicating that CSI received notice of a Jeshuat Israel meeting was in 1901. (D134A).

600.    Again, Shearith Israel knew or should have known that Jeshuat Israel was a functioning congregation holding meetings and votes. Nevertheless, CSI never complained about not receiving notices or proxy vote materials or even more generally about not being given an opportunity to participate in Jeshuat Israel's governance, such as Board or Congregational votes. (June 1 (Bazarsky) Tr. 171; June 8 (Katz) Tr. 81-83; Lustig Dep. Tr. 92-93, 96-97).

601.    The record overwhelmingly demonstrates that Shearith Israel has not had any involvement with Jeshuat Israel's governance for at least 100 years. Shearith Israel certainly has not been involved within the memory of any of the witnesses. (June 5 (Ross) Tr. 16 (during 19 years involved with Jeshuat Israel's leadership, CSI has never asked to participate in any way in the governance of Jeshuat Israel and never attempted to send a representative to Jeshuat Israel Board meetings); June 1 (Bazarsky) Tr. 171 (during lengthy involvement as a leader of Jeshuat Israel, including presidency from 1993 to 2005, CSI has not participated in Jeshuat Israel's governance)).

602.    Moreover, until this lawsuit, CSI never complained about the way Jeshuat Israel governed itself without CSI's input. (June 1 (Bazarsky) Tr. 171; June 8 (Katz) Tr. 82-83; Groopman Dep. Tr. 25-26; Angel Dep. Tr. 20, 36-37).

C.    1945 Jeshuat Israel by-laws

603.    Against the backdrop of CSI's lack of involvement, Jeshuat Israel adopted revised by-laws in January 1945. (P85).

604.    The 1945 by-laws are different from the 1897 by-laws in several key respects.

- 173 -

605.     The 1945 by-laws did not permit CSI-appointed trustees (if any) to vote by proxy.  (P85, Art. II).  Rather, the by-laws were specifically revised to state that the Board of Officers would consist of among other things "four trustees appointed from the trustees of the Congregation Shearith Israel of New York City, *but without a proxy vote . . . .*"  (P85, Art. II (emphasis added)).  To the extent CSI wanted to participate in Jeshuat Israel's governance, those trustees would have to go to Newport to attend meetings.

606.     The 1945 by-laws also did not include provisions requiring CSI-appointed trustees to affirmatively vote for alterations or amendments affecting their "status."  Under the 1945 revisions, the by-laws could be changed simply by a two-third vote of Jeshuat Israel members.  (P85, Art. XV).  And CSI-appointed trustees (if any) were no longer automatically members of Jeshuat Israel.  (P85, Art. VIII).

607.     Another change was that the 1945 by-laws did not require a member vote to dispose of personal property.  (P85, Art. VI (requiring congregation vote only for the sale of real property)).

D.     CSI was aware of the 1945 by-laws but took no action

608.     The tri-partite agreement among the United States Department of Interior, CSI, and Jeshuat Israel was negotiated and executed in the Fall of 1945.  (P90).

609.     In connection with that Agreement, Jeshuat Israel provided CSI with a copy of the 1945 by-laws, which had been adopted several months earlier on January 28, 1945.  (P85).  The Court reaches this conclusion based on the following evidence.

610.     Attached to the copy of the 1945 tri-partite agreement that CSI produced in this case from its own files are (i) minutes from an October 28, 1945 meeting of Jeshuat Israel, at which the 1945 agreement was approved by Jeshuat Israel, and (ii) a November 7, 1945 affidavit

from the Secretary of Jeshuat Israel, Frederick S. Dannin, attesting that the minutes are accurate. (P90 at CSI 100-02).

611.    The minutes provided that the "By-Law Manual" was to be "attached" to the executed copy of the agreement being provided to CSI.  (P90 at CSI 101).

612.    More importantly, Mr. Dannin attested that Jeshuat Israel in fact had annexed the 1945 by-laws to his affidavit by swearing that "the By-Laws *annexed hereto* have been duly adopted and are presently in full force and affect."  (*Id.* at 101-02 (emphasis added)).

613.    CSI itself produced the 1945 Jeshuat Israel by-laws from its files.  (P85).  The evidence shows that CSI received these by-laws in 1945.  In addition to Mr. Dannin's affidavit, the Court notes that the copy of the 1945 by-laws produced from CSI's files (P85) is not the same copy that Jeshuat Israel produced from its files in this litigation (P84).  Among other things, Jeshuat Israel's copy includes a cover with handwriting stating "old"; CSI's copy does not have this cover.  Jeshuat Israel's copy also is missing pages 4 through 15, which concerns historical documents relating to the congregation.  CSI's copy contains those pages.  Jeshuat Israel's copy has binder holes that occasionally obscure the text.  CSI's copy does not contain these holes.  (*Compare* P84 at CJI 496 *with* P85 at CSI 693).

