# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CONGREGATION JESHUAT ISRAEL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 12-822M |
| | : | |
| CONGREGATION SHEARITH ISRAEL, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT CONGREGATION SHEARITH ISRAEL'S
## ___POST-TRIAL REBUTTAL MEMORANDUM___

Deming E. Sherman (#1138)
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI  02903
Tel.:  (401) 274-9200
Fax:  (401) 276-6611
E-mail:  Deming.Sherman@lockelord.com

Louis M. Solomon (Admitted *Pro Hac Vice*)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
Tel.:  (212) 504-6600
Fax:  (212) 504-6666
E-mail:  Louis.Solomon@cwt.com

*Attorneys for Defendant*
*Congregation Shearith Israel*

July 10, 2015

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITIES ................................................................................... iv

SUMMARY OF ARGUMENT ................................................................................1

ARGUMENT ..........................................................................................................10

I.     THE INDENTURE WITH LEASE GOVERNS THE RELATIONSHIP
BETWEEN THE PARTIES ..........................................................................10

     A.     The Indenture With Lease Covered The Rimonim.................................11

     B.     CJI Is Responsible For Day-To-Day Maintenance, Insurance, And Care
For Touro Synagogue And The Rimonim Under The Law, So Its "Indicia
Of Ownership" Claims Are Meaningless ...........................................15

II.    CJI FAILED TO MEET ITS EVIDENTIARY BURDEN WITH RESPECT TO
OWNERSHIP OF THE RIMONIM ..............................................................17

     A.     CJI Failed To Prove That The Rimonim Were Made For Or Gifted To
Yeshuat Israel.......................................................................................19

           1.     CJI's "Safe Keeping" And Bailment Claims Fail......................24

           2.     Even If Yeshuat Israel Owned The Rimonim, CJI Failed To Prove
That It Is A *Legal* Successor To Yeshuat Israel .......................27

     B.     CJI Is Not Entitled To Any Evidentiary Presumption Of Ownership From
Its Possession Of The Rimonim............................................................29

           1.     Affording CJI The Presumption Of Ownership Would Turn Both
Property Law And Landlord-Tenant Law On Their Heads......................32

           2.     CJI's Spoliation Claim Is Frivolous And CJI Is Not Entitled To
Any Adverse Inference Or Presumption Of Ownership Based
Thereon ....................................................................................33

III.   CJI'S TRUST CLAIMS FAIL ON THE FACTS AND THE LAW ................35

     A.     CJI Failed To Prove The Existence Or Parameters Of A Charitable Trust
For Its Exclusive Benefit By The Clear And Convincing Evidence
Required By Law ..................................................................................38

           1.     The 1787 Will Of Jacob Rodrigues Rivera...............................38

           2.     The 1894 Deeds Of Conveyance From The Heirs And Descendants
Of Yeshuat Israel To Shearith Israel......................................40

## TABLE OF CONTENTS (cont'd)

PAGE

3.     The 1903 And 1908 Indentures With Lease ..............................40

4.     The 1945 Agreement Between Shearith Israel, CJI, And The Federal Government ................................................................41

B.    The Law Of Charitable Trusts Precludes All Of The Relief CJI Seeks ................43

1.     CJI Cannot Be The Sole Beneficiary Of A Charitable Trust As A Matter Of Law ....................................................................44

2.     Shearith Israel, As Trustee Of Any Putative Charitable Trust, Is Given Wide-Ranging Discretion In Administering The Trust ................47

3.     CJI Cannot Compel The Sale Of The Rimonim Or Petition For Removal Of A Trustee Of A Charitable Trust As A Matter Of Law ........48

4.     The Doctrines Of *Cy Pres* And Equitable Deviation Cannot Be Distorted To Give CJI The Relief It Seeks ................................50

C.    Even If CJI Could Have Standing To Remove The Trustee Of A Charitable Trust Or Compel The Sale Of The Rimonim, CJI Failed To Prove That Such Relief Is Warranted ....................................................56

D.    CJI Pervasively Misrepresents That Shearith Israel Admitted To Being In A Trust Relationship With CJI ....................................................60

IV.   *RES JUDICATA* BARS CJI'S TRUST CLAIMS AND DECLARATION OF OWNERSHIP CLAIM ........................................................................63

A.    *Res Judicata* Bars CJI's Trust Claims ....................................65

B.    *Res Judicata* Bars CJI's Ownership Claims ..............................66

C.    CJI Failed To Prove Any Changed Circumstances That Would Render *Res Judicata* Inoperable ................................................................67

V.   SHEARITH ISRAEL HAS RIGHTS IN CJI'S GOVERNANCE ....................68

A.    CJI's 1897 Constitution And By-Laws Give Shearith Israel Inalienable Governance Rights On CJI's Board ..........................................68

B.    CJI's Religious Practice Claims Are Meritless And Need Not Be Decided By The Court ......................................................................69

## TABLE OF CONTENTS (cont'd)

**PAGE**

VI.   THE COURT CAN AND SHOULD RELY ON THE EXPERT TESTIMONY OF DR. MANN AND PROFESSOR FISHER.........................................................................70

    A.   The Experts' Testimony Was Proper In The Context Of This Case And Will Help The Court ................................................................................70

    B.   The Experts' Testimony Tracked The Primary Evidence And Was Reliable ..............................................................................................75

VII.   CJI'S EQUITABLE DEFENSES ARE FACTUALLY AND LEGALLY MERITLESS.............................................................................................77

CONCLUSION AND RELIEF SOUGHT ...................................................................80

<u>**TABLE OF AUTHORITIES**</u>

<u>**PAGE(S)**</u>

<u>**CASES:**</u>

*Acevedo–Villabos v. Hernandez*,
    22 F.3d 384 (1st Cir. 1984)........................................................................64

*Ahuna v. Dep't of Hawaiian Home Lands*,
    640 P.2d 1161 (Haw. 1982).......................................................................41

*Am. Bridge Co. v. Providence Place Grp. Ltd. P'ship*,
    263 F. Supp. 2d 330 (D.R.I. 2003)......................................................65, 66

*Apparel Art Int'l, Inc. v. Amertex Enters., Ltd.,*
    48 F.3d 576 (1st Cir. 1995)........................................................................65

*Aramburu v. Boeing Co.*,
    112 F.3d 1398 (10th Cir. 1997) ................................................................34

*Arena v. City of Providence*,
    919 A.2d 379 (R.I. 2007)...........................................................................79

*Att'y-Gen. v. N. Am. Life Ins. Co.*,
    91 N.Y. 57 (1883).....................................................................................57

*Balcom v. Humane Soc'y of Ind., Inc.* (*In re Pub. Benevolent Tr. of Crume*),
    834 N.E.2d 705 (Ind. Ct. App. 2005)........................................................53

*Banks v. U.S.*,
    78 Fed. Cl. 603 (2007)..............................................................................20

*Bashir v. Amtrak*,
    119 F.3d 929 (11th Cir. 1997) ..................................................................34

*Blinzler v. Marriott Int'l, Inc.*,
    81 F.3d 1148 (1st Cir. 1996)......................................................................35

*Bliven v. Borden*,
    185 A. 239 (R.I. 1936)..............................................................................50

*Bolster v. Att'y Gen.*,
    28 N.E.2d 475 (Mass. 1940).....................................................................50

*Brice v. Trs. of All Saints Mem'l Chapel*,
    76 A. 774 (R.I. 1910)...........................................................................44, 47

**PAGE(S)**

*Bristol v. Nolan,*
    53 A.2d 466 (R.I. 1947) ................................................................................ 38, 39

*Brown v. Meeting St. Baptist Soc'y,*
    9 R.I. 177 (1869) ........................................................................................... 52, 55

*Buchanan v. Bank of Am., N.A.,*
    2011 WL 3705352 (R.I. Super. Ct. Aug. 17, 2011) ..................................... 52, 57

*Buchanan v. McLyman,*
    153 A. 304 (R.I. 1931) ......................................................................................... 44

*Burbank v. Burbank,*
    25 N.E. 427 (Mass. 1890) ................................................................................ 48-49

*Butler v. Deutsche Bank Tr. Co. Ams.,*
    748 F.3d 28 (1st Cir. 2014) .............................................................................. 23-24

*Chase v. Sanborn,*
    5 F. Cas. 521 (C.C.D.N.H. 1874) ......................................................................... 18

*Com. Union Ins. Co. v. Seven Provinces Ins. Co.,*
    9 F. Supp. 2d 496 (D. Mass. 1998), *aff'd,*
    217 F.3d 33 (1st Cir. 2000) ................................................................................... 76

*Com. Union Ins. Co. v. Seven Provinces Ins. Co.,*
    217 F.3d 33 (1st Cir. 2000) ................................................................................... 76

*Cooke v. Mortg. Elec. Registration Sys., Inc.,*
    2013 WL 2368846 (D.R.I. May 29, 2013) ............................................................ 64

*Corinth Invs. Holdings, LLC v. Evanston Ins. Co.,*
    2014 WL 4222168 (E.D. Tex. Aug. 25, 2014) ..................................................... 23

*Cuzzone v. Plourde,*
    2005 WL 2716749 (R.I. Super. Ct. Oct. 17, 2005) ............................................... 57

*Del Drago v. Comm'r,*
    214 F.2d 478 (2d Cir. 1954) ................................................................................. 39

*Denver Found. v. Wells Fargo Bank, N.A.,*
    163 P.3d 1116 (Colo. 2007) .................................................................................. 44

*Dew v. V.I.S., Inc.,*
    664 So. 2d 693 (La. Ct. App. 1995) ...................................................................... 21

**PAGE(S)**

*Don-Lin Jewelry Co. v. Westin Hotel Co.,*
    877 A.2d 621 (R.I. 2005) ................................................................21

*Elena Carcieri Tr.-1988 v. Enter. Rent-A-Car Co. of R.I.,*
    871 A.2d 944 (R.I. 2005) ................................................................14

*Emond v. Fallon,*
    186 A. 15 (R.I. 1936) ................................................................25-26

*Epworth Children's Home v. Beasley,*
    616 S.E.2d 710 (S.C. 2005) ................................................................52

*Est. of Mitchell v. Comm'r,*
    101 T.C.M. (CCH) 1435 (2011) ................................................................72

*Ferro v. Ferrante,*
    240 A.2d 722 (R.I. 1968) ................................................................15

*First Christian Church v. Brownell,*
    123 N.E.2d 603 (Mass. 1955) ................................................................50

*Fiumara v. Fireman's Fund Ins. Cos.,*
    746 F.2d 87 (1st Cir. 1984) ................................................................65, 66

*Fleet Nat'l Bank v. Colt,*
    529 A.2d 122 (R.I. 1987) ................................................................26

*Freshour v. King (In re Freshour's Est.),*
    345 P.2d 689 (Kan. 1959) ................................................................45

*Gammarino v. Hamilton Cnty. Bd. of Revision,*
    702 N.E.2d 415 (Ohio 1998) ................................................................62

*Glover v. BIC Corp.,*
    6 F.3d 1318 (9th Cir. 1993) ................................................................35

*Gonzalez v. Banco Cent. Corp.,*
    27 F.3d 751 (1st Cir. 1994) ................................................................67

*Gov't of Peru v. Johnson,*
    720 F. Supp. 810 (C.D. Cal. 1989), *aff'd,*
    933 F.2d 1013 (9th Cir. 1991) (Unpublished) ................................................................72

*Gumbs v. Int'l Harvester, Inc.,*
    718 F.2d 88 (3d Cir. 1983) ................................................................34

**PAGE(S)**

*Haffenreffer v. Haffenreffer*,
  994 A.2d 1226 (R.I. 2010) ....................................................................... 13

*Hammond v. Halsey*,
  336 S.E.2d 495 (S.C. Ct. App. 1985) ..................................................... 31

*Hansen v. Gov't of V.I.*,
  1999 WL 35015172 (V.I. Dec. 22, 1999) ............................................... 53

*Hardman v. Feinstein*,
  240 Cal. Rptr. 483 (Ct. App. 1987) ......................................................... 49

*Harrington v. City of Nashua*,
  610 F.3d 24 (1st Cir. 2010) ....................................................................... 23

*Hill v. M. S. Alper & Son*,
  256 A.2d 10 (R.I. 1969) ............................................................................. 15

*Hodgson v. Dorsey*,
  298 N.W. 895(Iowa 1941) .................................................................... 61-62

*Hughes v. Insley*,
  845 A.2d 1 (Md. 2003) ............................................................................... 67

*In re Aberlin*,
  695 N.Y.S.2d 383 (App. Div. 1999) ......................................................... 53

*In re Clark's Will*,
  150 N.Y.S.2d 65 (Surr. Ct. 1956) ............................................................. 51

*In re Cowee's Will*,
  120 N.Y.S.2d 674 (Surr. Ct. 1953) ........................................................... 58

*In re Elizabeth J.K.L. Lucas Charitable Gift*,
  261 P.3d 800 (Haw. Ct. App. 2011) ......................................................... 53

*In re Hoffman's Est.*
  195 N.E.2d 106 (Ohio 1963) ..................................................................... 62

*In re Pruner's Est.*
  136 A.2d 107 (Pa. 1957) ............................................................................. 49

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ....................................................... 74

*In re Ryan's Est.*,
  60 N.E.2d 817 (N.Y. 1945) ....................................................................... 41

**PAGE(S)**

*In re Small's Est.,*
  58 N.W.2d 477 (Iowa 1953) .................................................................47

*In re Will of Crabtree,*
  865 N.E.2d 1119 (Mass. 2007) ..............................................................49

*Indus. Nat'l Bank of R. I. v. Barrett,*
  220 A.2d 517 (R.I. 1966) ........................................................................26

*Indus. Nat'l Bank of R. I. v. Glocester Manton Free Pub. Library of Glocester, R.I.*
  265 A.2d 724 (R.I. 1970) ........................................................................51

*Ingersoll Milling Mach. Co. v. M/V Bodena,*
  829 F.2d 293 (2d Cir. 1987) ...................................................................79

*Integrated Cards, L.L.C. v. McKillip Indus., Inc.,*
  2008 WL 3286981 (N.D. Ill. Aug. 8, 2008) ..........................................78

*Israel v. Nat'l Bd. of Young Men's Christian Ass'n,*
  369 A.2d 646 (R.I. 1977) ........................................................................43

*Jinks-Umstead v. England.,*
  2005 WL 33129474 (D.D.C. Dec. 7, 2005).....................................34, 35

*Kansky v. Showman,*
  2011 WL 1362245 (M.D. Pa. Apr. 11, 2011) ........................................34

*Kidder, Peabody & Co. v. IAG Int'l Accept. Grp. N.V.,*
  14 F. Supp. 2d 391 (S.D.N.Y. 1998).......................................................74

*King v. Grand Chapter of R.I. Order of E. Star,*
  919 A.2d 991 (R.I. 2007) ........................................................................69

*Kolbe v. BAC Home Loans Servicing, LP,*
  738 F.3d 432 (1st Cir. 2013) ...................................................................14

*Langbord v. U.S. Dep't of Treas.,*
  2009 WL 1312576 (E.D. Pa. May 7, 2009) ...........................................72

*Leo v. Armington,*
  59 A.2d 371 (R.I. 1948) ..........................................................................43

*Levin v. Dalva Bros.,*
  459 F.3d 68 (1st Cir. 2000)......................................................................72

*Levinsky's, Inc. v. Wal–Mart Stores, Inc.,*
  127 F.3d 122 (1st Cir. 1997)....................................................................24

<u>**PAGE(S)**</u>

*Lima v. Holder*,
  748 F.3d 72 (1st Cir. 2014) .................................................................24

*Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003), *aff'd*,
  99 F. App'x 274 (2d Cir. 2004) (Amended Summary Order) ................74

*Longcor v. City of Red Wing*,
  289 N.W. 570 (Minn. 1940).................................................................49

*Lopardo v. Lehman Bros.*,
  2004 U.S. Dist. LEXIS 30863 (N.D. Ohio, Mar. 17, 2004) ................62

*Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*,
  2015 WL 1499449 (S.D.N.Y. Mar. 31, 2015) ......................................74

*Mac'Avoy v. Smithsonian Inst.*,
  757 F. Supp. 60 (D.D.C. 1991) .............................................................26

*MacDonald v. Manning*,
  239 A.2d 640 (R.I. 1968)..............................................................38, 39

*Madelone v. Whitten*,
  859 N.Y.S.2d 896 (TABLE),
  2008 WL 399175 (TEXT IN WESTLAW) (Sup. Ct. 2008)...................69

*Maine v. Adams*,
  672 S.E.2d 862 (Va. 2009)...........................................................30, 70

*McClure v. Middletown Trust Co.*,
  110 A. 838 (Conn. 1920) .....................................................................58

*MediaCom Corp. v. Rates Tech., Inc.*,
  4 F. Supp. 2d 17 (D. Mass. 1998) .......................................................73

*Minn. v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999)..............................................................................71

*Mitchell v. U.S.*,
  141 F.3d 8 (1st Cir. 1998)....................................................................73

*Motta v. Samuel Weiser, Inc.*,
  768 F.2d 481 (1st Cir. 1985).................................................................27

*Mulvaney v. King Paint Mfg. Co.*,
  256 F. 612 (2d Cir. 1919) .....................................................................26

**PAGE(S)**

*N.J. v. N.Y.*,
  1997 WL 291594 (U.S. Mar. 31, 1997) ..............................................................71

*Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa*,
  388 F.3d 15 (1st Cir. 2004) ..............................................................................15

*Navajo Tribe of Indians v. U.S.*,
  9 Cl. Ct. 336 (1986) ........................................................................................58

*Newport Hosp. v. Harvey*,
  133 A. 648 (R.I. 1926) .....................................................................................43

*Niemann v. Vaughn Cmty. Church*,
  77 P.3d 1208 (Wash. Ct. App. 2003),
  *aff'd*, 113 P.3d 463 (Wash. 2005) ..................................................................53

*Nobbe v. Nobbe* (*In re Nobbe*),
  831 N.E.2d 835 (Ind. Ct. App. 2005) ........................................................52, 55

*O'Keeffe v. Snyder*,
  416 A.2d 862 (N.J. 1980) ................................................................................77

*OneBeacon Am. Ins. Co. v. Com. Union Assur. Co. of Can.*,
  804 F. Supp. 2d 77 (D. Mass. 2011),
  *aff'd*, 684 F.3d 237 (1st Cir. Mass 2002) .......................................................74

*Phillips v. Calhoun*,
  956 F.2d 949 (10th Cir. 1992) .........................................................................71

*Pier of Newport, LLC v. N.A.J. Assocs.*,
  2014 R.I. Super. LEXIS 21 (Feb. 11, 2014) ....................................................13

*Powers v. Calvo*,
  1995 WL 941377 (R.I. Super. Ct. Jan. 19, 1995), *aff'd*,
  673 A.2d 74 (R.I. 1996) ...................................................................................16

*Powers v. Home for Aged Women*,
  179 A. 610 (R.I. 1935) .....................................................................................43

*Prado Alvarez v. R.J. Reynolds Tobacco Co.*,
  313 F. Supp. 2d 61 (D.P.R. 2004), *aff'd*,
  405 F.3d 36 (1st Cir. 2005) ..............................................................................71

*Primavera Familienstifung v. Askin*,
  130 F. Supp. 2d 450 (S.D.N.Y. 2001) .............................................................73

**PAGE(S)**

*Radaszewski ex rel. Radaszewski v. Maram*,
    2008 WL 20973821 (N.D. Ill. Mar. 26, 2008)..............................................73

*Rahn v. Hawkins*,
    464 F.3d 813 (8th Cir. 2006) ..........................................................................33

*Randon v. Edstrom*,
    307 N.E.2d 347 (Mass. 1974) ........................................................................79

*Russell v. Allen*,
    107 U.S. 163 (1883)........................................................................................44

*Saginaw Chippewa Indian Tribe of Mich. v. Granholm*,
    690 F. Supp. 2d 622 (E.D. Mich. 2010)........................................................71

*Sch. Comm. of City of Cranston v. Bergin-Andrews*,
    984 A.2d 629 (R.I. 2009) ...............................................................................77

*Schiavulli v. Sch. Comm. of Town of N. Providence*,
    334 A.2d 416 (1975).......................................................................................78

*Schuck v. John Morrell & Co.*,
    529 N.W.2d 894 (S.D. 1995) .........................................................................21

*Schwartz v. Lambise*,
    856 N.Y.S.2d 502 (TABLE),
    2007 WL 4686229 (TEXT IN WESTLAW) (Sup. Ct. 2007)........................21

*Sheldon v. Hamilton*,
    47 A. 316 (R.I. 1900) .....................................................................................15

*Smith v. Das*,
    5 N.Y.S.3d 72 (App. Div. 2015) ....................................................................23

*Stearns v. Newport Hosp.*,
    62 A. 132 (R.I. 1905) .....................................................................................48

*Sturm v. Boker*,
    150 U.S. 312 (1893)........................................................................................27

*Talbot v. Talbot*,
    78 A. 535 (R.I. 1911) .....................................................................................41

*Tefft v. Reynolds*,
    113 A. 787 (R.I. 1921) ...................................................................................32

**PAGE(S)**

*Tillinghast v. Council at Narragansett Pier, R.I., of Boy Scouts of Am.,*
    133 A. 662 (R.I. 1926) ................................................................... 46, 50-51

*Town of S. Kingstown v. Wakefield Tr. Co.,*
    134 A. 815 (R.I. 1926) ........................................................................ 52-53

*Tucker v. Countryman,*
    111 N.E.2d 101 (Ill. 1953) ..................................................................38, 39

*U.S. v. Artero,*
    121 F.3d 1256 (9th Cir. 1997) .................................................................34

*U.S. v. Luna,*
    649 F.3d 91 (1st Cir. 2011) .....................................................................72

*U.S. v. Newmont USA Ltd.,*
    2007 WL 4856859 (E.D. Wash. Nov. 16, 2007) ....................................71

*Union & New Haven Tr. Co. v. Koletsky,*
    167 A. 803 (Conn. 1933) .........................................................................39

*Vodusek v. Bayliner Marine Corp.*
    71 F.3d 148 (4th Cir. 1995) .....................................................................35

*Walsh v. Israel Couture Post No. 2274,*
    542 A.2d 1094 (R.I. 1988) ......................................................................15

*Webster v. Wiggin,*
    19 R.I. 73 (1895) ...............................................................................44, 45

*Willcox v. Stroup,*
    467 F.3d 409 (4th Cir. 2006) ............................................................. 30-31

*Williams v. Morris,*
    95 U.S. 444 (1877) ..................................................................................33

*Willis v. W. Hosp. Ass'n,*
    182 P.2d 950 (Idaho 1947) ......................................................................21

*Willison v. Watkins,*
    28 U.S. 43 (1830) ....................................................................................33

*Wood v. Trs. of Fourth Baptist Church,*
    61 A. 279 (R.I. 1905) ..............................................................................45

*Woonsocket Neighborhood Dev. Corp. v. Hoyceanyls,*
    1999 WL 191696 (R.I. Super. Mar. 26, 1999) ................................... 77-78

**PAGE(S)**

**STATUTES & OTHER AUTHORITIES:**

29A Am. Jur. 2d *Evid.* § 783 (2015)............................................................23

*Restatement (Third) of Trusts* (2003):
    § 66 (1) cmt. b.....................................................................................54
    § 67.........................................................................................................50

George Gleason Bogert *et al.*, *The Law Of Trusts & Trustees*
    (rev. 2d ed. 1993 & Supp. 2014):
    § 363.......................................................................................................45
    § 441.......................................................................................................50
    § 600.......................................................................................................58

Leonard B. Sand *et al.,*
    4 *Modern Federal Jury Instructions Civil* § 75.01 (2015)..................34

Defendant Congregation Shearith Israel ("Shearith Israel") respectfully submits this Post-Trial Rebuttal Brief, in response to Plaintiff Congregation Jeshuat Israel's ("CJI") Post-Trial Brief (ECF No. 93).  Responses to CJI's proposed findings of fact (ECF No. 94) can be found in the Shearith Israel Findings of Fact ("FoF") (ECF No. 90) and the Rebuttal Findings of Fact ("RFoF"), filed herewith.

