IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * * * * * * * * * * * * * *
CONGREGATION JESHUAT        *    CIVIL ACTION
ISRAEL                      *    12-822M
                            *
VS.                         *    JUNE 10, 2015
                            *
CONGREGATION SHEARITH       *
ISRAEL                      *    PROVIDENCE, RI
* * * * * * * * * * * * * * * * * * * * * * * * *
```


BEFORE THE HONORABLE JOHN J. McCONNELL

DISTRICT JUDGE

(Bench Trial)

VOLUME VII


**APPEARANCES**:

FOR THE PLAINTIFF:    STEVEN E. SNOW, ESQ.
                      Partridge Snow & Hahn LLP
                      40 Westminster Street
                      Suite 1100
                      Providence, RI  02903

                      GARY P. NAFTALIS, ESQ.
                      JONATHAN M. WAGNER, ESQ.
                      TOBIAS B. JACOBY, ESQ.
                      DANIEL P. SCHUMEISTER, ESQ.
                      Kramer Levin Naftalis & Frankel LLP
                      1177 Avenue of the Americas
                      New York, NY  10036

```
FOR THE DEFENDANT:      DEMING E. SHERMAN, ESQ.
                         Locke Lord LLP
                         2800 Financial Plaza
                         Providence, RI  02903

                         LOUIS M. SOLOMON, ESQ.
                         COLIN UNDERWOOD, ESQ.
                         YAN GRINBLAT, ESQ.
                         JENNIFER CHAING, ESQ.
                         Cadwalader, Wickersham & Taft
                         One World Financial Center
                         New York, NY  10281


Court Reporter:         Denise P. Veitch, RPR
                         One Exchange Terrace
                         Providence, RI  02903
```

I N D E X

<u>DEFENDANT'S WITNESS</u>                                    <u>PAGE</u>

<u>Vivian Mann</u>
  Continued Direct Examination by Mr. Solomon    8
  Cross-Examination by Mr. Wagner               24
  Redirect Examination by Mr. Solomon          154
  Recross-Examination by Mr. Wagner            199

1    10 JUNE 2015 -- 9:30 A.M.

2          THE COURT:  Good morning, everyone.  A couple of

3    matters before we begin.

4          We are having severe problems with all of us,

5    myself included, talking over each other, such that our

6    record isn't as preserved as it should be in many ways.

7    A lot of that has to do with the fact that we've been

8    more relaxed probably than we should be, and the

9    attorneys know the answers before they ask the

10   questions usually; so we have to be, all of us, have to

11   be incredibly conscious about that.  And that means

12   that you need to ask a question so that the witness

13   doesn't begin to answer it until you're done.

14         And Dr. Mann, I'll say that to you and any other

15   witnesses out there.  I'm going to monitor it a little

16   more closely; I've been a little more relaxed than I

17   should be about it.

18         Mr. Wagner, you've done something very good and

19   something not so good in your objections.  It is

20   excellent that you're speaking into the mic, and you've

21   remained seated for that, which has helped

22   tremendously.

23         We believe that one of the reasons that the

24   witness isn't -- is talking over your objections and

25   we're not dealing with it is because she doesn't see

1    you stand up, and other witnesses.  So she's not cued

2    to it.

3        So I'm wondering, again, it might be very

4    helpful if you stand up to cue it, but you can also

5    pick up the mic and do it.

6        MR. WAGNER:  That's fine.

7        THE COURT:  And you can either lean over or pull

8    it right up.  I have defendants, when I sentence them,

9    actually clutch on to it with their lives.

10        So if we could try that a little bit; and as

11   we're all conscious of each other and the witness, we

12   need to add to our circle of friends consciousness of

13   our court reporters, both the court one and the outside

14   one that parties have retained.  And I will take first

15   shift of blame for violating all those rules and not

16   enforcing the rules as we go along.

17        On to a substantive matter.  I received this

18   morning a submission from the Defendants concerning the

19   issue of disclosure and what Dr. Mann can and can't

20   testify to.  I've read all of that over, and I'm going

21   to stick with the line that I drew at depositions.

22        I understand that the scenario that Mr. Solomon

23   sets forth in his letter and in his argument when a

24   post-deposition supplementation of an expert witness

25   pursuant to the Rules is allowed.  It is unclear how

1    further deposition on those issues should be handled.

2    The Rules aren't particularly clear about it.  They

3    don't put the burden on one side or the other; one side

4    to offer up the person for supplemental deposition or

5    on the other side for the person to request it.

6         And so the Court is going to come down on the

7    side of what it considers in this regard the fair thing

8    to do and, that is, to draw the line at the deposition.

9    If the matter, and there are a couple of matters in

10   here we can address specifically, if it was brought

11   up -- if it was noticed before the deposition or if it

12   was brought up during the deposition, fair game.  If it

13   came afterwards, I'm going to use that as a cutoff.

14        One issue in particular that Mr. Solomon raised,

15   I think he's -- from what he's set forth, he's right.

16   I hear from you, Mr. Wagner, on that; that's the

17   reliability of relevance of museum catalogs

18   information.  He appears to set forth an argument in

19   that regard.

20        MR. WAGNER:  Mr. Solomon and I spoke before we

21   started court today, and we're actually in agreement.

22   I know it's surprising for peace to break out at all,

23   but we're in agreement that that testimony can be

24   given.  I had thought he was going in a different

25   direction, and he assured me he was not, and I have no

1    objection to that testimony.

2          THE COURT:  I appreciate that.  That makes

3    perfect sense in light of what Mr. Solomon set forth.

4          Mr. Solomon.

5          MR. SOLOMON:  The other item that Mr. Wagner and

6    I spoke about is allowing the witness to show the Court

7    the photographs, and I think we have agreement on that

8    as well.

9          THE COURT:  Fabulous.

10          MR. WAGNER:  Yeah.  It's technically barred by

11    your Honor's ruling, but I don't have a problem with

12    her addressing the photographs.

13          THE COURT:  Good, because curiosity would have

14    gotten the better of me, and I would have looked at

15    them anyway.  I'm glad you came to agreement.

16          So Mr. Solomon, despite the fact you rested, I

17    assume you're back up on a few matters?

18          MR. SOLOMON:  I apologize.

19          THE COURT:  Did you not finish with Dr. Mann?

20          MR. SOLOMON:  I think what I said is that other

21    than these open issues and so --

22          THE COURT:  Either way.  That's fine.  You can

23    inquire.

24          MR. SOLOMON:  Thank you, your Honor.

25

<u>VIVIAN MANN, DEFENSE WITNESS, RESUMES STAND</u>

<u>CONTINUED DIRECT EXAMINATION BY MR. SOLOMON</u>:

**Q.**   Dr. Mann, good morning.  I'd like you to look at DX221, please.

Up on the screen there, this is a document that you referred to in your initial expert report; correct?

**A.**   I'm sorry.  What is on the screen?

**Q.**   1937?

**A.**   Oh, this is the beginning.  Yes. Uh'huh (affirmative).

MR. SOLOMON:  I will state for the record that on inspection Dr. Mann referred to this in her opening report.

**Q.**   Dr. Mann, what is this?

**A.**   These are Minutes of a meeting held by the board of trustees of Congregation Shearith Israel on January 5th, 1937.

**Q.**   And is this Minute relevant to your opinion that subsequent to 1869 and the inventory, which you talked to the Court about, Shearith Israel did not act inconsistently with its ownership of rimonim 1, 2, 3 and 4?

**A.**   Yes.

**Q.**   Tell the Court why this is relevant.

**A.**   There's a report in the Minutes, which is on

1   Page 003 of this section, 221-003.  The first full

2   paragraph is a report by Dr. Cecil Roth, who was a

3   historian, who also discussed art, particularly

4   Judaica, at various points in his career.  And he

5   visited the Touro Synagogue and he reports to CSI's

6   board that the Myers finials were not being handled

7   properly and they appear to be in danger of damage and

8   he wanted them to know that.

9        The board responded by saying that they wished

10   to safeguard them further by lending them to the

11   forerunner of the Jewish Museum in New York, which was

12   then at the Jewish Theological Seminary, but because of

13   the need to replace the finials, that they would put

14   them for safekeeping in the museum, they didn't act

15   immediately.

16        I think that this incident shows, (a) that it

17   was -- that Dr. Roth assumed that CSI was responsible

18   for the rimonim, and there was concern about their

19   condition and use.

20   Q.   And with respect to the sentence:  "In view of the

21   fact, however, that the Touro Synagogue would have to

22   be given other bells to replace the Myer Myers sets, no

23   definite action was taken by the board," what, if

24   anything, do you take away from that with respect to

25   Shearith Israel maintaining its control and ownership

1    over rimonim 1, 2, 3 and 4?

2    **A.**    I think this is a sentiment which comes up again

3    and again in the Minutes, that they felt -- that CSI

4    felt a responsibility of providing Touro with the

5    requisite works of ceremonial art to allow them to

6    function.

7    **Q.**    Do you draw an inference that the board of

8    Shearith Israel --

9        THE COURT:  Mr. Solomon, how about what

10    inference does she draw.

11    **Q.**    What inference, if any, do you draw from the fact

12    that the Board of Shearith Israel is talking about the

13    Myer Myers rimonim specifically?

14    **A.**    They're mentioned, yes, they are.  Because

15    Dr. Roth is concerned with them because they were the

16    oldest finials then in use in Touro.

17        THE COURT:  You equate the showing of

18    responsibility to an indicia of ownership?

19        THE WITNESS:  Yes.

20    **Q.**    Where we left off yesterday is I was beginning to

21    ask you about published information about objet d'art,

22    or sacred objects.  That's something you addressed in

23    your report; correct?

24    **A.**    Yes.

25    **Q.**    Okay.  Do published descriptions of sacred objects

1    provide useful information about provenance?

2    **A.**    Sometimes.  It's not always useful.

3    **Q.**    And in the case of the rimonim here, did you

4    investigate the public descriptions of the rimonim as

5    they were in various catalogs or museums?

6    **A.**    I read them.  I noticed that they were at variance

7    with my conclusions regarding the ownership.

8    **Q.**    Were they at variance?  Meaning what did you look

9    at?  In your report you say, "In the case of the

10   rimonim, I find nothing in the public descriptions that

11   is inconsistent with CSI's ownership."  Is that an

12   opinion that you hold?

13   **A.**    Yes.

14   **Q.**    Can you explain to the Judge why.

15   **A.**    First of all, Barquist, who wrote the most

16   substantive catalog, did the most research, says, I did

17   not research the provenance.

18        MR. WAGNER:  Your Honor, that I object to

19   because that's hearsay.

20        THE WITNESS:  No.  It's in his declaration.

21        I'm sorry.

22        THE COURT:  How so, Mr. Wagner?

23        MR. WAGNER:  Because that information -- I'm

24   standing and I'm --

25        THE COURT:  You're doing well.

1        MR. WAGNER:  So far.

2        That information is in a hearsay declaration

3   from Dr. Barquist.

4        THE COURT:  This is the Barquist of the

5   declaration?

6        MR. WAGNER:  Yes.

7        THE COURT:  That would be a problem,

8   Mr. Solomon, wouldn't it?

9        MR. SOLOMON:  I don't think so for two reasons,

10  your Honor.  The first is that the witness can rely on

11  hearsay, 703.  The second is that Dr. Barquist in his

12  catalog itself says that there's no published

13  information, no records survive the document when the

14  Touro finials at either Shearith Israel or Jeshuat

15  Israel were commissioned by or donated to the

16  congregation.

17       THE COURT:  Mr. Wagner, what's the basis of your

18  objection in light of 703, which allows an expert

19  witness to rely on hearsay?

20       MR. WAGNER:  I don't have a problem with her

21  relying on it, but 703 doesn't allow you to reference

22  or describe the contents to the jury or to the trier of

23  fact.  703 is not a basis to avoid the hearsay rule.

24  So she can say she relied on it, but she can't say

25  what's in the document.  There was every opportunity to

1   depose Dr. Barquist, and CSI made a judgment not to do

2   so.

3       MR. SOLOMON:  We're going to have to brief that,

4   too, if your Honor wishes, but --

5       THE COURT:  Oh, no.

6       MR. SOLOMON:  -- that is certainly not my

7   understanding, that is not my understanding of 703 at

8   all.  No expert can rely on it.  Your Honor then takes

9   it as a hearsay statement that under 703 the expert can

10  rely on.

11      MR. WAGNER:  Well, what it says is, the text:

12  (Reading)  If expert in the particular field would

13  reasonably rely on those kinds of facts or data in

14  forming an opinion on the subject, they need not be

15  admissible for the opinion to be admitted.

16      So this is -- I mean, it's a declaration from an

17  out-of-court declarant.  There's no regular rules in

18  the art history field of relying on out-of-court

19  declarations.

20      THE COURT:  Here's my understanding of how 703

21  works, and that is that an expert witness can rely on

22  hearsay statements to form the basis of her opinion.

23  However, the underlying hearsay statement to which she

24  relies upon is not admitted as evidence because it's

25  still hearsay for all of the evils that hearsay brings

1    to a court proceeding.

2         And in that regard, I'm going to ask you to

3    re-put some questions to Dr. Mann in light of that, and

4    I'll rule hopefully consistent with what I just said I

5    believe 703 to apply.  She can rely on it to form the

6    basis of her opinion, but the underlying hearsay that

7    she's relying on is not considered a piece of admitted

8    evidence.

9         MR. WAGNER:  Your Honor, just I would ask that

10   what she said with respect to declaration be stricken.

11        THE COURT:  I'm going to strike it now only

12   because I want the questions put to Dr. Mann so that I

13   can rule consistent with that opinion.

14        MR. SOLOMON:  Thank you, your Honor.

15   **Q.**   I'd like you to look at Exhibit 414.

16        THE COURT:  That's for identification only.

17        MR. SOLOMON:  For identification only and, your

18   Honor, we don't intend to offer this document as

19   anything other than in a manner consistent with your

20   Honor's ruling.

21   **Q.**   This is a declaration of Dr. Barquist.  Did you

22   cite this in your opening report?

23   **A.**   I don't remember.

24        THE COURT:  Dr. Mann, it might be helpful if you

25   pull that mic all the way.  That's good.  Thank you.

1    **A.**    I said I don't remember.

2           MR. SOLOMON:  And I can advise the Court that it

3    is cited in Dr. Mann's opening report.

4    **Q.**    In this declaration, Dr. Barquist says:  (Reading)

5    I did not research --

6           MR. WAGNER:  Objection.

7           THE COURT:  I think the question to Dr. Mann is

8    what is your expert opinion, couched in that fashion,

9    on this particular issue.  What formed the basis of

10   your opinion?  She will then list what the basis of her

11   opinions are.  But you can't bootstrap in the hearsay

12   by reading it in as part of the question, which would

13   then become evidence.

14          MR. SOLOMON:  My apologies, Judge.

15          THE COURT:  That's okay.  It's not a very clear

16   way to proceed so we're all struggling with it,

17   Mr. Solomon.

18   **Q.**    In support of your opinion that you don't find

19   anything in the public descriptions that is

20   inconsistent with Shearith Israel's ownership of

21   rimonim 1, 2, 3 and 4, what did you rely on?

22   **A.**    I relied on the fact that in the latest catalog

23   which is Barquist's catalog for Yale, that he has --

24   that he stated in this -- he declared that he had not

25   done original research on the provenance, and he denied

1    that there were any records related to the production

2    of silver by Myer Myers.

3           MR. WAGNER:  Objection, your Honor.

4           THE COURT:  Overruled.

5    **A.**   And I also drew on my own experience as a curator

6    for 29 years.  And the process in a nonprofit

7    organization in terms of time and money does not allow

8    a curator to go to another institution and to try and

9    find information about provenance.  Once -- and this

10   would have possibly occurred only after the curator had

11   negotiated the loan, gone home, the people decided,

12   yes, we're going to give it to you, and then you would

13   have had to go back and stay there for months and not

14   know how the organization, that museum organized its

15   records.  It's just impractical.

16          And so the general policy and act is to accept

17   what is written on the loan form by the lender as being

18   true.

19          MR. WAGNER:  Your Honor, that I object to

20   because that piece is not in the report.

21          THE COURT:  Overruled.

22   **Q.**   Did you look at --

23          THE COURT:  Dr. Mann is talking about common

24   sense issues here in many ways so that's why I'm not

25   giving it a whole lot of -- I'm taking it in for the

1    weight that it deserves.

2    **Q.**   Did you look at all of the catalogs that were

3    shown to you at your deposition?

4    **A.**   I read them, yes.

5    **Q.**   And is the description in any of them inconsistent

6    with your opinion that Shearith Israel did not

7    relinquish ownership of rimonim 1, 2, 3 and 4?

8    **A.**   Yes.

9    **Q.**   Is there anything in there that is inconsistent?

10   **A.**   No.

11   **Q.**   Okay.  Now, I had also shown you some

12   demonstratives.  Do you have those?  These are the

13   slides and the photographs.  Do you have those?

14   **A.**   Yes.  These would be -- where they are?

15   **Q.**   DD50.  This is Defendant's Demonstrative 50.

16   **A.**   Uh'huh (affirmative).

17   **Q.**   I think I pulled those out of your binder

18   yesterday.

19   **A.**   No, I'm sorry; I don't see them.  (Pause)  Thank

20   you.

21   **Q.**   I think you described the images in DD51 and 52 to

22   the Court.  Let me ask you to turn to DD55.  And I

23   think you talked about these yesterday as well.

24       Do you have that in front of you?  Okay.  What,

25   if any, relevance do these photographs have to your

1    opinion that at the MFA now there is a mixed set of

2    rimonim 1, 2, 3, 4, so it's either 1 and 3 or 2 and 4?

3    **A.**    All the photographs pertain to that issue, and

4    this particular set shows you that the mark of Myers,

5    which was stamped, his silver mark, which was stamped

6    into the surface of the base of the rimonim, was placed

7    horizontal to the base on the left and vertical to the

8    base on the right.  And that indicates that they were

9    not made at the same time because no silversmith, you

10   know, just lackadaisically punches.  He usually punches

11   in the same place on both pieces of a set.

12   **Q.**    Dr. Mann, did you take the photographs that are in

13   DD55, and --

14   **A.**    Yes.  I apologize for the quality.

15   **Q.**    And did you take the photographs that are in the

16   subsequent pages, DD56, 57, 58?

17   **A.**    Yes.  Uh'huh (affirmative).

18   **Q.**    You have to answer audibly.

19   **A.**    Yes.

20        THE COURT:  Could I ask, Dr. Mann, have you

21   looked at the pair that's currently at the MFA to see

22   which way the Myers stamp is placed on the base?

23        THE WITNESS:  When I was at the MFA and saw

24   them.  They were very high in a corner case along with

25   other silver.  However, I have examined photographs

1    which show that, that one is stamped horizontal and one

2    is stamped vertical.

3         THE COURT:  Thank you.

4    Q.   When you saw the rimonim at the MFA, where were

5    they?

6    A.   They were in a tall case, and they were above my

7    eye level, so one had to look up at them.  And there

8    were other pieces of silver in the case.

9    Q.   When did you observe those?

10   A.   December 2013.

11   Q.   Thank you.  Now, your testimony yesterday, which

12   you don't need to repeat, is that the rimonim are not

13   detachable; right?

14   A.   Correct.

15   Q.   All right.  So that really the eye would be

16   following these bases up --

17   A.   Correct.

18   Q.   -- to then get to the top portion of the rimonim?

19   A.   Yes.

20   Q.   And then are the following pictures, pictures of

21   the top portions of the respective rimonim that you

22   reviewed?

23   A.   Each of these rimonim have two bulbous elements,

24   one smaller and one larger.  And these are -- all the

25   details come from the larger bulb part.

1         MR. WAGNER:  Your Honor, I just ask that there

2    be a little bit less leading.

3    Q.    Show the Court by looking at DD51 what the larger

4    bulbous part is, please.

5    A.    So at the bottom of the shaft and then there's a

6    bulge outward, a circular form, and then there's a

7    larger form which is pierced as well as chased, and

8    then above it is another small form and then the crown.

9    Q.    Thank you.  Now, looking at DD56, which has its

10   title *Comparison of Finials 1 and 3*, --

11   A.    Yes.

12   Q.    -- please explain to the Court what, if any,

13   relevance these photographs have to your opinion that

14   the entire finials at the MFA are a mix-matched,

15   unmatched set.

16   A.    The same stylistic characteristics occur on the

17   tops of finials with the same marks.  So there's a

18   match between the position of the mark and the style

19   above it.

20         And if you look at these two photographs, you

21   can see the difference in the form.  So on the right,

22   which is the pair -- that's the pair that originally

23   belonged to the -- that was -- belongs to CSI but was

24   used in Touro; and if you look at the flower form there

25   are a lot of -- the basic theme of the decoration are

1    flowers against vines.  The vines form the background

2    and then there are interposed flowers.

3        So this flower I call a daisy just for

4    nomenclature.  And if you look at the bottom and the

5    top you can see the way that the petals curve down.

6    They're three-dimensional.  And in a three-dimensional

7    object, when light falls on it, the part that curves

8    away is in shadow.  Okay?  So the highlight is the

9    center and the top, and then the part that curves away

10   from that surface ends up in shadow because the light

11   is falling, the way the light falls.

12       If you look at the other daisy on the left, you

13   see how flat it is in comparison.  The leaves just come

14   out from the center, and they're basically flat and

15   they don't have the detailing that you see on the

16   right.

17       So these are a basic comparison in the handling

18   of the flower that carries through with other flowers.

19       Then if you look at the vines around the flower,

20   you'll see that on the right the person who did the

21   chasing created interior marks, these dots, and also

22   lines that describe the three-dimensionality of the

23   leaves, and that is totally absent on the left.

24       And finally, the piercing is much more

25   accomplished on the right.  The piercing forms curves.

1      And on the left --

2      **Q.**   Dr. Mann, --

3      **A.**   I'm sorry.

4      **Q.**   Pause for a second.  The piercing, are you talking

5      about the holes?

6      **A.**   Yes.

7      **Q.**   Okay.  Please go ahead.

8      **A.**   This is done by either a second craftsman or could

9      be the same craftsman, but it's a whole different

10     technique.  It's a hammer and a chisel.

11     **Q.**   Please continue.

12     **A.**   So on the right, the open areas have outlines that

13     are curved and smooth and, shall we say, fluent.

14          If you look at the left on the left side of the

15     flower, you can still see the tool marks in the space

16     just directly left of the flower or on top of it.

17          In other words, he didn't smooth it out

18     afterwards.  He wasn't as careful as the person who did

19     the punching on the right.

20          So there are these differences, and they run

21     through all the motifs on the finials.

22     **Q.**   Would you look at DD57, please.  And is there

23     anything in addition that you want to point out to the

24     Court here that is supportive of your opinion that

25     these are different finials?

1    **A.**    I would make the same point if I -- can we turn to
2    57?  Is that what you said?
3    **Q.**    57.
4    **A.**    I'm sorry.  I was looking at 56.
5          Just for convenience, I call this a pineapple
6    flower.  And on the right, which is the more skilled
7    chaser --
8          THE COURT:  Hold on, Dr. Mann.  I actually
9    think, then, we're looking at 58.  Down in the lower
10   right-hand corner.
11         THE WITNESS:  Oh, you're right.  I'm sorry.
12   Fifty-eight.
13         MR. SOLOMON:  Thank you, Judge.
14   **A.**    Sorry.  On the right, again you have this
15   curvature so you see light merging into shadow at the
16   bottom; whereas on the left it's much flatter.  And on
17   the left, all of the pineapple markings, they appear
18   that they were done almost -- they're monotonous.
19   They're all the same shape.  You know, they fit into
20   lines; whereas on the right there's a sense of movement
21   about them, and they are skewered by the leaves and
22   there's a sense of movement up from the left to the
23   right.
24         In other respects, it's the same difference,
25   that there are more details on the leaves on the right

1   than there are on the left.

2   **Q.**   Thank you very much.

3        MR. SOLOMON:  Your Honor, I have nothing

4   further.

5        THE COURT:  Great.  Thanks, Mr. Solomon.

6        Mr. Wagner.

7        While Mr. Wagner is getting ready, I should warn

8   folks tomorrow it may take longer to get in here.

9   There's a rather well-publicized sentencing that's

10  going to go on on the third floor tomorrow morning, so

11  the courthouse is expecting crowds.  So if you want to

12  be in here on time, you might want to give yourself a

13  few extra minutes tomorrow morning.

14       MR. WAGNER:  Your Honor, may I proceed?

15       THE COURT:  Yes.

16       <u>CROSS-EXAMINATION BY MR. WAGNER</u>:

17  **Q.**   Good morning, Dr. Mann.

18  **A.**   Good morning, Mr. Wagner.

19  **Q.**   You and I know each other from another context.

20  **A.**   Yes.

21  **Q.**   And what is that?

22  **A.**   We belong to the same synagogue.

23  **Q.**   And we talk from time to time, believe it or not,

24  about matters that have nothing to do with this case;

25  right?

1    **A.**    Correct.

2            THE COURT:  Sometimes, Dr. Mann, when you're

3    more familiar with the deponent, you tend to not follow

4    my rule of waiting for him to finish his question

5    before you answer; that's normal when we're with people

6    that we're comfortable with, so I want you to be

7    particularly conscious of that, and Mr. Wagner, too.

8    **Q.**    And you understand I have to ask you some

9    questions today.

10   **A.**    Yes.

11   **Q.**    And you'll still be my friend afterwards?

12   **A.**    That depends.

13           THE COURT:  Excellent answer.

14   **Q.**    Why don't we dive in.  You've billed over $40,000

15   in this case through the end of April; correct?

16   **A.**    Yes.

17   **Q.**    And you've spent more time on this matter since

18   the end of April?

19   **A.**    Yes.

20   **Q.**    And you had a prior relationship with CSI before

21   this case; correct?

22   **A.**    It was not a deep relationship, but I had a

23   relationship.

24   **Q.**    Your brother was a member?

25   **A.**    Yes.  And he went to -- moved to Israel 20 years

1    ago, so that dates back.

2    **Q.**    So he was a member; correct?

3    **A.**    He was a member.

4    **Q.**    And you know some of the heads of the departments

5    there?

6    **A.**    Yes, one was my student and --

7    **Q.**    I would appreciate just answer yes or no.

8    **A.**    Yes.

9    **Q.**    And you know Rabbi Angel?

10    **A.**    Yes.

11    **Q.**    And you have friends at CSI?

12    **A.**    Yes.

13    **Q.**    And you knew what position CSI took in this case

14    even before you were involved; correct?

15    **A.**    Yes, I heard about it.

16    **Q.**    And in this case, what you did was you built a

17    case for ownership by CSI; correct?

18    **A.**    No.  I began by researching the provenance.

19    **Q.**    Just answer yes or no.

20    **A.**    Yes.

21    **Q.**    You did build a case for ownership; right?

22    **A.**    Yes.

23    **Q.**    Now, you're an expert -- I think you testified

24    you're an expert in Judaica, Jewish art and provenance;

25    correct?

1    **A.**    Yes.

2    **Q.**    You've never been qualified in court in those

3    fields, have you?

4    **A.**    No, I've never testified.

5    **Q.**    And you are an art historian; right?

6    **A.**    Yes.

7    **Q.**    You're not an expert in American Jewish history;

8    correct?

9    **A.**    Correct.

10    **Q.**    Never taught any courses in American Jewish

11    history; correct?

12    **A.**    I've taught about American Jewish history as part

13    of larger courses.

14    **Q.**    Have you ever taught a course in American Jewish

15    history?

16    **A.**    No.

17    **Q.**    You're not qualified to teach a course in American

18    Jewish history; correct?

19    **A.**    This is a one-word answer?

