TRIAL DAY 8

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF RHODE ISLAND

NO.:  12-822-M(LDA)

--------------------------------x

CONGREGATION JESHUAT ISRAEL,

                    Plaintiff

V.

CONGREGATION SHEARITH ISRAEL,

                    Defendant.

-----------------------------------x

TRIAL DAY 8,

Thursday, June 11, 2015, 9:30 a.m.

Before:    Judge John McConnell

United States District Court

One Exchange Street, Providence, Rhode Island

Reported by:

Tara L. Wosny, CSR

```
 1                    JUNE 11, 2015, 9:30 a.m.

 2

 3                    Trial, Day 8, held at the United States

 4          District Court, for the District of Rhode

 5          Island, One Exchange Street, Providence, Rhode

 6          Island, pursuant to Agreement before Tara L.

 7          Wosny, a Certified Shorthand Reporter, and a

 8          Commissioner within and for the State of

 9          Rhode Island.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        APPEARANCES:

 2        KRAMER LEVIN NAFTALIS & FRANKEL, LLP

 3        BY:  Gary P. Naftalis, Esquire,

 4        Jonathan M. Wagner, Esquire,

 5        Tobias B. Jacoby, Esquire,

 6        Daniel P. Schumeister, Esquire

 7        1177 Avenue of the Americas

 8        New York, NY 10036

 9        212.715.9253

10        gnaftalis@kramerlevin.com

11        tjacoby@kramerlevin.com

12        Counsel for the Plaintiff

13

14        PATRIDGE SNOW & HAHN, LLP

15        BY:  Steven E. Snow, Esquire

16        40 Westminster Street, Suite 1100

17        Providence, Rhode Island 02903

18        401.861.8200

19        ses@psh.com

20        Counsel for Plaintiff

21

22

23

24

25
```

```
 1          APPEARANCES CONTINUED:

 2          LOCKE LORD, LLP

 3          BY:  Deming E. Sherman, Esquire

 4          Providence, Rhode Island 02903

 5          401.274.9200

 6          deming.sherman@lockelord.com

 7          Counsel for the Defendant

 8

 9          CALDWALADER, WICKERSHAM & TAFT

10          BY:  Louis M. Solomon, Esquire,

11          Yan Grinblat, Esquire,

12          Colin Underwood, Esquire, and Jennifer Chiang,

13          Esquire

14          One World Financial Center

15          New York, New York 10281

16          212.504.6000

17          louis.solomon@cwt.com

18          yan.grinblat@cwt.com

19          jennifer.chaiang@cwt.com

20          Counsel for the Defendant

21

22

23

24

25
```

```
1        APPEARANCES CONTINUED:

2        RHODE ISLAND DEPARTMENT OF THE ATTORNEY GENERAL

3        BY:  Adam J. Sholes, Esquire

4        150 South Main Street

5        Providence, Rhode Island 02903

6        274.4400 x 2219

7        Ajsholes@riag.ri.gov

8        Counsel for the Attorney General of the State of

9        Rhode Island

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2    WITNESS:              Direct   Cross   Redirect   Recross

3

4    LINFORD FISHER

5

6    By Mr. Solomon       9                228

7

8    By Mr. Wagner                 137                  243

9

10

11

12                         E X H I B I T S

13

14    PLAINTIFF                        FOR ID

15

16    Dr. Fisher's Rpt 11/24/14         #408

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S

 2                       *   *   *

 3             THE COURT:  Good morning, everyone.

 4             Mr. Solomon, did you and Mr. Wagner

 5     come to an agreement about witnesses?

 6             MR. SOLOMON:  We were not able to do

 7     that, Your Honor, regretably.  Our next, and I

 8     believe next live witness is Dr. Linford

 9     Fisher.  I hope we will be able to complete his

10     testimony today.  If not, I will have a brief

11     application for you at the end of the day.

12             I'm still willing to [inaudible] just

13     not able to do it yet.

14             MR. WAGNER:  We're going to try our

15     best to finish today.

16             THE COURT:  Why can't we come to an

17     agreement because I could impose an agreement on

18     you.  It seems crazy for an entire day for a

19     witness with the way that we have conducted the

20     case so far and its examination that it couldn't

21     otherwise be done.

22             Is there something special about this

23     witness?

24             MR. WAGNER:  I've asked for an estimate

25     of the amount of time, and I haven't gotten
```

1           one.  If I had an estimate -- I also asked for

2           the topics.  The problem with Dr. Fisher is he

3           has a 65-page report.  I don't know what topics

4           he's going to cover.  So if I had some

5           understanding of what he's going to cover and

6           what the time would be, I could give a

7           response.  I did pose that question.  I'm happy

8           to come to some kind of an agreement if I knew

9           that information.

10                  MR. SOLOMON:  Your Honor, what I told

11          Mr.  Wagner last night was that we were going to

12          go chronologically, that the best way to

13          communicate Dr. Fisher's opinions.  I was

14          willing to split the day with him.  I've been

15          overly generous to the defendant on cross, and

16          I'm still willing to do that, Your Honor.

17                  MR. WAGNER:  If I could get a firm time

18          period, an amount of time that Dr. Fisher is

19          going to testify, I could --

20                  THE COURT:  Mr. Solomon, just proceed.

21                  MR. SOLOMON:  Your Honor, Shearith

22          Israel calls Professor Linford Fisher.

23                  LINFORD FISHER, sworn.

24                  MR. SNOW:  Please state your name, and

25          spell your last name for the record.

1          THE WITNESS:  Linford Fisher,

2     F-I-S-H-E-R.

3          THE CLERK:  Thank you, you may be

4     seated.

5          THE COURT:  Dr. Fisher, get yourself

6     comfortable and then once your seat is in the

7     appropriate place, pull that mic in as close to

8     your mouth as possible.  It may feel a little

9     unnatural, but if you can constantly remind

10     yourself to speak into it, that would be

11     helpful.

12          THE WITNESS:  Thank you, Your Honor.

13               *   *   *

14     EXAMINATION BY MR. SOLOMON

15  Q.  Dr. Fisher, the discussion that the parties had

16     with the Court about the time of your testimony

17     is not that we're not interested in what you

18     have to say, it's just that maybe all good

19     things should have an end.

20  A.  Yes.

21  Q.  But please tell the Court what your current

22     position is?

23  A.  I'm an assistant professor of history at Brown

24     University.

25          MR. SOLOMON:  And, Your Honor, just for

```
 1          everyone's clarity, we did hand out a binder of
 2          the documents, some of which I intend to be
 3          showing the professor.  And in the front pocket,
 4          I hope, are demonstratives that I think should
 5          be taken out separately so you don't have to
 6          find them in the binder.
 7                   THE COURT:  Got it, thanks.
 8          BY MR. SOLOMON:
 9     Q.   So you're an assistant professor at Brown, you
10          said.  For how long have you held that
11          position?
12     A.   I've been there since 2009.
13     Q.   Is that a tenured position?
14     A.   It was tenured track, and I received tenure in
15          December of 2014, just last year.
16     Q.   Okay.  Have you taught prior to being at Brown?
17     A.   I did.  I taught for one year at Indiana
18          University in South Bend.
19     Q.   Tell the Court about your education.
20     A.   I received my bachelor's degree in 1999 from
21          Lancaster Bible College in Lancaster,
22          Pennsylvania.  I received two masters, one in
23          church history, one in religion from Gordon-
24          Conwell Theological Seminary, just north of
25          Boston.  And I received my doctorate in American
```

1          religious history from Harvard University in

2          2008.

3     Q.   What areas of history do you focus on?

4     A.   My degree is in American religious history, the

5          entire span, and I have specializations in early

6          American history in New England history and

7          Native American history and the history of

8          slavery.

9     Q.   And do you teach at Brown?

10    A.   I do teach at Brown.

11    Q.   And what courses?

12    A.   I teach a wide range of courses.  I teach a two

13         semester survey on the history of American

14         religion, which is a lot of fun because that

15         second survey class, especially we deal with

16         stuff that happens yesterday and today in the

17         news.  So I urge by students to come to class

18         with things that they want to talk about in the

19         news.

20    Q.   We all prefer things that happened 250 years

21         ago, so maybe you've come to the wrong

22         courtroom.

23    A.   Obviously the historian isn't trusted in the

24         news.   So I also teaches classes specifically

25         on early America, Colonial America, New England

1          history, the history of slavery, the history of

2          Native Americans.

3      Q.  And have you published in the area of history?

4      A.  I have indeed.  I have two books that are out

5          already, the most recent one in 2014 was

6          co-edited with a Brown undergrad and a local

7          historian on Rhode Island history on Roger

8          Williams, and my first book came out in 2012.  I

9          have about a dozen articles and book chapters on

10         a wide range of topics related to American

11         religious history, Native American history.

12         I've given presentations on a variety of venues

13         on these topics as well.

14     Q.  The 2014 book, you say it deals with Rhode

15         Island history.  Does it deal with religious

16         history in Rhode Island?

17     A.  Yes.  Absolutely, yes.  Roger Williams, the

18         founder of Rhode Island.  And there was a

19         document, a manuscript document written in the

20         margins of a book that we discovered and

21         interpreted, deciphered and published this

22         essay.

23     Q.  Now, during 2012/2013, did you participate in a

24         something called a Spectacle of Toleration?

25     A.  Indeed.  This was a series of academic and

```
 1              public events that was related to the 350th

 2              anniversary of the 1663 charter.  I don't need

 3              to remind people in the room from Rhode Island

 4              about those events.

 5                      One aspect of that, in addition to the

 6              public events that were held was an academic

 7              conference specifically on the question of the

 8              religious toleration in the early part of the

 9              world, but also coming up into the present.  So

10              I was on the steering committee that was also

11              sponsored by the Rhode Island Council for

12              Humanities, Salve Regina University and other

13              nonprofit entities in Rhode Island.

14       Q.     Most of us have to slow down only when we're

15              reading.  You need to speak a little bit more

16              slowly.

17       A.     Okay.

18       Q.     Did you have any personal knowledge of the Touro

19              Synagogue prior to this engagement?

20       A.     Absolutely.  I cover the history of American

21              Judaism in my survey of classes.  And in the

22              summer of 2011, I've also taken my students down

23              to the Touro synagogue for visitations, which is

24              fantastic.

25       Q.     Now, is your writing on teaching limited to the
```

1          colonial period, because I know you mentioned

2          the colonial period a few times.

3     A.   No, not at all.  I mean, broadly speaking, as I

4          said, my degree is American religion and my

5          graduate training was in the full span of

6          American religion.  My sort of publications have

7          been in early American history generally, which

8          in a generous reading is up through 1820 to

9          1850.  So not just limited to colonial New

10         England.

11    Q.   Would you look at the document that's behind tab

12         483.

13              MR. SOLOMON:  So we've marked for it

14         for identification as DX 483, and it is in

15         evidence, Your Honor.

16              THE COURT:  Well, if it's either marked

17         for ID or it's in evidence, which is it?

18              MR. SOLOMON:  At the beginning of my

19         sentence it was marked for ID, and then I

20         remembered that, Your Honor, there is no

21         objection to this document.

22              THE COURT:  So it's actually in

23         evidence?

24              MR. SOLOMON:  Yes, Your Honor.

25         BY MR. SOLOMON:

1   Q.    What is this?

2   A.    This is an older version of my C.V., but my

3         C.V., nonetheless.

4               MR. SOLOMON:  Your Honor, at this point

5         we would proffer Professor Fisher as a historian

6         with the specialty in American religious history

7         and early American history.

8               THE COURT:  Mr. Wagner, any questions

9         on the qualifications?

10              MR. WAGNER:  Well, we made the motion,

11        and I understand Your Judge's ruling.  We do

12        challenge his qualifications, and I do object.

13        I understand Your Judge's ruling.  I will

14        reserve my questions about qualification, the

15        actual questions for the cross, but I do

16        object.  And, again, I object to the exercise

17        because I think what he's going to be going

18        here, again, is constructing a factual narrative

19        from the evidence and testifying to subjective

20        motivations of the parties, and I just -- the

21        receipt decision on this issue, the Louie V. Tom

22        against Sunny Merchandise, Corp., 2015 Westlaw,

23        149-9449, by Chief Judge Preska in the Southern

24        District, who said at star 17, "An expert may

25        neither be presented to the jury solely for the

1          purpose of constructing a factual narrative

2          based upon record evidence, nor attributing

3          subjective motivations to the parties."

4                    THE COURT:  I'm going to qualify

5          Dr. Fisher as an expert able to give opinion

6          testimony in this matter based on his experience

7          and background.

8                    Go ahead, Mr. Solomon.

9                    MR. SOLOMON:  Thank, Your Honor.

10         BY MR. SOLOMON:

11    Q.   What were you asked to do in this case?

12    A.   I was given three basic charges in this case

13         early on.  The first had to do with the

14         relationship between the various parties under

15         consideration here.

16                   Let me just explain a bit what I mean

17         by that.  The first set of relationships is

18         between the original colonial Congregation,

19         Yeshuat with a "Y" Israel, CYI that was here in

20         Rhode Island in the 17th and 18th Centuries.

21         And the question is their relationship between

22         that congregation and the newly-formed 1894 --

23         incorporated in 1894 CJI.

24         So what was the relationship between those two

25         parties.

1        In the process of investigating that

2    question, it naturally led to the question of

3    those two entities and the relationship to

4    Congregation Shearith Israel in New York, and

5    then of course all three of those the question

6    was raised about how many those three parties

7    relate to Touro Synagogue and the things inside

8    of if that make the use of that synagogue

9    meaningful.

10   Q.   All right.  That was the first task?

11   A.   That was the first task.

12   Q.   What was the second?

13   A.   The second one was to parse and understand and

14       investigate the usage of several terms that show

15       up in the documents repeatedly.  One of these is

16       appurtenances.  Another is paraphernalia.

17       There's other words like fixtures, furniture,

18       personal property, sacred removables.

19            And the question is, what do those

20       words mean in the specific context of American

21       religion more generally, but also particularly

22       in the context of the documents under

23       consideration here for this case.

24   Q.   Both the first charge related to the

25       relationships, second -- can I say usage?

1   A.   Usage of these terms.

2   Q.   What was the third request that we made?

3   A.   The third had to do with the broader picture,

4        the broader context for all of these

5        conversations, which is to say, it was to try to

6        understand the conduct of these different

7        parties and entities as it relates to over time

8        and to try to understand whether or not one

9        could parse from the documents what sort of

10       roles CYI had, for example, until they were --

11       essentially ceased to exist in the 1790s.  And

12       then what role Shearith Israel played when they

13       -- are there before the disbanding but also

14       through the 19th Century when there was nobody

15       at Touro.

16            And, again, you were interested in what

17       role CJI, once they were incorporated in 1894,

18       this new congregation, what role they play and

19       how they relate together, what kinds of

20       relationships they enter into and how their

21       actions, as exhibited by the documents, might

22       give some insight into the roles they thought

23       they were playing in this process as well wether

24       as owner, lessor, lessee and so far forth.

25   Q.   Can I call the last one conduct-based

1   investigation?

2   A.   Conduct fits well.

3   Q.   So if I just can summarize them as relationships

4        and usage and conduct, are those in inquiries

5        that you have made elsewhere in your

6        professional career from a historical point of

7        view?

8   A.   Absolutely.  I mean, the research I've done in

9        other kinds of settings whether it's early 19th

10       Century missionary organizations --an articles

11       that was just published recently -- or whether

12       it's land cases related to Native Americans from

13       the colonial period.

14            THE COURT:  You're going to have to

15       slow down.

16            THE WITNESS:  I'm sorry.

17            THE COURT:  It's not a natural thing

18       testifying in court, but the court reporter

19       needs to get it all down.

20            (Last answer read back.)

21   A.   In the colonial period.  So, yes, these

22       questions and this kind of analysis has

23       certainly been a part of my work.

24   Q.   Now, you are not a lawyer?

25   A.   I am not a lawyer.

```
 1    Q.   And have we asked you to give any legal

 2         opinions?

 3    A.   Not at all.

 4    Q.   And do you have any legal opinions on any of the

 5         issues here?

 6    A.   No.

 7    Q.   Okay.  And you are not versed in Jewish law

 8         either, are you?

 9    A.   I'm not.

10    Q.   And have we asked you to give any opinions on

11         Jewish law?

12    A.   Not at all.

13    Q.   Do you have any opinions on Jewish law relevant

14         to the issues here?

15    A.   No.

16    Q.   Now, how did you go about forming the tasks that

17         we asked you to perform?

18    A.   I did what any good historian does and I went to

19         the primary source documentation.  Some of that

20         was produced by both sides in this case that was

21         made available to me.  And part of what I was

22         looking at was related to the independent

23         research that I conducted to try to understand

24         whether or not there were other pieces of the

25         story, other pieces of evidence that were not
```

1       produced that were not made available to me.

2              And then once I looked at what I

3       thought and what I think is a reasonable span of

4       documents for the issues at hand here, I stepped

5       back and tried to understand what other

6       historians also had interpreted regarding these

7       particular entities and parties and this case.

8       I tried to understand the secondary sources in

9       light of the primary sources.

10   Q.  And in your work do you consider a hierarchy of

11       sources when you were doing the research?

12   A.  I think historians want to see stuff in the

13       primary evidence.  So this is really what's most

14       important.  Especially when you get into the

15       secondary evidence, some of it is older.  Stuff

16       published in the 1930s, as I think we've seen

17       already in the case.  There's not always

18       footnotes.  There's not always a paper trail.

19              So you can't always take a secondary

20       source at face value.  You want to go back and

21       follow and see what they're citing, what they're

22       using.  So this is of course important to me.

23       If I can find something in the primary sources,

24       it speaks more strongly to me than secondary

25       evidence.

1    Q.    And did you consider as part of your task, did

2          you consider it necessary to have an in-depth

3          knowledge of Jewish law?

4    A.    No.

5    Q.    All right.  Were you able to reach conclusions

6          on the issues of relationships, usage and

7          conduct?

8    A.    I was.  I'll try to be brief and talk slowly.

9    Q.    Good, because all I asked you was whether you

10         were able to reach conclusions, and so the

11         answer is you were?

12   A.    The answer is I was.

13   Q.    All right.  Well, with respect to the first of

14         the issues, what opinions, if any, do you have

15         concerning the relationships between and among

16         the parties?

17   A.    So to start with a question of the relationship

18         between the original CYI Newport and the 1894

19         CJI, my conclusions are that there absolutely

20         was no connection from my perspective as a

21         historian as the documents guiding me in this.

22              There was no connection between these

23         two congregations.  You have to understand that

24         the original CYI is coming from a completely

25         different part of Europe.  They're coming from

1    western Europe, from what is now Spain and

2    Portugal and they have their own set of rituals

3    and customs and tombs that they're using.  They

4    come in the 17th Century.  And the congregation

5    that's formed then in Newport in 1894 is a part

6    of a completely different wave of immigration.

7    There is no family connection.  There is no

8    geographical connections in terms of origins in

9    Europe.

10        The 1894 congregation is coming from

11   eastern Europe, from Germany, from Poland with

12   their own set of rituals and cultures, and they

13   come at a much, much later date.  And they show

14   up in Newport and begin to organize but

15   completely separate from any family and lineage

16   connections to the original CYI in Newport from

17   the colonial period.  And so with regard to

18   those two, there is no connection.

19        With regard to how Shearith Israel

20   relates to these two entities, what is evident

21   from the documents is that Shearith Israel

22   predates the colonial CYI and is the continuity

23   between what happens in Newport and the colonial

24   period and what happens with the sort of

25   restarting of the synagogue in 1894.

1      THE COURT:  You have to come up for air

2    every so often.  No problem.

3  A. So in 1894 Shearith Israel is the one who is --

4    not even 1894, 1880, 1881, even in the 19th

5    Century between the closing of Touro Synagogue

6    and what happens with the reopening of it in the

7    1880s, Shearith Israel is the one who was there

8    overseeing things and answering questions about

9    usage and ritual.

10      The 1880s and 1890s up to the 1903 bear

11   out that Shearith Israel is the one who is

12   organizing and authorizing the use of the

13   synagogue and the ritual objects and this

14   culminates in the 1903 lease.  From the 1903

15   lease onward, the relationship between CJI and

16   Shearith Israel is one of a lessor and lessee,

17   and this frames the entire course of the 20th

18   Century, up until the present in the 21st

19   Century.

20     MR. WAGNER:  I object to the conclusion

21   that they are lessor/lessee.  That, I believe,

22   is a legal conclusion.

23     THE COURT:  You know what, I've been

24   thinking about this as the doctor testifies, and

25   I think the appropriate way to go forward is

1    it's clear to me that they're going to be lines

2    that the Court is going to have to determine

3    about matters that Dr. Fisher can and can't

4    testify about given both his expertise and the

5    appropriateness for which he would comment,

6    including legal matters which we just heard a

7    bit of.

8      So what I'm going to do is I'm going

9    to -- subject to the plaintiff's objections, I'm

10   going to take Dr. Fisher's testimony and I'm

11   going to reserve on rulings on those matters

12   until sometime after I have a chance to review

13   the transcript.  So I think that's probably the

14   cleanest way to do this.

15     If there are -- I think that's the

16   cleanest way to do it.  That way it preserves

17   everyone's rights and it gives me a more

18   intelligent way to look at the testimony and to

19   rule on what may be somewhat fuzzy lines between

20   appropriate and inappropriate.

21     The objection is noted.  Thank you,

22   Mr. Wagner.

23   BY MR. SOLOMON:

24  Q. And Professor Fisher, if in giving any answers

25   you kind you feel like you're veering into a

 1          legal area, then I think it would be helpful to

 2          the Court if you would just explain why a

 3          historian has as something useful to say on the

 4          subject.

 5                    Did you complete now the summary of

 6          your opinion on the issue of the relationships?

 7     A.   I believe so, yes.

 8     Q.   Okay.  Now, what opinions, if any, do you have

 9          on the issue of usage, usage of terms?

10     A.   Usage of terms.  So my conclusion, my opinion on

11          this matter is that these various terms that I

12          mentioned before are appurtenances,

13          paraphernalia, fixtures, furnishings.  These all

14          refer to the same ritual items that are within a

15          synagogue that are desirable and necessary to

16          conduct services for a congregation.

17                    So maybe it's unclear to us sometimes.

18          We're looking at these terms.  We say, well,

19          they use fixtures here and personal property

20          here, but the documents make pretty clear that

21          they know what they're talking about.  They --

22          it's more than just the synagogue that's at

23          stake here.  The things that are inside of it,

24          the books of the law, the shofar, the rimonim.

25          These are the things that are being referred to

```
 1              when these terms are used in this specific

 2              context.

 3    Q.        On the third subject that relates to the conduct

 4              of the parties.  What opinions, if any, do you

 5              have?

 6    A.        Though I touched on this briefly earlier, and,

 7              again, I'm speaking as an historian here, not

 8              meaning to give any legal conclusions, but when

 9              you look at the entire scope of what is

10              happening here, which I think -- I'm a

11              historian.  This is how I think.  I think in the

12              big picture, as well these more minute details

13              of the documents.

14                   When you look at it from start to

15              finish, it seems apparent to me, again, that the

16              conduct of Shearith Israel has been consistent

17              from the time of their arrival in New York City

18              and aiding the Newport Congregation during the

19              building of the synagogue and in taking it over,

20              receiving the title and the transfer of

21              property.  And in the 1820s after the closing of

22              the synagogue and aiding the Newport

23              Congregation in this new wave of immigration to

24              try to start using the synagogue in Newport

25              again, to navigating the different legal
```

1     difficulties, the Court cases and so forth in

2     the 1890s and early 20th Century.  And then in

3     serving through the lease -- again, I'm not

4     trying to offer a legal opinion, but just saying

5     there is a lease in place that governs the

6     activity and the conduct of Shearith Israel and

7     CJI after 1903.

8          MR. WAGNER:  Your Honor, just note my

9     objection to any discussion, including the

10    lease, "the Court opinion."  I mean, that's

11    something for the Court.  I don't think there

12    should be any testimony about the Court

13    decision.

14         THE COURT:  You're talking about the

15    1903 court decision?

16         MR. WAGNER:  Yes, sir, and any other

17    court decision that may be referenced.  I mean,

18    it's hard enough for us to figure --

19         THE COURT:  I could conceive,

20    Mr. Wagner -- I'm trying to think about this as

21    it comes in.  I could conceive a historian's

22    perspective on the use of historical terminology

23    potentially being relevant to a document or a

24    contract maybe.

25              Clearly whether the lease is in effect

1          or not is a determination that the Court will
2          make not based on any expert opinion other than
3          my own not expert opinion, about it.  So I do
4          think that rather than -- I think the cleanest
5          way to get through this, again -- I agree with
6          you, actually, on that objection, but I think --
7          and I continue to note your objections.  Feel
8          free.  I'm going to assume that the plaintiff
9          continues to object to all of the testimony so
10         the record is preserved in that regard.
11             That will allow me to go back when
12         we're putting all of this together.  I think
13         that makes the most sense.  It may be that we
14         venture into such an area that it is so obvious
15         that I will stop it.  But your record is
16         entirely protected that you object to both the
17         totality of the testimony and to each of the
18         opinions that come out.  So I'll make sure the
19         record is clear in that regard.
20             MR. WAGNER:  I don't mean to bring up a
21         sore subject, and all of us do want to get home,
22         Your Honor, as much as Mr. Solomon, but if he
23         starts testifying about the Court decision, I
24         have a lot of material that I have to then cover
25         with him.

1              THE COURT:  I clearly was not happy

2        that an agreement wasn't reached, but you're

3        trying the case.  You're both trying the case,

4        and you have to do what you have to do.  I

5        understand the pressure is on both sides toward

6        that end.

7              So let's continue to plow through it

8        and see where we are when we get there.

9              MR. SOLOMON:  And I continue to be

10       willing to split the time with counsel.

11             With respect to the Court decisions,

12       Your Honor, I told Mr. Wagner last night that I

13       don't intend to have the witness go through the

14       Court record or the Court decisions.  Of course

15       that's for Your Honor.  They are, however,

16       relevant to his opinion in terms of the

17       historical context in which they sit.

18             Your Honor will find it helpful or not,

19       but that's what I intend to draw out of him, not

20       the substance of the decisions or the

21       arguments.

22             THE COURT:  Right.  That's why I said

23       it's going to take some parsing because what I

24       heard was the leases, which are in effect, and I

25       know that's a contested issue.  So rather than

```
 1              try it on the spot, rule on those kinds of

 2              matters makes a lot more sense when it's all

 3              over for me to be able to do that.  So, again,

 4              to your point, I can understand the part that

 5              you're trying to get in.

 6                   So thanks to both of you by.

 7         BY MR. SOLOMON:

 8    Q.   Professor Fisher, you note the historical figure

 9         Myer Myers, right?

10    A.   I do.

11    Q.   Okay.  And you know that this case is about

12         rimonim made by Myer Myers?

13    A.   I do.

14    Q.   Okay.  Is Myer Myers seen in a historical

15         context that you can share with the Court?

16    A.   He's well-known.  He's well-known for a number

17         of reasons.  He's well-known because he's the

18         first Jewish silversmith admitted to the

19         silversmith guild, and he is -- if you think

20         about the history of Jews coming to North

21         America and the meaning of that, having arrived

22         into a very exclusive guild and then producing

23         the very first articles of Judaica in North

24         America.  He is revered historically, and I

25         think appropriately so.
```

```
 1    Q.    Okay.  And with respect to the rimonim, the Myer
 2          Myers rimonim, do they fit in a historical
 3          context?
 4    A.    There is many ways to understand them in a
 5          historical context.  Because he created these
 6          pairs of rimonim, that alone would sort of allow
 7          them to take on a special place in the history
 8          of American Judaica, which I am not an expert
 9          in, but as a historian I see this reflected in
10          the documents and up to the present.  But there
11          is also something about them in particular
12          because of their history, because of their
13          connection to the colonial period that I think
14          allows them to take on a special significance in
15          a variety of ways over time.
16    Q.    Okay.  Can you give the Court any of those ways
17          just in summary?
18    A.    Well, again --
19    Q.    Slowly and in summary.
20    A.    Slowly.  So if you think about the way in which
21          Myer Myers is this colonial figure, and you
22          think about the way that these particular
23          rimonim at some point became associated both
24          with Newport, but also with Touro Synagogue, and
25          you think about the way that Touro Synagogue has
```

1    taken on this role as a symbol of something

2    special in Rhode Island that takes place here.

3         I mean, Rhode Islanders are kind of

4    funny that way.  We have that pride about our

5    history.  And for many of us who work in

6    American religion, the Touro Synagogue and the

7    story of the Jews in Newport is a part of that

8    state and national narrative, and I don't think

9    it's just our story as Rhode Islanders.  It's a

10   National story.

11        And these rimonim which have become a

12   associated with Newport also then are part of

13   the story, and they represent the kind of

14   religious freedom that the United States came to

15   represent not just for the western world, but

16   for the world.  And these rimonim embody part of

17   that history, just as the Touro Synagogue

18   embodies part of that history.

19   Q.   When did the Newport Jewish community begin?

20   A.   Records indicate in the 1650s was the first wave

21        of immigration to Newport, roughly 1658.

22   Q.   Why did the Jews start to settle in Rhode Island

23        and in Newport in particular?

24   A.   Well, they had a long journey to get to Newport,

25        as you know.  So they're coming from the

1      Iberian Peninsula in the 15 Century.  There's a

2      lot of persecution.  You have a few options.

3      You can convert.  You can be persecuted or put

4      to death or you can flee.  Not great options I

5      might say.  And so these Jews a portion of them

6      end up fleeing.

7           They go to the Netherlands for a bit.

8      They come down to different parts of the Dutch

9      Atlantic Empire to Recife, which for a while was

10     part of a Brazil, but was part of the Dutch

11     empire as well.  When these get uncomfortable

12     there, they flee to North America and they come

13     to Newport in 1658.

14  Q.  Was there a reason they came to Rhode Island in

15     particular?

16  A.  Even by 1658 Rhode Island is becoming known as a

17     place of established religious freedom -- for

18     religious freedom.  Not just the ability to be

19     there and pray quitely and hope you don't get

20     your door banged down by someone who wants to

21     throw you in prison, but full religious liberty

22     to worship freely and publicly.

