UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| CONGREGATION JESHUAT ISRAEL,<br>        Plaintiff, | ) ) ) ) | C.A. No. 12-CV-822-M-LDA |
| v. | ) ) |  |
| CONGREGATION SHEARITH ISRAEL,<br>        Defendant. | ) ) ) |  |

<u>MEMORANDUM, FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND ORDER</u>

JOHN J. MCCONNELL, JR., United States District Judge.

Bricks and mortar of a temple, and silver and gold of religious ornaments, may appear to be at the center of the dispute between the two parties in this case, but such a conclusion would be myopic. The central issue here is the legacy of some of the earliest Jewish settlers in North America, who desired to make Newport a permanent haven for public Jewish worship. Fidelity to their purpose guides the Court in resolving the matters now before it.

After a thorough and exhaustive review of the evidence, determination of the disputed facts, and application of the relevant law, this Court concludes that 1) Touro Synagogue is owned in charitable trust for the purpose of preserving a permanent place of public Jewish worship; 2) the pair of Myer Myers Rimonim previously owned by Newport's earliest Jews is now owned by Congregation Jeshuat Israel, which is free to do with its property as it wishes; 3) Congregation Shearith

Israel of New York should be removed as trustee of Touro Synagogue; and 4) Congregation Jeshuat Israel of Newport should be appointed as the new trustee.

## I.   PROCEDURAL BACKGROUND

On November 8, 2012, Congregation Jeshuat Israel brought an action in Rhode Island Superior Court (Newport County) against Congregation Shearith Israel over the ownership of a set of colonial-era finial bells (the Rimonim)[1] crafted by the silversmith Myer Myers, and the control of Touro Synagogue, the oldest active synagogue in the United States. Compl., ECF No. 1-2. Jeshuat Israel seeks an order: 1) pursuant to the Uniform Declaratory Judgments Act, R.I. Gen. Laws §§ 9-30-1, *et seq*, declaring that it is the true and lawful owner of the Rimonim with full power to sell and convey them and to deposit the proceeds of such sale into an irrevocable endowment fund; 2) restraining Shearith Israel from interfering with Jeshuat Israel's planned sale of the Rimonim to the Museum of Fine Arts in Boston (MFA) for $7 million in net proceeds;[2] 3) or in the alternative, declaring that Shearith Israel only owns the Rimonim in trust for the benefit of Jeshuat Israel,

---

[1] "Torah's importance was emphasized from ancient times by covering the scroll with silk mantles and ornamenting the staves with silver and gold decorations. . . . After removing the mantle and before reading the Torah, the reader raised the scroll with the finials still on the staves [ ] and an accompanying ringing of the bells would have focused the congregation's attention." David L. Barquist, *Myer Myers: Jewish Silversmith in Colonial New York* 154 (Yale University Press, 2001) (Exhibit P150 at 3248).

The Court uses the words rimonim, (which means pomegranates in Hebrew), finial bells, and finials, interchangeably in this opinion to refer to Torah ornaments that decorate the scroll's staves or handles. When capitalized, the word "Rimonim" refers to the finials at issue in this case.

[2] The Museum of Fine Arts has since withdrawn its offer to purchase the Rimonim. Trial Tr. vol. 3, 56, ECF No. 106 (Testimony of David Bazarsky).

and authorizing the sale of the Rimonim as in Jeshuat Israel's best interests; 4) removing Shearith Israel as trustee for Touro Synagogue and land, and declaring Jeshuat Israel's Board of Trustees as replacement trustee; and 5) declaring that Jeshuat Israel is the true and lawful owner of unspecified other personal property in its possession, besides the Rimonim, with full power to use, sell and convey the same.[3]  *Id.* at 12-16.

Shearith Israel removed the action to the United States District Court for the District of Rhode Island, based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a).  Pet. for Removal, Nov. 14, 2012, ECF No. 1 at 1-2.  Shearith Israel then filed an amended answer and six counterclaims against Jeshuat Israel, asking the Court 1) to find that Jeshuat Israel breached an agreement with Shearith Israel by filing a lawsuit;[4] 2) to declare that Shearith Israel owns the Rimonim; 3) to enjoin the sale of the Rimonim, transfer the possession and control of the Rimonim to Shearith Israel, and for damages; 4) to declare that Shearith Israel owns and has all legal and equitable rights to the Touro Synagogue, its lands, and any and all historic personalty used by or for Touro Synagogue; 5) to terminate Jeshuat Israel's lease of Touro Synagogue; and 6) to enforce Jeshuat Israel's contractual obligations

---

[3] Jeshuat Israel's request that the Court declare its rights to all personal property in its possession is not justiciable because it is overly broad.  Jeshuat Israel has not demonstrated the existence of some present danger to its rights with respect to any other personal property, besides the Rimonim, sufficient for this Court to grant declaratory relief on this count.  *See Berberian v. Travisono*, 332 A.2d 121, 124 (R.I. 1975) ("Section 9-30-1 is not intended to serve as a forum for the determination of abstract questions or the rendering of advisory opinions.")

[4] The Court considers this count waived because Shearith Israel did not argue it at trial.  *See Cookish v. Cunningham*, 787 F.2d 1, 6 (1st Cir. 1986) ("an issue raised in the pleadings only was not 'presented' to the trial court").

to Shearith Israel.  Am. Answer and Countercl., Dec. 6, 2012, ECF No. 8 at 17-23.[5]

The parties zealously litigated this suit for over three years.[6]  Beginning on June 1, 2015, the Court conducted a nine-day bench trial that generated a 1,850-page transcript and approximately 900 admitted exhibits consisting of thousands of pages.[7]  The Court heard from seven live witnesses and admitted 12 depositions consisting of 1,990 pages of transcripts.  Post-trial, the parties submitted 895 pages of briefing and proposed findings of fact.  The Court heard closing arguments on September 18, 2015.

## II.   FINDINGS OF FACT

After an extensive and lengthy study and review of the voluminous record in this case, the Court issues these findings of fact.  Following the numbered summary of the facts is a narrative elaborating on the Court's findings.

1.     Jews first came to Newport, Rhode Island in the mid-17th century, fleeing religious persecution in Europe.

2.     The Newport Jewish community formed a collective for worship that became known as Congregation Yeshuat Israel.

---

[5] On November 16, 2012, Shearith Israel filed a six-count complaint against Jeshuat Israel about the same issues in United States District Court for the Southern District of New York.  Compl., *Shearith Israel v. Jeshuat Israel*, No. 12-CV-8406 (S.D.N.Y.), ECF No. 1.  That court dismissed Shearith Israel's complaint in favor of the first-filed Rhode Island action.  Op., *Id.* (Jan. 30, 2014), ECF No. 47.

[6] The Court also gratefully acknowledges the herculean efforts of Chief Judge William E. Smith in attempting to mediate an amicable resolution of this dispute.

[7] The parties entered into a stipulation (ECF No. 82) that "all documents . . . shall be deemed admitted, except to the extent that a party . . . provides . . . the Court with specific objections to specific exhibits . . . ."  No party filed an objection to any of the exhibits upon which the Court relied in this Order.

3.     In the mid-18th century, members of the Newport Jewish community were taxed for the purchase of land for a Synagogue, and raised additional funds for building the edifice.

4.     The land and Synagogue were acquired and owned in trust for the purpose of public Jewish worship.

5.     The Newport Jewish community picked three leaders to serve as trustees for the Synagogue and lands, because at that time in Rhode Island, religious institutions could not incorporate, own land, or serve as trustees.

6.     The three original trustees were Jacob Rodrigues Rivera, Moses Levy, and Isaac Hart.  Although their names appeared on the deed to the Synagogue land, they did not own the land or Synagogue outright.  They were only the legal owners and trustees, with a duty to preserve the property for public Jewish worship.

7.     The construction of the Synagogue (now called Touro Synagogue) began in 1759 and ended by 1762.  The Synagogue was consecrated in 1763.

8.     The famous colonial-era silversmith Myer Myers made a pair of silver Rimonim for the Newport Jewish Community around the time when Touro Synagogue was built.  These Rimonim originally belonged to Congregation Yeshuat Israel.

9.     The majority of Jews left Newport in 1776 because of the Revolutionary War.  Regular religious services at the Synagogue ended around 1793, only 30 years after the Synagogue's consecration.  The last Jew left Newport in 1822.

10.     Some members of Yeshuat Israel who left Newport joined the New York Congregation Shearith Israel.   They brought with them Yeshuat Israel's religious articles, including the Rimonim, which they deposited for safekeeping with Shearith Israel.   They instructed Shearith Israel to return the Rimonim to the Jewish congregation thereafter worshiping in Newport.

11.     Shearith Israel branded Yeshuat Israel's Rimonim with the word "Newport" on their bases, to distinguish them from Shearith Israel's own similar pair.

12.     After the deaths of the three original trustees — Messrs. Rivera, Hart, and Levy — the duties of trustee were passed on informally.   Several individuals, including Moses Seixas, Moses Lopez, Abraham Touro, Judah Touro, and Stephen Gould acted as trustees for the Touro Synagogue and lands.   Shearith Israel also took on trustee duties.

13.     Shearith Israel helped care for the Synagogue during the period when there were no Jews in Newport.   It held the keys to the building and made it available for occasional funerals.   Shearith Israel became the trustee for the Touro Synagogue.

14.     Shearith Israel never owned the Synagogue outright or the Rimonim at all.   It only held legal title to the Synagogue as trustee, and served as bailee for the Rimonim.

15.     After a sixty-year absence of Jews from Newport, a Jewish community began to return in the 1870s.   The new community began to worship at Touro

Synagogue under the guidance of a rabbi selected by Shearith Israel.

16.    In 1894, the new Jewish community received articles of incorporation from the Rhode Island Legislature under the name Jeshuat Israel.  Since that time, Jeshuat Israel has worshiped at Touro Synagogue under that name.  It is currently the only established Jewish congregation in Newport, Rhode Island.

17.    Shearith Israel returned the Rimonim to Newport's new Jewish community, which became Jeshuat Israel, sometime in the late 1800s or early 1900s, as Yeshuat Israel instructed it to do.  Since that time, Jeshuat Israel has owned, controlled, and maintained the Rimonim without challenge, until this lawsuit over 100 years later.  There is no impediment to Jeshuat Israel's desire to sell the Rimonim in order to establish an endowment to ensure permanent public Jewish worship at the Touro Synagogue.

18.    A series of legal conflicts flared up between Shearith Israel and the Jews of Newport at the turn of the 20th century.  These disputes were motivated by Shearith Israel's concern that Newport's new Jewish community would not conform to the Sephardic (Spanish and Portuguese) religious traditions previously observed by Yeshuat Israel and still practiced by Shearith Israel.  Shearith Israel's concern about the form of Jewish worship was never a requirement of the original trust.

19.    The disputes were mutually resolved in the early 20th century, when Shearith Israel, as trustee of the Synagogue, entered into a lease to allow Jeshuat Israel, as tenant, to worship at the Synagogue.

20.    Jeshuat Israel has continually worshiped at Touro Synagogue since at

least the beginning of the 20th century. It has maintained, preserved, and protected the Synagogue as a place for public Jewish worship for over 100 years.

21. As Jeshuat Israel's responsibilities for Touro Synagogue have expanded, Shearith Israel's have receded. For at least the past 20 years, Shearith Israel has not taken any meaningful action in its capacity as trustee for the Touro Synagogue and lands.

22. In this litigation, Shearith Israel denies the existence of a trust, and attempts to evict Jeshuat Israel from Touro Synagogue. These actions, and the friction they have engendered, hinder and undermine the charitable trust, requiring removal of Shearith Israel as trustee.

23. Jeshuat Israel has been discharging all of the responsibilities of a trustee for the past century, and is the most appropriate new trustee over the Touro Synagogue and lands. It is the party most capable of continuing to preserve Touro Synagogue as a place of public Jewish worship.

The Court now sets forth it findings of fact in narrative form.

## NARRATIVE

The history of the ancient Synagogue in Rhode Island, now known as Touro Synagogue, begins with some of the first Jews who settled in pre-Revolutionary America. Many came to Newport in the late 1600s and early 1700s to escape the dire horrors of the Iberian Inquisition, while others sought to leave behind rampant anti-Semitism pervading the rest of the Old World. Regardless of their background, their overriding desire was to find a community where they could practice Judaism

freely and publicly.  Just as Roger Williams shaped Rhode Island, the colonial Jews made Newport known as a place of free and open public Jewish worship — memorialized more than anything else by the oldest surviving Jewish temple in America.  At stake in this case is the legacy left behind by those early pioneers of Rhode Island's ocean shores.

### Before Arriving in Newport, Rhode Island

Spain and Portugal in the 17th and 18th centuries was not a place where Jews could practice their religion legally, much less publicly.  Morris A. Gutstein, *The Story of the Jews of Newport; Two and a Half Centuries of Judaism, 1658-1908* 58-65 (1936) (Exhibits P81 and D448).[8]  At that time, those two countries were in the midst of the Inquisition — a brutal institution within the judicial systems of the royal Christian authorities and the Catholic Church, whose stated aim was to combat heresy.  The Inquisition forbade Judaism and singled out its adherents for exploitation and torture.  The royal authorities and the Catholic Church started by confiscating the property of anyone accused of "Judaizing"[9] and filling its coffers

---

[8] Morris Gutstein, who served as the Rabbi for Jeshuat Israel in the 1930s, wrote a comprehensive history of the Jews of Newport.  In the preface to the book, Rabbi Gutstein thanked "the spiritual leader of the Spanish-Portuguese Synagogue in New York [Rabbi De Sola Pool], for his kind assistance in reading the manuscript and offering many constructive suggestions, and for writing the Introduction." Morris A. Gutstein, *The Story of the Jews of Newport; Two and a Half Centuries of Judaism, 1658-1908* 11 (1936).  Jeshuat Israel and Shearith Israel separately offered Rabbi Gutstein's immensely helpful book as an exhibit (Exhibits P81 and D448) (page references to this source are to the book's page numbers) [hereinafter *Gutstein*].  The Court relied on Rabbi Gutstein's thorough and credible factual narrative, not his legal conclusions, in reaching its own conclusions in this case.

[9] "Judaizing" refers to the continuing observance of the Torah by Jews who had been coerced into Christianity.  *See* Seymour B. Liebman, *The Inquisitors & the*

with the ill-gotten loot. *Id.* at 63. Next came the autos-da-fé,[10] burnings at the stake, and other horrors. The Inquisition "claimed the lives of thousands of Jews, yielding up their souls, with the martyr's exclamation, 'Hear O Israel the Lord our God, the Lord is One.'" *Id.* at 63.

Some Jews were tortured and burned alive, others were expelled from the lands, and yet others were forced into compulsory baptisms. "Before long, a very large number of the population of the Iberian peninsula consisted of Crypto-Jews, who had been forced into baptism by persecution," and were referred to as "Neo-Christians" or "Marranos." *Id.* at 60.

> Many of the Marranos cherished their love for the Jewish faith in which they had been reared. As much as possible they secretly observed the traditions of their fathers in spite of the high positions they held. Some attended synagogue under the most dangerous circumstances. Others assembled in underground hiding places to carry out the tenets of Jewish religion, though openly they lived in beautiful homes religiously decorated according to the custom of the date, giving no cause for suspicion.

*Id.* at 61.

Official conversion did not immunize Iberian Jews from persecution. The inquisitors persisted in their charge, turning their victims against each other by undermining the persecuted group from within:

> The Inquisitors promised absolution to all Marranos guilty of observing Jewish customs, if they would appear before the tribunal and recant. Many fell victims to this snare, for no absolution was granted them, unless under the seal of secrecy and under oath

---

*Jews in the New World: Summaries of Procesos 1500-1810* 29 (Univ. of Miami Press 1973).

[10] *Auto-de-fé*, which translates to "act of faith," was the public penance required of persons the inquisitors condemned as heretics.

> extracted by torture in the Inquisition chambers, they betrayed the
> name of others whom they knew to be Judaizers and who on their
> testimony would become prey for the flames.

*Id.* at 63-64.

Escape from their homeland was often the only way to stay alive. This was the traumatic background of many Jews who found their way to Newport, Rhode Island in the late 17th and early 18th centuries.[11]

### *Arrival in Newport, Rhode Island*

Arriving in Newport in 1658, the first Jewish families — approximately fifteen in number — were said to have "immediately set out to organize their public worship." *Id.* at 30; *see also* Melvin I. Urofsky, *A Genesis of Religious Freedom: The Story of the Jews of Newport, RI and Touro Synagogue* 20 (George Washington Institute for Religious Freedom, 2013) (Exhibit D451 at 37) [hereinafter *Urofsky*]. They met to worship at private dwelling houses and formed a collective that was first known as Nefutsé Israel — the Scattered of Israel — and later became Congregation Yeshuat Israel. *Gutstein* at 31 and 343 n. 9; *Urofsky* at 54. In 1677, presumably when death came for one of their own, they purchased a plot of land for a Jewish cemetery. *Gutstein* at 36-38. This act was an important milestone for the

---

[11] For many of the survivors, the psychological scars of the Inquisition never completely healed. Many Jewish women in the colonies, who in Spain "seemingly told their [rosary] beads in public [to disarm suspicion], though their hearts formed not the Ave Maria and the Pater Noster, but the Shemang," continued the deception in their new world. *Gutstein* at 351 n. 17 (quoting Thomas Bicknell, *The History of the State of Rhode Island*, Vol. II at 626 (1920)) "[T]hese women were so much slaves of habit and fear that even here, [in Rhode Island,] far from their bloodthirsty oppressors they still fingered their beads as they repeated their Hebrew prayers, though their one desire was to throw off all memory of their days of persecution." *Id.*

burgeoning community, as a symbol that its families were permitted to live and die according to their true identities. *Id.* at 39.

The Riveras were one such family that populated Newport at the beginning of the 18th century. Abraham Rodrigues Rivera was the first of his family to arrive in North America in the early 1700s.[12] Typical of many North American Jews at the time, he was born and married in Seville, Spain, where he was forced to live as a Marrano in full accordance with the Catholic rites and under a different name. Upon coming to the British Colonies, he underwent all the religious rituals required by Jewish tradition, changing his name to Abraham, his sons' names to Isaac and Jacob, and his daughter's name to Rebecca. Young Jacob Rodrigues Rivera,[13] also born in Seville, would eventually grow up to become a respected Newport businessperson and the author of a key testamentary document at issue in this case.

Along with the exiles from Spain and Portugal, Jews from other European countries also populated Newport. *Id.* at 76-77. The Hart and Levy families are of

---

[12] Abraham Rodrigues Rivera landed in New York City, but later relocated his family to Newport. He was president of Shearith Israel in 1729 and one of the contributors to the building of its first Mill Street Synagogue in 1730. *Gutstein* at 70-71.

[13] Jacob Rodrigues Rivera lived for some time in the Caribbean island country of Curacao, where he married, before moving to New York. He was naturalized as a U.S. citizen in 1746 and moved his family to Newport in 1748. In his new home, he introduced the community to the manufacture of spermaceti candles, (wax extracted from whale oil), which became "one of the most important sources of Newport's prosperity" in the coming years. *Gutstein* at 71.

special importance to this case.   Isaac Hart[14] hailed from a London family of Ashkenazic origin.[15]   He settled in Newport around 1750 and soon became a successful merchant.  *Id.* at 77.  Moses Levy's family was also from London.[16]  *Id.* at 75.  They arrived in New York in 1705 and eventually settled in Newport.  *Id.* at 53. Like Jacob Rodrigues Rivera and Isaac Hart, Moses Levy also became a prominent businessperson, and was closely associated with the commercial, social, and spiritual life of Newport's Jewish community.[17]  *Id.* at 53-54.

---

[14] Isaac Hart's relative, Aaron Hart, was the first Chief Rabbi of the Ashkenazic Jews in England.  *Gutstein* at 77.  As late as in 1763, Jews in London were facing indictments for holding public services.  *Id.* at 342, n. 7.  For them too, the hope of public worship in North America was a great draw.

[15] Ashkenazic Jews generally hail from Germany, Russia, Poland, Hungary, Romania, Lithuania, Latvia and other places in Central and Eastern Europe. Sephardic Jews trace their roots back to Spain and Portugal.  The two groups differ in their rituals and pronunciations.  Bernard Kusinitz, *The 1902 Sit-In at Touro Synagogue* 44-45 (Rhode Island Jewish Historical Notes Vol. 7, No. 1 Nov. 1975) (Exhibit D445 at 5-6) [hereinafter *Kusinitz*]; *see also Gutstein* at 114-17; 268-70.

[16] There is no evidence before the Court about whether Levy's family was of Sephardic or Ashkenazic origin.

[17] The Court would be remiss here not to acknowledge a shameful chapter in the colonies' history, in which one prominent member of the Jewish community, Aaron Lopez, (*Gutstein* at 66-69), had a role.  "[D]uring the eighteenth century Jews participated in the 'triangular trade' that brought slaves from Africa to the West Indies and there exchanged them for molasses, which in turn was taken to New England and converted into rum for sale in Africa. . . .  Aaron Lopez of Newport in the late 1760's and early 1770's [participated in] slave trading on the American continent."  Rabbi Marc Lee Raphael, *Jews and Judaism in the United States: A Documentary History* 14, 23-25 (Behrman House, 1983); *see also* Eli Faber, *Jews, Slaves, and the Slave Trade: Setting the Record Straight* 136-37, 143 (New York University Press, 1998) (concluding that Mr. Lopez underwrote 21 slave ships to Africa between 1761 and 1774); Trial Tr. vol. 7, 201, ECF No. 110 (Testimony of Dr. Mann) ("[Aaron Lopez was] a slave trader").