614.    Thus, CSI received the 1945 Jeshuat Israel by-laws in 1945.  And Jeshuat Israel's adoption of new by-laws in 1945 was not otherwise a secret.  Rabbi Morris Gutstein in his 1958 book, "To Bigotry No Sanction," stated that "[m]ore than half a century later [after the 19th century by-laws], a new set of By-Laws was adopted by the Congregation Jeshuat Israel …" (P104 at CJI 3201).  Rabbi Gutstein specifically cited Jeshuat Israel by-laws adopted "January 28, 1945."  (P104 at CJI 3212 n.22).

615.    Despite CSI's receipt of the 1945 by-laws, there is no evidence that CSI ever complained, objected, or took any action whatsoever as a result of any changes in the way Jeshuat Israel was to be governed or how its by-laws could be altered in the future.

E.    After 1945, Jeshuat Israel continued without CSI-appointed trustees and amended its by-laws numerous times

616.    After 1945, CSI continued to have no involvement in Jeshuat Israel's governance.

617.    CSI did not appoint or seek to appoint any trustees to Jeshuat Israel's Board. CSI did not send anyone to Jeshuat Israel Board meetings or otherwise attempt to participate in the governance of Jeshuat Israel.

618.    After several more decades in which CSI was completely absent from the picture, Jeshuat Israel revised its by-laws again in 1983 to remove any reference to CSI or CSI-appointed trustees.  (P129).

619.    Since 1945, Jeshuat Israel has revised its by-laws at least thirteen times: in 1969, 1983, 1987, 1994, twice in 1995, 1996, 1998, 1999, 2000, 2004, and most recently in 2011. (P116; P129; P132; P137; P146; P216).

620.    There is no evidence that CSI ever objected to these revisions.  To the extent that CSI claims that it was not aware that changes were made, that only shows CSI's complete lack of involvement with Jeshuat Israel's governance.

621.    For example, in 1979, CSI's president (who was 57 years old at the time) wrote to Jeshuat Israel that, "For so long as I can remember, your Congregation has always had full autonomy and as you so aptly said in your letter, it has also had complete control of its destiny . . . .  As you know from our past experience, there is no desire on our part to interfere in any way with the conduct of your Congregation."  (P127).

622. The records show that over the past 100+ years, Jeshuat Israel held numerous meetings and made countless decisions concerning its governance — all without involvement from CSI.

623. After reviewing the record, the Court concludes that Jeshuat Israel has properly relied upon CSI's lack of involvement and silence to change its by-laws and to make decisions without CSI's involvement, and that CSI by its conduct is estopped from claiming otherwise.

## XIII. Jeshuat Israel's religious practices

624. Jeshuat Israel has practiced Judaism the same way for decades if not a century. Yet by its counterclaims CSI seeks to force Jeshuat Israel to pray differently. Specifically, CSI seeks a declaration that Jeshuat Israel is breaching the 1903/1908 leases and the 1945 agreement by using Touro Synagogue in a manner contrary to the "ritual, rites, and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed by Shearith Israel." (P241 at 20).

625. The First Amendment would prevent this Court from deciding what the Spanish and Portuguese "ritual, rites, and customs" are and whether Jeshuat Israel practices those rites and rituals. In any event, the Court finds these issues to be moot as a factual matter.

626. CSI's sole live witness, its vice president, Michael Katz, testified that the way in which Jeshuat Israel prays is acceptable. (June 8 (Katz) Tr. 33-34, 75). "There's been no issue between us on that," he said. (*Id.* at 34). Mr. Katz also said that he was comfortable at services at Touro Synagogue and never objected to the way services were conducted. (*Id.* at 75).

627. Moreover, Jeshuat Israel's religious practices have remained unchanged for generations. (June 1 (Bazarsky) Tr. 115; P233 at CJI 389; Angel Dep. Tr. 31-33, 36-37, 106-08; P113 at CSI 2739-40). All along, Shearith Israel has known how Jeshuat Israel prays and that it does not strictly comply with certain aspects of "Spanish and Portuguese" rites, but CSI never objected. (Angel Dep. Tr. 13, 31-33, 34-37, 106-08; Groopman Dep. Tr. 25-26; P233 at CJI 389;

June 1 (Bazarsky) Tr. 116; *see also* June 8 (Katz) Tr. 75). As CSI's long-time rabbi, Rabbi Marc Angel, put it, CSI "didn't press [its] rights." (Angel Dep. Tr. 32). It is far too late in the day to raise an objection now.