## SUMMARY OF ARGUMENT

Shearith Israel presented unchallenged, unrebutted testimony and documentary evidence showing (i) Shearith Israel's ownership and possession of the Rimonim 1, 2, 3, and 4 (using Dr. Mann's nomenclature throughout (FoF) 97, 123-125) by no later than 1869 (FoF 196); (ii) Shearith Israel's ownership of Rimonim 5 and 6 as of 1893 (FoF 125, 160); (iii) a tidal wave of consistent and again unchallenged evidence that Shearith Israel did not relinquish its right to control those Rimonim, that CJI recognized it had no rights to them other than at Shearith Israel's sufferance and as part of CJI's use of the Touro Synagogue, and that, indeed, CJI announced via an elaborate public ceremony that it had nothing and that its use of the Touro Synagogue and related ritual objects was solely at Shearith Israel's sufferance (FoF 324-337); (iv) that the Indenture with Lease covered the rimonim and remained in effect until 2012, rendering CJI a tenant with no rights to ownership in the real or personal property (FoF 19, 363-432); and (v) the history and provenance of the rimonim and the history of the relationships between the parties (FoF 101-362).  CJI's post-trial papers in turn offer up unsupported suppositions (literally dozens of "mays", "likelies", "could haves"), lawyer guesswork and photographs masquerading as expert testimony, and distortions of fact and law that culminate in CJI's requests that this Court grant it relief heretofore without precedent in trust, property, or contract law.

Three aspects of CJI's post-trial brief highlight the unwarranted nature of CJI's proposed

relief and the concomitant lack of proof that CJI adduced at trial in support of its claims.

First, and of signal importance, for the first time in this case CJI finally comes to rest on the type of trust in which it claims Touro Synagogue is held: a charitable trust. If that is so (we address that point below), then all of CJI's trust-related claims fail and should be dismissed. The Attorney General is an indispensable party to any action involving the claimed creation of a charitable trust, the replacement of the trustee under a charitable trust, or any other issues regarding the administration of a charitable trust. *See* Point III.B. Moreover, the law is clear that, even assuming for the sake of argument that a charitable trust can have an identifiable beneficiary, such a trust cannot exist for the sole benefit of an individual party such as CJI. Such a trust fails. *See id* at III.B.1. CJI's assertion of a charitable trust leaves it without standing and without relief: it cannot sue to enforce such a trust, purport to oust the trustee, or usurp control of trust property. *Id.* at III.B. Nor does CJI have any lawful basis to try to act on behalf of the claimed trust by selling the rimonim under the guise of funding an endowment.

CJI attempts to use trust law to strong-arm the Court into ousting Shearith Israel as the trustee, circumventing the Attorney General and creating a back door to possession of both the rimonim and the Touro Synagogue. To accomplish this, the law of trusts is so contorted that a charitable trust can now exist for the benefit of CJI alone (the legal impossibility of a charitable trust having a sole ascertainable beneficiary appears to be no impediment to CJI). Evidence that the Shearith Israel Trustees held property in trust for Shearith Israel transforms into evidence that Shearith Israel itself is a trustee and holds property for the exclusive benefit of CJI (never mind that not a single primary document refers to Shearith Israel, the organization, as trustee or CJI as beneficiary). The doctrines of *cy pres* and equitable deviation, rarely used tools that heretofore existed to make minor changes in a trust in order to conform it to the settlor's intent, become

CJI's blunderbuss to force the sale of the rimonim (an act that indisputably cuts *against* the stated purpose of any possible trust) and to appoint itself as trustee, effectively circumventing trust law in its entirety and giving CJI carte blanche to change the very essence of any trust in which the Touro Synagogue can possibly be held.

The second is the paucity of factual and legal citation in support of CJI's arguments. Over 110 of CJI's proposed findings of fact are not supported by any citation to the record. Hundreds more blithely overlook the record; and hundreds more distort it, engineering quotes that, on examination of what was actually, said fall to pieces. Large portions of CJI's brief likewise cite to no law in support of legally unsupportable arguments.

The third is the length to which CJI goes to try to obscure the fundamental and unalterable roles and relationships between the parties. Both fact and law are gnarled to serve this purpose. CJI is (or was) a lessee; its role is subservient to Shearith Israel's prior and superior rights in law. In no case does CJI have any right to sell what it does not own or control the destiny of property that, at best, its congregants are welcome and entitled to worship in but do not own or control.

CJI's now familiar misrepresentations continue unabated, including the PR stunt that Shearith Israel seeks to evict the congregants, and that Shearith Israel seeks to remove or profit from the rimonim. CJI continues to press that possession equals ownership – unless the possession is by Shearith Israel. Words on a plaque or in a magazine somehow strip property rights from Shearith Israel and convey them to CJI. And dispositive evidence is summarily ignored: Shearith Israel's 1869 Inventory, which along with the ledger entries 100 years earlier, is clear, tangible primary source proof of ownership and possession of the rimonim, does not make even a cameo in CJI's brief – but then again how else can CJI insist that "no document

shows that ownership of the Rimonim ever resided in or was conveyed to Shearith Israel" (CJI Br. at 12)?  CJI's claimed financial need means it can sell what it does not own (this claim is maintained even though the proof showed CJI has been and remains profitable and that all its financial needs have been met even without drastic and self-destructive theft of property it does not own).  CJI's colossal overreaches highlight the absence of any entitlement to relief by CJI.

Although silent on the entirety of the crucially important 22-year period leading up to the 1903 Indenture with Lease, CJI finally, if grudgingly, admits that the Indenture with Lease actually existed and remained in effect – at least until CJI breached it in 2012.  Yet now CJI claims that the instrument did not cover the rimonim.  Shearith Israel wants there to be no doubt: If the Indenture with Lease does not cover the rimonim, then CJI has absolutely no right even to possess or use them.  The evidence showed that at the time the 1903 Indenture was being drafted, CJI had nothing (FoF 325-337); CJI was locked out of the Synagogue, the rimonim were inside (meaning admittedly under Shearith Israel's control), and CJI needed, asked for, and received permission to *use* the edifice and related ritual objects.  The 1903 Indenture thus covered both realty and personalty, and the parties have acted accordingly for over 100 years (FoF 338-362, 380-432).  The existence and continued operation of the Indenture confirm, contrary to CJI's assertions, that any trust that may exist does not exist to benefit CJI as a corporate entity – a fact expressly acknowledged in the 1945 Agreement with the Federal Government.  *See* Point I.

But even if the Indenture does not cover the Touro personalty (the evidence showed that they do), the 20+ year course of dealing, the very public acknowledgment by CJI that it had nothing and possessed the Synagogue and associated personalty only at Shearith Israel's sufferance, the express coverage of the numerous limited use authorizations, the terms of CJI's 1897 Constitution and By-Laws, and CJI's own conduct over the past 100 years each

independently preclude CJI's sale of the rimonim as well.  *See* Point I.A.

CJI skirts the obvious:  As plaintiff in an ownership dispute, CJI bears the burden of proof.  CJI failed to meet this burden regarding ownership of the rimonim.  It failed to show by a preponderance of the evidence that the colonial Yeshuat Israel congregation ever possessed or owned the rimonim prior to its demise shortly after the Revolutionary War (FoF 150).  CJI's case for ownership leans on rank speculation having no role in this Court of law:  The rimonim "could have" been a gift (CJI Br. at 6) or "may have" been donated by a wealthy congregant (CJI FoF 48); the rimonim were "presumably" held for safe keeping because they "presumably" accompanied the Torah scrolls (CJI FoF 61, 73).  CJI's speculations are insufficient as a matter of law to meet the preponderance of evidence standard for ownership.  And mere possibilities do not begin to satisfy the heightened evidentiary standard that CJI bears to show that either it or Yeshuat Israel were ever gifted the rimonim.  Even ignoring the dispositive documents, the legal presumption operative here is that CJI's current possession of the rimonim is pursuant to a loan, nothing more.  Nor can CJI rely on preliminary statements in pleadings made by Shearith Israel to make its case.  The law is clear that statements made "on information and belief" are not judicial admissions.  *See* Point II.

CJI's bailment theories cannot stand – even if everything CJI claims is true, the arrangement it alleges would fail as a matter of law, both under bailment law and under the Rule Against Perpetuities.  CJI likewise failed to show that it was a *legal* successor to the colonial congregation (and cites no law in support of its successorship claims).  So even if Yeshuat Israel owned the rimonim (the evidence was to the contrary), CJI failed to show it can inherit any legal rights from such ownership.  *See* Point II.A.

Likewise, CJI is not entitled to any presumption of ownership from its possession of the

rimonim.  Such a presumption does not apply when the possessor holds property subject to a lease or other limited use agreement; neither does it apply when the counterparty claims ownership via older or better title.  Thus, evidence regarding Shearith Israel's 1869 Inventory, evidence that CJI was locked out and had surrendered premises and paraphernalia, as well as evidence regarding the Indenture with Lease and other limited use documents, precludes applying such a presumption to CJI's possession of the rimonim.  *See* Point II.B.

But even if such a presumption would apply, Shearith Israel has rebutted it by showing that it owned the rimonim.  The evidence at trial showed that Shearith Israel paid for Rimonim 1 and 2, as well as Rimonim 3 and 4 (FoF 128-156).  Independently, the evidence showed that Shearith Israel took title to the Touro Synagogue and its attendant personalty in the 1820s, so even if Rimonim 3 and 4 belonged to the colonial congregation before then, title to them passed to Shearith Israel (FoF 164-180).  Both sets were marked as property of Shearith Israel in its 1869 Inventory (FoF 194-201).  Shearith Israel's claims to the Touro Synagogue and the related personal property were reinforced in 1894, when the heirs and descendants of the colonial Yeshuat Israel congregation signed over deeds of conveyance in favor of Shearith Israel (thereby deliberately showing their intent to divest any possible ownership claims from CJI) (FoF 242-253).  *See* Point II.B.

CJI waves away the overwhelming evidence that the rimonim, not just the bases, were switched.  But this evidence obliterates its claims of ownership.  One of the rimonim CJI claims it owns *is not* marked Newport and was never possessed by Yeshuat Israel – so even CJI can't confabulate a basis for a claim of ownership (FoF 98, 265-273).  CJI states no independent basis for ownership to any of the rimonim at issue here, nor would the evidence support such claims.  One of the rimonim CJI does not claim to own *is* engraved 'Newport' – yet CJI has never asked

for this bell's return (FoF 273).  What would CJI's basis for ownership over this bell be anyway?
This bell, engraved 'Newport', has been in Shearith Israel's possession continually since at least
1869 (FoF 126-127, 201, 238; RFoF 88-89).  The absence of an ask is proof positive that CJI
knew it was bereft of any claim of ownership over this bell.  Moreover, the fact that Shearith
Israel split the rimonim is strong evidence that Shearith Israel owned all four bells and did not
intend for CJI to keep what was sent up (FoF 238, 265-273; RFoF 49, 146).  *See* Point II.A.

CJI continues to insist that only the bases of these rimonim were switched, a claim
manufactured to increase the auction price for a "true pair", and one that Dr. Mann thoroughly
debunked and was not seriously cross-examined on (FoF 266-272).  CJI hired no experts even to
examine much less address CJI's disproven speculation.  Instead of retaining someone qualified
to rebut Dr. Mann's unquestionably expert testimony, CJI's lawyers inserted their own personal
faux-expert testimony into CJI's proposed findings of fact to buttress CJI's "base switching"
claim, pointing to photos of the rimonim and testifying to the Court, after the close of evidence
and not subject to any cross-examination or rebuttal by the real experts.  This lawyer testimony
masking as expert evidence deserves no weight.  *See* Point II.A.

CJI's trust claims are also doomed as a matter of law.  The relationship between Shearith
Israel and the Touro Synagogue is not where CJI gets it wrong.  It is when CJI goes on to claim
that ***it*** is somehow a necessary part of the picture when it is not.  CJI is not the exclusive object
of any trust relationship.  Nor can it dictate how the Synagogue is used.  Nor can it usurp the role
of trustee by deciding that an unnecessary, vanity endowment is worth destroying one of the
most valuable aspects of the Touro Synagogue – its integral, intimate relationship to true
symbols of religious freedom and continuity embodied in the continued use of the Myer Myers
rimonim.  Where CJI gets it totally wrong is that somehow ***it*** is ***the*** trust's beneficiary.  A

charitable trust, by definition, cannot have a single identifiable beneficiary:  The trust that CJI supposes is a legal impossibility.  Charitable trusts exist to serve a charitable purpose, with the trustee given wide latitude to administer such a trust according to its terms as the trustee interprets them (CJI concedes that Shearith Israel would be the trustee of any putative trust).  *See* Points III.A and III.B.

Nor does CJI have standing to enforce the terms of any such trust.  The law is clear that, with respect to charitable trusts, only the Attorney General can enforce the administration of a charitable trust, compel or allow the sale of trust property, or petition the Court for removal of the trustee.  Nor can *cy pres* and equitable deviation save CJI.  Equitable deviation cannot be twisted to compel the sale of part of a trust's corpus (assuming the rimonim are held in trust – a claim CJI vehemently denies elsewhere) when the sale would contravene the stated purpose the trust serves, turning the trust into CJI's personal bank account at the public's expense, and when CJI has not shown the unanticipated "changed circumstances" necessary.  And *cy pres* cannot fundamentally re-write bedrock trust law, creating from whole cloth a charitable trust for the benefit of a single beneficiary.  The doctrine exists to modify the charitable *purpose* of a trust, not to create a private trust out of a charitable one.  *See* Point III.B.4.

CJI's declaration of trust, removal of trustee, and declaration of ownership claims are barred by *res judicata*.  In 1902, in *David v. Levy*, CJI claimed that Touro Synagogue was held in trust for its benefit – a claim it lost in Federal court (FoF 309-318).  That decision was both final and on the merits (FoF 291, 314-318), barring CJI from re-bringing its current trust claims.  And since CJI's claim in the past litigation was predicated on the very same documents it now uses to establish the existence of a trust (FoF 309, 318; RFoF 178), the circumstances surrounding its trust claim have not changed.  CJI cannot get a second bite at the apple solely because a hundred

years have passed:  Any trust that would have been created would have been created at the time the relevant documents were executed.  CJI's declaration of ownership claims are likewise barred, both by the *David* action and by a 1901 replevin suit, where the Court ruled in favor of Shearith Israel's agent, holding that certain personal property at the Touro Synagogue legally belonged to Shearith Israel (FoF 291, 301-305, 309-318).  As CJI admits, its current ownership claims had accrued well before both *David* and the replevin action, and CJI is now estopped from bringing ownership claims that could have been brought at that time.  *See* Point IV.

The Court can and should rely on the relevant, credible, and unrebutted testimony of Dr. Vivian Mann and Professor Linford Fisher.  The Court has already acknowledged that such expert testimony can help guide it in martialing and understanding the evidence.  CJI, having deliberately chosen not to call an expert in its case, again makes believe that every single avenue of testimony of both Professor Fisher and Dr. Mann is somehow improper.  But historians do testify in cases such as this, and provide precisely the type of testimony given by Professor Fisher and Dr. Mann.  In fact, one of the provenance cases CJI relies on hinges on expert testimony regarding the meanings of terms scrawled on the back of 18th Century documents. Experts have likewise testified regarding provenance of art and artifacts, and contextualized history to put into perspective and give meaning to the actions of historical actors.  Such testimony can and should be relied on.  *See* Point VI.

Finally, CJI's equitable defenses fail on both the law and the facts.  They fail first and foremost due to CJI's unclean hands in light of its conduct toward Shearith Israel, the Rhode Island Attorney General, and this very Court.  Moreover, the threshold inquiry for when such defenses begin to accrue is when a party's rights have actually been violated.  Threatening to sell the rimonim or claiming ownership over the rimonim is legally insufficient to start the equitable

defense clock. Shearith Israel's actions over the last 100+ years have been consistent with those of a lessor – a lessor is under no obligation periodically to remind the world that it has title to the leased property. Neither is a lessor required by Rhode Island law to pay for maintenance and repairs. Absent express contractual agreement (of which there was no evidence), that duty falls on the lessee. Thus, CJI's "indicia of ownership" – caring for, insuring, and maintaining the premises and personalty – are simply its obligations under the lease. Shearith Israel is no more estopped from vindicating its rights than any long-term lessor would be if the lessee tried to convert the lessor's property. *See* Point VII.

## **ARGUMENT**

## I.    **THE INDENTURE WITH LEASE GOVERNS THE RELATIONSHIP BETWEEN THE PARTIES**

CJI's post-trial papers essentially ignore the crucial time period from 1881 to 1903. It was during those decades that the Jewish Society of Newport began to revive. That Society was ***not*** CJI. Then, as before, Shearith Israel exercised direct ritual and cultural oversight. The Newport Synagogue was consecrated anew, and Shearith Israel carried out its role by ensuring that spiritual leaders were present and compensated, that ***all*** members of the Jewish Society were welcome, that the Synagogue was kept up, and that ritual appurtenances and paraphernalia were available for use pursuant to expressly limited authorizations.

A dozen years into this new period CJI came into existence. It then formally and repeatedly acknowledged that it had neither place nor personalty and needed to borrow both from Shearith Israel. Then, CJI began to challenge Shearith Israel's ownership and stewardship, which led to increased formality of the loans of space and personalty and, ultimately, to the forced closure of the Synagogue and non-use by CJI of the personalty. Shearith Israel was forced to vindicate its rights – and those of the Jewish Society of Newport past, present, and

future – repeatedly in court, prevailing each time.  After Shearith Israel prevailed in the last of these lawsuits in 1903, CJI unqualifiedly and publicly surrendered the premises and personalty, participated in a public Ceremony of the Keys, and executed the 1903 Indenture with Lease, which naturally included both the realty and personalty CJI disclaimed all rights to just days earlier.  Shearith Israel rests on its dozens of proposed findings on these topics, virtually all of which CJI ignores (FoF 226-362).

CJI's post-trial brief does finally concede what the evidence made inescapable – that the Indenture with Lease remained in effect at least until 2012 and that this formal instrument encompassed, at the very least, the Touro Synagogue.  *See* CJI Br. at 29-31.  This about-face calls into question the good faith of CJI's initial position on this issue pre-trial and casts yet more doubt on the credibility of CJI's main witness, David Bazarsky, who vehemently denied that the Indenture with Lease remained in effect, or that the $1 a year was actually rent (even though CJI's own website calls it that) (FoF 364, 398-402).

The trial evidence proved more still – the Indenture with Lease covered both the real and personal property associated with the Touro Synagogue, and the circumstances that brought about the need for the Indenture in 1903 completely undercut any argument of a trust relationship ***for the benefit of CJI*** (*see* Point II.B.3, below).

A.    __The Indenture With Lease Covered The Rimonim__

CJI cannot bring itself to analyze the events leading up to, or even the language and intent behind, the 1903 Indenture with Lease, arguing by *ipse dixit* that the Indenture must not include personal property because there is "no reference . . . to 'personal property'" and that the "reference [to] 'appurtenances' . . . was taken from a form book" (CJI Br. at 17).  The argument is reminiscent of CJI's cross-examination of Shearith Israel witnesses, where obsession over the formalistic use of ***specific*** terms became a substitute for getting at the substance of the matter.