20    **Q.**    Yes.

21    **A.**    No.

22        MR. SOLOMON:  Excuse me.  Your Honor, I do not

23    believe the witness has been instructed that she is

24    allowed to say I cannot answer that question in a

25    one-word answer.

1    THE COURT:  Answer yes or no where you can,

2  Dr. Mann.  If you can't answer yes or no to a question,

3  you can say, "I can't answer that yes or no."

4  **A.**   I think my answer would have to be qualified;

5  therefore, I can't answer that.

6  **Q.**   Can you turn to your deposition, Page 54 Lines 18

7  to 24.

8  **A.**   What is the document number here?

9  **Q.**   It's going -- the deposition will come up on your

10  screen.

11    MR. SOLOMON:  May the witness have a copy?

12    THE COURT:  Will you provide the witness with a

13  copy.

14    MR. WAGNER:  Yes, your Honor.

15  **Q.**   Dr. Mann, were you asked the following questions

16  at your deposition on December 31st, and did you give

17  the following answers:

18    Question:  Have you ever taught any courses in

19  American history?

20    Answer:  I'm not a historian.

21    Question:  So does that mean you have not taught

22  any courses in American Jewish history?

23    Answer:  I am not qualified to teach American

24  Jewish history.  Jonathan Sarna is qualified.

25    Were you asked those questions, and did you give

1    those answers?

2    **A.**    Yes.

3    **Q.**    And you've never written any articles on American

4    Jewish history; correct?

5    **A.**    No.

6    **Q.**    Correct?  You have not?

7    **A.**    I have not.

8    **Q.**    And you've never written any articles on the

9    Newport Jewish community, have you?

10   **A.**    No.

11   **Q.**    Never written any articles on Myer Myers?

12   **A.**    No.

13   **Q.**    Not a member of the American Jewish Historical

14   Society, are you?

15   **A.**    It's not a yes or no answer.  No, I am not a

16   card-carrying member.

17   **Q.**    You're not a member of the American Historical

18   Society, are you?

19   **A.**    Am I allowed to embellish with a couple of --

20         THE COURT:  Well, either you are a member or

21   you're not.

22         THE WITNESS:  No, I'm not.

23   **Q.**    You're not an accountant, are you?

24   **A.**    No.

25   **Q.**    And you're not an expert on colonial ledgers, are

1    you?

2    **A.**    I think I gained expertise by working on this

3    case.  I am not an acknowledged expert.

4    **Q.**    Before this case, you had no experience on

5    colonial ledgers; correct?

6    **A.**    Yes.

7    **Q.**    And you're not an expert on accounting ledgers of

8    any kind, are you?

9    **A.**    No.

10    **Q.**    You're not an expert at reading board Minutes, are

11    you?

12    **A.**    I would say that I am as expert as anyone else.

13    **Q.**    Do you have any special expertise with respect to

14    reading board Minutes?

15    **A.**    No.

16    **Q.**    Do you know the difference between a debit and a

17    credit?

18    **A.**    Of course.

19    **Q.**    Is a debit on the right side or the left side?

20         MR. SOLOMON:  Objection.  No foundation.

21         THE COURT:  Overruled.

22    **Q.**    In a ledger, is a debit on the right side or the

23    left side?  Do you know?

24    **A.**    I don't know what period you're talking about.

25    **Q.**    Any period.  Going back to the 1700s.

1    **A.**    I think they appear in this ledger, which I

2    studied closely, they could appear on either page.

3    **Q.**    Either page.  That's your testimony?

4    **A.**    Yes.

5    **Q.**    Did you look through the CSI ledgers and see that

6    the debit, the debt side is always on the left side?

7    **A.**    I don't believe that's the case.

8    **Q.**    Well, we'll come to that.

9         And did you look to see that the credit side is

10   always the right side?

11   **A.**    My impression is that --

12   **Q.**    Just answer that yes or no, please.

13   **A.**    No.  I don't believe that is the case.

14   **Q.**    We'll come to that.

15        Now, you gave opinions on ownership and control.

16   Do you recall that?

17   **A.**    Not in the legal sense.  I gave opinions on the

18   words as used in the vernacular.

19   **Q.**    And just so that it's clear, you're not qualified

20   to give legal opinions on ownership and control, are

21   you?

22   **A.**    No.

23   **Q.**    Now, you are an art historian; right?

24   **A.**    Yes.

25   **Q.**    And as an art historian, you try to present the

1    facts accurately and clearly; right?

2    A.    Yes.

3    Q.    And that's important to do in any scholarly

4    endeavor; correct?

5    A.    Yes.

6    Q.    Otherwise, the scholarly work is just a fairy tale

7    rather than reality; correct?

8    A.    Yes.  I believe you're quoting from the

9    deposition.

10    Q.    And you believe your report is fair and accurate;

11    right?

12    A.    Yes.

13    Q.    But the report didn't present both sides.  It only

14    presented one side; correct?

15    A.    Yes.

16    Q.    And what you did was you read documents and

17    reported what people said and drew factual conclusions;

18    right?

19    A.    Yes.

20    Q.    And you weighed the evidence; right?

21    A.    Yes.

22    Q.    And you drew factual conclusions from those facts;

23    right?

24    A.    Yes.

25    Q.    And with some sources you picked and chose what

1    you wanted to rely on, correct, within sources?

2    **A.**    I think that needs to be qualified.

3    **Q.**    Okay.

4    **A.**    Am I allowed to qualify?

5    **Q.**    We'll come to that.

6         Now, I am right, Dr. Mann, there is no complete

7    record of the provenance at stake in this case;

8    correct?

9    **A.**    No.

10   **Q.**    There is no record; right?

11   **A.**    There is no record on the part of CYI.  There is a

12   record on the part of CSI.

13   **Q.**    Okay.  But there's no complete record; correct?

14   **A.**    If you're defining "complete" by being on both

15   sides, then there's no complete record because

16   Congregation Jeshuat Israel of the colonial period has

17   no records left except one page.

18   **Q.**    Except one page.  And that one page refers to Myer

19   Myers; does it not?

20   **A.**    Yes.

21   **Q.**    That's all.  And missing evidence will lead to a

22   partial conclusion; correct?

23   **A.**    Not if the evidence existing is compelling.

24   **Q.**    Can you turn to your deposition, Page 73 Lines 10

25   to 16.  Were you asked the following questions -- you

1    can look at it on the screen, Dr. Mann -- and did you

2    give the following answers:

3        Question:  Is it fair to say that -- anytime I

4    say "historian" I'm going to mean an art historian.  I

5    may mess up.  But can missing or unavailable evidence

6    limit your ability as an art historian to reach a

7    particular conclusion?

8        Answer:  Without -- missing evidence will lead

9    to a partial conclusion.

10       Were you asked those questions, and did you give

11   that answer at your deposition on December 31st?

12   **A.**   Yes.  But I see no contradiction --

13       MR. WAGNER:  Your Honor, I'd ask the last piece

14   be stricken.

15       THE COURT:  Overruled.

16   **Q.**   Now, we really don't know what happened here given

17   that these events occurred 250 years ago.  We only have

18   what's recorded in documents; right?

19   **A.**   And we have the objects.

20   **Q.**   And with one or two exceptions, you've not read

21   records from CSI from the 20th century; correct?

22   **A.**   No, I read -- from the 20th century?

23   **Q.**   Yes.

24   **A.**   I read them.

25   **Q.**   Can you turn to Page 221 Lines 15 to 19.

1      Question:  Is it surprising to you that that

2  list has not turned up here?

3      Answer:  I have not read the records from the

4  20th century at CSI.  I've read the 18th and 19th

5  centuries.

6      Were you asked that question, and did you give

7  that answer?

8  **A.**  Yes, at the time that was true.  But I was allowed

9  in my report to say --

10      THE COURT:  Dr. Mann --

11      THE WITNESS:  That's it?  At that time it was

12  true.

13      THE COURT:  If you want her to stop, Mr. Wagner,

14  you're going to have to ask.

15      MR. WAGNER:  Yes.  But I'm mindful -- trying to

16  balance everything, I'm mindful of your Honor's

17  direction not to talk over, but -- well, any time she

18  answers anything other than what's in the deposition,

19  I'd ask that your Honor strike it just -- it will move

20  much faster.

21      THE COURT:  That part will be stricken.  She

22  gave that answer to that question.  That will remain.

23  **Q.**  Now, Dr. Mann, I think you testified in response

24  to his Honor's questions that you equate responsibility

25  to indicia of ownership; correct?

1   **A.**   Yes.

2   **Q.**   And in terms of the issue of ownership and control

3   and responsibility, you've not read records from the

4   20th century from CJI; have you?

5   **A.**   Yes, I've read some.

6   **Q.**   What have you read?

7   **A.**   I think the only thing are Minutes and also

8   statements, the whole issue of the designation as a

9   historic shrine and what was written there.  I've read

10  the website, other things.

11  **Q.**   And would you agree with me though, Dr. Mann, that

12  if CJI exercised ownership and control in the 20th

13  century over the rimonim, that would be relevant to

14  your opinion; correct?

15  **A.**   It would be.

16  **Q.**   And are you -- did you do any investigation, did

17  you look at any documents from CJI as to whether they

18  maintained the rimonim in the 20th century?

19  **A.**   Yes.  I did look at the Cecil Roth document that

20  was read before is one indication that they were not.

21  **Q.**   That's a CSI document; right?

22  **A.**   Doesn't prejudice what's written there.

23  **Q.**   Is that a CSI document?

24  **A.**   Yes.

25  **Q.**   And did you look into whether CJI paid for

1    insurance in the 20th century?

2    **A.**    I know that from personal experience.

3    **Q.**    Okay.  And are you aware that CJI paid for

4    restoration of the rimonim in the 20th century?

5    **A.**    Before the exhibition was being organized?

6    **Q.**    Any time.

7    **A.**    I only know what was done at the time that

8    Barquist was organizing the exhibition.

9    **Q.**    And we have that testimony already.

10        And are you aware that CJI loaned out the

11   rimonim several times without asking permission from

12   CSI?

13   **A.**    That is correct.

14   **Q.**    And are you aware that CJI publically proclaimed

15   that it owns the rimonim?

16        MR. SOLOMON:  Objection.  No foundation.  Goes

17   beyond proper cross-examination.  No facts in the

18   record.

19        THE COURT:  Overruled.

20   **Q.**    Are you aware that CJI publically proclaimed that

21   it owns the rimonim?

22   **A.**    I know that statement was made in some writings

23   but not in all.

24   **Q.**    Now, just by way of background, the rimonim go on

25   top of the Torah; right?

1    **A.**    Yes.

2    **Q.**    And they travel with the Torah; right?

3    **A.**    They don't have to.

4    **Q.**    But they usually do; right?

5    **A.**    No.

6    **Q.**    Well, you testified their only use with one

7    exception is on the Torah; correct?

8    **A.**    That's a different question.  You're asking me if

9    they travel with the Torah.  I would say as a curator

10   they travel separately.

11   **Q.**    Now, you -- when they're sent out to museums;

12   right?

13   **A.**    Correct.

14   **Q.**    Now, you testified this morning, yesterday, and

15   this is I think the heart of your testimony, that the

16   rimonim in question were, I wrote down, commissioned

17   and paid for by CSI; right?

18   **A.**    Yes.

19   **Q.**    And would you agree with me that CSI and the

20   congregation at Touro recognized that the Myer Myers

21   rimonim were something special?

22   **A.**    Yes.

23   **Q.**    And you would agree with me that CSI keeps

24   exceedingly meticulous records?

25   **A.**    We went over this in my deposition.  Yes.

1  **Q.**   And they have Minutes dating back to the 1730s;

2  right?

3  **A.**   Yes.

4  **Q.**   And would you agree with me --

5  **A.**   They don't have Minutes.  They have the ledger,

6  and there are only a few Minutes.

7  **Q.**   And would you agree with me, Dr. Mann, there is no

8  specific document dated 1910 or earlier from CSI

9  stating in words or substance, quote, we own the Myer

10  Myers rimonim that were located at Touro Synagogue.

11  Correct?

12  **A.**   There is no designation of any rimonim by name,

13  whatever the discussion is.  The Myer Myers are not

14  treated differently than any others.

15  **Q.**   I'd ask that the question be read back and

16  answered yes or no.

17      (Question was read)

18  **A.**   The answer is there is a document, and that is the

19  1869 inventory.

20  **Q.**   Can you please turn to your deposition, Page 7

21  Line 15:

22      Question:  Now, is there any document dated 1910

23  or earlier from CSI stating in words or substance,

24  quote, we own the Myer Myers rimonim that were located

25  in Touro Synagogue, and I mean a specific reference to

1    the Myer Myers rimonim.

2         Answer:  Not a specific reference.

3         Were you asked that question, and did the court

4    reporter properly transcribe your answer?

5    **A.**   If I said that, I made a mistake.

6    **Q.**   You made lots of mistakes here; didn't you?

7    **A.**   Everyone makes mistakes.  This is not correct

8    because the 1869 inventory -- I was allowed to do work

9    after the deposition.

10   **Q.**   But the reporter properly transcribed --

11   accurately transcribed your answer.

12   **A.**   Yes.

13   **Q.**   We'll come to your mistakes.

14        Now, am I right --

15        MR. SOLOMON:  I object.  Move to strike.

16        MR. WAGNER:  That's fine, your Honor.

17        THE COURT:  Go ahead.

18        MR. WAGNER:  We're trying all day to make life

19   easier for you.  I hope we're succeeding.

20        THE COURT:  You both are.  Thank you.

21   **Q.**   And am I right, Dr. Mann, there is no CSI document

22   stating, quote, we, CSI, hereby loan to you, CJI or

23   CYI, the Myer Myers rimonim; correct?

24   **A.**   Yes.

25   **Q.**   And you've seen no loan documents concerning the

1    Myer Myers rimonim; correct?

2    **A.**    I did not see them personally.  There have to be

3    loan documents that exist.

4    **Q.**    Just --

5    **A.**    Between CSI and CJI?

6    **Q.**    Yes.

7    **A.**    The question is --

8         (Interruption)

9         THE COURT:  Hold on, Dr. Mann.  Let's go back

10   and see where we need to be.

11        Mr. Solomon, put a question to Dr. Mann, please.

12        MR. WAGNER:  Mr. Wagner.

13        THE COURT:  Go ahead, Mr. Wagner.

14        MR. WAGNER:  I would be honored to be called

15   Mr. Solomon.  I'm not at that level.  He's done

16   everything here.  I can -- never mind.

17   **Q.**    Dr. Mann, you've seen no loan documents concerning

18   the Myer Myers rimonim, have you, other than loans to

19   museums?

20   **A.**    No.

21   **Q.**    And that even though you believe that, at some

22   point before 1818, CSI loaned those rimonim to CYI;

23   correct?  Isn't that what you believe?

24   **A.**    This is not a yes or no answer.  Yes, I have seen

25   no documents.

1    THE COURT:  Dr. Mann, when you say that, then

2    you have to stop.  If it's not a yes or no answer, then

3    Mr. Wagner --

4    THE WITNESS:  It's not a yes or no answer.

5    THE COURT:  Then Mr. Wagner can decide whether

6    to follow-up or not, and then Mr. Solomon gets a chance

7    to come back again and follow-up on anything he thinks

8    needs to be followed up on.

9    MR. WAGNER:  Your Honor, let me try to move it

10   along.

11   **Q.**   Can you turn to your deposition, Page 96 Line 16.

12   Were you asked the following question, and did

13   you give the following answer:

14   Question:  How does that relate to whether these

15   rimonim, how they ended up in Newport?

16   Answer:  So I think they were lent to Newport.

17   They were lent to Newport prior to 1818.  They came to

18   New York with the Seixas family.  CSI demands that all

19   the silver that the Seixases had custody of be handed

20   over to CSI.  It then appears in the inventory of 1869

21   among the possessions of Shearith Israel that they were

22   used in Newport.  Okay.  Then we have evidence that

23   another set of bells were sent after the formation of

24   CJI in 1897 to Newport by CSI.  There is no record of

25   being given; only lent.

1    Were you asked those questions, and did you give

2    those answers?

3    A.    Yes.

4    Q.    Now, you gave certain testimony about documents

5    referencing rimonim.  And I think this is clear; I just

6    want to clarify it.

7    In general, we don't know what specific rimonim

8    are being referenced in a document unless there's a

9    specific reference to them; correct?

10   A.    Yes.

11   Q.    Now let's turn to the issue of ownership and

12   control.

13   Your position is that CSI was the owner and

14   possessed the rimonim at issue from the start; correct?

15   A.    I don't -- would you clarify what you mean by

16   "possessed."

17   Q.    Well, let me ask you.  The rimonim in your view

18   were made for CSI; correct?

19   A.    Yes.

20   Q.    So they were originally in CSI's possession;

21   correct?

22   A.    Yes.

23   Q.    And you're sure of that conclusion; right?

24   A.    Yes.

25   Q.    You have zero doubt in your mind?

1    **A.**    Zero.

2    **Q.**    Not even a glimmer of doubt; right?

3    **A.**    No.

4    **Q.**    And that testimony I think is based on your

5    inspection of the -- or knowledge of the work, the

6    ledgers, the inventory, and the Minutes; right?

7    **A.**    Yes.

8    **Q.**    And the ledger is very important to your

9    conclusion; is it not?

10    **A.**    Yes.

11    **Q.**    And the inventory is very important to your

12    conclusion; right?

13    **A.**    Yes.

14    **Q.**    And you believe the inventory is accurate when it

15    discusses the Myer Myers rimonim; correct?

16    **A.**    Yes.

17    **Q.**    No mistakes in that inventory in your view;

18    correct?

19    **A.**    I didn't see any.

20    **Q.**    And you understand this is a very important issue

21    in this case; right?

22    **A.**    The inventory, yes.

23    **Q.**    Well, the whole issue of ownership and control, do

24    you understand that's an important issue?

25    **A.**    That's the basic issue, I believe, of this case.

1    **Q.**    That is the basic issue.

2           Now, there are lots of other scholars who say

3    that Myer Myers made the rimonim for Touro Synagogue;

4    correct?

5    **A.**    There are other scholars, not lots.  There are

6    other scholars who have said that.

7    **Q.**    Okay.  And you can't identify a single scholar who

8    lines up with you on this issue; correct?

9    **A.**    Other scholars did not do the work I did, no.  The

10    answer is no.

11    **Q.**    Nobody.

12    **A.**    No, I -- excuse me.  Let's -- can you ask the

13    question again.

14    **Q.**    Let me just turn to your deposition, Page 15

15    Line 9:

16           Question:  Okay.  Can you identify any scholar

17    besides you who says that Myer Myers made both sets of

18    those rimonim for CSI?

19           Answer:  No other scholar has done the research

20    in the original ledgers that I did.

21           Question:  So your answer is no?

22           Answer:  No.

23           Were you asked those questions, and did you give

24    those answers?

25    **A.**    Yes.

1          MR. WAGNER:  We'll call this Demonstrative P404,

2     just as a demonstrative.

3     **Q.**   Do you see the chart I prepared, Dr. Mann?

4     **A.**   Yes.

5     **Q.**   And is this chart accurate?

6     **A.**   No.

7     **Q.**   Not accurate?

8          MR. SOLOMON:  Your Honor, just so that record is

9     clear, I apologize for interrupting, I thought we were

10    going to be exchanging demonstratives.  We just

11    received this.  We're not objecting to its use.

12         THE COURT:  My usual practice when I was

13    practicing was that for cross-examination

14    demonstratives they weren't exchanged.  If you had an

15    agreement otherwise, that would be fine, but --

16         MR. SOLOMON:  Actually, I didn't know we were

17    drawing the distinction between direct and cross.

18    Thank you.

19         MR. WAGNER:  We didn't get Dr. Mann's

20    demonstratives until she testified.

21         THE COURT:  Let's just all move on.

22         MR. WAGNER:  Yes.  Let's go on.

23    **Q.**   Now, Dr. Mann, at the time you prepared your

24    report, did anyone ever tell you that CSI had

25    publically taken the position that CYI was the original

1    possessor of the rimonim?

2    A.   No.

3         THE COURT:  Hold on for one second.  (Pause)

4    Okay.  Thank you.

5    Q.   The records that you relied on here, the ledger,

6    the inventory, they all came from CSI; did they not?

7    A.   There are no records extant.  This is a period

8    from CYI or its successor organization, or the later

9    congregation.

10        MR. WAGNER:  Your Honor, I would ask an answer

11   to that -- like an answer to the question.

12   A.   The answer is yes.

13   Q.   Okay.  That's all.

14        Now, can you turn to P241 in your binder, in the

15   CSI binder.

16        Do you have it there, Dr. Mann?

17   A.   No.  I'm just looking.

18   Q.   P241?

19   A.   I'm looking.  Yes.

20   Q.   Do you remember I showed you this document at your

21   deposition; right?

22   A.   I don't remember being shown this.

23   Q.   This was a document that was listed on your list

24   of documents you reviewed for this case; correct?

25   A.   I don't remember.

**Q.** Well, the record is what it is.

Can you turn to Page 2 of the document, paragraph 8, which states -- I'll skip a little bit. This is the second line. (Reading) Admits on information and belief that during the operation of the Touro Synagogue in the 18th century the synagogue used Torah scrolls, including those loaned by Defendant, and that the scrolls were presumably adorned with bells or rimonim including at least one pair, on information and belief, crafted by the silversmith Myer Myers of New York.

Do you see that?

**A.** I see it.

**Q.** And can you turn to the next page, paragraph 13. I'll skip a little bit.

(Reading) Except admits that after 1818 ownership of the personal property including the rimonim, was transferred to Shearith Israel.

Do you see that?

**A.** You haven't read the beginning.

**Q.** (Reading) Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 13, except that it admits that after 1818 ownership of the personal property, including the

1    rimonim, was transferred to Shearith Israel.

2         Do you see that?

3    **A.**   Yes.

4    **Q.**   And if Shearith Israel owned the rimonim to start,

5    there would be nothing to transfer to them; correct?

6    **A.**   You're getting into, I believe --

7         MR. WAGNER:  Your Honor, I'd just like a yes or

8    no answer.

9         THE COURT:  Why don't you read the question back

10   to, Dr. Mann, Denise, please.

11   **A.**   I don't think --

12        THE COURT:  Hold on, Dr. Mann.

13        (Question was read)

14   **Q.**   Yes or no.

15   **A.**   I can't answer it in one word.

16   **Q.**   Can you turn to Page 11 of the document,

17   paragraph 15.

18        Do you see it says there:  (Reading) By 1822

19   Yeshuat Israel, original possessor of the rimonim,

20   ceased to exist.

21        Do you see that?

22   **A.**   I see that.

23   **Q.**   And if you look at paragraph 16, you'll see a

24   repetition of the language I quoted from Page 2 of the

25   document.  Do you see that?

1    **A.**    I'm sorry.  Repeat that.  After --

2    **Q.**    Do you see paragraph 16 tracks the language I read

3    to you earlier?

4    **A.**    It doesn't refer to the rimonim.

5    **Q.**    Okay.  Now, you submitted your report in November;

6    correct?

7    **A.**    Yes.

8    **Q.**    And you were deposed in December; correct?

9    **A.**    Yes.

10   **Q.**    And I showed you this material at your deposition

11   in December?

12   **A.**    I do not remember seeing this.

13   **Q.**    At your deposition?

14   **A.**    No.  I mean, I don't remember the names listed

15   here.  I don't remember this.

16   **Q.**    Can you look at your deposition, Page 64 Lines 22

17   to 25 -- actually let me start on Line 18.

18              MR. WAGNER:  Your Honor, I'll represent that I

19   was using this document.

20   **Q.**    Question:  My only question is whether you see

21   this here.

22              Answer:  I see this now.  I didn't read this

23   document.

24              Question:  Well, it's listed on your Exhibit B

25   as you having read it.

1    Answer:  I looked at it.  I did not -- I did not

2    focus on that sentence.

3    And then you go on to say:  Which I believe to

4    be erroneous.

5    Does that refresh your recollection that I

6    showed you the documents at the deposition?

7    **A.**   Yes.  And I said I hadn't read it before.

8    **Q.**   And you did say that this document, the

9    representations in that document were erroneous; right?

10   **A.**   I said the question you asked me about was

11   erroneous.

12   **Q.**   Okay.  And did you ever go back to CSI and ask

13   them about the document?

14   **A.**   I don't remember doing that.

15   **Q.**   You have no recollection that you raised it with

16   CSI; correct, after the deposition?

17   **A.**   Yes.

18   **Q.**   And are you aware there's been no amendment to

19   this pleading?

20   **A.**   You're getting into legal areas that I don't know

21   about.  I don't --

22   **Q.**   The record is what it is.

23   **A.**   Uh'huh (affirmative).

24   **Q.**   And I could show you the same statements in the

25   answer that this information is there three or four

1    times.  We won't go through it.

2            MR. WAGNER:  And in the Complaint your Honor,

3    just for the record, Page 240 -- Exhibit 240, Pages 2,

4    10 and 11 and Exhibit 239, Page 6.  So it's there many,

5    many times.

6    Q.    So just so that I understand, the party that

7    retained you doesn't believe in your opinion, does it?

8            MR. SOLOMON:  Objection.

9            THE COURT:  Overruled.

10   Q.    If this pleading is operative, they don't even

11   believe in your opinion; do they?

12   A.    This is a legal --

13   Q.    Just answer yes or no.

14   A.    About this?  You're not asking -- you're asking a

15   general question and you're not asking specifically

16   about this.

17   Q.    Fine.  I want to remain friends so I'll take your

18   advice.  Hold on.

19           Dr. Mann, turn back to Exhibit 241,

20   paragraph 15.

21           Do you see that?  You can look on the screen as

22   well.

23   A.    I'm reading it in the text.

24   Q.    (Reading)  By 1822, Yeshuat Israel, original

25   possessor of the rimonim, ceased to exit.

1        Do you see that?  Just asked did you see it.

2    A.   Yes.

3    Q.   And you believe that's erroneous; right?  Just

4    answer yes or no.

5    A.   I can't answer until you tell me whether

6    "possessor" is used here in a legal sense or a general

7    sense.

8    Q.   Any sense.  In a general sense.

9    A.   I do not believe that -- in a general sense, they

10   used them and they had them, but they did not own them.

11   "Possessed" cannot mean ownership here.

12   Q.   I'm not asking about ownership.  You believe that

13   CSI was the original possessor of the rimonim; correct?

14   A.   Yes.

15   Q.   And this says Yeshuat Israel is the original owner

16   of the rimonim; correct?  Is that what it says?

17   A.   Yes.  I don't know what it's based on.

18   Q.   Okay.  But whatever it is, they obviously disagree

19   with you, the party that's paying your fees; correct?

20   A.   Yes.

21   Q.   You know Marc Angel; right?  Rabbi Marc Angel?

22   A.   Yes.

23   Q.   He was the rabbi at the Spanish Portuguese

24   synagogue for many years; correct?

25   A.   Yes.

1    **Q.**   And you know him personally?

2    **A.**   Yes.  I'm not -- I don't have a close relationship

3    with him.

4    **Q.**   But you hold him in high regard; do you not?

5    **A.**   Yes.

6    **Q.**   And he knows a thing or two about CSI; does he

7    not?

8    **A.**   Yes.

9    **Q.**   And he knows a thing or two about CJI; correct?

10    **A.**   I can't answer that.