23          And Rhode Island because of Roger

24     Williams and other individuals, Roger Williams

25     viewed that you should not be persecuted for

1              what you believe in.  So atheists, Jews,

2              Muslims, heretics, should be welcomed and not be

3              disturbed by the government.  People in

4              Massachusetts called Rhode Island the latrine of

5              New England.  So this is kind of the

6              reputation.  All the religious riff-raff goes

7              here because they had the freedom to worship.

8                   So the Jews come here not just to live

9              but to worship freely, to establish themselves,

10             to establish their rituals and rites, RI-T-E-S,

11             and to worship together.

12        Q.   Fast forward about 100 years.  Did there come a

13             time when the Jews of Newport began to build an

14             edifice, a synagogue, a place of worship?

15        A.   Yes.  So in the late 1750s, there was Newport

16             community, the Jewish community is growing.

17             Newport as a city is growing and increasing in

18             prominence and becoming a major shipping center

19             of the British Atlantic, and the Jewish

20             community is also growing, and they have a

21             desire to build an actual synagogue building

22             within which to worship.

23        Q.   With respect to the first of the issues that you

24             looked at, the relationship, what role, if any,

25             did Shearith Israel play in connection with the

1      building of the synagogue?

2   A.   Well, there are two different appeals for

3        funding that take place during the process of

4        building, buying the land and building the

5        synagogue.

6   Q.   And did Shearith Israel take a part in either of

7        those?

8   A.   Absolutely.  So we have clear records regarding

9        the first contribution that was made, 149 pounds

10       and 6 pence.  And there is -- hence the second

11       contribution that's made later on as well from

12       Shearith Israel.

13  Q.   I'm going to fast forward a little bit also.

14       There seems to have been a war that took place

15       in between.  What happened to the Jewish

16       community that was in Newport and when?

17  A.   So the American Revolution takes place and the

18       British -- in the 1770s the British occupy

19       Newport, which leads to the fleeing of most of

20       the Newport residents out of the city, which

21       includes a vast majority of the Jewish

22       population as well.

23            The war is over in 1783.  Some of the

24       Jewish and non-Jewish residents return to

25       Newport, but Newport itself never returns to its

```
 1              former glory, not in the same way anyway, and

 2              the Jewish community itself never recovers

 3              numerically.

 4      Q.      Do the records indicate where most of the Jews

 5              relocated after the war?

 6      A.      A lot of them returned and go to New York City.

 7              Some of them had come there in the first place

 8              and so they end up in New York City.  Some of

 9              them go to Boston, other portions of the east

10              coast.

11      Q.      Did there come a time when the synagogue, the

12              Newport Synagogue wasn't having services

13              anymore, wasn't a house of worship?

14      A.      The records did indicate that by the 1790s, from

15              what we can tell, that the regular services had

16              ceased in Newport at some point.

17      Q.      And do the records tell you when the last of the

18              Jews left Newport?

19      A.      They do.  We have clear documentation by Stephen

20              Gold who is a quaker resident of Newport,

21              non-Jewish in 1822 who records in his diary that

22              the last Jew had left Newport for New York City,

23              Moses Lopez.

24      Q.      Okay.  What happened to the Newport Synagogue?

25      A.      Again, the records that we have indicate that
```

 1          the building was considered owned by Shearith

 2          Israel.  And the title and indeed the records

 3          suggest the personal property transferred to

 4          Shearith Israel.

 5     Q.   Do you know how Shearith Israel got into that?

 6          I know you told us about the building of the

 7          synagogue, but what role did they play?  How did

 8          they did get into the act in the 1820s?

 9     A.   Again, you have to remember that there is a deep

10          family connection.  There was at the beginning

11          and there was throughout and then there was at

12          the end of CYI and the original Newport

13          community.

14               There is a family connection to

15          Shearith Israel.  And so when the Jewish

16          community in Newport leaves Newport, and indeed

17          up through 1822, a lot of them returned to New

18          York City.  So there is a fairly organic

19          connection between Shearith Israel and a concern

20          for these same congregants who had been

21          worshiping up there for the care of the Newport

22          Synagogue.

23     Q.   What is being done with the Newport Synagogue?

24     A.   It has -- records we have indicate it was

25          empty.  It was unused, largely unused from parts

```
1              of the 1790s up until -- well, frankly until the

2              1880s in term of regular use.

3         Q.   Were any repairs or maintenance done during the

4              1820s or '30s?

5         A.   Yes.  We have evidence of correspondence

6              regarding necessary repairs, desired repairs.

7         Q.   How did that take place?

8         A.   Well, we have several records that -- one in

9              particular that there is a Newport City Council

10             minutes that indicate that -- well, let me step

11             back a bit further.

12                  In 1822 Abraham Touro, who was the son

13             of the first hazan in Newport, Isaac Touro.

14             Abraham Touro passes away in 1822 and bequeaths

15             $10,000 to the City of Newport for the

16             maintenance of the synagogue in Newport.  The

17             problem is they have the money.  They have the

18             authorization from the general assembly which

19             came in 1823, but they don't have the keys to

20             the synagogue.  So in 1826 they resolve to write

21             to the Shearith Israel for the keys so that they

22             actually work with Stephen Gold and other

23             people, including Shearith Israel.

24                  That same minute indicates that they

25             are communicating to Shearith Israel a desire to
```

1        have a conversation about what things should be

2        repaired and in what way.  And so this is how we

3        know that the repair process started.

4    Q.  And what role is Shearith Israel playing during

5        these decades?

6    A.  Indications are that they are having some input

7        in terms of the maintenance.  But I would

8        characterize the overall role as one of ritual

9        oversight.

10   Q.  Okay.  Let me ask you to look at Exhibit 20, D

11       24, please.

12            Tell the Court what this is, if you

13       could, both slowly and quickly, that would be

14       helpful.

15   A.  Simultaneously.  This is a letter dated

16       September 29, 1826 from Moses Lopez, who if you

17       recall, was the very last Jew that left Newport

18       in 1822.  And the letter is written from Moses

19       Lopez in New York City to Stephen Gold in

20       Newport.

21   Q.  I would like to draw your attention to page 2

22       and tell the Court what, if any, relevance this

23       has to any of the relationship usage or conduct

24       opinions that you've offered?

25   A.  So if you recall, this is after the Newport City

1        Council meeting and resolution that I mentioned

2        earlier regarding requesting the keys from

3        Shearith Israel.  Moses Lopez says at the top of

4        page 2 of this document, "that building,"

5        meaning the Newport Synagogue, "is now

6        considered as owned at present by the Hebrew

7        Society in this city."  And with regard to the

8        repairs he says, "I am doubtful whether the

9        trustees of it," meaning Shearith Israel, "will

10       timely submit to the forced agency of the

11       council to repair their own property without

12       their consent."

13   Q.  And the reference to "this city," what city is

14       that?

15   A.  Moses Lopez is in New York City.

16   Q.  Okay.  Let's look at DX 448, please.  Did you

17       consider the exhibit that we just looked at a

18       piece of primary evidence, primary source?

19   A.  Indeed, yes.

20   Q.  Now, have you seen in any secondary sources that

21       letter being referred to?

22   A.  I have, yes, in different places.

23   Q.  I'm showing you DX 448, which you can't read the

24       spy note, but it is a book entitled, The Story

25       of the Jews of Newport by Rabbi Gutstein, who

1          was the Rabbi of CJI.  And I'm calling your

2          attention to page 239.  Page 239 of the book and

3          page 274 of the exhibit of the page.

4                  Please describe to the Court what

5          relevance, if any, this has to the opinions that

6          you've offered?

7     A.   Well, this is a secondary source confirmation of

8          what we just saw in the letter to Stephen Gold

9          to Moses Lopez, and Gutstein says here about

10         halfway down the page, "The synagogue at this

11         time passed into the ownership of the New York

12         Congregation Shearith Israel of which the

13         majority of the heirs of the original owners

14         were members."

15                 Then he goes into the letter that we

16         just saw.

17    Q.   Okay.  Let me ask you to look at DX 19.  This is

18         a page from the CJI website.  Does this have any

19         use to you in terms of the opinions that you've

20         offered and the story that you're now telling?

21    A.   Indeed.  So if you go to the second page of D 19

22         about halfway through the paragraph entitled,

23         The Quiet Years, it says, "Legal oversite of the

24         building, its contents and its deed was handed

25         to Congregation Shearith Israel of New York."

1    Q.    Okay.  I want to talk now about the period in

2          the 1820s to 1850.  What role, if any, is

3          Shearith Israel playing with respect to the

4          Touro Synagogue?  It was still called the

5          Newport Synagogue?

6    A.    Newport Synagogue until slightly later.  So in

7          this period, 1820 to 1850, Shearith Israel

8          continues, as I mentioned before, to have

9          participation and oversight of the maintenance,

10         at least in terms of advising at times the City

11         Council of Newport.  And there is also specific

12         instances of ritual oversight as well where the

13         synagogue is very temporarily opened for

14         specific purposes that Shearith Israel is

15         involved in.

16   Q.    What role, if any, is Shearith Israel playing in

17         connection with burials?

18   A.    Shearith Israel is the one who is opening the

19         synagogue specifically for these burials?

20   Q.    Okay.  Is Shearith Israel supplying any of the

21         objects or personnel needed for a burial?

22   A.    Yes.  We have records of the minister from

23         Shearith Israel being a part of these burials.

24   Q.    Is there a record of Shearith Israel providing

25         any ritual oversight with respect to interment?

1    A.    There is.  There is a record that we have from

2          1854 when Judah Touro, who is also a son of

3          Isaac Touro, the first hazan of the synagogue in

4          the 18th Century.

5                Judah Touro passes away and is interred

6          at the Newport cemetery, the Jewish Cemetery.

7          And there is a request from the communicate they

8          would like to affirm an individual.  It's not

9          entirely clear who.  They would like to bury a

10         mutilated torah scroll with the body of

11         Abraham -- excuse me, Judah Touro.  And the

12         request comes to Shearith Israel.  Shearith

13         Israel says, you know what, we really respect

14         Judah Touro and we would love to do this, but we

15         simply can't according to our ritual guidelines

16         and rules and regulations.

17                Scroll can only be buried with someone

18         who has held an ecclesiastical office, and so

19         they denied the request.

20   Q.    Is there any historical evidence about the

21         rimonim at issue here, the Myer Myers rimonim

22         and where they were during this period of time,

23         1820s to 1850s?

24   A.    1820s to 1850s?  I've not seen any evidence

25         about the specific rimonim in that time period.

1     Q.   And is there evidence, not with respect to the

2          rimonim, but with respect to the torahs of where

3          they were?

4     A.   We have some minutes and correspondence

5          regarding some of the books of the law that were

6          at Newport.

7     Q.   And is there any relevance in your view to how

8          the torahs were treated to the questions that

9          we've asked you of relationship usage and

10         conduct?

11    A.   It's relevant, but we're not talking about

12         rimonim in those series of correspondences,

13         right, so it is of interest to see how these

14         torah scrolls are handled by the different

15         parties involved, but I would remind you that

16         it's not actually the rimonim in question.

17    Q.   How were the torahs handled?

18    A.   We have minutes and correspondence regarding the

19         torahs.  And if I could just summarize quickly,

20         there were two sefer torah that were lent to the

21         New York Synagogue in the 1760s, and in 1818

22         Shearith Israel requests them back.  And there

23         are four additional sefer torah that were at

24         Newport and Shearith Israel, also gains control

25         of those in the 1830s.

1    Q.   And are they treated separately by Shearith

2         Israel?

3    A.   They seemed to be treated slightly differently,

4         yes.

5    Q.   When is the first descriptive reference to the

6         rimonim that have been marked Newport?

7    A.   The first descriptive reference that I've seen

8         with regard to these rimonim marked Newport is

9         in 1869 in the inventory of Shearith Israel.

10   Q.   And is that inventory relevant to your inquiry?

11        We've had another testify to it but if it's

12        important to your inquiry, then we'll go through

13        it quickly.

14   A.   I think it's important a number of reasons, yes.

15   Q.   Let me ask you to look at DX 34, please, and in

16        particular page 36.  Explain to the Court why

17        this document is important to your analysis.

18   A.   So if you look -- I know the Court is familiar

19        with this document by now, but if you look two

20        thirds of the way down the page, you will see

21        two lines, one pair of ditto marked Myers, the

22        maker.  The next line says, one pair of ditto

23        marked Myers Newport.

24            And part of the reason why this is

25        important to me is that this is a firm stake in

1          the ground of where these rimonim are.  We've

2          lots of speculations, secondary source material,

3          but this shows where they were in 1869.  It's

4          clear as day.  And what is also important to me

5          is that the people who put together this

6          inventory knew how to designate ownership claims

7          outside of Shearith Israel.  They do not with

8          regard to these two rimonim.

9               If you look down on the left side of

10         the bottom, you'll see three different pair of

11         rimonim that are marked as a property of L.J.

12         Cohen, P. Freedman and Barsesas.  But if you

13         look back up to the Myer Myers rimonim, there is

14         no such designation.  One could also look to the

15         right of the two lines that I just read

16         regarding the Myers rimonim, and there are ditto

17         lines that bring down from several lines up,

18         "property of kahal" or congregation in keeping

19         of shamas.

20              MR. WAGNER:  Your Honor, just as I

21         noted yesterday on the English transcription, I

22         have an issue with how the ditto marks have

23         lined up.  So we can fix that later.

24    Q.   I think you completed your answer, and we were

25         just going to move on.

1                THE COURT:  Hold on.

2                MR. SOLOMON:  Yes, of course, Judge.

3                THE COURT:  Mr. Wagner, that's what you

4        referred to yesterday with Dr. Mann, you went

5        through on cross, and used the actual document

6        to make the point of the difference --

7                MR. WAGNER:  Yes.

8                THE COURT:  Okay.  Thanks.

9        BY MR. SOLOMON:

10   Q.   And here we're showing you the actual document,

11        Professor Fisher?

12   A.   Yes.

13   Q.   Is the explanation that you just offered to the

14        Court the same with respect to this document?

15   A.   Yes, indeed.

16   Q.   Okay.  Did you see in the inventory or anywhere

17        else that rimonim were held for safekeeping by

18        Shearith Israel for anyone?

19   A.   Yes.  These particular rimonim?

20   Q.   Fine, start with those.

21   A.   Start with those.  Well, not these particular

22        rimonim, no.

23   Q.   Okay.  Have you seen any evidence that any

24        rimonim were held for safe keeping by Shearith

25        Israel?  Just did that word come up in any of

1            the documents that you reviewed?

2    A.    With regard to this 1869 inventory or anything

3          else?

4    Q.    How about with respect to the 1869 inventory.

5    A.    Well, what I pointed out to you is what seems

6          the most relevant in terms of the property in

7          the left-hand corner on this page.

8    Q.    Do you have any evidence as to whether the

9          rimonim that were marked Newport were actually

10         in Newport at any time prior to 1869?

11   A.    I have not seen any primary source documentation

12         that indicates that these particular rimonim

13         were in Newport prior to this point.

14   Q.    Let me move to the 1850s.

15   A.    Sure.

16   Q.    What, if anything, is happening with respect to

17         the use of the Touro Synagogue or any of its

18         contents?

19   A.    So there is a brief and sporadic reopening of

20         the synagogue for summer visitors, Jewish

21         visitors to Newport.  There is a wedding that

22         takes place.  There is a few ritual ceremonial

23         events that take place during the 1850s.

24   Q.    What role, if any, is Shearith Israel playing

25         there?

1  A.  My understanding is that Shearith Israel is

2      involved in these events.

3  Q.  And CJI is not in existence at that point,

4      right?

5  A.  There is no CJI in 1850.  That's 1893, 1894.

6  Q.  All right.  Let's focus on the 1880s.  What, if

7      anything, is happening there?

8  A.  So by the time you reached the late 1870s and

9      early 1880s, as I think I alluded to before, you

10     have another wave of Jewish immigration coming

11     from Europe but it's from a very different part

12     of Europe.  As I said before, the Jewish

13     immigration that takes place in the colonial

14     period to Newport at least is largely Sephardic

15     in terms of its culture, in terms of its

16     leadership, in terms of its ritual.

17          In the 1870s and the 1880s, it's from a

18     different part of Europe.  They're coming from

19     eastern Europe, from Germany, from Poland.

20     They're ashkenazic so they have a different

21     ritual.  They're coming to Newport and hoping to

22     -- you can imagine.  You show up in Newport and

23     you're Jewish and you see the synagogue and you

24     say, well, how can we use this?

25  Q.  Do they begin using it?

```
 1    A.    Well, they do eventually, but it's not like they

 2          have any right just to march in.  I mean, the

 3          doors are locked.  They're not the owners.  They

 4          don't have any connection to it.  So they have

 5          to go through proper authorities.

 6    Q.    So what happens?

 7    A.    They begin to petition to begin using the

 8          synagogue.  It comes down eventually to Shearith

 9          Israel.  And the petition from this New Jewish

10          community is to reopen the synagogue on a year-

11          round basis, to hire a minister and to begin

12          conducting regular services.

13                Shearith Israel -- and we know this

14          from several sources.  One is a petition that

15          they sent to Newport City Council.  Shearith

16          Israel basically said, well, hold on.  We don't

17          even know who you are and how long you're going

18          to be here and you're from a different part of

19          Europe and you have different rituals and we

20          want to protect this place because our ancestors

21          worshipped here and we have some heirs who are

22          still among us who care deeply about this

23          place.

24                And so for that particular request

25          Shearith Israel declines to open it year round
```

```
 1                 because they say there is not a sufficient
 2                 number of male Jews to form a minion.  And
 3                 second of all, they say that we're concerned
 4                 about the permanence.  But then third of all
 5                 they say, but we're concerned -- we hear your
 6                 request, and we want to facilitate worship.  So
 7                 they open up the synagogue for the holy days in
 8                 1881, and then close it down again afterward.
 9        Q.       Let me ask you to look at DX 38, please.  Can
10                 you identify this for the Court?
11        A.       This is the memorial, the petition that I
12                 mentioned in 1881 by Shearith Israel to the
13                 Newport City Council.
14        Q.       Let me ask you if you could to turn to page 006
15                 at the bottom.  Describe for the Court anything
16                 of relevance there to the opinions that you
17                 offered.
18        A.       So this is actually getting back a little bit to
19                 items we talked about before in terms of this
20                 transfer of the scrolls of the law in 1818, and
21                 then later in 1832/1833.
22                     I would just highlight that this
23                 relates to my second opinion regarding
24                 terminology.  I would highlight that it says
25                 here on page 6, "These scrolls, the law, form
```

```
1              the chief and most necessary, in fact essential,

2              part of the furniture of a synagogue."

3                   So, again, this word "furniture."  It

4              might seem strange to us, right, why would they

5              use the word "furniture."  But there is no

6              confusion in their mind about what they mean

7              when they use the word "furniture" referring to

8              the scrolls of the law.

9                   MR. WAGNER:  Your Honor, just note my

10             objection to testimony about no confusion in

11             their mind.  That's just.

12                  THE COURT:  So noted.

13   Q.   I wanted to call your attention to the sentence

14        I guess -- so one above that one, which says in

15        part, It refers to the 1818 episode and

16        discusses "transfers to us for safekeeping two

17        of the scrolls of the law, which our

18        congregation had many years before loaned to the

19        Newport Congregation."

20                  Do you see that?

21   A.   Yes, I do.

22   Q.   What significance, if any, does that have to

23        your opinions?

24   A.   This is an instance, which I think is also

25        important because it involves terminology.  It
```

54

```
 1              is a reference to safekeeping, but with clear --

 2              in my mind as a historian -- reference to

 3              ownership.  So it indicates to me that ownership

 4              and safekeeping are not incompatible in every

 5              instance.

 6    Q.   Was the request to reopen the synagogue sent to

 7         Shearith Israel by the City of Newport?

 8    A.   It was.

 9    Q.   Okay.  And let me ask you to look at Exhibit 43,

10         please.  What are these?  It's Exhibit 43.

11    A.   It's the end of a minute that we don't have the

12         first page, I suppose, but I know that it's from

13         September 11, 1881.  If you look at the top here

14         of 43, there is a note here regarding Shearith

15         Israel presenting their petition to the City

16         Council and alderman.  And it says here at the

17         top of the page, second paragraph, third line

18         down.  "Resulting in their" -- the city

19         council -- "ordering the petition, the

20         application of the parties desiring the use of

21         the Newport Synagogue to be transmitted to the

22         board of trustees of this congregation."

23    Q.   Okay.  And on the next page.  We'll get the

24         first page of that for your binder at the break,

25         but on the next page.  It's DX 43 at 002.  The
```

1          top lines which in part reads, "Asking

2          permission to use the synagogue at that place or

3          worship during ensuing holy days."

4                    Do you see that?

5     A.   Yes.

6     Q.   "To have a permanent rabbi."  I'm not going to

7          read the rest of it.  What, if any, relevance

8          does that have to the explanation that you were

9          giving to the court?

10    A.   So, again, it's an indication that the request

11         by this new Jewish community did, in fact, come

12         to Shearith Israel who had the authority to open

13         it or not.

14    Q.   Okay.  Now, was the synagogue opened in 1881 for

15         the holy days?

16    A.   It was, in fact, yes.

17    Q.   Okay.  And what role, if any, did Shearith

18         Israel play in that?

19    A.   Shearith Israel seems to have done it all.  They

20         physically go up.  They open the synagogue.  The

21         rabbi of Shearith Israel conducts the services

22         for the holy days.  The books of the law and

23         other items are sent up during this time.  And

24         then when the holy days are done, the holidays

25         are done, the rabbi returns to Shearith Israel,

1           the books of the law and other items also comes

2           back to New York as well.

3    Q.     Would you look at DX 45, please.  Tell the Court

4           what this is?

5    A.     These are Shearith Israel minutes from October

6           25, 1881.  If you flip to page 2 of this

7           document, you will see about a third of the way

8           down it says, "The shamas was directed to bring

9           from Newport the sefarim and et cetera, loaned

10          to the synagogue there for service during recent

11          holy days."

12   Q.     I want to call your attention to the phrase "&

13          c."  I think you said "and et cetera."

14   A.     Sure.

15   Q.     Is that a phrase that you've seen in other

16          documents contemporaneously?

17   A.     Absolutely.  It shows up three to four times in

18          the particular set of documents that we're

19          looking at here, but it's a common shorthand as

20          well.

21   Q.     What is it a shorthand for?

22   A.     It's about context, I think.  To understand what

23          it means in this particular document, it refers

24          to everything else that would be a part of

25          opening up a synagogue and running it in terms

```
 1              of the religious and ritual items.
 2     Q.    Okay.  Was there a Rabbi appointed by Shearith
 3           Israel subsequent to 1818 for what was, I guess
 4           then, the Newport Synagogue?
 5     A.    Yes.
 6     Q.    And can you look at Exhibit 47, please.  What is
 7           this?
 8     A.    These are Shearith Israel minutes from December
 9           21, 1882.
10     Q.    Tell the Court what, if any, relevance this has
11           to the story that you're telling in connection
12           with the appointments of a rabbi by Shearith
13           Israel.
14     A.    So it is a note indicating the appointment, the
15           call to ministry of the Reverend Abraham P.
16           Mendes, who was in London at this time, the
17           Spanish and Portuguese Jews.
18                 If you look at the date, you'll recall
19           we were just talking about 1881.  This is 1882
20           after the holy days.  And so if I could say
21           there was another test run in 1882 of a
22           reopening of synagogue temporarily for the holy
23           days, and now this is in late 1882, result of a
24           conversation Shearith Israel is having about the
25           possibility to open the synagogue for year round
```

1              services.

2      Q.      Is there an organized congregation in Newport at

3              this time?

4      A.      Not that I've seen evidence of.

5      Q.      So who is doing the organizing and the

6              ministering?

7      A.      Seems to be Shearith Israel.

8      Q.      Okay.  1883, what happens in 1883 with respect

9              to the synagogue?

10     A.      In 1883 Abraham P. Mendes arrives in Newport and

11             begins officiating, begins ministering in the

12             Newport Synagogue.  I should point out, there is

13             two Mendes's here.  One is Abraham P. Mendes,

14             which was the newly-called minister of Newport

15             is the father of H.P. Mendes in New York City at

16             Shearith Israel.

17                  So Shearith Israel called the father of

18             their own rabbi in New York City to be the Rabbi

19             of this new congregation in Newport.

20     Q.      Was the Touro Synagogue reconsecrated at some

21             point?

22     A.      It was in May of 1883.

23     Q.      1883.  Would you look, please, at the

24             demonstrative set that we have in front of you.

25             We on page 9 took a picture from Gutstein's

1    book, which is in evidence at D 448, page 306.

2    Can you tell the Court what this is?

3  A.  If you look at the bottom of the page it says,

4    Order of the service at the reconsecration of

5    the synagogue.  And you can see the top is

6    actually called at this point Touro Synagogue

7    based on the bequest that had been made.

8         Newport Rhode Island, Friday, 19th --

9    25th of May, 1883.  And it's evidence of an

10    amazing and robust reconsecration that includes

11    processions into the synagogue with the scrolls

12    of the law.

13  Q.  And what role, if any, is Shearith playing in

14    the reconsecration?

15  A.  We have evidence that they are there.  They're

16    present, that they're attending this

17    reconsecration as well.

18  Q.  Any other congregation present?

19  A.  Not other than the -- this new community of Jews

20    that had been coming to Newport had been

21    arriving at Newport, but no, it's Shearith

22    Israel is the congregation that has oversight.

23  Q.  Let me ask you to look at DX 52, please.  What

24    is this?

25  A.  These are Shearith Israel minutes from May 17,

1      1883.

2   Q.   I'd like to call your attention to page 2, the

3        second full paragraph, beginning with the

4        language, "Invitation from Reverend H.P. Mendes

5        inviting the trustees on behalf of his father

6        Reverend A.P. Mendes to attend the

7        reconsecration of the Newport Synagogue under

8        his charge on the ensuing Shabbat, which was

9        seem to have accepted and ordered on file."

10            Just so the record is clear, there have

11       been some abbreviations in there that I've

12       ignored.

13            What, if any, relevance does this have

14       to what you were explaining to the Court?

15   A.   Again, it indicates the close connection of

16       Shearith Israel and the reconsecration,

17       reopening and is evidence of this invitation and

18       the accepting of that invitation by A.P. Mendes

19       in Newport to the trustees of Shearith Israel.

20   Q.   On page 003 of this Exhibit 52, there is

21       reference to the president authorizing -- I'm

22       going to quote now, "To designate two sefarim to

23       be used by the Newport Congregation during the

24       pleasure of this board and to sum not exceeding

25       $25, appropriated for the purchase of prayer

1          books, according to the sefardim minhag for the

2          use of the members of the Newport

3          Congregation."

4                  What, if any, relevance does that have

5          to your explanation?

6    A.    I think it shows several things that I would

7          highlight for the Court.  The first is that

8          there is an ongoing continuity in terms of the

9          willingness of Shearith Israel and the desire to

10         lend support and actual lending of physical

11         object to the Newport Congregation for it to

12         operate as a synagogue.

13                 And so there is a continuity.  This

14         happened in the 18th Century and the 1760s.

15         This happens during the 19th Century when there

16         is no one there.  It happens in the 1880s when

17         there is a new group of Jewish immigrants that

18         are unrelated to coming to Newport.  So that's

19         one thing that this indicates.  The second thing

20         is that it is an indication of a limited use in

21         terms of the loan as well.

22                 So designate two sefarim it says to be

23         used by the Newport congregation during the

24         pleasure of this board.  And then thirdly, maybe

25         connecting to the first one is this financial

1        donation for prayer books but, again, according

2        to the sephardi minhag.  So there is a concern

3        about ritual continuity with the prior

4        congregation in Newport.

5    Q.  In the 1892 or 1893 time periods, are there

6        records concerning any pair of the Myer Myers

7        rimonim at the Touro Synagogue?

8    A.  1892, 1893.  So we're fast forwarding a decade

9        here?

10   Q.  Yes.

11   A.  Yes, there are.

12   Q.  Let me ask you to look, please, at Exhibit 55

13       while you're turning there.  CJI is still not

14       yet in existence, right?

15            THE COURT:  What time period are you

16       talking about?

17            MR. SOLOMON:  1892, Your Honor.

18   A.  1892 there is no congregational entity called

19       CJI that's organized, no.

20   Q.  Okay.  Would you look at DX 55, please, and tell

21       the Court what this is.

22   A.  So this is a letter from Caroline Cohen, who is

23       a descendant of Moses Michael Hayes who was one

24       of the original congregational members of the

25       colonial CYI in Newport.  It's dated March 2,

1          1892.  She is writing to A.P. Mendes.  Again

2          it's confusing but A.P. is the father who is in

3          Newport at this time as the Rabbi.

4                    And she says, look, I have these bells,

5          these rimonim that have been in our family.

6          They were being used somewhere else.  That

7          congregation disbanded so they don't need them

8          anymore, and I was wondering if you might be

9          able to use them in Newport.  But if you look on

10         the backside, I think it's important to realize,

11         too, to understand sort of what she is getting

12         at.  She says at the very bottom, if you

13         notice.  She says, "please let me know whether

14         the synagogue at Newport or any Orthodox

15         synagogue in New York or Philadelphia would have

16         use for them."