*Building the Synagogue*

By the mid-18th century, the Jewish community of Newport was becoming sufficiently numerous and prosperous to plan building a synagogue. *Id.* at 82. They "desire[d] to build a synagogue that should equal in grandeur any other contemporary colonial structure." *Id.* at 87. The project required two rounds of fundraising, first to buy the land, and second to build the temple. *Id.* at 87-88. For the first round, the local Jewish community was taxed and the necessary funds gathered to make the purchase. *Id.*

A problem arose though, because in those days "patents of incorporation were not granted to religious institutions," meaning that the Congregation "could not purchase [or] hold real estate in its own name." *Id.* at 82; *see also Kusinitz* at 42 (Exhibit D445 at 3). Yeshuat Israel solved this problem by designating three of its leaders as title-holders and trustees on behalf of the Congregation:

> The procedure was this: at a public meeting of the Congregation, or of all the Jews of the community, trustworthy individuals were appointed to purchase whatever property might be necessary for building the synagogue and for whatever other use the Congregation might need. These members of the community thus became the trustees of the land, buildings and other property belonging to the Congregation. In reality the land and property belonged to the entire Jewish community; legally the title to the land and to everything with it, rested with the appointed trustees who purchased the plot as individuals.
>
> *****
>
> The Jewish Community of Newport found these trustworthy individuals in three noteworthy and respectable members of the Congregation, Jacob Rodrigues Rivera, Moses Levy and Isaac Hart. They were not only appointed to purchase the land, but also as "trustees for building the Synagogue."

*Gutstein* at 82-83; *see also Urofsky* at 54. After raising the funds from the Newport Jewish community, the Congregation purchased the necessary land from Ebenezer Allen of Sandwich of the Massachusetts Bay Colony sometime in 1759. *Gutstein* at 85; *see also* 1759 Deed (Exhibits D424 and D424A).

The second step, building the Synagogue, required raising additional capital. For this task, the Jews of Newport began at home, raising "a small fund by subscription" despite being strapped for funds after "having been taxed for the purchase of the land." *Gutstein* at 87-88. Next, they greatly expanded their fundraising sites. *Id.* at 88. Nine representatives of the Newport Jewish community — Jacob Rodrigues Rivera, Jacob Isaacs, Isaac Hart, Aaron Lopez, Abraham Rodrigues Rivera, Isaac Pollock, Moses Lopez, Isaac Elizer, and Moses Levy — penned letters to congregations near and far appealing for assistance in their goal of building a synagogue and school where they could "[i]nstruct [their] [c]hildren in the [p]ath of [v]irtuous [r]eligion." *Id.* at 88 and 117. Congregations in New York, Jamaica, Curacao, Surinam, and London all answered the call and donated. *Id.* at 88.

In a constructive chapter of history between Jews in Newport and New York, Shearith Israel "reserved the seventh day of Passover to appeal for contributions for the building of Newport's Synagogue."[18] *Id.* at 90. Newport's Naphtali Hart traveled to New York to collect the donation, and left a receipt stating, "Recd. of

---

[18] Shearith Israel likely contributed even more funding later on toward the building and furnishing of the Synagogue. *Gutstein* at 95-97.

Myer Myers [an official of Shearith Israel at the time] One Hundred and Forty nine Pounds and six pence which at my arrival at Newport, Rhode Island, I promise to deliver to Messrs. Jacob Rivera, Moses Levy and Isaac Hart, *trustees for building the Synagogue.*" *Id.* at 92 (emphasis added).

The construction of the Synagogue lasted from August 1, 1759 until 1762, and the dedication ceremony took place on December 2, 1763.[19] *Id.* at 92, 98. The dedication was a public celebration of the magnificent final product, and highlighted the stature and acceptance of Jews in Newport. "The invited audience consisted of Jews and non-Jews, including a great number of notables of the city and guests from other localities." *Id.* at 98. At this time, there were 60 to 70 Jewish families living in Newport. *Id.* at 113-14. The *Newport Mercury*[20] offered the following report: "The Order and Decorum, the Harmony and Solemnity of the Music, together with a handsome Assembly of People, in an Edifice the most perfect of the Temple kind perhaps in America, and splendidly illuminated, could not but raise in the Mind a faint Idea of the Majesty and Grandeur of the Ancient Jewish Worship mentioned in Scripture." *Id.* at 100-01. The dedication also marked a name change

---

[19] The Synagogue — "an architectural jewel" — was designed by Peter Harrison, a British-born colonial architect who immigrated to Rhode Island in the 1740s. *Urofsky* at 55-57. He likely drew inspiration for Newport's Synagogue from the designs of the Bevis Marks Synagogue in London and the Great Portuguese Synagogue of Amsterdam. *Id.* at 56. Mr. Harrison's other works include the Redwood Library and Athenaeum in Newport, and other buildings in Newport, Boston, Cambridge, and England. *Id.* at 55-56; *Gutstein* at 93.

[20] The *Newport Mercury* is one of the oldest newspapers in the country still in existence, dating back to 1758. Newport Public Library, *Local History: Rhode Island Newspapers* (2016), http://www.newportlibraryri.org/e-resources/local-history/.

for Newport's Jewish community.  No longer would they be known as Nefutsé Israel — the Scattered of Israel, but instead as Yeshuat Israel — the Salvation of Israel. *Urofsky* at 62.  At its very beginning, the Newport Synagogue was publically dedicated to the proposition that in Newport, Jews could worship freely and proudly, as their storied ancestors had done in the long ago past.

In sum, the Synagogue's trustees, Jacob Rodrigues Rivera, Isaac Hart, and Moses Levy were part of the community of Sephardic and Ashkenazic Jews that came to Newport in pursuit of religious freedom, economic prosperity, and happiness.[21]  They helped form a Jewish society that prospered in business but stayed grounded in religion.  It is heartening to imagine, as one of the trial witnesses described, the newly liberated European Jews finding a welcome place in Newport to build their Synagogue after years of furtiveness and torment:

---

[21] By the time the Synagogue was built, the Jewish population of Newport was composed of Jews from a variety of backgrounds:

> The majority of the Jewish population in [Newport before the American Revolution] were of *Sephardic* origin [from Spain and Portugal], but a considerable number taking an active interest in the affairs of the Jewish community were of *Ashkenazic* stock.  The *Ashkenazic* element came principally from Germany, though . . . the Harts came from England, the Pollocks from Poland, while the Myers came from Austria and Hungary.

> In affairs of the synagogue, the *Sephardic* element dominated because of their greater number and importance.  The *Ashkenazic* members cooperated fully, so that harmony and accord existed at all times.  The synagogue was deeded to Jacob Rodrigues Rivera the *Sephardi* and Isaac Hart the *Ashkenazi*.  While Moses Lopez, a *Sephardi*, was President of the Congregation one year, Naphtaly Hart, an *Ashkenazi*, occupied the position another year.

*Gutstein* at 115.

> [T]hey found this religious tolerance. And then they built this wonderful synagogue. And they built it high up on a hill overlooking the city. And it showed how comfortable they were, and how well accepted they were. And that's particularly important, when you look at other synagogues built in the same era. . . . [S]ynagogues were built in Europe behind other buildings, in alleyways so that they don't draw attention to them. And here, here in Rhode Island, they were able to build in such an open location.

Trial Tr. vol. 3, 177, ECF No. 106 (Testimony of Bertha Ross). Far from the fires of the Inquisition, the Jews of Newport were able to build a Synagogue that would serve always as a house of public worship and a beacon of religious freedom.



Exterior of the Synagogue in 2013. *Urofsky* back cover (Exhibit D451 at 2).



Interior of the Synagogue in 2008.  *Urofsky* at 59 (Exhibit D451 at 76).

### The Rimonim

Although the Touro edifice was completed by 1762, a building alone does not

a synagogue make.  It needed furnishings and articles of worship essential to the

religious ceremonies for which it was meant.  By dedication day, through the

generosity of patrons from Newport and abroad, most of these necessities were

gifted to the Synagogue and became part of the heritage of the Jews of Newport.

*Gutstein* at 96-97, 103-06.  The Synagogue was adorned with brass candlesticks

from Enoch Lyon, a perpetual lamp donated by Samuel Judah, wax from Hayim

Myers, a *Hechal* (Ark where the Torah scrolls are kept) and *Tebah* (reading desk at

the center of the synagogue) gifted by Jacob Pollock, and three Torah scrolls,

including a 200-year old scroll presented by a Congregation from Amsterdam.  *Id.* at

97, 104-05.   Soon, five beautiful candelabra were installed courtesy of Abraham

Rodrigues Rivera, Naphtali Hart Myers, Aaron Lopez, and one unknown donor.   *Id.*

at 104 and 354-55 n. 45.

The riches of the Synagogue kept growing.   "[B]y 1769 there were six Scrolls

of the Holy Law deposited in the Ark of the Newport synagogue . . . all adorned with

tops and bells made of silver and washed with gold."   *Id.* at 105.   These "tops and

bells" that adorn the Torah are called "rimonim," and are placed on the top of the

two handles of the Torah scroll when the Torah is not in use.   Gutstein described

two of those pairs from 1769 this way:

> One pair, having crown and bells is decorated with closed aca[n]thus
> leaves, open flowers, strap ornaments, and heading.   They were made
> by Myer Myers, freeman of New York, president of the Silversmith's
> Society, 1776.

> Another pair, by the same maker are engraved and embellished with
> flowers and foliage.   Gilt bells are suspended from brackets.   They were
> probably the gift of members of the Hays and Myers family as the
> inscription indicates.

*Id.* at 108.

Because the ownership of one of these pairs of Myer Myers' Rimonim is at

issue in this case, a discussion of the maker and the contested pair is fitting.   Myer

Myers, the son of a Jewish shopkeeper, was New York's foremost silversmith during

the late colonial period.   David L. Barquist, *Myer Myers: Jewish Silversmith in*

*Colonial New York* 25 (Yale University Press, 2001) (Exhibit P150 at 3234 and

D356 at 5) [hereinafter *Barquist*].[22]  An accomplished artisan and a successful merchant, his workshop was likely the largest in New York from the mid-eighteenth century until the outbreak of the Revolutionary War.[23]  *Id.*  Approximately 380 works bearing his mark survive to this day, including only six objects of Judaica: five pairs of rimonim and one circumcision shield.  *Id.* at 48 (Exhibit D356 at 28), 152, 154, 162, and 198 (Exhibit P150 at 3246, 3248, 3255, and 3259).  His exquisite rimonim have likely played the biggest role in establishing Mr. Myers' reputation as a great silversmith.  *Id.* at 60 (Exhibit D356 at 40).

Although born in New York and deeply involved with the Jewish community there, Mr. Myers' personal and professional life also connected him to Jewish communities in other cities, especially Newport.  *Id.* at 27 (Exhibit P150 at 3235).  As president of Shearith Israel, he facilitated his Congregation's donations for the construction of Newport's beautiful new Synagogue.  *Gutstein* at 92.  Then around the year 1770, his sister Rachel and her husband Moses Michael Hays moved to Newport, which opened up further avenues for his business interactions there.[24]  *Barquist* at 27, 98 (Exhibit P150 at 3235, 3259).  Mr. Myers made a circumcision shield for Yeshuat Israel's *mohel* (circumciser), Moses Seixas, who in the 1770s served as Yeshuat Israel's president and custodian.  *Barquist* at 152 (Exhibit P150

---

[22] The parties submitted partly overlapping excerpts from the Barquist catalogue.  The Court's citations to Barquist include the actual pages in the catalogue, as well as the exhibit and page numbers for the cited information.
[23] Mr. Myers was born in 1723, and by the age of 23, he became the first Jew to join the British Guild of Silversmiths since its founding in 1327.  *Barquist* at 8 (Exhibit P150 at 3230).
[24] The Hays family is related by marriage to the Touro family, which is closely associated with Newport's Synagogue.  *Barquist* at 98 (Exhibit P150 at 3259).

at 3246); *Exhibition of Works in Silver and Gold by Myer Myers*, Brooklyn Museum, 1954 (Exhibit P101 at 3720). And most importantly, for our purposes, in 1787 Mr. Myers was commissioned to mend a pair of Yeshuat Israel's Rimonim, and was paid 12 shillings for his services. Yeshuat Israel ledger (Exhibit P30). He was likely repairing the Rimonim at issue in this case, which he had made for use in Newport's new Synagogue.



The Rimonim (Exhibit D562).

*Late 18th Century Newport, Rhode Island*

The years immediately after the Synagogue was built coincided with the "Golden Era of Newport." The city, known as the "Garden of America," was a commercial rival of New York and Boston. *Gutstein* at 157-58, 174.[25] The Jewish community in Newport was the largest and most prosperous in North America, even compared to the other major Jewish communities in New York, Philadelphia, Savannah, Richmond, and Charleston. *Id.* at 176. Alas, the golden era was short-lived.

As fate would have it, the Jews who built the Newport Synagogue would worship there for only 30 years. The majority of Jewish families left Newport in the year 1776, some at the outbreak of the Revolution, and others immediately after the British captured the city:

> The conflict with Great Britain was a death blow to the prosperity of the city of Newport, and in particular to the Jewish community of the town. The factories gradually closed down; the extensive commerce and foreign trade slowly died out; many people threatened by the impending invasion of the British left the city, and by December 8, 1776, when the city of Newport was actually occupied by the British, there was but a handful of people left in the town.

*Id.* at 181-82; *see also id.* at 185.

The Revolutionary War and then the War of 1812 devastated the shipping and trading industries on which Newport's Jews depended, and drove the Jewish community to other locales. *Id.* at 190, 225. Services ceased in the Synagogue

---

[25] In his book, Gutstein refers to a letter from that time that was addressed, without irony, to "New York near Newport, Rhode Island." *Gutstein* at 158.

sometime around the year 1793, and by 1822, it appears that no Jews remained in Newport. *Id.* at 216, 225.

The wars also affected the leadership of Yeshuat Israel, including its three trustees. In 1780, one of the trustees, Isaac Hart, was killed in the midst of Revolutionary violence, and left no surviving will. *Id.* at 184, 365 n. 33. Another trustee, Jacob Rodrigues Rivera, waited out the Revolutionary War in Leicester, Massachusetts, and returned to Newport an old man. *Id.* at 185. He "was gathered to his fathers" on February 18, 1789 at age 72. *Id.* at 200. The third trustee, Moses Levy, passed away three years later in 1792. *Id.* at 216. Both Mr. Rivera and Mr. Levy left behind wills that are instructive for this case, and supportive of the finding that Touro Synagogue is owned in trust.

- ***The Rivera Will***

In his will, Jacob Rodrigues Rivera acknowledged that he had no equitable ownership interest in Touro Synagogue, and that his only personal interest was as the Synagogue's trustee. His will stated:

> Also I do hereby declare and make known unto All People, that I have no exclusive Right, or Title, Of, in, or to the Jewish Public Synagogue, in Newport, on Account of the Deed thereof, being made to Myself, Moses Levy & Isaac Harte, which Isaac Harte, thereafter Conveyed his One third Part thereof to me, but that the same was so done, meant and intended, in trust Only, to and for the sole Use, benefit and behoof of the Jewish Society, in Newport, to be for them reserved as a Place of Public Worship forever, THEREFORE, I do for myself and my Heirs hereby remise, release, and forever quit Claim to all exclusive right, title, or Interest therein or thereto and to every part and parcel thereof, Always saving and excepting such right as I have by being A Single Member of that Society.

Rivera Will at 19 (Exhibit D16 at 2).   The will, which will be discussed in more detail *infra*, is incontrovertible evidence that Touro Synagogue was owned in trust.

- *The Levy Will*

In his will, Moses Levy stated:

> I do hereby release and discharge all such ballances, as shall at the time of my Decease be due and unpaid of monies by me heretofore advanced towards building the Synagogue, in Newport, on condition that there shall be a solemn prayer said for me in the said Synagogue, Yearly and every Year; on the Evening or day of Kipne, or atonement.

Levy Will (Exhibit D18 at 1).

Mr. Levy's will, probated three years after Mr. Rivera's, is consistent with the finding that Messrs. Rivera, Hart, and Levy were trustees for the Synagogue. *See infra*.

### *Moses Seixas Becomes Acting Trustee*

While the Revolutionary War raged, Moses Seixas, who married into the family of one of the trustee's (Moses Levy),[26] took responsibility for the Synagogue and became the "lay leader of the Remnant of Israel in Newport." *Gutstein* at 188-89. He "was the warden of the [S]ynagogue, and carried out the functions that had been previously vested in Jacob Rodrigues Rivera." *Id.* at 189, 201. In other words, Moses Seixas acted as the Synagogue's successor trustee.

---

[26] Moses Seixas married Jochebed Levy, the daughter of Benjamin and Judith Levy. *Gutstein* at 189. Benjamin Levy was Moses Levy's brother. *Id.* at 76. Mr. Levy and Mr. Seixas were likely close, because Mr. Levy devised a large portion of his estate to Mr. Seixas, and appointed him as an executor of his will. Levy Will (Exhibit D18 at 2-4).

Moses Seixas also played the central role in the most celebrated instance in the Synagogue's history: the correspondence with George Washington. President Washington visited Newport on August 17, 1790. *Id.* at 207. The following morning, Mr. Seixas presented to the President a letter on behalf of the Hebrew Congregation, extolling his new government, "which gives to bigotry no sanction to persecution no assistance; but generously affording to all liberty of conscience and immunities of citizenship, deeming everyone, of whatever nation, tongue, or language, equal parts of the great Government machine." *Id.* at 210 (reproducing Mr. Seixas' letter to President Washington).

The President responded in kind, writing:

To the Hebrew Congregation in Newport, Rhode Island.

Gentlemen.

*****

The Citizens of the United States of America have a right to applaud themselves for having given to mankind examples of an enlarged and liberal policy: a policy worthy of imitation. All possess alike liberty of conscience and immunities of citizenship. It is now no more that toleration is spoken of as if it was by the indulgence of one class of people that another enjoyed the exercise of their inherent natural rights. For happily the Government of the United States, which gives to bigotry no sanction, to persecution no assistance, requires only that they who live under its protection, should demean themselves as good citizens, in giving it on all occasions their effectual support.

*****

May the Children of the Stock of Abraham, who dwell in this land, continue to merit and enjoy the good will of the other Inhabitants, while every one shall sit in safety under his own Vine and Figtree, and there shall be none to make him afraid. May the father of all mercies scatter light and not darkness in our paths, and make us all in our

several vocations useful here, and in his own due time and way everlastingly happy.

Go. Washington

*Id.* at 212-13.

This touching and lofty correspondence is celebrated by a public reading of the Seixas and Washington letters at the Touro Synagogue every year. Trial Tr. vol. 2, 8-13, ECF No. 105 (Testimony of David Bazarsky). It is a fitting tribute to Newport's original Jewish community, which had suffered through the indignities of the Inquisition, to find in Newport a safe haven for public worship.

### *Jews Leave Newport, Rhode Island*

The correspondence with President Washington was the last hurrah of Newport's original Jewish community. Around 1793, "the services at the synagogue completely ceased . . . [and] the building was left to the bats and moles, and to the occasional invasion, through its porches and windows, of boys who took great pleasure in examining the furniture scattered about." *Gutstein* at 216. "By 1800, the 'Jewish Society' of Newport contained no one outside the families of Rivera and Seixas, and some of their relatives, Lopez and Levy respectively." *Id.* at 217. In 1809, Moses Seixas died, and was put to rest in his family's plot in the Newport Jewish Cemetery. *Id.* at 219. The informal role of trustee thereafter likely passed down to Moses Lopez, who was the last Jew to leave Newport on October 5, 1822. *Id.* at 225-26.

After services at the Synagogue stopped, the few remaining members of the Jewish community of Newport began to relocate its articles of worship and other

treasures to safer locations. Many of Yeshuat Israel's congregants moved to New York and joined Congregation Shearith Israel. *Id.* at 226. They brought with them several Torah scrolls and the rimonim adorning them, which Shearith Israel agreed to keep safe, until Jews were once again worshiping in Newport's Synagogue. *Id.* at 216, 263; see also 1901 Letter from Shearith Israel's Rabbi to Mayor of Newport (Exhibit D133 and D133A at 3) ("This original congregation dwindled away through the Revolutionary war, and in 1818, the last residents sent to the New York Congregation the sacred movables."). The Rimonim were sent to Shearith Israel for safekeeping during the period when there were no Jews in Newport. Shearith Israel's minutes from December 3, 1832 state:

> [T]he Sepharim belonging to the New Port Shool [shul][27] & which was in the possession of the family of the late Mr. Moses Seixas and have been for about 40 years, could be obtained to be placed for safe keeping in our place of Worship until they should be required for the use of the New Port Shool [shul].

Shearith Israel's minutes (Exhibits D25 and D25A at 2).