## XIV.    Jewish Cemetery at Newport

628.    Both parties claim ownership over the Colonial-era Jewish cemetery at Newport, often called the Touro Synagogue Cemetery, which is located at the corner of Bellevue Avenue and Kay Street.

629.    Land for a cemetery at this location was first purchased in 1677 by Mordicay Campanall and Moses Pacheickoe on behalf of the Newport Jewish community. (P81 at CJI 3078-80; P131 at CJI 3337). A second plot was bought in 1768 by Messrs. Rivera, Levy and Hart for the Newport congregation. (P131 at CJI 3345).

630.    Jeshuat Israel maintains and insures the Cemetery and possesses the keys to it. (June 1 (Bazarsky) Tr. 172, 175). CSI contributes nothing to the maintenance and insurance of the Cemetery and has no keys. (June 1 (Bazarsky) Tr. 172-73, 174-75). There is no lease between the parties concerning the Cemetery.

631.    In the mid-1980s, the Society of Friends of Touro Synagogue (later re-named the Touro Synagogue Foundation) embarked on an effort to restore the Jewish cemetery. As noted by Bernard Kusinitz, the chair of the Cemetery Restoration committee of the Society, in his 1985 article "The Enigma of the Colonial Jewish Cemetery in Newport, Rhode Island, Myths, Realities and Restoration," "[t]he monuments, despite their historic importance, were suffering from well over two hundred years of neglect, dirt, grime, moss, mold, sap, maintenance abuse, and a late nineteenth century attempt at restoration of questionable value." (P131 at CJI 3346). One monument marking the resting place of Aaron Lopez, "the most important merchant of Newport and of colonial America," had completely collapsed. (*Id.*).

632.    In addition to Mr. Kusinitz, the Restoration committee consisted of among other individuals "Edwin Connelly, Cemeteries Director of the State of Rhode Island; . . . Dr. Daniel Snydacker, Executive Director of the Newport Historical Society; Capt. Howard Kay, former Commander of the Naval Education and Training Center in Newport; . . . and Representative Jeffrey Teitz, member of the Rhode Island General Assembly, from Newport."  (P131 at CJI 3346).

633.    Before commencing the extensive restoration project, the Restoration committee thoroughly researched the ownership of the cemetery.  Indeed, Mr. Kusinitz noted that "the question of legal ownership was of great concern before restoration could be started."  (P131 at CJI 3344).

634.    The Restoration committee conducted significant research and concluded that Congregation Jeshuat Israel owns the Cemetery.  The committee reached this conclusion based on several grounds:  (i) the cemetery land was purchased on behalf of the Newport congregation, (ii) "Congregation Jeshuat Israel maintained the cemetery grounds during the colonial days," (iii) "the Abraham and Judah Touro funds paid for them during the nineteenth century when there was no Jewish community in Newport," (iv) "the reconsecrated Congregation Jeshuat Israel has maintained them ever since," and (v) it can be "inferred that the Congregation [Jeshuat Israel] constitutes the 'heirs and assigns forever' of the three men appointed by the Congregation of Jews that shall 'inhabit & dwell within ye colony of Rhode Island aforesaid forever.'"  (P131 at CJI 3345).  At an August 25, 1985 meeting of the Society, "Judge Alexander Teitz, co-counsel of the Society, reported that he concurred in the committee's conclusions regarding ownership of the cemetery."  (P131 at CJI 3348).

635.    After completing the restoration project, the Society erected a large monument in the Cemetery in 1986.  The monument is situated up against the wrought iron fence surrounding the Cemetery on the side abutting the sidewalk along Bellevue Avenue.  (June 1 (Bazarsky) Tr. 173).  The monument is large – about four to five feet wide and three feet tall – and can be easily read from outside the Cemetery by looking through the wrought iron fence.  (June 1 (Bazarsky) Tr. 173-74; June 2 (Bazarsky) Tr. 202).

636.    The front of the monument – facing the street – is engraved as follows:



(P316).

637.    The back of the monument is engraved:



(P316).

638.    Thus, the Society's Restoration committee, which included the Cemeteries Director of the State of Rhode Island, the Executive Director of the Newport Historical Society, and a member of the Rhode Island General Assembly, publicly and permanently proclaimed Jeshuat Israel to be the owner of the Cemetery.

639.    At minimum, Shearith Israel should have known of the monument stating that Jeshuat Israel owns the Cemetery.  The monument was erected 29 years ago and is highly visible to anyone who walks by the Cemetery; one need not even enter the Cemetery to read the monument, which is quite large.  The record is devoid of any instance in which CSI objected to this monument or the statements made on it.  (June 1 (Bazarsky) Tr. 174).  This, even though attendees of the George Washington letter reading ceremony – which CSI members have attended – are encouraged to visit the Cemetery.  (June 1 (Bazarsky) Tr. 175; June 2 (Bazarsky) Tr. 202-03).