Obviously, a contract need not use any magical incantation to manifest the intent of the parties, although here the parties did use terms to include associated personal property that *they* had used many times in the past to embrace the very same personal property.  When the Indenture with Lease was drafted in 1903, CJI had nothing (FoF 325-337; RFoF 104).  It was locked out (FoF 326; RFoF 104).  It had just been thwarted in Federal Court (FoF 313-322, 325).  It had signed an unequivocal surrender, disclaiming ownership of both the real and personal property of Touro Synagogue (FoF 324, 329-337; RFoF 109).  There is no evidence that at this point CJI had access to, much less ownership of, any ritual items independent of what it received *by loan* from Shearith Israel (the evidence is just the opposite) (FoF 163, 262; RFoF 50, 104).  Anything CJI then used was subject to the terms of the Indenture with Lease and, independently, the earlier documents of limited use, all of which manifestly demonstrated Shearith Israel's priority of ownership and control (FoF 272, 323, 338-346; RFoF 49-50).

CJI has no proof that the term "appurtenances" came from a form book.  True, form books used the term appurtenances, but the parties used the term repeatedly to refer to personalty and specifically to rimonim long before any form book was consulted (FoF 347-356).  And there is no blinking that the term "paraphernalia" was specifically and intentionally added to the Indenture with Lease to cover associated personalty.  This strongly indicates that the parties ascribed a specific meaning to the term (RFoF 161).  Moreover, even though the Indenture with Lease does not specifically use the term of any of the associated personalty, it was obvious to the parties (and affirmed by the parties' conduct) that the rimonim, along with all other ritual personalty, were included in the ambit of the Indenture (FoF 344-346; RFoF 121, 153).

CJI devotes one sentence to why it believes "paraphernalia" does not include the rimonim, arguing that "CSI's expert Dr. Mann and ritual director Zachary Edinger testified that

they have never referenced Rimonim as 'paraphernalia'" (CJI Br. at 17).  CJI's frail attempt to distract has no bearing on the meaning of "paraphernalia" as it was used 112 years ago (RFoF 111).  Neither Dr. Mann nor Mr. Edinger testified regarding the historical use of "paraphernalia", and neither of them analyzed how this term was used between the parties when the 1903 Indenture was being drafted and signed.  Professor Fisher, on the other hand, performed both of these analyses and concluded that, as used between the parties, the parties fully understood and intended that the term "paraphernalia" encompassed the rimonim (FoF 344, 348-355).

The scope of the Indenture with Lease must be measured against the intent of the parties, which governs the interpretation of these documents.  *See Pier of Newport, LLC v. N.A.J. Assocs.*, 2014 R.I. Super. LEXIS 21, at *28 (Feb. 11, 2014) (interpreting lease agreement and emphasizing that the court's "primary objective is to ascertain the intent of the parties"); *Haffenreffer v. Haffenreffer*, 994 A.2d 1226, 1233 (R.I. 2010) (when interpreting contracts, a court's "primary objective is to ascertain the intent of the parties").  Courts interpret contract terms in consonance with the meanings the parties ascribed to those terms when executing the agreement.  *See Haffenrefferr*, 994 A.2d at 1233-34 (evaluating extrinsic evidence to ascertain parties' beliefs regarding meaning of "estate of").

Professor Fisher's testimony, based on primary evidence, clearly showed that the parties used both "appurtenances" and "paraphernalia" to refer to personal property, and specifically to objects of worship (FoF 347-356; RFoF 161-162).  Shearith Israel specifically called rimonim "appurtenances for worship" in a letter to the rabbi ministering at CJI just years earlier (FoF 256, 347, 349).  Both of these terms were used interchangeably by the parties with the term "personal property" contemporaneously with the signing of the Indenture with Lease (FoF 347-362).  In fact, during the drafting and signing of the instrument, both of the parties used the term

"paraphernalia" synonymously with the term "personal property" (FoF 348, 350-355).  That term

was later hand-written into the 1903 Indenture (FoF 354).  This was done following

correspondence in which Shearith Israel discussed the importance of obtaining "surrenders of the

building and personal property" and "obtain[ing] a list of the personal property" and, in the same

breath, instructing its representative to interline "paraphernalia" into the lease (FoF 352-353).

The Court is empowered to rely on this strong extrinsic evidence when interpreting the meanings

of these terms.  *See Elena Carcieri Tr.-1988 v. Enter. Rent-A-Car Co. of R.I.*, 871 A.2d 944, 947

(R.I. 2005).

      CJI concedes that the intent and conduct of the parties governs contract interpretation.

*See* CJI Br. at 18.  And Professor Fisher's testimony elucidates that both parties intended for the

Indenture to encompass the realty *and* associated personalty, whether through these specific

terms, or through the general scope of the Indenture, or through the surrender of the property and

the locking of the doors (with the rimonim inside) (FoF 323-324, 344-346).  CJI surrendered

both personalty and realty following the 1903 litigation (FoF 333-336).  Its conduct confirmed

this – during lease signing it engaged in an elaborate ritual showing that it was giving up

ownership rights to both the synagogue and to the ark, where the religious items were kept (FoF

326-332, 337).  Professor Fisher connected this specific concern with the Touro Synagogue

personalty to past events, where the parties were vying for control over both personal and real

property and showed that Shearith Israel exerted dominion over the religious items to be used at

Touro, loaning these to CJI pursuant to letters authorizing limited use (FoF 262, 297, 349).

      The conduct of the parties clearly indicates that personalty was to be included in the

Indenture.  *See Kolbe v. BAC Home Loans Servicing, LP,* 738 F.3d 432, 440 n.6 (1st Cir. 2013)

("When two parties draft a contract with language specific to their transaction, the relevant

expectations to assess are those of the individual parties to the contract . . . against background and purpose [of the agreement]"); *Hill v. M. S. Alper & Son*, 256 A.2d 10, 15 (R.I. 1969) ("we will . . . consider the situation of the parties and the accompanying circumstances at the time the contract was entered into, not for the purpose of modifying or enlarging or curtailing its terms, but to aid in the interpretive process and to assist in determining its meaning"); *see also Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa*, 388 F.3d 15, 20 (1st Cir. 2004) (evaluating evidence beyond the seemingly unambiguous four corners of the document because "extrinsic evidence may in fact reveal an ambiguity not otherwise patent . . . [and] language may point only slightly in one direction and extrinsic evidence strongly in another").  It would be irrational to assume that, even though CJI surrendered both realty and personalty to Shearith Israel, Shearith Israel leased the realty to CJI but outright gave the personalty right back, no strings attached. Illogical, unproven, and incorrect.

Moreover, contemporary legal usage of the terms "paraphernalia", "appurtenances", and "fixtures" disproves CJI's categorical assertions that these terms cannot encompass personal property.  Contemporaneous usage of these terms in legal and non-legal writings make clear that all of these terms encompassed the rimonim and confirmed that the rimonim (along with all other Touro Synagogue personalty) were within the ambit of the Indenture with Lease (FoF 347-362; RFoF 162).

**B.     CJI Is Responsible For Day-To-Day Maintenance, Insurance, And Care For Touro Synagogue And The Rimonim Under The Law, So Its "Indicia Of Ownership" Claims Are Meaningless**

CJI misapprehends the language of the Indenture and the relevant Rhode Island law in arguing that the Indenture does not create maintenance obligations in CJI.  In a non-residential lease, Rhode Island law places the burden for repairing and maintaining the leased property on the tenant.  *Ferro v. Ferrante*, 240 A.2d 722, 726 (R.I. 1968) (*citing Sheldon v. Hamilton*, 47 A.

316, 317 (R.I. 1900)); *see also Walsh v. Israel Couture Post No. 2274*, 542 A.2d 1094, 1097 (R.I. 1988); *Powers v. Calvo*, 1995 WL 941377, at *3 (R.I. Super. Ct. Jan. 19, 1995), *aff'd*, 673 A.2d 74 (R.I. 1996). Nothing in the lease shifts this default responsibility to Shearith Israel (FoF 370-379). And there is nothing to construe against the draftsman in light of this default rule.

Thus, all of CJI's "indicia of ownership" claims – insuring, maintaining, taking care of, and repairing the rimonim – are nothing more than its obligations under the lease and under the law. *See* CJI Br. at 18. They do not indicate CJI's ownership, but rather the Indenture's continued effect and CJI's actions in accordance with the Indenture. CJI had repeatedly affirmed its role as day-to-day caretaker of the Touro Synagogue and its contents to both Shearith Israel and the public (FoF 373-379, 380, 420-438; RFoF 81). Thus CJI's extensive testimony during trial that it maintained, insured, and cared for both the Touro Synagogue and the rimonim amounted to its admission that it acted in accordance with the Indenture and its self-stated responsibility as day-to-day caretaker. Until its recent breaches, CJI appears to have complied with its duties to maintain, insure, and repair both the real and personal property under the Indenture and the relevant law (FoF 380-402).

Moreover, with respect to insurance, the evidence (not CJI's continued distortion of it, but the actual evidence) is clear that Shearith Israel asked to be included on *all* of CJI's insurance policies. CJI understood that "***listing them could be a significant acknowledgement of the validity of their ownership claim***" (FoF 445; RFoF 85), but CJI in fact did add Shearith Israel to *all* its relevant policies (FoF 445; RFoF 86). It did so because its broker understood that Shearith Israel was the owner, not just of the building but of the personal property within. And even when CJI switched to a different carrier for its fine arts policy, CJI's broker made sure that Shearith Israel *was* included in the new policies as well (FoF 452-454; RFoF 86). The insurance

story backfired, proving exactly the opposite of what CJI claimed the evidence showed.

Nor does CJI's loaning of the rimonim give credence to its ownership claims. The evidence at trial showed that such loans were consistent both with Shearith Israel's ownership rights and with Shearith Israel's conduct in loaning out the rimonim that were in New York. *See* CSI Br. Point I.B. Such conduct was consistent with CJI's obligations under the Indenture, and there was no threat of divesting Shearith Israel of ownership by loaning the rimonim. *See id.*

Finally, CJI's claims that its care for the rimonim are "indicia of ownership" is also meaningless, since it does not claim ownership of Touro Synagogue by virtue of the same "indicia of ownership" evidence. Otherwise, CJI's argument proves too much. CJI does not argue that it somehow gained ownership over the Touro Synagogue although it claims it engaged in the exact same conduct with respect to it – CJI went to great lengths to argue that it maintained, insured, repaired, etc. the premises – so why does it not claim ownership to Touro in addition to the rimonim?

## II.    CJI FAILED TO MEET ITS EVIDENTIARY BURDEN WITH RESPECT TO OWNERSHIP OF THE RIMONIM

Shearith Israel's 1869 Inventory proved that Shearith Israel had both ownership and possession of Rimonim 1-2 and 3-4 in 1869 (FoF 156, 194-201; RFoF 88-91, 142-143). The Inventory clearly describes Rimonim 1-2 and 3-4 and identifies both pairs as "property of [Shearith Israel]" (FoF 196-197; RFoF 143). These Rimonim are not identified as "belonging to" someone else, as other items in the Inventory are (RFoF 142-143). Nor are they marked as being "formerly of" another place, as other items in the inventory are (RFoF 30). The overwhelming implication is that these Rimonim were property of Shearith Israel. Period. This puts the lie to CJI's claim that "no document shows that ownership of the Rimonim ever resided in or was conveyed to Shearith Israel" (CJI Br. at 12). Nor is there any primary proof that any of

these bells were ever in Newport prior to 1869 (RFoF 40). CJI is left bereft of any evidence of ownership. It offers no direct evidence that the rimonim were ever owned or even possessed by the colonial Yeshuat Israel, no evidence that CJI inherited any legal rights from the colonial congregation (assuming the colonial congregation, an unincorporated entity, had any legal rights to bequeath) and no evidence at all that CJI obtained ownership rights in the rimonim independent of its purported connection to Yeshuat Israel.

CJI, as the plaintiff, bears the burden of proving its ownership through "competent evidence." *Chase v. Sanborn*, 5 F. Cas. 521, 523 (C.C.D.N.H. 1874). But CJI's claim provides no such evidence, offering instead speculation piled on top of speculation. CJI argues – without evidence – that the colonial Yeshuat Israel originally owned and possessed the rimonim. CJI Br. at 4-8. It then contends that when that congregation disbanded, Shearith Israel held all of its property for safekeeping. *Id.* The Synagogue itself was also, according to CJI, held in safekeeping, yet CJI concedes that Shearith Israel holds title to the Touro Synagogue, albeit, according to CJI, in trust. CJI Br. at 25-32. CJI thus concedes that "safekeeping" does not mean "ok, we'll hold it for a century or so and then just give it away wholesale to some folks who happen to show up". Otherwise, why does CJI not argue that the personalty is held in the same trust (the "legal oversight" it describes on its website (FoF 462))?

Finally, CJI claims – without evidence and contrary to law – that it inherited the rimonim due to its connection to the colonial congregation. CJI Br. at 6-8. CJI bears the burden of proving all of this speculation before it can prevail on its ownership claim.

In light of clear primary source documentation that Shearith Israel owned and possessed the rimonim 25 years before CJI came into existence, CJI's hearsay and conjecture falls far short of the "competent evidence" it needed to adduce to prove its ownership claim. *See* CSI Br. Point

I.  Nor is CJI entitled to any presumption of ownership based on possession given the clear evidence of Shearith Israel's prior ownership.  *See* CSI Br. Point I.B (collecting cases).

### A.    CJI Failed To Prove That The Rimonim Were Made For Or Gifted To Yeshuat Israel

CJI's claims of ownership by succession fail for a host of reasons, including because five of the six rimonim CJI claims it owns were never at Touro Synagogue until the 1890s (at the earliest).  CJI claims ownership of Rimonim 2 and 4 (FoF 98, 123, 263).  But one of these – Rimon 2 – is not engraved "Newport" (FoF 97-98; RFoF 49).  There is no primary or reliable secondary evidence that Rimon 2 was ever at Newport during the existence of Yeshuat Israel or at any time before CJI's formation (FoF 126, 150, 161; RFoF 25, 40).  In fact, all evidence indicates that Rimon 2 had been in Shearith Israel's continued possession from the time it was made until around the 1890s (FoF 149-155, 272-273; RFoF 26).  And CJI does not claim ownership over Rimon 3, which is marked "Newport" and forms the second half of the original, true pair with Rimon 4 (FoF 273; RFoF 49).  This fact alone demolishes CJI's prior ownership claim.  And separately, the uncontroverted evidence shows that Rimonim 5 and 6 were not at Touro before the mid-1890s, FoF 125, 150, 218-222).

Dr. Mann's unrebutted testimony at trial established that the bases of the rimonim were never switched (FoF 265-273; CSI Br. Point I.A).  CJI's sole support for its "base switching" theory at trial was testimony from two lay witnesses who had never taken the rimonim apart, had never seen the rimonim being taken apart, and had never even seen the rimonim separated from their bases other than in unauthenticated photographs (FoF 271).  Nor did CJI retain any other expert to testify regarding its "base switching" theory, or seriously cross-examine Shearith Israel's expert, Dr. Mann, on this issue.

But now, after the close of evidence, CJI's lawyers, masquerading as expert witnesses,

submitted a facsimile of an expert report to the Court to buttress this "base switching" theory. CJI's attorneys spent pages and pages drawing boxes around photos of the rimonim and "testifying" to the Court about the bases being switched. CJI's attorneys represent this as fact (expert fact no less) although there was no in-court testimony about the photographs and nothing supporting these arguments, first seen in post-trial briefing. These arguments come directly from counsel, are without evidentiary support, and are not subject to cross-examination. None of this conjecture was presented to the Court when Dr. Mann was on the stand testifying about the bases of the rimonim (RFoF 147). CJI did not present a shred of evidence regarding these photographs during trial, so Dr. Mann could not rebut CJI's frivolous contentions. CJI should not be permitted to now employ its lawyers as faux-experts to provide testimony and argument under the guise of findings of fact to make the case for the bases being switched.

Even *considering* the "Findings of Fact" manufactured by CJI's attorneys with regard to the possible modification of the rimonim would be inconsistent with the Federal Rules of Evidence. *See Banks v. U.S.*, 78 Fed. Cl. 603, 619 (2007). In *Banks*, as here, plaintiffs "presented for the first time in their post-trial briefing many sections of exhibits that were not 'specifically pointed out at trial' or that were pointed out for an apparently different purpose than the purpose advanced in post-trial briefing." *Id.* The *Banks* court rejected these improper evidentiary submissions, holding that "[w]ithout expert assistance, the court will not reach conclusions on evidence that is beyond its non-expert ability to interpret, ***nor will it consider post-trial briefing that effectively amounts to testimony from plaintiffs' counsel in interpreting such evidence***." *Id.* (emphasis added). A determination of whether these photographs and the marks on the photographs show evidence of possible tampering with or modification to the rimonim is properly the realm of an expert with specialized knowledge rather than that of the

Court – and Shearith Israel has presented the Court with an expert witness to assist the Court in interpreting this physical evidence.  CJI failed to provide such an expert despite having the opportunity to do so at trial, and is now seeking in post-trial briefing to have its non-expert attorneys provide the expert testimony it failed to adduce at trial.  This is gamesmanship and should be given no weight by the Court.

Turning to Rimon 4, CJI adduced no direct evidence that this bell was ever in Newport prior to the 1890s.  It relies instead on hearsay secondary sources that were written two hundred years after Rimonim 3 and 4 were made and which cite to no primary sources in support of their contention that the colonial Yeshuat Israel was the original possessor of these Rimonim.  CJI can show no receipt, no acknowledgement of gift, and no other writing showing that these rimonim were ever owned by Yeshuat Israel (FoF 149-155, 162).  The most that CJI can muster are claims that this set of Rimonim "**could have been** a gift" (CJI Br. at 6).  Such conjecture is unsupported by any evidence and is patently insufficient to carry CJI's heightened burden of proof.  *See* CSI Br. at II.A.2.  Indeed, it is even insufficient to carry the lesser preponderance of the evidence standard.  *See Dew v. V.I.S., Inc.*, 664 So. 2d 693, 697 (La. Ct. App. 1995) ("A showing of a mere possibility or mere speculation is insufficient to carry the preponderance of the evidence burden of proof"); *see also Willis v. W. Hosp. Ass'n*, 182 P.2d 950, 954 (Idaho 1947) ("The burden of proof was on appellants, and it is not sufficient to merely show a possibility or raise a suspicion that respondents may have been negligent"); *Schuck v. John Morrell & Co.*, 529 N.W.2d 894, 899 (S.D. 1995) ("The claimant must prove [his claim] by a preponderance of the evidence . . .  a possibility is insufficient and a probability is necessary.").

CJI now attempts, after the close of evidence, to argue that Aaron Lopez of Newport "may" have gifted the rimonim to CJI (*see* CJI FoF 48).  CJI did not call an expert to try to

support this rank speculation, and it did not question Dr. Mann regarding this hypothesis either at her deposition or at trial – not giving Dr. Mann the opportunity to disprove this theory and provide an explanation for its inaccuracy.  Shearith Israel objected to this evidence (which was injected into the case by CJI lawyers, not witnesses, and is impossible to cross-examine or rebut), and the Court accepted the evidence subject to Shearith Israel's objections.  The Court should give this speculation no weight whatsoever.  In fact, CJI's post-trial speculation is flatly inconsistent with the educated, expert testimony of Dr. Mann, who testified that gifts from donors at the time bore the donor's inscription (the rimonim are not so inscribed) (FoF 151).  CJI's speculation is inconsistent as well with the fact that Mr. Lopez himself donated *and had inscribed* other gifts (RFoF 29) and the fact that at the time of the speculated donation Mr. Lopez had, in the words of CJI's rabbi/historian, "staggering" debts to creditors, thus hardly able to afford the significant expense of a set of rimonim (RFoF 29).

Bereft of evidence, CJI piles conjecture on conjecture to try to establish, by innuendo, that these rimonim were possessed by Yeshuat Israel.  CJI starts with an invoice showing payment from Yeshuat Israel to Myer Myers for mending a set of rimonim.  CJI then asks the Court to assume – without any proof – that the rimonim to be repaired were the rimonim at issue in this case (if we are playing the speculation game, they were more likely the rimonim from London, since those were not going to be shipped back to England for repair but would be sent to the single Jewish artisan in America dealing with rimonim:  Myer Myers).  CJI Br. at 5; CJI FoF 47.  It asks the Court to assume – without any proof – that Yeshuat Israel's paying to repair the rimonim means that Yeshuat Israel owned those rimonim.  *Id.*  It wants the Court to find that this invoice, which shows nothing more than payment of a fee for professional services rendered, establishes some sort of personal connection between Myers and Yeshuat Israel.  CJI Br. at 5.

And finally (in a theory new to CJI's post-trial brief), CJI makes believe, against all evidence and logic, that this invoice shows that "Myer Myers *traveled* to Newport to repair that congregation's rimonim."  CJI FoF 47 (emphasis added).

CJI then relies – mistakenly – on what it claims is an admission that the rimonim were initially possessed by Yeshuat Israel.  *See* CJI Br. at 4.  But the law is clear that statements made "on information and belief" – as was the statement CJI clings to (RFoF 39) – are not judicial admissions.  *Corinth Invs. Holdings, LLC v. Evanston Ins. Co.*, 2014 WL 4222168, at *2 n.1 (E.D. Tex. Aug. 25, 2014) ("the court agrees with Atrium that a statement made 'on information and belief' in a pleading does not constitute a binding judicial admission"); *Smith v. Das*, 5 N.Y.S.3d 72, 73 (App. Div. 2015) ("the allegations were made 'on information and belief', and therefore, were not a judicial admission") (citation omitted); *Schwartz v. Lambise*, 856 N.Y.S.2d 502 (TABLE), 2007 WL 4686229, at *3 (Sup. Ct. 2007) ("As the entire petition was drafted 'upon information and belief' none of its clauses may be viewed as judicial admissions").