11    **Q.**   Can you turn to your deposition, Page 295:

12        Question:  And he, meaning Rabbi Angel, knows a

13    thing or two about CJI, right?

14        And there was an objection, no foundation.

15        Question:  You can answer.

16        Answer:  I agree.

17        Were you asked those questions, and did you give

18    those answers at your deposition?

19    **A.**   Yes.

20    **Q.**   And you understand that Rabbi Angel was the rabbi

21    at CSI for 40 years; correct?

22    **A.**   Yes.

23    **Q.**   Now, you know that -- can you turn to P162 in your

24    book.

25    **A.**   Uh'huh (affirmative).  Yes.

1    **Q.**    And that's a book that Dr. Angel wrote -- I'm

2    sorry, Rabbi Angel wrote about CSI; correct?

3    **A.**    Yes.

4    **Q.**    Have you seen the book before?

5    **A.**    I read it.

6    **Q.**    Can you turn to Page 63.

7    **A.**    Yes.

8    **Q.**    Page 63, right there.  Do you see it says -- on

9    the bottom right:  (Reading)  These rimonim, silver

10   adornments for the Torah scrolls, were fashioned by the

11   great Jewish silversmith of the 18th century New York,

12   Myer Myers.  He also created rimonim for the

13   congregations in Newport and Philadelphia.

14          Do you see that?

15   **A.**    Yes.

16   **Q.**    And just -- can you turn to Page 57 in the

17   document.

18   **A.**    In the book?

19   **Q.**    Yes.  You'll see it there.

20   **A.**    Yes.

21   **Q.**    And do you see it says there:  (Reading)  Of the

22   five colonial congregations of colonial days, Shearith

23   Israel has remained the most notable representative of

24   the Western Sephardic tradition in America.

25          Do you see that?

1    **A.**    Yes.

2    **Q.**    And that's true; right?

3    **A.**    I can't answer that.

4    **Q.**    Okay.  But you look below, he lists Jeshuat Israel

5    in Newport better known as Touro Synagogue.  Do you see

6    that?

7    **A.**    Yes.

8    **Q.**    Okay.  And Jeshuat Israel is sometimes referred to

9    as Touro Synagogue; right?

10   **A.**    Yes.

11   **Q.**    And they're one of the five colonial

12   congregations?

13   **A.**    No, they're not.

14   **Q.**    But he called them one of the five; right?

15   **A.**    No.  He said --

16   **Q.**    Just answer yes or no.  Didn't he write that they

17   are one of the five colonial congregations?

18   **A.**    He's talking -- excuse me, but the whole sentence

19   reads:  (Reading)  Jeshuat Israel in Newport, better

20   known as the Touro Synagogue, is currently an Ashkenazi

21   Orthodox congregation.

22         He is talking about the time that he wrote the

23   book, not about the time of the colonial period.

24   **Q.**    All right.  Now, you know that Rabbi Angel gave a

25   lecture at Yale concerning the rimonim?

1    **A.**    Yes.

2    **Q.**    And you agree Yale is an illustrious university?

3    **A.**    We went over this in my deposition.

4         THE COURT:  I wasn't there, though.

5    **A.**    Yes, I agree.

6    **Q.**    I don't mean to suggest it's any more illustrious

7    and probably a lot less illustrious than the place up

8    the street but --

9         THE COURT:  You're playing to the home team

10   there, Mr. Wagner.  That won't be allowed.

11   **Q.**    But you understand there was an exhibition on Myer

12   Myers there; right?

13   **A.**    I saw it.

14   **Q.**    And you called that a significant exhibition;

15   right?

16   **A.**    Yes.

17   **Q.**    And you're aware that Rabbi Angel gave a speech at

18   Yale while this exhibition was going on; correct?

19   **A.**    Yes.

20   **Q.**    And let's look at that speech.  P158.

21        MR. WAGNER:  And can you turn to the

22   paragraph -- can you turn to the paragraph on the first

23   page right above Myer Myers, some biographical

24   information.  And just highlight that.

25   **Q.**    Do you see it says there, Dr. Mann -- do you see

1    there it says:  (Reading)  When Myer Myers decided to

2    fashion Torah bells for the synagogues in New York,

3    Newport and Philadelphia, he was participating in an

4    age-old Jewish tradition.

5         Do you see that?

6    **A.**   Yes.  But I'm only allowed to answer one word;

7    right?

8         THE COURT:  Yes.

9    **Q.**   Now, did you ever go back to Rabbi Angel and ask

10   him why he wrote that?

11   **A.**   I want to preface one sentence.  I could --

12   **Q.**   Can I just --

13   **A.**   No.  Did I ask him?  No.

14   **Q.**   That's all.

15   **A.**   I felt it was disrespectful.

16   **Q.**   Okay.  By the way, are you aware that people from

17   CSI attended that exhibition?

18   **A.**   I should hope so.

19   **Q.**   Also, would you agree with me that Rabbi Angel had

20   access to the same Minutes and ledgers that you had

21   access to?  Yes or no.

22   **A.**   I don't know that he read them.

23   **Q.**   Well, he says he read them; doesn't he?

24   **A.**   We went over this in my deposition, and I will

25   answer as I did then, that when people read with

1    different purposes they read differently.

2    Q.    My only question --

3    A.    And my understanding of the book is I can tell you

4    what parts of the book come from what sources.  This is

5    not a book that was created by Rabbi Angel totally

6    *ex nihilo*.

7    Q.    Dr. Mann, we're not talking about the book.  Now

8    I'm talking about the speech, so why don't you just

9    turn to Page 3, one, two, three, four, fifth paragraph,

10   "When I first began serving."

11         Can you read that paragraph, just read the

12   paragraph.

13   A.    (Reading)  When I first began serving Congregation

14   Shearith Israel in 1969, I spent many wonderful hours

15   reading through our early record and Minute books going

16   back to 1728.  I was profoundly moved by the

17   seriousness of purpose reflected in these documents,

18   gracious calligraphy, solemn invocation of God's name,

19   descriptions of the activities and concerns of the

20   congregation's leadership.

21   Q.    Now, you're an expert retained for litigation;

22   correct?

23   A.    Yes.

24   Q.    And Rabbi Angel wrote this 12, 13 years before the

25   litigation started; correct?

1    **A.**   Yes.

2    **Q.**   Fine.  Let's move on to Dr. Barquist.

3          Would you agree with me, Dr. Mann, that

4    Dr. Barquist is a recognized authority on Myer Myers?

5    **A.**   I believe that he is a recognized authority on

6    American silver, not specifically Myer Myers.

7    **Q.**   Can you turn to your deposition, Page 50.

8          Were you asked the following question, and did

9    you give the following answer on December 31st.

10   Line 19:

11          Question:  Can you name any recognized

12   authorities on Myer Myers?

13          Answer:  Barquist.

14          Were you asked that question, and did you give

15   that answer?

16   **A.**   Yes.

17   **Q.**   Now let's look at the Barquist catalog.  It's

18   P150.

19          Let's start with page -- this is the catalog

20   from that exhibition; correct?

21   **A.**   Yes.

22   **Q.**   Can you turn to Page 154, Item 64.

23   **A.**   Yes.

24   **Q.**   And do you see it's a description of the rimonim

25   that are now sitting at the Museum of Fine Arts;

1    correct?

2    **A.**   It's not a description.  It's what we call a

3    label.

4    **Q.**   Okay.  But it's the rimonim that are at issue

5    here; right?

6    **A.**   Yes.

7    **Q.**   Okay.  And do you see it says there:  (Reading)

8    Provenance with Congregation Yeshuat (now Jeshuat)

9    Israel by about 1780 and probably earlier.  See below.

10        Do you see that?

11   **A.**   Yes.

12   **Q.**   And can you turn to page 160 of the catalog.

13   Bottom left of page 160.

14        It reads:  (Reading)  At some point, the word

15   "Newport" was engraved on one finial in Catalog 63 and

16   64, thus two engraved presumably form a single pair

17   that belonged to the Newport congregation, but

18   subsequently became intermixed with a pair belonging to

19   Shearith Israel.  In other words, each congregation now

20   owns one finial originally from the Newport pair and

21   one finial originally from the New York pair.

22        Do you see that?

23   **A.**   Yes.

24   **Q.**   And can you turn to the top of the next column,

25   "However."

1    **A.**    Yes.

2    **Q.**    Do you see it says:  (Reading)  However, it was

3    not until 1833 that the four Torahs (and presumably

4    their ornaments) were transferred to Shearith Israel,

5    quote, for safekeeping in our place of worship until

6    they should be required for the use of the Newport

7    shul.

8          Do you see that?

9    **A.**    Yes.

10   **Q.**    So he's another person who doesn't agree with you;

11   right?

12   **A.**    He couches -- you were --

13   **Q.**    Just answer yes or no.

14   **A.**    I don't agree with him.

15   **Q.**    Fine.  Now let's talk about the Jewish Museum.

16          You worked at the Jewish Museum for 29 years;

17   did you not?

18   **A.**    Yes.

19   **Q.**    And that's one of the great Jewish museums in the

20   world; correct?

21   **A.**    Yes.

22   **Q.**    And the Jewish Museum takes care that the

23   statements it makes are accurate; right?

24   **A.**    We went over this in my deposition.  And the

25   point -- the answer is that it takes great care and one

1    has to consider what it writes in the time that it was

2    written.

3    **Q.**   Were you asked the following question, Page 83

4    Line 16:

5        Question -- this is the deposition, Page 83 of

6    the deposition.

7        Were you asked the following question, Line 16,

8    and did you give the following answer:

9        Question:  And I'm right that the Jewish Museum

10    takes care that statements that they make about Judaica

11    are accurate?

12        Answer:  Yes.

13        Were you asked that question, and did you give

14    that answer?

15    **A.**   Yes.

16    **Q.**   And the Jewish Museum from time to time makes

17    statements about Jewish ornaments in the context of

18    books or program brochures; correct?

19    **A.**   Yes.

20    **Q.**   Okay.  Let's turn to P114.

21        This is the brochure from an exhibition about

22    Myer Myers at the Jewish Museum; right?

23    **A.**   Yes.

24    **Q.**   Were you at the museum at the time?

25    **A.**   No.

1  **Q.**  And this brochure or presentation was written
2  by -- is it Dr. Freudenheim?
3  **A.**  No.  Mr. Freudenheim.
4  **Q.**  Mr. Freudenheim.  He began his career at the
5  Jewish Museum; right?
6  **A.**  Yes.
7  **Q.**  Got a master's degree at the Institute of Fine
8  Arts; right?
9  **A.**  Yes.
10  **Q.**  Became a curator at the Jewish Museum?
11  **A.**  Am I being asked each phrase or just --
12  **Q.**  Let me go on.  He then became a curator at the
13  Smithsonian?
14  **A.**  Correct.
15  **Q.**  And then he became a curator of the Gilbert
16  Collection in London; correct?
17  **A.**  Yes.
18  **Q.**  And he was also head of YIVO for a short time;
19  right?
20  **A.**  Yes.
21  **Q.**  That's the Yiddish Institute?
22  **A.**  It's the Institute For Eastern European Jews.
23  It's an archive.
24  **Q.**  And you consider Mr. Freudenheim a reliable
25  scholar for his time; correct?

1    **A.**    For his time, yes.

2    **Q.**    Now, you claimed, did you not, that you saw no

3    connection between Myer Myers and the Touro Synagogue

4    other than that one work he did on the rimonim; right?

5    **A.**    Yes.

6    **Q.**    In fact, as Mr. Freudenheim writes, his sister was

7    a member of the Touro Synagogue; was she not?

8    **A.**    I believe it was his wife's sister; wasn't it?

9    **Q.**    Well, I could be wrong.  Let's look at Page 1577

10    of the brochure.

11        And do you see it says there -- highlight where

12    it says each pair.  Do you see it there?

13    **A.**    "Each pair of headpieces," is that what you're

14    looking at?

15    **Q.**    Yes.  Dr. Mann, can you read that?

16    **A.**    (Reading) Each pair of headpieces comes from a

17    congregation to which Myers had a particular

18    connection:  His own congregation, Shearith Israel in

19    New York, Number 2, Congregation Mikveh Israel in

20    Philadelphia where he worshiped when he took refuge

21    from New York during the Revolution, Numbers 4, 5, and

22    the Touro Synagogue in Newport, whose beautiful

23    sanctuary by Peter Harrison was built in 1763, with the

24    financial aid of the New York congregation, Numbers 1

25    and 3.

1    Q.    Can you turn to the prior page where it says, the

2    second full paragraph, (Reading)  Myers' family had

3    been members of Congregation Shearith Israel.

4          Do you see that?

5    A.    Yes.

6    Q.    And do you see further on it says, (Reading)  But

7    it was not only the members of Congregation Shearith

8    Israel who showed interest in Myers' work.  He received

9    commissions from other synagogues, plural, as well as

10   from many of the most prominent families of his day.

11         Do you see that?

12   A.    Yes.

13   Q.    Now, if you look up top there's a reference to a

14   work by the late Jeannette Rosenbaum.  And the Jewish

15   Museum brochure notes that Jeannette Rosenbaum wrote a

16   monograph on Myer Myers; right?

17   A.    Yes.

18   Q.    And he writes here that that monograph remains an

19   exemplary work of its kind; correct?

20   A.    What line?

21   Q.    Is that what it says there?  Right up top.  The

22   last sentence of the paragraph at the top.  We'll

23   highlight it for you.

24   A.    That's okay.  I see it.

25   Q.    And can you turn to the very last note.  There's a

1    number there in the bottom right, CJIB1582.

2    **A.**    Yes.

3    **Q.**    And it says there -- it says -- can you read

4    actually the note, just the first --

5    **A.**    Just on the bottom?

6    **Q.**    Yes.  Just read that the first sentence.

7    **A.**    (Reading)  A monograph on Myers has been published

8    and remained the most definitive study of the man and

9    his work, Jeannette Rosenbaum, Myer Myers, Goldsmith,

10   1723-1795, Philadelphia JPS.

11   **Q.**    That's enough.  That's fine.

12   **A.**    Philadelphia, Jewish Publications Society, 1954.

13   **Q.**    That's fine.

14       MR. WAGNER:  Your Honor, if you want me to, I

15   would spend a few minutes on the Rosenbaum work or take

16   a break.  It's up to you.

17       THE COURT:  If it's a good time to take a break,

18   Mr. Wagner, we'll do that.  We'll be back in 15

19   minutes.  Thanks, everyone.

20       (Recess)

21       THE COURT:  Mr. Wagner.

22       MR. WAGNER:  Thank you, your Honor.

23   **Q.**    Back again, Dr. Mann.  You're aware there is a

24   book by Jeanette Rosenbaum about Myer Myers?

25   **A.**    Yes.

1   **Q.**   And you came across that book even before this

2   case; right?

3   **A.**   Yes.

4   **Q.**   And until Barquist, she wrote the only

5   comprehensive book about Myer Myers; correct?

6   **A.**   Yes.

7   **Q.**   And you consider the Rosenbaum work to be an

8   exemplary work for its time?

9   **A.**   You're quoting from Tom Freudenheim.

10  **Q.**   No.  Can you look at your deposition, Page 87

11  Line 22.

12  **A.**   Okay.

13  **Q.**   Question:  Do you consider it, meaning the

14  Rosenbaum book, to be an exemplary work?

15          Answer:  I said for its time.

16          Were you asked that question, and did you give

17  that answer?

18  **A.**   Yes.

19  **Q.**   And there was not another definitive study of Myer

20  Myers until Dr. Barquist; right?

21  **A.**   Correct.

22  **Q.**   By the way, you didn't do anything to look at

23  Jeannette Rosenbaum's research papers for that book;

24  did you?

25  **A.**   No.  You brought them to my attention.

1    **Q.**   Now let's look at some excerpts from her book,

2    Exhibit 100.  Is that the book?

3    **A.**   Yes.

4    **Q.**   Can you turn to Page 24.

5    **A.**   Is it in the binder, too?

6    **Q.**   Yes.  You can look at it on the screen.  It's

7    fine.

8          THE COURT:  Dr. Mann, could I just ask you to

9    try and be conscious of pulling the mic right up to

10   your mouth.  You tend to look down at the document and

11   the mic stays up here.  If you can just pull it down

12   when you're -- that would be great.  Thank you.

13         THE WITNESS:  Thank you.

14   **Q.**   Do you see the paragraph on Page 24, "Among the

15   18th century New York silversmiths"?

16   **A.**   Yes.

17   **Q.**   Can you read the sentence at the very end where it

18   says, "Illustrated in Alfred E. Jones."  Can you read

19   that sentence?

20   **A.**   (Reading)  Illustrated in E. Alfred Jones' "The

21   Old Silver of American Churches," 1913, are the two

22   pairs of scroll bells, which Myer Myers had made for

23   the  synagogue at Newport, Rhode Island.

24   **Q.**   And I think you referenced the Jones book in your

25   direct; right?

1    **A.**    Yes.

2    **Q.**    Okay.  Now can you turn to Page 36.

3    **A.**    Where is the tab?  I prefer to look at the printed

4    copy.

5    **Q.**    It's Tab 100.  Tab 100, Page 36.

6    **A.**    Yes.

7    **Q.**    And do you see it says, Figure 7.  Can you read

8    that one?

9    **A.**    (Reading)  Touro Synagogue, National Historic

10   Shrine, Newport, Rhode Island.  Myer Myers made silver

11   scroll bells for this congregation about 1765.

12   **Q.**    Now can you turn to Page --

13   **A.**    Then the credit is Society of Friends of Touro

14   Synagogue.

15   **Q.**    Now can you turn to Page -- well, that credit is

16   for the picture; right?

17   **A.**    Yes.

18   **Q.**    Can you turn to Page 67.  And can you read the

19   superscription at the bottom for both of those.

20   **A.**    I think I should explain that --

21   **Q.**    No.  You have able counsel who will bring -- just

22   read it.

23   **A.**    You want me to read both labels?

24   **Q.**    Yes, yes.

25   **A.**    (Reading)  The scroll bell -- this is under the

1    left picture -- one of a pair, Touro Synagogue, Newport

2    Rhode Island.

3         Then the right side, (Reading)  Scroll bells,

4    circa 1765.  And then it says, identical pairs located

5    at Congregation Shearith Israel, New York, and Touro

6    Synagogue, Newport, Rhode Island.

7    **Q.**   Now can you turn to Page 99 of the Rosenbaum work.

8    Scroll up, the first sentence.  Do you see it says --

9    the first sentence of the first paragraph, can you read

10   that, "The use of rimonim."

11   **A.**   Oh.  (Reading)  The use of rimonim scroll

12   ornaments is entirely an ornamental one.

13   **Q.**   And you agree with that, as a general matter?

14   **A.**   No.

15   **Q.**   Can you turn to your deposition, Page 92.  Were

16   you asked the following questions at Line 18, and did

17   you give the following answers:

18        Question:  The first paragraph, the first full

19   paragraph says, quote, the use of rimonim (scroll

20   ornaments is entirely ornamental).  Do you see that?

21        Answer:  Yes.

22        Question:  Do you agree with that as a general

23   matter?

24        Answer:  Yes.

25        Were you asked those questions, and did you give

1    those answers?

2    **A.**    Yes, but the qualification --

3          MR. WAGNER:  Just strike everything after "yes."

4    **Q.**    Now, am I right the Library of Congress is the

5    national library of the United States?

6    **A.**    Correct.

7    **Q.**    And you're impressed with the people who work at

8    the Library of Congress?

9    **A.**    Yes.

10    **Q.**    And the curators there --

11    **A.**    People I've met.

12    **Q.**    The curators there are professional?

13    **A.**    The curators I've met, yes.

14    **Q.**    Can you turn to Exhibit P172.  This is a portion

15    of a brochure concerning an exhibition that included

16    the Myer Myers bells at the Library of Congress; right?

17    **A.**    I did not see the exhibition.

18    **Q.**    But that's --

19    **A.**    But they are listed here on this.

20    **Q.**    Would you look at the last page of the document,

21    "Colonial Silversmith Myer Myers."

22    **A.**    Yes.

23    **Q.**    And can you read that.

24    **A.**    (Reading)  Born in New York in 1723, Myer Myers

25    was the skilled silver and goldsmith who created the

1    first American examples of Jewish ceremonial objects.

2    He served as president of New York's Congregation

3    Shearith Israel three times and created silver rimonim

4    for synagogues in New York, Newport and Philadelphia.

5    Displayed here are the finial belongings to Newport's

6    Touro Synagogue, which would have been placed over the

7    handles of the scroll as adornment.

8    Q.   Now, you have not seen any objections from CSI to

9    this statement, have you, to this specific statement?

10   A.   I object to the statement.

11   Q.   No.

12   A.   You don't -- oh, did they react to this?  I have

13   no idea.  I was not involved.

14   Q.   You haven't seen any reaction; right?

15   A.   No.

16   Q.   In your review?  Okay.  One more we're going to go

17   through.  Who is Guido Schoenberger?

18   A.   Guido Schoenberger was a German art historian who

19   was employed by the historical museum in Frankfort.

20   After the passage of the Nuremberg laws in 1933, he was

21   forced out of his position, and he went to work at the

22   Jewish Museum in Frankfort.  He then came -- he was

23   able to leave Germany in the '30s and came to the

24   United States.

25        When I knew him, he was a very old man, and he

1    was employed at the Institute of Fine Arts, my graduate

2    school, as a slide librarian, and at the Jewish Museum

3    he functioned sometimes as a curator.  It was the

4    practice of Germans who had come here and served as

5    professors to try and help out others.

6    **Q.**   Thank you.  Can you turn to Exhibit P99 in the

7    book.  Is this an article that he wrote about Myer

8    Myers?

9    **A.**   Yes.

10    **Q.**   Could you turn to Page 5.

11    **A.**   Are you on the pictures?

12    **Q.**   No.  Keep going.

13    **A.**   I've got it.

14    **Q.**   Do you see the paragraph, "And it comes to life

15    again."  Can you read the first two sentences of that

16    paragraph, the top -- the second paragraph on the page.

17         MR. WAGNER:  And can you highlight it.

18    **A.**   I think one needs to read the last sentence of the

19    previous paragraph.

20    **Q.**   No, no.

21    **A.**   (Reading)  And it comes to life again vigorously

22    in the 18th century if only in the general way of

23    flower and fruit motifs.  If we turn to the work of

24    Myer Myers first showing a pair of his rimonim made

25    circa 1770 for the synagogue at Newport built in 1759,

1    we see that the architectural form has disappeared.

2    Q.    You can stop there.

3          Now, we went through this CSI answer; right?

4    Yes?  If you look at the demonstrative, we went through

5    the CSI pleadings; correct?

6    A.    We didn't go through the whole thing.  We looked

7    at part of it.

8    Q.    And we looked at Rabbi Angel; correct?

9    A.    Yes.

10   Q.    And we looked at David Barquist; correct?

11   A.    Parts, yes.

12   Q.    And we looked at Jewish Museum; correct?

13   A.    Yes.

14   Q.    And we looked at Jeannette Rosenbaum?

15   A.    Yes.

16   Q.    And we looked at Library of Congress?

17   A.    Yes.

18   Q.    And we looked at Guido Schoenberger; right?

19   A.    Yes.

20   Q.    And they're all on the right side of the ledger

21   here, and you're on the left side; correct?

22   A.    This is your document, not mine.

23   Q.    Just didn't they all say that the rimonim were

24   made for the synagogue, for Touro Synagogue?

25   A.    I don't want to comment on the first three because

1    I don't know those intimately.

2    **Q.**    Fine.  The rest.

3    **A.**    The rest --

4    **Q.**    Just yes or no.  Don't they all say that it was

5    made for CYI, for the Touro Synagogue?  Isn't that what

6    we just saw?

7    **A.**    Yes.

8    **Q.**    Okay.  That's all.

9    **A.**    But you're --

10   **Q.**    Okay.  Now, let's look at what you've done.

11           You're still a hundred percent sure you're

12   correct; right?

13   **A.**    Yes.

14   **Q.**    Okay.  But let's look at what you've done.  Let's

15   look at your formulas.

16           By the way, the formulas were not in your

17   original report; were they?  Just tell me yes or no.

18   Were they in your original report?

19   **A.**    I won't answer because -- no.

20   **Q.**    So I've never had the opportunity to even question

21   you about these formulas before today; right?

22   **A.**    True.

23   **Q.**    But I will question you about them.

24           Now, are these calculations based on any

25   methodology that I can find in an art history book?

1    **A.**    Yes.

2    **Q.**    What's the name of that book?

3    **A.**    Barquist.

4    **Q.**    That's the only one?  So you think Barquist is a

5    reliable source with respect to Myer Myers rimonim?

6    **A.**    No.  I didn't say that.  I said that you asked me

7    about calculating the cost of the silver, and I said

8    that I relied on Barquist who gave general information

9    about what the cost of chased silver was, what the cost

10    of plate was, et cetera.

11    **Q.**    So am I right that you used Barquist for some

12    purposes; right?  Yes or no.

13    **A.**    Yes, but I do not rely on his discussion of the

14    rimonim.

15    **Q.**    So you used him for some, and you threw him out

16    with respect to other stuff; right?

17    **A.**    That is true.

18    **Q.**    Okay.  Now, let's look at your first calculation.

19        MR. WAGNER:  Can you put up I guess it's D53.

20        MR. SOLOMON:  DD.

21        MR. WAGNER:  I'm sorry.  DD53.  Actually, we may

22    not have it.  I would ask that you put up -- are you

23    able to put it up?  Okay.

24    **Q.**    So let's look on the left side.  You used here, it

25    says in 1738-9, CSI paid nine shillings three pence per

1    ounce of silver.

2         Do you see that?

3    **A.**   I haven't gotten there yet.

4         THE COURT:  Hold on, Dr. Mann.

5    **A.**   Could you repeat the designation?

6         MR. WAGNER:  If you want to go up and help

7    her --

8         MR. SOLOMON:  Your Honor, that's an additional

9    packet.

10         THE COURT:  Come on up, Mr. Solomon.  That would

11    be great.

12         (Mr. Solomon hands document to witness)

13    **Q.**   Do you see that, Dr. Mann?  That's your first

14    calculation; right?

15    **A.**   I haven't gotten to the document yet.

16    **Q.**   I'm sorry.

17    **A.**   No, it's not -- oh, here?

18    **Q.**   Yes, yes.

19    **A.**   It's not part of this packet.  I'm sorry.

20         MR. SOLOMON:  DD53, Dr. Mann.

21         THE WITNESS:  DD53.

22         MR. SOLOMON:  It's in the packet.  Four pages

23    in.

24         THE WITNESS:  Sorry.

25         MR. WAGNER:  That's okay.

1    **A.**    Yes.  So my -- you were asking --

2    **Q.**    So just let's go through it.  On the left, you

3    used the price of silver in 1739 and came up with a

4    calculation; right?

5    **A.**    Uh'huh (affirmative).  Yes.

6    **Q.**    And you used the price of silver from Barquist;

7    right?

8    **A.**    No.

9    **Q.**    Okay.

10   **A.**    This price of silver was in the ledger of CSI for

11   a payment that they made to somebody south, and it had

12   to be sent by ship.

13   **Q.**    That's fine.  But whatever it is, it's from 1739;

14   right?

15   **A.**    Correct.

16   **Q.**    Did you do anything to check to see if the price

17   of silver had changed from 1739, 35 years later to

18   1764?  Did you do anything?

19   **A.**    Yes, I did read about the price of silver.

20   **Q.**    And the price of silver in between those two years

21   quadrupled, didn't it?

22   **A.**    I don't remember the exact figure.

23   **Q.**    But it went up by a lot; right?