17    Q.   Okay.  And does that have significance to you?

18    A.   It does for a number of reasons.  First of all,

19         the date is important, 1892.  There is no CJI in

20         Newport.  Second of all, this is to the Reverend

21         A.P. Mendes who Shearith Israel sees as their

22         representative, their appointed minister in

23         Newport.  This is an important connection to

24         Shearith Israel.

25                   And then thirdly, there is a sense

```
 1                about this rimonim possibly servicing a much

 2                larger Jewish community outside of Newport if

 3                necessary.

 4         Q.     Okay.  Let me ask you to look at DX 63, please.

 5                What is this?

 6         A.     This is Caroline Cohen writing again, the same

 7                person we just saw on the last document.  She is

 8                writing a year plus later, July 20, 1893,

 9                writing to the Shearith Israel trustees.  She

10                addresses them, if you look on page 2.  She

11                says, "Gentlemen, I desire you to take charge of

12                the silver bells lent by me to the late Reverend

13                A.P. Mendes to be used in the Newport Spanish

14                and Portuguese Synagogue.  I wish them used in

15                that synagogue by any congregation following its

16                ancient minhag, subject to your approval."  That

17                is, Shearith Israel's approval.

18         Q.     And what, if any, significance do you attribute

19                to this document?

20         A.     Several things.  First of all on page 2 there is

21                language of lending.  It says that, "silver

22                bells" that she "lent by me to the late Reverend

23                and A.P. Mendes."

24                     So understanding in her mind is that

25                this was something that was temporary to be
```

1          used.  And then when A.P. Mendes passes away,

2          that that loan is over.  And so now she is

3          contacting Shearith Israel and saying I want you

4          to take charge of them and they can be used in

5          Newport by any congregation.  It's not only for

6          one specific congregational entity in Newport.

7      Q.  Is there an indication in the letter of who

8          decides which congregation it's used for?

9      A.  Again, it's Shearith Israel, trustees for

10          Shearith Israel.

11      Q.  You mentioned that during this period, between

12          1892 and 1893, Reverend A.P. Mendes dies?

13      A.  Reverend A.P. Mendes does die in 1893, in April

14          I believe it is.

15      Q.  What happens, if anything, to the Jewish

16          community up there?

17      A.  So when the Reverend A.P. Mendes dies, that

18          there is a schism within the Jewish community

19          more generally.  There are at least two fashions

20          that are organized, and both of them are vying

21          for use of the synagogue and the religious items

22          inside of it.

23      Q.  What role does Shearith Israel play in

24          connection with that schism?

25      A.  Well, they have to try to figure out what is

1           going on and understand the situation.

2    Q.    So what does Shearith Israel do?

3    A.    What does Shearith Israel do in response?  Well,

4           they form a committee and try to understand what

5           is happening.

6    Q.    Okay.  During this time, is CJI coming into

7           existence?  And I'm not asking for any legal

8           sense.

9    A.    Sure.  Yes, we have records of them of the very

10          first meeting of this newly formed CJI.  CYI

11          they called themselves at first in May of 1893.

12   Q.    And so in 1893, that's ten years after what

13          became as the Touro Synagogue was reconsecrated;

14          is that right?

15   A.    Twelve years after the first temporary reopening

16          of the synagogue, yes.

17   Q.    Let me ask you to look, please, at DX 58.  What

18          is this?

19   A.    These are the minutes of the very first meeting

20          of this newly formed congregation.  And you see

21          halfway down the first paragraph they're calling

22          themselves Congregation Yeshuat Israel.  The

23          officers are listed there at the bottom.

24   Q.    Okay.  And I wanted to call your attention to

25          page 2 of this 002 at the bottom, and in

1          particular the fourth paragraph beginning with

2          the words "it was voted that Reverend David

3          Baruch."

4     A.    Yes.

5     Q.    "He recommended to the city council as the

6          minister," right?  What is going on here?

7     A.    Well, this is about the new congregation trying

8          to understand how to get a minister to minister

9          to them as a new congregation.  And so this

10         paragraph and the one below it I would point you

11         to says -- it says that they accepted the

12         candidacy of Reverend David Baruch of New York

13         as the minister of this congregation.

14    Q.    Who appointed Rabbi Baruch?

15    A.    Shearith Israel.

16    Q.    There is another resolve.  It's the last one on

17         the page, the second to last paragraph.  It

18         says, "Resolved that the 19th Street Synagogue

19         of the City of New York."  Is that a reference

20         to Shearith Israel?

21    A.    It is.

22    Q.    "Be informed of the formation of the

23         congregation and its properly elected officers

24         and its application to the general assembly of

25         this state for a charter; that we request of

1         them the further assistance which they have in

2         the past rendered in the loan of such property

3         as has formally been in use in the services."

4              What, if any, significance does that

5         have to your opinions?

6   A.   I think this is a really critical document in

7         many ways.  Again, you have to understand what's

8         taking place up in Newport.  The Touro Synagogue

9         is empty for just shy of 100 years in terms of

10        regular ritual years.  And when a new

11        congregation shows up with absolutely no

12        connection to the families that used to worship

13        in here, they have nothing.  And they need to

14        find a way to use this synagogue in a meaningful

15        way.

16             And so they have to go through Shearith

17        Israel for the permission to use the synagogue,

18        first of all.  And then as this document and

19        other documents we've seen have shown, they have

20        to go through Shearith Israel for the ritual

21        items that would actually make use of the

22        synagogue in meaningful in any way to a

23        congregation.

24             So it's evidence that this newly formed

25        CJI recognized this, and they're asking for the

```
 1              loan of this property for use in the synagogue
 2              from Shearith Israel.
 3      Q.      Did Shearith Israel give the ritual objects to
 4              CJI?
 5      A.      Not directly to CJI, no.
 6      Q.      Let's look at Exhibit 60, please.  Tell the
 7              court what this is.
 8      A.      This is a letter dated June 13, 1893.  And I
 9              know the chronology is hard to keep in mind
10              here, but this is within a few weeks of the
11              minute from CJI that we just saw organizing
12              themselves.  It's from H.P. Mendes who is the
13              rabbi at Shearith Israel to David Baruch who we
14              just saw on the last document who was the newly
15              appointed minister by Shearith Israel in
16              Newport.
17                   Mendes is writing to Baruch saying,
18              "Dear, sir, you are hereby empowered to use the
19              sefarim, bells, books, shofar and all other
20              appurtenances for worship now in Newport
21              Synagogue or in storage at the Newport bank."
22                   And if you go down to the bottom it
23              says, "Upon termination of your appointment, you
24              will return to us or to our agent or legal
25              representative the custody of the buildings and
```

 1          appurtenances.

 2     Q.   What relevance, if any, does this document have

 3          to the opinions that you've expressed?

 4     A.   Well, when you put it in conjunction with the

 5          document we just saw at the request for the loan

 6          of property, this tells us what property they

 7          were talking about.  The sefarim, the bells, the

 8          books, the shofar and all other appurtenances of

 9          worship.

10               It just confirms that this congregation

11          does not have anything that would make the use

12          of the synagogue meaningful.  They even have to

13          go to Shearith Israel for the keys for the

14          synagogue.  So they don't have the synagogue.

15          They don't have the ritual items that would make

16          use of the synagogue meaningful or important.

17          And they go to Shearith Israel for both of

18          those.

19     Q.   In terms of the use of the word "appurtenances"

20          what relevance, if any, does that have to your

21          usage opinion?

22     A.   Again, words only have meanings in context,

23          right, and this letter gives us an incredible

24          context for the use of the word appurtenances.

25          At the top you see the phrase "appurtenances for

 1            worship."  It's with reference to the sefarim,

 2            the bells or the rimonim, the books, shofar and

 3            everything else, all other, right.

 4                    And if you look down at the bottom

 5            here, again, buildings and appurtenances.  This

 6            is within the same letter.  He is being very

 7            clear about this.  And I would just point out,

 8            too, that it says "buildings" at the bottom.

 9            Why buildings?  Well, halfway up in that letter

10            it says, "A synagogue building and adjoining

11            building."

12                    So buildings here refers to the

13            buildings.  It's what it says.  And

14            appurtenances I think very clearly ties back up

15            to the first part of the letter, appurtenances

16            for worship.

17    Q.    Now, did CJI attempt to get these ritual objects

18            sent directly to them for their use?

19    A.    They did indeed, yes.

20    Q.    Did they succeed?

21    A.    They did not.

22    Q.    Let me ask you please to look at DX 62.  What is

23            this?

24    A.    It's a sneaky letter, that's what it is.  It's

25            written on June 15, 1893 from Eugene Schreier to

 1          Mrs. A.P. Mendes.  Again, it's hard to keep all

 2          of the Mendes's in mind.  This is the wife of

 3          the minister, the father, who had ministered in

 4          Newport.  So the wife is now in New York having

 5          returned to New York after her husband passed

 6          away in Newport.

 7               So Eugene Schreier at this point is the

 8          vice president of the newly-formed CJI.  He is

 9          writing to Mrs. A.P. Mendes in New York on June

10          15, 1893, just two days after the authorization

11          given by Mendes on the previous document to

12          David Baruch.

13     Q.   What is he saying in this letter that's of

14          relevance to what you're talking about?

15     A.   Thank you.  On page 2, halfway down he says --

16          again, this is to Mrs. A.P. Mendes.  "I think it

17          proper that the silver in the Rhode Island Bank

18          should be delivered to us", meaning CJI, "direct

19          on your order."

20               And if you read down at the bottom it

21          says four lines up.  "I would therefore say that

22          an order from you to the Rhode Island Bank to

23          deliver the silver bells and all to our

24          congregation would be proper."

25               And if you look over on the third page,

```
 1              the last full paragraph he says -- this is

 2              Schreier speaking.  "I hardly think that

 3              Reverend David Baruch should be the receiver of

 4              these articles since he is only officiating as

 5              minister and does not represent us," meaning

 6              CJI, "as a body."

 7                   And then he references, again, "all the

 8              property contained in the synagogue."

 9         Q.   On page 2 there is a reference beginning at the

10              top in the paragraph a number of letters?

11         A.   Yes.

12         Q.   There is a reference there.  I'm reading only a

13              part of the sentence.  "I must say that this has

14              made the situation somewhat complicated as far

15              as the property and its contents are

16              concerned."

17                   Do you see that?

18         A.   I do.

19         Q.   Okay.  What importance, if any, does this have

20              to your opinions?

21         A.   Well, I'm going to sound like a broken record

22              here, but the documents really bear this out

23              multiple times, which is to say that the parties

24              here are not just concerned about the synagogue

25              building itself and the cemetery.  They're
```

1        concerned about a robust use of the synagogue

2        that involves the ritual items necessary to run

3        a religious service for a Jewish congregation.

4                So the property and its contents.

5        They're referring to the stuff inside that they

6        need to run ritual worship.

7                THE COURT:  Mr. Solomon, why don't we

8        take our morning break.  We'll be back in 15

9        minutes.

10                (Brief break taken.)

11                MR. SOLOMON:  Thank you, Your Honor.

12        BY MR. SOLOMON:

13   Q.   Was Mr. Schreier successful in his letter?

14   A.   The letter to gain personal and direct control

15        of the appurtenances of worship?  No, he was

16        not.

17   Q.   Were there subsequent communications between CJI

18        and Shearith Israel on this subject?

19   A.   There were, yes.

20   Q.   In them is there a reference to a proceeding or

21        a petition made before the city council?

22   A.   Indeed, yes.

23   Q.   Okay.  Let me ask you if you would please to

24        look at DX 69.  Tell the Court what this is.

25   A.   So this comes from 1893.  If you look at the top

1    of page 1, you can see -- well, I'll just tell

2    you what it is.  It's a report from a committee

3    of Shearith Israel reporting to the Board of

4    Trustees of Shearith Israel.  So it's an

5    internal Shearith Israel document.

6  Q.   I wanted to call your attention to the letter

7    beginning on page 4.  What is that?

8  A.   On page 4.  We have a copy of a letter that is

9    written from H.P. Mendes, the minister at

10   Shearith Israel written to the mayor and City

11   Council of Newport Rhode Island dated June 5,

12   1893.

13        Remember, this is within two weeks,

14   three weeks of the newly formed CJI coming into

15   existence.

16  Q.   This is a long letter, and so I'm going to ask

17   you just to summarize some parts of it.  Look at

18   the page beginning on 006, and tell the court

19   what is being done here, please.

20  A.   Sure.  So on page 6, about five lines down, this

21   is, again, Mendes writing from Shearith Israel

22   to the city council saying, "I therefore ask you

23   to cooperate with us in securing a proper

24   conduct of the services.  To this end we request

25   you to hand the keys of the synagogue to the new

1          organization, that is, CJI."

2                    And if you skip down to the bottom of

3          that paragraph it says, "Only upon condition

4          that they first sign the following stipulations

5          agreeing to them."

6                    THE COURT:  Hold on for one second.

7                    THE WITNESS:  Page 6.

8                    THE COURT:  Okay, I'm fine.

9     Q.   And then there are seven enumerated paragraphs

10         after that, right?

11    A.   There are.  I think for sake of time we'll just

12         summarize what I see as the four main concerns

13         that comes out of these seven different items.

14         The first if you look at number 1 on page 6.  It

15         says that, "All the Hebrew residents shall have

16         the right to worship in this synagogue for

17         private prayer at any time."

18                   So there was a concern here that the

19         synagogue is used and is open for everyone.  And

20         this actually reflects their concern just two

21         pages back on page 4 where they start the letter

22         by saying we want the synagogue to be open

23         halfway down on page 4.  We do not object.  We

24         naturally prefer to have the synagogue used for

25         worship.  So this is a part of their own

1    reference point when they come into this

2    letter.

3         The second concern I would say is I

4    would point you to page 7, number 4.  I'll just

5    read it here.  This is their second concern and

6    my summarization here that, "The ground shall

7    not be built upon or the buildings altered in

8    any way internally or externally or any

9    furniture or ornaments removed."

10        Remember, previously we saw the word

11   "furniture" being referred to as a scroll of the

12   law.

13        "Removed from the synagogue or adjacent

14   building without written consent of the trustees

15   of the guardian, New York Synagogue."  So that

16   concern is not changed or altered.  They don't

17   want this building to be messed up or items

18   removed in any way by this new congregation.

19   The third concern has to do with ritual.  And

20   that is point five here in their listing on page

21   seven.  It says, "The services shall be

22   according to the ancient Orthodox Spanish and

23   Portuguese ritual and customs as carried on by

24   the founders by their present heirs at law and

25   by the late Reverend A.P. Mendes ministered the

1          synagogue."

2                  Again, this shows their own frame of

3          reference.  It's the history that this building

4          embodies and the ritual that had been in it

5          prior to the formation of this congregation that

6          Mendes and Shearith Israel is looking to

7          preserve.

8                  The fourth thing that I would just

9          summarize for you here comes through on point

10         seven of page seven of this document.  It says

11         that, "If they disband at any time," meaning

12         CJI, "or decrease to less than ten resident

13         members," which is a minion or a quorum required

14         for a congregation, "the synagogue movables and

15         all property of the congregation shall be

16         returned to us upon our demand."

17                 Again, there is a concern here about

18         longevity.  This is a new congregation.  The

19         Jewish immigration, this wave has only been

20         around for 12, 13 years.  Shearith Israel has

21         been around for hundreds of years.  They're not

22         sure what's going to happen.  They're not sure

23         how long this new community will be around.  And

24         at the very time of CJI's founding, there are

25         already rival congregations buying for the

```
 1              synagogue.

 2                      So Shearith Israel is concerned that no

 3              matter what happens, no matter how long this

 4              congregation is in there, that the ritual items,

 5              the synagogue and all the property be returned

 6              back to Shearith Israel.

 7        Q.    Looking forward in time and focusing on Shearith

 8              Israel, were these same concerns echoed

 9              elsewhere?

10        A.    Indeed.  Before we go forward, I want to go

11              backward as a good historian and talk about 1881

12              just briefly.  These four concerns that I've

13              articulated here we see repeated on the part of

14              Shearith Israel over time, two different

15              governmental entities.

16                      So we find they're articulated in 1881

17              to the Newport City Council.  We find them here

18              in 1893 to the Newport City Council.  We find

19              them reflected in the deed of conveyance in 1894

20              by the heirs of law that we haven't gotten to

21              yet.  We will in a minute.  We find them again

22              reflected in 1895 in another petition to the

23              Newport City Council by Shearith Israel.

24                      We find them in 1897 in the revised

25              bylaws that Shearith Israel has a part of
```

1       forming.  We find them again reflected in some

2       of the disputes between 1899 and 1903 -- excuse

3       me, 1899 to 1903 regarding different

4       congregations breaking into the synagogue.

5           We find them reflected in 1903 and 1908

6       with the leases and indentures that were signed

7       between CJI and Shearith Israel.  And we find

8       them reflected, these same concerns some of them

9       at least in the 1945 agreement between the U.S.

10      Federal Government, the Department of the

11      Interior and CJI and Shearith Israel.

12          So there is a very long lineage of

13      these concerns being articulated.

14 Q.   That's from the perspective of Shearith Israel

15      from the perspective of CJI, did it agree to

16      these terms?

17 A.   So we have correspondence that indicates that

18      CJI said some of these makes sense to us and

19      others of them we're not quite sure we want to

20      adopt or accept quite yet.

21 Q.   Okay.  And ultimately what happened?

22 A.   Ultimately they were adopted and worked into the

23      very founding documents of CJI.

24 Q.   Can you look at Exhibit 65, please.  I'm sorry,

25      the first of 65.  What is this?

1   A.   This is a letter from Max Levy from CJI to the

2        president of Shearith Israel, Isaac Brandon,

3        dated June 25, 1893.  Again, keep the chronology

4        in mind.  This is still within a month of the

5        founding of CJI.  This is an ongoing

6        conversation about this.  It's after the

7        petition, the letter that Mendes made to the

8        Newport City Council that we just looked at.

9        And if you look halfway down the first paragraph

10       it says that, "We can not accept the

11       stipulations which you have forwarded to us for

12       your congregation."  And then looking at the

13       second paragraph he says, "We've adopted as our

14       own some of the stipulations, but cannot adopt

15       them as a whole as we are not in possession of

16       any facts which give your congregation -- excuse

17       me -- a right and power in the matter of making

18       conditions.

19            And then kind of repeats down below.

20       The second paragraph from the bottom he says,

21       the establishment of a clear title to the

22       property should be your aim.  Certainly we do

23       not claim any ownership in the property.  And

24       the last paragraph starts, "The heirs at law

25       alone can move in the matter, although we do not

1   claim ownership in the property or

2   appurtenances."  It says, "Rest assured we want

3   to protect them."

4 Q. Okay.  And is there a response to this letter?

5 A. There is a response, yes.

6 Q. And it's 67.  Would you look at 67, please.

7 A. Yes.

8 Q. What is this?

9 A. This is where the attorney steps in, W.P.

10   Sheffield, who is the counsel for Shearith

11   Israel writes to Max Levy and Eugene Schreier on

12   July 6th of 1893.

13 Q. Okay.  What, if any, relevance does this have to

14   the question that we're now focused on, and that

15   is the ultimate adoption of the stipulations

16   that Shearith Israel told the City of Newport?

17 A. Well, halfway down on the page you can see

18   Sheffield says, "We insist that you assent to

19   these reasonable conditions presented to the

20   city council at their meeting."

21     If you flip the page, you will see -- I

22   just want to point out here before I get into

23   the last part of this paragraph on page 2,

24   Sheffield communicates to CJI what I think is

25   really a consistent feeling of good will towards

1        the Newport Jewish Congregation from Shearith

2        Israel.  He says, "Reverend Dr. Mendes very

3        artly desires that there may be no friction

4        between the New York and Newport Congregations.

5             But -- this is an attorney speaking

6        here, "But as the trustees and owners of the

7        synagogue and personal property therein, they

8        will see that their rights are respected if it

9        should be necessary."

10            Again, this is within a week and a half

11       of Max Levy's letter that we just it saw.

12   Q.   Okay.  And is there a response?

13   A.   There is indeed.

14   Q.   DX 66, please.  Tell the Judge what this is,

15       please.

16   A.   Sure.  This is a letter from Eugene Schreier,

17       again from CJI writing to the attorney for

18       Shearith Israel, William P. Sheffield dated July

19       6, 1893.  So still part of this conversation.

20       And Schreier continues to push back.  He says on

21       page 2 about halfway down -- it's really the

22       bottom of the first paragraph.  He says, "If the

23       New York Congregation have a legal deed and

24       title to the property, why not prove it."

25            And then further down the page, about

1           two thirds of the way down at the bottom of the

2           second paragraph he says, "And I also fail to

3           see that the city council has ever conceded that

4           the New York Congregation are the guardians of

5           the heirs at law of the Newport Synagogue

6           building or personal property therein."

7                    THE COURT:  Is Mr. Schreier an

8           attorney?

9                    THE WITNESS:  Honestly don't know.  I

10          believe so, but I don't know.  Actually, I don't

11          know.

12                   MR. SOLOMON:  I'm sorry, Your Honor, I

13          don't know either.  We can try to find out.

14                   THE COURT:  I was asking the witness,

15          that's fine.

16     A.   What I can say about Schreier is he ends up

17          being a long-time representative of Shearith

18          Israel in Newport after a few wrinkles are

19          worked out.

20     Q.   There is reference in these various letters to

21          the removables and the personal property.  What,

22          if any, relevance does that have to the three

23          opinions that you've offered at the beginning?

24     A.   Again, I think this is ongoing evidence of what

25          I tried to lay out with regard to the opinion

1          regarding terminology is that what's at stake

2          here not just the synagogue.  There is more that

3          the parties involved understand.

4                    Meaningful use of the synagogue

5          involves these religious and ritual items.  We

6          see it's reflected all over the place in these

7          documents.  Personal property is talked about

8          time and time again.  Other terminology we've

9          seen, appurtenances for worship, and we will see

10         a couple more in just a little bit.

11                   These people are articulating a sort of

12         circle encompassing set of concerns about the

13         use of the synagogue that involves something

14         else other than the building, these ritual

15         items.  That is really my point here.

16    Q.   In the July 6th letter from Mr. Schreier he says

17         in essence if you, Shearith Israel, have legal

18         deed and title why not prove it.  What then

19         happened?

20    A.   Shearith Israel proves it essentially.  They

21         move to secure a confirmation of the title that

22         they had held since the 1820s.

23    Q.   We have put together a demonstrative,

24         Professor.  We're not going to be asking you any

25         questions about the deeds, but take a look at DD

```
 1              30.  Just enough to be able to give the Court an
 2              understanding of how many people did Shearith
 3              Israel get transfer of documents from?
 4    A.   Approximately 50.  Just over 50.
 5                   MR. WAGNER:  Your Honor, I don't have
 6              my demonstratives -- the ones I got stop at D
 7              28.
 8                   MR. SOLOMON:  They may be in the
 9              binder that I handed to you.
10    Q.   What happens between the parties after or during
11              the same time period, so after the letters are
12              exchanged and Shearith Israel goes and gets the
13              deeds and what happens?
14    A.   Between the parties subsequent to or before
15              these deeds are conveyed -- well, in 1893,
16              December of 1893, there is a constitution and
17              bylaws that CJI passes.
18    Q.   Let me ask you to look at D 71, please.  Is this
19              the constitution and bylaws that you were just
20              referring to?
21    A.   Indeed, yes.
22    Q.   Now, was there a proceeding before some
23              regulatory body about the name that CJI would
24              have?
25    A.   Indeed.
```

1    Q.   Tell the Court quickly about that.

2    A.   So you can see here on D 71 that the

3         constitution and bylaws references Congregation

4         Jeshuat Israel.  And even the document we saw

5         earlier from May of 1893, that same name was

6         used.  There is an attempt to incorporate

7         officially in Rhode Island using that same name

8         in January of 1894.  And Shearith Israel

9         protests the use of that name in the

10        incorporation.

11   Q.   And is the name given?

12   A.   The name is given.

13   Q.   And did you see in the record any legislative

14        findings along with that?

15   A.   Not at all.

16   Q.   And did the name -- as you understood it, did

17        the right to use the name carry with it the

18        right to use the synagogue?

19   A.   No.

20   Q.   Did it carry with it the right to use any of the

21        ritual objects in the synagogue?

22   A.   No.

23   Q.   All right.  So we have --

24             MR. WAGNER:  Objection.  It's hearsay

25        and a legal conclusion.

```
 1                    THE COURT:  Sustained.
 2       Q.   Well, did you see in any of the records any
 3            discussions of the synagogue at all in the
 4            discussions about the name?
 5                    MR. WAGNER:  Objection.  I don't know
 6            what he's referring to by "discussions."
 7                    THE COURT:  Overruled.
 8       A.   I thought that's what you were asking earlier.
 9            Have I seen anything in the primary documents
10            regarding what people on the ground thought the
11            giving of this name meant to them in terms of
12            any rights to the synagogue and appurtenances
13            for worship, and I have not seen any evidence
14            that the people on the ground interpreted it as
15            granting any kind of rights to the newly formed
16            CJI.
17       Q.   So I was looking at DX 71.  I want you also to
18            look at DX 95.  Please tell the Court what those
19            two documents are.
20       A.   So DX 71, I think we already referenced these is
21            the first set of bylaws passed by this new
22            congregation, Congregation Yeshuat Jeshuat
23            Israel, December 17, 1893.  If you flip to D 95,
24            this is a revised set of constitution and
25            bylaws -- they're both constitutional bylaws,
```

```
 1              sorry -- passed.  It's unclear from the front

 2              because there are several dates here so it's

 3              confusing, but if you flip to the back it's

 4              February 10, 1897, I believe.

 5     Q.       Okay.  And looking at that document, February of

 6              1897, DX 95.  Let me call your attention to page

 7              13 of that.  And if you can read it, at least

 8              tell the Court what significance, if any, the

 9              handwriting has on the bottom and the

10              explanation that you are giving.

11                   If you can't read it, I can read it

12              into the record.

13     A.       If you would like to read it into the record,

14              that's fine.  What's important to me is the very

15              bottom here.  But if you want to read the whole

16              thing, that's fine.

17     Q.       The language as I can read it says, "Pursuant to

18              the authority created -- something -- by the

19              Congregation Jeshuat Israel of Newport, RI at a

20              meeting held January 31, 1897.  I hereby ratify

21              and confirm the amendment to the forgoing

22              constitution as proposed by the Congregation

23              Shearith Israel -- something.  Newport.

24     A.       Embodies, I think.

25     Q.       And embodied in the foregoing copy of this
```

1          constitution and bylaws, the Congregation

2          Jeshuat Israel of Newport, Rhode Island, which

3          are hereby declared to be the permanent

4          constitution and bylaws of the said

5          congregation.  Dated New York, February 10,

6          1897."   And then can you recognize the

7          signatures there?

8     A.   Eugene Schreier is the first one here.

9     Q.   So can you quickly tell the Court the story of

10         what happens and how the constitution and bylaws

11         becomes the second constitution and bylaws?

12    A.   Sure.  So there is a series of negotiation back

13         and form.  I think I've already run through the

14         set of concerns that Shearith Israel had that it

15         communicated in several points to the Newport

16         City Council in terms of protecting the

17         synagogue as a place of worship for all Jews in

18         Newport and is also protecting the rights of

19         Shearith Israel as owner.

20              This negotiation goes back and forth,

21         but the end result is that in the end CJI makes

22         very specific amendments to the 1893 bylaws to

23         reflect the concerns of Shearith Israel and to

24         incorporate Shearith Israel into the actual

25         governance of this newly formed congregation.

1    Q.    Are the provisions of the 1897 constitution and

2          bylaws relevant to you as a historian?  I'm not

3          talking about anything legal, but you as a

4          historian with respect to the opinions that you

5          have offered here?

6    A.    I think that this whole process of negotiation

7          and the actual changes to the bylaws does relate

8          to the opinions that I had mentioned earlier.

9          Again, not legal opinions, but as a historian

10         reading the record and trying to understand what

11         people meant and what they thought was going on

12         the ground.

13              These changes very clearly incorporates

14         the concerns registered by Shearith Israel and

15         put Shearith Israel directly on the board of

16         trustees for Congregation Jeshuat Israel, which

17         is reflective of the kind of relationship that

18         CJI apparently thought it had in terms of

19         deferring to Shearith Israel regarding these

20         concerns.

21   Q.    Your Honor, we have, I hope, distributed some

22         demonstratives that I'd like to show the

23         witness.  They begin at DD 10.  They run to DD

24         12.  You have those in front of you, Professor

25         Fisher?

1     A.    I do, thank you.

2     Q.    Can you explain to the Court what this is?

3                 MR. WAGNER:  I think this falls under

4           the category of legal meters and the documents

5           really speak for themselves.

6                 THE COURT:  Your objection is noted.

7           As I said, I'll rule on it later.  Thank you.

8     A.    To me as a historian, again not intending to

9           provide any kind of legal conclusion.  It's just

10          simply a matter of fact to compare these two

11          documents to see what has been changed in them.

12          And if you look here on DD 10, Article 2 from

13          the 1893 and 1897 bylaws, you see 1987 is on the

14          right-hand side and in almost every case the

15          text has been elongated, lengthened to insert

16          references to Shearith Israel on this excessive

17          demonstrative here.

18                For this particular one, DD 10, it

19          deals with the four trustees that were placed of

20          Shearith Israel on the board of CJI.

21                THE COURT:  Out of a total of how many

22          trustees at the time?

23                THE WITNESS:  I'd have to go back and

24          double check the original bylaws to see.  I'm

25          sorry, it says over here, three trustees.  So

1    president, vice president and three trustees

2    originally in 1893, Article 2 on the left-hand

3    side.

4                MR. SOLOMON:  Your Honor, I took your

5    question to be then in 1897 four of how many?

6                THE COURT:  Four of how many?

7                THE WITNESS:  Four of how many, yes.

8    So it says here on the right-hand side 1897,

9    president, vice president and three trustees

10    elected by this congregation.  And four trustees

11    appointed by the Spanish Portuguese Congregation

12                THE COURT:  So four of nine total

13    trustees.

14                THE WITNESS:  Apparently yes.  If

15    indeed the president and vice president are

16    counted as trustees.

17                THE COURT:  Thanks.

18                THE WITNESS:  You're welcome.

19    Q.   Continue please.

20    A.   On DD 11, we see another comparison here.  This

21    is regarding the proxy vote.  So you can imagine

22    the problem if you are placing trustee members

23    on the board of trustees who live in New York.

24    This is the 1890s.  It's not quite as easy.

25    There's no acela express.  So you need to have a

1        way to have your vote be counted without having

2        to be required to travel to Newport every time

3        there is a meeting.

4              And so this article is intended to

5        allow vote by proxy for the Shearith Israel

6        trustees that are on the board of CJI.  DD 12 is

7        waiving the residency requirement.  Again, in

8        1893 there was a requirement that they had to be

9        residents of the City of Newport, and this is

10       waived for the said four trustees on the right-

11       hand side of the Congregation Shearith Israel.