Shearith Israel also memorialized receiving the Torah scrolls. Shearith Israel's minutes from February 10, 1833 state:

> The Committee appointed to receive the Sepharim [Torahs] belonging to the New Port Synagogue Report that they have received the same and deposited them in our Hachal [Ark] and had given a receipt to the family of the late Moses Seixas of which the following is a duplicate.

Shearith Israel's minutes (Exhibits D26 and D26A at 1, and P38 at 5257).

Shearith Israel's representatives testified that the Rimonim were also transferred to Shearith Israel for safekeeping around this time. Shearith Israel's

---

[27] "Shul" means synagogue. Merriam-Webster Dictionary; *see also Kusinitz* at 43 (Exhibit D445 at 4).

ritual director Zachary Edinger[28] stated, "it is likely that the [R]imonim were brought to New York for safekeeping sometime" in "[e]ither the 1820s or the 1830s." Edinger Dep. 92:25–93:5 (May 1, 2014).   Shearith Israel's vice president also testified, "the Torahs and rimonim and other ritual objects, which had been in the Touro Synagogue, we [Shearith Israel] took them for safekeeping; and that continued until the early 1880s . . . ." Trial Tr. vol. 6 at 61, ECF No. 109 (Testimony of Michael I. Katz).

It is likely that four pairs of rimonim traveled with the Torah scrolls from Newport to New York. *See Barquist* at 160 (Exhibit P150 at 3254) ("it was not until 1833 that the four Torahs (and presumably their ornaments) were transferred to Shearith Israel 'for safekeeping . . . .'").[29]   Whether they traveled with those four Torah scrolls, or with a different scroll, or arrived separately, the Court finds that the Rimonim at issue in this case were transported to New York and held for safekeeping by Shearith Israel after services stopped at Newport's Synagogue.[30] With no Jews remaining in Newport, Shearith Israel became the custodian for

---

[28] Zachary Edinger is Shearith Israel's ritual director.  Edinger Dep. 9:10–10:7 (May 1, 2014).  Portions of his deposition transcript were admitted by the Court in lieu of trial testimony.  Shearith Israel's objections the portions of his testimony relied upon by this Court are overruled.

[29] As counsel for Shearith Israel acknowledged during opening arguments about rimonim, "[t]heir job is to stay with the Torah." Trial Tr. vol. 1 at 69, ECF No. 104.

[30] When Shearith Israel returned the Rimonim to Newport in the late 1800s, it returned one finial marked "Newport" on the base, and one finial not so marked. Jeshuat Israel alleges that the Rimonim are a true pair with switched bases, while Shearith Israel alleges that they are not a true pair.  The Court need not decide this issue.  Shearith Israel has not asked the Court to exchange its single finial or its base, which is marked "Newport" for Jeshuat Israel's single finial that is not marked "Newport," and even if it did, both parties would retain the same number of finials.

Yeshuat Israel's religious artifacts, including the Rimonim, and the spiritual link to Jewish worship at the abandoned Newport Synagogue.[31]

### *Touro Brothers Save Newport's Synagogue*

By the time Moses Lopez left Newport in 1822, the Synagogue was in a dilapidated condition. There were no congregants to worship there, and no funds to preserve it. Mr. Lopez moved to New York and entrusted the keys and care of the Synagogue and cemetery to Stephen Gould, a non-Jew who did his best in this role without any remuneration. *Gutstein* at 238. In 1826, Mr. Lopez wrote to Mr. Gould about the Synagogue, stating that "th[e] building is now considered as own'd at present by the Hebrew Society [Shearith Israel] in this city." *Id.* at 239.

At this juncture, Shearith Israel assumed trustee responsibilities for the Newport Synagogue, most likely because so many members of the disbanded Yeshuat Israel moved to New York and joined Shearith Israel. By 1826, the keys to Touro Synagogue were transferred to Shearith Israel. *See* Newport Council Records Apr. 17, 1826 (Exhibit D23) (noting that keys to Synagogue resided with Shearith Israel). However, Shearith Israel could not be expected to "invest thousands and thousands of dollars to restore and maintain [a] building, which was in a state of ruinous disrepair when they first took possession of it, for the possible use of co-religionists who might or might not one day in the distant indefinite future come back to that city and ask for the use of the facility." Bernard Kusinitz, *How Touro*

---

[31] The Rimonim were certainly in the care of Shearith Israel by 1869, because they appear in the Congregation's inventory for that year. Shearith Israel's Inventory at 36 (Exhibits D34 and D34A).

*Synagogue Got Its Name* 93 n. 7 (Rhode Island Jewish Historical Notes Vol. 9, No. 1 Nov. 1983) (Exhibit D446 at 12) [hereinafter *Touro's Name*]. The future of public Jewish worship in Newport was in grave danger of crumbling alongside the building.

Newport's Synagogue was rescued from the brink by the progeny of its first Rabbi. Abraham and Judah Touro, sons of the Synagogue's first minister, Isaac Touro, devoted their resources to ensuring that the Synagogue survived through the lean decades to come. The brothers were born in Newport, but raised in Boston by their uncle, (and Myer Myers' brother-in-law), Moses Michael Hays, who prepared them for careers in business. *Gutstein* at 229-30. Both attained considerable financial success, Abraham Touro in Boston, and Judah Touro after he moved to New Orleans. *Id.* at 230. Both also "always remained faithful to the traditions of their father, and to their Jewish heritage," and "never forgot their cemetery and their synagogue." *Id.* at 229-30.

In 1822, the same year that Moses Lopez had left Newport, Abraham Touro took on the duty of maintaining Newport's Synagogue. He corresponded with Stephen Gould, whom Moses Lopez left in charge of the grounds, and sent him a sum of one thousand dollars to build a brick wall to replace the remnants of the wooden fence that enclosed the Jewish cemetery. *Id.* at 230-31. Unfortunately, Abraham Touro did not live to see the fence completed. He died on October 18, 1822, at age 48, when his horse bolted at the firing of artillery during a Boston military parade. *Id.* at 233.

Abraham Touro left a will, which accomplished what he had started a few months before — the preservation of Newport's Synagogue. He left $10,000[32] "for the purpose of supporting the Jewish Synagogue in that State, in Special Trust to be appropriated to that object, in such man[n]er as the [Rhode Island] Legislature together with the Municipal Authority of the Town of Newport may from time to time direct and appoint." *Id.* at 232. He also left $5,000 to the Town of Newport for the repair and preservation of the street leading out of the Jewish Cemetery, which was later renamed Touro Street. *Id.* at 232.[33]

With these gifts, Abraham Touro stepped into the shoes of the colonial Newport Jews and echoed their wish to preserve the Synagogue for the Jewish Society of Newport as a place of public worship forever. The wish was granted: "[n]ot long after [the General Assembly approved the Touro Jewish Synagogue

---

[32] This was a large sum of money at the time. For reference, the Bureau of Labor Statistics provides a consumer price index inflation calculator. In 1913, the earliest year that this calculator makes available, $10,000 had the same purchasing power as $240,537 has in 2016. U.S. Department of Labor, *CPI Inflation Calculator* (2016), http://www.bls.gov/data/inflation_calculator.htm.

[33] As Abraham Touro's charitable gift was being processed by the authorities, Titus Welles, the executor of Abraham Touro's estate and the donor's "close and intimate friend" wrote the following to the Rhode Island General Assembly:

It may be timely for me to remark on the subject of this Bequest regarding what I suppose to have been the intention of the Donor. From the decayed state of the Synagogue in Newport, and the want of any family or persons of the Jewish persuasion there, the deceased with some others seriously resolved to look into the situation of the property and devise some plan to revive the Jewish religion there; and in such way and manner as to induce some of that nation to settle and keep up a worship at least in such a degree that the building enclosures and the Institution itself should not go entirely to ruin and decay.

*Gutstein* at 236.

Fund], the synagogue was repaired properly, and once again appeared as in the days before the Revolution." *Id.* 238. Stephen Gould continued to guard the shrine, as he had done before, and only after the Touro Fund appropriated some money was he "partly repaid for his faithful services." *Id.* at 238-39.

Judah Touro picked up where his brother Abraham left off. In 1842, when the brick wall around the cemetery commissioned by Abraham began to show signs of decay, Judah paid for a beautiful Quincy granite wall to replace it. *Id.* at 244. He contributed about $12,000 that year to completely restore the cemetery, repair the monuments, and beautify the grounds. *Id.* Upon Judah Touro's death in 1854, he also requested, like his brother before him, to be buried in the Jewish Cemetery in Newport. In his will, he gave the following bequest:

> [T]en thousand dollars for the purpose of paying the salary of a Reader or Minister to officiate in the Jewish Synagogue of Newport, Rhode Island, and to endow the Ministry of the same, as well as to keep in repair and embellish the Jewish Cemetery in Newport aforesaid; the said amount to be appropriated and paid, or invested for that purpose in such manner as my executors may determine concurrently with the corporation of Newport aforesaid, if necessary.

*Id.* at 246.

On January 11, 1855, the City Council approved Judah Touro's bequest, with $200 to be expended annually for the upkeep of the cemetery, "subject to the control of David J. Gould and Nathan H. Gould," descendants of Stephen Gould. *Id.* at 248-49. Thereafter, "[t]he Judah Touro Ministerial and Cemetery Fund . . . grew steadily with the accumulation of interest, so that in later years an adequate amount was available for the salary of the minister." *Id.* at 249. Between the two

of them, the Touro brothers provided for the upkeep of the Synagogue, the cemetery, the connecting street, and for the eventual retainer of a Jewish minister in their ancestral prayer house. But for their "foresight, one doubts whether the synagogue would have survived to the time when Jews again began to settle in Newport towards the end of the nineteenth century." *Id.* at 234.

Between 1822 and the 1870s, the Synagogue remained in good repair, but infrequently used. It was opened for the funeral services of Moses Lopez, who died in New York in 1830 at the age of 86, and again for the funeral services of Rebecca Lopez, Reverend Isaac Touro's only daughter, who died in 1831. *Id.* at 240. In 1832, the Synagogue was opened for the funeral of Judah Hays, then in 1836 for the interment of Slowey Hays, and for other burials in 1842, 1866, and in the 1870s. *Id.* at 241, 251. In the summer of 1850, the Synagogue was reopened briefly — "after an interruption of about sixty years" — for regular services. *Id.* at 245. These moments, which kept the candle of public worship flickering in Newport, were facilitated by personnel from Shearith Israel, and made possible with funds from the Touro brothers. *Id.*

Despite these moments of worship and remembrance, Jewish life in Newport was in hibernation during the early and mid-1800s. In 1858, Henry Wadsworth Longfellow published a poem, *The Jewish Cemetery at Newport*, about the ancient Synagogue and cemetery, which reflected its state of dignified disuse:

> Closed are the portals of their Synagogue,
> No Psalms of David now the silence break,
> No Rabbi reads the ancient Decalogue
> In the grand dialect the Prophets spake.

> Gone are the living, but the dead remain,
> And not neglected; for a hand unseen,
> Scattering its bounty, like a summer rain,
> Still keeps their graves and their remembrance green.

*Id.* at 251-54 (excerpt); 241-42.

The Touro brothers — as well as the Gould family — were the unseen hand discerned by Longfellow. Without them, "almost certainly there would be no Touro Synagogue as we see it today," and perhaps it would no longer still be standing at all. *Touro Name* at 88 (Exhibit D446 at 7). It is no accident that the Synagogue has since taken the Touro name as its own.[34] *Id.*

### *The New Jewish Settlement in Newport – Synagogue Reopens*

In the 1870s, Newport was blessed with new Jewish immigrants arriving from Germany, Austria, Italy, Russia, Romania, and other parts of Eastern Europe, many likely drawn to the city by the preservation of its beautiful Synagogue. *Gutstein* at 256; *Touro Name* at 92 n. 5 (Exhibit D446 at 11) (stating that the "world-famous Touro Synagogue" was a draw for "Jews from small European *shtetls* (villages)"). Once again, Newport beckoned as a haven for public worship, which "the Colonial Jews had willed to posterity." *Touro Name* at 92 n. 5 (Exhibit D446 at 11). The newly arriving families offered the elusive promise of a new Jewish

---

[34] Touro Synagogue was referred to as the "Jews' Synagogue," the "Jewish Synagogue," the "Newport Synagogue," or just "The Synagogue" until the latter part of the nineteenth century. *Touro Name* at 84-85 (Exhibit D446 at 3-4). In 1834, the Newport Town Council renamed the street where the Synagogue stands, "Touro Street," in honor of Abraham Touro, who donated funds for its maintenance. *Id.* at 86. Around the time of the Synagogue's reconsecration in 1893, Rabbi Abraham Pereira Mendes likely renamed the Synagogue "Touro Synagogue" after that street. *Id.* at 88-89.

community worshiping in the same place as the ancient Congregation Yeshuat Israel.  Through the foresight of the Touro brothers, a majestic and sparkling Synagogue awaited their ready prayers, and a generous fund was in place to support their minister.  The new Jewish community, which became Congregation Jeshuat Israel, soon applied for the use of these blessings.

Shearith Israel held the keys to Touro Synagogue during the decades when there were no Jews in Newport. *Gutstein* at 257-58.  It was concerned that the new Ashkenazic population (those Jews mostly from Eastern Europe that recently immigrated to Newport) seeking to worship there would not use it according to Sephardic tradition. *Id.* at 271, 275 ("The attitude of the New York Congregation was motivated by the determination to preserve the ancient traditions . . . .") *See also Kusinitz* at 45 ("[T]he newcomers to town, who were Ashkenazic, found alien the traditional Sephardic *minhag*, or ritual in use in Touro Synagogue.").  Although not a condition of Mr. Rivera's Will, or either of the Touro brothers' Wills, this one issue dominated Shearith Israel's approach to the future of Touro Synagogue, and posed legal problems that linger to this day.[35]

At first, Shearith Israel's concerns did not present any problems.  Shearith Israel commissioned Rabbi Abraham Pereira Mendes, the father of its own Congregation's rabbi, to leave London for Newport, and become Touro Synagogue's official rabbi.  Rabbi Mendes was embraced by Newport's Jewish community, and

---

[35] "So real and passionate were such feelings [about Sephardic traditions] that they account in part for some of the bitterness that was engendered in the sequence of events that followed." *Kusinitz* at 45 (Exhibit D445 at 6).

on May 25, 1883, he presided over the reconsecration of the Synagogue in a beautiful ceremony reminiscent of the original 1763 dedication. *Gutstein* at 261-65. The reconsecration symbolized that Newport's most recent Jewish arrivals would be planting permanent roots in the city.

The reconsecration also signaled the return of Yeshuat Israel's articles of worship from New York back to Newport. Shearith Israel returned "the scrolls of the Law, which had been kept in New York . . . to be permanently deposited in the Ark of the Newport Synagogue." *Id.* at 263. "In 1887, an additional *Sefer Torah*, which had belonged to Newport, was brought back from New York and deposited in the Ark." *Id.* at 266. It is undisputed that around this time, though the exact date is unknown, Shearith Israel sent the Rimonim to Newport.[36] Shearith Israel's Prop. Findings of Fact and Conclusions of Law, ECF No. 91 at 56 ¶ 263. The Rimonim have remained in Jeshuat Israel's possession and control ever since. *See supra;* Edinger Dep. 106:20–109:13.

Rabbi Mendes passed away in 1893, which precipitated the first conflict between Shearith Israel and Newport's resurgent Jewish community. *See Gutstein* at 270-74; *Kusinitz* at 44 (Exhibit D445 at 5). The Newporters worshiping at Touro Synagogue applied for a charter from the Rhode Island legislature under the same name as the old Newport Congregation Yeshuat Israel, except spelling "Jeshuat"

---

[36] There is photographic evidence that the Rimonim were back at Touro Synagogue by the year 1913, and they may have been back as early as 1895. *Id.;* E. Alfred Jones, *The Old Silver of American Churches* (National Society of Colonial Dames of America, 1913) (Exhibit P77) (containing description and photograph of Rimonim in Newport); Touro Monthly, *Congregation Jeshuat Israel* 3 (Vol. 11, No. 6 Feb. 1975) (Exhibit P124 at 4111) (reproducing photograph of Rimonim dated 1895).

with a "J" instead of a "Y."[37]   *Gutstein* at 271.   Shearith Israel opposed the Congregation's incorporation under this name, fearing that it would amount to recognizing that the new Congregation was the successor to Yeshuat Israel.   It even submitted a petition to the Rhode Island State Assembly objecting to the name on account of the backgrounds of the new immigrants:

> [N]one of them belong to the Sephardic or Spanish and Portuguese section of the Jewish nation . . . they being of the German or Polish contingent . . . and by their action in endeavoring to adopt this name, are manifestly perpetrating an injury upon the citizens of Newport in attempting to establish a relation between the ancient Congregation and themselves, while as a matter of fact they are totally different in form of worship, and in social standing, as well among the Israelites as Gentiles . . . ."

Shearith Israel Petition at 3 (Exhibit P48 at 4057).

Shearith Israel worried that if Jeshuat Israel were recognized as the successor to Yeshuat Israel, then Shearith Israel would no longer be able to enforce Sephardic worship at Touro Synagogue.   *Gutstein* at 272.   To stave off this threat, Shearith Israel endeavored to formalize its legal relationship to Touro Synagogue. In April 1894, Shearith Israel drafted "Deeds of Trust," and obtained signatures from several alleged descendants of the Newport Synagogue's original three trustees, which purported to convey the descendants' interests in the Synagogue to Shearith Israel.   *Id.* at 272-73.   These deeds, for the first time, contained the condition that Jews practicing in the Touro Synagogue must observe the same rituals, rites, and customs of the Orthodox Spanish and Portuguese Jews as

---

[37] Whether spelled with a "J" or "Y," the name of the Congregation is the transliteration of the same Hebrew words, meaning "Salvation of Israel." *Gutstein* at 378.

practiced and observed by Shearith Israel. *Id.; see, e.g.,* 1894 Deeds (Exhibit D78 at 3, 9, 18, 21, 22, 23, and 26). In the meantime, Congregation Jeshuat Israel successfully received its charter from the Rhode Island Legislature on June 13, 1894. *See* State Charter (Exhibit P284). With both sides now armed with documents allegedly supporting their claims to the Synagogue, the conflict continued to simmer below the surface.

Shearith Israel next appointed Rabbi David Baruch to serve as the minister at Touro Synagogue. For the six years that he served in that post, Rabbi Baruch was also successful at keeping at bay the more serious problems between the Newport and New York congregations. The death of Rabbi Baruch on March 30, 1899 precipitated a formal split in Newport's Jewish community, multiple rounds of litigation, and the temporary closing of the Synagogue. *Gutstein* at 274-75; *Kusinitz* at 47 (Exhibit D445 at 8). On April 10, 1899, a group split off from Jeshuat Israel, and incorporated under the name of "Touro Congregation." *Kusinitz* at 47 (Exhibit D445 at 8). This group attempted to hold its own services at Touro Synagogue, but was removed from the Synagogue pursuant to an 1899 court order, and eventually rejoined with Congregation Jeshuat Israel. *Id.* at 47-50 (Exhibit D445 at 8-11).

Although the two Newport congregations prayed together for some time, friction between them continued, while the discord between Newport's Jewish community and Shearith Israel had never completely died down. *Id.* at 51 (Exhibit D445 at 8-11). The main point of contention was likely the Newport congregations'

efforts to appoint their own minister, rather than accepting a minister selected by Shearith Israel. *Id.* at 54-56 (Exhibit D445 at 15-17). In the midst of this hostility, Shearith Israel and their representatives in Newport chose to close Touro Synagogue on January 1, 1901. *Id.* at 53 (Exhibit D445 at 14); *see also* Shearith Israel's minutes from July 2, 1900 authorizing closure (Exhibits D128 and D128A at 2). The Synagogue was shuttered for over a year, until a Newport group consisting mostly of members from Touro Congregation, broke into the Synagogue to pray on April 21, 1902. *Id.* at 53 (Exhibit D445 at 14). Relying on a state law that forbade interference with an ongoing religious gathering, the Newport group conducted a sit-in and held continuous services at Touro Synagogue for almost a year, until early 1903. *Id.* at 57 (Exhibit D445 at 18).

While the Newport group was occupying the Synagogue, lawyers from Newport and New York sought to resolve the issue in the courts. Shearith Israel prevailed in the Rhode Island Superior Court in May 1902, only to have the decision reversed on procedural grounds by the Rhode Island Supreme Court on June 11, 1902. *Id.* at 66-67 (Exhibit D445 at 27-28). Parallel to the state litigation, the Newport group was pressing its case in equity, which Shearith Israel removed to the United States District Court for the District of Rhode Island. On January 10, 1903, Judge Arthur L. Brown of this court sustained Shearith Israel's demurrer and dismissed the Newport group's case in a cryptic opinion, *David v. Levy*, which brought the parties back to the position they were in before litigation began. Opinion on Defs' Demurrer & Plea, *David v. Levy*, No. 2613 (D.R.I. 1903) (Exhibit

D143); *Kusinitz* at 68 (Exhibit D445 at 29). The Newport group could continue in its occupation, while Shearith Israel could continue to assert its title.