640.    The monument is not the only instance in which Jeshuat Israel was publicly proclaimed to be the owner of the Cemetery.  The 2009 *Forward* article stated: "Just how personal the project was for [Ambassador] Loeb became apparent in 2002, when his representative suggested that the congregation allow him the right to be buried in the Touro Cemetery — a burial ground in which no one had been interred since 1864.  After a vote, the

congregation assented."  (P187; P189).  CSI's vice president, Michael Katz, read this article.
(*See above ¶¶* 517-541).  CSI's rabbi, Marc Angel, also "probably" read it.  (Angel Dep. Tr.
100).  And CSI's "liaison" to Jeshuat Israel from 2003 to 2005, Dr. Leonard Groopman, testified
at deposition that he was aware of an issue as to whether Jeshuat Israel was "following through
appropriately" on a guarantee given by Jeshuat Israel to provide for someone to be buried in the
cemetery.   (Groopman Dep. Tr. 42-43).   There is no evidence that CSI – which had a
subscription to the *Forward* (June 8 (Katz) Tr. 140) – objected to the 2009 *Forward* article or to
the burial guarantee disclosed to Dr. Groopman.

641.    CSI claims that it obtained the Cemetery by deed in 1894.  (P52).  However, as
set forth below Shearith Israel understood that it was not acting appropriately when it obtained
this deed.  In fact, Shearith Israel's actions in connection with the deed it procured concerning
the cemetery taint all its activities in the 1890s and highlight the lengths to which CSI was
willing to go to secure and create rights for itself in Newport property.

642.    In 1893, a CSI committee created for the purpose of "ascertaining the rights and
duties, *if any exist*, of this Congregation, in regard to the Synagogue and Burial Ground, formerly
of the Ancient Jewish Congregation at Newport" submitted a written report to the Board of
Trustees of Shearith Israel.  (P45 at CSI 5321).

643.    The CSI committee reported that it had been unable to locate the legal heirs to
the original purchasers of the cemetery land. (P45 at CSI 5350, 5352).   The committee
nevertheless recommended that Shearith Israel obtain a deed to the cemetery from last Jewish
resident of Newport because, although the deed would not provide Shearith Israel with "actual
legal title," no one would be able to uncover CSI's questionable actions, due to the passage of
time.  The committee recommended:

> (4) That there being no heirs in existence of the original purchasers of the Cemetery so far as is known, that your Board secure from the heirs of the last members of the ancient Congregation at Newport, namely, the Lopez', an assignment of all their rights in and to the same, and ***which will give your Body, while not an actual legal title, still a color of title sufficiently strong to be capable, in all probability, of being asserted against all the world, excepting perhaps, the heirs of the original purchasers, should they ever present themselves, which, of course, at this distance of time, over 215 years and the purposes for which the ground has always been utilized is scarcely a possibility***.

(P45 at CSI 5352).

644.    Shearith Israel nevertheless followed the committee's recommendation and in 1894 obtained a purported deed to the cemetery from one Mary Ann Lopez.  (P52).

645.    Beyond CSI's acknowledgment that the deed would not provide "actual legal title," it is not clear to the Court whether the deed was recorded or properly recorded.  Despite an apparently thorough search for records relating to the ownership of the Cemetery, the Society of Friends of Touro Synagogue evidently did not locate the document purportedly conveying the cemetery by deed to CSI.  (*See* P131).

CONGREGATION JESHUAT ISRAEL,

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

*/s/ Steven E. Snow*
Steven E. Snow (#1774)
40 Westminster Street, Suite 1100
Providence, RI  02903
(401) 861-8200 / (401) 861-8210 FAX
ses@psh.com

KRAMER LEVIN NAFTALIS & FRANKEL LLP

*/s/ Gary P. Naftalis*
Gary P. Naftalis (admitted *pro hac vice*)
Jonathan M. Wagner (admitted *pro hac vice*)
Tobias B. Jacoby (admitted *pro hac vice*)
Daniel P. Schumeister (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, NY  10036
(212) 715-9253 / (212) 715-9238 FAX
gnaftalis@kramerlevin.com
jwagner@kramerlevin.com
tjacoby@kramerlevin.com
dschumeister@kramerlevin.com

DATED:  June 29, 2015

### <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on the 29th day of June, 2015, I caused a true copy of the within document to be delivered through the ECF system to all counsel of record.

<u>/s/ Gary P. Naftalis         </u>