A judicial admission must be "a deliberate, clear, unequivocal statement of a party about a concrete fact within that party's knowledge".  29A Am. Jur. 2d *Evid.* § 783 (2015); *see also Harrington v. City of Nashua*, 610 F.3d 24, 31 (1st Cir. 2010).  Where a party's statement "relates, not to a fact peculiarly within his or her own knowledge and as to which the party could not be mistaken, but is in the nature of an estimate or an opinion as to which he or she may honestly be mistaken, the party does not unequivocally conceded that the fact is in accord with the opinion expressed and there is no injustice in permitting the court to consider the other evidence in the court, and determine from all the evidence what the actual facts are."  29A Am. Jur. 2d *Evid.* § 783.

Thus, in *Butler v. Deutsche Bank Tr. Co. Ams.*, 748 F.3d 28 (1st Cir. 2014), the First

Circuit held that "a statement that a foreclosure sale 'may' have been void cannot be treated as an unambiguous admission of the sale's definite invalidity." *Id.* at 39. The instant case squares with this logic. Shearith Israel's pleadings were filed prior to fact and expert discovery, and Dr. Mann's subsequent research conclusively disproved Shearith Israel's initial "on information and belief" statements. Shearith Israel has since moved to amend its pleadings to conform them to the overwhelming evidence adduced at trial that Yeshuat Israel was not the original possessor of the rimonim. *See* ECF No. 92.

CJI's lone case in support of its point (CJI Br. at 5) does nothing to aid its position. In *Lima v. Holder*, 748 F.3d 72 (1st Cir. 2014), the First Circuit notes that to be binding on a client, counsel's statements must be "'clear and unambiguous.'" *Id.* at 79 (*quoting Levinsky's, Inc. v. Wal–Mart Stores, Inc.,* 127 F.3d 122, 134 (1st Cir. 1997)). In *Lima*, the plaintiff was bound by his attorney's admission that the plaintiff had committed a certain crime – an unrebutted fact squarely within the realm of plaintiff's knowledge. Here, Shearith Israel pled, solely *on information and belief*, facts regarding original possession of the rimonim 250 years ago. This has been contravened by the evidence adduced at trial and, as shown above, cannot be considered a judicial admission.

### 1.    CJI's "Safe Keeping" And Bailment Claims Fail

CJI claims that after Yeshuat Israel disbanded, Shearith Israel held the rimonim and other silver solely "for safekeeping" as a gratuitous bailment, to be returned to the Touro Synagogue should another congregation ever worship there again. CJI Br. at 6-7. This misapprehends the law of bailment and has no basis in fact.

CJI contends that following Yeshuat Israel's disappearance, Shearith Israel agreed to store certain ritual items in perpetuity, in hopes of another congregation eventually worshipping in Newport. And if this congregation would ever materialize, ownership of those items would be

transferred in its favor.  *Id.*  But CJI's claim that it is entitled to any bailment crumbles under the weight of its own logic.  CJI claims that whatever items Shearith Israel had, these items had to "be returned once a new or re-established congregation occupied Touro Synagogue" (CJI Br. at 7).  The unrebutted evidence showed that another congregation worshipped at the Touro Synagogue for well over a decade – from 1881 until 1893 – before CJI even existed (FoF 202-217, 223-225; RFoF 54).  According to CJI's reasoning, that congregation should have received title to whatever goods Shearith Israel was tasked with keeping safe.

Moreover, there is no proof that Shearith Israel ever took possession of any rimonim from Yeshuat Israel.  So CJI's entire cascade of speculation fails from the get-go.  In fact, this claim is contrary to the evidence adduced at trial.  Dr. Mann and Professor Fisher offered unrebutted testimony, supported by primary evidence, that only certain of the Torah scrolls were kept by Shearith Israel for "safe keeping" (RFoF 41-42).  No document states or even intimates that the rimonim or silver was stored for "safe keeping"; and no evidence exists that the four Torahs allegedly stored this way were accompanied by rimonim (FoF 179; RFoF 41-42).  CJI, in arguing that the replevin action, which involved a Torah scroll, is not *res judicata* to its ownership claims, concedes as much, claiming that "[o]n its own terms, the secondary source reports that the replevin action concerned only one Torah – not any Rimonim" (CJI Br. at 52).  CJI thus concedes that unless rimonim are specifically mentioned, any document that traces movement or ownership of Torah scrolls has no bearing on the movement or ownership of rimonim.

A bailment can only be created when the specific goods to be kept safe are transferred along with a clear understanding of the parties' contractual obligations.  *See Emond v. Fallon*, 186 A. 15, 18 (R.I. 1936).  "'No bailment can be implied where it appears it was the intention of

the parties . . . that the property was to be held by the party in possession in some capacity other than as bailee.'" *Mac'Avoy v. Smithsonian Inst.*, 757 F. Supp. 60, 65 (D.D.C. 1991) (artist's transfer of artwork to museum did not create bailment, even if artist considered artwork to be on loan, absent any similar understanding on part of museum) (citation omitted). "[C]ontracts of bailment should not be enlarged beyond their plain meaning to impose further liability upon the bailee." *Mulvaney v. King Paint Mfg. Co.*, 256 F. 612, 615 (2d Cir. 1919) (finding that "[a] covenant to insure should never be implied, and should be imposed only where it is found in the agreement by clear and explicit language"). Here, there is no evidence that the rimonim, or anything other than the Torah scrolls, could have been subject to any sort of bailment contract or obligation. Imposing a bailment obligation on Shearith Israel absent "clear, explicit language" that the rimonim were stored for safekeeping (all evidence points to the contrary) would violate the law of bailments. *Id.*

CJI errs on the law as well. It cites no case, nor could Shearith Israel find one, wherein a bailment was created or even attempted in favor of an indeterminate, non-existent third party, much less one that *might* arrive in the future – and with good reason. Such an agreement would violate Rhode Island's rule against perpetuities and be void. The "bailment" CJI advocates would not vest or fail within 21 years of a life in being. "It is fundamental law that when the free alienation of a future interest in property is limited, the interest must vest within lives in being plus twenty-one years from the date of the creating instrument." *Indus. Nat'l Bank of R.I. v. Barrett*, 220 A.2d 517, 523 (R.I. 1966). "[The] rule against perpetuities prohibits the creation of future interests or estates which by possibility may not vest within a life or lives in being at the time of the testator's death plus twenty-one years." *Fleet Nat'l Bank v. Colt*, 529 A.2d 122, 129 (R.I. 1987). Here, CJI wants the Court to affirm the existence and validity of a contract that,

when made, would *never* be guaranteed to vest or fail.  According to CJI, whatever items Shearith Israel allegedly held "for safekeeping" would "be returned once a new or re-established congregation occupied Touro Synagogue" (CJI Br. at 6-7).  At the time these so-called bailments would have been created, there was no guarantee that another congregation would ever occupy the Touro Synagogue, and accordingly, any such contract would be void.

CJI's cases do not support the finding of a bailment based on the facts at bar.  In *Don-Lin Jewelry Co. v. Westin Hotel Co.*, 877 A.2d 621, 623 (R.I. 2005), the bailment at issue was between two ascertained entities and was discharged the day it was created, when a hotel delivered several boxes to a group of guests, pursuant to the bailor's specifications.  Likewise, in *Sturm v. Boker*, 150 U.S. 312, 329 (1893), the bailment was between two ascertained entities and would have been discharged by a return of the goods at issue to the bailor.  Neither case stands for the proposition that a bailment can be established for the benefit of an unidentified third party that may or may not ever exist.

> **2.     Even If Yeshuat Israel Owned The Rimonim, CJI Failed To Prove That It Is A *Legal* Successor To Yeshuat Israel**

Even assuming the colonial congregation owned or possessed any of the rimonim at issue here, CJI offers no evidence and can cite no caselaw showing that it is a *legal* successor to the colonial Yeshuat Israel.  It cites no principle of law for why it should inherit *legal* rights or, for that matter, no proof that Yeshuat Israel had any *legal* rights in property to begin with (*see* CJI Br. at 4-8).  Yeshuat Israel was an unincorporated entity that could not own property; only its individual members could do so.  *See Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 485 (1st Cir. 1985).  Since Yeshuat Israel had no ownership rights to property to begin with, there is nothing for CJI to inherit.  CJI's trust claims reinforce this point – CJI does not allege that Yeshuat Israel, as a juridical entity, placed the Newport Synagogue in trust.  It alleges that the three purchasers

of the land on which the synagogue was built did so, because these three individuals and not Yeshuat Israel had property rights in the land.  *See* CJI Br. at 27.  Thus, even if CJI could establish some sort of connection to Yeshuat Israel (it cannot), that connection would not endow CJI with any property rights; Yeshuat Israel had no such rights to pass down.

As shown in Shearith Israel's Post-Trial Brief, (1) CJI cannot, and does not, claim to be the successor, legal or otherwise, to any of the *heirs and descendants* of Yeshuat Israel, and (2) even if Yeshuat Israel, as an unincorporated entity, could be deemed to have successors, CJI would not qualify as a successor based on any established test for corporate legal successorship.  *See* CSI Br. Point II.B.  CJI cites no cases giving legal validity to its successorship theory.  So even if Yeshuat Israel could own property and could have a *legal* successor, CJI could not be that legal successor (and as between CJI and Shearith Israel, the evidence in the record points to Shearith Israel being the more apt legal successor to the colonial congregation.  *See id.*

Moreover, CJI's argument for successorship defies logic and history.  As noted, another congregation worshipped at the Touro Synagogue for over a decade before there was any mention of CJI, and 13 years before CJI's legal incorporation (FoF 202-217, 223-225; RFoF 54).  Further, during the first decade of CJI's existence, it was not the sole congregation worshipping at the Touro Synagogue.  Professor Fisher testified that, on at least two instances in the 1890s, rival congregations battled CJI for the occupation of the Touro Synagogue (FoF 224-225, 292-296; RFoF 54).  CJI only outlasted these other congregations because it aligned itself with Shearith Israel.  CJI formally and permanently agreed to uphold Sephardic customs, even though none of its members came from that tradition (FoF 238-253, 274-289; RFoF 13).  It formally and permanently gave Shearith Israel rights on its Board, agreeing to Shearith Israel's terms regarding the proper use of Touro Synagogue and its contents, and granting Shearith Israel

oversight over CJI's governance (FoF 278-283; RFoF 59-60).  These are the reasons Shearith

Israel acquiesced to CJI's use of the Touro Synagogue and its paraphernalia in the 1890s – and

when CJI attempted to renege on these obligations, Shearith Israel repeatedly vindicated its

rights in court (*see* Points I and VI; CSI Br. Points III and VIII).

But even were this not the case, CJI's evidence of successorship is legally meaningless.

CJI claims that its ability to draw on the Touro funds is evidence of successorship, but the Rhode

Island Legislature made no legislative findings of successorship when it gave CJI access to the

Touro Funds – it simply allowed CJI to draw on the funds directly.  *See* CJI Br. at 7.  By CJI's

logic, Shearith Israel would have been the legal successor of Yeshuat Israel because for over a

century, Shearith Israel had the sole right to draw on the Touro Funds in order to pay for repairs

and ministers' salaries at the Touro Synagogue (FoF 205-206, 210-211, 217, 284, 424).  Neither

does CJI's putting up a plaque inaccurately claiming that CJI was founded in 1658 re-write

history and make it so.  *See* CJI Br. at 7-8.  CJI was incorporated as a legal corporate entity in

1894 (FoF 16, 231).  This legal act granting CJI corporate existence and rights under the law

does not get overwritten by a piece of signage.  Nor can CJI's self-serving representations of

successorship or statements by non-lawyer "scholars" (CJI Br. at 7-8; FoF 226) somehow convey

CJI property rights, even were this done without objection from Shearith Israel (of course

Shearith Israel objected, and the evidence at trial showed that Shearith Israel was unaware of

these declarations until well after they were made (*see* Point VII, below).

**B.    CJI Is Not Entitled To Any Evidentiary Presumption Of Ownership From Its Possession Of The Rimonim**

CJI does not even argue that it got access to the rimonim independently of any

connection to the Touro Synagogue and Shearith Israel.  Instead, it attempts to skirt its burden of

establishing title or ownership by claiming entitlement to a presumption of ownership that flows

from its possession of the rimonim. *See* CJI Br. at 9-18. But no such presumption applies when the counterparty can show older or better title, as Shearith Israel has done at trial. *See* CSI Br. Point I.B. The presumption also cannot be applied because the rimonim are covered by the Indenture with Lease and the limited use documents. *See id.*, Point III.C. And the presumption cannot be applied because CJI has repeatedly disclaimed ownership of the Touro personalty, as seen through a host of dispositive evidence such as CJI's being locked out, CJI's conduct in surrender, the CJI Constitution and By-Laws, and many others. *See id.*

The cases CJI relies on (*see* CJI Br. at 9-15) offer it no aid. In *Maine v. Adams*, 672 S.E.2d 862 (Va. 2009), Maine tried to recover possession of a copy of the Declaration of Independence from a bona fide purchaser, who traced his title to documentary evidence. *Id.* at 866. More importantly, Maine had no evidence that it ever owned or possessed the document, and the *Maine* court simply never reached the issue of prior possession or ownership, disposing of the case solely by holding that the document was not a "public record". *Id.* at 868 ("We do not reach the common law issue whether the print was "kept" by the clerks of the town after the Declaration's text was transcribed into the town book. The fact that the print was not made by an authorized public officer and was not intended to be the official memorial of the Declaration precluded the print from qualifying as a "public record" under the common law, irrespective whether the print later was "kept" by the town's clerks").

*Willcox v. Stroup*, 467 F.3d 409 (4th Cir. 2006), is inapposite for substantially the same reason. Wilson dealt with ownership of Civil War-era documents which South Carolina claimed ownership of solely on the grounds that these documents were "public property." *Id.* at 410. The state had no evidence of prior ownership nor did the court address this issue – it held for Willcox solely because "the State has failed to establish that South Carolina law at the relevant

time treated gubernatorial papers as public property." *Id.* at 417.

But during trial, Shearith Israel elicited overwhelming evidence that it had both ownership and possession of the rimonim prior to CJI's existence (FoF 126-163, 194-201). The 1869 Inventory alone is dispositive on this point, so neither *Maine* nor *Willcox* have any relevance to the case at bar.

*Hammond v. Halsey*, 336 S.E.2d 495 (S.C. Ct. App. 1985), is also of no bearing on this case. In *Hammond*, the court cited the fact that the original owner created a Society to "acquire" historic relics and transferred the cannon to that Society. *Id.* at 496. The trial court sided with the party that could best trace possession and title to actual documentation (like Shearith Israel does here), holding that "there is evidence from which the jury could reasonably infer that Senator Hammond transferred title to the Society." *Id.* at 498. There is no evidence here that Shearith Israel created CJI or otherwise endowed it with title upon transfer. And here, unlike in *Hammond*, there is no evidence that Shearith Israel transferred title of the rimonim to CJI any time after Shearith Israel had both possession and ownership of the rimonim in 1869.

In fact, the evidence points squarely in the opposite direction – Shearith Israel loaned religious items to Shearith Israel, subject to limited use documentation (FoF 254-262). CJI repeatedly disclaimed ownership of all personal property at Touro Synagogue (FoF 233-237, 323-337). The personal property at the Touro Synagogue was also subject to restrictions that Shearith Israel inserted into CJI's 1897 Constitution and By-Laws (FoF 282). Congregants at Touro had to resort to suing Shearith Israel's representative in Newport to gain possession of a Torah scroll in 1901 (and lost) (FoF 301-304). And finally, after the 1903 litigation, CJI abdicated all claims to the Touro Synagogue and related personalty, and Shearith Israel made sure that the Indenture with Lease covered the Synagogue personal property (FoF 323-356).

1.    **Affording CJI The Presumption Of Ownership Would Turn Both Property Law And Landlord-Tenant Law On Their Heads**

CJI claims that the presumption of ownership based on possession squares with good public policy by promoting stability and protecting expectations.  CJI Br. at 10.  But policy considerations expressly militate against affording a mere possessor the presumption of ownership when the counterparty can show older title.  The law is clear that absent evidence of title transfer or donative intent, the law presumes that mere transfer of possession creates a loan.  *See Tefft v. Reynolds*, 113 A. 787, 789 (R.I. 1921).  Here, Shearith Israel had both possession and ownership of Rimonim 1-2 and 3-4 several decades before CJI came into existence (FoF 126-163, 194-201).  The proper presumption to apply here – and the presumption that is supported by the overwhelming evidence adduced at trial – would be that any subsequent transfer to CJI was a loan.  *See* CSI Br. at II.A.2.

The presumption cannot be mechanically applied, or else possessors of loaned items where little evidence of the actual loan exists will instantly gain a foothold in establishing – errantly – ownership rights over such property.  Taken to CJI's advocated-for extreme, such a presumption would afford thieves a presumption of rightful ownership that the victim of theft would be required to rebut.  CJI cites no case where the presumption was applied when the counterparty had evidence of prior ownership, nor could it – applying the presumption in those instances would upend property law norms.

Neither can such a presumption be applied when the property in question is subject to a lease or other written agreement of limited use.  A lessee is not presumed to own his apartment just because he has resided there, no matter how long this residency period may be.  And the law sides with the owner in such cases, estopping lessees from challenging a landlord's title until the lessees abdicate possession, thereby rendering any presumption from the lessee's possession

inapplicable. *Willison v. Watkins*, 28 U.S. 43, 47 (1830); *Williams v. Morris*, 95 U.S. 444, 455 (1877). *See* CSI Br. Point III.C.

Neither does *Rahn v. Hawkins*, 464 F.3d 813, 821 (8th Cir. 2006), help CJI (CJI Br. at 13, 21). CJI never represented *to Shearith Israel* that it owned the rimonim, and Shearith Israel had no reason to think its ownership claims were being challenged, since CJI's conduct had accorded with its lease obligations. *See* Point I.B, above. Shearith Israel, as loaner or lessor, was not obligated to peek in and remind CJI or anyone else that it claimed title to both the building and the personal property therein.

Nor can CJI rely on equitable defenses. These defenses would have been triggered only when Shearith Israel's rights were actually violated. Threats to sell the rimonim and representations of provenance in museum catalogues do not rise to the threshold necessary to trigger laches, estoppel, or waiver. *See* Point VII, below; *see also* CSI Br. Point IX.

## 2. CJI's Spoliation Claim Is Frivolous And CJI Is Not Entitled To Any Adverse Inference Or Presumption Of Ownership Based Thereon

CJI's attempts to distort the facts in order to assert a specious spoliation claim cannot be allowed. Dr. Mann did not lose or destroy any evidence. She may have seen a primary source referencing the transportation of the silver between Newport and New York (RFoF 47, 128). This was made clear to CJI in Shearith Israel's Opposition to CJI's Motion to Compel, where Shearith Israel averred that "Dr. Vivian Mann, and Shearith Israel's counsel reviewed Shearith Israel's extant files from the first half of the 19th Century, and we asked Dr. Mann to review her prior research, which was more extensive than just Shearith Israel's files, in an attempt to locate [the document]" ECF No. 66. CJI could have sent its own expert to search for and obtain the primary sources but chose not to do so, and cannot now benefit from this strategic choice.

A spoliation sanction cannot stand when only a copy of the evidence is mislaid, and the

original remains. *Kansky v. Showman*, 2011 WL 1362245, at \*4 (M.D. Pa. Apr. 11, 2011) ("The actual studies and records were not destroyed, only the copies sent to [defendant's expert witness] were destroyed . . . . It is apparent that Dr. Fedder did not destroy any evidence, merely copies of records that were sent to him. Accordingly, a spoliation sanction is inappropriate"); *see also Jinks-Umstead v. England*, 2005 WL 3312947, at \*4 (D.D.C. Dec. 7, 2005) ("While it is true that Ms. Holleran did destroy the personal notes she made as she developed the staffing levels for Carderock, those personal notes were also based on data obtained from the FIS database. In short, by being given access to the FIS database, Plaintiff has been given the opportunity to obtain all the relevant information which she was denied at the first trial"). Here, like in *Kansky*, only copies, not the originals, were mislaid (FoF 47, 128). CJI did not attempt to conduct its own search for the document and did not retain an expert to do so. A spoliation sanction cannot be given on these facts.

Moreover, even were CJI's claims to be credited, a spoliation sanction is improper here because CJI cannot show bad faith. Spoliation sanctions makes sense only where the evidence permits a finding of bad faith destruction; ordinarily, negligent destruction would not support the logical inference that the evidence was favorable to the defendant. *See* Leonard B. Sand *et al.*, 4 *Modern Federal Jury Instructions Civil* § 75.01 (instruction 75-7) (2015); *see also U.S. v. Artero*, 121 F.3d 1256, 1259-60 (9th Cir. 1997) (bad faith required); *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (same); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) (same); *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983) (suppression of evidence must be intentional, not accidental). CJI does not even allege that Dr. Mann acted intentionally or in bad faith, nor does the evidentiary record support such an inference (RFoF 128). A spoliation sanction would thus be inappropriate.