24   **A.**    I don't remember.

25   **Q.**    Well, we'll show you.

1          By the way, you're not an expert on the price of

2     silver in colonial times; are you?

3     **A.**    No.

4     **Q.**    You're not an economist; right?

5     **A.**    No.

6     **Q.**    Can you look at Exhibit P135.

7          Before I get to it, did you actually do any

8     research into whether the price of silver fluctuated

9     between 1739 and 1764 or '65?

10    **A.**    I did research the prices.

11    **Q.**    Okay.  And what specifically did you look at?

12    **A.**    I looked at this book.

13    **Q.**    Okay.  Well, let's look at it.

14    **A.**    For one thing.  And I looked at other books.

15    **Q.**    Okay.  This is -- you found this book to be

16    reliable; did you not?

17    **A.**    No.  I found that your selection was unreliable.

18    **Q.**    That's not my question.  Is this book reliable as

19    far as you know?

20    **A.**    I can't judge that.

21    **Q.**    Okay.  Well, let's look at it.

22    **A.**    I looked at it because you brought it into

23    evidence.

24    **Q.**    Okay.  Let's look at.  Let's look at Table 3.

25    **A.**    Can I --

1    **Q.**    No.

2    **A.**    Uh'huh (affirmative).

3    **Q.**    Just look at Table 3.  Three -- CJI 3366.  Do you

4    see that?

5    **A.**    Yes.

6    **Q.**    And do you see the price of silver or just take --

7    we'll take Rhode Island since we're here.  The price of

8    silver, 27.5, do you see that, in 1740?

9    **A.**    Yes.

10    **Q.**    And do you see the next page, 1763, the price of

11    silver in Rhode Island was 160.75.  Do you see that?

12    Just do you see it?

13    **A.**    I see it.

14    **Q.**    That's all.  That's about four or five times,

15    right, four or five -- went up by about 400 or 500

16    percent; didn't it?

17    **A.**    Not in New York.

18    **Q.**    But in Rhode Island it did; correct?  Just that's

19    -- in Rhode Island; did it?

20    **A.**    In Rhode Island, yes.

21    **Q.**    Okay.  And you know from your American history

22    there was a war in 1754; correct?

23    **A.**    Yes.

24    **Q.**    And that war lasted 10 years; correct?

25    **A.**    I don't remember.

1    **Q.**   And if you look on this chart, you'll see the

2    price of silver went up a lot during that time period;

3    correct?

4    **A.**   There's an incorrect assumption here.

5    **Q.**   That's not my question.  My question is whether

6    the numbers showed an increase here.

7    **A.**   Yes.

8    **Q.**   Okay.  And would you agree with me -- I'm allowed

9    to pose a hypothetical -- that if the price of silver

10   quadrupled between 1739 and 1764, your first formula is

11   completely worthless?  Yes or no.

12   **A.**   No, because there are other circumstances.

13   **Q.**   Fine.  Now, let's look at your second formula.

14       By the way, you testified on direct to sort of

15   mistreatment or lack of care by CJI of the rimonim in

16   the 1930s; right?

17   **A.**   Yes.  1937, Cecil Roth.

18   **Q.**   Okay.  And you would expect the rimonim were

19   probably -- were they banged around, would you expect?

20   **A.**   I don't know what he was -- whatever he said is in

21   that statement.  I don't know any more than what's in

22   the statement.

23   **Q.**   Okay.  But things could have fallen off, is

24   that --

25   **A.**   I cannot speculate.

1    **Q.**   Okay.  Just staying with McCusker for a second, do

2    you see in 1760 the price of silver in Rhode Island,

3    this is on the third page, was 137.78; and in 1763, it

4    was 160.75.  Do you see that?

5    **A.**   I see what is written in McCusker.

6    **Q.**   That's all.  You have very able counsel.

7         But you didn't take into account any fluctuation

8    in the weight of the silver in your second formula; did

9    you?

10   **A.**   No, because --.

11   **Q.**   Just that -- just no.

12        MR. WAGNER:  Can you put that back up.

13   **A.**   No.

14   **Q.**   Now, you relied on Dr. Barquist for the weight of

15   the rimonim; correct?  Yes or no.

16   **A.**   No, not totally.  They were also weighed in the

17   inventory of 1869 and the weight appears consistent.

18   **Q.**   Is that your testimony?  It appears consistent?

19   Let's look at that.

20        MR. WAGNER:  Can you put up -- we'll use

21   Defendant's Exhibit 34-A.  You have it.  We don't need

22   more paper.

23   **Q.**   Can you turn to page --

24   **A.**   Wait a minute.  This is your exhibit or --

25   **Q.**   No, no, no.  It's the Defendant's exhibit.

1          THE COURT:  Do you have it, Dr. Mann, or no?

2          THE WITNESS:  This is -- you're talking about

3     the inventory?

4          THE COURT:  Why don't you bring her up one.

5          THE WITNESS:  It's all right.  I have it.  I

6     just -- yeah.  Okay.

7     **Q.**   I have some issues with the ditto marks but not

8     with anything else.  Page 36.

9     **A.**   Yes.

10    **Q.**   No.  Keep going.  D34A-36.

11    **A.**   Yes.

12    **Q.**   Hold on.  It will be 4956 at the bottom.

13         Are you there?  Do you see that page?

14    **A.**   I'm reading in the original.

15    **Q.**   Okay.  Now, do you see at the top it says,

16    "Articles of Silver"?

17    **A.**   Yes.

18    **Q.**   And do you see it says, "Weighed by Mr. Bronn

19    Jeweller on Friday"?

20    **A.**   Yes.

21    **Q.**   And do you see the weight of the Myer Myers

22    Newport marked rimonim, 45 ounces?  Do you see that?

23    **A.**   Yes.

24    **Q.**   You did not use 45 ounces in your calculation; did

25    you?

1    **A.**    No.  I used the 40.8.

2          MR. WAGNER:  Can you put this one up?

3          THE COURT:  Could I ask, Doctor, is there a

4    quick calculation between the Jewish calendar and that?

5          THE WITNESS:  Yes.

6          THE COURT:  What do you subtract?

7          THE WITNESS:  You add 1240 to the Jewish date

8    and you get the Gregorian date.  So if you have

9    5520 (sic) and you add 1240, you get 1760.

10         THE COURT:  Thank you.

11         THE WITNESS:  But there is a slight overlap of

12   the previous year.  It depends on the month.  Okay?

13         THE COURT:  Just in general that gives you a

14   good ballpark?  Thanks.

15   **Q.**   Do you have any quarrel with my math on this

16   exhibit?  Any quarrel with the multiplication and the

17   division?

18   **A.**   I don't have a calculator, but I will assume you

19   did it correctly.

20         MR. WAGNER:  Your Honor, this is Plaintiff's 405

21   for identification.

22         THE COURT:  Thank you.

23   **Q.**   And again, the 45 that I used came from the

24   inventory that was so important to your opinion;

25   correct?  Is that where the number came from?

1    **A.**    Yes.

2    **Q.**    And that's the inventory you told us a few minutes

3    ago and on direct is accurate with respect to the

4    rimonim; correct?

5    **A.**    Yes.

6    **Q.**    Now, this inventory was done 150 years before

7    Barquist; correct?

8    **A.**    Yes.

9    **Q.**    That's much closer to the time that these rimonim

10    were made; right?

11    **A.**    Yes.

12    **Q.**    And we don't know whether things have fallen off

13    between --

14    **A.**    We do know.

15    **Q.**    Things have fallen off?

16    **A.**    If you look at the photographs, particularly the

17    one that dates from the Jewish Museum in the mid-1960s,

18    which was published in Barquist as being contemporary,

19    you will see that the top part of one of the finials is

20    missing.

21    **Q.**    Okay.  So the rimonim could have weighed 45 ounces

22    in 1869 and they could have weighed 40 ounces; correct?

23    But we're looking at the weight -- we're looking at the

24    price of the rimonim when Myer Myers made them, not the

25    weight using -- not the price using Barquist's weight

1    250 years later; correct?

2    **A.**    Correct.

3    **Q.**    Now, we can put this aside for now.  Put this

4    aside for now.  Let's look at the ledgers.

5    **A.**    Am I allowed to make a comment or not?

6    **Q.**    Nope.  Nope.

7    **A.**    Okay.

8    **Q.**    Well, you can, but he has to ask you the

9    questions.  You'll have a chance.

10          Now, you said the ledger is conclusive as to the

11    rimonim, that the CSI ledger is conclusive that the

12    rimonim were made for CSI; right?

13    **A.**    You're talking about both pairs or one pair?

14    **Q.**    We're talking about the one pair that's at issue,

15    the ledger entry 1764, 1765.  You believe it's

16    conclusive?

17    **A.**    I believe it indicates payment for rimonim.

18    **Q.**    Okay.  And I think you wrote, this is at

19    paragraph eight of your declaration, that it's not

20    explicable on any other basis; right?

21    **A.**    Correct.

22    **Q.**    Okay.  Now, let's look at P16.

23          Before I get to that, we are all in agreement

24    that with respect to the 1764 and 1765 ledgers, there's

25    no specific reference to rimonim?

1    **A.**    Next to the amount, no.

2    **Q.**    Okay.  Now let's look at P16.

3    **A.**    Yes.

4    **Q.**    Now, it's very -- it's really hard to read this,

5    but am I right that there's a reference on this page, a

6    specific reference to paying Myer Myers 20 pounds to

7    create a work for a plate?

8    **A.**    Just a minute.  I have to find it.

9        THE COURT:  Mr. Wagner, what document?  Whose

10   document?

11       MR. WAGNER:  I'm sorry.

12       THE COURT:  Just describe the document.

13       MR. WAGNER:  I'm sorry.  It's from the CSI

14   ledger in 1759.

15       THE COURT:  Thank you.

16       MR. SOLOMON:  The debit side or the credit side?

17   I can't see it.  I'm sorry.

18       MR. WAGNER:  Very good question.

19   **Q.**    Can you look at the debit side, the left side.

20   **A.**    I don't see the 20 pounds.  There's another

21   document where it's listed.  This is not the page.

22       It says specifically that he was paid the

23   20 pounds for a piece of plate to honor Abraham

24   Abrahamson, and this is not it.

25       MR. WAGNER:  It's not so clear, but can you

1    highlight that piece?

2            We'll do the best we can, Dr. Mann.

3    **A.**   I don't see a listing of 20 pounds.

4    **Q.**   Okay.  Well, it's there.  We'll do the best we

5    can.  It's hard to see.

6    **A.**   No, it isn't.

7            MR. WAGNER:  Okay.  Toby, can you highlight

8    that.

9            MR. JACOBY:  We're going to red box it.

10           MR. WAGNER:  Can you highlight that.

11   **Q.**   We're getting there.

12   **A.**   You're going too fast.  Myer Myers --

13   **Q.**   You see it there.

14   **A.**   No, it's not.  That's Hyman Myers.  Sorry.

15           THE COURT:  Right there.

16   **Q.**   Can you read that?

17   **A.**   Okay.  Mr. -- is this the page?  I don't see it

18   on --

19           MR. WAGNER:  Your Honor, can I help.

20           THE WITNESS:  This is not the same page.

21           THE COURT:  You can also point on that screen in

22   front of you.

23           MR. WAGNER:  I can't.

24           THE COURT:  No, no.  Mr. Wagner --

25           MR. WAGNER:  If I point --

1    THE COURT:  You have the ability to point, and

2    it will come out.

3        MR. WAGNER:  Do you see it now?  Mr. Myer Myers.

4        THE COURT:  There you go.

5        MR. WAGNER:  Yes.

6    **Q.**  And you see it says 20 at the end?

7    **A.**  Correct.  But -- oh, I see it now.  All right.

8    **Q.**  I'm sorry.

9    **A.**  All right.  I have it now.

10   **Q.**  That's our punishment for trying a case with

11   ancient documents.

12   **A.**  Can you highlight that in yellow instead of the

13   deep blue that's difficult to read?

14   **Q.**  I'm going to move on, but just --

15   **A.**  It says --

16   **Q.**  It says what it's for; right?

17   **A.**  It says the piece of plate, yes.

18   **Q.**  And that's on the left side, the debit side of the

19   ledger; correct?  As Mr. -- do you see up top it says,

20   "debt"?

21   **A.**  Yes.

22   **Q.**  Okay.  Now let's turn to P29.

23       MR. WAGNER:  And your Honor, this is the ledger,

24   the CSI ledger from 1774.

25   **Q.**  And I'm going to ask you -- well, first of all, do

1    you see on the upper left that this is the debt side of

2    the ledger?  Do you see that?

3    **A.**   Yes.  Oh, you're asking me?  I thought you were

4    asking -- I'm sorry.  Yes.

5         MR. WAGNER:  You don't get to cross-examine him.

6    He gets to --

7         THE COURT:  They tried, Dr. Mann, but I don't

8    let them.

9         MR. WAGNER:  He gets to cross-examine us.

10        THE WITNESS:  Okay.

11        MR. WAGNER:  And can you highlight --

12   **A.**   It says, The cash paid to Mr. Myer Myers --

13   **Q.**   Keep going.

14   **A.**   Wait a minute.  It says, "late parnas," doesn't

15   it?

16   **Q.**   No, no, no.  We'll get to it.

17   **A.**   Oh, that's Manuel Myers.  Sorry.

18   **Q.**   Do you see what I just underlined?

19   **A.**   Oh, it's about 10 lines down.

20   **Q.**   Yes.  Can you read that as best you can.

21   **A.**   (Reading)  The cash paid to Mr. Myer Myers on his

22   account of a pair -- it's something like his account on

23   a pair of rimonim, and then it lists 10 pounds 13

24   shillings.

25   **Q.**   And I think you testified that that was only a

1    partial payment; right?

2    **A.**   Yes.

3    **Q.**   Okay.  But it's a specific reference to payment

4    for rimonim; correct?

5    **A.**   Yes.

6    **Q.**   Now, let's look at the entry in question.

7         Actually, before I get to it.  I'm right that

8    there are Minutes that pertain to the ledger that

9    Mr. Solomon showed you; correct?

10    **A.**   There are only partial Minutes.

11    **Q.**   Okay.

12    **A.**   And I will not testify as to which portions of the

13    ledger they correspond to, and there are only draft

14    Minutes.  They're not complete Minutes.

15    **Q.**   Okay.  But these are published in the Lyons

16    Collection; right?  Yes or no.

17    **A.**   They are transcribed in the Lyons Collection.

18    **Q.**   And you attested to the Lyons Collection on your

19    direct; right?

20    **A.**   Yes.  I mean, what are you specifically

21    referencing?

22    **Q.**   You testified you relied on the Lyons Collection

23    for your testimony this morning; correct?  I'm sorry,

24    yesterday.

25         Don't you remember you cited there were gifts

1    and things like that?  You cited them, remember?

2    **A.**    Oh, I cited those, yes.

3    **Q.**    Okay.  Now, let's look at -- and by the way, the

4    Minutes, these Minutes have been in the public domain

5    for over a hundred years; right?

6    **A.**    Well, part of them.  1913 -- 1910, 1913 and 1920.

7    **Q.**    Okay.  And I think you told me the Lyons

8    Collection is a voluminous miscellaneous collection of

9    every document Mr. Lyons or Dr. Lyons could lay his

10   hands on that had anything to do with American Jewish

11   history; right?

12   **A.**    You're quoting from a published source, not me.

13   **Q.**    Okay.  And Volume I of the Lyons Collection are

14   the earliest extant Minutes of the books of the Spanish

15   Portuguese synagogue; correct?

16   **A.**    Yes, but --

17   **Q.**    No.

18   **A.**    No buts.

19   **Q.**    Let's look -- well, I'm going to address the

20   "but."  Can you look at page -- can you look at Exhibit

21   P78, the next page.  This is the Lyons Collection,

22   right, Volume I?

23   **A.**    Yes.

24   **Q.**    And it says on the page, (Reading)  Containing the

25   earliest extant Minutes of the books of the Spanish

1    Portuguese synagogue.

2         Do you see that?

3    A.   Yes.

4    Q.   Now let's turn to Page 88.

5         MR. WAGNER:  And if you could highlight the

6    bottom where it says, "At a meeting."  Fifty-five --

7    start at 5525 until the end.

8         The next entry.  Let me just go on.

9    Q.   Do you see it says there -- actually, can you read

10   it, 5525?

11   A.   Okay.  (Reading)  This is the meeting on

12   October 21st, 1764, at a meeting of the assistants with

13   the parnas and the following articles were agreed to

14   and resolved.  First, that Mr. Myer Myers may be paid

15   the balance of the sedakah account and the 36 pounds

16   four shillings one pence.  Also for balance due to him

17   on the new house, one pound 14 shillings and four.

18   Q.   Okay.  So the second entry specifically says it's

19   a payment for a house; right?

20   A.   The second entry.

21   Q.   Okay.  And the first payment says, (Reading)

22   Mr. Myers may be paid the balance of his sedakah

23   account, 36.4.1.

24        Is that what it says?  That's all.

25   A.   It does not --

1    **Q.**   Am I reading the words --

2    **A.**   This is what Lyons wrote, yes.

3    **Q.**   Okay.  And --

4          THE COURT:  That document, you may have already

5    said this, but what does --

6          THE WITNESS:  Sedakah is a general -- when you

7    use it vernacularly it just means charity, but it is

8    used in these ledgers to mean all the disbursements and

9    the income to the congregation.

10         THE COURT:  Thank you.

11   **Q.**   Let me just -- "sedakah" does mean charity, is

12   translated as charity; correct?

13   **A.**   In the vernacular, not in relation to the ledger.

14   **Q.**   But just the definition.  If I took down a

15   Hebrew/English dictionary, sedakah --

16         (Interruption)

17         THE COURT:  This is a great example of what

18   we're trying to avoid.

19         MR. WAGNER:  Don't look at me.

20         THE COURT:  I'm looking at both of you.

21   **Q.**   If I took down a Hebrew dictionary, "sedakah," it

22   would mean charity; right?

23   **A.**   One definition would be charity.

24   **Q.**   Okay.  But sedakah does not mean "bells," does it?

25   **A.**   Bells?

1    **Q.**   Yes.

2    **A.**   I don't understand.

3    **Q.**   Sedakah -- if I looked in the dictionary, Hebrew

4    dictionary, sedakah would not be translated as bells;

5    would it?

6    **A.**   Meaning rimonim?

7    **Q.**   Yes.

8    **A.**   It's apples and oranges, your question.

9    **Q.**   Just answer my question.  If I looked --

10   **A.**   You would not see rimonim as a definition of

11   sedakah.

12   **Q.**   Okay.

13   **A.**   Now --

14   **Q.**   No.  You are absolutely sure you covered all the

15   sources; right?

16   **A.**   No; there may be others that will be found.

17   **Q.**   Okay.  But you looked for all the literature about

18   Myer Myers, and you didn't find anybody who mentioned

19   this payment; right?

20   **A.**   No.

21   **Q.**   But you thought of looking at the American Jewish

22   Archives; correct?

23   **A.**   Yes.

24   **Q.**   But you didn't look there; did you?

25   **A.**   No, I did not go through the archives.

1    **Q.**   And you didn't look at Jeannette Rosenbaum's

2    papers there; did you?

3    **A.**   No.

4    **Q.**   And let's look at those papers, P267.

5         MR. WAGNER:  Your Honor, do you have it there?

6         THE COURT:  I do.  Thank you.

7         MR. WAGNER:  I should probably explain that we

8    asked for and we got some records of Jeannette

9    Rosenbaum from the American Jewish Archives in

10    Cincinnati, and this is an excerpt from it.

11    **Q.**   Now, she looked at this 36.4.1 entry in the

12    Minutes; correct?

13         MR. SOLOMON:  Objection.

14    **A.**   I don't know that.

15         THE COURT:  Hold on.  What's the objection,

16    Mr. Solomon?

17         MR. SOLOMON:  Well, the testimony that this

18    comes from some particular place that she does not

19    know, has not been verified by us, Judge.  And so we

20    can't object to the asking of the questions, but just

21    the assumption in the question doesn't have any

22    foundation.

23         THE COURT:  Well, it's an admitted exhibit by

24    stipulation.  It doesn't -- it does appear at the

25    bottom to say that it came from the American Jewish

1    Archives.  I think anything beyond that you could ask

2    her to assume, but doesn't appear that it would

3    otherwise be in evidence.  Is that your --

4              MR. SOLOMON:  Yes.

5              THE COURT:  I think on that point Mr. Solomon is

6    correct, or appears to me to be correct.

7    Q.    Just do you see that she references -- she

8    references Page 88 at the bottom.  Do you see that?

9    A.    Yes.

10   Q.    And if I looked in the Lyons Collection for the

11   resolution with respect to 36.4.1, it would be on

12   Page 88; correct?

13   A.    That is correct.

14   Q.    And can you read what she wrote there, assuming

15   that's her handwriting, for October 21, 1764.  Can you

16   read that?

17   A.    (Reading)  Resolution to pay Mr. Myer Myers

18   36.4.1, which he advanced congregation for charity; and

19   one pound 14 shillings and four pence due him on the

20   new house.

21   Q.    And would it be fair to say that Jeannette

22   Rosenbaum drew a different conclusion from what you

23   drew with respect to the 36.4.1 payment?  Yes or no.

24   A.    She drew a different conclusion.

25   Q.    And she wrote a book on Myer Myers; correct?

1    **A.**   She did not consult the ledger.

2    **Q.**   Can you look at your deposition, Page 135.

3    **A.**   She wrote a book on Myer Myers, which was the most

4    substantial book up until that time.

5    **Q.**   And you did not write any books on Myer Myers; did

6    you?

7    **A.**   No.

8    **Q.**   You're serving as a paid expert in this case;

9    right?

10   **A.**   Yes.

11   **Q.**   You were shown Exhibit D15.

12        MR. WAGNER:   Okay.  You can bring it up.  Make

13   it D15-A.  It will be easier for Dr. Mann.

14   **A.**   I have D15001, is that what you're talking about?

15   **Q.**   Yeah, that's the one.

16   **A.**   Okay.

17   **Q.**   Now, you testified on direct that these are

18   payments to Myer Myers; right?

19   **A.**   Correct.

20   **Q.**   And they say specifically what they are for;

21   correct?   They identify what they're for.

22   **A.**   Yes, but they're reimbursements.

23   **Q.**   Okay.  Now let's look at whether Jeannette

24   Rosenbaum was right or not.  The word "parnas" is

25   related to the word "parnasa;" right?

1    **A.**    I'm not an etymologist.

2    **Q.**    Okay.  And we heard what the definition of

3    "sedakah" is.  It means charity; right?

4    **A.**    Not in this case.

5    **Q.**    But if I looked in a dictionary, it would be

6    charity; right?

7    **A.**    That would be one of the meanings.

8    **Q.**    There's no dictionary, Hebrew dictionary in the

9    world that would define "sedakah" as rimonim; is there?

10    **A.**    That's not the analogy.  They wouldn't define it

11    as rimonim.

12         MR. WAGNER:  Your Honor, I'd ask for an answer

13    to my question.

14         THE COURT:  The question has already been asked

15    and answered.

16         MR. WAGNER:  Okay.  That's fine.

17    **Q.**    Now, you testified yesterday to a practice of the

18    parnas making up the difference between the debit side

19    and the credit side; correct?

20    **A.**    Yes.

21    **Q.**    And that's exactly what happened here.  That's

22    what this payment is for, isn't it?

23    **A.**    I don't think so.

24    **Q.**    Let's take a look.

25    **A.**    Because it does not have the usual tag of money

1    received from the late parnas.

2    **Q.**    Well, let's take a look.  You know that Myer Myers

3    in 1764, the date of these critical ledgers, he was the

4    parnas --

5    **A.**    Correct.

6    **Q.**    -- of Shearith Israel; right?

7    **A.**    Yes.

8    **Q.**    And in your report you said, I'm quoting, that the

9    1764 minutes, and by that I think you meant the ledger,

10    lists a debt of 36.4.1.  Do you recall that in your

11    report?

12    **A.**    Yes.

13    **Q.**    Let's look at that.

14    **A.**    In the deposition?

15    **Q.**    No.  That was in your report.  It's on Page 5.  So

16    let's look at the ledger.

17          Dr. Mann, this is what I'm going to ask you to

18    do.  Take out P23 from the books, from the books and

19    put them side-by-side, and just let me know when you

20    have it.

21          MR. WAGNER:  And your Honor, if you could let me

22    know when you have P23, we'll put it side-by-side in

23    front of us.

24          THE COURT:  Side by side with what?

25          MR. WAGNER:  It's two pages.  Put debit on the

1    left and credit on the right.

2    **Q.**    Do you have it, Dr. Mann?

3    **A.**    Yes.

4    **Q.**    And the 36.4.1 balance due to Myer Myers, that's

5    listed on the credit side, isn't it?

6    **A.**    Yes.

7    **Q.**    Okay.  And let's look at the debt side.  It lists

8    debts -- first of all, it says:  Cash paid to Jacob

9    Franks, his balance.  Do you see that?

10   **A.**    Yes.

11          THE COURT:  I don't.

12          MR. WAGNER:  I'm sorry.

13          THE WITNESS:  It's on the left page at the top.

14          MR. WAGNER:  We've been living with this for

15   months and months.

16          THE WITNESS:  This one?

17          THE COURT:  And unfortunately now I have to live

18   with it for months and months so you better help me out

19   here.  I see the top line.  Thank you.

20   **Q.**    Jacob Franks, his balance, 59.12, do you see that?

21   **A.**    Yes.

22   **Q.**    And are you aware that he was the prior parnas?

23   **A.**    That's right.

24   **Q.**    And it doesn't say -- the payment doesn't say to

25   the prior parnas.  It just said payment to Jacob

1   Franks; correct?

2   **A.**   His balance.

3   **Q.**   Yes.

4   **A.**   So we don't know what "his balance" means.

5   **Q.**   Just answer my question.  He was the parnas; he

6   was the prior parnas?

7   **A.**   Doesn't mean that this --

8   **Q.**   No.  That's not my question.

9   **A.**   I'm sorry.  He was the prior parnas.

10  **Q.**   That's all.  And do you see underneath on the debt

11  side it lists -- I can't even begin to read this --

12  ditto --

13  **A.**   For cleaning the synagogue?

14  **Q.**   Yeah.  On Shavuoth; right?

15  **A.**   It's Line 5.

16           (Interruption)

17           THE COURT:  I don't see that, Mr. Wagner.

18           THE WITNESS:  It's written in Hebrew.  It's the

19  line --

20           THE COURT:  That may be the problem.

21           THE WITNESS:  Do you see the first word in

22  Hebrew on the fifth line?

23           THE COURT:  Hold on.  I see it now, Dr. Mann.

24  **Q.**   So on the debt side there are lots of payments of

25  things; right?

1    **A.**    Yes.

2    **Q.**    And do you see at the bottom, do you see the total

3    amount of the debts is 246.2.2?  Do you see that?

4    **A.**    Yes.

5    **Q.**    And then it's signed by Myer Myers himself; right?

6    **A.**    Yes.

7    **Q.**    And there's nothing on the left side, on the debit

8    side of the ledger for a payment for rimonim, is there?

9    **A.**    No, but this --

10   **Q.**    That's all.

11   **A.**    Excuse me.

12   **Q.**    Okay.  Now let's look on the credit side of the

13   ledger.  Do you see at the top the total credits before

14   we get to the balance due Myer Myers are 209.18.1?  Do

15   you see that?

16   **A.**    Yes.

17   **Q.**    And do you see balance due Myer Myers 36.4.1.  Do

18   you see that?