12       And it also declares these four trustees from

13       Shearith Israel to be members of CJI.

14              So not just members of the board of

15       trustees, but actual members of the

16       congregation.  DD 13 has to do with changes or

17       alterations to the constitution and bylaws, as

18       well as Article 19, which we'll get to in just a

19       minute.  So this you can tell it's twice, three

20       times as long as the original article and it

21       inserts Shearith Israel into the process by

22       which CJI can actually make changes or

23       amendments to the constitution and bylaws.

24    A.  And it says that no change can be made, "No

25       addition, alteration or amendment shall be made

1          to this constitution and bylaws that shall in

2          any way add to, alter or affect the status of

3          the four trustees of the Spanish and Portuguese

4          Congregation Shearith Israel of the city of New

5          York or of Article 19, unless the said four

6          trustees of the said congregation Shearith

7          Israel vote affirmatively for such proposed

8          addition, alteration or amendment."

9              If you turn to DD 14, we have the

10         description of what Article 19 says.  Now,

11         you'll notice there is no comparison here

12         because there was no change made between 1893

13         and 1897.  What changed was who gets to change

14         Article 19.  And according to the article that

15         we just read from 1897, Shearith Israel has to

16         be voting on any changes made to Article 19.  So

17         article 19 says, "No real or other property

18         owned or which may hereafter be acquired by this

19         congregation, shall be sold or exchanged or

20         mortgaged unless by unanimous vote of the

21         members present and represented by proxy,"

22         meaning Shearith Israel, "At a special meeting

23         convened for that purpose."

24    Q.   Thank you.  Now, after this time, did Mr.

25         Schreier begin to play a different role?

```
 1   A.   He did.  It seems like whatever differences they
 2        had were smoothed over and he began to serve
 3        simultaneously in leadership at CJI, as well as
 4        the official agent of Shearith Israel in
 5        Newport.
 6   Q.   Would you look at Exhibit 103, please.  This is
 7        DX 103.  Tell the Court what this is.
 8   A.   This is dated from May 30, 1898.  You can see
 9        it's a copy of text that was entered into the
10        guest book of CJI in Newport as a result of an
11        official visit made by Shearith Israel to
12        Newport.  If you turn the page --
13   Q.   I would like to know if anything is relevant to
14        your opinions in here?
15   A.   On page 2, just to return to what we were just
16        talking about with the role of Dr. Eugene
17        Schreier of Newport, Rhode Island, it says here
18        on page 2 of this document that, "Dr. Eugene
19        Schreier of Newport, Rhode Island is to act as
20        the representative or agent of said congregation
21        Spanish and Portugese, Shearith Israel of New
22        York to take charge of the building,
23        appurtenances, properties, services and cemetery
24        situated at the synagogue building on the
25        ancient site of Touro Steet and the cemetery at
```

```
 1              the corner of K Street and Bellevue Ave."
 2    Q.   After this time, did -- what happened to Rabbi
 3         Baruch?
 4    A.   As will happen to all of us, he passed away.
 5    Q.   And what happened then among the City and among
 6         the Jews?
 7    A.   Once again, there was disorder within the wider
 8         Jewish community of Newport.  Again, you have to
 9         keep in mind that these moments indicate to us
10         that the Jewish community of Newport is wider
11         than just CJI.  So in 1899, when Baruch passes
12         away, there is actually two congregations vying,
13         which is what happened in 1893, essentially, as
14         well after the death of Revenerend A.P. Mendes.
15         So not only is there CJI in 1899, but there is
16         another rival congregation that is formed called
17         the Touro Congregation, which I know these all
18         get confusing.  The Touro Congregation is
19         officially incorporated by the State of Rhode
20         Island and they both, Touro Congregation and
21         CJI, are vying for the use of Touro Synagogue
22         and the stuff inside of it during this period
23         where there is not a minister up there.
24    Q.   What, if anything, happens with respect to the
25         edifiace, the place, the house of worship itself,
```

1          Touro synagogue?

2     A.   So there is a fascinating series of events that

3          I will try to summarize quickly.  Essentially,

4          Touro Congregation sees themselves as asserting

5          themselves as the rightful sort of inhabitors of

6          Touro synagogue, even though there has been no

7          official designation, but the doors are locked,

8          right?  So Shearith Israel has this place locked

9          because there's this discord and dissention.

10         Touro congregation, the rival congregation,

11         decides to take the law into their hands, take

12         matters into their hand and break in.

13             So in 1899, the Touro Congregation breaks

14         into the synagogue, they change the locks and

15         they begin to perform astramasic [phonetic]

16         ritual in the synagogue.

17    Q.   What does Shearith Israel do?

18    A.   Well, CJI actually comes to Shearith Israel and

19         says, Hey, someone broke into your synagogue and

20         so Shearith Israel then sues this Touro

21         congregation and gets them ejected.

22    Q.   How many litigations take place during the

23         period 1899 to 1902, 1903?

24    A.   There are four different court cases.  And,

25         again, I'm not here to speak to the legal

1          significance of them.  What interests me is how

2          people respond to these court cases and the

3          decisions that are made.

4     Q.   Did any of the court cases involve,

5          specifically, personal property inside the

6          synagogue?

7     A.   One of them did, yes, in 1901.

8     Q.   Where --

9               MR. WAGNER:  I object to any testimony

10         about that case.  There is no reported decision,

11         there's zero except for some secondary source

12         referencesing.  We don't know what happened in

13         this case.  That's unlike the 1903 decision, at

14         least we have.

15              THE COURT:  Secondary sources aren't

16         good, Mr. Wagner?

17              MR. WAGNER:  Not for a description of a

18         litigation.

19              THE COURT:  Why don't you do this, Mr.

20         Wagner -- I'll decide on that as we move on.

21              Mr. Solomon, why don't if you get from

22         the witness what forms the basis for his opinion

23         on that?

24              MR. SOLOMON:  That was actually the

25         very next question.

```
 1          BY MR. SOLOMON:

 2    Q.    Where does the information come from with

 3          respect to that action?

 4    A.    Really what people rely on is a description by

 5          Bernard Kucinich in an article in, I think, 1975

 6          titled "1902 Break In."

 7    Q.    And do you know if Mr. Kucinich was the

 8          president of CJI?

 9    A.    Indeed.  And their official -- CJI's official

10          historian.

11    Q.    Can you tell the Court what you understand about

12          that litigation?

13    A.    Sure.  To summarize it briefly, and again, this

14          is coming from Kucinich and so I don't have the

15          documentation that I would rely upon.  But the

16          way it Kucinich describes this, there was some

17          money given and two, at least some -- it's

18          unclear to whom it was given exactly, but the

19          money, a thousand dollars was used to buy a

20          scroll, and the congregation, this is now CJI

21          who is back in the synagogue, they asked Eugene

22          Schreier who was then the president to write up

23          a document that would guarantee that the scroll

24          belongs to the congregation.

25                And Schreier, who is acting simultaneously
```

1          in the capacity as CJI president and the legal

2          representative for Shearith Israel, says to

3          them, No, actually, I will write up a document

4          that says it is for your use as long as you're

5          in the synagogue.  And the Congregation does not

6          like that and sues Schreier directly.

7                    MR. WAGNER:  Your Honor, I object to

8          the description of the Kucinich piece because

9          that's hearsay.  I mean, it's hearsay within

10         hearsay, but he's testifying to what Kucinich

11         said and that's hearsay

12                   THE COURT:  Is Kucinich's book in

13         evidence or the section in evidence?

14                   MR. SOLOMON:  It is, Judge.

15                   MR. WAGNER:  I'd ask that it be pointed

16         to.

17                   MR. SOLOMON:  Can I continue on with

18         the examination?

19                   THE COURT:  Yeah, I don't think we need

20         that.  The book says what the book says, and

21         I'll take it into consideration like I do all of

22         the other evidence that's in.

23         BY MR. SOLOMON:

24    Q.   Who represented Mr. Schreier in that case?

25    A.   The legal representative for -- or the attorney

1          that represented Schreier in that (inaudible) is

2          W. P. Sheffield who is the attorney for Shearith

3          Israel.

4     Q.   Now, did there come a time when Shearith Israel

5          unlocked the doors to the synagogue?

6     A.   The doors were locked at multiple points

7          throughout the whole course of the time we're

8          talking about here, between 1880 and 1903.  But

9          there are several specific moments regarding or

10         surrounding these court cases, especially, which

11         the doors were locked.

12    Q.   If we look at Exhibit DD 16, please.  Just for

13         the record, I want you to look at the notice on

14         top, the photograph that we added on the bottom

15         is not from 1901, but what is the notice?

16    A.   It's a notice in the Newport Daily News dated

17         January 1, 1901 by Eugene Schreier.  Again,

18         you'll see here agent for the trustees and

19         owners, meaning Shearith Israel.  "That the

20         synagogue on Touro Street will remain closed

21         until further notice by the order of L. Napoleon

22         Levy, trustee, and for the owners of the

23         property."

24    Q.   Now, as it relates to CJI and Shearith Israel

25         and just on top of the waves so that the Court

1    can get your view as an historian, what

2    litigation ensued?

3  A.    So to take a very brief view of it, part of the

4        reason why the synagogue had been closed is

5        because Shearith Israel -- because of these

6        vying congregations in Newport, and realized

7        that it needs to find a way to protect the use

8        of the synagogue for the wider Jewish community,

9        and not have it be co-opted by one faction.

10       They also wanted to protect their own interest

11       and rights as owners.  So they propose a lease

12       between Shearith Israel and CJI.  And this is

13       what -- partly what prompts these closings.  In

14       1902, then, there is another break into the

15       synagogue.

16           The first one in 1899 was a Touro

17       congregation, in 1902 it's actually a

18       combination of CJI and the Touro Congregation.

19       They break in on April 21st, 1902, during

20       passover and take over the building,

21       essentially.  This leads to a lawsuit on the

22       part of Shearith Israel who sues these

23       individuals.  There is a countersuit in 1902

24       that leads to the Judge Brown decision.

25           Again, I'm not here to interpret that, but

1           to give a bird' eyeview of this back and forth.

2     Q.    How did the parties react?  That's my question

3           not with respect to what Judge Brown said, but

4           how they reacted?  How did the parties react?

5     A.    Again, this is important to me as an historian

6           to understand how people understood the meaning

7           of these kinds of events.  And there we have

8           clear documentation regarding actions of both

9           parties in light of these series of litigation

10          and especially the Judge Brown decision in

11          January of 1903.

12    Q.    Let's look at DX 144, please.  What is that?

13    A.    These are minutes from January 22, 1903.  There

14          is a notice here or a note in the minutes, the

15          second paragraph about halfway down the page,

16          they reference the suit in U.S. Court at

17          Providence, Rhode Island, by the Hebrews at

18          Newport to determine their title to the

19          synagogue at that place.  And Shearith Israel

20          says, "All the issues having been determined in

21          favor of the congregation."

22    Q.    When the litigation was going on or when the

23          doors were locked, where were the rimonim at

24          issue here?

25    A.    From what I've seen, everything was inside of

1          the synagogue building itself.

2     Q.   Okay.  And were the rimonim insdie the ark?

3     A.   They would have been presumably locked inside of

4          the ark inside of the synagogue, yes.

5     Q.   I want you to look at Demonstrative DD 15,

6          please.

7               MR. WAGNER:  Your Honor, I object to

8          use of this demonstrative.  These documents were

9          not referenced in Dr. Fisher's report.

10              THE COURT:  The same rule will apply.

11              MR. SOLOMON:  No, of course, Your

12         Honor.  I thought we did check -- is that

13         correct?  Okay.

14              I won't use the document, Your Honor.

15     BY MR. SOLOMON:

16    Q.   Now, from CJI's perspective, what was its

17         reaction to the judicial decisions?

18    A.   Again, as a historian, I can only describe --

19         actually, they describe themselves in their

20         responsiveness as absolute surrender of the

21         property and the things inside of the synagogue

22         to Shearith Israel.

23    Q.   Would you look, please, at Exhibit 146.  What is

24         this?

25    A.   This is a settlement agreement between the two

```
 1            parties, of sorts.  Again, I'm reading it as an

 2            historian here, but we have representatives from

 3            both parties signing here at the bottom dated

 4            January 30th, 1903.  So again, within a few

 5            weeks of the Judge Brown decision.

 6                 And I'll just read from the top here.  It

 7            says, "The congregation Jeshuat Israel agrees to

 8            admit and recognize without qualification, the

 9            title and ownership of L. Napoleon Levy and

10            other trustees to the synagogue building,

11            premises and fixtures."  And at the top of the

12            second paragraph there is a reference to "the

13            absolute surrender of said premises."

14    Q.      And what relevance, if any, does this have to

15            the opinions concerning the relationship between

16            the parties or the usage of terms for the

17            conduct of the parties?

18    A.      Again, this is a moment of -- one of several, I

19            would add, but a moment of unambiguous

20            recognition by CJI of their position that they

21            have nothing.  They are, without qualification,

22            in absolute surrounder, giving up the premises,

23            giving up the items inside.  Which if you

24            understand the history of what has just taken

25            place over the last 20 years, this makes perfect
```

1       sense, right?  They come in the 1880s, they have

2       nothing -- the Newport -- they're from a

3       different part of Europe, they have no claim to

4       the synagogue of any of its appurtenances.  They

5       form in 1893 -- we saw all the letters.  They

6       have to go to CJI and say, We want to loan this

7       property (inaudible) and Shearith Israel does

8       that through their agent, through the minister

9       up in Newport.

10          And then we come here to 1903 after a series

11      of closings at the synagogue, a series of break-

12      ins and, once again, CJI reflecting this

13      history, reflecting this acknowledgement that

14      they came with nothing and in 1903, as of

15      January 30th, also have nothing, in light of the

16      court ruling.  So there's a very, in my mind,

17      clear progression here and recognition of this

18      history.

19  Q.  In light of the research that you've done, do

20      you read any particular limitations into the

21      phrase "the synagogue, building, premises and

22      fixtures"?

23  A.  Not at all.  The party, as I think we can see

24      from other correspondence in this time period,

25      understood this to be all compassing.

1    Q.   Let me ask you to assume that the word

2         "fixtures" wasn't even there, and the word

3         "appurtenances" wasn't even there,

4         "paraphanalia" wasn't even there, just talking

5         about the synagogue, okay?  What did the parties

6         intend with respect to the synagogue and what

7         was in it?

8    A.   Again, it's -- the parties involved, based upon

9         the correspondence that I've looked at that we

10        have available to us, understood that this -- it

11        included meaningful use of the synagogue,

12        right?  So even if they only said

13        "synagogue," where are the religious items?

14        Where are the paraphanalia?  Where are the

15        objects of ritual use?  They're inside the

16        synagogue at this time.  And the parties seem to

17        clearly understand that meaningful use of the

18        synagogue entails meaningful -- or a robust use

19        of these religious articles that CJI did not

20        have, repeatedly, through the course of the two

21        decades prior to this point, and did not have

22        here.

23   Q.   Look at Exhibit 147, please, DX 147.  Tell the

24        Court what this is.

25   A.   This is a -- dated just a few days later after

1      the document we just saw, so this is February 2,

2      1903.  It's a resolution from a special meeting

3      of the board of trustees of CJI.

4    Q.   I want to call your attention to the language in

5      the resolution that -- I think it points to

6      three people, and I'm going to read, of this

7      Congregation.  "B.  And they hereby are

8      authorized and directed to surrender the

9      possession of the synagogue building, premises

10     and paraphanalia belonging thereto at Newport to

11     the said trustees, owners of the property, and

12     to agree upon the terms and provisions of a

13     lease from said trustees to this congregation

14     for the term of five years."  I not going to

15     read any further.

16          Do you see that?

17   A.   Yes, I do.

18   Q.   What relevance does this have, if any, to the

19     opinions that you've expressed?

20   A.   Again, it's an echo of the document we just saw

21     from January 30th.  The first one was an

22     agreement -- well, a settlement of sorts between

23     two parties, apparently.  The second one is an

24     internal resolution for the board of trustees

25     for CJI.  And we see some of the same language

1            here directed to surrender the possessions in

2            that building, premises, and paraphanalia

3            belonging thereto at Newport.  Again --

4     Q.    Thank you.  Let me ask you to look at -- so was

5            there then a negotiation or a draft of the

6            lease?

7     A.    Yes.  There's a series of exchanges that go back

8            and forth internally at Shearith Israel.

9     Q.    Let me ask you to look at Exhibit 149, please.

10           And what is this?

11                 MR. WAGNER:  Your Honor, this is one of

12           the exhibits that we've objected to.  This is a

13           letter from an attorney to a client on the CSI

14           side, and unless we're going to get all such

15           materials, unless it's a total waiver of

16           attorney-client privilege, you shouldn't be

17           allowed to selectively use letters back and

18           forth between attorney and client.

19                 THE COURT:  I don't recall an objection

20           to this, Mr. Wagner.

21                 MR. WAGNER:  Yes, yes, this is one of

22           the documents we did object to.

23                 MR. SOLOMON:  Your Honor, nothing has

24           been withheld.

25                 THE COURT:  I know that.  I'm just

```
 1          saying to him, I don't recall reading this or
 2          seeing an objection.  I'm not looking -- I'm not
 3          alleging waiver.  I just thought I had ruled on
 4          all of the --
 5                    MR. SOLOMON:  No, you --
 6                    MR. WAGNER: whatYour Honor did was rule
 7          on CSI's objection to CJIs documents, but we
 8          submitted a series of objections and this one is
 9          listed in the submission we made on June 1.
10                    THE COURT:  You are correct.  I've
11          missed that.  I have not ruled on any of those
12          yet.
13                    MR. SOLOMON:  So that we don't have to
14          bring the witness back, Your Honor, I can
15          represent that we have not withheld any
16          documents, it's not as if we have a selected
17          waiver.  These were all of the documents that
18          were in the files, nothing had been withheld.
19                    MR. WAGNER:  Well, there were -- is the
20          representation that nothing has been withheld on
21          attorney-client grounds from the beginning of
22          the relationship between the parties until the
23          litigation began?
24                    MR. SOLOMON:  We're talking about 1903,
25          Judge.  Nothing with respect to this lease has
```

1    been withheld.  By the way, Your Honor, prior to

2    the current dispute, I'm not aware of any

3    attorney-client documents that have been with

4    withheld.  Your Honor has already seen attorney-

5    client communications.  They had the McLoud

6    memo.

7             I'm just very concerned about the

8    time.  I would like to complete my examination.

9             THE COURT:  I'm going to have to look

10   at this at the break.  I apologize.  I did not

11   pay attention to that list.  I'll try and get

12   through as many of them as I can during the

13   lunch break.

14             So why don't we withhold on that, right

15   now, Mr. Solomon, and we'll move on and I'll let

16   you come back, depending on what I rule.

17             MR. SOLOMON:  Thank you, Your Honor.

18   BY MR. SOLOMON:

19   Q.   In connection with the signing of the lease,

20        Professor, was there a ceremony?

21   A.   There was, on February 18, in 1903.

22   Q.   Describe the ceremony to the Court, please?

23   A.   So their representatives from Shearith Israel

24        that go to Newport, and there is a very public

25        event and it is reported in the local press that

```
 1              involves the surrender of the keys, it involves

 2              the signing of the lease and it involves the

 3              return -- I'm sorry, not the return, but the

 4              giving of the keys from Shearith Israel to CJI.

 5     Q.       And what were the keys to?

 6     A.       From what I've seen, it's to the synagogue and

 7              the ark and other things.

 8     Q.       And in your understanding in 1903, where were

 9              the rimonim at issue in this case?

10     A.       My understanding is that the rimonim at issue in

11              this case would have been inside the synagogue.

12     Q.       And when the doors were locked, who had the

13              keys?

14     A.       When the doors were locked at multiple points of

15              time during this whole series of events,

16              Shearith Israel was the one who was there

17              holding the keys, authorizing the keys to be

18              given or handing over the keys directly.

19     Q.       Can you confirm, without looking at the lease,

20              that the language of the lease includes the

21              language of "appurtenances and paraphanalia"?

22     A.       Yes.

23     Q.       And did you look to see whether the

24              interpretation that you have given to those

25              words as expressed to the Court here, was
```

```
 1              continent with other uses of those terms?
 2   A.   Indeed, yes.  It was important for me to
 3        understand the use of these terms in a wider
 4        context, outside of this particular exchange and
 5        the lease itself, but then also with regard to
 6        secondary sources and how it's being used there
 7        as well.
 8   Q.   I'd like to you give the Court just one example,
 9        we have these in the demonstratives.  Choose
10        whenever you want from 17, 18, 19, 20, 21 --
11              THE COURT:  Not 17 --
12              MR. SOLOMON:  Excuse me, Your Honor.  I
13        misspoke.
14        BY MR. SOLOMON:
15   Q.   And then 22.
16              MR. WAGNER:  I'm sorry, which one has
17        he selected?
18              THE WITNESS:  I haven't done it yet.
19        So DD 21 is it one I'd like to turn your
20        attention to.  DD 21, which is from the Jewish
21        Yearbook, 1899.  So it would have been within a
22        few years of what we're talking about here.
23              MR. WAGNER:  Your Honor, can I just
24        interpose an objection.  First of all, with
25        respect to the demonstratives, obviously they're
```

1        not in evidence, but there are some references

2        in these demonstratives to exhibits that were

3        not referenced in Dr. Fisher, any of

4        Dr. Fisher's reports.

5               But he's testifying about 21.  The

6        issue that I have with 21 is its paraphrasing

7        the language and I think it's paraphrasing it in

8        an inaccurate way.  I think the original should

9        be put into evidence

10              THE COURT:  Well, I'm assuming that --

11              MR. WAGNER:  And it's not on the other

12       side's exhibit list.

13              THE COURT:  I guess that was a wrong

14       assumption on my part.  There is no exhibit,

15       admitted exhibit, that is identified -- I'm just

16       looking at 21 right now -- for that matter; is

17       that right?

18              MR. SOLOMON:  Correct, Your Honor, with

19       respect to these public documents.  We thought

20       that since the other side didn't have an expert,

21       they and we would be referring to them, the

22       Court would be taking them for what they're

23       worth.  We're happy for these to be marked as

24       exhibits.

25              THE COURT:  Dr. Fisher, are the

1        underlying documents that are referenced in 18,

2        19, 20 and 21, material that you rely on and is

3        it reliable material in your profession?

4              THE WITNESS:  Yes, they are all

5        different.  So one by one, but they represent

6        usages that I think are the kinds of things that

7        historians would try to turn to understand these

8        usages, yes.

9              THE COURT:  Were any of the underlying

10       materials that are cited in 18, 19, 20, or 21,

11       that is DD 18 through 21, referenced in

12       Dr. Fisher's report?

13             MR. WAGNER:  Yes, those were

14       referenced, but I'd like to conduct a voir dire

15       with respect to at least a couple of them.

16             THE COURT:  On the reliance by this

17       witness on those particular underlying

18       documents?

19             MR. WAGNER:  Yes.

20             THE COURT:  If you want to proceed,

21       Mr. Solomon, I think Mr. Wagner is entitled to

22       that.

23             MR. SOLOMON:  I think, Your Honor, that

24       we want to proceed.  (

25             THE COURT:  Mr. Wagner.  On that

```
 1            limited issue.
 2                          VOIR DIRE
 3            BY MR. WAGNER:
 4       Q.   Good afternoon, Dr. Fisher.  You have the
 5            demonstrative in front of you, do you not?
 6       A.   I do.
 7       Q.   Let's look at D 18.
 8       A.   Yes.
 9       Q.   D --
10                    MR. SOLOMON:  Your Honor, the witness
11            was on D 21
12                    MR. WAGNER:  I was talking about all of
13            them.
14                    MR. SOLOMON:  Well, then let's do all
15            of them.
16            BY MR. WAGNER:
17       Q.   Sir, D 18.  That's a reference to a synagogue in
18            North Africa, correct?  Yes or no.
19       A.   We'd have to go back to the full document, but
20            it appears, so, yes.
21       Q.   You have no expertise with respect to religion
22            in North Africa, do you?
23       A.   No, but this is what historians --
24       Q.   Just yes or no.  Do you have any expertise with
25            respect to synagogues in North Africa?
```

```
 1    A.    I can't answer that yes or no.

 2    Q.    Do you have any expertise with respect to North

 3          African religion?

 4    A.    I can't answer that yes or no.

 5    Q.    The answer is no, right?  Where on your resume

 6          is there a reference to North African religion?

 7    A.    The reason I can't answer yes or no is because

 8          historians routinely do this kind of survey

 9          outside side of their own -- what they're

10          investigating, just trying to understand how

11          these things are being used.

12    Q.    Sir, yes or no, do you have any expertise with

13          respect to North African religion?  Yes or no.

14    A.    No.

15    Q.    Now let's look at --  and by the way, this is

16          17th century North African synagogue, right?

17    A.    Yes.

18    Q.    Now let's look at D 19.  This is a reference to

19          synagogues in Great Britain, correct?

20    A.    Yes, but I would have thought --

21    Q.    Just yes or no.  Is it?

22    A.    I can't answer yes or no.  There is an

23          explanation here.

24    Q.    The Bevis Marks synagogue is in London, isn't

25          it?
```

1    A.    But it seems relevant to --

2    Q.    Don't give me that it's relevant.  He'll ask

3          those questions.  Is the Bevis Mark Synagogue in

4          London?

5    A.    (No audible response.)

6    Q.    Do you know?

7    A.    Appears so.

8    Q.    And you have no expertise with respect to

9          British synagogues, do you?  Yes or no.

10   A.    I would qualify the answer, but no.

11   Q.    Now, let's turn to D 20.  This is an article

12         from the New York Times 50 years later, correct?

13   A.    Correct.

14   Q.    You just pulled it out of some search, right?

15         You did a word search, correct?

16   A.    I was trying to understand the broader usage of

17         this term, which all of these documents are

18         referring to.

19             It's what historians routinely do, Your

20         Honor, to try to understand how things are being

21         used.

22   Q.    So you had -- you found some reference in a

23         newspaper 50 years after the fact?  That's what

24         you're telling us you did?

25   A.    To demonstrate continuity of the use of the term

1    which I thought would be relevant for the Court

2    in understanding how these terms are used by a

3    wide variety of different parties in very

4    similar ways.

5              MR. WAGNER:  Your Honor, I have no

6    questions with respect to D 21, but I believe

7    that that presentation of the quotes is not

8    accurate.

9              THE COURT:  Well, as to 21, before it

10    can be used, it needs to ensure that it's

11    accurate.  As to 18, 19 and 21, the Court is

12    going to allow Mr. Solomon to inquire and the

13    Court will accept the evidence for what weight

14    it eventually gives it.

15    EXAMINATION BY MR. SOLOMON:

16    Q.   Why don't you please explain to the Court what

17         method you used to find other references.

18    A.   Again, the only way words have meaning is to

19         understand both the context of specific words in

20         specific documents, but also how these words

21         have been understood by other people and other

22         places over time.  My opinion, as a historian,

23         is when you find references and uses of these

24         terms outside of the context you're talking

25         about, by other people within the global Jewish

1          community, it confirms not detracts from the

2          usage of the word that is under consideration in

3          a specific document.

4               It merely says, yes, I've tapped into

5          something that is illustrative of a wider

6          understanding, a wider shared usage.  So DD 18,

7          yes, it's North Africa, yes, it's 17th Century.

8          What it means is that within global Judaism

9          there is an understanding of -- by scholars

10         writing on this, that there is a shared

11         verbiage, a shared terminology --

12              THE COURT:  Doctor, how do you make the

13         leap from a 1700 reference about a synagogue in

14         North Africa to the term "globally used amongst

15         the Jewish community"?  I'm having a hard time

16         following your leaps.  I accept that that's your

17         opinion and I'll weigh it for what it's worth.

18         But you want to bring me along, you're taking

19         leaps that I'm not hearing the underlying basis

20         for.

21              THE WITNESS:  So the main point here is

22         that the scholars who are working on these

23         communities use specifically -- this is scholars

24         using these terms with reference to these.  So,

25         in part, I'm referencing the scholarly community

1           working on global judaism and recognizing that

2           these terms have a cachet throughout time with

3           regard to specific items.

4                    THE COURT:  Thank you.

5                    THE WITNESS:  You're welcome.

6        BY MR. SOLOMON:

7        Q.  Having looked more broadly than just the

8            particular issues between the parties, did you

9            -- did it cause you to support or undermine your

10           opinions that you expressed here.

11       A.  These wider examples confirm to me that the

12           understanding that I've come to, in terms of the

13           use of these terms, are not just my own sort of

14           imagination or fabrication.  It's actually not

15           even just unique to the parties in the late 19th

16           Century, early 20th Century, we're talking about

17           here, but they themselves are articulating a

18           wider understanding that I think we need to

19           listen to.  That's what historians do, we listen

20           to the sources.

21       Q.  Professor, did you study communications between

22           the parties, and more broadly in this case, in

23           the 20th Century in order to test the

24           conclusions and opinions that you had with

25           respect to the relationship among the relevant

1           parties, the usage of terms and the conduct of

2           the parties?

3   A.      Yes, I referenced this briefly earlier with

4           regard to understanding how things play out

5           after the signing of the lease in 1903.  I think

6           that from the documents I've reviewed, there are

7           indications that the parties involved in this

8           acted in ways that seemed consistent with the

9           terms of the lease from 1903.

10  Q.      Can you give the Court a couple of examples,

11          please.

12  A.      Sure.  I think the first and most clear one, in

13          many way, is simply the payment of rent over

14          time in the 20th Century.  You don't need to

15          look very far to see many examples of times when

16          rent was paid.  There is also one of the

17          provisions of the lease that Shearith Israel

18          should be approving ministerial appointments and

19          you see examples of this happening over the

20          course of the 20th Century.  You see examples of

21          Shearith Israel getting involved in terms of

22          questions of alterations of the property itself,

23          which was one of the concerns articulated by

24          Shearith Israel.  And there are other examples,

25          too, of involvement, financial contributions.

1          And from my perspective as a historian, there is

2          been a lot of talk about the last 20, 30 years

3          in this case, and from my perspective, we have

4          to understand a broader time frame to understand

5          the dynamics, to understand the relationships.