Fortunately, by this point in the dispute, "attitudes softened and a spirit of conciliation once again permeated the air" both as between the two Newport congregations, which had coalesced under the banner of Jeshuat Israel, and between Newport's Jews and Shearith Israel. *Kusinitz* at 69 (Exhibit D445 at 30). After Judge Brown's decision, "[l]awyers for the New York trustees of Congregation Shearith Israel . . . approached [Newport's attorney] and posed the question of reconciliation so that the controversy could be settled once and for all." *Id.* Newport's attorney "indicated that if the New York group would be reasonable, [reconciliation] could be accomplished." *Id.* By January 30, 1903, the parties reached a compromise that resolved the conflict for the next 100 years. Settlement Agreement (Exhibit D146).

### *1903 and 1908 Leases*

The compromise was that Shearith Israel, which held the keys to Touro Synagogue as its trustee from the time when no Jews were in Newport, agreed to lease the Synagogue to Jeshuat Israel for five years at the nominal price of $1 per year. 1903 Lease (Exhibit D148 at 2). As part of the agreement, Jeshuat Israel could select its own minister, subject to Shearith Israel's approval, rather than Shearith Israel unilaterally appointing a minister for Jeshuat Israel. *Kusinitz* at 70 (Exhibit D445 at 31). That same year, Jeshuat Israel selected Touro Synagogue's first Ashkenazic rabbi, Jacob M. Seidel. *Gutstein* at 277. Jeshuat Israel also

agreed in the lease to use the Synagogue according to Sephardic ritual as practiced by Shearith Israel.  1903 Lease (Exhibit 148 at 3).  On February 2, 1903, Jeshuat Israel passed a resolution, directing its trustees "to surrender the possession of the Synagogue building, premises and paraphernalia belonging thereto at Newport, to the [Shearith Israel] Trustees, owners of the property," which formally ended the sit-in.  Jeshuat Israel Resolution (Exhibit D147).  On February 18, 1903, the parties signed the lease.[38]  1903 Lease (Exhibit D148).  The lease[39] was renewed for another five years in 1908, and never again.

The lease was a compromise that again permitted Newport's Jews to use Touro Synagogue for public worship, while maintaining Shearith Israel in its role as trustee for the building.  From that point forward, Jeshuat Israel continued to use Touro Synagogue as its own with no interference from Shearith Israel.  After this brief flurry of litigation at the turn of the 20th century, Jeshuat Israel and Shearith Israel did not have any major conflicts of relevance until the present.

---

[38] Around this time, Shearith Israel endeavored to include "personal property" into the terms of the lease, in an apparent effort to shore up its rights to Yeshuat Israel's articles of worship.  On February 10, 1903, Shearith Israel's trustee L. Napoleon Levy instructed Dr. H. P. Mendes to insert the words "with the paraphernalia" into the lease, which would echo Jeshuat Israel's February 2 resolution.  In the same letter, Levy gave Mendes a seven-point list of conditions to check off before Shearith Israel would hand the keys to Jeshuat Israel.  February 10, 1903 Correspondence from Levy to Mendes (Exhibit D151).  From this correspondence, it appears that Shearith Israel used the word "paraphernalia" to refer to "personal property."  There is no evidence that Jeshuat Israel understood the term to have that meaning.  Moreover, the inclusion of the term "paraphernalia" in the lease had no operative effect over the Rimonim because Shearith Israel did not own the Rimonim.  *See infra.*

[39] In its briefing, Shearith Israel refers to the 1903 and 1908 Leases as "Indentures with Lease."

### 1945 Tri-Party Agreement

One noteworthy event involving both Congregations was a November 7, 1945 agreement among Jeshuat Israel, Shearith Israel, and the United States Government to protect and preserve Touro Synagogue, and to establish it as a national historic site. Tri-Party Agreement (Exhibit D240). The Agreement named "Shearith Israel Trustees" as "holders of the fee simple title *upon certain trusts* in the Touro Synagogue. . . ." *Id.* at 1 (emphasis added). Echoing the 1787 will of Mr. Rivera, the 1945 Agreement obligated Shearith Israel to ensure:

> [t]hat the public shall be admitted to all parts of the said Touro Synagogue . . . so far as consistent with *the preservation of the Synagogue for the use, benefit and behoof of the Jewish Society in Newport as a place of public worship forever* and for the maintenance of divine services in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed in the Synagogue of said Congregation Shearith Israel . . . .

*Id.* at 4 (emphasis added).

The parties settled on this language after amending an earlier draft, with the understanding that "Congregation Jeshuat Israel will not be prevented from presenting in any future Legal action the full story of the trusts originally established for the Jewish Society of Newport." Letter from William MacLeod to Jeshuat Israel dated September 25, 1945 at 4 (Exhibit P86 at 507); *see also* Shearith Israel Letters (Exhibits P87 and P88) (discussing MacLeod letter).

### Modern Day History – To the Present

Over time, the interactions between Jeshuat Israel and Shearith Israel decreased. Each Congregation attended to its own business affairs, with little cause

for communication. At some point, the parties reached an agreement that Jeshuat Israel could hire any rabbi from Yeshiva University, without seeking Shearith Israel's approval. Trial Tr. vol. 2, 55-56, ECF No. 105 (Testimony of David Bazarsky). Jeshuat Israel had also several times amended its governing documents, and by 1983, those documents no longer even mentioned Shearith Israel. Jeshuat Israel By-Laws as amended in 1969, 1983, 1987, 1994, 1999, and 2011 (Exhibits P116, P129, P132, P137, P146, and P216). Jeshuat Israel paid its symbolic dollar rent payment sporadically, and only once during the period from 1987 to the present. Trial Tr. vol. 3, 12-13, ECF No. 106 (Testimony of David Bazarsky). By 1993, when David Bazarsky became president of Jeshuat Israel, there was no communication between Jeshuat Israel and Shearith Israel. Trial Tr. vol. 1, 162, ECF No. 104 (Testimony of David Bazarsky) ("[W]hen I became president in 1992, nobody knew anything about Shearith Israel. We heard about Shearith Israel. We didn't know, we didn't know anything about them.").

This litigation came about when Shearith Israel objected to Jeshuat Israel's proposed sale of the Rimonim to the Boston Museum of Fine Arts. In 2008, Jeshuat Israel was struggling because of the global financial crisis. Trial Tr. vol. 4, 29, ECF No. 107 (Testimony of Bertha Ross). The Congregation adopted a series of cost cutting measures, including eliminating its part-time administrator, closing down its community center in the winter months, bidding out its insurance programs, and even scrapping its stamp machine. Trial Tr. vol. 3, 68-70, ECF No. 106 (Testimony of Michael Pimental). The only paid employee remaining at Jeshuat Israel was its

rabbi. Trial Tr. vol. 1, 177, ECF No. 104 (Testimony of David Bazarsky). Jeshuat Israel also attempted to raise income through a one-time assessment on its members, and other fund raising programs. Trial Tr. vol. 3, 70-77, ECF No. 106 (Testimony of Michael Pimental). Nonetheless, the Congregation was "one sort of large financial responsibility away from insolvency." *Id.* at 78.

To solve its financial difficulties, Jeshuat Israel formed a committee to examine its assets and determine whether it could sell any of them to fund an endowment to ensure continued public Jewish worship in Newport. Trial Tr. vol. 1, 179, ECF No. 104 (Testimony of David Bazarsky) and Trial Tr. vol. 4, 29-30, ECF No. 107 (Testimony of Bertha Ross). Jeshuat Israel owned two pairs of Myer Myers rimonim, which it asserts were the only asset whose sale could protect Jeshuat Israel's financial future. Trial Tr. vol. 1, 182-83, ECF No. 104 (Testimony of David Bazarsky) and Trial Tr. vol. 4, 36, ECF No. 107 (Testimony of Bertha Ross). Around October 2, 2009, Jeshuat Israel engaged Christie's, an auction house and private sales broker, to seek a buyer for one pair of its rimonim. Agreement between Jeshuat Israel and Christie's Inc. (Exhibit P195); Trial Tr. vol. 4, 42-43, ECF No. 107 (Testimony of Bertha Ross). In 2011, Christie's negotiated an offer of $7.4 million from the Boston Museum of Fine Arts for the one pair of the Rimonim, which was formalized in a January 31, 2012 letter. Trial Tr. vol. 1, 188, ECF No. 104 (Testimony of David Bazarsky); Trial Tr. vol. 4, 52-53, ECF No. 107 (Testimony of Bertha Ross); Preliminary Sale Agreement (Exhibit P223). Jeshuat Israel's committee concluded that selling the Rimonim at that price would secure the

financial future of Touro Synagogue, the Congregation, and ensure the preservation of public Jewish worship in Newport. Jeshuat Israel therefore decided to proceed with the sale. Trial Tr. vol. 4, 53, ECF No. 107 (Testimony of Bertha Ross). On June 29, 2012, Shearith Israel issued a letter demanding that Jeshuat Israel cease and desist from selling the Rimonim, and this litigation followed. Trial Tr. vol. 5, 156-57, ECF No. 108 (Testimony of Michael I. Katz); Shearith Israel Letter (Exhibit P231).

## III. CONCLUSIONS OF LAW

The Court has jurisdiction over this dispute based on the parties' diversity of citizenship and the requisite amount in controversy. 28 U.S.C. § 1332(a) (2012). When sitting in diversity, a federal court must abide by state substantive law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). The Court therefore turns to Rhode Island law to resolve the issues presented.

### A. TOURO SYNAGOGUE AND LANDS ARE THE CORPUS OF A CHARITABLE TRUST

The first issue before the Court is ownership of Touro Synagogue. As explained below, the evidence is clear and convincing that Touro Synagogue is owned in trust for the purpose of public Jewish worship. *Desnoyers v. Metropolitan Life Ins. Co.*, 272 A.2d 683, 688-91 (R.I. 1971) (holding that certain types of trusts must be proved by clear and convincing evidence). The charitable trust — established for public Jewish worship over 250 years ago — lives on to this day.

### 1.    *Legal Standard*

A "trust" is a term that describes a web of legal relationships among parties and property.  The four basic elements needed to create a trust are a settlor, a trustee, a beneficiary, and some trust property.  A. Hess, G. Bogert, & G. Bogert, *The Law of Trusts and Trustees* § 1 at 5-8 (3d ed. 2007) [hereinafter *Bogert*].  Most often, a settlor creates a trust by giving legal title over trust property to a trustee, while imposing on the trustee a duty to use that property solely for the benefit of a third party, the beneficiary.  *Id.* § 1 at 7.  When the trust is a charitable one, "the beneficiary . . . is the public, or a substantial class thereof, and not the institutions or individuals who obtain and administer benefits from the trust." *Id.* §1 at 8.

Unlike private trusts, which must have specified beneficiaries, charitable trusts must have a public purpose:

> A fundamental distinction between private and charitable trusts lies in the character of the benefits to flow from their administration. In private trusts money or money's worth is to be distributed by way of gift to the beneficiaries or in satisfaction of an obligation of the settlor. In charitable trusts the benefits to be provided through the trust are to be intangible advantages to the public or to some significant class thereof which improve its condition mentally, morally, physically or in some similar manner.  The trustees pay out money and other property not for the personal benefit of the donees, but rather to secure for society certain advantages.

*Bogert* § 362 at 19-20.

Rhode Island defines a charitable trust as "any fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it and subjecting the person by whom the property is held to equitable duties to deal with the property for charitable, educational, or religious purposes." R.I. Gen. Laws

§ 18-9-4. Therefore, the elements of a charitable trust in Rhode Island are a settlor, a trustee, some trust property, and a duty imposed by the settlor on the trustee to use that property for a charitable, educational, or religious purpose.

Creation of a trust simply requires "a present intent to make a trust or gift at the time . . . [plus] an execution of the intent by some act, [which] . . . must be such as to give a present right or benefit to the donee." *Desnoyers*, 272 A.2d at 688 (quoting *People's Savings Bank v. Webb*, 42 A. 874 (R.I. 1899)); *see* Br. of Att'y General at 6, July 10, 2015, ECF No. 95. Creating a trust does not require the settlor to use any special words or perform any particular ceremony. *Ray v. Simmons*, 11 R.I. 266, 268 (1875). "The intention to create a trust is the essential thing; this intention must be expressed and must be clearly established by proof, the nature of which naturally varies in different cases." *Knagenhjelm v. Rhode Island Hosp. Trust Co.*, 114 A. 5, 9 (R.I. 1921). The court's inquiry into determining whether the intention to create a charitable trust exists should not be derailed by formalism. *See City of Providence v. Payne*, 134 A. 276, 280 (R.I. 1926) (counseling that equity favors charitable trusts).

The Court must rely on the totality of the "circumstances which appear in evidence" to determine whether property was "intended" to be devoted to a "charitable object." *Tillinghast v. Council at Narragansett Pier, R.I., of Boy Scouts of Am.*, 133 A. 662, 663 (R.I. 1926). Even when title to land is "absolute in form," the courts will find "a charitable trust if . . . such appears to have been the [settlor's] intention." *Town of S. Kingstown v. Wakefield Trust Co.*, 134 A. 815, 816 (R.I.

1926).  Furthermore, "trusts which cannot be upheld in ordinary cases . . . will be established and carried into effect when created to support a gift to a charitable use." *Payne*, 134 A. at 280 (citing *Jackson v. Phillips*, 96 Mass. (14 Allen) 539, 550 (1867)).

Jeshuat Israel argues Shearith Israel is only the legal owner and trustee for Touro Synagogue, which is dedicated to public Jewish worship.  Shearith Israel argues that that it owns Touro Synagogue outright, rather than in trust.  The Court finds for Jeshuat Israel.

### 2.    *Establishing the Trust*

The evidence in this case is clear and convincing: the Touro Synagogue and lands have been the corpus of a charitable trust since the lands were acquired and the Synagogue built.  This charitable trust was established to ensure a permanent place for public Jewish worship in Newport.

The factual circumstances around the purchase of the land and the construction of the Synagogue support the recognition of a trust.  We know that the Newport Jewish community was first "taxed for the purchase of the land," and that the greater Jewish community was later solicited for funds toward the building of a temple.  *Gutstein* at 87.  It would defy common sense to think that these funds were gathered so three individuals could enrich their own stock.  Primary documents from the time belie such an implausible assertion.  *See, e.g.*, July 13, 1759 receipt for contribution to building the Synagogue (Exhibit P20) (referring to Messrs. Rivera, Hart, and Levy as "trustees for building the Synagogue").  The three men

whose names are on the deed did not own this property outright. Rather, the Jewish community of Newport, organized as Congregation Yeshuat Israel, settled the trust and selected these three men to serve as trustees.

The legal circumstances of the time explain why the deed to the property listed Messrs. Rivera, Hart, and Levy, rather than Congregation Yeshuat Israel, as the grantees. Prevailing law forbade a religious "association . . . in its aggregate name as an organization, [from] hold[ing] real estate or act[ing] as trustee." *Guild v. Allen*, 67 A. 855, 857 (R.I. 1907). Therefore, Yeshuat Israel itself could not own the property. As a workaround, it singled out three leaders to take title to the real estate in its stead. *See Gutstein* at 82-83; *Kusinitz* at 42 (Exhibit D445 at 3). In light of this context, the lack of trust language on the face of the original deed is not indicative of the absence of a trust. *See Malley's Estate v. Malley*, 34 A.2d 761 (R.I. 1943) (disregarding ownership attribution on the face of a document because of circumstantial evidence); *Blackstone Canal Nat. Bank v. Oast*, 121 A. 223, 225 (R.I. 1923) (relying on circumstances of transaction and the relationship between the relevant parties to find existence of a trust).

One need not look far beyond the Last Will and Testament of a revered leader of Congregation Yeshuat Israel, Jacob Rodrigues Rivera, to reach the conclusion that the Jews of Newport intended to establish a trust. In his January 9, 1787 Will, Mr. Rivera stated:

> Also I do hereby declare and make known unto All People, that I have no exclusive Right, or Title, Of, in, or to the Jewish Public Synagogue, in Newport, on Account of the Deed thereof, being made to Myself, Moses Levy & Isaac Harte, which Isaac Harte, thereafter Conveyed his

One third Part thereof to me, but that the same was so done, meant and intended, in trust Only, to and for the sole Use, benefit and behoof of the Jewish Society, in Newport, to be for them reserved as a Place of Public Worship forever, THEREFORE, I do for myself and my Heirs hereby remise, release, and forever quit Claim to all exclusive right, title, or Interest therein or thereto and to every part and parcel thereof, Always saving and excepting such right as I have by being A Single Member of that Society.

Rivera Will at 19 (Exhibit D16 at 2).[40]

Mr. Rivera's will recited that the three named purchasers — Messrs. Levy, Hart, and he — had always held legal title only,[41] for the purpose of preserving public Jewish worship. The history of the Jews who built the Synagogue reveals the significance of that purpose. In Newport, Jews no longer had to hide their identities and pretend to believe what others forced upon them. They no longer had to fear persecution and burnings at the stake. Instead, they could gather at a beautiful temple, and say their prayers openly and proudly. Public worship was the embodiment of their freedom from oppression, and they dedicated their Synagogue to that purpose.

In his will, Mr. Rivera does not devise his interest in the Synagogue or declare that he is therein forming a trust. What he does is "declare" that he never

---

[40] The Rivera Will is not a newly discovered archival relic. It is a much-quoted founding document in Touro Synagogue's lore, long familiar to both parties in this dispute. The existence of the trust, apparent from the face of that document, could not come as a surprise to Shearith Israel. It has been reaffirmed many times over by various documents from later in the Synagogue's history, many of which Shearith Israel signed on to. *See infra.*

[41] "Legal title refers to that which 'evidences apparent ownership but does not necessarily signify full and complete title or a beneficial interest.' Equitable title, on the other hand, pertains to that which 'indicates a beneficial interest in property.'" *Bucci v. Lehman Bros. Bank, FSB*, 68 A.3d 1069, 1088 (R.I. 2013) (citing *Black's Law Dictionary* 1622 (9th ed. 2009)).

51

had any "exclusive right or title" to the "Synagogue." He explains that although the deed to the Synagogue named Messrs. Levy, Hart, and him as owners, that this "was so done, meant, and intended, in trust only," for the benefit of "the Jewish Society, in Newport, to be for them reserved as a place of public worship forever." Then, out of an abundance of caution, Mr. Rivera "quit claim[s]" any right to the Synagogue that a court might mistakenly attribute to him because of the language in the deed. Mr. Rivera's will is not a conveyance, but rather it is persuasive evidence that the Synagogue was always the object of a charitable trust from the time it was built to the present.

Tracing the legal ownership of the Synagogue only confirms that position. From a legal standpoint, Moses Levy was the sole trustee for the Synagogue when he died in 1792, because he was the last surviving original trustee. *See Bogert* § 530 at 109 (co-trusteeship usually considered a joint tenancy under the common law). Mr. Levy did not name a successor trustee at his death, likely because his relative Moses Seixas was already taking care of the Synagogue. *See supra.* There are several terms that might describe Moses Seixas' role at that point — de facto trustee, constructive trustee, or trustee de son tort[42] — but suffice it to say that he was subject to the same obligations as the original trustees, and carried out those obligations. *Bogert* § 529 at 104-06; *see also Jones v. Katz*, 325 Ill. App. 65, 80 (Ill. App. Ct. 1945) (holding that an individual who "treated the trust as an obligation to

---

[42] "[T]rustees de son tort are not expressly declared by the settlor to be trustees but rather are deemed to be constructive trustees by operation of law, due to their meddling with trust affairs . . . ." Thomas and Hudson, *The Law of Trusts* ¶ 30.03 (2d ed. 2010).

which he had succeeded . . . and exercised the same duties and responsibilities toward the beneficiaries of the trust as though he were the original trustee" therefore "became successor trustee . . . either by construction, implication or operation of law . . . .").

After Mr. Seixas' death, Moses Lopez likely took over the role of acting trustee. When Mr. Lopez left Newport in 1822, the Gould family took over on the ground, the Touro brothers contributed the necessary funding to preserve the Synagogue, and Shearith Israel provided religious oversight from New York. All those parties — the Gould family, the Touro brothers, and Shearith Israel — served a role in helping the Synagogue survive until Jews were once again practicing within its walls. By the time that Jews returned to Newport in the late 1800s, Shearith Israel was the lone surviving acting trustee for the Touro Synagogue and lands.

Numerous documents spanning centuries support the conclusion of a trust drawn from Mr. Rivera's Will. These documents include the 1894 deeds executed by several descendants of the original trustees, the 1903 and 1908 leases, a 1932 enactment by the Rhode Island legislature, the 1945 tri-party agreement, and numerous other references to Touro Synagogue trust throughout history.

The Court next turns to these documents:

- In 1894, in the face of a new Jewish settlement in Newport, Shearith Israel attempted to shore up its legal relationship to Touro Synagogue by drafting deeds and obtaining signatures from the descendants of the

Synagogue's original trustees.  *See supra*.  Several of these deeds explicitly stated that the Synagogue is subject to a trust.  1894 Deeds (Exhibits P50 at 4506, P51 at 4545, and P53 at 84) ("To have and to hold, the above granted premises . . . IN TRUST . . . .").  It is telling that even when Shearith Israel was drafting documents that purported to give it a legal stake in the Synagogue, it acknowledged the existence of a trust.