Finally, CJI could claim no prejudice because the allegedly lost evidence dovetailed with copious other evidence indicating that there was no connection between movement of the Torah scrolls and movement of the rimonim.  As explained in detail in Shearith Israel's Opposition to CJI's Motion to Compel, the document would have simply provided further support for Dr. Mann's conclusion that the Torah scrolls and silver were treated separately and transported separately when they traveled between New York and Newport (RFoF 43).  *See* ECF No. 66. Dr. Mann made clear that she did not rely on this document in formulating her conclusion regarding the movement of the silver, relying instead on primary source documents that are in evidence and were admitted as exhibits at trial.  *See id.*  In light of this, CJI was "given the opportunity to obtain all the relevant information" regarding this conclusion, and cannot be prejudiced.  *See Jinks-Umstead*, 2005 WL 3312947, at *4.

CJI's cases are misleading and cannot support a spoliation sanction on the instant facts (CJI Br. at 23-25).  Each case that CJI relies on hinges on destruction of ***original*** evidence, where no alternate route to the truth exists post-destruction.  *See Glover v. BIC Corp.*, 6 F.3d 1318, 1322 (9th Cir. 1993) (tampering with a lighter alleged to be the cause of a fire); *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1159 (1st Cir. 1996) (destruction of original evidence by the party (not an expert)) (noting that sanctions should be rejected without a showing of bad faith); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) (destruction of primary source physical evidence) (observing that "[a]n adverse inference . . . cannot be drawn merely from [a party's] negligent loss or destruction of evidence; the inference requires a showing that . . . his willful conduct resulted in its loss or destruction").

## III.    CJI'S TRUST CLAIMS FAIL ON THE FACTS AND THE LAW

CJI finally provides some clarity with respect to its trust claim and asserts that the Touro Synagogue is held in a charitable trust.  *See* CJI Br. at 25-28.  It also acknowledges, or at least

pays lip service to, the fact that Shearith Israel would be the trustee of any such trust.  But CJI, as plaintiff, bears the burden of proving trust creation by clear and convincing evidence.  It has failed to prove the scope of the putative trust (all of the Touro Synagogue?  1/3?  2/3?  is the personalty included?).  It has failed to prove, or even to allege, the charitable purpose that, by law, is indispensable to the existence of a charitable trust.  It has failed also by alleging that this charitable trust exists to serve a sole, ascertainable beneficiary – CJI – although this contravenes trust law.  And finally it has failed to square its demands (compelling sale of trust property, ousting the trustee) with the governing legal principles, which unequivocally hold that only the Attorney General can enforce administration of charitable trusts, and those who receive the benefits of such a trust lack standing to even petition a court for the relief CJI seeks.

CJI uses trust law as an end-run around the law of ownership.  It argues that, even if it does not own the rimonim, its status as purported sole trust beneficiary entitles it to unilaterally sell or make profound changes to the trust property.  *See* CJI Br. at 45-47.  But under trust law, this power is reserved for the trustee.  CJI goes farther still and claims that its status as purported sole beneficiary entitles it to eject Shearith Israel as trustee and somehow claim ownership to both the Touro Synagogue and to its personal property.  *See* CJI Br. at 38-44.  But the law makes equally clear that only the Attorney General can seek such extraordinary relief.

Shearith Israel's objections to CJI's trust claims are rooted in CJI's resort to these extreme positions.  This is especially so since CJI claims the existence of a charitable trust solely for its benefit.  *See* CJI Br. at 34-36.  But any such trust cannot have a single concrete, identifiable beneficiary, so that the trust's charitable purpose may be perpetuated and that the present recipients of its benefits do not deplete the trust for future generations.  Likewise, the law of charitable trusts does not give CJI any standing to enforce the means by which the trust is

administered, even if CJI members are entitled to reap the benefits of such a trust.  Only the

Attorney General may do so.  And finally, CJI fails to acknowledge that any charitable trust

would exist for an express religious purpose.  Each of the trust-creating instruments identified by

CJI specifies that the Touro Synagogue must be used for a religious purpose, with most

specifying that the purpose would be the maintenance of worship according to Jewish rites,

rituals, and customs as practiced by Shearith Israel.  But CJI wants, on one hand, to establish the

existence of a religious trust, and on the other, for the Court to reject the religious purpose of any

such trust and Shearith Israel's control over any such trust.

For CJI, the existence of a trust leads to the conclusion that Shearith Israel must be

stripped of any rights it has in Touro Synagogue and its personal property.  If not for CJI's

radical misuse of trust law, Shearith Israel would not have objected to the characterization of its

relationship being described as one of trust (lower case 't').  After all, Shearith Israel has

functioned as the religious and cultural overseer of the Touro Synagogue for two centuries (FoF

462).  Shearith Israel has, according to this moral obligation, overseen the Synagogue and

cemetery and conducted services at the Synagogue for the better part of a century after the

colonial Yeshuat Israel disbanded.  It loaned religious items to every congregation worshipping

at Touro Synagogue since 1760, and otherwise sought to preserve and honor the traditions of the

original occupants of that edifice (FoF 205, 208-209, 211-216, 254-264, 463).  Shearith Israel

does not aim to abdicate this responsibility, whether or not a concomitant legal responsibility

exists.  But Shearith Israel does not do so for the benefit of CJI, the corporation.  It does so, as it

did, and will continue to do, for the Jewish residents of Newport and all others who wish to

worship at Touro or simply to experience its famed history, past, present, and future.

A.    **CJI Failed To Prove The Existence Or Parameters Of A Charitable Trust For Its Exclusive Benefit By The Clear And Convincing Evidence Required By Law**

CJI, who bears the burden of establishing existence of a charitable trust by "clear and convincing evidence" (*see* CSI Br. Point VI), failed to satisfy this stringent evidentiary threshold. A charitable trust must state an intention to convey property for an express charitable purpose. *Bristol v. Nolan*, 53 A.2d 466, 469 (R.I. 1947); *MacDonald v. Manning*, 239 A.2d 640, 644-45 (R.I. 1968). And a charitable trust cannot exist for the benefit of a concrete, identifiable beneficiary such as CJI. *See* Point III.B.1, below. "To constitute a valid testamentary trust, it is essential that its material terms are certain . . . [and] [i]f any of [the trust's] elements is not described within certainty, no trust is created." *Tucker v. Countryman*, 111 N.E.2d 101, 103-04, 05 (Ill. 1953) (finding a testamentary trust void for vagueness due to "incongruities and uncertainties [in] . . . the subject of the trust").

None of the documents that CJI alleges create or affirm a trust – the 1787 will of Rodrigues Rivera, the 1894 Deeds, and the 1945 Agreement – list CJI as the beneficiary (FoF 466-473, 484). Moreover, both CJI and the "Jewish Society of Newport" had existed starting in 1894 and were ***not*** the same. To wit, 1894 Deeds, the Indenture, and the 1945 Agreement never equate CJI with the Jewish Society or even mention the two in the same context (and CJI was a signatory to the Indenture and the 1945 Agreement) (RFoF 185). This is strong evidence that, whatever trust may exist, CJI is not its beneficiary. To the extent that CJI claims that these two documents affirm the trust allegedly created by the 1787 will (CJI Br. at 26-28), this would indicate that CJI is not a beneficiary of that putative trust either.

1.    **The 1787 Will Of Jacob Rodrigues Rivera**

CJI failed to plead, much less prove, the scope of the trust allegedly created by the 1787 will of Jacob Rodrigues Rivera. The terms of the will are too uncertain: It is unclear whether

Rodrigues Rivera owned 1/3 or 2/3 of the Touro Synagogue land at his death (FoF 118), and this ambiguity precludes trust formation, which requires clear and convincing evidence. *See, e.g.*, *Tucker*, 111 N.E.2d at 103-04; *Del Drago v. Comm'r*, 214 F.2d 478, 480 (2d Cir. 1954); *Union & New Haven Tr. Co. v. Koletsky*, 167 A. 803, 806 (Conn. 1933). *See* CSI Br. Point VI.B.

CJI also failed to plead, much less prove, the general charitable purpose of the bequest – an indispensable element to the creation of a charitable trust (RFoF 165). *See* Point III.B.1, below. CJI claims that the will creates a trust for the "Jewish Society of Newport" which, according to CJI's reading, means the Jewish congregation worshipping in Newport. *See* CJI Br. at 27. But a bequest naming a religious *organization*, and not a religious *purpose*, cannot create a charitable trust. *See Bristol*, 53 A.2d at 469 (charitable purpose required); *MacDonald*, 239 A.2d at 644-45 (same); *see also* CSI Br. Points VI, VI.A, VI.B.

Whatever its scope, the 1787 will of Jacob Rodrigues Rivera does not create a trust for CJI's benefit. Initially, it is impossible to ascertain for purposes of trust creation what Rodrigues Rivera meant by the Jewish Society of Newport. He may have been referencing the congregation Yeshuat Israel. But this congregation ceased to exist 100 years before CJI came into existence, and CJI shares no connection, legal or otherwise, to the colonial Yeshuat Israel. *See* Point II.A.2, above; CSI Br. Point II.B. Or it could refer to the Jewish community in Newport. But CJI does not even speak for all of its membership, much less for the entire Jewish community of Newport, which is far broader and more varied than the makeup of CJI (FoF 488-492; *see also* CSI Br. Point II.B). Moreover, CJI cannot be such a proxy because it is attempting to unilaterally deprive the Newport Jewish community (and the world's Jewish community) of a priceless part of its history (FoF 500-512).

2.    **The 1894 Deeds Of Conveyance From The Heirs And Descendants Of Yeshuat Israel To Shearith Israel**

CJI failed to prove by clear and convincing evidence that the 1894 Deeds create a charitable trust. Only 3 out of the 9 deeds, which were signed by only 22 of the 57 total signatories, contain trust language (FoF 249-250, 470; RFoF 167). CJI cannot meet its burden of proving trust creation by clear and convincing evidence in light of this ambiguity. *See* CSI Br. Point VI.C.

The evidence adduced at trial likewise shatters CJI's wish of being the intended beneficiary as contemplated by the 1894 Deeds. There is no mention of CJI in the Deeds, in any capacity at all, and certainly not as beneficiary (FoF 247; RFoF 169). Testimony and evidence clearly showed that when the heirs and descendants of Yeshuat Israel signed the 1894 Deeds, they were pledging their support for Shearith Israel at a time when CJI was attempting to take control of the Touro Synagogue (FoF 242-253). These deeds, transferring the synagogue, lands, and contents to Shearith Israel, were a direct reaction to CJI's attempted coup and were intended to strip CJI of any possible claim to the Touro Synagogue or its contents (FoF 236, 242-253; RFoF 19). Whatever rights and obligations these deeds transferred, they transferred to Shearith Israel and away from CJI (FoF 253).

3.    **The 1903 And 1908 Indentures With Lease**

The events surrounding the signing of the 1903 Indenture with Lease prove that CJI is not the sole beneficiary of any trust that may be subject to Shearith Israel's trusteeship. CJI repeatedly challenged Shearith Israel's rights in the Touro Synagogue and its personalty leading up to the 1903 decision in *David v. Levy*. In *David*, CJI claimed that Touro Synagogue was held in trust for its benefit – and lost. *See* Point IV.A, below; CSI Br. Point VIII. CJI entered into an absolute surrender of both the Synagogue and the personal property. *Id.* Shearith Israel and CJI

enacted an elaborate ceremony to confirm that surrender and that both the real and personal property was changing hands, and was subject to the Indenture with Lease. *Id.* And this arrangement was repeatedly confirmed, including in the 1945 Agreement, which expressly acknowledged that CJI's rights and obligations are subject solely to its status as lessee.

The case law cited by CJI does nothing to refute this (*see* CJI Br. at 29-30). In *In re Ryan's Est.*, 60 N.E.2d 817, 819 (N.Y. 1945), there was no dispute about the trustee-beneficiary relationship of the lessor and lessee, and ***the lease was expressly made subject to these trust obligations***. *Ahuna v. Dep't of Hawaiian Home Lands*, 640 P.2d 1161 (Haw. 1982), is even farther off the mark. In *Ahuna*, the trust existed expressly for the purpose of leasing plots of land to native Hawaiians. *Id.* at 1163. The sole issue was whether the trustee discharged its duty by leasing 6.5 acres or whether it was obligated to lease 10 acres to an individual. *Id.* Here, the Indenture makes no mention of any trust obligations borne by Shearith Israel (its mention of the Shearith Israel trustees does not help CJI's cause – *see* Point III.D, below) and, more importantly, does not mention any possible benefits flowing to CJI (FoF 340-343).

### 4.    The 1945 Agreement Between Shearith Israel, CJI, And The Federal Government

Nor can the 1945 Agreement with the Federal Government create a trust. At most, the 1945 Agreement affirms whatever obligations existed in the 1894 Deeds of Conveyance (FoF 472) (noting that Shearith Israel Trustees are "Trustees under Deed of Trust dated April 27, 1894"); *see also* RFoF 177-178. But such after-the-fact recognitions of supposed rights and obligations that a party claims existed in a prior trust does not give legal effect to those rights or obligations. *See Talbot v. Talbot*, 78 A. 535, 540 (R.I. 1911) (contemporaneous donative intent required); *see also* CSI Br. Point VI.D.

Nor does the 1945 Agreement identify CJI as a possible beneficiary of any trust. The

1945 Agreement echoes both the language and intent of the 1894 Deeds.  And CJI's creative use of ellipses cannot hide this point.  Twice, CJI claims that "[t]he 1945 Agreement recites that 'Shearith Israel Trustees' are 'holders of the fee simple title upon certain trusts in the Touro Synagogue . . . .'"  (CJI Br. at 28).  CJI then claims that this harkens back to the 1787 will of Rodrigues Rivera.  *Id.*  But that same page makes clear which Deeds of Trust are being referenced here:  "the members of the Board of Trustees and Clerk of the Trustees of the Congregation Shearith Israel . . . as Trustees under **Deed of Trust dated April 27, 1894**" (FoF 472 (emphasis added); *see also* RFoF 177-178, 180).

The 1945 Agreement quotes extensively from the 1894 Deeds and from the Indenture with Lease (FoF 406; RFoF 177; *see also* Point III.B.2, below).  First, this reinforces that the 1945 Agreement does not form an independent trust but simply reaffirms the existing obligations of the parties.  The Shearith Israel Trustees are identified as the owners in fee simple of the Touro Synagogue "upon certain trusts" – with both ownership and these "certain trusts" emanating from the 1894 Deeds.  Second, this reinforces that the Indenture with Lease is still in effect and govern the relationship between Shearith Israel and CJI – why else quote it here?  Third, this reinforces that whatever trust may exist, CJI cannot be its sole beneficiary.  There is no mention of CJI as being the beneficiary of any trust.  There is no mention of or even intimation that CJI is the equivalent of the Jewish Society of Newport, either at that time or at any other time.  CJI's status is relegated solely to that of lessee, and all of CJI's privileges and obligations are governed solely by this lessee status (FoF 405)).  The Agreement expressly states that "in carrying out the provisions of this Agreement, [Shearith Israel and CJI's] obligations shall be performed in accordance with and subject to their respective rights and obligations as **lessor and lessee**" (FoF 405, 472; RFoF 177).  In light of the absolute clarity of this sentence, it

is telling that the 1945 Agreement never refers to CJI as a beneficiary and never specifies any trust obligations Shearith Israel might have.  The only obligations the Agreement references are those in the Indenture with Lease.

Finally, Shearith Israel cannot be estopped from denying the existence of any putative trust *for CJI's benefit*.  CJI can point to no document or statement wherein Shearith Israel affirmed the existence of a trust relationship between it and CJI.  Nor has CJI expressly alleged the existence of a trust for its benefit since its 1902 lawsuit against Shearith Israel – a claim that was comprehensively rejected by the Court (*see* Point IV, below).

## B. __The Law Of Charitable Trusts Precludes All Of The Relief CJI Seeks__

The law of charitable trusts prohibits the very relief that CJI seeks.  The Attorney General must be a party to any proceedings involving charitable trusts, and only the Attorney General has standing to assert that a charitable trust exists under Rhode Island law.  "It is well settled in this state that the attorney general is the representative of the interests of the public under charitable trusts and that he should be made a party in any suit in which the __existence__ or the __validity__ of such a trust is in question or wherein the administration of such a trust is involved."  *Leo v. Armington*, 59 A.2d 371, 371 (R.I. 1948) (holding that no final order could be made in suit involving charitable trust where the Attorney General was not named party respondent) (emphasis added).  *See also Israel v. Nat'l Bd. of Young Men's Christian Ass'n*, 369 A.2d 646, 649 (R.I. 1977) (holding Attorney General to be indispensable party to lawsuit involving charitable trust construction); *Powers v. Home for Aged Women*, 179 A. 610, 612 (R.I. 1935) (same); *Newport Hosp. v. Harvey*, 133 A. 648 (R.I. 1926) (same).

Moreover, CJI cannot be a beneficiary of such a trust (a charitable trust cannot have an ascertainable beneficiary to the exclusion of others).  *See* Point III.B.1, below.  Nor can CJI cannot petition to enforce the terms of such a trust, cannot petition to sell the trust property of

such a trust, and cannot petition to remove the trustee of such a trust.  All of these powers lie

solely with the Attorney General.  *See* Point III.B.3, below.  Nor can CJI use *cy pres* or equitable

deviation to circumvent the law of trusts in order to transform the trust into its personal fiefdom.

*See* Point III.B.4, below.

### 1.   CJI Cannot Be The Sole Beneficiary Of A Charitable Trust As A Matter Of Law

CJI's post-trial brief misapprehends the law of charitable trusts.  *See* CJI Br. at 34-36.  A

charitable trust cannot exist to favor a single identifiable beneficiary – its benefits are to be

meted out by the trustee for the benefit of the public or a subset thereof, and to be used according

to an express charitable purpose.  "[Charitable trusts] may, and indeed must, be for the benefit of

an indefinite number of persons; for if all the beneficiaries are personally designated, the trust

lacks the essential element of indefiniteness".  *Russell v. Allen,* 107 U.S. 163, 167 (1883);  *see

also Webster v. Wiggin*, 31 A. 824, 829 (R.I. 1895) (*citing Russell* and holding that a charitable

trust must have an indefinite beneficiary); *Buchanan v. McLyman*, 153 A. 304, 305 (R.I. 1931)

("It is well established that a trust creating a place for 'public worship for the benefit of an

indefinite number of persons is a good and valid trust to a charitable use'") (*quoting Brice v. Trs.

of All Saints Mem'l Chapel*, 76 A. 774, 781 (R.I. 1910)); *Denver Found. v. Wells Fargo Bank,

N.A.*, 163 P.3d 1116, 1125 (Colo. 2007) ("Instead of identifying a person or corporation as

beneficiary, the settlor of a charitable trust must describe a purpose which is of substantial public

benefit").

This rule has been recognized in case law and other legal sources.  "[T]he great

difference between charitable and private trusts lies in the character of their respective

beneficiaries; that the private trust requires definite beneficiaries, whereas the charitable trust

demands indefinite beneficiaries; that not only is a charitable trust *permitted* by law to have

vague, undefined, uncertain beneficiaries, but that it is *required* to have such beneficiaries; and that the very essence of a charitable or public trust lies in the indefiniteness of the charitable trust beneficiaries."  George Gleason Bogert *et al.*, *The Law Of Trusts & Trustees* § 363 (rev. 2d ed. 1993 & Supp. 2014) (emphasis in the original).  The rationale for requiring an indefinite beneficiary is laid out in *Freshour v. King* (*In re Freshour's Est.*), 345 P.2d 689 (Kan. 1959), wherein the Supreme Court of Kansas explained that "[w]hile the human beings who are to obtain advantages from charitable trusts may be referred to as beneficiaries, the real beneficiary is the public and the human beings involved are merely the instrumentalities from whom the benefits flow."  *Id.* at 695.

The Rhode Island Supreme Court, in *Webster*, provides a legal basis for this indefiniteness requirement, noting that "'[a] trust [for an indefinite beneficiary] would not in any way infringe the law or rule against perpetuities, because we know very well that when you have a trust which, if it were for the benefit of private individuals, or a fluctuating body of private individuals, would be void on the ground of perpetuity, yet, if it creates a charitable – that is to say, a public – interest, it will be free from any obnoxiousness to the rule with regard to perpetuities.'"  31 A. at 829. (citation omitted).

A case cited in CJI's brief makes abundantly clear that a charitable trust is required to be for the benefit of an unidentifiable class of people, noting that "uncertainty and indefiniteness as to the individuals and numbers to be benefited are necessary and essential elements to the creation of a valid charitable trust".  *Wood v. Trs. of Fourth Baptist Church*, 61 A. 279, 281 (R.I. 1905) (*see* CJI Br. at 26).  CJI misrepresents the substance of the case by claiming that the trust at issue is "for [the] benefit of Fourth Baptist Church in Providence" (CJI Br. at 26).  Not so. The Fourth Baptist Church was the ***trustee***.  The charitable purpose, as recognized by the court,

was "the advancement of the cause of religion in the Regular Baptist Denomination". *Wood*, 61 A. at 281. The Baptist Church was charged with administering the gift in accordance with that purpose, which is to say, it could use the funds to further its own charitable aims.

Courts do occasionally refer to the trustees of a charitable trust as its "beneficiaries" when those trustees are nonprofit organizations, because these trustees can administer the trust in accordance with their own charter or purpose. This was the case in *Wood*, and in another case that CJI errantly relies on, *Tillinghast v. Council at Narragansett Pier, R.I., of Boy Scouts of Am.*, 133 A. 662 (R.I. 1926). *See* CJI Br. at 36. In *Tillinghast*, the court was interpreting the validity of a bequest to "the Council at Narragansett Pier, Rhode Island, of the Boy Scouts of America, to be used under the supervision of the proper officials of that organization **to aid the carrying on its work and effecting its admirable purposes**." *Id.* at 662 (emphasis added). Thus, the organization was the trustee charged with administering the bequest, and the organization's purpose was the object of the trust, for which the money was to be used. The court, in shorthand, referred to the organization as the "beneficiary" because it received the money, but the true benefits were meted out to the public in accordance with the organization's aims and discretion.