19   **A.**    Yes.

20   **Q.**    And that totals up to 46.2.2.  Do you see that?

21   **A.**    Yes.

22   **Q.**    And do you see that in this ledger the difference

23   between the debts and the credits is the payment to

24   Myer Myers of 36.4.1?  Yes or no.

25   **A.**    Yes.

1    **Q.**    And he was the parnas at the time; correct?

2    **A.**    No.

3    **Q.**    You've already --

4    **A.**    Excuse me.  He was the parnas in 1759, 1764, 1770,

5    1783 and 1786.  This is when he writes -- this is the

6    way it ledger is.

7    **Q.**    That's not -- Dr. Mann.

8    **A.**    He was not parnas at this time.

9    **Q.**    You already testified that he was parnas in 1764.

10   You wrote that in your report.  Page 5 of your report,

11   Myer Myers was parnas in 1764.

12       (Interruption)

13   **Q.**    Did you write that in your report?

14   **A.**    Yes.

15   **Q.**    And he was parnas in 1764?

16   **A.**    Yes.

17   **Q.**    And do you see that he is making up the difference

18   between the credit side and the debit side; right?

19   **A.**    I think there is a different interpretation.

20   **Q.**    Just tell me, is his 36.4.1 the difference between

21   the debit side and credit side?

22   **A.**    Yes.

23   **Q.**    And then we see from the resolution in 1765 that

24   he was paid back 36.4.1; correct?

25       Just answer.  Was he paid back in 1765

1      thirty-six --

2    **A.**   I can't answer that question as it's posed.

3    **Q.**   Can you look back at P78, Page 88 of that exhibit.

4         Do you see that resolution, he was paid back the

5    next year, the next Jewish year, 36.4.1.

6    **A.**   Do you see the words "sedakah account" in the

7    ledger?

8         MR. WAGNER:  Your Honor, I'd ask that the

9    witness answer the question whether she sees that he

10   was paid back the 36.4.1.

11        THE COURT:  I'm going -- I'm not going to

12   instruct her.  I can see what it says.

13        MS. WAGNER:  Okay.  Fine.

14   **Q.**   Let me just go back.  You testified yesterday the

15   practice was the rimonim -- that the parnas makes up

16   the difference; right?

17   **A.**   Yes.

18   **Q.**   And then he gets paid back the next year?

19   **A.**   If the debts -- if the pledges were covered.

20   **Q.**   Okay.  Now, you testified that you thought this

21   was different because there's no reference to late

22   parnas; right?

23   **A.**   That's one of the reasons.

24   **Q.**   Okay.  But if you look back at the ledger, it says

25   cash paid to Mr. Jacob Franks, his balance?

1    **A.**    What page?

2    **Q.**    This is on the 1764 ledger on the debt side.

3    **A.**    Yes.

4    **Q.**    And again, he was parnas in the prior year; right?

5    **A.**    No.  This is the page when Myer Myers was parnas.

6    **Q.**    But in the prior year --

7    **A.**    I don't remember that off the top of my head.

8    **Q.**    Will you take my representation, or do I have to

9    show you in a book that he was the parnas in the prior

10   year?

11   **A.**    I know there are lists in books.

12            MR. WAGNER:  Okay.  And for the record, I'll

13   just note it so we can move on.  P102 -- your Honor,

14   P102 at 3193 has a list of parnassim and Mr. Franks is

15   listed.

16   **Q.**    But let's go to the Lyons Collection, the last

17   question about this subject, Page 41.

18            This is Exhibit P78.  Do you have it there,

19   Dr. Mann?

20   **A.**    I'm on P78, yes.  What page?

21   **Q.**    It's Page 41 at the top.

22   **A.**    Yes.

23   **Q.**    And do you see under 5500, the year 5500, 1739 to

24   1740, for payment by me to my brother, Daniel, for

25   balance 8.14.

1    Do you see that?  Just my question is do you see

2    it?

3    **A.**   Yes.

4    **Q.**   Okay.  And do you see that the 8.14 is the

5    difference, if you go back one page, between the debit

6    side and the credit side for the prior year?

7    Do you see that?  Difference between 235 and 226

8    on the prior page.  Just do you see that?

9    **A.**   I see it, but I --

10   **Q.**   Okay.  That's all.  That's all.

11   **A.**   Doesn't say what you're saying it says.

12   **Q.**   And then the next page it pays back my brother

13   Daniel 8.14.  Do you see that?

14   **A.**   Yes.

15   **Q.**   And there's no reference to late parnas there, is

16   there?

17   **A.**   No.

18   **Q.**   Okay.  Now let's move to a different subject.

19   Can you look at P30.  This is on the subject of

20   whether Mr. Myers had any connection to Touro

21   Synagogue.  Can you look at P30 in the book.

22   Now, you looked at this document; right?

23   **A.**   Yes.

24   **Q.**   This is one of the few surviving CYI ledgers;

25   right?

1    **A.**    I was presented this as the only surviving page of

2    the ledger.

3         MR. WAGNER:    Okay.    And can you highlight the

4    reference to payment to Myer Myers rimonim.

5    **A.**    It says at the bottom, "paid Myer Myers mending

6    rimonim, 12 shillings."

7    **Q.**    Now, Myer Myers lived in New York; right?

8    **A.**    Correct.

9    **Q.**    And this synagogue was in Newport; right?

10   **A.**    Yes.

11   **Q.**    And there were silversmiths in Newport; correct?

12   Yes or no.

13   **A.**    Yes.

14   **Q.**    And there were silversmiths in Boston; right?

15   **A.**    Yes.

16   **Q.**    Silversmiths probably in Providence; right?

17   **A.**    I won't answer.

18   **Q.**    Okay.    But Touro asked Myer Myers to mend the

19   rimonim; right?    Correct?

20   **A.**    Yes.

21   **Q.**    Now, you said you saw nothing from the 17 -- this

22   is yesterday.    You said you saw nothing from the 1760s

23   through the 1860s with respect to the transfer of

24   silver.    Do you recall that?

25   **A.**    From --

1    **Q.**    I think --

2    **A.**    Transfer from what to what?

3    **Q.**    I assume from either Shearith Israel to Yeshuat

4    Israel or Yeshuat Israel to Jeshuat Israel.    Did you

5    see anything in that period of time?

6    **A.**    There's no Jeshuat Israel.

7    **Q.**    Yeshuat Israel?

8    **A.**    Yeshuat Israel.

9    **Q.**    Do you see anything?

10   **A.**    Yeshuat Israel closed in 1790-91, so --

11   **Q.**    My only question is whether you saw anything.  Did

12   you see anything concerning a transfer of silver

13   between 1760 and 1869 back and forth between those

14   places one way or the other?

15   **A.**    No.

16   **Q.**    But there are Minutes, are there not, concerning

17   the transfer of Torahs during that period; correct?

18   **A.**    Yes.

19   **Q.**    Okay.  And those Minutes --

20   **A.**    Is the ledger.

21   **Q.**    Those Minutes lay the groundwork -- actually, let

22   me -- there are Minutes from 1833; right?

23   **A.**    I said to you I know there are scattered Minutes

24   from the 19th century.  I'm not going to -- I don't

25   feel confident to testify as to the exact date.

1    **Q.**   Let's put that aside.  You did see Minutes from

2    1833; correct?

3    **A.**   Yes, I did.

4    **Q.**   And am I right that those Minutes lay the

5    groundwork for your opinion that the items that were

6    used in Newport, the sefardim, which means the Torahs,

7    and later the silver, were sent to CSI?

8    **A.**   They're not -- that's the last part is not in

9    those Minutes.  I believe -- let's go to it, but I

10   believe the 1833 Minutes only refer to the Torah

11   scrolls.

12   **Q.**   Okay.  Can you turn to Page 19 of your deposition,

13   Line 5.  Were you asked the following question --

14   **A.**   One second, please.

15   **Q.**   I'm sorry.  Do you have it there, Dr. Mann?

16   **A.**   I'm sorry?

17   **Q.**   Do you have it?

18   **A.**   In the Page 19?

19   **Q.**   Yes.

20   **A.**   I'm getting there.  Okay.

21   **Q.**   Do you see you were asked the following question:

22        Question:  Are those Minutes important to your

23   opinion?  And I was talking about the 1833 Minutes.

24        Answer:  Um, they lay the groundwork for my

25   opinions that the items that were used in Newport is

1    the sefardim and later the silver was returned to CSI.

2        Do you see that?

3    **A.**   Yes.

4    **Q.**   And this was an important document that you cited

5    in your report; correct?

6    **A.**   Yes, but --

7    **Q.**   That's all.

8    **A.**   No buts.

9    **Q.**   Now, let's look at those Minutes.  It's P38.

10   **A.**   I'm sorry?

11   **Q.**   It's P38.  Actually, I'm sorry.  Let's use the --

12   we'll use the translation.

13       MR. WAGNER:  I think that will be much easier,

14   your Honor.

15   **Q.**   D26-A.

16   **A.**   Excuse me.  The original is P38?

17   **Q.**   Yes, but I think it will be easier --

18   **A.**   No, I don't -- I'm more familiar with the written

19   documents.

20   **Q.**   All I can say is wow.

21   **A.**   And sometimes there are mistakes when you

22   transcribe things.

23   **Q.**   Okay.  But we're going to --

24       MR. WAGNER:  I think it would be easier, your

25   Honor, if the rest of us use the translation.

1   **Q.**    Now, these are CSI's Minutes from 1833; correct?

2   **A.**    Yes.

3   **Q.**    And can you read -- actually, let me -- would it

4   be okay if I read it?

5   **A.**    Where are you reading?

6   **Q.**    "The committee appointed to receive" -- actually,

7   if you could read it, that would be great.

8   **A.**    (Reading)  The committee appointed to receive the

9   sefardim belonging to the Newport Synagogue report that

10  they have received the same and deposited them in our

11  hachal and had given a receipt to the family of the

12  late Moses Seixas of which the following is a

13  duplicate.

14        And this is signed N -- I can't read the last

15  name.  Oh, Phillips.  N. Phillips and Isaac Barseixas.

16        This is the now the copy of the receipt.

17  (Reading)  Received from the family of the late

18  Mr. Moses Seixas of Newport, Rhode Island, four

19  sefardim belonging to the congregation of that place

20  and which are now to be deposited in the synagogue in

21  New York of the Congregation Shearith Israel under the

22  charge of the trustees of said congregation to be

23  returned -- what does it say?

24  **Q.**    Redelivered.

25  **A.**    -- redelivered when duly requested for the use of

1    the congregation hereafter worshiping in the synagogue

2    at Newport, Rhode Island, casualties excepted.

3    **Q.**   Okay.  That's enough.

4         THE COURT:  Could you just stop for a second.

5         Dr. Mann, could you look again because you read

6    something differently than the translation.  Delivered

7    when duly -- you said "requested for the use of the

8    congregation."

9         THE WITNESS:  "Required."  I'm sorry.

10        THE COURT:  Oh, okay.  So you think it is

11   "required."

12        THE WITNESS:  Yes.  I read it wrong.

13        THE COURT:  Okay.  Great.  Thanks.

14   **Q.**   Now, you quoted this, these Minutes in your

15   report; correct?

16   **A.**   I believe so.

17   **Q.**   And are you aware the report was submitted twice

18   by CSI to the Court?

19   **A.**   I'm not aware of it.

20        MR. WAGNER:  Could we put up the demonstrative.

21        This will be P403 for demonstrative purposes.

22        THE COURT:  This looks like rather long.  Should

23   we pick this right up after lunch?

24        MR. WAGNER:  I could probably finish it -- well,

25   I could probably finish it in two minutes, if that's --

1          THE COURT:  Only if you talk slowly.

2          MR. WAGNER:  I would think if I talk quickly.

3     Q.   Do you see this document?

4     A.   Yes.

5     Q.   And on the left side is your report; right?

6     A.   Yes.

7     Q.   And on the right side are the actual Minutes?

8     A.   Correct.

9     Q.   And when you wrote your report, you put in a three

10    dot ellipsis taking out the language "belonging to the

11    Newport synagogue;" correct?

12    A.   We went over this in my deposition, yes.

13    Q.   And you are responsible for that punctuation?

14    A.   Yes.

15    Q.   And can you look at the bottom, the receipt.  You

16    put a period after "requested;" right?

17    A.   "Required," I thought.

18    Q.   "Duly requested."  That's --

19    A.   Are you in the bottom?

20    Q.   Yes.

21    A.   In my main report?

22    Q.   Yes.  The receipt.

23    A.   Redelivered when duly requested.

24    Q.   Okay.  And you put a period there; right, in your

25    report?

1    **A.**    Yes.

2    **Q.**    But the actual receipt went on, quote, "for the

3    use of the congregation hereafter worshiping in the

4    synagogue at Newport, Rhode Island;" correct?

5    **A.**    I made a mistake and left off the two dots that

6    should have been there to indicate an ellipsis.

7    **Q.**    And am I right that the congregation that is now

8    worshiping in Newport is CJI?  Yes or no.

9    **A.**    Yes.

10         MR. WAGNER:  We can break, your Honor.

11         THE COURT:  Thank you.

12         Dr. Mann, you're still under cross-examination.

13    I forgot to tell you this earlier.  That means that you

14    can't discuss the substance of your testimony at all

15    with any of the attorneys for CSI.  You're welcome to

16    go to lunch with them and engage them in other

17    conversation but just not about your testimony.

18         THE WITNESS:  I know.

19         THE COURT:  Okay.  Great.  Thank you.  We'll be

20    back at 1:30.

21         (Lunch Recess)

22         THE COURT:  Good afternoon, everyone.

23         Counsel, we're going to have to break at 4:00

24    today.  I have a 4:30 speaking engagement up on The

25    Hill, so -- not about this.  I'd rather talk about

1     this.  They won't let me.

2          MR. WAGNER:  Your Honor, I've been admonished by

3     an authority even higher than you, and that is the

4     court reporters, and I really want to try to sort this

5     out, because we've been unfortunately talking -- even

6     though we're friends, we're talking over each other.

7     And I think part of it is if Dr. Mann can't answer a

8     question yes or no, that's fine; she should just tell

9     us.  But I think it would help if she answers the

10    question that I'm asking.  I think that's important.

11    And Mr. Solomon, I know, is going to do what he has to

12    do on redirect, but I just think it will --

13         THE COURT:  Dr. Mann, a little bit of advice

14    might be that you just wait a second or two after the

15    question.  Sometimes that focuses on it.  And even if

16    it doesn't, at least it will help the court reporter

17    out.  So this is not a normal human activity, what

18    you're going through, or the lawyers.

19         THE WITNESS:  Super.

20         THE COURT:  And we realize that's hard.  But

21    there's certain processes we have to go through for a

22    lot of reasons, and everyone gets held to the same

23    standard and everyone makes those same errors, so it's

24    no reflection on you; but if you can just take a second

25    or two after the question is done, that might be a good

1      thing for helping make sure that the record stays

2      straight.  Thanks.

3           MR. WAGNER:  Thank you.

4      **Q.**   I want to turn back to the demonstrative.  Do you

5      see that, Dr. Mann, on the screen?

6      **A.**   No, there's nothing on the screen.  Now there is.

7      **Q.**   Okay.  And again, the language that you deleted

8      with the three dot ellipsis was "belonging to Newport

9      Synagogue."  Do you see that?

10     **A.**   Yes.

11     **Q.**   And "belonging to" is language that was found in

12     the inventory; correct?

13     **A.**   No.  These are the Minutes.

14     **Q.**   I know, but "belonging to" is language that's on

15     the front page of the inventory; correct?

16     **A.**   Where it refers to Shearith Israel.

17     **Q.**   I understand.  But do those words appear on the

18     inventory on the cover?

19     **A.**   Yes.

20     **Q.**   And when CSI uses the words "belonging to," it

21     means ownership; correct?

22     **A.**   In the general sense.

23     **Q.**   Now, on the bottom part, the language "For the use

24     of the congregation hereafter worshiping in the

25     synagogue at Newport, Rhode Island," do you see that?

1    **A.**    Yes.

2    **Q.**    And that's the language that you deleted; correct?

3    **A.**    I can't answer that.

4    **Q.**    Okay.  Let me help you.  Can you turn to

5    Exhibit 270 in the book.

6    **A.**    I'm not doubting that I deleted it.  I am doubting

7    that I think I deleted it because the context was

8    clear.  It's not clear when you just lift that out and

9    put it on the screen.

10   **Q.**    Dr. Mann, you deleted it because you didn't think

11   it was important; correct?

12   **A.**    No.

13   **Q.**    Can you turn to your deposition, Page 39 Line 25.

14   Do you have it there?

15   **A.**    One second.  Yes.

16   **Q.**    Page 39 Line 25:

17            Question:  Tell me how that didn't make it into

18   your report, did it?

19            Answer:  I didn't consider -- considered it

20   redundant.  I just -- I wrote -- I quoted the part that

21   they belonged to the congregation of that place right

22   after Newport, Rhode Island, and they were being put in

23   Shearith Israel in charge of the trustees to be

24   redelivered when duly requested.  I didn't consider the

25   end of it important.

1        Were you asked that question, and did you give

2    that answer at your deposition?

3    **A.**   Yes.

4    **Q.**   Now can you turn to Exhibit 270.   Do you have it

5    there?

6    **A.**   Yes.

7    **Q.**   And Exhibit 270 is a chronology that you prepared

8    while you were doing your work on this matter; correct?

9    **A.**   When I was doing my work on the initial report.

10   **Q.**   And you wrote down in the chronology the material

11   you thought was important; correct?

12   **A.**   To help me remember the sequence.

13   **Q.**   Can you turn to the second page of the -- third

14   page of the chronology.   Under "Other Notes," a little

15   bit further down do you see you wrote -- you had an

16   entry for the receipt that's reflected in the

17   February 18, '33 Minutes?

18   **A.**   Yes.

19   **Q.**   And do you see the language at the end, "For the

20   use of the congregation thereafter worshiping in the

21   synagogue at Newport."

22   **A.**   Yes.

23   **Q.**   And then that language was then dropped from the

24   report; correct?

25   **A.**   This was, as they call it, an aide-mémoire.   It

1    was a helpful document for me to write with.

2    **Q.**   Was it then not put in the report, the language

3    you had in your own chronology?  Just tell me yes or

4    no.

5    **A.**   I won't answer that question.

6           MR. WAGNER:  I'm entitled to an answer whether

7    that language is in the report.

8           THE COURT:  If you can't answer it, Dr. Mann,

9    the way it's been phrased, you can say, "I can't answer

10   that the way it's been phrased," but you can't refuse

11   to answer a question.  I don't think you meant that.  I

12   think you meant -- I assume you meant that you couldn't

13   answer it the way it was phrased.

14          THE WITNESS:  Correct.

15          MR. WAGNER:  I think the record is clear, so

16   I'll move on.

17   **Q.**   Now, you testified at your deposition that there

18   was an entry in 1833 about getting the Sifrei Torah

19   back, that's the Torah, and there is an entry later

20   about getting the silver back.

21          Do you recall that?

22   **A.**   Yes.

23   **Q.**   And you were asked several times about that at

24   your deposition, and you responded several times there

25   is some document; correct?

1    **A.**    Yes.

2    **Q.**    Now, that documents seems to have disappeared;

3    correct?

4    **A.**    That is correct.

5    **Q.**    And how did it disappear?

6    **A.**    If I knew, I would have found it.

7    **Q.**    Well --

8    **A.**    The point --

9    **Q.**    No, no.  Was it in your possession and then it

10   disappeared?

11   **A.**    I read it.

12   **Q.**    And now it's gone?

13   **A.**    I know that I read this material.  I remembered

14   it.  I couldn't find it afterwards.

15   **Q.**    Do you have any idea what happened to it?

16   **A.**    May I answer more fully or not?  The point I

17   brought that up was -- the reason for which I brought

18   it up was to show that the CSI differentiated between

19   sefardim, that is Torah scrolls, and silver, that they

20   separated out the two and that they handled them

21   differently.  I subsequently found other documents that

22   made the same point.

23        So in a way, it's just not relevant that I

24   couldn't find this specific one because the point is

25   made over and over again in other documents that belong

1      to CSI.

2            MR. WAGNER:  Your Honor, I move to strike the

3      answer except for the description of -- I just need to

4      know what happened to the document.

5            THE COURT:  The motion is denied.

6            THE WITNESS:  Motion is what?

7            THE COURT:  Denied.

8      **Q.**   Was the document in your possession and then it

9      disappeared?

10     **A.**   It may be something I read in a book or I read in

11     some original documents.  I'm sorry; I don't remember.

12     **Q.**   Now, did you give the document to CSI?

13     **A.**   No.

14     **Q.**   You submitted an addendum report; right?

15     **A.**   Correct.

16     **Q.**   There's no reference to this issue in the addendum

17     report, is there?

18     **A.**   No.

19     **Q.**   And there's no reference in your declaration;

20     correct?

21     **A.**   No.

22     **Q.**   There's no reference in your rebuttal report;

23     right?

24     **A.**   My rebuttal to Professor Diner.

25     **Q.**   Yes.  So this is the first we're hearing that the

1    document is gone; right?

2    **A.**    No.  You've already asked for it five times and

3    you were told that it was -- that I could not

4    retrieve -- I could not find it again, which I admit

5    was unfortunate, but that the point -- the reason I

6    brought it up is fully documented by other sources.

7    **Q.**    Now, you testified that the rimonim were not -- is

8    it your testimony the rimonim, yes or no, were not

9    brought back to New York when the Sifrei Torah were

10   brought back for safekeeping?  Is that your testimony?

11   **A.**    I don't know.

12   **Q.**    Let's look -- we know that Barquist said the

13   rimonim were brought back at the same time.  We saw

14   that earlier today; right?

15   **A.**    Yes.  That's what he said.

16   **Q.**    Let's look at what CSI said.  Can you look at

17   Exhibit P234.

18          Do you see that this was a memorandum that was

19   prepared by Zachary Edinger, the shamas of CSI, for the

20   board of trustees of CSI?

21   **A.**    Yes.

22   **Q.**    And do you see, just note at the top there's a

23   notation that -- you may not know this, but the

24   document was filed in court.  Do you see that notation

25   at the top?

1    **A.**    Yes.

2    **Q.**    And can you turn to Page 5 of the document.

3    **A.**    Yes.

4    **Q.**    And can you read the first bullet on that page.

5    **A.**    (Reading)  In 1818, Benjamin Seixas of Newport

6    wrote a letter to Shearith Israel, with the consent of

7    Moses, Jacob and Samuel Lopez, transferring two Sifrei

8    Torah from Newport to Shearith Israel for safekeeping.

9    These appear to be the two Sifrei Torah originally

10   loaned to Newport by Shearith Israel in the

11   mid-18th century.

12           In 1833, two additional or possibly four scrolls

13   of the Newport congregation were deposited for

14   safekeeping in New York.  It is likely that the rimonim

15   adorning these scrolls were brought to New York for

16   safekeeping at this time.

17   **Q.**    Now, "safekeeping" is another word for

18   guardianship?

19   **A.**    I believe so.

20   **Q.**    And guardianship is not ownership; right?

21   **A.**    Correct.

22   **Q.**    Now, let's go to the inventory.  That's D34.

23   **A.**    I have it.

24   **Q.**    And I'm going to do what you're going to do, which

25   is I'll look at the original with you.

1    **A.**    Good.

2    **Q.**    I knew we could be friends.

3         Now, the cover page, if you could put it up,

4    D34, says:  Inventory of all property effects belonging

5    to or in keeping of Shearith Israel; right?

6    **A.**    Yes.

7    **Q.**    "Belonging to" means ownership; right?

8    **A.**    Yes.

9    **Q.**    "In keeping of" is not necessarily ownership;

10   right?

11   **A.**    No.  It's safekeeping.

12   **Q.**    Right.  Now, this inventory was prepared by

13   Reverend Lyons; right?

14   **A.**    Yes.

15   **Q.**    And he's the same person who transcribed the old

16   CSI Minutes that we looked at earlier today?

17   **A.**    They were not all Minutes.  But he transcribed

18   records.  Shall we say that?

19   **Q.**    Yes.  And you've seen no evidence that when

20   Reverend Lyons prepared his inventory in 1869, he

21   looked at the 1833 minutes we just looked at; correct?

22   **A.**    I can't tell what he did.

23   **Q.**    And you have no evidence that anyone from CJI or

24   CYI looked at the inventory back then; right?

25   **A.**    They were not in existence then.

1    **Q.**    They weren't in existence, right.

2    **A.**    And all the members of CYI had left Newport at

3    this time.

4            MR. WAGNER:  Move to strike the last piece.

5            THE COURT:  Denied.

6    **Q.**    You have no knowledge that Reverend Lyons

7    conducted any investigation of the provenance of the

8    Myer Myers rimonim; correct?

9    **A.**    Correct.

10   **Q.**    Let's look at the page that you found so critical,

11   which is Page 34.

12   **A.**    Yes.

13   **Q.**    Can you scroll down.  So it says one pair of --

14   one pair of ditto marked Myers, New York.  Do you see

15   that?

16   **A.**    No.  It says Myers --

17   **Q.**    I'm sorry.  Newport.  Do you see that?

18   **A.**    No.  Which -- you're reading the first line or the

19   second line?

20   **Q.**    Why don't you --

21   **A.**    Pair of ditto marked which --

22           MR. WAGNER:   One second.  Just get rid of my

23   underline.

24           THE COURT:  Mr. Wagner, can you re-reference me.

25   I'm not on the same page.

1          MR. WAGNER:  It's Bates Number 4956.  Got it?

2          THE COURT:  Off by one page.  Thanks.  There we

3     go.

4          MR. WAGNER:  Can you get rid of my underline.

5          THE COURT:  I will.

6          MR. WAGNER:  You're definitely all powerful.

7          THE COURT:  If only I were.

8     **Q.**    Okay.  You see the line that says:  One pair of

9     ditto marked Myers Newport.  Do you see that?

10    **A.**    Yes, I see that.

11    **Q.**    And then there are three ditto marks.  Do you see

12    that?

13    **A.**    Yes.

14    **Q.**    And the ditto marks are directly under "Keeping of

15    Shamas."  Do you see that?

16    **A.**    Yes.

17    **Q.**    And the ditto marks follow all the way to the

18    bottom; correct?

19    **A.**    Yes.

20    **Q.**    And if you look on the last three items, even

21    though the ditto marks -- the ditto -- again, even

22    though the ditto marks are just under "Keeping of

23    Shamas," it lists property of L. Cohen and two other

24    people.  Do you see that?

25    **A.**    Yes.

1    **Q.**   Okay.

2    **A.**   Am I allowed to comment?  No.  Okay.

3         THE COURT:  Dr. Mann, remind me what shamas is,

4    keeping of shamas.

5         THE WITNESS:  The sexton.

6         THE COURT:  Sexton.  Great.  Thank you.

7         THE WITNESS:  He's the person in charge of the

8    building.

9         THE COURT:  In charge of the building?

10        THE WITNESS:  Yes.

11        THE COURT:  Great.  Thank you.

12   **Q.**   There are mistakes in the inventory, are there

13   not?

14   **A.**   What are you referring to?

15   **Q.**   Well, we know that four Torahs were sent back

16   to -- four Torahs were given from Touro Synagogue to

17   CSI for safekeeping; correct?

18   **A.**   Yes.

19   **Q.**   And only one of those Torahs is referenced here;

20   correct?

21   **A.**   Yes.  But that doesn't -- it means only in 1869.