6          The whole 20th Century, I would argue back into

7          the colonial period, this all informs the state

8          of mind of people in the 20th Century in terms

9          of how they proceeded.

10                 THE COURT:  Doctor, in your research of

11         the term "appurtenances" that produced what we

12         see on the 18, 19, 20 and maybe 21, did you find

13         any uses of the term outside of the exhibits

14         that we've gone through in this case?  Did you

15         find any use of the term "appurtenances" in this

16         country in the 1600s, 1700s or 1800s?

17                 THE WITNESS:  With regard to the

18         religious ritual items, outside of the documents

19         that were produced for this case, you mean?

20                 THE COURT:  Yes.

21                 THE WITNESS:  I mean, it depends how

22         did you define it.  There are instances where

23         congregations are writing regarding Jewish

24         synagogues, in Jamaica, for example.

25                 THE COURT:  I'm talking about the word

1           "appurtenances."

2                   THE WITNESS:  Yes.

3                   THE COURT:  Did you find the word

4           "appurtenances" used in the 1600s, 1700s and

5           1800s in any documents other thatn the exhibits

6           that are in this case?

7                   THE WITNESS:  This is not a

8           comprehensive survey.

9                   THE COURT:  But you have to answer my

10          question -- or you don't have to answer my

11          question --

12                  THE WITNESS:  I guess I'm not sure --

13                  THE COURT:  You searched --

14                  THE WITNESS:  Try again.

15                  THE COURT:  You searched for the use of

16          the word "appurtenances."  And you came up with

17          some examples here that support your opinion and

18          we have that as represented in D 18, 19, 20.

19          I'm asking, in that search, did you, in

20          addition, find any usage of the term

21          "appurtenances," other than in the documents in

22          this case, that you have seen it used.  That

23          used the word "appurtenances" in the 1600s,

24          1700s, 1800s.

25                  THE WITNESS:  Yes.

1          THE COURT:  Tell me about those

2     instances and how it was used?

3          THE WITNESS:  So there are some

4     instances in which it seems to be similar to

5     these usages, but, again --

6          THE COURT:  Where did you find that

7     usage?  Where did you find that usage?

8          THE WITNESS:  I thought I just

9     referenced one in terms of some correspondence

10    regarding a synagogue in Jamaica.  I will say,

11    and freely say, that not every time this word is

12    used does it mean, does it refer, to Jewish

13    ritual objects, right?  They show up in leases,

14    they show up -- this word shows up in wills and

15    deeds and other legal documents that -- that's

16    not why I'm here to interrupt those documents.

17         Why it's important to me to understand

18    the use of the word in the context of the 1890s

19    is because the people who are invoking these

20    terms, often they are Jewish rabbis and Jewish

21    laymen, and they're not sitting there with a

22    legal dictionary saying, look, appurtenance,

23    definition three means this.

24         No, they know what they're referring

25    to.  They're referring to things that they are

1          using inside of the synagogue

2                    THE COURT:  Why don't we take a lunch

3      break.

4                    THE WITNESS:  Thank you, Your Honor.

5                    (Lunch recess taken at 12:30)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(1)                    STATE OF RHODE ISLAND

(2)

(3)        I, Tara L. Wosny, Certified Shorthand Reporter

(4)   and Commissioner in and for the State of Rhode Island,

(5)   do hereby certify that the witnesses whose testimony is

(6)   herein before set forth, was duly sworn and that such

(7)   testimony is a true record, to the best of my ability, of

(8)   the testimony given by the witnesses.

(9)        I further certify that I am neither related to

(10)  or employed by any of the parties in or counsel to this

(11)  action, nor am I financially interested in the outcome of

(12)  this action.

(13)       In witness whereof, I have hereunto set my hand

(14)  and seal this 11th day of June, 2015.

(15)

(16)       Tara L. Wosny

       Tara L. Wosny

(17)

       Notary Public

(18)

       My commission expires:

(19)

       June 10, 2017

(20)

(21)

(22)

(23)

(24)

(25)

```
 1                    AFTERNOON SESSION

 2              (Commencing at 1:35 p.m.)

 3              THE COURT:  Good afternoon

 4    everyone.  Mr. Solomon.

 5              MR. SOLOMON:  Thank you, Your

 6    Honor.  Two clarifying points I was

 7    completed, and I would like to have the

 8    witness.

 9              THE COURT:  Sorry about that, I

10    would have let you finish earlier, I

11    apologize.

12              MR. SOLOMON:  No.  Judge, we are

13    here for you.  It's actually, to react To

14    a couple of things Your Honor asked.

15         BY MR. SOLOMON.

16     Q.  Look at Exhibit 148, please, DX148, and

17    look at the last page, there's some language

18    under the seal, and the "delivered in the

19    presence of."

20              I'm going to read it, if I get it

21    wrong, someone correct me.  I think it

22    says the words "...and paraphernalia

23    belonging thereto, interlined or lineated

24    before signing."

25              And then there's the signature of
```

130

 1    Mr. Sheffield; do you see that?

 2     A.  I do.

 3            THE COURT:  I don't, and neither

 4    do the graphics people that I always turn

 5    to for advise.

 6            MR. SOLOMON:  It's page 004.

 7            THE COURT:  Second to last page.

 8            MR. SOLOMON:  Yes.  And it's

 9    right below the printed text.

10            THE COURT:  Got it now.  Thank

11    you.

12     Q.  Right off on the left, did I read that

13    correctly?

14     A.  Yes.

15     Q.  What significance is that to you?

16     A.  This is significant because it

17    refers -- it is the product of a prior

18    series of conversations regarding things

19    having to do with the wording of the

20    lease that took place on the part -- the

21    parties at Shearith Israel.

22            And if you read this

23    correspondence, you understand that the

24    word was referring -- used simultaneously

25    to other words in their correspondence,

1    the most common being personal property;

2    so by adding this term, and the

3    paraphernalia beginning there up to the

4    clear references whereby the parties

5    involved at Shearith Israel had in their

6    mind everything that's involved with the

7    synagogue, not just the building, but the

8    that are inside of it.

9    Q.  When you --

10          THE COURT:  Mr. Solomon, now that

11   I have actually seen that, can you read,

12   again, you are reading that handwriting;

13   is that right?  Could you read that one

14   more time for me.

15          MR. SOLOMON:  I also believe,

16   Your Honor, that we have a certified

17   transcription of this, which we will

18   supply.  But what I was reading was, the

19   words, "...and paraphernalia belonging

20   thereto, interlined or interlineated by

21   signing."

22          THE COURT:  Got it.  Thank you.

23   Q.  Now, The Court asked you whether in your

24   research you had come across usages of the

25   terms paraphernalia appurtenances in America

1    and I'm -- I want to say contemporaneous to

2    the time we are talking about, I know The

3    Court asked for a longer period of time.

4        A.  Sure.

5        Q.  But what evidence did you see about

6    how -- not these parties, but others, were

7    using the terms paraphernalia and

8    appurtenances?

9        A.  One piece of evidence we have, right

10   after the signing of this lease, is the

11   press uses -- this is in local reports of

12   the signing of the lease, which was a

13   public event.

14       Q.  The press uses what?

15       A.  Paraphernalia.

16       Q.  And what do you take from that?

17       A.  It's an indication, to me, as a

18   historian, this is not some sort of an

19   obscure term that are used by the two

20   parties signing the lease, but a broader

21   recognition by a reading public that

22   would understand what paraphernalia might

23   mean in this context.

24            MR. WAGNER:  Your Honor, I don't

25     know if that is a reference to a document

1    that was not used by Dr. Fisher in the

2    initial reports, so I don't know

3    whether -- what he just testified to is

4    inappropriate or not.

5              THE COURT:  Well, I would -- you

6    can bring out what you need to on your

7    very able cross, Mr. Wagner.  I ask the

8    question -- and I'm not totally bound by

9    what took place during the course of it,

10   so I would overrule the objection.

11             MR. SOLOMON:  And, Your Honor, I

12   would like to hand out to The Court, I

13   have given it to opposing counsel, and to

14   the witness, two other documents, one, a

15   demonstrative for identification only,

16   DD33.

17             And one for identification,

18   DX571.

19     Q.  Over lunch did you go back to your

20   expert report at my request?

21     A.  I did.

22     Q.  And are these two references cited in

23   your report?

24     A.  There are.

25     Q.  And can you explain them to The Court,

1    please.  You can start with DD33.

2      A.  Sure.

3          DD33 contains the fuller excerpt

4    from my report that discusses the Jewish

5    Encyclopedia, and published in 1907.

6          And my point here was two-fold.

7    First of all, it specifically mentioned --

8    mentions the appurtenances of the

9    synagogue, this is 1907, this is the

10   Jewish Encyclopedia, referring to the

11   appurtenances of the synagogue.

12         And it lists out some of the

13   common elements that are inside the

14   synagogue that would be used, including

15   the scrolls of law, of the sacred books,

16   the ark and the table.

17         And the Jewish Encyclopedia makes

18   a clear link between a word we just heard

19   about, paraphernalia, which is interlined

20   into the lease, and the encyclopedia 1908,

21   typed in normally into the lease, and the

22   Jewish Encyclopedia makes a link between

23   the paraphernalia and the synagogue

24   silver, by referencing the silver

25   paraphernalia of the temple, which, I say

1    here, it is including the rimonim among

2    other items.

3      Q.  Okay.  And that the demonstrative 33,

4    correct?

5      A.  Yes.

6      Q.  All right.  And look at 571 for ID,

7    please.

8              This is cited in your excerpt,

9    right?

10     A.  This is the Jewish Yearbook, yes,

11   1899.

12     Q.  So tell The Court what this is, what

13   significance it has.

14     A.  So when trying to understand how

15   parties outside of these particular

16   events were using these terms, I went and

17   I looked at books like this, which have

18   certain definitions and descriptions,

19   which I think are helpful, were helpful

20   to me, and hopefully to The Court.

21             And this isn't any kind of, you

22   know, mysterious process, just trying to

23   understand what they are referring to, on

24   page 276 here, the -- when the scrolls of

25   law are removed from the ark, its

1    appurtenances have to be removed before it

2    can be unrolled and placed upon the

3    reading table.  And so you have the

4    reference to appurtenances, appurtenances

5    with records with regard to the Torah, so

6    I was trying to understand what the

7    appurtenances might be.

8         So I turn to the Sefer Torah, on

9    page 318, you have here, 318, and the next

10   page, and about half way down, it says --

11   this is in describing the Sefer Torah --

12   "The scroll of law, while not in use,

13   their bound by a binder and covered with a

14   mantel while the two tops of the handles

15   are over -- or religious letters are

16   covered with a crown of silver or gold,

17   and with gold or silver bells.  So in my

18   report I was not trying to do anything

19   strange or unorthodox, it was simply

20   trying to understand, connect the dots

21   here to draw these pieces together to

22   understand what is taking place.

23    Q.  Professor Fisher, I notice on the cover

24   page 6 of the Jewish Yearbook, it was

25   published in London, is that at all relevant

```
 1   to your -- the opinion that you just gave The

 2   Court?

 3     A.  Not at all, because the --

 4   especially given the history of the

 5   United States and what's taking place

 6   over -- or even in Great Britain there's

 7   a wider readership outside of London, and

 8   in global Judaism, that is being referred

 9   here.

10            MR. SOLOMON: Thank you, Your

11   Honor.  Nothing further.

12            THE COURT:  Thank you, Mr.

13   Solomon.

14            Mr. Wagner.

15            MR. WAGNER:  Your Honor, may I

16   proceed.

17            THE COURT:  Sure.

18            MR. WAGNER:  Thank you.

19       CROSS EXAMINATION BY MR. WAGNER:

20     Q.  Dr. Fisher, nice to see you again.

21     A.  Good to see you again, Mr. Wagner.

22            (Discussion off the record.).

23     Q.  Dr. Fisher, you are an expert retained

24   for litigation, correct?

25     A.  Yes.
```

138

1    Q.  And through the end of the April, you

2  had billed over $60,000 on this matter,

3  correct?

4    A.  I have not added that up recently.

5  But perhaps.

6          MR. SOLOMON:  Rather than delay,

7    if all you are doing is getting my email,

8    what I said in the email was accurate at

9    the time.

10          THE COURT:  We can stipulate to

11    what the number is.

12    Q.  It's, the end of the April, $64,000, you

13  had billed on this matter; is that correct?

14    A.  I will take your representation on

15  that.

16    Q.  And you have billed more time since

17  then, correct?

18    A.  Yes.

19    Q.  And you are probably about up to

20  $100,000?

21    A.  I don't know until I look.

22    Q.  Now, you believe you are qualified to

23  give opinions in this case, correct?

24    A.  Not legal opinions.  I have been

25  asked to weigh in on certain matters,

1    yes.

2      Q.  And, in fact, you think that you are

3    highly qualified, right?

4      A.  I think I'm qualified.

5      Q.  Well, you wrote in the declaration,

6    paragraph 2, that you are highly qualified;

7    is that correct?

8      A.  I would like to see it.

9      Q.  Look at paragraph 2, you say there, "I

10   believe I'm highly qualified to address the

11   issues that I speak to."

12     A.  (Reads document.)

13     Q.  Did you write that?

14     A.  I did.

15     Q.  And is that a true statement?

16     A.  I believe so.

17     Q.  Now, there's a Judaica Studies

18   department at Brown; is that correct?

19     A.  There's a Judaica study.

20     Q.  You are not part of that department?

21     A.  I am not.

22     Q.  You have not published any papers solely

23   on American Jewish History; is that correct?

24     A.  Not solely on American Jewish

25   History.

1    Q.  And you have not taught any course

2    specifically on Jewish ornaments?

3    A.  No specifically on the --

4    Q.  And not a course on religious objects?

5    A.  Not solely on American Jewish --

6    solely American Jewish religious objects.

7    Q.  And you have not published any articles

8    devoted solely to Jewish ornaments; is that

9    correct?

10    A.  Not solely to Jewish religious

11    ornaments.

12    Q.  You have no degree in linguistics,

13    correct?

14    A.  I do not have a degree in

15    linguistics.

16    Q.  And you have not published a single

17    essay dedicated to American Jewish History,

18    entirely dedicated to --

19    A.  Entirely dedicated, no.

20    Q.  And never published any article devoted

21    solely to the Newport Jewish community; is

22    that correct?

23    A.  Solely to the Newport Jewish

24    community?

25    Q.  Yes.

```
 1     A.  No.

 2     Q.  And you are not a member of the American

 3  Jewish Historical Society are you?

 4     A.  I'm not.

 5     Q.  You are not a member of any local Jewish

 6  Historical Society?

 7     A.  I am not.

 8     Q.  And not taught any courses solely on

 9  Jewish History, correct?

10     A.  Solely, no, I have not.

11     Q.  And min fact, you've never taken any

12  courses devoted solely to American Jewish

13  History, correct?

14     A.  Not solely, no.

15     Q.  And, now, you said this morning, that,

16  in your class, you covered the history of

17  American Judaism in your class; do you recall

18  that?

19     A.  I do.

20     Q.  And am I right that you devoted one

21  class out of your 13 to American Jewish

22  History?

23     A.  For the colonial period, yes.

24     Q.  And the only class that you have taken

25  in Judaism, were devoted to pre Second Temple
```

1  Judaism?

2    A.  I don't understand the question.

3    Q.  Can you turn to the your deposition,

4  page 46, line 5.  Pre Second Temple

5  Judaism --

6    A.  Sorry, just to the clarify, the 64

7  is the reference to the bottom right

8  number?

9    Q.  No, the top, the top right.

10   A.  The top right.  46.

11   Q.  Line 5.

12         "QUESTION:  Have you ever taken

13  any courses solely in Judaism?

14         "ANSWER:  When I was at seminary,

15  when I was at Protestant seminary three

16  years, I had to learn the Hebrew bible, I

17  did study that for two years, and I recall

18  classes on the Hebrew bible.

19         "QUESTION:  Were any of the

20  courses devoted solely to Judaism?

21         "ANSWER:  The courses I took,

22  were largely devoted to the pre Second

23  Temple Judaism."

24         Were you asked those questions

25  and did you give that answer?

1    A.  Yes, I did.

2    Q.  And you had not published any works

3  dealing solely with American Jewish History,

4  at all, correct?

5    A.  Not solely with American Jewish

6  History.

7    Q.  Not an essay, correct?

8    A.  Not solely devoted to it.

9    Q.  Never given a lecture solely devoted to

10  American Jewish History?

11    A.  I have given lectures within which I

12  have discussed American Jewish History,

13  but not solely.

14    Q.  And you have never been to a conference

15  devoted solely to American Jewish History,

16  correct?

17    A.  No.  But I have been to conferences

18  where there have been --

19    Q.  Whether or not the -- just, we all want

20  to go home, just answer my questions.

21         THE COURT:  Mr. Snow and I can

22   stay.

23         (Discussion off the record.)

24    Q.  And I'm right that your courses that you

25  teach at Brown, don't require any specific

144

 1  reading on Touro Synagogue?

 2   A.  That specific course does not, no.

 3   Q.  And you reference conferences, but you

 4  are not an author of any papers at that

 5  conference dealing with American Jewish

 6  History, were you?

 7   A.  Which conferences are you talking

 8  about?

 9   Q.  The one that you reference that you went

10  to concerning -- in which Jewish History came

11  up, you didn't publish any of the papers?

12   A.  Still confused which conference you

13  are talking about.  The conference we

14  referenced the beginning of the day, or

15  just a few minutes ago?

16   Q.  Can you turn -- nevermind.  Just go on.

17      Now, you are not able to cite any

18   authorities of American Jewish History

19   that have a descriptions of historic

20   method, can you?

21   A.  Aside from Jonathan Sarno who is a

22  well recognized scholar.

23   Q.  And your only training in American

24  Jewish History is your studying -- study for

25  field exams in 2005; is that correct?

1    A.  Formal training, yes.

2    Q.  Well, Dr. Fisher, to the extent that you

3  know anything about Jewish History apart from

4  this case, it's only as part of the wider

5  scope of American religious history, correct?

6    A.  Historians are not --

7    Q.  Yes or no.  I don't want to hear --

8    A.  Historians --

9    Q.  That question is yes or no.

10    A.  I can't answer yes or no.

11    Q.  Then turn to your deposition, page 175.

12  I don't want to hear today what historians

13  do, I want to hear what you did.  Page 175,

14  line 2.  You answer this question:

15        "QUESTION:  Do you really know

16   anything about American Jewish History?

17        "ANSWER:  The history of American

18  Judaism is part of the wider scope of

19  American religious history in which I have

20  -- was trained and which I teach."

21        Were you asked that question and

22  did you give that answer at your

23  deposition?

24    A.  Yes.

25    Q.  By the way, you gave testimony today

146

1  about Torahs and their uses, but at your

2  deposition you didn't even know when they

3  were used, correct?

4    A.  I would have to go back with you and

5  look at the deposition.

6    Q.  And you are not an expert on Jewish

7  laws, Mr. Solomon brought out --

8    A.  Right.  Right.

9    Q.  You are not an expert on Jewish ritual?

10   A.  Correct.

11   Q.  And never written any articles or

12  essays, lectures for finials have you?

13   A.  Not specifically on for finials.

14   Q.  And you have no prior experience with

15  finials, other than this case; is that

16  correct?

17   A.  I don't agree with that, no.

18   Q.  And in response to the Judge's

19  questions, you referenced global Judaism; do

20  you recall that?

21   A.  I do.

22   Q.  And you are not an expert on global

23  Judaism, are you?

24   A.  Again, I cannot answer yes or no.

25   Q.  Do you have any degree in Judaism?

1    A.  Degrees are not required --

2    Q.  No.  No.

3         MR. WAGNER:  Your Honor, I would

4    ask he be directed to answer whether he

5    has a degree in Judaism.

6         THE COURT:  Dr. Fisher, you have

7    to -- if the question calls for a yes or

8    no answer, you have to answer that yes or

9    no.  If you are not able to answer that

10   yes or no, you can say, "I cannot answer

11   that question yes or no," but if it calls

12   for a yes or no, you have to answer yes or

13   no, and then follow-up points or whatnot,

14   that you want explanation, Mr. Solomon

15   will have a chance to get up on the

16   redirect.  And if you cannot answer yes or

17   no, then you say, "I can't answer yes or

18   no."

19        MR. WAGNER:  Thank you, Your

20   Honor.

21   Q.  Can you answer whether you have a degree

22   in Judaism?  Yes or no.

23   A.  I cannot -- I can't answer the

24   question as it's posed.

25   Q.  Can you show me on your resume the

1  degree that you have in Judaism?

2      A.  No.

3      Q.  You are not an expert on corporate

4  governance, are you?

5      A.  No.

6      Q.  Not an expert on nonprofit, are you?

7      A.  No.

8      Q.  Not an expert on organizational bylaws,

9  are you?

10     A.  No.

11     Q.  Never read synagogue bylaws before this

12  case, did you?

13     A.  Not to my recollection.

14     Q.  Can you give me a reference for -- in a

15  book, the methodology, can you give a

16  reference in a book about American Jewish

17  History to the methodology that you brought

18  to this case?

19     A.  A book in American Jewish History?

20     Q.  Yes.

21     A.  With regard --

22     Q.  Regarding the methodology.

23     A.  Yes.

24     Q.  Can you give me one?

25     A.  Nothing comes to mind with regard to

1    that particular point.

2      Q.  Now, you visited Touro Synagogue, did

3    you not?

4      A.  I did.

5      Q.  And you took your class there?

6      A.  I did.

7      Q.  And when was the last time that you were

8    there?

9      A.  I think I said earlier, 2011.

10      Q.  Now, sir, when you were there, did you

11    see the plaque?

12      A.  Not on that visitor -- no.

13            It's actually off to the side of

14     the building when you approach it from the

15     front on a auditorium, you have to step

16     around to see it.

17      Q.  Can you read -- the plaque is not

18    hidden, is it?

19      A.  My recollection is when you walk up

20    to the front, into the main doors, it

21    is not there, it's around the corner.

22      Q.  Is it your testimony that the Department

23    of the Interior was hiding a plaque?

24      A.  No.  My testimony is that a normal

25    person walking in the front door of the

1    the synagogue, would not be able to see

2    it without walking around the corner.

3        Q.  Let's go on.

4            Now, you are not a lawyer, are

5     you?

6        A.  I'm not a lawyer.

7        Q.  Never taken any courses in law school,

8    correct?

9        A.  No.

10       Q.  Never taken any cases in property law,

11    correct?

12       A.  No.

13       Q.  Don't know how a contract comes into

14    being, correct?

15       A.  No.

16       Q.  Don't know how parties alter a contract,

17    correct?

18       A.  Not to my knowledge.

19       Q.  No courses in contract law, correct?

20       A.  No.

21       Q.  Now, you gave some testimony about the

22    word paraphernalia and it's use in a lease,

23    lease, the word paraphernalia was a

24    comprehensive -- take this back.

25            You are not a lawyer, right?

1    A.  I'm not a lawyer.

2    Q.  Okay.  But the words paraphernalia in

3   the lease, was a comprehensive legalese, was

4   it not?

5    A.  Are you quoting me?

6    Q.  I'm asking you questions at trial, sir.

7    A.  The word paraphernalia encompassed a

8   wide range of ritual objects that I think

9   are important in this case, yes.

10    Q.  So my answer is yes, paraphernalia is a

11   comprehensive legalese in your view, correct?

12    A.  In my view, I think that makes the

13   most sense, given the context of these

14   documents.

15    Q.  Am I right the parties recognized the

16   Myer Myers -- you gave some testimony about

17   Myer Myers; do you recall that?

18    A.  I do.

19    Q.  And did the parties recognize the Myer

20   Myers rimonim as important?

21        MR. SOLOMON:  Objection.  Your

22   Honor, when.

23        THE COURT:  In what time period.

24    Q.  Any time period.

25    A.  It depends.  I can't answer -- I

1    can't answer the question as posed, it

2    depends on the time period.

3      Q.  The 1800's?

4      A.  Part of the 18 -- what part of the

5    1800's?

6      Q.  Any part of it, sir.

7           THE COURT:  Mr. Wagner, can you

8     repeat the question.

9      Q.  Did the parties, did the parties

10    recognize the Myer Myers rimonim as special

11    during any part of the 1800's; can you answer

12    that?

13      A.  I can answer with an explanation,

14    but I can't answer that because CJI

15    didn't exist before 1894, so I cannot

16    talk about whether they thought it was

17    special in 1850.

18      Q.  Fine.  Did CSI -- did CSI consider them

19    special in the 1800's?

20      A.  Shearith Israel -- yes, but I need

21    to explain.

22      Q.  I don't needed explanation, just wanted

23    the answer.

24           Now, am I right that in this case

25     you searched widely for evidence?

1    A.  Yes.

2    Q.  And you made determinations based on the

3  evidence, right?

4    A.  For the purposes of -- myself as a

5  historian, yes, I --

6    Q.  And you weighed the evidence, right?

7    A.  Within the context of my historical

8  research, yes.

9    Q.  And a fair amount of your report and

10  your testimony today, is to opine as to what

11  the parties you believed knew, believed,

12  discussed or understood, correct?

13    A.  Based on the documents that I looked

14  at, yes.

15    Q.  And you drew factual conclusions based

16  on your readings of the document, correct?

17    A.  Not in the legal sense.  But within

18  my parameters as a historian, yes.

19    Q.  Not asking you legal.  So just -- you

20  make credibility determinations, did you not?

21    A.  I need more information to answer

22  that question.

23    Q.  Can you turn to your deposition, page

24  137.  You can turn, actually, to 138.

25         It would safe some time.  138

 1   line 7.

 2          "QUESTION:  So just what you did,

 3   you made some credibility determinations?"

 4          And then an objection.

 5          "ANSWER:  And I think -- I

 6   already said this, that, yes, as a

 7   normal -- in the historical profession I

 8   had to make certain kinds of assessments

 9   about documents and their reliability."

10          Were you asked that question, and

11   did you give that answer?

12   A.  I did.  But the answer I gave --

13   Q.  Sir, all I want to know is whether the

14   court reporter accurately transcribed your

15   answer correctly?

16   A.  Yes.

17   Q.  And Mr. Solomon will ask whatever

18   follow-up questions he needs to ask.  We all

19   want to go home, some people excepting.

20          THE COURT:  He is at home, too,

21   so be careful.

22          MR. WAGNER:  I'm happy to hang

23   around here.  We are having a nice time.

24   Not sure about the families, that's the

25   issue.

155

1    Q.  You testified to a lot of, what somebody

2   said to somebody else today, right?

3    A.  (No response.)

4    Q.  Yes or no.

5    A.  I cannot answer that question as

6   posed.

7    Q.  Fine.  Don't answer it.

8          You were not present during any

9    of these conversations that took place in

10   the 1800's, were you?

11    A.  (No response.)

12    Q.  Yes or no.

13    A.  No.

14    Q.  And all of these events occurred before

15   your lifetime, correct?

16    A.  As is always the case with

17   historians, most of the cases for

18   historians, yes.

19    Q.  And you don't have a degree in mind

20   reading, do you?

21    A.  No.

22    Q.  You, in this case, submitted 65 major

23   reports, right?

24    A.  Approximately.

25    Q.  Declaration afterwards, right?

1    A.  Yes.

2    Q.  And addendum, right?

3    A.  Yes.

4    Q.  Rebuttal, right?

5    A.  Yes.

6    Q.  And four hours of testimony so far,

7    right?

8    A.  If you say so.

9    Q.  And you made hundreds of judgements

10   about the facts, right?

11   A.  That's why I was brought on as a

12   historian to understand --

13   Q.  But I'm right, you made hundreds --

14   A.  I have not counted.

15   Q.  But every one of those judgements are in

16   favor of the party that is paying your bill;

17   is that correct?

18   A.  I don't agree with that.

19   Q.  Well, we will get into the that.

20       Your testimony -- you testified

21   about a lot of documents today, right?

22   A.  Yes.

23   Q.  By you skipped a lot documents, didn't

24   you?

25   A.  I can't answer the question in that

1    way.  I disagree with the

2    characterization.

3      Q.  Now, am I right that when you started

4    this process, you trusted the judgment of the

5    lawyers to give you the relevant documents

6    that had been produced in this case, correct?

7      A.  I don't agree with the implication

8    of that question.

9      Q.  Just answer the question.  Did you trust

10   their judgment?

11     A.  It's complicated.  I cannot just say

12   yes or no.

13     Q.  Then we can turn to your deposition.

14   134, line 15.  Actually, let's go to line 6.

15           "QUESTION:  But we saw at least

16    some documents that were produced in this

17    case by CSI that you did not look at,

18    right, the telegrams?

19           "ANSWER:  It appears to be the

20    case, although counsel for CSI must have

21    made the decision about whether or not

22    they were important or necessary, and

23    frankly, it's unclear without further

24    study and investigation whether they would

25    have impacted the case one way or the

1    other.

2         "QUESTION:  But you trusted their

3    judgment, correct?

4         "ANSWER:  To a certain extent, I

5    had to lean upon what they gave me,

6    because I don't have unlimited resources

7    to go through the archives of CSI and CJI

8    and nor do I have the time to go through

9    the archives in Newport, of the city and

10   the historical society to make sure that

11   every paper was turned over.

12        "But I did, in addition to

13   receiving documents from them, part of

14   which had been submitted by CJI, do a

15   reasonable amount of looking around and

16   reading and research to see if there was

17   anything that was contrary or had been

18   overlooked by them."

19        "QUESTION:  Sir, can you just

20   answer my question."

21        I see I have made no progress.

22        "QUESTION:  I thought it was a

23   very simple question, did you trust the

24   judgment of the CSI lawyers to give you

25   what was relevant from the parties

1    document production, or did you not trust

2    them?  I want an answer.

3            "ANSWER:  I think I..." --

4            And an objection.

5            "ANSWER:  I think I answered your

6    question.  I trusted them to give me what

7    must be -- they thought was relevant, yet

8    I conducted my own independent

9    investigation that was within reason and

10   within the allotment of time and resources

11   I had at my disposal."

12           Were you asked those questions

13   and did -- were you asked those questions

14   and did you give those answers?