- Recurring legal disputes between the Newport Jewish community and Shearith Israel about control of Touro Synagogue marked the period at the tail end of the 19th and the beginning of the 20th century.  *See supra*. The culmination of this discord resulted in a lease of the Synagogue by Shearith Israel to Jeshuat Israel for the symbolic price of $1 per year.[43] In that lease, signed in 1903 and renewed in 1908, the representatives of Shearith Israel identified themselves as "Trustees."  1903 Lease (Exhibits P71 at 473 and D150 at 2) and 1908 Leases (Exhibit P76 at 1).  The lease was consistent with the terms of the trust because Shearith Israel obligated Jeshuat Israel to use the Synagogue "for the maintenance of . . . religious services."[44]  *Id.*  These leases show Shearith Israel acting as trustee for Touro Synagogue.

---

[43] As trustee, Shearith Israel had the right and obligation to make the Synagogue available for Jewish worship.  The nominal price of $1 reflected the lessee's equitable right to worship there.

[44] Shearith Israel specifies that the religious services must be conducted in the same manner as those practiced in its own Congregation, which this Court finds is not a requirement of the charitable trust. *See infra*.

- In 1932, the Rhode Island General Assembly enacted legislation exempting from taxation "[t]he property located on the corner of Touro and Division streets in the city of Newport," because the property was "held in trust" and used by Congregation Jeshuat Israel "for religious and educational purposes." Rhode Island Acts and Resolves 427, Jan. 1932 (Exhibit P287 at 3076). This declaration by the Rhode Island Legislature served as a public affirmation of the trust's existence and purpose.

- In 1945, Jeshuat Israel, Shearith Israel, and the United States Government entered into a tri-party agreement about the maintenance of the Synagogue. The agreement recognized that "the Shearith Israel Trustees [are] holders of fee simple title *upon certain trusts* in the Touro Synagogue." Tri-Party Agreement at 1 (Exhibit D240 at 1) (emphasis added). By this recognition, Shearith Israel again acknowledged that its legal title to Touro Synagogue is subject to obligations under "certain trusts." The remainder of the document reveals that Mr. Rivera's 1759 Will dictated the substance of those obligations. In the agreement, Shearith Israel Trustees covenanted to ensure:

> [t]hat the public shall be admitted to all parts of the said Touro Synagogue . . . so far as consistent with *the preservation of the Synagogue for the use, benefit and behoof of the Jewish Society in Newport as a place of public worship forever* and for the maintenance of divine services in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed in the Synagogue of said Congregation Shearith Israel . . . .

*Id.* at 4 (emphasis added). While the second part of the duty, (to worship according to certain "rituals, rites and customs"), is self-imposed by the 1894 deeds Shearith Israel drafted, the emphasized portion comes directly from Mr. Rivera's Will. The Tri-Party Agreement is effectively an admission by Shearith Israel that it is obligated by the terms of Mr. Rivera's Will.[45]

- As recently as 1996, Shearith Israel's vice president Alvin Deutsch (who later became president) reaffirmed that his Congregation is bound by the trust when he referred to Shearith Israel as "trustee of the building" in conversation with Jeshuat Israel's then-president. Trial Tr. vol. 1, 157, 160, ECF No. 104 (Testimony of David Bazarsky). Mr. Bazarsky's testimony is uncontroverted on that point.

\* \* \*

Taking all the evidence together, the "proof of an intention" on the part of the Newport Jewish community "to establish a trust" for public worship is "clear and satisfactory." *Blackstone Canal*, 121 A. at 225. The history, the documents, and the actions of the parties involved with Touro Synagogue confirm that it was built by the community to provide a permanent place for public Jewish worship in Newport,

---

[45] Jeshuat Israel's minutes from the time of the agreement evidence that incorporating language from Rivera's will and "[s]ubstituting the word trustees for ownership" were thoughtful revisions to an earlier draft, and that "the revised agreement was accepted by the C[ongregation] S[hearith] I[srael]." Jeshuat Israel's minutes (Exhibit P89 at 2). Shearith Israel's minutes note that Shearith Israel's Trustees and Clerk signed the agreement, "who hold the property in trust . . . ." Shearith Israel's minutes (Exhibit P91).

and is held in trust for that purpose. Certainly, Shearith Israel has helped the Synagogue remain dedicated to that purpose during the time when there was no permanent Jewish settlement in the city. By its actions, Shearith Israel assumed the role of trustee over the Synagogue, and continued in its role when Jews returned to Newport. However, Shearith Israel never did, nor could it, convert its role as trustee into an equitable title to the Synagogue. Shearith Israel is obligated — just as Messrs. Rivera, Levy, and Hart once were — to preserve the Synagogue for the benefit of public Jewish worship in Newport. The Synagogue itself is the corpus of a charitable trust dedicated to that venerable purpose.

### 3.    *The Trust is for a Valid Charitable Purpose*

The foregoing section sets forth the facts and law establishing that the Touro Synagogue and lands are the corpus of a trust; that the settlor was Congregation Yeshuat Israel; and that the original trustees were Messrs. Rivera, Hart, and Levy. The final element to finding this trust valid is that it must have a charitable purpose. This one clearly does. "It is well established that a trust creating a place for public worship for the benefit of an indefinite number of persons is a good and valid trust to a charitable use." *Buchanan v. McLyman*, 153 A. 304, 305 (R.I. 1931); *see also Brown v. Meeting St. Baptist Soc'y*, 9 R.I. 177 (1869); *Guild v. Allen*, 67 A. 855, 857 (R.I. 1907); *Brice v. All Saints Mem'l Chapel*, 76 A. 774, 781 (R.I. 1910); *Todd v. St. Mary's Church*, 120 A. 577, 578 (R.I. 1923).[46]

---

[46] Dedicating property for a charitable religious purpose was recognized under Rhode Island's common law, and is explicitly permitted under the state's current statutory law. R.I. Gen. Laws § 18-9-4 ("'Charitable trusts' . . . means any fiduciary relationship . . . subjecting the person by whom the property is held . . . to deal with

The best evidence about the purpose of this trust comes from the time closest to its creation, which in this case is Mr. Rivera's Will. The will recited that the property is "reserved as a Place of [Jewish] Public Worship forever." Rivera Will (Exhibit D16 at 2). Because the trust created a place for public worship for an indefinite number of persons, the Court concludes it has a valid charitable purpose.

### 4. *Shearith Israel's Arguments against the Trust Are Unpersuasive*

Shearith Israel has taken the position that no trust exists and that it alone owns the legal and equitable title to the Synagogue. Am. Answer and Countercl., Dec. 6, 2012, ECF No. 8 at 7, 9; Shearith Israel's Post-Trial Mem., ECF No. 90 at 60-68; Trial Tr. vol. 9 at 156-57, ECF No. 112 (Shearith Israel's Closing Argument). It poses five arguments against the existence of a trust. None is persuasive.

---

the property for . . . *religious* purposes.") (emphasis added). This purpose would also likely have been recognized as valid in the Colony of Rhode Island and Providence Plantations at the time of the trust's formation. *See The Queen, the Attorney General, and the Modern Charitable Fiduciary: A Historical Perspective on Charitable Enforcement Reform*, 11 U. Fla. J.L. & Pub. Pol'y 131, 139 (2000) (characterizing religious charities as predating even the Statute of Elizabeth of 1601); 43 Eliz. c. 4, 1601 (liberalizing charitable trust law); *Comm'rs of Income Tax v. Pemsel*, (1891) A.C. 531; David Villar Patton (listing the advancement of religion as a valid charitable purpose under the Statute of Elizabeth); *Derby v. Derby*, 4 R.I. 414, 437-39 (1856) (reciting the history of Rhode Island's "Act to Redress the Misemployment of Lands, Goods, and Stocks of Money, heretofore given to certain Charitable Uses" (1721)); Howard S. Miller, *The Legal Foundations of American Philanthropy 1776-1844*, The State Historical Society of Wisconsin Madison, 1961, 17 (describing Rhode Island's 1721 Act as "even more permissive" than the Statute of Elizabeth). *But see Bogert* § 376 at 153 (questioning whether Statute of Elizabeth permitted charitable trusts for general religious uses and citing Gray, J., in *Jackson v. Phillips*, 96 Mass. (14 Allen) 539 (1867)). Even if the colonial courts would not have recognized the trust in 1759, the trust persisted and is valid under Rhode Island's current common and statutory laws.

First, Shearith Israel argues that it became the owner of Touro Synagogue when the Jewish community left Newport in the 1820s, and confirmed its exclusive ownership via the 1894 deeds. Shearith Israel's Proposed Findings of Fact and Conclusions of Law, June 29, 2015, ECF No. 91 at 35-40, 43-46. That argument does not bear out in law or fact. Touro Synagogue was the corpus of a charitable trust from its inception, and nothing that Shearith Israel did or the trustees' descendants signed, altered that trust. *See Wakefield Trust Co.*, 134 A. at 817 (holding that passage of time, period of disuse, and even statutory enactments do not alter title of property owned in a charitable trust.)

Shearith Israel asserts that the 1894 deeds conveyed full title and ownership of the Synagogue to it. However, because the Synagogue and lands were always owned in trust, neither the original trustees nor their descendants ever held equitable title, and so did not have full title to convey. Moreover, because the descendants had never exercised the responsibilities of a trustee, they could not transfer that role. Shearith Israel assumed legal title and the role of trustee not because of the 1894 deeds, but because of its active involvement in the affairs of the Touro Synagogue when no Jews remained in Newport. The deeds are legal nullities with absolutely no effect on the rights adjudicated in this litigation.[47]

---

[47] Even if the 1894 deeds had some legal significance, they would not alter the outcome of this suit. Contrary to Shearith Israel's assertion that they confirmed its legal and equitable ownership, several of the deeds only purported to give Shearith Israel ownership "in trust." Furthermore, Shearith Israel has not produced evidence that it has collected signatures from all of Moses Levy's descendants. These shortcomings alone would have precluded the deeds from giving Shearith Israel equitable ownership of the Synagogue.

Shearith Israel's second argument is that two court decisions from the early 1900s preempted several of the claims and issues in this case. Shearith Israel's Post-Trial Mem., ECF No. 90 at 77-84. The Court disagrees. The first suit was a 1901 replevin action over a single Torah for which no primary documents survive. *Kusinitz* at 53 (Exhibit D445 at 14). The second was a 1903 federal action, which was dismissed on demurrer. Op. on Defs' Demurrer & Plea, *David v. Levy*, No. 2613 (D.R.I. 1903) (Exhibit D143).

No claim or issue preclusion can apply to the 1901 replevin action because the Court does not have sufficient information about the issues in dispute or the legal reasoning used to decide that case. The case appears to have concerned a single, recently purchased Torah scroll, and the outcome appears to have permitted the scroll to remain in Touro Synagogue. *Kusinitz* at 53 (Exhibit D445 at 14). The outcome of that case does not bar the Court from finding the existence of a charitable trust or deciding the ownership of the Rimonim.

*David v. Levy*, which the court dismissed on demurrer in 1903, also does not result in claim or issue preclusion. As Shearith Israel correctly identified, a dismissal on demurrer is "the equivalent today of a motion to dismiss for failure to state a claim." Shearith Israel's Post-Trial Mem., ECF No. 90 at 79; *see also* 5 B C. Wright & A. Miller, *Federal Practice and Procedure* § 1355 at 351 (3d ed. 2004). For claim preclusion to apply, a court's judgment must be "upon the merits." *Cromwell v. Sac Cty.*, 94 U.S. 351, 352 (1876). While today, dismissals for failure to state a claim are considered on the merits, this is largely the result of the liberalized

pleading requirements and the right of amendment afforded by the Federal Rules of Civil Procedure established in 1938. 18 J. Moore, *Moore's Federal Practice – Civil* § 131.30[3][e] at 108.1, 109 (Matthew Bender 3d ed. 2016). *David v. Levy* was decided well before that, when such dismissals were not generally considered upon the merits. *See Gould v. Evansville & C. R.R. Co.*, 91 U.S. 526, 533-34 (1875). Therefore, it would not be equitable to apply preclusive effect to a decision that did not carry such effect when it was made, and the Court declines to do so now.[48] 18 *Moore's Federal Practice – Civil* § 131.30[3][e] at 108.1, 109.

In its third argument against the existence of a trust, Shearith Israel challenges the veracity of Mr. Rivera's claim in his will that Mr. Hart earlier conveyed his one-third interest to Mr. Rivera. Shearith Israel's Post-Trial Mem., ECF No. 90 at 62 ("[b]ut no independent evidence of [Mr.] Hart's will exists – no evidence of the alleged conveyance."). At the outset, the Court notes that this point

---

[48] The court in *David v. Levy* appears to grant the demurrer for four reasons, none of which goes to the merits. The reasons are 1) none of the plaintiffs claimed to be a Jew, 2) the plaintiffs did not allege sufficient facts that would give them an equitable or legal interest in the Synagogue or lands, 3) the plaintiffs claimed to be the Jews of Newport rather than members of the Jewish Society in Newport, and 4) the plaintiffs proceeded with unclean hands (they had broken into the Synagogue). Op. on Defs' Demurrer & Plea, *David v. Levy*, No. 2613 (D.R.I. 1903) (Exhibit D143). The first three reasons for dismissal do not go to the merits because an amended complaint could have easily addressed them. The last reason — unclean hands — also does not go to the merits or result in claim preclusion. *See Keystone Driller Co. v. Nw. Eng'g Corp.*, 294 U.S. 42, 44 n.2 (1935); *see also Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1377 (Fed. Cir. 2001). Finally, to the extent that *David v. Levy* bases the demurrer on other grounds, those grounds are not decipherable to this Court and are too ambiguous to bar the current litigation. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel*, 830 F.2d 374, 380 (D.C. Cir. 1987) (affirming refusal to apply res judicata because decision "was ambiguous on its face").

is not relevant to the outcome of this case. The only interest that Mr. Hart ever owned was his legal interest as trustee, and nothing in this case turns on whether Mr. Hart conveyed this interest to Mr. Rivera. Furthermore, there is absolutely no evidence suggesting that Jacob Rodrigues Rivera mischaracterized the original transaction or fraudulently conveyed property that belonged to Mr. Hart and Mr. Levy. *See Blackstone Canal*, 121 A. at 225 (noting that preference is to be given an interpretation "which assumes that [an] act was performed with a right rather than a wrong intention."). It appears much more likely that Mr. Hart conveyed his legal interest to Mr. Rivera, than that Mr. Rivera fabricated this conveyance in a will that was then publicly probated.[49] Accordingly, the Court finds that Mr. Hart did convey his legal interest to Mr. Rivera.

Fourth, Shearith Israel protests that the will of Moses Levy "makes absolutely no mention of any trust," which "makes patently clear that at least 1/3 of the Touro land cannot possibly be held in trust." Shearith Israel's Post-Trial Mem., ECF No. 90 at 62. This Court finds more persuasive, given all the circumstances in this case, the explanation that Mr. Levy's will did not mention the Touro land

---

[49] Mr. Rivera was a man who occupied one of the "highest position[s] in the commercial, social, and religious life of the growing and prospering Jewish community of Newport before the American Revolution," and was eulogized as a man "very much respected for his integrity and benevolence." *Gutstein* at 71, 166 (quoting a contemporaneous obituary in a Newport newspaper). Gutstein recounts an anecdote about Mr. Rivera's famed scrupulousness. Mr. Rivera's business had failed and he needed recourse to the bankrupt act, which eliminated his debts. When Mr. Rivera again entered into business and regained his wealth, "he arranged a banquet to which he invited all his former creditors. When all were seated at the banquet table and had removed the napkins from the plates, they found a check for the amount of their debts, together with interest on the money for the entire time." *Id.* at 166.

because Mr. Levy never believed that he had any equitable ownership interest in it, and therefore had nothing to convey. That explains why Mr. Levy did not devise his purported one-third interest to anyone, despite devising his other real property interests. *See* Levy Will (Exhibit D18 at 2-3) (devising interests in Newport dwelling house, spermacetae factory, and adjoining lands). When Mr. Levy's will is read in light of Mr. Rivera's, which three years earlier explained the nature of the legal relationship between the original trustees and the Synagogue, it is clear that Mr. Levy also viewed himself as only a trustee. Before he died, his duties in that capacity had already passed into the able hands of his relative, Moses Seixas. *See supra.*

Mr. Levy did mention the Synagogue in his will once, forgiving all debts owed to him for the construction of the Synagogue, on condition that prayers are said in his name. Levy Will (Exhibit D18 at 1). This statement is further proof that the Synagogue was owned in trust, and that Messrs. Rivera, Hart, and Levy were its trustees. There are two reasons for this. First, this statement shows that Mr. Levy viewed his contributions to the Synagogue's construction as a loan to be repaid, rather than as an investment in its property value, as would have been expected if he owned an equitable interest in the Synagogue. Second, the condition requires the Jews of Newport to pray in Mr. Levy's name, in exchange for the discharge of the debt, which implicitly recognizes the Jews of Newport as the beneficial owners of the Synagogue. This condition is consistent with the finding that Touro Synagogue is the corpus of a charitable trust.

Fifth, Shearith Israel argues that the 1903 and 1908 leases, which identified Shearith Israel as the landlord and Jeshuat Israel as the tenant, preclude finding the existence of a charitable trust. That is not so. There is nothing incompatible about Shearith Israel's role as a charitable trustee and its decision to lease the Synagogue to Jeshuat Israel for the nominal price of $1 per year. *See In re Ryan's Estate*, 294 N.Y. 85, 91 (1945) (referencing an arrangement where the beneficiary renting the trust's property reduced his rent from approximately $10,000 per year to a symbolic $10). On the contrary, by leasing the Synagogue at no profit to a group that uses it for public Jewish worship, Shearith Israel was executing its duties as the charitable trustee. *Cf. Ahuna v. Dep't of Hawaiian Home Lands*, 64 Haw. 327, 338 (1982) (requiring the state to lease land to eligible native Hawaiian trust beneficiaries).

Shearith Israel has pointed to no evidence, direct or circumstantial, that would lead this Court as fact finder to conclude that Shearith Israel possesses legal and equitable title to Touro Synagogue. The Court concludes, as a matter of fact and law, that the Touro Synagogue and lands are the corpus of a charitable trust, and that the original trustees were Jacob Rodrigues Rivera, Moses Levy, and Isaac Hart. Neither the Synagogue nor the lands ever belonged to Messrs. Rivera, Levy, and Hart alone — each had only an equitable interest equal to that of any other single member of their community. Shearith Israel has only ever served as trustee for that charitable trust, which has operated continuously in fact and law for over

250 years, and whose valid purpose is best enunciated in Mr. Rivera's Will: "to be . . . reserved as a Place of [Jewish] Public Worship forever." Rivera Will (Exhibit D16).

## B.   JESHUAT ISRAEL OWNS THE RIMONIM

### 1.   *Summary*

Jeshuat Israel proved by a preponderance of the evidence that it is the owner of the Rimonim. The Court finds that Myer Myers made the Rimonim for Yeshuat Israel; that Yeshuat Israel transferred the Rimonim to Shearith Israel for safekeeping, with instructions to return them to the Jewish congregation thereafter worshiping in Newport; and that Shearith Israel complied with those instructions. As the Congregation worshiping in Newport, Jeshuat Israel became the owner of the Rimonim. Moreover, even absent the proof of Jeshuat Israel's ownership, its continuous possession of the Rimonim for the past century entitles it to a strong presumption of ownership, which Shearith Israel did not come close to overcoming. The Court concludes that Jeshuat Israel owns the Rimonim and is free to do with them as it wishes.

### 2.   *Proof of Ownership*

Myer Myers made the Rimonim between the years 1766 and 1776 for use by Yeshuat Israel.[50] While there is no direct evidence about the provenance of the Rimonim, the Court concludes that Yeshuat Israel originally owned them for three reasons. First, Yeshuat Israel's payment to Mr. Myers for "mending rimonim," at a time when there were several practicing silversmiths in Newport and Boston,

---

[50] The maker's mark on the Rimonim dates their creation to that year interval. *Barquist* at 154, 160, and 257 (Exhibit 150 at 3248, 3254, and 3265).

suggests that the Congregation was employing the Rimonim's original maker to make the repair. Yeshuat Israel ledger (Exhibit P30).[51] Second, as discussed *supra*, Shearith Israel took possession of the Rimonim in the 1820s for safekeeping, and sometime between then and 1869, engraved the words "Newport" on them, to differentiate them from a similar pair that it owned. *Barquist* at 160 (Exhibit P150 at 3254). The most natural interpretation of this act is that Shearith Israel regarded the Rimonim as belonging to Newport's congregation. This interpretation is consistent with Shearith Israel's return of the Rimonim to Newport sometime after 1869. *See supra*. Finally, there is a unanimous scholarly consensus, apart from Shearith Israel's trial experts, that the Rimonim originally belonged to Congregation Yeshuat Israel.[52] Trial Tr. vol. 7, 45, 53-76, ECF No. 110 (Testimony of Vivian Mann) (admitting scholarly consensus against her); *see, e.g., Barquist* at 154 and 160 (Exhibit 150 at 3248 and 3254) (attributing the Rimonim to "Yeshuat (now Jeshuat) Israel"); Guido Schoenberger, *The Ritual Silver Made by Myer Myers* 5 (1953) (Exhibit P99) (discussing "pair of [Myer Myers'] rimonim made circa 1770

---

[51] There were practicing silversmiths at that time in Newport and Boston. Trial Tr. vol. 7, 109, ECF No. 110 (Testimony of Dr. Mann).