CJI never claims that it is currently the trustee of any trust – it readily abdicates this duty and admits that Shearith Israel is the trustee of any charitable trust that may exist. *See* CJI Br. Point II. Thus, under the logic (and somewhat unique nomenclature) of *Tillinghast* and *Wood*, Shearith Israel would be the so-called "beneficiary" of any trust that CJI advocates for, because the object of such a trust would be to maintain the use of Touro Synagogue and its contents in accordance with certain Jewish rites and rituals, as interpreted by Shearith Israel. The individual members of CJI could reap the benefits of this trust purpose. But the Court does not need to find a trust for this to happen. Shearith Israel has been committed for 250 years to keeping the Touro

Synagogue open in accordance with its undertakings (FoF 462-463).

### 2.    Shearith Israel, As Trustee Of Any Putative Charitable Trust, Is Given Wide-Ranging Discretion In Administering The Trust

Courts tasked with enforcing religious trusts and overseeing their stated religious purpose do so by giving broad deference to the trustees to effectuate the wishes of the settlor and act in accordance with the stated charitable purpose. *See, e.g.*, *Brice*, 76 A. at 775; *In re Small's Est.*, 58 N.W.2d 477, 489 (Iowa 1953). In *Brice*, the court held that the trust's purpose may be "carried out as near as may be according to the intention of the donor by the trustee under the supervision of a court of equity", giving the trustee leeway to interpret and effectuate the trust according to the trustee's interpretation of the donor's intent. 76 A. at 782. Likewise, in *In re Small's Est.*, the court deferred to the trustees to administer a testamentary trust for the benefit of "believers in the fundamental principles of the Christian religion, and in the Bible" in a manner "as they 'believed' would be acceptable to and approved by [the testator], were he living". 58 N.W.2d at 489.

Whatever trust may exist here, it would be a religious trust that exists to carry out an express religious purpose. The 1787 will of Rodrigues Rivera contemplates that the Touro Synagogue be used "as a Place of Public Worship forever" (FoF 119, 475). At the time the will was executed, that worship would have clearly been according to Orthodox Sephardic custom and ritual – no other congregations existed at that time, and the colonial Yeshuat Israel followed these traditions (FoF 11-13). The 1894 Deeds, Indenture, and 1945 Agreement make this plainer still. The 1894 Deeds state that Touro Synagogue is to be used

> [f]or the maintenance therein of the usual and stated religious services according to the Ritual, Rites and Customs of the Orthodox Spanish and Portuguese Jews, as at this time practiced and observed in the Synagogue of the CONGREGATION SHEARITH ISRAEL

(FoF 478, 500). The Indenture uses nearly identical language, specifying that Touro must be

used

> for the maintenance therein of the usual and stated religious services according to
> the ritual rites and customs of the Orthodox Spanish and Portuguese Jews as at
> this time practiced in the Synagogue of the Congregation Shearith Israel

(FoF 479).  The 1945 Agreement echoes this sentiment and uses substantially similar verbiage, to achieve identical effect, noting that Touro must be used

> for the maintenance of divine services in accordance with the ritual, rites and
> customs of the Orthodox Spanish and Portuguese Jews as practiced and observed
> in the Synagogue of said Congregation Shearith Israel

(FoF 480).  Thus, any putative trust would exist for the purpose of preserving and maintaining these rites, rituals, and customs (RFoF 10, 13, 202).

Were the Court to find that a religious charitable trust exists, Shearith Israel, as trustee, would be afforded wide-ranging discretion to effectuate the terms of the trust according to its interpretation of the trust's beneficial purpose – "legal oversight" that Shearith Israel has carried out for 250 years (FoF 462-463).  *See generally* CSI Br. Point VII.

### 3. CJI Cannot Compel The Sale Of The Rimonim Or Petition For Removal Of A Trustee Of A Charitable Trust As A Matter Of Law

Assuming that the rimonim were part of any putative trust, a point that CJI elsewhere argues against (*see* CJI Br. Point I), the law of charitable trusts still precludes CJI from compelling their sale.  Trust law likewise makes clear that CJI has no standing to remove the trustee of a charitable trust.

Only the Attorney General has standing to petition the Court to remove the trustee of a charitable trust – a beneficiary cannot instigate a removal action.  *See Stearns v. Newport Hosp.*, 62 A. 132, 135 (R.I. 1905) (holding that a beneficiary has no standing to petition for removal and noting that "[t]he trust is a public one, and the Attorney General is the proper person to represent the public in any judicial inquiry into the conduct of the trustee in administering it"); *Burbank v.*

*Burbank*, 25 N.E. 427, 428 (Mass. 1890) (holding that the Attorney General is proper party to institute removal proceeding and noting that "the law has provided a suitable officer to represent those entitled to the beneficial interests in a public charity.  It has not left it to individuals to assume this duty, or even to the court to select a person for its performance").  *Stearns* and *Burbank* make clear that CJI cannot institute or maintain removal proceedings as a matter of law.

In fact, all trust enforcement functions in a charitable trust must be brought by the Attorney General.  Even a party who receives benefit from the aims of the trust lacks standing to enforce the trust terms:

> The beneficiary of charitable trusts is the general public to whom the social and economic advantages of the trusts accrue.  But because the public is the object of the settlors' benefactions, private parties have insufficient financial interest in charitable trusts to oversee their enforcement.  Consequently, the Commonwealth itself must perform this function if charitable trusts are to be properly supervised.  The responsibility for public supervision traditionally has been delegated to the attorney general to be performed as an exercise of his *parens patriae* powers.

*In re Pruner's Est.*, 136 A.2d 107, 109 (Pa. 1957); *see also Hardman v. Feinstein*, 240 Cal. Rptr. 483, 485 (Ct. App. 1987) ("a party who has no interest in a charitable trust other than as a taxpayer and a member of the general public to be benefited does not have the requisite interest"); *Longcor v. City of Red Wing*, 289 N.W. 570, 574 (Minn. 1940) ("It is the nearly uniform rule that a charitable trust can only be enforced by the attorney general").  CJI thus has no standing to request any modification of the trust for any purpose as a matter of law.

CJI cites only one case where the court contemplated the removal of a trustee for a charitable trust.  But in *In re Will of Crabtree*, 865 N.E.2d 1119, 1123 (Mass. 2007) (CJI Br. at 41), the proceedings were initiated by the court, who supervised administration of the trust.  The educational institutions and students who reaped the benefits of the trust funds were not parties to the proceedings.

4.      **The Doctrines Of *Cy Pres* And Equitable Deviation Cannot Be Distorted To Give CJI The Relief It Seeks**

a.      ***Cy Pres* Cannot Turn A Charitable Trust Into A Private Trust For CJI's Benefit**

Just as a charitable trust cannot have a sole identifiable beneficiary, *cy pres* cannot transform a charitable trust into a trust for the benefit of such a sole identifiable beneficiary. And, just like a beneficiary has no standing to enforce the terms of a charitable trust, a potential recipient of trust benefits has no standing to bring a *cy pres* claim and divert the benefits of an existing trust toward itself. *See Bolster v. Att'y Gen.*, 28 N.E.2d 475, 476 (Mass. 1940) ("As an institution that hoped to be the beneficiary or active agency of the application of the *cy pres* doctrine, Simmons College had no legally recognized private interest in the disposition of the fund. It had no interest different in kind from that of the public generally, which is represented exclusively by the Attorney General"); *see also First Christian Church v. Brownell*, 123 N.E.2d 603, 607 (Mass. 1955) (holding that putative beneficiary lacks standing); Bogert *et al.*, *supra* § 441 ("A suit to secure the application of *cy pres* may be brought by the trustee or a sub-trustee, or by the Attorney General or other public official authorized to represent the public, in his own name or on the relation of interested persons").

*Cy pres* exists to reform a trust's charitable *purpose* to the extent that purpose cannot be carried out – not to insert a concrete beneficiary into the terns of a charitable trust. CJI's own brief concedes that *cy pres* exists only to "direct application of the property or appropriate portion thereof to a charitable **purpose** that reasonably approximates the designated **purpose**." CJI Br. at 36-37 (*quoting Restatement* (*Third*) *of Trusts* § 67 (2003)). CJI's cases confirm as much. In *Bliven v. Borden*, 185 A. 239, 249 (R.I. 1936), the court substituted a different trustee to effectuate the charitable purpose intended by the testator. The court did nothing to modify the charitable purpose the donor intended, nor did it reform the trust to include a beneficiary. *Id.*

Likewise, in *Tillinghast*, the court reformed a will to make sure that charitable donation specified therein was being overseen by the trustee intended by the terms of the will, and that the domination would therefore be used according to the charitable purpose designated in the will. 133 A. at 663. The court did not change the purpose of the trust, nor did it reform the charitable trust to one that would benefit a concrete beneficiary, holding that "[b]y her gift of $50,000, the testatrix desired to aid this charitable object *for the benefit of the boys of Narragansett and vicinity*, through the agency of Veteran Troop No. 1, with which she was acquainted, but as to the name of which she was slightly in error." *Id.*

Moreover, the doctrine of *cy pres* does not apply to the type of trust that CJI is advocating for – that is, it cannot be applied to a trust for a specific charity and requires "general charitable intent." *Indus. Nat. Bank of R. I. v. Glocester Manton Free Pub. Library of Glocester*, R.I. 265 A.2d 724, 727 (R.I. 1970). That is, if "the donor had a specific intent to aid one particular object, then the cy pres doctrine is inapplicable." *Id.* (holding that trust did not demonstrate general charitable intent where bequest appeared to be for benefit of specific nursing home). CJI advocates for a charitable trust for a single "Society". *See* CJI Br. Point IV. Such a trust would lack the general charitable intent necessary before cy pres could even theoretically apply.

*In re Clark's Will*, 150 N.Y.S.2d 65, 69 (Surr. Ct. 1956), does nothing to advance CJI's cause. There, the testatrix left a sum of money for the charitable purpose of paying the salary of a minister of a certain church (not a certain congregation worshipping at that church). When that church closed, the court, wishing for this charitable purpose to be perpetuated, applied the funds to be used for the payment of a minister of another church, in keeping with the wishes of the testatrix. *Id.* This case confirms that CJI cannot be the sole beneficiary of any trust that may exist – the charitable purpose of the trust must serve a mutable public good, not be usurped by

CJI to the detriment of others that may seek to benefit from this charitable purpose in the future.

There is no occasion here to re-write the law of trusts through *cy pres* and create, without precedent, a charitable trust for the benefit of an ascertainable beneficiary, as CJI now advocates. Moreover, CJI failed allege, much less prove, that the charitable purpose of any putative trust can no longer be carried out and must be changed.

### b.    Equitable Deviation Cannot Be Used To Compel The Sale Of The Rimonim

CJI cites no cogent reason to apply equitable deviation to compel the sale of the rimonim, nor can it do so, since the doctrine exists to aid trustees, not beneficiaries.  Courts have applied this "extraordinary relief" to permit deviation from the terms of a will or trust only when there have been unforeseen changes in circumstances and adherence to the original terms threatens to defeat or substantially impair the purpose of the trust.  *See, e.g.*, *Nobbe v. Nobbe* (*In re Nobbe*), 831 N.E.2d 835, 842 (Ind. Ct. App. 2005) ("it is necessary that circumstances not anticipated by the settlor exist before the extraordinary relief of equitable deviation may be granted"); *Epworth Children's Home v. Beasley*, 616 S.E.2d 710, 717 (S.C. 2005) (holding the equitable deviation doctrine inapplicable where "trustee has not identified any changed conditions or circumstances which would justify deviation from the terms of Testatrix's charitable trust").

Moreover, equitable deviation is invoked by the trustee, who is tasked with effectuating the trust according to its stated purpose, and not by a beneficiary.  CJI's own cases confirm as much.  *See Buchanan v. Bank of Am*, 2011 WL 3705352, at *3 (R.I. Super. Ct. 2011) (noting that equitable deviation is a tool used to "authoriz[e] a trustee to deviate from provisions governing the management and administration of the trust estate"); *Brown v. Meeting St. Baptist Soc'y*, 9 R.I. 177, 177 (1869) (action brought by trustees to authorize sale of building and purchase of replacement building).  CJI's final case brought up the court's power to permit a sale only in

dicta; and even then, the court would only permit such deviation if the property in question could not be used to effectuate the charitable *purpose* of the trust.  *See Town of S. Kingstown v. Wakefield Tr. Co.*, 134 A. 815, 817 (R.I. 1926) (hypothesizing that "[i]f, as the complainant claims, the tract of land can no longer be advantageously used to carry out the charitable purpose of the donor, it would be within the jurisdiction of the superior court, if satisfied of the force of the complainant's contention, to permit a sale of the property").  CJI cites no case wherein a beneficiary so much as petitioned for, much less succeeded in invoking equitable deviation.

Other courts similarly note that equitable deviation is a power reserved for a trustee.  *See, e.g.*, *In re Aberlin*, 695 N.Y.S.2d 383, 383 (App. Div. 1999) ("equitable deviation has been applied to allow ***trustees*** to depart from the terms of a trust instrument") (emphasis added); *Balcom v. Humane Soc'y of Ind., Inc.* (*In re Pub. Benevolent Tr. of Crume*), 834 N.E.2d 705, 706 (Ind. Ct. App. 2005); ("Under the equitable deviation doctrine, [the court will permit the ***trustees***] to 'deviate from the mechanical means of administration of the trust'") (emphasis added); *Hansen v. Gov't of V.I.*, 1999 WL 35015172, at *17 (V.I. Dec. 22, 1999) ("Under the doctrine of equitable deviation, courts permit ***trustees*** to deviate from trust terms") (emphasis added); *Niemann v. Vaughn Cmty. Church*, 77 P.3d 1208, 1214 (Wash. Ct. App. 2003) (emphasis added; citation omitted), *aff'd*, 113 P.3d 463 (Wash. 2005) ("Equitable deviation allows a ***trustee*** of a charitable trust to deviate from a term of the trust"); *In re Elizabeth J.K.L. Lucas Charitable Gift*, 261 P.3d 800, 813 n.13 (Haw. Ct. App. 2011) ("equitable deviation permits ***trustees*** to deviate 'from the mechanical means' of administering the trust") (emphasis added; citation omitted).

This limitation makes sense in a charitable trust context.  The trustee of a charitable trust must administer the trust in accordance with the charitable purpose specified by the beneficiary.

The trustee is tasked with interpreting that purpose and is given wide-ranging discretion to administer the trust accordingly, especially when the trust is a religious one. *See* Point II.B.2, above; CSI Br. Point VII. The beneficiary, so to speak, is the public at large, but the real aim of a charitable trust is its stated purpose. *See* Point III.B.1, above. If a trustee believes the charitable purpose would require action unanticipated and uncalled for in the trust instrument, the beneficiary should be allowed to petition the court to reform the trust.

But the public, to whom these benefits flow, cannot be allowed to burden the courts and meddle with administration of the trust by forcing disposition of trust property. The *Restatement of Trusts*, which CJI extensively relies on, makes clear that the court should not apply equitable deviation where, as here, the proposed change would detract from the trust's purpose (preserving the Touro Synagogue according to Orthodox custom) or diminish the interests of some beneficiaries in favor of others (by depriving other Jews, in Newport and across the world, from seeing the rimonim in use as intended by custom and their maker). *See Restatement* (*Third*) *of Trusts* § 66 (1) cmt. b (2003) ("upon a finding of unanticipated circumstances, the court must further determine whether a proposed or contemplated modification or deviation would tend to advance (or, instead, possibly detract from) the trust purposes. . . . In this process, it is appropriate that courts act with particular caution in considering a modification or deviation that can be expected to diminish the interest(s) of one or more of the beneficiaries in favor of one or more others").

Moreover, even if a charitable trust could have a specific, identifiable beneficiary, and even if CJI were the beneficiary of a charitable trust containing Touro Synagogue and the rimonim, CJI has failed to show the threshold unanticipated changed circumstances that equitable deviation requires. The Touro Synagogue is doing just fine. It operates at a surplus –

something quite unheard of in the non-profit world (FoF 574-578; RFoF 249).  All of its repair and construction needs have been met through fundraising (FoF 588-593; RFoF 249).  Its revenue and expenses have been rising (RFoF 249).  It manages to get this done with a team of dedicated volunteers, like many not-for-profits (RFoF 249).  CJI relies on cases where the court granted equitable deviation due to pressing and obvious financial need.  *See, e.g.*, *Brown*, 9 R.I. at 178 (allowing sale of old building and purchase of new building when old building was "so greatly out of repair as to be nearly worthless").  The facts at bar are wholly different and do not require implementing this drastic remedy.

But even if CJI's circumstances were more dire, financial straits would not constitute "changed circumstances" that were unanticipated by the putative trust instruments.  If, assuming solely for the sake of argument, the trust-creating instrument is indeed the 1787 will of Rodrigues Rivera, Touro Synagogue's financial hardship would have been a fact of life for him. Rivera would have lived through the stoppage of construction of the synagogue due to lack of funds (FoF 110).  He also would have been acutely aware, writing his will immediately post-Revolution, that Newport's dwindling Jewish community was in shambles (FoF 164-168).  Yet the will does not contemplate selling any property, and there is no evidence that the original Yeshuat Israel attempted to do so in order to preserve the congregation (FoF 164-178).  Yeshuat Israel disbanded, but there is no evidence that the congregation ever contemplated the sale of religious objects even in this time of dire need.  In similar circumstances, courts have disfavored equitable deviation.  *See, e.g.*, *In re Nobbe*, 831 N.E.2d at 842 (holding that decedent knew of potential changes to banking laws, and therefore there were no "unanticipated" changed circumstances that would warrant equitable deviation).  The result here must be the same.

C.    **Even If CJI Could Have Standing To Remove The Trustee Of A Charitable Trust Or Compel The Sale Of The Rimonim, CJI Failed To Prove That Such Relief Is Warranted**

CJI's claims for removal of Shearith Israel as trustee are predicated on claims that (1) it had an inescapable financial need and selling the rimonim was the sole means for meeting this need, and (2) Shearith Israel was looking out for its own best interests in blocking the sale. The evidence at trial disproved both assertions. Moreover, CJI's removal claim is based on the rimonim being part of the trust corpus, which it flatly resists elsewhere in its brief. *See* CJI Br. Point I. If the rimonim are not part of the trust, then blocking their sale cannot cause Shearith Israel to breach any trust obligations that may have existed.

Initially, CJI has shown no immediate or long-term financial need for the mammoth $7.4 million endowment it seeks, and thus Shearith Israel's actions in opposing the sale cannot violate any duty of care or loyalty owed to the trust (RFoF 228-229). The evidence showed that CJI has been in the black since 2010 (FoF 569, 573-578). CJI did no projections for future need (FoF 567). And every single financial need it had was met through fundraising (the vast majority of which was done by the Touro Synagogue Foundation, and not CJI) (FoF 588-593). CJI even expended millions on projects that had nothing to do with maintenance or upkeep, building a visitor's center and purchasing other properties (FoF 571, 600-601). The evidence at trial showed simply that the plan to sell the rimonim, originated in 2008 when CJI (and the rest of the world) were pressed for cash, persisted in secret for four years as CJI's financial position steadily improved – CJI was profitable since 2010 but no changes to the mooted sale were made or even discussed (FoF 573-578; RFoF 223).

Nor was Shearith Israel acting in its own interests in blocking the possible sale. Shearith Israel sought (and continues) to seek to preserve the rimonim and to maintain the Touro Synagogue as an active house of worship (FoF 507, 556-557). Shearith Israel attempted to work

with CJI, suggesting monetizing the rimonim via a long-term loan, which would have guaranteed that the rimonim would not be lost to Jews in the future (RFoF 211). Shearith Israel suggested funding CJI/Touro Synagogue out of its own pocket (which it had no duty to do) (FoF 604; RFoF 250). Nothing Shearith Israel proposed would have favored it at the expense of CJI – just the opposite is true. Shearith Israel went above and beyond any duty it may have had in order to preserve the Touro Synagogue and the rimonim. But CJI was not interested in cooperation or moderation. It rejected all of these proposals and filed suit in the midst of negotiations, in breach of a standstill agreement between the parties (FoF 496-497). On these facts, removal would be wholly inappropriate.

Rhode Island law also militates against removal of Shearith Israel as trustee of any putative trust. Rhode Island courts "remain[n] steadfast in [their] belief that the removal of a trustee by a court is an **extreme remedy** which should be exercised 'sparingly and only upon a showing that the trustee has failed to perform his duties through more than mere negligence.'" *Buchanan*, 2011 WL 3705352, at *5 (*quoting Cuzzone v. Plourde*, 2005 WL 2716749, at *2-3 (R.I. Super. Oct.17, 2005) (refusing to remove trustee)).

The doctrine of equitable deviation exists to allow trustees (not beneficiaries) to receive permission to sell trust property if that permission does not expressly exist in the trust instrument. *See* Point III.B.4.b, above. And the trustee can only do so if unforeseen, changed circumstances require such a sale. *See id.* No express grant allowing sale of property can be gleaned from any of the purported trust instruments (FoF 493, 500-502). And there were no unforeseen, changed circumstances requiring a sale (which would have contravened the trust purpose in any event). *See* Point III.B.4.b, above. Thus, Shearith Israel would have breached its duty by *selling* the rimonim.