22   **Q.**   Now let's talk about the base.  You believe that

23   someone wrote "Newport" on the base to indicate that

24   the rimonim were used in Newport; correct?

25   **A.**   That's what I thought at the time of my

1   deposition.

2   **Q.**   Okay.  By the way, you had the chance to correct

3   your deposition; right?  You submitted a --

4   **A.**   Addendum.

5   **Q.**   I'm sorry?

6   **A.**   An addendum.

7   **Q.**   And you also submitted corrections to your

8   deposition transcript.  Do you recall that?

9   **A.**   No.

10   **Q.**   Okay.  But you didn't correct this entry, did you?

11   **A.**   No.

12   **Q.**   And you don't know who wrote "Newport" on the

13   base; right?

14   **A.**   I have no idea.

15   **Q.**   But that was a means of identifying what had been

16   in Newport; correct?

17   **A.**   I don't know what it means.

18   **Q.**   Can you turn to your deposition, Page 165.

19   **A.**   I know that I said it.

20        MR. SOLOMON:  I'm sorry.  Your Honor, could we

21   just, I need to just ask the witness to -- I too join

22   the objection to this expert --.  Let's let her look at

23   the deposition.

24        THE COURT:  Sure.  That makes sense.  What page

25   are we on, Mr. Wagner?

1      MR. WAGNER:  Page 165 Line 7.

2  Q.   Do you have it there, Dr. Mann?

3  A.   Uh'huh (affirmative).

4  Q.   And were you asked the following question, and did

5  you give the following answer at your deposition on

6  December 31st:  (Reading)

7       Okay.  Do you know why someone wrote "Newport"

8  on the base?

9       Answer:  I think we had gone through --

10      Question:  I really apologize if I -- I don't

11  want you to think I'm not paying attention to you.

12      Answer:  I think based on the fact that there's

13  an entry in the, in the inventory of a Sifrei Torah

14  that had been used, that is specifically said to have

15  been in Newport, that this was just a means of

16  identifying what had been in Newport.

17      Were you asked that question, and did you give

18  that answer?

19  A.   Yes.

20  Q.   And someone would need to identify what had been

21  in Newport, because there was an expectation that the

22  rimonim would be returned there; correct?

23  A.   There was a subsequent request from Newport to CSI

24  when they were reconstituted in 13 -- excuse me -- in

25  1883, that CSI loan what they had lent before.  But we

1    don't know what that means.

2    **Q.**    Well, can you look at your deposition, Line 18:

3         Question:  Why would somebody need to identify

4    what had been in Newport?

5         Answer:  Because there was always the

6    expectation that CSI stated we want these back, but if

7    you reform your congregation we will lend to you again.

8         Were you asked that question, and did you give

9    that answer?

10   **A.**    Yes.

11   **Q.**    And you don't know who it is who messed up the

12   bases; right?

13   **A.**    I don't agree --

14        MR. SOLOMON:  Objection.

15   **A.**    -- that the bases were messed up.

16        THE COURT:  The objection is overruled.  You're

17   fine.

18        THE WITNESS:  Okay.

19   **Q.**    Can you turn to your deposition.  I actually, I

20   apologize for the language of the question.  But you

21   don't know what the person --

22        MR. WAGNER:  I withdraw the question, your

23   Honor.

24   **Q.**    You don't know what the person was thinking when

25   he sent the, what you said was the wrong rimonim back;

1    right.

2    **A.**    I said that I can only understand it if the person

3    in charge of choosing viewed all four as the property

4    of Shearith Israel.  Because if he didn't view it that

5    way, he would have sent only those that didn't belong.

6    **Q.**    But you don't know who the person was; right?

7    **A.**    I have no idea.

8    **Q.**    And we have no idea what he was actually thinking,

9    correct, because he's not around?

10    **A.**    That is true.

11    **Q.**    Now, you know that there was a dispute at some

12    point in the 1890s -- actually let me go back a step.

13        CSI sent when the, when the synagogue was

14    reconstituted, CSI sent back to Touro Synagogue a

15    number of sets of rimonim; right?

16    **A.**    When CSI -- say that again.  When CSI--

17    **Q.**    I'm sorry.  When CJI, when Touro Synagogue

18    reopened, at some point CSI sent back a number of pairs

19    of rimonim; right?

20    **A.**    They sent -- I will not say "sent back."  They

21    sent a number of pairs.

22    **Q.**    A number of pairs.  And you know that in the 1890s

23    there was a dispute between the congregations; correct?

24    **A.**    Not in the 1890s.

25    **Q.**    In the early 1900s?

1    **A.**    Yes.

2    **Q.**    Okay.  Now can you turn to P72.

3         MR. WAGNER:  If you could turn to that.

4    **Q.**    And this is a -- I showed you this at your

5    deposition.  This is a telegram from Mr. Steinberg.

6    **A.**    Oh, yes.  So we're looking at this.

7    **Q.**    Yes.  This is a telegram from Mr. Steinberg of

8    CSI.  Who was Mr. Steinberg?

9         MR. SOLOMON:  I apologize.

10        THE COURT:  Can you hold on for a second.

11        MR. WAGNER:  Oh, I'm sorry.

12        THE COURT:  It's not in our book.  Let's let --

13   hold on.

14        MR. WAGNER:  I think this might be the only one

15   that's --

16        THE COURT:  That's fine.  We just need to make

17   sure Mr. Solomon gets it before the question.

18        MR. WAGNER:  Okay.

19        THE COURT:  I can look on the screen, that's

20   fine, but why don't we get Mr. Solomon a copy.

21        MR. SOLOMON:  We'll use the DX; that's fine.

22   Thank you, Judge.

23        MR. WAGNER:  I want to get it.  We'll get it.

24        THE COURT:  Okay.

25        THE WITNESS:  Thank you.

1      THE COURT:  Thanks.

2   **Q.**   Now, this is a telegram dated February 11, we

3   believe it's 1903, from Mr. Steinberg of CSI to

4   Dr. H.P. Mendes.  Do you see that?

5   **A.**   Yes.

6      MR. SOLOMON:  Your Honor, I object.  If the

7   representation is that it's 1903, that's one thing.

8   But we don't know that this is 1903 at all.

9      THE COURT:  It's 190-something.  Why don't we go

10  on that assumption.

11      MR. WAGNER:  Perfectly fine.

12      THE COURT:  Okay.

13  **Q.**   And Mr. Steinberg was the shamas at CSI at the

14  time?

15  **A.**   I did not look up that fact.

16  **Q.**   I'm sorry?

17  **A.**   I'm sorry; I didn't look up to see his position.

18  **Q.**   But he had a position at CSI; right?

19  **A.**   He was involved with CSI.  That's all I can tell

20  from the telegram.

21  **Q.**   I don't want to belabor the point, but --

22  **A.**   I'm sure that there are sources on this.

23  **Q.**   Okay.  And he wrote this telegram to H.P. Mendes;

24  right?

25  **A.**   Correct.

1    **Q.**    And it says:  "One sepher and bells is now at

2    Newport, our property."

3         Do you see that?

4    **A.**    Yes.

5    **Q.**    He was referencing only one set; right?

6    **A.**    Of bells.

7    **Q.**    Yes.  Okay.  Now let's look at Exhibit 73, which

8    also might not be in the book.

9    **A.**    P73?

10   **Q.**    Yes.  I'm sorry, Dr. Mann, it might not be in your

11   book, but we'll give it to you.

12   **A.**    It's not here.

13   **Q.**    And you see this telegram dated February 18, we

14   don't know the year, but do you see it's from Mr. Levy

15   to Mr., to Reverend Mendes?

16   **A.**    Yes.

17   **Q.**    And will you accept my representation that

18   Napoleon Levy was from CSI?

19   **A.**    I don't know which Levy, oh, it says L.N. Levy.

20   **Q.**    Yes.  I think it's Napoleon Levy.  But you'll

21   accept my representation?

22   **A.**    Mr. Levy was from CSI, but I don't know which

23   Levy.

24   **Q.**    And it says in the telegram --

25        MR. WAGNER:  Your Honor, I was about to say

1    "e-mail."

2    **Q.**    It says, "Dent insist matter sefer and bells,

3    leave to your discretion."

4        Do you see that?

5    **A.**    Yes.

6    **Q.**    And these two telegrams weren't given to you

7    before you prepared your report, were they?

8    **A.**    No.  You gave me the first one at my deposition,

9    and this is the first time I'm seeing this one.

10    **Q.**    Now, just a little bit more.  You gave some

11    testimony about the 1937 Minutes.  Do you recall that?

12    **A.**    Yes.

13    **Q.**    Let's look at that, P83.  Actually, Dr. Mann,

14    would it be easier for you to use the transcription of

15    these Minutes?  I think that Mr. Solomon used them.

16    Are you okay with this?  Okay.

17    **A.**    It's perfectly clear.

18    **Q.**    Okay.  If you look on the bottom, I think it's

19    Page 5.

20        MR. SOLOMON:  Your Honor, it's DX221, so there

21    would be a 221A.

22        THE COURT:  221.  Thanks.

23    **A.**    I have 121 where it says "Newport" in the margins.

24    I have CSI 11 and 120 and 12 --

25    **Q.**    1121.  So the words "ownership" don't appear in

1    those Minutes with respect to the rimonim, do they?

2    **A.**   I have not read the page.

3    **Q.**   Okay.  Why don't you read it.  It's just the

4    reference to Cecil Roth.

5         (Pause)

6    **A.**   We discussed this paragraph this morning.

7    **Q.**   That's why I'm asking you.  The words "ownership"

8    don't appear in the paragraph, do they?

9    **A.**   No.

10   **Q.**   And you've seen no evidence that CSI did anything

11   after these, after this incident with respect to the

12   rimonim; correct?  Zero.

13   **A.**   I have seen no evidence.

14   **Q.**   And CSI didn't stop functioning after these

15   Minutes, did they?  They continued to go on; right?

16   **A.**   I remind you, as I did in my deposition, of the

17   year.

18   **Q.**   What year was that?

19   **A.**   1937.

20   **Q.**   Okay.  And you said at your deposition that

21   because a war broke out; right?

22   **A.**   I know the war didn't break out.  I know that the

23   Nazis marched into Poland on September 1st, 1939, and

24   we were not yet involved in the war.

25        But what I meant by that was it's a period of

1    time when people in this country were being asked to

2    accommodate refugees, and it may have been for that

3    reason.

4    **Q.**    You're just speculating; right?

5    **A.**    I am speculating.

6    **Q.**    Now, you, I think you testified that your --

7    actually, let me take a step back.

8         You in your report noted that you said that

9    CSI -- that CJI contacted CSI in connection with the

10   possible loan to the Smithsonian; correct.

11   **A.**    Yes.

12   **Q.**    And you believe that if a request for permission

13   to loan had been made, that that would be significant;

14   right?

15   **A.**    I have to tell you, I reread the correspondence

16   and I believe that there was a misunderstanding on the

17   part of the rabbi at CSI.  It was Rabbi Guts

18   (phonetic).  The letter from the Smithsonian says we

19   need help accessing, meaning acquiring objects.

20        MR. WAGNER:  Your Honor, let me just --

21   **Q.**    I just want an answer to my question whether

22   you -- not what happened, but whether a request, a

23   request for approval to loan, would be significant in

24   your view.

25   **A.**    This incident is not a request for approval to

1    loan.

2    Q.    Not my question.

3          My question is if a request for approval had

4    been made, that would have been significant?

5    A.    Yes.

6    Q.    And if there was no request for approval, that

7    would be significant; right?

8    A.    I don't want to answer that.

9    Q.    Can you turn to your deposition, Page 232.  Were

10   you asked the following question at Line 21.

11         Do you have it there?

12   A.    Yes.

13   Q.    Question:  Now, what if there was no request for

14   approval.  Would that be significant?

15         Answer:  That is what happens recently.

16         Question:  No, no.  My question is would that be

17   significant, too?

18         Answer:  Yes.  But they did request approval as

19   late as 1959.

20         Were you asked those questions, and did you give

21   those answers at your deposition?

22   A.    Yes.

23   Q.    And you're aware that there are lots of instances

24   after 1959 in which CJI loaned out the rimonim without

25   the approval of CSI?

1    **A.**    Yes.

2    **Q.**    Now, if CJI proclaimed in a public way that it

3    owned the rimonim, you would have expected CSI to

4    object; correct?

5    **A.**    I can't answer that.

6    **Q.**    Can you look at Page 104 of your deposition,

7    Line 9:  (Reading)

8          Question:  If CJI proclaimed in a public way

9    that it owned the rimonim, would you have expected CSI

10   would have objected?

11         Answer:  Yes.

12         Were you asked that question, and did you give

13   that answer?

14   **A.**    Yes.

15   **Q.**    Now let's look at Exhibit 187.

16   **A.**    P197?

17   **Q.**    Yes, P178.  It's the *Forward* article, Dr. Mann.

18   Now, this is an article from the *Forward*; right?

19   **A.**    Correct.

20   **Q.**    The *Forward* is a Jewish weekly newspaper?

21   **A.**    Yes.

22   **Q.**    And it focuses on articles of Jewish interest;

23   right?

24   **A.**    Yes.  It also includes others.

25   **Q.**    And it's a prominent Jewish newspaper in New York?

1    **A.**    In New York.

2    **Q.**    And CSI is located in New York; right?

3    **A.**    Yes.

4    **Q.**    And can you turn to Page 2.

5         MR. WAGNER:  Actually just highlight the

6    language, if you could just highlight the language to

7    the congregation.

8         THE WITNESS:  Where?

9         MR. WAGNER:  We'll get it for you.

10        (Pause)

11   **Q.**    Can you read that highlighted language.

12   **A.**    No.  I would like to read it in the document.

13   **Q.**    Okay.

14   **A.**    Can you tell me which page is it?  Sorry.

15   **Q.**    I can give you my copy, if you want.  Would that

16   be --

17   **A.**    No.  I have the three pages.  I just -- what page?

18   **Q.**    The paragraph that says "to the congregation," I

19   think it's on Page 1.  Page 1976 of the --

20   **A.**    Okay.  Got it.

21   **Q.**    Can you read the paragraph, "But to the."

22   **A.**    (Reading)  But to the congregation, Touro is a

23   different story, one of prayer, ritual and ongoing

24   Jewish communal life, and it appears that their story

25   may lose out.  So desperate is the synagogue's

1    financial situation, that it is quietly making

2    inquiries about potentially selling some of its assets,

3    including a 19th century mansion that holds the

4    synagogue's offices and two sets of rare silver

5    rimonim, covers for the handles of the Torah scroll,

6    that were crafted by colonial era Jewish silversmith

7    Myer Myers and have belonged to the synagogue since

8    that era.

9    **Q.**    And am I right that if someone from CSI had read

10   this article and was knowledgeable about ownership, you

11   would have expected the person to protest to CJI?

12   **A.**    I can't answer that.

13   **Q.**    Can you turn to your deposition, Page 106 Line 8:

14        Question:  So if someone from CSI read this --

15   meaning the article -- would you have expected them to

16   have protested to CJI?

17        And there was an objection.

18        Question:  You can answer.

19        Answer:  I don't know if anyone from CSI read

20   it.

21        Question:  That's not my question.  My question

22   is if they read it would you have expected them to

23   protest to CJI?

24        Answer:  If they were knowledgeable about

25   ownership, yes.

1          Were you asked that question, and did you give

2     that answer?

3     **A.**   Yes.

4     **Q.**   And again, I don't want to belabor this, but

5     you've not seen any reference in the records that CJI

6     asked CSI's permission to loan out the rimonim, at

7     least not after 1959; right?  Zero.

8     **A.**   I have not seen any request.

9          MR. WAGNER:  Your Honor, I just note for the

10    record the various loans.  They're in the record.  It's

11    97, P97, P103, P114, P156, P172, and the MFA.

12    **Q.**   So let's -- I'm going to turn to some smaller

13    topics, and then we'll get you home.

14          You said with respect to the Caroline Cohen pair

15    of rimonim, that it was absolutely clear-cut; right?

16    **A.**   Yes.

17    **Q.**   But there were others who believe that the pair

18    was donated to CJI; correct?

19    **A.**   I don't know that.

20    **Q.**   Okay.  Can you look at P150, Barquist.

21          (Pause)

22    **Q.**   Can you look at Barquist, Page 200, the very end,

23    "In addition."  Do you see it, "In addition"?

24          MR. WAGNER:  Can you highlight that.

25    **A.**   Two hundred, Page 200?

1    **Q.**    Yes, Page 200 on the left.  I've highlighted the

2    language for you.

3    **A.**    Yes.

4    **Q.**    Can you read that.  Can you read it out loud.

5    Just read it.

6    **A.**    (Reading)  In addition to this pair marked by

7    Myers, the Touro Synagogue now owns a pair of Torah

8    finials of Mediterranean origin with the same engraved

9    inscription, that is, it says Hays Myers, and it seems

10   likely that these two pairs were those donated by

11   Caroline Cohen.

12   **Q.**    So he says "donated;" right?  Just my question is,

13   is that what he says?

14   **A.**    To whom are you asking about?

15   **Q.**    I'm asking did Barquist write that these rimonim

16   were donated to Touro Synagogue?

17   **A.**    It doesn't say that here.

18   **Q.**    Fine.  Let's look at Exhibit 92, and if you turn

19   to page CSI 420, --

20   **A.**    Yes.

21   **Q.**    -- you see an article, some notes on the Touro

22   Synagogue by Reverend da Silva Pool, rabbi at CSI.  Do

23   you see that?

24   **A.**    Yes.

25   **Q.**    And can you turn to page, CSI 424 in the document.

1    MR. WAGNER:  And can you highlight that

2  language, "In 1892."

3  **Q.**   Can you read that language.

4  **A.**   (Reading)  In 1892 the congregation received two

5  pairs of silver bells for the Torah from Ms. Edward

6  Cohen of Washington, D.C., a descendent of Moses

7  Michael Hays of the revolutionary community in Newport.

8       "Received" is the word.

9  **Q.**   Okay.  Now, you gave some testimony about whether

10  this was a true pair or not a true pair.  Do you recall

11  that?

12  **A.**   Yes.

13  **Q.**   And there are some people, for example, Jeannette

14  Rosenbaum, who says the rimonim are a true pair; right?

15       All my question is, is what she says, not -- I

16  know your opinion.

17  **A.**   I believe under the photograph that we read this

18  morning --

19  **Q.**   Yes, yes.

20  **A.**   -- she said there is a similar pair in Shearith

21  Israel.

22       The same two different finials -- the finials

23  that are depicted on that page are from two different

24  sets.  One is the Caroline Cohen one, if I remember

25  correctly, and the right one represents, she says, two

1    pairs:  One in Newport and one at, currently at CSI.

2    One is currently Newport.

3    **Q.**   I don't want to belabor this, but she said they

4    were identical pairs; right?

5    **A.**   I think the wrong word is -- excuse me.  She said

6    they were identical pairs.

7    **Q.**   That's all --

8    **A.**   You're using the term to mean like, the two are

9    like each other.  I'm saying to you I've used the word

10   "sets."

11   **Q.**   Fine.

12   **A.**   She does not negate what I'm saying.  She's using

13   a different term.

14   **Q.**   Okay.  Now, but there are others who say that

15   they're a true pair; right?  Just yes or no.

16   **A.**   They said that.  Ten, 15 years ago.

17   **Q.**   Christie's said it was a true pair; right?

18   **A.**   Are you going to rely on an auction house?

19   **Q.**   I'm not relying on anybody.  I'm just posing a

20   question.

21        Is that what they said?

22   **A.**   I have to look at it again, exactly what they

23   said, or whether they quoted something.

24   **Q.**   Okay.  Will you take my representation that that's

25   what they said?

1    **A.**   Without context, no.

2    **Q.**   I thought we were friends.

3    **A.**   It stops at a certain point.

4    **Q.**   Okay.

5         THE COURT:  Touché, Dr. Mann.

6         THE WITNESS:  Thank you.

7    **Q.**   Now just a few more questions.  I might come back

8    to this; we'll see.  But just a few more questions

9    about rimonim.

10        I'm right that a synagogue doesn't need or

11   require rimonim to have a service; correct?

12   **A.**   Correct.  They need a sepher Torah.

13   **Q.**   And a synagogue can function properly without

14   rimonim; right?

15   **A.**   Correct.

16   **Q.**   And, for example, if a synagogue can't afford

17   rimonim, it's still a service; right?

18   **A.**   As long as they have a Torah scroll.

19   **Q.**   Okay.  And, by the way, there're lots of rimonim

20   on -- there are and were lots of rimonim on display at

21   the Jewish Museum; correct?

22   **A.**   Only a small portion of the collection.

23   **Q.**   But there are rimonim on display there; right?

24   **A.**   Six pairs, seven pairs.

25   **Q.**   Okay.  And these rimonim are on display at the

1    MFA; correct?

2    **A.**    The Myers rimonim.

3    **Q.**    Yes.

4    **A.**    One pair, one set are on display in the MFA.

5    **Q.**    And it would be a good thing that the rimonim are

6    displayed in a museum; correct?

7    **A.**    I won't answer that question; it's too broad.

8    **Q.**    Can you turn to your deposition, Page 139.

9    **A.**    I know what I said in my deposition.

10            MR. SOLOMON:  I'm sorry.  Dr. Mann, the

11    document, please.

12            THE WITNESS:  Let him talk about it.

13            MR. WAGNER:  This is one where he and I are in

14    agreement.  I just think it will move faster if she

15    answers the question.

16    **Q.**    Were you asked the following question at Page 139,

17    and did you give the following answer:

18            Question:  And is that a good thing that they've

19    been displayed in museums?

20            Answer:  Yes.

21            Did you give that answer?  Were you asked that

22    question, and did you give that answer?

23    **A.**    Yes, but it was qualified.

24    **Q.**    Okay.  All I'm asking --

25    **A.**    Yes, I gave that answer.

1  **Q.**   And that's because more people would get to know

2  the rimonim and see them and appreciate the work;

3  correct?

4  **A.**   Would you please read the following, after that?

5  **Q.**   Fine.

6       Question:  Why is that?

7       Answer:  Because more people get to know them

8  and see them and that is -- and appreciate the work.

9       Were you asked that question, and did you give

10  that answer?

11  **A.**   Could you go to Line 23?  You're reading out of

12  context.

13       THE COURT:  Be careful, Mr. Wagner, she's

14  getting used to this.

15       If the witness requests that the complete answer

16  be read, it has to be read.

17  **Q.**   Okay.  And when asked -- you would want the people

18  to see the rimonim in a proper setting; right?

19       THE COURT:  No.  We have to complete the answer

20  that she asked.

21  **Q.**   Fine.  Go ahead.  Go ahead.  You can read whatever

22  else you want from these pages, that's fine.  Go ahead.

23  Why don't you just read it.

24  **A.**   And I said:

25       (Reading)  Yes, that it's good to display them

1    and that people will then appreciate the work.

2            Is that, in general, a good thing?  You asked.

3            And I said:  It is a good thing when it's part

4    of a temporary exhibition.  When they become -- I'll

5    just paraphrase -- when they become part of a permanent

6    exhibition people tend to lose interest.  I would

7    say -- and then I say I believe that the being good of

8    being in a museum is regarding temporary exhibition.

9    **Q.**    Okay.  But the MFA is a proper setting; right?

10   **A.**    That's your opinion.

11   **Q.**    Can you turn to deposition Page 140 Line 16.

12   Question -- Page 140 Line 16:

13           (Reading)  And in your view is the MFA a proper

14   setting?

15           Answer:  They have placed them in the context of

16   other American silver, which is a good thing.  It's a

17   reputable museum, one of the major museums in the

18   country.

19           Were you asked that question, and did you give

20   that answer?

21   **A.**    Yes.

22   **Q.**    Okay.  Now, Dr. Mann, you are an expert in the

23   field of Jewish ornaments; right?

24   **A.**    Jewish art.

25   **Q.**    Jewish art.  You're one of the country's leading

1    experts; right?

2    **A.**    Yes.

3    **Q.**    You're one of the world's leading experts;

4    correct?

5    **A.**    Okay.

6    **Q.**    You don't have to be modest.  Yes?

7         You've written books in the field of Jewish

8    ornaments; correct?

9    **A.**    I've written books on the field of Jewish art.

10    **Q.**    Yes.

11    **A.**    One of them is specifically "Crowning Glory," and

12    it deals with Torah ornaments.

13    **Q.**    Yes.

14    **A.**    I edited it and contributed.

15    **Q.**    And you have other writings about Jewish ornaments

16    and rimonim; right?

17    **A.**    Yes.

18    **Q.**    And am I right, you've never in your writings

19    referred to rimonim as "paraphernalia"?

20    **A.**    No, it's not a term I normally use.

21    **Q.**    You've never used it in connection with rimonim;

22    correct?

23    **A.**    I won't answer.

24    **Q.**    Can you look at your deposition, Page 258 Line 3.

25    Were you asked the following question, and did you give

the following answer:

(Reading)  Have you ever, in any of your writings, ever referred to rimonim as "paraphernalia"?

Answer:  I don't think so.

Were you asked that question, and did you give that answer?

**A.**  Yes.  I don't think so.

**Q.**  Okay.

**A.**  But that does not -- I didn't.

**Q.**  Okay.  And you've never in your writings referred to rimonim as "fixtures;" correct?

**A.**  I wouldn't use that term.

**Q.**  And you've never referred to them as fixtures; right?

**A.**  I don't believe I ever did.  I've been writing articles since 1975.  You cannot expect me to remember every word of every article.

**Q.**  We're all only human.

**A.**  That's right.

MR. WAGNER:  Your Honor, if you'd give me a minute, I may be done.

THE COURT:  Sure.  Thanks, Mr. Wagner.

(Pause)

MR. WAGNER:  Dr. Mann, thank you for your patience today.  I'll see you back at the ranch.

1          THE COURT:  Thanks.

2          Mr. Solomon.

3          MR. SOLOMON:  May I inquire, Judge.

4          THE COURT:  Yes, please.

5          MR. SOLOMON:  Thank you.

6          <u>REDIRECT EXAMINATION BY MR. SOLOMON</u>:

7     **Q.**    Thank you.  Dr. Mann, at the beginning of your

8     cross-examination today you used the phrase or agreed

9     with the phrase that you "built a case" for provenance.

10    Do you remember that discussion?

11    **A.**    Yes.

12    **Q.**    When you --

13         MR. WAGNER:  It was built "a case for

14    ownership."

15    **Q.**    When you began --

16         THE COURT:  The objection is overruled.

17    **Q.**    When you began this assignment, were you building

18    a case for anything one way or the other?

19    **A.**    No.  I was asked to investigate the provenance.  I

20    was not told to build a case for one side or the other.

21    **Q.**    Would you have taken the assignment if you were

22    asked to do that?

23    **A.**    No.

24    **Q.**    Now, you have come to the Newport -- you've gone

25    to the Newport synagogue; correct?

1    **A.**    I've been there twice.

2    **Q.**    And you have had or have friends at the Newport

3    synagogue, don't you?

4    **A.**    I did.

5    **Q.**    Someone you were close to?

6    **A.**    A friend of mine was the rabbi in 1990,

7    Rabbi Chaim Shapiro.

8    **Q.**    Now, do you think that you had enough information

9    to form the opinions that you expressed to this Court?

10    **A.**    Then?

11    **Q.**    You've testified here now.

12    **A.**    Yes.

13    **Q.**    I've moved off the question of --

14    **A.**    Okay.

15    **Q.**    Okay.  You know people at Shearith Israel, and you

16    know people or you knew people at the Touro Synagogue;

17    right?