15   A.  Yes.

16   Q.  And there were a couple of telegrams

17   that I showed you at your deposition; do you

18   recall that?

19   A.  I do.

20   Q.  And they did not show you those

21   documents before you submitted your report,

22   did they?

23   A.  No, I don't believe they did.

24   Q.  Now, you testified about rimonim today.

25   Can you just tell me, are rimonim personal

1    property, yes or no?

2      A.  I can't answer the question.

3      Q.  Are rimonim real property?

4      A.  I can't answer the question without

5    more context.

6      Q.  You have a Ph.D. from Harvard and you

7    cannot tell me whether rimonim are presently

8    personal property?

9      A.  That's why I cannot say yes or no,

10   it's -- it needs more explanation.

11     Q.  So when the documents refer to personal

12   property, do you know whether they are

13   referring to the rimonim?

14     A.  Depends on the context and which

15   document.

16     Q.  Are the rimonim removables?

17     A.  It depends which rimonim, what time

18   period, and what document.

19     Q.  Any.  Are rimonim -- can you answer that

20   question, are rimonim removables?

21     A.  Depends on context.

22     Q.  Right, that you cannot even give me a

23   definition of the difference between real

24   property and personal property, can you?

25     A.  Not one that would satisfy you, I'm

1   sure.

2     Q.  It might.  You said you knew primary

3   sources that the rimonim were in Newport

4   prior to 1869; do you recall that?

5     A.  Read back the question.

6     Q.  You said earlier this morning that you

7   saw no primary source documents that --

8   indicating that the rimonim were in Newport

9   prior to 1869; did you give that testimony

10  this morning?

11    A.  I think that the testimony was a

12  specific and descriptive reference in the

13  primary sources.

14    Q.  So the answer is yes, that's what you

15  said this morning?

16    A.  No.  I just qualified that by

17  descriptive and specific.

18    Q.  So I would ask the question.  Did you

19  see any primary source documents indicating

20  that the rimonim were in Newport prior to

21  1869?

22    A.  Still not sure, back to square one

23  in terms of the question.

24          My testimony was specific in

25   descriptive.

162

1    Q.  Just -- can -- are you able to answer

2    that question?  You answered that for Mr.

3    Solomon when he asked it.

4    A.  Because the question was different.

5    Q.  Are you aware, sir, that there are lots

6    of the secondary source documents that

7    indicate that the rimonim were made for

8    Newport?

9    A.  In Touro Synagogue I'm aware of the

10   secondary source documentation.

11   Q.  And all those secondary sources are more

12   knowledgeable about the Jewish community in

13   Newport than you are, correct?

14   A.  I disagree with that

15   characterization.

16   Q.  You are more knowledgeable than David

17   Barquist?

18   A.  I don't have evidence that he has

19   looked at the same set of documents that

20   I have.

21   Q.  That's not my question.

22        Do you believe that you are more

23   knowledge than David Barquist on Myer

24   Myers?

25   A.  I cannot answer that question.

1    Q.  You are -- are you more knowledgeable

2  than Jeanette Rosenbaum with respect to Myer

3  Myers?

4    A.  I can't answer that question.

5    Q.  And you understand that they both wrote

6  books about Myer Myers?

7    A.  I do.

8    Q.  And have you written a book about Myer

9  Myers?

10    A.  I have not.

11    Q.  Have you written an article about Myer

12  Myers?

13    A.  I have not.

14    Q.  Did you hear of Myer Myers before this

15  case?

16    A.  Yes.

17    Q.  Did you do any research on Myer Myers in

18  your career?

19    A.  Not quite sure what you mean.  I

20  can't answer the question as posed.

21    Q.  Sir, I represent to you that this is the

22  answer, the amended answer that was submitted

23  by CSI in this case, and can you turn to page

24  11, paragraph 15.

25        (The witness complies).

1              THE COURT:  Do you have the

2     document, Mr. Wagner?

3              MR. WAGNER:  Yes.  241.

4     A.  This is in the binders.

5     Q.  Yes, but put that up on the screen for

6     you, if you would like.

7              Can you read paragraph 15 for us.

8      It's up on the screen.

9     A.  241, you said?

10    Q.  Yes.

11    A.  Sorry.  I'm old school, I prefer the

12    hard copy.  What page is this again?

13    Q.  Page 11.

14    A.  Page 11.

15    Q.  Paragraph 15.

16    A.  Page 11, paragraph 15.

17    Q.  Yes, can you read that.

18    A.  "By 1822 Jeshuat Israel's original

19    possession of the rimonim ceased to

20    exist."

21    Q.  Now, you were in court, I think on last

22    week, when Mr. Solomon said that during the

23    opening that, quote, the job of the rimonim

24    is to stay on top of the Torah"; do you

25    recall that in his opening?

165

1    A.  It sounds familiar.  I would have to

2   go back and read the transcript.

3    Q.  And to move on, will you take my

4   representation that that is what he said?

5    A.  Yes.

6    Q.  And finials go on top of the Torah,

7   right?

8    A.  Finials go on top of the rods of the

9   Torah, yes.

10    Q.  And the historical evidence, both

11   primary and secondary, is that all -- every

12   Torah is adorned by a set of rimonim, right?

13    A.  When possible.

14    Q.  And am I right that, that author seemed

15   to think that the rimonim always traveled

16   with the books of the law?

17    A.  I don't have any basis for that

18   either way.

19    Q.  Can you turn to your deposition, page

20   179.  Line 18.

21        "QUESTION:  Is it your

22    understanding that those scrolls, is it

23    your opinion that scrolls traveled with

24    rimonim such that whoever had custody of

25    the Torahs, had custody of the rimonim ?

1    "ANSWER:  The documentation is

2    not always clear on that question.

3    "QUESTION:  So do you know one

4    way or the other?

5    "ANSWER:  Again, the

6    documentation is not clear on that

7    question of whether or not the rimonim

8    always traveled with the books of the law.

9    Some authors seem to think that that would

10   be the case."

11   Were you asked those questions

12   and did you give that answer?

13   A.  Yes.

14   Q.  Now, you said this morning, I took it

15   down, you saw no evidence that the rimonim

16   were held for safekeeping; is that your

17   testimony?  By CSI.

18   A.  That the rimonim were held for

19   safekeeping?

20   Q.  Yes.

21   A.  What time period?

22   Q.  In the early 1800's.

23   A.  In the early?

24   Q.  Up through 1869.

25   A.  That's what I said this morning.

1    Q.  Okay.  And can you put up P38.

2    A.  In the binder here?

3    Q.  Yes.

4          THE COURT:  One second, Your

5    Honor.  I'm trying to make our life easier

6    and move this along, so just give me a

7    second.

8    Q.  We are going to make it easier for you,

9    Dr. Fisher, and use the transcription that

10   was provided by CSI to this document.

11          And I think it's just easier for

12   us.

13          MR. SOLOMON:  D26.

14          MR. WAGNER:  No, it's 25 --

15   sorry, is it 26?  Can you put up D26.

16   26A.  Sorry.

17   Q.  Scroll down.  And can you read the

18   portion "the committee appointed to receive."

19   A.  (No response.)

20   Q.  At the bottom.

21   A.  On the screen?

22   Q.  Do you see that, sir?

23   A.  I do.  Yes.  The second to the last

24   paragraph.

25   Q.  Can you read that.

1    A.  "The committee --

2              THE COURT:  First, can you orient

3    me, Mr. Wagner.

4              MR. WAGNER:  I will tell you,

5    this is the document that we say evidences

6    the transfer of the Sefer rimonim along

7    with the rimonim from Newport to CSI.

8              THE COURT:  These are the

9    minutes.

10              MR. WAGNER:  These are minutes of

11   CSI in 1833.

12              THE COURT:  Okay.

13   Q.  Sorry, go ahead, sir.

14   A.  "The committee appointed to receive

15   the Sefer rimonim belonging to the

16   Newport synagogue, reported that they

17   have received the same, and deposited

18   them in our hachal and given a receipt to

19   the family to the late Moses Sexias, of

20   which the following is a duplicate."

21   Q.  And can you --

22              THE COURT:  Stop for a second.

23   What is a hachal?

24              THE WITNESS:  My understanding --

25   actually, there's several different terms,

 1    but it's a -- it's the ark.  Is it?  I

 2    believe it's a storage area, I thought it

 3    was the ark, but I could be wrong.

 4     Q.  Keep going.  Can you keep reading.  Can

 5    you read that.

 6     A.  "Received from the family of the

 7    late Mr. Moses Sexias of Newport, Rhode

 8    Island four Sefer rimonim belonging to

 9    the congregation of that place, which are

10    now to be deposited in the synagogue in

11    New York of the Congregation of Shearith

12    Israel under the charge of the trustees

13    of said congregation.  To be delivered

14    when duly required or for the use of the

15    congregation hereafter worshiping in the

16    synagogue."

17     Q.  And am I right, that the congregation

18    that is now worshiping at Touro Synagogue, is

19    CJI?

20     A.  I cannot answer that question as --

21    as currently phrased.

22     Q.  Sir, what congregation uses Touro

23    Synagogue today?

24     A.  Congregation Jeshuat Israel.

25     Q.  By the way, Congregation Jeshuat Israel,

1    in terms of the translation, means the same

2    thing as Congregation Yeshuat Israel; is that

3    correct?

4      A.  Yes, that's correct.  They both mean

5    salvation.

6              THE COURT:  Do you have a copy

7    that you can send up to me.  I cannot put

8    my hands on this one, and not in my -- any

9    of my ready binders.

10             MR. WAGNER:  If I highlight, at

11   the time, I go back it's a lot easier.

12             THE COURT:  Whenever.  You don't

13   have to delay.  But just, they can bring

14   that up.  I know it's here somewhere,

15     Q.  And, sir, now, can you turn to P234 in

16   the book.

17             MR. SOLOMON:  Your Honor, he was

18   using our exhibit.

19             THE COURT:  Do you have a copy?

20             Great.  Thank you.

21             I know it's multiple times up

22   here, but.

23     Q.  You have P234 there, sir?

24     A.  Yes.

25     Q.  And can you turn to page 5, this is --

1   just to orient, this is a memorandum prepared

2   by someone at CSI?

3      A.  In 2012.

4      Q.  Can you turn to the bullet, first

5   bullet, and read that bullet.

6      A.  Page 5, it says, "In 1818 Benjamin

7   Sexias of Newport wrote a letter to

8   Shearith Israel with the consent of

9   Moses, Jacob and Samuel Lopez

10  transferring two Sefer rimonim Torah of

11  Newport to Shearith Israel for

12  safekeeping."

13     Q.  Keep going.

14     A.  "These appear to have the Sefer

15  Torah originally loaned to Newport by

16  Shearith Israel, and in the mid 18th

17  century, in addition to two additional or

18  possibly four scrolls of Newport

19  congregation were deposited for

20  safekeeping in New York.

21           "And it is likely that the

22   rimonim adorning these scrolls were

23   brought to New York for safekeeping at

24   that time."

25     Q.  And you are aware that this memorandum

1    was prepared by somebody at CSI, right?

2    A.  I am, yes.

3    Q.  Now, can you name me an authority on

4    Myer Myers?

5    A.  Besides David Barquist?

6    Q.  Well, let's -- let's take David

7    Barquist.

8    A.  Sure.

9    Q.  Turn to 150 in your book.

10   A.  150.

11          THE COURT:  The second binder.

12   A.  Thank you, Your Honor.

13   Q.  Turn to page 160 of the right and read

14   those first four lines.

15   A.  Page 160 on the right-hand side of

16   the top.  Says, "However, it was not

17   until 1833 that the four Torahs and

18   presumedly their only comments were

19   transferred to Shearith Israel, quote,

20   for safekeeping in our place of worship

21   until they should be required for use at

22   the Newport shul.  End quote.

23   Q.  Thank you, sir.

24          Now, you told us that, that title

25    to the synagogue was transferred in the

1    1820's, correct?

2    A.  Correct.

3    Q.  You see no primary source document from

4    that period of time indicating that transfer,

5    have you?

6    A.  Primary source evidence of people

7    talking about the ownership being resided

8    in Shearith Israel.

9    Q.  Tell me the name of a document from the

10   1820's evidencing transfer of title that

11   formally transferred the title?

12   A.  Nothing comes to mind at the moment.

13   Q.  You testified earlier this morning that

14   there's no connection between CYI and CJI; is

15   that your testimony?  I took it down.  No

16   connection?  Was that your testimony?

17   A.  Yes.

18   Q.  You cited Gutstein this morning, right?

19   A.  I did.

20   Q.  And his work is wildly consulted, right?

21   A.  It's old, but people do cite him.

22   Q.  No, is his book wildly consulted?

23   A.  His book -- I don't know that I can

24   answer that fully, but it's one of a

25   dozen of books on the Jews of Newport

174

1    that people refer to.

2    Q.  Turn to page 25, line 4.

3    A.  Of the same exhibit?

4    Q.  No, of the deposition transcript.

5    A.  Well, that makes a difference.

6    Q.  Were you asked the following question,

7    and did you give, volunteer the following

8    answer:

9         "QUESTION:  You also cited

10   Gutstein, is he an authoritative source on

11   the Jews of Newport?

12        "ANSWER:  His work is wildly

13   consulted."

14        Were you asked that question and

15   did you give that answer?

16   A.  I'm just now arriving to the page.

17   Yes.

18   Q.  And am I right, that he writes that CJI

19   was the legal successor of the old

20   congregation, did he write that?

21   A.  I would need to see the document.

22   Q.  Well, look at it -- look at P81, page

23   275 of the document.  Actually, why don't you

24   go to the front page, you see that this is

25   the Gutstein source?

1    A.  I do.

2    Q.  And you cited that in your report?

3    A.  I believe so, yes.

4    Q.  Turn to page 275.

5        (The witness complies).

6    Q.  Can you read, sir, the paragraph in the

7    middle of the page, beginning with "The

8    controversy."

9    A.  "The controversy between the

10   congregation Jeshuat Israel and the Touro

11   Synagogue was only temporarily settled at

12   this time.  The final fusion of the two

13   did not come about until the early part

14   of the present century.

15       "And in the controversy the

16   Congregation Shearith Israel inevitably

17   supported the Congregation Jeshuat Israel,

18   which was the legal successor of the old

19   congregation.

20       "The attitude of the New York

21   congregation was motivated by the

22   determination to preserve the ancient

23   traditions and maintain over the synagogue

24   in Newport their authority which had --

25   which now seemed to be challenged."

1    Q.  Now, sir, you also cite Kusintz this

2    morning; do you that recall?  That CJI is the

3    successor to CYI, is --

4    A.  I need to take a look.

5    Q.  Can you look at P125 in your book.  Do

6    you see that Kusintz article?

7    A.  I do.

8    Q.  And turn to the page 71.

9    A.  Is this the same article that you

10   were questioning earlier in terms of the

11   authenticity and reliability?

12   Q.  I did not ask any questions about

13   Kusintz's reliability, sir.

14   A.  Okay.

15   Q.  Can you read the story of the paradox,

16   can you read that first one, two, three,

17   four, five, six, seven, eight, nine, ten

18   lines.

19   A.  Read the ten lines from "Story of

20   the Paradox"?

21   Q.  Yes.

22   A.  "It is a story of the paradox of the

23   Congregation Jeshuat Israel and the basis

24   for the enduring relationship of relaxed

25   congeniality that flourished from the

1    Sephardic Shearith Israel of New York and

2    the Ashkenazi Jeshuat Israel of Newport.

3              "This relationship, which has

4    been put to the test and has been revived

5    many times, contrasts with the earlier

6    controversy begriming in 1893.  It settled

7    once and for all the principals of which

8    Newporters with the legal successor to the

9    old congregation, Jeshuat Israel, and

10   which group shapes the destiny of Touro

11   Synagogue in the years ahead."

12   Q.  And now, sir, can you turn to page 47 of

13   that document, and can you read the paragraph

14   under the New York group takes action.

15   A.  The first paragraph.

16   Q.  Yes.

17   A.  "Congregation Shearith Israel

18   motivated by its desire to preserve

19   tradition, to protect its legal authority

20   over the synagogue that was now being

21   placed in jeopardy, and to support

22   Congregation Jeshuat Israel, the legal

23   successor to the original congregation,

24   Yeshuat Israel, and immediately brought

25   suit against Touro Synagogue charging

178

1    entry by force, and unlawful detention of

2    their property.

3              "The ensuing complicated legal

4    maneuvering resulted in several court

5    cases, which ended three and one and a

6    half years later, after a precipitated

7    famous 1902 break in -- break into Touro

8    Synagogue followed by the unprecedented

9    sit in."

10   Q.  By the way, you cited this article in

11   your report, do you recall?

12   A.  I do recall that.

13   Q.  You didn't cite this line, did you, this

14   paragraph, did you, when you concluded there

15   was no connection between the two?

16   A.  I did not cite this particular line.

17   Q.  And you cited what was helpful to your

18   cause, right?

19   A.  I disagree with that entirely.

20   Q.  Do you have any -- are you offering any

21   opinions as to whether Judge Brown's decision

22   decided the issue of the legal ownership?

23   Yes or no.  Are you offering an opinion on

24   that?

25   A.  I cannot answer the question as

1    posed.

2       Q.  Well, are you offering any legal

3    opinions in this case.

4       A.  No.  Not legal opinions.

5       Q.  Okay.  Now, do you know who Rabbi Angel

6    is?

7       A.  I do.

8       Q.  Who is he?

9       A.  My understanding is he was a rabbi

10   -- actually, not sure.  I'm a little

11   confused, it's Shearith Israel or CJI.

12      Q.  Would you take my representation that he

13   was the rabbi for 40 years at CSI.

14      A.  I will, yes.  Thank you.

15      Q.  Now, can you turn to P167 in your book.

16           I represent to you, sir, that

17    this is a speech by Rabbi Angel given in

18    October of 2004 that was placed in the

19    congressional record.  Will you take my

20    representation?

21      A.  I will.

22      Q.  Can you turn to page 2 of the document.

23      A.  Yes.

24      Q.  1, 2, 3 paragraphs, and read that first

25   sentence, "We welcome."

180

1     A.  "We welcome representatives of our

2  sister congregation that date back to the

3  Colonial period from Touro Synagogue in

4  Newport, from Mikveh Israel in

5  Philadelphia, we have representatives and

6  words of the congregation from the

7  historic congregation in Savannah,

8  Charleston, and Richmond.

9          "We welcome members of your

10  sister congregation, the Spanish, and

11  Portuguese community of London."

12    Q.  Now, I showed you that paragraph stating

13  Congregation Jeshuat Israel dating back to

14  the 1650's, do you recall that?  Do you

15  recall that?

16    A.  The one that you had on the screen

17  earlier?

18    Q.  Yes.

19    A.  Yes.

20    Q.  Are you aware, sir, that Shearith

21  Israel's president attended the dedication of

22  that plaque?

23    A.  I have not seen anything either way

24  regarding that.

25    Q.  Can you turn to P104 in the book.

1    A.  By the way, we did not go over the

2    wording of that plaque, when it was up on

3    the screen.

4    Q.  Say that again?

5    A.  We were referring to the plaque, and

6    if we are going to continue talking about

7    that, we should take a look at it, I

8    think.

9    Q.  Sir, do you see that this is another

10   article by Morris Gutstein?

11   A.  I do.

12   Q.  Do you see at the bottom this is the

13   dedication, for the dedication of the plaque,

14   page 148, at the bottom.  Says the

15   dedication, celebration lasted three days

16   from the Friday, August 29, through Sunday

17   August 29th, did you -- Sunday, August 31st,

18   it commenced with the Sabbath eve services

19   conducted by Lewis Gurstein, rabbi of

20   Congregation Shearith Israel; do you see

21   that?

22   A.  I do.

23   Q.  And now can you turn to page 150.  Do

24   you see the paragraph, starting "Alderman"?

25   A.  Yes, I do.

1      Q.  And it says, "Alderman, John J. Dannin

2   the city's greetings on behalf of Mary Edward

3   Edward Glading, Henry Hendricks, president of

4   the Congregation Shearith Israel spoke for

5   his congregation"; do you see that?

6      A.  I do.

7      Q.  Now, you testified that there was lots

8   of goodwill between the parties in 1893, 1894

9   period, do you recall that?

10     A.  The documents seem to bear that out,

11  yes.

12     Q.  And, in fact, there was a lot of ill

13  will, wasn't there?

14     A.  It depends when you are talking

15  about.

16     Q.  Well, didn't CSI petition to block

17  CJI -- to block the City of Newport from

18  incorporating CJI under that name?

19     A.  The State of Rhode Island, yes.

20     Q.  And let's look at that petition by CSI,

21  submission, P47, is this the petition that

22  you cited in your -- cited in your report to

23  the general assembly of the State of Rhode

24  Island in which CSI tried to block CJI from

25  incorporating under the name CYI?

1    A.  Yes.

2    Q.  Just -- you testified earlier today

3   about all the laudatory motives of CSI in

4   helping CJI, right?

5    A.  Yes.

6    Q.  And let's see what they sent to the

7   state legislature.

8          Do you see, can you read where it

9   says, that of the congregation, this is

10   the just make clear, this is the petition

11   that was submitted by CSI to the state

12   legislature, right?

13    A.  It appears so, yes.

14          THE COURT:  Can you clarify for

15   me, because I'm getting CJI and CYI's

16   slightly mixed during this time period for

17   obvious reasons.  The petition to

18   incorporate was originally filed under the

19   CYI name?

20          MR. WAGNER:  I don't know the

21   answer to that actually.

22          THE COURT:  Do you know, doctor?

23          THE WITNESS:  This document, from

24   what I have seen, most of the usages,

25   prior to the actual active incorporation,

1    June 13th, 1894, it say the Y, as this

2    document here, not every document.  But

3    most documents I have seen, use the "Y."

4    And does here as well.

5              THE COURT:  So a petition was

6    filed, and then CSI filed Exhibit 47,

7    objecting to something that we are about

8    to see.

9              MR. WAGNER:  Let me put this in

10   context.

11   Q.  Jeshuat Israel and Yeshuat Israel, J or

12   Y, has the same meaning?

13   A.  It's true.

14   Q.  And, just, you gave the opinion that

15   there's, again, there's no connection between

16   the two congregations, right?  The old

17   Yeshuat Israel and the current Jeshuat

18   Israel, right?

19   A.  Right.

20   Q.  And those same arguments were based on

21   this petition, weren't they?

22   A.  Well, we should look, but that's my

23   recollection, yes.

24   Q.  And they were rejected, were they not?

25   A.  I disagree entirely with the

1   characterization to the rejection and the

2   reasons there.

3          THE COURT:  Well, I'm just

4   confused, Doctor, do you disagree that

5   this was rejected, that CSI petition?

6          THE WITNESS:  Well, so the --

7   ultimately, there was an initial rejection

8   by the state legislature of Rhode Island

9   for the incorporation using this name.

10  And then this was a renewed attempt to

11  incorporate it, and it actually did pass,

12  the wording, Congregation Jeshuat Israel,

13  with the J, yeah, and the reason I'm -- I

14  disagree, is he is implying there's a

15  deeper meaning regarding both the

16  connection to the CYI, in this ultimate

17  approval of the incorporation, and as well

18  as -- I think he is implying some sort of

19  right to the synagogue, that's what I'm

20  clarifying.

21         THE COURT:  They make all the

22  legal arguments later.  But I just want to

23  get the sequencing, that's all.

24         So is it your testimony that the

25  legislature did not accept the argument

1    made by CSI to block CYI from

2    incorporating under that name?

3            THE WITNESS:  No commentary on

4    the reasons, but it was -- the

5    congregation in Newport was incorporated

6    in June of 1894.  That's what we know.

7            THE COURT:  After the filing?

8            THE WITNESS:  After the filing of

9    this protest.

10           THE COURT:  In 18 -- after the

11   filing of the protest as we see in Exhibit

12   47.  So I can move this along.

13           THE WITNESS:  The P284, is the

14   document allowing -- in effect rejecting

15   the petition and allowing the -- the

16   entity the congregation to incorporate.

17           THE COURT:  Thank you.

18    Q.  Now, let's just look at a couple of

19   things in this petition.

20           Let's actually turn to page 4.

21   The third line from the top.  Is there

22   any -- do the words personal property

23   appear on this page, sir?

24    A.  It needs a read.  Hold on.

25           (Witness reviews document.)

1    A.  The words personal property do not

2    appear on this page.

3    Q.  And am I right the first full sentence,

4    we, meaning, CSI, "however, protest most

5    emphatically as lawful custodians of the

6    ancient synagogue edifice"; do you see that?

7    A.  I do see that.

8    Q.  And, now, let's go to the second page.

9            (The witness complies).

10    Q.  And do you see, one, two, three, four,

11    five, six, seven, eight, nine lines, eight

12    lines, actually, eight lines, do you see

13    that, where it says, on page 2, said

14    congregation on the 20th of February, 1818,

15    when they were made custodians of the sacred

16    scrolls of law; do you see that?

17    A.  I do see that.

18    Q.  And then two lines below that, it says,

19    your petitioners, congregation has ever since

20    been recognized as having a supervisory

21    interest over the synagogue properties at

22    Newport; do you see that?

23    A.  I do see that.

24    Q.  And the words ownership, do not appear

25    in this petition, do they?

188

1     A.  I would have to read the whole thing

2  to know for sure.

3     Q.  Can you just take my representation the

4  words ownership do not appears?

5     A.  For now, yes.

6     Q.  Can you turn to page 1, let's see what

7  the arguments that were raised.  Just, you

8  gave a description of the differences in

9  practices between the eastern Europeans and

10  the Sephardim, right?

11     A.  This morning you mean?

12     Q.  Yes?

13     A.  Yes.

14     Q.  And that was raised in this petition,

15  wasn't it?

16     A.  I believe so.

17     Q.  And if you look, the first page, can you

18  read where it says that, I'm going --

19     A.  Half way down.

20     Q.  Read that to the asterisk, to the

21  semi-colon, that congregation -- do you see

22  that?

23     A.  "Referring to the Spanish and

24  Portuguese right to worship in the

25  congregation, your petition is --

1  shall -- essentially points entirely to

2  different -- from the rights as practiced

3  by the German and Polish Jews, they are

4  even said to spring from different

5  divisions of the disbursed tribes of

6  Israel."

7    Q.  Now, can you turn to page 3, and can you

8  start reading, one, two, three, four, five,

9  six, seven lines down, any descendants, and

10 keep reading.

11   A.  "Nor are there any descendants or in

12 any way connected with the former

13 congregation, they being the German or

14 Polish contingent here, and before

15 allowed to -- and by their actions and

16 enduring to the adopt this name, by

17 manifestly perpetrating a fraud upon the

18 citizens of Newport in attempting to

19 establish a relationship between the

20 ancient congregation and themselves,

21 while as a matter of fact they are

22 totally different in forms of worship."

23        And then it's crossed out,

24   "...and as well as among the Israelites as

25 gentiles."

190

1    Q.  What was crossed out there?

2    A.  Social stand in, as well as

3  mentioned the Israelites as Gentiles in

4  addition to the reasons before -- before

5  and -- your petitioners enter objections

6  to the assumption of the name Yeshuat

7  Israel, with a Y, by the president  --

8  present Jewish residence of Newport as

9  being a bar to the descendants of the

10  original members of the congregation in

11  the -- even -- I think it means events --

12  that they should hearafter wish to renew

13  the residence at Newport and incorporate

14  themselves by name under which the

15  ancestors assembled for devine worship,

16  and now, that even now steps are being

17  made to -- for establishment of a

18  congregation during the summer months

19  composed of these persons who may not say

20  the termination of this beginning --

21    Q.  And just -- again, sir, the petition was

22  rejected, was it not?

23    A.  I have not seen evidence of that.

24    Q.  Well, the synagogue, the congregation

25  was incorporated under the name CJI wasn't

1   it?

2      A.  The congregation was indeed

3   incorporated under the name CJI.

4      Q.  And am I right that your assignment did

5   not include whether looking at what CJI has

6   done with respect to the rimonim over the

7   past, let's say, 75 years, whether they

8   maintained them, paid to restore them, paid

9   insurance, that was not part of your task,

10  was it?

11     A.  It was not officially part of my

12  task, but it did fall under what I looked

13  at for the third section of my report,

14  and in terms of -- in the course of 20th

15  September.

16     Q.  You gave some testimony about D30.  Can

17  you put that up D0030.

18     A.  Yes.  0030.

19           THE COURT:  One of the colored

20   slides.  It's all right.

21           Our friends here will put that

22   up.  DD30.  The demonstrative that Mr.

23   Solomon used.

24     Q.  Now, let's look at -- skip that one, but

25   look at Exhibit 2, can you read that.

1    A.  In DD30, Variant No. 2, "We the

2    undersigned descendants of Hebrews of

3    Newport, Rhode Island, unite with the

4    Spanish and Portuguese Congregation of

5    New York, you are acting on behalf of

6    other descendants with the view of

7    exercising a welcoming control over the

8    buildings erected by our ancestors."

9    Q.  Only a reference there to buildings; is

10   that right?

11   A.  In this particular document?

12   Q.  Yes?

13   A.  The wording only says the buildings.

14   Q.  And that had 34 signature, right?

15   A.  Indeed.

16   Q.  And now the one underneath appurtenances

17   of worship, slightly different wording, do

18   you see that?

19   A.  Under Variant 3, I see that, yes.

20   Q.  That's the only one that references

21   appurtenances instance; is that correct?

22   A.  That's the only one that used the

23   specific phrase appurtenances.

24   Q.  And when it came to writing your report,

25   that's the only one that you cited, isn't

1    that true?

2        A.  I disagree with that

3    characterization.

4        Q.  Tell me, that's the one you quoted,

5    was --

6        A.  I quoted this one.

7        Q.  Yes, you skipped the other ones, the 34,

8    right?

9        A.  I disagree with that

10   characterization.

11              In the context of my discussion

12    regarding the use of the word

13    appurtenances of worship, with regard to

14    the discussion of Caroline Cohen that uses

15    this phrase, I do use this particular

16    quote, yes.

17       Q.  And you ignored the other ones, right,

18   the 34, you chose the one, and you ignored

19   the 34?

20       A.  I disagree with that

21   characterization.