[52] The consensus is so unanimous that when Shearith Israel filed its first pleadings in this case, it referred to Yeshuat Israel as the "original possessor of the Rimonim." Answer and Countercl. at 10, Dec. 4, 2012, ECF No. 6; Am. Answer and Countercl. at 11, Dec. 6, 2012, ECF No. 8. It made the same statement in the later-filed and since-dismissed Southern District of New York action. Compl. at 6, *Shearith Israel v. Jeshuat Israel*, No. 12-CV-8406 (S.D.N.Y.), ECF No. 1.

Shearith Israel has since moved to excise these statements from its pleadings in this case by moving to amend its complaint. Defendant's Motion to Amend (ECF No. 92) is GRANTED. The amendment does not alter that Shearith Israel previously acknowledged Yeshuat Israel's original possession of the Rimonim in this action. In addition, Shearith Israel never amended this statement in its pleadings filed in the New York action.

for the new Synagogue at Newport"); Jeanette W. Rosenbaum, *Myer Myers, Goldsmith 1723-1795* 24, 33, 36 and 67 (Philadelphia, The Jewish Publication Society of America, 1954) (Exhibit P100) (attributing the Rimonim to Touro Synagogue since 1765); Tom L. Freudenheim, *Myer Myers: American Silversmith* (The Jewish Museum, 1965) (Exhibit P114 at 1577) (explaining connection between Mr. Myers and Touro Synagogue); Library of Congress Exhibition: From Haven to Home: 350 Years of Jewish Life in America 2 (Exhibit P172 at 3226) (stating that the Myers rimonim belong to Newport's Touro Synagogue); Rabbi Marc D. Angel,[53] *Remnant of Israel* 63 (Riverside Book Company, 2004) (Exhibit P162) (stating that Mr. Myers made rimonim for Newport); Rabbi Marc D. Angel, *The Torah Bells of Myer Myers: Ancient Traditions in a New Land* 1, 3 (Lecture at Yale University Art Museum, 2001) (Exhibit P158) (same); Angel Dep. 41:9–42:13 (July 17, 2014)[54] (same); Edinger Dep. 91:23–92:19 (naming Yeshuat Israel as Rimonim's original possessor).

Furthermore, there is simply no persuasive evidence in the record that these Rimonim belonged to any person or entity except Yeshuat Israel during the early colonial period.[55]   The Court concludes by a preponderance of the evidence that

---

[53] Rabbi Marc D. Angel has served as Congregation Shearith Israel's rabbi since 1969.  Angel Dep. 5:25–7:9 (July 17, 2014).

[54] Shearith Israel's objections to the portions of Rabbi Angel's testimony relied upon by this Court are overruled.

[55] Dr. Mann, Shearith Israel's expert, differentiated between original possession of the Rimonim, which she conceded might have been with Yeshuat Israel, and ownership, which she testified was with Shearith Israel.  Trial Tr. vol. 7, 158-60, ECF No. 110 (Testimony of Vivian Mann).  The Court finds this difference is pure

Myer Myers made the Rimonim for Newport's Synagogue. Yeshuat Israel used the Rimonim before regular services there ended in 1793. Sometime after 1793, the Rimonim were transported to New York, where Shearith Israel took possession of them for safekeeping. Shearith Israel agreed to store Yeshuat Israel's religious items, including the Rimonim, which were "to be redelivered when duly required for the use of the Congregation hereafter worshipping in the Synagogue [a]t New Port Rhode Island." Shearith Israel's minutes (Exhibits D26 and D26A at 1, 3, and Exhibit P38) (discussing the four Torah scrolls that Yeshuat Israel deposited with Shearith Israel in 1833).

By accepting Yeshuat Israel's religious items under these conditions, Shearith Israel assumed the obligations of a gratuitous bailee. *See Don-Lin Jewelry Co. v. The Westin Hotel Co.*, 877 A.2d 621, 624 (R.I. 2005) (describing gratuitous bailee as possessor of personalty subject to instructions for dealing with it without remuneration). The terms of bailment instructed Shearith Israel to deal with the Rimonim according to Yeshuat Israel's directions, which it did by redelivering them to the congregation thereafter worshiping at Newport Synagogue. *Id.* This action terminated Shearith Israel's obligations as bailee, and terminated any relationship it had to the Rimonim. Jeshuat Israel has proven that it is the owner of the Rimonim.

---

speculation, and the record is devoid of any support for it. The Court finds that Yeshuat Israel was the original owner and possessor of the Rimonim.

### 3.    Presumption of Ownership

One of the few undisputed facts in this litigation is that for over 100 years,
the Rimonim have been in the possession of Congregation Jeshuat Israel. Jeshuat
Israel's Prop. Findings of Fact, June 29, 2015, ECF No. 94 at 25 and Shearith
Israel's Prop. Findings of Fact, June 29, 2015, ECF No. 91 at 72.[56] Even without
the Court's findings about the provenance of the Rimonim, possession alone,
especially of that length, entitles Congregation Jeshuat Israel to a strong
presumption of ownership. *Hamilton v. Colt*, 14 R.I. 209, 212 (1883) ("the
introduction of any proof . . . by the defendant, under his plea of property, to the
action of replevin, is entirely unnecessary, his title by possession being sufficient
until the plaintiff can show a better title . . . ."); *see also Baxter v. Brown*, 59 A. 73,
74 (1904) (requiring plaintiff to show "good title from some unimpeachable source in
order to overcome the presumption of ownership which arises from occupation" in

---

[56] Over this entire time, Jeshuat Israel not only used the Rimonim in its
services, but also exercised various other responsibilities of ownership with respect
to them. In 2001, Jeshuat Israel paid $25,000 for the restoration of the Rimonim.
Trial Tr. vol. 1 at 147, ECF No. 104 (Testimony of David Bazarsky). Jeshuat Israel
also paid the insurance premiums for the Rimonim, and conducted appraisals to
ensure that they had adequate insurance. *Id.* at 155. Jeshuat Israel also facilitated
displays of the Rimonim by loaning them to various museums and exhibitions,
where the Rimonim were always attributed to Touro Synagogue or Congregation
Jeshuat Israel. *See, e.g.,* 1953 Boston MFA catalogue (Exhibit P97 at 1961); 1954
Brooklyn Museum catalogue (Exhibit P101 at 3720); 1955 Rhode Island School of
Design catalogue (Exhibit P103 at 1390); 1965 Jewish Museum in New York
catalogue (Exhibit P114 at 1581); 2001 Yale catalogue (Exhibit P150 at 3248). The
Rimonim are currently on loan at the Boston Museum of Fine Arts. Trial Tr. vol. 3
at 203-04, ECF No. 106 (Testimony of Bertha Ross); MFA Display (Exhibit D564).
When not on display, Jeshuat Israel now stores the Rimonim in a safety deposit
box. Trial Tr. vol. 1, 133, ECF No. 104 (Testimony of David Bazarsky); Trial Tr. vol.
3, 63-66, ECF No. 106 (Testimony of Michael Pimental).

an ejectment action); *In re J. K. Chemicals, Inc.*, 7 B.R. 897, 898 (Bankr. D.R.I. 1981) ("the general rule [is] that possession of property raises a presumption of ownership"). Shearith Israel is unable to overcome the presumption in favor of Jeshuat Israel.

The purpose, pedigree, and good sense of this presumption of ownership were discussed at length in a Fourth Circuit case that bears key similarities to our own. *Willcox v. Stroup*, 467 F.3d 409 (4th Cir. 2006). In that case, the plaintiff filed for a declaratory judgment that certain historic documents, which were valued at $2.4 million and had been in his family's possession for over 140 years, were part of his estate. The State of South Carolina contended that these documents, concerning two of its Civil War-era governors, constituted public property and therefore belonged to the State. The Fourth Circuit could have been writing about the Rimonim when it observed:

> The exceptional nature of the [items] in dispute — their early vintage, their unknown history — presents issues distinct from those of the typical personal property case. Without the benefit of clear chain of title, evidence of original ownership, eyewitness testimony, and any number of documentary aids usually helpful in the determination of ownership, the court must utilize the legal tools that remain at its disposal. In this situation, tenets of the common law that usually remain in the background of ownership determinations come to the forefront, their logic and utility revealed anew.

*Id.* at 412.

Those common law tenets dictated that long-standing "possession . . . trigger[ed] the presumption [ ] of ownership." *Id.* at 413. The court in *Willcox* noted that this presumption, often stated as the "truism" that "possession is nine-tenths of

the law" is nearly as old as the common law itself. *Id.* at 412 (citing a collection of adages from 1616 and other sources); *see also McFarland v. Brier*, 850 A.2d 965, 968 (R.I. 2004) (citing approvingly "the old saw that 'possession is nine-tenths of the law'"). The Fourth Circuit summarized that "the presumption of ownership in the possessor[ ] resolves otherwise insoluble historical puzzles in favor of longstanding distributions and long-held expectations. Such a rule both protects the private interests of longtime possessors and increases social utility." *Willcox*, 467 F.3d at 414. The court then ruled in favor of the plaintiff, finding that the State had adduced insufficient evidence "to rebut the strong presumption of possession." *Id.* at 417. Faced with the same burden to overcome over 100 years of uncontested possession, Shearith Israel has also failed to meet the mark.

### 4. *Shearith Israel's Arguments for Ownership*

To overcome Jeshuat Israel's presumption of ownership, Shearith Israel mounts an effort to prove better title to the Rimonim. Shearith Israel introduced testimony from two experts in support of its position.[57] Relying on the experts' testimony, Shearith Israel cited "three junctures during which Shearith Israel would have obtained ownership rights to the [R]imonim." Shearith Israel's Post-Trial Mem., ECF No. 90 at 53. These three junctures are: 1) "Shearith Israel paid for the [R]imonim in 1765," 2) "title to the Touro Synagogue and its contents passed

---

[57] Shearith Israel's experts were Dr. Vivian Mann and Dr. Linford Fisher. Dr. Mann is a professor of Jewish Art at the Jewish Theological Seminary in New York. Trial Tr. vol. 6, 97-98, ECF No. 109 (Testimony of Dr. Mann). Dr. Fisher is an assistant professor of history, with a focus on religious history, at Brown University. Trial Tr. vol. 8, 11, ECF No. 111 (Testimony of Dr. Fisher).

to Shearith Israel in the 1820s," and 3) "Shearith Israel reinforced its title to the Touro Synagogue . . . and its contents [including the Rimonim], in 1894 by obtaining Deeds of Conveyance." *Id.* Reviewing each juncture in turn, the Court determines that Shearith Israel failed to prove better title to the Rimonim.

> a.  *Failure to Prove that the Rimonim Were Made for Shearith Israel*

Before this lawsuit, every scholar who had ever studied the Rimonim had concluded that the Rimonim originally belonged to the ancient Newport Congregation Yeshuat Israel. Trial Tr. vol. 7, 45, 53-76, ECF No. 110 (Testimony of Dr. Mann); *see supra.* Litigation has altered Shearith Israel's view of this settled historical opinion.[58] Based on its experts' testimony, Shearith Israel now maintains that Myer Myers made the Rimonim for its own Congregation and denies that Congregation Yeshuat Israel ever owned or even possessed the Rimonim.

The lynchpin of Shearith Israel's novel theory is a record in its 1765 accounting ledger, which reads, "Cash paid Myer Myers Balla. of his accot. passed £36[.]4[.]1~." Shearith Israel ledger (Exhibits D9 and D9A). Dr. Mann singled out this record to argue that it must have been a payment for the Rimonim. Dr. Mann pointed to the notation, timing, amount, wording, and circumstances of this notation as evidence for her position. On cross-examination, Dr. Mann's position crumbled as Jeshuat Israel demonstrated that this record was actually a repayment

---

[58] "And, on information and belief, Shearith Israel did say that it believed at the beginning of the lawsuit, before we *spent countless amounts finding the evidence and paying the experts to tell us what we think* — what the facts are, that Yeshuat Israel was the original possessor." Trial Tr. vol. 1, 61, ECF No. 104 (Shearith Israel's Opening Argument) (emphasis added).

of Myer Myer's advance to the Congregation in his capacity as president, to cover Shearith Israel's cash shortfall from the previous year. This payment had nothing to do with the Rimonim. The Court is persuaded that Jeshuat Israel's position is factually correct.

Dr. Mann acknowledged that Myer Myers was the parnas (president) of Shearith Israel in 1764. Trial Tr. vol. 7, 101, 105, ECF No. 110 (Testimony of Dr. Mann); David and Tamar De Sola Pool, *An Old Faith in the New World: Portrait of Shearith Israel 1654-1954* 502-03 (Columbia University Press 1955) (Exhibit P102 at 3193-94). She also acknowledged the practice at Shearith Israel that whenever the Congregation's debits exceeded its credits at the end of a year, the sitting President would cover that difference, and the Congregation would repay that same amount in the next year. Trial Tr. vol. 7, 106, ECF No. 110 (Testimony of Dr. Mann).

In 1764, the difference between Shearith Israel's credits and debits was exactly £36.4.1. Shearith Israel ledger (Exhibit P23). Shearith Israel's debits, which appeared on the left side of its ledger, included such expenses as cleaning the Synagogue and purchasing wood and a ladder.[59] *Id.* They totaled £246.2.2. *Id.* On the right side of the ledger are Shearith Israel's credits from various sources of

---

[59] The first expense on the debit side is actually a payment to the previous year's president, with the notation, "To Cash Paid Mr. Jacob Franks his Ballance 59.12.4." Shearith Israel ledger (Exhibit P23); David and Tamar De Sola Pool, *An Old Faith in the New World: Portrait of Shearith Israel 1654-1954* 502 (1955) (Exhibit P102 at 3193) (listing Jacob Franks as the president in 1763-64, immediately before Myer Myers); Trial Tr. vol. 7, 102-03, ECF No. 110 (Testimony of Dr. Mann). The notation for this payment to Jacob Franks is similar to the notation for the payment to Myer Myers in 1765.

income.   *Id.*   These credits include cash received for rent, payments from outstanding debts, cash from the charity box, and the year's offerings from the congregants.   *Id.*   The total credits in 1764 were £209.18.1.   *Id.*   Below that amount, still on the credit side of the ledger, which tallies up the Congregation's sources of income, is the notation "Ballance Due to Myer Myers [£]36.4.1."   *Id.*   When the ledger pages are viewed side-by-side, the conclusion is inescapable that Myer Myers contributed £36.4.1 in 1764 to cover the Congregation's deficit, as was expected of him in his role as President of Shearith Israel.



Shearith Israel ledger (Exhibit P23) (left side) (boxes added).



Shearith Israel ledger (Exhibit P23) (right side) (boxes added).

Confirmation of this conclusion, if any is needed, appears in Shearith Israel's minutes and ledger for the next year. At the beginning of the next Hebrew year, Shearith Israel's minutes contain the following notation: "At a meeting of the assistants with the Parnassim [presidents] the following articles were agreed to, and resolved— 1st That Mr Myer Myers may be paid the Ballance of his Sedakah accot: £ 36.4.1."[60] The Lyons Collection 88 (American Jewish Historical Society No. 21 Vol. 1, 1913) (Exhibit P78 at 3391). And in turn, the first expense tallied on the debit side of Shearith Israel's ledger for the next year is "Cash paid Myer Myers Balla. of his accot. passed £36[.]4[.]1~." Shearith Israel ledger (Exhibits D9 and D9A). Given this trail of documents, it is incredible that Dr. Mann concluded that

_____

[60] While sedakah usually means "charity" in Hebrew, the "Holy Sedakah" was also "the name given to all the incoming disbursements of [Shearith Israel]." Trial Tr. vol. 6, 136, ECF No. 109 (Testimony of Dr. Mann). The Court concludes that in the quotation above, the word "Sedakah" refers to the debt owed Myer Myers for covering the Congregation's budget shortfall.

this payment is anything but a reimbursement of Myer Myers' previous year's advance for the Congregation's deficit. The Court finds Dr. Mann's testimony and opinions on this topic not credible.[61]



Shearith Israel ledger (Exhibit D9) (left side) (boxes added).

---

[61] Although clearly a learned scholar, the Court discounts Dr. Mann's opinions because at trial she was a zealot rather than an objective expert witness. She was often blind to the many contrary facts. Moreover, her trial testimony differed from her prior testimony in important respects. *See id.* at 39-40 (changing her position about existence of a record dated 1910 or before that attributed the Rimonim to Shearith Israel), 60 (denying that Dr. Barquist is a recognized authority on Myer Myers after naming him as an authority), 129-31 (changing her position on the significance of the Rimonim's "Newport" inscription), 141 (refusing to answer a question she had previously answered in the affirmative), 143-44 (same), 152-53 (same), 203-04 (stating that it is inappropriate for a historian to ignore contrary evidence or only look at part of the available evidence, after saying the opposite at deposition). When quoting primary documents in her report, Dr. Mann simply excised portions not helpful to her position. *Id.* at 32, 115-16. She admitted to speculating in her explanations for parties' actions. *Id.* at 139. She also admitted that she is not an expert on accounting ledgers, and that she did not know which side of a ledger debits and credits generally occupy. *Id.* at 30-31. For all these reasons, the Court found her testimony not credible.

Dr. Mann also found persuasive the timing of the 1765 payment to Myer Myers, which occurred within the 11-year period between 1764 and 1775, when Mr. Myers used the particular maker's mark that appears on the Rimonim at issue. Trial Tr. vol. 6, 110-11, 128, 132, and 143-44, ECF No. 109 (Testimony of Dr. Mann). More persuasive to the Court is that Mr. Myers was Shearith Israel's president in 1764, and was responsible for covering the Congregation's budget shortfall, which equaled exactly the amount that he was paid in 1765.

Dr. Mann also supported her theory about the 1765 payment with some back-of-the-envelope calculations suggesting that £36.4.1 would have been a fair price for Rimonim. *Id.* at 135-38, 143-44. Jeshuat Israel pointed to significant flaws in her analysis, including problems with the price of silver and the weight of the Rimonim used in her calculations, all of which the Court finds further discredited her analysis. Trial Tr. vol. 7, 77-85, ECF No. 110 (Testimony of Dr. Mann); *see also* John J. McCusker, *Money and Exchange in Europe and America 1600-1775* (1978) (Exhibit P135) (listing silver prices for relevant years).

Dr. Mann also opined that the £36.4.1 payment to Myer Myers in 1765 was not consistent with other reimbursements made to him previously, but was similar to a different payment to another person, which was for a specific item. Shearith Israel's Prop. Findings of Fact and Conclusions of Law, ECF No. 91 at 28-30. Specifically, she testified that the payment could not be a reimbursement to a past president because it did not have the notation "late parnas" next to it. Trial Tr. vol. 6, 141-42, ECF No. 109 and Trial Tr. vol. 7, 106-07, ECF No. 110 (Testimony of Dr.

Mann); Shearith Israel ledger (Exhibits D10 and D10A) (containing notation "late Parnas"). She then concluded that it must be for an item, because she thought it similar to the following payment, which was for an item: "For balance due me per agreement ('consiertto') of the holy synagogue, on account of another item which is charged here." Trial Tr. vol. 6, 142-43, ECF No. 109 (Testimony of Dr. Mann); The Lyons Collection at 40 (Exhibit P78 at 3378).

Dr. Mann's opinion on this issue does not persuade the Court that the 1765 payment was for the Rimonim. First, when Shearith Israel paid Myer Myers for a different pair of Rimonim in 1774 and for a silver plate in 1759, it specified exactly which items it was paying for in its ledger. Trial Tr. vol. 7, 88-92, ECF No. 110 and Trial Tr. vol. 6, 146, ECF No. 109 (Testimony of Dr. Mann); Shearith Israel ledgers (Exhibits P16 and P29) (paying Mr. Myers £20.0.0 "for a piece of plate" and £10.15 for "rimonim"). Unlike those two examples, the 1765 payment does not say that it is for rimonim. Second, the presence of the words "late parnas" next to payments that all turn out to be reimbursements does not convert those words into a necessary condition for a reimbursement. All that Dr. Mann has proved is that the notation "late parnas" signals reimbursement, not that its absence signals non-reimbursement.[62] Finally, the logical leap from discovering another payment for an unspecified item in the Shearith Israel ledgers, to concluding that the payment to

---

[62] In fact, a substantial payment to Shearith Israel's president from the year before Myer Myers became president also lacks the notation "late parnas," which Dr. Mann apparently dealt with by asserting that it must not be a reimbursement. Trial Tr. vol. 7, 102-03, ECF No. 110 (Testimony of Dr. Mann). This type of "heads I win, tails you lose" reasoning does not persuade the Court.

Mr. Myers must also be for an unspecified item is astronomical. The wording of this payment in Shearith Israel's ledger does not persuade the Court it was for the Rimonim.