Moreover, a trustee has no duty to expend his own financial resources to maintain the trust. *See, e.g.*, *Att'y-Gen. v. N. Am. Life Ins. Co.*, 91 N.Y. 57, 61 (1883) ("the trustee has no interest, outside of the performance of duty.  What he does is for the benefit of others whose interests are for the time being in his keeping.  He owes them no duty to expend his own money for their benefit"); *McClure v. Middletown Trust Co.*, 110 A. 838, 841 (Conn. 1920) ("In the protection and increase of the estate the trustee is not required to advance his own funds"); *Navajo Tribe of Indians v. U.S.*, 9 Cl. Ct. 336, 386-87 (1986) ("the government was under no duty to use its own funds to preserve the trust property").  A source selectively and inaccurately summarized by CJI (*see* CJI Br. at 40-41) makes this plain when quoted in full.  "A trustee who holds real or tangible personal property is often faced with the problem whether he has the privilege or duty *of using trust income or principal* to preserve the physical integrity of the property in question and to prevent it from deteriorating or declining in value."  Bogert *et al.*, *supra*  § 600 (emphasis added).

By CJI's concession, any putative trust would be limited to the Touro Synagogue and perhaps its contents.  There are no additional trust funds for Shearith Israel to draw on to conduct repairs.  This is why CJI is allowed to lease the property for $1 per year – in exchange for its duty under the Indenture and Rhode Island law to conduct maintenance and repairs of the realty and personalty (among other duties).  *See* Point I.B, above.  CJI admits and has embraced this duty.  *Id.*  The law is clear that, even were CJI a beneficiary, it must first exhaust self-help before resorting to the trust for funding.  *See In re Cowee's Will*, 120 N.Y.S.2d 674, 682 (Surr. Ct. 1953) ("It is, therefore, the conclusion of this Court that the life beneficiary, Helen Selleck Baldwin, must first resort to her personal means before payment shall be made to her by the trustee from the principal of said trust fund").  Clearly CJI did not exhaust all options before

resorting to seeking sale – it had no need for funds, and it rejected all the options that Shearith Israel proposed.

CJI is also barred by unclean hands from petitioning this Court to compel sale of the rimonim. If everything that CJI alleges is true, this means that CJI, as the beneficiary of a charitable trust – a beneficiary who has no ownership rights in the trust property – secretly planned over the course of four years to convert and sell a part of the trust property without so much as telling the trustee, much less the Attorney General or this Court. The evidence at trial showed that CJI's claims of financial peril (which the evidence disproved in any case (FoF 573-578)) was manufactured in order to validate its attempts to sell the rimonim and ameliorate the inevitable backlash that would emanate from the Jewish community, among others (FoF 585, 617; RFoF 228-229). And this plan remained in effect even though by 2012, CJI had been in the black for three straight years and was making more and more each year from the Visitors Center (FoF 571, 573-578). Then, after being caught by Shearith Israel, CJI cried foul and initiated suit to give post-hoc judicial validation to its heretofore lawless and deceitful action. This conduct should be condemned, not rewarded.

Finally, equity cannot permit removal of a trustee when the existence of the trust has yet to be established, is being hotly contested, and the terms of any putative trust have yet to be set out. It is impossible to repudiate a trust if the Court has yet to declare whether a trust exists. If this Court were to find that a trust exists, Shearith Israel should be given the opportunity to abide by the trust terms as trustee and administer the trust as law requires. It would be manifestly inequitable for this Court to order removal of Shearith Israel as trustee after just having announced that a trust exists and having enunciated the terms and parameters of this trust.

**D.    CJI Pervasively Misrepresents That Shearith Israel Admitted To Being In A Trust Relationship With CJI**

CJI repeatedly conflates Shearith Israel, the organization, with the Shearith Israel trustees, the individuals that held property in trust *for the benefit of Shearith Israel*.  But CJI, by engineering quotations, would have this Court believe that every time the Shearith Israel trustees are mentioned, this is an admission that Shearith Israel itself is a trustee for CJI's benefit.  CJI, as if by reflex, inserts the words "for the benefit of CJI" every time the words "trust" or "trustee" appear – although not a single document it cites identifies CJI to be a beneficiary of any trust. *See* CJI Br. at 27-29, 57.

None of the primary documents CJI excerpts from refer to Shearith Israel, the organization, as trustee or refer to CJI as putative beneficiary.  These documents all refer to several named individuals acting as "Trustees . . . all of the City of New York" (P71, P76) or to "this Board, the Trustees and owners of the Ancient Synagogue Property at Newport" (D423-4).  These individual trustees are acting in their role as trustees for the benefit of Shearith Israel, not for the benefit of CJI.  There is no mention in any of these documents of Shearith Israel, as an organization, as a trustee.  The Indenture refers to the individual Shearith Israel trustees (and only mention CJI as lessor of the property, not as any beneficiary) (RFoF 174).  The 1945 Agreement is similarly unequivocal, referring to several named individuals as "being for the time being the members of the Board of Trustees and Clerk of the Trustees of the Congregation Shearith Israel" (RFoF 180).  That document, too, specifies that CJI is solely a lessee and that all of its rights and obligations are governed by its status as lessee (not as beneficiary) (FoF 405). *See* Point III.A.4, above; CSI Br. Point IV.D.

CJI's initial example (CJI Br. at 27, 57), which cuts hardest against its position, is in the absolute surrender of 1903, wherein "[CJI] agrees to admit and recognize without qualification

the title and ownership of L Napoleon Levy and acting Trustees to the synagogue building, premises and fixtures" (P68).  The Shearith Israel Trustees are receiving, without qualification, title and ownership to the synagogue building, premises and fixtures.  This is no promise of trusteeship – this is simply an acknowledgement of the recipients' position as *trustees of Shearith Israel*.  The following clause, which reads "The said L Napoleon Levy and acting Trustees, upon receiving the absolute surrender of said premises . . ." (*id.*) makes this abundantly clear.  Here, L. Napoleon Levy and the other Trustees of Shearith Israel are receiving the "absolute surrender" of the premises.  They are not receiving an absolute surrender from CJI in order to hold the very same property in trust for the benefit of CJI.  CJI's logic defies credulity.  This document is on its face an unequivocal surrender by CJI (who was incorporated and thus had property rights) to the trustees of Shearith Israel (who hold property in trust for the benefit of Shearith Israel, which cannot do so as an unincorporated entity).

The fallacy of CJI's position is underscored by myriad documents that make plain that the Shearith Israel trustees are acting in their capacity as trustees for Shearith Israel, and not as trustees of some trust for CJI's benefit.  For example, the 1894 Conveyances deed the Touro Synagogue and contents to the named Shearith Israel Trustees "so long as [the named individuals] shall continue to be the Trustees . . . of the ***CONGREGATION SHEARITH ISRAEL***" (RFoF 169) (emphasis added).  The evidence shows that the heirs and descendants of Yeshuat Israel, in making these conveyances, intended the Shearith Israel Trustees to hold and use the Touro Synagogue in precisely the same way as they held and used the properties of Shearith Israel.  This is underscored by the intended use specified in the conveyances, namely that the trustees are "to use and apply [Touro Synagogue], or cause the same to be used, occupied and employed for the maintenance there if of the usual and stated religious services

according to the Ritual, Rites and Customs of the orthodox Spanish and Portuguese Jews, as at this time practiced and observed in the synagogue of the ***CONGREGATION SHEARITH ISRAEL***" (FoF 478) (emphasis added).

*Hodgson v. Dorsey*, 298 N.W. 895 (Iowa 1941), is instructive. *Hodgson* involved a dispute over whether a deed given by a wife to her husband created a trust. The deed stated: "I, Maggie Dorsey, hereby sell and convey to Frank B. Dorsey, Sr., ***trustee***, with power to encumber, sell and convey, alienate for reinvestment, ***or transfer this trust*** as in the discretion of a trustee may seem best, the following parcels of real estate . . . ." *Id.* at 895 (emphasis added). The trial court held that "'[t]here is nothing else in the deed indicative of the grantor's purpose to pass the property in trust . . . I am therefore constrained to hold that the name of the grantee being followed by the word "trustee" does not show an intention to create a trust.'" *Id.* at 896 (citation omitted). The appellate court affirmed, holding that "[t]he use of such words [trust or trustee] will not of itself be sufficient to create a trust." *Id.* at 897. Here, no evidence exists of any attempt to create a trust ***for the benefit of CJI***. No document mentions it as beneficiary of any trust either directly or indirectly (FoF 466-467, 484; RFoF 169, 177, 185). Thus, there can be no clear and convincing evidence of any intent to create a trust for the benefit of CJI.

Similarly, in *Lopardo v. Lehman Bros.,* 2004 U.S. Dist. LEXIS 30863 (N.D. Ohio, Mar. 17, 2004), the court held that "certain 1099 tax forms issued with respect to account gains and income, and a single check made out to Catherine Lopardo ***Trustee***" were insufficient to show creation of a trust by the clear and convincing evidence required, especially since the putative trustee "was unaware of the terms of the purported trust and had no understanding of what her duties were as trustee." *Id.* at *11-12 (emphasis added); *see also In re Hoffman's Est.* 195 N.E.2d 106, 109 (Ohio 1963) (the word "trustee" on bank account passbook insufficient

evidence to establish existence of a trust); *Gammarino v. Hamilton Cnty. Bd. of Revision*, 702 N.E.2d 415, 417-18 (Ohio 1998) (the word "trustee" following person's name on a deed did not demonstrate that property was held in trust). Here, the evidence is weaker still – not a single document lists Shearith Israel, the Shearith Israel trustees, or anyone else as trustee for the benefit of CJI (FoF 464-473, 484; RFoF 169, 177, 185). CJI's pervasive and transparent attempts to insert "for the benefit of CJI" into every document in which the word "trust" or "trustee" appears cannot be allowed to stand.

## IV.    *RES JUDICATA* BARS CJI'S TRUST CLAIMS AND DECLARATION OF OWNERSHIP CLAIM

CJI's attempts to explain away the *res judicata* effect of *David v. Levy* and the replevin action fail. Both decisions were final and on the merits. There can be no doubt about the finality and merits underpinning the replevin action, which was tried to verdict (FoF 301-304, 318; RFoF 97-99). CJI has only itself to blame for the lack of documentation regarding the replevin action. Its official historian, Bernard Kusinitz, clearly relied on primary documentation when describing the suit in 1975 (FoF 301-304; RFoF 97). Yet CJI averred that it had produced all relevant documents in its files when Shearith Israel specifically inquired about documents it received from Kusinitz (FoF 305; RFoF 97).

*David v. Levy* was decided on demurrer, with the Circuit Court for the District of Rhode Island holding that CJI, a named plaintiff, failed to state a claim on which relief can be granted (FoF 309-318). CJI's argument that the matter was decided solely on the grounds of standing or unclean hands (CJI Br. at 56-57) is belied by the text of the decision. Judge Brown began by summarizing CJI's claims, noting that "[t]he bill alleges, in substance that in 1759 a tract of land in Newport was purchased by a number of persons of the Jewish faith, and that a deed of said land was executed by its owner" and noting that the bill of complaint alleges the existence of "a

trust for the Jews of Newport" (RFoF 194). Judge Brown then held that "[t]his deed, which is annexed to the bill, is upon its face a deed to the grantees named for a full money consideration, and ***affords no evidence itself of the allegation of the bill that the said grantees 'became joint tenants of said parcels of land as trustees of the Jews of Newport, forever'***" (*id.*).

Judge Brown went on to hold that several pleading deficiencies are fatal to CJI's complaint and require dismissal. He noted that "***[o]n the complainants' own theory of a trust for the Jews of Newport, the bill is fatally defective***, for its omission to set forth that any one of the complainants is a jew; and it is difficult to imagine how the 'Congregation Jeshuat Israel, a corporation created by law,' can be regarded as having any right or interest in such a trust, since a domestic corporation of this state cannot be regarded as a 'Jew of Newport.'" (FoF 315). Judge Brown noted a subsequent pleading deficiency that mandates dismissal, holding that "***the bill is still fatally defective for its failure to allege any facts which would give [plaintiffs] any legal or equitable interest in the land or building in question***" (FoF 316; RFoF 196).

These were not lack of standing arguments – these arguments went to the merits of CJI's claim and point out fatal pleading deficiencies that cannot be cured, requiring dismissal. Judge Brown's opinion unequivocally established that CJI's complaint must be, and was, dismissed because of a total and incurable failure to allege facts that would give CJI any legal or equitable claim to relief. Such decisions are indisputably final and on the merits. *See Cooke v. Mortg. Elec. Registration Sys., Inc.*, 2013 WL 2368846, at *2 (D.R.I. May 29, 2013) (McConnell, J.) ("'A dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6) is a decision on the merits'") (*quoting Acevedo–Villabos v. Hernandez*, 22 F.3d 384, 388 (1st Cir. 1984)).

Judge Brown buttressed his holdings regarding the incurable shortcomings of factual pleading by noting that CJI came to court with unclean hands and merits no relief because of

this.  But he expressly noted that this reason for dismissal was "in addition to the entire failure of the complainants to set forth any legal or equitable interest as the basis of this bill" (RFoF 195).  Thus, Judge Brown made clear that CJI's suit would have been dismissed solely for the above-described pleading deficiencies, which is a dismissal on the merits.

Finally, CJI does not argue, and thus concedes, that the parties in *David* were sufficiently identical for *res judicata* to apply.  Accordingly, *res judicata* would extinguish "all of the plaintiff's possible rights to remedies against the defendant arising out of [the prior] transaction". *Fiumara v. Fireman's Fund Ins. Cos.*, 746 F.2d 87, 91 (1st Cir. 1984).  Accordingly, the prior judgment "'precludes the parties or their privies from relitigating claims that were raised *or could have been raised* in that action.'"  *Am. Bridge Co. v. Providence Place Grp. Ltd. P'ship*, 263 F. Supp. 2d 330, 333 (D.R.I. 2003) (*quoting Apparel Art Int'l, Inc. v. Amertex Enters., Ltd.*, 48 F.3d 576, 583 (1st Cir. 1995)) (emphasis added).  *See also* CSI Br. Point VIII.C.

**A.**    *Res Judicata* **Bars CJI's Trust Claims**

CJI's current declaration of trust claims are nearly identical to the declaration of trust claims brought by CJI and rejected by the *David* court in 1903.

| **CJI's Claim In 1902** (RFoF 101) | **CJI's Claim Now** (ECF No. 2 at ¶ 30) |
|---|---|
| "And that it may be declared that the said lands are charged with *a trust in favor of and ought to be held for the use and benefit of your Complainants and all other, the* <u>*Jewish residents of said City of Newport*</u>, forever" (emphasis added) | ". . . that the Court declare that The New York Congregation holds such interest *in trust to and for the sole use, benefit and behoof of Touro and/or the* <u>*Jewish community of the City of Newport*</u>" (emphasis added) |

Then, as now, CJI's theory of trust creation hinged on the wording of the 1787 will of Jacob Rodrigues Rivera, which was quoted in its Complaint and attached thereto (FoF 309).  CJI also referenced the 1894 Deeds of Conveyance in both Complaints (then, arguing that they were void and now, arguing that they created or affirmed the trust) (FoF 309).  CJI now concedes that

in 1902, it, along with certain individual plaintiffs, alleged that "the Synagogue was held in trust for the 'Jews of Newport'" (CJI Br. at 55).  It now seeks the same declaration from this Court. The fact that CJI now couches the trust as being for "the Jewish Society" or "Jewish Community" of Newport has no bearing here.  CJI's argument that trust claims regarding the "Jewish Society, in Newport" were not brought and are thus preserved misapprehends the law. *Res judicata* extinguishes all claims that were *or could have been brought*, if they rise out of the same set of operative fact.  *Fiumara*, 746 F.2d at 91; *Am. Bridge,* 263 F. Supp. 2d at 333 (*quoting Apparel Art Int'l,* 48 F.3d at 583); *see also* CSI Br. Point VIII.C.

CJI's last-gasp effort to stave off *res judicata*'s preclusive effect is to claim that Shearith Israel acknowledged its trustee status following the lawsuit.  *See* CJI Br. at 58-59.  But, as is clear, the Indenture with Lease and the unequivocal surrender documents that CJI signed simply refer to the Shearith Israel trustees, who hold property for the benefit of Shearith Israel.  None of these documents evince or even hint at the existence of a trust for the benefit of CJI.  *See* Point III.D, above.

**B.    *Res Judicata* Bars CJI's Ownership Claims**

Again, CJI attempts to curtail the law of *res judicata* by arguing that ownership of the rimonim was not decided.  CJI Br. at 53-54.  This is emphatically *not* the relevant inquiry – res judicata extinguishes claims that were *or could have been* brought at the time.  *Fiumara*, 746 F.2d at 91; *Am. Bridge*, 263 F. Supp. 2d at 333.  And CJI concedes that ownership of personal property was at issue in the *David* action because CJI tried to enjoin Shearith Israel from removing certain personal property from the Touro Synagogue claiming that Shearith Israel had no rights in that property (FoF 309; RFoF 101).  *See* CJI Br. at 53-54.  The court rejected CJI's claim by refusing to grant such an injunction (FoF 313-318; RFoF 194-196).

CJI could, and should, have brought an ownership claim at that time.  Instead it waited,

even though its claims for ownership over the rimonim would have been identical then as they were now (recall that CJI is wholly reliant on its connection to Yeshuat Israel to establish its ownership claim – a connection that would have had to exist then if it exists now). Such vexatious and prejudicial claim splitting is precisely the reason courts apply *res judicata* to claims that could have been brought and is precisely the reason it should be applied to claims of ownership of personal property before this Court. *See Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 755 (1st Cir. 1994) ("res judicata serves many desirable ends, among them finality and efficiency").

**C.      CJI Failed To Prove Any Changed Circumstances That Would Render *Res Judicata* Inoperable**

CJI bases its current trust claims on the same documents it used to allege the existence of a trust in 1903 (FoF 313-316). Thus, nothing in the past 100 years would change whether or not CJI is a beneficiary of any putative trust containing the Touro Synagogue. The case CJI relies on is patently inapplicable. In *Hughes v. Insley*, 845 A.2d 1 (Md. 2003), changed circumstances circumvented claim preclusion because the claimant's "alternative theory did not become viable until April 4, 2001 [after conclusion of the first suit], when Lottie Mae, as personal representative, deeded the property to herself, which, by operation of law, conveyed it to Russell, Jr." *Id.* at 12. Here, CJI does not rely on any new documents or even new theories to establish that the Touro Synagogue is held in trust for its benefit. It predicates its claims on the very same documents it used, to no avail, to prove existence of a trust for its benefit in 1903 (FoF 309; RFoF 178).

Nor is there any ambiguity regarding Judge Brown's reasoning in *David*. CJI does not identify a single ambiguity in the decision (CJI Br. at 59), much less an ambiguity that would render inoperable *res judicata*'s preclusive effects. Judge Brown's decision clearly held that CJI

was not a beneficiary of any trust containing the Touro Synagogue, and clearly rejected CJI's reading of the 1759 Deed to the Touro lands and the 1787 will of Jacob Rodrigues Rivera (FoF 313-318; RFoF 194-196).  This, without more, is enough to preclude CJI's current claims.

## V.    SHEARITH ISRAEL HAS RIGHTS IN CJI'S GOVERNANCE

### A.    CJI's 1897 Constitution And By-Laws Give Shearith Israel Inalienable Governance Rights On CJI's Board

CJI does not address and thereby effectively concedes that its amendments of the CJI 1897 Constitution and By-Laws were *ultra vires*.  Instead, it simply argues that Shearith Israel did not appoint trustees and is now – for some unexpressed and unproven reason – precluded from doing so, and that Shearith Israel "knew about [the 1945] changes in the bylaws, which were sent to CSI at the time and produced from CSI's files during the litigation" (CJI Br. at 60). But Shearith Israel was under no duty to appoint trustees.  The evidence made clear that Shearith Israel's role on the CJI board was meant to preserve Shearith Israel's property rights and nurture and maintain Touro Synagogue's purpose (FoF 238-239, 276, 281-283).  Shearith Israel reinforced these desires several times before and after the enactment of what CJI itself called the "permanent" 1897 Constitution, culminating in the 1903 Indenture with Lease (FoF 240-241, 274-285).  The 1897 Constitution placed the onus on CJI to notify Shearith Israel regarding upcoming votes, and Shearith Israel could participate – or not – by proxy as it saw fit (FoF 279). CJI concedes that Shearith Israel's trustees did not need to "make themselves known" to CJI in order for this to happen (FoF 288).

Nor did CJI present any evidence that Shearith Israel knew of the illicit 1945 amendment to the CJI By-Laws.  There is no notice to Shearith Israel, either before or after the 1945 amendment was passed, nor do CJI's board minutes reflect notice being sent (FoF 286-289; RFoF 255-256).  Likewise, Shearith Israel's board minutes are devoid of any mention of the

1945 amendment, strongly suggesting Shearith Israel was kept in the dark, especially since the Shearith Israel minutes contain detailed descriptions of other, much more minor interactions between the parties at this time (RFoF 258). Finally, there is no evidence that Shearith Israel received a copy of the 1945 amendments contemporaneously or, indeed, even prior to the exchange of documents during the pendency of this lawsuit (FoF 287-289; RFoF 255-256).

CJI's evidence fails as a matter of law in any event. First, CJI cites no law that even an authorized by-law amendment (and this was not) could supersede a "permanent" Constitutional provision. Second, CJI wholly ignores the fact that the "permanent" 1897 Constitution precludes amendment without Shearith Israel Trustee unanimous consent. The law respects such no-amendment clauses. *Madelone v. Whitten*, 859 N.Y.S.2d 896 (TABLE), 2008 WL 399175, at *6 (Sup. Ct. 2008) ("the company's operating agreement expressly precludes . . . amendment except where the amendment or waiver is in writing, executed by all members of the company and refers specifically to each provision of the Agreement being waived or amended. In absence of compliance with such provisions, the Court sees no basis for giving force and effect to the November 20, 2007 resolutions (even assuming they were properly adopted)"); *see also King v. Grand Chapter of R.I. Order of E. Star*, 919 A.2d 991, 998 (R.I. 2007); *see also* CSI Br. Point IV.A.