18    **A.**    Uh'huh (affirmative).

19    **Q.**    Okay.  And I want to set that aside.

20         Now, do you believe that you had enough

21    information to form the opinions and offer them to the

22    Court, the ones that you offered?

23    **A.**    Today.

24    **Q.**    Today.  Yesterday, today.

25    **A.**    Yes.

1    **Q.**   And what criteria did you use in writing the

2    disclosure report -- not the opinions that you've

3    given -- but the disclosure report that you did back in

4    December, November?

5    **A.**   The original report?

6    **Q.**   Right.  What criteria did you use for what

7    information you supplied and what information you

8    decided not to supply?

9    **A.**   I, I wrote of the examination of the objects.  I

10   wrote on the secondary literature that I had read and

11   on the primary work on documents, particularly the

12   ledger and the Minutes of the 19th century.

13   **Q.**   Did you include in the report the things that you

14   thought were pertinent?

15   **A.**   Yes.  I did not include everything.

16   **Q.**   You were also asked about a review of 20th century

17   materials.

18   **A.**   That was more spotty, but I did read Minutes of

19   both CJI and CSI from the 20th century.

20   **Q.**   And have you been shown anything today from the

21   20th century that changes your, the opinions that you

22   offered to the Court?

23   **A.**   No.

24   **Q.**   What about from any other century?  Does anything,

25   anything that they showed you change your opinions?

1    **A.**    No.  I feel that there's some erroneous documents

2    that were given to me.  I think the transcription of

3    one of the original pages of the ledger is wrong.  It

4    doesn't agree with the original.

5    **Q.**    And I am going to, I'm going to get to that.

6    **A.**    Get to that.

7    **Q.**    Okay?  But one thing that's important, that you're

8    trying to not give -- are you trying to speculate for

9    this Court?

10   **A.**    No.

11   **Q.**    Okay.  When you went back to the original

12   documents, why did you go back to the original

13   documents, rather than using a slew of secondary

14   materials?

15   **A.**    Because if I've learned one thing as an art

16   historian, it's anybody who copies something makes

17   mistakes, and so it's always better to get back to the

18   original account.

19   **Q.**    Now, you were shown a lot of pages from your

20   deposition and, as the judge said, you kind of picked

21   it up toward the end.  I want to show you a very

22   important one.

23        Let's turn to Page 95, and at 95 and 96 you were

24   read a piece of this where you said that the rimonim

25   were lent to Newport prior to 1818.

1      Do you remember that that was read?

2  **A.**   Yes.

3  **Q.**   I want you to go to Page 95, --

4  **A.**   I'm here.

5  **Q.**   -- right before, okay?  And what you were asked

6  about is whether you could speculate, whether you could

7  come up with a plausible way that the rimonim went to

8  Newport before 1818.

9      Do you remember that?

10 **A.**   Yes.

11     MR. WAGNER:  Your Honor --

12 **Q.**   Okay.  And the discussion that --

13     THE COURT:  Hold on.  Mr. Wagner.

14     MR. WAGNER:  I object because that misstates the

15 question.  It specifically says is it a more likely

16 than not conclusion.  Not speculation.

17     THE COURT:  I think, Mr. Solomon, if you're

18 going to use the deposition, then we have to quote from

19 it and not paraphrase from it.  That wouldn't be a

20 proper use of it.

21     MR. SOLOMON:  Thank you, your Honor, and I will.

22 **Q.**   Would you look at Line 9, beginning on Line 9

23 where the question and answers are as follows:

24     (Reading)  That is not my question.  Do you know

25 how those rimonim ended up in Newport?

1      Answer:  I believe I can construct the scenario

2   as to how they ended up in Newport.

3      My question is do you know how they ended up?

4      Answer:  From the available facts I can give you

5   a plausible way they ended up in Newport.

6      Question:  Is it a mere likely -- more likely

7   than not conclusion?

8      Answer:  They -- paraphrase?

9      Mr. Solomon:  What?  I'm sorry.  I don't even --

10   I'm sorry.  Okay.  Rephrase.

11   **Q.**   Is that what you said?

12   **A.**   Yes.

13   **Q.**   Okay.  Now, do you know where the rimonim that

14   we're talking about now, do you know where they were

15   after they were made and before 1869?

16   **A.**   Not -- I only reconstructed a possibility.  I did

17   not know based on facts.  There are no facts.

18   **Q.**   In your professional opinion, does anybody know

19   where the rimonim were after they were made and before

20   1869?

21   **A.**   No.

22   **Q.**   I may have heard an answer incorrectly, but I want

23   to ask whether -- who owned the Myer Myers rimonim when

24   they were made?

25   **A.**   CSI.

1    Q.    And what you don't know, I think, is who possessed

2    them at any given point in time after they were made

3    and before 1869; is that right?

4    A.    That's correct.

5    Q.    Okay.  So you're differentiating between

6    ownership, who paid for them and who owned them, and

7    where they might have been --

8    A.    Been used, yes.

9    Q.    -- before 1869; correct?

10   A.    Correct.

11   Q.    Now, one of the bases that you offered the Court

12   for the conclusion that Shearith Israel owned the

13   rimonim, when they were made, was the ledger from the

14   18th century; correct?

15   A.    Yes.

16   Q.    Now, what you weren't shown on your

17   cross-examination is Exhibit 9, DX9, and that's in the

18   binder that I had given you, and we're going to pull it

19   up on the screen.

20        (Pause)

21   Q.    Do you have it?  Okay.

22        Now, tell the Court, if you can, just briefly,

23   what on this page you rely on for the conclusion that

24   Shearith Israel paid for the set one of the rimonim.

25   A.    The first line where it said, "Cash paid Myer

1    Myers, balance of his account past."

2    **Q.**   And that's 36.4 --

3    **A.**   Thirty-six pounds four shillings and one ounce --

4    one pence.

5    **Q.**   And, Dr. Mann, I'm trying to speak slowly and you

6    need to pause, please, before you answer.

7    **A.**   Uh'huh (affirmative).

8    **Q.**   And I'll try to pause before I then ask my next

9    question.  Okay.

10        Now, this says, "Cash paid Myer Myers;" right?

11   And you're not an accountant; right?

12   **A.**   No.

13   **Q.**   Do you think you need to be an accountant to know

14   what "cash paid" means?

15   **A.**   No.

16   **Q.**   Okay.  I then showed you a document, that you were

17   also shown on your cross-examination, for when this

18   debt arose; right?  So this, in 5525, --

19   **A.**   Yes.

20   **Q.**   -- is being paid out; right?

21        MR. WAGNER:  Objection.  Leading.

22   **A.**   What page are you on?

23   **Q.**   Same page.  I'm sorry.  Exhibit 9.

24        THE COURT:  Overruled.

25   **A.**   Yes.

1     **Q.**    Right?

2     **A.**    Yes.

3     **Q.**    Okay.  And it doesn't say in the -- does it say in

4     the payment line anything about a sedakah account?

5     **A.**    No.

6     **Q.**    Is that meaningful?

7     **A.**    Yes, it is.

8     **Q.**    Why?

9     **A.**    Because Lyons, and I'm not sure where -- Lyons

10    wrote for his sedakah account --

11    **Q.**    Dr. Mann, why is it meaningful?  I promise I'll

12    show you the Lyons document.

13    **A.**    Oh, why is it meaningful?  Because that phrase

14    implies that he owed money as a pledge to the

15    synagogue, and that amount was 36 pounds et cetera.

16    But, in fact, those, the words do not appear in the

17    ledger.

18           So we don't know what -- we don't know from the

19    ledger that he paid for debt that he was given for

20    charity.

21    **Q.**    So this line that you've just read to the judge

22    doesn't tell you what is being paid for; right?

23    **A.**    Yes.

24    **Q.**    Now, on your cross-examination you were shown a

25    ledger entry from the year before.

1      MR. SOLOMON:  And I'd like to look at that,

2  please.  I wish I knew what exhibit number it was.  You

3  don't have the exhibit numbers on the back.

4      You can use Defendant's Exhibit 8.  Plaintiff

5  offered one as well.

6  **Q.**  Plaintiff's 23 or Defendant's Exhibit 8, okay?

7  **A.**  Okay.

8  **Q.**  Do you have that?

9  **A.**  Uh'huh (affirmative).

10  **Q.**  Okay.

11  **A.**  Yes.

12  **Q.**  Now, this is a ledger from 5524; correct?

13  **A.**  Yes.

14  **Q.**  So that this is the year before the 5525 ledger,

15  that was Exhibit 9 that I showed you, that you were not

16  shown on your cross-examination.

17  **A.**  Yes.

18  **Q.**  Okay.  And this one has a reference, "Balance due

19  to Myer Myers."  Do you see that?

20  **A.**  This is 1918 CSI 19 -- 11918.  Is that what you're

21  on?

22  **Q.**  Yes, it is.

23  **A.**  Yeah.  Okay.

24  **Q.**  If you look --

25  **A.**  It says, "Balance due to Myer Myers."

1    **Q.**    Right.  And so that's the amount that was paid to

2    him the next year; correct?

3    **A.**    Correct.

4    **Q.**    And this doesn't say -- does this contain the

5    words "for his sedakah account"?

6    **A.**    No.

7    **Q.**    And if you look at the page beneath it, there are

8    numbers that add up to the, 209.18.1.  Do you see that?

9    **A.**    Correct.

10    **Q.**    Okay.  So that the nine pounds 14-seven is what

11    you get when you add the first three lines?

12    **A.**    Yes.

13    **Q.**    The 177.13.9 is over on the left-hand side of the

14    page, and that's brought up to the top?

15    **A.**    Yeah.  Okay.  I'm --

16    **Q.**    And the 22.9.9 is over on the right-hand column in

17    the center, and that's brought up to the top as well;

18    right?

19    **A.**    Yes.

20    **Q.**    And so those numbers 209.18.1, okay, and then, in

21    addition, there's a balance due to Myer Myers; right?

22    **A.**    Uh'huh (affirmative).  Yes.

23    **Q.**    And this ledger entry does not say what it's for?

24    **A.**    Correct.

25    **Q.**    Now, is it significant to your opinion that it

1    does not say "sedakah account"?

2    **A.**    Absolutely.

3    **Q.**    Please explain to the judge why.

4    **A.**    The words "sedakah account" imply that he owed

5    money on a charitable donation.  It does not say that.

6         Lyons wrote that, and I don't know whether

7    Rosenbaum copied Lyons, because she repeats the same

8    words; but it does not appear in the original page.

9         It only says that he is due that amount.  It

10    doesn't say, on the next page, that he paid that or was

11    paid that amount and it had anything to do with his

12    charitable contributions to the synagogue.

13    **Q.**    Dr. Mann, have you seen other ledger entries that

14    refer to the sedakah account?

15    **A.**    Yes.

16    **Q.**    Okay.  Now --

17    **A.**    May I also make a point about this page?  About

18    the page we've been looking at, that it includes both

19    debits and credits on one page?

20    **Q.**    It does.  Thank you.  We were going to point that

21    out to the Court also and thank you for pointing that

22    out.

23         You were shown the entry from the Reverend

24    Lyons' transcriptions; right?

25    **A.**    Yes.

1    MR. SOLOMON:  Why don't we put that up on the

2  screen, please, so the judge can see what we're talking

3  about.  It's P78, and then the internal page is 88.

4  **Q.**    Now, P78, is that the original ledger, P78?

5  **A.**    No.

6  **Q.**    Okay.  And is it -- what is it?

7  **A.**    It's Reverend Lyons' transcription of the ledger

8  page.

9  **Q.**    And do you note that there are errors on this

10  page, right on this very page?

11  **A.**    I have to compare it to the original.

12  **Q.**    Well, this says for his -- of his sedakah account;

13  right?

14  **A.**    The 36 pounds?

15  **Q.**    Yes.  Do you see that?

16  **A.**    Oh, this page.  I'm sorry.  I'm looking at a

17  different page.

18        Yes.

19  **Q.**    But the ledger doesn't say that.

20  **A.**    Those words are not in the ledger.

21  **Q.**    And let me ask you whether you can quickly tell

22  the Court about another error on this page.

23        Above there there's an entry for 5525, the

24  fourth day of Tishrei.

25  **A.**    Right.

1    **Q.**    September 30, 1765?

2    **A.**    Yes.

3    **Q.**    And then there's, below that, 5525 Tishrei 25, and

4    it says October 21, 1764.  And without knowing anything

5    else in the universe, don't you know that there's an

6    error there?

7    **A.**    There's an error in the year.  In other words it

8    is -- it also should be 1765, and he made a mistake.

9    **Q.**    You were also then shown references to the

10    Rosenbaum article.

11    **A.**    Yes.  Rosenbaum's notes.

12    **Q.**    Rosenbaum's notes, right, which don't tell you

13    what they're quoting from; right?

14    **A.**    Correct.

15    **Q.**    So Reverend Lyons' transcriptions are not the

16    original ledger; right?

17    **A.**    Correct.

18    **Q.**    Is Dr. Rosenbaum quoting from, or do you know

19    whether she had the original ledger?  Is there any

20    indication?

21    **A.**    If she -- no, I don't.  It says that the papers

22    were in the Cincinnati archives, but I don't know that

23    she looked at the original letter.

24        I have a suspicion that she didn't because she

25    repeats Lyons' wording.

1  **Q.**   Well, we know -- do you know whether our ledger,

2  the Shearith Israel ledger, is in Cincinnati?

3  **A.**   No, it's not in Cincinnati.  That's one thing.

4  But the other thing is that the way she writes it down

5  is exactly the same wording, or very close to the

6  wording that he wrote in mistake.

7  **Q.**   So the opinion you gave to the judge is based on

8  the original ledger; correct?

9  **A.**   Correct.

10  **Q.**   And what you were shown on your cross-examination

11  is not the original ledger?

12  **A.**   Not.  There are two transcriptions:  One from the

13  ledger, and one from the Lyons' notes on the ledger,

14  transcription of the ledger.

15  **Q.**   Well, you don't know actually if Reverend Lyons

16  was transcribing the ledger, do you?

17  **A.**   I believe, yes, he was transcribing because the

18  list of items is practically --

19  **Q.**   He makes reference to a sedakah account, where the

20  ledger does not?

21  **A.**   No, no.  I'm saying he made mistakes in

22  transcribing, but I believe he was transcribing the

23  pages.

24  **Q.**   I want to call your attention to one other page of

25  the Lyons Collection.  There is a glossary that appears

1    on page -- let's see here.  We've marked it as DX480,

2    at Page 4, and I believe this is the Lyons Collection.

3    Do you see that?

4    **A.**    DX4, yes.

5    **Q.**    DX4.  I'm told it's in the binder.  Do you see

6    that?

7    **A.**    I'm sorry.  DX -- I'm looking in the CSI binder;

8    right?  And DX --

9         MR. SOLOMON:  Does your Honor have DX4?

10        THE COURT:  Uh'huh (affirmative).

11        MR. SOLOMON:  May I?

12        THE COURT:  Yes.

13        THE WITNESS:  Sorry.

14   **A.**    I've seen the item, but it's not in here.

15   **Q.**    Can you look it up on the screen?

16   **A.**    Yes.  Fine.

17   **Q.**    And this is a glossary in that same document the

18   judge asked, and there's been some discussion.  Please

19   read the judge what it says about sedakah or tzedakah.

20   It's spelled two different ways.

21   **A.**    Okay.  It says:  (Reading)  H for Hebrew, charity,

22   open quote, literally righteousness, used also to

23   denote the synagogue funds devoted not exclusively to

24   charity.

25        So that it includes other disbursements and

1   income.

2   **Q.**   In your investigation, did you see other instances

3   where payments of balances were shown as balance due,

4   but were for things that are not reflected on the

5   ledger?

6   **A.**   Yes.   There is a payment to another person

7   where -- there's a word that is old Portuguese --

8   consiertto, and it says this is for an item, another

9   item, but I'm owed this amount.   But it doesn't say

10  what the item is.   It says simply this is what I was

11  paid for an another item, not specifying what the item

12  is.

13  **Q.**   And so, but in relying on the original ledger,

14  what relevance is that fact to your opinion?

15  **A.**   That there were other payments made to other

16  individuals that likewise were not specified as to

17  their purpose.

18  **Q.**   You gave the Court yesterday a number of reasons

19  why you concluded that the payment shown there was for

20  the rimonim, and you were asked about a few of them on

21  cross-examination.   I want to go back and talk to you

22  about one.

23        Let's look at DD, that's the demonstrative that

24  was in that separate packet, --

25  **A.**   Yes.

1    **Q.**    -- 53, which shows the calculations.

2         MR. SOLOMON:  Thank you.  It's up on the screen.

3    **Q.**    Do you have it there?

4    **A.**    Uh'huh (affirmative).  Yes.

5    **Q.**    Okay.  Tell the judge the chronology of when you

6    came up with the respective calculations.

7    **A.**    Before I wrote the addendum, I came up with method

8    one, okay?  That was based on the ledger, the cost of

9    the silver I took from the CSI records; and then I

10   added, based on what Barquist had written about the

11   percentages that each workman was given, I then

12   calculated the total.

13        Method two was later on.  Some months later I

14   realized that there was also a notation that in 1760

15   the price of chased silver was 18 shillings per ounce,

16   and then I calculated based on the weight of the pairs,

17   or the sets.

18   **Q.**    That was the chronology?

19   **A.**    That's the chronology.

20   **Q.**    That's what I asked you.

21   **A.**    Right.

22   **Q.**    So now I want you to focus on the first

23   calculation that you did, the left-hand side, okay?  Do

24   you see that?

25   **A.**    Yes.

1    **Q.**    All right.  And in your cross-examination you were

2    shown an exhibit, P135, titled Money and Exchange in

3    Europe and America, 1600 to 1775, and counsel pointed

4    you to listings of silver in Rhode Island.

5    **A.**    Correct.

6    **Q.**    Do you remember that?

7    **A.**    Yes.

8    **Q.**    Do you want to put that in front of you, or you

9    have it?

10    **A.**    I have it.

11    **Q.**    You have it.  Now, do you have any evidence that

12    Myer Myers would have used the Rhode Island price of

13    silver in making or charging for his rimonim?

14    **A.**    I actually went and read this book after.

15    **Q.**    I'm sorry.

16    **A.**    No, no, you don't want me to answer --

17    **Q.**    Yeah, I'll give you the chance to explain.  But

18    could you just answer my question.

19    **A.**    Which was?  No --

20    **Q.**    Is there any evidence that he used Rhode Island

21    prices?

22    **A.**    No.

23    **Q.**    Okay.  What prices do you believe he used?

24    **A.**    I believed he used New York prices.  He was

25    working in New York.

1    **Q.**   Okay.  So why don't you go ahead and explain to

2    the judge.

3    **A.**   After this was submitted to CSI's side, I went and

4    read the book, and what the book says is that the price

5    of silver varied everywhere in the colonies.  So there

6    was one price in Boston, one price in New York, and in

7    the intervening areas like Rhode Island there was often

8    a different, a third price for the same ounce of

9    silver.

10           So, it's irrelevant to state what the price was

11   in Rhode Island because he was working in New York.

12   **Q.**   And in your cross-examination, were you shown the

13   price of silver in Rhode Island -- in New York?  Pardon

14   me.

15   **A.**   No.

16   **Q.**   Okay.  Now let's talk about the second half, the

17   second side of this.

18   **A.**   Yes.

19   **Q.**   Now, you said 18 shillings is the price that you

20   were using; right?  Where did you get that?

21   **A.**   From Barquist.

22   **Q.**   Let's look at PX --

23   **A.**   He used --

24   **Q.**   Excuse me.

25   **A.**   I'm sorry.

1    **Q.**    Let's just look at PX150, please, and in the PX

2    it's document number, Page 3237.

3    **A.**    Yes.

4    **Q.**    If you could tell the judge, is that what you are

5    relying on?

6    **A.**    It says, about one, two, three -- about six lines

7    from the bottom of the first column, the pair of chased

8    sauce pots, meaning like gravy boats, that Katherine

9    Skeiler (phonetic) purchased from Halsted & Myers, this

10   was a partnership in 1760, was priced at 18 shillings

11   per ounce.

12   **Q.**    Thank you.  So does that --

13   **A.**    In contrast, I just want to say, to 16 shillings

14   for plain silver.

15   **Q.**    Okay.  And this was not plain silver, was it?

16   **A.**    No.

17   **Q.**    And so is that where you got the 18 shillings?

18   **A.**    Yes.

19   **Q.**    And that was a New York price?

20   **A.**    Correct.

21   **Q.**    In 1760?

22   **A.**    This is the price that -- yes.  Absolutely.

23   **Q.**    Now, you were also asked about the weight, and you

24   used 40.8 ounces.

25   **A.**    Uh'huh (affirmative).

1    **Q.**   You see that?

2    **A.**   Yes.

3    **Q.**   Why did you use that weight?

4    **A.**   Frankly, I don't remember.

5    **Q.**   You don't know where you got it from?

6    **A.**   I don't remember exactly.

7    **Q.**   You were shown a demonstrative, I think it's PX405

8    for identification only, that used the weight.  It's

9    this one-page document.

10   **A.**   Uh'huh (affirmative).  Yes.

11   **Q.**   Do you have that?  So you were told that this was

12   the weight that was used in the inventory.  And so if

13   that was the weight, then the total price would have

14   been 40 pounds, not 36 pounds; right?

15   **A.**   Correct.

16   **Q.**   If that was the price, do you have an opinion as

17   to whether the Newport congregation could have afforded

18   this in the 1760s?

19   **A.**   My opinion is, or the fact is they couldn't afford

20   to pay for the, for the -- finish the building.  In

21   1762 they ran out of money and had to make a second

22   appeal to other Sephardic congregations in the colonies

23   and in the West Indies and northern South America.

24   They ran out of money; therefore, I don't see how they

25   would have come up with the money for a pair of

1    rimonim.

2         And it's interesting, if you look at this

3    ledger, the functionaries of the synagogue, I mean, to

4    show you how, what a big amount this is, the chochet,

5    the person who did the ritual slaughtering, was paid

6    25 pounds a year, and this is an item that cost over

7    36.  This is a big amount of money.

8    Q.   I'd like to turn to this document that you were

9    shown.

10   A.   Yes.

11   Q.   The first three are references to pleadings that

12   Shearith Israel has filed in this case.

13        THE COURT:  Hold up, Mr. Solomon.  I think they

14   need to put the right one up.

15        MR. SOLOMON:  I apologize.  P404.

16        THE COURT:  Thank you.

17   Q.   So the first three are, referred to pleadings that

18   Shearith Israel has filed in this case.

19        Dr. Mann, I see, I see that you don't --

20   A.   No, I think that we're not on the right page.

21   Q.   You don't have it.  Okay.

22   A.   No.  I had it before.

23        THE COURT:  It's on the screen.

24   A.   Oh, this is --

25   Q.   Is that okay?  Can you look at the one on the

1    screen?

2    **A.**    -- where I'm on the one column, and everybody else

3    is on the other?  That's what I have on the screen.

4    Okay.

5    **Q.**    That's it.  And you're the horse we're riding;

6    we'll take you on our team.

7          Now, the first three were a pleading, pleadings

8    that Shearith Israel filed in this case; right?

9    **A.**    I'm sorry; I have to be honest and say I don't

10   remember seeing all of them.

11   **Q.**    Right.  And, in fact, I wasn't going to ask you

12   any questions about them except to ask you whether, do

13   you know what a pleading is when its made on

14   information and belief?

15   **A.**    No.

16   **Q.**    Okay.  And do you know that, whether there's a

17   procedure in cases like this to amend pleadings to

18   conform to the evidence at the trial?

19   **A.**    I'm ignorant about pleadings.

20   **Q.**    Okay.  Sitting here today, do you believe that

21   Shearith Israel agrees or disagrees with the

22   conclusions that you have reached?

23   **A.**    I would think they agree.

24   **Q.**    You don't know?

25   **A.**    I believe they do.

1    **Q.**    Now, you were shown something by Rabbi Angel, and

2    you started to give an answer about respecting him.

3    Let me ask you just a few questions, please.

4          Is Rabbi Angel an art historian?

5    **A.**    No.

6    **Q.**    Is he a historian?

7    **A.**    Not a professional one.

8    **Q.**    And you don't know whether he reviewed the ledger,

9    do you?

10   **A.**    No.  My impression, having read the other sources,

11   secondary sources like de Sola Pool, et cetera, I think

12   that a lot of Rabbi Angel's material came from

13   de Sola Pool and other prior writings.

14   **Q.**    And did you think that it was a reliable source

15   or -- did you think it was a reliable source for the

16   issues that you were addressing?

17   **A.**    No.

18         MR. SOLOMON:  Let me put up Exhibit D449,

19   please, Page 94.

20         THE COURT:  Mr. Solomon, why don't we take a

21   break now, the afternoon break.  It's three o'clock.

22   We'll be back in 15 minutes.

23         (Recess)

24         THE COURT:  Mr. Solomon.

25         MR. SOLOMON:  Thank you, your Honor.

1    **Q.**    Dr. Mann, during the break did you refresh your

2    recollection of how you came up with the weight of the

3    rimonim that you used in the second side, method two

4    calculation that you gave the Court?

5    **A.**    Yes.  I used one of the weight -- since we're

6    dealing with sets in the Barquist, I only isolated the

7    same, those two from the same pair, and then I --

8    that's how I got to the weight.

9    **Q.**    Okay.

10    **A.**    And, must remember that the pair that is now in

11    Shearith Israel is missing -- he may have weighed after

12    it was missing its crown, rather than when it was

13    restored so that it looks the same as the other.

14    **Q.**    If the weight were the weight that was given in

15    the 1869 inventory, rather than the weight that you

16    used, would that change your opinion?

17    **A.**    No.

18    **Q.**    Why not?

19    **A.**    Because so close, and with handmade objects you

20    may have a little deviation.  You're not talking about

21    something that gets pushed out or punched out by a

22    machine.  You're talking about something that starts

23    with a lump of silver and it's built up, and so there

24    can be slight variations.

25    **Q.**    If we did have that slight variation, would it

1    alter the anomalous nature of the payment?

2    **A.**    No.  The payment, I believe, is different from all

3    others.

4    **Q.**    Thank you.  Now, we were at this Exhibit P404 just

5    talking about Rabbi Angel.  Do you remember that?

6    **A.**    Yes.

7    **Q.**    And then you were shown Dr. Barquist's book.

8    That's PX150.

9    **A.**    Yes.

10   **Q.**    And you spoke about him during your direct

11   examination; right?

12   **A.**    I believe so.  Yes.

13   **Q.**    And what I wanted to call to your attention was

14   the language that, it was on the page that was read to

15   you, and it's Page 160, or CJI 3254.

16   **A.**    Yes.

17   **Q.**    And there Dr. Barquist begins the bottom paragraph

18   on the left-hand column, in the second sentence he

19   says:  (Reading)  Thus the two thus engraved presumably

20   formed a single pair that belonged to the Newport

21   congregation.

22        And then at the top of the next page, he says:

23   However, it was not until 1833 that the four Torahs

24   (and presumably their ornaments) were transferred to

25   Shearith Israel.

1          And as an art historian coming into this court

2     to give the opinions that you did, would you rely on

3     the presumablies?

4     **A.**    No, because the -- one reason is that in the

5     ledger consistently the Torah scrolls are mentioned

6     separately from finials, and if a Torah scroll came to

7     a congregation with the finials, it's always

8     specifically mentioned.