22       Q.  Tell me, is that what you did?

23       A.  I did not ignore the other 34.

24       Q.  You didn't quote them, did you?

25       A.  Not in this specific discussion with

194

1    Caroline Cohen and the -- her other

2    correspondents, no.

3        Q.  Now, you were shown a lot of documents,

4    I think you testified earlier that at some

5    point in the 1800's, Shearith Israel believed

6    that the rimonim were special, right?

7        A.  Yes.  We are talking about

8    qualifying that, but yes.

9        Q.  And at any point did CJI think that the

10    rimonim were special, say, the late 1800's or

11    early 1900's?

12        A.  I don't know what you mean by

13    special.  But we don't have a specific

14    documentation coming from CJI that in

15    that time period that you just mentioned,

16    that I can recall, sitting here right

17    now, that references the specific rimonim

18    under discussion in this case as special.

19        Q.  Okay.  And you testified about a lot of

20    documents in the 1890's, referring to bells,

21    and rimonim; do you recall that?

22        A.  I do.

23        Q.  And am I right, there's no specific --

24    other than the Caroline Cohen pair, which is

25    not fighting about, at least not yet, there's

1  no specific reference in those documents that

2  Mr. Solomon showed you to Myer Myers rimonim,

3  is there?

4     A.  Ranging from 1880 to 1903?

5     Q.  That's right.

6     A.  Aside from Caroline Cohen?

7     Q.  Yes.

8     A.  That specifically say Myer Myers?

9     Q.  Yes.

10     A.  None that I can recall right now

11  sitting here, no.

12     Q.  Were you in court when Dr. Mann

13  testified yesterday that we don't know what

14  rimonim are being referenced unless there's a

15  specific reference?

16     A.  I was not in court when she said

17  that yesterday.

18     Q.  And you said the rimonim, the Myer Myers

19  rimonim, were in the synagogue in 1903 when

20  the synagogue was locked; is that your

21  testimony?

22     A.  Based upon the representations as I

23  understand them, from the claims and

24  counterclaims, yes.

25     Q.  Sir, what primary source document says

1    that the rimonim were in the ark in 1903,

2    give me one primary source document that says

3    that?  Zero?  Right?

4    A.  I need to explain.

5    Q.  Just tell me is there -- give me the

6    name of the primary source document that says

7    the rimonim were in the ark in 1903 as you

8    testified on direct.

9    A.  I cannot answer the question without

10   explanation.

11   Q.  No, give me the name, can you give me

12   the name?

13   A.  I cannot, I need to explain.

14   Q.  Well, move on.

15            Now, sir, you testified about

16    certain terms, fixtures, appurtenances

17    appurtenances and paraphernalia.  My

18    question to you is, do they all mean the

19    same thing?  Yes or no.

20   A.  I need to -- I can't answer yes or

21   no to that.

22   Q.  But it's your testimony that rimonim are

23   fixtures, right?

24   A.  (No response.)

25   Q.  Yes or no.

1    A.  I cannot answer yes or no to that.

2    Q.  Well, you believe that when the

3  documents refer to the fixtures, they are

4  referring to the rimonim?

5    A.  Depends on the content.

6    Q.  Really.  And when it refers -- so it's

7  unclear, right?

8    A.  That's not what I said.

9    Q.  Do appurtenances refer to rimonim?

10    A.  It depends on the context.

11    Q.  Do they refer to the rimonim?

12    A.  It depends on the context.

13  Paraphernalia --  appurtenances --

14    Q.  No, just -- can you, are you able to

15  give me a yes or no answer as to whether the

16  rimonim in this context are fixtures?  Yes or

17  no, in this context, where we are sitting

18  today, before Judge McConnell.

19    A.  Not without explaining.

20    Q.  You cannot.  So you are taking back your

21  testimony earlier today that rimonim are

22  fixtures when referenced in the settlement,

23  right?

24    A.  What I testified to today, this

25  morning, with regard to that particular

1    context, is that the people involved with

2    that series of conversations in 1902 and

3    1903, specifically 1903, were referring

4    to everything that was inside the

5    synagogue.

6            That's what I meant my that.  It

7     takes a context to understand how these

8     words are being used.

9     Q.  And appurtenances, you don't have the

10    slightest idea, sir, what was in the

11    synagogue at the time, do you?

12    A.  All we can tell, it was everything

13    that was required that had been in there

14    and for religious services.

15    Q.  Again, no specific document saying that

16    the Myer Myers rimonim were in the synagogue

17    at the time, right?

18    A.  I cannot answer that without

19    explaining.

20    Q.  Now, let's look at some definitions of

21    the fixtures, definitions and appurtenances.

22    Can you turn to P298 in the book.

23            I represent to you, sir, this is

24     a dictionary of law from 1890's -- by the

25     way, so it's clear, the word fixture was

1    used in a legal document here, right?  Yes

2    or no.

3     A.  From January 30th?

4     Q.  Yes, at any time, early 1900's?

5     A.  Between these parties sometimes.

6     Q.  Okay.  And let's look at the definition

7    of the fixtures.  Page 498.

8          Can you read the first paragraph,

9     the definition of fixture.

10     A.  Sorry, I must not have the right

11    tab.  Where are we at?

12     Q.  298.  It's highlighted on the screen.

13          The first paragraph says, "Under

14     fixture it says, a fixture is personal

15     chattel substantially affixed to the land

16     but which may afterwards, may be lawfully

17     removed therefrom by the part affixing or

18     his representative without the consent of

19     the owner of the freehold."

20          And then look at the word, the

21     definition of appurtenances, 299, Exhibit

22     299.

23          This is another dictionary from

24     around that time period, 1891.  Can you

25     read the first paragraph, the definition

1    of appurtenances.

2    A.  This is Page 83, appurtenances, that

3    which the belongs to something else, and

4    adjoined -- and appendage, something next

5    to another, and then, excuse me, more

6    worthy as principal and which passes as

7    incident to it as a right of way or other

8    easement to the land and outhouse, barn,

9    garden, or orchard to a house or

10    messuage.

11         MR. WAGNER:  Your Honor, really,

12    never want to hear the word paraphernalia

13    again.

14    Q.  P34, sir.  The definition of fixture,

15    and page 321.

16    A.  "Fixture, a chattel to affixed or

17    fastened to the land or building as to

18    be -- as to become real property, so

19    fixed or fastened it cannot be removed

20    without material injury to itself or to

21    the freeholder."

22    Q.  And can you turn to Exhibit 303, page

23    15, the definition of appurtenances.

24    A.  The bottom of the page here.

25    "Appurtenances in a lease only such

1  things as belong to the realty and not to

2  include personal property."

3    Q.  Let's turn to a different subject.

4  Okay.

5          Did you testified earlier today

6   that with respect to the settlement, it

7   was "total surrender," right?  Those were

8   your words this morning, total surrender?

9    A.  I would have to look at the

10  transcript.  But intending to quote the

11  document itself, absolutely surrender.

12    Q.  Just -- do you remember that you

13  testified this morning that it was total

14  surrender, do you remember that you said that

15  this morning?

16    A.  I remember that I was intending to

17  quote the document itself, absolute

18  surrender.

19    Q.  Sir, please, just answer my question.

20          Do you remember saying that just

21   a couple of hours ago?

22    A.  I cannot remember if I used that

23  exact phrase, that's why I'm --

24    Q.  I took it down, I hope you trust me.

25          Can you turn to the P72 in the

1    book.

2              (The witness complies).

3    Q.  By the way, am I right that the events

4    to the first two months of 1903 are an

5    important piece of the larger story?

6    A.  Correct.  The events in February of

7    1903.

8    Q.  The first two months?

9    A.  The first two month, yes.

10   Q.  And you would have expected counsel to

11   give you all the documents that they had

12   about those events, right?

13   A.  Within reason, what was relevant,

14   yes.

15   Q.  And this is one they didn't give you

16   before you issued your report, right?  Do you

17   remember that I showed that for the first

18   time at your deposition?

19   A.  I recall that, yes.

20   Q.  And dated February 11, and this is other

21   testimony in the record that this is a

22   telegram from Mr. Steinberg, whose was at CSI

23   to -- referenced -- says, one Sefer and bells

24   is now, is now at Newport, our property, do

25   you see that?

1              THE COURT:  Hold on.  Mr. Solomon

2     did you want to be heard?

3              MR. SOLOMON:  There is no

4     evidence in the record that this is from

5     1903.

6              THE COURT:  I remember that.  It

7     ended in 19 -- got it.

8       Q.  Do you see that, sir?

9       A.  I do see what you just read to me.

10    Yes.

11      Q.  And it says one Sefer and bells is now

12    our property; is that right?

13      A.  It's unclear what it means, but it

14    says one Sefer and bells, yes.

15      Q.  And you would agree with me, sir, that

16    this -- this telegrams is pretty nebulous,

17    right?

18      A.  There's no date exactly, and in some

19    ways nebulous, right.

20      Q.  You wrote that in your declaration,

21    right, it's nebulous?

22      A.  In some ways nebulous, yes.

23      Q.  I mean, there was concern for the Sefer

24    and bells around that time, right?

25      A.  There was concern for a lot of the

204

1    Sefer -- all the Sefer and bells at this

2    time, yes.

3      Q.  And yet in the settlement agreement, in

4    the lease, in the resolution, there's no

5    specific reference to the rimonim, is there?

6      A.  Because there are --

7      Q.  No, just tell me, is there a reference

8    to the rimonim.  Yes or no.

9      A.  I cannot answer that without

10   qualifying it.

11     Q.  If I showed you the document, you will

12   pick out the words rimonim, and in the

13   document?  Do you want to go through that

14   exercise at 3:00 and what we hope is the last

15   day of trial.  Would you take my word for it.

16     A.  I would take your word for it.  And

17   to say, we are talking about something

18   more than just those specific words that

19   are at play here.

20     Q.  Mr. Solomon is as gifted as anyone, and

21   he can bring that out.

22            THE COURT:  Take the afternoon

23    break.

24                     (Recess taken.)

25            THE COURT:  Mr. Wagner.

1          MR. WAGNER:  Thank you.

2     Q.  Just to go, actually, just let me finish

3  with the telegrams.

4          Can you look at P73 in the book.

5  Can you read the text of that telegram.

6     A.  Yes.  It says "Don't insist matter,

7  Sefer and bells, leave to your

8  discretion."

9     Q.  And I'm right, he cannot be sure what

10  prompted this, right?

11     A.  Again, they didn't -- as to the

12  year?

13          MR. WAGNER:  Your Honor, just on

14   that point, I don't want to leave The

15   Court hanging, but just the reason that we

16   believe it's around the time, other than

17   the words, is that it was produced by CSI

18   next to a document that was dated February

19   10th, 1903, and just, I think it's an

20   exhibit in the case, but it's CSI 5408.

21          THE COURT:  Thank you.

22     Q.  I want to go back to something that you

23  said this morning.  You looked at D24.  Can

24  you look at that.  D24.  D24, in the book.

25     A.  In my book.

206

1    Q.  Look at page 437.

2    A.  In binders.

3    Q.  D24.  Look at -- look on the screen, it

4  might be easier.

5         You see it says that building, is

6  what you point to this morning, this --

7  that building is now considered as owned

8  at present by the Hebrew Society in the

9  city; do you see that?

10   A.  I do.

11   Q.  And the building, again, is the Touro

12  Synagogue, right?

13   A.  The building is the Touro Synagogue.

14   Q.  And you interpreted Hebrew Society of

15  the city, to mean CSI, right?

16   A.  Based on other correspondence, yes.

17   Q.  And there was more than one synagogue in

18  New York City at the time, right?

19   A.  The thing -- 1826?

20   Q.  Yes.

21   A.  I believe so.  The date --

22   Q.  Yes?  And you understand that the 1945

23  document here referencing the Jewish Society

24  in Newport, right?

25   A.  If we can look at the document.

1    Yes.

2    Q.  And you are aware of any other synagogue

3    in the City of Newport?

4    A.  There was --

5    Q.  Just -- just, sir, at the time of the

6    1945 agreement that was signed, was there any

7    other synagogue in Newport?

8    A.  Synagogue, no.

9    Q.  Now, you gave testimony about the lease,

10   do you recall that?

11   A.  I do.

12   Q.  And you are not an expert on leases, are

13   you?

14   A.  I'm not.

15   Q.  And you believed that the reference of

16   appurtenances is to the rimonim, right?  Is

17   that your testimony?  In the lease?  Yes?

18   A.  I can't answer that yes or no

19   without a qualification.

20   Q.  Fine.  The word appurtenances in that

21   document, comes from a form book, doesn't it?

22   A.  Possibly.  I don't know without

23   investigating that question further.

24   Q.  Did you investigate that question?

25   A.  The question of whether or not the

```
 1    word appurtenances in the lease came from

 2    a form book?

 3       Q.  Yes.

 4       A.  That is not a question that I

 5    investigated.

 6       Q.  Well, let's look at it.  Can you look at

 7    P58.

 8              Now, this is, I represent, this

 9     is a draft of the a lease that was

10     produced by CSI in this case for the Touro

11     Synagogue, will can accept my

12     representation?

13       A.  For now, yes.

14       Q.  Okay.  And do you see that this

15    preprinted form, in script, in the middle, in

16    the middle, the words, with the

17    appurtenances, you to see that, in the

18    preprinted form?

19       A.  Yes.

20       Q.  By the way, this issue came up at your

21    deposition, right?  Do you remember I asked

22    you questions about this?

23       A.  I would have to look to be sure.

24       Q.  Well, can you look at, just, I don't

25    want to spend a lot of time, but look at your
```

1    deposition, page 230, lines 21 to 25.  Did no

2    one -- I asked you about, on that page you

3    leases were prepared in 1903, did no one ever

4    tell that the leases in those days came from

5    a formally noticed -- they were certain

6    standard term and certain kinds of

7    documentation in this time period; do you

8    recall those questions?

9       A.  I do.

10      Q.  And there was no subsequent

11   investigation by you despite the fact that

12   you submitted a declaration and addendum and

13   rebuttal report, right?

14      A.  I cannot answer that yes or no.

15      Q.  Now, you testified to a lot of different

16   words that were used today, used by the

17   parties.  Can you put up the templative with

18   the list.  Do you see all the words on the

19   screen?

20      A.  I do.

21      Q.  And you would agree with me, that bells

22   were very much on the minds of the parties at

23   this time, right?  Yes or no.

24      A.  Yes.

25      Q.  And none of these words appear in the

1    lease, right?

2      A.   Parts of these words.

3      Q.   Just tell me, show me where those

4    specific words appear in the lease, sir.

5      A.   Paraphernalia, appurtenances, both

6    appear in the lease.

7      Q.   No, sir, religious paraphernalia does

8    appear in the lease, those words?

9      A.   That exact phrase?

10     Q.   Yes?

11     A.   Not appear in the lease.

12     Q.   And the words appurtenances of worship

13   don't appear there, do --

14     A.   I cannot answer without

15   qualifications.

16     Q.   Okay.  Show me where the words

17   appurtenances of worship appear, show me the

18   in the text?

19     A.   You are not understanding --

20     Q.   No.  We all would like to go home.

21   Please point me to those words in the lease.

22     A.   I just -- you are misunderstanding.

23     Q.   Just so that it's clear, so I can avoid

24   this topic, you are not testifying about any

25   form of ownership by CSI, correct?

1    A.  As to the form of ownership?

2    Q.  Yes?

3    A.  No.

4    Q.  Now, you testified earlier today that

5    finials are necessary to conduct services; do

6    you recall that?

7    A.  I don't recall that exact phrase.

8    But I'll take your representation.

9    Q.  That's not accurate, is it?

10   A.  I disagree with that

11   characterization.

12   Q.  Okay.  Can you turn to 269 in the book.

13          Do you recall, sir, I collected

14   all of these statements by you, just a

15   couple of them on page 37 without these

16   essential religious and ritual objects

17   that the Jewish synagogue could not

18   legitimately exist and function, page 40,

19   sacred religious required to operate a

20   synagogue, page 50, Jewish synagogue needs

21   very specific religious objects to

22   function as a legitimate house of worship,

23   these include rimonim; do you see that?

24   A.  I do, but --

25          MR. SOLOMON:  Can --

1    Q.  Sir, please, and were you in court

2    yesterday -- by the way, do you know who

3    Vivian Mann is?

4    A.  I do.

5    Q.  And she is an expert on ritual objects,

6    Jewish ritual objects, correct?

7    A.  I do.  Yes.

8    Q.  And were you in court when she said, in

9    response to my question:

10            "QUESTION:  I'm right, that a

11    synagogue doesn't require rimonim to have

12    a service?

13            "ANSWER:  Correct.  They need a

14    Sefer Torah.

15            "QUESTION:  And a synagogue can

16    function properly without rimonim, right?

17            "ANSWER:  Correct."

18            Were you in court when she gave

19    that testimony?

20    A.  I was not.

21    Q.  And by the way, did you ever discuss

22    this issue with her?

23    A.  With her directly?

24    Q.  Yes, directly?

25    A.  I do not recall that right now.

213

 1    Q.  You didn't call up the phone and ask her

 2   about it, did you?

 3    A.  I don't recall doing that, no.

 4    Q.  Would you agree with me she knows a lot

 5   more about rimonim than you do?

 6    A.  I disagree with that

 7   characterization without knowing more

 8   about what you are talking about.

 9    Q.  Now, let's talk about what might be

10   close -- maybe the second to last topic,

11   maybe not.  Not trying to create too much

12   suspension.  You said in your report, if you

13   use the term appurtenances, page 35 of your

14   report, "If use of the term appurtenances or

15   paraphernalia was intended to include sacred

16   ritual objects in the synagogue, including

17   the rimonim, then those objects would be

18   included in the indentures of the leases or

19   items leased from CSI"; do you recall that in

20   your report?

21    A.  I would have to see it, but I can

22   take your representation that's actual.

23    Q.  So here's my question for you, sir.

24        MR. SOLOMON:  Sorry, where are

25    you reading?

214

1              MR. WAGNER:  On page 35.

2    Q.  Just -- you don't have to take my word

3    for everything.  You see it there, sir?

4              THE COURT:  Mr. Wagner, does it

5     have a document number?

6              MR. WAGNER:  No.  Not in

7     evidence.  It's his report.  Just use it

8     to refresh his.

9              THE COURT:  We can mark it for --

10    you want me to mark it just for ID.

11    Whenever.

12    Q.  All right.  Do you see there, "If use of

13    the term appurtenances and paraphernalia was

14    intended to include the sacred ritual objects

15    in the synagogue, including the rimonim, then

16    those objects would be included within the

17    indentures with the leases as items leased

18    from CSI," do you see that.

19    A.  Sorry.  I'm still -- not highlighted

20    on the screen, and I cannot find that on

21    page 34, either.

22    Q.  Because it's page 35.  Sorry.

23              MR. WAGNER:  We will call it 408

24     for ID.

25              THE COURT:  Great.  So Dr.

1    Fisher's report of November 24th, 2014, is

2    Plaintiff's 408 for identification.

3                      (Plaintiff's Exhibit 408

4                      marked for identification.)

5    Q.  You see that, sir, now?

6    A.  Yes.

7    Q.  And my question for you is, the converse

8    true, if appurtenances and paraphernalia was

9    not intended to include sacred ritual

10   objects, those objects are not included in

11   the lease?

12   A.  I would need more time to think

13   about it, but I think we already covered

14   this morning, that my testimony is that

15   the parties understood that --

16   Q.  Sir, sir, please, that's not my

17   question.  Don't answer -- sorry.  Just

18   answer my question so we can move on.

19             Is the converse true, if

20    appurtenances and paraphernalia were not

21    intended to include sacred ritual objects,

22    then those are not included in the lease?

23   A.  I cannot answer that question as

24   asked.

25   Q.  So it's basically heads win, tails you

1    lose, is that what you are telling us today?

2    A.  That's not what I said.

3    Q.  Sounds like it.

4          Now, before this case you never

5    undertook any in depth analysis of these

6    words, did you?

7    A.  Of these specific words in this

8    specific context within Judaism?

9    Q.  Yes.

10    A.  I don't recall doing it, no.

11    Q.  You never did it, not that you don't

12    recall?  You never did it?

13    A.  I don't recall.

14    Q.  Can you turn to your deposition, Page

15    84, line 19.

16          (The witness complies)?

17    Q.  Well, make it 85.

18          "QUESTION:  Had you ever looked

19    at those terms before.

20          "ANSWER:  To the best of my

21    recollection, sitting here today, I recall

22    -- never recall ever in teaching a much

23    in-depth study on those particular words."

24          Do you see that, those questions

25    and that answer?

1    A.  Yes.

2    Q.  And, sir, you, on this assignment, for

3  which you have been paid probably or billed

4  well over $60,000, brought to bear all of the

5  expertise that you could marshal in trying to

6  assess the meaning of these words, correct?

7  You brought all of your expertise, right?

8    A.  I draw upon everything that was in

9  my training and what was available to me,

10  yes.

11    Q.  And you believed that you did a diligent

12  job, right?

13    A.  I believe so.

14    Q.  And you are satisfied with the work that

15  you did, correct?

16    A.  Yes.  Although I would say that we

17  have continued to look at additional --

18  our duty, as historians, we are always

19  refining our understanding of the --

20    Q.  Do you believe you did a thorough job?

21    A.  With the parameters I testified

22  before of the time allotted to me.

23    Q.  And what you did was, you looked for

24  specific references to rimonim as

25  paraphernalia or appurtenances, right?

218

1    A.  No, that's not true.

2    Q.  Can you turn to your deposition, page

3    223, were you asked the following questions

4    and did you give the following answers:

5              "QUESTION:  Did you specifically

6    look for references to rimonim as

7    paraphernalia or appurtenances?

8              "ANSWER:  That was part of the

9    process to try to understand the full

10   range of use of the term, these terms."

11             Were you asked that question, and

12   did you give that answer?

13   A.  I was, and both times, there's a

14   qualification.

15   Q.  Just -- The court reporter properly

16   transcribed your answer; is that right?

17   That's all, that is my question.

18   A.  From my recollection, of my

19   response, it seems to be an accurate

20   transcription.

21   Q.  And at least through the time of your

22   deposition, you didn't recall a specific

23   place -- any place where rimonim were

24   specifically called paraphernalia alone,

25   right?

1    A.  I would have to go back and look at

2  the additional research that I have done.

3    Q.  No, it's just -- take the time of your

4  deposition, nothing --

5    A.  Nothing comes to mind, but doesn't

6  mean it's not out there.

7    Q.  And at least through the time of your

8  deposition, other than one source from

9  England from 1980, you could not cite any

10  other source that used the appurtenances

11  alone to mean rimonim, correct?

12    A.  At the time?

13    Q.  Yes.

14    A.  Of the deposition?

15    Q.  Yes.

16    A.  I would have to look and see.

17    Q.  Well, let's look at that source.

18        Let's -- that was the Goldberg &

19  Rainer source.  I think it's DD17.

20        Let's get it.  From the

21  demonstratives DD17.

22        Look at DD17.  Can you put that

23  up.  Now, this is a cite to Goldberg &

24  Rainer; is that right?

25    A.  It is.

1    Q.  And they published a book in 1989 in

2    England, right?

3    A.  By Penguin Books, yes.

4    Q.  And at the time of the deposition, you

5    could not recall any investigation into

6    the -- into those sources, right?

7    A.  At that time.

8    Q.  But you examined the book, right?  You

9    skimmed it.

10   A.  That's not what I said -- that's not

11   -- I don't agree with that

12   characterization of my research.

13   Q.  Can you look at page 62 of your

14   deposition, 62, line 4.

15        "QUESTION:  Let me stop you for a

16   second.  What investigation did you do

17   with respect to David Goldberg and John

18   Rainer, and what did you do to see what

19   kind of authorities they are?  Did you do

20   any investigation in this particular case?

21   Sitting here, do you not recall having

22   done any additional investigation into the

23   two authors.

24        "ANSWER:  I did skim the book and

25   assessed it as I would any other secondary

1    source, and to see how they were using

2    sources and evidence and whether or not it

3    seems like it would be something that

4    would be credible to use in a historical

5    investigation."

6            Were you asked that question, and

7    did you give that answer?

8    A.  I did.

9    Q.  And you were shown another source by Mr.

10   Solomon that was -- that was from England,

11   right?

12   A.  I believe so, yes.

13   Q.  And you have no expertise with respect

14   to British religion, right?

15   A.  I cannot answer that yes or no,

16   because historians are always working

17   outside of their particular fields to

18   draw examples and parallels into taking a

19   broader understanding.

20   Q.  And in this case, sir, you are way

21   outside your field, aren't you?

22   A.  I disagree with that entirely.

23   Q.  Now, you cited Jewish Yearbook from

24   1899, from London, right?

25   A.  I believe so.  Is that something we

1    can look at.

2      Q.   Actually, we can pass on that.   That's

3    fine.

4              Now, again, you know, Dr. Mann,

5     right?

6      A.   I know of her.   I have met her.

7      Q.   And she, again, is an expert in the

8    field of the Jewish ornaments, right?

9      A.   That's my understanding.

10     Q.   And were you in court when she was asked

11   the following question yesterday and gave the

12   following answer -- page 162 of the rough

13   transcript.

14             "QUESTION:   Am I right that you

15    never, in the writings, referred to the

16    rimonim as paraphernalia?

17             "ANSWER:   No, it's not a term

18    that I normally use."

19             And then at the bottom I asked

20    her:

21             "QUESTION:   And you never use

22    items referred to rimonim as fixtures.

23             "ANSWER:   I would not use those

24   -- I would not use that term."   Do you see

25    that?   Would you take my -- do you

1   remember her testifying?

2    A.  I was not here for the entire day

3   yesterday.

4    Q.  Did you ever call her up to discuss the

5   issue of the paraphernalia and fixtures with

6   her?

7    A.  I don't recall doing that, no.

8    Q.  Now, when you refer -- actually, come

9   back to that.  You gave some testimony about

10  bylaws, right?

11   A.  Bylaws.

12   Q.  Do you recall giving testimony about

13  bylaws?

14   A.  We looked at -- we compared two

15  versions of the bylaws, yes.

16   Q.  And you are not an expert of corporate

17  governance, are you?

18   A.  No.

19   Q.  You know, after the bylaws CJI amended

20  it's bylaws, right?

21   A.  I would have to see the

22  documentation.  But I have -- that's my

23  understanding, not legitimately.

24   Q.  Forget the legitimate, legitimate --

25   A.  Changes were made.

1    Q.  Legitimate is a legal issue, right.

2    A.  That's something that The Court

3  would decide.

4    Q.  And are you aware that CSI had in place

5  it's possession, subsequent bylaws from CJI?

6    A.  I cannot recall seeing that either

7  way.

8          MR. WAGNER:  Well, just for the

9   record, so we can move this on, Your

10   Honor, it's P84, P85, and P89.

11   Q.  And are you aware that the bylaws were,

12  again, amended in 1984, are aware of that?

13   A.  I don't recall.  I don't recall

14  reading either way about that.

15   Q.  Didn't you note that in your report?

16   A.  That's possible.  A long time ago,

17  it's a long report.  I may have said

18  that, recited that.

19   Q.  Now, when you refer to rimonim, you are

20  referring to the rimonim that go on top of

21  the Torah, right?

22   A.  Yes.  In my report, yes.

23   Q.  Okay.  And do you know, sir, that there

24  are other kinds to rimonim, right, that are

25  used?

1    A.  I cannot answer that question yes or

2    no.

3    Q.  Well, let's look at your report at page

4    36.  Just, can you read on page 36, starting

5    at indeed, can you read that, sir.

6    A.  At the bottom.  "Indeed the specific

7    references also evident in the English

8    translation of the Hebrew word

9    tashmishei, which is often rendered as

10   appurtenances, and as the authoritative

11   Oxford dictionary of the Jewish religion,

12   the translation of tashmishei, tashmishei

13   as appurtenances of holiness, and which

14   are defined as, quote, ritual objects

15   e.g., the shofar, spice box, menorah,

16   sedar plate plate, or items used to

17   decorate, visual objects, e.g. the

18   indicate for, or the rimonim ornaments."

19   Q.  And what follows after the words

20   ornaments?

21   A.  Ellipses.

22   Q.  And are aware of that the report was

23   submitted to The Court?

24   A.  I believe so.

25   Q.  And you are responsible for these

1  ellipses; is that right?

2    A.  Yes.

3    Q.  And, now, let's look at what the

4  document actually says, P211.

5           Do you remember, sir, I showed

6   you this at your deposition, the document

7   that you cited?

8    A.  I remember we had a conversation

9  about this, yes.

10   Q.  And can you turn to page 723.

11   A.  Yes.

12   Q.  And can you read for us, sir, what's

13  actually in the text of the document?

14   A.  Sure.  Tashmishei appurtenances of

15  holiness ritual objects, e.g. the shofar,

16  spice box, menorah, sedar plate, or items

17  used to decorate ritual objects, e.g. the

18  Torah or the rimonim ornaments for the

19  ornaments, embroidered parochet, or the

20  curtain that covers the synagogue ark.

21   Q.  So what was being referred here, are

22  rimonim that went on the cover of the ark,

23  correct?

24   A.  It's unclear from this.

25   Q.  Well, it says, "rimonim, ornaments,

1    Torah, the embroidered parochet," right?  Is

2    that what it says?

3      A.  Those are the words that are here,

4    yes.

5      Q.  And parochet is translated, for those

6    who are not steeped in Hebrew, as you

7    continue, that covers the brackets, that

8    covers the synagogue ark, right?

9      A.  That's what it says.

10     Q.  And that language, that you left out?

11     A.  I cannot answer that question yes or

12   no.  Because I need to explain.

13     Q.  P406, so on the right side we have your

14   report, with the three dot ellipses, and on

15   the left side we have the reference

16   explaining what rimonim are referenced here,

17   right?

18     A.  That's what it seems to be.

19     Q.  And, sir, that's the level of

20   scholarship that you brought to this matter,

21   right?

22     A.  I disagree with that entirely.

23   There's more to be explained here.

24          MR. WAGNER:  Your Honor, if I can

25    take two minutes, I may be done.

1                        (Pause.)

2            MR. WAGNER:  Your Honor, just

3    give me one more second.