Turning to circumstantial evidence, Dr. Mann opined that Yeshuat Israel could not have obtained the Rimonim through purchase or gift. She pointed to Yeshuat Israel's financial difficulties in building the Synagogue as evidence that it could not have afforded the Rimonim. *Id.* at 117, 144. She also opined that it was unlikely that anybody gifted the Rimonim to Yeshuat Israel, because the Rimonim did not have a donor's name inscribed on them. *Id.* at 144-45. She specifically ruled out Shearith Israel and Myer Myers as potential donors because Shearith Israel did not have a record of the gift and Mr. Myers was allegedly frugal. Trial Tr. vol. 6, 117-18, 129, ECF No. 109 (Testimony of Dr. Mann). This evidence is speculative and insubstantial. Having discarded Dr. Mann's theory about the 1765 ledger, the Court finds her remaining arguments not credible and insufficient to prove that Shearith Israel has better title.

> b.   *Failure to Prove Shearith Israel Acquired Title Around 1820*

In the absence of any documents contemporaneous with the making of the Rimonim that clearly established their original owner, Shearith Israel turned to some later documents in attempting to prove its ownership stake. Shearith Israel argued that by returning the Rimonim to New York around the 1820s, Yeshuat Israel conceded that it originally only held the Rimonim on loan from Shearith Israel. In the alternative, Shearith Israel argued that Yeshuat Israel gifted the

Rimonim to Shearith Israel when the Jewish community of Newport disbanded. The Court does not find either theory persuasive or supported by the credible evidence. Instead, the Court concludes that Yeshuat Israel brought the Rimonim to New York for safekeeping, with the instruction that Shearith Israel return them to the congregation thereafter worshiping in the Newport Synagogue. The evidence shows that Shearith Israel complied with that instruction when they returned them to Newport. *See supra.*

There is no extant record of the Rimonim leaving Newport or arriving in New York. One surviving record is Shearith Israel's minutes from February 10, 1833, which states:

> Received from the family of the late Mr. Moses Seixas of New Port Rhode Island, Four Sepharim Belonging to the Congregation of that place, and Which are now to be deposited in the Synagogue In New York of the Congregation "Shearith Israel" Under the charge of the Trustees of said Congregation to be redelivered when duly required for the use of the Congregation hereafter worshipping in the Synagogue At New Port Rhode Island casualties excepted New York 19 Kislev 5593 – 11th December 1832; In behalf and by resolve of the Trustees of the Congregation Shearith Israel Signed by N. Phillips; Isaac B Seixas.

Shearith Israel's minutes (Exhibits D26 and D26A at 1, 3, and Exhibit P38).[63]

The parties drew vastly different conclusions from this record. Shearith Israel argued that this record proves that Yeshuat Israel used sepharim (Torah books) and other items that belonged to Shearith Israel, and that this record memorialized their return to New York. Shearith Israel's expert, Dr. Mann,

---

[63] "Sepharim," which is a word that can be spelled in various ways, is the plural for books of Torah. *See* Trial Tr. vol. 7, 121, ECF No. 110 (Testimony of Dr. Mann) ("there was an entry in 1833 about getting the Sifrei Torah back, that's the Torah").

testified that the minutes "lay the groundwork for [her] opinions that the items that were used in Newport [included] . . . the silver [rimonim, which] w[ere] returned to C[ongregation] S[hearith] I[srael]."   Trial Tr. vol. 7, 111-12, ECF No. 110 (Testimony of Dr. Mann).[64]   That is not a reasonable reading of the record.

Shearith Israel's February 10, 1833 minutes do not advance its claim to the Rimonim; quite the opposite.   This record plainly references four Torah scrolls arriving in New York from Newport, to be returned when needed by Newport's Jews.   This is credible evidence that Shearith Israel served as the bailee for certain religious items, including the Rimonim, belonging to the Jews of Newport.   Shearith Israel's other expert, Dr. Fisher, admitted, "the historical evidence, both primary and secondary, is that . . . every Torah, [when possible], is adorned by a set of rimonim."   Trial Tr. vol. 8, 165, ECF No. 111 (Testimony of Dr. Fisher).   In its opening, Shearith Israel said of the Rimonim: "Their job is to stay with the Torah."   Trial Tr. vol. 1, 69, ECF No. 104 (Shearith Israel's Opening Argument).

Although Shearith Israel's 1833 minutes do not specifically reference the Rimonim, they raise the inference — that this Court adopts as a finding of fact — that the Rimonim traveled with the Torah scrolls from Newport, and that Shearith Israel took hold of these items under the instruction to return them.   This

---

[64] Dr. Mann bolstered her opinion by referencing another document from that time, which allegedly memorialized Shearith Israel receiving silver back from Newport.   Trial Tr. vol. 7, 121-24, ECF No. 110 (Testimony of Dr. Mann).   The problem with that document is that Dr. Mann is the only person who remembers ever having seen it, and that it is now nowhere to be found.   *Id.* at 122 (Question: "Now, that document [ ] seems to have disappeared; correct?"   Dr. Mann's Answer: "That is correct.").

interpretation also best explains Shearith Israel's later actions, specifically branding the Rimonim with the words "Newport" to differentiate them from its own pair, and returning them to the congregation thereafter worshiping in Newport. In other words, Shearith Israel's handling of the Rimonim is fully consistent with the terms of bailment described in the 1833 minutes, not ownership by Shearith Israel, and the Court so finds.

The next record that Shearith Israel offered to prove its ownership claim was an 1869 inventory conducted by its own officials. Inventory (Exhibits D34 and D34A). Shearith Israel's president asked Rabbi J.J. Lyons to undertake an inventory of the Congregation's possessions on May 23, 1869, and less than three months later, he had completed the project. Shearith Israel's minutes (Exhibits D33 and D33A) (requesting that Rabbi Lyons prepare an inventory). The Myer Myers Rimonim appear toward the end of the inventory, which describes them as "marked Myers New Port" and lists their weight. Inventory at 34 (Exhibits D34 and D34A at 36). This inventory is noteworthy because it is the first direct reference to the Rimonim in the record, but it is not helpful to Shearith Israel's assertion of ownership. The relevant portion of the inventory is reproduced below:

*Id.* (boxes added).

The only appropriate inference the Court draws from this record is that the Rimonim were in Shearith Israel's possession in 1869. This record does not advance Shearith Israel's claim to better title, because its possession in the mid-19th century is fully consistent with Shearith Israel's role as bailee for the Rimonim. The parties do make arguments based on the position of the ditto marks and other aspects of this inventory to support their ownership claims, but these arguments are so tenuous they are most properly relegated to a footnote.[65] This inventory does not advance Shearith Israel's claim to better title.[66]

---

[65] Above the listing of the Rimonim is the note, "property of Kahal [written in Hebrew, meaning Congregation] in keeping of Shamas [the sexton]," and ditto marks apply this note to all of the rimonim below. Inventory at 34 (Exhibits D34 and D34A at 36). Shearith Israel focuses the Court on the first part of this phrase to argue that the Rimonim were marked as property of their Congregation, while

  c.  *1894 Deeds Do Not Reinforce Shearith Israel's Ownership Claim*

Shearith Israel argues that whether it originally held title to the Rimonim or if it obtained title in the 1820s, "the heirs and descendants of the colonial Newport congregation confirmed Shearith Israel's rights in the . . . [Rimonim] in 1894 when they executed deeds conveying the synagogue and personalty to Shearith Israel." Shearith Israel's Post-Trial Mem., ECF No. 90 at 54. Shearith Israel further argues that the 1903 lease of the Synagogue, and the 1908 renewal of the lease, confirmed that position. *Id.* at 42-49.

---

Jeshuat Israel focuses on the second part to argue that they were in the safekeeping of the Congregation's sexton, but not the Congregation's property. The document does not allow an inference one way or the other, especially in light of the inventory's title page, which is labeled: "Inventory of all Property & Effects belonging to *or in keeping of* [the Congregation]." *Id.* at 1 (emphasis added).

Shearith Israel also points to the last three rimonim listed on this document, all of which have separate notations to the left attributing them as property of specific persons. *Id.* at 34; Trial Tr. vol. 6, 164, ECF No. 109 (Testimony of Dr. Mann). Dr. Mann argues that because the Myers Rimonim do not have an analogous notation attributing them to Yeshuat Israel, they must have always belonged to Shearith Israel. There are two problems with this argument. First, Yeshuat Israel had disbanded by this time, so it would not have been apparent to Rabbi Lyons how to attribute its Rimonim. Second, even the rimonim that are marked as property of specific persons, nonetheless have ditto marks apparently attributing the phrase "property of [the Congregation] in keeping of [the Sexton]" to them as well, which undercuts Shearith Israel's theory that those rimonim belong to the persons listed on the left.

Finally, the most that this document could indicate, which the Court holds it does not, is that Rabbi Lyons, who had conducted the inventory, *believed* that the Rimonim belonged to Congregation Shearith Israel as of 1869. It could not prove that Myer Myers originally made the Rimonim for Shearith Israel.

[66] Dr. Mann made one more argument for Shearith Israel's original ownership: the fact that someone from Shearith Israel sent two allegedly mismatched rimonim to Touro Synagogue suggested to her that this person viewed all four finials as being the property of Shearith Israel. Trial Tr. vol. 6, 144, ECF No. 109 (Testimony of Dr. Mann). This argument is unsupported, pure speculation, and too tenuous to be credible.

Shearith Israel points to language in the 1894 Deeds, which purport to convey the Synagogue "[t]ogether, with the appurtenances and all the estate" to its Congregation. Shearith Israel's Prop. Findings of Fact and Conclusions of Law, ECF No. 91 at 52 (citing 1894 Deeds at 2 (Exhibit D78)).[67]  Then on January 30, 1903, following litigation between the parties, Shearith Israel and Jeshuat Israel signed a settlement agreement, where Congregation Jeshuat Israel agreed, "to admit and recognize without qualification the title and ownership of L. Napoleon Levy and other Trustees to the synagogue building, premises, and fixtures." Settlement Agreement (Exhibit P68).   Three days later, on February 2, 1903, Jeshuat Israel and Shearith Israel signed a lease agreement for Touro Synagogue, which encompassed "the appurtenances and paraphernalia belonging thereto." 1903 Lease (Exhibit D148 at 2).   The same words were included in the renewed lease in 1908. 1908 Lease (Exhibit D174 at 1).  Shearith Israel's expert, Dr. Fisher, testified that "these various terms . . . appurtenances, paraphernalia, fixtures, furnishings . . . . all refer to the same ritual items that are within a synagogue that are desirable and necessary to conduct services for a congregation." Trial Tr. vol. 8, 26, ECF No. 111 (Testimony of Dr. Fisher).

---

[67] Shearith Israel states there are "at least nine separate deeds[, which] were executed by 57 heirs of Jacob R. Rivera, Isaac Hart, and Moses Levy." Shearith Israel's Prop. Findings of Fact and Conclusions of Law, ECF No. 91 at 52. It does not allege that every descendent was tracked down and executed a deed. Shearith Israel admits that three of the deeds, signed by 22 heirs, purport to convey the property *in trust*.   *Id.* at 53.   Only one of the deeds purports to convey "appurtenances of worship." *Id.* (citing 1894 Deed at 20 (Exhibit D78)).

Shearith Israel's argument that the 1894 Deeds reinforce its claim to the Rimonim fails from the outset, because the Court found that Shearith Israel never held or obtained title to the Rimonim. Instead, the Court found that in the 1820s, Shearith Israel became a trustee for the Synagogue and the bailee for some of its possessions; it did not usurp ownership over everything that previously belonged to the Newport Jewish community. It never owned the Rimonim. Shearith Israel does not argue that the Deeds gave them title, and it follows that the Deeds could not "reinforce" a claim to title that was never valid.   Furthermore, the Court concluded *supra* that the Deeds were legal nullities, and therefore could not have any effect on the parties' rights.

Likewise, the 1903 and 1908 leases could not create title to the Rimonim in Shearith Israel. Even if Shearith Israel purported to include the Rimonim within those leases, this action could not alter title to the Rimonim.[68]   In any event, the leases do not clearly refer to the Rimonim, and are therefore not nearly sufficient to overcome Jeshuat Israel's strong presumption of ownership.

### 5.   *Shearith Israel Cannot Block the Sale of the Rimonim*

Failing in its bid to claim ownership of the Rimonim, Shearith Israel seeks to block their sale by relying on Jeshuat Israel's 1897 By-Laws. Exhibit D95. The By-

---

[68] Shearith Israel may have believed that it owned all of the property previously belonging to Yeshuat Israel at the signing of the 1903 lease. *See, e.g.*, 1893 letter (Exhibit D67 at 2) (identifying Shearith Israel as "Trustees and owners of the [Touro] Synagogue and personal property therein"); Shearith Israel correspondence (Exhibit D151) (instructing Shearith Israel's representatives in Newport to include the phrase "with the paraphernalia" into the 1903 lease). This belief gives short shrift to Shearith Israel's obligations as bailee, and its duties to Newport's new Jewish population as trustee for the Touro Synagogue.

Laws vest the government of Jeshuat Israel "in the President, Vice President and three Trustees elected by this Congregation [Jeshuat Israel] and four Trustees appointed by the Spanish and Portuguese Congregation Shearith Israel . . . ." 1897 By-Laws at 1 (Exhibit D95 at 2). There is no evidence of Shearith Israel appointing trustees to govern Jeshuat Israel since 1899. *Compare* Shearith Israel's July 1, 1897 minutes (Exhibits D99 and D99A at 1); July 1, 1898 minutes (Exhibits D105 and D105A at 2); and June 30, 1899 minutes (Exhibits D114 and D114A at 2) (appointing trustees to Jeshuat Israel's board) *with* Shearith Israel's July 2, 1900 minutes (Exhibit D128 and D128A) (resolving to close Touro Synagogue and failing to appoint trustees). Shearith Israel does not allege that it has appointed trustees to govern Jeshuat Israel in over 110 years.

The By-Laws also restrict the sale of property owned by Jeshuat Israel "unless by unanimous vote of the members present and represented by proxy at a Special Meeting convened for that purpose." 1897 By-Laws at 8 (Exhibit D95 at 10). The By-Laws prohibit amendment to these sale restrictions and to the status of Shearith Israel's four Trustees "unless the said four Trustees of the said Congregation Shearith Israel vote affirmatively for such proposed . . . amendment." Nonetheless, on January 28, 1945, Jeshuat Israel adopted a new set of By-Laws, which prohibited Shearith Israel's Trustees from voting by proxy. 1945 By-Laws at 18 (Exhibit P85 at 689). The 1945 By-Laws also eliminated restrictions on the sale of Jeshuat Israel's personal property, and the requirement that Shearith Israel's Trustees must affirmatively vote to change their status. *Id.* at 22, 37-38 (Exhibit

P85 at 691, 698-99).  Jeshuat Israel provided these amended by-laws to Shearith Israel, with no record of an objection from Shearith Israel.  *See* Jeshuat Israel's minutes from October 28, 1945 (Exhibit P90 at 101).  Finally, in 1983, Jeshuat Israel amended its By-Laws again to remove any reference to Shearith Israel. Jeshuat Israel's 1983 By-Laws (Exhibit P129).

Over 110 years after last exercising power to appoint trustees, over 70 years after its power was restricted, and over 30 years after its power was rejected, Shearith Israel is now too late to challenge Jeshuat Israel's governance.  *See Puleio v. Vose*, 830 F.2d 1197, 1203 (1st Cir. 1987) ("The law ministers to the vigilant not to those who sleep upon perceptible rights.")  Jeshuat Israel has adapted to Shearith Israel's abdication by running its own operations at its own discretion, and Shearith Israel's attempted takeover of Jeshuat Israel's governance at this late date would cause it prejudice.  Laches bars Shearith Israel's attempt at upending Jeshuat Israel's corporate governance in this way.  *See Hazard v. E. Hills, Inc.*, 45 A.3d 1262, 1271 (R.I. 2012) (applying laches and finding prejudice when party delayed an extremely long time in bringing suit); *Arena v. City of Providence*, 919 A.2d 379, 395-96 (R.I. 2007) (applying laches in declaratory action).  The Court finds that Shearith Israel cannot rely on the 1897 By-Laws to intervene in Jeshuat Israel's governance or affairs.

### 6.    *Jeshuat Israel Has Title to the Rimonim*

The Court found that Congregation Yeshuat Israel was the original owner and possessor of the Rimonim.  When Yeshuat Israel disbanded, it left the Rimonim

in the care of Shearith Israel, charging it with the duty to return the Rimonim to "the Congregation [thereafter] worshipping" in Newport. Shearith Israel's minutes (Exhibits D26 and D26A at 1, 3). While Shearith Israel may have believed that it became the owner of Touro Synagogue and its contents in the 1820s, it nonetheless executed its obligations to Yeshuat Israel and returned the Rimonim to the congregation then worshiping in Newport — Jeshuat Israel. At that time, Jeshuat Israel became the lawful owner of the Rimonim, in accordance with the wishes of the original owners of the Rimonim — Yeshuat Israel.[69]

Since that time, Jeshuat Israel has possessed and controlled the Rimonim for over 100 years. It has used them in its public worship, insured and repaired them, and sent them on various exhibitions all across the country. Even if Yeshuat Israel had not dedicated the Rimonim to the congregation thereafter worshiping in Newport, Jeshuat Israel's long-standing possession of the Rimonim entitles it to a strong presumption of ownership, which Shearith Israel has failed to overcome. *Hamilton v. Colt*, 14 R.I. 209, 212 (1883) (treating possession of property as prima facie evidence of ownership). On the record before us, and in the absence of other challenges to Jeshuat Israel's title, the Court finds, as a matter of fact and law, that Jeshuat Israel is the true and lawful owner of the Rimonim. There are no outstanding challenges before this Court that would prevent Jeshuat Israel from dealing with its personal property in any manner that it deems appropriate.

---

[69] Jeshuat Israel also argues that it is the legal successor to Yeshuat Israel. The Court does not need to reach this argument in making its decision.

C.   **SHEARITH ISRAEL IS REMOVED AS TRUSTEE**

Jeshuat Israel seeks to remove Shearith Israel from its position as trustee over the Touro Synagogue and lands.   Shearith Israel argues first that Jeshuat Israel does not have standing to call for removal, and second that grounds for removal do not exist.   The Court concludes that Jeshuat Israel has standing as an interested third party, and that the overwhelming weight of the evidence compels this Court to remove Shearith Israel as trustee.

   *1.*  *Jeshuat Israel Has Standing to Bring an Action Removing the Trustee*

Who has standing to remove a charitable trustee can be a thorny question and requires some further background about trust law.   In private trusts, beneficiaries are the equitable owners of a trust's corpus and the natural parties to police trustees.   Charitable trusts are different, because everybody — the public — benefits from their existence.   By definition, charitable trusts must have a charitable purpose that benefits society, rather than just one person or group.   *See generally Bogert* § 362-63 at 19-36.   For that reason, states' attorneys general, as the representatives of the public, have traditionally shouldered the responsibility of enforcing charitable trusts.   *Id.* § 411 at 11-12.

Although a charitable trust must benefit the public at large, oftentimes "the settlor directs that his bounty be distributed among a class or group," which serves as the "conduit through which the settlor desires the public benefits to flow."   *Id.* § 365 at 45.   In other words, charitable trusts often work through a conduit, who uses the trust's assets to further the trust's purpose.   Sometimes, courts colloquially refer

to these conduits as "'beneficiaries', although it is more accurate to say that the real beneficiary is the public or community and the persons involved are merely instrumentalities through which the community benefits flow." *Id.* § 363 at 28. In Rhode Island, the party that directly benefits from a charitable trust is considered the holder of the beneficial interest in the trust, and is colloquially referred to as the "beneficiary." *See Webster v. Wiggin*, 31 A. 824, 827-28 (R.I. 1895) ("[T]he beneficiaries [of charitable trusts] are a succession of persons, in each of whom the beneficial interest vests from time to time, in the future, to remote ages."); *Bogert* § 411 at 3.

When the conduit of a charitable trust is a religious organization,[70] courts have often allowed it to enforce the terms of the trust, without invoking the attorney general:

> If a trust exists . . . to advance the cause of religion through support of [a] local church, the members and pewholders of that church have a rather certain and definite interest in the enforcement of the trust. Though the benefits will go to all in the community who elect to take advantage of the services, and also to the general public, it is nearly certain that all the members of the church will obtain some advantage. Therefore, a number of courts have allowed a church member or pewholder in such a case to sue to enforce the trust's charitable purpose.

*Bogert* § 414 at 56.

This is an altogether sensible approach that alleviates the burden on the attorney general and involves the actual parties in interest, all without opening up the floodgates of vexatious litigation. *See The Queen, the Attorney General, and*

---

[70] This doctrine is not limited to religious organizations.

*the Modern Charitable Fiduciary: A Historical Perspective on Charitable Enforcement Reform,* 11 U. Fla. J.L. & Pub. Pol'y 131, 162-63 (2000). It is also endorsed by the Restatement, which grants standing "for the enforcement of a charitable trust" to any "person who has a special interest in the enforcement of the trust." Restatement (Third) of Trusts § 94(2) (2012). Simply said, when there is a ready party that has a distinguishable interest in enforcing a charitable trust, there is no justification for also requiring the attorney general to join as plaintiff. *See Cannon v. Stephens*, 159 A. 234, 237 (Del. Ch. 1932).