## B.    CJI's Religious Practice Claims Are Meritless And Need Not Be Decided By The Court

Neither party is seeking any order from the Court regarding CJI's religious practices. Shearith Israel has pointed to the "rites, rituals, and custom" provision of the Indenture with Lease, the 1894 Deeds of Conveyance, and the 1945 Agreement – which all contemplate that Touro Synagogue is to be used in accordance with Orthodox custom and tradition as practiced and interpreted by Shearith Israel (*see* Point III.B.2, above) – to prove that Shearith Israel

reasonably objected to the proposed sale of the rimonim.  Moreover, CJI has claimed that the Court cannot permit any evidence of rites, rituals, and customs, and the Court precluded Shearith Israel's proof on this subject with respect to the proposed testimony of Rabbi Soloveichik.  CJI put on no evidence of its religious practice, either as it stands now or as it stood 100 years ago (RFoF 259).  It now wants the Court, without any proof, to take it at its word that it has been praying the same way for over 100 years, after CJI had affirmatively and successfully precluded proof of religious practice on other issues.  This portion of CJI's brief is evidently provided for collateral use, and presents no live case or controversy.  It would be improper for the Court to decide these issues.

## VI.  THE COURT CAN AND SHOULD RELY ON THE EXPERT TESTIMONY OF DR. MANN AND PROFESSOR FISHER

CJI trots out the same arguments that this Court considered and rejected months ago to support its argument that the testimony of Professor Fisher and Dr. Mann is unreliable.  Nothing has changed since February; CJI's arguments still fail.  The expert testimony at trial was consistent with the proof found in the primary documents.  And CJI offered no opposing expert testimony to challenge the substantive conclusions reached by Professor Fisher and Dr. Mann.  Nor did CJI offer rebuttal expert testimony regarding the procedural deficiencies it claims.

### A.    The Experts' Testimony Was Proper In The Context Of This Case And Will Help The Court

Expert historians and provenance experts testify regularly about the very issues at stake here.  And courts routinely rely on expert evidence to interpret terms in historical documents, ascertain provenance, and put events into the wider context of history.  To accomplish this, historians and provenance experts can and do testify regarding the thoughts and motivations of historical actors.

In fact, in *Maine.*, a dispute over the ownership of a print of the Declaration of

Independence heavily relied on and cited four times in CJI's post-trial brief (*see* CJI Br. at 9, 11, 14, 16), an expert "discussed the handwritten entries appearing on the reverse side of the print" and opined that "these entries indicated that the print continued to 'reside' with the town's clerks for 'at least a short period of time' after 1776." 672 S.E.2d at 865. Yet this is precisely the testimony CJI seeks to downplay in this case.

But courts routinely rely on the testimony of historians to analyze historical documents and terms, weigh historical evidence, and draw historical conclusions in a variety of contexts. *See, e.g.*, *N.J. v. N.Y.*, 1997 WL 291594, at *10 (U.S. Mar. 31, 1997) (hearing expert testimony of five historians on whether New York or New Jersey had sovereignty over a portion of Ellis Island); *Minn. v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 181 (1999) (embracing expert testimony regarding the historical context surrounding the signing of two ancient treaties); *Phillips v. Calhoun*, 956 F.2d 949, 952 (10th Cir. 1992) (relying on experts "to offer their understanding of the customary meaning and usage of the terms in question"); *Saginaw Chippewa Indian Tribe of Mich. v. Granholm*, 690 F. Supp. 2d 622, 635 (E.D. Mich. 2010) (historian provided expert opinions concerning the historical interpretation of two 19th Century treaties).

Historians also routinely testify about the thoughts, actions, and motivations of historical actors, who cannot testify themselves. *See, e.g.*, *N.J./N.Y.*, 1997 WL 291594, at *59 (historian testified concerning public's perception about ownership of land); *Prado Alvarez v. R.J. Reynolds Tobacco Co.*, 313 F. Supp. 2d 61, 74 (D.P.R. 2004) (historian testified that "there has been widespread, pervasive common knowledge throughout the twentieth century" about the adverse effects of smoking), *aff'd*, 405 F.3d 36 (1st Cir. 2005)

Historians also testify regarding historical connections between corporations and

organizations.  *See, e.g.*, *U.S. v. Newmont USA Ltd.*, 2007 WL 4856859, at *1 (E.D. Wash. Nov.

16, 2007) (expert historian testified providing "'detailed corporate and technological history of

Dawn Mining Company and its relationship to the company that was called Newmont Mining

Corporation'" and concluded that "Newmont has controlled Dawn and Dawn's operations since

Dawn's creation in 1955").

      And provenance experts routinely testify regarding historical ownership of objects, and

perform physical examinations of those objects to aid in their testimony.  *See, e.g.*, *Est. of*

*Mitchell v. Comm'r*, 101 T.C.M. (CCH) 1435, at *12 n.5 (2011) (noting that experts may opine

regarding "provenance", the "origin or history of ownership"); *U.S. v. Luna,* 649 F.3d 91, 105

(1st Cir. 2011) (expert testified regarding provenance of weaponry); *Levin v. Dalva Bros.*, 459

F.3d 68, 79 (1st Cir. 2000) (expert testified regarding provenance of an antique); *see also Gov't*

*of Peru v. Johnson*, 720 F. Supp. 810, 812-14 (C.D. Cal. 1989), *aff'd*, 933 F.2d 1013 (9th Cir.

1991) (Unpublished); *Langbord v. U.S. Dep't of Treas.*, 2009 WL 1312576, at *4-6 (E.D. Pa.

May 7, 2009).

      Here, Professor Fisher testified, based on primary evidence, regarding the historical

backdrop surrounding the history of the parties and placed the events in the greater context of

history (RFoF 153).  He tied together the writings of the parties to show the parties' thoughts,

desires, and concerns (FoF 344-356; RFoF 152).  And he analyzed the usage of certain terms

between the parties, as well as contemporaneously, in order to conclude whether the terms

"appurtenances", "fixtures", and "paraphernalia", as used between the parties, encompassed the

rimonim (FoF 347-356).  This testimony was rooted in primary sources, was consistent with the

other evidence adduced, and its substance was not seriously called into question on cross-

examination.

Likewise, Dr. Mann testified to the provenance of the rimonim, performing a physical analysis of the objects, taking into account their physical characteristics (FoF 131-135; RFoF 148). Dr. Mann buttressed this with examinations of volumes of documentary history spanning hundreds of years, focusing on primary source material (RFoF 126-127). Dr. Mann's analysis incorporated material that was never cited in previously published secondary works in order to conclude that the rimonim were originally paid for by Shearith Israel (FoF 128-156; RFoF 31). The secondary works that CJI relies on, in lieu of expert testimony, cite no evidence in support of their statements that the rimonim were originally made for the colonial Yeshuat Israel congregation (RFoF 34, 38). Like the testimony of Professor Fisher, Dr. Mann's testimony relied on extensive research into primary source material and was consistent with the other primary evidence at trial. Shearith Israel failed to cross-examine or rebut Dr. Mann's testimony flowing from her physical examination of the rimonim. Moreover, CJI does not even argue that Dr. Mann's testimony regarding the bases of the rimonim and the mismatched pairs is improper expert testimony, thereby conceding the expert nature and propriety of Dr. Mann's testimony on this issue.

The Court can rely on Professor Fisher and Dr. Mann's credible testimony, based on primary proof. *See Mitchell v. U.S.*, 141 F.3d 8, 17 (1st Cir. 1998) (finding expert's testimony reliable because "it was plainly plausible, internally consistent . . . and was not critically impeached"); *Radaszewski ex rel. Radaszewski v. Maram*, 2008 WL 2097382, at *11 (N.D. Ill. Mar. 26, 2008) ("Dr. Flint's opinions were based on sufficient facts and reliable principles and methodology. Dr. Flint further applied the principles and methods reliably to the facts. Dr. Flint's expert testimony was credible and persuasive").

CJI's cases do nothing to further its argument (CJI Br. at 48-50). In *Primavera*

*Familienstifung v. Askin*, 130 F. Supp. 2d 450 (S.D.N.Y. 2001), the court excluded the expert's testimony for proffering "inadmissible legal opinions and conclusions directed at telling the jury what result to reach". *Id.* at 529. Similarly, in *MediaCom Corp. v. Rates Tech., Inc.*, 4 F. Supp. 2d 17, 21 (D. Mass. 1998), the court declined to hear expert evidence on "claim construction", simply because "construction of patent claims is a question of law for a court to decide." No such problems present themselves here. Both Dr. Mann and Professor Fisher made clear that they were not offering legal opinions or construing the legal effects of legal documents through their testimony, nor were they telling the fact finder what result to reach (RFoF 124, 153).

CJI cites several cases that exclude testimony because the experts attempt to testify about what the actual living parties to the existing lawsuit thought or said. In *Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*, 2015 WL 1499449, (S.D.N.Y. Mar. 31, 2015), the court excluded testimony regarding the knowledge and motivation of the defendant, who could have testified regarding his own knowledge and motivation. Moreover, this testimony was excluded on "ultimate issue" grounds – a claim that CJI does not make. *Id.* at *17. In *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004), testimony was excluded because it could have been contextualized through "percipient witnesses" where the expert was testifying regarding events that happened four years before trial. The same was true in *Kidder, Peabody & Co. v. IAG Int'l Accept. Grp. N.V.*, 14 F. Supp. 2d 391, 398 (S.D.N.Y. 1998) (excluding expert testimony regarding "what [defendants] did, or what they said to each other" because "[t]hat evidence must come from the trial testimony of the individuals concerned, where it will be subject to cross-examination"), *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (excluding testimony regarding "the credibility of defendants' witnesses and defendants' 'real' motivation[n]"), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (Amended Summary Order) and

*OneBeacon Am. Ins. Co. v. Com. Union Assur. Co. of Can.*, 804 F. Supp. 2d 77, 85 (D. Mass. 2011) (excluding testimony regarding intent of the parties to the lawsuit), *aff'd*, 684 F.3d 237 (1st Cir. 2002).  These cases are plainly inapposite here, where the primary evidence is being used to show the intent and behavior of individuals who are long dead and incapable of testifying to their "true" intentions.

**B.     The Experts' Testimony Tracked The Primary Evidence And Was Reliable**

Dr. Mann brought to bear her expertise as an art historian and her knowledge of Jewish ceremonial objects to conduct a physical inspection of the rimonim, analyze primary and secondary documents evincing their provenance, and analyze the same evidence to show how the objects were treated by the parties (RFoF 123-124, 126-127).  She testified that part of her job is to opine on provenance and "ownership" – and the Court readily permitted Dr. Mann to opine on these, with the understanding that she was not offering opinions regarding legal ownership (RFoF 124).  These are all tasks that Dr. Mann performs in the course of her profession (*id.*).

CJI for the second time distorts Dr. Mann in claiming that she "'built a case for ownership' by CSI" (*see* CJI Br. at 49).  This same contention was made by CJI – and refuted – during *Daubert* briefing.  Shearith Israel must again refute this baseless claim with Dr. Mann's actual words:  "I was asked to investigate the provenance.  In the course of my studies, I became convinced that CSI owns the rimmonim" (RFoF 123).  Dr. Mann's opinion was colored by the evidence, and not the other way around.  And of course Dr. Mann had to read documents, evaluate the credibility of sources, report on what the sources said, and draw conclusions – these tasks are crucial to the testimony of almost every expert (and to the work of every academic).

Likewise, Professor Fisher made plain that he followed the standards of his profession and brought to bear his skills as a historian of New England religious history in performing his tasks (RFoF 152, 156).  He testified regarding the relationships between the historical

USActive 33079875.10                                   -75-

participants in this case (and these parties' relationships to the Touro Synagogue and the rimonim) based on primary source documents (RFoF 156). He too read primary and secondary sources, evaluated their worth and credibility, and reported on his findings, using the primary evidence as guideposts (RFoF 152, 156). He also conducted research into the historical meanings of certain words in order to ascertain whether this historical usage dovetailed with the usage of the terms between the parties (RFoF 161-162). These are all tasks that he has undertaken outside this case (RFoF 152).

Nor was Professor Fisher's testimony partisan, as CJI contends (CJI Br. at 50). Professor Fisher cited all of the sources he used – he was not obliged to quote the entirety of every source. On the stand, he and Dr. Mann repeatedly explained why certain sources are trustworthy for some points (such as providing a historical narrative) but not others (such as opining about "legal successorship" by non-lawyers) (RFoF 34, 64, 156). He and Dr. Mann also explained that they discounted the credibility of secondary sources that did not cite to primary evidence in drawing their conclusions – such as all of the sources that reflect that the rimonim were originally made for Yeshuat Israel, none of which cites any primary authority in support of this point (FoF 64). Nor did Professor Fisher ignore documents that were unfavorable to Shearith Israel. When confronted with these documents on the stand, Professor Fisher readily explained how these documents fit into the historical framework of the case (FoF 152).

*Com. Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 39 (1st Cir. 2000), offers no help to CJI. In that case, the trial court discounted the testimony of an expert because he "has been intimately involved in this dispute since early 1995 [well before the litigation began], when he was hired as a consultant by [the defendant]". *Com. Union Ins. Co. v. Seven Provinces Ins. Co.*, 9 F. Supp. 2d 49, 56 (D. Mass. 1998) *aff'd*, 217 F.3d 33 (1st Cir. 2000). In contrast, both

Professor Fisher and Dr. Mann are independent experts. They had no ties to either party prior to their retention, which occurred well after litigation had commenced.

## VII.  CJI'S EQUITABLE DEFENSES ARE FACTUALLY AND LEGALLY MERITLESS

In its post-trial brief, Shearith Israel showed that CJI's equitable defenses fail on both facts and law. Shearith Israel's claims are not barred by equitable estoppel, laches, or waiver because until 2012, CJI's conduct never actually infringed on Shearith Israel's ownership rights over the rimonim. CSI Br. Point IX.A. Under relevant caselaw, mere threats to violate a right are insufficient to trigger these equitable defenses – only an actual violation starts the clock. *Id.* And courts have routinely held that three years is insufficient to constitute relinquishment of rights under these defenses. *See id.* Moreover, even were this not the case, CJI's evidence that Shearith Israel had notice of the sale is woefully deficient and contradictory. CSI Br. Points IX.C-E. And CJI's assertions in museum catalogues did not amount to representations of ownership. The catalogues merely identified CJI, or, much more often, Touro Synagogue, as the source of the loan and not as owner. CSI Br. Point I.B. What's more, such representations are often inaccurate in their attributions, since they seldom engage in independent research to verify the loaner's claims and frequently rely solely on the representations of the loaner. *Id.*

Finally, CJI's equitable defenses must fail due to CJI's unclean hands. In addition to its deceitful actions in trying to sell the rimonim (*see* CSI Br. Point IX.B), CJI – based on its own theory of the case – has attempted to convert putative trust property and sell it, in contravention of trust law, and without consulting with the trustee, the Attorney General, or this Court. *See* Point III.C, above.

CJI's cases offer it no support. In *O'Keeffe v. Snyder*, 416 A.2d 862 (N.J. 1980), the court held that the equitable clock would begin "from the time of the wrongful taking". *Id.* at

872.  In *Sch. Comm. of Cranston v. Bergin-Andrews*, 984 A.2d 629 (R.I. 2009), the court noted that laches was triggered "where the school committee determines that its annual appropriated budget ***is not*** sufficient to meet state imposed educational mandates" – not when the budget may not be sufficient or even might not be sufficient.  *Id.* at 645 (emphasis added).

In *Woonsocket Neighborhood Dev. Corp. v. Hoyceanyls*, 1999 WL 191696, at *5 (R.I. Super. Mar. 26, 1999), estoppel barred the defendant from now claiming plaintiff's claim was untimely because the defendant affirmatively represented to plaintiff that the zoning board would hear his claim.  Here, Shearith Israel never affirmatively represented to CJI or to anyone else that CJI owns the rimonim.  Likewise, in *Schiavulli v. Sch. Comm. of N. Providence*, 334 A.2d 416, 419 (R.I. 1975), silence was found to act as an estoppel only once the defendant received a formal written application from plaintiff, promised to act on that application, and failed to do so – the silence was considered acquiescence.

Here, CJI never sent Shearith Israel formal written notice of its plans to sell the rimonim.  Its "notice" consisted of a short, cryptic conversation with a Shearith Israel board member in 2009, where CJI's plans to sell the rimonim were not specifically mentioned (the plans were in place for an entire year by then) (FoF 641-648; RFoF 75, 84), and a newspaper article which CJI failed to prove anyone at Shearith Israel had read prior to commencement of this litigation (FoF 650-652; RFoF 75, 84, 234, 237).  Moreover, the facts surrounding production of this article cast serious doubt regarding whether Shearith Israel or even CJI's lawyers knew anything about it until well after litigation had commenced.  The article was first mentioned by Bea Ross in her deposition in 2014, *sua sponte* and not in response to any question.  The article was only produced to Shearith Israel a few days after the deposition, and the copy produced shows that it was downloaded from the internet and printed following Bea Ross's deposition (RFoF 236).

This strongly indicates that no one other than Bea Ross knew about the article until she brought it up in 2014. CJI's whole theory on notice was incoherent and inconsistent with its other proof. CJI at the same time asserted that it put Shearith Israel on notice of its plans to sell the rimonim, and asserted that it hid the plan to sell from Shearith Israel in order to prevent other congregations from selling their rimonim and keep the selling price high (RFoF 75, 239).

In *Arena v. City of Providence*, 919 A.2d 379, 396 (R.I. 2007), laches was triggered when "plaintiffs learned that their COLA benefits were going to be reduced by ordinance in 1995 and saw an actual reduction in 1996" but suit was not brought until 2001. Here, Shearith Israel acted before its rights were actually infringed on. In *Integrated Cards, L.L.C. v. McKillip Indus., Inc.*, 2008 WL 3286981, at *2 (N.D. Ill. Aug. 8, 2008), laches would have been triggered when a party knew of the existence of another product that may have infringed on its patent – not the potential future release of such a product. And finally, in *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293 (2d Cir. 1987), the court refused to find implicit waiver, holding that "[t]he mere fact that Ingersoll can be deemed to have been informed that its machinery was being shipped to Korea on deck does not mean that the conclusion must be drawn that it knowingly consented to a modification of the original contract." *Id.* at 300.

Finally, *Randon v. Edstrom*, 307 N.E.2d 347, 349 (Mass. 1974), a case CJI claims is "on all fours" with the instant matter (CJI Br. at 21), is distinguishable based on CJI's own description. In *Randon*, as CJI avers, for 21 years, the petitioner knew that the "property stood in respondent's name" (CJI Br. at 22, *quoting Randon*, 307 N.E.2d at 349) – meaning that respondent held title to the property and petitioner knew it – and petitioner still failed to bring suit. But CJI does not hold title to the rimonim. It can show no direct proof of ownership. No deed, no receipt, no evidence of gift. It relies on its "indicia of ownership", which are consistent

with its obligations as lessee (*see* Point I.B, above), and thus legally meaningless.  These mere

"representations" – cannot give rise to laches in the same way that a party's actual knowledge

that the counterparty holds title to property would.

## CONCLUSION AND RELIEF SOUGHT

Shearith Israel respectfully prays for the following relief:

(1)    Dismissal of CJI's claims with prejudice and with costs;

(2)    A declaration that Shearith Israel is the true and rightful owner of Rimonim 1-6;

(3)    A declaration that Shearith Israel is the true and rightful owner of the Touro

Synagogue, its lands, historic cemetery, and all of the personal property at Touro Synagogue that

Shearith Israel took title to in the 1820s or were or are subject to the Indenture with Lease and/or

the Documents of Limited Authorized Use, including without limitation Rimonim 1-6;

(4)    A declaration that the 1903/1908 Indentures with Lease cover Rimonim 2, 4, 5-6;

that the Indentures with Lease continued in force until at least 2012; that CJI materially breached

the Indentures with Lease by attempting to sell Rimonim 2 and 4; and that this or any other Court

of competent jurisdiction may take up proceedings arising from said breach should the parties

not come to an agreement beforehand;

(5)    A declaration that Touro Synagogue and Rimonim 2, 4, 5-6 are not held in trust

for CJI's benefit; or that, in the alternative, Shearith Israel did not breach any obligation it had to

CJI or to any other beneficiary under any alleged trust; or that, in the alternative, any alleged

breach by Shearith Israel is wholly insufficient to permit CJI to remove Shearith Israel as trustee

and/or permit the sale of Rimonim 2 and 4;

(6)    A declaration that Shearith Israel maintains the rights as specified for it or its

Trustees by CJI's 1897 Constitution and By-Laws; and

(7)    Costs and any other relief that the Court deems just and proper.

DEFENDANT CONGREGATION SHEARITH ISRAEL,

By its Attorneys,

/s/ Deming E. Sherman
Deming E. Sherman (#1138)
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI  02903
(401) 274-9200
(401) 276-6611
E-mail:  deming.sherman@lockelord.com

/s/ Louis M. Solomon
Louis M. Solomon (Admitted *Pro Hac Vice*)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
Tel.:  (212) 504-6600
Fax:  (212) 504-6666
E-mail:  Louis.Solomon@cwt.com

July 10, 2015

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of July, 2015, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

/s/ Louis M. Solomon