9     **Q.**    Okay.  I'm going to -- I think I can come back to

10    that in a minute.

11         I want to look at the next item.  This is P114.

12    This is the Jewish Museum catalog.

13    **A.**    Yes.

14    **Q.**    Now, in terms of provenance research, did a

15    distinction exist between research that was done for

16    purposes of acquiring objects and putting catalogs

17    together?

18    **A.**    There's a difference between even catalogs that

19    one produces of one's own objects.  For example, most

20    of the exhibitions I did had, at their core, works that

21    were in the collection of the Jewish Museum, and then I

22    would borrow others that I needed.

23         The works that come from your collection you

24    feel great responsibility to present the provenance as

25    it is exact.

1            But there's no time and there are no resources

2    to go back to another museum and research their

3    provenance.  You just accept what they write on the

4    loan form.

5    **Q.**    Part of the deposition that you were read just a

6    little snippet of talked about the research or

7    abilities at the Jewish Museum at the particular time.

8    **A.**    Yes.

9    **Q.**    And can you explain what you meant by that, to the

10   Court.

11   **A.**    I would say that until the late seventies the

12   study of Jewish art was, well, the study of -- the

13   presentation of art history generally in museum

14   catalogs before the seventies was very -- were more

15   listings of objects, rather than discussions of them

16   and relating them one to the other.

17          And it's only with the big blockbuster shows,

18   like Tutankhamun and others, that major museums began

19   to produce substantive catalogs like the Barquist.

20          So, at that time the presentations were always

21   slimmer.

22   **Q.**    Did any of the Dr. Barquist, the Jewish Museum,

23   Jeannette Rosenbaum, the Library of Congress or

24   Dr. Schoenberger, do you know whether they had access

25   to the actual original ledgers?

1    **A.**    I have no knowledge that they did or didn't.

2    **Q.**    Is anything published in their books that says,

3    that suggests that they did?

4    **A.**    No.  Rosenbaum, as I said, I think is the

5    secondary taken from Lyons because of the wording.

6    **Q.**    In the Jewish Museum catalog, which is PX114, I

7    want to call your attention to Page 1577 at the bottom.

8    **A.**    Yes.

9    **Q.**    And here it says, and I'm reading:  Each pair of

10    headpieces comes from a congregation to which Myers had

11    a particular connection.

12        Do you recall --

13    **A.**    Where are you?

14    **Q.**    -- that was called to your attention on cross?

15    **A.**    Yes.  Uh'huh (affirmative).

16    **Q.**    And then it goes on:  (Reading)  His own

17    Congregation, Shearith Israel in New York, number two,

18    Congregation Mikveh Israel in Philadelphia where he

19    worshiped when he took refuge from New York during the

20    revolution, numbers four and five, and the Touro

21    Synagogue in Newport, whose beautiful sanctuary by

22    Peter Harrison was built in 1763 with the financial aid

23    of the New York congregation, numbers one and three.

24        Do you see that?

25        And so what is, in your reading of this, what is

1    the particular connection that is being made between

2    Myer Myers and the Newport synagogue?

3    **A.**    May I go back to --

4    **Q.**    No.  I'm just asking you to look here.  Is there

5    anything in here?

6    **A.**    I just want to say that --

7    **Q.**    I know, Dr. Mann, I know you want to tell me.

8    **A.**    The sentence is full of fallacies.

9    **Q.**    Okay.  Is there anything listed here that

10   identifies the relationship that Myer Myers had with

11   the Newport synagogue?

12   **A.**    No.

13   **Q.**    Okay.  And the fallacy with respect to

14   Philadelphia, what is it that you wanted to say?  Just

15   say it quickly, please.

16   **A.**    Yes.  The transfer of finials that Myers made for

17   Mikveh Israel was done in 1772.  It's the only

18   documentation related to his Judaica.  And he didn't

19   have a relationship in Philadelphia beyond the sale of

20   finials to them.  His stay postdated the British

21   capture of New York, so that was later.

22   **Q.**    And does this say anything about ownership?

23   **A.**    No.

24   **Q.**    All right.  And does it identify the sources that

25   it's referring to, if it is referring to anything?

1    **A.**    No.

2    **Q.**    Okay.  Let's look at Jeannette Rosenbaum.  This is

3    P100.

4    **A.**    Yes.  What page?

5    **Q.**    It's the page that you were shown.  P100, Page 24.

6    **A.**    Yes.

7    **Q.**    What, so first there's -- agree with me, or

8    correct me, that there's no reference here to

9    ownership; correct?

10    **A.**    On Page 24?

11    **Q.**    Twenty-four.  And the paragraph, the phrase that

12    was called to your attention is right at the end of the

13    second to last paragraph, which says:  (Reading)  And

14    two pairs of scroll bells which Myer Myers had made for

15    the synagogue at Newport, Rhode Island.

16        Do you see that?

17    **A.**    Yes.

18    **Q.**    Okay.  And was there anything about ownership here

19    that was cited?

20    **A.**    I, I have -- there's no, nothing here about how

21    he -- she concluded they were owned by Newport.

22    **Q.**    So there's no citation?

23    **A.**    There's no citation, and it contradicts other

24    evidence.

25    **Q.**    In particular, when she says here that two pairs

1   of scrolls were made for the synagogue at Newport,

2   Rhode Island, is one of the pairs that she's talking

3   about the Caroline Cohen pair?

4   **A.**   She has to be because those are -- that was one of

5   the two pairs.

6   **Q.**   And that, I think you explained to the Court

7   yesterday, was never made for Newport; right?

8   **A.**   No.  It was a private commission for Samuel Myers.

9   **Q.**   Okay.  And you showed the Court the documentation

10  transferring those to Shearith Israel?

11  **A.**   Which were the two letters of Caroline Cohen; one

12  to the minister in Newport and, after his death, to

13  Shearith Israel saying that he's gone and I lent it to

14  him and therefore I'm now giving them to you.

15  **Q.**   Thank you.  The next item here is the Library of

16  Congress, which is P172.

17        Now, I think you testified that the provenance

18  people at the Library of Congress are, the ones that

19  you know about, are qualified, highly qualified;

20  correct?

21  **A.**   I only know the people in the Jewish division, and

22  I would say they're certainly qualified people.

23  **Q.**   And you don't know whether any of them was

24  involved with this?

25  **A.**   No.

1    **Q.**    Okay.  Now, what I wanted to call to your

2    attention was that the language here says that Myer

3    Myers, and I'm picking up with the word "served as

4    president of New York's Congregation Shearith Israel

5    three times."  You see that?

6    **A.**    You're on page, on the second page?

7    **Q.**    I'm on the second page of text, yes, second page

8    of the document.

9    **A.**    Yes.

10   **Q.**    How many times was Myer Myers the president of

11   Shearith Israel?

12   **A.**    Five times.  It says three times, but he was

13   actually parnas five times.

14   **Q.**    And what it says here, it says next -- it says,

15   "Displayed here are the finials belonging to Newport's

16   Touro Synagogue."

17          Do you see that?

18   **A.**    Yes.

19   **Q.**    Does it say anything about ownership here?

20   **A.**    I guess --

21   **Q.**    Does it say anything about ownership?

22   **A.**    It doesn't use the word "ownership."

23   **Q.**    Okay.  Is there any research that's cited here?

24   **A.**    No.

25   **Q.**    So is there any way for you, as an art historian,

1    to check what's going on?

2    **A.**    No, I can't, I can't check because I don't know

3    the sources.  And this is an exhibition, I believe it

4    was put together by Abraham Karp, who was a rabbi by

5    profession and a collector, but he had no formal

6    training in art history.

7    **Q.**    All right.  The last item that you were shown was

8    P99, Dr. Guido Schoenberger, and you told us of his --

9    **A.**    History, yes.

10   **Q.**    Of his history, and I want you to look at what's

11   Page 5 at the top, numbered.

12   **A.**    Yes.

13   **Q.**    And you were called -- your attention was called

14   to the beginning of the second paragraph.  It says, in

15   the second sentence:  (Reading)  If we turn to the work

16   of Myer Myers, first showing the pair of his rimonim

17   made circa 1770 for the new synagogue at Newport, built

18   in 1759.

19        You see that?

20   **A.**    Yes.

21   **Q.**    Okay.  This, too, doesn't have any reference to

22   ownership, does it?

23   **A.**    No.

24   **Q.**    And is there anything cited for the proposition

25   that's there made?

1    **A.**   No.

2    **Q.**   Is there any research that's disclosed?

3    **A.**   Well, he does have some footnotes.

4    **Q.**   For the --

5    **A.**   But not for this paragraph.

6    **Q.**   Okay.  Right.  And is the ownership of these

7    rimonim even pertinent to the discussion on this page?

8    **A.**   No.  It's general discussion of the forms of, the

9    evolving forms of rimonim through the ages.

10   **Q.**   Now, you wanted to comment on the phrase, which is

11   the sentence right above the paragraph I was just

12   reading:  "This indicates that even in the West the

13   rimonim (pomegranate) symbolism was never completely

14   forgotten."

15         What is your reaction?

16   **A.**   That's true, I mean, I don't -- I remember talking

17   about that, but.

18   **Q.**   Fine.  Are rimonim ritual objects?

19   **A.**   Yes.

20   **Q.**   And you draw a distinction between those rimonim

21   that have been used?

22   **A.**   Jewish law distinguishes that once an object is

23   used, or proscribes that once an object is used in

24   conjunction with the Torah, it partakes of the holiness

25   of the Torah.

1    **Q.**    You were asked --

2    **A.**    And things that are used directly on the Torah

3    have the most sanctity.

4    **Q.**    And the Touro Synagogue rimonim have that

5    sanctity?

6    **A.**    Yes.

7    **Q.**    Now, you were asked about rimonim at the Jewish

8    Museum.

9    **A.**    Correct.

10    **Q.**    In general, in the main, how did those come to the

11    Jewish Museum?

12    **A.**    There were collectors, certain collections that

13    were bought.  Beginning in 1922 there was a private

14    collection bought.

15        And then, as a result of the Holocaust and the

16    coming, the Nazi conquest, conquests, the Jews who

17    lived in Danzig, Poland, which was a free city between

18    the wars, voted to emigrate, and when they did so they

19    quote/unquote sold the objects to the Joint

20    Distribution Committee, which is a welfare refugee

21    organization in New York, and they were sent to the

22    archives to Jerusalem.

23        And that's how this whole collection of some

24    200 objects that were used within the Danzig community

25    came to New York and were acquired, were placed in the

1    Jewish Theological Seminary Museum, the forerunner of

2    the Jewish Museum.

3         Most other things, a lot of things came with the

4    refugees in the thirties and were sold to, to feed

5    themselves really, to maintain themselves.

6         And then there was a distribution of items.

7    This had to do with the *Monuments Men* films.  There was

8    a distribution of Nazi-seized art, and the Judaica

9    within those hordes was subdivided among various

10   institutions throughout the world, including the Jewish

11   Museum.

12   **Q.**   Was any of the rimonim at the Jewish Museum in

13   use, in ritual use right before it was -- they were

14   acquired by the Jewish Museum?

15   **A.**   No.

16   **Q.**   You were asked, I want to turn your attention to

17   the inventory, which is DX34, and you were asked about

18   whether you knew if Reverend Lyons looked at the

19   1833 Minutes in preparing the inventory.

20        Do you remember that discussion?

21   **A.**   No, but I don't know how I would know that.

22   **Q.**   Okay.  I want you to look at two documents,

23   please.  First, D22.

24   **A.**   Yes.

25   **Q.**   Do you have that in your book?

1    **A.**    Uh'huh (affirmative).

2    **Q.**    What is that?  And just tell briefly what it is

3    and how it relates to the inventory.

4    **A.**    These are a draft of Minutes from 1823 and it's,

5    included is a report that the finials that belonged to

6    Ephraim Hart had been purchased for a certain amount by

7    the congregation.  And subtracted from the purchase

8    amount was the amount he owed the synagogue for

9    charitable donations that he had promised.

10          MR. WAGNER:  And, your Honor, I object.  This is

11   an exhibit that was not referenced in any of her

12   reports, any -- I'm sorry.  It was first disclosed in

13   her addendum, that which is after her deposition.

14          MR. SOLOMON:  Your Honor, may I be heard.

15          THE COURT:  Sure.

16          MR. SOLOMON:  I think counsel is correct.

17   That's why I didn't do it on her direct.

18          They've now asked her about the care being taken

19   with respect to the preparation of the inventory, and

20   this relate directly to that, and I can connect that up

21   in one question.

22          THE COURT:  I'm going to allow it.

23   **Q.**    Look please at the rimonim page, Page 36 of DX34.

24   And in 1869, please show the Court where there's a

25   reference to the Hart bells.

1    **A.**    Okay.  This is, it's at Page 34 of the inventory

2    which is 34-36.

3         And, yes, it says, above the Myers citations it

4    says:  One pair of ditto, meaning rimonim, known as

5    Ephraim Hart bells, property of the congregation in

6    keeping of the shamas.

7    **Q.**    So whoever prepared the inventory knew that in

8    1823, I guess that's, whatever, 46 years earlier, the

9    bells were sold by Mr. Hart to the synagogue?

10   **A.**    This is not --

11   **Q.**    Did I --

12   **A.**    That is correct.

13   **Q.**    All right.  So let me ask you to look at a second

14   document.  Begin with the page that we're on first,

15   please, where it says "Property of LI Cohen" --

16   **A.**    Yes.

17   **Q.**    -- down on the left-hand side.

18   **A.**    Yes.

19   **Q.**    Do you see that?

20   **A.**    Uh'huh (affirmative).

21   **Q.**    Look at Exhibit D28, please, and tell the Court

22   what that is.

23   **A.**    This is a notation in the Minutes of 1847 that

24   includes --

25   **Q.**    I'm calling your attention to Page 7.

1    **A.**   Yes, Page 7, 28-007, and it is a copy of a letter

2    received from Lewis Cohen, and it says as follows:

3    (Reading)  To the president of Congregation Shearith

4    Israel:  Dear sir, I have deposited my Seapher, that

5    means my Torah scroll, bells and mantels, which are the

6    coverings, the textile coverings, in synagogue for the

7    use of the congregation, subject to my order for which

8    I should like to have from -- to have your written

9    acknowledgment.  Yours truly, truly yours, signed

10    Lewis I. Cohen.

11         MR. WAGNER:  I object.  The document was first

12    referenced in Dr. Mann's rebuttal report, Page 3

13    Note 14.

14         MR. SOLOMON:  The proffer is the same.

15         THE COURT:  I'm having a hard time connecting

16    this up to anything that was brought up on

17    cross-examination, Mr. Solomon, directly.

18         MR. SOLOMON:  My proffer is the same, Judge.  If

19    it's not helpful to the Court, then I actually am done.

20         There was a suggestion that the inventory that

21    people, that the person who prepared the inventory

22    didn't look at the records of Shearith Israel, and the

23    first case, 46 years earlier, there's a record that's

24    picked up in the inventory.

25         In this case, 20 years earlier the rimonim are

1   deposited and 20 years later they're noted as being the

2   property of I.L. Cohen, and that's what I wanted to

3   call to the Court's attention.

4          THE COURT:  Got it.  Thank you.

5   **Q.**   Dr. Mann, let's look at the demonstrative that you

6   were shown, P403.

7   **A.**   This is what, the --

8   **Q.**   The two-column document.

9   **A.**   Uh'huh (affirmative).

10  **Q.**   Do you see that?

11  **A.**   I'm getting there.  Yes.

12  **Q.**   Okay.  Now, as I understood your testimony, the

13  belonging to the congregation up at the top of the

14  right-hand column, that the congregation that's being

15  there referred to is the Newport congregation; is that

16  right?

17  **A.**   Yes.

18  **Q.**   And so quoting the part that was, that you

19  omitted, was also the reference to the Newport

20  congregation?

21  **A.**   Yes.

22  **Q.**   Okay.

23  **A.**   And this is taken out of context.

24  **Q.**   Right.  But did you intend to deceive or mislead

25  anybody from this reference?

1  **A.**  No, because the preceding portion references the

2  Newport congregation.

3  **Q.**  Let's look at the two telegrams, please.

4  **A.**  Yes.

5  **Q.**  And I'm going to ask you to assume, as you were on

6  the questions asked of you, that these are from 1903.

7  **A.**  Yes.

8  **Q.**  Do you know that in February of 1903 the lease

9  between the parties was being negotiated?

10  **A.**  I didn't know the month.  I did not know the month

11  of 1903.

12  **Q.**  If these are from 1903, what would this indicate

13  to you about whether sepher and bells were part of the

14  negotiations, part of the discussion of the lease?

15       MR. WAGNER:  Objection.  Way beyond the scope.

16       THE COURT:  And it's leading.  The objection is

17  sustained.

18  **Q.**  What, if any, indication do you draw from these

19  documents if you assume that they are dated in 1903?

20  **A.**  I can't -- I don't consider myself an expert on

21  the lease negotiations, so I would not connect them

22  with this.

23       However, what I would say, what I did note was

24  that there were two photographs of the rimonim that

25  were present at, in Newport; one dated 1895, that is

1   before the telegram, and then another, other

2   photographic evidence 1913 and later.

3        And there was one set of rimonim in the original

4   photograph that did not appear later and the -- may

5   have been taken back and be the ones referenced here.

6   **Q.**   Thank you.  Let me ask you this question.

7        If one sepher and bells is referring to one

8   sepher and one set of bells, just assume that for the

9   minute, am I right that the Caroline Cohen set, which

10  was gifted to Shearith Israel, was never in New York,

11  according to the research that you've done; correct?

12       MR. WAGNER:  Objection.

13  **A.**   Well, they had to have been in New York to begin

14  with because Myers made them.

15  **Q.**   Right.  But once they were gifted to Shearith

16  Israel, were they in New York to your knowledge?

17  **A.**   I can't answer that.  I don't -- in other words,

18  she leaves Richmond.  Richmond, the congregation falls

19  apart.  And then we know that she deeds them.

20       I don't know what -- I can't say to you

21  definitively that they didn't stop in New York before

22  going to Newport.

23  **Q.**   But you have no evidence that they were in New

24  York; right?

25  **A.**   No.

1    **Q.**   And you have no evidence that whoever was writing

2    this telegram would even know about those bells;

3    correct?

4         MR. WAGNER:  Objection.  Leading.  And I think

5    it's just beyond --

6         THE COURT:  Sustained.

7    **Q.**   Well, do you have any evidence that anyone at

8    Shearith Israel in New York knew about the Caroline

9    Cohen bells at Touro?

10   **A.**   No evidence.

11        (Pause)

12   **Q.**   Dr. Mann, does Mr. Edinger have any training in

13   art history?

14   **A.**   Not to my knowledge.

15   **Q.**   Is he a historian, to your knowledge?

16   **A.**   No.

17        MR. SOLOMON:  Your Honor, give me one minute.

18        (Pause)

19   **Q.**   In the deposition testimony that you yourself

20   read, you talked about short-term loans of objects to

21   museums; is that right?

22   **A.**   Yes.

23   **Q.**   In your professional opinion, is there anything

24   inconsistent about a short-term loan to a museum and

25   ownership by someone else?

1    **A.**    No.    That's generally the -- unless the museum

2    itself puts up its own objects, that is generally the

3    case if there's a loan.    That's only for a specified

4    period of time.

5    **Q.**    You were asked about Page 92 of your deposition

6    where you said, not in the question, but when you read

7    it, that as a general matter you agree that the use of

8    rimonim are entirely ornamental.    You said as a general

9    matter.    Okay.

10        What is it you wanted to say then?

11   **A.**    They decorate the Torah scroll.    What is not in

12   that statement is that they derive holiness from having

13   been adorning the Torah scroll, and thereafter their

14   status is changed.    And that's what I wanted to say.

15       MR. SOLOMON:    Your Honor, I have nothing

16   further.    Thank you.

17       THE COURT:    Thank you, Mr. Solomon.

18       Mr. Wagner.

19       (Pause)

20       <u>RECROSS-EXAMINATION BY MR. WAGNER</u>:

21   **Q.**    Dr. Mann, you gave some testimony on redirect

22   about the Lyons Collection.    Am I right that yesterday

23   you cited the Lyons Collection in support of your

24   testimony?    Yes or no.

25   **A.**    I don't think -- yes.

1    **Q.**   Now, do you understand the difference between

2    ledger and accounting ledger and board Minutes?

3    **A.**   Of course.

4    **Q.**   You testified that Touro ran out of money in the

5    1760s.  I'm right that the rimonim could have been a

6    gift; right?

7    **A.**   There's no record of that.

8    **Q.**   Just -- they could have been; correct?

9    **A.**   They're --

10   **Q.**   Yes or no.

11   **A.**   They could have been, yes.

12   **Q.**   Okay.  And you, I think, testified yesterday that

13   Myer Myers made a circumcision plate for someone at

14   Touro Synagogue; right?

15   **A.**   He made it for an individual name Moses Seixas,

16   who was a member of the Touro Synagogue.

17   **Q.**   And I think you also testified that Myer Myers'

18   sister-in-law was living in Newport; right?

19   **A.**   No.  You testified.  Somebody else mentioned it.

20   **Q.**   Yes.

21   **A.**   I don't think that -- I don't find that

22   significant at all.

23   **Q.**   But you know that people have said that his

24   sister-in-law lived there; right?

25   **A.**   That she lived there is a fact.

1    **Q.**    Yes.  Okay.  And there were individuals at Touro

2    Synagogue in those days who were very well off; right?

3    **A.**    The synagogue -- we're talking about a -- excuse

4    me.

5    **Q.**    Just --

6    **A.**    Yes, there were people well off.

7    **Q.**    Okay.  Aaron Lopez was one of the biggest shipping

8    magnates in the United -- in the colonies in those

9    days; right?

10   **A.**    And a slave trader.

11   **Q.**    But he was one of the biggest shipping magnates;

12   right?

13   **A.**    Correct.

14   **Q.**    And there were other rich people there; right?

15   **A.**    I don't know.

16   **Q.**    Okay.  But any one of them could have bought the

17   rimonim and donated them; right?

18   **A.**    Could have, yes.

19   **Q.**    But we don't know; right?

20   **A.**    We do know that Lopez gave a set, and they were

21   not the Myer Myers ones.

22        MR. WAGNER:  Your Honor, just on D8A there's a

23   mistake in the transcription that I think that we can

24   straighten out, and I wanted to point that out.

25        THE COURT:  Excuse me.  The cite, again?

1          MR. WAGNER:  It's Page D8A-001.  I bring it up

2     because Dr. Mann mentioned that there may have been a

3     mistake in the transcription, and I think that counsel

4     can work that out and I think we can give you a correct

5     copy.  I don't think there will be any dispute about

6     that.

7     Q.   Dr. Mann, you testified about the McCusker book;

8     right?  Do you recall that?

9     A.   Yes.

10         MR. WAGNER:  Your Honor, I just want to make a

11    representation there's nothing in the book about silver

12    prices in New York.

13    Q.   But one way or the other, you didn't look for

14    silver prices in New York, did you?

15    A.   I read the McCusker book, and it has silver prices

16    in New York and Boston.

17    Q.   And did you cite those here?

18    A.   Did I cite them?

19    Q.   Yes.  Did you use them in your calculation?

20    A.   No, I --

21    Q.   Just -- that's all.  No.

22    A.   No.

23    Q.   Now, you talked about variations of silver prices.

24    We looked at silver.  We showed you silver prices for

25    three states, right; Rhode Island, Connecticut and New

1   Hampshire.  Correct?

2   **A.**   Yes.

3   **Q.**   And we showed you silver prices in 1739 and 1765;

4   correct?

5   **A.**   Yes.

6   **Q.**   And silver prices went up by hundreds of percent;

7   correct?

8   **A.**   In those states.

9   **Q.**   Do you have any reason to believe they didn't go

10  up between 1739 and 1765 in New York?

11  **A.**   This is speculation.

12  **Q.**   Everything you've given us is speculation, isn't

13  it?

14  **A.**   No.

15      MR. SOLOMON:  Objection.

16      THE COURT:  It's cross-examination.  Overruled.

17  **Q.**   Now, much of what you're telling, you're just

18  guessing, aren't you?

19  **A.**   No.

20  **Q.**   Okay.  Is it -- just two more questions.

21      Is it inappropriate, as a historian, to ignore

22  contrary evidence?  Yes or no.

23  **A.**   It's inappropriate, yes.

24  **Q.**   It is inappropriate.  Can you look at your

25  deposition, Page 70 Line 24.  Were you asked the

1    following question on Page 70, and did you give the

2    following answer:

3         Question:  Is it inappropriate, as a historian,

4    to ignore contrary evidence?

5         Answer:  No.

6         Were you asked that question, and did you give

7    that answer?

8    **A.**   I don't remember giving that answer.  I, I --

9    **Q.**   This is what is written here.

10   **A.**   You know there are mistakes in the transcript.

11   **Q.**   And that's not one of the ones you corrected;

12   right?

13   **A.**   I didn't give any corrections.  I wrote them in

14   myself.  If you want to examine my copy, you may do so.

15        MR. WAGNER:  Your Honor, we'll submit the list

16   of corrections.

17   **Q.**   Then is it inappropriate, as a historian, to look

18   at part, at only part of the available record?

19   **A.**   I never did that.

20   **Q.**   Just tell me, is it inappropriate or not?

21   **A.**   Yes.

22   **Q.**   Can you look at your deposition, Page 71 Line 3:

23        Question:  Is it inappropriate, as a historian,

24   to look at only part of the available record?

25        Answer:  No.

1          Were you asked that question, and did you give

2     that answer?

3     **A.**   I see the way the question is phrased.  I did give

4     that answer, but I --

5     **Q.**   That's all.  That's all.

6     **A.**   That's all you want to know.

7          MR. WAGNER:  Nothing further, your Honor.

8          THE COURT:  Thanks.

9          Dr. Mann, you can step down.  Thank you, ma'am.

10         THE WITNESS:  You're welcome.

11         THE COURT:  Mr. Solomon, who is up?  What's the

12    order up tomorrow?

13         MR. SOLOMON:  Yes.  We have our remaining

14    witness, Dr. Fisher, who he is the last witness live we

15    will be calling.  And I've started the up until now

16    fruitless negotiation with Mr. Wagner to try to make

17    sure that we can get out of here tomorrow, and

18    hopefully we'll have some success in doing that.  That

19    would be our hope.

20         THE COURT:  So it's your expectation, albeit

21    unworthy and unreliable, that you will finish with live

22    witnesses tomorrow?

23         MR. SOLOMON:  Yes.

24         MR. WAGNER:  Your Honor, it would help if, I

25    mean, if I got some estimate about the direct and maybe

1    even the subject so I can --

2            THE COURT:  Why don't you talk.

3            MR. WAGNER:  Okay.  And I can pass up Dr. Mann's

4    errata sheet, if you would like, or we can submit it

5    later today.

6            THE WITNESS:  I'm sorry, but I have them

7    handwritten into my --

8            MR. SOLOMON:  Your Honor, I'm willing now.  We

9    try cases in other cities like New York; we'll commit

10   to getting finished tomorrow and splitting the time.

11           THE COURT:  Great.

12           MR. WAGNER:  We're not, we're not, we're not

13   going to commit.

14           THE COURT:  You guys work it out.  We're going

15   to stand adjourned.

16           (ADJOURNED)

<u>C E R T I F I C A T I O N</u>

I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


/s/  Denise P. Veitch
_____
        Denise P. Veitch, RPR


June 26, 2015
_____
        Date