4            THE COURT:  Okay.

5            MR. WAGNER:  Thank you, Your

6    Honor, nothing further for now.

7            THE COURT:  Thank you, Mr.

8    Wagner.  Mr. Solomon.

9            MR. SOLOMON:  Thank you.

10           REDIRECT EXAMINATION BY MR. SOLOMON:

11    Q.  Professor Fisher, a few questions.

12           You were shown P406.  This is the

13    side by side demonstrative that you were

14    shown.

15    A.  Yes.

16    Q.  You were asked to explain something,

17    what is that that you wanted to explain?

18    A.  This is the one from the tashmishei,

19    so several things I think are important

20    to point out here.

21           First of all, the main point of

22    this entry, what I would submit to The

23    Court, is that the two data entries of

24    ritual objects that are talked about here,

25    as being tashmishei, the appurtenances,

1    appurtenances of holiness, if you can look

2    on the right -- or the right-hand side,

3    actual ritual objects, skip the

4    parenthesis, or items used to decorate

5    ritual objects, that's the point, Your

6    Honor, the e.g. that's a listing of items,

7    it's not exhaustive, it's not conclusive,

8    and the Torah rimonim, it's very unusual

9    to have rimonim referencing anything else

10   other than these finials that go on the

11   Torah.

12           And I have not come across any

13   other instance in which rimonim was

14   something else.  And so, I frankly, I

15   assume that it would -- might have been a

16   mistake in the -- does not fit with

17   anything else I have seen.  But the main

18   point, was that appurtenances of holiness,

19   are ritual objects are always used to

20   decorate ritual objects.

21    Q.  You were asked whether CJI thought that

22   the rimonim were special, do you remember

23   that?  You then said, well, could not tell

24   you about the 19th century, only became

25   incorporated in 1893 or 1894, do you remember

1    that discussion?

2     A.  I do, yes.

3     Q.  Did you in your research come across any

4    communications where Shearith Israel asked

5    for any rimonim back?

6     A.  In the 1890, I seem to recall.

7     Q.  And what did CJI do?

8     A.  CJI sent them back as requested.

9     Q.  You were asked about DX26, at least

10   that's the DX equivalent, can we have that

11   put up, please.  And we need to explain this

12   to The Court.  What is this?

13    A.  Sorry, still trying to locate it.  I

14   can't find it.  So I have to use the

15   screen.

16           This appears to be a Shearith

17    Israel minute from February 10th, 1833.  I

18    do recall looking at this before.

19    Q.  Okay.  And tell The Court, if you would,

20   --

21           MR. SOLOMON:  Your honor, do you

22    have a copy?

23           THE COURT:  Yes, I do.

24    Q.  Okay.  We made reference on direct --

25   why don't you just tell The Court what is

1    going on here.

2      A.  So, this is, as I said, Shearith

3    Israel minutes from February 10th, 1833.

4             And if you can see, half way

5    down, this is what ellipses read before,

6    this is the tail end of a series of

7    correspondences, it started in 1818,

8    regarding Sefer Torah books of law that

9    are in Newport.

10             And this is the tail end of that,

11   the lengthy conversation -- that is

12   lengthy process whereby up to six, maybe

13   even more Sefer Torah of books of law were

14   brought to New York that had been in

15   Newport.

16     Q.  Okay.  Is there a reference to rimonim

17   in this document?

18     A.  Not at all.

19     Q.  Okay.  So does this document address

20   rimonim or artifacts at all?

21     A.  Not rimonim at all, no.

22     Q.  Okay.  Now, it does address the Torahs,

23   right?

24     A.  It does.

25     Q.  And, now, is a distinction made between

 1    the categories of Torahs in this document?

 2      A.  It does seem to distinguish the two

 3    that had been loaned to Newport

 4    synagogue, and the in the 1760's, from

 5    Shearith Israel, versus the other four

 6    that are coming to New York from Newport

 7    that may not have been loaned

 8    specifically from Shearith Israel in the

 9    colonial period.

10      Q.  So you have said that the dialogue began

11    -- the discussion began in 1818, would you

12    look at D20 please.

13              (The witness complies.)

14      Q.  What is that?

15      A.  These are always Shearith Israel's

16    minutes from January 11th, 1818.

17      Q.  Okay.  Now, if you look down, I'm going

18    to use the transcribed version.  On page 2,

19    there's a paragraph that begins whereas, and

20    in the year 5520; do you see that?

21      A.  Yes.

22      Q.  And you happen to know that 5520 is

23    1760?

24      A.  That's my understanding.

25      Q.  Okay.  And this congregation loaned the

 1    congregation of Newport Rhode Island, two

 2    Sefer, right?

 3      A.  Yes.

 4      Q.  And by way, does this, board minutes,

 5    does that address rimonim at all?

 6      A.  Not at all.

 7      Q.  Okay.  So we are still just talking

 8    about the Sefer Torah?

 9      A.  Obviously Sefer Torah.

10      Q.  All right.  So then if you go down into

11    the resolve, after that, there's a reference

12    there it says -- it's easier to read:

13          "Therefore resolved that the copy

14     of the above be presented to Mr. Benjamin

15     Gomez Sexias in the city by the clerk of

16     this court requesting him to forward on

17     this the city to the care and the

18     president of this board the two Sefer

19     above mentioned, and hereafter, if here a

20     minyan shall be in Newport, Rhode Island,

21     or a request be made for a further loan of

22     said Sefer, that the trustees of this

23     congregation will, again, loan the same to

24     the purpose of being used in the

25     synagogue."  So what if anything, do you

1    -- do you understand from that reference?

2    A.  It's referring to the original loans

3  to the original CYI in Newport of the two

4  sister -- and this is -- this the

5  Shearith Israel taking their own Sefer

6  back, but expressing a willingness to

7  loan them to Newport if in the future

8  there might be a congregation, which, in

9  1818, there was not.

10    Q.  And do you see anything in the minutes

11  that said that there -- if there's another

12  congregation up there, we are not going to

13  loan them a thing?

14    A.  Not at all.

15    Q.  Now, go back, go further down in the

16  minutes, because then it says, "And

17  understanding, that it says, they are -- I

18  think it must be there -- "there are other

19  Sefer in the possession of Mrs. Sexias

20  Anderson; and do you see that?

21    A.  I do.

22    Q.  And, okay, is that -- now, talking about

23  the, the other the, the four Sefer?

24    A.  It seems to be, yes.

25    Q.  And so Shearith Israel is saying with

1   respect to it's two, it's taking them back?

2   A.  Yes.

3        MR. WAGNER:  Objection.  Leading.

4   Q.  What is Shearith Israel saying with

5   respect to its two Sefer that -- that belong

6   to it?

7   A.  It is saying that bringing them back

8   to New York City, but if it requests from

9   a congregation in Newport, requests a

10  loan, then, to them again, they will send

11  them back on loan again.

12  Q.  Okay.  And you were asked about whether,

13  it was your understanding, given the research

14  that you did, whether the rimonim were in the

15  synagogue, and in 1902 or 1903, when the

16  ceremony happened and the doors were locked

17  and then the lease was signed; do you

18  remember that discussion?

19  A.  I do.  Yes.

20  Q.  And is it your best understanding that

21  the rimonim were in the synagogue?

22        MR. WAGNER:  Objection.  Leading.

23  Q.  What's your understand best

24  understanding of where the rimonim were?

25  A.  From all the evidence that I have

1    seen, there's no evidence that anything

2    was ever taken out of the synagogue

3    before this transfer of the keys before

4    the signing of the lease, and it had been

5    used, and had been used often and by CJI

6    throughout the past decade, and my

7    understanding is, it would be in the

8    synagogue, in the ark, and locked.

9      Q.  Okay.  Now, I'm asking you

10   hypothetically, let's suppose the rimonim

11   were not in the ark.  Let's suppose they were

12   -- were not in the synagogue at all.

13          Let's suppose they were in the

14   Bank of Rhode Island.  Okay.  And when

15   this scenario happened, would that change

16   your opinion at all about the -- what the

17   intent of the parties were that you

18   testified to?

19          MR. WAGNER:  Object to the

20   hypothetical and on redirect.

21          THE COURT:  Overruled.

22     A.  Not at all.  The intent of the

23   parties, everything that I have read in

24   the prior 20 years, and then in the

25   conversations regarding the lease, and

237

```
 1    the two documented surrender from the
 2    CJI, and January in January 30th, and
 3    February 2nd, indicate that -- -- and
 4    again, we get inside their minds the
 5    intention was the synagogue and it's
 6    meaningful use, which included these
 7    ritual items that were either inside,
 8    which is what I'm -- I'm going on the
 9    representation of, made or follow your
10    hypothetical, in the Rhode Island bank,
11    it doesn't matter really where they are
12    at.
13              The point is, how do you use a
14     synagogue.  You use the books of law, you
15     use the relationship, that's what they are
16     talking about.
17       Q.  And you were shown two telegrams, do you
18    remember that?
19       A.  I do.
20       Q.  And those were shown to you at your
21    deposition?
22       A.  They were.
23       Q.  But they didn't have a date on them, and
24    a year on them, then, either, did they?
25       A.  Not then, either.
```

238

1    Q.  Did you submit a supplemental report?

2    A.  I did.

3    Q.  Have you seen those?

4    A.  Yes.

5    Q.  All tell The Court what the opinion on

6    the telegrams -- assume you would, that CJI

7    says is correct, and that is that they date

8    from the February of 1903.

9    A.  Yes.

10           THE WITNESS:  It's quite simple,

11   Your Honor, these are additional evidence

12   of the importance of the rimonim and other

13   ritual objects that are on the minds of

14   the people crafting this lease.

15           So their having conversations

16   about specific religious ritual items as

17   they are putting together the lease, as

18   they are interlining the paraphernalia

19   belonging thereto, as they are

20   transferring the keys, the -- not just to

21   the synagogue, but to the ark, which is

22   where the books of law are stored, which

23   is where the rimonim are stored, with the

24   books of law, books of the law, that's why

25   those telegrams are of interest to me,

1    they are unclear in so many ways, and like

2    history, comes down to, it's partial, we

3    don't have the full back and forth to

4    really reconstruct this.

5              But what it does do, it shows me

6    what's important to the people who are

7    involved, and in the crafting and the

8    signing of this lease.

9    Q.  Thank you.

10             You went on to explain something

11   about the word appurtenances being in a

12   form of lease and I think the question was

13   asked, well, did you look at that after

14   your deposition.  Did you?

15   A.  I did look into it briefly.  But I

16   come back to this idea that -- I think I

17   said in court here, that the different

18   contexts for the uses of those materials,

19   and the fact that it's in a form, that

20   anyone might use for any other building,

21   or for any other property, it changes

22   when you come into this specific Jewish

23   religious context, and as a historian,

24   it's virtually impossible for me to

25   believe that the people who made -- had

240

1   been talking about these religious

2   objects, and using that term,

3   appurtenances, right, appurtenances, and

4   objects of worship, or just appurtenances

5   by itself, over the course of the prior

6   20 years, when they come to sign the

7   lease, they sit down, and they read

8   through it, and they -- appurtenances,

9   and paraphernalia belong there, that

10  suddenly they just block out the prior 20

11  years.

12          And the matter, have been on

13  everybody's mind, and suddenly at the --

14  revert to some sort of strict legal

15  meanings.

16  Q.  Did you see any reference to the

17  paraphernalia belonging there as being in a

18  form book?

19  A.  Never seen it in a form book, no.

20  Q.  Okay.  You were asked about two former

21  CJI people who made reference to legal

22  successorship on the cross-examination; do

23  you remember that?

24  A.  I recall that.

25  Q.  Were you offering an opinion about legal

1  successorship?

2     A.  I was not offering a legal opinion

3  on successorship.

4     Q.  Let me call to your attention to the

5  book, 270, the book you were shown.

6          This is a Gutstein book, and

7  where he says, "By the time that Mr.

8  Mendes died, the new Jewish community of

9  Newport had not as yet formed an organized

10  congregation, and the old, quote,

11  congregation, Yeshuat Israel, closed

12  quote, had long ago been dissolved."

13          Okay.  Is that consistent at a

14  factual level, put aside the legal issues,

15  is that a factual level, what you

16  determined?

17          MR. WAGNER:  Objection.  Leading.

18          THE COURT:  Overruled.

19     A.  Yes.  That's the case.

20     Q.  You were shown the amended answer and

21  counterclaim in this case under

22  cross-examination, and you were asked to read

23  paragraph 15.

24     A.  I believe that's the case, yes.

25     Q.  And I would ask you to read paragraph

1    29.   I'm going to -- I would quote from

2   paragraph 29:   "At the time of the resolution

3   of the litigation between the congregations

4   in 1902, the rimonim, among other Torah

5   bells, existed in the Touro Synagogue."

6              And were you aware that the

7    plaintiff in this is case, CJI, CJI,

8    admitted that allegations?

9              MR. WAGNER:  Objection.

10    A.  I was aware of that.

11              MR. WAGNER:  Objection, Your

12   Honor, he has not referenced the pleadings

13    in any of the reports.

14              THE COURT:  Overruled.

15              MR. SOLOMON:  Your Honor, I have

16    nothing further?  Thank you.

17              THE COURT:  Thank you.  Anything

18    further, Mr. Wagner?

19              MR. WAGNER:  Your Honor, I have

20    about a half an hour.

21              THE COURT:  Nice try.

22              (Discussion off the record.)

23              MR. WAGNER:  No one ever told me

24    that I have moved too slowly.

25

1              RECROSS EXAMINATION BY MR. WAGNER

2        Q.  Sir, let's try and finish up.

3              You testified that in 1890, the

4    rimonim were sent back from CSI -- CJI to

5    CSI, right?

6        A.  That's my understanding, yes.

7        Q.  And you have no evidence that that was

8    the Myer Myers rimonim, right?

9        A.  I have not seen any evidence either

10   way, no.

11       Q.  And you testified about loans, you have

12   not seen any loan documents specifically

13   referencing the Myer Myers rimonim?

14       A.  When are you talking about?

15       Q.  Any point in time.  Any loan document

16   that specifically references Myer Myers

17   rimonim, other than Caroline Cohen?

18       A.  I can't answer the question as

19   asked.  I can prior -- I can't answer the

20   question as asked.

21       Q.  Now, you testified that rimonim were on

22   the minds of the people who are exchanging

23   those telegrams, right?

24       A.  That's what I testified.

25       Q.  And, again, not the words rimonim, do

244

1   not appear in the lease, right?

2   A.  The words rimonim do not -- those

3   specific words, that word does not appear

4   in the lease.

5   Q.  Okay.  You just gave some testimony

6   about appurtenances, can you look at P75 in

7   you book.

8           (The witness complies).

9   Q.  Now, my boss, Mr. Jacoby tells me this

10  is a March 2, 1903 letter from Napoleon Levi

11  on behalf of CSI through the mayor and city

12  council; do you see that, sir?

13  A.  At the bottom I see that.

14  Q.  Do you see at the box around the time

15  that the lease was signed, right?

16  A.  This is shortly after the lease was

17  signed.

18  Q.  And do you see it says the appurtenances

19  would -- we desire that neither the synagogue

20  nor the annex be in any way altered or the

21  coloring or the appurtenances changed; do you

22  see that?

23  A.  I do see that.

24  Q.  And that doesn't reference rimonim, does

25  it?

 1    A.  I would have to look at the document

 2  further to answer that.

 3            MR. WAGNER:  Nothing further.

 4            THE COURT:  Thanks, Mr. Wagner.

 5  You can step down there, sir.  Mr.

 6  Solomon.

 7            MR. SOLOMON:  Your Honor, we have

 8  no other live witnesses.  I think the only

 9  two document that we would ask the Court

10  to allow us to discuss briefly, are the

11  two that we are going to use with this

12  witness, they were identified this

13  morning.

14            One is D149.  That's

15  correspondence from Napoleon Levi, from

16  William Sheffield, and D155,

17  correspondence from the Sheffield to the

18  L. Napoleon.

19            And the other documents that have

20  been objected to, on the list that CJI

21  submitted, we are either withdrawing the

22  proper, Judge, or they are already in.

23            CJI has withdrawn.  And with

24  respect to these two documents, we did go

25  back at lunch and we checked to see

 1    whether there were any relating to the

 2    negotiations of the lease, or the post

 3    litigation communications between parties

 4    between being, tried to go as broad as the

 5    subject matter would allow, we could not

 6    find any.

 7         We don't believe we withheld any.

 8    So we are not trying to use both the sword

 9    and shield, the privilege, so I don't

10    think there should be any claim of partial

11    waiver.  And I do not agree that these

12    documents would then waive our litigation

13    communications 112 years later.

14         We think that these are -- we are

15    -- think they are the important documents.

16         THE COURT:  Mr. Solomon, walk me

17    through for each of these.  Who the people

18    are.

19         MR. SOLOMON:  William Sheffield a

20    CSI attorney.  He was the lawyer here in

21    Rhode Island, Your Honor.

22         THE COURT:  For who.

23         MR. SOLOMON:  For CSI.

24         THE COURT:  Okay.

25         And we know about Mr. L Napoleon

1    Levi was Shearith Israel's representative.

2    And the same with respect to D155, where,

3    I think the parties are reversed.

4         Okay.  Mr. Wagner.  In light of

5    Mr. Solomon's representation what is your

6    objection.

7         MR. WAGNER:  I don't think you

8    can segregate waivers of attorney/client

9    privilege just to one area.  If he is

10    waiving documents with respect to a

11    particular event that helps him, he is

12    withholding them with respect to events

13    that -- he is withholding the

14    attorney/client privilege document on some

15    other event.

16         THE COURT:  But no evidence at

17    all, or representation at all that

18    anything is being held of any relevance to

19    this issue, other than current

20    attorney/client privilege material.

21         MR. WAGNER:  Well, I mean --

22         THE COURT:  I think we have the

23    representation that they have searched,

24    they looked, that all of the -- what could

25    have been attorney/client privilege

 1    material from the 1700, 1800, 1900, has

 2    been turned over, and if requested, is

 3    that right --

 4              MR. SOLOMON:  I misspoke.  So let

 5    me clarify.  So with respect -- they were

 6    documents withheld with respect to the

 7    litigation between the parties in 1899,

 8    and 1900, and 1901.  That litigation, then

 9    ended.  And the parties are then --

10    entered into a settlement agreement.

11              THE COURT:  Right.

12              MR. SOLOMON:  And then from then

13    on, nothing has been withheld.  So the

14    litigation, or the work product, if Your

15    Honor, will, we -- I'm quite certain we

16    have not withheld all -- either, but if

17    the using any of that, Judge, but with

18    respect to the end of the litigation,

19    where the parties are then, trying to

20    negotiate with each other, and these

21    documents related to how they are going to

22    negotiate the lease and how they are

23    going, to, then, finalize the lease, we

24    have not withheld anything.

25              THE COURT:  I apologize, I don't

```
 1    have realtime, I cannot go back to look at
 2    what you said, so I would ask you,
 3    specifically, Mr. Solomon, what is your
 4    representation concerning what was and
 5    wasn't turned over relating to
 6    attorney/client or work product privilege
 7    during the 1890 through 1904.
 8            MR. SOLOMON:  That --
 9            THE COURT:  Was anything withheld
10    during that period for purposes of
11    attorney/client privilege.
12            MR. SOLOMON:  Yes, Your Honor.
13            THE COURT:  I would not allow
14    these two in for the reasons stated by the
15    plaintiff.  I don't think -- I think that,
16    based on your representation, that the --
17    the argument of the selective waiver of
18    the attorney/client privilege is well
19    founded.
20            I'm not saying its purposeful, or
21    I'm not saying, but just a reality.
22            MR. SOLOMON:  Your Honor, okay.
23    Nothing on the subject matter of -- there
24    is nothing on the subject matter of the
25    document that we have withheld that
```

1  relates at all to the subject matter, as

2  -- as Your Honor wants to make the subject

3  matter.

4          THE COURT:  I would stick with my

5  ruling.  Thank you, Mr. Solomon.

6          MR. SOLOMON:  Your Honor, we have

7  depositions we have designated and

8  agreements with the parties on that, and

9  with -- with that, we have nothing.  No

10  further evidence.

11          THE COURT:  Great.  Okay.  And

12  any rebuttal from the plaintiff.

13          MR. NAFTALIS:  Just, you were --

14  just so the record is clear, my

15  understanding is, I think Your Honor has

16  the list of documents to which we

17  objected.

18          THE COURT:  I do.

19          MR. NAFTALIS:  I just want to be

20  sure that none OF them, with the exception

21  of defendant's Exhibit 405, which we

22  dropped our objection to, will be coming

23  into evidence now THAT he has withdrawn

24  the professor, at any of the others.

25          THE COURT:  But I have already --

```
 1    I have already taken out D375.  I have

 2    already sustained your objection to that

 3    document, I believe, right.

 4              MR. SOLOMON:  Correct, Your

 5    Honor.

 6              THE COURT:  And 405.

 7              MR. NAFTALIS:  We withdraw our

 8    objection to that one, Your Honor.

 9              MR. SOLOMON:  And 414, Your

10    Honor, that was used with the expert only.

11              MR. NAFTALIS:  That, we plainly

12    objected to, that is total hearsay

13    document.

14              THE COURT:  And I believe that I

15    have ruled on the objection would be

16    sustained on it.

17              MR. SOLOMON:  Yes.  But, Your

18    Honor, permitted, Your Honor, if you

19    remember, I just answered yesterday for

20    that purpose, that we will be citing it to

21    The Court for identification only.

22              MR. NAFTALIS:  It was for

23    identification -- to be only, to be used

24    from the expert, he cannot put the content

25    in front of your Your Honor.
```

1          THE COURT:  Whatever was used,

2     whatever is in the transcript, is in

3     evidence.

4          MR. SOLOMON:  Thank you.

5          MR. NAFTALIS:  Other than that,

6     one -- I just want to be sure, so there's

7     no dispute down the road when you are

8     writing -- writing our papers, other than

9     the very limited use for identification,

10    he can make of the defendant's Exhibit

11    414, and defendant's Exhibit 405, which we

12    withdraw our objection to, all the other

13    documents on this list, are not coming in.

14         THE COURT:  I'm going to go

15    through each one and tell you what I

16    think.

17          And you can both tell me whether

18    I'm wrong or not.  And Vicky then can have

19    a valid list.

20          Defendant's Exhibit 72, 77, and

21    80, were withdrawn.

22         MR. SOLOMON:  Agreed, Your Honor.

23         THE COURT:  Defendant's Exhibit

24    149 and 155 were offered to plaintiff

25    objected to, The Court sustained the

1    objection, they are not in.

2              And Defendant's Exhibit 375, was

3    offered, plaintiff objected, The Court

4    sustained the objection to 375.

5              Exhibit 405, was originally

6    objected to, the objection was withdrawn.

7              Exhibit 405 is admitted as a full

8    exhibit.

9              Exhibit 413 was withdrawn.

10             Exhibit 414 was offered, and

11   plaintiff objected, defendant -- The Court

12   sustained the objection, that was a

13   document that was used on cross or

14   redirect.

15             MR. SOLOMON:  It was actually on

16   cross and redirect, of Dr. Mann.

17             THE COURT:  Both parties used

18   portions of that, and in --

19             MR. WAGNER:  No, I didn't use --

20             THE COURT:  So --

21             MR. SOLOMON:  You opened the

22   door.

23             THE COURT:  I think you did, but

24   the record is what the record is on that

25   document.  Not admitted as a full exhibit.

1    The transcript will contain who did what

2    at what time on that one.

3              Exhibit 486, 586, and 526 from

4    the defendants, are withdrawn.

5              MR. SOLOMON:  Yes, Your Honor.

6              THE COURT:  Thank you, Mr.

7    Solomon.

8              Mr. Wagner?

9              MR. WAGNER:  Aren't you happy to

10   express -- I'm learning how to stand up.

11   I learned -- we learned a tremendous

12   amount in the last two weeks, I say.

13             THE COURT:  As I did.

14             MR. WAGNER:  But just for the

15   record, and we move to strike the two

16   experts on -- under 703 on Daubert, based

17   on the lack of the expertise, and absent a

18   methodology.  He did not testify to a

19   reasonable degree of certainty.

20             With respect to Dr. Mann, the

21   issue of -- the issue of important

22   documents that disappeared.

23             THE COURT:  In general the

24   objection is denied, as I stated earlier.

25   And The Court was reserving as to any

 1    specific areas to which the plaintiff

 2    objected.

 3            And The Court will make those

 4    rulings as it reviews the transcript.

 5            MR. NAFTALIS we are, you were,

 6    the rebuttal case, Your Honor asked, you

 7    would be pleased to hear, a very, very

 8    brief rebuttal case.

 9            We have no live witnesses.  The

10    only thing we want to do is additional

11    designation from Mr. Lustig's deposition.

12    And I can read them into the record and

13    what I have is pages to substitute into

14    the book for the older pages.

15            THE COURT:  Any objections, Mr.

16    Solomon.

17            MR. SOLOMON:  We have never seen

18    them or heard of them, so.

19            THE COURT:  Why don't we do this,

20    give them to Mr. Solomon.

21            MR. SOLOMON:  I leave the record

22    open until Monday.

23            THE COURT:  That's fine.

24             You let me --

25            MR. SOLOMON:  Judge, all the

```
 1    depositions are in front of The Court, as

 2    he said.

 3              MR. NAFTALIS:  Only selected,

 4    only pieces.  These are -- I can describe

 5    what they are, they are very small things,

 6    they relate to things that came up in the

 7    defense case.

 8              THE COURT:  Read them.

 9              MR. NAFTALIS:  Make sure I give

10    the right ones.

11              MR. SOLOMON:  Your Honor, were

12    you inviting Mr. Naftalis to the read the

13    documents.

14              MR. NAFTALIS:  I said I would

15    read them -- the fast -- I'm handing them

16    to Your Honor, hand a copy to Mr. Solomon.

17    These are replacement pages of --

18              MR. SOLOMON:  Did you counter

19    designate is the question.

20              MR. NAFTALIS:  For the benefit of

21    the court reporter and Mr. Solomon let me

22    explain what I handed up and what -- very

23    small additional designation.  It's on the

24    first one is page 23, beginning at line 6,

25    to page 24, line 2.
```

1             What happened, we did, Your

2    Honor, you will see, in lieu, you see that

3    in front of me, we did substitute a page,

4    there's other, other yellow stuff that is

5    already in the record, in other words.

6             THE COURT:  Got it.

7             MR. NAFTALIS:  That and the other

8    small additional piece of Mr. Lustig's

9    testimony begins at page 94, line 25.  And

10   ends at page 96, line 4.

11            And, again, we gave a substituted

12   page, because there's some additional

13   yellow highlighted materials, and that

14   page, that was already been designated.

15            I hope I'm clear to everybody on

16   that.

17            THE COURT:  Absolutely.

18            Mr. Solomon.

19            MR. SOLOMON:  I have read these,

20   Judge, no objection.  Nothing to counter

21   designate.

22            THE COURT:  You have nothing.

23   Thank you.

24            MR. NAFTALIS:  With that lengthy

25   and extensive presentation, we -- I guess,

1    before I guess formally move to dismiss

2    the counterclaim, I don't know what the

3    practice is in bench trials here at the

4    closing of the case.

5              So for the record, and with --

6    passing that, so I don't get accused of

7    malpractice, and not having made a motion,

8    and then I have to have Mr. Solomon defend

9    hopefully.

10             THE COURT:  You would be well

11   served.

12             MR. NAFTALIS:  We rest our case.

13             But before you close the record,

14   Your Honor, I just wanted to say

15   something.

16             I think both sides would

17   probably, would agree with this, it's been

18   a wonderful experience, trying this case

19   before Your Honor.  And I say it before

20   you decide it.

21             THE COURT:  You may not

22   afterwards.

23             MR. NAFTALIS:  On the record,

24   win, lose or draw, we really, it's been,

25   you know, it's a been a wonderful

1    professional experience.

2              We enjoyed every minute of it.

3    Maybe not the long nights.

4              And it was also nice to come back

5    to Providence, where I spent a year in

6    grad school.

7              Long -- lot of years since I was

8    involved with history, before this case,

9    so my kids went to school, I, for one,

10   like hanging around Providence.

11             MR. SOLOMON:  I see he loves

12   hanging around Providence.

13             We do share in the gratitude,

14   both of The Court, the court reporter,

15   your clerk's, and thank you very much.

16             I did have one substantive, I

17   have a substantive point, because I need

18   to renew my motion at the close of theirs,

19   I would like to hereby do so.

20             THE COURT:  Let me just say for

21   the record, I would take all the motions

22   under advisement.

23             MR. SOLOMON:  This is on our off

24   the record.

25             THE COURT:  Let's put it on.

1          MR. SOLOMON:  The thing troubling

2   me, the way we have -- the post trial

3   briefs and the arguments set up, I very

4   much want to make sure, and both sides

5   want to make sure, we are addressing any

6   issues that Your Honor has.

7          THE COURT:  Well, you know, I

8   thought -- we can go off the record.

9          (Discussion off the record.)

10         THE COURT:  Thank you everyone.

11  Stand adjourned.

12       (Whereupon the proceedings

13       were adjourned at 4:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 261

(1)

(2)

(3)        RHODE ISLAND.

(4)          (Providence)

(5)

(6)

(7)        I, Lisa Lee Gross, Registered Professional
Reporter and Notary Public duly commissioned and
qualified in and for in the State of Rhode
(8)   Island, do hereby certify that this is a true
record of the testimony given in Re:  U.S.
(9)   District Court, Jeshuat Israel vs. Shearith
Israel.
(10)

(11)       I further certify that I am neither attorney
nor counsel for, nor related to or employed by,
(12)  any of the parties to the action in which this
deposition is taken, and further that I am not a
(13)  relative or employee of any attorney or counsel
employed by the parties hereto or financially
(14)  interested in this action.

(15)       In Witness Whereof, I have hereunto set my
hand and affixed my seal this 11h day of June,
(16)  2015.

(17)

(18)              _Lisa L. Gross_____
                   Notary Public
(19)              My Commission Expires:
                   April 13, 2018
(20)

(21)

(22)

(23)

(24)

(25)

Rhode Island Court Reporting