This is true under Rhode Island law as well. Rhode Island does not vest exclusive enforcement power over charitable trusts in the attorney general. Instead, the law requires that "[t]he attorney general shall be notified of all judicial proceedings . . . in any manner dealing with[ ] a trustee who holds in trust within the state property . . . for charitable[ ] or religious purposes . . . and [the attorney general] shall be deemed to be an interested party to the judicial proceedings." R.I. Gen. Laws § 18-9-5. This provision would be illogical if the attorney general were required to be a plaintiff in all such proceedings, because that would obviate the need to deem the attorney general an interested party.[71] By requiring notification

_____

[71] In this action, the Rhode Island Attorney General intervened as amicus curiae and filed a post-trial memorandum expressing the opinions that Touro Synagogue is part of the corpus of a charitable trust, and that Shearith Israel is the current trustee. The Attorney General expressed no position on the issues of removal of the current trustee or on the ownership of the Rimonim. *See* Mot. for Leave to Intervene as Amicus Curiae, ECF No. 61; Text Order dated Apr. 22, 2015 granting Attorney's General motion to intervene ("The Court grants the motion with the understanding that the state's Attorney General, as amicus curiae, will fully assist the Court with legal and factual analysis because of its statutory and common law

of the Attorney General, Rhode Island law presupposes that third parties may commence suit, and proceed without the attorney general as a plaintiff.[72]  In fact, Rhode Island state courts have entertained numerous challenges brought by interested third parties against charitable trustees, without the attorney general joining as a plaintiff. *See, e.g., Darcy v. Brown Univ. & Pine*, C.A. No. KC 94-774, 1997 WL 839894 (R.I. Super. Feb. 20, 1997) (plaintiff is potential recipient of a charitable fund for needy students); *Meyer v. Jewish Home for the Aged of R.I.*, C.A. No. 93-5374, 1994 WL 930887 (R.I. Super. Jan. 19, 1994) (plaintiffs are residents of charitable home).

Having decided in Rhode Island that third parties may enforce charitable trusts without joining the attorney general as a plaintiff, the Court has little difficulty concluding that Congregation Jeshuat Israel has standing to do so in this case. Any concerns about vexatious litigation arising in such enforcement suits are incorporated into a standard standing inquiry. *See Chu v. Legion of Christ, Inc.*, 2 F. Supp. 3d 160, 171 (D.R.I. 2014) (applying standing inquiry to determine who can sue a religious charity in a different context).  The standing inquiry prevents "kibitzers, bureaucrats, publicity seekers, and 'cause' mongers from wrestling control of litigation from the people directly affected." *Id.* at 170 (citing *Valley*

---

special interest in this matter, untethered by any restrictions on its advocacy."); and Br. of R.I. Attorney General, ECF No. 95.

[72] This interpretation is consistent with the canon against surplusage, or "*verba cum effectu sunt accipienda*," because this entire statute would be superfluous if the attorney general were required to be a plaintiff in enforcement and removal proceedings. *See, e.g., Sturges v. Crowninshield*, 17 U.S. 122, 202 (1819) (Marshall, J.); *New Process Steel, L.P. v. N.L.R.B.*, 560 U.S. 674, 680 (2010) (applying this canon).

*Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982)). These same considerations animate the inquiry into third party standing to remove a charitable trustee. Jeshuat Israel satisfies the constitutional and prudential standing requirements to bring this suit for removal because it has been the only congregation praying at Touro Synagogue for over 100 years and is now facing eviction.

### a. Constitutional Standing

To satisfy the constitutional minimum standing requirements, a plaintiff must allege an injury in fact caused by the defendant, which could be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Jeshuat Israel easily satisfies this floor. Among other harms, Jeshuat Israel is facing eviction at the hands of Shearith Israel, the trustee. Am. Answer and Countercl., ECF No. 8 at 23 (asking this Court to "order the eviction of the Plaintiff [Jeshuat Israel] from the Touro Synagogue and related real property.") Potential eviction from its place of worship certainly qualifies as an injury in fact, caused by the defendant, which could be redressed by the requested relief of removing Shearith Israel as trustee.

### b. Prudential Standing

The standing inquiry also incorporates three prudential considerations: "(1) whether a plaintiff's complaint falls within the zone of interests protected by the law invoked; (2) whether the plaintiff is asserting [its] own rights and interests, and not those of third parties; and (3) that the plaintiff is not asking the court to

adjudicate abstract questions of public significance." *Chu*, 2 F. Supp. 3d at 171. Jeshuat Israel again easily satisfies all three.  The zone of interests protected by the process of removing a charitable trustee includes protecting the interests of third parties who serve as conduits of the trust's benefits.  Here, Jeshuat Israel is asserting its own rights and interests because it has been worshiping at Touro Synagogue since the late 1800s, and it has developed strong ties to the building and lands. [73]  Finally, as Shearith Israel admits, there is "a live dispute and controversy . . . over the ownership, rights, status, and legal relations relating to the building, real estate, and any and all personalty used by or for Touro Synagogue."  Am. Answer and Countercl., ECF No. 8 at 20.  If any third party has standing to enforce this charitable trust, that party is Congregation Jeshuat Israel.

### 2.    *Shearith Israel's Conduct Requires its Removal as Trustee*

Shearith Israel's single role as charitable trustee is to ensure the preservation of Touro Synagogue for public Jewish worship.  When Jews returned to Newport, Shearith Israel executed its duties by facilitating the use of the Synagogue by the new community.  In 1903, after some unfortunate legal spats, Shearith Israel again executed its duties as trustee by leasing the Synagogue to

---

[73] Jeshuat Israel is the only congregation that presently prays at Touro Synagogue, and some of its members' families have been praying there for four generations. Trial Tr. vol. 1, 104, 112, ECF No. 104 (Testimony of David Bazarsky). Jeshuat Israel has also purchased land abutting the Synagogue, and built a visitor center there, from where it runs tours from Memorial Day through Columbus Day. *Id.* at 118-19.

Furthermore, Jeshuat Israel is the only Jewish congregation in the city of Newport. *Id.* at 128.  Of the 1,000 Jews or 300 Jewish families living in the six towns of Newport, Middletown, Portsmouth, Jamestown, Tiverton, and Little Compton, approximately 100 families belong to Touro Synagogue. *Id.* at 128-29.

Jeshuat Israel for only a nominal fee.  By this action, Shearith Israel recognized that Jeshuat Israel is the representative of the Jews of Newport.  Since that time, Jeshuat Israel has been the only congregation worshiping at Touro Synagogue.

"Trustees exist for the benefit of those to whom the creator of the trust has given the trust estate." *Petition of Statter*, 275 A.2d 272, 276 (R.I. 1971).  In this case, Yeshuat Israel created the trust estate for the benefit of public Jewish worship, which can only be accomplished if Jews have access to the Synagogue.  Under Rhode Island law, the present beneficial interest in the charitable trust is held by Jeshuat Israel.  *See Webster*, 31 A. at 827-28 (holding that beneficial interest in a charitable trust vests in the party receiving its benefits).  Shearith Israel's single obligation is to act for the benefit of Jeshuat Israel, unless doing so no longer ensures public worship at Touro Synagogue.

Removal of Shearith Israel as trustee is appropriate because it has strayed from that obligation.  *See Petition of Statter*, 275 A.2d at 276 ("In deciding [removal] cases, the court's paramount duty is to see that the trust is properly executed and that beneficiaries are protected.")  Specific grounds for removal can include a serious breach of trust, a lack of cooperation between the trustee and beneficiary, or even a substantial change of circumstances.  *See generally* Unif. Trust Code § 706(b) (Removal of Trustee).  Here, Shearith Israel repudiated the existence of the trust and sought to evict Newport's only Jewish congregation from the trust estate.  Furthermore, the conditions that required Shearith Israel to step in as acting trustee no longer exist.  In these circumstances, the Court finds it

96

necessary to remove Shearith Israel from its position as trustee, for the reasons stated below.

       *a.*     *Serious Breach of Trust*

No breach of trust is more egregious than when a trustee claims to own the trust property outright, and refuses to admit the trust's very existence. "[R]epudiation of the trust is a clear ground of removal even though the trust property has not yet been devoted to personal uses." *Bogert* § 527 at 87; *see also In re Matthew W.T. Goodness Trust*, No. PM/08-7349, 2009 WL 3328364, at *6-7 (R.I. Super. May 4, 2009), 5-8 (discussing appropriation of trust property by trustees as grounds for removal).

In this action, Shearith Israel claims to own the trust property — Touro Synagogue — outright, and refuses to acknowledge that a trust exists. Shearith Israel claims in its pleadings that "[f]or over 100 years Shearith Israel has owned the Touro Synagogue, including its land, building, and religious objects," and seeks "a declaration of Shearith Israel's ownership of legal and equitable rights in the Rimonim along with the land, building, and other personalty used by Touro Synagogue . . . ." Am. Answer and Countercl., 7, 9, ECF No. 8. Shearith Israel denies that Jacob Rodrigues Rivera's Will and Testament provided sufficient evidence of a trust, and repudiates any acknowledgement of a trust that could be gleaned from the 1894 deeds, the 1945 Agreement with the federal government, or any other sources. Shearith Israel's Post-Trial Mem., ECF No. 90 at 60-68. At

closing argument, when the Court directly asked Shearith Israel about this issue, it provided the following response:

> Our position . . . is that *Shearith Israel owns equitable and legal title*, and the title is subject to a condition. . . . And when we obtained title, it was with the understanding that there was going to be a public place of Jewish worship in accordance with the specific kind of ritual forever. That is how we hold it. We will have breached — *I'm not sure who can enforce it at that point* — but will have breached it if we ever tried, if we turned it into a bowling alley or a bingo alley. So there is plenty that we have the right to do.

Trial Tr. vol. 9, 156-57, ECF No. 112 (Shearith Israel's Closing Argument) (emphasis added). In its briefing, Shearith Israel doubled down on its position, arguing "the Shearith Israel trustees . . . hold [the Touro Synagogue] property *for the benefit of Shearith Israel*." Shearith Israel's Post-Trial Rebuttal Mem., ECF No. 97 at 80 (emphasis added).

Shearith Israel's claim to own legal and equitable title to Touro Synagogue renders it unsuitable to act as trustee. By claiming to own the Synagogue outright, Shearith Israel committed a serious breach of trust. Such a renunciation of one's role requires a trustee's removal.

### b.    *Lack of Cooperation*

"When friction between the trustee and beneficiary . . . impairs the proper administration of the trust . . . or if the trustees' continuing to act as such would be detrimental to the interest of the beneficiary, the trustee may be removed." *Petition of Statter*, 275 A.2d at 276. Charitable trustees are subject to the same standard. *See Nugent ex rel. Lingard v. Harris*, 184 A.2d 783, 785 (R.I. 1962) (stating that a charitable trustee's "lack of sympathy for the objects of the trust" is grounds for

removal).[74]   The animosity between the parties is evaluated by a subjective standard from the point of view of the holder of the equitable interest.  *See Petition of Statter*, 275 A.2d at 276 ("When the ill feeling has reached the point that it interferes with the administration of the trust, the trustee may be removed even though the charges of his misconduct are either not made out or greatly exaggerated." (internal citations omitted)).

Congregation Jeshuat Israel is currently the holder of the equitable interest in the Touro charitable trust.  It has used the Synagogue for public Jewish worship for over 100 years.  As discussed *infra,* the trustee, Shearith Israel, has not had any relationship with the trust property or with Jeshuat Israel for at least the past 20 years.   Furthermore, Shearith Israel's positions in the current litigation have engendered such animosity in the relationship, that its continued service as trustee would be detrimental to the trust's purpose.

Jeshuat Israel had absolutely no relationship with Shearith Israel when David Bazarsky became president of Jeshuat Israel in 1993.[75]  Trial Tr. vol. 1, 162, ECF No. 104 (Testimony of David Bazarsky).  Mr. Bazarsky testified that during his

---

[74] Rhode Island law recognizes that the conduits of charitable trusts often occupy the same position as the beneficiaries of private trusts, and are entitled to similar rights and protections.  *See Webster*, 31 A. at 827-28; *see also* R.I. Gen. Laws § 18-9-16 ("A charitable trust . . . may be terminated at any time . . . with the consent of . . . [*inter alia*] the beneficiary or beneficiaries by delivery of the assets to the beneficiary or beneficiaries."); *see also* R.I. Gen. Laws § 18-9-9 (beneficiary, among other parties, must comply with attorney general's investigation into administration of charitable trust); § 18-9-10 (similar); § 18-9-11 (similar); § 18-9-13(a) (charitable trustee shall make annual written report that includes names and addresses of trust's beneficiaries).

[75] The Court found Mr. Bazarsky to be a credible witness, and his testimony was compelling.

tenure as president, he unsuccessfully attempted to reestablish a connection with Shearith Israel. In 1996, he organized a trip to New York to meet with members of Shearith Israel, in part to discuss fundraising efforts to restore Touro Synagogue. *Id.* at 163-64. He summarized Shearith Israel's response as, "[w]e're not paying; [w]e're not giving you any money; [y]ou're on your own. . . . We have our own synagogue to take care of; [w]e're not taking care of your synagogue." *Id.* at 165. He testified that Shearith Israel even refused to provide Jeshuat Israel's delegation with its membership list, because they did not want Jeshuat Israel syphoning off its members' resources. *Id.* Mr. Bazarsky reported that Jeshuat Israel's delegation left that meeting with the impression that Shearith Israel had "no interest in us." *Id.* at 166. Mr. Bazarsky's impression was confirmed by another fruitless meeting between the two Congregations about restoring Touro Synagogue in 2004. *Id.* at 166-69. The record is entirely devoid of any meaningful interaction or cooperation between the two Congregations for the past several decades. This shows a lack of sympathy by trustee Shearith Israel toward the object of the charitable trust.

Through this litigation, Shearith Israel is seeking to evict Jeshuat Israel from Touro Synagogue, without any other congregation standing ready to take its place. This act would undermine the very reason for the trust's existence — public Jewish worship in Newport. Witnesses for Jeshuat Israel have testified with one voice that the eviction threatened by Shearith Israel "would be devastating . . . [because] it would be the destruction of . . . the congregation." Trial Tr. vol. 1, 126-27, ECF No. 104 (Testimony of David Bazarsky).

Bertha Ross, the current co-President of Jeshuat Israel, described the relationship between the two Congregations as follows: "I would say there is a lot of friction, a lot of tension between the organizations.  I think Shearith Israel has been disloyal to us." Trial Tr. vol. 4, 56, ECF No. 107.[76]  Ms. Ross concluded that Jeshuat Israel could no longer work with the leadership of Shearith Israel.  *Id.*  Shearith Israel offered no evidence to refute this testimony of an acrimonious relationship between the two Congregations.

Shearith Israel's bid to evict the only organized Jewish congregation in Newport from Touro Synagogue does not bode well for its continuing capacity to maintain the Synagogue for public Jewish worship.  The contentious course of this litigation also renders unlikely "the smooth functioning of the [t]rust" with Shearith Israel as trustee.  *See Dennis v. Rhode Island Hosp. Trust Nat. Bank*, 571 F. Supp. 623, 639 (D.R.I. 1983) *aff'd as modified* 744 F.2d 893 (1st Cir. 1984) (citing parties' litigation positions, rather than any conduct by trustee, as independent reason for removal).  In sum, the Court finds that the lack of cooperation between Jeshuat Israel and Shearith Israel over at least the past 20 years, and the recent animosity between the parties engendered by this litigation, require the removal of Shearith Israel from its role as trustee.

c.    *Substantial Change of Circumstances*

Shearith Israel was a valuable trustee for Touro Synagogue from the 1820s through the 1880s, when no Jews were permanently settled in Newport.  Several

---

[76] The Court found Ms. Ross to be a credible witness, and her testimony was compelling.

times during those lean decades, Shearith Israel sent its own religious representatives to officiate lifetime events in Newport. *See supra.* While the Synagogue was maintained and restored with funds from the Touro brothers, Shearith Israel stepped in to provide a religious lifeline to the Newport Jewish tradition.

Likewise, Shearith Israel was instrumental in restarting organized Jewish worship at Touro Synagogue by sending its own officials to hold regular services there in the late 1800s. It then arranged for the father of its own rabbi to relocate from London to Newport and serve as Touro Synagogue's first permanent rabbi for Newport's new Jewish community. In sum, despite some discord at the turn of the 20th century, Shearith Israel contributed positively to Newport's Jewish revival.

These events all took place well over 100 years ago. In the meantime, Shearith Israel's involvement with public Jewish worship in Newport waned. By 1993, there was no longer any communication between Shearith Israel and Jeshuat Israel. It is natural that Shearith Israel's involvement with Touro Synagogue receded over the last several decades, while Jeshuat Israel has assumed responsibility for the building and lands. Speaking plainly, Shearith Israel has long ago ceased to function as the trustee.

Shearith Israel's attempt to disturb that desuetude by seeking to evict Jeshuat Israel from Touro Synagogue in this legal action is contrary to its duties. It did not need to do so to prosecute its claim for the Rimonim.

By disavowing the trust and seeking to evict Jeshuat Israel from its place of worship, Shearith Israel has shown itself unfit to continue to serve as trustee. The law and the evidence in this case support removing Shearith Israel from its position as trustee over the Touro Synagogue and lands, and the Court does so now. As a result, Shearith Israel no longer holds legal title to Touro Synagogue.

### D. THE COURT APPOINTS JESHUAT ISRAEL AS THE NEW TRUSTEE

Having removed Shearith Israel, this Court must next address the question of who shall serve as the new trustee. The documents the Court relied upon to find that the trust exists, do not name a residuary trustee. In this circumstance, the trial court is authorized to appoint an appropriate successor trustee. *Lux v. Lux*, 288 A.2d 701, 705 (R.I. 1972) (citing R.I. Gen. Laws § 18-2-1) ("the Superior Court . . . is authorized to appoint a trustee whenever an instrument creating a trust fails to name the residuary fiduciary"). Because this Court, when sitting in diversity, has the same role as the state superior court, and because it is familiar with the parties and issues animating this charitable trust, this Court will exercise its power to appoint a new trustee in order to avoid an interruption in the operations of Touro Synagogue.

"A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate." *Cuzzone v. Plourde*, No. 03-0524, 2005 WL 2716749, at *3 (R.I. Super. Oct. 17, 2005) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928)

(Cardozo, C.J.)).  The new trustee must serve with "the punctilio of an honor the most sensitive" in the furtherance of the trust's original purpose, passed down from Yeshuat Israel through Jacob Rodrigues Rivera's Will, by preserving the Touro Synagogue and lands for public Jewish worship.  *Id.*

For over 100 years, Congregation Jeshuat Israel has done exactly that. Jeshuat Israel "maintains the synagogue [and] pays the utilities . . . mow[s] the lawn . . . [and] make[s] repairs on the synagogue." Trial Tr. vol. 4, 17, ECF No. 107 (Testimony of Bertha Ross).  But more than just taking care of the building, Jeshuat Israel has ensured that Touro Synagogue is available for public Jewish worship.  It holds services at Touro Synagogue at least twice a week, which are open to any member of the public.  Trial Tr. vol. 1, 104, 112, ECF No. 104 (Testimony of David Bazarsky).  In the summer, the Congregation opens up the Synagogue seven days a week to accommodate visitors from all over the world.  *Id.* at 117, 119.  The Congregation also offers free membership to naval officers serving at the nearby Naval War College.  *Id.* at 118.  Significantly, Jeshuat Israel is the only Jewish congregation in the city of Newport.  *Id.* at 128.

This litigation has clarified that Jeshuat Israel is the party responsible for public Jewish worship in Newport.  Even without the Court's appointment, Jeshuat Israel has been executing all of the duties of a trustee for many years.  Evicting it from Touro Synagogue is unthinkable.  Appointing it as the legal owner and trustee for the Synagogue only recognizes in law, that which is already obvious in fact.

## IV.   CONCLUSION

### A.   PLAINTIFF'S CLAIMS

I.   The Court finds for Plaintiff, Congregation Jeshuat Israel as to Count I and DECLARES, pursuant to the Uniform Declaratory Judgments Act, R.I. Gen. Laws §§ 9-30-1, *et seq.*, that Congregation Jeshuat Israel is the true and lawful owner of the Rimonim, with full power to sell and convey them, and to deposit the proceeds of such sale into an irrevocable endowment; and

II.   The Courts finds that Count II is moot in light of its finding on Count I and therefore DISMISSES Count II; and

III.   The Courts finds that Count III is moot in light of its finding on Count I and therefore DISMISSES Count III; and

IV.   The Court finds for Plaintiff, Congregation Jeshuat Israel as to Count IV and DECLARES that the Touro Synagogue and its lands are owned in a charitable trust for the purpose of public Jewish worship.  The Court orders the removal of Congregation Shearith Israel as trustee over that Touro Synagogue charitable trust.  The Court appoints Congregation Jeshuat Israel as trustee of the Touro Synagogue and its lands; and

V.   The Court dismisses Count V because the declaration sought is overly broad and therefore not justiciable.

### B.   DEFENDANT'S COUNTERCLAIMS

The Court DISMISSES all of Congregation Shearith Israel's counterclaims.

Both parties' requests for attorneys' fees and costs are DENIED.

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

May 16, 2016